# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

JOHN NAVELSKI, LINDA NAVELSKI, ERICK ALEXANDER, JACOB HUTCHINS, AMBER HUTCHINS, JEANNE HENDERLY, RICHARD BULLARD and BEVERLY BULLARD on their own behalf and those others similarly situated

        Plaintiffs,

           v.

INTERNATIONAL PAPER COMPANY,

        Defendant.

_____/

Case No. 3:14 - cv- 00445
Hon. M. Casey Rodgers
Hon. Charles J. Kahn

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

**Table of Contents**

Introduction..................................................................................................................... 1

I.    Plaintiffs' proposal presents the superior means of resolving this dispute............. 3

II.   IP's liability-based arguments intended to defeat typicality, adequacy and
      predominance fail because the class members do not rely on different
      theories of liability, and IP's argument only highlights common issues
      that support the need for certification .................................................................... 4

      A.  Plaintiffs are typical of other putative class members……………………….. 4

      B.  The recollections of individual Plaintiffs as to the timing of
          the flood present no bar to certification…………………………………….5

III.  IP's remaining predominance arguments are easily dispensed with ..................... 7

      A.  Florida law does not bar stigma damages......................................................... 7

      B.  IP's attacks on Plaintiffs' damages expert merely present a common
          question of fact for resolution at trial.............................................................. 9

      C.  The limited questions requiring individual determinations do not
          predominate over the common questions. ...................................................... 10

Conclusion ...................................................................................................................... 11

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adinolfe v. United Technologies Corp.*,
    768 F.3d 1161 (11th Cir. 2014) ..................................................................................9, 10

*Allapattah Servs., Inc. v. Exxon Corp.*,
    333 F.3d 1248 (11th Cir. 2003) .......................................................................................11

*Appleyard v. Wallace*,
    754 F.2d 955 (11th Cir. 1985) ...........................................................................................4

*In re Checking Account Overdraft Litig.*,
    307 F.R.D. 630 (S.D. Fla. 2015).........................................................................................4

*Gasway v. Lalen*,
    526 N.E.2d 1199 (Ind. Ct. App. 1988) ..............................................................................8

*Maddox v. Claytor*,
    764 F.2d 1539 (11th Cir. 1985) ..........................................................................................9

*Royce Homes, L.P. v. Humphrey*,
    244 S.W.3d 570 (Tex. Ct. App. 2008)................................................................................8

*The St. Joe Co. v. Leslie*,
    912 So. 2d 21 (Dist. Ct. App. Fla. 2005) .........................................................................10

*Sterbenz v. Anderson*,
    No. 11-cv-1159, 2012 WL 5387885 (M.D. Fla. Nov. 2, 2012)..........................................8

*Sterling v. Velsicol Chem. Corp.*,
    855 F.2d 1188 (6th Cir. 1988) ............................................................................................4

**Other Authorities**

Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the
    Unreliability of Eyewitness Testimony*, 2 Fed. Cts. L. Rev. 1, 11 (2007)..................................7

**Introduction**

Plaintiffs have demonstrated that this case presents the ideal circumstances for certification. As in any litigation, there are disputes about liability and damages, but here those disputes – the cause of the flood, its impact on the neighborhood, stigma damages – can be resolved by answering common questions applicable to the entire putative class. In Phase I of the two phase trial Plaintiffs propose, the jury will resolve these common questions using a uniform body of evidence applicable to the entire class.

At the outset of this litigation, IP acknowledged that it did not act "differently with respect to any particular member or members of the putative class." Parties' Joint Rule 26(f) Rpt. at 6 (ECF No. 20, Oct. 31, 2014).  This statement has proven true in discovery; all of the liability evidence regarding IP's acts and omissions which led to the dam's failure and resulting flooding are completely uniform to the Class.  Indeed, common liability issues are abundant, supporting certification here.

Although IP's brief in opposition concedes that several Rule 23 prerequisites are met, it challenges certification by focusing almost entirely on the parties' disputes as to the merits issues. As Plaintiffs have known since the inception of this litigation, it is IP's position that the dam failure did not cause or have a "meaningful impact" on the flooding in the subdivisions. (Def. Mem. at 3). Yet this is a common question best resolved on a class-wide basis.

