# EXHIBIT A

# C L A R I O N

## Summary Appraisal Review Report

*of the Tom Fruitticher, MAI, Appraisal Report •*
*Submitted in John Navelski, et al. v. International Paper Company •*
*Related to 316 Single-Family Homes in a Proposed Class Area •*
*Located in Escambia County, Florida*



**Clarion Associates, Inc.**

**An Illinois Corporation**

**September 2015**

## SUMMARY APPRAISAL REVIEW REPORT

REPORT BY TOM FRUITTICHER, MAI
APPRAISAL OF 316 HOMES IN A PROPOSED CLASS AREA
LOCATED IN ESCAMBIA COUNTY, FLORIDA

*JOHN NAVELSKI, ET AL. V. INTERNATIONAL PAPER COMPANY*

## PREPARED FOR

MOORE, HILL & WESTMORELAND, P.A.
350 WEST CEDAR STREET, SUITE 100
PENSACOLA, FLORIDA 32502

AS OUTSIDE COUNSEL FOR INTERNATIONAL PAPER COMPANY

## DATE OF FRUITTICHER REPORT

AUGUST 7, 2015

## DATE OF SUBMISSION OF APPRAISAL REVIEW

SEPTEMBER 11, 2015

## SUBMITTED BY

CLARION ASSOCIATES, INC.
30 WEST MONROE STREET, SUITE 810
CHICAGO, ILLINOIS  60603

COPYRIGHT © 2015 BY CLARION ASSOCIATES, INC.
AN ILLINOIS CORPORATION

C  L  A  R  I  O  N

*Clarion Associates, Inc.*          *Real Estate Consulting*
*The Inland Steel Building*          *Appraisal*
*30 West Monroe Street, Suite 810*   *Litigation Support*
*Chicago, Illinois 60603*            *Historic Preservation*
*312.630.9400*                       *Land Use Planning*
*312.630.9525 fax*                   *Economic Analysis*
*www.clarionassociateschicago.com*

# C L A R I O N

September 11, 2015

Mr. Larry Hill
Moore, Hill & Westmoreland, P.A.
350 West Cedar Street, Suite 100
Pensacola, Florida  32502

**RE:    *John Navelski, et al. v. International Paper Company***
**APPRAISAL REVIEW OF THE TOM FRUITTICHER, MAI APPRAISAL REPORT DATED AUGUST 7, 2015**

Dear Mr. Hill:

We are pleased to submit the attached Appraisal Review of the expert report issued by Mr. Tom Fruitticher (hereafter, the "Fruitticher Report") submitted by attorneys for Plaintiffs in the *John Navelski, et al., v. International Paper Company* litigation.  The Plaintiffs claim that the flooding event of April 2014 has adversely impaired the market value of 316 single-family homes in a proposed Class Area in Escambia County, Florida.

A detailed list of the purposes of this assignment are contained in the attached Appraisal Review report.  Those purposes fit into the following four general categories:

- First, to summarize and explain the generally accepted and recognized methods of the appraisal profession for analyzing the impacts of detrimental conditions and environmental events such as flooding on prices and values of single-family homes and for quantifying any resulting environmental "stigma;"

*Affiliated Offices:   Chapel Hill  •  Cincinnati  •  Denver  •  Florida  •  Philadelphia*

*Mr. Larry Hill*
*September 11, 2015*
*Page 2*

- Second, to explain how those accepted and recognized methods should be applied to determine the effect of the April 2014 Pensacola flooding event on the 316 homes in the proposed Class Area;

- Third, to review the August 7, 2015 Appraisal Report prepared by Tom Fruitticher, MAI, of Fruitticher-Lowery Appraisal Group (hereinafter, "the **Fruitticher Report**"); and

- Fourth, to provide our opinion of the levels and duration of "stigma" due to the flooding event that are supportable once the inaccuracies and misapplication of accepted methods in the Fruitticher Report are corrected and comment from a real estate appraisal perspective on the appropriateness of a one-size-fits all method as contrasted with property-by-property analysis as techniques for arriving at fair and accurate measures of the effect of the flooding event on prices values of the 316 homes.

My review of the Fruitticher Report has been undertaken by reference to the *Uniform Standards of Professional Appraisal Practice* (USPAP) published by the Appraisal Standards Board of the Appraisal Foundation, and the *Supplemental Standards of Professional Practice and Code of Professional Ethics* published by the Appraisal Institute. As part of that review, I have evaluated and tested the general accuracy, reliability, and appropriateness of the appraisal methods used, valuation conclusions, and "stigma" conclusion reached, in the Fruitticher Report.

This Appraisal Review report was prepared for you as counsel in the above-referenced litigation for International Paper Company. It is intended to be used by the parties in the litigation to assist the court in determining the following: the admissibility and reliability of expert testimony; the market value of the Plaintiffs' property; the stigma damages, if any, as alleged by Plaintiffs in this matter; and the appropriate techniques to be used to determine damages, if any, in litigation.

This report has been researched and written in conformity with the requirements of the *Code of Ethics* of the Appraisal Institute and the *Uniform Standards of Professional Appraisal Practice* adopted by the Appraisal Standards Board of the Appraisal Foundation. This report is subject to the statement of assumptions and limiting conditions included in it. Neither the Clarion Associates, Inc. name nor the material submitted in the report may be included in any prospectus or used in offerings or representations in connection with the sale of real estate, securities, or participation interests to the public, without our written consent.

The appraisal review report describes in detail the scope of work involved in the appraisal review assignment; the nature, extent, and detail of the review process undertaken; and our conclusions concerning the completeness, adequacy, relevance, appropriateness, and reasonableness of the data, methods, techniques, analyses, opinions and conclusions in the Fruitticher Report. It is presented as a summary appraisal review report and additional

**C L A R I O N**

*Mr. Larry Hill*
*September 11, 2015*
*Page 3*

materials have been retained in our files. This letter is not to be separated from the body of the attached Summary Appraisal Review Report, of which it is a part.  It is also subject to the Statement of Assumptions and Limiting Conditions included in the report.


Sincerely yours,

CLARION ASSOCIATES, INC.

By:


_____
Richard J. Roddewig, MAI, CRE, FRICS
Florida State-Certified General Real Estate Appraiser #RZ3166

**C   L   A   R   I   O   N**

## 1. EXECUTIVE SUMMARY

### 1.1 PURPOSE OF THE ASSIGNMENT

There are four overall purposes to our assignment:

- First, to summarize and explain the generally accepted and recognized methods of the appraisal profession for analyzing the impacts of detrimental conditions and environmental events such as flooding on prices and values of single-family homes and for quantifying any resulting environmental "stigma;"

- Second, to explain how those accepted and recognized methods should be applied to determine the effect of the April 2014 Pensacola flooding event on the 316 homes in the proposed Class Area;

- Third, to review the August 7, 2015 Appraisal Report prepared by Tom Fruitticher, MAI, of Fruitticher-Lowery Appraisal Group (hereinafter, "the **Fruitticher Report**"); and

- Fourth, to provide our opinion of the levels and duration of "stigma" due to the flooding event that are supportable once the inaccuracies and misapplication of accepted methods in the Fruitticher Report are corrected.

### 1.2 QUALIFICATIONS OF THE APPRAISERS

Clarion Associates, Inc. is one of the most experienced firms in the United States in the evaluation of the effects of detrimental conditions and "stigma" on real estate markets, prices, values, and use and enjoyment. The firm has worked on such previous assignments in more than 25 states including Florida. Richard J. Roddewig, MAI, CRE, FRICS, President of the firm, is a licensed real estate appraiser in Florida and in many other states and has authored, co-authored and edited articles in professional journals and developed professional educational seminars on the subject of the appraisal of properties impacted by environmental events and stigma. Mr. Roddewig has also edited two books on the subject for the Appraisal Institute. Mr. Roddewig and his firm have prior experience analyzing the impact of flooding on property prices, markets, and values. He has testified as an expert witness on the stigma effects of various types of detrimental conditions on real estate in other courts and venues. In the past 15 years, as a Florida licensed real estate appraiser, Mr. Roddewig has been involved in Florida appraisal assignments involving more than 10,000 homes and land parcels.

### 1.3 THE RECOGNIZED AND GENERALLY ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE IMPACT OF ENVIRONMENTAL EVENTS SUCH AS FLOODING

Licensed real estate appraisers are required by the *Uniform Standards of Professional Appraisal Practice* (USPAP) to apply recognized and generally accepted methods as contained in the peer-

reviewed books, publications, seminars and courses of the appraisal profession as well as in Advisory Opinion 18 (AO-18) promulgated by the Appraisal Standards Board that deals specifically with use of automated valuation models and Guide Note 10 of the Appraisal Institute that deals with appraising in the wake of natural disasters.

The appraisal profession recognizes flooding as a type of "detrimental condition." The methods for determining the "stigma" impact from detrimental conditions including flooding[1] are set forth in various books, articles, courses, and seminars of The Appraisal Institute including the second edition of *Real Estate Damages: Applied Economics and Detrimental Conditions*.

The generally recognized techniques for determining the impact of a detrimental condition are as follows:

- Paired sales analysis including sale/resale analysis;
- Analysis of impaired sales comparables including analysis of market resistance;
- Neighborhood studies including trend line analysis;
- Proximity studies;
- Case study analysis; and
- Statistical studies including simple and multiple regression analysis and time series (trend line) analysis;

### 1.4    STIGMA FROM DETRIMENTAL CONDITIONS SUCH AS FLOODING IS NOT ALWAYS PRESENT AND IS TYPICALLY TEMPORARY NOT PERMANENT

The application of those techniques as set out in the articles, books, courses and seminars recognizes that environmental stigma does not always result from a detrimental condition such as flooding.

Those sources also make it clear than when "stigma" does result from a detrimental condition such as flooding, it is typically temporary rather than permanent and can be eliminated by the process of investigation and repair.  As investigation, remediation and cleanup goes on following an environmental event such as flooding, impacts on prices and values typically decrease.  The basic model showing the temporary "stigma" impact and the recovery of market value over time is shown below.[2]

---

[1] Flooding is characterized in the book as Detrimental Condition Class X which includes "natural disaster and weather issues, i.e., flood, hurricane, typhoon, wildfire, seismic, volcano, tornado, global warming, tsunami, famine, drought, storms, etc."  Bell, et al. (2008) at 21.
[2] Randall Bell, MAI, *Real Estate Damages: An Analysis of Detrimental Conditions*, Appraisal Institute, 1999.



### 1.5 PUBLISHED STUDIES OF PAST FLOODING EVENTS INDICATE THAT TEMPORARY STIGMA IMPACTS DUE TO FLOODING TYPICALLY END WITHIN A FEW YEARS

One of the most recent summaries and analyses of the published literature concerning the impact of flooding events is in a paper presented at the 2015 Floodplain Management Association National Conference.[3] That paper states that the typical impact of a major flooding event is a temporary impact on prices of between 5.0% and 10.0% that generally lasts for only one or two years.

That paper shows the typically temporary nature of the price impact from a flooding event in the following graphic:

---

[3] S. Yeo, K. Roche, and J. McAneney, "Effects of Disclosure of Flood-Liability on Residential Property Values: An Update," Floodplain Management Association, 2015 Floodplain Management Association National Conference, available at http://floods.org.au/wp-content/uploads/Stephen-Yeo-Full-Paper.pdf.



That 2015 Floodplain Management Association National Conference paper also recognized that sometimes flooding events can have no impact on post-flooding prices. It also pointed out that there can be significant variability in impacts from one flood event situation to another and even within the same neighborhood or area from the same flooding event. The variability is due to the wide variety of factors that can affect housing prices, either positively or negatively, in a particular community, area, or neighborhood.

### 1.1 MASS APPRAISAL METHODS SUCH AS MULTIPLE REGRESSION MODELING TO DETERMINE FLOODING IMPACTS HAVE BEEN FOUND TO BE HIGHLY INACCURATE WHEN APPLIED TO DETERMINE VALUES OF INDIVIDUAL PROPERTIES

The 2015 Floodplain Management Association National Conference paper said the following about the difficulties of applying multiple regression modeling techniques in the determination of the stigma impact following flooding:

- While many flood-impact studies utilize multiple regression analysis of sales prices, the accuracy and reliability of multiple regression modeling is very much dependent on the depth and quality of the sales price data utilized in the model. Statistically accurate flood impact models require a large number of variables to be modeled and require a large number of sales prices to be statistically reliable.

- Sale/resale analysis involving the same house sometimes called "repeat sales analysis" (i.e., primary paired sales analysis) can be more reliable than multiple regression analysis when only a small post-flooding price data set is available.[4]

Although multiple regression modeling has long been used by property tax assessors in the United States as part of their "mass appraisal" of properties for purposes of levying ad valorem taxes, it has also long been recognized as a highly inaccurate, but unfortunately necessary, part of the property tax system.   As The Appraisal Institute states: "Traditional mass appraisal methods have originated with county assessors, who are confined by the goals and realities of the ad valorem tax process. . . the goal of the assessor's valuation process is an equitable distribution of the tax burden across all properties. . . *Assessor models, therefore, focus on equity rather than on individual market valuation veracity*."[5] (emphasis added)

The inaccuracy of mass appraisal techniques is specifically recognized by the Appraisal Standards Board USPAP Standard 6: "It is implicit in mass appraisal that, even when properly specified and calibrated mass appraisal models are used, some individual value estimates will not meet standards of reasonableness, consistency, and accuracy."[6]

Many of the problems in tax assessment procedures are also found in Automated Valuation Models (AVMs).[7]  Because of their inaccuracies, the home lending industry has not been widely utilizing AVM products to determine the value of individual properties for mortgage origination: "The reluctance to use this product (AVMs) for first mortgages is due to uncertainty concerning the reliability of the product in high loan-to-value situations."[8]

According to The Appraisal Institute, the largest professional organization of real estate appraisers, "AVMs are rarely accepted by mortgage investors." (*Appraiser News Online*, June 1, 2004)

The Appraisal Institute, in its book on valuation modeling, comments on AVMs as follows:

---

[4] One of the articles referenced by Yeo, et al. (2015) in making this point is J. Lamond, D. Proverbs, and A. Antwi, "Measuring the Impact of Flooding on UK House Prices", *Property Management*, Vol. 25, No. 4 (2007), pp. 344-359 discussed in more detail later in our discussion of appropriateness of regression modeling.
[5] *A Guide to Appraisal Valuation Modeling*, Appraisal Institute (2000), p. 44.
[6]  USPAP 2014-2015 Edition, Standard 6:  Mass Appraisal, Development and Reporting, Lines 1377-1379.
[7]  In fact, many tax assessment jurisdictions incorporate some elements of AVMs in their procedures.  Therefore, the inaccuracy of AVMs may be part of the cause of the inaccuracy of tax assessment mass appraisal.
[8] Mark R. Linne, MAI, CRE, ASA, FRICS, "A Vision for Valuation:  Automated Valuation Models and Appraisal Practice," paper presented at the 23rd Pan Pacific Congress of Appraisers, Valuers and Counselors, San Francisco, CA, September 16-19, 2006.  AVMs have also begun to be used by some lenders "for internal purposes, either in a quality control environment as an appraisal review tool or for funding on high-quality loans that were kept within the institution such as home equity loans."  Victoria Cassens Zillioux, "Automated Valuation Models:  Automation vs. Hyprid," paper presented at the 23rd Pan Pacific Congress of Appraisers, Valuers and Counselors, San Francisco, CA, September 16-19, 2006.

> "Most AVMs are good at estimating the value of properties with homogeneous property characteristics and location factors. With appraiser-based market estimate modeling, however, the valuation process that an appraiser uses can be more refined and meaningful because it may better reflect the concerns that the actual real estate market mechanism presents in a defined neighborhood."[9]

A number of academic researchers have found that multiple regression modeling falls short when measured against the traditional sales comparison approach using an adjustment grid to determine values. Colwell, Cannaday and Wu in an early article in the *AREUA Journal* compared regression analysis to traditional adjustment grid methods used by appraisers. The authors' comparison "makes clear the superiority of the grid approach over a pure regression approach" in the analysis situation evaluated.[10]

The Colwell, Cannaday and Wu article, as well as an article by Professor Vandell,[11] attribute the superiority of properly weighted comparable sales to regression modeling to a fundamental problem of every multiple regression model – it cannot "solve" for every variable affecting the price and value of a particular property.[12]

A seminal article by Lentz and Wang attributed a "high standard error" as the central problem in relying on the output of regression modeling:

> "*The Real Problem*. One of the most serious problems involved with the application of the regression method to appraisals has yet to be adequately addressed in the literature: the large standard error of the regression estimate. The high standard error of estimates reported in most hedonic studies might render the fitted values useless (for example, see the standard errors reported in Vandell, 1991, Tables 2 and 3). Indeed, when the standard error of estimate is normally 10% to 30% of the estimated value of residential properties, we fail to see that the appraisal can contribute very much to the underwriting process."[13]

The fundamental inaccuracy of mass appraisal techniques makes them inherently unacceptable in measuring actual damages to individual properties and owners in areas affected by flooding with various levels of flooding damage. So-called "mass appraisal" techniques such as multiple regression models and AVMs (automated valuation models) are prone to high rates of error and

---

[9] *A Guide to Appraisal Valuation Modeling*, Appraisal Institute (2000), p. 41.

[10] Peter F. Colwell, Roger E. Cannaday, and Chunchi Wu, "The Analytical Foundations of Adjustment Grid Methods," *AREUEA Journal*, Vol. 11, No. 1., 1983, 11, at 27. See also, Kerry D. Vandell, "Optimal Comparable Selection and Weighting in Real Property Valuation," *AREUEA Journal*, Vol. 19, No. 2., 1991, 213, at 236.

[11] Kerry D. Vandell, "Optimal Comparable Selection and Weighting in Real Property Valuation," *AREUEA Journal*, Vol. 19, No. 2., 1991, 213.

[12] "Pure regression prediction suffers from an omitted variable problem. . ." Colwell, Cannaday, and Wu, supra, at 26.

[13] George H. Lentz and Ko Wang, "Residential Appraisal and the Lending Process: A Survey of Issues," *Journal of Real Estate Research*, Vol. 15, Numbers 1/2, 1998, p. 19.

cannot fairly, efficiently and accurately measure real property damages caused by the type of flooding event that occurred in Pensacola in April of 2014.  Instead, rigorous property-by-property analysis is necessary.

### 1.2   MASS APPRAISAL REGRESSION MODELING WAS FOUND TO BE INHERENTLY INACCURATE IN ESTIMATING DAMAGES DUE TO FLOODING IN NEW ORLEANS FOLLOWING HURRICANE KATRINA

Even before Hurricane Katrina, mass appraisal using multiple regression modeling was recognized as inherently inaccurate in New Orleans.[14]  The flooding made that even more apparent, and it was eventually recognized that property-by-property investigation and individualized appraisal reports were necessary to accurately determine appropriate damages.

The 2007 New Orleans reassessment in the wake of Hurricane Katrina resulted in more than 5,200 appeals by property owners to the City Council,[15] "an unprecedented number of appeals."[16]  The number of appeals to the New Orleans City Council was so large that the city hired an outside contractor to "manage the complex process and handle much of the work reviewing the 5,262 appeals."[17]

The Road Home program established in the wake of Hurricane Katrina to provide grants to home owners for reconstruction considered, but ultimately rejected, the use of local parish tax assessment mass appraisal techniques.  Local tax assessor values based on mass appraisal techniques were found to be inaccurate and prone to error when used to establish pre-storm market values.   As a result, the Road Home program "prefers to base pre-storm values on a formal appraisal of the property done before the storm and submitted by the homeowner."[18]  An early summary of the program on the City of New Orleans website also indicated that in the absence of such an appraisal, the Road Home program would use an Automated Valuation Model.

By mid-December of 2006, however, the Louisiana Office of Community Development had acknowledged "serious problems with use of the Automated Valuation Method."  By January of 2007, the Road Home program had decided to commission individual property appraisals using local New Orleans appraisers "for as many properties as necessary to get the values right."[19]

---

[14] In 2003, the State of Louisiana Legislative Auditor tested the tax assessment procedures in some parishes and concluded that "the methodology used by the assessor does not get to fair market value." State of Louisiana Legislative Auditor, "Residential Tax Assessment Practice," April 2003, p. 12.  The study found examples of similar homes on the same street in the same subdivisions being assessed at significantly different levels. The market value determinations for the similar houses on the same street could be as much as 88% higher for one house than the other.

[15] The New Orleans City Council sits as the Board of Review for tax assessment appeals.

[16] *Times-Picayune*, August 28, 2007.

[17] *Times-Picayune*, August 28, 2007.

[18] http://www.nola.com/newslogs/rpanswerspot/index.ssf?/mtlogs/nola_tpqa/archives/2006_12.html.

[19] *The Times-Picayune*, May 1, 2007.

**1.3   OUR PAST FLOODING IMPACT RESEARCH IN TWO OTHER CITIES HAS FOUND NO STIGMA IMPACT IN ONE SITUATION AND SHORT-TERM TEMPORARY STIGMA IN ANOTHER**

*Mandeville, Louisiana Flooding Case Study*:   In 2010 we investigated prices paid for flood remediated homes in Mandeville, Louisiana, an area on the north shore of Lake Pontchartrain that is subject to flooding as a result of periodic heavy rains coupled with strong southerly winds that bring high tides which back up the rivers and drainage ways.

We collected sales of homes known to have been remediated and resold following storm related flooding events.  The sale price for each remediated property on a price paid per square foot basis was then compared to the sale prices of comparable homes in similar locations that were not flooded.

We found no post-remediation stigma in the marketplace for flood-remediated homes in Mandeville.  The Mandeville marketplace is comfortable in paying normal market prices for homes that have been remediated following flooding events even though there was some possibility for lingering behind-the-walls moisture or mold problems post-remediation, and even a high likelihood of future flooding.

*Milwaukee, Wisconsin Flooding Case Study*: In 2013, we studied home prices in Milwaukee, Wisconsin in the years following a 2008 flooding and sewer backup event that resulted in thousands of flooded basements.

We found a temporary impact on home prices in the flood affected neighborhoods in the second half of 2008 but no impact in the first half of 2009. By the second half of 2009, any temporary impact had clearly ended, and prices in the Case Study Area impacted by the June 2008 flood event had rebounded to a point that would not have been expected if the 2008 flood event was continuing to have an effect on the market.

We also found a temporary decrease in the number of sales, a temporary increase in the time it took to sell a home, and a temporary decrease in the sale price to list price ratio in the second half of 2008 immediately after the June 2008 flooding event.

As a result, the only property owners in the flood affected area who suffered an actual out of pocket loss due to that temporary impact on the market were those who actually sold their homes under contracts signed between the June 9, 2008 date of the flood event and the end of 2008.

**1.4    THE FRUITTICHER REPORT USES ONLY MASS APPRAISAL REGRESSION MODELING TO ANALYZE MARKET VALUES AND STIGMA IN THE PROPOSED CLASS AREA**

The Fruitticher Report uses only mass appraisal multiple regression modeling to arrive at a "market value" of each of the 316 homes in the proposed class area as of a date immediately prior to the April 29, 2014 flooding event.  Fruitticher then uses linear regression modeling (trend line analysis) to arrive at a stigma impact percentage.  The Fruitticher Report concludes that every non-flooded home should receive a stigma damages payment equal to 12% of its pre-flood "market value" and every flooded home should receive a stigma damages payment equal to 18% of its pre-flood market value.  The Fruitticher Report (page v) concludes that the total sum of the post-flooding "stigma" damages is $9,034,000, or an average of $28,589 per property.  The Fruitticher Report treats these damages as a permanent effect on the market value of the 316 properties.

Mr. Fruitticher did not test the results of his regression modeling by applying any of the other recognized methods of the appraisal profession for determining the impact of flooding.  In fact, for the 10 properties that have sold in the proposed Class Area since the April 2014 flood event, he never even compared his predicted "market values" to the actual prices paid.

**1.5    THE APPRAISAL PROFESSION RECOGNIZES THAT THE PREDICTIVE VALUES RESULTING FROM A MULTIPLE REGRESSION MODEL ARE NOT THE SAME AS MARKET VALUE AND THAT RELYING EXCLUSIVELY ON REGRESSION MODELING TO DETERMINE THE INDIVIDUALIZED STIGMA DAMAGES DUE TO A DETRIMENTAL CONDITION SUCH AS FLOODING IS LIKELY TO RESULT IN INEQUITABLE DAMAGE CALCULATIONS**

A mass appraisal such as that conducted by Mr. Fruitticher is a form of automated valuation model, or AVM.  As Advisory Opinion 18 (AO-18) in USPAP clearly states, "the output of an AVM is not, by itself, an appraisal.  An AVM's output may become a basis for appraisal or appraisal review if the appraiser believes the output to be credible for use in a specific assignment."[20]

An *Appraisal Journal* article on the proper appraisal techniques to use in reports produced in class action litigation says the following:

> "Estimating the mean or average impacts to the value of a group of properties is a different assignment and use of the regression technique than using it to estimate the market value of individual properties.  The errors associated with the estimation of individual property values can be large, while the errors associated with the estimation of mean or average impacts to a group of properties with a properly constructed regression model usually fall within acceptable limits.  Since a regression analysis of environmental impacts produces only estimates of average effects for a group of properties, it is likely to

---

[20]  USPAP, 2014-2015 Edition, p. A-45, Lines 16-17.

overestimate impacts for some properties and underestimate impacts for others. This could potentially result in an inequitable allocation of damages in class actions involving the impacts of environmental contamination on property values."[21]

### 1.6    THE FRUITTICHER REPORT IS MISLEADING AND UNRELIABLE AND THE STIGMA IMPACT, IF ANY, IS SIGNIFICANTLY LESS THAN ESTIMATED IN THE FRUITTICHER REPORT

Our findings regarding the reliability and credibility of the Fruitticher Report and our conclusions concerning the post-flooding stigma situation in the proposed Class Area are as follows:

- There are too few sales (observations) in the data set used by Fruitticher to support a statistically reliable regression model.

- The $t$-statistics and $p$-values for all but two of his independent (predictor) variables indicate that there is a high likelihood that the coefficients for those independent variables emerged by chance and do not describe a real relationship.

- Fruitticher failed to test the credibility of his model by using any of the recognized means for testing regression model and mass appraisal results.

- When the 10 sales that have occurred in the proposed Class Area post-flooding are included in the Fruitticher multiple regression model, they indicate an average stigma impact of only 4.0% not the 15% average impact in the Fruitticher conclusion.

- When the actual prices of the 10 post-flooding sales are compared to the regression model that includes post-flooding sale prices, the average stigma impact is only 3.0% not 15.0% and five of the homes show no stigma impact.

- When the Fruitticher predicted unimpaired "market values" pre-flood are compared to the predicted prices for each of the 316 homes when the 10 post-flooding sales are included in the model, the mean average impact from the flooding event is only -1.63% and 113 of the homes show a predicted post-flood value higher than the Fruitticher unimpaired value.

- When two homes are appraised using the sales comparison technique, the average differential is 5.7% not 15%.

---

[21] Thomas O. Jackson, PhD, MAI, "Real Property Valuation Issues in Environmental Class Actions," The Appraisal Journal, Spring 2010, at p. 148.

- The trend line analysis in the Fruitticher Report contains too few sales data points (observations) to be a statistically reliable linear regression.

- The Fruitticher Report does not analyze the outliers in the simple linear regression trend lines.  When only one outlier is removed from the trend line supposedly showing a 9% drop in average price in the past two years, the trend line flips to an indication of a 9% increase in average price in the flooded portion of the proposed Class Area.

- The Fruitticher Report does not consider the improvements being made to the flood control process in the affected area.  Nor does he consider the possible effect on prices of the proposed buyout program by the federal government and the door to door promotional campaign that has accompanied that program.

- A comparison of the actual sale prices in the proposed Class Area since the April 2014 flooding event to the Fruitticher "predicted" prices indicates that average actual prices are 15% higher than the Fruitticher predicted "stigmatized" market value -- since the average Fruitticher "stigma" impact is 15%, that comparison indicates no stigma impact has occurred.

- The actual sales prices since April 2014 are less than 2.0% below the unimpaired predicted market values that result from the Fruitticher multiple regression model.

- If there is any stigma impact due to the April 2014 flooding event, it is temporary and not permanent.  That is demonstrated by the fact that the average price paid in the seven most recent 2015 post-flooding sales in the proposed Class Area is 18.6% higher than the predicted stigmatized market prices in the Fruitticher Report while the three earlier 2014 post-flooding sales are only 8.5% higher than the Fruitticher stigmatized market values.

- The likelihood of a temporary rather than permanent impact is also demonstrated by the fact that actual sales prices since April 2014 are less than 2.0% below the unimpaired predicted market values that result from the Fruitticher multiple regression model.

- The published flooding impact literature also confirms that the stigma impact, if there has been one, is temporary rather than permanent.  Studies in the published literature indicate that such impacts when they do occur typically last no more than a few years.

- The likelihood of a temporary rather than permanent impact is also demonstrated by our past research in other flooding impact situations in which we found some evidence of temporary rather than permanent impact on prices and values.

- If the flooding impacts have been temporary rather than permanent, then not all 316 homeowners in the proposed Class Area have or will suffer any actual economic loss. Only those who sell their houses (or unsuccessfully attempt to sell)  -- or obtain a mortgage loan based on an appraisal that reflects actual stigma derived from market prices -- during any temporary stigma time frame will have suffered any actual out-of-pocket loss.

- If stigma impacts are only temporary -- and possibly have ended -- or are actually less than the average 15% impact arrived at by Fruitticher, it is not appropriate to compensate every one of the 316 homeowners based on the Fruitticher Report.  Some, if not most, of the homeowners would receive a windfall.

- In the one year prior to the flooding event, there were 16 sales in the proposed Class Area.  That is a turnover (sales velocity) rate of 5.06%.  At that velocity, it would take 19.75 years for the entire inventory of 316 homes to turn over.

- The flooding impact literature indicates that when stigma impacts due to flooding do occur, they are temporary and typically end within four years.  At the turnover rate indicated by past sales in the proposed Class Area, only about 64 of the 316 homes would turn over during the first four years following the flooding event.

- An analysis of actual prices paid in the proposed Class Area since the April 2014 flooding based on the various measures we have used to test the Fruitticher Report analysis and conclusions indicates an average stigma impact varying from about 2.5% to about 5.7% -- not the 12% to 18% indicated in the Fruitticher Report.  Some home sale prices demonstrate no stigma.

- An analysis of the sales prices compared to the results of the Fruitticher regression model indicates that any temporary impact due to the flooding may already have ended.

- The proposed government buyout program and flood protection improvements and changes since April 2014 may be having a significant positive effect on prices and values in the proposed Class Area.

- An appraisal of two of the properties in the proposed Class Area indicates the need for property-by-property analysis to determine the current impact, if any, from the April 2014 flooding event

The Fruitticher Report does not comply with standards of professional appraisal practice and evidences bias as defined by the Appraisal Standards Board.  Among the failures of the Fruitticher Report to comply with standards and generally recognized methods and procedures are the following:

- Failure to properly apply linear and multiple regression modeling;

- Failure to test the results of a multiple regression model for credibility and reliability as required by Standard 6 of USPAP and Advisory Opinion 18 (AO 18);

- Failure to follow Guide Note 10 of the Appraisal Institute related to appraisal assignments in areas affected by a natural disaster;

- Failure to analyze actual prices paid following an environmental event;

- Calling the result of an automated valuation model "market value" without checking the results against any of the other recognized sales comparison approaches to value when determining the effect of a detrimental condition under standards of professional appraisal practice;

- Failure to check the peer-reviewed articles and publications published by the appraisal profession for the appropriate methods for determining the effect of a detrimental condition;

- Failure to follow the guidance in the seminars and courses of the Appraisal Institute and other professional appraisal organizations; and

- Producing an appraisal report that contains significant errors and omissions that affect the outcome of the appraisal analysis.

In summary, Mr. Fruitticher has not offered a reliable or credible opinion of stigma damages in this case. The Fruitticher Report contains numerous substantial and serious errors, omissions, inaccuracies, and mis-statements of fact that cause it to be a biased, misleading and unreliable opinion of either market value "before" or "after" considering the stigma, if any, related to the April 2014 flooding event in the proposed Class Area. For these reasons, the Fruitticher Report is in violation of the *Uniform Standards of Professional Appraisal Practice.*

## TABLE OF CONTENTS

1.    EXECUTIVE SUMMARY ....................................................................................................................1
    1.1    PURPOSE OF THE ASSIGNMENT .............................................................................................1
    1.2    QUALIFICATIONS OF THE APPRAISERS .....................................................................................1
    1.3    THE RECOGNIZED AND GENERALLY ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE IMPACT OF ENVIRONMENTAL EVENTS SUCH AS FLOODING ....................................................................................1
    1.4    STIGMA FROM DETRIMENTAL CONDITIONS SUCH AS FLOODING IS NOT ALWAYS PRESENT AND IS TYPICALLY TEMPORARY NOT PERMANENT.............................................................................................................2
    1.5    PUBLISHED STUDIES OF PAST FLOODING EVENTS INDICATE THAT TEMPORARY STIGMA IMPACTS DUE TO FLOODING TYPICALLY END WITHIN A FEW YEARS.................................................................................................3
    1.1    MASS APPRAISAL METHODS SUCH AS MULTIPLE REGRESSION MODELING TO DETERMINE FLOODING IMPACTS HAVE BEEN FOUND TO BE HIGHLY INACCURATE WHEN APPLIED TO DETERMINE VALUES OF INDIVIDUAL PROPERTIES ..............................4
    1.2    MASS APPRAISAL REGRESSION MODELING WAS FOUND TO BE INHERENTLY INACCURATE IN ESTIMATING DAMAGES DUE TO FLOODING IN NEW ORLEANS FOLLOWING HURRICANE KATRINA.................................................................7
    1.3    OUR PAST FLOODING IMPACT RESEARCH IN TWO OTHER CITIES HAS FOUND NO STIGMA IMPACT IN ONE SITUATION AND SHORT-TERM TEMPORARY STIGMA IN ANOTHER..................................................................................8
    1.4    THE FRUITTICHER REPORT USES ONLY MASS APPRAISAL REGRESSION MODELING TO ANALYZE MARKET VALUES AND STIGMA IN THE PROPOSED CLASS AREA ..................................................................................................9
    1.5    THE APPRAISAL PROFESSION RECOGNIZES THAT THE PREDICTIVE VALUES RESULTING FROM A MULTIPLE REGRESSION MODEL ARE NOT THE SAME AS MARKET VALUE AND THAT RELYING EXCLUSIVELY ON REGRESSION MODELING TO DETERMINE THE INDIVIDUALIZED STIGMA DAMAGES DUE TO A DETRIMENTAL CONDITION SUCH AS FLOODING IS LIKELY TO RESULT IN INEQUITABLE DAMAGE CALCULATIONS ..................................................................................9
    1.6    THE FRUITTICHER REPORT IS MISLEADING AND UNRELIABLE AND THE STIGMA IMPACT, IF ANY, IS SIGNIFICANTLY LESS THAN ESTIMATED IN THE FRUITTICHER REPORT.................................................................................10

TABLE OF CONTENTS...................................................................................................................... 14

2.    INTRODUCTION AND PREMISES OF THE APPRAISAL REVIEW ...................................................... 21
    2.1    CLIENT .........................................................................................................................22
    2.2    REVIEW APPRAISER.........................................................................................................22
    2.3    SUBJECT AND PURPOSE OF THE ASSIGNMENT.......................................................................22
    2.4    INTENDED USE AND USERS OF THE APPRAISAL REVIEW ...........................................................23
    2.5    DATE OF WORK UNDER REVIEW .......................................................................................24
    2.6    EFFECTIVE DATE OF OPINION IN WORK UNDER REVIEW ..........................................................24
    2.7    DATE OF APPRAISAL REVIEW SUBMISSION...........................................................................24
    2.8    APPRAISER WHO COMPLETED THE WORK UNDER REVIEW .......................................................24
    2.9    QUALIFICATIONS AND COMPETENCY OF THE REVIEW APPRAISER TO UNDERTAKE THE APPRAISAL REVIEW ASSIGNMENT .........24
    2.10   REAL ESTATE APPRAISERS AND APPRAISALS IN FLORIDA MUST COMPLY WITH THE *UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE*................................................................................................27
    2.11   DEFINITION OF APPRAISAL REVIEW ....................................................................................28
    2.12   DEFINITION OF MARKET VALUE.........................................................................................28
    2.13   OTHER DEFINITIONS IMPORTANT TO THE APPRAISAL REVIEW ASSIGNMENT .................................29
    2.14   USPAP REQUIRED CONTENT OF AN APPRAISAL REVIEW .........................................................33
    2.15   TYPE OF APPRAISAL REVIEW CONDUCTED AND USPAP ADVISORY OPINION AO-20 .....................34
    2.16   SCOPE OF THE APPRAISAL REVIEW ASSIGNMENT ..................................................................35
    2.17   SPECIAL ASSUMPTIONS, HYPOTHETICAL AND LIMITING CONDITIONS REGARDING THE APPRAISAL REVIEW ..........................36

3.   THE GENERALLY ACCEPTED AND RECOGNIZED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE STIGMA ASSOCIATED WITH DETRIMENTAL CONDITIONS INCLUDING ENVIRONMENTAL EVENTS SUCH AS FLOODING ....................................................................................... 38

3.1   COMPONENTS OF THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE................................................39
3.2   THE USPAP REQUIREMENT THAT APPRAISERS USE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR THE PARTICULAR VALUATION ASSIGNMENT.......................................................40
3.3   SOURCES FOR DETERMINING THE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE IMPACT OF DETRIMENTAL CONDITIONS ON PRICES AND VALUES .......................................40
3.4   THE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE IMPACT OF DETRIMENTAL CONDITIONS ON PRICES AND VALUES .......................................................41
3.5   THE SOURCES FOR THE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR UTILIZING REGRESSION MODELING IN THE APPRAISAL PROCESS .......................................................47

4.   TESTING THE ACCURACY AND RELIABILITY OF THE ANALYSIS OF POST-FLOODING STIGMA IN THE FRUITTICHER REPORT ....................................................................................... 49

4.1   SUMMARY OF THE ANALYSIS AND CONCLUSIONS CONCERNING STIGMA IN THE FRUITTICHER REPORT ................................50
4.2   TECHNIQUES AND METHODS USED BY THE REVIEW APPRAISER TO TEST THE ACCURACY AND RELIABILITY OF THE MULTIPLE REGRESSION MODEL AND STIGMA ANALYSIS AND CONCLUSIONS IN THE FRUITTICHER REPORT .........................................51
4.3   THE FRUITTICHER SALES DATA SET IS TOO SMALL GIVEN THE NUMBER OF VARIABLES IN THE FRUITTICHER MODEL..............52
4.4   THE STANDARD ERRORS FOR EACH INDEPENDENT VARIABLE AND THE RESULTING T-VALUES AND P-VALUES IN THE FRUITTICHER MULTIPLE REGRESSION ANALYSIS DEMONSTRATE THE MODEL'S INHERENT UNRELIABILITY IN  PREDICTING VALUES AND STIGMA ....................................................................................................................................54
4.5   ANALYSIS OF THE ACTUAL SALE PRICES PAID SINCE THE APRIL 2014 FLOODING EVENT DEMONSTRATES THE FUNDAMENTAL INACCURACY AND UNRELIABLITY OF THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION..............................................56
4.6   TESTING THE FRUITTICHER MULTIPLE REGRESSION MODEL BY INCLUDING POST-FLOOD EVENT SALES IN THE PROPOSED CLASS AREA IS ADDITIONAL EVIDENCE OF THE INHERENT INACCURACY AND UNRELIABILITY OF THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION ....................................................................................................................................58
4.7   ANALYSIS OF SALES VELOCITY, DAYS ON MARKET, AND SALE PRICE TO LIST PRICE RATIOS ALSO DEMONSTRATES THE FUNDAMENTAL INACCURACIES IN THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION................................................60
4.8   TESTING THE RESULTS OF THE FRUITTICHER ANALYSIS BY COMPARISON TO ACTUAL POST-FLOODING URAR APPRAISAL REPORTS DEMONSTRATES THE FUNDAMENTAL INACCURACIES IN THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION AND PROVES THE NEED FOR INDIVIDUALIZED PROPERTY-BY-PROPERTY ANALYSIS ......................................................61
4.9   THE LINEAR TREND LINE MODELING IN THE FRUITTICHER REPORT CONTAINS SERIOUS ERRORS THAT CAUSE IT TO BE INHERENTLY INACCURATE AND UNRELIABLE ....................................................................................................64
    4.9.1   *Fruitticher "Comparative Analysis" and Conclusions of Value Diminution Due to Stigma that Came from the Flood*..........................................................................................................................64
    4.9.2   *Summary of the Problems in the Fruitticher Trend Line "Comparative Analysis"*................................65
    4.9.3   *Summary of Fruitticher Trends and Stigma Analysis* .........................................................66
    4.9.4   *Reconstruction of the Fruitticher Trend Lines* ...............................................................67
    4.9.5   *Reporting of $R^2$ Shows that All of the Trend Lines Shown in the Fruitticher Report are Statistically Insignificant*..........................................................................................................68
    4.9.6   *Selection of Analysis Period – One Year Before the Flooding to One Year After the Flooding*.............72
4.10  FAILURE OF THE FRUITTICHER REPORT TO CONSIDER THE EFFECT OF GOVERNMENT PROGRAMS AND FLOOD PROTECTION IMPROVEMENTS ON THE FUTURE FLOOD RISKS IN THE PROPOSED CLASS AREA SINCE APRIL OF 2014E ..............................75

5.   TESTING THE ACCURACY AND RELIABILITY OF THE STIGMA CONCLUSIONS IN THE FRUITTICHER REPORT BY COMPARISON TO THE PUBLISHED FLOODING, HURRICANE AND MASS APPRAISAL LITERATURE AND PAST CLARION ASSOCIATES FLOOD IMPACT RESEARCH...................................................................................... 77

5.1   INTRODUCTION TO THE USE OF LITERATURE REVIEWS AND CASE STUDIES IN THE DETERMINATION OF IMPACT OF DETRIMENTAL CONDITIONS AND STIGMA.....................................................................................................78
5.1   SUMMARY OF THE FLOODING IMPACT LITERATURE .............................................................................78

5.2    REVIEW OF THE LITERATURE ON USE OF MASS APPRAISAL METHODS ..........................................................................82
5.3    PAST CLARION ASSOCIATES FLOODING IMPACT RESEARCH ............................................................................88
    *5.3.1    Review of Mass Appraisal Modeling Difficulties in Determining Flood Damaged Property Values in New Orleans in the Wake of Hurricane Katrina* ......................................................................................89
    *5.3.2    Analysis of Prices for Flood Remediated Homes in Mandeville, Louisiana* ..........................................90
    *5.3.3    Analysis of Prices Paid for Flood Remediated Homes in Milwaukee, Wisconsin*.................................93

**6.    THE FRUITTICHER REPORT FAILS TO COMPLY WITH GENERALLY ACCEPTED STANDARDS AND METHODS FOR DETERMINING THE EFFECT OF A DETRIMENTAL CONDITION ON MARKET VALUE ........................................ 98**
6.1    THE CONCLUSION CONCERNING ENVIRONMENTAL STIGMA IN THE FRUITTICHER REPORT IS NOT SUPPORTABLE....................99
6.2    THE APPROPRIATE STIGMA CONCLUSIONS THAT RESULT FROM OUR REVIEW, ANALYSIS AND TESTING OF THE FRUITTICHER MULTIPLE REGRESSION MODELING AND MASS APPRAISAL METHODS .......................................................................100
6.3    THE FRUITTICHER REPORT FAILS TO COMPLY WITH GENERALLY ACCEPTED STANDARDS FOR THE APPRAISAL OF PROPERTIES IMPACTED BY DETRIMENTAL CONDITIONS AND POSSIBLE ENVIRONMENTAL STIGMA......................................................102

**7.    EVIDENCE OF BIAS AS DEFINED BY USPAP IN THE FRUITTICHER REPORT ................................................. 104**
7.1    DEFINITION OF BIAS IN THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE............................................105
7.2    EVIDENCE OF BIAS IN THE FRUITTICHER REPORT .....................................................................................106

**8.    SUMMARY OF CONCLUSIONS FROM REVIEW OF THE FRUITTICHER REPORT ......................................... 107**
8.1    CLARION CONCLUSIONS: THE FRUITTICHER REPORT IS MISLEADING AND UNRELIABLE AND THE STIGMA IMPACT, IF ANY, IS SIGNIFICANTLY LESS THAN ESTIMATED IN THE FRUITTICHER REPORT .........................................................................108

**9.    ADDENDA ...................................................................................................................................... 112**
9.1    CERTIFICATION...................................................................................................................................113
9.2    ASSUMPTIONS AND LIMITING CONDITIONS...............................................................................................116
9.3    QUALIFICATIONS ................................................................................................................................121
9.4    USPAP ADVISORY OPINION (AO-18) .................................................................................................135
9.5    APPRAISAL INSTITUTE GUIDE NOTE 10 ................................................................................................143
9.6    STATEMENT OF COMPENSATION............................................................................................................150
9.7    RODDEWIG DEPOSITION AND TRIAL TESTIMONY.......................................................................................152
9.8    TABLES SHOWING AVERAGE AND MEDIAN MARKETING TIME ......................................................................154
9.9    APPRAISAL DOCUMENTS, 2023 JOSHUA DRIVE & 10050 BRISTOL PARK ROAD PROVIDED BY M. EUGENE PRESSLEY, MAI, SRA OF PRESLEY - MCKENNEY & ASSOCIATES, INC. .............................................................................157
9.10   LIST OF DOCUMENTS RELIED UPON ......................................................................................................174

*Appraisal Review Report*                                  *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

**Subject Overview Maps**

*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*
                                              *316 Homes in a Proposed Class Area in Escambia County, Florida*





*Appraisal Review Report*                                    *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

**USGS Topographical Map of Plaintiff Property Area FLOODPLAIN**



**2.   INTRODUCTION AND PREMISES OF THE APPRAISAL REVIEW**

### 2.1   CLIENT

Moore, Hill & Westmoreland, P.A.

c/o Mr. Larry Hill

350 West Cedar Street, Suite 100
Pensacola, Florida 32502

As Outside Counsel for Defendants International Paper Company Partnership

### 2.2   REVIEW APPRAISER

Richard J. Roddewig, MAI, CRE, FRICS
President, Clarion Associates, Inc.
Florida State Certified General Real Estate Appraiser # RZ3166

Clarion Associates, Inc.
The Inland Steel Building
30 West Monroe Street, Suite 810
Chicago, Illinois  60603
(312) 630-9400

The qualifications of the review appraiser are provided in the Addenda.

### 2.3   SUBJECT AND PURPOSE OF THE ASSIGNMENT

The subject of this Appraisal Review is an Appraisal Report prepared by Tom Fruitticher, MAI, of Fruitticher-Lowery Appraisal Group (hereinafter, "the **Fruitticher Report**").  The Fruitticher Report is dated August 7, 2015.  It was submitted on behalf of the Plaintiffs in litigation entitled *John Navelski, et al. v. International Paper Company.*

The purposes of this appraisal review assignment are as follows:

- First, to explain the generally accepted and recognized methods of the appraisal profession for analyzing the impacts of detrimental conditions and environmental events such as flooding on prices and values of single-family homes and for quantifying the resulting environmental "stigma," if any;

- Second, to review and summarize the previously published professional literature on the effects of flooding on prices and values;

- Third, to review the Fruitticher Report for compliance with those generally accepted and recognized methods of the appraisal profession for determining "stigma," including compliance of the Fruitticher Report with the *Uniform Standards of Professional Appraisal Practice*;

- Fourth, to compare the Fruitticher opinions of market value before and after considering possible environmental "stigma" to the actual prices paid for some of the 316 homes in the proposed Class Area since the date of the April 2014 flooding event in order to evaluate the accuracy and reliability of the stigma conclusions reached in the Fruitticher Report;

- Fifth, to test the general accuracy and reliability of the regression model and price trend analyses utilized in the Fruitticher Report;

- Sixth, to compare the outcome of the multiple regression model utilized in the Fruitticher Report to the results of individualized property appraisal reports that would be used in the actual marketplace of buyers, sellers, and mortgage lenders;

- Seventh, to summarize some of the published literature on the inherent problems associated with mass appraisal modeling;

- Eighth, to summarize our research into the methods used to arrive at post-flooding market values in New Orleans post-Katrina and to summarize our research into the effects of flooding on prices and values in other areas of the United States;

- Ninth, to arrive at conclusions concerning the overall reliability of the Fruitticher Report in determining the appropriate damages, if any, that should be paid to the individual homeowners in the proposed Class Area; and

- Tenth, to provide my opinion as to whether property-by-property analysis is more appropriate than a mass appraisal technique in determining the post-flooding stigma resulting from the flooding event of April of 2014 in the proposed Class Area.

## 2.4    INTENDED USE AND USERS OF THE APPRAISAL REVIEW

This Appraisal Review was prepared for Moore, Hill & Westmoreland, P.A., as counsel to International Paper Company in the matter of *John Navelski, et al. v. International Paper Company*, *Case No. 3:14-cv-00445*, in the United States District Court, Northern District of Florida, Pensacola Division.

This Appraisal Review is intended to be used in the federal district court proceeding. Intended users are the court handling the litigation and the attorneys for the Defendants. Attorneys for the plaintiff property owners are also expected to use this Appraisal Review report.

### 2.5    DATE OF WORK UNDER REVIEW

The Fruitticher Report is signed and dated August 7, 2015. We received a copy of the Fruitticher Report on August 9, 2015.

### 2.6    EFFECTIVE DATE OF OPINION IN WORK UNDER REVIEW

The Fruitticher Report states that it determines the "diminution in market value" of the 316 homes as of April 29, 2014. (Fruitticher Report p. v).

### 2.7    DATE OF APPRAISAL REVIEW SUBMISSION

This Appraisal Review is submitted as of September 11, 2015.

### 2.8    APPRAISER WHO COMPLETED THE WORK UNDER REVIEW

The Certification in the Fruitticher Appraisal is signed by Tom Fruitticher, MAI.

### 2.9    QUALIFICATIONS AND COMPETENCY OF THE REVIEW APPRAISER TO UNDERTAKE THE APPRAISAL REVIEW ASSIGNMENT

The Clarion Associates review appraiser is Richard J. Roddewig, MAI, CRE, FRICS.

Mr. Roddewig is President of Clarion Associates, Inc., one of the most experienced firms in the United States in evaluating the effect of detrimental conditions and environmental stigma on real estate prices, values, and marketability.

Mr. Roddewig has determined the impact on market value and real estate markets of a wide variety of detrimental conditions and environmental risks. Among the states in which he has worked on such assignments are the following: Alaska, Hawaii, Washington, California, New Mexico, Colorado, Wyoming, Texas, Kansas, Oklahoma, Tennessee, Louisiana, Mississippi, Alabama, Florida, Georgia, South Carolina, North Carolina, Maryland, Pennsylvania, Ohio, West Virginia, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Maine, Michigan, Indiana, Illinois, Wisconsin, Minnesota, and Missouri. He has investigated the real estate impacts of such environmentally sensitive activities as oil spills, industrial emissions and contamination, sanitary landfills, hazardous waste disposal sites, quarries, power plants, electrical transmission lines, wind farms, airports, and building in flood zones. He has researched and analyzed the impact on property values resulting from flooding, groundwater contamination, soil contamination, vapor intrusions, and air emissions. Among the types of

hazardous or toxic materials potentially affecting the market values of properties he has analyzed to determine their real estate market impacts have been the following:  mold, lead, heavy metals, chlorinated solvents, PCBs, furans and dioxins, sulphur, crude oil, fuel oil, diesel fuel, TCE/PCE, radon, and various polyaromatic hydrocarbons (PAHs) and volatile organic compounds (VOCs) including MTBE.

Mr. Roddewig holds the MAI designation from the Appraisal Institute (the largest organization of professional real estate appraisers in the United States) and the CRE designation from The Counselors of Real Estate.  He has also been designated as a Fellow with the Royal Institute of Chartered Surveyors (FRICS).

Mr. Roddewig has more than 35 years' experience as a real estate appraiser. The types of properties Mr. Roddewig has analyzed or appraised in relationship to detrimental conditions or environmental risks potentially affecting their marketability or value include the following: single-family homes, apartment buildings, townhouses, hotels, nursing homes, office buildings, industrial plants, warehouses, gas stations, shopping centers, radio broadcasting facilities, restaurants and night clubs, landfills, and undeveloped land (residential, commercial, retail, industrial and agricultural).

Mr. Roddewig has authored, co-authored, or edited 12 books, and has authored or co-authored more than 50 articles in professional publiscations including *The Appraisal Journal*.  He has also developed seminars and courses for the Appraisal Institute and served on special committees of The Appraisal Institute.  Among those activites have been the following:

- In 1993, the Appraisal Institute selected Richard Roddewig and Gary Papke of Clarion Associates to jointly develop an educational seminar entitled *Environmental Risk and the Real Estate Appraisal Process*.  He subsequently taught that course across the country.

- Between 1996 and 2002 Mr. Roddewig was the regular environmental columnist for *The Appraisal Journal*, the professional publication of The Appraisal Institute.

- In 1996, the Appraisal Institute awarded Mr. Roddewig the annual Sanders A. Kahn Award as "the author who develops the best example of a thought-provoking presentation on concepts and practical problems facing the appraisal and real estate industries." The award was given for Mr. Roddewig's article in *The Appraisal Journal* entitled "Stigma, Environmental Risk and Property Values: 10 Critical Inquiries."

- In 2000, Mr. Roddewig served on the Appraisal Institute *Special Task Group for the Development of Standards for Determining the Acceptability of Applications for Statistical and Market Survey Techniques to the Valuation of Real Property*.

Case 3:14-cv-00445-MCR-CJK   Document 80-1   Filed 04/13/16   Page 32 of 181

*Appraisal Review Report*                          *John Navelski, et al. v. International Paper Company*
                                                  *316 Homes in a Proposed Class Area in Escambia County, Florida*

- In 2001 Mr. Roddewig and Mr. Papke updated their 1993 Appraisal Institute seminar, renamed *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma*.

- In 2002, Mr. Roddewig was asked by the Appraisal Institute to edit an anthology of *Appraisal Journal* articles published by the Appraisal Institute in a book titled *Valuing Contaminated Properties: An Appraisal Institute Anthology*.

- The latest 2010 Appraisal Institute seminar on proper techniques for determining environmental stigma incorporates much of the earlier 2001 seminar developed by Mr. Roddewig and Mr. Papke.

- In 2013, Mr. Roddewig together with his Clarion colleagues Charles T. Brigden and Gary R. Papke received the William S. Ballard Award from the Counselors of Real Estate as the authors "whose work best exemplifies the high standards of content maintained by *Real Estate Issues*, the professional journal published by The Counselors of Real Estate." The award was given for their article entitled "Determining Real Estate Damages from Natural Disasters: Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina."

- In 2014, the Appraisal Institute published Mr. Roddewig's second volume of the 2002 Anthology, incorporating the published appraisal literature since 2002 related to stigma resulting from environmental conditions.

Mr. Roddewig has regularly conducted appraisal reviews in assignments for a wide variety of clients including financial institutions, governmental agencies such as the Internal Revenue Service and the Department of Justice, and law firms across the United States. In the past 20 years, Mr. Roddewig has prepared and produced approximately 30 appraisal review reports, many of which involved appraisal review assignments involving properties potentially impacted by environmental risk and stigma.

Mr. Roddewig has also been a designated expert in cases involving determination of the impact of detrimental conditions including environmental conditions and stigma on property values and markets. A number of these cases have been class actions and some have included claims for damages due to flooding impacts. The largest of the flooding cases in which Mr. Roddewig has been involved as an expert witness related to the appropriate techniques for determining the stigma impact of flooding was *In Re: Katrina Canal Breeches Consolidated Litigation*, Civil Action No. 05-4182 "K" in the United States District Court for the Eastern District of Louisiana.

Mr. Roddewig is a Florida licensed certified general real estate appraiser and much of his real estate appraisal work in the past 15 years has been in Florida. During that period of time, he has been involved in appraisals and market studies involving more than 10,000 homes and land parcels in more than 25 Florida counties including the following: Nassau, Duval, Clay, St. Johns,

Putnam, Volusia, Lake, Seminole, Orange, Brevard, Polk, Osceola, Pasco, Hillsborough, Indian River, Manatee, Sarasota, DeSoto, St. Lucie, Martin, Lee, Collier, Palm Beach, Broward, Miami-Dade, and Escambia. Total value of the single-family homes involved in the Florida appraisal assignments in which Mr. Roddewig during the past 15 years is in excess of $800.0 million. A number of these assignments in Florida have involved determinations of the stigma resulting from various types of detrimental conditions.

Mr. Roddewig has the qualifications and experience to prepare an appraisal review related to the impact of the environmental conditions related to the flooding event of April 2014 in the Pensacola area on real estate prices and values, and is therefore competent to undertake this assignment under the *Uniform Standards of Professional Appraisal Practice*.

A more complete description of the qualifications of the review appraiser is included in the Addenda.

**2.10   REAL ESTATE APPRAISERS AND APPRAISALS IN FLORIDA MUST COMPLY WITH THE *UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE***

As a result of the savings and loan industry crisis in the mid-to-late 1980s, the appraisal profession concluded that a set of industry-recognized professional appraisal standards was needed. In 1986, nine leading professional appraisal organizations formed an Ad Hoc Committee on the *Uniform Standards of Professional Appraisal Practice* (USPAP). The Appraisal Foundation was founded in 1987 to implement the new standards. Its Appraisal Standards Board adopted USPAP in January of 1989.

Congress also saw the need for professional appraisal standards in the wake of the savings and loan crisis. FIRREA stipulated that all real estate appraisals used in conjunction with federally related transactions must be performed in accordance with USPAP. A federally related real estate transaction is one in which a federal financial institution engages in, contracts for, or regulates and requires the services of an appraiser. The federal financial institutions include the Federal Reserve Board, the Office of the Comptroller of the Currency (OCC), the Office of Thrift Supervision (OTS), the Federal Deposit Insurance Corporation (FDIC), and the National Credit Union Administration (NCUA).

Some states have gone even further and require that all licensed and/or certified appraisers must comply with USPAP in every appraisal assignment. Most voluntary professional appraisal organizations also require USPAP compliance by their members.

Florida requires all real property appraisals to be done in accordance with USPAP.[22]

---

[22]  Florida Administrative Code, Department of Business and Professional Regulation, Chapter 61J1-9.001.

## 2.11  DEFINITION OF APPRAISAL REVIEW

The "Definitions" Section of USPAP defines an "appraisal review" as "the act or process of developing and communicating an opinion about the quality of another appraiser's work."[23]

## 2.12  DEFINITION OF MARKET VALUE

The Fruitticher Report (page 4) uses the following definition of "market value" taken from the 13th Edition of *The Appraisal of Real Estate*:

> "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> 1. Buyer and seller are typically motivated;
>
> 2. Both parties are well informed or well advised and each acting in what they considers their own best interest;
>
> 3. A reasonable time is allowed for exposure in the open market;
>
> 4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto;
>
> 5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

For purposes of this Appraisal Review, we have used the same definition.  We note, however, that the 13th Edition of *The Appraisal of Real Estate* relied on by Fruitticher was published in 2008 and the edition in effect on the date that the Fruitticher Report was prepared was the 14th Edition published in 2013.  The wording of the definition of market value as used by federal agencies and referenced in the Fruitticher Report changed slightly between the 13th Edition published in 2008 and the 2013 14th Edition.

---

[23] *Uniform Standards of Professional Appraisal Practice (USPAP)*, 2014-2015 Edition, p. U-1, Lines 23-24.

**2.13  OTHER DEFINITIONS IMPORTANT TO THE APPRAISAL REVIEW ASSIGNMENT**

The *Dictionary of Real Estate Appraisal* (5th Edition) published by the Appraisal Standards Board contains a number of important definitions, including the following that are specifically applicable to this review assignment:

> **"environmental risk.**   The additional or incremental risk that may exist for investing in, financing, buying, or owning property attributable to the property's actual or perceived environmental condition." (p. 326)

> "**unimpaired value**. The market value of a property prior to some event that adversely affects its value when compared with the 'before condition.'" (p. 332)

> "**diminution in value**. The difference between the unimpaired and impaired values of a property; when applied to an environmental condition, generally measured as the difference between the market values in the before and after conditions." (p. 324)

> "**impaired value**:  The value of property in its 'after condition' following some event that adversely affects its value when compared with the 'before condition.'  Generally measured in terms of differences in market value." (p. 328)

> "**as is market value**. The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date." (p. 12)

Also of significance to this assignment are the following definitions from the Second Edition of *Real Estate Damages* published by The Appraisal Institute:

> "**detrimental condition**.  Any issue or condition that may cause a diminution in value to real estate." (p. 374)

> "**detrimental condition stages**.  The three stages of a detrimental condition analysis, specifically, the assessment, repair, and ongoing stages." (p. 374)

> "**assessment stage**.  The first stage of a detrimental condition analysis.  It includes all costs and losses of income." (p. 372)

> "**repair stage**. The second stage in detrimental condition analysis.  It includes all the costs of repairs or remediation resulting from the a detrimental condition, including incidental costs, contingencies, use issues, and project incentive." (p. 382)

"**ongoing stage**. The third stage in a detrimental condition analysis. It includes all costs associated with a damaged property after all repairs or remediation have been completed -- e.g., additional financing or insurance costs, use, and market resistance." (p. 380)

"**stigma**. *See* **market resistance**, **project incentive**, *or* **uncertainty factor**." (p. 384)

"**market resistance**. The risk, if any, associated with the ongoing stage of a detrimental condition analysis. Market resistance includes the reluctance on the part of the real estate market to buy a property that has historically been damaged or tainted. Sometimes called *stigma*." (p. 379)

"**uncertainty factor**. The risks, if any, associated with the assessment stage of a detrimental condition analysis." (p. 385)

"**use issues**. All losses associated with the use of the property during the assessment, repair, and ongoing stages of a detrimental condition analysis." (p. 386)

Other terms and definitions important to the assignment include the following:

- **R-squared (also designated as $r^2$ or $R^2$ or called the coefficient of determination (COD))** -- "a mathematical representation of the proportion of the variation in y [the dependent variable] accounted for by the multiple linear regression equation."[24] A regression modeling manual on the Tennessee government website explains it in simpler terms: "One of the measures of how well the model explains the data is the $R^2$ value. Differences between observations that are not explained by the model remain in the error term. The $R^2$ value tells you what percent of those differences is explained by the model. An $R^2$ of .68 means that 68% of the variance in the observed values of the dependent variable is explained by the model, and 32% of those differences remains unexplained in the error term."[25]

- **Adjusted R-squared** -- "The **adjusted R-squared** is a modified version of **R-squared** that has been **adjusted** for the number of predictors in the model."[26] "Simply put, R is the correlation between the predicted values and the observed

---

[24] Appraisal Institute, *Quantitative Analysis*, (Version PC502GDCH-D) (2012),Part 10-286.

[25] http://webcache.googleusercontent.com/search?q=cache:6QPg0HKgsLgJ:www.state.tn.us/tacir/Fiscal%2520Capa%20city/Workshop/Regression%2520Analysis%2520Handout%2520(Methodology%2520Part%25201).ppt+&cd=1&hl=en&ct=clnk&gl=us

[26] http://blog.minitab.com/blog/adventures-in-statistics/

values of Y. R square is the square of this coefficient and indicates the percentage of variation explained by your regression line out of the total variation. This value tends to increase as you include additional predictors in the model. Thus, one can artificially get higher R square by increasing the number of Xs in the model. To penalize this effect, adjusted R square is used. When you compare models with their complexity, you should then rely on Adj R square."[27]

"The adjusted R-squared compares the explanatory power of regression models that contain different numbers of predictors.

Suppose you compare a five-predictor model with a higher R-squared to a one-predictor model. Does the five predictor model have a higher R-squared because it's better? Or is the R-squared higher because it has more predictors? Simply compare the adjusted R-squared values to find out! . . The adjusted R-squared increases only if the new term improves the model more than would be expected by chance."[28]

- **_t_-value** and **_p_-value** -- "the t-value is simply the coefficient valued divided by the standard error of the coefficient. The larger the *t*-value, the better. The corresponding *p* (i.e., probability) value reflects the probability that the coefficient value is spurious and the independent variable does not contribute to the equation. The smaller the *p*-value is, the better. Since *p* is a function of *t*, as *t* increases in value *p* diminishes."[29] Another on-line explanation defines p-value in simpler terms: "Each independent variable has another number attached to it in the regression results . . . its 'p-value' or significance level. The p-value is a percentage. It tells you how likely it is that the coefficient for that independent variable emerged by chance and **does not** describe a real relationship. A p-value of .05 means that there is a 5% change that the relationship emerged randomly and a 95% chance that the relationship is real. It is generally accepted practice to consider variables with a p-value of less than .1 as significant, though the only basis for this cutoff is convention." [30]

---

[27] http://www.researchgate.net/post/What_does_R_square_Adjusted_R_and_R_indicate_in_terms_of_Multiple_Regression_Analysis.

[28] http://blog.minitab.com/blog/adventures-in-statistics/multiple-regession-analysis-use-adjusted-r-squared-and-predicted-r-squared-to-include-the-correct-number-of-variables

[29] M. S. Kane, M. R. Linne, MAI, CRE, CAE, ASA, and J. A. Johnson, MAI, *Practical Applications in Appraisal Valuation Modeling: Statistical Methods for Real Estate Practitioners*, The Appraisal Institute, 2004, p. 154.

[30] http://webcache.googleusercontent.com/search?q=cache:6QPg0HKgsLgJ:www.state.tn.us/tacir/Fiscal%2520Capacity/Workshop/Regression%2520Analysis%2520Handout%2520(Methodology%2520Part%25201).ppt+&cd=1&hl=en&ct=clnk&gl=us

"**P value**.  The probability that each individual variable does not significantly contribute to the model."[31]

- "**Probabilit**y.  The likelihood that a specific event will occur."[32]

- "**Slope (coefficients)**. The amount of contribution attributable to the independent variable."[33]

- **standard deviation and standard error** -- "the standard deviation is the square root of the variance, and the variance of a population is the arithmetic mean of all of the squared deviations from the population mean of members of the population."[34]  "The standard deviation provides a nominal measure of dispersion.  That is, the larger the standard deviation, the greater the dispersion from the mean."[35]  "Put simply, the **standard error** of the sample is an estimate of how far the sample **mean** is likely to be from the population **mean**, whereas the **standard deviation** of the sample is the degree to which individuals within the sample differ from the sample **mean**."[36]

- **F-statistic or Significance F value** --  "There is also a significance level for the model as a whole.  This is the 'Significance F' value in Excel; some other statistical programs call it by other names.  This measures the likelihood that the model as a whole describes a relationship that emerged at random, rather than a real relationship.  As with the p-value, the lower the significance F value, the greater the chance that the relationships in the model are real."[37]

---

[31]  Appraisal Institute, *Residential Applications: Using Technology to Measure and Support Assignment Results*, (2011) Part 5-77.
[32]  Appraisal Institute, *Residential Applications: Using Technology to Measure and Support Assignment Results*, (2011) Part 5-76.
[33]  Appraisal Institute, *Residential Applications: Using Technology to Measure and Support Assignment Results*, (2011) Part 5-77.
[34] Appraisal Institute, *Quantitative Analysis*, (Version PC502GDCH-D) (2012),Part 4-70.
[35] Appraisal Institute, *Quantitative Analysis*, (Version PC502GDCH-D) (2012),Part 4-75.
[36]  https://en.wikipedia.org/wiki/Standard_error.  Another online comment puts the difference as follows: "Standard deviation is a measure of dispersion. When you are looking at individual datapoints, standard deviation gives you a measuring tool to put a probability value on the difference of the datapoint and the mean of the population.
Standard error is EXACTLY the same thing... a measure of dispersion... only not for individual datapoints but sample means. When you take a sample of a certain size "n", the mean of that sample is measured against the population mean using standard error as the measuring stick instead of standard deviation." http://www.talkstats.com/showthread.php/6596-Standard-error-v-standard-deviation
[37] http://webcache.googleusercontent.com/search?q=cache:6QPg0HKgsLgJ:www.state.tn.us/tacir/Fiscal %2520Capacity/Workshop/Regression%2520Analysis%2520Handout%2520(Methodology%2520Part%25201).ppt+ &cd=1&hl=en&ct=clnk&gl=us

- **ANOVA** -- This is an acronym for "Analysis of Variance." It is a calculation that compares means across populations.  The other abbreviations in an Excel ANOVA presentation are as follows: *df* (degrees of freedom); *SS* (sum of squares); *MS* (mean square); and *F* (F-statistic).  The *df* is the number of independent variables minus 1 (the intercept).  *SS* is the sum of the squares of the deviation from the mean for the total sample.  The mean square equals *SS/df*.

### 2.14   USPAP REQUIRED CONTENT OF AN APPRAISAL REVIEW

The *Uniform Standards of Professional Appraisal Practice* (USPAP) address the review of appraisal <u>components</u> separately from the review of the overall <u>report</u>.

**USPAP Standards Rule 3-3(a),** requires the reviewer to do the following in the review of analyses, opinions, and conclusions:

> "(i) develop an opinion as to whether the analyses are appropriate within the context of the requirements applicable to that work;

> (ii) develop an opinion as to whether the opinions and conclusions are credible within the context of the requirements applicable to that work; and

> (iii) develop the reasons for any disagreement.

> *Comment: Consistent with the reviewer's scope of work, the reviewer is required to develop an opinion as to the completeness, accuracy, adequacy, relevance, and reasonableness of the analysis in the work under review, given law, regulations, or intended user requirements applicable to the work under review."*[38]*(emphasis added)*

**USPAP Standards Rule 3-3(b),** requires the reviewer to do the following in the review of a report:

> "(i) develop an opinion as to whether the report is appropriate and not misleading within the context of the requirements applicable to that work; and

> (ii) develop the reasons for any disagreement.

> *Comment: Consistent with the reviewer's scope of work, the reviewer is required to develop an opinion as to the completeness, accuracy, adequacy, relevance, and reasonableness of the report, given law, regulations, or intended user requirements applicable to that work."*[39] *(emphasis added)*

---

[38]   USPAP, 2014-2015 Edition, p. U-30, Lines 971-979.
[39]   USPAP, 2014-2015 Edition, p. U-31, Lines 981-986.

This appraisal review assignment **DOES NOT** include the reviewer's own opinion of market value of the real property that is the subject of the Fruitticher Report. Nor does it include the reviewer's opinion of the stigma impact on any one of the 316 individual homes included in the proposed Class Area, other than first, to comment on whether the Fruitticher conclusions concerning stigma impact are supportable on a property-by-property basis given the prices on the subset of homes that have subsequently sold since the 2014 flooding event, and, second, to comment on the likely range in possible stigma impacts and whether the stigma impacts, if any, are likely to be temporary rather than permanent.

### 2.15  TYPE OF APPRAISAL REVIEW CONDUCTED AND USPAP ADVISORY OPINION AO-20

The Appraisal Institute differentiates between a "desk review" and a "field review."  A desk review is defined by *The Dictionary of Real Estate Appraisal* (4th Edition) as follows:

> "An appraisal review that is limited to the data presented in the report which may or may not be independently confirmed.  A desk review is generally performed using a customized checklist of items. The reviewer checks the accuracy of the calculations, the reasonableness of the data and the appropriateness of the methodology as well as compliance with client guidelines, regulatory requirements, and professional standards.  See also, **appraisal review**; **field review**."

The 5th Edition of *The Dictionary of Real Estate Appraisal* simply states that a "desk review" is "an appraisal review in which the reviewer's scope of work does not include an inspection of the subject property."

A "field review" is defined by *The Dictionary of Real Estate Appraisal* (5th Edition) as follows:

> "An appraisal review for which the scope of work includes inspection of the exterior and sometimes the interior of the subject property and possibly inspection of the comparable properties to confirm the data provided in the report.  A field review is generally performed using a customized checklist that covers the items examined in a desk review and may also include confirmation of market data, research to gather additional data, and verification of the software used in preparing the report. *See also*, appraisal review; desk review."

This appraisal review assignment, as undertaken by Clarion Associates, is a field review rather than a desk review because the review appraiser has conducted an exterior inspection of the homes in the proposed Class Area that is the subject of the Fruitticher Report and has also checked the accuracy of some of the market data used in the Fruitticher Report.

This appraisal review assignment is also, however, a technical review rather than an administrative review since we have developed an opinion concerning the appropriateness and reasonableness of the Fruitticher Report analysis, opinions, and conclusions.[40]

As part of an appraisal review, it is appropriate to comment on apparent violations of the *Uniform Standards of Professional Appraisal Practice* in the Fruitticher Report.  The need for a review appraiser to comment on violations of professional standards was reiterated in Advisory Opinion 20 (AO-20) issued by the Appraisal Standards Board on July 10, 2000, which suggests that a reviewing appraiser include a statement in the appraisal review as to whether or not "the content, analyses, and conclusions stated in the report under review are (or are not) in compliance with applicable standards and requirements." (USPAP, 2014-2015 Edition, AO-20, Lines 175-176, p. A-61).

### 2.16  SCOPE OF THE APPRAISAL REVIEW ASSIGNMENT

USPAP defines scope of work as "the type and extent of research and analyses in an assignment."  Additionally, *The Appraisal of Real Estate* includes the following discussion of the importance of the scope of work to an appraisal assignment:

> "Scope of work for an assignment is acceptable if it leads to credible assignment results, is consistent with the expectations of parties who are regularly intended users for similar assignments, and is consistent with what the actions of the appraiser's peers would be in the same or similar assignment," (*The Appraisal of Real Estate*, Thirteenth Edition, page 135).

The scope of this appraisal review assignment involved the following:

- Detailed reading and evaluation of the Fruitticher Report;

- Review of documents and data included, referenced or footnoted in the Fruitticher Report as well as documents and spreadsheets produced by Mr. Fruitticher;

- Review of Multiple Listing Service sales data both before as well as after the flooding event of April 2014;

---

[40] Former Advisory Opinion 6 (AO-6) of USPAP distinguished between a "technical review" and an "administrative review."  According to AO-6, "a technical review is work in accordance with STANDARD 3 for the purpose of '. . . develop[ing] an opinion as to whether the analyses, opinions, and conclusions are appropriate and reasonable, given the scope of work applicable in the assignment, and develop[ing] the reasons for any disagreement." Administrative reviews, by contrast, are conducted by clients or users of appraisal services in the course of making business decisions.  Under that prior Advisory Opinion, this Appraisal Review Report would be classified as a technical review.  Advisory Opinion 6 (AO-6) was added June 2, 1992, and was in effect until June 15, 2004, when it was retired by The Appraisal Standards Board of The Appraisal Foundation.

- Reading of the transcript of the Frutticher deposition taken on August 27, 2015;

- Replication and testing of the Excel based regression model utilized in the Fruitticher Report and analysis;

- Review of articles published in *The Appraisal Journal* on regression modeling and "multiple regression analysis" and the appraisal of real property affected by detrimental conditions and environmental stigma;

- Exterior inspection of the 316 homes that are the subject of the Fruitticher Report from the streets on which they are located;

- Inspection of the market area in which the 316 homes are located;

- Review of the 2014-2015 Edition of the *Uniform Standards of Professional Appraisal Practice* (USPAP);

- Review of the 14th Edition of *The Appraisal of Real Estate* and the 4th and 5th Edition of *The Dictionary of Real Estate Appraisal*, both published by the Appraisal Institute;

- Review of courses, seminars and books of the Appraisal Institute related to regression modeling and to the appraisal of real property affected by detrimental conditions and stigma;

- Internet research related to mulitple regression modeling;

- Collection and review of published literature related to mass appraisal modeling and to the impacts of flooding events on prices and values;

- Internet research and review related to various news stories concerning the flooding event of April 2014;

- Review of past Clarion research concerning single-family homes impacted by flooding events and post-flooding stigma; and

- Preparation of this Appraisal Review.

### 2.17  SPECIAL ASSUMPTIONS, HYPOTHETICAL AND LIMITING CONDITIONS REGARDING THE APPRAISAL REVIEW

*The Assumptions and Limiting Conditions related to this assignment are included following the Certification in the Addenda to this report.*

*This Appraisal Review is based on our analysis of statements, data and information contained in the Appraisal Report filed by Tom Fruitticher and dated August 7, 2015.  The Fruitticher Report did not include his supporting documentation.   Mr. Fruitticher has produced only some of his supporting data.  Therefore, the author of this Appraisal Review report reserves the right to amend or supplement this report based on additional review of the supporting documentation produced by Mr. Fruitticher.*

*There are no hypothetical conditions associated with this appraisal review assignment.*

### 3. THE GENERALLY ACCEPTED AND RECOGNIZED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE STIGMA ASSOCIATED WITH DETRIMENTAL CONDITIONS INCLUDING ENVIRONMENTAL EVENTS SUCH AS FLOODING

### 3.1    COMPONENTS OF THE STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE

The standards of professional appraisal practice consist of the following components:

- The *Uniform Standards of Professional Appraisal Practic*e (USPAP) promulgated by The Appraisal Standards Board (ASB) of The Appraisal Foundation.  The 2014-2015 elements of USPAP are as follows: Definitions, a Preamble, Five Rules, and 10 Standards.  Each Standard consists of various Standards Rules and a set of Comments to each.

- Statements on Appraisal Standards which "clarify, interpret, explain, or elaborate on a Rule or Standards Rule."[41]

- Advisory Opinions "a form of guidance issued by the ASB [Appraisal Standards Board] to illustrate the applicability of USPAP in specific situations and to offer advice from the ASB for the resolution of appraisal issues and problems."[42]

- Supplemental Standards "issued (i.e., published) by government agencies, government sponsored enterprises, or other entities that establish public policy."[43]

The Appraisal Standards Board also issues USPAP Frequently Asked Questions, defined as "a form of guidance issued by the ASB to respond to questions raised by appraisers, enforcement officials, users of appraisal services and the public to illustrate the applicability of USPAP in specific situations and to offer advice from the ASB for the resolution of appraisal issues and problems."[44]

In addition, appraisers who are members of the Appraisal Institute, the largest organization of professional real estate appraisers, must also comply with the Supplemental Standards, Code of Professional Ethics, and Guide Notes promulgated by the Appraisal Institute.  These requirements of the Appraisal Institute must be complied with by designated members such as

---

[41]  USPAP, 2014-2015 Edition, Preamble, p. U-5, Lines 182-183.  The Foreword to the 2005 Edition of USPAP at p. II. went on to say: "Statements have the full weight of a Standards Rule and can be adopted by the ASB only after exposure and comment."

[42]  USPAP Advisory Opinions, 2014-2015 Edition, Foreword, p. A-i. The Foreword also says: "Advisory Opinions do not establish new standards or interpret existing standards."

[43]  Prior to 2002, USPAP clearly included additional standards issued by appraisal organizations as part of USPAP. The comment to the 2001 Edition of USPAP stated that the Supplemental Standards "augment USPAP with requirements issued by client groups, governmental entities, and/or professional appraisal organizations that add to the requirements set forth by USPAP." (emphasis added)  Now such requirements by professional appraisal organizations are not officially part of USPAP, but are an additional set of standards that must also be complied with by members of such organizations.

[44]  USPAP, 2014-2015 Edition, p. F-i.

all MAIs.  Mr. Fruitticher holds the MAI designation from the Appraisal Institute and therefore must comply with its supplemental professional standards.

As part of an appraisal review, it is appropriate to comment on apparent violations of the *Uniform Standards of Professional Appraisal Practice.*[45]

### 3.2   THE USPAP REQUIREMENT THAT APPRAISERS USE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR THE PARTICULAR VALUATION ASSIGNMENT

Standards Rule 1-1 of the *Uniform Standards of Professional Appraisal Practice* (USPAP) states that an appraiser must "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal"[46] and USPAP then establishes criteria for determining whether an appraiser has met that requirement.

USPAP states that the appropriateness of an appraiser's work  is measured against what "an appraiser's peers actions would be in performing the same or a similar assignment."[47]   The phrase "an appraiser's peers" is defined in USPAP as "other appraisers who have expertise and competency in a similar type of assignment."[48]   The answer to USPAP Frequently Asked Question 160 entitled "Judging the Actions of An Appraiser's Peers" states that "appraisal journals and publications, professional meetings and conferences, education through courses and seminars, and appraisal discussion groups"[49] are the sources of knowledge about what an appraiser's peers would do in a similar assignment.

### 3.3   SOURCES FOR DETERMINING THE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE IMPACT OF DETRIMENTAL CONDITIONS ON PRICES AND VALUES

The Fruitticher Report purports to determine the post-flooding "stigma" using a combination of mass appraisal multiple regression modeling to "predict" pre-flooding values and simple linear regression trend line analysis to arrive at a "stigma factor" for each of 316 homes in the proposed Class Area.  When the stigma factor is deducted from each pre-flooding predicted value, the result, according to the Fruitticher Report, is the home's post-flooding remediated market value.

---

[45]   This is reiterated in Advisory Opinion 20 (AO-20) issued by the Appraisal Standards Board.  USPAP, 2014-2015 Edition, pp. A-58 to A-63.

[46] USPAP, 2014-2015, Standard 1,  p. U-16, Lines 487-88.

[47] USPAP, 2014-2015, Scope of Work Rule, p. U-14, Lines 433-434.

[48] USPAP, 2014-2015, Definitions, p. U-1, Line 32.

[49] USPAP, 2014-2015,  FAQ 160, p. F-73.

As a result of the methods used in the Fruitticher Report, there are four topics in the courses and peer reviewed publications of the appraisal profession that are central to a review of the appropriateness of the methods applied in the Fruitticher Report.  They are as follows:

- Courses, seminars, books and articles related to analysis of detrimental conditions;

- Courses, seminars, books and articles, as well as an Advisory Opinion included in USPAP, related to analysis of environmental stigma (including stigma due to past, present, or future environmental conditions);

- Courses, seminars, books and articles related to regression modeling; and

- Courses, seminars, books and articles related to mass appraisal.

Also of importance to this review of the Fruitticher Report are Standard 6 of the *Uniform Standards of Professional Appraisal Practic*e entitled *Mass Appraisal, Development and Reporting;* Advisory Opinion 18 (AO-18) entitled "Use of an Automated Valuation Model;" and Guide Note 10 entitled *Developing an Opinion of Market Value in the Aftermath of a Disaster* and published by The Appraisal Institute.

The central source for determining the appropriate methods of the appraisal profession related to stigma due to flooding are the courses, seminars, articles and books related to analysis of the impact of "detrimental conditions" on prices and values.  Flooding is one of the detrimental conditions recognized in those sources.

**3.4    THE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR DETERMINING THE IMPACT OF DETRIMENTAL CONDITIONS ON PRICES AND VALUES**

The appropriate techniques of the appraisal profession related to the determination of flooding impacts on real estate markets, property prices, and market value are set out in the following sources:

- Two books, the first entitled *Real Estate Damages: An Analysis of Detrimental Conditions*[50] and published in 1999 and its sequel published in 2008 and entitled *Real Estate Damages: Applied Economics and Detrimental Conditions;*[51]

- Various courses courses and seminars of the Appraisal Institute including the  course on the analysis of detrimental conditions as well as the course entitled *Environmental Risk*

---

[50]  Randall Bell, MAI, *Real Estate Damages: An Analysis of Detrimental Conditions*, Appraisal Institute, 1999.
[51]  Randall Bell, MAI, Orell C. Anderson, MAI, and Michael V. Sanders, MAI, SRA, *Real Estate Damages: Applied Economics and Detrimental Conditions*, Appraisal Institute, 2008.

**C L A R I O N**

*and the Real Estate Appraisal Process.*  Both of those courses were first developed by the Appraisal Institute in the 1990s and have been updated many times since.

Both editions of the *Real Estate Damages* book reference flooding as a detrimental condition. The Fruitticher Report does not reference any of those sources for the methods used in it.[52]

In 1999, the Appraisal Institute published *Real Estate Damages: An Analysis of Detrimental Conditions*, which set forth a "detrimental condition model" and applied it to a variety of types of detrimental conditions (including environmental contamination) that potentially affect real estate markets and values.  The model stresses that the impact of a detrimental condition has a life cycle that proceeds through an initial impact stage to first, an assessment stage, second, a repair stage, and third and finally, to an ongoing stage.  At each stage, cost, use and risk factors can vary depending upon the "case-by-case" circumstances at play.  As a result, impacts on real estate prices and values can change over time depending upon the stage in the interplay between cost, use and risk factors.

The second edition of the book published in 2008 discusses the same stages and cost, use and risk analysis.  It even more carefully points out how the effect of a detrimental condition, such as flooding, can vary over time.  The date of value is critically important to an analysis of the effect of a detrimental condition on market value: "While all valuation assignments depend on the date of value, the date is an even more important issue for a property impacted by a detrimental condition because the property's value can vary considerably over the three potential stages of a detrimental condition."[53]

Both the first and second editions of the *Real Estate Damages* book emphasize that the adverse impacts of a detrimental condition decrease as the cause is investigated and remediated.  The basic model in the first edition for the recovery of value over time is shown below.[54]

---

[52] On pages 32-33 of his deposition dated 8/27/15, Fruitticher references only relying on the Appraisal Institute course entitled: "Residential Applications Using Technology to Measure and Support Assignment Results."
[53]  Bell, et al. (2008), at pp. 12-13.
[54]  Bell (1999) at p. 15.

**C L A R I O N**



The model from the second edition of the *Real Estate Damages* book as presented at the detrimental conditions seminar at the 2013 annual meeting of the Appraisal Institute is presented below.



The methods for determining the "stigma" impact from detrimental conditions including flooding[55] set forth in the second edition of the *Real Estate Damages: Applied Economics and Detrimental Conditions* book include the following:

- Paired sales analysis including sale/resale analysis;
- Analysis of impaired sales comparables including analysis of market resistance;
- Neighborhood studies including trend line analysis;
- Proximity studies;
- Case study analysis;
- Statistical studies including simple and multiple regression analysis and time series (trend line) analysis;

Two types of "statistical studies" are discussed in the *Real Estate Damages* book: "time series" studies (such as simple linear trend line analysis) and "multiple regression analysis." The Fruitticher Report uses both, although, as discussed later, they are applied inappropriately. The Fruitticher Report does not utilize either sale/resale analysis, neighborhood studies, proximity studies, or case studies.

The second edition of the *Real Estate Damages* book also makes the following points that are particularly relevant to a review of the Fruitticher Report:

- "Failing to research and apply relevant market data is the single most common flaw noted in the analysis of detrimental conditions.  While preconceptions about the analysis of detrimental conditions do exist, questions can only be resolved with relevant market data.  The effect of a detrimental condition cannot be generalized and is unique to a particular market *and the facts of a particular property at a specific date of value*."[56] (emphasis added)

- "The fact that a property is impacted by a detrimental condition does not automatically mean that it has a material impact on the property's value. Detrimental conditions may or may not cause a material impact on value. *Frequently, detrimental conditions have no material impact on value whatsoever.*[57] (emphasis added)

---

[55] Flooding is characterized in the book as Detrimental Condition Class X which includes "natural disaster and weather issues, i.e., flood, hurricane, typhoon, wildfire, seismic, volcano, tornado, global warming, tsunami, famine, drought, storms, etc."  Bell, et al. (2008) at 21.

[56] Bell, et al. (2008), at p. 235.

[57] Bell, et al. (2008), at p. 238.

**C L A R I O N**

- In the analysis of detrimental conditions, it is important that the appraiser be knowledgeable about available tools, properly select and apply those tools, avoid unproven or suspect methodologies, and ultimately have relevant market data to support opinions and conclusions."[58]

Analysis of the "stigma" or risk (also termed "market resistance" in the *Real Estate Damages* book) following the remediation or repair of a detrimental condition such as flooding is a critical part of the analysis. The second edition of the book *Real Estate Damages: Applied Economics and Detrimental Conditions* says the following about the analysis of stigma:

> "There may be risks, as perceived by the market, associated with each applicable stage. These risks are sometimes referred to as stigma, a somewhat non-specific term relating to adverse public perceptions. Risks may be temporary or permanent in nature, depending on the analysis of empirical market data; however, most appraisal assignments require a risk measurement as of a specific date of value."[59]

The Fruitticher Report states that his final "value loss is strictly associated with the stgma resulting from the flood" and that "any demolition and repair work would be extra costs that were not considered in this report." (Fruitticher Report, page v.).

The *Real Estate Damages* book emphasizes the importance of looking at costs as part of the analysis of the true impact of a detrimental condition such as flooding on market value. The book describes the "repair stage" in the analysis of the effect of a detrimental condition as follows:

> "If repairs are required, they take place after the assessment stage. Repairs may involve remediation, reconstruction, preventative construction, actual repairs, cleanup and correction of the condition, and contractor contingencies. Repairs may require a vast spectrum of costs depending on the issue and the remediation or repair method chosen." (p. 13, emphasis added)

That book goes on to make the following three very important points related to repair costs.

- First, "[u]nderstanding the magnitude of each of these costs and how they relate to each stage is a critical task in assessing damages" (p. 15);

- Second, "[a] key issue to consider is the market's response to proposed remediation or repair costs and the related empirical evidence of such a response. . . The cost of repair

---

[58] Bell, et al. (2008), at p. 238.
[59] Bell, et al. (2008), at p. 17.

or remediation does not necessarily equal value diminution,[60] however, and it is critically important to make sure that such deductions are consistent with market behavior" (p. 16); and

- Third, "the costs relative to the benefits must be studied. . . whether the costs are actually required and make economic sense in the context of the marketplace." (p. 16)

The Fruitticher Report does not analyze or even discuss the various remediation, cleanup, reconstruction or repair costs that have been expended on individual homes in the proposed Class Area since April of 2014, nor does that Fruitticher Report discuss the various "preventative" measures that have been announced by governmental authorities in the wake of the April 2014 flooding event.

Stigma analysis is addressed in most detail in the courses, seminars, articles and books of the appraisal profession dealing with contamination and other related environmental conditions.

The courses, seminars, articles and books define the generally accepted methods and techniques for determining the impact of various types of environmental conditions (including flooding) on real estate markets, property prices, and market value.  Sources of this methodology include:

- Advisory Opinion AO-9 from The Appraisal Standards Board entitled "The Appraisal of Property that May be Impacted by Environmental Contamination."

- Courses and seminars of the Appraisal Institute including the most recent 2010 national seminar, *Analyzing the Effects of Contamination on Real Estate* and the two earlier seminars *Environmental Risk and the Real Estate Appraisal Process* and *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma.*

- Books and publications of the Appraisal Institute including articles in *The Appraisal Journal*, the book entitled *Real Estate Damages: An Analysis of Detrimental Conditions*,[61] and the book entitled *Valuing Contaminated Properties: An Appraisal Institute Anthology*.[62]

---

[60]   As discussed earlier in this review report, Advisory Opinion 9 (AO-9) makes the same point: "The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value." USPAP, 2012-13 Edition, p. A-20, Lines 170-171.

[61]   Randall Bell, MAI, *Real Estate Damages: An Analysis of Detrimental Conditions*, Appraisal Institute, 1999.

[62]   Richard J. Roddewig, MAI, CRE, Editor, *Valuing Contaminated Properties:  An Appraisal Institute Anthology*, Appraisal Institute, 2002.

USPAP Advisory Opinion AO-9 defines "Diminution in Value (Property Value Diminution)" as "The difference between the unimpaired and impaired values of the property being appraised."[63]

The methods generally accepted by the appraisal profession to determine the difference between the unimpaired market value and market value as impacted by contamination (impaired value) and diminution in value are as follows:

"1. Paired sales analysis of potentially impacted properties

2. Analysis of environmental case studies

3. Multiple regression analysis of potentially impacted neighborhood areas or properties in proximity to a contamination source

4. Adjustment of income and yield capitalization rates to reflect environmental risk premiums in an income capitalization analysis"[64]

### 3.5    THE SOURCES FOR THE GENERALLY RECOGNIZED AND ACCEPTED METHODS OF THE APPRAISAL PROFESSION FOR UTILIZING REGRESSION MODELING IN THE APPRAISAL PROCESS

Regression modeling is the subject of many standards, courses and seminars published by The Appraisal Standards Board and the Appraisal Institute.  These include the following:

- Advisory Opinion 18 (AO-18), Use of an Automated Valuation Model (AVM);

- Uniform Standards of Professional Appraisal Practice (USPAP)(2014-2015 Edition), STANDARD 6: MASS APPRAISAL DEVELOPMENT AND REPORTING;

- Marvin L. Wolverton, PhD, MAI, *An Introduction to Statistics* (2009);

- M. Steven Kane, Mark R. Linne, MAI, CRE, CAE, ASA, and Jeffrey A. Johnson, MAI, *Practical Applications in Appraisal Modeling: Statistical Methods for Real Estate Practitioners* (2004);

- "Quantitative Analysis," Appraisal Institute Course Number PC502GDCH-D (2012); and

- "Residential Applications: Using Technology to Measure and Support Assignment Results," Appraisal Institute Course Number PS110SH-C.

---

[63] *Uniform Standards of Professional Appraisal Practice*, 2012-13 Edition, p. A-18, Lines 74-75.
[64] Appraisal Institute, *Analyzing the Effects of Environmental Contamination on Real Property*, Instructor Handbook (2010), Part 4, Page 4-33.

The proper application of regression modeling in determining the impact of detrimental conditions such as flooding is discussed in a wide variety of articles and publications of the appraisal profession including the following in particular:

- Chapter 14 of *The Appraisal of Real Estate* (14th Edition) (2013);

- Randall Bell, MAI, Orell C. Anderson, MAI, and Michael V. Sanders, MAI, SRA, *Real Estate Damages: Applied Economics and Detrimental Conditions*, Second Edition, Appraisal Institute (2008);

- The various articles and chapter introductions in Richard J. Roddewig, MAI, CRE, Editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology*, Appraisal Institute (2002);

- The various articles and chapter introductions in Richard J. Roddewig, MAI, CRE, Editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology*: *Volume II*, Appraisal Institute (2014); and

- Thomas O. Jackson, PhD, MAI, "Evaluating Environmental Stigma with Multiple Regression Analysis," *The Appraisal Journal*, Fall 2005.

Some of the important concepts and techniques from the key publications of the appraisal profession discussing the appropriate and generally accepted methods for detrimental conditions analysis, environmental stigma analysis, and regression modeling are discussed later in this Appraisal Review.

## 4.  TESTING THE ACCURACY AND RELIABILITY OF THE ANALYSIS OF POST-FLOODING STIGMA IN THE FRUITTICHER REPORT

### 4.1    SUMMARY OF THE ANALYSIS AND CONCLUSIONS CONCERNING STIGMA IN THE FRUITTICHER REPORT

The Fruitticher Report uses a multiple regression analysis as part of a "mass appraisal" to determine the value of the 316 homes in the proposed Class Area as of the day before the April 29, 2014 flooding event.

The sales data set used in the regression analysis consists of 32 sales in the year prior to the flooding event that occurred in a larger area that included the proposed Class Area.  The sales prices, as well as other information about each home in the sales data set, were then inserted into an Excel based multiple regression model.  The model then statistically analyzed the sales data and determined the contribution to the prices paid by various features (independent variables) of the homes.  The features -- called independent variables in regression modeling -- analyzed by the Fruitticher model were building size, lot size, age of the home, quality of the construction (based on a rating applied by Fruitticher), location (also based on a rating by Fruitticher), and presence or absence of a pool, yard buildings such as storage sheds, and a screened in porch.  The Fruitticher Report states that other elements of a typical home were considered and tested in the model but not included as one of the variables contributing to the outcome of the model because "they resulted in a less accurate valuation." (Fruitticher Report, p. 71)

The Fruitticher Report then used the Excel multiple regression model to estimate what he calls the "market value" of each of the 316 homes as of the day before the flooding event.

Then the Fruitticher Report derived an estimated stigma factor to apply to each of the "market values" that resulted from the Excel multiple regression model.  Although the Fruitticher Report includes information on 13 sales that occurred in the proposed Class Area following the flooding event, he does not use these sales in the regression model to arrive at a value post-flooding.

Instead, the sales that occurred in the proposed Class Area within one year before and one year following the flooding event -- a total of 27 sales -- were used in a "trend line analysis."  The sales prices per square foot of home size were placed on a "scatter plot" graph.  A simple linear regression line was then calculated that showed the price change over the two year period. Two trend lines were developed -- one involving 14 sales in the portion of the proposed Class Area that flooded and the other involving 13 sales in the portion that did not flood.

According to the Fruitticher Report (pages 74-75), the trend lines showed a 9% decline in "values" in the flooded area from a date one year before the flood to one year after the flood and a 3% drop in "values" over the same two year period in the non-flooded portion of the proposed Class Area.

The Fruitticher Report then compared those trend lines to trend lines derived in three other neighborhoods outside the Class Area. One of the three other neighborhoods (Gulf Breeze) also experienced flooding from the same April 2014 event. The other two neighborhoods (the Nature Trail development as well as another area directly north of the proposed Class area) did not experience any flooding.

Based on those trend line comparisons, the Fruitticher Report concluded that the portions of the proposed Class Area that flooded experienced a "stigma" impact of 18% while the non-flooded portions of the Class Area experienced a "stigma" impact of 12%.

The final four steps in the Fruitticher Report analysis were as follows:

- First, multiply the 12% and 18% stigma factors by each of the pre-flooding "market values" that resulted from his Excel multiple regression model to arrive at a dollar amount that he variously calls "diminution in value," "value loss," and "stigma associated with the flood;"

- Second, subtract the "diminution in value" from the previously calculated "market values" resulting from his Excel multiple regression model to arrive at another indication of so-called "market value" after considering "stigma associated with the flood;"

- Third, add up the individual indicated stigma calculations on a property-property basis to arrive at a total combined "stigma associated with the flood" equaling $9,034,000; and

- Fourth, and finally, separate that $9,034,000 total stigma calculation into the "total loss" for homes in the flooded ($5,669,000) and unflooded ($3,365,000) portions of the proposed Class Area.

### 4.2   TECHNIQUES AND METHODS USED BY THE REVIEW APPRAISER TO TEST THE ACCURACY AND RELIABILITY OF THE MULTIPLE REGRESSION MODEL AND STIGMA ANALYSIS AND CONCLUSIONS IN THE FRUITTICHER REPORT

We have used the following generally recognized and accepted methods of the appraisal profession to test the accuracy and reliability of the methods, analysis and conclusions in the Fruitticher Report:

- A comparison of the number of sales (observations) used in the model to the number of variables selected by Fruitticher to determine the reliability of the Fruitticher regression model;

Case 3:14-cv-00445-MCR-CJK    Document 80-1    Filed 04/13/16    Page 58 of 181

*Appraisal Review Report*                        *John Navelski, et al. v. International Paper Company*
                                        *316 Homes in a Proposed Class Area in Escambia County, Florida*

- A check of the *t*-values and *p*-values of the independent (predictor) variables;

- Comparison of the actual post-flooding sale prices of homes that have sold in the proposed class area to the "predictive prices" that resulted from the multiple regression model in the Fruitticher Report;

- Analysis of the "predictive prices" that result from the Fruitticher multiple regression model when the actual post-flooding sale prices of homes in the proposed class area are included in the sales data set used in the model;

- Comparison of the "stigma" conclusions arrived at by Fruitticher to the "stigma" calculations that results from running the Fruitticher multiple regression model with post-flooding sale prices of homes in the proposed Class Area included as data points (observations) in the regression model;

- Comparing the Fruitticher Report post-flooding stigma impacted market value estimates to a sample set of the appraised values post-flooding that would result from using the traditional sales comparison approach to determine the post-flooding market value of homes in the proposed class area;

- Testing the accuracy of the trend line analysis in the Fruitticher Report by removing the most significant outliers; and

- Testing the overall reliability of the trend line analysis in the Fruitticher Report by analyzing their r-squareds and resulting explanatory power.

### 4.3 THE FRUITTICHER SALES DATA SET IS TOO SMALL GIVEN THE NUMBER OF VARIABLES IN THE FRUITTICHER MODEL

The various textbooks, courses and seminars of the appraisal profession make it very clear that for a multiple regression model to be reliable, the number of sales -- also called the "number of observations," the "data set," or the "sample" -- "will have to be large enough to accommodate all of the variables you may need to include in the model."[65]  The 14th Edition of *The Appraisal of Real Estate* (p. 746) states that there is an important relationship between the number of observations (number of sales) and the number of independent variables.

> "Since $R^2$ and the ability to generalize from a sample to a population are affected by the ratio of *n* [number of observations or sales] to *k* [number of independent variables], many researchers suggest that the minimum ratio should be in the

---

[65] Marvin L. Wolverton, PhD, MAI, *An Introduction to Statistics for Appraisers*, The Appraisal Institute, 2009, at p. 159.

range of 10 to 15 observations per independent variable, with a ratio of 4:1 to 6:1 as an absolute minimum."

The Appraisal Institute book entitled *An Introduction to Statistics for Appraisers* says the following about the proper relationship between the number of sales (observations or data set) and the number of independent variables in the model:

"(T)he size of the data set puts constraints on how many variables that data set will accommodate.  A good rule of thumb is to include at least 10 to 15 observations per independent variable.  That is, $n/k$ 10 to 15.  Hair, et al. suggest an absolute minimum of $n/k \geq 6$ to 10.  When the ratio of n to k is too low, model fit and prediction statistics can be misleading. Therefore, caution is advised whenever $n/k < 10$. Dielman notes that 30 observations plus 10 to 20 per additional independent variable is also often suggested as a rule of thumb."[66]

Some of the flooding impact literature makes the same point.  For example, as stated in the Lamond, et al. article in a 2007 issue of *Property Management*:

"It is apparent that to explain adequately the variation in house price between one property and another a great variety of causal variables are needed, and equally that large numbers of observations are necessary to estimate such complex models with any degree of confidence.  Large datasets are lacking in flood modelling in general as described below and therefore the suitability of hedonic [multiple regression] models in the flooding context is questionable."[67]

The Appraisal Institute course *Residential Applications: Using Technology to Measure and Support Assignment Results* in the section entitled "The Basics of Regression Analysis (Simple Linear Regression)" (pp. 78 to 83) states that "25 to 30" observations is "desirable" in running a single variable simple linear regression model and that "as the number of independent variables increases, the sample size should increase as well."  The course then provides an example of a simple one variable linear regression model in which 33 observations are used.

---

[66] Marvin L. Wolverton, PhD, MAI, *An Introduction to Statistics for Appraisers*, The Appraisal Institute, 2009, Chapter 10, "Multiple Linear Regression Analysis," at pp. 323-324.  The Hair, et al. reference is to J. F. Hair, R. E. Anderson, R. C. Tatham, and W. C. Black, *Multivariate Data Analysis with Readings*, 3rd Edition, Macmillan, 1992. The Dielman reference is to  T. Dielman, *Applied Regression: Analysis for Business and Economics*, 3rd Edition, Duxbury/Thomson Learning, 2001).

[67] J. Lamond, D. Proverbs, and A. Antwi, "Measuring the Impact of Flooding on UK House Prices," *Property Management*, Vol. 25, No. 4, 2007, at 346.  The same point is made in S. Yeo, K. Roche, J. McAneney, "Effects of Disclosure of Flood-Liability on Residential Property Values: An Update," a paper presented at the 2015 Flodplain Management Association National Conference and available at http://floods.org.au/wp-content/uploads/Stephen-Yeo-Full-Paper.pdf.

The multiple regression model in the Fruitticher Report uses a data set of only 32 sales (observations) to analyze the contribution to value of eight independent variables (building size, lot size, age, building quality, location, pool, yard building, and screen porch).  The 4:1 ratio of observations to variables (n/k ratio) in the Fruitticher model is at the extreme low end of the range considered even marginally appropriate.  As indicated above, the "good rule of thumb" for real estate appraisers to assure proper "model fit" and predictive reliability is 10 to 15 observations per variable.  Base on that rule of thumb, Fruitticher would need 80 to 120 sales for his multiple regression model to avoid being "misleading."

As explained later, the inaccuracy and unreliability of the Fruitticher analysis of stigma impact is due in large part to the inadequate number of sales used in his model.

### 4.4  THE STANDARD ERRORS FOR EACH INDEPENDENT VARIABLE AND THE RESULTING T-VALUES AND P-VALUES IN THE FRUITTICHER MULTIPLE REGRESSION ANALYSIS DEMONSTRATE THE MODEL'S INHERENT UNRELIABILITY IN PREDICTING VALUES AND STIGMA

Fruitticher relied completely on a review of the R-squared of his multiple regression model in judging its reliability.  That was a fundamental error in the Fruitticher analysis.  As the Appraisal Institute course on *Quantitative Analysis* puts it, relying "solely on R-squared in model-building decisions can be misleading because in a stochastic environment, some of the apparent correlation between the predictor variables [building size, lot size, age, building quality, location, pool, yard building, and screen porch in the Fruitticher model] and the outcome variable [predicted price in the Fruitticher model] can be the result of random association."[68]

Various aspects of the results of the Fruitticher multiple regression model, especially the size of the standard errors and resulting *t*-values and *p*-values of all but two of his independent variables, indicate the basic unreliability of the Fruitticher model.  The Fruitticher Report does not reference any attempt by him to check the *t*-values or *p*-values resulting from his modeling.

The *t*-value and *p*-value are explained as follows in an Appraisal Institute book on regression modeling:

> "the *t*-value is simply the coefficient valued divided by the standard error of the coefficient.  The larger the *t*-value, the better. The corresponding *p* (i.e., probability) value reflects the probability that the coefficient value is spurious and the independent variable does not contribute to the equation.  The smaller the *p*-value is, the better.  Since *p* is a function of *t*, as *t* increases in value *p* diminishes."[69]

---

[68] Appraisal Institute, *Quantitative Analysis*, (Version PC502GDCH-D) (2012),Part 10-286.
[69] M. S. Kane, M. R. Linne, MAI, CRE, CAE, ASA, and J. A. Johnson, MAI, *Practical Applications in Appraisal Valuation Modeling: Statistical Methods for Real Estate Practitioners*, The Appraisal Institute, 2004, p. 154.

Therefore, analysis of the standard error and the resulting *t*-values and *p*-values -- or the  "t Stat" as it is called in the Fruitticher model -- for each independent (predictor) variable is important for determining the reliability of the model.

The standard errors for all but two of the independent variables in the Fruitticher multiple regression are quite large.  As a result, the resulting *t*-statistic for the variables lot size, building quality, location, pool, yard building, and screen porch are extremely small, varying from 0.865 (yard building) to 1.816 (screen porch).  The corresponding *p*-values for those variables are also quite poor.  As the definition for *p*-value included earlier stated, the *p*-value is a percentage that "tells you how likely it is that the coefficient for that independent variable emerged by chance and **does not** describe a real relationship" and "it is generally accepted practice to consider variables with a p-value of less than .1 as significant."  The *p*-values for lot size (0.259), location (0.138), pool (0.176), and yard building (0.396) are all significantly larger than 0.1 indicating that the chance that the relationship between that variable and its value emerged randomly are 25.9%, 13.8%, 17.6% and 39.6% respectively.  Only building size and age have a *p*-value below the 0.1 threshold.  The *p*-value for building quality (0.105) is slightly above the 0.1 (10%) threshold.

As a result, Fruitticher has "overfitted" the model.  Only building size (square footage) and age are significant variables.

Fruitticher mistakenly relies only on an analysis of the R-squared in determining the variables to include in his model.  The Fruitticher Report (pages 71-72) states that an alternative model that included other variables "such as garages, bathrooms and fireplaces" was tested, but those variables "were eliminated" after testing because "adding these variables did nothing to improve the accuracy of the value model," presumably as determined by the R-squared outcomes.

As explained below, Fruitticher should have also analyzed the adjusted R-squares of his alternative model runs to determine if the additional variables should have been left in the model.

> "Every time you add a predictor to a model, the R-squared increases, even if due to chance alone.  It never decreases.  Consequently, a model with more terms may appear to have a better fit simply because it has more terms.
>
> \*                          \*                          \*
>
> The adjusted R-squared compares the explanatory power of regression models that contain different numbers of predictors.
>
> Suppose you compare a five-predictor model with a higher R-squared to a one-predictor model.   Does the five predictor model have a higher R-squared

because it's better?  Or is the R-squared higher because it has more predictors? Simply compare the adjusted R-squared values to find out! . .  The adjusted R-squared increases only if the new term improves the model more than would be expected by chance."[70]

### 4.5   ANALYSIS OF THE ACTUAL SALE PRICES PAID SINCE THE APRIL 2014 FLOODING EVENT DEMONSTRATES THE FUNDAMENTAL INACCURACY AND UNRELIABLITY OF THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION

The 14th Edition of *The Appraisal of Real Estate* published by the Appraisal Institute emphasizes the importance of testing the reliability of a predictive regression model.   One recommended testing procedure is comparing the "predicted values" to the actual prices paid for homes.[71]

Standards Rule 6-7 in Standard 6 of USPAP entitled "Mass Appraisal, Development and Reporting" states that the appraiser should "reconcile the quality and quantity of data available" and use "testing procedures and techniques to ensure that standards of accuracy are maintained."[72]  The Comment to that Standards Rule 6-7 says the following:

"It is implicit in mass appraisal that, even when properly specified and calibrated mass appraisal models are used, some individual value conclusions will not meet standards of reasonableness, consistency, and accuracy.  However, appraisers engaged in mass appraisal have a professional responsibility to ensure that, on an overall basis, models produce value conclusions that meet attainable standards of accuracy.  This responsibility requires appraisers to evaluate the performance of models, using techniques that may include but are not limited to, goodness-of-fit statistics, and model performance statistics such as appraisal-to-sale ratio studies, evaluation of hold-out samples, or analysis of residuals."[73]

While Fruitticher claims he compared actual prices paid to the "predicted" outcomes of the model, he only did this for the 32 pre-flooding sales used in his model.  He did not compare the predicted values from his regression model to the actual prices paid for homes in the proposed class area after the flooding event.

The table below compares the Fruitticher "predicted" values to the actual prices paid for homes in the proposed class area since June of 2014.  It is an example the appropriate type of

---

[70]   http://blog.minitab.com/blog/adventures-in-statistics/multiple-regession-analysis-use-adjusted-r-squared-and-predicted-r-squared-to-include-the-correct-number-of-variables

[71] The 14th Edition of *The Appraisal of Real Estate* describes this as the use of a "holdout sample" and states that the correlation between the predicted values for the "holdout sample" and their actual sale prices should be high "when the model is valid."  *The Appraisal of Real Estate*, 14th Edition, pp. 745.

[72]  *Uniform Standards of Professional Appraisal Practice*, 2014-2015 Edition, page U-43, LInes 1373 to 1376.

[73]  *Uniform Standards of Professional Appraisal Practice*, 2014-2015 Edition, page U-43, LInes 1377 to 1384.

"appraisal-to-sale ratio" study and "hold-out sample" study that was not undertaken by Fruitticher.

| Address | Sale Date | Actual Sale Price | Fruitticher Predicted Pre-Flood Price | Actual Sale Price As % of Predicted Pre-Flood Price | Fruitticher Stigma % | Fruitticher Predicted Post-Flood Stigmatized Price | Actual Post-Flood Price as % of Fruitticher Predicted Post-Flood Price |
|---|---|---|---|---|---|---|---|
| 2043 Joshua | 6/26/14 | $166,000 | $162,880 | 1.0192 | 12.0% | $143,334 | 1.1581 |
| 2039 Joshua | 8/27/14 | $194,000 | $221,414 | 0.8762 | 12.0% | $194,844 | 0.9957 |
| 10304 Nightwind Cir | 9/5/14 | $185,000 | $205,851 | 0.8987 | 18.0% | $168,798 | 1.0960 |
| 10101 Bristol Park Rd | 1/26/15 | $160,000 | $196,263 | 0.8152 | 18.0% | $160,936 | 0.9942 |
| 10112 Bristol Park Rd | 2/24/15 | $205,000 | $191,652 | 1.0696 | 18.0% | $157,155 | 1.3044 |
| 2131 Jarrod | 3/13/15 | $149,900 | $144,341 | 1.0385 | 12.0% | $127,020 | 1.1801 |
| 2723 Ashbury Lane | 4/1/15 | $269,000 | $291,457 | 0.9229 | 18.0% | $238,995 | 1.1255 |
| 1534 Witt | 4/6/15 | $179,900 | $205,538 | 0.8753 | 12.0% | $180,873 | 0.9946 |
| 10011 Bristol Park Rd | 5/8/15 | $210,000 | $181,216 | 1.1588 | 18.0% | $148,597 | 1.4132 |
| 2730 Ashbury Lane | 6/25/15 | $192,000 | $169,124 | 1.1353 | 12.0% | $148,829 | 1.2901 |
| | | **Average Differential** | | 0.9810 | **Average Differential** | | 1.1552 |

The table demonstrates the fundamental unreliability of the Fruitticher regression model in accurately estimating the "stigmatized" prices that would be paid in the class area marketplace for rehabilitated homes post-flooding.  The actual average price of a home that has sold post-flooding -- including any actual stigma imposed by the marketplace -- is only about 2.0% lower than the Fruitticher predicted pre-flooding unimpaired values and is actually 15.5% higher than the predicted "stigmatized" value that results from the Fruitticher regression model.

This also indicates another fundamental error in the Fruitticher Report -- his failure to consider the repair costs, if any, expended on each property in the proposed Class Area following the flooding event of April 2014.  Note that in the table above, the average price paid for the homes that were in the Class Area **but did not flood** (the Fruitticher 12% stigma homes) was an average 12.37% higher than the Fruitticher predicted pre-flood value.

And, the ability of the Fruitticher model to accurately predict "stigma" impacts is decreasing as time passes.  The average price paid in the three earlier 2014 post-flooding sales was 8.5% higher than the predicted stigmatized price in the Fruitticher Report.  The average price paid in the seven most recent 2015 post-flooding sales has been 18.6% higher than the predicted stigmatized price in the Fruitticher Report.

The failure of the Fruitticher Report to compare his predicted stigmatized values to the actual prices paid in the proposed Class Area post-flooding prices is especially serious given the purpose of the Fruitticher Report -- to measure appropriate damages that should be paid to individual property owners in a class action litigation.

**4.6    TESTING THE FRUITTICHER MULTIPLE REGRESSION MODEL BY INCLUDING POST-FLOOD EVENT SALES IN THE PROPOSED CLASS AREA IS ADDITIONAL EVIDENCE OF THE INHERENT INACCURACY AND UNRELIABILITY OF THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION**

The Fruitticher multiple regression model itself can be used to test the accuracy and reliability of his stigma analysis and conclusion. Typically, a regression model used to determine the impact of a detrimental condition such as flooding on prices and values incorporates prices paid for properties that have been affected by the detrimental condition.[74] For example, an independent variable is created for "flood damaged" or "location in a flooding area" and the model is run to determine the value of the coefficient for "flood damaged" or "location in a flooding area." The model can also be run to arrive at the "predictive values" for flood damaged or flooding area homes, and those predictive values tested against actual prices paid later (or in a holdout sample) to determine the accuracy and reliability of the model.

In order to test the accuracy and reliablility of the Fruitticher stigma analysis and conclusions, we have added 10 post-flooding sales in the Class Area referenced in the Fruitticher Report[75] to the 32 sales in the data set utilized in the Fruitticher multiple regression model. We have then run the model to determine the value of the coefficient for "Class Area" that results from the model. We have then also run the model to arrive at the "predictive values" considering location in the Class Area post-flooding for those properties that have actually sold in the proposed Class Area.

The results of the regression model are shown below.

---

[74] See, for example, the discussion in Thomas O. Jackson, PhD, MAI, "Evaluating Environmental Stigma with Multiple Regression Analysis," *The Appraisal Journal*, Fall 2005, pp. 363-369.

[75] The Fruitticher Report (pages 74-75) includes 13 sales that "closed" after April 29, 2014. Three of the sales closed in May of 2014, less than one month after the flood. The contract date for two of those sales (2714 Ashbury Lane and 2007 Joshua Drive) were in March of 2014, more than one month before the flooding event. The third sale, involving the home at 2714 Ashbury Lane, had a "sale date" of May 1, 2014, two days after the flood. Since the home had been on the market since November of 2013, it is possible that the actual meeting of the minds on the sale price occurred just before the April 29th flooding event. Therefore, for purposes of analyzing post-flooding sale prices, we have also excluded it from the sales used to test the predicted stimatized market values in the Fruitticher Report.

| SUMMARY OUTPUT | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| *Regression Statistics* | | | | | | | | |
| Multiple R | 0.939666147 | | | | | | | |
| R Square | 0.882972469 | | | | | | | |
| Adjusted R Square | 0.850058476 | | | | | | | |
| Standard Error | 16325.45217 | | | | | | | |
| Observations | 42 | | | | | | | |
| | | | | | | | | |
| ANOVA | | | | | | | | |
| | *df* | *SS* | *MS* | *F* | *Significance F* | | | |
| Regression | 9 | 64348664015 | 7149851557 | 26.82666 | 1.82794E-12 | | | |
| Residual | 32 | 8528652432 | 266520388.5 | | | | | |
| Total | 41 | 72877316446 | | | | | | |
| | | | | | | | | |
| | *Coefficients* | *Standard Error* | *t Stat* | *P-value* | *Lower 95%* | *Upper 95%* | *Lower 95.0%* | *Upper 95.0%* |
| Intercept | -8900.281328 | 26910.2639 | -0.330739281 | 0.742997 | -63714.69515 | 45914.13249 | -63714.69515 | 45914.13249 |
| Building Size | 73.77899594 | 7.127714781 | 10.35100284 | 9.68E-12 | 59.26031604 | 88.29767584 | 59.26031604 | 88.29767584 |
| Lot Size | 41709.07751 | 15389.55898 | 2.710219154 | 0.010716 | 10361.57169 | 73056.58332 | 10361.57169 | 73056.58332 |
| Age | -1171.112412 | 386.6880532 | -3.028571486 | 0.004829 | -1958.770201 | -383.4546227 | -1958.770201 | -383.4546227 |
| Building Quality | 12075.3732 | 5249.641698 | 2.300228071 | 0.028105 | 1382.202983 | 22768.54342 | 1382.202983 | 22768.54342 |
| Location | 9052.352526 | 8100.422691 | 1.117516069 | 0.272094 | -7447.66855 | 25552.3736 | -7447.66855 | 25552.3736 |
| Pool | 12618.88609 | 7673.582651 | 1.644458223 | 0.109872 | -3011.690276 | 28249.46246 | -3011.690276 | 28249.46246 |
| Yard Building | -5693.664153 | 6688.738534 | -0.851231383 | 0.400966 | -19318.1787 | 7930.850393 | -19318.1787 | 7930.850393 |
| Screen Porch | 14676.75503 | 9349.168822 | 1.569845973 | 0.126288 | -4366.878678 | 33720.38874 | -4366.878678 | 33720.38874 |
| Class Area Fruitticher Subdivisions(After) | -7584.797142 | 8157.352263 | -0.929811156 | 0.35943 | -24200.77996 | 9031.185678 | -24200.77996 | 9031.185678 |

The value of the coefficient for location in the proposed Class Area is a -$7,585. That is the average "stigma" impact per home due to location in the proposed Class Area and a sale date post-April 2014   That is 73.5% lower than the average "stigma" damage of $28,589 as determined in the Fruitticher Report, and is equivalent to an impact of only 4.0% on the average unimpaired Fruitticher Report home value of $188,406 for the 316 homes in the proposed Class Area.

Based on the expanded set of 42 sales, we can also compare the Fruitticher unimpaired values and Fruitticher stigmatized values to the "predictive values" for each of the 10 homes that have sold in the proposed Class Area since the April 2014 flooding event.  That analysis is shown below.

| Address | Sale Date | Fruitticher Model Predicted Pre-Flood Value | Predicted Class Area Location Value Using Post-Flood Class Area Sales | Fruitticher Report Post-Flood Stigmatized Value | Fruitticher Report Stigma % | Class Area Post-Flooding Location % Indicated by the Regression Model |
|---|---|---|---|---|---|---|
| 2043 Joshua | 6/26/14 | $162,880 | $163,579 | $143,334 | 12.0% | None |
| 2039 Joshua | 8/27/14 | $221,414 | $212,985 | $194,844 | 12.0% | 3.81% |
| 10304 Nightwind Cir | 9/5/14 | $205,851 | $193,587 | $168,798 | 18.0% | 5.96% |
| 10101 Bristol Park Rd | 1/26/15 | $196,263 | $183,779 | $160,936 | 18.0% | 6.36% |
| 10112 Bristol Park Rd | 2/24/15 | $191,652 | $193,493 | $157,155 | 18.0% | None |
| 2131 Jarrod | 3/13/15 | $144,341 | $146,133 | $127,020 | 12.0% | None |
| 2723 Ashbury Lane | 4/1/15 | $291,457 | $277,555 | $238,995 | 18.0% | 4.77% |
| 1534 Witt | 4/6/15 | $205,538 | $187,058 | $180,873 | 12.0% | 8.99% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10011 Bristol Park Rd | 5/8/15 | $181,216 | $183,378 | $148,597 | 18.0% | None |
| 2730 Ashbury Lane | 6/25/15 | $169,124 | $169,252 | $148,829 | 12.0% | None |
| | | | **Average Differential** | | **15.0%** | **2.99%** |

Five of the predicted values in the Class Area using post-flooding sales data are higher than even the unimpaired values predicted by the Fruitticher Report regression model.  When the slight positives are averaged in, the overall differential due to a location in the Class Area after the flood event is only 2.48% lower than the unimpaired values that result from the Fruitticher Report multiple regression analysis.

At a minimum, based on a regression model using actual sales in the proposed Class Area post-flooding, the Fruitticher Report has overestimated the average "stigma" impact by 83.5%.

The Fruitticher multiple regression model with the 10 post-flooding sales included can be run to provide an indication of the predicted values for each of the 316 Class Area homes.  Those predicted values can then be compared to the Fruitticher unimpaired pre-flood "market values" of each home.  When that model is run, the mean average indicated value post-flooding is only 1.63% less than the pre-flood unimpaired "market values" determined by Fruitticher.  The median differential is only -1.72%. There is also considerable variation in the results of that model -- 199 of the homes show a predicted value less than the Fruitticher unimpaired values and 117 show a predicted value higher than the Fruitticher unimpaired values.  The negative impacts on the 199 homes vary from less than -1.0% to a maximum of -10.24%.  The other 117 homes have predicted values ranging from +1.0% to +14.34% higher than the Fruitticher unimpaired pre-flood values.  All of that is another indication that the Fruitticher conclusion of -12% to -18% stigma impacts is incorrect.  It also highlights, again, the need for property-by-property analysis of the impact on prices and values due to the flooding event.

**4.7    ANALYSIS OF SALES VELOCITY, DAYS ON MARKET, AND SALE PRICE TO LIST PRICE RATIOS ALSO DEMONSTRATES THE FUNDAMENTAL INACCURACIES IN THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION**

Based on our past experience and the published literature related to the effects of environmental events on real estate prices and markets, if the flooding event of April 2014 had an adverse "stigma" impact on the market for single-family homes in the proposed Class Area, we would expect to see the following:

- A decrease in the number of sales transactions (sales velocity) in the affected area immediately after the flooding event by comparison to the period before the event;

- An increase in the time it took to sell a home (days on market) after the flooding event by comparison to the same time period before the event; and

Case 3:14-cv-00445-MCR-CJK     Document 80-1     Filed 04/13/16     Page 67 of 181

*Appraisal Review Report*                          *John Navelski, et al. v. International Paper Company*
                                                   *316 Homes in a Proposed Class Area in Escambia County, Florida*

- A decrease in the sale price to list price ratio after the flooding event by comparison to the same time period before the event.  Sellers, in the aftermath of an environmental event or discovery of a detrimental condition that could affect a market, typically continue to set their asking prices based on pre-event or pre-discovery prices.  They let the marketplace decide what discount, if any, to apply.  As a result, if an event or condition is having an effect, offering prices are typically lower than before the event happened or condition occurred.  The price eventually resulting from the back and forth negotiations should be lower as a percentage of pre-discovery asking prices.

As shown in the tables in Addenda 9.9 to this Appraisal Review Report, the average marketing time (DOM or days on market) was 112.75 days and the median was 99 days in the year prior to the flood.   By contrast, the 10 homes that have sold since the April 2014 flooding event in the proposed Class Area had an average marketing time of only 69.3 day and a median of 39.5 days, significantly lower than before the flooding event.

Similarly, the average and median "sale price to list price ratio" was lower for the post-flooding sales in the proposed Class Area than for the 32 pre-flood sales in the Fruitticher Report.

That data indicates that the flooding event had no adverse impact on marketing times or sales price ratios in the proposed Class Area.  It is another indication that the Fruitticher Report has overestimated the "stigma" impact on prices and values.

There have been 13 closed sales in the proposed Class Area in the one year since the flooding event compared to 16 in the proposed Class Area in the one year before April 29, 2014.  That could be some indication of a possible effect due to the flooding event.

**4.8   TESTING THE RESULTS OF THE FRUITTICHER ANALYSIS BY COMPARISON TO ACTUAL POST-FLOODING URAR APPRAISAL REPORTS DEMONSTRATES THE FUNDAMENTAL INACCURACIES IN THE FRUITTICHER STIGMA ANALYSIS AND CONCLUSION AND PROVES THE NEED FOR INDIVIDUALIZED PROPERTY-BY-PROPERTY ANALYSIS**

Real estate appraisers in performing their every day appraisal work in neighborhoods like the proposed Class Area would not use multiple regression modeling.  Instead, when asked by a property owner or a lender to determine the market value of a property post-flooding, a licensed appraiser would prepare an appraisal report using the sales comparison approach and three to as many as six comparable sales to arrive at an opinion of value.

Mr. Fruitticher admitted at his deposition that even he has not used multiple regression modeling in his everyday appraisal practice.[76]

---

[76] Page 202, Lines 17-20. Deposition of Tom Fruitticher, dated 8/27/2015.

A mass appraisal such as that conducted by Mr. Fruitticher is a form of automated valuation model, or AVM. As Advisory Opinion 18 (AO-18) in USPAP clearly states, "the output of an AVM is not, by itself, an appraisal. An AVM's output may become a basis for appraisal or appraisal review if the appraiser believes the output to be credible for use in a specific assignment."[77]

And an appraiser such as Mr. Fruitticher who uses an AVM has responsibilities to test the results before relying on them. As Advisory Opinion (AO-18) states:

> "A client may suggest or request the use of an AVM in an appraisal or appraisal review assignment, but ultimately the appraiser is responsible for the decision to use or not use the AVM and its output. The appraiser must be able to reasonably conclude that the AVM's output is credible before deciding to use the AVM or rely on its output. For example, in an appraisal assignment, the credibility of the AVM output may be established by comparison to the subject market. If the appraiser concludes that using the AVM output in an assignment would be misleading, the appraiser should either use other tools to perform the assignment or decline the assignment." [78]

We commissioned Mr. M. Eugene Pressley, MAI, SRA, a Florida State-Certified General Real Estate Appraiser to prepare appraisal reports as of a current date for two homes in the proposed Class Area. One of the homes selected for analysis (2023 Joshua) was not flooded while the other home (10050 Bristol Park Road) was flooded in April of 2014.

We asked Mr. Pressley to prepare the appraisal reports on the standard form that would be used for mortgage financing purposes and to utilize comparable sales that have occurred since April of 2014 in the proposed Class Area. He was also asked to adjust the sales for differences in their physical characteristics in the normal and customary manner based on his firm's analysis of the appropriate market supported adjustments for the items of comparison included on the standard form.

Mr. Pressley used three non-flooded comparable sales to appraise the 2023 Joshua home and three flooded comparable sales to appraise the 10050 Bristol Park Road home.

The appraisal reports prepared by Mr. Pressley are contained in the Addenda to this Appraisal Review Report (Addenda 9.10)

We then compared the results of the Pressley appraisals to the unimpaired and stigmatized market value conclusions that emerged from the multiple regression model in the Fruitticher Report.

---

[77] USPAP, 2014-2015 Edition, p. A-45, Lines 16-17.
[78] USPAP, 2014-2015 Edition, p. A-47, Lines 90-95.

The comparison is shown in the table below.

| Address | Pressley Post-Flooding Appraised Market Value | Fruitticher Predicted Pre-Flood Market Value | Fruitticher Predicted Post-Flood Stigmatized Value | Fruitticher Report Stigma % | Stigma % Indicated by the Pressley Appraisal |
|---|---|---|---|---|---|
| 10050 Bristol Park Rd | $203,000 | $201,242 | $165,018 | 18.0% | None (+0.87%) |
| 2023 Joshua Drive | $175,000 | $199,616 | $175,662 | 12.0% | 12.33% |
|  |  | Average Differential | | 15.0% | 5.73% |

The comparison indicates that a property-by-property appraisal of each home in the proposed Class Area post-flooding is likely to show significantly different results than indicated by the multiple regression model in Fruitticher Report.

As another check on the reliability of the multiple regression model "predicted" pre-flood values, we consulted with Mr. Gene Pressley, MAI, SRA, concerning comparables sales that would be appropriate to use in arriving at a market value estimate for the 2023 Joshua Drive home as of April 29, 2014, before the flooding event.  The three most appropriate sales would be as follows: 2028 Joshua Drive (sale price of $181,000 on March 19, 2014); 2035 Jason Drive (sale price of $125,000 on November 5, 2013); and 2054 Joshua Drive (sale price of $169,000 on October 15, 2013).  Mr. Pressley indicated that based on those sales, his opinion of the pre-flood market value of the 2023 Joshua Drive home would be approximately the same as the post-flooding value of $175,000.  Mr. Pressley is preparing an appraisal report on that home as of April 29, 2014 immediately before the flooding event.

That analysis by Mr. Pressley indicates that the Fruitticher Report predicted pre-flood "market value" of $199,616 for 2023 Joshua Drive is incorrect.  As a result, there likely has been no "stigma" impact on that property.

The again demonstrates the inherent unreliability of the  Fruitticher multiple regression model in determining the post-flooding "stigma" and resulting damages.

*Appraisal Review Report*                             *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

**4.9    THE LINEAR TREND LINE MODELING IN THE FRUITTICHER REPORT CONTAINS SERIOUS ERRORS THAT CAUSE IT TO BE INHERENTLY INACCURATE AND UNRELIABLE**

**4.9.1    FRUITTICHER "COMPARATIVE ANALYSIS" AND CONCLUSIONS OF VALUE DIMINUTION DUE TO STIGMA THAT CAME FROM THE FLOOD**

Fruitticher used 27 sales that occurred in the Class Area within one year before and one year following the flooding event in a "trend line analysis." The sales prices paid per square foot of home size were placed on a "scatter plot" graph. A simple linear regression line was then calculated that showed the price change over the two year period. Two trend lines were developed -- one involving 14 sales in the portion of the proposed Class Area that flooded and the other involving 13 sales in the portion that did not flood.

According to the Fruitticher Report (pages 74-75), the trend lines showed a 9% decline in "values" in the flooded area from a date one year before the flood to one year after the flood and a 3% drop in "values" over the same two year period in the non-flooded portion of the proposed Class Area.

The Fruitticher Report then compared those trend lines to trend lines derived in three other neighborhoods outside the Class Area. One of the three other neighborhoods (Gulf Breeze) also experienced flooding from the same April 2014 event. The other two neighborhoods (the Nature Trail development as well as another area directly north of the proposed Class area) did not experience any flooding.

Based on those trend line comparisons, the Fruitticher Report concluded that the portions of the proposed Class Area that flooded experienced a "stigma" impact of 18% while the non-flooded portions of the Class Area experienced a "stigma" impact of 12%.

The most basic problem in the Fruitticher trend line analysis is that the array of data points (sales prices) on the scatter plot diagrams includes clear "outliers" that significantly affect the outcome of the model. Fruitticher failed to follow the requirements of the appraisal profession that the presence of outliers in the array be considered, and inappropriate outliers removed from the analysis.

As stated in the second edition of the *Real Estate Damages* book on the analysis of the impact of detrimental conditions such as flooding on market value:

> "It is important to consider the inclusion or exclusion of outliers since a small number of extreme values can impact some statistical analyses. Exclusion of outliers should normally be done using a decision rule (i.e., more than two standard deviations from the mean, 10% above or below the next highest or lowest value, etc.) to minimize bias in the data selection and refinement process.

**C L A R I O N**

At a minimum, outliers should be investigated to determine why these values differ significantly from the rest of the data."[79]

### 4.9.2    SUMMARY OF THE PROBLEMS IN THE FRUITTICHER TREND LINE "COMPARATIVE ANALYSIS"

We have reviewed his analysis and reach the following major conclusions:

- The Fruitticher depictions of sales trend lines are erroneously drawn and statistically insignificant.

- Fruitticher's method of comparing the apparent (but not truly calculable) values at each end of the trend lines to derive estimates of percentage diminution is both statistically and mathematically illogical and incorrect.

- Even if the trend lines had been statistically significant, exclusions of outlier data have a major effect on the results.

- The period of analysis selected biases the conclusions of purported post-flooding stigma by including trends in sales that occurred during the entire year preceding the flood, significantly increasing the conclusions of diminution which could be attributable to the flooding.

- The "control areas" selected are not sufficiently comparable to the subject subdivisions to allow reasonable comparison.

- Mr. Fruitticher's conclusions of 18% stigma diminution in flooded areas and 12% diminution in un-flooded areas are not mathematically or factually supported by his trend lines, even if they had been statistically accurate.

- When properly analyzed, the sales prices shown in the Fruitticher analysis – both in and outside the subject subdivisions – clearly support the conclusion that pricing and values are highly variable; that no overall, uniform determination of percentage diminution in purported stigma can be derived; and that any conclusions of impact of the flooding event on home values in the area must be analyzed on a property-by-property basis.

In the following sections, we present our detailed review and support for these conclusions.

---

[79]  Bell, et al. (2008), at p. 34.

### 4.9.3   SUMMARY OF FRUITTICHER TRENDS AND STIGMA ANALYSIS

He includes in his report a series of charts depicting sales in the following areas:

- Flooded Areas of Subject Subdivisions $/SF Sales One Year Before the Flood Vs One Year After the Flood;

- Non-Flooded Area of Subject Subdivisions $/SF Sales One Year Before the Flood VS One Year After the Flood;

- Control Group 1 – Flooded Areas of Gulf Breeze $/SF Sales One Year Before the Flood VS One Year After the Flood;

- Control Group 2 – Non-Flooded Areas Found Directly North of Subject Subdivisions $/SF Sales One Year Before the Flood VS One Year After the Flood; and

- Control Group 3 – Non-Flooded Areas in Nature Trail $/SF Sales One Year Before the Flood VS One Year After the Flood.

From this series of charts, Mr. Fruitticher draws the following analysis and conclusions:

> It was noticed that the trends in the flooded areas were down while the trends in the non-flooded areas were up resulting in my conclusion that there was stigma attached to the subject subdivisions that flooded.  While there were areas of the subject subdivisions that did not flood, these home values on average showed a two year downward trend of about -3%, while the flooded areas showed a two year downward trend of -9%.  These are in keeping with the areas of Gulf Breeze that flooded and showed a two year downward trend of -6%.  The areas north of the subject development, during the same two year time period, showed an increase of 8% and the nearby Nature Trail development, which realized no flooding had a two year increase of 11%.  From these studies, I concluded that the differential between the subject flooded areas and other non-flooded properties is about 18%.  Additionally, it has been proven that even the non-flooded homes in the subject's subdivision [sic] realized a value differential of the non-flooded subdivisions of about 12%.  These drops are directly related to the stigma that came from the flood.[80]

---

[80] Fruitticher Report, pp. 82-83.

**C L A R I O N**

### 4.9.4    RECONSTRUCTION OF THE FRUITTICHER TREND LINES

Mr. Fruitticher reports that "…A computer generated exponential trend line was then placed on the graph as an aid in determining the change in value over time.[81]   Not having access to his computer software, it appeared that these charts might have been generated using Excel spreadsheet software, so our first step was to attempt to reconstruct his analysis by entering the data included in his report in an Excel spreadsheet, then applying the charting functions in Excel to that data.  We found that the resulting charts were essentially identical to those in the Fruitticher report.  We are confident we have used the same tools he used in reconstructing his analysis.

An example of a chart from Mr. Fruitticher's report, and a version reconstructed by Clarion are presented below for comparison.

**Original Fruitticher Trend Line Chart**



**Clarion Reconstructed Trend Line Chart**

---

[81] Fruitticher Report, p. 74.



Two differences are worth noting.  In our Clarion reconstructed chart, we have gone into the Excel charting function and asked the program to show the $R^2$ of the line shown on the chart. Mr. Fruitticher could have clicked on the same option box we did to generate the same information on his chart in a matter of seconds; but he did not do so.  On the other hand, in the Fruitticher chart there are values shown at each end of the trend line -- $79.00/sf on the left, and $72.00/sf on the right – that are not on the Clarion version of the Excel chart.  This is because Excel does not report specific values for any points on this trend line.  Finally, both versions of the chart include a reference to "Expon", meaning that the option selected for the depicted line was an exponential regression, rather than any of the other available options in the program, including linear regression.

We address each of these differences below.

### 4.9.5   REPORTING OF $R^2$ SHOWS THAT ALL OF THE TREND LINES SHOWN IN THE FRUITTICHER REPORT ARE STATISTICALLY INSIGNIFICANT

Since Mr. Fruitticher has already applied a multiple regression analysis in his report to determine the pre-flooding property values, he should have been well aware of the importance of $R^2$ -- the coefficient of correlation -- in assessing the statistical significance or relevance of any model.  In this case, he apparently did not ask the Excel program to display correlation coefficients for the regression lines in his charts.   Had he done so, it would have been very apparent to him – and to the reader of his report – that the trend lines in his charts may be the best possible "fit" to the sales data analyzed, but they have no statistical significance.

**C L A R I O N**

Trend lines are often used in real estate analysis and appraisal. Most typically, they are used to show change over extended periods of time for large volumes of transactional or other data in a market area, usually by comparing annualized averages. That is not what Mr. Fruitticher is doing here. Rather, he is suggesting that a regression line generated by a statistical program from a small set of sales (a sample) automatically provides a reliable indicator of changes in property values for hundreds of particular properties (a population). To do so requires a determination that the resulting line is statistically significant.

The Excel charting function Mr. Fruitticher used merely generates the best possible "fit" for any set of data. Given a collection of entirely random numbers, the program would still generate a best fit line, however meaningless that line might be.

None of the trend lines in Mr. Fruitticher's charts are meaningful. The following table compares the $R^2$'s for the line in each of his charts to the $R^2$ in the multiple regression model he used to estimate pre-flood values.

| Fruitticher Analysis | $R^2$ |
|---|---|
| Multiple Regression Analysis | 0.9184 |
| Flooded Subject Areas | 0.0053 |
| Un-Flooded Subject Areas | 0.0032 |
| Control Group 1 – Gulf Breeze | 0.0022 |
| Control Group 2 – North of Subject | 0.0109 |
| Control Group 3 – Nature Trail | 0.0586 |

The $R^2$ value is an indicator of the degree to which there is a relationship between the variables which a trend line is attempting to show. A value of 1 would indicate a perfect correlation between the variables; a value of 0 would indicate there is no correlation. A statistical program will generate a straight line even for a random set of numbers.

The statistical indicators are supported by simple observation of the charts. In each case, the sales are widely dispersed from the trend line. For example, here is the Fruitticher chart for the Gulf Breeze Control Group area.

*Appraisal Review Report*                               *John Navelski, et al. v. International Paper Company*
                                                        *316 Homes in a Proposed Class Area in Escambia County, Florida*



This supposed trend line is based on an array of sales which range from higher prices of more than \$150/sf to lower prices of less than \$90/sf. Given this dispersion, it is not surprising that the correlation coefficient ($R^2$) is very close to zero, at 0.0022.

In the flooded and un-flooded subject areas, there were relatively few sales in the two year period being analyzed. This increases the unreliability of any trend line, since it is based on such a small sample size. Removing a single outlier significantly changes the resulting best fit line.

When just one of the outliers In the Fruitticher Report linear regression trend line model for the flooded area is removed, the performance of the linear trend line model is improved and it reverses the trend line result from a -9.0% market price decline to a +9.0% market price increase, as shown by a comparison of the two graphs below.

**C  L  A  R  I  O  N**





### 4.9.6  SELECTION OF ANALYSIS PERIOD – ONE YEAR BEFORE THE FLOODING TO ONE YEAR AFTER THE FLOODING

We have already shown – using information from the Excel program he used -- that the trend lines on which Mr. Fruitticher bases his conclusions of diminution in value due to stigma are statistically insignificant and meaningless.  His analysis is further flawed in its efforts to analyze the impact of the flooding event because it includes sales that occurred as much as a year prior to the flood.  The result is that his trend lines combine the effects of pre-flood and post-flood activities in inappropriate and unpredictable ways.[82]

Below is Mr. Fruitticher's two year trend line for the flooded areas of the subject subdivisions, which he maintains shows a decline in prices from $79.00/sf to $72.00/sf.



In the following two reconstructed charts, we show the effects of looking separately at the lines for sales occurring the year before the flooding and sales occurring in the year after the flood.

---

[82] The sales data also does not include the most recent sales in the area available to Mr. Fruitticher.

*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*
                                    *316 Homes in a Proposed Class Area in Escambia County, Florida*

By separately depicting the regression lines for the data before the flood and the data after the flood, it is apparent that the resulting two lines move in opposite directions.  It is still important to note that neither of these lines is statistically meaningful, given their very low $R^2$s.





Interestingly, plotting separate regression lines before and after the flood for sales in Fruitticher's non-flooded area gives the opposite result, with the line declining before the flood, but actually increasing after the flood.  Once again, however, neither line has any real predictive statistical significance.

**C L A R I O N**





*Appraisal Review Report*                                    *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*



As discussed earlier, the Appraisal Institute course *Residential Applications: Using Technology to Measure and Support Assignment Results* states that "25 to 30" observations is "desirable" in running a single variable simple linear regression model.  The Fruitticher "Flooded Areas of Subject Subdivisions" trend line (Fruitticher Report, p. 74) contains only 14 sales data points and the "Non-Flooded Areas of Subject Subdivisions" trend line (Fruitticher Report, page 75) contains only 13 data points.  That is the most important reason why the Fruitticher trend line analysis fail to have any statistical reliability.

### 4.10  FAILURE OF THE FRUITTICHER REPORT TO CONSIDER THE EFFECT OF GOVERNMENT PROGRAMS AND FLOOD PROTECTION IMPROVEMENTS ON THE FUTURE FLOOD RISKS IN THE PROPOSED CLASS AREA SINCE APRIL OF 2014E

Since the 2014 flooding event, Escambia County has been moving forward on a multi-faceted initiative to resolve what they characterize as the "repetitive flooding" which has occurred along 11-Mile Creek, particularly in the portion adjacent to the Bristol Park, Bristol Creek, and Ashbury Hills subdivisions.  Various strategies for flood mitigation are being pursued as part of the *11-Mile Creek Watershed Master Drainage Plan*, under the direction of the Escambia County Division of Public Works – Engineering.  The plan calls for the eventual development of 11 regional stormwater management ponds.  It also includes various activities to restore, manage and preserve stream and wetland habitat through channel enhancements, flood plain expansion, flood plain storage, and invasive species eradication.

The initial focus, however, is on the acquisition of improved residential properties in Flood Zone AE, followed by the removal of structures on those properties that are within the 100-year

floodplain.   The County submitted an application on March 9, 2015, through the Florida Department of Emergency Management, to FEMAs Hazard Mitigation Grant Program (HMGP) for funding to begin the acquisition process.   Prior to submitting its application, Escambia County distributed "door-hangar" notifications to homeowners in areas of Bristol Creek and Ashbury Hills designated on the following map.



Responses of interest received through this process were compiled and included in the grant application to FEMA.  A decision on the grant application is expected in December 2015.

## 5. TESTING THE ACCURACY AND RELIABILITY OF THE STIGMA CONCLUSIONS IN THE FRUITTICHER REPORT BY COMPARISON TO THE PUBLISHED FLOODING, HURRICANE AND MASS APPRAISAL LITERATURE AND PAST CLARION ASSOCIATES FLOOD IMPACT RESEARCH

### 5.1    INTRODUCTION TO THE USE OF LITERATURE REVIEWS AND CASE STUDIES IN THE DETERMINATION OF IMPACT OF DETRIMENTAL CONDITIONS AND STIGMA

Reviewing published literature can be important in two ways in an analysis of the potential stigma impacts due to a detrimental condition such as flooding.  First, it can be an important first step in determining the potential impact that a particular environmental detrimental condition might have on prices and values.  However, the generally accepted methods of the appraisal profession make it clear that relying on the published results in the literature is not an appraisal method in its own right.  Rather, such a literature review can serve as an appropriate first step in understanding the possible effects, or, secondly, it can serve as a check on the results of an actual analysis of sales data in the potentially impacted market area.[83]

### 5.1    SUMMARY OF THE FLOODING IMPACT LITERATURE

There have been many published studies of the impact of flooding events on single-family home prices and values.  One of the most recent summaries and analysis of the published literature concerning the impact of flooding events and floodplain designation on prices and values is in a paper presented by Yeo, et al. at the 2015 Floodplain Management Association National Conference.[84]  Yeo, et al. (2015) summarize the literature in the following sidebar in their paper.

---

[83] See, for example, the following statement in Richard J. Roddewig, MAI, Editor, *Valuing Contaminated Properties: An Appraisal Institute Anthology -- Volume II*, The Appraisal Institute, 2014, p. 113. "While a review of the published literature on the impacts of contamination, environmental risks, and other detrimental conditions on property prices and markets can be an important starting point in understanding how others have analyzed contamination and what they have found, it is not an appraisal method in and of itself or even a proper application of case study analysis. It is not a substitute for the collection and analysis of actual sale prices in the market in which the appraiser is working or in suitable case study markets to determine impaired values or price impacts."

[84] S. Yeo, K. Roche, and J. McAneney, "Effects of Disclosure of Flood-Liability on Residential Property Values: An Update," Floodplain Management Association, 2015 Floodplain Management Association National Conference, available at http://floods.org.au/wp-content/uploads/Stephen-Yeo-Full-Paper.pdf.

**Figure 2:** Extract from 'Flood, Insurance and Your Property' fact sheet (FMA)

> **Will Council's flood plan affect the value of my property?**
> Many factors affect the property market and the individual choice of buyers, including interest rates, the health of the economy and the desire to live in a particular location. Studies on the value of properties in flood-affected areas here and overseas show some consistent patterns:
> - There is already a discount built into the market for properties that are known to flood
> - Even in known flood areas, other factors such as aspect, views, and direct water frontage are strong drivers of value
> - In some particular cases prices may drop after a major flood or other disaster prices (typically five to 10 per cent) but generally recover after one or two years

The final bullet point in that Yeo, et al Figure 2 from their paper is especially relevant to a review of the Fruitticher Report since it states that the typical impact of a major flooding event is a temporary impact on prices of between 5.0% and 10.0% that generally lasts for only one or two years.

Yeo, et al. (2015) show the typically temporary nature of the price impact from a flooding event in the following graphic:



$P_{ZR}$ = Zero risk constant quality house price
$P_{RA}$ = Risk-adjusted constant quality house price
$P_A$ = Actual (observed) constant quality house price

**C L A R I O N**

Yeo, et al. (2015) state that "one of the main findings in the literature is the discounting effect of actual flooding and how this changes with time since the last flood" and attributes this recovery in market prices to "people's tendency for amnesia -- forgetting past floods -- and myopia -- disregarding future risks that may be perceived with scepticism."[85]

Among the many studies cited by Yeo, et al. that demonstrate temporary impacts followed by relatively quick recovery in prices of homes in flooded areas are the following:

- A study of the impact of a 2011 flood in Brisbane, Australia found a decline of 18.9% in prices in the first year after the flood but only 7.1% on average during the first two years after the flood.[86]  Prices for properties located in the flood-prone areas that did not actually flood decreased by about 9.6% in the first year following the flood "but that this effect disappeared after two years."[87]

- Another study of the 2011 Brisbane floods cited by Yeo, et al. (2015) found "evidence of a recovery in sectors of the market one year after the 2011 flood."[88]

- A 2013 study of prices following flooding in Dougherty County, Georgia, found that price impacts following a 1994 flood "disappeared between four and nine years after the flood."[89]

- A study of prices in three United Kingdom communities following floods found price impacts lasted less than three years.[90]

Yeo, et al. (2015) (referencing the Lamond & Proverbs, 2006, article)[91] says the "possible reasons for only temporary impacts include turnover of the population, strong demand, prospects of improved flood defences, optimism and a lack of any restriction on purchase (mortgages and insurance available) that overrides lingering memory of the flood."[92]

---

[85] S. Yeo, et al. (2015), at p. 7.  Available at http://floods.org.au/wp-content/uploads/Stephen-Yeo-Full-Paper.pdf.

[86] Yeo, et al. (2015) provide only a partial citation as follows: P. Doupe, L. Dobes, and F. Jotzo, "Adjusting to New Information: Property Price Effects of Flood-risk Information and Flooding," submitted to _____ , December 2014.

[87] Yeo, et al. (2015) at 9.

[88]  Yeo, et al. (2015) at 9 citing C. Eves and S. Wilkinson, "Assessing the Immediate and Short-Term Impact of Flooding on Residential Property Participant Behaviour," *Natural Hazards*, Vol. 71 (2014), pp. 1519-1536.  DOI 10.1007/s11069-013-0961-y.

[89] Yeo, et al. (2015) citing A. Atreya, S. Ferreira, and E. Kriesel, "Forgetting the Flood? An Analysis of the Flood Risk Discount Over Time," *Land Economics*, Vol. 89, No. 4 (2013) pp. 577-596.

[90] Yeo, et al. (2015) citing J. Lamond and D. Proverbs, "Does the Price Impact of Flooding Fade Away?", *Structural Survey*, Vol 24, No. 5, (2006), pp. 363-77; and . J. Lamond, D. Proverbs, and F. Hammond, "The Impact of Flooding on the Price of Residential Property: A Transactional Analysis of the U.K. Market, *Housing Studies*, Vol 25, No. 3 (2010), pp. 335-356.

[91] J. Lamond and D. Proverbs, "Does the Price Impact of Flooding Fade Away?", *Structural Survey*, Vol 24, No. 5, (2006), pp. 363-77.

[92] Yeo, et al. (2015), at 10.

In an earlier paper reviewing the literature, Yeo asked the following question: "*How prolonged are any effects of disclosure?*"  He answered it this way by reference to various boxes in his article:

> "Deep, highly damaging floods have generated the longest recovery times -- in excess of 10 years for parts of Linda/Olivehurst, where abandoned homes acted as reminders of the damage (Box 4) and about 5-8 years for Oak Grove (Box 1). That property values recovered to their pre-flood levels within about two years at Wilkes-Barre (Box 3) and one year at Nyngan (Box 7) -- despite severe floods -- is thought to reflect the infusion of government relief funds, which speeded restoration.  Adverse market effects of Te Aroha's flood and landslip had vanished after four years (Box 6).  Twice-flooded houses at Des Plaines were still recovering after two years (Box 2)."[93]

Four other aspects of the Yeo, et al. (2015) study of the published flooding impact literature are particularly important to a review of the reliability of the Fruitticher Report analysis and conclusions.

- First, as the Yeo, et al. article points out, sometimes flooding events can have no impact on post-flooding prices.  The authors cite a 2010 study of effects of the 1993 flooding in Missouri that found no impact on property values in some portions of the flooded areas.[94]

- Second, there can be significant variability in impacts from one flood event situation to another and even within the same neighborhood or area from the same flooding event. For example, a review of 19 US studies of impacts of location in a floodplain found a range in effects from -53% to actual positive effects of +58% with an overall average impact of only -2.0%.[95]  Another article summarizing 37 studies found a range in impacts on prices due to floodplain location between -75% and +61%.[96]  The variability is due to the wide variety of factors that can affect housing prices, either positively or negatively, in a particular community, area, or neighborhood.

---

[93] Stephen Yeo, "Effects of Disclosure of Flood-Liability on Residential Property Values," available at https://www.bouldercolorado.gov/links/fetch/10582

[94] Yeo, et al. (2015) citing C. Kousky, "Learning from Extreme Events: Risk Perceptions after the Flood," *Land Economics*, Vol. 86, no. 3 (2010), pp. 395-422.

[95] V. E. Daniel, R. J. G. M. Florax, and P. Rietveld, "Flooding Risk and Housing Values: An Economic Assessment of Environmental Hazard," *Ecological Economics*, Vol. 69 (2009), 355-365, as found on the internet at page 7. of a June 2007 Working Paper # 07-02 from the Department of Agricultural Economics at Purdue University.

[96] A. Beltran, D. Maddison, and R. Elliott, "Is Flood Risk Capitalized in Property Values?: A Meta-analysis Approach from the Housing Market," paper presented at Meta-Analysis of Economics Research Network 8th Annual Colloquium, University of Athens, Greece, September 11th-13th, 2014.

- Third, the accuracy and reliability of multiple regression modeling is very much dependent on the depth and quality of the sales price data utilized in the model. As Yeo, et al. state, citing a 2007 study of flooding impacts in the United Kingdom:[97] "To adequately explain the variation in house prices from one property to another requires large numbers of causal variables and large numbers of observations (selling prices)."

- Fourth, sale/resale analysis involving the same house sometimes called "repeat sales analysis" (i.e., primary paired sales analysis) can be more reliable than multiple regression analysis when only a small post-flooding price data set is available.[98]  The reason, as stated by Yeo, et al., is that "most of the variables are constant for the same house" so analysis of a small data set can give more accurate results.


## 5.2    REVIEW OF THE LITERATURE ON USE OF MASS APPRAISAL METHODS

Multiple regression modeling has long been used by property tax assessors in the United States as part of their "mass appraisal" of properties for purposes of levying ad valorem taxation.  That regression modeling process has long been recognized as a highly inaccurate, but unfortunately necessary, part of the property tax system.

The over-riding purpose of ad valorem taxation at the local level is fairness or "uniformity" not accuracy:  "The relevant test for uniformity is not whether a particular property has been assessed correctly; it is whether that property has been assessed at about the same level as other similar parcels."[99]  This important distinction between the purposes of local government assessment valuation and valuations for other purposes (such as to measure actual marketplace economic damages in litigation), has been recognized by The Appraisal Institute: "Traditional mass appraisal methods have originated with county assessors, who are confined by the goals and realities of the ad valorem tax process. . . the goal of the assessor's valuation process is an equitable distribution of the tax burden across all properties. . . *Assessor models, therefore, focus on equity rather than on individual market valuation veracity*."[100] (emphasis added)

Virtually every state, in recognition that mass appraisal techniques used by local tax assessors are highly inaccurate, has created a process for state review of local assessment practices. Typically this involves a state "assessment/sales ratio study" of the assessed values established by each local tax assessment office or board in the state.   In these studies, the tax assessments

---

[97] The reference is to Lamond, et al. (2007).

[98] One of the articles referenced by Yeo, et al. (2015) in making this point is J. Lamond, D. Proverbs, and A. Antwi, "Measuring the Impact of Flooding on UK House Prices", *Property Management*, Vol. 25, No. 4 (2007), pp. 344-359 discussed in more detail later in our discussion of appropriateness of regression modeling.

[99] John H. Bowman and John L. Mikesell, "Assessment Uniformity:  The Standard and Its Attainment," in *The Property Tax Journal*, December 1990, 219, at 221.

[100] *A Guide to Appraisal Valuation Modeling*, Appraisal Institute (2000), p. 44.

arrived at using mass appraisal techniques are compared to actual sale prices of individual properties to determine the level of inaccuracy in each locale.

The most widely used way to determine the relative accuracy of the mass appraisal techniques used by local assessors is to determine each assessment district's "coefficient of inter-area dispersion" variously referred to as either the CD or the COD.   The higher the COD number, the greater is the inaccuracy in relating assessed values to actual prices paid in the marketplace for the appraised properties.

Mass appraisal techniques used by tax assessors are so inaccurate that a COD between 15 and 20 is often considered a mark of good assessing and acceptable assessment uniformity.[101]   For example, on a group of three similar houses in Pensacola that actually sell for $98,000, $100,000, and $102,000 respectively (an average price of $100,000), the type of mass appraisal technique used for tax assessment purposes would be equally judged to have achieved a "good" result if it either indicates an assessed value of $80,000 or alternatively indicates an assessed value of $120,000 for the same home.  An $80,000 assessed value or, alternatively, a $120,000 assessed value, would each have a COD of 20 (a range between 20% above and 20% below the average prices paid) and therefore, in the assessment world, be considered a "good" and "acceptable" result of the use of mass appraisal techniques.

In reality, mass appraisal techniques used by local tax assessors typically do not even achieve a COD 20 level of inaccuracy.  The U.S. Census Bureau studied 1,367 local assessing units in the 1980s.  It found that less than half of the assessing units scored a COD below 20, and in more than 10% of the assessing units using mass appraisal techniques, the COD was above 50.

In some states, mass appraisal techniques have been so inaccurate in predicting actual sale prices that more than half the assessing districts had CODs above 40.

The fundamental inaccuracy of property tax assessment mass appraisal techniques makes them inherently unacceptable in measuring actual damages to individual properties and owners in areas affected by flooding with various levels of flooding damage.

The inaccuracy of the mass appraisal process used by tax assessors is also demonstrated by the numbers of property owners who appeal their property tax assessment.  State lawmakers have specifically recognized the fundamental inaccuracies of the mass appraisal techniques used by tax assessors and created procedures for individual property owners to appeal their assessed values.  In many municipalities,[102] the number of property owners appealing their property tax

---

[101]  David L. Chicoine and J. Fred Gertz, "Real Estate Tax Assessment Uniformity in Illinois," *Illinois Business Review*, February 1988, p. 12.

[102]  In 2004 in Montgomery County, MD, for example almost 5,000, or 5% of roughly 96,000 property owners submitted appeals claiming the assessments were too high. At least 30% of those appeals resulted in lowered assessments. These figures do not reflect those properties that are under assessed, as very few residents would appeal in such an instance.  A survey conducted by Clarion Associates of several townships in Saginaw County,

*Appraisal Review Report*                            *John Navelski, et al. v. International Paper Company*
                                                     *316 Homes in a Proposed Class Area in Escambia County, Florida*

assessments has increased dramatically in recent years, especially in years when reassessed values are set.

The inaccuracy of mass appraisal techniques is specifically recognized by USPAP Standard 6: "It is implicit in mass appraisal that, even when properly specified and calibrated mass appraisal models are used, some individual value estimates will not meet standards of reasonableness, consistency, and accuracy."[103]

Many of the problems in tax assessment procedures are also found in Automated Valuation Models (AVMs).[104]

AVMs have not yet been widely accepted in everyday real estate applications. The reason is simple: AVMs have been found to be extremely unreliable in the absence of property-by-property checking of the AVM results. The principal realm in which AVMs are being used regularly is in the packaging of home loans in the secondary mortgage market, where the inaccuracies of AVM value determinations on a property-by-property basis can be balanced against the relatively low loan-to-value ratios and large number of properties in the portfolios. Yet even in the secondary markets, AVMs have been "unable to capture more than the 20% share of the greater collateral valuation market that it has taken five years to attain *because regulators and lenders are concerned about the accuracy and appropriateness of AVM values* without the involvement of an appraiser." (emphasis added) [105]

Because of their inaccuracies, the home lending industry has not been widely utilizing AVM products to determine the value of individual properties for mortgage origination: "The reluctance to use this product (AVMs) for first mortgages is due to uncertainty concerning the reliability of the product in high loan-to-value situations."[106] Fitch Ratings, one of the largest bond rating companies in the United States, has "questioned the reliability of the data

Michigan, revealed that the number of property owners that submit appeals increases whenever the local assessors reassess property values. In some jurisdictions, the number of appeals by homeowners from the results of the inaccurate mass appraisal techniques exceeded 5%. In the 1980's and early 1990's in Michigan, that number may have exceeded 10% to 15%.

[103] USPAP 2014-2015 Edition, Standard 6: Mass Appraisal, Development and Reporting, Lines 1377-1379.

[104] In fact, many tax assessment jurisdictions incorporate some elements of AVMs in their procedures. Therefore, the inaccuracy of AVMs may be part of the cause of the inaccuracy of tax assessment mass appraisal.

[105] Mark R. Linne, MAI, CRE, ASA, FRICS, "A Vision for Valuation: Automated Valuation Models and Appraisal Practice," paper presented at the 23rd Pan Pacific Congress of Appraisers, Valuers and Counselors, San Francisco, CA, September 16-19, 2006.

[106] Linne, supra. AVMs have also begun to be used by some lenders "for internal purposes, either in a quality control environment as an appraisal review tool or for funding on high-quality loans that were kept within the institution such as home equity loans." Victoria Cassens Zillioux, "Automated Valuation Models: Automation vs. Hyprid," paper presented at the 23rd Pan Pacific Congress of Appraisers, Valuers and Counselors, San Francisco, CA, September 16-19, 2006.

underlying automatic valuation models" and ruled on April 15, 2004, that "it would discount by 10 percent to 15 percent home prices calculated by anything other than full appraisals."[107]

AVMs have also been found to be particularly inaccurate in the valuation of a widely disparate group of properties, or in neighborhoods with a wide variety of property characteristics, as evidenced by the following:

- "AVMs' accuracy tends to suffer in areas where local housing is highly heterogeneous or where there is a lack of sufficient long-term data. . ."[108]

- "AVMs cannot observe the subject, its condition, safety hazards, lot utility, view, traffic conditions, adjacent negative land uses.  They cannot tell if it is really a house (a highest-and-best-use issue).  They work poorly for unique properties and for mixed neighborhoods.  They can err greatly in either direction."[109]

- "They (AVMs) must somehow try to adjust for every possible unusual condition, atypical property or different circumstance – an almost impossible challenge."[110]

The limited applicability of AVMs, especially when it involves unusual properties, has also been recognized by The Appraisal Institute.  According to The Appraisal Institute, the largest professional organization of real estate appraisers, "AVMs are rarely accepted by mortgage investors." (*Appraiser News Online*, June 1, 2004)

The Appraisal Institute, in its book on valuation modeling, comments on AVMs as follows:

> "Most AVMs are good at estimating the value of properties with homogeneous property characteristics and location factors.  With appraiser-based market estimate modeling, however, the valuation process that an appraiser uses can be more refined and meaningful because it may better reflect the concerns that the actual real estate market mechanism presents in a defined neighborhood."[111]

As a result, AVMs are almost never utilized to value non-residential properties, and even for single-family homes, have been recognized as "reliable without human interaction for only 30%-35% of the market."[112]

---

[107] *Appraiser News Online*, June 1, 2004.
[108]  Brenda B. White, "Evaluating AVMs," in *Mortgage Banking*, September 2006, p. 17, referencing the March 2006 issue of *Mortgage Technology*.
[109]  George Dell, MAI, "AVMs:  The Myth and the Reality; the Problem and the Solution," *Valuation Insights & Perspectives*, The Appraisal Institute, Third Quarter, 2004, p. 13.
[110]  Dell, supra., at 50.
[111]  *A Guide to Appraisal Valuation Modeling*, Appraisal Institute (2000), p. 41.
[112]  Linne, supra.

A number of academic researchers have found that hedonic modeling falls short when measured against the traditional sales comparison approach using an adjustment grid to determine values.  Colwell, Cannaday and Wu in an early article in the *AREUA Journal* compared regression analysis to traditional adjustment grid methods used by appraisers.  The authors' comparison "makes clear the superiority of the grid approach over a pure regression approach" in the analysis situation evaluated.[113]

The Colwell, Cannaday and Wu article, as well as an article by Professor Vandell,[114] attribute the superiority of properly weighted comparable sales to hedonic modeling to a fundamental problem of every hedonic model – it cannot "solve" for every variable affecting the price and value of a particular property.[115]

This has also been recognized as the fundamental inaccuracy of hedonic modeling in many other studies as well, including a study by Atkinson and Crocker who reviewed 15 hedonic property value studies conducted by others.  There was little agreement among the studies as to which independent variables should be included – the 15 studies recognized approximately 110 different potential independent variables.  However, Atkinson and Crocker found that the number of independent variables used in the models typically ranged between 15 and 18, with one study using 29 and another study only 11.[116]

A seminal article by Lentz and Wang attributed a "high standard error" as the central problem in relying on the output of regression modeling:

> "*The Real Problem*.  One of the most serious problems involved with the application of the regression method to appraisals has yet to be adequately addressed in the literature:  the large standard error of the regression estimate.  The high standard error of estimates reported in most hedonic studies might render the fitted values useless (for example, see the standard errors reported in Vandell, 1991, Tables 2 and 3).  Indeed, when the standard error of estimate is normally 10% to 30% of the estimated value of residential properties, we fail to see that the appraisal can contribute very much to the underwriting process."[117]

---

[113]  Peter F. Colwell, Roger E. Cannaday, and Chunchi Wu, "The Analytical Foundations of Adjustment Grid Methods," *AREUEA Journal*, Vol. 11, No. 1., 1983,  11, at 27.  See also, Kerry D. Vandell, "Optimal Comparable Selection and Weighting in Real Property Valuation," *AREUEA Journal*, Vol. 19, No. 2., 1991,  213, at 236.

[114] Kerry D. Vandell, "Optimal Comparable Selection and Weighting in Real Property Valuation," *AREUEA Journal*, Vol. 19, No. 2., 1991,  213.

[115]  "Pure regression prediction suffers from an omitted variable problem. . ." Colwell, Cannaday, and Wu, supra, at 26.

[116]  Atkinson and Crocker, supra, at 28.

[117]  George H. Lentz and Ko Wang, "Residential Appraisal and the Lending Process:  A Survey of Issues," *Journal of Real Estate Research*, Vol. 15, Numbers 1/2, 1998, p. 19.

The Bureau of National Affairs in 2004 reported on the results of the first comprehensive study of the accuracy of recent studies utilizing statistical techniques such as hedonic modeling, predictive regression (survey) analysis, and other mathematical techniques to determine the impact of contamination on property values. The six year study involved review of more than 90 papers published in the peer reviewed literature, followed by testing of the accuracy of the results of three of the studies. This comprehensive review of the published academic literature impacts[118] by Albert R. Wilson found a central methodological flaw[119] endemic to the use of statistical methods to quantify damages – the analysts failed to acknowledge that the result of the statistical testing in reality never actually isolates the impact due to the factor studied (dependent variable) from the impact due to all other factors not specifically accounted for in the model.

The Wilson BNA article explains this failure of the result to truly test for the impact of proximity to the source of the detrimental condition price impairment as follow:

> "Which omitted variables are contributing and how much are they contributing? The included predictor variable no longer represents just itself (in our example, proximity to a source of contamination) but also some portion of all of the contributing omitted variables. This question is virtually unanswerable."[120]

Wilson points to that failure to account for all variables as the critical flaw that makes such statistical methods useless in measuring actual damages in the real world: "These conditions (inclusion of every possible variable in the model) may be obtainable in a carefully designed laboratory experiment, but the probability of their occurrence for real world observational data is vanishingly small."[121]

As a result, all such statistical models are inherently suspect because "there is no 'correct' hedonic model" and there is no "means of identifying a 'correct' model from the many thousands of possible models."[122]

---

[118] Albert R. Wilson, CRE, "The Questionable Reliability of 'Peer Reviewed' Real Estate Literature, *Bureau of National Affairs: Expert Evidence Report*, January 5, 2004.

[119] The study also found a number of other errors in the studies including the following: failure to properly validate sales data and failure to eliminate inappropriate data (i.e., failure to undertake quality control) apparently due to an apparent belief that sound statistical theory believes that gross volume of data is preferable to an appropriately selected set of data.

[120] In more scientific terms, he explains this fundamental flaw as follows: "With respect to the quantitative meaning of the predictor variable coefficients, and the related interpretation of those coefficients as the marginal contributor of that predictor variable to the response, these assumptions are true if – and only if – all of the predictor variables have been included in the regression and the predictor variables are absolutely independent of each other. . . Any relationship between the included and/or omitted predictor variables or any overall relationship not specifically addressed by the regression (e.g., 'location' in its many real estate related facets), compromise the assumption of independence."

[121] Wilson, supra, at 23.

[122] Wilson, supra, at 23.

So-called "mass appraisal" techniques such as AVMs (automated valuation models) are prone to high rates of error and cannot fairly, efficiently and accurately measure real property damages caused by the type of flooding event that occurred in Pensacola in April of 2014. Instead, rigorous property-by-property analysis is necessary.

As discussed earlier, the Mass Appraisal provisions in USPAP recognize that an AVM is not an appraisal of "market value." An AVM's output may become a basis for appraisal or appraisal review if the appraiser believes the output to be credible for use in a specific assignment."[123]

### 5.3   PAST CLARION ASSOCIATES FLOODING IMPACT RESEARCH

In recent years, the appraisal profession has come to accept the need to undertake "case study" analysis in some situations involving properties affected by detrimental conditions and environmental stigma.  In a case study analysis, the real estate appraiser looks to what has happened in other locations involving similar properties and similar detrimental condition situations in order to understand what has happened, or could happen, in the particular market in which the appraiser is working.

According to a seminal article in *The Appraisal Journal*:

> "Generally, case studies are utilized when there is a lack of direct market data or where analyses of direct market data need additional support.  For example, if the impact of a landfill on surrounding properties were being studied, the most pertinent approach would involve actual sales of the surrounding properties.  In the event that no direct market data is available, the case studies approach utilizing market data derived of other landfill-proximate sales would become relevant.  Although case studies are useful any time there is available and relevant data, they have a secondary role if there is direct market data available at the subject site."[124]

Given the short length of time that has passed since the April 2014 Pensacola flooding event, there are only a limited number of sales in the proposed class area that can be analyzed.  As a result, we have also utilized the case study method to understand the likely variability in the effect of the flooding on a property-by-property basis.

---

[123]  USPAP, 2014-2015 Edition, p. A-45, Lines 16-17.
[124]  Thomas Jackson, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal*, January 2002, as cited in Richard J. Roddewig, Editor, *Valuing Contaminated Property:  An Appraisal Institute Anthology*, The Appraisal Institute, 2002, p. 275.

Our work in the past 25 years has sometimes included an analysis of the impact of floodplain location and sometimes flooding itself on prices and values. Our three most recent research projects involving single-family homes affected by flooding are as follows:

- A 2007 analysis of the inaccuracies encountered by appraisers in New Orleans in attempting to apply multiple regression (mass appraisal) modeling to determine the impact of Hurricane Katrina flooding on property values.

- A 2010 analysis of prices paid for flood remediated homes in Mandeville, Louisiana following flooding due to various hurricanes.

- Analysis of the impact of flooding events in Milwaukee, Wisconsin in June of 2008.


**5.3.1    REVIEW OF MASS APPRAISAL MODELING DIFFICULTIES IN DETERMINING FLOOD DAMAGED PROPERTY VALUES IN NEW ORLEANS IN THE WAKE OF HURRICANE KATRINA**

The City of New Orleans and the State of Louisiana tried to use multiple regression modeling mass appraisal techniques to determine the impact of flooding from Hurricane Katrina on property values. It was a miserable failure and the city and the state eventually admitted so.

Even before Katrina, mass appraisal using multiple regression modeling was recognized as inherently inaccurate in New Orleans.[125] The flooding made that even more apparent, and it was eventually recognized that property-by-property investigation and individualized appraisal reports were necessary to accurately determine appropriate damages.

The 2007 New Orleans reassessment in the wake of Hurricane Katrina resulted in more than 5,200 appeals by property owners to the City Council,[126] "an unprecedented number of appeals."[127] According to the *Times-Picayune*, the City Council normally hears only "a few dozen appeals."[128] In the 6th tax assessment district alone, the number of formal appeals equaled approximately 8.6% of all property owners. The large number of appeals occurred even after the individual tax assessment districts handled "massive lines" of property owners and successfully resolved "hundreds" of additional individual contested cases on a property-by-property basis during a two-week roll review period in early August.

---

[125] In 2003, the State of Louisiana Legislative Auditor tested the tax assessment procedures in some parishes and concluded that "the methodology used by the assessor does not get to fair market value." State of Louisiana Legislative Auditor, "Residential Tax Assessment Practice," April 2003, p. 12. The study found examples of similar homes on the same street in the same subdivisions being assessed at significantly different levels. The market value determinations for the similar houses on the same street could be as much as 88% higher for one house than the other.

[126] The New Orleans City Council sits as the Board of Review for tax assessment appeals.

[127] *Times-Picayune*, August 28, 2007.

[128] *Times-Picayune*, August 28, 2007.

*Appraisal Review Report*                                    *John Navelski, et al. v. International Paper Company*
                                          *316 Homes in a Proposed Class Area in Escambia County, Florida*

The number of appeals to the New Orleans City Council was so large that the city hired an outside contractor to "manage the complex process and handle much of the work reviewing the 5,262 appeals."[129]

The Road Home program established in the wake of Hurricane Katrina to provide grants to home owners for reconstruction considered, but ultimately rejected, the use of local parish tax assessment mass appraisal techniques.  Local tax assessor values based on mass appraisal techniques were found to be inaccurate and prone to error when used to establish pre-storm market values.   As a result, the Road Home program "prefers to base pre-storm values on a formal appraisal of the property done before the storm and submitted by the homeowner."[130] An early summary of the program on the City of New Orleans website also indicated that in the absence of such an appraisal, the Road Home program would use an Automated Valuation Model.

However, by December of 2006, it became clear that the AVMs being used in the absence of an appraisal were also subject to a high error rate:  "The problems (with AVMs) seem most acute in Orleans Parish, where neighborhoods with checkerboard demographics and home values aren't well-suited to 'average' calculations of value used in the automatic assessments."[131]  By mid-December of 2006, however, the Louisiana Office of Community Development had acknowledged "serious problems with use of the Automated Valuation Method."  By January of 2007, the Road Home program had decided to commission individual property appraisals using local New Orleans appraisers "for as many properties as necessary to get the values right."[132] In June of 2007, *The Times-Picayune* was still reporting that "the preponderance of erroneous computer-generated values remains one of the biggest bottlenecks in the troubled (Road Home) homeowner aid program."[133]

### 5.3.2   ANALYSIS OF PRICES FOR FLOOD REMEDIATED HOMES IN MANDEVILLE, LOUISIANA

In 2010 we investigated prices paid for flood remediated homes in Mandeville, Louisiana, an area on the north shore of Lake Pontchartrain that is subject to flooding as a result of periodic heavy rains coupled with strong southerly winds that bring high tides which back up the rivers and drainage ways. These regularly occurring events are not specifically enumerated by local governments.  In addition, hurricanes and tropical storms hit Louisiana almost annually creating their own flooding havoc.   Between 2001 and 2008, there were nine flooding events in Louisiana resulting from the following hurricanes and named tropical storms:

- Allison – June 2001

---

[129]  *Times-Picayune*, August 28, 2007.
[130]  http://www.nola.com/newslogs/rpanswerspot/index.ssf?/mtlogs/nola_tpqa/archives/2006_12.html.
[131]  http://www.nola.com/weblogs/pring.ssf?/mtlogs/nola_tpupdates/archives/print217834.html.
[132]  *The Times-Picayune*, May 1, 2007.
[133]  *The Times-Picayune*, June 7, 2007.

**C L A R I O N**

- Isidore – September 2002
- Lili – October 2002
- Matthew – October 2002
- Katrina – August 2005
- Rita – September 2005
- Humberto – September 2007
- Gustav – August/September 2008
- Ike – September 2008

Remediation after a flood event typically involves removal of some or all of the interior (and even exterior) wall surfaces, removal of some or all of the electrical and/or HVAC systems, and cleaning of surfaces both inside and outside  walls and partitions to remove existing or potential mold and mildew.

To determine the manner in which the Mandeville single-family home market responded to flooding events, we worked in conjunction with a firm of local Mandeville area real estate appraisers to collect sales of homes known to have been remediated and resold following storm related flooding events.  The sale price for each remediated property on a price paid per square foot basis was then compared to the sale prices of comparable homes in similar locations that were not flooded.

Information related to the five remediated properties and the comparables is summarized in the table below.  Locations are considered comparable.  More detailed information about the sales and the comparables, including maps showing locations of the homes, is retained in our files.

*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

| Property/Comparable# | Address | Beds | FB/HB | Living Area | Sale Date | List Price | Sold Price | $/SF | % Diff. Unadjusted | DOM | Sale to List Price Ratio | Condition | % Condition Adjust. | Adjusted $/SF | % Diff. Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sale # 1 - 211 Carroll St.** | | | | | | | | | | | | | | | |
| *Subject* | *211 Carroll St.* | *2* | *1* | *950* | *Dec-09* | *$185,000* | *$173,000* | *$182.11* | | *199* | *93.5%* | *Excellent* | - | | |
| Comparable 1 | 340 Girod St. | 2 | 1 | 1,200 | Oct-09 | $274,500 | $225,000 | $187.50 | | 33 | 82.0% | Very Good | 5.0% | $196.88 | |
| Comparable 2 | 231 West Ave. | 3 | 1/1 | 1,209 | Apr-09 | $189,900 | $192,000 | $158.81 | | 92 | 101.1% | Excellent | 0.0% | $158.81 | |
| **Average of Comparables** | | | | **1,205** | | **232,200** | **208,500** | **$173.15** | **5.17%** | **63** | **91.5%** | | | **$177.84** | **2.40%** |
| **Sale # 2 - 211 East St.** | | | | | | | | | | | | | | | |
| *Subject* | *211 East St.* | *2* | *1* | *800* | *Dec-09* | *$174,000* | *$161,000* | *$201.25* | | *21* | *92.5%* | *Very Good* | | | |
| Comparable 1 | 340 Girod St. | 2 | 1 | 1,200 | Oct-09 | $274,500 | $225,000 | $187.50 | | 33 | 82.0% | Very Good | 0.0% | $187.50 | |
| Comparable 2 | 231 West Ave. | 3 | 1/1 | 1,209 | Apr-09 | $189,900 | $192,000 | $158.81 | | 92 | 101.1% | Excellent | -5.0% | $150.87 | |
| **Average of Comparables** | | | | **1,205** | | **232,200** | **208,500** | **$173.15** | **16.23%** | **63** | **91.5%** | | | **$169.18** | **18.95%** |
| **Sale # 3 - 2021 Claiborne St.** | | | | | | | | | | | | | | | |
| *Subject* | *2021 Claiborne St.* | *2* | *2/1* | *2,024* | *May-07* | *$350,000* | *$325,000* | *$160.57* | | *20* | *92.9%* | *Very Good* | | | |
| Comparable 3 | 1932 Jefferson St. | 2 | 2 | 1,773 | Mar-07 | $265,000 | $265,000 | $149.46 | | 72 | 100.0% | Very Good | 0.0% | $149.46 | |
| Comparable 4 | 263 East St. | 1 | 2 | 1,546 | Oct-07 | $299,000 | $255,000 | $164.94 | | 43 | 85.3% | Excellent | -5.0% | $156.69 | |
| Comparable 5 | 215 Carondelet St. | 3 | 2 | 1,856 | Jul-07 | $325,000 | $290,000 | $156.25 | | 62 | 89.2% | Ecellent | -5.0% | $148.44 | |
| **Average of Comparables** | | | | **1,725** | | **296,333** | **270,000** | **$156.89** | **2.35%** | **59** | **91.5%** | | | **$151.53** | **5.97%** |
| **Sale # 4 - 1306 Sycamore St.** | | | | | | | | | | | | | | | |
| *Subject* | *1306 Sycamore St.* | *4* | *2* | *1,849* | *Aug-09* | *$229,900* | *$218,000* | *$117.90* | | *3* | *94.8%* | *Excellent* | | | |
| Comparable 6 | 1202 S. Ridge Dr. | 4 | 2 | 1,900 | Nov-09 | $237,500 | $230,000 | $121.05 | | 158 | 96.8% | Very Good | 5.0% | $127.11 | |
| Comparable 7 | 1229 Sycamore Pl. | 3 | 2 | 1,852 | Oct-09 | $225,900 | $225,000 | $121.49 | | 136 | 99.6% | Excellent | 0.0% | $121.49 | |
| Comparable 8 | 2172 Olvey Dr. | 4 | 2 | 2,038 | Sep-09 | $239,500 | $225,000 | $110.40 | | 271 | 93.9% | Very Good | 5.0% | $115.92 | |
| Comparable 9 | 1302 S. Ridge Dr. | 4 | 2 | 1,897 | Nov-09 | $229,900 | $225,000 | $118.61 | | 126 | 97.9% | Very Good | 5.0% | $124.54 | |
| Comparable 10 | 2040 Olvey Dr. | 3 | 2 | 1,820 | Sep-09 | $219,900 | $210,000 | $115.38 | | 11 | 95.5% | Excellent | 0.0% | $115.38 | |
| Comparable 11 | 1353 State St. | 4 | 2/1 | 2,014 | Jul-09 | $225,000 | $224,500 | $111.47 | | 137 | 99.8% | Very Good | 5.0% | $117.04 | |
| **Average of Comparables** | | | | **1,920** | | **229,617** | **223,250** | **$116.40** | **1.29%** | **140** | **97.3%** | | | **$120.25** | **-1.99%** |
| **Sale # 5 - 601 Johnson St.** | | | | | | | | | | | | | | | |
| *Subject* | *601 Johnson St.* | *2* | *1* | *825* | *Feb-07* | *$139,900* | *$133,000* | *$161.21* | | *193* | *95.1%* | *Very Good* | | | |
| Comparable 12 | 134 Vista St. | 3 | 2 | 1,124 | Jan-07 | $149,900 | $149,900 | $133.36 | | 97 | 100.0% | Very Good | 0.0% | $133.36 | |
| Comparable 13 | 144 Poe St. | 3 | 2 | 1,350 | Jun-07 | $159,900 | $161,000 | $119.26 | | 110 | 100.7% | Excellent | -5.0% | $113.30 | |
| Comparable 14 | 106 Dummyline Rd. | 2 | 1 | 832 | Dec-06 | $165,000 | $161,000 | $193.51 | | 115 | 97.6% | Very Good | 0.0% | $193.51 | |
| **Average of Comparables** | | | | **1,102** | | **158,267** | **157,300** | **$148.71** | **8.41%** | **107** | **99.4%** | | | **$146.72** | **9.88%** |

In all five of the situations analyzed, the average price per square foot paid for the comparables was less than the price paid for the remediated property. However, we also considered differences in the quality rating of each comparable compared to each flood-remediated property. We adjusted each comparable up or down by 5.0% to account for the difference between an "excellent" and "very good" quality rating. After making the quality rating adjustments, one of the sets of comparables (flood remediated Sale No. 4 at 1306 Sycamore Street) shows a slight differential of about 2.0%. The flood remediated sales prices for the other four homes, however, are between 2.4% and 18.95% higher than the average quality rating adjusted sale prices.

In three of the five comparisons, the flood remediated property sold at a higher sale-to-list-price ratio while in two of the comparisons the sale-to-list-price ratio was lower. The same is true of marketing times (days-on-the-market, or DOM) – the flood remediated properties had shorter marketing times in three of the comparisons and longer in two. Overall, the days-on-market and sale-to-list data show no evidence of any stigma impact post-remediation.

Based on this information, we have concluded that there was no post-remediation stigma in the marketplace for flood-remediated homes in Mandeville. The Mandeville marketplace is comfortable in paying normal market prices for homes that have been remediated following flooding events even though there was some possibility for lingering behind-the-walls moisture or mold problems post-remediation, and even a high likelihood of future flooding.

### 5.3.3    ANALYSIS OF PRICES PAID FOR FLOOD REMEDIATED HOMES IN MILWAUKEE, WISCONSIN

In June of 2008, the Lincoln Creek Parkway area of Milwaukee, Wisconsin, experienced some surface flooding and many basement sewage backups during a heavy rainfall event. However, the Lincoln Creek Parkway area was not alone in experiencing basement backups, nor was 2008 the first, or the only, time that significant basement backups occurred here or elsewhere in the Milwaukee area as a result of heavy rainfall events. Basement backups are a well known fact of home-ownership in many parts of Milwaukee including the multiple neighborhoods located within in and around Lincoln Creek Parkway areas.

We identified five major storm events between 1997 and 2010 for which the Milwaukee Metropolitan Sewerage District (MMSD) provided basement backup data. We mapped this data using a Geographic Information System software package (*ESRI ArcView 10.1*)

We undertook various types of recognized detrimental condition studies, including "sale/resale (paired sales) analysis," marketing time analysis, and affected area compared to control area analysis.

We also compared average home prices between 2002 and 2013 in the flooding impacted Case Study neighborhoods compared to the average home price in an unaffected Milwaukee control

area.[134]  The Control Area performed significantly worse after 2007, when the most significant flooding events occurred, than did the flooding affected Case Study Area as shown on the graphic below.



| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Study Areas | $81,245 | $85,918 | $106,918 | $119,197 | $114,869 | $129,035 | $103,982 | $83,531 | $85,299 | $63,848 | $66,125 | $66,211 |
| Control Areas | $98,528 | $107,311 | $119,862 | $136,131 | $140,956 | $128,517 | $110,677 | $87,763 | $90,372 | $65,668 | $60,979 | $64,313 |

We also analyzed single-family home contract sale prices in the six months before and the six months after the June 2008 flood event in the Case Study Area and compared those prices to contract sale prices during the same time periods in the Northwest and North Control Areas.

We found a temporary impact on home prices in the flood affected neighborhoods in the second half of 2008 but no impact in the first half of 2009 and by the second half of 2009, any temporary impact had clearly ended, and prices in the Case Study Area impacted by the June 2008 flood event had rebounded to a point that would not have been expected if the 2008 flood event was continuing to have an effect on the market.

---

[134] The average prices are based on Multiple Listing Service data.  For the majority of our analyses we have excluded all sales at less than $10,000, which would most likely be "tear downs" represent lot value only and all sales of homes with an indicated sales price of greater than $400,000.

As a result, the only property owners in the flood affected area who suffered an actual out of pocket loss due to that temporary impact on the market were those who actually sold their homes under contracts signed between June 9, 2008 and the end of 2008.

As indicated above, if the flooding event was having an effect on the marketplace, we would expect to see a decrease in the number of home sales in the flood impacted neighborhoods.

The number of sales on a half year basis in the affected Case Study neighborhoods and in the control areas were as follows:

| Number of Sales | | | | |
|---|---|---|---|---|
| Period | Case Study Areas | % Change | Control Areas | % Change |
| Jan-June 2007 | 31 | | 38 | |
| Jul-Dec 2007 | 30 | -3.2% | 33 | -13.16% |
| Jan-June 2008 | 38 | +26.7% | 31 | -6.06% |
| July-Dec 2008 | 36 | -5.3% | 35 | +12.9% |
| Jan-June 2009 | 37 | +2.8% | 29 | -17.14% |
| July-Dec 2009 | 49 | +32.4% | 38 | +31.03% |

The data in the table indicates a possible impact on the number of sales in the second half of 2008 immediately after the June 2008 flooding event.  The number of sales decreased by -5.3% in the affected neighborhoods while increasing by +12.9% in the control areas.  However, it was only a six month impact as evidenced by the sales data from the subsequent periods.  The number of sales rebounded in the affected area in the first half of 2009 and then increased by +32% in the first half of 2009.  That was a superior performance to that of the control areas in 2009.

Also, as indicated above, if the flooding event was having an effect on the marketplace, we would expect to see an increase in the time it took to sell a home in the flood impacted Case Study neighborhoods.

That is exactly what happened, as indicated by the marketing times on a half year basis in the affected neighborhoods and in the Anderson control areas were as follows:

| Marketing Time (Days on Market) | | | | |
|---|---|---|---|---|
| Period | Case Study Areas | % Change | Control Areas | % Change |
| Jan-June 2007 | 102 | | 88 | |
| Jul-Dec 2007 | 75 | -26.3% | 80 | -9.9% |
| Jan-June 2008 | 69 | -8.0% | 82 | +3.0% |
| July-Dec 2008 | 89 | +28.9% | 77 | -5.9% |
| Jan-June 2009 | 86 | -3.6% | 98 | +26.9% |
| July-Dec 2009 | 83 | -3.9% | 106 | +6.0% |

The data in the table indicates that it took 20 days longer, on average, to sell a home in the affected Case Study neighborhoods in the second half of 2008 than it did in the first half of the year before the June flood event.  By comparison, it took five days less time to sell a home in the control areas.

However, that impact on marketing times was only temporary and lasted no more than six months as indicated by the comparisons of the days on market in the affected Case Study neighborhoods and the control areas in 2009.  Marketing times went down significantly in the affected neighborhoods during 2009 while increasing significantly in the control areas.

Sale price to list price ratios should also be lower in the aftermath of the June 2008 flood event if it was adversely impacting the marketplace.  Sellers, in the aftermath of an environmental event or discovery of a detrimental condition that could affect a market, typically continue to set their asking prices based on pre-event or pre-discovery prices.  They let the marketplace decide what discount, if any, to apply.  As a result, if an event or condition is having an effect, offering prices are typically lower than before the event happened or condition occurred.  The price eventually resulting from the back and forth negotiations should be lower as a percentage of pre-discovery asking prices.

Sale price to list price ratios before and after the flooding event in the affected Case Study Plaintiff neighborhoods and in the control areas were as follows:

| Sale Price to List Price Ratios | | | | |
|---|---|---|---|---|
| Period | Case Study Areas | % Change | Control Areas | % Change |
| Jan-June 2006 | 0.98 | | 1.00 | |
| July-Dec 2006 | 0.98 | 0.1% | 0.99 | -1.4% |
| Jan-June 2007 | 0.98 | 0.2% | 0.98 | -1.0% |
| July-Dec 2007 | 0.96 | -3.0% | 0.97 | -0.9% |
| Jan-June 2008 | 0.93 | -2.4% | 0.97 | 0.4% |
| July-Dec 2008 | 0.91 | -2.8% | 0.95 | -2.1% |
| Jan-June 2009 | 0.92 | 1.3% | 0.91 | -4.2% |
| July-Dec 2009 | 0.92 | 0.8% | 0.97 | 6.0% |
| Jan-June 2010 | 0.91 | -2.1% | 0.97 | 0.9% |
| July-Dec 2010 | 0.91 | 0.4% | 0.98 | 0.5% |
| Jan-June 2011 | 0.96 | 5.3% | 0.90 | -8.3% |
| July-Dec 2011 | 0.88 | -7.7% | 0.93 | 4.2% |
| Jan-June 2012 | 0.94 | 6.1% | 0.96 | 2.9% |
| July-Dec 2012 | 0.92 | -1.6% | 0.96 | 0.0% |

From January of 2006 through the first half of 2008, the average sale to list price ratio in the affected neighborhoods was 96.8% while in the control areas was 98.1%, approximately 1.3 percentage points higher.  In the first six months after the June 2008 flood event, the average sale to list price ratio in the affected Case Study neighborhoods decreased from 93% to 91%.  In

Case 3:14-cv-00445-MCR-CJK    Document 80-1    Filed 04/13/16    Page 103 of 181

*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

the control areas it also decreased by 2.0 percentage points, from 97% to 95%. When both the first six months and second six months following the June 2008 flooding event are considered, the average sale price to list price ratio in the control areas was 93.0, exactly 2.0 points higher than the 91.5% average in the affected neighborhoods during the same two six month periods. And when the averages from the second half of 2008 through the end of 2012 are analyzed, the overall average sale to list price ratio in the control areas was 94.86%, was about 3 percentage points higher than the 91.8% average in the affected neighborhoods.

That data indicates that the sale to list price ratio in the affected Case Study neighborhoods decreased by about 1.0 percentage points, on average, in the six month periods since the second half of 2008. However, if that overall change was due to the June 2008 flooding event, we would have expected to see a significant drop in the ratio in the second half of 2008 and first half of 2009 by comparison to the control areas. That did not occur. Instead the drop in the ratio in the second half of 2008 in the affected neighborhood mirrored the change in the control areas. In the first half of 2009, the affected Case Study Area outperformed the control areas. It appears, therefore, that something other than the June 2008 flood event accounts for the overall difference in the ratios in the second half of 2009 and later.

The comparative analysis indicates the following:

- Average home prices were not permanently impacted by the June 2008 flooding event and subsequent basement flooding and sewer backups. Since 2007, one year before the 2008 flooding, home price trends in the flooding affected Case Study Area have been better than in the control areas.

- However, there was a possible temporary impact on home prices between July of 2008 and year-end 2008. In the second half of 2008, the average price of a home was about $9,123 lower than would have been expected based on price trends in the control areas. That equates to about a 9.1% decrease in price. During the first half of 2009, some of the average sale price data indicated a possible impact on prices but our sale/resale and paired sales data, as well as marketing time and sale price to list price data, indicated no impact.

- That impact on prices was temporary and only affected those homeowners who sold their homes during the second half of 2008, and potentially also the first half of 2009.

**6.  THE FRUITTICHER REPORT FAILS TO COMPLY WITH GENERALLY ACCEPTED STANDARDS AND METHODS FOR DETERMINING THE EFFECT OF A DETRIMENTAL CONDITION ON MARKET VALUE**

**6.1    THE CONCLUSION CONCERNING ENVIRONMENTAL STIGMA IN THE FRUITTICHER REPORT IS NOT SUPPORTABLE**

The Fruitticher Report concludes that there has been a 12% post-flooding "stigma" impact to non-flooded homes and an 18% "stigma" impact to flooded homes in the proposed Class Area. The Fruitticher Report (page v) concludes that the total sum of the post-flooding "stigma" damages is $9,034,000, or an average of $28,589 per property. The Fruitticher Report treats these damages as a permanent effect on the market value of the 316 properties.

Our testing of the Fruitticher multiple regression model and trend line linear regression model indicates that those conclusions are not supportable. Among the reasons set out in this Appraisal Review Report are the following:

- There are too few sales (observations) in the data set used by Fruitticher to support a statistically reliable regression model.

- The *t*-statistics and *p*-values for all but two of his independent (predictor) variables indicate that that is a high likelihood that the coefficients for those independent variables emerged by chance and do not describe a real relationship.

- Fruitticher failed to test the credibility of his model by using any of the recognized means for testing regression model and mass appraisal results.

- When the 10 sales that have occurred in the proposed Class area post-flooding are included in the Fruitticher multiple regression model, they indicate an average stigma impact of only 4.0% not the 15% average impact in the Fruitticher conclusion.

- When the actual prices of the 10 post-flooding sales are compared to the regression model that includes post-flooding sale prices, the average stigma impact is only 3.0% not 15.0% and five of the homes show no stigma impact.

- When two homes are appraised using the sales comparison technique, the average differential is 5.7% not 15%.

- The trend line analysis in the Fruitticher Report contains too few sales data points (observations) to be a statistically reliable linear regression.

- The Fruitticher Report does not analyze the outliers in the simple linear regression trend lines. When only one outlier is removed from the trend line supposedly showing a 9% drop in average price in the past two years, the trend line flips to an indication of a 9% increase in average price in the flooded portion of the proposed Class Area.

- The Fruitticher Report does not consider the improvements being made to the flood control process in the affected area. Nor does he consider the possible effect on prices of the proposed buyout program by the federal government and the door to door promotional campaign that has accompanied that program.

## 6.2 THE APPROPRIATE STIGMA CONCLUSIONS THAT RESULT FROM OUR REVIEW, ANALYSIS AND TESTING OF THE FRUITTICHER MULTIPLE REGRESSION MODELING AND MASS APPRAISAL METHODS

Based on our review, analysis and testing of the appraisal methods in the Fruitticher Report, we have arrived at the following additional conclusions:

- A comparison of the actual sale prices in the proposed Class Area since the April 2014 flooding event to the Fruitticher "predicted" prices indicates that average actual prices are 15% higher than the Fruitticher predicted "stigmatized" market value -- since the average Fruitticher "stigma" impact is 15%, that comparison indicates no stigma impact has occurred.

- The actual sales prices since April 2014 are less than 2.0% below the unimpaired predicted market values that result from the Fruitticher multiple regression model.

- If there was any stigma impact due to the April 2014 flooding event, it is temporary and not permanent. That is demonstrated by the fact that the average price paid in the seven most recent 2015 post-flooding sales in the proposed Class Area is 18.6% higher than the predicted stigmatized market prices in the Fruitticher Report while the three earlier 2014 post-flooding sales are only 8.5% higher than the Fruitticher stigmatized market values.

- The likelihood of a temporary rather than permanent impact is also demonstrated by the fact that actual sales prices since April 2014 are less than 2.0% below the unimpaired predicted market values that result from the Fruitticher multiple regression model.

- The published flooding impact literature also confirms that the stigma impact, if there has been one, is temporary rather than permanent. Studies in the published literature indicate that such impacts when they do occur typically last no more than a few years.

- The likelihood of a temporary rather than permanent impact is also demonstrated by our past research in other flooding impact situations in which we found some evidence of temporary rather than permanent impact on prices and values.

- If the flooding impacts have been temporary rather than permanent, then not all 316 homeowners in the proposed Class Area have or will suffer any actual economic loss.

Only those who sell their houses -- or obtain a mortgage loan based on an appraisal that reflects actual stigma derived from market prices -- during any temporary stigma impact time frame will have suffered any actual out-of-pocket loss.

- If stigma impacts are only temporary -- and possibly have ended -- or are actually less than the average 15% impact arrived at by Fruitticher, it is not appropriate to compensate every one of the 316 homeowners based on the Fruitticher Report.  Some, if not most, of the homeowners would receive a windfall.

- In the one year prior to the flooding event, there were 16 sales in the proposed Class Area.  That is a turnover (sales velocity) rate of 5.06%.  At that velocity, it would take 19.75 years for the entire inventory of 316 homes to turn over.

- The flooding impact literature indicates that when stigma impacts due to flooding do occur, they are temporary and typically end within four years.  At the turnover rate indicated by past sales in the proposed Class Area, only about 64 of the 316 homes would turn over during the first four years following the flooding event.

- An analysis of actual prices paid in the proposed Class Area since the April 2014 flooding based on the various measures we have used to test the Fruitticher Report analysis and conclusions indicates an average stigma impact varying from about 2.5% to about 5.7% -- not the 12% to 18% indicated in the Fruitticher Report.  Some home sale prices demonstrate no post-flooding stigma.

- An analysis of the sales prices compared to the results of the Fruitticher regression model indicates that any temporary impact due to the flooding may already have ended.

- The proposed government buyout program and flood protection improvements and changes since April 2014 may be having a significant positive effect on prices and values in the proposed Class Area.

- An appraisal of two of the properties in the proposed Class Area indicates the need for property-by-property analysis to determine the current impact, if any, from the April 2014 flooding event.  Such an analysis would need to take into account any repairs made -- or not made -- to the particular home.  As a result, a "one size fits all" class area wide stigma approach is not appropriate for determining the effects of the April 2014 flooding event on prices and values.

This confirms the need for individualized appraisal analysis in this situation, something that the appraisal literature has recognized is typically necessary in appraisal assignments involving proposed class certification.  An article in *The Appraisal Journal*

Professor Thomas Jackson, PhD, MAI, a former member of the Appraisal Standards Board, summarizes that point as follows: "Since a regression analysis of environmental impacts produces only estimates of average effects for a group of properties, it is likely to overestimate impacts for some properties and underestimate impacts for others." Professor Jackson goes on to state such a result would be "an inequitable allocation of damages" and that in some cases, it simply "may not be possible to analyze effects on a class-wide basis without significantly disaggregating the properties." [135]

- The following statement from the second edition of the *Real Estate Damages* book also underscores the fundamental problem with the type of analysis undertaken in the Fruitticher Report in an appraisal report dealing with detrimental condition impacts in a proposed Class Area:

    "Failing to research and apply relevant market data is the single most common flaw noted in the analysis of detrimental conditions. While preconceptions about the analysis of detrimental conditions do exist, questions can only be resolved with relevant market data. The effect of a detrimental condition cannot be generalized and is unique to a particular market *and the facts of a particular property at a specific date of value*."[136] (emphasis added)

### 6.3 THE FRUITTICHER REPORT FAILS TO COMPLY WITH GENERALLY ACCEPTED STANDARDS FOR THE APPRAISAL OF PROPERTIES IMPACTED BY DETRIMENTAL CONDITIONS AND POSSIBLE ENVIRONMENTAL STIGMA

This Appraisal Review previously summarized the various standards and techniques of the appraisal profession for determining the impact of detrimental conditions, including flooding, on market value. The Fruitticher Report fails to comply with those standards.

As stated in an *Appraisal Journal* article on standards of professional practice issues involved in appraising properties impacted by contamination:

    "It is not enough simply to use *any* method or technique – it must be a 'recognized' technique and one 'necessary' to produce a credible appraisal. How does one know if a method or technique has become 'recognized?' Appraisal

---

[135] Thomas O. Jackson, PhD, MAI, "Real Property Valuation Issues in Environmental Class Actions," *The Appraisal Journal*, Spring 2010, at p. 148, as reprinted in Richard J. Roddewig, MAI, Editor, *Valuing Contaminated Properties: Appraisal Institute Anthology: Volume II*, The Appraisal Institute, 2014, at p. 450.
[136] Bell, et al. (2008), at p. 235.

Institute courses, seminars, and publications provide guidance to its members on recognized methods and techniques."[137]

Among the failures of the Fruitticher Report to comply with standards and generally recognized methods and procedures are the following:

- Failure to properly apply linear and multiple regression modeling;

- Failure to test the results of a multiple regression model for credibility and reliability as required by Standard 6 of USPAP and Advisory Opinion 18 (AO 18);

- Failure to follow Guide Note 10 of the Appraisal Institute related to appraisal assignments in areas affected by a natural disaster;

- Failure to analyze actual prices paid following an environmental event;

- Calling the result of an automated valuation model "market value" without checking the results against any of the other recognized sales comparison approaches to value when determining the effect of a detrimental condition under standards of professional appraisal practice;

- Failure to check the peer-reviewed articles and publications published by the appraisal profession for the appropriate methods for determining the effect of a detrimental condition;

- Failure to follow the guidance in the seminars and courses of the Appraisal Institute and other professional appraisal organizations; and

- Producing an appraisal report that contains significant errors and omissions that affect the outcome of the appraisal analysis.

---

[137] Richard J. Roddewig, "Contaminated Properties and Guide Note 8: Questions, Answers, and Suggestions for Revisions," cited in Richard J. Roddewig, Editor, *Valuing Contaminated Property: An Appraisal Institute Anthology*, the Appraisal Institute, 2002, at 162.

**7.   EVIDENCE OF BIAS AS DEFINED BY USPAP IN THE FRUITTICHER REPORT**

**7.1    DEFINITION OF BIAS IN THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE**

Bias is defined in USPAP as "a preference or inclination that precludes an appraiser's impartiality, independence, or objectivity in an assignment." (USPAP, 2014-2015 Edition, p. U-2, Lines 43-44)

USPAP defines "bias" in terms of impartiality.  The ETHICS RULE of USPAP then states:

> "An appraiser must perform assignments with impartiality, objectivity, and independence and without accommodation of personal interests . . . (and)  An appraiser must not advocate the cause or interest of any party or issue." (USPAP, 2014-2015 Edition, p. U-7, Lines 229-233)

The Appraisal Institute has its own Code of Professional Ethics that supplements and goes beyond USPAP.  Canon 3 of the Code of Professional Ethics states: "In Providing Services (Appraisal, Appraisal Review, Appraisal Consulting, or Real Property Consulting), A Member Must Develop and Report Unbiased Analyses, Opinions, and Conclusions."  The Comments to Canon 3 state the following:

> "A Member may never develop, prepare, use, or report a biased analysis, opinion, or conclusion.  A biased analysis, opinion, or conclusion is: a) not reasonably supported; and b) favors or promotes the cause or interest of the client, one's self, or another.
>
> Evidence that a Member developed, prepared, used, or reported a biased analysis, opinion, or conclusion may include, but is not limited to, deviation from reasonable appraisal, appraisal review, appraisal consulting, or real property consulting practices resulting in an analysis, opinion, or conclusion that is not reasonably supported and that favors or promotes the client's, the Member's, or another's interest or cause.  Many of these reasonable practices are outlined in the Standards of Professional Appraisal Practice of the Appraisal Institute, Guide Notes to the Standards of Professional Appraisal Practice of the Appraisal Institute, and Appraisal Institute courses, seminars, and textbooks such as *The Appraisal of Real Estate*.  The intended use of the analysis, opinion, or conclusion is relevant in determining the direction of a client's interest." (Code of Professional Ethics of the Appraisal Institute, effective November 12, 2009, E.R. 3-1 Comment, Lines 720-731)

In the course handbook for the Appraisal Institute's Course 420, *Standards of Professional Practice, Part B,* the following explanation of Canon 3 is provided:

"This rule relates to a biased or misleading appraisal analysis or opinion, which is usually considered the most serious type of appraisal misconduct.

A biased analysis or value opinion is generally outside of a reasonable range and deviates in a direction that would favor the client's, or the appraiser's, interest. In addition there is no reasonable explanation for reaching the analysis or value opinion.

If an appraiser wanted to bias an appraisal in favor of a client's interest, he or she could use numerous techniques to distort the valuation process and arrive at an appraisal analysis or opinion that is not justified.  For example, the appraiser could depart from reasonable appraisal practices, many of which are outlined in the Standards of Professional Appraisal Practice, the Guide Notes, Appraisal Institute courses, and appraisal textbooks such as The Appraisal of Real Estate." (Course 420, *Standards of Professional Practice, Part B,* p. 1-36)

## 7.2    EVIDENCE OF BIAS IN THE FRUITTICHER REPORT

Included in the specific evidence of bias are the following aspects of the Fruitticher Report that have been discussed already in this appraisal review.

- Failure to use proper regression modeling techniques.

- Failure to check the results of a regression model using generally accepted tests to determine credibility and reliability.

- Failure to consider actual post-flooding sale prices in the market area as a check on the results of the regression analysis.

- Failure to consider repair costs in determining post-flooding stigma.

- Failure to consider post-flooding government programs that may have offset or eliminated any potential stigma impact on prices and values.

- Failure to use the generally accepted and recognized methods for determining the impact of a detrimental condition on market value.

Based on all that evidence, we have concluded that the Fruitticher Report is biased.

**8.  SUMMARY OF CONCLUSIONS FROM REVIEW OF THE FRUITTICHER REPORT**

**8.1    CLARION CONCLUSIONS: THE FRUITTICHER REPORT IS MISLEADING AND UNRELIABLE AND THE STIGMA IMPACT, IF ANY, IS SIGNIFICANTLY LESS THAN ESTIMATED IN THE FRUITTICHER REPORT**

As discussed in greater detail throughout our Appraisal Review report, the following list serves as a summary of our findings regarding the reliability and credibility of the Fruitticher Report and our conclusions concerning the post-flooding stigma situation in the proposed Class Area:

- There are too few sales (observations) in the data set used by Fruitticher to support a statistically reliable regression model.

- The *t*-statistics and *p*-values for all but two of his independent (predictor) variables indicate that that is a high likelihood that the coefficients for those independent variables emerged by chance and do not describe a real relationship.

- Fruitticher failed to test the credibility of his model by using any of the recognized means for testing regression model and mass appraisal results.

- When the 10 sales that have occurred in the proposed Class Area post-flooding are included in the Fruitticher multiple regression model, they indicate an average stigma impact of only 4.0% not the 15% average impact in the Fruitticher conclusion.

- When the actual prices of the 10 post-flooding sales are compared to the regression model that includes post-flooding sale prices, the average stigma impact is only 3.0% not 15.0% and five of the homes show no stigma impact.

- When the Fruitticher predicted unimpaired "market values" pre-flood are compared to the predicted prices for each of the 316 homes when the 10 post-flooding sales are included in the model, the mean average impact from the flooding event is only -1.63% and 113 of the homes show a predicted post-flood value higher than the Fruitticher unimpaired value.

- When two homes are appraised using the sales comparison technique, the average differential is 5.7% not 15%.

- The trend line analysis in the Fruitticher Report contains too few sales data points (observations) to be a statistically reliable linear regression.

- The Fruitticher Report does not analyze the outliers in the simple linear regression trend lines. When only one outlier is removed from the trend line supposedly showing a 9% drop in average price in the past two years, the trend line flips to an indication of a 9% increase in average price in the flooded portion of the proposed Class Area.

- The Fruitticher Report does not consider the improvements being made to the flood control process in the affected area.  Nor does he consider the possible effect on prices of the proposed buyout program by the federal government and the door to door promotional campaign that has accompanied that program.

- A comparison of the actual sale prices in the proposed Class Area since the April 2014 flooding event to the Fruitticher "predicted" prices indicates that average actual prices are 15% higher than the Fruitticher predicted "stigmatized" market value -- since the average Fruitticher "stigma" impact is 15%, that comparison indicates no stigma impact has occurred.

- The actual sales prices since April 2014 are less than 2.0% below the unimpaired predicted market values that result from the Fruitticher multiple regression model.

- If there was any stigma impact due to the April 2014 flooding event, it is temporary and not permanent.  That is demonstrated by the fact that the average price paid in the seven most recent 2015 post-flooding sales in the proposed Class Area is 18.6% higher than the predicted stigmatized market prices in the Fruitticher Report while the three earlier 2014 post-flooding sales are only 8.5% higher than the Fruitticher stigmatized market values.

- The likelihood of a temporary rather than permanent impact is also demonstrated by the fact that actual sales prices since April 2014 are less than 2.0% below the unimpaired predicted market values that result from the Fruitticher multiple regression model.

- The published flooding impact literature also confirms that the stigma impact, if there has been one, is temporary rather than permanent.  Studies in the published literature indicate that such impacts when they do occur typically last no more than a few years.

- The likelihood of a temporary rather than permanent impact is also demonstrated by our past research in other flooding impact situations in which we found some evidence of temporary rather than permanent impact on prices and values.

- If the flooding impacts have been temporary rather than permanent, then not all 316 homeowners in the proposed Class Area have or will suffer any actual economic loss. Only those who sell their houses (or unsuccessfully attempt to sell) -- or obtain a mortgage loan based on an appraisal that reflects actual stigma derived from market prices -- during any temporary stigma impact time frame will have suffered any actual out-of-pocket loss.

- If stigma impacts are only temporary -- and possibly have ended -- or are actually less than the average 15% impact arrived at by Fruitticher, it is not appropriate to compensate every one of the 316 homeowners based on the Fruitticher Report.  Some, if not most, of the homeowners would receive a windfall.

- In the one year prior to the flooding event, there were 16 sales in the proposed Class Area.  That is a turnover (sales velocity) rate of 5.06%.  At that velocity, it would take 19.75 years for the entire inventory of 316 homes to turn over.

- The flooding impact literature indicates that when stigma impacts due to flooding due occur, they are temporary and typically end within four years.  At the turnover rate indicated by past sales in the proposed Class Area, only about 64 of the 316 homes would turn over during the first four years following the flooding event.

- An analysis of actual prices paid in the proposed Class Area since the April 2014 flooding based on the various measures we have used to test the Fruitticher Report analysis and conclusions indicates an average stigma impact varying from about 2.5% to about 5.7% -- not the 12% to 18% indicated in the Fruitticher Report. Some home sale prices demonstrate no stigma post-flooding.

- An analysis of the sales prices compared to the results of the Fruitticher regression model indicates that any temporary impact due to the flooding may already have ended.

- The proposed government buyout program and flood protection improvements and changes since April 2014 may be having a significant positive effect on prices and values in the proposed Class Area.

- An appraisal of two of the properties in the proposed Class Area indicates the need for property-by-property analysis to determine the current impact, if any, from the April 2014 flooding event

Among the failures of the Fruitticher Report to comply with standards and generally recognized methods and procedures are the following:

- Failure to properly apply linear and multiple regression modeling;

- Failure to test the results of a multiple regression model for credibility and reliability as required by Standard 6 of USPAP and Advisory Opinion 18 (AO 18);

- Failure to follow Guide Note 10 of the Appraisal Institute related to appraisal assignments in areas affected by a natural disaster;

- Failure to analyze actual prices paid following an environmental event;

- Calling the result of an automated valuation model "market value" without checking the results against any of the other recognized sales comparison approaches to value when determining the effect of a detrimental condition under standards of professional appraisal practice;

- Failure to check the peer-reviewed articles and publications published by the appraisal profession for the appropriate methods for determining the effect of a detrimental condition;

- Failure to follow the guidance in the seminars and courses of the Appraisal Institute and other professional appraisal organizations; and

- Producing an appraisal report that contains significant errors and omissions that affect the outcome of the appraisal analysis.

In summary, Mr. Fruitticher has not offered a reliable or credible opinion of stigma damages in this case. The Fruitticher Report contains numerous substantial and serious errors, omissions, inaccuracies, and mis-statements of fact that cause it to be a biased, misleading and unreliable opinion of either market value "before" or "after" considering the stigma, if any, related to the April 2014 flooding event in the proposed Class Area. For these reasons, the Fruitticher Report is in violation of the *Uniform Standards of Professional Appraisal Practice.*

*Appraisal Review Report*                                      *John Navelski, et al. v. International Paper Company*
                                                      *316 Homes in a Proposed Class Area in Escambia County, Florida*

## 9.    ADDENDA

**9.1    CERTIFICATION**

## CERTIFICATION

I HEREBY CERTIFY to the best of my knowledge and belief the following is true and accurate:

the facts and data reported by the reviewer and used in the review process are true and correct;

the analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions;

that I have no present or prospective interest in the property that is the subject of this appraisal review report and no personal interest with respect to the parties involved;

that I have no bias with respect to the property that is the subject of this appraisal review report or to the parties involved with this assignment;

that my engagement in this assignment was not contingent upon developing or reporting predetermined results;

that my compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in this review or from its use;

that the reported analyses, opinions, and conclusions were developed and this review report was prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice*;

that I have performed no other services, as an appraiser or in any other capacity, related to the specific property that is the subject of this review assignment within the three years prior to beginning my review appraisal work;

that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives;

that no one other than the undersigned prepared the analyses, conclusions and opinions concerning the real estate that are set forth in this appraisal review report.  Richard J. Roddewig conducted an exterior inspection of the subject properties in the appraisal report being reviewed;

that the Appraisal Institute conducts a continuing education program for its members.  As of the date of this report, we have completed requirements of the continuing education program of the Appraisal Institute;

Richard J. Roddewig is currently licensed and certified as a general real estate appraiser in the State of Florida as well as in Illinois, Colorado, Indiana, Michigan, Wisconsin, Minnesota, Ohio, Maryland, Oklahoma, Mississippi, Louisiana, Alabama, New Jersey, and Pennsylvania; and

that significant professional assistance in the preparation of this appraisal review was provided by the following:  Mr. Gary R. Papke, MAI, CRE, FRICS, AICP, and Ms. Anne S. O'Connell of Clarion Associates who assisted in the analysis of linear and multiple regression models and in the collection and analysis of multiple listing sales data; and Mr. M. Eugene Pressley, MAI, SRA who assisted in the collection and analysis of multiple listing sales data as well as in the preparation of form appraisal reports on a selected group of homes in the proposed class area.

Respectfully submitted,

**Electronic PDF Copy**

CLARION ASSOCIATES, INC.

_____
Richard J. Roddewig, MAI, CRE, FRICS
President

Florida State-Certified General Real Estate Appraiser #RZ3166
Expiration: November 30, 2016

Report Date: September 11, 2015

**9.2**    ASSUMPTIONS AND LIMITING CONDITIONS

## ASSUMPTIONS AND LIMITING CONDITIONS

This opinion is expressly subject to the following assumptions and limiting conditions:

1.    This review assumes no responsibility for matters of a legal nature.  It is assumed that title to the properties is marketable and any legal description provided is correct.  No separate review of legal descriptions has been undertaken in this review process.  It is also assumed that title to the properties involved in any sales considered in this review was also marketable and that any legal description furnished is correct.  The legal description provided in the underlying appraisal being reviewed should be verified by competent legal counsel.

2.    This review assumes that the properties that were the subject of the underlying appraisal were under responsible ownership and competent and efficient management, and free and clear of all liens and encumbrances except as specifically provided within the appraisal report reviewed.

3.    This appraisal review assumes that there are no hidden or non-apparent physical conditions affecting value, other than the effects from the flooding event described in the underlying appraisal.  No liability is assumed for the soundness of structural members or equipment or suitability of soil conditions for construction, since no engineering tests were made other than those conducted for purposes of revealing environmental conditions of each property.

4.    Improvements, if any, are considered to be within lot lines and in accordance with local zoning and building ordinances, unless otherwise stated.   We have also assumed that any plats, diagrams or drawings in the underlying appraisal are not meant to be used as references in matters of survey, as no survey was made by the appraiser, and no responsibility was assumed by the appraiser regarding questions of survey.  The same caveats apply to any additional maps, plans, sketches and GIS information in this review report.

5.    This appraisal review has found no statement, definition or consideration of compliance or non-compliance with all applicable federal, state, and local environmental regulations and laws in the underlying appraisal.  Therefore, it must be assumed for purposes of this appraisal review that the appraiser who prepared the underlying appraisal has found no evidence of non-compliance with federal, state, and local environmental regulations and laws.

6.    This appraisal review also assumes that all applicable zoning and use regulations and restrictions have been complied with since no such exceptions were described in the underlying appraisal report being reviewed.

7.  This appraisal review assumes that utilization of the land and improvements involved in the appraisal assignment is within lot lines or boundaries of the property described.

9.  It is assumed that any value estimates in the underlying appraisal are based on the purchasing power of the dollar as of the date of the appraisal report reviewed, except as otherwise specified.

10. It is assumed that in the underlying appraisal, when the property being considered is part of a larger parcel or tract, any values reported relate only to the portion being considered and should not be construed as applying with equal validity to other portions of the larger parcel or tract.  It is also assumed that any allocation of value in the underlying report between land and improvements applies only to that report, and that the value reported for any portion appraised plus the value of all other portions may or may not equal the value of the entire parcel or tract considered as an entity.

11. It is assumed that any projections of future rents, expenses, net operating income, mortgage debt service, capital outlays, cash flow, inflation, capitalization rates, interest rates or discount rates in the underlying appraisal are intended solely for analytical purposes and are not to be construed as predictions.  To the extent that they are used in estimating the value of an interest or interests in real property, it is assumed that they represent only the judgment by the author of the report of the assumptions likely to be used by purchasers and sellers active in the marketplace.

12. It is assumed that the author of the underlying appraisal made inquiries to determine if there are any recorded legal restrictions upon the use, sale or disposition of the properties, and all such restrictions found are described in the underlying appraisal.

13. Any information and data received from others in the course of reviewing the underlying appraisal and verifying its accuracy is believed to be reliable; however, no warranty is given for its accuracy.

14. Other than in the litigation for which this appraisal review report is being submitted, the authors of this appraisal review report shall not be required to give further consultation or testimony, or appear in court, by reason of this report with reference to either the underlying appraisal or the properties that are the subject of the underlying appraisal unless previous arrangements have been made to that effect.

15. Disclosure of the contents of this appraisal review report is governed by the By-Laws and Regulations of the Appraisal Institute.  Possession of this report, or a copy thereof, or any part thereof, does not carry with it the right of publication, nor may it be used by anyone but the party for whom it has been prepared or in the legal proceedings for

which it has been produced, without the previous written consent of the review appraisers.  Any use of the report outside of the legal proceedings for which the report has been produced must be undertaken with proper written qualification and the report must be used only in its entirety.

16.   Neither all nor any part of the contents of this appraisal review report (especially the identity of the appraisers and firm whose appraisal is the subject of this review) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser, except by the client and its counsel for whom this appraisal review has been prepared as part of the legal proceedings for which it has been produced.

17.   This appraisal review report is intended to be read and to be used as a whole and not in parts.  Separation of any section or page from the main body of the report, in the absence of specific authorization from the signers, is expressly forbidden and will be considered as invalidating the report.

18.   The professional fees paid for preparing this appraisal review report were not based in whole or in part on the amount of the appraised value of the underlying properties or upon the outcome of the legal proceedings for which it has been produced.  Rather, professional fees have been based upon an hourly reimbursement basis plus reimbursements for costs and expenses associated with research, travel and report production.

19.   Effective January 26, 1992, the Americans with Disabilities Act (ADA) established requirements intended to make most privately operated, non-residential buildings accessible to and usable by disabled persons.  We have not undertaken a specific compliance survey and analysis of any of the properties that are the subject of the underlying appraisal to determine whether or not or to what extent it conforms to the provisions of the ADA.  Such a survey and detailed analysis of ADA requirements could reveal that the properties do not comply with the act in one or more respects.  We have assumed that the properties either are in compliance or that measures can be taken to remove architectural barriers or otherwise achieve compliance at minimal cost.

20.   Unless otherwise noted in this report, no responsibility is assumed for detecting the existence of any structural, mechanical or utility defects or deficiencies, or the presence of hazardous substances such as but not limited to radon gas, asbestos, natural or artificial radiation, or toxic substances of any description, whether on or off the premises, other than those readily apparent from a visual inspection of the property. The review appraiser is not qualified to test for the presence of such factors, and does not assume responsibility for the engineering or scientific knowledge or expertise required to discover them.

21.     *This Appraisal Review is based on our analysis of statements, data and information contained in the Expert Report filed by Tom Fruitticher, MAI and dated August 7, 2015. At his deposition, Mr. Fruitticher was asked to produce other appraisal reports prepared by him in the prior three years.  Those reports were not produced.  Therefore, the authors of this Appraisal Review report reserve the right to amend or supplement this report based on additional review of the supporting documentation to be produced by Mr. Fruitticher.*

**9.3    QUALIFICATIONS**

GENERAL QUALIFICATIONS OF
**RICHARD J. RODDEWIG, MAI, CRE, FRICS**
**CLARION ASSOCIATES, INC.**

**PROFESSIONAL HISTORY**

Present                    President - Clarion Associates, Inc.

Prior                      Senior Principal - Pannell Kerr Forster, 1987-1988

Senior Vice President - Shlaes & Co., Real Estate Counselors and Appraisers, 1986-1987

Vice President and General Counsel, Shlaes & Young Information Systems, 1982-1986

Consultant - Shlaes & Co., 1978-1986

Attorney-at-law - Roddewig and Associates, 1976 to 1977; 1978-1987; 1988 to 1992.

Research Attorney - Northeastern Illinois Planning Commission, 1977-1978

Associate and Attorney - Ross & Hardies, Chicago, 1973-1976

Staff Attorney and Consultant in Australia, International Comparative Land Use Project - The Conservation Foundation, Washington, D.C., 1974-1975

Adjunct lecturer - Governors State University, Park Forest South, Illinois, 1978; Northeastern Illinois University, Chicago, Illinois, 1979; School of Urban Sciences, University of Illinois at Chicago Circle, 1979 to 1987; School of History of Art and Architecture, University of Illinois at Chicago Circle, 1985 to 1989; Department of Finance, DePaul University, Chicago, Illinois, 1990 to Present.

**AREAS OF SPECIAL COMPETENCE**

Real estate consulting practice concentrated on appraisals, feasibility studies, and market studies of larger residential, retail,

commercial office, industrial, hotel and motel properties and vacant sites.   Special concentration in valuation of historic structures, contaminated property, and special purpose properties.   Legal experience in real estate, income tax, land use and zoning, and historic preservation.

## REPESENTATIVE MAJOR PROJECTS

Real estate appraisal and consulting assignments on projects in more than 50 cities and 30 states.

Qualified as an expert witness before arbitration panels and in federal and state courts in Arizona, Colorado, Alaska, Minnesota, Illinois, Maryland, West Virginia, Tennessee, Mississippi, Louisiana, Texas and Pennsylvania.

Directed appraisal of 1300 miles of railroad right-of-way for federal bankruptcy trustee.

Consultant to City of Chicago Department of Planning on revisions to Chicago Zoning Ordinance.

Valuation of more than 100 historic preservation easement donations for private developers and the Internal Revenue Service.

Valuation consultant and expert witness for $20.0 million township open space acquisition program.

Analysis of impacts of contamination and environmental risks on neighborhoods, markets and properties in cities, towns and rural areas in approximately 25 states including Alaska, Hawaii, California, Washington, Wyoming, Colorado, Missouri, Minnesota, Illinois, Wisconsin, Michigan, Indiana, Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, New York, Connecticut, Massachusetts, South Carolina, Georgia, Florida, Louisiana and Mississippi.

Analysis of appropriate methodology for determining impact of Hurricane Katrina on property prices and values in New Orleans, Louisiana.

Consulting and expert testimony for Exxon concerning impact of *Exxon Valdez* oil spill on land markets and property values in Alaska.

Valuation of landfills in Colorado and Pennsylvania.

Valuation of water storage and irrigation district properties in Colorado and Alberta, Canada.

Valuation of all privately owned real estate at the South Rim of Grand Canyon National Park.

Valuation of the Saturn integrated automobile manufacturing and assembly plant in Spring Hill, Tennessee.

**EDUCATION**

Master of Arts - University of Chicago

Juris Doctor - University of Chicago

Bachelor of Arts (Summa cum Laude) - University of Notre Dame

**PUBLICATIONS**

Author, co-author, or contributor to twelve books and more than fifty monographs and articles in publications such as <u>Real Estate Review</u>, <u>The Appraisal Journal</u>, <u>Valuation</u>, <u>Urban Land</u>, <u>The Urban Lawyer</u>, <u>Real Estate Issues</u>, and <u>Real Estate Today</u>. Featured speaker nationally on preservation law, environmental risk analysis, real estate economics, rehab feasibility, and appraisal practice.

**PROFESSIONAL MEMBERSHIPS**

Member, Appraisal Institute (designated MAI). Chair, Government Affairs Committee, Illinois Chapter, Appraisal Institute, 1991-92. Past Member, Regional Ethics and Counseling Panel. Member, Appraisal Institute Special Task Group for the Development of Standards for Determining the Acceptability of Applications for Statistical and Market Survey Techniques to the Valuation of Real Property, 2000. Member, Appraisal Institute Special Task Group on Conservation and Historic Preservation Easement Valuation, 2005-2006.

Currently licensed as a Certified General Real Estate Appraiser in following states: Illinois, License No. 553.000129; Michigan, License No. 1201070816; Wisconsin, License No. 1166; Indiana, License No. CG40400323; Ohio, License No. 2009003123; Maryland, License No. 31824; Oklahoma, License No. 13043 CGA; Louisiana, License No. APR.0000002976-CGA; Florida, License No. RZ3166; Colorado, License No. CG01319904; Minnesota, License No. 40094488; Mississippi, License No. GA-839; Alabama, License No. G00996; and Pennsylvania, License No. GA004159.  Previously permanently licensed in Alaska (No. 210), Georgia, License No. 274679, and Nebraska, License No. CG210047.   Temporarily licensed in many other states including Missouri, New York, New Jersey, Connecticut, Texas, Tennessee, the District of Columbia, West Virginia, North Carolina, Arizona, Nevada, and New Mexico.

Currently licensed as a Real Estate Broker in Illinois and formerly in Pennsylvania.

Member, Counselors of Real Estate (designated CRE).  Chair, Midwest Chapter, 1991; Vice Chair, Midwest Chapter, 1992.

Awarded FRICS designation by the Royal Institute of Chartered Surveyors.

Member of the Illinois Bar and American Bar Association.

American Bar Association:  Chairman, Historic Preservation and Architectural Controls Subcommittee, 1984-1988; Vice Chairman, Land Use Law Committee, 1985-1987; Chairman, Land Use Law Committee, 1987-1990; Co-Chair, Waste Disposal and Land Use Law Subcommittee, 1991 to 1998; Member, Real Estate Damages Subcommittee of Environmental Litigation Committee, 2004 to present.

Member, Ely Chapter, Lambda Alpha International; Treasurer, 1987-1988; Vice President, 1988-1989; President, 1990.

Member, American Planning Association.

**HONORS**                    Elected to Phi Beta Kappa, University of Notre Dame (1970).

Second Annual Richard Nickel Award, Professional Preservationist of the Year (1985), Landmarks Preservation Council of Illinois.

Sanders A. Kahn Award (1996) as the author who develops the best example of a thought-provoking presentation on concepts and practical problems facing the appraisal and real estate industries, for article in *The Appraisal Journal*, published by the Appraisal Institute.

Regular contributing columnist (Environment and the Appraiser Department), *The Appraisal Journal* (1996 to 2002).

George L. Schmutz Award (2012) from the Appraisal Institute for the "most outstanding Appraisal Institute Publication of 2011" for the book entitled *Appraising Conservation and Historic Preservation Easements.*

William S. Ballard Award (2013) from The Counselors of Real Estate in recognition of an article in *Real Estate Issues* that best "exemplifies the high standards of the content of the journal."

**CIVIC INVOLVEMENT**

Member, Advisory Board, John Marshall Law Center for Real Estate Law, 2010 to present.

Member, Board of Governors, Landmarks Preservation Council of Illinois, 1976-1979 and 1982-1985; Vice President, 1978-1979 and 1983-1984.

Member, Illinois Historic Sites Advisory Council, 1979-1982.

Member, Illinois Governor's Advisory Task Force on Historic Preservation, 1985.

Member, Board of Trustees, Illinois Historic Preservation Agency, 1985-1991.

Member, Illinois Governor's Tourism Task Force, 1986-1987 (Chairman, Financing Subcommittee).

Board of Directors, Preservation Action, Washington D.C., 1988-1990.

Board of Directors, Frederick Law Olmsted Society of Riverside, Illinois, 1986-1988.

## PUBLICATIONS BY RICHARD J. RODDEWIG

**BOOKS (AUTHOR, CO-AUTHOR, EDITOR OR CONTRIBUTOR)**

"Australia: Land Banking as an Emerging Policy," in Neal Roberts (ed.), The Government Land Developers, (Lexington:  D.C. Heath and Company, 1977).

Green Bans: The Birth of Australian Environmental Politics, (New York, N.Y.: Allanheld Osmun & Co./Universe Books, in conjunction with The Conservation Foundation, 1978).

"Preservation Law and Economics," Chapter 7 in A Handbook on Historic Preservation Law, (Washington, D.C.: The Conservation Foundation and the National Center for Preservation Law, 1983).

Rehab for Profit:  New Opportunities in Real Estate, with Jared Shlaes, (Chicago: National Association of Realtors, 1984).

The Conservation Easement Handbook: Managing Land Conservation and Historic Preservation Easement Programs, with Cheryl A. Inghram et al., (San Francisco: Trust for Public Land and the Land Trust Exchange, 1988).

"The Office Building as an Economic Generator and Contributor," Chapter 3 in The Office Building:  From Concept to Investment Reality, (Chicago: Counselors of Real Estate, the Appraisal Institute, and the Society of Industrial and Office REALTORS, 1993).

"Inverse Condemnation in Regulatory Takings," with Christopher J. Duerksen, Chapter 14E in Nichols on Eminent Domain, (New York: Matthew Bender & Company, Inc., updated release, 1996).

"Appraising Theme Parks," with Gary R. Papke and Steven Schiltz, Chapter 36 in David C. Lennhoff (ed.), A Business Enterprise Value Anthology, (Chicago: The Appraisal Institute, 2001).

"The EPA's Brownfields Initiative: Will It Improve the Market for Contaminated Properties?" and "Mortgage Lenders and the Institutionalization and Normalization of Environmental Risk Analysis," with Allen C. Keiter, in Thomas A. Jaconetty, (ed.),  Issues Confronting Properties Affected by Contamination or Environmental Problems, (Chicago: International Association of Assessing Officers, 2002).

Valuing Contaminated Properties: An Appraisal Institute Anthology, (Chicago: The Appraisal Institute, 2002).

Appraising Conservation and Historic Preservation Easements (Chicago: The Appraisal Institute, 2011).

Valuing Contaminated Properties: An Appraisal Institute Anthology: Volume II, (Chicago: The Appraisal Institute, 2014).

**MONOGRAPHS**

"Components of a Good Historic Preservation Ordinance," (Chicago: Landmarks Preservation Council of Illinois, 1980).

Condominium Conversion Legislation: Separating Myth From Reality, (Washington, D.C.:  National Association of Realtors, 1980).

Loft Conversions: Planning Issues, Problems and Prospects, Planning Advisory Service Report Number 362, (Chicago:  American Planning Association, 1981).

Preservation Easements in Illinois, (Chicago: Landmarks Preservation Council of Illinois, 1982).

Preservation Ordinances and Financial Incentives: How They Guide Design, (Washington, D.C.:  National League of Cities, 1982).

"The Uniform Condominium Act and Illinois Condominium Ordinances:  A Comparison,"  ORER Report No. 1, (Urbana, Illinois:  University of Illinois Office of Real Estate Research, 1982).

Preparing a Historic Preservation Ordinance, Planning Advisory Service Report Number 374, (Chicago: American Planning Association, 1983).

Analyzing the Economic Feasibility of a Development Project: A Guide for Planners, Planning Advisory Service Report Number 380, (Chicago:  American Planning Association, 1983).

Economic Benefits from Rehabilitation of Historic Buildings in Illinois, (Springfield, Illinois: Illinois Historic Preservation Agency, 1984).

Transferable Development Rights Programs: TDRs and the Real Estate Marketplace, with Cheryl A. Inghram, Planning Advisory Service Report Number 401, (Chicago:  American Planning Association, 1987).

Responding to the Takings Challenge:  A Guide for Officials and Planners, with Christopher J. Duerksen, Planning Advisory Service Report Number 416, (Chicago: American Planning Association, 1989).

"Compensation for Temporary Takings After First English: Has a Taking Occurred and What Is the Measure of Damages?," in Section 1983 and Land Use, (Clifton, N.J.:  Prentice Hall Law and Business, 1989, p. 153).

Economic Incentives for Historic Preservation, A Critical Issues Fund Report, (Washington, D.C.: National Trust for Historic Preservation, 1989).

Takings Law in Plain English, with Christopher J. Duerksen, produced for the American Resources Information Network, 1994.

Preparing a Historic Preservation Plan, with Bradford J. White, Planning Advisory Service Report Number 450, (Chicago:  American Planning Association and National Trust for Historic Preservation, 1994).

Environmental Risk and the Real Estate Appraisal Process: Seminar Workbook, with Gary R. Papke, (Chicago: The Appraisal Institute, 1994).

Special Purpose Properties: The Challenges of Real Estate Appraising in Limited Markets: Seminar Workbook, with Gary R. Papke, (Chicago: The Appraisal Institute, 1995).

Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma: Seminar Workbook, (Chicago: The Appraisal Institute, 2001).

Appraising Historic Preservation Easements: Seminar Workbook (Chicago: The Appraisal Institute, 2008).

### ARTICLES

"In Australia, Unions Strike for Environment," with John S. Rosenberg, in The Conservation Foundation Letter, November 1975.

"New Shelters in Old Properties: The Tax Reform Act of 1976," with Michael S. Young, in Real Estate Issues, Volume 3, Number 2, (Chicago:  American Society of Real Estate Counselors, Winter 1978, p. 9).

"Neighborhood Revitalization and the Historic Preservation Incentives of the Tax Reform Act of 1976: Lessons from the Bottom Line of a Chicago Red Brick Three Flat," in The Urban Lawyer, Volume 11, Number 1, (Kansas City:  University of Missouri at Kansas City School of Law, Winter 1979, p. 35).

"Real Estate Tax Impact of Condominium Conversions: A Chicago Perspective," with Michael S. Young, in The Appraisal Journal, January 1980.

"Creating a Workable Historic Preservation Ordinance," in American Planning Association, Illinois Chapter, Newsletter, May 1980.

"Condomania or Condophobia?," in Real Estate Issues, Volume 5, Number 1, (Chicago:  American Society of Real Estate Counselors, Summer 1980, p. 16).

"Building on the Past," in Real Estate Today, (Chicago:  National Association of Realtors, October 1980).

"The Changing Character of Chicago's Condominium Market," in Condominium: Chicagoland's Condominium Guide, First Edition, Summer-Fall 1981.

"Preservation Rulings Foster Development and Economic Growth," in Design, December 14, 1981.

"Appraising the Best Tax Shelter in History," with Jared Shlaes, in The Appraisal Journal, Volume L, Number 1, (Chicago: American Society of Real Estate Appraisers, January 1982, p. 25) .

"'Certified' Rehabilitation of Historic Buildings:  Are the Tax Benefits Worth the Extra Cost?," in Real Estate Review, Volume 12, Number 3, (Boston: Warren, Gorham & Lamont, Autumn 1982, p. 67).

"Preservation Easements Reconsidered: An Alternative Approach to Value," with Jared Shlaes, in The Appraisal Journal, Volume LII, Number 3, (Chicago: American Society of Real Estate Appraisers, July 1984, p. 325).

"Appraising Theme Parks," with Steven P. Schiltz and Gary Papke, in The Appraisal Journal, Volume LIV, Number 1, (Chicago: American Society of Real Estate Appraisers, January 1986, p. 85).

"Preservation Easement Law:  An Overview of Recent Developments," in The Urban Lawyer, Volume 18, Number 1, (Kansas City:  University of Missouri at Kansas City School of Law, Winter 1986, p. 229).

"Supreme Court Rules for Landowners," with Jared Shlaes, in The Inland Architect, (Chicago:  The Inland Architect Press, September/October 1986, p. 4).

"Landmark Preservation: The New Chicago Ordinance," in Preservation Law Reporter, Volume 6, Nos. 1 and 2, (Washington, D.C.: National Trust for Historic Preservation, Spring/Summer 1987, 6 PLR 2017).

"Essential Elements of a Statewide Legislative Program for Historic Preservation," in Preservation Forum, Volume 2, Number 2, (Washington, D.C.: National Trust for Historic Preservation, Summer 1988, p. 11).

"Selling America's Heritage . . . Without Selling Out," in Preservation Forum, Volume 2, Number 3, (Washington, D.C.:  National Trust for Historic Preservation, Fall 1988, p. 2).

"Measuring Regulatory Hardship: Dealing with Real Estate Questions in Takings Cases," with Christopher J. Duerksen, in Urban Land, Volume 48, No. 1, (Washington, D.C.: Urban Land Institute, January 1989, p. 21).

"Measuring Regulatory Hardship: Are California Elephants Pink?," with Christopher J. Duerksen, in Urban Land, Volume 48, No. 5, (Washington, D.C.:  Urban Land Institute, January 1989, p. 15).

"Measuring Regulatory Hardship," with Christopher J. Duerksen, in Valuation, Volume 34, Number II, (Washington, D.C.: American Society of Appraisers, June 1989, p. 48).

"Recent Developments in Land Use, Planning and Zoning," in The Urban Lawyer, Volume 21, Number 4, (Chicago:  American Bar Association, Fall 1989, p. 769).

"Recent Developments in Land Use, Planning and Zoning," in The Urban Lawyer, Volume 22, Number 4, (Chicago:  American Bar Association, Fall 1990, p. 719).

"Report of the Subcommittee on Land Use and Solid Waste," with Richard V. Houpt and Glenn C. Sechen, in The Urban Lawyer, Volume 23, Number 4, (Chicago:  American Bar Association, Fall 1991, p. 753).

"Measuring the Damages in Takings Cases:  The Next Frontier," with Christopher J. Duerksen, in Zoning and Planning Law Report, Volume 15, Number 7, (New York:  Clark Boardman Callaghan, July-August 1992, p. 49).

"Ready for Takeoff:  Developing the 21st Century Airport," with Christopher J. Duerksen, in Urban Land, Volume 51, No. 11, (Washington, D.C.:  Urban Land Institute, November 1992, p. 26).

"The Commerce Clause and Waste Disposal Management Plans," with Richard V. Houpt and Glenn C. Sechen, in The Urban Lawyer, Vol. 24, No. 4, (Chicago, American Bar Association, Fall 1992, p. 907).

"Market Value and Public Value: An Exploratory Essay," with Gary Papke, in The Appraisal Journal, Volume LXI, Number 1, (Chicago: Appraisal Institute, January 1993).

"A Better Way to Plan Airports," with Christopher J. Duerksen and Raymond L. Reaves, in Urban Land, Vol. 52, No. 3, (Washington, D.C.: Urban Land Institute, March 1993, p. 35).

"Recent Developments with RCRA Subtitle D and Commerce Clause Cases After the *Hunt* and *Fort Gratiot* Decisions," with Glenn C. Sechen, in The Urban Lawyer, Vol. 25, No. 4, (Chicago, American Bar Association, Fall 1993, p. 797).

"Historic Preservation and the Constitution: Dispelling the Thirteen Myths," Historic Preservation Forum, July/August 1993, p. 11.

"Municipal Solid Waste: The Uncertain Future of Flow Control -- A Municipal Perspective," with Glenn C. Sechen, in The Urban Lawyer, Vol. 26, No. 4, (Chicago: American Bar Association, Fall 1994, p. 801).

"Reduce Income Taxes with a Preservation Easement," with Victoria L. Allan, in Innkeeping, Vol. 14, No. 4, (Santa Barbara, Professional Association of Innkeepers International, April 1996, p. 1).

"Stigma, Environmental Risk and Property Values: 10 Critical Inquiries," in The Appraisal Journal, Volume LXIV, Number 4 (Chicago: The Appraisal Institute, October 1996, p. 375).

"Environment and the Appraiser: Temporary Stigma: Lessons from the *Exxon Valdez* Litigation," in The Appraisal Journal, Volume LXV, Number 1 (Chicago: The Appraisal Institute, January 1997, p. 96-101).

"Environment and the Appraiser: Using the Cost of Environmental Insurance to Measure Contaminated Property Stigma," in The Appraisal Journal, Volume LXV, Number 3 (Chicago: The Appraisal Institute, July 1997, p. 304).

"EPA's Brownfields Initiative: Will It Improve the Market for Contaminated Properties?"
in Valuation Insights & Perspectives, Volume 2, Number 3 (Chicago: The Appraisal Institute, Third Quarter 1997, p. 46).

"Environment and the Appraiser: Contaminated Properties and Guide Note 8: Questions, Answers, and Suggestions for Reform," in The Appraisal Journal, Volume LXVI, Number 1 (Chicago: The Appraisal Institute, January, 1998, p. 99).

"Environment and the Appraiser: Choosing the Right Analytical Tool for the Job," in The Appraisal Journal, Volume LXVI, Number 3 (Chicago:  The Appraisal Institute, July, 1998, p. 320).

"Environment and the Appraiser: Classifying the Level of Stigma and Risk Affecting Contaminated Property," in The Appraisal Journal, Volume LXVII, Number 1 (Chicago: The Appraisal Institute, January, 1999, p. 98).

"Environment and the Appraiser: Adjusting Environmental Case Study Comparables by Using an Environmental Risk Scoring System," in The Appraisal Journal, Volume LXVIII, Number 4 (Chicago: The Appraisal Institute, October, 2000, p. 371).

"Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," in The Appraisal Journal, Volume LXVII, Number 4, (Chicago:  The Appraisal Institute, October 1999, p. 447).

"Environment and the Appraiser: Mortgage Lenders and the Institutionalization and Normalization of Environmental Risk Analysis," in The Appraisal Journal, Volume LXIX, Number 2 (Chicago: The Appraisal Institute, April, 2001, p. 119).

"Testing the Reliability of Contingent Valuation in the Real Estate Marketplace," with James D. Frey, CRE, FRICS, in The Appraisal Journal, Volume LXXIV, Number 3 (Chicago:  The Appraisal Institute, Summer 2006, p. 267).

"Law as Hidden Architecture:  Law, Politics, and Implementation of the Burnham *Plan of Chicago* Since 1909," in The John Marshall Law Review, Volume 43, Number 2 (Chicago: John Marshall Law School, Winter 2010, p. 375).

"Determining Real Estate Damages from Natural Disasters:  Real Estate Counseling in Class Action Litigation – Lessons from Hurricane Katrina," with Gary R. Papke and Charles T. Brigden, in *Real Estate Issues*, Volume 37, Issues 2 and 3 (Chicago: The Counselors of Real Estate, December 2012, p. 77).

Analyzing Effects of Environmental Contamination on Real Property: Seminar Workbook, (Chicago, Appraisal Institute, 2010).  Prepared by Professor Thomas Jackson.  Includes cases studies previously prepared by Richard J. Roddewig.

"Power Lines and Property Prices," with Charles T. Brigden, in *Real Estate Issues*, Volume 39, Number 2 (Chicago: The Counselors of Real Estate, October 2014, p. 15).

"Real Estate Value Impacts from Fracking: Industry Response and Proper Analytical Techniques," with Rebel A. Cole, PhD, in *Real Estate Issues*, Volume 39, Number 3 (Chicago: The Counselors of Real Estate, December 2014, p. 6).

## BOOK REVIEWS

Federal Historic Preservation Case Law, Charlotte R. Bell, in The Appraisal Journal, Volume LIV, Number 2, (Chicago: American Society of Real Estate Appraisers, April 1986, p. 306).

Landmark Justice:  The Influence of William J. Brennan on America's Communities, Charles M. Haar and Jerold S. Kayden, in The Urban Lawyer, Volume 21, Number 2, (Kansas City, Missouri: University of Missouri at Kansas City School of Law, Spring 1989, p. 399).

Icons and Aliens, John Costonis, in Inland Architect, Volume 34, No. 1, (Chicago:  January/February 1990, p. 81).

Environmental Engineering Dictionary, 3d ed., compiled and edited by C.C. Lee, PhD., in The Appraisal Journal, Volume LXVII, Number 2, (Chicago: The Appraisal Institute, April 1999, p. 224).

**9.4    USPAP ADVISORY OPINION (AO-18)**

**ADVISORY OPINION 18**

**ADVISORY OPINION 18 (AO-18)**

*This communication by the Appraisal Standards Board (ASB) does not establish new standards or interpret existing standards. Advisory Opinions are issued to illustrate the applicability of appraisal standards in specific situations and to offer advice from the ASB for the resolution of appraisal issues and problems.*

**SUBJECT: Use of an Automated Valuation Model (AVM)**

**APPLICATION: Real Property, Personal Property, Intangible Property**

**THE ISSUE:**

What steps should an appraiser take when using an AVM as a tool in the development of an appraisal or appraisal review concerning an individual property?

In addition, what steps should an appraiser take when he or she is using an AVM only to process information and communicate the AVM's output but is not performing an appraisal or appraisal review assignment?

**BACKGROUND:**

This Advisory Opinion addresses how an appraiser may use an AVM.

An AVM is a computer software program that analyzes data using an automated process. For example, AVMs may use regression, adaptive estimation, neural network, expert reasoning, and artificial intelligence programs.

The output of an AVM is not, by itself, an appraisal. An AVM's output may become a basis for appraisal or appraisal review if the appraiser believes the output to be credible for use in a specific assignment.

An appraiser can use an AVM as a tool in the development of an appraisal or appraisal review. However, the appropriate use of an AVM is, like any tool, dependent upon the skill of the user and the tool's suitability to the task at hand.

This Advisory Opinion applies when an appraiser uses an AVM in connection with an individual property. This Advisory Opinion does not apply to mass appraising.

An appraiser needs to know, before using an AVM, whether it is to be used:

1. to perform an appraisal or appraisal review or
2. solely to provide the client with AVM output.

When an appraiser uses an AVM to develop his or her own opinions or conclusions in an appraisal or appraisal review assignment, all of the USPAP rules governing that assignment apply and all of this Advisory Opinion is relevant.

An appraiser is not performing an appraisal or appraisal review assignment when he or she simply runs an AVM by using information provided by the client and:

1. does not alter the input or affect the output of the AVM, and
2. does not communicate his or her own appraisal or appraisal review regarding the AVM's output.

If the appraiser uses an AVM only to provide the client with the AVM output, the references to the Conduct section of the ETHICS RULE and the "Communicating the AVM Output" section in this Advisory Opinion are relevant.

USPAP Advisory Opinions 2014-2015 Edition
©The Appraisal Foundation

A-45

## ADVISORY OPINION 18

**ADVICE FROM THE ASB ON THE ISSUE:**

**Relevant USPAP & Advisory References**

- Conduct section of the ETHICS RULE:

  *An appraiser must not engage in criminal conduct.*

  *An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.*

  Further, *An appraiser must not communicate assignment results with the intent to mislead or to defraud.. An appraiser must not use or communicate a report that is known* by the appraiser *to be misleading or fraudulent.*

- The COMPETENCY RULE states, ... *Competency requires: (1) the ability to properly identify the problem to be addressed; and (2) the knowledge and experience to complete the assignment competently; and (3) recognition of, and compliance with, laws and regulations that apply to the appraiser or to the assignment.*

- The Comment to the COMPETENCY RULE states: *Competency may apply to factors such as, but not limited to, an appraiser's familiarity with a specific type of property or asset, a market, a geographic area, an intended use, specific laws and regulations, or an analytical method.*

- SCOPE OF WORK RULE: *The scope of work must include the research and analyses that are necessary to develop credible assignment results... Appraisers have broad flexibility and significant responsibility in determining the appropriate scope of work for an appraisal or appraisal review assignment." "The appraiser must be prepared to demonstrate that the scope of work is sufficient to produce credible assignment results... An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased.*

- Standards Rule 1-1(a): An appraiser must *be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal.*

- Standards Rule 1-1(b): An appraiser must *not commit a substantial error of omission or commission that significantly affects an appraisal.*

- Standards Rule 1-1(c): An appraiser must *not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affect the credibility of those results.*

- Standards Rule 1-6(b): An appraiser must *reconcile the applicability and relevance of the approaches, methods and techniques used to arrive at the value conclusion(s).*

- STANDARD 2: *In reporting the results of a real property appraisal, an appraiser must communicate each analysis, opinion, and conclusion in a manner that is not misleading.*

- STANDARD 3: In developing an appraisal review assignment, an appraiser acting as a reviewer must identify the problem to be solved, determine the scope of work necessary to solve the problem, and correctly complete research and analyses necessary to produce a credible appraisal review. In reporting the results of an appraisal review assignment, an appraiser acting as a reviewer must communicate each analysis, opinion, and conclusion in a manner that is not misleading.

- Statement on Appraisal Standards No. 9: *Although an appraiser must identify and consider the intended use of the appraiser's opinions and conclusions, an appraiser must not allow the objectives of the client or other intended users of the report to affect the appraiser's independence and objectivity. An appraiser must not allow the objectives of a client or other intended users to cause the analysis or report to be biased.*

A-46                                    USPAP Advisory Opinions 2014-2015 Edition
                                              ©The Appraisal Foundation

ADVISORY OPINION 18

Competency

When an appraiser is asked to use an AVM in an assignment, the appraiser must ensure that he or she can comply with the requirements of the COMPETENCY RULE both prior to accepting the assignment and in the course of performing it.

In an appraisal assignment, an appraiser must have a basic understanding of how the AVM works in order to reasonably determine that:

1. use of the AVM is appropriate for the assignment;
2. the output of the AVM is credible for use in the assignment; and
3. the AVM does not exclude relevant market measures or factual information necessary for a credible calculation.

A client may suggest or request the use of an AVM in an appraisal or appraisal review assignment, but ultimately the appraiser is responsible for the decision to use or not use the AVM and its output. The appraiser must be able to reasonably conclude that the AVM's output is credible before deciding to use the AVM or rely on its output. For example, in an appraisal assignment, the credibility of the AVM output may be established by comparison to the subject market. If the appraiser concludes that using the AVM output in an assignment would be misleading, the appraiser should either use other tools to perform the analysis or decline the assignment.

Under What Conditions May AVMs Be Used?

There are five critical questions to which the appraiser should answer "yes" before deciding to use an AVM in an appraisal or appraisal review assignment:

1. Does the appraiser have a basic understanding of how the AVM works?
2. Can the appraiser use the AVM properly?
3. Are the AVM and the data it uses appropriate given the intended use of assignment results?
4. Is the AVM output credible?
5. Is the AVM output sufficiently reliable for use in the assignment?

The answers to these questions may be affected by the degree to which the appraiser can interact with the AVM. The decision to use an AVM may also be affected by support information supplied by the AVM's developer, the appraiser's previous experience in using the AVM, or other available information.

Database

Credibility of the AVM output depends on the quality of its database and how well the AVM is designed to analyze that database. When using an AVM in an appraisal or appraisal review assignment, the appraiser must have reason to believe the AVM appropriately uses data that are relevant.

Understanding and Control of the AVM

When using an AVM in an appraisal or appraisal review assignment, an appraiser should have a basic understanding of how the AVM analyzes data to determine whether the AVM measures and reflects market activity for the subject property. The appraiser does not need to know, or be able to explain, the AVM's algorithm or intricacies of its statistical or mathematical formulae. However, the appraiser should be able to describe the AVM's overall process and verify that the AVM is consistent in producing results that accurately reflect prevailing market behavior for the subject property.

AVMs differ in the number and type of data characteristics as well as in the volume of data analyzed. The appraiser should know which characteristics (e.g., size, location, quality) are analyzed and how the analysis is

USPAP Advisory Opinions 2014-2015 Edition                                A-47
©The Appraisal Foundation

## ADVISORY OPINION 18

tested for accuracy and reasonableness. The appraiser should ascertain that the characteristics analyzed are those to which the market responds.

Some AVMs allow the appraiser to select the data analyzed on the basis of, for example, distance from subject, size, or age of the improvements. An appraiser's ability to change the AVM's selection parameters may affect the appraiser's decision to use or rely on the AVM output.

The appraiser should be aware that the AVM may not perform consistently given the same input criteria. The appraiser should be confident of the AVM's credibility when applied to a specific property. The appraiser decides whether to rely on the AVM output, regardless of the AVM's overall test performance. In some cases, the appraiser may accept the AVM's output, while in other cases that same AVM's output would not be acceptable.

### Communicating the AVM Output

An appraiser must ensure that his or her communication of an AVM's output is not misleading.

An AVM's output is not, by itself, an appraisal, and communication of an AVM's output is not, in itself, an appraisal report. When an AVM is used in an appraisal or appraisal review assignment, information furnished about an AVM in the appraiser's report must satisfy the reporting requirements applicable to the type of report provided (e.g., in the case of a real property appraisal, an Appraisal Report or Restricted Appraisal Report). The appraiser should cite the name and version of the AVM software and provide a brief description of its methods, assumptions, and level of allowed user intervention. The report should, to the extent possible, identify the database (e.g., Multiple Listing Services) and the data analyzed.

An appraiser bound by USPAP may be asked to run an AVM and communicate its output without performing an appraisal or appraisal review assignment. For example, an appraiser may be asked to simply enter property characteristics provided by the client but not alter the input or affect the AVM's output. In this specific instance, the appraiser is not acting in the capacity of an appraiser but rather is functioning only as an AVM operator. In such a situation, an appraiser must carefully avoid any action that could be considered misleading or fraudulent. The appraiser should take steps to ensure that communication of the AVM's output is not misconstrued as an appraisal or appraisal review report. For example, the appraiser should:

1. not communicate his or her opinions or conclusions as an appraiser regarding the credibility or reliability of the AVM's output;
2. not provide an appraiser's certification or statement of limiting conditions in connection with the AVM's output; and
3. ensure that his or her role as only an AVM operator is clearly indicated if his or her signature or other identification marks appear on document(s) used to communicate the AVM's output.

### Analyzing an AVM's Effectiveness

An appraiser bound by law, regulation, or an agreement to comply with USPAP may be asked to analyze and comment on the effectiveness of an AVM for a stated intended use. Such a request involves an aspect of value and thereby this would be an appraisal practice service, but one for which USPAP has no specific performance standards. In order to accept such an assignment, an appraiser bound to comply with USPAP must ensure compliance with the ETHICS RULE, the COMPETENCY RULE, and the JURISDICTIONAL EXCEPTION RULE. To meet the COMPETENCY RULE, at a minimum, the appraiser should also have a basic understanding of how the AVM works.

A-48                                                    USPAP Advisory Opinions 2014-2015 Edition
©The Appraisal Foundation

**ADVISORY OPINION 18**

**Review of the Output of an AVM**

An appraiser bound by law, regulation, or an agreement to comply with USPAP may be asked if the output of an AVM is credible for a specific property, given the intended use of the AVM's output. Such a request involves an aspect of value and thereby making this determination is an appraisal practice service, but one for which USPAP has no specific performance standards. The appraiser must ensure compliance with the ETHICS RULE, the COMPETENCY RULE, and the JURISDICTIONAL EXCEPTION RULE.

**Review of an Appraisal Report Containing Output of an AVM**

An appraiser may be asked to review an appraisal report that includes an opinion of value based on the output of an AVM. This is an appraisal review assignment under USPAP which must follow the requirements of STANDARD 3. This kind of appraisal review assignment may be accepted if the appraiser performing the review understands how the AVM works and can form an opinion as to the adequacy and relevancy of the data and the appropriateness of the analysis, based on the information provided in the report under review.

**Use of an AVM in an Appraisal Review Assignment**

An AVM may be used in the process of reviewing a real property appraisal report. The appraisal reviewer may use the AVM to test the reasonableness of the value conclusion in the report under review if the appraisal reviewer has a basic understanding of how the AVM works, can use the AVM properly, determines that use of the AVM is appropriate for the appraisal review assignment, and believes the AVM output is credible and sufficient for the appraisal review assignment.

**Illustrations:**

1(a).   Staff Appraiser D, who has access to market databases, is asked to use an AVM to process information. When Appraiser D runs the AVM, she has done no other appraisal research. Appraiser D does not apply any of her appraisal knowledge or judgment in operating the AVM. Appraiser D has entered only property characteristics provided by the client and does not know how the AVM analyzes the data. Is the AVM output an appraisal?

No. The AVM output by itself is not an appraisal. Appraiser D did not apply her appraisal knowledge, judgment, or expertise, nor did she represent that the output was her own opinion of value.

Appraiser D must be very careful in communicating the AVM output to ensure that there is no misunderstanding as to her role in operating the AVM or communicating its output. For example, Appraiser D should:

1. not communicate her opinions or conclusions as an appraiser regarding the credibility or reliability of the AVM's output;

2. not provide an appraiser's certification or statement of limiting conditions in connection with the AVM's output; and

3. ensure that her role as only an AVM operator is clearly indicated if her signature or other identification mark appears on documents used to communicate the AVM's output.

1(b).   Staff Appraiser D receives AVM output from a coworker who is not an appraiser. Appraiser D is requested to determine if the AVM output is credible, given the intended use. What can Appraiser D do?

Appraiser D should not express an opinion regarding value. However, the request involves an aspect of value and, therefore, Appraiser D can indicate if the AVM output is credible. USPAP includes no specific performance standards for this kind of service. However, because performing

USPAP Advisory Opinions 2014-2015 Edition                              A-49
©The Appraisal Foundation

*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*

*316 Homes in a Proposed Class Area in Escambia County, Florida*

---

**ADVISORY OPINION 18**

the service requires an appraiser to consider an aspect of property value, it is part of appraisal practice. Appraiser D must, therefore, ensure compliance with the ETHICS RULE, the COMPETENCY RULE, and the JURISDICTIONAL EXCEPTION RULE.

1(c).   After staff Appraiser D has received the AVM output, can she incorporate the information into the appraisal process?

Yes. However, Appraiser D must be able to understand how the AVM works and determine that the information analyzed is credible and reliable.

2.   Appraiser V provides residential appraisals to Client A, whose intended use is to document security for equity lines of credit. Appraiser V has determined that Orange Box AVM is sufficiently reliable to use as a tool in these appraisals. Orange Box AVM was recently used by Appraiser V on a house in a suburban single-family residential subdivision.

Client B requests Appraiser V to use Orange Box AVM, alone, for a relocation appraisal assignment on an identical house in the same subdivision. Can Appraiser V use Orange Box AVM alone in this relocation appraisal assignment?

AVM itself and the AVM output for Client A's needs may not be appropriate for Client B's needs.

Client A's intended use of the appraisal is to document security for an equity line of credit. Typically, Client A's lending decision is based primarily on the homeowner's capacity to pay the debt and only secondarily on the value of the house. The reliability expectation of the value opinion needed by Client A is relatively low.

The intended use of the relocation appraisal for Client B is to develop an opinion of a sale price of the house under very specific conditions. Typically, the reliability expectation of the opinion needed by Client B is relatively high because his or her intended use involves a near-term transfer of the house, with immediate financial implications. Appraiser V must determine if Orange Box AVM's output is sufficiently reliable to meet Client B's stated expectations.

3(a).   Appraiser A developed a regression analysis model that suggests a relationship between the size of a residence and the price per square foot of similar residences in a specific market. This relationship has been confirmed by market behavior, and the database used is believed to be reliable. Can the appraiser use the regression analysis model in other appraisal assignments of similar properties in the same market?

Yes, because the appraiser knows how the regression analysis model works, has independently tested the conclusions it provides, and believes the database is reliable. However, the appraiser must consider whether the AVM output is credible and reliable for each assignment on a case by case basis.

3(b).   Appraiser A's friend, Appraiser B, works in a different market area. Appraiser B is impressed with Appraiser A's model and wants to use the model in Appraiser B's market area. Can Appraiser B use Appraiser A's model?

Yes, if Appraiser B understands how Appraiser A's model works and verifies by independent testing that the model produces reliable results in Appraiser B's market area and that the database used by Appraiser B reflects behavior in Appraiser B's market area. However, the appraiser must consider whether the AVM output is credible and reliable for each assignment on a case-by-case basis.

---

*Addenda*

**C L A R I O N**

**ADVISORY OPINION 18**

4(a).    A client of Appraiser A requests that Appraiser A use Blue Box AVM. The client says, "Since we are only doing residential appraisals, you can skip the cost and income approach. To lower the cost of the appraisal just use the Blue Box AVM results as the basis for your value conclusion." The client also says, "Blue Box AVM makes thirteen adjustments, and that is all that the appraiser needs to be concerned with." The Blue Box AVM developer feels that appraisers cannot understand this new technology and that appraisers do not need to know how the thirteen adjustments are made. What should Appraiser A do?

Appraiser A should:

1.  learn how the Blue Box AVM works;
2.  determine if he can use the AVM properly; and,
3.  given the intended use, determine if the output of Blue Box AVM is credible and sufficiently reliable for use in the assignment.

If Appraiser A cannot understand how the Blue Box AVM works or concludes that the results are not credible, given the intended use, Appraiser A should discuss the issue with the client. This discussion may result in a modified scope of work or in the appraiser declining the assignment.

4(b).    Another client requests that Appraiser A consider Green Box AVM. The client indicates that Appraiser A can modify six of the thirteen items analyzed in Green Box AVM, such as the distance within which the comparables are selected and the size range (square footage) of the comparables. The developer of Green Box AVM will also describe how the AVM works and provide the results of test data, which indicate that the model is reliable. What should Appraiser A do?

Appraiser A needs to follow the same steps described in 4(a).

*Appraisal Review Report*                                      *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

**9.5    APPRAISAL INSTITUTE GUIDE NOTE 10**



## Guide Note 10
## Development of an Opinion of Market Value in the Aftermath of a Disaster



MARKET VALUE



VALUATION CONSIDERATIONS & PRINCIPLES



SUSTAINABILITY OF VALUE



COMPETENCY ISSUES

## Background/Rationale

In recent years, the United States has experienced terrorist attacks, unusually destructive natural disasters and catastrophic man-made disasters. The aftermath of a disaster poses special challenges in real property valuation. During such periods, real property markets in affected areas often exhibit instability, even chaos. Analyzing market data in such markets can be difficult. Appraisers and clients regularly have sought guidance from the Appraisal Institute on how to handle these situations.

In response, the Appraisal Institute offers Guide Note 10 on "Developing an Opinion of Market Value in the Aftermath of a Disaster" to assist appraisers and clients. The purpose of Guide Notes to the Appraisal Institute's Standards of Professional Appraisal Practice is to provide guidance as to how the requirements of the Standards may apply in specific situations. The Guide Note was adopted by the Appraisal Institute Board of Directors in November 2010.

# GUIDE NOTE 10
## Developing an Opinion of Market Value in the Aftermath of a Disaster

Natural disasters include hurricanes, floods, tornadoes, earthquakes, tsunamis, fire, severe winter storms, avalanches and mudslides, among others. Disasters can also be caused by human action or error; examples include terrorist attacks, riots, war, panic in the financial markets, industrial accidents, chemical leaks, oil spills, shipping accidents, airline crashes, and structural failures of dams, bridges or buildings. Disasters tend to occur suddenly, taking the public by surprise, even when the location is known to be prone to such an occurrence. Depending on the nature of the disaster, injuries and death may be widespread and destruction of property may occur to varying degrees. Initially the collective reaction to any disaster is shock, then disbelief, mourning and sorrow. Eventually, there is recovery; those affected move on with their lives. Damaged property is repaired and destroyed property is often replaced.

**The human tragedy aside, the aftermath of a disaster can be especially problematic in real property valuation assignments.**

During that time period, real property markets in affected areas often exhibit instability, even chaos. Analyzing data in such markets presents an array of challenges. *How can an appraiser develop a credible opinion of market value in the aftermath of a disaster?*

## Characteristics of "Market Value"



"Market value" is the focus of many appraisal assignments. This Guide Note is intended to address market value assignments only; if the objective of an assignment is not market value, not all of the discussion in this Guide Note will apply.

There are many different definitions of "market value" in use, but all exhibit common characteristics. The entry for "market value" in the Definitions section of the *Uniform Standards of Professional Appraisal Practice (USPAP), 2010 Edition*, addresses these common characteristics:

> **MARKET VALUE:** a type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of owner ship or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal.
>
> > Comment: Forming an opinion of market value is the purpose of many real property appraisal assignments, particularly when the client's intended use includes more than one intended user. The conditions included in market value definitions establish market perspectives for development of the opinion. These conditions may vary from definition to definition but generally fall into three categories:
> >
> > 1. the relationship, knowledge, and motivation of the parties (i.e., seller and buyer);
> > 2. the terms of sale (e.g., cash, cash equivalent, or other terms); and
> > 3. the conditions of sale (e.g., exposure in a competitive market for a reasonable time prior to sale).

The Appraisal Institute's *The Dictionary of Real Estate Appraisal, 5th Edition*, includes the following in its entry for "market value":

> The most widely accepted components of market value are incorporated in the following definition:
>
> The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

The *Dictionary* goes on to cite the definition of "market value" used by agencies that regulate federally insured financial institutions in the United States:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
> • Buyer and seller are typically motivated;
> • Both parties are well informed or well advised, and acting in what they consider their best interests;
> • A reasonable time is allowed for exposure in the open market;
> • Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
> • The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
> (12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

The International Valuation Standards Committee defines "market value" as follows:

> The estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently, and without compulsion.
> *(International Valuation Standards, Eighth edition 2007, 27.)*

It is important to observe that the following elements are common to each of the foregoing definitions:

> • Market value results when the parties are typically motivated, are generally well informed, and are acting in their best interest;
> • Market value results when the property is exposed on the market for a reasonable length of time;
> • Payment is in cash or its equivalent.

An appraiser must be especially mindful of these characteristics of *market value* when appraising in a chaotic or unstable market. Quite often, in the aftermath of a disaster, these characteristics are absent from the transactions that occur – if any occur at all. For example, buyers and sellers might choose to act before they have full information. Because of the disaster, they might be extraordinarily motivated to buy or to sell. Exposure times for properties on the market might become extended, or might suddenly become contracted. Sometimes, market activity will virtually cease altogether in the aftermath of a disaster; open escrows fall out; prospective sellers cancel plans to sell; and prospective buyers cancel plans to buy. The lack of data only further exacerbates the challenge for the appraiser.

# Applicability of Basic Valuation Principles



Any appraisal problem must be approached using recognized appraisal methodology and in light of basic valuation principles, regardless of whether market conditions are at their most chaotic. Applying established approaches to solving valuation problems will help to simplify even the most complex assignments. Valuation in the aftermath of a disaster requires special attention to the fundamental appraisal principles of supply and demand, anticipation, change, substitution, contribution, externalities, and balance.

## SUPPLY AND DEMAND

In economic theory, the principle that states that the price of a commodity, good, or service varies directly, but not necessarily proportionately, with demand, and inversely, but not necessarily proportionately, with supply. In a real estate appraisal context, the principle of supply and demand states that the price of real property varies directly, but not necessarily proportionately, with demand and inversely, but not necessarily proportionately, with supply.

## ANTICIPATION

The perception that value is created by the expectation of benefits to be derived in the future.

## CHANGE

The result of the cause and effect relationship among the forces that influence real property value.

## BALANCE

The principle that real property value is created and sustained when contrasting, opposing, or interacting elements are in a state of equilibrium.

## SUBSTITUTION

The appraisal principle that states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price will attract the greatest demand and widest distribution. This is the primary principle upon which the cost and sales comparison approaches are based.

## CONTRIBUTION

The concept that the value of a particular component is measured in terms of its contribution to the value of the whole property, or as the amount that its absence would detract from the value of the whole.

## EXTERNALITIES

The principle that economies outside a property have a positive effect on its value while diseconomies outside a property have a negative effect upon its value.

# Valuation Considerations



Forces that influence real property values include social trends, economic circumstances, governmental controls and regulations and environmental conditions. Any or all of these might be impacted by a disaster. Factors that create value include utility, scarcity, desire and effective purchasing power. Again, any or all of these might become issues in the aftermath of a disaster. Property utility might be impacted by damage or destruction; properties might be more scarce because damaged or destroyed properties are removed from the overall supply; desire for property might increase because displaced homes and businesses need replacement space; and effective purchasing power might be impacted by changes in lending policies and practices in the area in response to the disaster.

A disaster might have a drastic impact on both supply and demand, causing them to suddenly be out of balance. There may be a dramatic drop in supply due to destruction and damage. At the same time, there may be a spike in demand because those who suffered loss or damage to owned or leased real estate will need to find replacement space. Many will not have the luxury of time in doing so. This is especially true with regard to residential real estate; people need to find alternative shelter immediately. As a result, sharp increases in asking and selling prices might be observed. This raises several questions from an appraisal viewpoint: Do such higher prices represent "market value"? Are the parties to the transactions "typically motivated" and acting in their best interest or is their behavior irrational? Are the properties being exposed on the market for a "reasonable" length of time prior to sale?

The principles of substitution, contribution and externalities help provide the answers to these questions. As in any assignment, identification of the subject's market area is critical. Generally, all properties in the subject's *market* area are similarly impacted by the disaster. "Typical" motivations and "reasonable" exposure times are therefore measured by what is observed in that market area during the same time period. In other words, "normal" is redefined – at least for the time being.

The principles of anticipation and change are especially relevant to valuation assignments in the aftermath of a disaster. There is generally a great deal of *uncertainty* in the market during this time period. Is the disaster likely to be repeated in the near future? Will further damage and destruction result? What is the extent of the damage? To what degree can structures be replaced? Are there environmental concerns, and if so, to what extent? And how long will it take before things return to "normal"? The impact of such uncertainty may be readily perceived but difficult to measure. Uncertainty in real estate markets means increased risk to property owners and investors. Such increased *risk* might be reflected in higher capitalization and discount rates. It might also be manifested in "discounted" prices – which to some degree might offset upward pressure on prices resulting from increased demand and decreased supply.

The appraiser must be especially mindful of issues relating to the date of value. Ideally, comparable data must be selected from the same market area and must be subject to the same market conditions. Transactions that occurred prior to the disaster will not reflect the same market conditions as those occurring after.

Following a catastrophic event, there may be few if any truly comparable sales from which to support a value opinion as of current date. Additional data may need to be taken into consideration such as experience from other disaster-affected areas or anecdotal information obtained from interviews with market participants, for example. It is important that appraisers continue to apply and rely upon the same methods and techniques as in other assignments, remembering the analysis necessary to determine comparability of data.

Some appraisal assignments require the *date* of value to be prior to the disaster. Such retrospective valuations include those provided to assist insurers and insureds in establishing loss amounts for insurance purposes. In these cases, the appraiser must rely on data that occurred prior to that retrospective value date. Such transactions occurring in that time period would not have been impacted by the disaster. The difficulty in these retrospective valuations is that the appraiser cannot obtain firsthand information about the characteristics of the property that are relevant to the assignment as of the date of value; i.e., one cannot go back in time to visually inspect the property. The appraiser must therefore rely on the best available information about the nature of the subject property as of the date of value.

Such an appraisal would be based on one or more *extraordinary* assumptions about the property condition and other characteristics that are as presumed to be true in the appraisal assignment.

The more problematic appraisal assignments are those for which the *date of value* occurs in the aftermath of the disaster. If no data is available on transactions that occurred in the aftermath of the disaster, data on transactions that occurred prior will require adjustment for market conditions. Such adjustments may be difficult to substantiate. An appraiser must be extremely careful in the use of such data and the estimation of any such market conditions adjustment. In time, more transactions will occur and more data will become available for analysis. Until then, the appraiser must work with what is available. The terms and conditions of any sales that do occur must be analyzed more closely; buyer and seller motivations must be investigated more thoroughly, and the nature of the property's exposure on the market must be examined.

## Sustainability of value



A client might request an opinion of value, but to many clients the answer to another question may be paramount: *How durable is that value?* Are values in the aftermath of a disaster likely to be sustained over time? If values have risen in the aftermath of the disaster, are they likely to fall again in the near future? If values have fallen, are they likely to rise again? It is important to recognize that these questions are separate from the question of value, and answering them goes beyond the provision of an appraisal.

To some degree, the sustainability of value over time will be reflected in the current market value, because market participants build their expectations into prices; if they believe values will rise in the long run, they might be willing to pay more now. After a disaster there is much more uncertainty, and this tends to cause buyers and sellers to be more cautious. In the aftermath of a disaster there is more than the normal amount of risk in the marketplace. The market may be very fluid. Changes to market conditions may cause changes in market value to occur more rapidly than usual.

It may be helpful to communicate to the client the relative reliability of the value opinion. It is appropriate to point out in the appraisal report that the data upon which the appraisal is based is limited in quantity or quality and that this affects the reliability of the conclusions. If acceptable to the client, expressing the value opinion within a range may be an appropriate way to address this situation.

## Competency Issues



The requirements of the Competency Rule in USPAP become greatly enhanced in assignments to develop market value opinions in the aftermath of a disaster. The Competency Rule identifies several types of competency, including competency with regard to (1) a property type (2) a market (3) a geographic area and (4) an analytical method. An appraiser who previously possessed sufficient competency to appraise a given property type in a given area might not have sufficient competency to appraise the same property type in that area in the aftermath of a disaster.

Government agencies and other bodies such as Fannie Mae, Freddie Mac, and the bank regulatory agencies might issue guidance or impose additional requirements on appraisers working in the affected areas after a major disaster. Appraisers must be cognizant of such additional requirements and pay them particular attention, as they may become enforceable requirements for such assignments.

Appraisers should be wary of requests to provide services other than appraisal services for which they lack competency. For example, in the aftermath of a disaster, some clients might request a signed report indicating the condition of a property, noting any damage or destruction. Unless the appraiser possesses the requisite competency to make judgments about these matters, the appraiser must not take on assignments that require competency that is beyond that of a real property appraiser.

Appraisers must avoid making statements of fact about what they *believe* they observed, when such statements are not substantiated by the necessary expertise. For example, an appraiser might observe what he or she thinks is mold in a flood-damaged property; but without definitive input from an expert in mold, making a statement about the presence of mold might be misleading. Instead, the appraiser's statements should be limited to what he or she actually observed. Instead of stating that mold was observed, state that "a black substance was observed on the walls."

Appraisers must not allow their personal involvement in the disaster to affect their objectivity. This can be challenging in the wake of a disaster that has affected one's own family, friends and/or hometown. An appraiser must be prepared to decline any assignment in which he or she cannot maintain impartiality.

## Summary of Standard Practices

1. Developing an opinion of value in the aftermath of a disaster might require competency that surpasses or is different from that required prior to the disaster.

2. The characteristics of the applicable definition of *market value* must be carefully examined when appraising in a chaotic or unstable market.

3. Valuation in the aftermath of a disaster requires special attention to the fundamental appraisal principles of supply and demand, anticipation, change, substitution, contribution, externalities, and balance.

4. Transactions that occurred prior to the disaster will not reflect the same market conditions as those occurring after. Ideally, comparable data must be selected from the same market area and must be subject to the same market conditions as the subject property.

5. In appraisal assignments for which the date of value is a retrospective date prior to the disaster, the appraiser must rely on comparable sales that occurred prior to that retrospective value date.

6. In appraisal assignments for which the date of value is a retrospective date prior to the disaster, the appraiser must rely on the best available information concerning the nature of the subject property as of the date of value. Such an appraisal would be based on one or more *extraordinary assumptions* about the property condition and other characteristics that are as presumed to be true in the appraisal assignment.

7. Unless the appraiser possesses the requisite competency to make judgments about these matters, the appraiser must not take on assignments that require competency that is beyond that of a real property appraiser.

(Please Note: The purpose of the Guide Notes to the Standards of Professional Appraisal Practice is to provide Members, Candidates, Practicing Affiliates and Affiliates with guidance as to how the requirements of the Standards may apply in specific situations.)

**C L A R I O N**

**9.6**    STATEMENT OF COMPENSATION

Our professional fees are based upon an hourly reimbursement basis plus reimbursements for costs and expenses associated with research, travel and report production. The hourly rates for Clarion Associates staff ranges from $90 per hour to $575 per hour. The current hourly rate for Mr. Roddewig is $575 per hour.  The professional fees paid for preparing this appraisal review report were not based in whole or in part on upon the outcome of the legal proceedings for which it has been produced.

**9.7    RODDEWIG DEPOSITION AND TRIAL TESTIMONY**

*Appraisal Review Report*                                          *John Navelski, et al. v. International Paper Company*
                                                                   *316 Homes in a Proposed Class Area in Escambia County, Florida*

---

**Richard J. Roddewig**
**Depositions and Trial Testimony: 2009-Present**

Gary Paulson, et al. v. 3M Company, 10th Judicial District Court, Washington County, Minnesota, Civil File No. C2-04-6309.  (Deposition given August 21, 2008 and Trial Testimony given June 9-10, 2009)

BB&A Ventures, et al., vs. WWLD Hotel Investors, LLC, et al., Lease Arbitration Proceeding, No. 51-115 Y 001227-09 (Deposition given February 15, 2010 and Hearing Testimony given May 17 and 18, 2010)

In re: Chinese-Manufactured Drywall Products Liability Litigation, United States District Court, Eastern District of Louisiana, MDL No. 2047, Section L, Judge Fallon (Deposition given June 10, 2010)

Allison, et al. v. Exxon Mobil, et al., Circuit Court for Baltimore County, Maryland, Case No. 03-C-07-003809 (Deposition given June 1, 2010; Testimony given in a Frye/Reed Hearing, November 3, 2010; and Trial Testimony, June 1 and 2, 2011)

Johnson, et al. v. Prime Tanning Corp., Circuit Court of Buchanan County, Missouri, Case No. 09BU-CV06421 (Deposition given June 16, 2011)

Friesland Farms, LLC, et al. v. Big Sky Wind LLC, United States District Court for the Central District of Illinois, Case No. 10-01232 (Deposition given April 24, 2012)

City of Joliet v. Mid-City National Bank of Chicago, et al., United States District Court for the Northern District of Illinois, Case No. 05 C 6746 (Deposition given July 31, 2012)

John Johnson, et al. v. Orleans Parish School Board, et al., State of Louisiana, Division M, CDC No. 93-14333 (Trial Testimony given April 29, 2013)

Thomas Reep, et al. v. City of Milwaukee, State of Wisconsin, Milwaukee County Circuit Court, Case No. 09-cv-3483, Case Code 30201 (Deposition given September 11, 2013; Trial Testimony given September 25, 2013)

Jerilyn Allen, et al. v. Exxon Mobil, et al., Circuit Court for Baltimore County, Maryland, Case No. 03-C-11-008536 (Deposition given May 22, 2014)

Peter Ng and Dolly Wu v. International Disposal Corporation of California, et al., Superior Court of the State of California, County of Santa Clara, Case No. 112CV228591 (Deposition given July 11, 2014)

Yashayahu Michaely, et al. v. Browning-Ferris Industries, et al., Superior Court of the State of California, County of Los Angeles, Case No. BC497125 (Deposition given April 28, 2015)

John Battier, et al. v. Waste Management of Pennsylvania, Inc., United States District Court for the Eastern District of Pennsylvania, Case No. 2:14-cv-07013 PD (Deposition given July 21, 2015)

---

*Addenda*

**C L A R I O N**

**9.8    TABLES SHOWING AVERAGE AND MEDIAN MARKETING TIME**

*Appraisal Review Report*                                    *John Navelski, et al. v. International Paper Company*
                                                              *316 Homes in a Proposed Class Area in Escambia County, Florida*

| Fruitticher Regression Model: 32 Before Flooding Event Sales (Observations) | | | | | | | |
| Observation | MLS Closed Sale # | DOM | Sale Price | List Price | SP:LP Ratio | Before/After Flood | Address | Date of Sale |
|---|---|---|---|---|---|---|---|---|
| 1 | 436250 | 130 | $115,000 | $120,000 | 96% | Before | 344 Twisted Oak Dr | 4/19/2013 |
| 2 | 442854 | 69 | $139,900 | $139,900 | 100% | Before | 176 Millet Cir | 9/10/2013 |
| 3 | 448509 | 116 | $148,199 | $140,900 | 105% | Before | 148 Millet Cir | 8/5/2013 |
| 4 | 456374 | 17 | $180,000 | $185,900 | 97% | Before | 3225 Copper Ridge Cir | 2/21/2014 |
| 5 | 433767 | 163 | $149,000 | $149,000 | 100% | Before | 304 Twisted Oak Dr | 5/15/2013 |
| 6 | 425645 | 331 | $167,961 | $166,585 | 101% | Before | 249 Millet Cir | 5/17/2013 |
| 7 | 446325 | 132 | $156,000 | $158,530 | 98% | Before | 290 Wiregrass Pl | 11/25/2013 |
| 8 | 455687 | 0 | $160,580 | $160,580 | 100% | Before | 165 Millet Cir | 12/6/2013 |
| 9 | 444953 | 92 | $175,000 | $175,000 | 100% | Before | 125 Millet Cir | 8/29/2013 |
| 10 | 450758 | 138 | $162,900 | $162,900 | 100% | Before | 120 Millet Cir | 2/21/2014 |
| 11 | 437406 | 155 | $161,000 | $172,500 | 93% | Before | 2742 Ashbury Ln | 9/27/2013 |
| 12 | 441196 | 182 | $125,000 | $125,000 | 100% | Before | 2035 Jason Dr | 11/5/2013 |
| 13 | 442186 | 80 | $155,000 | $166,500 | 93% | Before | 2441 Devine Farms Rd | 8/14/2013 |
| 14 | 447995 | 84 | $169,000 | $179,000 | 94% | Before | 2054 Joshua Dr | 10/15/2013 |
| 15 | 427643 | 408 | $167,000 | $169,000 | 99% | Before | 3219 Windmill Cir | 7/19/2013 |
| 16 | 450366 | 145 | $198,885 | $198,885 | 100% | Before | 256 Millet Cir | 7/25/2013 |
| 17 | 457727 | 14 | $190,500 | $185,000 | 103% | Before | 2724 Ashbury Ln | 3/28/2014 |
| 18 | 434036 | 146 | $182,850 | $179,900 | 102% | Before | 3244 Windmill Cir | 4/30/2013 |
| 19 | 451707 | 106 | $175,000 | $190,000 | 92% | Before | 9970 Bristol Park Rd | 2/7/2014 |
| 20 | 443610 | 276 | $181,000 | $189,900 | 95% | Before | 2028 Joshua Dr | 3/19/2014 |
| 21 | 444381 | 203 | $196,100 | $208,900 | 94% | Before | 3272 Windmill Cir | 12/19/2013 |
| 22 | 444087 | 66 | $192,000 | $206,900 | 93% | Before | 3201 Windmill Cir | 7/15/2013 |
| 23 | 455268 | 15 | $201,000 | $209,000 | 96% | Before | 860 Copper Ridge Dr | 2/6/2014 |
| 24 | 442086 | 0 | $250,000 | $250,000 | 100% | Before | 2351 Queens Ferry Ln | 8/22/2013 |
| 25 | 443909 | 9 | $249,900 | $249,900 | 100% | Before | 3150 Byron Pl | 6/28/2013 |
| 26 | 454262 | 75 | $182,000 | $186,000 | 98% | Before | 2713 Woodbreeze Dr | 2/21/2014 |
| 27 | 444458 | 64 | $204,500 | $204,900 | 100% | Before | 3205 Windmill Cir | 9/18/2013 |
| 28 | 443949 | 50 | $202,500 | $209,900 | 96% | Before | 2704 Silhouette Dr | 8/13/2013 |
| 29 | 437174 | 174 | $282,000 | $289,900 | 97% | Before | 2904 Sundance Ln | 7/1/2013 |
| 30 | 450965 | 3 | $280,000 | $285,000 | 98% | Before | 2905 Sundance Ln | 10/11/2013 |
| 31 | 450318 | 158 | $300,700 | $289,900 | 104% | Before | 3248 Sundial Cir | 3/24/2014 |
| 32 | 451204 | 7 | $248,000 | $249,900 | 99% | Before | 712 Rock Hill Ct | 10/28/2013 |
| | **Average:** | 112.75 | | | 98% | | | |
| | **Median:** | 99 | | | 99% | | | |

*Addenda*

**C L A R I O N**

*Appraisal Review Report*                              *John Navelski, et al. v. International Paper Company*

*316 Homes in a Proposed Class Area in Escambia County, Florida*

| Sales Since Flooding Event in Proposed Class Area | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Observation | MLS Closed Sale # | DOM | Sale Price | List Price | SP:LP Ratio | Before/After Flood | Address | Date of Sale |
| 33 | 460632 | 51 | $166,000 | $169,900 | 98% | After | 2043 Joshua Dr | 6/26/2014 |
| 34 | 455761 | 227 | $194,000 | $193,000 | 101% | After | 2039 Joshua Dr | 8/27/2014 |
| 35 | 464826 | 0 | $185,000 | $195,000 | 95% | After | 10304 Nightwind Cir | 9/5/2014 |
| 36 | 468527 | 28 | $160,000 | $150,000 | 107% | After | 10101 Bristol Park Rd | 1/26/2015 |
| 37 | 462075 | 3 | $205,000 | $205,000 | 100% | After | 10112 Bristol Park Rd | 2/24/2015 |
| 38 | 469439 | 135 | $149,900 | $149,900 | 100% | After | 2131 Jarrod Dr | 3/13/2015 |
| 39 | 477795 | 7 | $269,000 | $269,000 | 100% | After | 2723 Ashbury Ln | 4/1/2015 |
| 40 | 471402 | 129 | $179,900 | $179,000 | 101% | After | 1534 Witt Dr | 4/6/2015 |
| 41 | 478324 | 20 | $210,000 | $215,000 | 98% | After | 10011 Bristol Park Rd | 5/8/2015 |
| 42 | 473483 | 93 | $192,000 | $195,000 | 98% | After | 2730 Ashbury Ln | 6/25/2015 |
| | **Average:** | 69.3 | | | 100% | | | |
| | **Median:** | 39.5 | | | 100% | | | |

*Addenda*

156                              **C L A R I O N**

**9.9    APPRAISAL DOCUMENTS, 2023 JOSHUA DRIVE & 10050 BRISTOL PARK ROAD PROVIDED BY M. EUGENE PRESSLEY, MAI, SRA OF PRESLEY - MCKENNEY & ASSOCIATES, INC.**

*Appraisal Review Report*                                        *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

---

Presley - McKenney & Associates, Inc.

**UNIFORM RESIDENTIAL APPRAISAL REPORT**

MEP

File No. 15151Z8

### Property Description

| | | | |
|---|---|---|---|
| Property Address 2023 Joshua Dr | City Cantonment | State FL | Zip Code 32533 |
| Legal Description Lot 10, Blk A Bristol Creek Phase II | | County Escambia | |
| Assessor's Parcel No. 09 0236 670 | Tax Year 2014  R.E. Taxes $ 1,575.66 | Special Assessments $ N/A | |

**SUBJECT**

Borrower Henry Bishop — Current Owner Bishop — Occupant: [X] Owner  [ ] Tenant  [ ] Vacant
Property rights appraised  [X] Fee Simple  [ ] Leasehold — Project Type  [ ] PUD  [ ] Condominium (HUD/VA only) — HOA$ ___ /Mo.
Neighborhood or Project Name Bristol Park — Map Reference Z8 — Census Tract 036.12
Sale Price $ N/A — Date of Sale — Description and $ amount of loan charges/concessions to be paid by seller N/A
Lender/Client Moore, Hill & Westmoreland — Address 350 W Cedar St, Pensacola, FL 32502
Appraiser M. Eugene Presley, MAI, SRA — Address P.O. Box 329, Pensacola, FL 32591

**NEIGHBORHOOD**

| Location | [ ] Urban | [X] Suburban | [ ] Rural | Predominant occupancy | Single family housing | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | | PRICE $(000) / AGE (yrs) | One family 99% | [X] Not likely  [ ] Likely |
| Growth rate | [ ] Rapid | [X] Stable | [ ] Slow | [X] Owner | 120 Low / 5 | 2-4 family | In process |
| Property values | [ ] Increasing | [X] Stable | [ ] Declining | [ ] Tenant | 300 High / 35 | Multi-family | To: |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | [X] Vacant (0-5%) | Predominant | Commercial | |
| Marketing time | [ ] Under 3 mos. | [X] 3-6 mos. | [ ] Over 6 mos. | [ ] Vacant (over 5%) | 200 / 20 | Vacant ) 1% | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics:  Kingsfield Road to the north, Interstate 10 south, Pine Forest Road east and the Alabama boundary or Beulah Road west

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):  Although having a Cantonment address, the subdivision is in the northwest quadrant of Pensacola suburbia. The subject subdivision consists of a mix of older and newer homes on typical sized residential sites. Almost all homes appear well maintained and upgraded. The area is located close to several major roadways allowing easy access to all parts of Pensacola. All types of public services are available within a reasonable distance. Market appeal is considered average.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):  Please note that sales prices for single-family residential housing in Escambia and Santa Rosa counties declined across the board from late 2006 through 2011. The amount and rate of decline varied from area to area. In 2012 the residential market stabilized. The subject market area is considered stable, but very "soft".

**PUD**

Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)?  [ ] YES  [X] NO
Approximate total number of units in the subject project ___ .  Approximate total number of units for sale in the subject project ___ .
Describe common elements and recreational facilities:

**SITE**

| | | | |
|---|---|---|---|
| Dimensions  66.7' x 199.38' x 100.88' + 78.84' x 128.8' | | Topography | Level at road grade |
| Site area  22,651 Sq.Ft. +/- per county property appraiser | Corner Lot  [ ] Yes  [X] No | Size | Typical for area |
| Specific zoning classification and description MDR, Medium Density Residential | | Shape | Irregular |
| Zoning compliance  [X] Legal  [ ] Legal nonconforming (Grandfathered use)  [ ] Illegal  [ ] No zoning | | Drainage | Appears adequate |
| Highest & best use as improved:  [X] Present use  [ ] Other use (explain) | | View | Average |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | Asphalt | [X] | [ ] | Landscaping | Typical |
| Gas | [X] | | Curb/gutter | Concrete | [X] | [ ] | Driveway Surface | Concrete |
| Water | [X] | | Sidewalk | None | [ ] | [ ] | Apparent easements | None apparent |
| Sanitary sewer | [X] | | Street lights | Yes | [X] | [ ] | FEMA Special Flood Hazard Area  [ ] Yes  [X] No | |
| Storm sewer | [X] | | Alley | None | [ ] | [ ] | FEMA Zone X  Map Date 09/29/2006 | |

FEMA Map No. 12033CO290G

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.):  This is an interior, wedge shaped lot backing to Eleven Mile Creek.

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | One | Foundation | Slab | Slab | Yes | Area Sq.Ft. | | Roof | [ ] |
| No. of Stories | One | Exterior Walls | Wd fr/BV | Crawl Space | No | % Finished | | Ceiling | [X] |
| Type (Det./Att.) | Detached | Roof Surface | Architectural | Basement | None | Ceiling | | Walls | [X] |
| Design (Style) | Contemp | Gutters & Dwnspts. | Alum. Gutters | Sump Pump | None | Walls | | Floor | [ ] |
| Existing/Proposed | Existing | Window Type | Aluminum | Dampness | None noted | Floor | | None | [ ] |
| Age (Yrs.) | 14 | Storm/Screens | Screens | Settlement | None noted | Outside Entry | | Unknown | [ ] |
| Effective Age (Yrs.) | 10 | Manufactured House | No | Infestation | None noted | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | *X | | *X | *X | | *X | | *4 | *2 | *X | | 2,291 |
| Level 2 | | | | | | | | | | | | |

Finished area **above grade** contains:  4 Rooms;  4 Bedroom(s);  2 Bath(s);  2,291 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Tile, Cpt / Good | Type | FWA | Refrigerator | [ ] | None | [ ] | Fireplace(s) #1 [X] | | None | [ ] |
| Walls | Drywall | Fuel | Electric | Range/Oven | [X] | Stairs | [ ] | Patio Open | | Garage 2  # of cars | |
| Trim/Finish | Wood/Avg. | Condition | Avg. | Disposal | [X] | Drop Stair | [X] | Deck | | Attached  X | |
| Bath Floor | CrmTile/Avg | COOLING | | Dishwasher | [X] | Scuttle | [ ] | Porch Entry | | Detached | |
| Bath Wainscot | Tile | Central | Yes | Fan/Hood | [X] | Floor | [ ] | Fence | | Built-In | |
| Doors | 6 panel | Other | None | Microwave | [ ] | Heated | [ ] | Pool | | Carport | |
| | | Condition | Avg. | Washer/Dryer | [ ] | Finished | [ ] | | | Driveway | |

**COMMENTS**

Additional features (special energy efficient items, etc.):  Data of the interior is from a 2011 MLS listing. A 2015 building permit was obtained for A/C. Property appraiser data states a detached garage but this is not shown on aerial photos nor visual inspection from street.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.:  * An interior inspection of the improvement has not been made. All data describing the improvement is obtained from a 2011 MLS listing of the property and public records with amenities assumed to be "similar" to those of other homes in the neighborhood. The property was viewed from Joshua Drive.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property:  No adverse environmental conditions were noted.

Freddie Mac Form 70  6-93 — PAGE 1 OF 2 — Produced using ACI software, 800.234.8727 www.aciweb.com — Fannie Mae Form 1004  6-93

---

*Addendum*

**C L A R I O N**

*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

Presley - McKenney & Associates, Inc.

**UNIFORM RESIDENTIAL APPRAISAL REPORT**

MEP
File No.  15151Z8

**Valuation Section**

### COST APPROACH

| | | |
|---|---|---|
| ESTIMATED SITE VALUE. . . . . . . . . . . . . . . . . . . . . . . . = $ | 30,000 | |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | | |
| Dwelling       2,291 Sq. Ft. @ $  70.00  = $ | 160,370 | |
| Sq. Ft. @ $_____  = | | |
| K App, O/P, Screen Porch          = | 12,400 | |
| Garage/Carport  420  Sq. Ft. @ $  18.00  = | 7,560 | |
| Total Estimated Cost New . . . . . . . . . . . . . . = $ | 180,330 | |
| Less   50 Physical | Functional | External   Est. Remaining Econ. Life:  40 | |
| Depreciation $39,955          = $ | 39,955 | |
| Depreciated Value of Improvements . . . . . . . . . . . . . . . . = $ | 140,375 | |
| "As-is" Value of Site Improvements . . . . . . . . . . . . . . . . = $ | 5,000 | |
| INDICATED VALUE BY COST APPROACH . . . . . . . . . . . = $ | 175,375 | |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property):
Replacement cost data was derived from the Marshall Swift Handbook and knowledge of the local building costs. Depreciation was estimated using the age/life method.

### SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 2023 Joshua Dr Cantonment | 2043 Joshua Dr Cantonment | | 10304 Nightwind Circle Cantonment | | 2039 Joshua Dr Cantonment | |
| Proximity to Subject | | Same S/D | | Same S/D | | Same S/D | |
| Sales Price | $  N/A | $ 166,000 | | $ 185,000 | | $ 194,000 | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 82.34 ☑ | | $ 79.09 ☑ | | $ 72.39 ☑ | |
| Data and/or Verification Sources | | MLS 460632 OR 7188 page 1470 | | MLS 464826 OR 7224 page 31 | | MLS 455761 OR 7219 page 652 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing Concessions | N/A | Conventional Typical Terms | | Conventional Typical Terms | | Conventional Atypical terms | -7,500 |
| Date of Sale/Time | | 6/27/14 | | 9/5/14 | | 8/27/14 | |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 22,651 SF +/- | 13,939 SF +/- | 0 | 21,344 SF/inf | +5,000 | 14,375 SF | 0 |
| View | Average | Sim.Homes | | Sim.Homes | | Sim.Homes | |
| Design and Appeal | Contemp/Avg. | Contemp/Avg. | | Contemp/Avg. | | Contemp/Avg. | |
| Quality of Construction | Average | Average | | Average | | Average | |
| Age | 14 Years, eff 10 | 14 Years, eff 10 | | 24 Years, eff 10 | | 14 Years, eff 10 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade Room Count | Total 4 / Bdrms 4 / Baths 2.00 | Total 6 / Bdrms 3 / Baths 2.00 | | Total 7 / Bdrms 4 / Baths 3.00 | -2,500 | Total 8 / Bdrms 4 / Baths 2.00 | |
| Gross Living Area | 2,291 Sq.Ft. | 2,016 Sq.Ft. | +11,000 | 2,339 Sq.Ft. | | 2,680 Sq.Ft. | -15,600 |
| Basement & Finished Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | CH&A | CH&A | | CH&A | | CH&A | |
| Energy Efficient Items | Energy Features | Energy Features | | Energy Features | | Energy Features | |
| Garage/Carport | 2 Att. Garage | 2 Att. Garage | | 2 Att., 1 Det Gar | -6,400 | 2 Att. Garage | |
| Porch, Patio, Deck, Fireplace(s), etc. | O/P, Sc/P 1 Fireplace | O/P, Deck 1 FP | -2,000 | Ent, cov & open pto 1 FP | +1,500 | O/P 1 FP | +6,000 |
| Fence, Pool, etc. | | | | Fnc, pool | -10,000 | | |
| Net Adj. (total) | | [X] +  [ ] -  $ | 9,000 | [ ] +  [X] -  $ | 12,400 | [ ] +  [X] -  $ | 17,100 |
| Adjusted Sales Price of Comparable | | Gross: 7.8% Net: 5.4%  $ | 175,000 | Gross: 13.7% Net: -6.7%  $ | 172,600 | Gross: 15.0% Net: -8.8%  $ | 176,900 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc. ):  The subject, located on a curve of Joshua St is a wedge shaped lot widening to the rear. The comp lots are rectangular shaped. Comp lots one and three have equal utility selling at the same pricing. Comp two backs to SR 97 and is considered inferior. The subject GLA is bracketed by the three sales with sale 1 requiring an upward adjustment and sale 3 a downward adjustment. The subject has an open entry porch and rear screen porch. Adjustments are made to the three sales for these features based on cost data. Sale two has a pool with the adjustment considered the contributing value.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | 11/18/2011 $163,000 OR 6788/176 | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:  Again, an interior inspection has not been made of sales nor subject. Data for each is obtained from public records plus MLS for the comps. About equal weight is given each sale.

INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 175,000
INDICATED VALUE BY INCOME APPROACH (If Applicable)   Estimated Market Rent $  N/A  /Mo. x Gross Rent Multiplier  N/A  = $ 0

### RECONCILIATION

This appraisal is made  [X] "as is"  [ ] subject to the repairs, alterations, inspections or conditions listed below  [ ] subject to completion per plans and specifications.
Conditions of Appraisal:  The appraisal is made of the subject "as-is" with all data from public records. A reasonable marketing period is considered to be less than 6 months.
Final Reconciliation: Most weight is to the sales comparison approach well supported by cost.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised  6/93  ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF  09/07/2015
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $  175,000 .

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature | Signature | [ ] Did  [ ] Did Not |
| Name  M. Eugene Presley, MAI, SRA | Name | Inspect Property |
| Date Report Signed  09/07/2015 | Date Report Signed | |
| State Certification #  Cert Gen RZ 103    State FL | State Certification #    State | |
| Or State License #    State | Or State License #    State | |

Freddie Mac Form 70  6-93

PAGE 2 OF 2
Produced using ACI software, 800.234.8727 www.aciweb.com
Presley-McKenney

Fannie Mae Form 1004  6-93

*Addend...*

**C L A R I O N**

FLOORPLAN SKETCH

| Borrower: Henry Bishop | | File No.: 15151Z8 |
| Property Address: 2023 Joshua Dr | | Case No.: MEP |
| City: Cantonment | State: FL | Zip: 32533 |
| Lender: Moore, Hill & Westmoreland | | |

Address:2023 JOSHUA DR, Year Built: 2001, Effective Year: 2001

**Structural Elements**
**DECOR/MILLWORK**-*AVERAGE*
**DWELLING UNITS**-*1*
**EXTERIOR WALL**-*BRICK-FACE/VENEER*
**FLOOR COVER**-*HARDWOOD/PARQET*
**FOUNDATION**-*SLAB ON GRADE*
**HEAT/AIR**-*CENTRAL H/AC*
**INTERIOR WALL**-*DRYWALL-PLASTER*
**NO. PLUMBING FIXTURES**-*8*
**NO. STORIES**-*1*
**ROOF COVER**-*COMPOSITION SHG*
**ROOF FRAMING**-*HIP-HI PITCH*
**STORY HEIGHT**-*0*
**STRUCTURAL FRAME**-*WOOD FRAME*

Areas - 3093 Total SF
**BASE AREA** - *2291*
**GARAGE FIN** - *420*
**OPEN PORCH FIN** - *94*
**SCRN PORCH UNF** - *288*

Images



*Appraisal Review Report*                    *John Navelski, et al. v. International Paper Company*
                                        *316 Homes in a Proposed Class Area in Escambia County, Florida*

| | | |
|---|---|---|
| Borrower: Henry Bishop | File No.: 15151Z8 | |
| Property Address: 2023 Joshua Dr | Case No.: MEP | |
| City: Cantonment | State: FL | Zip: 32533 |
| Lender: Moore, Hill & Westmoreland | | |



2023 Joshua Dr

Produced using ACI software, 900.234.8727 www.aciweb.com                    PHT 1052120 T3

*Addend⌣*

**C L A R I O N**

PLAT MAP

| Borrower: Henry Bishop | File No.: 15151Z8 | |
|---|---|---|
| Property Address: 2023 Joshua Dr | Case No.: MEP | |
| City: Cantonment | State: FL | Zip: 32533 |
| Lender: Moore, Hill & Westmoreland | | |

MEP
File No. 15151Z8

**DEFINITION OF MARKET VALUE:**    The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**    The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Freddie Mac Form 439 6-93                    Page 1 of 2                    Fannie Mae Form 1004B 6-93

MEP
File No. 15151Z8

**APPRAISERS CERTIFICATION:**    The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

Contrary to #8, an interior inspection has not been made of the subject improvement. The property was viewed only from the roadway of Joshua Drive.

**SUPERVISORY APPRAISER'S CERTIFICATION:**    If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**    2023 Joshua Dr

| **APPRAISER:** | **SUPERVISORY APPRAISER (only if required)** |
|---|---|
| Signature: | Signature: |
| Name: M. Eugene Presley, MAI, SRA | Name: |
| Date Signed: 09/07/2015 | Date Signed: |
| State Certification #: Cert Gen RZ 103 | State Certification #: |
| or State License #: | or State License #: |
| State: FL | State: |
| Expiration Date of Certification or License: 11/30/2016 | Expiration Date of Certification or License: |
| | ☐ Did  ☐ Did Not Inspect Property |

Freddie Mac Form 439 6-93                    Page 2 of 2                    Fannie Mae Form 1004B 6-93

*Addend..*

**C L A R I O N**

*Appraisal Review Report*                                    *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

Presley - McKenney & Associates, Inc.

MEP
File No. 15151Z8

## USPAP ADDENDUM

Borrower: Henry Bishop
Property Address: 2023 Joshua Dr
City:    Cantonment              County: Escambia          State: FL          Zip Code: 32533
Lender:    Moore, Hill & Westmoreland

### APPRAISAL AND REPORT IDENTIFICATION

This report was prepared under the following USPAP reporting option:

[X] **Appraisal Report**         A written report prepared under Standards Rule 2-2(a).

[ ] **Restricted Appraisal Report**    A written report prepared under Standards Rule 2-2(b).

An interior inspection was not made of the subject property. All data stated in the report was obtained from public records to include Property Appraiser data and building permit data. Information was also obtained from MLS 406976, a 2011 listing of the property.

**Reasonable Exposure Time**

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 90-180

**Additional Certifications**

[X] I have performed **NO** services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

[ ] I **HAVE** performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

Intended Use - To aid in the settlement of a lawsuit

Intended User - Attorneys for the Defendant in a lawsuit and possibly the Court

**Additional Comments**

APPRAISER:                                    SUPERVISORY APPRAISER (only if required):

Signature:                                     Signature:
Name: M. Eugene Presley, MAI, SRA              Name:
Date Signed: 09/07/2015                        Date Signed:
State Certification #: Cert Gen RZ 103         State Certification #:
or State License #:                            or State License #:
or Other (describe): _____ State #: ____     State: FL
State: FL                                      Expiration Date of Certification or License:
Expiration Date of Certification or License: 11/30/2016    Supervisory Appraiser inspection of Subject Property:
Effective Date of Appraisal: September 7, 2015     [ ] Did Not  [ ] Exterior-only from street  [ ] Interior and Exterior

Produced using ACI software, 800-234-8727 www.aciweb.com                         USPAP_1431072014

*Addend…*

**C  L  A  R  I  O  N**

*Appraisal Review Report*                                          *John Navelski, et al. v. International Paper Company*
*316 Homes in a Proposed Class Area in Escambia County, Florida*

Presley - McKenney & Associates, Inc.

MEP

**UNIFORM RESIDENTIAL APPRAISAL REPORT**     File No. 15150Z8

**Property Description**

| SUBJECT | | |
|---|---|---|
| Property Address 10050 Bristol Park Rd | City Cantonment | State FL   Zip Code 32533 |
| Legal Description Lot 6, Block C, Bristol Park Unit 1 | | County Escambia |
| Assessor's Parcel No. 09 0238 395 | Tax Year 2014  R.E. Taxes $ 1,369.53 | Special Assessments $ N/A |

Borrower Robert Sheets   Current Owner Sheets   Occupant: [X] Owner   [ ] Tenant   [ ] Vacant
Property rights appraised [X] Fee Simple   [ ] Leasehold   Project Type [ ] PUD   [ ] Condominium (HUD/VA only)   HOA$ /Mo.
Neighborhood or Project Name Bristol Park   Map Reference Z8   Census Tract 036.12
Sale Price $ N/A   Date of Sale   Description and $ amount of loan charges/concessions to be paid by seller  N/A
Lender/Client Moore, Hill & Westmoreland   Address 350 W Cedar St, Pensacola, FL 32502
Appraiser M. Eugene Presley, MAI, SRA   Address P.O. Box 329, Pensacola, FL 32591

**NEIGHBORHOOD**

| | | | Predominant occupancy | Single family housing PRICE $(000) / AGE (yrs) | Present land use % | Land use change |
|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban  [ ] Rural | | | One family  99% | [X] Not likely  [ ] Likely |
| Built up | [X] Over 75% | [ ] 25-75%  [ ] Under 25% | | 120 Low  5 | 2-4 family | [ ] In process |
| Growth rate | [ ] Rapid | [X] Stable  [ ] Slow | [X] Owner | 300 High  35 | Multi-family | To: |
| Property values | [ ] Increasing | [X] Stable  [ ] Declining | [ ] Tenant | Predominant | Commercial | |
| Demand/supply | [ ] Shortage | [X] In balance  [ ] Over supply | [X] Vacant (0-5%) | 200  20 | Vacant  1% | |
| Marketing time | [ ] Under 3 mos. | [X] 3-6 mos.  [ ] Over 6 mos. | Vacant (over 5%) | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: Kingsfield Road to the north, Interstate 10 south, Pine Forest Road east and the Alabama boundary or Beulah Road west

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): Although having a Cantonment address, the subdivision is in the northwest quadrant of Pensacola suburbia. The subject subdivision consists of a mix of older and newer homes on typical sized residential sites. Almost all homes appear well maintained and upgraded. The area is located close to several major roadways allowing easy access to all parts of Pensacola. All types of public services are available within a reasonable distance. Market appeal is considered average.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): Please note that sales prices for single-family residential housing in Escambia and Santa Rosa counties declined across the board from late 2006 through 2011. The amount and rate of decline varied from area to area. In 2012 the residential market stabilized. The subject market area is considered stable, but very "soft".

**PUD**

Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)?   [ ] YES  [X] NO
Approximate total number of units in the subject project _____.   Approximate total number of units for sale in the subject project _____.
Describe common elements and recreational facilities:

**SITE**

| | | | | | |
|---|---|---|---|---|---|
| Dimensions  99.15 x 295 +/- | | | | Topography | see remark below**** |
| Site area  29249 Sq.Ft. | | Corner Lot [ ] Yes [X] No | | Size | Typical for area |
| Specific zoning classification and description MDR, Medium Density Residential | | | | Shape | Rectangular |
| Zoning compliance [X] Legal  [ ] Legal nonconforming (Grandfathered use)  [ ] Illegal  [ ] No zoning | | | | Drainage | Appears adequate |
| Highest & best use as improved: [X] Present use  [ ] Other use (explain) | | | | View | Average |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | Asphalt | [X] | [ ] | Landscaping | Typical |
| Gas | [X] | | Curb/gutter | Concrete | [X] | [ ] | Driveway Surface | Concrete |
| Water | [X] | | Sidewalk | None | [ ] | [ ] | Apparent easements  None apparent | |
| Sanitary sewer | [X] | | Street lights | Yes | [X] | [ ] | FEMA Special Flood Hazard Area [ ] Yes [X] No | |
| Storm sewer | [X] | | Alley | None | [ ] | [ ] | FEMA Zone X   Map Date 09/29/2006 | |

FEMA Map No. 12033CO290G

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.):  *** the building site is level with the rear yard sloping downward to Eleven Mile Creek. With the lots being relatively deep the rear half of almost all lots in the subdivision backing to the creek have been left in a "natural" wooded state.

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | One | Foundation | Slab | Slab | Yes | Area Sq.Ft. | | Roof | [ ] |
| No. of Stories | One | Exterior Walls | Wd Fr/stucco | Crawl Space | No | % Finished | | Ceiling | [X] |
| Type (Det./Att.) | Detached | Roof Surface | Architectural | Basement | None | Ceiling | | Walls | [X] |
| Design (Style) | Contemp | Gutters & Dwnspts. | None | Sump Pump | None | Walls | | Floor | [ ] |
| Existing/Proposed | Existing | Window Type | Aluminum | Dampness | None noted | Floor | | None | [ ] |
| Age (Yrs.) | 24 | Storm/Screens | Screens | Settlement | None noted | Outside Entry | | Unknown | [ ] |
| Effective Age (Yrs.) | 10 | Manufactured House | No | Infestation | None noted | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | |
| Level 1 | *X | | *X | *X | | *X | | *4 | *2 | *X | | 2,176 |
| Level 2 | | | | | | | | | | | | |

Finished area above grade contains:  7 Rooms;  4 Bedroom(s);  2 Bath(s);  2,176 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Tile, Cpt / Good | Type | FWA | Refrigerator | [ ] | None | [ ] | Fireplace(s) #1 | [X] | None | [ ] |
| Walls | Drywall | Fuel | Electric | Range/Oven | [X] | Stairs | [ ] | Patio Open | [ ] | Garage 2  # of cars | |
| Trim/Finish | Wood/Avg. | Condition | Avg. | Disposal | [X] | Drop Stair | [X] | Deck | [ ] | Attached | |
| Bath Floor | CrmTile/Avg | COOLING | | Dishwasher | [X] | Scuttle | [ ] | Porch Entry | [ ] | Detached | X |
| Bath Wainscot | Tile | Central | Yes | Fan/Hood | [X] | Floor | [ ] | Fence | [ ] | Built-In | |
| Doors | 6 panel | Other | None | Microwave | [X] | Heated | [ ] | Pool | [ ] | Carport | |
| | | Condition | Avg. | Washer/Dryer | [ ] | Finished | [ ] | | | Driveway | |

**COMMENTS**

Additional features (special energy efficient items, etc.):  The home was repaired/renovated in 2014 with at least seven building permits obtained for mechanical, plumbing, electrical & carpentry.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.:  With the home having some flood damage in April 2014, it is assumed all needed repairs have now been made. *An interior inspection of the improvement has not been made. All data describing the improvement is obtained from public records with amenities assumed to be "similar" to those of other homes in the neighborhood.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: No adverse environmental conditions were noted.

Freddie Mac Form 70  6-93                PAGE 1 OF 2                Fannie Mae Form 1004  6-93
Produced using ACI software, 800.234.8727 www.aciweb.com

*Addendum*

**C L A R I O N**

Presley - McKenney & Associates, Inc.

MEP

**UNIFORM RESIDENTIAL APPRAISAL REPORT**    File No. 15150Z8

**Valuation Section**

### COST APPROACH

ESTIMATED SITE VALUE . . . . . . . . . . . . . . . . . . . . . . . . = $ 45,000

ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS:

| | | | |
|---|---|---|---|
| Dwelling | 2,176 Sq. Ft. @ $ 70.00 = $ | 152,320 |
| Det Grg. 240 SF | Sq. Ft. @ $ 35.00 = | 8,400 |
| K App, Porches, FP, Sc Pool | = | 31,500 |
| Garage/Carport 420 | Sq. Ft. @ $ 18.00 = | 7,560 |
| Total Estimated Cost New . . . . . . . . . . . . . . . . = $ | 199,780 |
| Less 50 Physical \| Functional \| External | Est. Remaining Econ. Life: 40 |
| Depreciation $39,955 | = $ | 39,955 |
| Depreciated Value of Improvements . . . . . . . . . . . . . . . . = $ | 159,825 |
| "As-is" Value of Site Improvements . . . . . . . . . . . . . . . . = $ | 5,000 |
| INDICATED VALUE BY COST APPROACH . . . . . . . . . . . = $ | 209,825 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property):
Replacement cost data was derived from the Marshall Swift Handbook and knowledge of the local building costs. Depreciation was estimated using the age/life method.

### SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 10050 Bristol Park Rd Cantonment | 10112 Bristol Park Rd Cantonment | | 10304 Nightwind Circle Cantonment | | 10011 Bristol Park Rd Cantonment | |
| Proximity to Subject | | Same S/D | | Same S/D | | Same S/D | |
| Sales Price | $ N/A | $ 205,000 | | $ 185,000 | | $ 210,000 | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 88.90 ☑ | | $ 79.09 ☑ | | $ 95.72 ☑ | |
| Data and/or | | MLS 462075 | | MLS 464826 | | MLS 478324 | |
| Verification Sources | | OR 7327 page 1604 | | OR 7224 page 31 | | OR 7342 page 601 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing Concessions | N/A | Conventional Typical Terms | | Conventional Typical Terms | | Conventional Typical Terms | |
| Date of Sale/Time | | 2/24/15 | | 9/5/14 | | 5/8/15 | |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 29,249 Sq.Ft. | 43,995 SF | 0 | 21,344 SF/inf | +15,000 | 18,730 SF | |
| View | Average | Sim.Homes | | Sim.Homes | | Sim.Homes | |
| Design and Appeal | Contemp | Contemp/Avg. | | Contemp/Avg. | | Contemp/Avg. | |
| Quality of Construction | Average | Average | | Average | | Average | |
| Age | 24 Years, eff 10 | 20 Years, eff 10 | | 24 Years, eff 10 | | 23 Years, eff 10 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total \| Bdrms \| Baths | Total \| Bdrms \| Baths | | Total \| Bdrms \| Baths | | Total \| Bdrms \| Baths | |
| Room Count | 7 \| 4 \| 2.00 | 7 \| 4 \| 2.00 | | 7 \| 4 \| 3.00 | -2,500 | 7 \| 4 \| 2.00 | |
| Gross Living Area | 2,176 Sq.Ft. | 2,306 Sq.Ft. | -5,500 | 2,339 Sq.Ft. | -6,900 | 2,194 Sq.Ft. | |
| Basement & Finished Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | CH&A | CH&A | | CH&A | | CH&A | |
| Energy Efficient Items | Energy Features | Energy Features | | Energy Features | | Energy Features | |
| Garage/Carport | 2 Att., 1 Det Gar | 2 Att. Garage | +6,400 | 2 Att., 1 Det Gar | | 2 Att. Garage | +6,400 |
| Porch, Patio, Deck, Fireplace(s), etc. | Entry, patio 1 Fireplace | Entry, patio 1 FP | | Ent.cov&open patio 1 FP | -1,000 | Entry, patio | +2,500 |
| Fence, Pool, etc. | Screened pool | Yrd bld, sun rm | | Fnc, pool | +5,000 | Pool, shop, Fl Rm | -11,000 |
| Net Adj. (total) | | ☒ + ☐ - $ | 900 | ☒ + ☐ - $ | 9,600 | ☐ + ☒ - $ | 2,100 |
| Adjusted Sales Price of Comparable | | Gross: 5.8% Net: 0.4% $ | 205,900 | Gross: 16.4% Net: 5.2% $ | 194,600 | Gross: 9.5% Net: -1.0% $ | 207,900 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): The lot size of comp 1 is larger than the subject but like the subject the rear half was left as "natural woods"; #2 requires no adjustment for size but is located on a cul-de-sac backing to Hwy 97, being inferior; #3 is considered equal. It is assumed the subject is 4BR/2bath with adj made to comp 2. The subject is superior to comps 1 & 3 for having a det. garage. MLS data does not describe Comp 3 as having a fireplace. The subject has a screened pool comparing to comp one with a yard bld and sun room. Comp #2 has an unscreened pool. Comp 3 is superior having an unscreened pool but shop and florida room.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:
Again, an interior inspection has not been made of sales nor subject. Data for each is obtained from public records plus MLS for the comps. About equal weight is given each sale.

INDICATED VALUE BY SALES COMPARISON APPROACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 203,000

INDICATED VALUE BY INCOME APPROACH (If Applicable)    Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier N/A = $ 0

### RECONCILIATION

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans and specifications.

Conditions of Appraisal: The appraisal is made of the subject "as-is" with all data from public records. A reasonable marketing period is considered to be less than 6 months.

Final Reconciliation: Most weight is to the sales comparison approach well supported by cost.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 09/07/2015 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 203,000 .

| APPRAISER: | | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|---|
| Signature | | Signature | ☐ Did ☐ Did Not |
| Name M. Eugene Presley, MAI, SRA | | Name | Inspect Property |
| Date Report Signed 09/07/2015 | | Date Report Signed | |
| State Certification # Cert Gen RZ 103 | State FL | State Certification # | State |
| Or State License # | State | Or State License # | State |

Freddie Mac Form 70  6-93

PAGE 2 OF 2
Produced using ACI software, 800.234.8727 www.aciweb.com
Presley-McKenney

Fannie Mae Form 1004  6-93

*Addend⌐*

**C L A R I O N**



| Borrower: Robert Sheets | | File No.: 15150Z8 | |
|---|---|---|---|
| Property Address: 10050 Bristol Park Rd | | Case No.: MEP | |
| City: Cantonment | State: FL | | Zip: 32533 |
| Lender: Moore, Hill & Westmoreland | | | |



10050 Bristol Park Road

Produced using ACI software, 800.234.8727 www.aciweb.com                    PHT1 05212013

MEP
File No. 15150Z8

**DEFINITION OF MARKET VALUE:**   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**   The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Freddie Mac Form 439 6-93                    Page 1 of 2                    Fannie Mae Form 1004B 6-93

MEP
File No.  15150Z8

**APPRAISERS CERTIFICATION:**   The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

Contrary to #8, an interior inspection has not been made of the subject improvement. The property was viewed only from the roadway of Bristol Park.

**SUPERVISORY APPRAISER'S CERTIFICATION:**   If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

ADDRESS OF PROPERTY APPRAISED:   10050 Bristol Park Rd, Cantonment, FL  32533

**APPRAISER:**                                               **SUPERVISORY APPRAISER (only if required)**

Signature:                                                   Signature:
Name:  M. Eugene Presley, MAI, SRA                           Name:
Date Signed:  09/07/2015                                     Date Signed:
State Certification #:  Cert Gen RZ 103                       State Certification #:
or State License #:                                          or State License #:
State: FL                                                    State:
Expiration Date of Certification or License:  11/30/2016     Expiration Date of Certification or License:

☐ Did   ☐ Did Not Inspect Property

Freddie Mac Form 439 6-93                    Page 2 of 2                    Fannie Mae Form 1004B 6-93

Presley - McKenney & Associates, Inc.

MEP

**USPAP ADDENDUM**

File No. 15150Z8

Borrower: Robert Sheets
Property Address: 10050 Bristol Park Rd
City: Cantonment County: Escambia State: FL Zip Code: 32533
Lender: Moore, Hill & Westmoreland

### APPRAISAL AND REPORT IDENTIFICATION

This report was prepared under the following USPAP reporting option:

[X] **Appraisal Report** A written report prepared under Standards Rule 2-2(a).

[ ] **Restricted Appraisal Report** A written report prepared under Standards Rule 2-2(b).

An interior inspection was not made of the subject property. All data stated in the report was obtained from public records to include Property Appraiser data and building permit data.

### Reasonable Exposure Time

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: 90-180

### Additional Certifications

[X] I have performed **NO** services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

[ ] I **HAVE** performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

Intended Use - To aid in the settlement of a lawsuit

Intended User - Attorneys for the Defendant in a lawsuit and possibly the Court

### Additional Comments

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: M. Eugene Presley, MAI, SRA | Name: |
| Date Signed: 09/07/2015 | Date Signed: |
| State Certification #: Cert Gen RZ 103 | State Certification #: |
| or State License #: | or State License #: |
| or Other (describe): State #: | State: |
| State: FL | Expiration Date of Certification or License: |
| Expiration Date of Certification or License: 11/30/2016 | Supervisory Appraiser inspection of Subject Property: |
| Effective Date of Appraisal: 09/07/2015 | [ ] Did Not [ ] Exterior-only from street [ ] Interior and Exterior |

Produced using ACI software, 800-234-8727 www.aciweb.com USPAP_1431072014

*Addend...*

173

**C L A R I O N**

**9.10  LIST OF DOCUMENTS RELIED UPON**

*Appraisal Review Report*                                              *John Navelski, et al. v. International Paper Company*

*316 Homes in a Proposed Class Area in Escambia County, Florida*

| No. | Document | Category |
|---|---|---|
| | List of Documents Relied Upon | |
| 1 | Escambia County Flooding Maps | Environmental |
| 2 | FEMA Maps | Environmental |
| 3 | Maps prepared by Clarion Associates | Environmental |
| 4 | Media Accounts regarding the Flooding Event | News |
| 5 | Photos from Site/Area Inspection | Photos |
| 6 | Escambia County Property Information | Plaintiff Info. |
| 7 | Pensacola Board of Realtors MLS Data | Plaintiff Info. |
| 8 | Class Action Complaint, dated February 20, 2015 | Provided Docts |
| 9 | Deposition of Tom Fruitticher, MAI | Provided Docts |
| 10 | Documents and Spreadsheets produced by Tom Fruitticher, MAI | Provided Docts |
| 11 | Expert Report of Tom Fruitticher, MAI | Provided Docts |
| 12 | Supplemental Rule 26 Initial Disclosures | Provided Docts |
| 13 | Advisory Opinion 6 (AO-6) of USPAP; June 2, 1992, and was in effect until June 15, 2004 | Sources Cited |
| 14 | AI Seminar: *Analyzing the Effects of Contamination on Real Property* | Sources Cited |
| 15 | AI Seminar: *Appraising Environmentally Contaminated Properties: Understanding and Evaluating Stigma* | Sources Cited |
| 16 | AI Seminar: *Environmental Risk and the Real Estate Appraisal Process* | Sources Cited |
| 17 | Appraisal Institute, *A Guide to Appraisal Valuation Modeling.* | Sources Cited |
| 18 | Appraisal Institute, *Quantitative Analysis*, (Version PC502GDCH-D) (2012),Part 10-286. | Sources Cited |
| 19 | Appraisal Institute, *Residential Applications: Using Technology to Measure and Support Assignment Results*, (2011) Part 5-77. | Sources Cited |
| 20 | Atreya, A., S. Ferreira, and E. Kriesel, "Forgetting the Flood? An Analysis of the Flood Risk Discount Over Time," *Land Economics*, Vol. 89, No. 4 (2013). | Sources Cited |
| 21 | Bell, Randall, "Real Estate Damage Economics & Statistics," Appraisal Institute Annual Meeting Presentation. 2013. | Sources Cited |
| 22 | Bell, Randall, MAI, Orell C. Anderson, MAI, and Michael V. Sanders, MAI, SRA, *Real Estate Damages: Applied Economics and Detrimental Conditions*, Appraisal Institute, 2008 | Sources Cited |
| 23 | Bell, Randall, MAI, *Real Estate Damages: An Analysis of Detrimental Conditions*, Appraisal Institute, 1999. | Sources Cited |
| 24 | Bowman, John H., and John L. Mikesell, "Assessment Uniformity: The Standard and Its Attainment," in *The Property Tax Journal*, December 1990. | Sources Cited |
| 25 | Chicoine, David L, and J. Fred Gertz, "Real Estate Tax Assessment Uniformity in Illinois," *Illinois Business Review*, February 1988 | Sources Cited |
| 26 | Colwell, Peter F., Roger E. Cannaday, and Chunchi Wu, "The Analytical Foundations of Adjustment Grid Methods," *AREUEA Journal*, Vol. 11, No. 1., 1983 | Sources Cited |
| 27 | Daniel, V.E., R. J. G. M. Florax, and P. Rietveld, "Flooding Risk and Housing Values: An Economic Assessment of Environmental Hazard," *Ecological Economics*, Vol. 69 (2009). | Sources Cited |
| 28 | Dell, George, MAI, "AVMs: The Myth and the Reality; the Problem and the Solution," *Valuation Insights & Perspectives*, The Appraisal Institute, Third Quarter, 2004 | Sources Cited |
| 29 | Dielman,T., *Applied Regression: Analysis for Business and Economics*, 3rd Edition, Duxbury/Thomson Learning, 2001) | Sources Cited |
| 30 | Eves, C., and S. Wilkinson, "Assessing the Immediate and Short-Term Impact of Flooding on Residential Property Participant Behaviour," *Natural Hazards*, Vol. 71 (2014). | Sources Cited |
| 31 | Florida Administrative Code, Department of Business and Professional Regulation, Chapter 61J1-9.001 | Sources Cited |
| 32 | Frost, Jim, "Adventures in Statistics." | Sources Cited |
| 33 | Hair, J.F., R. E. Anderson, R. C. Tatham, and W. C. Black, *Multivariate Data Analysis with Readings*, 3rd Edition, Macmillan, 1992. | Sources Cited |
| 34 | Jackson, Thomas, PhD, MAI, "Real property valuation issues in environmental class actions." *Environment and the Appraiser*. 2010. | Sources Cited |
| 35 | Jackson, Thomas, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal*, January 2002 | Sources Cited |
| 36 | Jackson, Tom, PhD, MAI, "Evaluating Environmental Stigma with Multiple Regression Analysis," The Appraisal Journal, Fall 2005. | Sources Cited |
| 37 | Jackson, Tom, PhD, MAI, "Methods and Techniques for Contaminated Property Valuation." | Sources Cited |
| 38 | Jackson, Tom, PhD, MAI, and Randall Bell, MAI, "The Analysis of Environmental Case Studies," The Appraisal Journal, January 2002. | Sources Cited |
| 39 | Kane, M.S., M. R. Linne, MAI, CRE, CAE, ASA, and J. A. Johnson, MAI, *Practical Applications in Appraisal Valuation Modeling: Statistical Methods for Real Estate Practitioners*, The Appraisal Institute, 2004. | Sources Cited |
| 40 | Kousky, C., "Learning from Extreme Events: Risk Perceptions after the Flood," *Land Economics*, Vol. 86, no. 3 (2010). | Sources Cited |
| 41 | Lamond, J. and D. Proverbs, "Does the Price Impact of Flooding Fade Away?", Structural Survey, Vol 24, No. 5, (2006). | Sources Cited |
| 42 | Lamond, J., D. Proverbs, and A. Antwi, "Measuring the Impact of Flooding on UK House Prices," *Property Management*, Vol. 25, No. 4, 2007. | Sources Cited |
| 43 | Lamond, J., D. Proverbs, and F. Hammond, "The Impact of Flooding on the Price of Residential Property: A Transactional Analysis of the U.K. Market, *Housing Studies*, Vol 25, No. 3 (2010) | Sources Cited |
| 44 | Lentz, George H., and Ko Wang, "Residential Appraisal and the Lending Process: A Survey of Issues," *Journal of Real Estate Research*, Vol. 15, Numbers 1/2, 1998 | Sources Cited |
| 45 | Linne, Mark R., MAI, CRE, ASA, FRICS, "A Vision for Valuation: Automated Valuation Models and Appraisal Practice," | Sources Cited |
| 46 | Mundy, Bill, "The Impact of Hazardous Material on Property Value" | Sources Cited |
| 47 | Roddewig, Richard J., *Valuing Contaminated Properties, An Appraisal Institute Anthology, Vol. 2.* | Sources Cited |
| 48 | Roddewig, Richard J., *Valuing Contaminated Properties, An Appraisal Institute Anthology.* | Sources Cited |
| 49 | Statistics Help Talk Stats Forum RSS, "Standard error v standard deviation." | Sources Cited |
| 50 | Tennessee State Government, "Regression Analysis." | Sources Cited |
| 51 | *The Appraisal of Real Estate*, 13th Edition | Sources Cited |
| 52 | *The Appraisal of Real Estate*, 14th Edition | Sources Cited |
| 53 | *The Dictionary of Real Estate Appraisal, Fifth Edition.* | Sources Cited |
| 54 | *Uniform Standards of Professional Appraisal Practice 2012-2013, Edition* | Sources Cited |
| 55 | *Uniform Standards of Professional Appraisal Practice 2014-2015, Edition* | Sources Cited |
| 56 | Vandell, Kerry D. "Optimal Comparable Selection and Weighting in Real Property Valuation," *AREUEA Journal*, Vol. 19, No. 2., 1991 | Sources Cited |
| 57 | White, Brenda B., "Evaluating AVMs," in *Mortgage Banking*, September 2006 | Sources Cited |
| 58 | Wikipedia, "Standard Error." | Sources Cited |
| 59 | Wilson, Albert R., CRE, "The Questionable Reliability of 'Peer Reviewed' Real Estate Literature, *Bureau of National Affairs: Expert Evidence Report*, | Sources Cited |
| 60 | Wolverton, Marvin, *An Introduction to Statistics for Appraisers*, The Appraisal Institute, 2009, at p. 159 | Sources Cited |
| 61 | Yeo, S., K. Roche, J. McAneney, "Effects of Disclosure of Flood-Liability on Residential Property Values: An Update." | Sources Cited |

*Addenda*

**C L A R I O N**