UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN NAVELSKI, et al.,

      **Plaintiffs,**

v.                                **Case No. 3:14cv445/MCR/CJK**

INTERNATIONAL PAPER
COMPANY,

      **Defendant.**

_____/

## ORDER

This matter is before the Court on five motions:  (1) Plaintiffs' Motion for Class Certification, ECF No. 61; (2) Defendant's Motion to Exclude Expert Testimony from Tom Fruitticher, MAI, ECF No. 77; (3) Defendant's Motion to Exclude Expert Testimony from Mark Ross, Ph.D., P.E., ECF No. 78; (4) Plaintiffs' Motion to Limit or Exclude Expert Testimony of Richard J. Roddewig, ECF No. 80; and (5) Defendant's Motion for Summary Judgment, ECF No. 81.  The Court's rulings are set forth below.

## I.    Background

A heavy, slow-moving rainstorm entered Escambia County, Florida on the afternoon of April 29, 2014, where it remained through the early hours of April 30, 2014.  The events that led to this litigation occurred during the course of this

extraordinary storm, when the Elevenmile Creek overflowed its banks and approximately 160 homes in the Bristol Park, Bristol Woods, Bristol Creek, and Ashbury Hills subdivisions of Cantonment, Florida were flooded.  The Elevenmile Creek is a 13-mile stream located within the Elevenmile Creek watershed in Escambia County.   The watershed has a 47.97-square-mile drainage area that reaches from Cantonment to Perdido Bay, Florida.  Defendant International Paper Company, a New York corporation, owns and operates a paper mill in Cantonment. The Elevenmile Creek runs through Defendant's property.  Prior to 2012, the paper mill's wastewater was filtered through various holding ponds on Defendant's property and then discharged into the Elevenmile Creek through the Kingsfield Road Dam, which was also located on Defendant's property.[1]  In 2012, Defendant stopped using the Dam to discharge wastewater and, instead, began moving it by pipeline to the wetlands above Perdido Bay.  The Dam, however, remained in place and continued to impound storm water runoff from Defendant's property.   It is undisputed that, during the subject storm, the Dam collapsed, discharging the stormwater impounded behind it into the Elevenmile Creek.

---

[1] The Kingsfield Road Dam was a "large concrete structure with earthen embankments on each side" that was located on the southern edge of Defendant's property, where Elevenmile Creek intersects Kingsfield Road in Escambia County, Florida.  *See* ECF No. 62 at 8.  The parties refer to the Dam, interchangeably, as the Elevenmile Creek Dam, the Kingsfield Road Dam, and the International Paper Dam.  The Court will refer to this structure as either the "Kingsfield Road Dam" or the "Dam."

Plaintiffs are current and former property owners in the Bristol Park, Bristol Woods, Bristol Creek, and Ashbury Hills subdivisions. Their properties are situated along the Elevenmile Creek, approximately two miles downstream from Defendant's paper mill and the Dam.[2]  Plaintiffs allege that the flooding they experienced was caused or made more severe by the collapse of the Dam, which they claim resulted from Defendant's failure to properly maintain or remove it.

Plaintiffs filed this action against Defendant in the Circuit Court of Escambia County, Florida on May 13, 2014.  ECF No. 1-1.  On September 2, 2014, Defendants removed the action to this Court under the Class Action Fairness Act and diversity jurisdiction.  *See* ECF No. 1.  In their First Amended Complaint, Plaintiffs assert claims for negligence, trespass, nuisance, and strict liability.  ECF No. 38.  Plaintiffs now move for class certification, ECF No. 61, which Defendant opposes, ECF No. 65.  Both the motion and the response in opposition are supported by expert testimony.  Each side challenges the other's experts as unreliable and those motions are also pending.  ECF Nos. 77, 78, 80.  Finally, Defendant has moved for summary judgment.  ECF No. 81.  The Court held a three-day evidentiary hearing on all

---

[2] In its motion for summary judgment, Defendant stated that it had applied for the appropriate permits to remove the remnants of the Dam and stabilize the stream banks to allow the Elevenmile Creek to flow unimpeded, as if the Dam never existed.  ECF No. 81 at 5.

motions.[3]  Now, having fully considered the law, the voluminous record, and the arguments of the parties, the Court rules as follows.

## II.  Expert Challenges

In support of their motion for class certification, Plaintiffs have proffered Dr. Mark A. Ross as an expert on the cause of the flooding in the subject neighborhoods. Plaintiffs have also proffered Tom Fruitticher as an expert on damages.  Defendant has proffered Richard J. Roddewig as an expert to rebut Fruitticher's opinions.  Each side now moves to exclude the other's expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Because this expert testimony is challenged as unreliable and is also critical to class certification, the Court must perform a full *Daubert* analysis before resolving the class certification motion.[4]  *See Sher v. Raytheon Co.*, 419 Fed App'x 887, 890 (11th

---

[3] At the hearing, Plaintiffs presented live testimony from Kyle Moore, Christopher Quackenbush, Richard Bullard, Jacob Hutchins, Jeanne Henderly, Linda Navelski, Erick Alexander, Richard Tarbox, David Pavlock, Cynthia Kersey, Dr. Mark Ross, and Tom Fruitticher. Defendant presented live testimony from William "Gene" Yuhasz, Stephen Wistar, Christopher Curb, Dr. Frank Lan, and Richard Roddewig.

[4] Some courts have noted that in the class certification context, the *Daubert* analysis may be narrower than that conducted for purposes of trial because "the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Braggs v. Dunn*, 2:14cv601-MHT, 2016 WL 6917203, at *5 (M.D. Ala. Nov. 25, 2016) (quoting *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co*., 301 F.R.D. 116, 126 (S.D.N.Y. 2014)). The Eleventh Circuit, however, has not expounded further on the practical application of the "full *Daubert*" standard in the class certification context in a case involving a bifurcated discovery procedure, such as in this case.  The Eighth Circuit applies a "focused *Daubert*" standard to scrutinize expert testimony necessary to class certification issues, not necessarily requiring a conclusive determination of admissibility at trial.  *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011).  The Third Circuit recently found it unnecessary to determine whether differences exist between the "full" *Daubert* standard articulated in the Seventh Circuit

Cir. 2011) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (per curiam)).  For the reasons that follow, the Court finds that the expert testimony of both Dr. Ross and Roddewig is admissible; however, Fruitticher's testimony must be excluded.

## A.    Legal Standard

Rule 702,[5] as explained by *Daubert* and its progeny, governs the admissibility of expert testimony.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Under Rule 702 and *Daubert*, district courts are compelled to act as "gatekeepers" to ensure the reliability and relevancy of expert testimony.  *Id.* (quoting *Daubert*, 509 U.S. at 589).   Expert testimony is reliable and relevant—and, therefore, admissible—when the following criteria are met:   (1) the expert is sufficiently qualified to testify about the matters he intends to address; (2) the  methodology used is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;

---

(adopted by the Eleventh) and the standard applied in the Eighth Circuit, stating that under either articulation, courts limit the *Daubert* inquiry to expert testimony necessary to prove the requirements of Rule 23.  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 188 n.8 (3d Cir. 2015) (declining to examine whether there might be some variation between the Seventh and Eighth Circuit formulations of the relevant *Daubert* inquiry, noting only that a plaintiff cannot rely on expert testimony to establish class certification without satisfying *Daubert*).   This Court likewise finds no reason to speculate on the potential differences among the circuits on this matter but instead will endeavor to apply the "full" *Daubert* analysis as set forth in *American Honda*, which the Eleventh Circuit has twice cited with approval in *Sher* and *Local 703*.

[5] Rule 702 provides that a witness qualified as an expert in "scientific, technical, or other specialized knowledge" may testify thereto if:  (a) his expertise will help the factfinder "to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id*.   The Eleventh Circuit refers to these criteria separately as "qualification, reliability, and helpfulness," *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).   The party offering the expert has the burden of showing, by a preponderance of the evidence, that each of these requirements is met. *Rink*, 400 F.3d at 1292.

To meet the qualification requirement, a party must show that its expert has sufficient "knowledge, skill, experience, training, or education" to form a reliable opinion about an issue that is before the court. *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citing Fed. R. Evid. 702) ("*Hendrix II*"). The qualifications standard for expert testimony is "not stringent" and "[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. Jan. 28, 2009) ("*Hendrix I*").

To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue. *Frazier*, 387 F.3d at 1261–62.  The reliability analysis is guided

by several factors:   (1) whether the scientific technique can be or has been tested;   (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the technique has a known or knowable rate of error; and (4) whether the technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94.  "[T]hese factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech.*, 326 F.3d at 1341.   The court's focus must be on the expert's principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 595.  The test for reliability is "flexible" and courts have "broad latitude" in determining both how and whether this requirement is met. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Finally, to satisfy the helpfulness requirement, expert testimony must be relevant  to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).  Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).  When scrutinizing the reliability and relevance

of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate factfinder. *Frazier*, 387 F.3d at 1272. The court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272. Thus, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, *Quiet Tech*, 326 F.3d at 1341; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence," *Frazier*, 387 F.3d at 1272.

### B.    Dr. Mark A. Ross

Plaintiffs have proffered the expert testimony of Mark A. Ross, Ph.D., P.E.[6] ("Dr. Ross"), a civil engineer and professor at the University of South Florida with extensive experience in the areas of hydrologic and hydraulic modeling.[7] Dr. Ross has offered his opinion that the flooding of Plaintiffs' properties was caused or made more severe by the failure of the Kingsfield Road Dam. Defendant does not dispute

---

[6] "P.E." stands for "professional engineer."

