# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

JOHN NAVELSKI, LINDA
NAVELSKI, ERICK
ALEXANDER, JACOB
HUTCHINS, AMBER
HUTCHINS, JEANNE
HENDERLY, RICHARD
BULLARD, and BEVERLY
BULLARD, on their own behalf
and those others similarly situated,

    Plaintiffs,

v.

INTERNATIONAL PAPER
COMPANY,

    Defendant.

Case No. 3:14-cv-00445
MCR/CJK

---

## DEFENDANT INTERNATIONAL PAPER COMPANY'S MOTION IN LIMINE AND INCORPORATED MEMORANDUM OF LAW TO EXCLUDE EVIDENCE REGARDING THE COMPOSITION OF PAPER MILL EFFLUENT AND MATERIALS USED IN EFFLUENT TREATMENT, AND HISTORIC EXCEEDANCES OF INDUSTRIAL WASTEWATER FACILITY PERMIT SPECIFICATIONS

Defendant International Paper Company ("IP") respectfully moves in limine for an order excluding evidence regarding the composition of IP's paper mill effluent and materials used in the effluent treatment process, as well as evidence of historic exceedances of IP's industrial wastewater facility permit discharge

specifications.  In support of its motion, IP submits the following memorandum of law.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND .................................................................2

ARGUMENT ........................................................................................6

I.   Evidence Relating To The Content Of Mill Effluent And Exceedances Of Industrial Wastewater Facility Permit Discharge Specifications Is Not Relevant To The Issues Presented In The Class Trial.....................................6

    A. Evidence Regarding Materials Present In Mill Effluent Or Used In The Effluent Treatment Process Has No Tendency To Prove Or Disprove Any Issue Presented In The Class Trial ...............................7

    B. Evidence Of Industrial Wastewater Facility Permit Exceedances Has No Tendency To Prove Or Disprove Any Issue Presented In The Class Trial...........................................................................................10

II.  The Evidence Is Unduly Prejudicial, Likely To Confuse The Issues, And Likely To Mislead The Jury ................................................................11

III. Evidence Relating To Industrial Wastewater Facility Permit Exceedances Is Inadmissible Character Evidence Based On Prior Acts ......16

CONCLUSION ...................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cities Serv. Co. v. State,*
    312 So. 2d 799 (Fla. 2d DCA 1975)....................................................9

*Huddleston v. United States,*
    485 U.S. 681 (1988)........................................................................16

*United States v. Beechum,*
    582 F.2d 898 (5th Cir. 1978) ...........................................................17

*United States v. Miller,*
    959 F.2d 1535 (11th Cir. 1992) .......................................................17

**Rules**

Fed. R. Evid. 401 ....................................................................................7

Fed. R. Evid. 403 ..................................................................................12

Fed. R. Evid. 404(b)........................................................................16, 17

# INTRODUCTION

Plaintiffs allege negligence, trespass, nuisance, and strict-liability claims against IP based on flooding that occurred during an unprecedented April 2014 rainstorm. During the storm, stormwater breached an overflow structure, sometimes referred to as the "Kingsfield Road Dam," on IP's paper mill site in Cantonment, Florida. Plaintiffs assert that the *stormwater* released as a result of the breach of the Kingsfield Road Dam caused all of the flooding in the class area. Nonetheless, Plaintiffs have indicated to IP that they intend to introduce evidence during the class trial relating to the composition of IP's paper mill effluent— including materials present in the effluent and used in the effluent treatment process—as well as evidence of exceedances of the mill's industrial wastewater facility permit discharge specifications prior to the April 2014 rainstorm.

