**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

JOHN NAVELSKI, LINDA NAVELSKI,
ERICK ALEXANDER, JACOB HUTCHINS,
AMBER HUTCHINS, JEANNE HENDERLY,
RICHARD BULLARD, and BEVERLY
BULLARD, on their own behalf and those
others similarly situated,

      Plaintiffs,

v.                              Case No. 3:14-cv-445 MCR/CJK

INTERNATIONAL PAPER COMPANY,

      Defendant.

**PLAINTIFFS' SECOND OMNIBUS MOTION IN *LIMINE*
TO EXCLUDE THE PROPOSED EXPERT TESTIMONY
OF STEPHEN M. WISTAR AND JAMES H. DUKE, JR.**

## **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................... 1

II. DISCUSSION................................................................. 3

    A.  Legal Standards: Federal Rule of Evidence 702 and Daubert..............3

    B.  Application of Law to Facts................................................4

        1.  Summary of Mr. Wistar's Opinions ........................................ 4

        2.  Mr. Wistar: Federal Rule of Evidence 702 and *Daubert* .......... 5

        3.  Dr. Duke: Summary of Opinions ............................................11

        4.  Dr. Duke: Failures Concerning *Daubert* and Federal Rules of Evidence 701-702 ..............................................13

III. CONCLUSION ........................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B-K Cypress Log Homes, Inc. v. Auto-Owners Ins. Co.*,
   No. 09-cv-00211, 2012 WL 1933766 (N.D. Fla. May 25, 2012) .......................3

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ............................................................................ 1, 3, 5, 13

*Davis v. Carroll*,
   No. 09 Civ. 1088 (JPO), 2013 WL 1285272 (S.D.N.Y. Mar. 29,
   2013) ................................................................................................... 1, 11, 14

*Hudgens v. Bell Helicopter/Textron*,
   328 F.3d 1329 (11th Cir. 2003) .........................................................................3

*In Re Med Diversified*,
   346 B.R. 621 (Bankr. E.D.N.Y. 2006) ................................................... 2, 11, 14

*Olin v. Demings*,
   No. 12-1455, 2014 WL 117081 (M.D. Fla. Jan. 13, 2014) .............................11

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ...................................................................... 1, 3

**Rules**

Fed. R. Evid. 701 .......................................................................................... 13

Fed. R. Evid. 702 ....................................................................................*passim*

Fed. R. Evid. 702(d) ....................................................................................... 10

## I.   INTRODUCTION

Plaintiffs John Navelski, *et al.* (collectively, "Plaintiffs") hereby move this Court for an Order in *Limine* precluding or limiting the proposed expert opinion testimony of Stephen M. Wistar ("Mr. Wistar") and James H. Duke, Jr., Ph.D, P.E. ("Dr. Duke"), both of whom are experts designated by Defendant International Paper Company ("Defendant" or "IP"). In support of this Second Omnibus Motion in *Limine* ("Motion"), the Plaintiffs respectfully state as follows:

Under *Daubert*, the Supreme Court requires district courts to act as "gatekeepers" for the admission of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The relevant examination under *Daubert* involves looking at both "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *U.S. v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004).

Both Mr. Wistar and Dr. Duke fail these tests, and they have further engaged in the impermissible cherry-picking of facts to support their flawed opinions. *See, e.g.*, *Davis v. Carroll*, No. 09 Civ. 1088 (JPO), 2013 WL 1285272, at * 25 (S.D.N.Y. Mar. 29, 2013) ("Where an appraisal or other expert testimony rests on . . . a misleadingly partial selection of relevant facts, it must be excluded under Rule 702."). Moreover, a conclusion based on "deliberate, manifest and systemic bias in

selecting . . . data points" should be afforded little weight. *In Re Med Diversified*, 346 B.R. 621, 626 (Bankr. E.D.N.Y. 2006).

The flaws in Mr. Wistar's and Dr. Duke's methodologies and analyses are discussed in detail below. These flaws include at least 11 independently sufficient reasons to strike Mr. Wistar's anticipated testimony, and 18 independently sufficient reasons to strike Dr. Duke's proposed testimony. And when those reasons are considered collectively, they certainly work to preclude completely both experts' anticipated testimony on the grounds of lack of reliability.