The central theme of IP's liability defense is that the timing of the flood's impact is inconsistent with Plaintiffs' position that the IP dam's failure caused the flooding. This argument has no bearing on class certification.  Regardless of individual Plaintiffs' and class members' recollections about when water entered their homes, what actually happened during the storm is not in dispute.  The dam broke or washed out, and water entered residents' homes.  What is in

dispute is whether the neighborhood would have flooded had the dam not broken or not been in place at all. This question will be addressed by hydrologists applying accepted scientific methodologies, not by the recollections of lay witnesses.

Notwithstanding this point, a detailed review of lay witness testimony reveals that the recollections and other evidence are actually materially consistent, and certainly much more harmonious than IP would have the Court believe. IP's "Initial Flooding" chart (Def. Mem. at 17) makes assumptions and approximations based on varying recollections. The following chart better reflects the evidence and testimony of the witnesses:

| Putative Class Rep or Class Member | Observation of Initial Flooding in House |
|---|---|
| Tarbox | Unknown - Sometime "after dinner" |
| Pavlock | 9:56pm - photo with water in house[1] |
| Bullard | 10:28pm - first photo of water in house |
| Navelski | 11:39pm - first photo with a couple feet of water already in house |
| Henderly (tenants) | 10:55pm - first photo of water in house |
| Hutchins | 11:41pm - first photo with a couple feet of water already in house |
| Alexander | N/A - Home did not flood |

The photographic evidence of water entering homes is consistent with variations of approximately 30 minutes, which both parties' experts say is to be expected given the flow of

---

[1] * Pavlock's photo was taken with a hand-held camera that had a time-stamp not adjusted for daylight savings, true time 10:56pm

2

water and the fact that some houses are located farther than others from Eleven Mile Creek. Further, IP's representation of "peak flooding" misconstrues the timing because the Navelskis were rescued and Alexander left his home around 12:30 a.m., which is not the time they observed the maximum high water level. The two Plaintiff couples who stayed in their homes during the flood, the Bullards and the Hutchins, are consistent in their testimony and recall that the water did not begin to recede until around 3:00 a.m. The only somewhat inconsistent testimony is based solely on the recollection of Mr. Tarbox and concerns a home that both experts agree would have experienced some flooding regardless of the dam breach. Likewise, IP's argument about discrepancies in the "peak flow" of water at the homes ignores the work of its expert and the consistency of Plaintiffs' testimony demonstrating that the expert and lay witness testimony support a singular timing sequence. IP's expert opines that the peak of the flood occurred between 1:00 a.m. to 2:00 a.m.

In sum, this case involves a single event – the breach of IP's dam – which Plaintiffs intend to prove caused flooding in the Bristol Park and Ashbury Hills neighborhoods. Whether this breach and the resultant flooding were IP's fault, and whether Plaintiffs and the class incurred stigma damages to their homes' values as a result, are predominant, common questions that are best resolved on a class-wide basis, as many courts have done in mass-tort actions arising from a single incident.

I. **Plaintiffs' Proposal Presents the Superior Means of Resolving this Dispute.**

Glaringly absent from IP's brief is either an alternative for adjudicating this case that would improve upon Plaintiffs' proposal, or an acknowledgement or distinction of the body of law certifying claims arising out of a single event. For all its criticisms of Plaintiffs' evidence and liability theories, IP has no response to the many cases where courts have certified similar

3

classes and likewise recognized that "where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1988); *see also Pl. Mem. at 16-18 (citing cases).* The well-established body of law holding that a class action is appropriate where a single event led to class-wide injuries supports certification.

**II.     IP's liability-based arguments intended to defeat typicality, adequacy and predominance fail because the class members do not rely on different theories of liability, and IP's argument only highlights common issues that support the need for certification.**

IP primarily relies on a single line of argument regarding factual disputes as to the timing of the flooding in an attempt to defeat typicality, adequacy, and predominance. (Def. Mem. at 17-20).

### A.     Plaintiffs are typical of other putative class members.

Regarding typicality, IP argues that the named Plaintiffs are not typical of other class members because the named Plaintiffs received physical flood damage, but not all class members did. The typicality requirement, however, is satisfied even though there may exist factual distinctions between the claims of the class members and the class representative. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir. 1985); *In re Checking Account Overdraft Litig.,* 307 F.R.D. 630, 642 (S.D. Fla. 2015). Here, all Plaintiffs' and class members' claims rely on the same legal theory – that IP failed to maintain its dam and that the dam's breach caused flooding damages.