[7] Hydrologic and hydraulic modeling use a mathematical construct to simulate and predict how a water system will respond to various environmental conditions. The hydrologic model in this case estimated, *inter alia*, the rate at which rainfall became surface runoff at the relevant cross-sections of the Elevenmile Creek under conditions approximating those of the subject storm. The hydraulic model simulated the movement of floodwaters through the Elevenmile Creek, and calculated the timing and depth of flood levels.

Dr. Ross's qualifications to opine as an expert on flood causation.  Nor does Defendant deny that expert testimony regarding the cause of the flooding in this case would assist the factfinder in determining Defendant's liability.  Defendant's sole challenge is to the reliability of Dr. Ross's methodology.  More specifically, Defendant argues that Dr. Ross's testimony should be excluded because he did not reliably apply a differential etiology in reaching his opinions.

As an initial matter, Defendant characterizes Dr. Ross's methodology as a species of differential etiology, which is a well-recognized "scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated."  *Kilpatrick v. Breg, Inc*., 613 F.3d 1329, 1336 n.7 (11th Cir. 2010) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).   The Eleventh Circuit has explained that "when applied under circumstances that ensure reliability, the differential etiology method can provide a valid basis for medical causation opinions." [8]   *Hendrix II*, 609 F.3d at 1195.  The

---

[8] The parties do not cite, and the Court has been unable to find, a single Eleventh Circuit case in which differential etiology was offered as the basis for causation testimony from a nonmedical expert.  Other courts, however, have considered the reliability of differential etiology in support of expert testimony on causation in a broad range of nonmedical contexts.  *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227 (10th Cir. 2005) (cause of gas explosion); *Curran v. Werner Co.*, No. 12-CV-1221, 2016 WL 1090919 (S.D. Ohio March 21, 2016) (cause of ladder collapse); *Roper v. Kawasaki Heavy Industries, Ltd.*, No. 1:13-CV-03661-ELR, 2015 WL 11236553 (N.D. Ga. June 29, 2015) (cause of mechanical failure that led to a motor vehicle accident); *Brotherhood Mut. Ins. Co. v. ADT, LLC*, No. 13-1870(DSD/JJK), 2014 WL 2993728 (D. Minn. July 2, 2014) (cause of sprinkler head activation); *Dean v. Thermwood Corp.*, No. 10-cv-433-CVE-PJC, 2012 WL 90442 (N.D. Okla. Jan. 11, 2012) (cause of router machine accident); *Dow v. Rheem Mfg.*, No. 09-13697-BC, 2011 WL 4484001 (E.D. Mich. Sept. 26, 2011) (cause of water heater explosion); *Kerns v.*

instant case, however, does not involve medical causation and the traditional evidentiary foundations that have proven reliable in that context are unsuitable for analyzing the causation question presented here.[9]   This is, in part, because the reliability of medical causation opinions often turns on a challenge to the core science on which the opinions are based.  *See, e.g.*, *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014) (affirming exclusion of expert testimony where no "recognized methodology" or evidence established generally that Fixodent is capable of causing myelopathy); *Hendrix II*, 609 F.3d 1183 (affirming exclusion of expert testimony where no scientifically reliable evidence supported conclusion that traumatic brain injury can cause autism).

In this case, the core science is not in dispute, as Defendant concedes the general scientific proposition that a dam failure can cause a river or stream to overflow its banks and flood adjoining neighborhoods.  Notably, Dr. Ross did not himself refer to his methodology as differential etiology or any variation of that technique.  Moreover, as discussed in greater detail below, Dr. Ross's analysis relied primarily on data specific to the subject storm and watershed, whereas a traditional

---

*Sealy*, No. 06-0431-WS-B, 2007 WL 2012867 (S.D. Ala. July 6, 2007) (cause of fire); *McGuire v. Davidson Mfg. Corp.*, 238 F. Supp. 2d 1096 (N.D. Iowa 2003) (cause of stepladder collapse).

[9] Eleventh Circuit *Daubert* jurisprudence in toxic tort and product liability cases outlines a number of different types of medical evidence—for example, dose-response relationship, epidemiological studies, background risk, clinical studies, and case reports—that have provided reliable bases for inferences of general causation.  *See* Christopher R.J. Pace, *General Causation Expert Testimony: The Eleventh Circuit Construct*, 37 Am. J. of Trial Advoc. 47 (2013) (collecting cases).

differential analysis ordinarily is based on more generalized scientific assumptions extrapolated from external sources. Thus, while the Court finds that Dr. Ross's approach bears some resemblance to differential etiology, it is "more aptly characterized as a process of reasoning to the best inference," in which logical inferences "are drawn about a particular proposition or event by a process of eliminating all other possible conclusions to arrive at the most likely one, the one that best explains the available data."[10] *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237 n.5 (10th Cir. 2005). Even so, because the two approaches share broadly analogous analytical frameworks, the Court will evaluate the reliability of Dr. Ross's causation testimony using the differential etiology construct adopted by the parties.

An expert whose opinions are the product of differential etiology must show that the technique was reliably employed in the context of a particular case. *See Hendrix II*, 609 F.3d at 1195; *see also*, *Kilpatrick*, 613 F.3d at 1342. A reliable differential analysis is performed in two steps. *Id*. First, the expert identifies the scientifically possible explanations for the harm at issue. *See id*. The issue at this "ruling in" stage is general causation, which focuses on whether a mechanism or event is "generally capable of causing" the type of harm alleged by the plaintiff. *See id*.; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005).

---

[10] There is more than a semantic difference between these terms. Expert opinions based on differential etiology generally must be supported by very specific categories of medical evidence. *See supra* note 10.

Second, the expert systematically and scientifically rules out each potential explanation "until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Guinn v. AstraZeneca Pharmaceuticals LP*, 602 F.3d 1245, 1253 (11th Cir. 2010). This second step focuses on specific causation, which requires a showing that the mechanism or event in question actually did cause the plaintiff's harm. *Chapman*, 766 F.3d at 1308. In this case, Defendant contends that Dr. Ross's methodology does not reliably establish either general or specific causation. The Court disagrees.

### 1.    General Causation

With respect to general causation, the Court finds that Dr. Ross appropriately "ruled in" the failure of the Kingsfield Road Dam as a possible cause of the flooding in the subject neighborhoods. General causation is established by a demonstration, through a scientifically valid methodology, that a mechanism or event *can cause* a particular result. *Hendrix II*, 609 F.3d at 1196. The core science with respect to general causation in this case—that the failure of a dam can cause a river or stream to overflow its banks and flood adjoining neighborhoods—is well-established and uncontroverted.[11] This fact alone would suffice to establish general causation under *Daubert*. *See McClain*, 401 F.3d at 1239 ("The court need not undertake an

---

[11] Indeed, during the *Daubert* hearing, Defendant expressly conceded the "common sense" observation that a dam breach can cause elevated water levels and flooding in downstream areas.

extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges."); *see also Chapman,* 766 F.3d at 1303 ("In cases where the cause and effect or resulting diagnosis has been proved and accepted by the medical community, federal judges need not undertake an extensive *Daubert* analysis on the general toxicity question."); *Bitler*, 400 F.3d at 1235-37 (expert's theory that copper sulfide particles caused propane explosion sufficiently reliable where supported by physical evidence, fire investigator's professional experience, and undisputed "core science" of copper sulfide particulate contamination as a cause of propane gas leaks).  But, it is noteworthy in this case that Dr. Ross based his causation opinion on considerably more evidence than just the universally accepted science of dam failures and water flow, as his methodology also accounts for the specific drainage characteristics of *this* dam and real-time rainfall data from *this* storm.  More specifically, Dr. Ross testified that he examined the Dam site, the subject neighborhoods, and the topographic, hydrologic, and vegetation characteristics of the Elevenmile Creek watershed.  Dr. Ross also analyzed historical rain gauge data collected by the United States Geological Survey (USGS) in conjunction with Next-Generation Radar (NEXRAD) precipitation data to calculate the spatial and temporal distribution of the rainfall over the Elevenmile Creek watershed during the Storm.  Additionally, he calculated the dimensions of the Dam, its static storage and its dynamic storage,

using a computer-based hydrologic model (Hydrological Simulation Program--Fortran, or HSPF) of the actual rainfall conditions during the Storm.[12]

From this physical evidence and empirical data, Dr. Ross was able to conclude that the flooding in the subject neighborhoods could have been caused by either:  (1) the amount and distribution of the rainfall during the Storm, alone; or (2) the amount and distribution of the rainfall, together with the failure of the Kingsfield Road Dam. Defendant has offered no evidence or even argument to question the core science underlying Dr. Ross's opinion or the reliability of his models.  On the contrary, Defendant's expert, Dr. Frank Lan, confirmed that Dr. Ross used appropriate industry models to analyze the rainfall and water flow in this case, and he took no issue with the data on which the models were based.  The Court, therefore, finds that Dr. Ross's reliance on the known science of dam failures and water flow, together with the data he gathered with respect to the unique characteristics of the subject watershed, dam, and rainfall event, constitutes a scientifically valid methodology for "ruling in" the failure of the Kingsfield Road Dam as a possible cause of the subject flooding.   Dr. Ross's opinion is "properly grounded, well-reasoned, and not speculative."  *See Frazier*, 387 F.3d at 1296.  Nothing in Rule 702 or *Daubert*

---

[12] Static storage means the normal amount of water that was artificially impounded, or stored, in the reservoir behind the Dam when it was filled to storage capacity, but in a stable condition, with no additional water flowing in.  Dynamic storage, as used by Dr. Ross, refers to the volume and motion of water behind the Dam during high flow events, such as the Storm in this case.

requires more.  The appropriate way to assess the validity and strength of Dr. Ross's conclusions is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *See Daubert*, 509 U.S. at 596.