All of this evidence should be excluded as irrelevant and unduly prejudicial. As an initial matter, evidence regarding exceedances of wastewater facility permit specifications before the April 2014 storm (some more than two decades before the event) is simply not relevant to whether the breach of the Kingsfield Road Dam caused all of the flooding in the class area. Moreover, beginning in 2012, the mill's treated effluent was discharged through a pipeline into the Perdido Bay wetlands and thus did not pass through the discharge point at the Kingsfield Road Dam area into Elevenmile Creek. Accordingly, evidence regarding the

1

composition of mill effluent discharged through the wastewater treatment system is not relevant to the issues to be decided in the class trial—i.e., whether IP is legally responsible for the breach of the Kingsfield Road Dam and whether the breach of the structure caused all of the flooding in the class area. In addition, even if evidence regarding the content of mill effluent or prior wastewater treatment system permit exceedances had some modest relevance, it would be far outweighed by the unduly prejudicial impact of the evidence on IP and its likelihood of confusing the issues and misleading the jury. Finally, evidence concerning industrial wastewater facility permit discharge exceedances prior to April 2014 constitutes improper character evidence based on prior acts and is thus inadmissible on additional grounds.

For all of these reasons, the Court should enter an order excluding all evidence regarding the content of IP's paper mill effluent and any chemicals or other materials used in the effluent treatment process, as well as evidence of any exceedances of industrial wastewater facility permit discharge specifications.

## FACTUAL BACKGROUND

For many years, the structure that Plaintiffs refer to as the Kingsfield Road Dam was part of the Cantonment paper mill's wastewater treatment system. Prior to 2012, the structure was part of the final discharge point for the mill's treated effluent and helped to regulate the release of treated water into Elevenmile Creek.

*See* Ex. A, William Yuhasz Dep. 42:10–13; Ex. B, Kyle Moore Dep. Vol. II 181:9–24.  Effluent flowed through a series of treatment ponds in the wastewater system before it was discharged into Elevenmile Creek.  After passing through primary clarifiers to remove solids, the effluent flowed through three treatment ponds for aeration and other treatment—"Pond One," "Pond Two," and "Pond Three."  Ex. A, William Yuhasz Dep. Vol. I 38:2–7, 38:20–25, 39:23–41:5, 41:16–25.  After passing through Pond Three, the treated effluent flowed into Pond Four, and ultimately into Elevenmile Creek.  *Id.* at 41:6–15.  The Kingsfield Road Dam area (including a drop-box and pipe system) controlled the release of water from "Pond Four" into Elevenmile Creek.  Ex. C, Kyle Moore Dep. Vol. I 49:22–50:6.

In 2012, however, IP completed construction of a pipeline to the Perdido Bay wetlands, which replaced Elevenmile Creek as the destination for treated mill effluent.  *See* Ex. D, Laurie McLain Dep. 31:9–32:16.  As a result of this change, the mill's treated effluent no longer flowed into Pond Four.  Instead, after the mill transitioned to the pipeline, effluent passed through two primary clarifiers to remove solids before flowing into an aerated stabilization basin system in Pond One.  *Id.* at 31:9–19; Ex. E, John Taylor Dep. 38:16–21.  Effluent then flowed into Pond Three, for secondary treatment.  Ex. D, Laurie McLain Dep. 31:15–21; Ex. E, John Taylor Dep. 44:6–9.  From Pond Three, effluent passed into the "Final Effluent Mix Box" before discharge into the pipeline to the Perdido Bay wetlands.

Ex. D, Laurie McLain Dep. 31:21–32:16; Ex. E, John Taylor Dep. 45:20–22. Thus, in April 2014, treated mill effluent was not flowing into Elevenmile Creek via the Kingsfield Road Dam area. *See* Ex. A, William Yuhasz Dep. Vol. I 44:24– 45:8, 46:11–15.