Moreover, Mr. Wistar relies exclusively on the ***untestable*** work of other alleged experts Defendant failed to designate as witnesses, which means Plaintiffs will not have the opportunity to cross-examine them at trial. *Where, as here, the opinions of the expert (Mr. Wistar) are based **exclusively** on the work of others, it is improper to consider that other work without some meaningful threshold showing of reliability—a showing that Mr. Wistar himself cannot make because he does not understand the methodology or work of the alleged experts at OneRain, as he has admitted on the record.* In short, then, Mr. Wistar is just a mouthpiece; he did no work on his own.

Following a recitation of the applicable legal standards, the Plaintiffs' argument is set forth in detail below.

## II.     DISCUSSION

### A.     Legal Standards: Federal Rule of Evidence 702 and Daubert

The Supreme Court requires district courts to act as "gatekeepers" for the admission of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The relevant examination under *Daubert* involves looking at both "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *U.S. v. Frazier*, 387 F.3d 1244, 1261-62 (11th Cir. 2004). Determining both reliability and "fit" are vital to the district court's finding on admissibility. *Daubert*, 509 U.S. at 590-91.  The "fit" requirement refers to whether the reasoning can be properly applied to the facts of the case. *Id.* at 591.  When examining reliability, "a trial court must examine the expert's conclusions in order to determine whether the conclusions could reliably flow from the facts known to the expert and the methodology used." *B-K Cypress Log Homes, Inc. v. Auto-Owners Ins. Co.*, No. 09-cv-00211, 2012 WL 1933766, at*2 (N.D. Fla. May 25, 2012). The Eleventh Circuit has stated that "an expert's failure to explain the basis for an important inference mandates exclusion of his or her testimony." *Hudgens v. Bell Helicopter/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003).

**B.      Application of Law to Facts**

    **1.      Summary of Mr. Wistar's Opinions**

Mr. Wistar is the Defendant's "consulting meteorologist." (Wistar Expert Report of 9/9/2015 ("Wistar Report"), at 1, 9, attached as Ex. A.) He is from AccuWeather and is expected to discuss the storm moving across two states and dumping an alleged 21 inches of rain ***outside of*** the relevant and agreed-upon basin. (*Id.* at 9.) His opinions are about the timing, amount and severity of rainfall, and his opinions about rainfall outside of the basin, are irrelevant.

More importantly, Mr. Wistar is not qualified to offer his "core opinion" about radar-interpreted rainfall. His radar-interpreted rainfall "analysis," such as it were, was performed by other ***undisclosed*** experts—Charles Yost and James Logan at OneRain—neither of whom was ever disclosed in this case as an expert witness by Defendant. Mr. Wistar's principal "conclusions," such as they are, stand ***exclusively*** on the shoulders of the (unreliable and, ***in particular***, ***untestable***) work of other alleged experts who were not themselves disclosed as experts here. In sum, Mr. Wistar's proposed testimony is based on objectively incomplete and incorrect information, and upon an analysis that Mr. Wistar himself referred to as a "secret sauce" that he does ***not*** understand, as he was forced to admit on cross-examination previously.

## 2.    Mr. Wistar: Federal Rule of Evidence 702 and *Daubert*

Mr. Wistar's opinion testimony is not admissible under the *Daubert* standard. His methodology and opinions are glaringly deficient, as explained in detail below.

Key passages from his report (Ex. A) and the transcript of the Evidentiary Hearing of June 1, 2016 ("Wistar Tr.," attached as Ex. B), reflect Mr. Wistar's cherry-picking and other flaws, which include but are not limited to the following:

*First*, Mr. Wistar is not even the primary author of "his" report; that was Joseph P. Sobel, Ph.D., AccuWeather's Director of Forensic Services. (*See* Ex. A, Wistar Report, at 11.)

*Second*, Mr. Wistar admitted that OneRain uses a proprietary formula, but that he does not know what it is or understand it:

> Q.    And OneRain, if I understand it, they used some kind of ***proprietary formula*** that adjusts the ground rain [gauges] to the radar; is that correct?
>
> A.    Yes.
>
> Q.    ***And you don't know what that proprietary formula is, correct?***
>
> A.    ***I don't.***

(Ex. B, Wistar Tr., at 57 (emphasis added).)