Plaintiffs are representative of the class's damages as a whole. All have stigma damages, and some -- the Navelskis, Bullards, Hutchins and Henderly -- had flooding in their homes. Alexander had no flooding in his home and can represent the category of residents who pursue

4

only stigma damages.[2] In sum, typicality is satisfied because Plaintiffs have all damages bases covered, and IP can identify no class member with a different damage or legal theory.

          B.      *The recollections of individual Plaintiffs as to the timing of the flood present no bar to certification.*

IP's attempt to defeat class certification by stirring confusion on the timing of initial flooding to defeat class certification fails because: (1) the timing of the dam breach is a common question, and (2) the experts all applied common methodologies that relied very little, if at all, on Plaintiffs' recollections to determine when the dam breach occurred and its impact on the neighborhood.

Plaintiffs do not need to identify the exact timing of the dam breach to sustain their liability theory. Experts on both sides agree the breach occurred and that it was caused by overtopping and erosion. (Carrier Rpt. at 2; France Rpt at 1). The parties dispute the timing of the breach; Plaintiffs will present evidence to show that the dam breach occurred earlier than the class members' homes flooding. Indeed, according to IP's own experts, erosion of the dam embankment could have started as soon as the concrete portion of the dam began to overtop. (France Depo. at 122:15 to 123:1). IP's expert Mr. Lan testified the flow of water significantly overtopped the concrete structure by 7:00 p.m. on April 29, 2015, overtopped the earthen embankment by 9:00 p.m., and continued to overtop the dam until around 7:00 a.m. on April 30, 2015 (Lan Dam Breach Rpt. Fig. 7-4, at 7-4). There is no expert who has definitively identified when the breach occurred, but the breach could have started as early as 7:00 p.m. IP will argue that it happened later. Regardless and even assuming that there are great disparities in the recollections of the Plaintiffs, this is simply a factual dispute that the jury can resolve for the

---

[2] Henderly was renting her home out at the time and lost rental income.

5

class. After all, the dam could only breach once, and its impact on the neighborhood is the critical issue.

On this score, the parties will each rely on expert testimony that does not depend on residents' recollections. Plaintiffs will present expert testimony from their hydrology expert, Dr. Ross, demonstrating that had the dam not breached or had it never been present in the first place, the vast majority of homes in the neighborhood would not have flooded. Dr. Ross can ascertain with precision the level of water, if any, in this comparison at each of the Plaintiffs' and putative class members' homes. (Ross Rpt. at 32). Moreover, Dr. Ross logically deduced that IP's dam caused the higher water levels experienced by Plaintiffs and class members because IP's dam and property are the only impoundments of large volumes of water upstream from the homes that could have caused the actual flooding experienced. IP's expert Mr. Lan ran comparable models and reached a different conclusion, namely that the homes would have flooded regardless of whether the dam breached.

Interestingly, in a supplemental report produced after Plaintiffs filed their class certification motion, Mr. Lan provided Plaintiffs with a chart detailing maximum water elevations and when he expected those elevations to occur at certain homes in the neighborhood. (Ex. A.) Mr. Lan's simulations show a fairly uniform timing of maximum flood elevations at each of the Plaintiffs' homes, between approximately between 1:00 a.m. and 2:00 a.m. Not only did Mr. Lan perform his analysis for the Plaintiffs' homes, but also for class members Pavlock (2703 Silhoutte Drive), Tarbox (2703 Ashbury Lane), and Kersey (10112 Bristol Park Road) (Ex. B.) This same information can be generated for the entire class should IP choose to present it.

Despite IP's attempt to defeat certification by relying on slight differences in class members' recollections of an extremely traumatic event,[3] as opposed to scientific evidence and analysis, the difference in class members' recollections does not mean that there are not common questions or that predominance is lacking. At most, the recollections would be among the many data points to be considered when addressing the common question of when the dam breach occurred.

### III.    IP's remaining predominance arguments are easily dispensed with.

Next, IP wrongly contends that Plaintiffs cannot prove that common questions of law or fact predominate over questions affecting only individual members because of issues associated with Plaintiffs' damages claims. (Def. Mem. at 20).