Defendant insists that Dr. Ross's general causation opinion is unreliable because he did not "model or test his dam failure hypothesis" by designing an exact simulation of the process by which the Kingsfield Road Dam could have failed and flooded the subject neighborhoods.  Taking this argument to its logical conclusion, Defendant would have Plaintiffs prove causation to a scientific certainty before expert testimony could be admitted.   The Court finds this argument wholly inconsistent with *Daubert* and the fundamental premise of Rule 702.  *See Daubert*, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.").   "[T]esting is not necessary in all instances to establish reliability under *Daubert*," particularly where an expert's conclusion is premised on well-established and undisputed scientific knowledge.  *Bitler*, 400 F.3d at 1236.  On this point, the Tenth Circuit's decision in *Bitler v. A.O. Smith Corp.*, is instructive. In *Bitler*, the plaintiffs' experts opined that a propane explosion in a home was caused by copper-sulfide contamination of the safety valve seat of a water heater. *Id*. at 1231.  The defendants challenged the admission of plaintiffs' experts' opinions

for, among other reasons, failure to test their theory that copper sulfide had passed through a mesh screen before lodging on the safety valve seat. *Id*. at 1235. The Tenth Circuit observed that the experts' theory of the accident was based on the "known science of copper sulfide particulate contamination as a cause of propane gas leaks" and that testing of this established scientific principle would generally be unnecessary. *Id*. at 1236. The court reasoned that while the presence of a mesh screen designed to filter out those particles may have changed the jury's causation determination, it did not "fundamentally and necessarily change[] the nature of the underlying science." *Id*. Thus, because the "core science—that copper sulfide particles are the kind of thing that when lodged on the valve seat can cause leaks—[was] sufficiently well-established," the court concluded that testing was not required to permit the plaintiffs' experts to opine on the cause of the explosion. *Id*. The same is true here.

## 2.    Specific Causation

With respect to specific causation, Defendant argues that Dr. Ross did not reliably "rule out" alternative explanations for the flooding in the subject neighborhoods. In particular, Defendant claims that Dr. Ross failed to consider and eliminate the possibility that the flooding was caused or impacted by either: (1) the actual distribution of the rainfall during the Storm alone; or (2) the increased vegetation along the path of the flood. According to Defendant, Dr. Ross's analysis

thus is not sufficiently reliable to support his opinion on specific causation. This is incorrect.

Contrary to Defendant's assertion, the evidence shows that Dr. Ross did account for the distribution of the rainfall during the Storm, as that data drove the computer-based modeling programs he used to simulate the rainfall event. Dr. Ross testified that he collected data about the amount, duration, and varying intensities of the rainfall over the Elevenmile Creek watershed during the subject storm from both the USGS and the National Oceanic and Atmospheric Administration (NOAA).[13] Dr. Ross compared radar rainfall data with rain gauge measurements to estimate the spatial and temporal rainfall distribution over the Elevenmile Creek watershed during the Storm. He input these rainfall estimates into his hydrologic model, along with details about the physical characteristics of the Elevenmile Creek watershed, to compute the volume and timing of surface water runoff. These runoff calculations were combined with cross-sectional and frictional values from the Elevenmile Creek channel to produce a computerized hydraulic model (Hydraulic Engineering Center River Analysis System, or HEC-RAS) that could simulate the Storm's effect on the Elevenmile Creek watershed, in terms of the potential depths and duration of

---

[13] The USGS, in cooperation with the Florida Department of Environmental Protection (FDEP) and the Community Collaborative Rain, Hail & Snow Network (CoCoRaHS) provided rainfall measurements from three separate rain gauge stations within the Elevenmile Creek watershed. The NOAA published NEXRAD radar accumulated rainfall values for the area, which Dr. Ross accessed online.

floodwaters, under two hypothetical scenarios—one approximating water flow conditions had the Kingsfield Road Dam remained intact and fully functioning during the Storm, and the other approximating the result had there been no dam in place and the Elevenmile Creek existed in a natural, unobstructed state.  Under both hypothetical scenarios, the hydraulic model predicted a three to five-foot decrease in water depths during the Storm, which likely would have resulted in the flooding of no more than six houses in the subject neighborhoods.  Because, together, the hydrologic and hydraulic models digitally approximated the actual rainfall conditions in the Elevenmile Creek watershed during the storm, these findings support Dr. Ross's conclusion that the rainfall alone could not have caused the flooding.

The evidence also shows that Dr. Ross properly considered and ruled out the possibility that vegetation growing within the Elevenmile Creek channel caused or significantly contributed to the flooding of Plaintiffs' homes.  According to both parties' experts, the density and distribution of vegetation along a river channel can impact the rate at which water flows through it.  Dense vegetation and undergrowth, for example, can impede the flow of water, causing higher flood elevations.  In hydraulic modeling, the collective effect of a channel's resistance to water flow is represented by a "roughness" parameter called a Manning's coefficient, also known as a frictional value.  Dr. Ross testified that, to account for vegetation along the

Elevenmile Creek main channel and flood plain, he selected frictional values of .03 and .05, respectively.  Dr. Ross indicated that the procedure for estimating frictional values is relatively subjective, but that the figures he used were based on the vegetative characteristics he observed at the Elevenmile Creek and were "typical values for forested coastal-plain sub-tropical floodplains" like this one.  *See* ECF No. 78-1 at 25.  With the inclusion of these frictional values, Dr. Ross's hydraulic model accounted for the impact of vegetation on flood levels during the Storm.  Dr. Ross did not test other, theoretical frictional values because he was satisfied that the values he selected accurately represented the roughness characteristics of Elevenmile Creek.  That Defendant's expert disagrees and chose different, higher frictional values for use in his own hydraulic model does not render Dr. Ross's methodology unreliable.  This objection goes to the weight of Dr. Ross's testimony, not its admissibility.  The Court finds Dr. Ross's testimony admissible.

### C.     Tom Fruitticher

Plaintiffs seek classwide damages for the diminished values of their homes as a result of the alleged stigma that attaches to real property that has experienced flooding.  In support of this claim, Plaintiffs have proffered the expert testimony of Tom Fruitticher, a state-certified general appraiser with over thirty years' experience appraising and valuating real property.  Fruitticher has offered his opinion as to the expected percentage of reduction in the fair market value of Plaintiffs' properties as

a result of the flooding.   Defendant challenges Fruitticher's testimony on qualification, reliability, and helpfulness grounds.

### 1.   Qualification

Fruitticher performed a series of statistical analyses, namely, multiple regression and linear regression analysis, to reach his conclusion as to stigma damages.  Defendant contends that Fruitticher is not qualified to provide expert testimony based on multiple regression analysis because he is not a statistician, has not routinely employed this technique in valuing real properties, and lacks extensive training in its use and application in the mass appraisal context.   In essence, Defendant argues that Fruitticher's general education and experience in the field of real property appraisal do not translate into qualifications that enable him to testify competently based on regression analysis in this case.   Defendant reads the "qualification" prong of Rule 702 too stringently.   "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Furmanite America, Inc. v. T.D. Williamson, Inc*., 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).[14]

---

[14] *See also Kipperman v. Onex Corp*., 411 B.R. 805, 843 (N.D. Ga. 2009) ("[A]n expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case."); *Trilink Saw Chain, LLC v. Blount, Inc*., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) ("[A]n expert with the education or background to permit him to analyze a given set of circumstances…can through reading, calculations, and reasoning from known scientific principles make himself very much an expert [regarding a] particular product even though he has not had actual experience with the product.").

Again, "so long as the [expert] is minimally qualified, objections to the level of [his] expertise go to credibility and weight, not admissibility." *Hendrix I*, 255 F.R.D. at 585. The critical question for qualification purposes is whether the proffered expert has such "knowledge, skill, experience, training, or education" that his opinion will aid the trier of fact in understanding the evidence or resolving a factual issue. *See* Fed. R. Evid. 702.

In this case, the Court finds Fruitticher at least minimally qualified to use statistical analysis to assist the trier of fact in determining whether and to what extent Plaintiffs are entitled to so-called stigma damages. The record reflects that Fruitticher has spent thirty years appraising residential properties in the Pensacola area and, in that time, has performed "numerous" disaster-related diminished value assessments. This background equips him for the task of evaluating the impact of the subject flood on Plaintiffs' property values. Moreover, Fruitticher has formal training in the application of multiple regression analysis and has used the technique once before in connection with a mass appraisal valuation project. His experience with multiple regression analysis, though limited, is sufficient to support his proposed testimony in the area of statistics. A witness need not be the best or most qualified authority in a field to be admitted as an expert. *See, e.g.*, *Burgett v. Troy-Bilt LLC*, 579 Fed. App'x 372, 378 (6th Cir. 2014) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert

to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.") quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *Robinson v. GEICO Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (same); *Bracey v. Jolley*, No. 1:10-cv-4064-TCB, 2012 WL 12870257, at *3 (N.D. Ga. 2012) ("Rule 702 does not require a party to produce the 'most qualified' expert."). Fruitticher need only possess enough general knowledge of a subject that his testimony would likely assist the trier of fact. *See, e.g.*, *Maiz*, 253 F.3d at 665 (economist was properly qualified to estimate damages resulting from real estate investment scheme even though he had no experience in real estate development); *United States v. Hensel*, 711 F.2d 1000, 1006 (11th Cir. 1983) (holding that trial court did not err in allowing witness with extensive background in arson investigation to testify as an expert on admiralty arson although most of his experience involved fires on land). Given Fruitticher's extensive experience in the appraisal industry, his knowledge of multiple regression analysis, and the liberal standard for admission of expert testimony under Rule 702, *see Frazier*, 387 F.3d at 1294, the Court concludes that he is qualified to offer his opinion as to stigma damages in this case. Objections to the level of his expertise go to the credibility and weight of his opinion, not its admissibility. *See Hendrix I*, 255 F.R.D. at 585.