In April 2014, the Kingsfield Road Dam breached during an unprecedented storm event, releasing stormwater into Elevenmile Creek. Ex. C, Kyle Moore Dep. Vol. I at 42:17–43:7. Although there is evidence that the ponds in the wastewater treatment system reached capacity during the storm, there is no indication that any non-stormwater effluent overflowed from the ponds, made its way to the Kingsfield Road Dam, and was discharged when the structure breached. *See* Ex. F, Christopher Quackenbush Dep. 49:14–50:5, 69:12–16. According to mill employees, the wastewater treatment system remained intact structurally during the storm. *See* Ex. G, IP Internal Communication. Plaintiffs, however, seek to introduce evidence regarding the materials present in paper mill effluent and used in the effluent treatment process, as well as evidence of historic exceedances of industrial wastewater facility permit discharge specifications. For example, Plaintiffs intend to offer an Operations Manual for Treatment of Mill Effluent, dated January 1972. *See* Ex. H, Operations Manual. The manual describes the mill effluent treatment process that existed in 1972, when the mill was owned by a company called St. Regis, and provides instructions for the operation of the

treatment system. *Id.* at 5. It discusses chemicals that St. Regis used for effluent treatment, such as ammonia and phosphoric acid, their potential adverse effects on human health, and the safety procedures that mill employees should follow in connection with their use. *Id.* at 9–30. It also contains a lengthy appendix with detailed standards (current as of 1972) for the safe handling and use of ammonia and phosphoric acid. *Id.* at 33–115.

Plaintiffs also asked questions during IP employees' depositions concerning the materials in IP's paper mill effluent and used during the effluent treatment process. For example, Plaintiffs' counsel questioned IP employees about the chemicals contained in paper mill effluent and used during the treatment process, and their potential health hazards. *See, e.g.*, Ex. D, Laurie McLain Dep. 51:14–52:14, 53:20–56:25; 60:1–25. Ex. E, John Taylor Dep. 26:7–33:19. Plaintiffs' counsel even asked IP employees if they would swim in the mill's effluent treatment ponds. *See* Ex. D, Laurie McLain Dep. 51:25–52:14; Ex. E, John Taylor Dep. 30:17–32:24.

Plaintiffs also seek to introduce evidence regarding industrial wastewater facility permit discharge exceedances prior to April 2014. This evidence includes a summary of discharge exceedances from January 1994 through April 2006, which lists instances where IP or a former owner of the paper mill, Champion International, exceeded the surface water discharge specifications outlined in the

applicable wastewater facility permit, *see* Ex. I, Exceedances Summary, and a document that includes information reflecting enforcement actions and fines against Champion International for discharge violations between 1990 and 1994, *see* Ex. J, Champion's Stormwater History.

Plaintiffs also intend to introduce a 2009 consent order between IP and the Florida Department of Environmental Protection ("FDEP"), which describes (and settles) allegations by FDEP regarding exceedances of Champion's and IP's industrial wastewater facility permit discharge specifications. *See* Ex. K, Consent Order at 1, 4–5. The consent order also includes tables of interim discharge limits for materials including fecal coliform, mercury, and arsenic. *See, e.g.*, *id.* at 19–20.

## ARGUMENT

**I. Evidence Relating To The Content Of Mill Effluent And Exceedances Of Industrial Wastewater Facility Permit Discharge Specifications Is Not Relevant To The Issues Presented In The Class Trial.**

The Court should exclude evidence relating to the content of paper mill effluent and exceedances of industrial wastewater facility permit discharge specifications, because it is not relevant to the issues that will be decided in the class trial—namely, whether IP is legally responsible for all of the flooding in the class area during the April 2014 storm.

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The relevance inquiry focuses on the "relation between an item of evidence and a matter properly provable in the case," asking whether "the item of evidence tend[s] to prove the matter sought to be proved." Fed. R. Evid. 401 Advisory Committee's Note to 1972 Proposed Rules.

### A. Evidence Regarding Materials Present In Mill Effluent Or Used In The Effluent Treatment Process Has No Tendency To Prove Or Disprove Any Issue Presented In The Class Trial.