5

***Third***, Mr. Wistar admitted that he had no idea how OneRain used its proprietary formula and "how they smooth [the rainfall] between the various points to make it so it's a map of the area":

> Q.   And ***you don't know what the steps were that OneRain took as far as their proprietary formula*** in order to convert the radar to the ground [gauge] data?
>
> A.   Well, we know what they're doing. They're doing the same thing we do when we want to figure out how much rain fell at one spot, but they're doing it for a whole area. ***So I guess the part I don't know is exactly how they smooth it between the various points to make it so it's a map of the area.***

(Ex. B, Wistar Tr., at 57 (emphasis added).)

***Fourth***, Mr. Wistar acknowledged again (and repeatedly throughout his testimony) that he did not understand the OneRain formula and its concept of "smoothing":

> Q.   ***So you don't know how they distribute it throughout the points***, you can only know a rough estimate of what the rain is as far as the calibration?
>
> A.   Well, my understanding is they're using the rain [gauges] as anchor points because they know how much rain fell there, and then using an appropriate method to -- and using the radar data to show how the rain changes from place to place across the whole area. ***Exactly how they do that and how they smooth it, that's the part we don't know.***

(Ex. B, Wistar Tr., at 57-58 (emphasis added).)

***Fifth***, Mr. Wistar was not the author of the OneRain report, and that author (Charles Yost) is not expected to be called at trial, although it would not have been difficult for Defendant to disclose Mr. Yost as a witness in discovery so that he could, in fact and law, testify at trial:

> Q.   And for the rainfall calculations, you refer to the OneRain report in your report, correct?
>
> A.   Yes.
>
> Q.   ***And you did not author the OneRain report, did you?***
>
> A.   ***That's correct***, I did not author the OneRain report.
>
> Q.   And the author of that report was Charles Yost, correct?
>
> A.   Yes.

(Ex. B, Wistar Tr., at 58 (emphasis added).)

***Sixth***, Mr. Wistar has no understanding of the OneRain report, and he does not know how to test its accuracy:

> Q.   ***Do you have, as you sit here today, any way to understand what the accuracy -- or to test the accuracy of that report as you sit here today?***
>
> A.   In the OneRain report it says there was good correlation between, you know, what he was doing --
>
> Q.   I understand it says that in the report. But how do you know that what it says is true?

7

> A.   *I haven't tried to test it. I'd have to think about that.* I mean, one thing to do is to match up the rain gages -- the data we have with the output from his report.

(Ex. B, Wistar Tr., at 59 (emphasis added).)

*Seventh*, Mr. Wistar referred to OneRain's proprietary formula as a "secret sauce" because he doesn't "know exactly how they're doing their analysis":

> Q.   *And you referred to their proprietary formula as a "secret sauce" at your deposition; is that correct?*
>
> A.   *I think I might have said that because we don't know exactly how they're doing their analysis*. . . .

(Ex. B, Wistar Tr., at 59 (emphasis added).)

*Eighth*, Mr. Wistar has admitted that the rain numbers OneRain relied upon are "wrong":

> Q.   So going from 47.78, how would you calculate the amount of rain that fell according to this [gauge] in this time period from the morning of the 29th until eight a.m. on the 30th?
>
> A.   You subtract the number it started with from the morning of the 29th, and you're going to end up with about 16 inches, which is underdone. *It's wrong. It's missing some rain.*
>
> Q.   Now, it's going to measure approximately 16 inches, that's what you said, correct?
>
> A.   *Yes, that's what the numbers show.*

> Q.     And you contend that this [gauge] is incorrect?
>
> A.     ***It's missing some of the rain. I'm not sure why.*** Perhaps – it's on the side of the bridge -- some of it splashed over. Perhaps it can't – I was raining so fast it couldn't record it. I don't know the reason. But I could see when I matched this up with the radar data that this [gauge] was light on its rainfall. There was a nearby gage that had about 20 inches and this has only 16. There's not a hole in the radar that would explain this lower reading so –

(Ex. B, Wistar Tr., at 63-64 (emphasis added).)