#### A.    *Florida law does not bar stigma damages.*

IP argues that stigma damages sought by Plaintiffs are merely "temporary" and therefore not recoverable. Plaintiffs dispute that assumption. Plaintiffs have presented expert testimony demonstrating that Plaintiffs and the class have incurred significant and permanent damages for the diminution in value due to the flood caused by IP's dam failure. Mr. Fruitticher, a broker who is experienced in area homes sales, explained that sellers must disclose prior flooding on the standard form real estate disclosure, creating a stigma that reduces a home's value.  (Fruitticher Rpt. at 35: Ex. C, Fruitticher Dep. 164:24-165:15).  Mr. Fruitticher noted that after Hurricane Ivan, the Navy Pointe neighborhood flooded, and now, eleven years later, stigma damages and lower prices still persist in that neighborhood. (Fruitticher Dep. 167:11-168:25).  In addition, a home that already flooded may require flood insurance, which results in a buyer expecting to pay

---

[3] *See* Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2 Fed. Cts. L. Rev. 1, 11 (2007) (citing psychological studies explaining that when stress in an event is too high, the ability to concentrate and perceive are negatively impacted).

a lower price compared to a house that did not flood. (*Id.*) Further, IP's argument that the 1998 flooding did not cause permanent stigma damages ignores the facts that the 1998 storm only flooded a few homes and many homes in the neighborhood had not even been built yet. Moreover, there may in fact be stigma damages associated with the 1998 storm. These have not been quantified, however, by either party and in any event would have been encompassed when Plaintiffs' expert established his baseline for home values assuming the present event did not occur.

Whether stigma damages are temporary or permanent is a jury question. *Sterbenz v. Anderson,* No. 11-cv-1159, 2012 WL 5387885, at *7 (M.D. Fla. Nov. 2, 2012) (discussing stigma damages and finding that, under Florida law, "the question of whether a property injury is temporary or permanent in nature, and thus, what damages are recoverable, is a question of fact for determination by the jury"). Indeed, other courts have found that stigma damages from flooding can be permanent. *See Royce Homes, L.P. v. Humphrey,* 244 S.W.3d 570, 577 (Tex. Ct. App. 2008) (real estate appraiser's "testimony is more than a scintilla of evidence that would enable reasonable and fair-minded persons to find that Humphrey's home suffered a diminished market value as a result of the flood **and that these damages were permanent**") (emphasis added); *Gasway v. Lalen,* 526 N.E.2d 1199, 1203 (Ind. Ct. App. 1988) (finding real estate appraiser's testimony that "due to the publicity and notoriety created by the flooding **a permanent stigma was associated with the residence** which would render it impossible to sell in the future," along with other evidence, to be sufficient to support trial award) (emphasis added). Further, "where a property injury is shown to be permanent in nature due to permanent impairment of market value for example, a plaintiff may in fact recover stigma damages in addition to the cost of repair." *Sterbenz,* 2012 WL 5387885, at *7 (allowing plaintiff to go to trial

8

without electing his remedy of either restoration cost or diminution in value beforehand because permanency of stigma damages was a question of fact); *see also Adinolfe v. United Technologies Corp.,* 768 F.3d 1161 (11th Cir. 2014) (reversing district court's holding that plaintiffs "could not recover 'stigma' damages or diminution in the value of their properties" under Florida law in absence of contamination, and finding instead that stigma damages could in fact be recovered).

### B. IP's attacks on Plaintiffs' damages expert merely present a common question of fact for resolution at trial.

IP's two-pronged attack on Mr. Fruitticher's methodology - that the expert did not tie his calculated stigma damages to IP's conduct, and that the damages cannot be calculated using a mass appraisal approach – raises common questions for a jury and does not preclude certification.

IP essentially argues that its dam no longer causes stigma damages because it no longer exists.  This argument misses the mark. Plaintiffs will show that IP's negligence caused the flood and that the stigma damages are the natural consequences of the flood caused by IP.