### 2.    Reliability

Defendant challenges the reliability of Fruitticher's methodology on multiple grounds.[15]   First, Defendant argues that Fruitticher's methodology constitutes an improper combination of two different methodologies, rather than the proper application of a single methodology.   Second, Defendant objects to Fruitticher's multiple regression analysis as an "impermissible black box opinion."   Third, Defendant objects to the reliability of Fruitticher's linear regression model and the data that he used to support his trend line analysis.

### a.    Fruitticher's Methodology

Fruitticher used a series of different techniques to evaluate the impact of the subject flooding on Plaintiffs' homes.   First, he used multiple regression analysis to estimate the pre-flood market values of the homes in the subject neighborhoods. Next, he conducted two separate linear regression analyses of the actual sales prices of flooded and non-flooded homes within the subject neighborhoods during the one-year periods immediately before and after the subject flood.[16]   Fruitticher's linear regression analyses revealed a downward trend in home values in the year following the flood.   More specifically, under his linear regression model, the homes that

---

[15] During the *Daubert* hearing, Defendant raised reliability arguments that are not contained in its motion.  This opinion addresses all of Defendant's arguments.

[16] Linear regression analysis is also referred to as either trend line analysis and time series analysis.

flooded during the Storm exhibited a nine percent decline in value and the non-flooded homes exhibited a three percent decline.  Finally, Fruitticher performed two additional linear regression analyses of home sales in two neighboring subdivisions during the same two-year period.  According to Fruitticher, because of these subdivisions' close proximity to the subject neighborhood, home values there are driven by the same market forces that drive the values in the subject neighborhood.  However, none of the homes in these two subdivisions experienced flooding during the Storm.  The linear regression analyses of home sales in these areas reflected an upward trend in values of approximately nine percent.[17]  Fruitticher attributes the divergence in market trends between Plaintiffs' neighborhood and the two comparable, nearby communities to the stigma that attaches to properties that have experienced flooding.  Fruitticher calculated the percentage decrease in market value due to flood stigma as the difference between the upward trend in the subdivisions outside the stigma area and the downward trend within the stigma area.  Thus, according to Fruitticher, the flood stigma has resulted in a 12 percent decline in the value of non-flooded homes in the subject neighborhood and an 18 percent decline

---

[17] Fruitticher first analyzed 85 home sales in the area immediately north of the subject neighborhoods, which did not experience flooding during the Storm.  Sale prices in that area reflected an average eight percent increase over the relevant time period.  Fruitticher then analyzed home sales in the Nature Trail subdivision, which is another residential area located near the subject neighborhoods that did not experience flooding during the Storm.  The Nature Trail home sales reflected an average 11 percent increase in value over the same two-year period.  Fruitticher's "conservative" average of the upward trend in market growth experienced by the two neighborhoods was nine percent.

in the value of homes that actually flooded.  Applying these percentages to the pre-flood market values generated by his multiple regression analysis, Fruitticher concluded that the total stigma damages amount for the subject neighborhood is $9,034,000.[18]  *See* ECF No. 77-1 at 94.

### b.    Mixed Methodology

Defendant first argues that Fruitticher's methodology is unreliable because he used a combination of two distinct statistical techniques—multiple regression analysis and linear regression analysis—to calculate Plaintiffs' stigma damages, when he should have analyzed the issue using only one of the techniques, preferably multiple regression analysis.  Defendant does not offer any legal support for this argument, nor does it point to any generally accepted standard in the appraisal industry establishing that a stigma damages evaluation should be performed using a single method alone.[19]  Defendant's damages expert, Richard Roddewig, testified that when applied properly, both multiple and linear regression analysis are mainstream tools in the real estate valuation industry and that each is an accepted method for determining the effect of a natural disaster, such as the subject flooding, on property values.  *See also* ECF No. 80-1 at 8.  Indeed, courts have routinely found

---

[18] By Fruitticher's calculations, flooded homes in the subject neighborhood experienced a combined stigma loss of $5,669,000.  ECF No. 77-1 at 94.  Non-flooded homes experienced a combined loss of $3,365,000.  *Id*.

[19] Roddewig testified that multiple regression analysis was inappropriate for individual home valuations, but this is not a single valuation case.

that properly constructed regression models can provide reliable support for expert conclusions in a broad range of subjects.  *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400-01 (1986) (holding that a properly performed multiple regression analysis is an accepted method for determining damages and causation); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (finding use of multiple regression analysis reliable in antitrust conspiracy case); *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1136 (D. Colo. 2006) (admitting expert opinion as to effect of environmental contamination on real property values based on analysis of price trends in comparable markets).  An expert's analysis on diminution in value damages has also been admitted when it "incorporated five different, multi-disciplinary approaches" to the question of whether property values in a class area had been impacted by environmental contamination.  *Cook*, 580 F. Supp. 2d at 1130 (admitting real estate appraiser's expert opinion as to stigma damages based on combination of real estate market research, review of analogous case studies, analysis of market sales data and information, multiple regression analysis, and review of public opinion surveys).  In light of these authorities, the Court finds no grounds for excluding Fruitticher's expert opinion as unreliable simply because it incorporates two statistical methods, provided that each, taken in isolation, contains sufficient analytical rigor to satisfy *Daubert*.

In this case, Fruitticher did not, as Defendant asserts, perform "half" of a multiple regression analysis and "half" of a linear regression analysis. Instead, Fruitticher's multiple regression analysis was complete when it generated estimates of the pre-flood market values of homes in the subject neighborhood. His linear regression analysis was complete when it calculated the market trends in the subject neighborhood and in nearby communities during the years before and after the flood. Synthesizing the findings from the two analyses does not render the opinion unreliable. Defendant's expert may disagree with this approach, but the experts' conflicting opinions reveal only a factual dispute, not a flaw in Fruitticher's methodology. Under the circumstances, it would be improper for the Court to pick and choose which variant of the methodology it prefers, to the exclusion of the other. *See generally Kumho Tire*, 526 U.S. at 153 (stating that if an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts"); *Rink*, 400 F.3d at 1293 n.7 (observing that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert"). This issue may be explored vigorously through cross-examination, but it does not preclude the admissibility of Fruitticher's opinion. *See Quiet Tech.*, 326 F.3d at 1341 ("[V]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### c.    Multiple Regression Analysis

Defendant challenges Fruitticher's multiple regression analysis on the ground that, because he cannot explain or manually perform the mathematical calculations that are built into his regression model, his use of the technique amounts to the sort of "black box" damages analysis that several district courts have found unreliable under Rule 702. *See, e.g.*, *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, *6 (N.D. Cal. Jan. 23, 2015); *Lawrence v. Raymond Corp.*, No. 3:09-cv-1067, 2011 WL 3418324, at *7-8 (N.D. Ohio Aug. 4, 2011) (stating that experts may not be "a black box into which data is fed at one end and from which an answer emerges at the other"); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (rejecting expert analysis that was "in a black box out of the view of the court . . . [because] the court cannot simply take an expert's word for a specific proposition). The Court disagrees. A "black box" expert opinion, as that term is used in the cases cited by Defendant, is one in which an expert's conclusion is stated without any reasoned explanation that would enable the Court, a jury, or an opposing party to meaningfully evaluate the process by which it was reached. *See id*. Such an opinion is, essentially, an expert's *ipse dixit*, which the Supreme Court has admonished district courts against admitting into evidence. *See Joiner*, 522 U.S.

at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion.")(internal citations omitted).  In *Open Text*, for example, the Northern District of California excluded royal rate testimony where the expert failed to "spel[l] out the steps she took to go from the data to the royalty rate opinion" because "the jury [could not] see how the pieces fit together or how the data [drove] the conclusion."  2015 WL 349197 at *6.  The expert's opinion in *Open Text* was supported only by her professional experience, which is an "abstraction" not "testable in the crucible of cross-examination."  *Id*.; *see also GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (excluding royalty rate testimony where expert "advance[d] no reasoned basis for deriving his $1 per unit royalty from the $86 average net incremental profit" and instead stated that his opinion was based on "all of the evidence in the record" and his "30 years of experience").  Understandably, the court in *Open Text* found that the expert's opinion was a classic "black box," in which she asserted that her proposed royalty rate was reasonable simply because she said so.  *Id*.

In contrast, Fruitticher's opinion is based on the application of a widely accepted statistical technique to empirical data drawn from the Multiple Listing

Service (MLS) and the public property records of Escambia County, Florida.  *See*

*Tuscaloosa*, 158 F.3d at 566 (reversing exclusion of expert testimony based on data

compilations and estimated damages that were "the products of simple arithmetic

and algebra and of multiple regression analysis, a methodology that is well-

established as reliable").  Fruitticher's report describes exactly how he used multiple

regression analysis to determine the pre-flood market value of the subject homes and

how that determination fits into his overall stigma damages opinion.  *See* ECF No.

77-1.  Fruitticher also articulated the precise steps he took to select the independent

variables for his model and to confirm the accuracy of its results.  *Id*.  Perhaps the

best evidence that Fruitticher's multiple regression analysis is not *ipse dixit* comes

indirectly, however, from Defendant's own expert witness, Richard Roddewig.