Evidence about the content of the mill's effluent or chemicals used in the effluent treatment process sheds no light on the issues to be decided in the class trial, which include whether IP exercised reasonable care in maintaining the Kingsfield Road Dam in the period preceding the April 2014 storm, and whether the breach of the structure caused all of the flooding in the class area. For example, the 1972 effluent treatment manual describes a wastewater treatment process in use more than forty years earlier by the St. Regis company. Even if the wastewater treatment process were somehow relevant to the questions presented in the liability trial, the St. Regis manual would still not be relevant, because the mill's treatment process has changed significantly since the manual was published in 1972. *See* Ex. A, William Yuhasz Dep. Vol. I 20:22–21:10. In a similar vein, a

substantial portion of the manual consists of safety standards for the use of ammonia and phosphoric acid, which are not only irrelevant but also seriously outdated. The operations manual is thus too remote in time and substance to have any relevance here.

For similar reasons, testimony about the toxicity of materials in the mill effluent and used during the treatment process is not relevant to assessing IP's conduct with respect to the Kingsfield Road Dam, or to the potential cause of the flooding in the class area. In April 2014, the mill's treated effluent was discharged into a pipeline to the Perdido Bay wetlands, bypassing the Kingsfield Road Dam area. Moreover, even if there were evidence that some modest amount of treated effluent overflowed Ponds One or Three as they filled with stormwater on April 29, there is no basis to conclude that the treated effluent caused all of the flooding of the class area.

Evidence about the composition of the effluent or chemicals used during the treatment process is not relevant to any other issue presented in the class trial. Plaintiffs' negligence claim is focused on whether IP failed to exercise reasonable care in its maintenance of the Kingsfield Road Dam—a question not informed by the chemicals used to treat mill effluent or the content of the effluent. Plaintiffs' trespass claim, which concerns whether IP intended for the Kingsfield Road Dam to breach and for the impounded water to enter each class member's property, and

their nuisance claim, which hinges on the reasonableness of IP's usage of its property as it pertains to the Kingsfield Road Dam and whether any flooding of the class area attributable to the breach of the dam was prolonged or recurring, are likewise uninformed by the content of the effluent.

Nor is the composition of mill effluent relevant to Plaintiffs' strict-liability claim, which requires a showing that IP's maintenance of the Kingsfield Road Dam was not suited to the land and was so uniquely dangerous that the risk of harm could not be mitigated through reasonable care. *See Cities Serv. Co. v. State*, 312 So. 2d 799, 802 (Fla. 2d DCA 1975). The content of the mill's effluent reveals nothing about any dangers that might have been posed by IP's maintenance of the Kingsfield Road Dam during the period leading up to the storm, when effluent was discharged through the pipeline into the Perdido Bay wetlands, or to an assessment of whether the Kingsfield Road Dam posed a risk of harm that was serious and abnormal and that could not be eliminated by the exercise of reasonable care.

The Court should therefore exclude all evidence regarding materials present in mill effluent or used during the effluent treatment process, because it is not relevant to any issue presented in the class trial.

**B. Evidence Of Industrial Wastewater Facility Permit Exceedances Has No Tendency To Prove Or Disprove Any Issue Presented In The Class Trial.**

Evidence of historic exceedances of industrial wastewater facility permit discharge specifications is likewise not relevant to whether IP is legally responsible for the breach of the Kingsfield Road Dam during the April 29–30, 2014 storm or whether the breach of that structure caused all of the flooding in the class area.[1]

Indeed, many of the exceedances Plaintiffs seek to introduce occurred well before 2014, in most cases during the 1980s and 1990s. For example, a summary of discharge exceedances for the period January 1994 through April 2006 lists instances where IP or a former owner of the paper mill, Champion International, exceeded the surface water discharge specifications outlined in the applicable permit. *See* Ex. I, Exceedances Summary. Another document includes information reflecting enforcement actions and fines against Champion International for discharge violations between 1990 and 1994. *See* Ex. J, Champion's Stormwater History. None of these exceedances relates to the