***Ninth***, Mr. Wistar never went to the site of the flood, at any time, and he didn't know why the rain numbers used by OneRain were wrong, just that they were:

> Q.     Do you see any holes in this time series of it not recording a value every 15 minutes?
>
> A.     No, no. There was a number there for every time period. But depending on the exposure of a rain [gauge], there are reasons why all the rain maybe didn't make it in. It's on the side of the bridge, is my understanding, so perhaps it's splashing -- ***I don't know. I have not been to the site where the [gauge] is.*** But I can tell you from experience in looking at the radar data that this gage is missing a few inches of rain, and that's why it's not used in our report. And the USGS [gauge] that's listed in our report is a different one, it's north of the basin.

(Ex. B, Wistar Tr., at 64 (emphasis added).)

***Tenth***, Mr. Wistar admitted that Baldwin County, Alabama, is not part of the basin that is at issue in this case:

> Q. ***But Baldwin County is not in the basin?***
>
> A. ***No, it's not.*** It's just to the west. But if you look at the radar, the radar wouldn't show the same amount of rain in both places if one had a whole lot more than the other. So if we have a gauge in Baldwin County showing 23 inches and that area of heavy rain you can see it on the radar extending over into the lower part of this basin, even where there's no rain gage to confirm it, you can assume that the rainfall in that part of the basin is similar.

(Ex. B, Wistar Tr., at 66 (emphasis added).)

And ***eleventh***, Mr. Wistar admitted that ***the only rain gauge that measured 23 inches was in a different county, in a different state!***

> Q. So the only rain [gauge] that measured 23 inches is ***in Baldwin County, Alabama***, correct?
>
> A. ***That may be true, yes.***

(Ex. B, Wistar Tr., at 66-67 (emphasis added).)

Rule 702(d) requires that the party seeking to admit the expert must demonstrate that "the expert has reliably applied the principles and methods of the facts of the case." Where "the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably." Fed. R. Evid. 702, Advisory Committee's Note (Amend. 2000). Where there is no way for

the Court to test the reliability of the proffered opinion, the Court should exclude the testimony. *Olin v. Demings*, No. 12-1455, 2014 WL 117081, at *3 (M.D. Fla. Jan. 13, 2014) (excluding testimony where there was "no way of knowing if [the expert] used [methodologies] properly or adequately in this case.")

The evidence in support of Mr. Wistar's flawed methodology and analysis is overwhelming. He seeks to paint an artificially prejudicial portrait of the flood event, ***and he does not even know the "secret sauce" that underpins all of his conclusions***. Moreover, his cherry-picking of the facts renders his report so unreliable that it is worthy of no consideration. *See, e.g.*, *Davis v. Carroll*, No. 09 Civ. 1088 (JPO), 2013 WL 1285272, at * 25 (S.D.N.Y. Mar. 29, 2013); *see also In Re Med Diversified*, 346 B.R. 621, 626 (Bankr. E.D.N.Y. 2006).

### 3.    Dr. Duke: Summary of Opinions

Dr. Duke, who is the flood-plain expert for Defendant, has offered a variety of tenuous opinions on this case. Not one of these opinions is supported by an appropriate methodology. Just so the record is clear, here is a list of the five core (and unsupportable) opinions offered by Dr. Duke in his first expert report, dated September 10, 2015 (*see* Ex. C):

> ** Construction of the Bristol Park and Ashbury Hills subdivisions was begun between 1978 and 1994 and that construction continued after 1994.

11

** If the flood along Elevenmile Creek that resulted from the rainfall event of 29-30 April 2014 reached, or was greater than, the 100-year flood level many houses would have been in danger of flooding. Evidence shows that many facilities were damaged by the flood.

** FEMA ignored the existence of the International Paper dam when the Flood Information Study and flood plain maps were prepared.

** Likewise, all computations performed in this [FEMA] study and elevations shown in Table 1 ignore the International Paper dam.

** The flood of 29-30 April 2014 was substantially greater than the 100-year flood and likely exceeded the 500-year flood.