IP cites *Maddox v. Claytor*, 764 F.2d 1539 (11th Cir. 1985) for the proposition that multiple regression analysis, the methodology employed by Mr. Fruitticher, is unreliable (Def. Br. at 23), ignoring the Eleventh Circuit's explanation that "[t]he Supreme Court has repeatedly recognized the strong potential of [regression analysis] for supplying an accurate statistical comparison." *Maddox*, 764 F.2d at 1552.  The Eleventh Circuit's criticism was not of regression analysis overall, but simply that, like all types of evidence, "[its] usefulness depends on all the surrounding facts and circumstances." *Id.*

As anecdotal evidence of "flaws" in Mr. Fruitticher's analysis, IP notes the sale of the Kerseys' home, which lost 12.5% of its value after the storm compared to Mr. Fruitticher's opinion that flooded homes in the class lost 18%. (Def. Br. at 24). IP's argument is misplaced

because it fails to account for lost appreciation of homes in Mr. Fruitticher's analysis, where he found surrounding homes in control neighborhoods appreciated 8% to 11%. (Fruitticher Rpt. at 82-83). Not only did the Kerseys lose 12.5% on their home, but also failed to gain the same 8%-12% appreciation experienced by the surrounding area; thus, the Kerseys' actual damages are 20.5% to 23.5%, further supporting Mr. Fruitticher's 18% figure as conservative. At trial IP can argue that stigma damages are unwarranted, but again the issues of whether or not the damages are permanent or temporary, or recoverable at all, are common questions that the jury can resolve on a class-wide basis. IP's criticism of Mr. Fruitticher's mass appraisal methodology may properly be addressed by cross-examination at trial.

This case is markedly different from the waste dumping case of *The St. Joe Co. v. Leslie,* 912 So. 2d 21 (Dist. Ct. App. Fla. 2005). There, the intermediate appellate court reversed certification based on both an incorrect finding that stigma damages were not recoverable for uncontaminated properties, and because plaintiffs failed to provide evidence that a mass appraisal or regression analysis had been performed to prove stigma damages on a class-wide basis. *Id.* at 25. The Eleventh Circuit has already found that *Leslie* is incorrect on stigma damages. *See Adinolfe,* 768 F.3d at 1177. As to the proof issue, Plaintiffs here actually *had* the exact analysis performed that the *Leslie* court required, and will rely on it to prove the class-wide damages.

### C. The limited questions requiring individual determinations do not predominate over the common questions.

In a final bullet point list of non-issues, IP criticizes Plaintiffs' showing of predominance by pointing out, again, that some class members' claims will differ from others because not all class members incurred flood damage. (Def. Mem. at 24). These issues do not affect either predominance or Plaintiffs' ability to serve as class representatives. All class members suffered

stigma damages regardless of whether there was actual water in the homes.  Indeed, these kinds of minor isolated damages questions are dwarfed by the long list of common questions, demonstrating all the more strongly that predominance is met here. *See Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir. 2003) (recognizing that the "presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.")

**Conclusion**

For all the foregoing reasons, Plaintiffs request that the Court grant their motion.

Dated: December 22, 2015                                Respectfully Submitted,

By: /s/ James L. Kauffman
James L. Kauffman, Fl. Bar No. 12915
Jonathan R. Marshall
**BAILEY & GLASSER LLP**
1054 31st Street, N.W., Suite 230
Washington, DC  20007
Telephone: (202) 463-2101
Fax:  (202) 463-2103
jkauffman@baileyglasser.com
jmarshall@baileyglasser.com

Jeremiah J. Talbott
Tyler L. Gray
**Law Office of J.J. Talbott, P.A.**
900 East Moreno Street
Pensacola, FL 32503
jj@talbottlawfirm.com

Christopher M. Vlachos
**Vlachos Injury Law, P.A.**
244 East Intendencia Street
Pensacola, FL 32502
chris@vlachosinjurylaw.com

*Counsel for Plaintiffs*

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 22nd day of December, 2015, a true copy of the foregoing

was served via electronic delivery on counsel below:

Charles F. Beall, Jr.
cbeall@mhw-law.com
Florida Bar No. 66494
Larry Hill
lhill@mhw-law.com
ljohnson@mhw-law.com
Florida Bar No. 173908

Kimberly S. Sullivan
ksullivan@mhw-law.com
Florida Bar No. 101408
MOORE, HILL & WESTMORELAND, P.A.
220 West Garden Street
SunTrust Tower, 9th Floor
Pensacola FL 32502
Telephone: (850) 434-3541
*Attorneys for Defendant*

*/s/ James L. Kauffman*
James L. Kauffman