During the *Daubert* hearing, and also in his 175-page report, *see* ECF No. 80-1,

Roddewig explained, in meticulous detail: (1) the various inputs Fruitticher used in

his regression analysis; (2) information that he believed Fruitticher should have

included in the analysis, but did not; (3) various problems that he identified in

Fruitticher's modeling (*e.g*., allegedly faulty assumptions); and (4) how and why

certain data points used by Fruitticher produced results that were skewed and lacking

in statistical significance.   Roddewig even explained how, after reviewing

Fruitticher's report, he was able to "replicate" Fruitticher's statistical model and

"correct" the perceived flaws.  Thus, this is clearly not a case where the expert failed

to follow any "discernible methodology," *see GPNE Corp.*, 2014 WL 1494247, at *4, as Fruitticher's methodology was sufficiently transparent for Roddewig to highlight its myriad alleged deficiencies.  Because the Court has already found Fruitticher qualified to testify on the basis of statistical analysis in this case, the fact that Fruitticher "cannot perform the statistical functions personally" does not undermine the reliability of his methodology for admissibility purposes.[20]

### d.    Linear Regression Analysis

Finally, Defendant raises several objections to Fruitticher's linear regression methodology, each premised on inherent principles of statistical analysis that Defendant contends must be satisfied in order for the analysis to be valid.  More specifically, Defendant first argues that the explanatory power of Fruitticher's linear regression model, as indicated by its $R^2$ value, is too low for his trend lines to have statistical significance.  Second, Defendant argues that Fruitticher failed to remove a statistical outlier from his dataset, which renders the analysis invalid under standard, accepted techniques for performing regression analyses.  Because this latter objection identifies a reliability problem that the Court finds dispositive, the merits of the former objection are not addressed.

---

[20] The Court notes that if the standard for admissibility depended on an expert's ability to manually perform statistical calculations, then the testimony of Defendant's expert necessarily would be excluded by virtue of his own concession that he is not a statistician and does not know the math behind various calculations performed by a multiple regression model.

Expert testimony must be based on "sufficient facts or data" and "the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Every step of an expert's analysis must be "supported by good grounds," which "means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain*, 401 F.3d at 1245; *see also Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*."). To meet this standard, "[a]n expert's method need not be perfect, nor must he apply it perfectly." *Banta Props., Inc. v. Arch Specialty Ins. Co.*, No. 10-61485-CIV, 2011 WL 13096149, at *4 (S.D. Fla. Dec. 20, 2011); *see also Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009) ("Admissibility under Rule 702 does not require perfect methodology."). Thus, a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. *See Quiet Tech.,* 326 F.3d at 1345-46. However, where "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions," exclusion of the expert's testimony is warranted. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994). For the reasons that follow, the Court concludes that Fruitticher's erroneous

inclusion of an outlier data point that significantly distorted the results of his linear regression analysis renders his stigma damages opinion unreliable.

Linear regression is an analytical tool used to examine the relationship between two variables—a dependent variable, which is the variable to be explained, and an independent variable, which is the variable believed to explain the dependent variable—by plotting data on the X (horizontal) and Y (vertical) axes of a graph and then finding the straight line, called a regression line, that best fits through the data points.[21]  Federal Judicial Center, *Reference Manual on Scientific Evidence* 305, 336–38 (3d ed. 2011).  The regression line, also called a trend line, reflects the extent to which a change in the independent variable is associated with a change in the dependent variable.[22]  *Id.* at 264.  The existence of a trend does not necessarily imply that a change in one variable *causes* the change in the other; rather, it only indicates that there is some significant association between the two variables.  A regression line can be used, as it was in this case, to predict the value of a dependent variable based on the known value of an independent variable.[23]  Fruitticher's linear

---

[21] The "best fit" is the straight line that minimizes the sum of the squared vertical distances between each data point and the line.  *ATA Airlines, Inc. v. Federal Exp. Corp.*, 665 F.3d 882, 890 (7th Cir. 2011).

[22] Stated differently, the regression line shows how much and in what direction the dependent variable changes when the independent variable changes.

[23] The mathematical equation relating the independent variable to the expected value of the dependent variable, known as the regression equation, is $Y = a + bX$.  *Reference Manual* at 335. In this case, Y represents the sales price of a home, which is the dependent variable to be explained. *See id.*  X represents the date of each home sale, which is the explanatory variable.  *See id.*  The *a*

regression model was designed to evaluate the extent to which property values in various neighborhoods (the dependent variable) changed over the one-year periods immediately before and after the subject flood (the independent variable). This information was then used to calculate the percentage of reduction in the fair market value of Plaintiffs' properties as a result of the flooding

Most data points on a given graph, called a scatterplot or scatter diagram, will not lie directly on the regression line. This is because the regression line is a mathematical representation of the best linear relationship between all of the data points, based on their respective vertical distances from the line. "An 'outlier' is an extreme data point that lies far from a regression line [that fits] the remaining data points." *Estate of Bud Hill v. ConAgra Poultry Co.*, No. 4:94-CV-0198-HLM, 1997 WL 538887 (N.D. Ga. Aug. 25, 1997). Outliers can significantly impact the slope of the regression line and, ultimately, distort the results of an otherwise accurate regression analysis.[24] *See Reference Manual* at 345. This does not mean that outliers should be automatically excluded or that a regression analysis that includes outliers is necessarily unreliable. *See Best-Practice* at 284. Outliers may convey important,

---

is the point at which the regression line intercepts with the Y-axis when X equals 0. *See id*. The *b* is the slope of the regression line, which represents the change in the dependent variable (sales price) associated with a change in the explanatory variable (the passage of time). *See id*.

[24] *See also*, Herman Aguinis, *et al*., *Best-Practice Recommendations for Defining, Identifying, and Handling Outliers*, 16(2) Org. Research Methods 270, 271 (2013) ("Outliers, by virtue of being different from other cases . . . usually exert disproportionate influence on substantive conclusions regarding relationships among variables.").

legitimate information about the data sample as a whole, in which case, their inclusion is entirely appropriate. *See Hill*, 1997 WL 538887, at *9. But when outliers result from inaccuracies or errors in the data selection process, "the correct procedure is to either adjust the data points to correct their values or remove such observations from the data set." *Best-Practice* at 284. The key is to carefully examine what causes a data point to be an outlier. *Reference Manual* at 327.

In this case, Fruitticher's regression analysis of sales in the subject neighborhood included an outlier data point representing the sale of a home located at 3639 Hwy 297 A for $33.32 per square foot, or $64,500. *See* ECF No. 77-1 at 80. This price differed markedly from all other transactions during the relevant time period, which ranged from $66.56 to $102.44 per square foot, or $160,000 to $248,000. *Id*. Fruitticher testified that he recognized the 3639 Hwy 297 A data point as an extreme outlier, but included it in his regression analysis anyway because it represented a sale in the area. Fruitticher stated that he did not attempt to determine the cause of the apparent anomaly. With the outlier, Fruitticher's regression model calculated a nine percent decline in the market values of flooded homes in the subject neighborhood after the flood. ECF No. 77-1 at 80–81. Richard Roddewig, Defendant's damages expert, replicated Fruitticher's linear regression model using the same data set relied on by Fruitticher. It is uncontroverted that when Roddewig identified the outlier and removed it from the analysis, the model calculated a nine

percent incline (as opposed to a decline) in the trend line during the same period.  In other words, without the outlier, the market values of flooded homes actually increased rather than decreased.  Like Fruitticher, Roddewig does not appear to have sought an explanation for the aberrant sales price.  The Court has, however.

As part of its requisite "rigorous examination" of Fruitticher's analysis, the Court reviewed the Escambia County Property Appraiser's online real property records for 3639 Hwy 297 A.[25]  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303

---

[25] The Court takes judicial notice of the Escambia County Property Appraiser's real property records with respect to transactions involving 3639 Hwy 297 A in Cantonment, Florida. A court may take judicial notice of appropriate adjudicative facts at any stage of a proceeding, whether or not the notice is requested by the parties.  Fed. R. Evid. 201(c); *see also United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 2008) (explaining that a district court may take judicial notice *sua sponte*).  In general, a court may judicially notice a fact not subject to reasonable dispute because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  Documents that are public records are the proper subject of judicial notice.  *Universal Express, Inc. v. U.S. S.E.C.*, 177 Fed. App'x 52, *2 (11th Cir. 2006).  Also, it is not uncommon for courts to take judicial notice of factual information found on official governmental agency websites.  *See, e.g.*, *Marshek v. Eichenlaub*, 266 Fed. App'x 392 (6th Cir. 2008) (holding that court is permitted to take judicial notice, sua sponte and at the appeals stage, of information on the Inmate Locator, which enables the public to track the location of Federal inmates, is maintained by the Federal Bureau of Prisons and is accessed through the agency's website, to discover that appellant has been released since the filing of his appeal and conclude that there remains no actual injury which the court could redress with a favorable decision and, thus, dismiss the appeal as moot); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003) (holding that district court erred when it refused to take judicial notice of information on official federal agency website that maintained medical records on retired military personnel; that fact was appropriate for judicial notice because it is not subject to reasonable dispute).  Accordingly, the Court may take judicial notice of the documents related to the sale of 3639 Hwy 297 A in Cantonment, Florida, which are publicly recorded with the Escambia County Property Appraiser's Office and publicly available on that agency's website.  *See, e.g.*, *Champlaie v. BAC Home Loans Servicing, LP*, 706 F. Supp. 2d 1029, 1039 (E.D. Cal. 2009) (taking judicial notice of, *inter alia*, publicly recorded Deed of Trust, Notice of Default, Notice of Trustee's Sale, and Trustee's Deed Upon Sale); *Mann v. Wells Fargo Bank*, No. C12-03014 DMR, 2012 WL 6025781, *3 (N.D. Cal. Dec. 4, 2012) (taking judicial notice, as matters of public record, of documents recorded in the County Recorder's Office related to two deeds of trust and a foreclosure); *Glover v. Wachovia*

F.3d 256, 267 (2d Cir. 2002) ("In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."). These records are publicly available and, importantly, they were Fruitticher's primary source of information for data about home sales in the subject neighborhood.[26] The public records indicate that this property sold for $197,000 in April 2006. In August 2014, Wells Fargo Bank received title to the property after purchasing it for $5,100 through a judicial foreclosure sale.[27] Two months later, in October 2014, Wells Fargo sold the property to its current owner for $64,500. This final sales transaction is the outlier data point that Fruitticher selected for inclusion in his linear regression model, without any meaningful explanation. The public records for this transaction make clear, however, that this sale was not a traditional, arm's length sale that

---

*Equity Servicing LLC*, No. 03:11-cv-00210 (D. Or. July 18, 2011) (taking judicial notice of county real property records filed in separate state court and bankruptcy actions).