---

[1] The fact that IP's permit from FDEP regulated both the mill's wastewater and stormwater systems does not change the relevance analysis for evidence of wastewater permit exceedances. Portions of the wastewater permit deal with inspections of IP's stormwater system, including the Kingsfield Road Dam, and thus shed light on both the purposes of the structure and IP's maintenance of it before the April 2014 storm. It does not follow that evidence about *effluent* treatment, including historic exceedances of wastewater permit discharge specifications, is also relevant. These exceedances are not only irrelevant to IP's conduct with respect to the Kingsfield Road Dam, they also have no bearing on whether the structure's breach caused all of the flooding in the class area.

maintenance of the Kingsfield Road Dam or to the cause of the April 2014 flooding in the class area.

For similar reasons, the 2009 consent order is not relevant to the issues that will be litigated at the class trial. The consent order describes unproven allegations against Champion International and IP pertaining to permit discharge exceedances (which were settled). *See* Ex. K, Consent Order. The exceedances discussed in the order—which occurred before IP transitioned to the wetlands pipeline system—are unconnected to Plaintiffs' claims about flooding that occurred in the class area during the 2014 storm.

The Court should therefore exclude as irrelevant all evidence regarding exceedances of industrial wastewater facility permit discharge specifications.

## II. The Evidence Is Unduly Prejudicial, Likely To Confuse The Issues, And Likely To Mislead The Jury.

Even if evidence regarding the composition of mill effluent and exceedances of industrial wastewater facility permit discharge specifications were somehow relevant, its exclusion would still be warranted, because any minimal probative value is substantially outweighed by the evidence's unduly prejudicial effect on IP and its likelihood of confusing the issues and misleading the jury.

Federal Rule of Evidence 403 authorizes courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury,

undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Evidence about the composition of mill effluent and industrial wastewater facility permit discharge exceedances would severely prejudice IP by leaving the jury with the misimpressions that the stormwater impounded by the Kingsfield Road Dam was polluted with chemicals used in the effluent treatment process, and that IP failed to adhere to regulatory requirements regarding the wastewater treatment system. It would also distract the jury from the relevant factual questions in the class trial, which have nothing to do with any historic exceedances of industrial wastewater facility discharge permit conditions in the 1980s and 1990s, or the composition of the treated effluent, but rather focus on IP's actions relating to the breach of the Kingsfield Road Dam and whether the water released when the Kingsfield Road Dam breached caused all of the flooding in the class area.

The unduly prejudicial impact of the evidence regarding materials present in mill effluent and used in the effluent treatment process is clear. For example, the January 1972 operations manual for treatment of mill effluent comprises more than one hundred pages outlining the mill's effluent treatment process as it existed more than forty years before the April 2014 storm, when the mill was owned and operated by a different company. *See* Ex. H, Operations Manual. It describes in

detail the various chemicals used throughout that process, including ammonia and phosphoric acid, and their potential dangers—even though the mill's treatment process has changed significantly during the intervening decades, and the Kingsfield Road Dam was not even part of the mill's treatment and discharge system in April 2014. *Id.* at 9–30. Several sections of the manual refer to mill employees wearing gas masks and protective gloves for safety purposes during the effluent treatment process, *see, e.g.*, *id.* at 17, 37, and the appendix includes safety standards (current in 1972) for the handling and use of ammonia and phosphoric acid, *id.* at 33–115.

The deposition questions that Plaintiffs' counsel posed regarding the materials present in mill effluent and used in the treatment process have a similarly prejudicial impact. For example, Plaintiffs' counsel asked several IP employees during their depositions if the mill's effluent was toxic and whether they would feel comfortable swimming in it. *See, e.g.*, Ex. D, Laurie McLain Dep. 51:14–52:14; Ex. E, John Taylor Dep. 30:17–33:19. Counsel also repeatedly asked detailed questions about the composition of the effluent, the specific chemicals used to treat it, and their potential health hazards. *See, e.g.*, Ex. D, Laurie McLain Dep. 53:20–56:25; 60:1–25; Ex. E, John Taylor Dep. 26:7–30:16. At one point, counsel attempted to equate stormwater impounded by the Kingsfield Road Dam with effluent treated through the mill's processing system, even though the effluent

was discharged through the separate pipeline to the Perdido Bay wetlands in 2014. Ex. D, Laurie McLain Dep. 56:1–7.