(Ex. C, Duke Expert Report of 9/10/2015 ("Duke 2015 Report"), at 14-15.)

In addition, Dr. Duke—***more than 2 years later and after the close of discovery***—prepared and filed a supplemental expert report. (*See* Ex. D, Duke Supp. Report of 12/9/2017 ("Duke Supp. Report"), at 1-2.) That supplemental expert report should be struck, as having being filed in an untimely and prejudicial fashion, as explained in detail in Plaintiffs' First Omnibus Motion in *Limine*, which is being filed concurrently. Nevertheless, in that untimely and prejudicial supplemental expert report, Dr. Duke indicates that he has reviewed additional documents in the case—which documents the Plaintiffs submit that Dr. Duke should not be able to rely upon, given their grossly late disclosure. Dr. Duke did not offer any additional

"expert" opinions in his December 2017 supplemental report. (Ex. D, Duke Supp. Report, at 1-2.)

### 4.  Dr. Duke: Failures Concerning *Daubert* and Federal Rules of Evidence 701-702

Dr. Duke's opinion testimony is not admissible under the *Daubert* standard. His methodology and opinions are woefully deficient, as explained in detail below.

Dr. Duke is the Defendant's flood plain expert. In his expert reports, he discusses the FEMA flood maps and admits that none of his work or the FEMA models take into account the Defendant's dam. He did some modeling in the neighborhood based on the peak flows which does not account for the contribution from Defendant's property or the dam's collapse and release of water. Dr. Duke took the observed flows and concluded it was at least a 100-year and possibly greater than a 500-year storm. But his modeling does not account for the actual conditions that were present during the storm, largely because he entirely ignores the Defendant's property, at the head of the drainage basin. He took rainfall from an area miles south of the relevant drainage sub-basins and plugged it into the FEMA model. His methodology and analysis concerning the rainfall amounts are wrong because he took the rainfall from a USGS gauge (located at the far south end of the Elevenmile Creek drainage basin, essentially at the "end of the line" at the bottom of the map on Plaintiff's Trial Exhibit No. 3, attached hereto as Ex. E. (*See* Ex. E.) Any rain that

falls there has no way to make it upstream to the neighborhood and the heavier rain in the south of the basin does not reflect the lighter rain in the north sub-basins that contribute to water in the neighborhood. In short, there are hydrologists that modeled the storm and the impact of the dam. Dr. Duke failed to do that, and his testimony is not only cumulative, but is based on objectively incomplete and incorrect information.

The evidence in support of Dr. Duke's flawed methodology and analysis is, as with Mr. Wistar, overwhelming. He too seeks to paint an artificially "rosy" portrait—from the perspective of Plaintiffs and even-keeled observers—of the flood event. And as with Mr. Wistar, Dr. Duke's cherry-picking of the facts renders his opinions so unreliable that they are worthy of no consideration at trial. *See, e.g.*, *Davis v. Carroll*, No. 09 Civ. 1088 (JPO), 2013 WL 1285272, at * 25 (S.D.N.Y. Mar. 29, 2013); *see also In Re Med Diversified*, 346 B.R. 621, 626 (Bankr. E.D.N.Y. 2006).

Key passages from the transcript of his deposition (Ex. F) reflect Dr. Duke's cherry-picking and other flaws, which include but are not limited to the following:

*First*, Dr. Duke admits that he is not a licensed professional engineer in the state of Florida, and that he has never testified or given expert opinion testimony in Florida:

Q.    Are you a licensed professional engineer?

14

> A.     In the states of Texas and Arizona, ***but not Florida***.
>
> Q.     ***Have you ever testified or given an opinion -- expert opinion testimony in Florida?***
>
> A.     ***No***, sir.

(Ex. F, Duke Dep. at 13 (emphasis added).)