[26] In his report, Fruitticher stated that he obtained "building size, land size, age and amenity information from the Escambia County Property Appraisers office" and that he was "relying on" these property records "for the values provided in th[e] report." ECF No. 77-1 at 9.

[27] The Court notes that the Wells Fargo transaction in August 2014 does not appear in Fruitticher's data set, despite his insistence that he included "every sale that was available" in his analysis. The August 2014 transaction would have been an extreme outlier and, for obvious reasons, a candidate for elimination. In a proper regression analysis, the existence of each data point, even those which are excluded, still must be noted and disclosed to ensure transparency. *See Best Practices* at 287.

appropriately reflected the depressed state of the market after the flood.[28]  Instead, the transaction followed a judicial foreclosure and therefore, by Fruitticher's own standard with respect to homes sales before the flood, it should have been "eliminated from consideration" because such transactions "noticeably skew[]" the results of a regression analysis.  *See* Fruitticher's Appraisal Report, ECF No.77-1 at 9.  This is not an insignificant or minor flaw.  On this record, this single data point is the difference between a finding of classwide stigma and a finding of no classwide stigma.

Generally, criticisms of an expert's decision to include or exclude particular data points and variables affect the probative value of the methodology, not its admissibility.  *Bazemore*, 478 U.S. at 400 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").  But where a "flaw is large enough that the expert lacks 'good grounds' for his or her conclusions," the expert's opinion should be excluded.  *See Paoli*, 35 F.3d at 746; *Amorgianos*, 303 F.3d at 267 (same); *Hendrix I*, 255 F.R.D. at 578 ("[T]he court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded.").  In this case, the flaw in Fruitticher's methodology is significant enough

---

[28] This sales price also is not an indication that the flood damage to the property still needed to be remediated.  Fruitticher testified that every flooded home in this data set was repaired before it was sold.

for the Court to conclude that his stigma damages opinion is unreliable—correcting the error by removing the outlier from his data set essentially negates his conclusion. Because of this flaw, Fruitticher's linear regression results are skewed, misleading, and overall unreliable for demonstrating that market values declined in the subject neighborhood after the flood.  Therefore, his testimony must be excluded.

### D.    Richard Roddewig

Plaintiffs have moved to exclude the testimony of Richard Roddewig, Defendant's proposed rebuttal damages expert.  In his Summary Appraisal Review Report, Roddewig stated that he had been retained to assess the "general accuracy, reliability, and appropriateness" of Tom Fruitticher's stigma damages analysis.  ECF No. 80-1 at 5.  Plaintiffs argue that Roddewig is not qualified to offer an opinion on stigma damages in this case because he lacks sufficient "local knowledge" of the real estate market in Escambia County, Florida.  *See* ECF No. 80 at 2.  Plaintiffs also challenge what they characterize as Roddewig's "methodology," which they contend is unreliable because he draws on professional experience and case studies that are too "disconnected" from the local market to provide any insight into the appropriateness of stigma damages in this case.  *Id*. at 9.  During the *Daubert* hearing, the Court ruled that Roddewig was qualified to testify as a rebuttal expert on generally accepted methods in the appraisal industry for determining the effect of a natural disaster on property values and to critique Fruitticher's stigma damages

opinion.  On further review, the Court again concludes that Roddewig's proposed expert testimony satisfies *Daubert*.

Roddewig's qualifications to testify as a rebuttal expert are aptly demonstrated by his broad experience in the real estate appraisal industry and, in particular, in analyzing the impact of flooding and other natural disasters on property values.  Like Fruitticher, Roddewig is a certified general real estate appraiser in Florida and holds an MAI designation from the Appraisal Institute.[29]  He has taken and taught numerous courses on real property appraisal, and has written extensively on the topic.  For this case, Roddewig consulted with Eugene Pressley, a local real estate appraiser, regarding market trends specific to the Cantonment area.  Roddewig clearly possesses the "knowledge, skill, experience, training, [and] education" to critique Fruitticher's stigma damages opinion.  *See* Fed. R. Evid. 702.

Roddewig prepared a standard rebuttal report of the type the Court would expect to see in response to Fruitticher's Appraisal Report.  Roddewig does not offer a stand-alone appraisal or opinion on stigma damages in this case; rather, his report is limited to a critique of Fruitticher's methodology.  This was entirely appropriate. The task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal

---

[29] MAI stands for "Member, Appraisal Institute."  The MAI designation is awarded to professional appraisers who meet certain education and experience requirements.  Appraisal Institute, http://www.appraisalinstitute.org/our-designations/ (March 21, 2007); *see also U.S. v. 25.202 Acres of Land & Bldg. Affixed to Land Located in the Town of Champlain, Clinton Cnty., N.Y.*, 860 F. Supp. 2d 165, 173 n.10 (N.D.N.Y. 2010).

expert, by definition, criticizes or rebuts the methodology and opinions of another expert. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) ("The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."). There is no requirement that a rebuttal expert offer a competing damages analysis, for example; his opinions properly may be limited to criticizing the analysis and conclusions presented by another party. *See, e.g., Clark v. Edison*, 881 F. Supp. 2d 192, 212 (D. Mass. 2012) (admitting rebuttal expert testimony that directly contradicted plaintiff's expert's testimony because both experts' testimony fell "within the range where experts might reasonably differ); *In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendant's experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiff's experts."); *1st Source Bank v. First Res. Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) (noting that "as a rebuttal witness, [an expert] may criticize [plaintiff's] damage theories and calculations without offering alternatives"). In this case, Roddewig stated that he reviewed Fruitticher's report and the data referenced within it, replicated and tested Fruitticher's regression models, visually inspected the subject homes and the surrounding neighborhoods, reviewed literature on appraisal standards and statistical modeling, and prepared a rebuttal report. *See* ECF No. 80-1 at 41-42. In his report, Roddewig identified alleged errors and inconsistencies in

Fruitticher's methodology, provided a reasoned basis for each criticism, and furnished reference materials in support of his positions. Thus, the Court is satisfied that Roddewig's opinion is sufficiently grounded in his expertise and analysis of the facts of the case to render it reliable. Plaintiffs' challenges to Roddewig's lack of prior experience with Escambia County real estate and to the applicability of various case studies go to the weight of Roddewig's testimony, not its admissibility.

## III. Class Certification

Plaintiffs are pursuing class certification on claims of negligence, trespass, nuisance, and strict liability, pursuant to Rule 23 of the Federal Rules of Civil Procedure. Class actions are an exception to the rule that litigation is ordinarily conducted only on behalf of individually named parties. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). A district court has discretion to certify a class if, after "a rigorous analysis," the court is satisfied that the requirements of Rule 23 of the Federal Rules of Civil Procedure are met. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citing *Dukes*, 564 U.S. at 351); *Carriuolo v. Gen. Motors, Co.*, 823 F.3d 977, 981 (11th Cir. 2016). The party seeking to certify the class bears the burden to establish the requirements of Rule 23 by a preponderance of the evidence, and remaining doubts are resolved against class certification. *See Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). The district court must resolve all conflicts in the evidence necessary to make the requisite

determinations under Rule 23.  *See Comcast*, 133 S. Ct. at 1432 (noting Rule 23 is not a mere pleading standard and it may be necessary for the court to "probe behind the pleadings" to determine the certification issue); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (the class action inquiry is not whether the plaintiff has stated a cause of action or will prevail on the merits but whether Rule 23 is satisfied); *Sher*, 419 F. App'x at 891 ("[A] district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification."). "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied."  *See Valley Drug Co. v. Geneva Pharm., Inc*., 350 F.3d 1181, 1188 n. 15 (11th Cir. 2003); *see also Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (cautioning that, although a "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,'" quoting *Dukes*, 564 U.S. at 351, there is "no license to engage in free-ranging merits inquiries at the certification stage") (securities fraud).

Before a class is certified, the plaintiff must establish all four prerequisites of Rule 23(a), plus at least one of the alternatives listed in Rule 23(b).  *See Valley Drug*, 350 F.3d at 1188 ("Failure to establish any one of these four factors and at least one

of the alternative requirements of Rule 23(b) precludes class certification."). The

Rule 23(a) prerequisites of "numerosity, commonality, typicality, and adequacy of

representation," *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012),

require Plaintiffs to show, and the Court to find, by a preponderance of the evidence

that:

> (1)    the class is so numerous that joinder of all members is impracticable;
>
> (2)    there are questions of law or fact common to the class;
>
> (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Additionally, because Plaintiffs in this case seek certification

under Rule 23(b)(3), they must prove that:

> questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

In addition to the Rule 23 requirements, at least one named plaintiff seeking

class certification must have standing.[30]  *See Prado-Steiman ex rel. Prado v. Bush*,

---

[30] "[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  At least one named plaintiff must have standing in the constitutional sense to represent the class, which requires a showing of a redressable injury

221 F.3d 1266, 1279-80 (11th Cir. 2000). The plaintiffs must also demonstrate that the proposed class is "adequately defined and clearly ascertainable." *Carriuolo,* 823 F.3d at 984 (quoting *Little,* 691 F.3d at 1304). The district court has discretion to redefine the class to cure a deficiency in the proposed class, *see Benefield v. Int'l Paper Co.*, 270 F.R.D. 640, 645 (M.D. Ala. 2010), but the Plaintiffs "must propose an administratively feasible method by which class members can be identified," *Karhu v. Vital Pharms., Inc.*, 621 F. App'x. 945, 947 (11th Cir. 2015) (unpublished).