If any of this evidence regarding chemicals in the mill effluent or used during the effluent treatment process were introduced during trial, it would unfairly prejudice IP by encouraging the jury to conflate IP's discharge of treated effluent through the underground pipeline to the Perdido Bay wetlands with the stormwater impounded by the Kingsfield Road Dam, and by inaccurately suggesting to the jury that the stormwater was polluted. The jury should decide this case based on IP's conduct in connection with the Kingsfield Road Dam and the cause of the flooding that occurred during the storm, not based on visceral or emotional reactions to evidence about the composition of the mill's effluent or materials used in the effluent treatment process.

Those misimpressions would be compounded if Plaintiffs were permitted to introduce evidence regarding industrial wastewater facility permit discharge exceedances, many of which predate the April 2014 event by a decade or more, or historical enforcement actions and fines incurred by Champion International for permit violations during the 1990s. This evidence could mislead jurors into inaccurately concluding that IP is a chronic polluter that repeatedly failed to adhere to regulatory standards setting requirements for the content of its treated effluent— which, even if it were true, is not relevant to the issues presented in the class trial.

The 2009 consent order between IP and the Florida Department of Environmental Protection could confuse and mislead jurors in a similar manner. The order discusses alleged permit exceedances associated with Champion's and IP's effluent discharges, and outlines a schedule of actions IP agreed to take to settle, without admission, FDEP's allegations.

In order to combat the misimpressions created by these documents and place them in proper context, IP would need to introduce its own evidence regarding (1) the infrequency of, and explanations for, IP's permit discharge exceedances; and (2) the non-toxicity of treated effluent discharged into the Perdido Bay wetlands. This would needlessly prolong the trial (and still risk misleading and confusing jurors) without informing the jury's consideration of the central issues in this case regarding IP's maintenance of the Kingsfield Road Dam and the cause of the flooding in the class area.

To prevent this unfair prejudice to IP—and to avoid unduly complicating and prolonging this trial by focusing on issues that are not relevant—the Court should exclude evidence relating to materials present in mill effluent and used in the effluent treatment process, as well as evidence about any exceedances of wastewater permit discharge specifications.

## III. Evidence Relating To Industrial Wastewater Facility Permit Exceedances Is Inadmissible Character Evidence Based On Prior Acts.

Finally, evidence of industrial wastewater facility permit discharge exceedances is inadmissible for an additional reason:  it constitutes improper character evidence based on prior acts.

Federal Rule of Evidence 404(b) prohibits the use of evidence of "a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Although Rule 404(b) is often used to bar evidence of prior crimes or bad acts in criminal cases, the rule also applies in civil cases.  *See Huddleston v. United States*, 485 U.S. 681, 685 (1988).

Rule 404(b) is grounded in the principle that the use of prior bad acts to prove character or propensity "is inherently prejudicial."  *Id.* at 910.  As the note to Rule 404 explains, "Character evidence . . . tends to distract the trier of fact from the main question of what actually happened on the particular occasion."  Fed. R. Evid. 404 Advisory Committee's Notes on Proposed Rules (internal quotation marks omitted).  Instead, "[i]t subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."  *Id.*  Given these risks, evidence of other acts is potentially admissible only when relevant to an issue other than character, such as motive, intent, knowledge, or lack of accident.  Fed. R.

Evid. 404(b)(2). Even then, such evidence is inadmissible unless its "inherent prejudice" does not substantially outweigh the evidence's probative value. *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978).