***Second***, Dr. Duke's so-called "modeling" is a perfect example of cherry-picking, in that he changed only one data point in order to achieve his desired results:

> Q.     Okay. Did you do any modeling?
>
> A.     Yes.
>
> Q.     Okay. What modeling did you do?
>
> A.     The modeling that I did was only to the extent of getting the FEMA models and running the FEMA models first to reproduce -- well, to run the models exactly as furnished to see if they reproduced the results that FEMA had in their files.
>
> Q.     And did they produce the same results?
>
> A.     They did. And you have been given in the download the runs -- in the Dropbox, you were given runs that I had made.
>
> Q.     Okay. What was the calculated rain that you used and how did you determine that for this watershed?
>
> A.     For the FEMA model, it was what FEMA furnished.
>
> Q.     Okay. So you used the FEMA number?

15

> A.     Only for the test. ***Later, I furnished – I replaced the FEMA rainfall distribution with the rainfall distribution measured during the storm***.

(Ex. F, Duke Dep. at 29-30 (emphasis added).)

***Third***, Dr. Duke used data from outside the applicable watershed in compiling his conclusions in this case:

> Q.     Right. So you ran one [model] running a FEMA model with theirs to replicate their data?
>
> A.     Correct, correct.
>
> Q.     Okay.
>
> A.     And then I replaced their rainfall. And I actually made several runs with several different rainfalls, one I used a Pensacola gauge, the airport gauge, but that record was incomplete.
>
> Q.     ***And is it fair to say that that Pensacola Airport is not within the same watershed involving this?***
>
> A.     ***That's correct.***

(Ex. F, Duke Dep. at 30-31 (emphasis added).)

***Fourth***, Dr. Duke did not use any of the rainfall data obtained by Defendant's employees during the course and scope of their measuring that data on a daily basis:

> Q.     Okay. With respect to that particular gauge, would you agree that that is approximately four miles south of the subject properties at Bristol Park and Ashbury Hills?

16

A.     *I didn't actually measure it*, but that would not surprise me.

Q.     *And did you use any of the rainfall data that was derived and obtained by International Paper employees during the course and scope of their measuring that data on a daily basis for purpose of their stormwater -- or excuse me, their wastewater management system?*

A.     *No.*

(Ex. F, Duke Dep. at 32 (emphasis added).)

*Fifth*, Dr. Duke is not familiar with the ICPR Model, which is the proprietary

model that the State of Florida requires:

Q.     What is the ICPR model?

A.     *To be quite honest with you, I don't know. That is a proprietary model that now is apparently what the State of Florida requires. I don't know anything about it.*

Q.     Is that the *generally accepted model* instead of HEC -- isn't the HEC-1 a one-dimensional flow model?

A.     *Yes*, it is.

(Ex. F, Duke Dep. at 38 (emphasis added).)

*Sixth*, Dr. Duke did not use the precipitation frequency data

server from NOAA, or any other such mechanism:

Q.     Okay. With respect to the precipitation frequency data server from NOAA, which you've handed me, do you have one that was used for purposes of this?

17

> A.   *I did not use that*.

(Ex. F, Duke Dep. at 41 (emphasis added).)

*Seventh*, Dr. Duke did not know that the rain gauge at Mobile Highway was approximately four miles south of the Bristol Park neighborhood, and he did not independently verify that data from the USGS website:

> Q.   Okay. And also just to be clear, that's the rain gauge at Mobile Highway, which is approximately four miles south of the Bristol Park neighborhood and the southern part of this watershed; correct?
>
> A.   If I might correct you, I think you said it was about four miles south, not one mile.
>
> Q.   I thought I said four miles. About four miles south?
>
> A.   *I didn't measure*, but yes –
>
> Q.   Okay.
>
> A.   -- that sounds reasonable.

(Ex. F, Duke Dep. at 43 (emphasis added).)

*Eighth*, Dr. Duke did not know what specified rainfall distribution is used in the state of Florida:

> Q.   Okay, go ahead.
>
> A.   But that's what's normally done. Different places have different specifications. For instance, if you're doing a development for a city, Austin, Texas, then you use a three-hour rainfall in a specified

18

> distribution that the city has developed, as opposed
> to a 24-hour rainfall distribution.
>
> Q.    Okay. ***What does Florida use?***
>
> A.    ***I don't know what Florida uses.*** I suspect it's the
> 24-hour distribution based on the fact that this was
> done that way.

(Ex. F, Duke Dep. at 47-48 (emphasis added).)