## A.    Ascertainability

"Although not explicit in Rule 23(a) or (b), courts have universally recognized that the first essential ingredient to class treatment is the ascertainability of the class." *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 663 (N.D. Ala. 2010). This threshold issue requires a showing that "the class definition contains objective criteria that allows for class members to be identified in an administratively feasible way." *Karhu*, 621 Fed. App'x at 946; *see also* Manual for Complex Litigation (Fourth) § 21.222 (2004) (class definition must be "precise, objective, and presently ascertainable . . . by reference to objective criteria").

---

that is fairly traceable to the defendant's conduct. *See id.* Standing is not challenged in this case, but the Court has considered the issue. There is evidence that at least one proposed class representative, John Navelski, owns real property within the proposed class area that experienced flooding during the subject storm, which was allegedly caused or made severe by the failure of the Kingsfield Road Dam. This evidence is sufficient to establish that John Navelski has suffered a redressable injury that is traceable to Defendant's conduct. Accordingly, the Court finds that at least one named plaintiff has Article III standing to raise each class claim.

Identifying class members is administratively feasible when doing so is a "manageable process that does not require much, if any, individual inquiry." *Id*. In this case, the proposed class boundaries are defined in objective terms as including only individuals who were homeowners in the Bristol Park, Bristol Woods, Bristol Creek, and Ashbury Hills subdivisions in Cantonment, Florida as of April 29, 2014. The names and addresses of the proposed class members are easily ascertainable by reference to the real property records of Escambia County, Florida. Accordingly, because Plaintiffs have sufficiently demonstrated that the members of the class may be identified in an administratively feasible way, the Court finds that the ascertainability requirement is satisfied.

## B.    Rule 23(a) Requirements

### 1.    Numerosity

The numerosity requirement is met when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). While there is no predetermined threshold number of plaintiffs required to certify a class, in the Eleventh Circuit, a prospective class consisting of more than forty members is generally deemed sufficient. *Cox v. American Cast Iron Pipe Co*., 784 F.2d 1546, 1553 (11th Cir. 1986). In this case, Plaintiffs' proposed class consists of more than 300 property owners in the subject neighborhoods. *See* ECF Nos. 62 at 16, 62-4 at 2-3. Joinder of this number of claims would be unmanageable and costly. The Court

thus finds, as Defendant concedes, that the proposed class is sufficiently numerous to satisfy Rule 23(a).

### 2.    Commonality

To satisfy the commonality requirement, plaintiffs must show the presence of questions of law or fact that are common to the entire class.  Fed. R. Civ. P. 23(a)(2). A "common" question is one that has a classwide answer or resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Carriuolo*, 823 F.3d at 984. Commonality also requires the plaintiffs to demonstrate that the class members have all suffered the same injury. *Dukes*, 564 U.S. at 350.  Individual claims of the class members do not need to be factually or legally identical, however, and differences among them will not defeat commonality if common questions of law exist.  *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986).  Ultimately, the commonality test is a "low hurdle" that is easily surmounted, *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009), because "for purposes of Rule 23(a)(2) even a single common question will do," *Carriuolo*, 823 F.3d at 984.

In this case, Plaintiffs have alleged questions of fact for which there are common answers pertaining to Defendant's maintenance or abandonment of the Kingsfield Road Dam and to whether the flooding of homes in Plaintiffs'

neighborhoods was caused or made more severe by the failure of the Dam. Plaintiffs have also presented questions of law, for which there are common answers, regarding whether Defendant is liable, under four separate legal theories, for its alleged course of conduct with respect to the Dam and for the alleged consequences therefrom. These are issues that underlie every claim and they are common not only to the representative plaintiffs, but also to the rest of the class. The Court thus finds, as Defendant concedes, that Plaintiffs have met the commonality requirement.

### 3.    Typicality

To satisfy the typicality requirement of Rule 23(a)(3), the class representatives' claims or defenses must be typical of the claims or defenses of the class. This inquiry focuses on the relationship between the interests of the representative parties and the interests of the class as a whole. *See Prado-Steiman*, 221 F.3d at 1279. "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical." *Busby v. JRHBW Realty, Inc*., 513 F.3d 1314, 1322-23 (11th Cir. 2008). This is established by a showing that the claims of the class and its representatives arise from the same events, practice, or conduct and are based on the same legal theories. *Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984). This does not mean that the claims of the class representatives and those of the class must be identical, however. *Id*. Once the class representatives demonstrate that the same

unlawful conduct affected both them and the rest of the class, factual variations among the individual claims generally will not defeat typicality. *Id*.

The claims of the class representatives in this case are typical since they are based on the same legal theories—negligence, trespass, nuisance, and strict liability—and  arise from the same event, practice, or course of conduct—the collapse of the Kingsfield Road Dam as a result of Defendant's alleged failure to properly maintain or abandon it—that give rise to the claims of the other class members.  The fact that individual homes within the proposed class area did not all flood at the exact same time does not, as Defendant argues, render Plaintiffs' claims atypical.  All individual homes within the proposed class area are alleged to have experienced stigma damages and/or flooding that was either caused or made more severe by the Dam's failure, regardless of the time it occurred.  Individual variations among class members' claims with respect to the extent of their damages do not defeat typicality for purposes of class certification.  *Id*.  ("Differences in the amount of damages between the class representative and other class members does not affect typicality.").  The Court will not need to make highly individualized legal or factual determinations to assess Defendant's liability.  On this record, there is plainly a sufficient nexus between the claims of the class representatives and those of the class as a whole to satisfy the typicality requirement.

### 4.    Adequacy of Representation

Rule 23(a)(4) requires that both the named plaintiffs and their counsel will "fairly and adequately protect the interests of the class." To satisfy the adequacy requirement, the named plaintiffs must show (1) that their interests are not "antagonistic" to the interests of other class members; and (2) that class counsel is "qualified, experienced, and generally able to conduct the proposed litigation." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987). This inquiry is meant to identify any substantial conflicts of interest between the named plaintiffs and the rest of the class. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1994). Minor conflicts among class members, however, will not defeat class certification. *Valley Drug*, 350 F.3d at 1189. To render representative plaintiffs inadequate, a conflict must be "fundamental" and "go[] to the specific issues in controversy." *Id*. A fundamental conflict exists where a defendant's alleged conduct has benefitted some class members, but harmed other members. *Id*. Alternatively, there is a fundamental conflict when the economic interests and objectives of the named representatives differ significantly from those of other class members. *Id*.

Defendant contends there are two conflicts in this case that make class certification inappropriate. First, Defendant argues that since not every flooded home was deluged with water at exactly the same time, class members have mutually antagonistic interests with respect to proving the precise time that the Kingsfield

Road Dam actually failed.  Second, Defendant asserts, without elaboration, that class representatives who experienced flooding cannot adequately represent the interests of members whose homes did not flood.  Both of these arguments fail because neither involves an intra-class divergence of interests so substantial that it amounts to a "fundamental conflict" for adequacy purposes.  As discussed with respect to typicality, all class members' claims arise from a common nucleus of facts and all members are alleged to have experienced stigma damages and/or flooding that was either caused or made more severe by the failure of the Dam, regardless of the time it occurred.  The economic interests and litigation objectives of all class members are therefore entirely consistent in that they each seek a judgment from this Court that Defendant's alleged inaction with respect to the Dam was unlawful and that their consequent damages entitle them to monetary relief.  The class members' damages will differ in degree, perhaps, but not in nature.  Under any reasonable application of Rule 23(a)(4), it is clear that the incentives of the representative plaintiffs are aligned with those of the rest of the class in a manner that ensures they will fully and adequately protect the interests of all members.  Any individual inquiries necessary to determine damages need not be addressed until after all common issues are resolved.

Defendant does not challenge class counsel as inadequate, nor does it allege that there is an improper relationship between Plaintiffs and their counsel that would

defeat the adequacy of representation.  The Court has reviewed the affidavits of Plaintiffs' counsel, which detail the education and professional experience of each. *See* ECF Nos. 62-8, 62-9, 62-10.  The Court also had the opportunity to observe Plaintiffs' counsel during the class certification hearing and has read numerous briefs submitted by them in this case.  The Court concludes that Plaintiffs' counsel possess the necessary qualifications and experience to serve as class counsel.  Thus, Plaintiffs have met their burden of establishing all of the Rule 23(a) requirements.

## C.     Rule 23(b)(3) Requirements

In addition to establishing the elements of Rule 23(a), Plaintiffs in this case must also show that their action satisfies the criteria in Rule 23(b)(3).  To maintain a class action under Rule 23(b)(3), the questions common to the class must predominate over the questions affecting individual class members and a class action must be superior to other available methods of adjudication.

### 1.     Predominance

To satisfy the first prong of Rule 23(b)(3), Plaintiffs must establish that the issues subject to generalized proof in the class action, and thus applicable to the class as a whole, predominate over the issues that are subject only to individual proof. *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). "Common issues can predominate *only* if they have a direct impact on every class member's effort to establish liability that is more substantial than the impact of

individualized issues in resolving the claim or claims of each class member." *Carriuolo*, 823 F.3d at 985. On the other hand, common issues will not predominate over individual questions if, "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996). Certification is inappropriate if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), abrogated in part on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). In determining whether class or individual issues predominate in a putative class action suit, a court must take into account "the claims, defenses, relevant facts, and applicable substantive law" to assess the degree to which resolution of the classwide issues will further each individual class member's claim against a defendant. *Id.* at 1254.