Courts apply a three-part test to determine whether evidence of prior acts is admissible for a permissible purpose. "First, the evidence must be relevant to an issue other than the defendant's character." *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992). "Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act." *Id.* (footnote omitted). Finally, "the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403." *Id.*

The evidence regarding permit exceedances is inadmissible under this test. As explained above, this evidence is not relevant to any issue in the liability trial, which will address questions about IP's conduct in relation to the Kingsfield Road Dam and the cause of the flooding in the class area. But even if the evidence did have some relevance, it could only be pertinent to IP's character as a company that supposedly fails on occasion to meet its treated effluent discharge obligations (whether or not those obligations are related in any respect to the maintenance of the Kingsfield Road Dam). Thus, evidence relating to industrial wastewater facility permit discharge exceedances could only be relevant for the impermissible

purpose of showing that IP had a propensity to violate its legal obligations and acted in accordance with that character with respect to the Kingsfield Road Dam.

Moreover, even if evidence of industrial wastewater facility permit discharge exceedances were arguably relevant to an issue other than character, it still would be unable to clear the Rule 403 hurdle and would have to be excluded at step three of the *Miller* analysis. As discussed in Part II, any slight probative value of this evidence is substantially outweighed by its serious risk of unfairly prejudicing IP, confusing the issues, and misleading the jury.[2] Evidence regarding industrial wastewater facility permit exceedances is therefore inadmissible on multiple grounds and must be excluded.

## CONCLUSION

For the foregoing reasons, IP respectfully requests that the Court enter an order excluding evidence regarding the materials in paper mill effluent and used

---

[2] Plaintiffs have suggested they will rely on evidence of industrial wastewater facility permit exceedances to prove that IP was aware of previous erosion or overflow issues with the Kingsfield Road Dam, yet failed to take appropriate corrective actions. In addition to posing serious risks of unfair prejudice, the summary of permit exceedances from 1996–2004 does not reveal any erosion or design problems associated with the Kingsfield Road Dam. *See* Ex. I, Exceedances Summary. Nor does evidence of fines imposed for exceedances of permit discharge specifications reveal anything about whether water previously eroded the structure. This evidence is thus not only inherently prejudicial, but also not relevant. To the extent Plaintiffs wish to argue that IP knew about prior erosion issues with the Kingsfield Road Dam, they should rely on evidence that does not pose the same serious risks of prejudice and confusion that Rule 403 is designed to avoid.

during the effluent treatment process, and evidence regarding any exceedances of industrial wastewater facility permit discharge specifications.

Dated: January 19, 2018                              Respectfully submitted,

                                                     /s/ Daniel W. Nelson
Larry Hill                                           Daniel W. Nelson
Florida Bar No. 173908                               District of Columbia Bar No. 433415
MOORE, HILL & WESTMORELAND, P.A.                     GIBSON, DUNN & CRUTCHER LLP
350 West Cedar Street                                1050 Connecticut Avenue, N.W.
Pensacola, FL 32502                                  Washington, D.C. 20036
Telephone: (850) 434-3541                            Telephone: (202) 887-3687
Fax: (850) 435-7899                                  Fax: (202) 530-9571
lhill@mhw-law.com                                    dnelson@gibsondunn.com

*Counsel for Defendant*                              *Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

I hereby certify that counsel for Defendant conferred with counsel for

Plaintiffs, and Plaintiffs oppose the relief sought in this motion.

*/s/ Daniel W. Nelson*
Daniel W. Nelson

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that this memorandum contains 4,639 words and therefore

complies with the word limit set forth in Local Rule 7.1(F).

*/s/ Daniel W. Nelson*
Daniel W. Nelson

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of January, 2018, the foregoing

document was filed using the Court's CM/ECF system. In addition, (1) the filing is

available for viewing and downloading via the CM/ECF system, and (2) the

CM/ECF system will send notification of this filing to all attorneys of record who

have registered for CM/ECF updates.

*/s/ Daniel W. Nelson*
Daniel W. Nelson