*Ninth*, Dr. Duke did not know what kind of rain gauges were used at or near

the site of the flood event:

> Q.    Okay. Is there an amount that the rain gauge can
> actually hold before it has to be reset?
>
> A.    ***I'm not sure what kind of rain gauges they have
> there.*** I suspect that in the old days we used to use
> buckets, the tipping bucket rain gauges. But I
> suspect that these rain gauges that they're using now
> just dump the water on the ground and can't be
> checked, but ***that's speculation on my part***.

(Ex. F, Duke Dep. at 50-51 (emphasis added).)

*Tenth*, Dr. Duke did not know the total rainfall that fell during the applicable

period:

> Q.    After midnight of April 29th, starting on April 30th,
> basically, that increment following that starting at
> 15, ***what's the total rainfall that fell through the
> rest of the run***?
>
> A.    ***I don't know that I've accumulated that.***

(Ex. F, Duke Dep. at 52 (emphasis added).)

***Eleventh***, Dr. Duke did not use stream gauge data to estimate a flood frequency distribution:

> Q.    As far as the flood event and that peak flow of the flood event, how do you -- and that's what I'm trying to get at is how do you differentiate between a 100- and a 500-year event?
>
> A.    Okay, now I understand your question. My analysis was keyed to if FEMA calculated the ten, the 50, the 100 and the 500-year event, then they set a flood frequency distribution at whichever point we happen to be located. Now, at the stream gauge, we can actually use stream gauge data to estimate a flood frequency distribution. ***I did not do that***, I just simply used the FEMA distribution.

(Ex. F, Duke Dep. at 55-56 (emphasis added).)

***Twelfth***, Dr. Duke used just one data point, and cannot say "whether there is more or less rain than occurred upstream of this [single] gauge:

> Q.    And that's what I'm trying to as far as the accuracy of your model, you're relying on one data point?
>
> A.    That's exactly right, I agree. ***Yes, I just used the one data point.***
>
> Q.    So as far as the reliability of that data point as being the most accurate, you can't say that that is the determining -- that is not accurate as it pertains to what was occurring in Bristol Park or even at IP at the same time?
>
> A.    ***I cannot say that it is more or less rain than occurred upstream of this gauge.***

(Ex. F, Duke Dep. at 60 (emphasis added).)

   ***Thirteenth***, Dr. Duke was not aware of the amount of property that Defendant

owns within the relevant watershed:

> Q. Okay. Are you aware of the -- ***are you aware of the***
> ***amount of property that International Paper owns***
> ***within this within this watershed?***
>
> A. ***No.***

(Ex. F, Duke Dep. at 62 (emphasis added).)

   ***Fourteenth***, Dr. Duke has never changed the rainfall (single data point) and

compared that result with the FEMA result, as he did here:

> Q. As far as your being retained as an expert or
> consulting in any fashion, have you ever made this
> kind of floodplain analysis where you've classified
> a storm event and its effect within a floodplain?
>
> A. Let me see if I can rephrase your question. You're
> asking have I ever taken a model, and let's just say
> a FEMA model as I did here, change the rainfall and
> run the model to test how it compared and what the
> result -- how the result compared with the FEMA
> result, is that what you're asking me?
>
> Q. ***Yes. And I'm asking you how many times you've***
> ***done that and, you know, whether you've differed***
> ***on opinions rendered before?***
>
> A. ***No, I've not done this before.***

(Ex. F, Duke Dep. at 65-66 (emphasis added).)

*Fifteenth*, Dr. Duke did not start his analysis at the headwater of Elevenmile Creek, which is located on Defendant's property:

> Q.   Did you ever consider a run from what's on IP property and north through the actual beginning of Eleven Mile Creek?
>
> A.   *No.*
>
> Q.   That far in the watershed?
>
> A.   *No.*

(Ex. F, Duke Dep. at 70 (emphasis added).)