Plaintiffs have alleged claims for negligence,[31] nuisance,[32] trespass,[33] and strict liability.[34]   Each of these claims is based on Plaintiffs' contention that Defendant did not maintain or abandon the Dam properly, which led to its failure during the Storm, causing harm to the subject neighborhood and Plaintiffs' homes as a result.   Thus, the core factual and legal issues with respect to liability in this case—whether or not Defendant's conduct caused the Dam to fail, whether or not the Dam's failure caused flooding in the subject neighborhood, and, if so, to what extent Defendant should be held liable—are resolvable by proof that is common to all class members.[35]   Contrary to Defendant's assertion, even the issue of causation

---

[31] In Florida, negligence requires proof of four elements:  (1) duty of care; (2) breach; (3) legal or proximate causation; and (4) actual damages.  *Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009); *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).

[32] A nuisance under Florida law is "[a]nything which annoys or disturbs one in the free use, possession, or enjoyment of his property, or which renders its ordinary use or occupation physically uncomfortable."  *Jones v. Trawick*, 75 So. 2d 785, 787 (Fla. 1954); *Knowles v. Cent. Allapattae Properties, Inc.*, 198 So. 819, 822 (Fla. 1940).  "As to the nuisance claim, such an action is dependent upon an interference with the plaintiff's health, comfort, safety, or proprietary rights."  *State ex rel. Pettengill v. Copelan*, 466 So. 2d 1133, 1135 (Fla. 1st DCA 1985).  Under Florida common law, "a tort plaintiff seeking to recover for economic harm caused by pollution or contamination need not own property that is itself polluted or contaminated."  *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1178 (11th Cir. 2014) (discussing nuisance and negligence claims) (citing *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010)).

[33] Florida law states that trespass to real property is "an injury to or use of the land of another, by one who has no right or authority."  *Brown v. Solary*, 37 Fla. 102, 112 (1896); *see also Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1254 n.1 (11th Cir. 2006) (quoting *Guin v. City of Riviera Beach*, 388 So. 2d 604, 606 (Fla. 4th DCA 1980)).

[34] To recover on a claim for strict liability under Florida law, a plaintiff must show that the defendant engaged in an abnormally dangerous activity that resulted in "harm to the person, land or chattels of another."  *Bunyak v. Clyde J. Yancey & Sons Dairy, Inc.*, 438 So. 2d 891, 894 (Fla. 2d DCA 1983).

[35] This is true even with respect to Plaintiffs' trespass claim, despite the fact that a number of putative class members did not experience flooding.  That some class members ultimately may

is capable of classwide proof.   Dr. Ross's hydraulic model predicts the flood areas and water depths that would have resulted throughout the subject neighborhood both if the Dam had remained intact and if it had been removed properly before the Storm. The model also calculates the difference between the predicted depths under those two hypothetical scenarios and the water levels that were actually observed after the Storm.   In other words, Dr. Ross's models and calculations, if credited, establish, on a classwide basis, which houses in the subject neighborhood experienced flooding that was caused by the Dam's failure and which did not.   Every class member's claims depend on common evidence that will resolve these same liability issues, and proof of one plaintiff's claims necessarily will be proof of the others'.

However, with the exclusion of Tom Fruitticher's classwide stigma damages opinion, there is no dispute that if Plaintiffs establish liability, computation of damages will be a property-specific endeavor.   *See* ECF No. 62 at 25-28, 30.[36] Indeed, Plaintiffs have identified no alternative method for proving damages on a classwide basis.   The need for individualized damages determinations, however,

---

not be successful on the trespass claim does not defeat certification where common issues otherwise predominate. *See, e.g.*, *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct."); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (observing that it is inevitable "that a class will often include persons who have not been injured by the defendant's conduct;" but "[s]uch a possibility or indeed inevitability does not preclude class certification").

[36] Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification.

does not prevent a finding that common issues predominate. *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003). Instead, the Court must determine whether the individual issues involved in calculating damages so overwhelm the common issues related to liability that predominance is destroyed. *Id*. Because in this case, every aspect of liability can be resolved on a classwide basis, it would be neither efficient nor fair to anyone, including Defendant, to hold over 300 trials to hear the same evidence and decide the same liability issues. The Court is thus satisfied that common issues of law and fact as to causation and liability predominate over the issues requiring individualized proof, and the need to bifurcate and allow individual trials as to damages does not preclude certification of a class for these common issues.

### 2. Superiority

The second prong of Rule 23(b)(3) requires Plaintiffs to show that a class action is superior to other available methods for the fair and effective adjudication of the controversy. The focus of this inquiry is on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. As a result, the predominance analysis "has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Id*. Factors

relevant to the superiority analysis include:  (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by other members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. 23(b)(3).

In light of the Court's findings regarding the other Rule 23 criteria, Defendant's contention that a class action is not a superior method to adjudicate Plaintiffs' claims is unpersuasive, at least with respect to the question of liability. Defendant proposes an alternative method of adjudication, namely, the filing of individual claims by each of the homeowners allegedly harmed in this case. However, it is likely that class members would have little interest in pursuing separate actions, as this matter involves relatively small individual claims compared to the cost of litigating complex legal issues against a relatively large corporate entity like Defendant.  Joinder is impracticable due to the number of potential claimants and, if liability claims proceed separately, there is a very real risk of inconsistent adjudications holding Defendant to varying standards of conduct with respect to the same common nucleus of operative facts.  As discussed above, repeated litigation of the same core liability issues would be grossly inefficient and wasteful of the resources of the parties and the judiciary.  This action appears to be the only existing

litigation concerning the subject flooding.  The Northern District of Florida is an appropriate forum because the proposed class is comprised of homeowners who allegedly suffered harm here, and all of the alleged conduct occurred here.  Finally, because proof during the liability phase will not differ among class members, it is unlikely that management of the class action will become overwhelming or unreasonably difficult.  Therefore, all of the Rule 23(b)(3) factors weigh in favor of finding class treatment superior for determining liability in this case.  Accordingly, the Court will exercise its discretion under Rule 23(c)(4) to certify a liability-only class and bifurcate damages from liability.

### D.    Class Definition

In sum, the Court finds that Plaintiffs' claims of liability may be resolved in a class action and, therefore, certification of a class for that purpose is appropriate. Accordingly, the Court certifies the following liability-only class with respect to Plaintiffs' negligence, nuisance, trespass, and strict liability claims:

> All persons who, as of April 29, 2014, owned real property in the Bristol Park, Bristol Woods, Bristol Creek, or Ashbury Hills Subdivisions in Cantonment, Florida, as specifically delineated in Plaintiffs' Motion for Class Certification, Exhibit A, ECF No. 61-1 at 2.

Because this class is certified under Rule 23(b)(3), "the [C]ourt must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

Fed. R. Civ. P. 23(c)(2)(B).  The Court directs the parties to submit a joint proposed notice to the Court within seven days of the date of this Order.  If the parties are unable to agree on the content of the notice, they must each submit a proposed notice, together with briefing, within 14 days of the date of this Order.  The Court will schedule a case management conference to discuss the progression of the litigation going forward.

## IV.  Summary Judgment

Defendant moves for summary judgment on grounds that the record contains no admissible evidence of causation and, in the alternative, on the issue of stigma damages.  With respect to causation, summary judgment is improper.  Defendant asserts that Plaintiffs rely solely on Dr. Mark Ross's inadmissible expert opinion to prove causation, without which, their claims fail.  Because the Court has found Dr. Ross's expert testimony admissible, there exists a genuine dispute of material fact on the issue of whether Plaintiffs' homes experienced flooding that was caused or made more severe by the failure of the Kingsfield Road Dam.[37]  Thus, Defendant's motion for summary judgment on the issue of causation is due to be denied.  *See* Fed. R. Civ. P. 56(a).  Defendant's motion for partial summary judgment as to classwide stigma damages, however, is due to be granted.  With the exclusion of Tom Fruitticher's expert testimony, there is no admissible evidence that stigma

---

[37] *See* Section II(B) above.

damages in this case are capable of measurement on a classwide basis.[38]   *See*

*Comcast*, 133 S. Ct. at 1433 (holding that plaintiffs seeking certification of damages

questions must produce a model establishing that damages are measurable on a

classwide basis).

Accordingly, it is **ORDERED** that:

1.   Defendant's Motion to Exclude Expert Testimony from Tom Fruitticher, MAI, ECF No. 77, is **GRANTED**.

2.   Defendant's Motion to Exclude Expert Testimony from Mark Ross Ph.D., P.E., ECF No. 78, is **DENIED**.

3.   Plaintiffs' amended Motion to Limit or Exclude Expert Testimony of Richard J. Roddewig, ECF No. 80, is **DENIED**.  The Clerk is directed to terminate Plaintiffs' original motion, ECF No. 79.

4.   Defendant's Motion for Summary Judgment, ECF No. 81, is **GRANTED** as to classwide stigma damages and **DENIED** as to causation and/or liability.

5.   Plaintiffs' Motion for Class Certification, ECF No. 61, is **GRANTED** in part and **DENIED** in part, as discussed above.

6.   The Court certifies a class with respect the issue of liability only, as defined in Section III(D) of this Order.

7.   Within seven days of the date of this Order, the parties must submit a joint proposed notice to the Court.  If the parties are unable to agree on the content of the notice, then each side must submit a proposed notice, together with briefing, within 14 days of the date of this Order.

8.   The named plaintiffs are appointed as class representatives.

---

[38] The Court does not express an opinion on the merits of Defendant's objections to stigma damages or on the question of whether individual plaintiffs may, should Defendant be found liable, pursue claims for stigma damages.

9.     Plaintiffs' counsel, James L. Kauffman and Jonathan R. Marshall of Bailey & Glasser LLP, Jeremiah J. Talbott of Law Office of J.J. Talbott, P.A., and Christopher M. Vlachos of Vlachos Injury Law, P.A., are appointed as class counsel.

10.    As discussed herein, this case will proceed in two phases:  liability and damages.   By separate order, the Court will schedule a case management conference to discuss the progression of the litigation going forward.

**DONE** and **ORDERED** on this 25th day of March, 2017.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**