*Sixteenth*, Dr. Duke has run infiltration studies in Venezuela, but he did not do so in this case:

> Q.   And you stated the rainfall was so intense that no rainfall was infiltrating into the ground and the times -- well, to make that determination, wouldn't you have to be a soil engineer to make sure that depending on the material is whether –
>
> A.   No.
>
> Q.   -- it was going to be able to absorb water?
>
> A.   No.
>
> Q.   Why not?
>
> A.   Well, I've done that by the way.
>
> Q.   Soil engineering?
>
> A.   *No. I've done infiltration tests –*

22

Q.    Okay.

A.    *-- in my career. I did it in Venezuela and I've done it up here.*

Q.    *Did you do it in this case?*

A.    *No.*

(Ex. F, Duke Dep. at 77 (emphasis added).)

*Seventeenth*, Dr. Duke did not consider areas up to the Kingsfield Dam and

north of the Kingsfield Dam in his analysis:

Q.    Okay. Did you -- as part of the watershed, did you consider areas up to the Kingsfield dam and north of the Kingsfield dam?

A.    *No.* As I said, FEMA lumped all of that everything north of Kingsfield Road into a single watershed, that's what I used.

(Ex. F, Duke Dep. at 78 (emphasis added).)

And *eighteenth*, Dr. Duke did not have rain gauge data or interpret rainfall at

the relevant neighborhood or drainage area:

Q.    Okay. *But you can't say*, again in the Bristol Park neighborhood, *what the intensity of the storm was at the data point*, the soil -- I know you have numbers of the actual location of that data point was not accurate?

A.    *In my study, I did not look at that.*

Q.    Okay.

23

A. ***I have no data.*** Well, I had no rain gauge data within that subdivision or those subdivisions, for that matter, that would allow me to make an evaluation of the intensity of the rainfall with respect to time.

(Ex. F, Duke Dep. at 83-84 (emphasis added).)

Thus, Dr. Duke's proposed expert opinions should be eliminated from this case.

## III.   CONCLUSION

For the reasons stated, Plaintiffs request that the Court grant Plaintiffs' Motion in *Limine* barring the Defendant from introducing the proposed expert opinions testimony of Mr. Wistar and Dr. Duke.

24

## <u>Local Rule 7.1(F) Certification</u>

The undersigned counsel hereby certifies that this pleading is compliant with the limitations imposed by the Court and, according to Microsoft Word's "Word Count" function, pursuant to the methodology contained in Local Rule 7.1(F), this Second Omnibus Motion in Limine is 5,392 words, which includes headings, footnotes, and quotations.

Dated: January 19, 2018

Respectfully Submitted,

*/s/ James L. Kauffman*
James L. Kauffman, Fl. Bar No. 12915
Jonathan R. Marshall, *Pro Hac Vice*
**BAILEY & GLASSER LLP**
1054 31st Street, N.W., Suite 230
Washington, DC 20007
Telephone: (202) 463-2101
Fax: (202) 463-2103
jkauffman@baileyglasser.com
jmarshall@baileyglasser.com

Jeremiah J. Talbott
**Law Office of J.J. Talbott, P.A.**
900 East Moreno Street
Pensacola, FL 32503
jj@talbottlawfirm.com

Christopher M. Vlachos
**Vlachos Injury Law, P.A.**
244 East Intendencia Street
Pensacola, FL 32502
chris@vlachosinjurylaw.com

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 19th day of January 2018 that a true copy of the foregoing was served via electronic delivery on counsel below:

Daniel W. Nelson
Jason Meltzer
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 887-3687
Fax: (202) 530-9571

Charles F. Beall, Jr.
cbeall@mhw-law.com
Florida Bar No. 66494

Larry Hill
lhill@mhw-law.com
ljohnson@mhw-law.com
Florida Bar No. 173908

Kimberly S. Sullivan
ksullivan@mhw-law.com
Florida Bar No. 101408
MOORE, HILL & WESTMORELAND, P.A.
220 West Garden Street
SunTrust Tower, 9th Floor
Pensacola FL 32502
Telephone: (850) 434-3541

*Attorneys for Defendant*

Patrick Clerkin
Aaron S. Imhoff
Clerkin, Sinclair & Mahfouz, LLP
530 B Street, 8th Floor
San Diego, CA 92101
Telephone: (619) 308-6550
Fax: (619) 923-3143

Attorneys for *USAA and USAA GIC*

/s/ James L. Kauffman
James L. Kauffman

27