UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


JOHN NAVELSKI, LINDA NAVELSKI,    )
ERICK ALEXANDER, JACOB HUTCHINS, )
AMBER HUTCHINS, JEANNE HENDERLY, )
RICHARD BULLARD, and BEVERLY     )
BULLARD, on their own behalf and )
those others similarly situated, )
                                 )
        Plaintiffs,              )
                                 )
                                 )        Case No. 3:14cv445/MCR
                                 )
vs.                              )        Pensacola, Florida
                                 )        February 20, 2018
                                 )        8:05 a.m.
                                 )
INTERNATIONAL PAPER COMPANY,     )
                                 )
        Defendant.               )
_____)


**JURY TRIAL - DAY ONE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury
(Pages 1-140)

## APPEARANCES

FOR THE PLAINTIFFS:     **_JONATHAN R. MARSHALL, ESQUIRE_**
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia  25301

**_JAMES L. KAUFFMAN, ESQUIRE_**
**_BRIAN A. GLASSER, ESQUIRE_**
Bailey & Glasser, LLP
1054 31st Street NW, Suite 230
Washington, DC  20007

**_CHRISTOPHER M. VLACHOS, ESQUIRE_**
Christopher M. Vlachos, PLLC
244 E Intendencia
Pensacola, Florida  32502

**_J.J. TALBOTT, ESQUIRE_**
Law Offices of Jeremiah J. Talbott, PA
900 E Moreno Street
Pensacola, Florida  32503

FOR THE DEFENDANT:     **_T. LARRY HILL, ESQUIRE_**
Moore, Hill & Westmoreland, P.A.
P.O. Box 13290
Pensacola, Florida  32591

**_DANIEL W. NELSON, ESQUIRE_**
**_MEGAN B. KIERNAN, ESQUIRE_**
**_JASON R. MELTZER, ESQUIRE_**
Gibson Dunn & Crutcher, LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036

1 ‖                           P R O C E E D I N G S

2 ‖          **THE COURT:**  Good morning.  We're here this morning

3 ‖ ready for jury selection and then the trial in the case of John

4 ‖ Navelski, et al., versus International Paper.

5 ‖          I have a number of attorneys present in the courtroom.

6 ‖ I'm going to ask you all to identify yourselves for me.  I need

7 ‖ to make note of everyone and your name so I can make sure to

8 ‖ introduce you all to the jury.  Whoever is going to be

9 ‖ participating on your team during the trial, I need to

10 ‖ introduce to the panel.

11 ‖          So I'll start with Mr. Marshall.

12 ‖          **MR. MARSHALL:**  Thank you, Your Honor.  Jonathan

13 ‖ Marshall, James Kaufman, J.J. Talbott.

14 ‖          **THE COURT:**  And Mr. Talbott, do you prefer to be

15 ‖ introduced as J.J., Jeremiah --

16 ‖          **MR. TALBOTT:**  J.J. is fine, Your Honor.

17 ‖          **THE COURT:**  Okay.

18 ‖          **MR. MARSHALL:**  Brian Glasser, Chris Vlachos.

19 ‖          **THE COURT:**  Thank you.

20 ‖          And then Mr. -- I'm sorry, who are you?  Are you a

21 ‖ party?

22 ‖          **MR. VLACHOS:**  Paralegal, Troy Pulliam.

23 ‖          **THE COURT:**  How do you spell your last name.

24 ‖          **MR. PULLIAM:**  P-u-l-l-i-a-m.

25 ‖          **THE COURT:**  And you're with what firm?

1        **MR. PULLIAM:**  I'm with Chris Vlachos's office.

2        **THE COURT:**  Okay.  Thank you, sir.

3        Then, Mr. Nelson?

4        **MR. NELSON:**  Good morning, Your Honor.  Participating

5    will be myself, Mr. Hill, and Mr. Meltzer.  We will also have

6    at counsel table and she's not here yet, Ms. Laurie McLain, who

7    is our corporate representative for International Paper.

8        Oh, come on up, Laurie.  I'm sorry.

9        **THE COURT:**  Spell the last name so I have it right.

10       **MR. NELSON:**  M-c-L-a-i-n, and it's L-a-u-r-i-e.

11       **THE COURT:**  Thank you.  And she is in-house corporate

12   counsel?

13       **MR. NELSON:**  She is the environmental health and

14   safety manager.

15       **THE COURT:**  But she'll be the corporate

16   representative, got you, okay.

17       Now, I apologize for this -- I'm sorry, Mr. Nelson,

18   I'm going to let you continue, but I do apologize for this IT

19   glitch we had.  It just so happened that -- it happened on

20   Friday as I believe one of you -- the Plaintiffs were here

21   trying out the system, and our projector died.  And it's not as

22   simple as a lamp, so that's what I'm told.

23       We were looking to see if we could get a replacement

24   projector from our Gainesville division.  I think they're still

25   checking on that, but for now we're going to have to make do,

1    but I do apologize to Defense that -- I mean, you're certainly

2    welcome to use the table behind the monitor, but it's not the

3    best vantage point.

4              Who else, Mr. Nelson, with your team?

5              **MR. NELSON:**  Others here -- and they will not be

6    presenting during the course of the trial -- are Ms. Megan

7    Kiernan and Mr. Joshua Robbins.  They are also from my law firm

8    Gibson Dunn.

9              **THE COURT:**  Both are from Gibson Dunn?

10             **MR. NELSON:**  Gibson Dunn, yes.  And then Mr. Andy

11   Kline will be helping us with some of the technology

12   presentation.

13             **THE COURT:**  Mr. Kline is with what firm?

14             **MR. NELSON:**  He's with Dubane Consulting.

15             **THE COURT:**  Does that cover it or is there anyone

16   else?

17             **MR. NELSON:**  I think that's it.

18             **THE COURT:**  All right.  So the panel members are here

19   at the courthouse and they are being processed as I'm here

20   talking to you all.  We will get their questionnaires copied

21   just as quickly as we can provide them to you.  We do not -- I

22   may have said this to you at our pretrial conference -- we do

23   not get those questionnaires ahead of time, and so they bring

24   them with them this morning, we take them and make copies, and

25   then those will be provided to you.

1            We like and strive to start jury selection as close to

2    nine o'clock as is humanly possible for our clerk's office in

3    terms of the processing of the panel.  I will be honest with

4    you and confess, it's rare that we actually start at nine, but

5    everyone is going to shoot for that, but it's usually closer to

6    9:15, sometimes even 9:30.  Hopefully it won't be 9:30.  So

7    you'll have some time with those questionnaires.  Like I said,

8    we'll get them to you as quickly as we can.

9            I've been over the jury selection process with you

10   all.  Are there any questions that have come up since our

11   pretrial conference in regards to that process?

12           *(No response.)*

13           The Plaintiffs did submit proposed voir dire.

14   Defendants did not.  I incorporated I think most, and some of

15   what you submitted I ask in any event.

16           To the Defendants, I did think it appropriate to ask,

17   obviously, if anyone has any affiliation with International

18   Paper, but I would also suggest including Champion.  People

19   used to work at that plant.  It has been an employer in our

20   community for decades, and so it might be worth just asking

21   that, unless you have an objection for some reason.

22           **MR. NELSON:**  We have no objection to that, Your Honor.

23           **THE COURT:**  Any questions about our trial schedule?

24   Mr. Marshall, you all should be prepared to start with your

25   first witness today, you know that, right?

1      **MR. MARSHALL:**  Yes, ma'am.

2      **THE COURT:**  Very good.  We handled a number -- or

3   addressed a number of pretrial issues, including one most

4   recently yesterday regarding concurrent cause instruction.

5      I don't know of any other outstanding issues.  I mean,

6   certainly there are objections to exhibits.  But hopefully I've

7   resolved the big objections.  But if you know of something now

8   that you think I should address to make things more manageable

9   for you all, I'm happy to do it.

10      Mr. Marshall?  Sometimes I have to hear the evidence,

11   though, before I can rule, particularly if it's a relevance

12   objection.

13      **MR. MARSHALL:**  Yes, ma'am, we do have some issues with

14   respect to demonstrative exhibits.  We've received roughly 92

15   proposed demonstrative exhibits from the Defendant.

16      **THE COURT:**  92?

17      **MR. MARSHALL:**  Yes.  We provided them with a list of

18   issues that we had.  They kind of pared the list down to about

19   40 or 45.  And the reason I'm raising this now is, it was my

20   understanding from the Court that in terms of opening materials

21   that if we could come to agreement on those opening materials,

22   then we could present those during our openings.  If we could

23   not come to agreement as to those opening materials, then those

24   materials would not be used.  That was what I understand.

25      **THE COURT:**  I believe that's what my order -- I know

1   it says that as far as the use of evidence, but I believe it

2   pertains to demonstrative aids as well.

3         **MR. MARSHALL:**  And that was my understanding, Your

4   Honor.  And so as it stands right now, we have not been able to

5   come to an agreement on those matters.  I requested from the

6   Defendant to specifically identify their materials, and I was

7   not provided with exactly what they're intending on using.  And

8   I had supplied mine, of course, which was about ten things and

9   so --

10        **THE COURT:**  Well, you were instructed to exchange

11  them, I believe.

12        **MR. MARSHALL:**  I received the 92 demonstratives but I

13  don't know what --

14        **MR. KAUFFMAN:**  97.

15        **MR. MARSHALL:**  I'm sorry, 97 -- but I wasn't sure what

16  they were intending on using versus being a demonstrative, and

17  so that is an issue.  But I understand that essentially the

18  Court's thought process was, if we could come to an agreement

19  then we can use it, and if we can't come to an agreement then

20  we can't.  I just wanted to clarify that point.

21        **THE COURT:**  Mr. Nelson?

22        **MR. NELSON:**  Thank you, Your Honor.  A little bit of

23  context, I think, here is relevant.  I believe you, during the

24  pretrial conference, stated that you wanted the parties to

25  disclose demonstratives if they had not done so already a week

1    before trial.

2           You issued an order on February 5th that states,

3    "Materials, whether to be admitted or demonstrative, that a

4    party proposes to show the jury in opening statement must be

5    disclosed to opposing counsel before 8:00 a.m. on Tuesday

6    February 13 unless opposing counsel waives this right.  If

7    properly disclosed, these materials may be used during opening

8    statements, but evidence may be shown to the jury during

9    opening statements only if both sides agree."

10          Mr. Marshall and I had a telephone call on I think it

11   was Friday, February 8th, about the intersection between the

12   pretrial conference and the wording of the order, and I

13   suggested to Mr. Marshall that it might make sense to just

14   exchange the opening demonstratives by the February 13th

15   deadline.

16          Mr. Marshall said he thought it would be better if we

17   exchanged all demonstratives that would be used at any point

18   during the proceeding, including perhaps with an expert witness

19   or maybe even in closing.

20          I said to Mr. Marshall:  *Okay, if that's what you want*

21   *to do and if that's what you believe Judge Rodgers wanted us to*

22   *do, we can do that,* but I said I wanted to reserve the right as

23   we get toward closing to go back to the Court and ask to adjust

24   demonstratives to use at closing depending on how the evidence

25   went in.

1          **THE COURT:**  Sure.

2          **MR. NELSON:**  So we made the disclosure, Your Honor.

3    We properly disclosed everything that we would use.

4          **THE COURT:**  All right.  How many of these

5    demonstrative exhibits or aids are at issue for opening?

6          **MR. MARSHALL:**  And that's the issue, Your Honor, I

7    asked them to specifically just tell me what you are going to

8    use, tell me what you're going to use.

9          **THE COURT:**  To use when, opening at any time?

10          **MR. MARSHALL:**  I'm sorry, at opening, that was it.  I

11    sent a lot of -- this is it -- I sent a lot of emails the last

12    week requesting, *Tell me what you're going to use, I'll let you*

13    *know if I have a problem with it.  We have a general, you know,*

14    *some issues with some of these other demonstratives but we can*

15    *maybe work those out, but I just need to know what you're going*

16    *to use at opening so if I have an issue I can let you know.*

17          **THE COURT:**  You need to let him know what you're going

18    to use at opening so he can let me know if he has an issue.

19          **MR. NELSON:**  And Your Honor, I thought I had done

20    that.  We had pared that list down substantially as we got

21    closer to trial and I communicated that to Mr. Marshall, and he

22    refused to engaged in a discussion about the demonstratives,

23    but we will do that.

24          **MR. MARSHALL:**  Thank you.

25          **MR. NELSON:**  And I also asked Mr. Marshall to tell me

1  whether or not he is going to object to the use of any evidence

2  during opening, and he won't do that.

3          **MR. MARSHALL:**  Your Honor, again, back to the point,

4  if I know what the evidence is that he intends to use, I will

5  let him know.  But I don't know what it is.

6          **THE COURT:**  Right, so I'm not sure if Mr. Marshall

7  knows as far as opening -- and again, I haven't seen your

8  emails, but I don't want to get into making credibility calls

9  here, please don't make me have to do that.  I'm not sure he

10 knows what you're going to be using in opening and whether that

11 is just demonstrative or whether it is to be, you know, if

12 you're going to seek to admit it.

13         So when we finish this conference, you all talk,

14 please let him know what you all are going to use and whether

15 it is -- you should know, I mean, you know your evidence --

16 whether it's based on evidence or whether it is truly

17 demonstrative.

18         And then, Mr. Marshall, you can let me know if you

19 have an objection to the use of evidence and I'll decide.  And

20 same goes for the Defense and your opening.

21         **MR. MARSHALL:**  Thank you, Your Honor.

22         **THE COURT:**  Any other issue outstanding?  Mr. Nelson?

23         **MR. NELSON:**  Your Honor, there's one kind of a

24 logistical issue that we would like to raise.  The Plaintiffs

25 have asked us to produce a company witness Mr. Kyle Moore

1    during their case.  Mr. Moore doesn't reside in the Pensacola

2    area anymore.  He flew in from Memphis and is available to

3    testify.

4          We would like to just complete Mr. Moore's examination

5    while he is here rather than requiring him to fly back down to

6    Pensacola during our case.  I don't expect our examination of

7    him would be very voluminous at all, but there are a couple of

8    documents that we would propose to have admitted through

9    Mr. Moore.

10         **THE COURT:**  What's the problem with that,

11   Mr. Marshall?  This is done often.

12         **MR. MARSHALL:**  No objection.

13         **THE COURT:**  Oh, okay.

14         **MR. NELSON:**  I hadn't had the chance --

15         **THE COURT:**  All right, very good, thank you.

16         **MR. NELSON:**  And then just one other point I wanted to

17   give a heads-up.  We have done our best to go back through the

18   confidential documents, which, if used at trial, would require

19   some additional steps.  And I don't think there are going to be

20   many of those, but there are a couple of documents including a

21   third-party document that could come up as early as today where

22   we just are uncomfortable waiving the confidentiality

23   designation, and so I just would ask for the Court's guidance

24   about how you'd like us to handle that during the trial.

25         **THE COURT:**  Well, I mean, I haven't seen it.  I don't

1   know -- simply because something is confidential doesn't

2   necessarily mean that it should be sealed.  I can make a

3   determination in that regard and I can seal it as far as the

4   record.

5        **MR. MARSHALL:**  Perhaps, Your Honor, if Mr. Nelson

6   would let us know what that document or those documents are,

7   we'll work together to avoid disclosing something they'd rather

8   not disclose that's not important to the case.

9        **THE COURT:**  Is it the entire document or is it a

10  portion of the document that's the troublesome --

11       **MR. NELSON:**  It would be the entire document in this

12  instance.  And as I read the protective order, it has a

13  provision that says that if there's a confidential document

14  that's used during court proceedings, you know, non-parties and

15  non-counsel need to be excluded, and the jury obviously, but

16  other public participants or attendees would need to be

17  excluded from the courtroom.

18       **THE COURT:**  I'm not excluding anyone from the

19  courtroom.  This is a public venue, and it would be the most

20  extreme and rare circumstance that I would exclude people from

21  this courtroom.  So you're going to have to give me more

22  information about this document and why it is so dire that we

23  protect it.

24       **MR. NELSON:**  I think that answers our concern, Your

25  Honor.  I had just looked at the wording in the protective

1    order and wanted to place -- but if the Court's determination

2    is --

3              **THE COURT:**  That slipped by me in your proposed order.

4    I have to again confess, I don't remember seeing that in the

5    order.  If I had caught it, I would have excised it from the

6    order.  Again, it would just be very, very rare that I would

7    ever close the doors to this courtroom and exclude people.  But

8    that doesn't mean that I'm unwilling to seal it.

9              Again, I don't know what we're talking about, and I

10   don't know the subject of it and why it is confidential and

11   needs to be protected.  If you want to address that with me,

12   I'll certainly decide whether it should be sealed or not.

13             **MR. NELSON:**  Our sensitivity was it was produced by a

14   third-party to the litigation.  In my judgment, it is not a

15   document that requires that degree of heightened protection.  I

16   just, as I say, I wanted to be true to the terms of the

17   protective order, and I think we've fully addressed that.

18             **THE COURT:**  All right.  Thank you.

19             Anything else?

20             **MR. NELSON:**  Your Honor, one other logistical question

21   I wanted to ask.  If we were to propose to use electronic

22   copies of deposition testimony for impeachment, would that be

23   acceptable to publish on a monitor to the witness?

24             **THE COURT:**  You can, but I strongly urge you to have

25   the hard copy available if the witness wants to see it.  And I

1    have to issue a caveat.  You certainly can use the electronics.

2    But in impeaching a witness, when you start that process, the

3    jury doesn't see the exhibit.  So you'll be able to see it and

4    the witness will be able to see it, certainly the Court can see

5    it, but the jury will not see it.

6         It doesn't gain you any advantage, if you will, in

7    using the court electronics and electronic deposition in terms

8    of impeachment.  We still proceed in the same fashion.  The

9    witness still reads it, decides whether there is a true

10   contradiction, and then you would repeat it back.

11        If there is a true contradiction, then I don't have a

12   problem with you showing it.  But that's -- you've got to make

13   sure there's a true contradiction.  And sometimes there's a

14   difference of opinion about that in the courtroom.

15        So I would just ask you to approach if you have a --

16   either side, if during the sort of the foundation that's laid

17   for the impeachment -- let's just say, Mr. Nelson, you are

18   attempting to impeach a witness, Mr. Marshall, you feel like

19   when you read that transcript that there's not a contradiction,

20   before it's shown to the jury just ask to approach and let me

21   make that decision up here.

22        **MR. NELSON:**  Thank you.

23        **THE COURT:**  How long, Mr. Marshall, for opening, and

24   who is making it?  Are you making the opening?

25        **MR. MARSHALL:**  Yes, ma'am.

1    **THE COURT:**  And also, after you tell me that, can you

2    tell me what members of your team are playing what roles in the

3    trial?

4    **MR. MARSHALL:**  Sure.  Mr. Kauffman, Mr. Glasser, and

5    Mr. Vlachos will all be examining witnesses.

6    **THE COURT:**  And you remember my admonition of one

7    attorney/one witness?

8    **MR. MARSHALL:**  Yes, ma'am.

9    **THE COURT:**  For opening, what are you anticipating?

10   **MR. MARSHALL:**  I think it's about 30 to 15 minutes.

11   **MR. GLASSER:**  Not 15.

12   **THE COURT:**  We'll just call it 30.

13   **MR. GLASSER:**  Thank you.

14   **THE COURT:**  Same question for you all, Mr. Nelson.

15   **MR. NELSON:**  Your Honor, I will be delivering the

16   opening, and I estimate it's going to be in the 35 to 45 minute

17   range.

18   **THE COURT:**  And as far as your team and roles?

19   **MR. NELSON:**  So the lawyers examining witnesses will

20   be myself, Mr. Hill, and Mr. Meltzer.

21   **THE COURT:**  Thank you.  I have an observation that may

22   turn into a question.  When the Court entered its order on the

23   Motion for Reconsideration there were -- and again, as you know

24   from my order yesterday, that decision was based largely, if

25   not exclusively, on the testimony and the reports of the two

1     experts, Mr. Ross and Mr. Lan, and the way that they had framed

2     the issues in the case.

3            In Dr. Ross's opinion, there were five homes that

4     would have flooded anyway notwithstanding any dam breach.  My

5     observation is that those five homes -- those five homeowners

6     -- or there may be more than five individuals, but those

7     properties would be excluded from this case.

8            We haven't addressed this and I should have --

9     somebody, myself or you all, it should have been addressed

10    probably at our status conference after the order came out.

11    What is the status in your mind, Mr. Marshall, of these five

12    homes?

13           **MR. MARSHALL:**  Well, we have two runs of the model.

14    The first model is the dam holding and it reflects what the

15    Court has observed.  The second run, and one of our primary

16    contentions in this case, is that this dam should have been

17    removed completely, but certainly after 2012 it wasn't being

18    used anymore.  And that model run revealed that no houses

19    flood.

20           **THE COURT:**  So none of these five are the named

21    Plaintiffs, are they?

22           **MR. MARSHALL:**  One of homes is the named Plaintiff,

23    Mr. Bullard, who would have had -- the model revealed a couple

24    of inches.  Again, whether that would have actually gotten into

25    his home, I mean, we're talking an inch or two or three.  But

1    -- and so, I mean, that's the evidence, Your Honor.

2           **THE COURT:**  So, with the model of the dam having been

3    removed, Mr. Bullard --

4           **MR. MARSHALL:**  Does not flood.

5           **THE COURT:**  He does not flood.  All right.  Well, we

6    may have to address this through interrogatories with the jury,

7    I'm not sure.  Thank you, Mr. Marshall.

8           Mr. Nelson, do you have anything you want to add?

9           **MR. NELSON:**  Not beyond what we've already briefed,

10   Your Honor.  And we appreciate you issuing the order yesterday.

11          **THE COURT:**  Right, and let me follow-up with that as

12   well.  You know, I regret that there was such confusion over

13   this.  It was never my intent to create the confusion,

14   obviously, and I didn't know that I had.

15          The Plaintiffs, you know, they have a burden to prove

16   causation in this trial and causation of an injury.  Well,

17   their injury is the damage that occurred to their homes.  Their

18   injury is not the damage that occurred to their neighborhoods.

19   And so it just doesn't make any sense to me that that would be

20   the focus.

21          So I hope I explained that sufficiently in my order

22   yesterday.  And I understand you all may disagree, but you have

23   the benefit of my ruling -- rulings, plural.

24          Is there anything else that we need to discuss before

25   hopefully we get you those questionnaires?

1    **MR. MARSHALL:** No, ma'am.

2    **THE COURT:** As to the questionnaires, you'll hear me

3    tell the panel, I'll explain this to them, but at the

4    conclusion of jury selection today after you've selected your

5    jury I will ask that you return to Ms. Simms all copies of your

6    questionnaires. So you'll have the copies, we keep the

7    originals. I have a copy, I give her my copy as well. So all

8    of the copies are collected, they're destroyed, and the

9    original questionnaire for each panel member is maintained

10   under seal in the court docket.

11       Are you all going to each need a copy of all of the

12   questionnaires? How about two per side?

13   **MR. MARSHALL:** Yes.

14   **MR. NELSON:** That's fine, Your Honor. Thank you.

15   **THE COURT:** Thank you. That would delay us a little

16   bit.

17       Any exhibit issue that I can resolve that hasn't been

18   resolved that's a stand-out issue, anything you can think of?

19   **MR. MARSHALL:** Your Honor, I would suggest that maybe

20   we could meet about the opening.

21   **THE COURT:** Oh, certainly.

22   **MR. MARSHALL:** And we have some issues with some of

23   these other demonstratives, maybe throw that into the

24   conversation while we're waiting.

25   **THE COURT:** All right. Then you all do that, and then

1    I won't address this with you until after jury selection

2    because the next time I come in the panel will be seated.  So

3    after jury selection but before we recess you all for lunch we

4    can take this up and hopefully -- maybe there won't be anything

5    to take up.

6            **MR. MARSHALL:**  Does the Court expect we would do open

7    after lunch?

8            **THE COURT:**  You know, Mr. Marshall, it depends on what

9    time we finish with -- you know, it would be very unlikely that

10   we would finish before eleven.  I mean, that would be a record.

11   I don't think that's going to happen.

12           So my rule of thumb is, if we're at eleven or after

13   when we finish with jury selection, I go ahead and recess for

14   lunch.  But I just can't tell you what time that will be,

15   obviously.  I don't have that crystal ball.  I've been asking

16   for it for years, along with the magic wand, and I don't have

17   either.

18           So we will recess -- and ordinarily on jury selection

19   day I recess for a little bit longer for lunch, depending on

20   what time we're at, but usually about an hour-and-a-half so

21   that our jurors can get oriented.  Many of them will not be

22   from Pensacola.  I'm hoping a lot will not be from Pensacola.

23   We may have issues if they're all from Cantonment.

24           **MR. MARSHALL:**  One other issue, Your Honor.  We will

25   have some clients with us sitting at counsel table.  Will we

1   need to let you know?

2          **THE COURT:**  Will they be here for today for jury

3   selection?

4          **MR. MARSHALL:**  Yes, we intend to have some of our

5   clients sitting with us.

6          **THE COURT:**  I need to know -- and you can provide that

7   information to Ms. Simms -- because I will introduce them along

8   with all of you, obviously, to the panel, and I'll ask them to

9   stand, but I need to know their names.  I'm going to give them

10  all of their names, but for the ones that are here I'd like to

11  be able to introduce them.

12          **MR. MARSHALL:**  Thank you, Your Honor.

13          **THE COURT:**  And that's fine to have them there with

14  you at the table wherever you can squeeze them in.

15          **MR. MARSHALL:**  Thank you, Your Honor.

16          **THE COURT:**  I don't know if you all noticed but they

17  actually started work on the courthouse.  Have you seen the

18  north side?  That is fantastic.  I texted GSA and the

19  contractor this morning and I said that's the ugliest most

20  beautiful sight I have ever seen, so good news.

21          I'm going to step off the bench, we'll get those

22  questionnaires to you just as quickly as we can, and we'll get

23  the panel seated as quickly as we can.

24          *(Whereupon, Jury Selection proceedings were held, after*

25  *which, trial proceedings commenced as follows at 1:10 p.m.)*

1          **THE COURT:**  What issues do we need to discuss before

2     we start the trial at 2:15, Mr. Marshall?

3          **MR. MARSHALL:**  I think it was just the issue regarding

4     some of the opening.

5          **THE COURT:**  The demonstrative aids?

6          **MR. MARSHALL:**  Yes, ma'am.

7          **THE COURT:**  What didn't get resolved?

8          **MR. MARSHALL:**  We have issues with approximately four

9     or five -- I'm sorry, more than that -- I think six or seven of

10    the exhibits that were being offered or will be offered during

11    the opening, and I could address those.  It might be easier for

12    the Court to resolve them.

13         **THE COURT:**  Okay.  But are these -- these are on the

14    Defendants' exhibit list?  I mean, is this to the evidence or

15    is this --

16         **MR. MARSHALL:**  It's not clear to me exactly if this

17    was to be evidence or demonstrative.  I believe that some of it

18    is evidence.

19         **THE COURT:**  Mr. Nelson, can you clarify?

20         **MR. NELSON:**  Yes, Your Honor.  I have an extra copy,

21    if it would be helpful, that I can hand up.

22         **THE COURT:**  Okay, thank you.  You're going to seek the

23    admittance of the items at the trial?

24         **MR. NELSON:**  The only items that we would seek the

25    admittance of at trial from this group are Exhibits -- it's

1   Exhibit 10 and 15, which is the Escambia County floodplain map

2   which was addressed in the Court's order, Document No. 209.

3   This was attached to the 2008 Hatch Mott MacDonald study.

4        Now, these are exhibits -- slide No. 15 is zoomed in,

5   and the original didn't have the red box, so it has been

6   altered and wouldn't be offered into evidence as such, so it is

7   demonstrative, but the underlining document is based on

8   evidence that we would intend to offer.

9        **THE COURT:**  So 10 and 15 -- the pictorial here, are

10  you going to seek to admit these pictures?

11       **MR. NELSON:**  No, Your Honor, we are not, just the

12  underlying document.

13       **THE COURT:**  So, Mr. Marshall, you now know that

14  actually none of these -- I'll call them exhibits, but

15  demonstrative exhibits are going to be admitted, so they're not

16  evidence.  So then what is the objection?

17       **MR. MARSHALL:**  Well, I think with respect to the first

18  one, we had an agreement of this -- this is the -- and I'm

19  sorry, my page numbers were not numbered, but there is a series

20  of Escambia County damage assessment maps.

21       **THE COURT:**  Right, that's No. 2.

22       **MR. MARSHALL:**  No. 2 as well as --

23       **THE COURT:**  Oh, I see that is a series, yes.

24       **MR. MARSHALL:**  Yes.  We had agreed amongst counsel

25  that obviously the damage assessment as to our particular

1    neighborhood was okay.  But, you know, expanding this out to

2    the entire county is, you know, highly prejudicial and unfair,

3    and that's not something we had ever agreed that they would be

4    allowed to use.

5            **THE COURT:**  Mr. Nelson, what is the purpose of -- I'll

6    just have you go ahead and state on the record the purpose of

7    the larger area.

8            **MR. NELSON:**  Yeah, to start with, Your Honor, I want

9    to clarify something Mr. Marshall said.  In the pretrial

10   stipulation we stated, "The parties have also agreed to the use

11   of static or live versions of the 2014 Escambia County Damages

12   Assessments Map."

13           **THE COURT:**  Let me pull the pretrial stip.  I

14   apologize.  What page are you on, please?

15           **MR. NELSON:**  Page 7, Your Honor, Item D.

16           **THE COURT:**  Mr. Marshall, that is what it says.

17           **MR. MARSHALL:**  We had always used this exhibit.  We

18   weren't talking about some zoom out of the entire county.  You

19   know, this is, you know, been part of the evidence that we've

20   been providing and work with.  Nobody ever zoomed out and

21   grabbed the entire county.

22           **THE COURT:**  Well, but there's going to be -- I'm

23   allowing in evidence of the event beyond the neighborhoods.

24           **MR. MARSHALL:**  But I guess in terms of other people

25   who suffered damage, I just don't see any relevancy to what

1    we're talking about here.

2         **THE COURT:**  Well, I don't think you're going to be

3    talking about any other people who suffered damages.

4         **MR. NELSON:**  That's correct, Your Honor.  The point of

5    this is to illustrate, just like the rainfall, that this was a

6    very large storm event.

7         **THE COURT:**  Mr. Marshall, I've already ruled that's

8    relevant, so I don't have an issue with it.

9         Anything else?  Now, with that, Mr. Nelson, I guess I

10   feel like I need to now issue a qualification to that.  I would

11   not expect certainly not in opening statement to hear about any

12   individual home, business that experienced flooding.  I mean,

13   you can talk about the event and how large it was and certainly

14   how much rainfall the county had.  Are you planning to identify

15   a specific area of flooding outside of the area that's at issue

16   in this lawsuit?

17        **MR. NELSON:**  I am not, Your Honor, I'm not going to

18   point to businesses or structures or municipal buildings or

19   anything like that.

20        **MR. MARSHALL:**  I guess the only thing I would ask is

21   that I don't have page numbers on this so I'm making a poor

22   record.

23        **THE COURT:**  Well, I think you were -- I have Escambia

24   County Damages Assessment for 2014 as the first three pages of

25   the pages that were handed to me.  They're marked 2, 8, and the

1    third one is not marked.

2         **MR. NELSON:**  The third one they didn't object to, Your

3    Honor, and I included that for completeness so he could see if

4    they thought this one was okay but they wanted to object to the

5    other two.

6         **THE COURT:**  I think your record is fine.  I'm looking

7    at what I believe you were looking at, Mr. Marshall, and that

8    is two pages from the Escambia County damages assessment that

9    show the class area but then show areas beyond the class.

10        **MR. MARSHALL:**  Yes, ma'am.

11        **THE COURT:**  Anything else?

12        **MR. MARSHALL:**  Yes, Your Honor.  There were the --

13   there's two references -- again, I just don't have page

14   numbers --

15        **THE COURT:**  Just, if you'll give me the title of the

16   top of the page and then we can go from there.

17        **MR. MARSHALL:**  It's the Stormwater Advisory Team

18   report on April 29th-30th, 2014 rain event.

19        **THE COURT:**  That's No. 21 in what I have.

20        **MR. MARSHALL:**  And the Stormwater Advisory Team report

21   on April 29th-30th, 2014, rain.

22        **THE COURT:**  And that's 26.

23        And your objection to these are?

24        **MR. MARSHALL:**  As I understand, these are -- again,

25   it's a 403 issue, it's talking about a 500-year storm event.

1    There's no evidence -- in fact, none whatsoever that there was

2    a 500-year storm event over our neighborhood or over any of the

3    areas that contribute to the flooding that might have been

4    caused in the neighborhood.

5           The same thing with the other exhibit, which is 200,

6    500-year event, it's talking about a different rainfall.  And

7    these are extremely unfair and prejudicial.

8           **THE COURT:**  I disagree.  And this to me relates more

9    to weight as opposed to admissibility.  Myself, I mean, I've

10   heard this event referred to as a 100-year event, a 200-year

11   event, and a 500-year event.  So I think you'll have to save

12   your arguments or points for cross-examination when this

13   evidence is admitted.  And if at that time I find under 403

14   that the relevance is substantially outweighed by the

15   prejudice, then I'll strike it.  But at this point I can't make

16   that finding, so I'm going to allow it.

17          **MR. MARSHALL:**  The other two were the Escambia County

18   floodplain maps, so -- and I don't have the number.

19          **THE COURT:**  That's 10 and 15, I believe.

20          **MR. MARSHALL:**  As I understood the Court's rulings on

21   these issues -- and, of course, we filed the motion -- that

22   before these would come in that there would have to be some

23   sort of predicate laid by Mr. Curb and we would have possibly

24   an opportunity to voir dire just to see exactly what he would

25   be testifying to as to these issues.

1     **THE COURT:**  That's what my memory is as well, Mr.

2     Nelson.

3            **MR. NELSON:**  Your Honor, this was addressed in

4     Document No. 209 where the Court specifically had addressed

5     this map, the underlying document, which was attached to the

6     2008 Hatch Mott MacDonald study.  And we had a dispute about

7     whether or not that was a public record, and we understood Your

8     Honor's ruling in Document 209 as reflecting that these

9     documents do qualify as public records and can be admitted.

10           **THE COURT:**  Well, let me -- 209 was -- I've entered so

11    many orders in the last week or so, I'm not sure which one

12    you're referring to.

13           **MR. NELSON:**  This is a February 17th order and was a

14    ruling on the Plaintiffs' Motion in Limine relating to a group

15    of public record documents, one of which was a 2008 Hatch Mott

16    MacDonald study.

17           **THE COURT:**  I'm not sure that I have it up here,

18    believe it or not, with all the paperwork that I have up here.

19    Do you have a copy?

20           **MR. NELSON:**  May I?

21           **THE COURT:**  Yes.  My law clerk is, I think, not

22    hearing me.

23           So this is not the Lake Charlene area study?

24           **MR. NELSON:**  That's correct, Your Honor.  This map was

25    specifically addressed on page 10, Exhibit AA.

1    **THE COURT:**  Yeah, I didn't have that qualification,

2  Mr. Marshall.  I did with Exhibit Q, but I did not with this

3  exhibit.

4         **MR. MARSHALL:**  Your Honor, we would ask that we be

5  given that opportunity with respect to this particular exhibit.

6         **THE COURT:**  What's the objection to the exhibit?  I

7  mean, it's already been -- it's admissible, so I'm not going to

8  rehear that argument.  So the issue is why shouldn't it be

9  discussed in opening.

10        **MR. MARSHALL:**  I mean, Your Honor, our understanding

11  was that we'd have an opportunity to talk to Mr. Curb about his

12  personal knowledge as to this particular exhibit and how it was

13  prepared but, you know, I understand the Court has addressed

14  that issue.

15        **THE COURT:**  I did.  I've ruled as far as the hearsay

16  objection.

17        Well, the risk, Mr. Nelson, is that, if I find that

18  there's a problem with it during the trial and it's not a

19  hearsay issue but it's a different issue, which I don't want to

20  identify because I don't want to argue your cases for you, but

21  if for another reason it's not admissible, then it will be

22  stricken from the record and the jury will be instructed that

23  they have to disregard it.  But I'm going to allow the

24  reference to it during opening.

25        Was there any objections to the Plaintiffs'

1    demonstratives?

2              **MR. NELSON:**  No, Your Honor.

3              **THE COURT:**  Anything else?

4              **MR. MARSHALL:**  No, ma'am.

5              **THE COURT:**  I'd like, please, to ask you all to

6    provide Ms. Simms -- or return the questionnaires to her.

7    Thank you.

8              *(Questionnaires returned.)*

9              So we will reconvene at 2:15.  I will have preliminary

10   instructions for the jury that typically take about 20 minutes,

11   20, 25 minutes, and then you'll start your openings.  I was

12   told 30 minutes or so for Plaintiffs, 45 minutes or so for

13   Defense.  And then hopefully we'll get to a witness or two,

14   Mr. Marshall, we'll just have to see where we are at that

15   point.

16             **MR. MARSHALL:**  Yes, ma'am.

17             **THE COURT:**  Anything else?

18             **MR. GLASSER:**  Yes, ma'am.  Could we mark the open

19   demonstratives we were just discussing just for identification?

20             **THE COURT:**  Yes, we can.  That's a good suggestion.  I

21   have them here, so I'll give them to Ms. -- what I'm going to

22   do --

23             **MR. GLASSER:**  Can we just use letters since we're

24   using numbers for real exhibits, A or something?

25             **THE COURT:**  Do these correspond with your exhibit

1  numbers, Mr. Nelson?  I assumed they did.

2  **MR. NELSON:**  They do not, Your Honor, because none of

3  these is an exact replica of an exhibit, they have the blow-up

4  and things like that.

5  **THE COURT:**  Okay.  Well, I don't want to change the

6  nomenclature or the references now because I've already been

7  discussing them based on how they were marked.  So, for the

8  record, Demonstrative Aid No. 2 is Escambia County Damages

9  Assessment, which is a zoomed-in version of the next exhibit,

10  which is No. 8, which is Escambia County Damages Assessment as

11  well.

12  Both exhibits show the paper mill, the Kingsfield Road

13  dam, and the class area.  One is just a zoomed-in version, and

14  that would be the first one, No. 2, so that's 2 and 8.

15  The third page does not have a number on it; it, too,

16  reads "Escambia County Damages Assessment," and there are

17  actually roadways identified on this exhibit or aid.  I'm going

18  to mark it No. 3.  There's not a No. 3, so it's going to have a

19  No. 3 on it.

20  The next is Escambia County Floodplain Map, No. 10,

21  which is a zoomed-in version of the next aid, which is No. 15,

22  Escambia County Floodplain Map.  The next is No. 21, Stormwater

23  Advisory Team report on April 29th-30th, 2014, rain event, with

24  two sentences highlighted.  The final is No. 26, Stormwater

25  Advisory Team report on April 29th-30th, 2014, rain event, and

1  this has another two sentences that are taken from a larger

2  document, and again it's zoomed in.

3         **MR. GLASSER:**  Thank you, Your Honor.  Nothing else.

4         **THE COURT:**  Thank you.  We will be in recess until

5  2:15.

6         *(Recess taken from 1:28 p.m. to 2:22 p.m.)*

7         **THE COURT:**  As I said earlier, I apologize for the

8  electronics.  This is not what we're accustomed to, but it is

9  what we have.  And we are trying to make arrangements to get a

10  projector over here from our Gainesville courthouse.  There's

11  no guarantees when it gets here that it's going to work.  Our

12  IT personnel are also trying an alternate avenue as well.  But

13  for now, this is what we have to work with, so I appreciate

14  your patience with us.

15         If you'll bring the jury in, please, Ms. Adams.

16         *(Jury in the box.)*

17         **THE COURT:**  Welcome back, ladies and gentlemen.  I'd

18  ask you now if you would all please rise to be sworn as the

19  jury to hear the case of John Navelski, et al., versus

20  International Paper Company.  Please raise your right hands.

21         *(Jury duly sworn.)*

22         Thank you.  Be seated.

23         Ladies and gentlemen, now that you've been sworn as

24  the jury to hear this trial, I'd like to take a few minutes

25  before we actually start with the evidence in the trial and

1   give you some preliminary instructions that hopefully will be

2   of assistance to you as you serve as jurors and participate as

3   jurors during the trial.

4          Jury duty may be a new experience for you.  I don't

5   believe we have any attorneys in the group, so I do hope that

6   my instructions will be helpful to you.

7          Before I actually begin the instructions, though, let

8   me re-introduce you to those who will be participating in the

9   trial, give you another brief overview of the trial and then

10  also introduce you to some of the court personnel that you'll

11  be working with during the trial.

12         First, if you are a named Plaintiff here in the

13  courtroom and you hear your name called, please stand so the

14  jury is able to see you.

15         Mr. John Navelski.  Mr. Navelski again, thank you.

16  Linda Navelski, thank you.  Erick Alexander, Jacobs Hutchins,

17  Amber Hutchins.  I'm not sure if this is Jean or Jeanne

18  Henderly.

19         **MS. HENDERLY:**  It's Jeanne.

20         **THE COURT:**  Jeanne Henderly.  Thank you.

21         Richard Bullard, Beverly Bullard.  Thank you all.  You

22  may be seated.

23         Ladies and gentlemen, the Plaintiffs in this case are

24  represented by attorneys.  I introduced you to them this

25  morning, I'll re-introduce them.  Mr. Jonathan Marshall,

1   Mr. James Kauffman, Mr. Brian Glasser, Mr. Christopher Vlachos,

2   and Mr. Jeremiah -- or J.J. Talbott.

3       You'll also recall this morning I introduced to you

4   Ms. Laura McLain, who is the corporate representative for the

5   International Paper Company, and she is represented by

6   Mr. Daniel Nelson, Mr. Larry Hill, Mr. Jason Meltzer, Ms. Megan

7   Kiernan, and Mr. Josh Robbins.

8       And ladies and gentlemen, you'll also remember from

9   jury selection this morning that this is a class action lawsuit

10  that is brought by the named Plaintiffs on behalf of themselves

11  and others who are similarly situated who, as of April 29th,

12  2014, owned property in the Bristol Park, Bristol Woods,

13  Bristol Creek, or Ashbury Hills subdivisions in Cantonment,

14  Florida.

15      The Plaintiffs claim that during a rainstorm on April

16  29th and April 30th, 2014, that a dam on the Defendant's

17  property -- International Paper's property failed and that

18  failure caused flooding to their homes.  The Plaintiffs

19  maintain that International Paper is responsible for that dam

20  failure.

21      International Paper disputes the Plaintiffs' claim and

22  contends that the flooding of the Plaintiffs' homes was due to

23  the severe rainstorm and the property's location in a

24  stormwater basin and not due to the breach of the dam and the

25  resulting collapse of the dam.

1      The attorneys will explain this case to you in much

2  more detail when they present their opening statements to you

3  in just a little bit.

4      Now, for the court personnel that you'll be working

5  with during the trial, I'll introduce you to them.  Ms. Donna

6  Boland is our official court reporter.  And as you can see,

7  she's busy taking down everything that I am saying as I'm here

8  speaking to you on her magic machine.  It is her job to record

9  every single utterance that is made here in the courtroom

10 during the trial so that we have an official transcript of the

11 trial.

12     To my left is Ms. Susan Simms, who I believe you've

13 met.  Ms. Simms is a deputy clerk of the District Court.  She

14 is my administrative assistant here in the courtroom.  She will

15 have responsibility for all of the paperwork and the evidence

16 in the case.  She will also be the person who swears in the

17 witnesses before they give testimony to you, just as she swore

18 you in as the jury.

19     Also, of particular importance to you as jurors, Ms.

20 Simms is the person who you can contact with what I'll refer to

21 as any logistical questions that you might have about your jury

22 duty.

23     Now, I believe you have met Ms. Donna Adams, you all

24 have met Ms. Adams.  She is a court security officer.  Also,

25 Mr. Leonard Thomas, who the court security officer who is

1   standing now in the back of the courtroom.

2          Both of them, again, are court security officers.

3   They are in charge of enforcing all of the Court's orders here

4   in the courtroom and for maintaining security here in the

5   courtroom.

6          They are also in charge of the jury.  And so, if at

7   any time during the trial you have any personal issue or matter

8   of concern that arises, you should please notify the court

9   security officer of that issue, and they'll handle the matter

10  for you; or if they're not able to, they'll bring it to my

11  attention and I will handle it.

12         Seated to my direct left is Ms. Tevenia Jacobs.

13  Ms. Jacobs is an attorney; she is one of my law clerks.  She

14  will be assisting me with legal matters that will undoubtedly

15  arise during the trial and it actually assists everyone --

16  Ms. Jacobs will be assisting everyone because she will help me

17  keep the trial on track.

18         Now, to your preliminary instructions.  As I explained

19  this morning, the jury has the sole, the sole and exclusive

20  responsibility for deciding the facts of the case, and it will

21  be your duty as jurors to find from the evidence what the facts

22  of the case are during the trial.  As I said earlier this

23  morning, that's the who, what, why, when, where, and how.

24         At the end of the trial, you will apply the law that I

25  give to you at that time to those facts that you have found to

exist, and that's how you'll decide your verdict.  You will

apply the law that I give you to the evidence that you have

found, and that's how you'll decide your verdict.  And of

course, you must follow all of the Court's instructions on the

law as a whole whether you agree with those instructions or

not, and that's in keeping with the oath that you have now

taken.

            Also, as I explained earlier, I have no role

whatsoever in deciding any of the facts in this case, and

therefore please do not assume from anything that I may say or

anything that I may do during the trial that I have any opinion

concerning any of the factual issues in this case or what your

verdict should be, because I do not.  And therefore, except for

my instructions to you on the law, you must disregard anything

that I may say or do during the trial in arriving at your own

decision about the fact.

            Now, the evidence from which you will find the facts

in the trial will come in various forms.  There will be

testimony of witnesses from the witness stand.  The witness

stand is right here directly in front of you all.  There will

also be documents or other what we call exhibits that will be

admitted into the record.  Anything the lawyers might agree to

or what we call stipulate to then would also be something you

could base your decision on.  And finally, any facts that I

might direct that you are to accept as true or established

1    would also be something that you could base your decision on.

2          Witness testimony, exhibits admitted into the record,

3    attorneys' stipulations, or factual matters that I direct that

4    you are to accept as true or established, those are the forms

5    of evidence from which you will find the facts in this case.

6    And as you will note, everything that I just referred to will

7    occur here in this courtroom.  Your decision cannot be based on

8    anything outside of this courtroom, and I'll talk to you more

9    about that in just a bit.

10          The exhibits, whether it's documents, which will be

11   the most likely type of exhibit, but there may also be physical

12   exhibits, they will be admitted -- they are usually from a

13   document camera.  I don't know if you can actually see the

14   document camera.  You can probably see the top of it on the far

15   side of the lectern, here on the attorney lectern in the center

16   of the court there's a camera on the far side of it.

17          If the attorney is questioning a witness and they have

18   a document or some type of physical object that they want to

19   show to you, then they'll place it on the document camera.

20   When they do that, everyone in the courtroom -- the attorneys,

21   myself, the witness -- will be able to see the exhibit.  You

22   will not be able to see it at that point, and the reason for

23   that is I haven't yet admitted it into the record, so it's not

24   technically or officially evidence in the case yet.

25          Once the proper foundation has been laid and I admit

1   the document or the exhibit into evidence, then it will appear

2   for you on this monitor directly in front of you all and you'll

3   be able to see it.

4           Also, you will have all of the exhibits, whether

5   they're physical objects or documents, with you for your

6   convenience during your deliberations at the conclusion of the

7   trial.

8           Now, you won't have witness testimony with you.  You

9   will have your notepads at that point but you won't have --

10  obviously, you're not going to have an official transcript of

11  this trial, so I have permitted you to take notes, and I'll

12  give you some instructions on that in just a little bit, but do

13  keep in mind you will not have witness testimony with you but

14  you will have everything else that's been admitted into the

15  record in the jury room.

16          Now, there are certain things that are not evidence

17  and must never be considered by the jury as evidence in

18  arriving at your decision in the case.  As I said, nothing

19  outside of this courtroom is evidence in this case.

20          Also, even from within the courtroom certain things

21  are not evidence.  Statements, arguments, questions by the

22  attorneys are not evidence.  Nothing I say at any time during

23  the trial is evidence.  Also, objections to questions are not

24  evidence.  But you should understand that the attorneys have an

25  obligation to their respective clients to raise objections that

1    they believe are appropriate and proper based on our Rules of

2    Evidence and our Rules of Procedure.

3          And so, if one attorney is questioning a witness and

4    the other attorney believes that the question asked seeks to

5    elicit testimony that would be in violation of those rules,

6    then the attorney will raise an objection to the question that

7    was asked.  And you will hear just that, you will hear, *Your*

8    *Honor, objection, relevance.  Objection, hearsay.  Objection,*

9    *foundation,* any number of objections that can be raised.

10          Once an objection is raised, nothing else can happen

11   in the trial until I rule on that objection.  You'll hear me

12   make one of two rulings.  I'll either sustain the objection or

13   I'll overrule the objection.

14          If I sustain the objection, then the witness will not

15   be permitted to answer the question.  You must not speculate on

16   what the answer might have been or what might have occurred if

17   the objection had not been sustained.  And of course, you must

18   not draw any inference solely from the question itself.  Why is

19   that?  Because the question itself is not evidence.  Evidence

20   only comes from that person sitting right there in that witness

21   stand.

22          If I overrule the objection, then the witness will be

23   permitted to answer.  And once that testimony comes into the

24   record, then you should weigh it and judge it just as you do

25   with regard to any other testimony in the case without regard

1   to the fact that an objection was made and without regard to my

2   ruling on the objection.

3          On occasion I may admit some evidence for a limited

4   purpose.  If I do that, I will give you an instruction at that

5   time in which I define for you the very narrow and limited

6   purpose for which you may consider that piece of evidence.  And

7   you must follow that instruction and consider that evidence

8   only within the confines of the instruction that I give you and

9   for no other purpose.

10         Also, there may be an occasion -- it doesn't happen

11  often but it can happen -- where I exclude some form of

12  testimony or maybe even an exhibit that has already come into

13  the record.  I make a decision that it shouldn't have come in,

14  and so then I have to strike it from the record.

15         If I do that, I'll give you an instruction at that

16  time in which I tell you that the information is no longer

17  evidence in this case, and therefore you must exclude it, you

18  cannot consider it in any way.  You have to just eliminate it

19  from your mind, and you cannot consider it in any way in

20  deciding the issues in the case.

21         Now, there are two kinds of evidence.  You've probably

22  heard the terms direct and circumstantial evidence.  Direct

23  evidence is the direct proof of a fact such as the testimony of

24  an eyewitness.

25         If this case involved a traffic accident at an

1    intersection, you might have a witness who comes in and takes

2    the witness stand and testifies that he or she was standing on

3    the corner, was there personally observing the stoplight at the

4    time the car careened through the intersection and observed the

5    fact that the light was red at that point in time.  That would

6    be direct evidence of the fact that the light was red at the

7    time the car drove through the intersection.  The person was

8    there, has personal knowledge of the fact that they are telling

9    you about.

10          Circumstantial evidence, on the other hand, is proof

11   from facts from which you may infer or conclude that other

12   facts exist.  So, the person -- same situation, car accident at

13   an intersection, the person comes in and testifies, says he was

14   standing on the street corner, observed the light red, saw the

15   car careen through the intersection, it wasn't raining at the

16   time, but the person testified that the sky was dark, the

17   ground was soaking wet, there were puddles all over the road.

18          You could conclude from that that it must have

19   recently rained.  It wasn't raining at that moment, but from

20   those other facts you could reasonably infer that it must have

21   recently rained.

22          I'll give you further instructions on direct and

23   circumstantial evidence at the conclusion of the trial, but for

24   now please do keep in mind that you may consider both direct

25   and circumstantial evidence in deciding the case, and the law

1    makes no distinction between the weight that you give to either

2    one.

3            Now, because you are the trier of fact, as I said

4    earlier this morning, the issue of witness credibility is

5    solely for you to decide.  Please keep that in mind throughout

6    this trial.  It's going to be up to you to decide which

7    witnesses to believe, which witnesses not to believe, how much

8    of a witness's testimony to accept or how much of it to reject.

9    This is something else I'll give you further instructions on,

10   this evaluating witness credibility at the conclusion of the

11   trial.

12           Now, just a few words about the jury and what I'm

13   going to be asking of you during the trial.  First -- and

14   you'll hear me give you these instructions -- every time you

15   leave the courtroom I'm going to be giving you these

16   instructions:

17           You are not to discuss the case amongst yourselves nor

18   with anyone else or allow anyone to talk to you about the case

19   at any point during this trial.  Until you all retire as a

20   group to the jury room to deliberate at the very end of this

21   trial, you are simply not to talk about this case at all.

22           You certainly can have lunch with one another, you

23   certainly can talk and talk about anything other than this

24   trial and what is happening in this trial.  And of course, that

25   extends to your loved ones at home when you retire at the end

1    of each day.

2         I suspect that each one of you has a cell phone, you

3    probably use the Internet and other tools of technology.  My

4    instructions to you regarding not to communicate with anyone

5    about this trial extends to those electronic devices or tools

6    of technology.

7         You must not communicate with anyone on your cell

8    phone, texting, through email, Twitter -- I'm still not sure

9    what that is, but you cannot tweet, nothing like that, no

10   Internet chat rooms, social networking sites, Facebook, any of

11   that.

12        You can certainly tell people where you've been all

13   day, you've been in federal court, you are a juror in a trial

14   and that you have to be back tomorrow, but that's the extent of

15   it.  Nothing specific about the case.

16        Now, if anyone should attempt to talk to you about the

17   case or to speak about the trial or the case in your presence,

18   this is what I'd like you to do.  And by the way, this is

19   unusual for this to occur, in fact, it would be rare for this

20   to occur, but there is a possibility, and it's a very serious

21   matter and so I want you to understand and know what I would

22   expect of you should it occur.

23        Advise the person who is trying to talk to you about

24   the case that you are on the jury, tell them to stop talking

25   about the case in your presence.  If they should persist, then

1    I want you to leave them, report the matter promptly to any

2    court security officer.  The court security officer would bring

3    it to my immediate attention, and it would be dealt with as a

4    matter of criminal contempt of court and it would be punished

5    accordingly.

6            The issue of anyone trying to influence a jury or a

7    juror during a trial, as I said, is a very, very serious

8    matter.  The attorneys and the parties understand how serious a

9    matter this is, and so they will actually -- particularly the

10   attorneys, they're officers of this Court, they know what their

11   ethical obligations are, and they will go out of their way to

12   avoid even the appearance of impropriety with the jury.

13           So, they certainly won't have any discussions with you

14   or talk about the case in your presence, but as I said, they'll

15   go even an extra step, and they're going to do everything to

16   avoid anything that could even give anyone the idea that

17   there's something improper about their contact with you.

18           And so this is a small courthouse, you may run into

19   the attorneys or a party on the courthouse steps coming up the

20   stairwell here in the courthouse.  If that's the case and the

21   attorneys turn and go the other way, maybe they don't exchange

22   pleasantries with you, they're doing what they should do, and

23   that is to avoid even the appearance of any impropriety.

24   They're not being intentionally rude to you, and please do not

25   assume that to be the case at all.  Again, they're just abiding

1    by the instructions that they've been given and what they know

2    to be their ethical obligations.

3          Also, you should not read, listen to, or watch any

4    news reports of this trial, should there be any.  I don't know

5    whether there will be any.  But to the extent there are, you

6    are instructed that you must avoid them.  If you open the

7    morning paper and there is an article, turn the page, go to a

8    different article.  If you turn on the radio and there's a

9    report about the trial, turn off the radio or change the

10   station.  Same with the television.

11         And why is that?  Because that is outside of this

12   courtroom, it is not evidence in this case, it is nothing the

13   attorneys or the parties have had an opportunity to prepare

14   for, it certainly has no bearing whatsoever on the law that

15   you'll be given at the conclusion of the trial, so you must

16   avoid anything like that.

17         Similarly, you should not do any research, conduct any

18   independent investigation on your own into the matters that

19   have been discussed here during the trial.  And this can be

20   very tempting especially in this day and age of technology.  It

21   used to be we only had to worry about dictionaries and

22   encyclopedias, but nowadays again the concern is must greater

23   with the Internet.  You are specifically prohibited from,

24   again, conducting any research, Googling, anything like that

25   about any of the issues in this case.

1      Again, why is that?  It's outside the courtroom, it's

2  nothing that has been involved in this litigation, it's nothing

3  the attorneys are aware of or the Court is aware of, and so you

4  can't go off on your own.

5      Do you all understand?

6      **THE JURY:**  *(Indicating affirmatively.)*

7      **THE COURT:**  And finally, you should not attempt to

8  form any opinion about the merits of the case until after you

9  have heard all the evidence that the attorneys have to present

10  to you, you've heard their closing arguments, and you've

11  received your instructions on the law.  You should continue to

12  keep an open mind about the case until the very end of the case

13  when you are in the jury room with the other members of the

14  jury ready to begin your deliberations.

15      Now, as I said, I'm going to permit you to take notes.

16  I see that Ms. Simms has given you notepads and pens.  Those

17  will be available for you each day here in the courtroom.  You

18  will not be permitted to leave the courtroom with your notepads

19  until you actually go in and deliberate on your verdict at the

20  conclusion of the trial.  Your notepads will be available for

21  you each morning when you return.

22      During the evening recess, if you're interested to

23  know, your notepads will be stored in our court vault.  Ms.

24  Simms is the only one that has any access to your notepads, and

25  she doesn't read them.  She stores them overnight, puts them on

1   your chairs so that they're ready for you when you return the

2   next morning.

3           At the conclusion of the trial, Ms. Simms collects all

4   of the notepads and she destroys them.  She doesn't read them

5   and they're destroyed.  They're not maintained in any way as

6   part of the court record.

7           Now, during the trial it may be necessary on occasion

8   for me to speak to the attorneys outside of the hearing of the

9   jury concerning matters of law or procedure that are simply not

10  of concern to you all as the trier of fact.

11          If that happens, if I think I can resolve the issue

12  quickly, I'll invite the attorneys here to the bench and we'll

13  have a bench conference.  Hopefully it will be quickly.  You

14  saw us do this this morning when the jury was selected.

15          However, if I think it may take a little bit longer,

16  then I'm not comfortable with having you all just sit there in

17  the jury box kind of twiddling your thumbs, then I'll excuse

18  you to the comforts of the jury room while we continue our

19  discussion here in open court.  But either way, I assure you

20  that I'll do everything that I can to resolve the matter as

21  quickly and expeditiously as I can.

22          No one in this courtroom, certainly not anyone

23  participating in the trial, wants to waste the jury's time,

24  least of all, me.  So I will do everything I can to utilize

25  your time in an efficient manner.

1    Now, just briefly how the trial will be conducted.  In
2  just a few moments I am going to stop talking and I am going to
3  turn the trial over to the attorneys, and they will begin
4  talking to you.  Please remember, though, at no time anything
5  that any attorney in this case says is evidence in the case.

6    Nonetheless, they will start with their opening
7  statements.  The opening statements are an opportunity for the
8  attorney to tell you what they expect the evidence in the case
9  to be.

10    Now, at the time of the opening statements, you will
11  not have heard one piece of evidence.  So, if you take notes
12  during the opening statements, you're certainly free to do
13  that, but make a notation to yourself that this is opening
14  statement, this is not what any witness said, this is not
15  evidence.

16    And the same holds true for closing arguments, and
17  I'll remind you of that at the conclusion of the trial, because
18  the closing arguments is an opportunity for the attorneys to
19  tell you what they remember themselves the evidence to have
20  been, but again, it's not the evidence.  The evidence comes
21  from here and from that lectern and what I admit into the
22  record.

23    So after the opening statements are made, then we will
24  start with what's called the Plaintiffs' case in chief or their
25  direct case.  And Mr. Marshall and the other attorneys will

1    present the evidence that they have to present on behalf of

2    their clients, the Plaintiffs.

3            There will be direct testimony from witnesses,

4    cross-examination from Defense counsel of those witnesses,

5    redirect examination by the Plaintiffs' attorneys.

6            Once the Plaintiffs have introduced all of the

7    evidence that they have to introduce during their case in

8    chief, you'll hear Mr. Marshall announce that the Plaintiffs

9    rest their case.

10            Once the Plaintiffs' case has rested, then it will be

11   the opportunity for International Paper as the Defendant in the

12   case to present its case to you.  And we will proceed in the

13   similar fashion with direct examination by the Defense team,

14   Mr. Nelson or Mr. Hill or Mr. Meltzer will be asking questions

15   of the witnesses, the Plaintiffs' team will be conducting

16   cross-examination of those witnesses, and then redirect by the

17   Defense.

18            Once International Paper has admitted all of the

19   evidence that it intends to admit during its case, then I will

20   ask the Plaintiffs if they have a rebuttal case.  They may or

21   may not.  It doesn't always happen that there's a rebuttal

22   case.  But they do have the burden and, because of that, they

23   have the opportunity to present a rebuttal case.  But if they

24   do, it will be much, much briefer in duration than the case in

25   chief.

1    Once all of the evidence has been admitted, then I'm

2    going to give you your instructions on the law.  Following

3    that, the attorneys will make their closing arguments to you.

4    So, now is the time for the attorneys to present their

5    opening statements to you.  Again, they're going to summarize

6    what they believe the facts in evidence will be during the

7    trial.

8    I noticed that you all have been paying careful

9    attention to my instructions that I've given to you, and I'm

10    going to ask that you continue with your careful attention,

11    please, as the attorneys present their opening statements to

12    you.  Thank you.

13    Mr. Marshall, if you wish to proceed.

14    **MR. MARSHALL:**  Yes, ma'am.  Your Honor, is it

15    permissible for me to turn this screen around?

16    **THE COURT:**  Yes, sir.

17                    **OPENING STATEMENT**

18    **MR. MARSHALL:**  This case boils down to cause and

19    effect.  It involves a dam called the Kingsfield Road dam.  The

20    dam was on International Paper's property and was owned,

21    operated, and controlled by International Paper.

22    The dam was constructed without a permit using sandy

23    soil that International Paper knew was prone to erosion.  This

24    dam which served as a choke point for the water draining out of

25    International Paper's property failed at the beginning of a

1    storm when only a relatively small amount of rain had fallen,

2    this released water being held behind the dam on International

3    Paper's property, and soon after the residences of these

4    neighborhoods began to flood.

5            Why?  The evidence will show cause and effect.  The

6    dam fails, it releases water, it travels down to these

7    neighborhoods, and the homes flood as a result.  All of this

8    could have been avoided because the dam should have never been

9    there in the first place.  And the evidence will show:  no dam,

10   then no flood.

11           I represent the residents of Ashbury Hills and Bristol

12   Park, who are here in the courtroom today, 163 of which flooded

13   the night of April 29th, 2014.  As the Court has already told

14   you, the residents of the neighborhood are not asking you to

15   award any money at all but instead are asking you to find

16   International Paper to be responsible for its actions.  Once

17   responsibility is established, the judge will decide whether

18   further proceedings are necessary.

19           Many of the facts are not in dispute.  Some are

20   disputed.  I'm going to go over these facts with you, describe

21   the dam, the timeline in modeling that shows how the dam

22   failure caused the flood.  But first I'm going to focus on one

23   home and their experience.

24           On April 29th, 2014, Rick and Beverly Bullard were at

25   their house in Bristol Park, the Bullards are right here.  Mrs.

1    Bullard went to bed early, and later that evening Mr. Bullard

2    checked out of his window and saw that water was rising in his

3    neighborhood.  He awoke Mrs. Bullard, they tried to pack a bag,

4    they tried to leave.  They weren't able to do so.

5         Soon water began to enter their home.  They tried to

6    unplug appliances, they tried to put things up, they tried to

7    get their dogs out of the water.  They then took pictures, one

8    at 10:28 p.m. and then this one at 10:38 p.m.

9         This picture depicts approximately one foot of water.

10   The water rose quickly and within just a short period of time

11   was up to their kitchen counters.

12        Where did this water come from?  It had only been

13   raining for a short period of time for water to have entered

14   the home.  Unbeknownst to the Bullards and the residents of

15   these neighborhoods, the dam that was owned, operated, and

16   controlled by International Paper had broken, sending water

17   down Elevenmile Creek towards the Bullards' home and these

18   neighborhoods.

19        Why did the dam break?  How did the dam break cause

20   the flooding?

21        Let's talk a little bit more about some of these facts

22   and the evidence that you will see in here that may help you

23   answer some of these questions.  As I mentioned before, it is

24   not disputed that International Paper owned and operated this

25   dam.

1      The Kingsfield Road dam served as a manmade

2  obstruction to water naturally flowing down Elevenmile Creek.

3  During storm events and when International Paper's ponds

4  overtopped, the evidence will show that the dam stored

5  magnitudes higher amounts of water than during a static flat

6  pool or otherwise known as a sunny day condition.  This is a

7  picture of the failed Kingsfield Road dam.

8      There is no dispute that this dam eroded and failed

9  and released water being stored behind it.  It is also not

10  disputed that other dams that had been on this very site have

11  eroded and needed to be substantially repaired or replaced in

12  the past.  In fact, the evidence will show that dams on this

13  very site have needed to be repaired or replaced approximately

14  every nine to ten years, in 1986, then again 1996, 2004, 2005,

15  and then finally in 2014.

16      The evidence will show that the Kingsfield Road dam

17  was built using the same sandy soil that had eroded in the

18  past.  This is a picture of the sandy soil -- you can see the

19  dam there to the right -- that was used to build the dam.

20      International Paper was operating this dam without

21  having first obtained a license to have a dam in the form of a

22  permit.  In order to have obtained a license for this dam,

23  International Paper would have had to have submitted an

24  application to a dam regulatory body that included a design and

25  maintenance plan that would have only been approved if deemed

1  safe.  This was never done.

2  The rain that fell on April 29th and 30th was

3  significant over parts of Alabama and parts of Escambia County.

4  For instance, over the course of the entire storm event, which

5  is two days, 23 inches of rain fell over the Pensacola airport.

6  It is undisputed, though, that 23 inches of rain did not fall

7  over the mill site or the neighborhood.  The evidence will show

8  that far less rain fell over these sites because the storm was

9  generally more severe in the south than it was in the north.

10 It is undisputed that the rain that fell over the airport had

11 nothing to do with this flood.

12 Nowhere near that amount of rainfall fell when this

13 dam failed and the homes began to flood.  In fact, the evidence

14 will show that only approximately 6 inches of rain or so had

15 fallen over the course of a period of time at the time that

16 these residences began to flood.  The evidence will show that

17 this was not a 500-year storm event at the mill site or over

18 the neighborhood.

19 The evidence will show that the dam failure occurred

20 and was caused by rapid erosion of the earthen part of the dam

21 during the first few hours of the storm event on the night of

22 April 29th, 2014.  The failure started at approximately nine

23 o'clock p.m. when water began to overtop this broken part and

24 this caused a very rapid failure thereafter.

25 A 41-foot-long hole that was 13 feet high was ripped

1    into the earthen embankment.  This failure occurred prior to

2    the Bullards receiving water into their home.  The evidence

3    will show that this hole released water being stored on

4    International Paper's property.

5              This is an overview of the mill site and the

6    neighborhood.  When the dam, which is here, failed, it released

7    water that was being held up here, and that water flowed down

8    Elevenmile Creek into the neighborhoods.

9              Once the water was in Elevenmile Creek, there wasn't

10   anyplace for the water to go because it's an extremely steep

11   stream structure and deep in size.  And therefore, the creek

12   acted as a funnel and shipped the waters down into the

13   neighborhoods where it was able to flood the residences.

14             Soon after the hole was open and the water was

15   released into the creek, the evidence will show that residents

16   in these neighborhoods began to experience severe flooding into

17   their home when only six inches of rain had fallen over a

18   several-hour period.

19             I've already introduced a picture the Bullards took to

20   you.  The Bullards' home is one of the lowest elevations in the

21   neighborhood and would have been one of the very first to

22   experience flooding.  The picture that I showed you was taken

23   at 10:38 with a cell phone.  Is not dependent upon

24   recollection, and it helps to establish the start of the flood.

25   The water stayed up for a period of time and then slowly

1  receded by the early morning hours of April 30th, 2014.

2          The evidence will show that all of this could have

3  been avoided.  Various press releases and communications from

4  International Paper following the dam break and flood referred

5  to the dam as abandoned, inactive, and stated that it served no

6  purpose.  The evidence will show that as of 2012, two full

7  years prior to failure of the dam, it indeed served no purpose

8  and was not used by the mill for any processes.

9          The evidence will show that International Paper -- and

10  International will admit that the dam could have been removed

11  at that time.  Had the dam been removed before April 29th,

12  2014, I wouldn't be standing here before you, because the

13  evidence will show that the flood could not have occurred.

14          None of the finished floor elevations of the homes

15  were in the official 100-year FEMA floodplain.  The County has

16  suggested that modification of the floodplain map, but FEMA has

17  not changed its view.  The maps themselves do not model this

18  storm event or the dam break.

19          In addition to the timeline, the evidence will show

20  that the dam failure caused the flooding based upon hydrologic

21  modeling.  Dr. Mark Ross is a professor of hydrology and the

22  director of the Hydrologic Modeling Center at the University of

23  South Florida.

24          Professor Ross specializes in developing and

25  performing water models for coastal plain geographies such as

1  Florida.  He performed water modeling that took into account
2  this very same rainstorm event, the stream conditions of the
3  dam, and all the water that could have caused this flooding.
4  He calibrated his model by using historic rainfall events and
5  making sure that his model could match real life observations
6  of stream conditions that were made.

7          This calibration process took many, many hours to
8  complete and involved a detailed process of measuring rainfall
9  and its impact on stream flows in Elevenmile Creek over a
10  two-year period.  He then ran two scenarios.  First he modeled
11  what would have happened had the dam held.  He then ran a
12  second model and scenario which modeled what would have
13  happened had the dam not been there at all and the water
14  released naturally.

15          The difference between a dam failure and the dam
16  holding or not being there at all is significant.  Had the dam
17  held, only a handful of homes may have had some water in them
18  instead of the 163 that flooded that night.

19          Strikingly, had the dam been removed and the stream
20  returned to a natural, unobstructed channel, no one would have
21  flooded.  Instead, the stream would have acted as it's always
22  acted, naturally releasing the water as it fell instead of
23  storing this water behind it and then catastrophically failing.
24  No dam, no flood.

25          What would International Paper say?  You can expect at

1    least three things.  International Paper will try to grow the

2    storm by pointing to rain that fell at other places.

3    International Paper will try to minimize the dam and the water

4    that it was holding back.  International Paper will talk about

5    other rainstorms and some flooding that occurred in the

6    neighborhood during Hurricane George nearly 20 years ago.

7         When they do this, please remember three things:

8    First, the rain that matters is what fell over the

9    neighborhoods and the mill site, not over the airport or down

10   here in Pensacola, because water doesn't flow up hill, and

11   these homes began to flood very early on in the storm event.

12        Second, the dam was holding back much more water than

13   what would be there on a sunny day condition because it was

14   storming and International Paper's ponds were overflowing at

15   the time.

16        Third, the storm that is at issue is the one that

17   occurred on April 29th, 2014, not Hurricane George, not any

18   other rainstorm.

19        As I said at the beginning, this case is about cause

20   and effect.  No dam, no flood.  Therefore, at the end of this

21   case we will ask that you find International Paper responsible

22   for its actions and render a verdict against it.  Thank you

23   very much for your service, and I hope you enjoy it.

24        **THE COURT:**  Thank you very much.

25        Mr. Nelson, you may proceed.

1          And ladies and gentlemen, please continue with your

2    careful attention as Mr. Nelson presents the opening statement

3    on behalf of International Paper Company.

4          **MR. NELSON:**   International Paper is not responsible

5    for the flooding that occurred in this area during a historic

6    rainstorm on April 29th and 30th of 2014.

7          The cause of the flooding is the fact that the area is

8    located along a floodway down Elevenmile Creek and there was a

9    massive amount of rainfall.  It flooded for that reason, not

10   because of anything International Paper did.  But you can't sue

11   mother nature, which is why we're here today.

12         The cause of the flooding in homes in the class area

13   is the key question that's presented in this trial.  The

14   Plaintiffs are asking you to find that all of the flooding in

15   the homes in the class area which rose to a level of 5 feet or

16   more in some of the homes was because of the failure of the

17   structure known for purposes of this case as the Kingsfield

18   Road dam that's located on the International Paper property.

19   In other words, but for the breach of that structure, all of

20   the flooding in the homes in the class area would not have

21   occurred.

22         Now, Mr. Marshall told you about some of the facts in

23   the case, but there are some that he didn't tell you about and

24   others that he attempted to minimize, so I want to tell you a

25   little bit more about them now.

1    First, the rainstorm that hit the Pensacola area on

2    April 29th and 30th of 2014 was massive and it was truly

3    historic.  Following the storm, Escambia County commissioned an

4    investigation.  It was called the Stormwater Advisory Team

5    known as SWAT that investigated this storm and its effects on

6    Escambia County and they published a report.

7    I'm going to show you a little graphic from this

8    report.  19.56 inches of rain dumped by this storm in the area.

9    Now, Mr. Marshall would like you to believe that there

10   wasn't much rainfall in the class area.  You'll hear that the

11   experts in this case agree that the class area and the

12   watershed around that area received somewhere in the

13   neighborhood of 16 to 20 inches of rain during this storm.  Any

14   way you cut it, it is a massive amount of rain that fell during

15   this event.

16   The National Weather Service looked at this storm and

17   noted that it deposited the most rain in this area since

18   records were kept dating all the way back to 1879.  You think

19   about that, 1879 is the year Thomas Edison invented the light

20   bulb.  That's a period of 135 years and this was the greatest

21   recorded storm.  It was unprecedented and historic.

22   The other point that Mr. Marshall touched on but he

23   didn't really emphasize is the fact that the homes in the class

24   area had flooded before.

25   Now, this case is about the flooding that occurred on

1    April 29th and 30th of 2014.  But the fact that the class area

2    flooded in the past during lesser but still significant

3    rainstorms such as Hurricane George is probative of what

4    produced the flooding in April of 2019 [sic].

5         If you look a little more closely at the class area,

6    you'll see that Elevenmile Creek, the floodway runs right

7    through the middle of it.  So, when you think about where the

8    water is coming from, it is running down this floodway that

9    literally goes right through the class area, which is over here

10   and over here.

11        Third, both Escambia County and FEMA, the Federal

12   Emergency Management Agency, have studied the potential for

13   flooding in the Elevenmile Creek watershed, including the class

14   area, and they've determined that properties are located within

15   the 100-year flood zone.

16        What that means is, a property located in the 100-year

17   flood zone is expected to flood when you have a storm event and

18   a runoff event that exceeds the 100-year interval, which this

19   storm absolutely did.

20        Fourth, Escambia County has concluded that the

21   Elevenmile Creek watershed, including the class area, is so

22   susceptible to flooding that they have applied for and received

23   federal assistance to engage in flood mitigation steps.  And

24   that's been done since this storm event in April of 2014.  And

25   it's been done, and those judgments reached by Escambia County

1    and FEMA to make that federal funding available for flood

2    mitigation is wholly separate and apart from anything that

3    International Paper has done or not done or anything having to

4    do with the Kingsfield Road dam structure.

5         These facts and other evidence will show that the

6    flooding of homes within the class area on April 29th and 30th,

7    2014 was due to the historic rain event, and that Plaintiffs'

8    claims that all of that flooding was attributable to the breach

9    of the Kingsfield Road structure simply cannot be supported by

10   the evidence.

11        My name is Dan Nelson, and I have the privilege of

12   representing International Paper in this case.  Trying the case

13   along with me are Mr. Larry Hill and Mr. Jason Meltzer.  Judge

14   Rodgers introduced you to them before.  Also with us at counsel

15   table is Ms. Laurie McLain.  She is the environmental health

16   and safety manager at the International Paper mill up in

17   Cantonment, and she's here to be part of the trial on behalf of

18   the 450 individuals who work at the facility.

19        I should also tell you a little bit about the facility

20   so it's not just a name.  The mill has been in continuous

21   operation in this area since the 1940s.  It's made a variety of

22   products over time, but today the two products that it

23   manufactures are container board, which is material that's used

24   to make cardboard boxes.

25        So, if you order something on the Internet and you

1    have a product shipped to you in the mail, that is the type of

2    product that may have been made with container board produced

3    at this facility.

4           The other thing that the mill makes is fluff pulp,

5    which is utilized in products such as diapers.  So it's a

6    company that makes products that we see in our everyday lives

7    and it's been a part of this community for a long time.

8           We'll talk a lot about the area.  I know some of you

9    are probably very familiar with it.  But just for orientation,

10   this is a satellite view.  You can see Pensacola Beach, down

11   toward the bottom is Perdido Bay.  And then we'll zoom in a

12   little bit here, and that red area is the class area.  The

13   yellow shaded area above it is part of the Elevenmile Creek

14   watershed that is situated above the class area.

15          If we zoom in a little bit more, that's the

16   International Paper mill facility, and that's the location of

17   the Kingsfield Road dam structure.

18          So, now to turn back to a couple of other aspects of

19   this storm that I think will be important to keep in mind.  It

20   wasn't just the volume of rainfall that made this storm so

21   exceptional and caused it to have such an impact in the area.

22   There was also an intense amount of rain that fell over a very

23   short period of time in the early evening of April 29th.  There

24   were rainfall rates over 3 inches an hour that occurred in and

25   around the watershed that's at issue here, including in the

1   class area.

2            International Paper has an expert witness, Stephen

3   Wistar, who is a meteorologist at AccuWeather, who will be here

4   at trial to talk more about this storm and to zero in on the

5   rainfall event that happened around the class area and above

6   the class area in the watershed.

7            The other fact is that April had been a very wet

8   month.  Normal rainfall in this area during the month of April

9   a little over 4 inches.  The first 28 days of April in 2014 had

10  already experienced over 8 inches of rain.  The morning of

11  April 28th there was another inch-and-a-half to

12  two-and-a-quarter inches of rain that fell.  The result is that

13  the ground was saturated by the time the big rainstorm hit the

14  night of the 29th.

15           To think of an analogy, imagine a sponge that's dry

16  and you dump water on it and the ground retains some of that

17  water.  Well, the ground is like a wet sponge when this storm

18  hit the night of the 28th.  It had already absorbed the water

19  that it was going to absorb.  So you've got the rapid and

20  pretty severe runoff event when the intense rainfall came the

21  evening of April 29th.

22           Turning back to the Escambia County post-event report,

23  this was observed when Escambia County studied the storm.  They

24  talked about the saturated soil condition and the intensity of

25  the rainfall and observed that these conditions combined to

1  produce historic flooding in the Pensacola and surrounding

2  areas.  They talked about the severity of the rainfall itself

3  being described as approaching the 500-year storm, and the

4  flooding may have been of an even greater degree because of the

5  compounding factors of the wet soil and the intensity of the

6  rainfall in a short period of time.  This was truly an

7  extraordinary storm, and it had a lot of impacts, and it's

8  tragic that it did, but the impacts were felt throughout the

9  county.

10          Another thing that Escambia County did was they

11  conducted a post-storm damage assessment.  And this is an

12  excerpt from that assessment that was performed by Escambia

13  County.  And you can see all of those icons indicate some form

14  of damage, whether it was to structures, building damage, road

15  damage, other reports of flooding.

16          If we zoom in, you can see there's quite a lot of it,

17  and it's not confined to the class area.  But there's an

18  interesting thing when you look at the class area as it's

19  depicted on the damage assessment.  You see that, while the

20  class area encompasses homes entirely within the red boundary,

21  the flood damage is really confined to the properties that are

22  right down there along the Elevenmile Creek floodway.

23          Let's turn now to the watershed.  You'll hear a lot of

24  testimony about this from some expert witnesses.  Watershed

25  generally is an area where, if rain falls, it's going to drain

1    down to a common point.  In the case of the Elevenmile Creek

2    watershed, kind of the main artery is Elevenmile Creek itself,

3    but it starts all the way to the north and it runs down to

4    Perdido Bay in the south.

5           There's Elevenmile Creek.  But you'll also note there

6    are some tributaries that contribute flow into Elevenmile

7    Creek, and you'll hear testimony about several of these

8    tributaries.  One is Turtle Creek.

9           And the important point about Turtle Creek is that it

10   comes in below the Kingsfield Road dam structure, so any water

11   during this storm event that ran down Turtle Creek necessarily

12   never passed by the Kingsfield Road dam structure.

13          But that's not the only waterway.  You'll hear

14   testimony about other significant creek beds that were carrying

15   large volumes of water the night of April 29th.  This, too, is

16   water that comes into Elevenmile Creek before it ever flowed

17   down into the class area.

18          You'll also hear testimony about waterways that come

19   into the Elevenmile Creek below the class area.  And the

20   natural question is, well, why is that relevant.  You'll hear

21   from hydrologists who will talk about something called the

22   backwater effect.  Imagine it's kind of like a drain.  If you

23   have a drainpipe and you're the only one putting water into the

24   drainpipe, it flows very easily.  But if there are people

25   farther down that are also putting water into that drainpipe,

1    it causes it to back up because there's only so much water that

2    can flow through a channel.  And you'll hear about the effects

3    some of these other waterways had on the water levels back out

4    toward the class area.

5         This is the drainage area above the class area within

6    the Elevenmile Creek basin, and you'll see it's roughly

7    14-and-a-half square miles.  What is important is to consider

8    that 10-and-a-quarter, approximately, of those square miles are

9    situated down gradient of the Kingsfield Road structure, which

10   means that any of the water that drained out of those areas and

11   went through the class area necessarily did not pass the

12   Kingsfield Road dam structure.

13        You'll hear testimony about some locations around

14   Elevenmile Creek from witnesses.  This map will give you a

15   little bit of a sense of that.  You can see the class area down

16   at the bottom.  You'll hear about what the conditions were like

17   in the early evening hours of April 29th before and around the

18   time of the reported flooding in the class area on Highway 29

19   and over on Highway 297A, and you'll hear people describe to

20   you their firsthand impressions of what it was like out there

21   that night in the early evening, how much water was out there

22   and where it was running.

23        I mentioned prior flooding.  You'll hear testimony

24   about that.  Some of it will come through the named Plaintiffs

25   themselves, and some of it will come from Mr. Christopher Curb,

1  who is Escambia County's stormwater engineer, and he'll be here

2  to testify and tell you about his work over twenty-some-odd

3  years in trying to manage stormwater issues in the areas of the

4  county, including Elevenmile Creek and the class area.

5      Now, the Plaintiffs' case focuses on the Kingsfield

6  Road dam structure.  That was the structure that was on the

7  International Paper property.  Plaintiffs claim that the

8  Kingsfield Road structure failed because IP did not exercise

9  reasonable care.

10      IP did act reasonably.  But I do want to be clear

11  about one thing.  No matter what action IP took on April 29th

12  and before, the class area was going to flood as a result of

13  this historic rainstorm and its location in the class area.

14      Plaintiffs say that the structure had been abandoned.

15  Not so.  You'll hear testimony from several company witnesses

16  who will talk to you about their regular inspection of that

17  facility before the storm in 2014.

18      In fact, you'll hear testimony about an individual who

19  came into work early during this torrential rainstorm on April

20  29th because he was concerned about one of his coworkers being

21  on duty by herself, and he inspected the wastewater treatment

22  system at the company and drove all the way down to that

23  outfall structure that night and he'll tell you about what he

24  saw.  But if that structure were abandoned, ask why did he

25  drive down there in those conditions.  It had not been

1    abandoned.

2            The Plaintiffs fixate on some language in a couple of

3    internal company communications where people were trying to get

4    a handle on what had happened after the storm event.  You'll

5    have an opportunity to hear from the people who were involved

6    in those communications, and they can tell you about what they

7    were doing and how they perceived things.

8            The Plaintiffs would also have you believe that this

9    Kingsfield Road structure was like the Hoover Dam, that it was

10   designed to retain a large volume of water on the International

11   Paper property.  That's just not the case.

12           First of all, we have to think about the size of the

13   structure.  On the upstream side, it had a height of about 8

14   feet, so about this high.  The downstream side was higher, it

15   was about 13 feet.  But this was simply not the kind of

16   structure that is going to hold back a massive amount of water.

17           You'll hear evidence that demonstrates that it was

18   never intended to do that.  It was an outfall structure.  It

19   was originally part of the company's wastewater treatment

20   system when they deposited effluent into Elevenmile Creek.  In

21   fact, the structure had an area called a drop box that allowed

22   water to flow through a 48-inch pipeline to go around the

23   structure.

24           You'll hear about a concrete weir portion of the

25   Kingsfield Road outfall that had notches cut into it and it was

1    designed to allow stormwater to overflow the structure during

2    storm events.  It was never intended or designed to stop the

3    flow of water.

4         Mr. Marshall also told you that the structure that was

5    in place in 2014 was built without a permit.  Not so.  When the

6    company upgraded the structure in 2005 and 2006, it

7    specifically sought permission from the Florida Department of

8    Environmental Protection and the United States Corps of Army

9    Engineers, and it received authorization from both agencies to

10   move forward with that construction project.

11        In addition to their negligence claim in this case,

12   the Plaintiffs have also asserted that International Paper

13   should be found strictly liable for any consequence of the

14   Kingsfield Road dam failure even if IP acted with reasonable

15   care.

16        IP disputes that contention.  But even if the strict

17   liability theory were to be applied in this case, IP is

18   entitled to an "Act of God" defense.  In other words, if the

19   sole cause of the Kingsfield Road structure was the

20   unprecedented rainfall event on April 29th and 30th, 2014, then

21   IP is entitled to an "Act of God" defense.  There's just

22   certain things that no matter what you do you're not going to

23   be able to stop.

24        Now, what do we know about the breach that occurred

25   sometime during the April 29th to 30th time period?  You'll

1    hear eyewitness testimony from a couple of individuals that I

2    think you will find informative.  The first will be

3    Mr. Christopher Quackenbush.  This is the man who came into

4    work early through the rainstorm, and he drove all the way

5    down, and he will tell you about what he saw at approximately

6    9:45 p.m. when he looked at the structure that night.

7            And the question will be:  Based on what he saw, can

8    that be reconciled with the reports of flooding in homes in the

9    class area starting shortly after nine o'clock and continuing

10   towards ten o'clock that evening?

11           You'll also hear testimony from another gentleman

12   named Gene Yuhauz, a long-time operator at the facility who

13   came into work the morning of the 30th, and he will tell you

14   about what he saw when he drove down to the supposedly

15   abandoned structure that morning as part of his regular work

16   duties.

17           He'll tell you what he saw, and he'll also show you

18   some photographs that he took at 7:17 a.m. about the condition

19   of the structure at that time, and you'll hear testimony about

20   what that signifies in terms of the plausibility of a breach of

21   the structure the night before.

22           On causation, as I mentioned, the Plaintiffs want you

23   to find that all of the flooding in the homes in the class area

24   was caused by the breach in the Kingsfield Road structure.

25           How do the Plaintiffs attempt to meet their burden to

1    prove that?  The Plaintiffs' causation case rests on a single

2    leg -- the expert opinion of their hired witness, Dr. Ross.

3              What did Dr. Ross do?  Well, he reached the conclusion

4    that, had the dam not failed, the flood conditions would not

5    have occurred.  He did that by running a post-event hydrologic

6    model, and he looked at two scenarios.

7              **JUROR** ▓▓▓▓:  I'm sorry.

8         **THE COURT:**  Do you want to step out and get something

9    to drink?  That's all right.

10             *(Juror* ▓▓▓▓▓▓ *exits courtroom briefly.)*

11        **THE COURT:**  Ladies and gentlemen, if at any time you

12   find yourself getting sleepy -- and that can occur, especially

13   after lunch -- there's no problem at all with you standing up.

14   Just sometimes that can help keep you awake.  I try to keep the

15   temperature in here -- if you haven't already noticed, it's on

16   the cooler side.  And if I warm it up, I promise you we'll all

17   be asleep, including me, which is never good.

18             *(Juror* ▓▓▓▓▓▓ *returns.)*

19        **THE COURT:**  Ms. ▓▓▓▓, are you all right?

20        **JUROR** ▓▓▓▓:  I'm sorry.

21        **THE COURT:**  No, that's fine, that's no problem.

22             All right, Mr. Nelson, you can proceed.

23        **MR. NELSON:**  Thank you, Your Honor.

24             So, how did Dr. Ross reach the conclusion?  Well, he

25   ran two hypothetical scenarios in his model.  The first is, if

1    the dam was there but did not fail what would have happened;

2    and the second is, had the dam been removed and not been

3    present what would have happened.

4            And according to Dr. Ross, his study concludes that in

5    either of those two hypothetical situations the flooding in the

6    class area would not have occurred.  And from there, Dr. Ross

7    leaps to the conclusion that it must follow that the flooding

8    was caused by the breach of the Kingsfield Road structure.

9            You'll hear testimony and evidence during trial about

10   some of the subjective judgments Dr. Ross made with his model

11   that facilitated the outcomes that his model produced.  But

12   what Dr. Ross did not do is even more important.

13           You'll hear about well accepted models that are used

14   to evaluate the impact of dam breaches.  In fact, the United

15   States Army Corps of Engineers has a model called "dam break."

16   Dr. Ross knew about the existence of these models, he knew they

17   were out there, and yet he never ran one.

18           So I'd ask you to consider, if he really wanted to

19   know whether or not the water released through the breach of

20   the Kingsfield Road dam structure could have caused all of the

21   flooding in the class area, why didn't he run the dam break

22   model?

23           IP's causation case rests on multiple pillars.  As

24   with the Plaintiffs, IP has an expert witness, Dr. Frank Lan.

25   He's a hydrologist with more than 25 years of experience

1  working on surface water projects including hydrologic modeling

2  and dam break analyses.

3       Like Dr. Ross, Dr. Lan studied the available data

4  about rainfall and the topography in the watershed, and he ran

5  the same model scenarios that Dr. Ross did:  what happens if

6  there's a dam in place and no breach, and what happens if the

7  dam had not been there.

8       What Dr. Lan found when he ran his model the way he

9  believed the model should be correctly run is that there would

10  have been a lot of flooding in houses in the class area due to

11  just the runoff from the storm and into Elevenmile Creek.

12       And you'll have the opportunity to listen to both Dr.

13  Ross and Dr. Lan about why they constructed their models the

14  way they did.  But unlike Dr. Ross, Dr. Lan went on and he

15  said:  *The question here is what happened when the dam*

16  *breached.  Was there enough water that went through the dam*

17  *breach to cause the flooding?*

18       So Dr. Lan looked at that question, and he looked at

19  it in two ways.  The first is he looked at the evidence of the

20  breach itself, including the photograph Mr. Yuhauz took at 7:17

21  a.m.  And based on his review of that evidence and his

22  empirical work and consultation of scientific literature, it's

23  his judgment that the dam breach did not begin to form until an

24  hour or so before Mr. Yuhauz took that picture at 7:17 a.m.  So

25  when he looked at it, he said the best evidence tells me this

1  breach happened well after the flooding in the homes in the
2  class area.
3          But Dr. Lan did not stop there.  He also actually ran
4  the dam breach model which is set up to evaluate the question:
5  *We've got a volume of water impounded behind a dam.  The dam*
6  *breaches.  Where does that water go?  What's the effect of that*
7  *water when it goes into a channel like Elevenmile Creek that's*
8  *already receiving so much water from the other waterways?*
9          And when he ran that analysis, he did it in a couple
10  of different permeations.  The first is he ran it based on the
11  time that in his judgment the breach happened, which was in the
12  early morning hours of April 30th.  And what he found when he
13  ran the model with that breach time is that the dam breach had
14  no impact in the class area.  And it makes sense because the
15  large volume of water had gone through earlier so the high
16  watermark had been achieved in the class area before the
17  breach.
18          Dr. Lan didn't stop there.  He also said, *Well, let me*
19  *look at this another way.  I want to be thorough about this,*
20  *and I really want to get to the bottom of the answer.*  So he
21  ran the dam breach at the worst case time.  He ran the dam
22  breach when the water behind the Kingsfield Road structure was
23  at his maximum elevation, so worst case scenario for the dam
24  breach.
25          And what he found when he ran that worst case scenario

1     is that the dam breach, which would have been shortly after

2     midnight for the worst case scenario, would have led to about

3     an additional two-and-a-half inches of water in homes in the

4     class area.

5              So think about that. Homes with over 5 feet of water,

6     worst case dam breach scenario, maybe two-and-a-half inches.

7     And of course, that's not what Dr. Lan really believed

8     happened, but he tried to look at it every way he could to

9     answer the question is there a way the breach of this structure

10    could have produced the flooding in the class area, and his

11    conclusion is that it's not possible.

12             Let's turn to the other pillars that are supporting

13    IP's causation defense, because we're not resting on simply

14    expert testimony.

15             You've got to remember, this was a historic rainstorm

16    event, and the class area had flooded before during less

17    significant but still intense rainfall events.

18             The second fact is the watershed itself. The

19    Elevenmile Creek drainage channel runs right through the middle

20    of the class area. This drainage channel picks up more than

21    10-and-a-quarter square miles of drainage that originates below

22    the Kingsfield Road structure.

23             A third pillar supporting IP's causation defense is

24    that both FEMA and Escambia County have identified properties

25    in the class area as being present within the 100-year flood

1    zone.  Well, if you're in a property that's in the 100-year

2    flood zone and you have an event that's a 100-year event or

3    greater event like this storm clearly was, you expect there to

4    be flooding from the storm runoff.

5          This is a map that's been prepared by Escambia County.

6    This is a map that Escambia County has prepared as part of its

7    work to understand the flooding issues in the Elevenmile Creek

8    drainage area.  And when Escambia County has looked at this --

9    it's a little bit hard to see with the resolution here, but

10   basically the area that's in gray contains homes that are

11   within what Escambia County has deemed to be the 100-year flood

12   zone.

13         So you will see that with Escambia County's modeling,

14   which is performed in 2008, by the way, well before this event,

15   there are a lot of the houses that are within the 100-year

16   flood zone, which is where you would expect there to be flood

17   effects when you get a big storm that exceeds the 100-year

18   interval.

19         A fourth pillar supporting IP's causation defense is

20   Escambia County's efforts to address future flooding in the

21   class area through flood mitigation programs.  It's an

22   unfortunate fact that parts of the class area are so prone to

23   flooding that Escambia County has gone to the federal

24   government to get assistance for flood mitigation, and that's

25   work that's ongoing.

1    And you'll hear from Mr. Curb, the Escambia County

2    stormwater engineer, about his concern for future flooding in

3    this area and everything that he's doing to try to keep it from

4    happening again.  And that has nothing to do with a breach of a

5    Kingsfield Road structure on International Paper.  That's

6    because this man is dedicated and he is concerned and he does

7    not want there to be another flood event in this area during an

8    intense rainstorm.

9    A seventh [sic] factor or pillar that supports IP's

10   causation defense is what I would characterize as geography and

11   common sense.  This is a graphic that shows the Kingsfield Road

12   dam structure in the class area and you can see that the

13   Elevenmile Creek drainage channel running down, you can see a

14   lot of the other green that runs in there, and those are some

15   of the creeks that I depicted on the watershed graphics.  You

16   see a lot of water coming in.

17   It's about 2 miles from the structure down to the

18   class area, so that's a lot of area to pick up water.  And you

19   also have to think about -- I think this image is helpful in

20   showing it -- the relative size of the area behind the

21   Kingsfield Road structure and how much water was this very

22   modestly sized overflow structure capable of retaining.  It's

23   not a large area.

24   Just for comparison, if you zoom in and you look at

25   the area behind the Kingsfield Road structure over on the right

1    and compare it with the area in the class neighborhoods, you

2    get a sense that it's just not that big compared to the area

3    that was supposedly inundated with up to 5 feet of water.  If

4    you look back out, you get a sense of perspective for the

5    watershed that will be at issue.

6            So, in short, unlike the Plaintiffs' case,

7    International Paper's causation case is not based on only

8    expert testimony.  It's also based on the facts about the April

9    29th and 30th storm event, it's based on the facts about the

10   Elevenmile Creek watershed, it's based on the history of the

11   flooding in the class area during significant storm events,

12   it's based on Escambia County's studies of this area and its

13   conclusion that homes in the class area are located within the

14   100-year flood zone, and it's based on common sense which you

15   as members of the jury are entitled to exercise in evaluating

16   whether to credit post-event expert testimony and modeling.

17           I thank you for your time serving on this jury.  And

18   we're going to ask that, after you hear all of the evidence,

19   you find that International Paper was not responsible for all

20   of the flooding in the homes in the class area during the

21   historic rainstorm on April 29th and 30th of 2014.  Thank you.

22           **THE COURT:**  Thank you very much.

23           Ladies and gentlemen, we'll take a brief recess for

24   your comfort before we start with the Plaintiffs' case in

25   chief.  We'll be in recess for 15 minutes.  Please don't

1  discuss the case amongst yourselves nor with anyone else during

2  the recess; and very importantly, please don't begin to form

3  any opinion yet about the merits of the case.  Leave your pads

4  there on your chairs, and we'll see you back in 15 minutes.

5  Thank you.

6            *(Jury out.)*

7            Mr. Marshall, who is your first witness?

8            **MR. MARSHALL:**  Mr. Bullard.

9            **THE COURT:**  He'll be on the stand at around five to

10  four.  Thank you.  We'll be in recess.

11            *(Recess taken.)*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(Recess was taken from 3:42 to 3:58 p.m.)*

2         THE COURT:  All right.  Mr. Kauffman.

3         MR. KAUFFMAN:  Yes, Your Honor.  At this time we'd

4    like to invoke the rule of sequestration for this witness.  If

5    there is any fact witness, nonexpert or nonparty, who's present

6    in the courtroom, we ask that they be instructed to leave.

7         THE COURT:  Counsel, the rule has been invoked.  You

8    should advise your witnesses accordingly.

9         MR. NELSON:  Yes, Your Honor.

10        THE COURT:  Okay.

11        All right.  Then we're ready to proceed?

12        Ms. Adams, if you'll bring the jury in, please.

13        All right, ladies and gentlemen if you'll remain

14   standing.  Everybody else can be seated.  And if you'd raise

15   your right hand to be sworn.

16        *(Jury sworn.)*

17        **RICHARD BULLARD, PLAINTIFF WITNESS, DULY SWORN**

18        DEPUTY CLERK:  Please state your full name and spell

19   your last name for the record.

20        THE WITNESS:  Richard Lee Bullard.  It's

21   B-U-L-L-A-R-D.

22        THE COURT:  All right.  Ladies and gentlemen,

23   Mr. Bullard is the plaintiffs' first witness; and Mr. Kauffman,

24   you may proceed when you're ready.

25

1                        **DIRECT EXAMINATION**

2     BY MR. KAUFFMAN:

3     Q.   Good afternoon.  I know that you just introduced yourself.

4     Where did you live at April of 2014?

5     A.   970 Bristol Park Road.

6     Q.   Did your house flood on the morning of April 29, 2014?

7     A.   Yes, it did.

8     Q.   Are you married?

9     A.   Yes.

10    Q.   Do you have any children?

11    A.   I have one son.

12    Q.   How long have you been married?

13    A.   40 years.

14    Q.   What do you do for work?

15    A.   I recently retired from the U.S. Marshal's Service.

16    Q.   How long did you work for the U.S. Marshal's Service?

17    A.   20 years.

18    Q.   Where did you work?

19    A.   Primarily out of the Mobile, Alabama, and the Pensacola

20    office.

21    Q.   What did you do before you worked for the United States

22    Marshal's Service?

23    A.   I worked at a rayon plant over in Mobile, and I was also in

24    the Air National Guard at that time and the Air Force Reserves.

25    Q.   How long were you in the Air Force?

1   A.   I was active duty for ten years and ten years I was in the

2   Air Force Reserves and Guard.

3   Q.   What was your rank when you retired from the Air Force?

4   A.   Master Sergeant.

5            THE COURT:  Mr. Bullard, could you move your chair,

6   please, closer?  The device with the red light, or dot, is your

7   microphone.  Just so we can make sure everybody can hear you.

8   Thank you.

9   BY MR. KAUFFMAN:

10  Q.   Mr. Bullard, when did you buy your home on Bristol Park

11  Road?

12  A.   February 2014.

13  Q.   Before you bought your home, what did you understand was

14  the history of the home with regard to flooding?

15  A.   I understood that it had not flooded.

16  Q.   Did I understand that correctly, that it had not flooded

17  before?

18  A.   It had not flooded.

19  Q.   What was your understanding when you bought the home

20  regarding whether it was in a FEMA flood zone?

21  A.   I understood it was not in a flood zone.

22  Q.   I'd like to show you what has been marked for

23  identification as Exhibit 43.  It will appear on your screen,

24  Mr. Bullard.

25            Mr. Bullard, do you recognize what has been marked as

1    Plaintiff's trial Exhibit 43?

2    A.   Yes, I do.

3    Q.   Is this an accurate depiction of an aerial of the

4    neighborhood?

5    A.   Yes.

6              MR. KAUFFMAN:  Your Honor, move to admit.

7              THE COURT:  That's not what I'm showing as Plaintiff's

8    number 43.  Did you say 43?

9              MR. KAUFFMAN:  43, yes, ma'am.

10             THE COURT:  My Plaintiff's Exhibit list -- let me see

11   your Plaintiff's Exhibit list.

12             So tell me again what this is.  This says it's coming

13   in through -- my list says this document is coming in through

14   Mark Ross.

15             MR. KAUFFMAN:  No, Your Honor.  That's mislabeled.

16   It's just an aerial of the neighborhood.  So Mark Ross --

17             THE COURT:  My description says tax plat of property.

18             MR. KAUFFMAN:  Okay.  Your Honor, this is the aerial

19   from that -- it is the same exhibit that is a tax plat of the

20   property.

21             THE COURT:  Okay.  All right.  Any objection --

22             MR. HILL:  No objection.

23             THE COURT:  -- to 43?

24             43 is admitted.

25        (PLAINTIFF EXHIBIT 43:  Received in evidence.)

1          MR. KAUFFMAN:  Your Honor, may I please publish to the

2    jury?

3          THE COURT:  Yes.

4    BY MR. KAUFFMAN:

5    Q.   Mr. Bullard, could you please take the pen that is in front

6    of you and please circle on the screen your home on this map?

7    A.   I'm not seeing that map on my screen.

8          THE COURT:  No, it's not on any of the screens.  It's

9    not on mine, and it's not -- is it on yours?

10          What about counsel table?

11          MR. KAUFFMAN:  It's on.

12          THE COURT:  Ladies and gentlemen, let me explain

13    something to you.  The attorneys are aware of this, and the

14    parties.  This is not our ordinary or normal evidence

15    presentation system.  We have a large screen that drops down

16    from the roof.  We have a projector.  And that is what we're

17    typically used to using, and that hooks up to this system.

18          On Friday the projector died, so we are makeshift with

19    an alternate-type system.  And I know that Ms. Simms is fast

20    messaging our IT folks to get them up here because the witness

21    needs to be able to see the exhibit on his monitor.

22          MR. KAUFFMAN:  Your Honor, I can proceed.

23          THE COURT:  Oh, is it up now?  So it was mine.  Okay.

24    BY MR. KAUFFMAN:

25    Q.   Do you have a pen in front of you?

1    A.    Yes.

2    Q.    Could you circle on the map your home.

3          Okay.  So you've circled it in black on Exhibit 43?

4    A.    Yes.

5    Q.    And I'd like to show demonstrative 7.

6          Mr. Bullard, do you recognize what is demonstrative 7?

7    A.    Yes, I do.

8    Q.    Which one of the colored boxes is the one around your

9    house?

10   A.    The yellow box.

11   Q.    And can you identify, please, what this road is on the

12   right side of the neighborhood?

13   A.    This road is 297A.

14   Q.    What's the road on the --

15   A.    297A.

16         THE COURT:  297A?

17         THE WITNESS:  Yes.

18         THE COURT:  Is that right?

19         THE WITNESS:  Yes.  And then the road that turns to

20   the left going west is 97.

21   BY MR. KAUFFMAN:

22   Q.    Now, looking at this map, how would you tell someone to get

23   to your house from 297A?

24   A.    Take a left on Highway 97, and then take the first left

25   onto Bristol Park Road.

1  Q.   Could you please trace for me Bristol Park Road.

2  A.   This road right here.

3  Q.   Now, as you drive down Bristol Park Road, how does the road

4  slope?

5  A.   It's a gradual slope all the way down to our house.

6  Q.   Is your house at the bottom of the downhill slope?

7  A.   Yes.

8  Q.   Now, looking out from your front door, how does the house

9  across the street sit?

10  A.   It sits up on a slight hill.  It's probably four feet

11  higher elevation than ours is.

12  Q.   Looking out your front door, the house on your right, the

13  one that is immediately up the street towards Highway 97, how

14  does that sit compared to your house?

15  A.   It's also slightly higher than our house.  Maybe a foot or

16  two at the most.

17  Q.   Does your house sit the lowest of all of the houses on

18  Bristol Park Road?

19  A.   Yes, it does.

20  Q.   How do you think your house sits compared to the rest of

21  the neighborhood?

22  A.   It's probably the lowest in the whole neighborhood.

23  Q.   How big was the lot that your house was built on?

24  A.   It was about an acre.

25  Q.   Can you describe the backyard portion?

1  A.   The first 50 to 75 feet was inside a fence, and it was --

2  had grass in it.  The rest of it was just natural, all the way

3  down to the stream.

4  Q.   Can you mark the stream on the map.

5       Did you ever walk back to -- it's Elevenmile Creek; is

6  that correct?

7  A.   Yes.  Yes.

8  Q.   Did you ever walk back to the creek?

9  A.   Yes, I did.

10 Q.   How far is the creek from the back of your house?

11 A.   275, 300 feet.

12 Q.   And to describe that, what -- what would be a good

13 indication of --

14 A.   It's about the length of a football field.

15 Q.   Now, walking from the back of your house to the creek, how

16 does the ground slope?

17 A.   It slopes gradually down to the stream.

18 Q.   Can you describe for the jury, please, the creek's bank.

19 A.   The bank was about five feet higher than the water level.

20 Q.   Did you ever climb down the bank?

21 A.   Yes, I did.

22 Q.   How did you do that?

23 A.   I tied a rope to a tree and just threw it over the bank and

24 used that to climb down and climb up.

25 Q.   Once you get to the creek bed, how deep was the water?

1   A.   It was about ankle deep, three or four inches at the most.

2   Q.   Was the creek narrow enough, for example, that a dog could

3   swim through it?

4   A.   Yes.

5   Q.   When you bought the home, did you know anything about a dam

6   being upstream in the creek above your property?

7   A.   I had no indication of that at all.

8   Q.   At the time of the flood on April 29, 2014, did you have

9   any idea there was a dam in the creek upstream of your property?

10  A.   No.

11  Q.   Were you at home at your Bristol Park home on the evening

12  of April 29, 2014?

13  A.   Yes.

14  Q.   When did you arrive home?

15  A.   About 6:00 o'clock.

16  Q.   Did you work that day?

17  A.   Yes, I did.

18  Q.   Where did you work that day?

19  A.   Here in the Pensacola office, in the courthouse.

20  Q.   Was it this courthouse or the one across the street?

21  A.   I worked in both of them, so it could have been either one.

22  Q.   And how far is it, would you say, from downtown Pensacola

23  to the home in Bristol Park?

24  A.   About 15 miles.

25  Q.   Did you have any difficulty driving home on the way home?

1    A.    Not at all.

2    Q.    Now, when you arrived at home -- I'm sorry.  What direction

3    is your home from downtown Pensacola?  What direction is the

4    Bristol Park home?

5    A.    North northwest.

6    Q.    Now, was there anyone else at home when you arrived on

7    April 29, 2014?

8    A.    My wife was there.

9    Q.    Did you have any pets at home?

10   A.    We have two dogs.

11   Q.    Now, how do your pets react once it starts raining?

12   A.    They don't like thunder and lightning at all.  They shake.

13   They try to hide under beds or whatever.  They need to be out of

14   sight so they can't see the windows or anything so they're not

15   scared.

16   Q.    On April 29, 2014, did your pets react to the storm?

17   A.    Oh, yes.

18   Q.    About what time did it start storming?

19   A.    It was about 8:00 o'clock, 8:00 p.m.

20   Q.    Now, what did you do as your pets were getting upset?

21   A.    My wife took the dogs and put them on the bed, and she went

22   back there and laid down with them.

23   Q.    She went to bed?

24   A.    Yeah.  About 8:30 or so she was in bed, asleep.

25   Q.    Now, after your wife went to bed, what did you do?

1  A.    I watched TV for a while.

2  Q.    On the television were there any flood warnings of specific

3  flooding in your area?

4  A.    It was on the local channels and so, of course, the local

5  weather reports would pop up and, you know, say there's

6  rainstorms in the area or coming.

7  Q.    Now, after your wife went to bed, did your son check in on

8  you?

9  A.    It was about 9:15, he texted me and said he saw something

10  on Facebook that there might be water in the area.

11  Q.    What did you do when you received a text message?

12  A.    I went out and looked, and the water was running clear in

13  the roads and in the gutters, no problem.

14  Q.    How long were you outside?

15  A.    About 10 or 15 minutes.

16  Q.    When you came back inside after you looked for a while, was

17  there any water in your house?

18  A.    No.

19  Q.    Did you go back outside again?

20  A.    Yeah.  After I had been in the house about 10 or 15

21  minutes, I went back out and just looked again.  And it was

22  starting to stay in the gutters.  I mean, it wasn't rain

23  draining away.  It was backing up.  And it started covering the

24  road, and so I went back in the house and told the wife -- or I

25  woke her up, and thought we needed to leave.

1  Q.   And what was your wife's reaction when you told her that

2  you had to leave?

3  A.   I had to wake her up, and so she didn't want to wake up.

4  And she didn't believe me at first, and so we argued a little

5  bit, and she went outside herself to look.

6  Q.   How long was she outside?

7  A.   About 10 minutes.

8  Q.   Once she came back what did you do?

9  A.   We threw some, you know, personal belongings in a bag --

10  medicines, computers, phones, chargers, dog food, leashes, and

11  stuff like that into a bag, and put it out in the truck and got

12  ready to leave.

13  Q.   What happened as you tried to leave?

14  A.   Well, the water had come up pretty quickly by then?  And

15  when the back wheels got out to the street, the back end of the

16  truck floated.

17  Q.   What did you do then?

18  A.   It was a four-wheel drive vehicle, so I still had traction

19  in the front.  So I just pulled back up in the driveway, tried

20  to go back in the house.

21  Q.   After you went back into the house, did you get -- did you

22  have any water in your house at that time?

23  A.   It was already standing in the garage, and the garage

24  was -- it was about a three-inch step or so into the house, so

25  it wasn't quite into the house yet, but it was already standing

1    in the garage.

2    Q.   Now, after that point in time, did you get water in your

3    house?

4    A.   Oh, yes.

5    Q.   I'd like to show you what's been marked as Plaintiff's

6    Exhibit 110.

7            If you could please erase what you've put on the

8    screen.

9            Mr. Bullard, do you recognize what's been marked as

10   Plaintiff's Exhibit 110?

11   A.   Yes, I do.

12   Q.   Is this a fair and adequate photograph -- or a fair and

13   accurate photograph of the inside of your house on the --

14   A.   Yes.

15   Q.   -- evening of the flood?

16   A.   Yes.

17           MR. KAUFFMAN:  Move to admit.

18           MR. HILL:  No objection.

19           THE COURT:  110 is admitted.

20       (PLAINTIFF EXHIBIT 110:  Received in evidence.)

21           MR. KAUFFMAN:  May I please publish to the jury?

22           THE COURT:  Yes.

23   BY MR. KAUFFMAN:

24   Q.   Mr. Bullard, what room of your house is this?

25   A.   This is the master bedroom.  My wife took this while she

1   was still on the bed with the dogs.

2   Q.   And what is next to the chair?  What is that piece of

3   furniture?

4   A.   That's my desk.

5   Q.   I see a clock on there.  Does that clock work?

6   A.   No, it did not.  That was a clock that my dad bought when

7   he was in the military years and years before this time.  And my

8   mom was moving in with my brother, and so we were moving all her

9   belongings down to our house.  And that clock always meant a lot

10  to me, so I was going to bring it to our house and fix it; but

11  at that point, no, it was not working.

12  Q.   What time do you think this photo was taken?

13  A.   10:38.

14  Q.   How much water was in your house at the time this photo's

15  taken?

16  A.   That's about a foot of water, 12 inches.

17  Q.   What device was this photo taken with?

18  A.   Cell phone.

19  Q.   Do you understand whether or not photos that are taken with

20  a cell phone record the date and time?

21  A.   Yes.

22          MR. KAUFFMAN:  May I approach, Your Honor --

23          THE COURT:  Yes.

24          MR. KAUFFMAN:  -- with Exhibit 128.

25          THE COURT:  You may.

1    BY MR. KAUFFMAN:

2    Q.   Mr. Bullard, I've handed you what's been marked as

3    Exhibit 128.  Do you recognize it?

4    A.   Yes, I do.

5    Q.   What is Exhibit 128?

6    A.   It's a list of pictures and the times they were taken.

7             MR. KAUFFMAN:  Move to admit, Your Honor.

8             MR. HILL:  No objection.

9             THE COURT:  128, Plaintiff's 128 is admitted.

10        *(PLAINTIFF EXHIBIT 128:  Received in evidence.)*

11            MR. KAUFFMAN:  I'm going to show for the jury

12   Exhibit 128 on the ELMO here.  Adjust it here.

13   BY MR. KAUFFMAN:

14   Q.   Mr. Bullard, do you find the photo that we saw from

15   Exhibit 10, which was -- if we could go back to Exhibit 10, just

16   to look at what the number was on it.

17            MR. VLACHOS:  It's 935.

18            MR. KAUFFMAN:  935.

19   BY MR. KAUFFMAN:

20   Q.   Mr. Bullard, do you see 935 on the third page of the

21   document?

22   A.   Yes, I do.

23   Q.   What is the date/time taken stamp on the photograph for

24   935?

25   A.   It's 4-29-2014, and it's at 2238.

1  Q.   I'm going to highlight this number right here.  You'll see

2  it on your screen.

3           Mr. Bullard, have I highlighted the correct time stamp

4  for that photograph?

5  A.   Yes, you have.

6  Q.   Now, looking at some of the previous photographs listed in

7  this exhibit, do you have an idea of when water started coming

8  into your house?

9  A.   Well, there was another photo taken of the hallway when it

10 started coming in.  I mean, this is already 12 inches of water

11 in the house.

12 Q.   Okay.  So when do you think the photo was first taken when

13 you first got in the hallway with water coming into the house?

14 A.   It's about 10:30.

15 Q.   Okay.  Do you think that it's this photo, 933, based off of

16 your review of your photos?

17 A.   Yes, it is.

18 Q.   So I've highlighted 933.  Have I highlighted that

19 correctly?

20 A.   Yes.

21 Q.   So, Mr. Bullard, what's the time difference between 933,

22 the picture that's taken there, and 935?

23 A.   Ten minutes.

24 Q.   Can we go back to Exhibit 110, please.

25           Now, Mr. Bullard, how quickly do you think the

1   water -- based off of your review of the time stamps on those

2   photographs, how quickly did the water rise in your house?

3   A.   Well, in ten minutes' time, that's about 9 inches of depth.

4   Q.   Now, how would you describe how the water continued to rise

5   in your house?

6   A.   Very quickly.

7   Q.   Now, what did you do as it began to rise?

8   A.   Well, when we first got back in the house and put

9   everything on the bed in the master bedroom, me and my wife took

10  this picture.  And it wasn't long after that, I mean, just a

11  minute or two, we started moving stuff into the kitchen, laid

12  all of our stuff on the kitchen counters, because the water was

13  coming in pretty quickly.  And by the time we got all the stuff

14  on the kitchen counters, we went ahead and put it on top of the

15  cabinets.

16  Q.   Why did you have to put it on top of the cabinets?

17  A.   Well, we had an arched, open ceiling in the house.  It was

18  arched, and so it was open above the cabinets.  And so we stood

19  on top of the countertops and just put everything up there, our

20  dogs included, dogs and all of our belongings up there.

21  Q.   I'd like to show you what's been marked as Exhibit 271.

22       Mr. Bullard, on your screen is 271.  Do you recognize

23  it?

24  A.   Yes, I do.

25  Q.   Is 271 an accurate depiction of the inside of your house --

1    A.    Yes.

2    Q.    -- the evening of April 29?

3    A.    Yes, it is.

4          MR. KAUFFMAN:  Move to admit.

5          THE COURT:  Any objection?

6          MR. HILL:  No objection.

7          THE COURT:  271 is admitted.

8          *(PLAINTIFF EXHIBIT 271:  Received in evidence.)*

9          MR. KAUFFMAN:  I'd like to publish to the jury.

10   BY MR. KAUFFMAN:

11   Q.    Mr. Bullard, what does Exhibit 271 show?

12   A.    Well, we were standing on the counters taking these

13   pictures, and that's the hood vent of our stove across the other

14   side of the kitchen.

15   Q.    Is that water in this photo?

16   A.    The dark stuff is the water.

17   Q.    How high is the water in this photo?

18   A.    It's right to the bottom of those wall cabinets.

19   Q.    Now, going back to Exhibit 128 that's on the ELMO here --

20   remember, this is Number 937.  If I could go back to the ELMO.

21   937.  What is the time stamp on 937?

22   A.    2336.

23   Q.    2336.  And I'm going to mark that here.  I'm going to

24   highlight it.  Have I highlighted the right one?

25   A.    Yes, sir.  Yes, sir.

1  Q.    Okay.  Mr. Bullard, looking at the time stamps between the

2  photo that you took in the bedroom at 2238 and the photo when

3  you're in the kitchen at 2336, do you have an idea of how long

4  it took the water to rise from one foot to almost underneath

5  your kitchen cabinets?

6  A.    Right at an hour.

7  Q.    Did you say about an hour?

8  A.    About an hour.

9  Q.    Can we go back to 271.

10        Now, where were you standing when this photo was

11  taken?

12  A.    We were standing on the kitchen countertops.

13  Q.    Did the water continue to rise?

14  A.    Yes, it did.

15  Q.    I'd like to show the witness Exhibit 111.

16        Mr. Bullard, do you recognize what's been marked as

17  Exhibit 111?

18  A.    Yes, I do.

19  Q.    Is Exhibit 111 an accurate depiction of your inside of your

20  home that evening?

21  A.    Yes, it is.

22        MR. KAUFFMAN:  Move it admit, Your Honor.

23        MR. HILL:  No objection.

24        THE COURT:  That will be admitted.

25        *(PLAINTIFF EXHIBIT 111:  Received in evidence.)*

1      MR. KAUFFMAN:  May I please publish to the jury.

2      THE COURT:  Yes.

3  BY MR. KAUFFMAN:

4  Q.   Mr. Bullard, what does this photo show?

5  A.   That is our breakfast nook that adjoins to the kitchen.

6  Q.   And how high is the water in this photo?

7  A.   It's about five feet deep there.

8  Q.   Do you think that this is near the peak of the water as it

9  rose in your house?

10  A.   It's close to the peak.

11  Q.   Looking back at Exhibit 128 that's here on the ELMO,

12  remember, this is 942.  Do you see 942 on this list?

13  A.   Yes, I do.

14  Q.   Okay.  What is the time stamp next to 942?

15  A.   044.

16  Q.   That's military time for what time?

17  A.   12:44 a.m.

18  Q.   Now, if I could go back to Exhibit 111.  How long -- or let

19  me ask this:  Where were you when this photo was taken?

20  A.   We were standing on the kitchen counters, in the kitchen.

21  Q.   Was the water up to your --

22  A.   It was about up to our waist at that point.

23  Q.   Even standing on the counters?

24  A.   Even standing on the kitchen counters.

25  Q.   How long did you and your wife stay on the kitchen

1  counters?

2  A.   We got up there about 11:00 o'clock, 11 p.m. that night.

3           THE COURT:  Okay.  Excuse me.  Ladies and gentlemen,

4  I'm going to ask you to step into the jury room for just a few

5  moments.  I'll call you back in in just a moment.  Please don't

6  discuss the case.

7           I'm sorry, sir.  Will you leave your pad?  Thank you.

8       *(Jury excused.)*

9           THE COURT:  Counsel, approach the bench, please.

10      *(Following conference held at the bench.)*

11          THE COURT:  I'm very sensitive to the jury being --

12          THE REPORTER:  Your Honor, I'm sorry.  I can't hear

13  you.

14          THE COURT:  I don't know why.

15      *(Due to a technical difficulty, a portion of the sidebar*

16  *was not heard or recorded.)*

17          THE COURT:  Yeah, that's not going to happen.

18          MR. KAUFFMAN:  Okay.  We'll ask --

19          THE COURT:  Yeah.  Is she a party?  I assume she's --

20          MR. KAUFFMAN:  I believe she's a class member, Your

21  Honor.

22          THE COURT:  I just -- I can't have that.  I wouldn't

23  allow it on either side of the courtroom.

24          MR. KAUFFMAN:  I understand.

25          THE COURT:  And I understand it's an emotional

1    situation for everyone, you know, all the plaintiffs.  She's

2    sitting, literally, two or three arm lengths away from the jury.

3              MR. KAUFFMAN:  Okay.  We'll resolve this, Your Honor.

4              MR. HILL:  While we're up here, I would like to

5    mention, I have refrained from objecting because of Your Honor's

6    rulings about the level of water and that sort of thing.

7              THE COURT:  Mm-hmm.

8              MR. HILL:  We're getting into territory where really

9    the testimony elicits sympathy, talking about having to stand up

10   on top for hours, talking about the dogs.  All of that we

11   allowed, but -- under your ruling, but we're getting dangerously

12   close.  I hate to have to object in front of --

13             THE COURT:  Well, so far I haven't had --

14             MR. HILL:  Understood.

15             THE COURT:  -- a problem.  I have been listening

16   carefully.

17             MR. HILL:  Thank you.

18             THE COURT:  But the crying, I mean --

19             MR. KAUFFMAN:  I understand.

20             THE COURT:  -- openly is not going to -- I can't

21   tolerate it.

22       *(End of bench conference.)*

23             THE COURT:  All right.  We're going to take a brief

24   recess.

25       *(Recess was taken from 4:27 to 4:33 p.m.)*

1          THE COURT:  Excuse me.

2          MR. KAUFFMAN:  Your Honor, may I approach?

3          THE COURT:  Yes.  Mr. Hill.

4      *(Following conference held at the bench.)*

5          MR. KAUFFMAN:  Your Honor, the woman who was weeping,

6  we took her outside to get a glass of water.  We do not think

7  that this will be an issue.

8          THE COURT:  Okay.

9          MR. KAUFFMAN:  She's outside to compose herself, have

10  a glass of water.  She'll be fine.

11          THE COURT:  Okay.  Well, I'll have a word with

12  everybody in the courtroom and just make sure everybody

13  understands how important it is that we not have any displays of

14  that.  It was very audible.

15          MR. KAUFFMAN:  I'm sorry, Your Honor.  I was not aware

16  of it.

17          THE COURT:  Yeah.  I know you were focused on the

18  witness, but she was being consoled and, again, literally, you

19  know, 4 or 5 feet, at the most, from the jury box.

20          MR. KAUFFMAN:  Well, Your Honor, I didn't see it, so I

21  can't really comment on it, but --

22          THE COURT:  I think Mr. Hill saw it.

23          MR. HILL:  I saw it, and I also thought I heard Your

24  Honor ask that she be removed from the courtroom just

25  temporarily, but I may have misunderstood.

1          THE COURT:  Well, I am not going to -- well, no, she

2     can come back in.  Now, if it happens again, she'll have to

3     be -- I just can't -- we can't have these kind of outbursts and

4     delays.

5          MR. KAUFFMAN:  Okay.

6       *(End of bench conference.)*

7          THE COURT:  Ladies and gentlemen, let me have a word

8     with everyone in the courtroom.

9          Just now we had one of the -- I believe one of the

10    class members who was emotional during some of Mr. Bullard's

11    testimony; and she was seated very close, as you all know, to

12    the end of the jury box, within just a few feet, and it was very

13    audible.

14         And, now, I can certainly understand, you know, why

15    she would get emotional.  This was, I'm sure, a very emotional

16    event for those of you who lived through it, very traumatic.

17    But this jury -- and I'm going to be very sensitive to this.

18    This jury cannot base its decision on any prejudice or sympathy

19    for or against anyone, any party in this courtroom.  And I will

20    be vigilant in making sure that doesn't happen.

21         So I'm going to ask everyone in the courtroom, both

22    sides -- this applies, obviously, to everyone.  But you were --

23    the plaintiff's side, you-all lived through this event.  And so

24    if you are not -- if you don't feel you can sit through the

25    testimony, this factual testimony without showing and displaying

1    emotion, then I'm going to ask you to leave until this testimony

2    is over, and then you can return to the courtroom.

3            I can't afford to continue to have these delays.  We

4    can't.  And I just would ask, if you're not able to sit quietly

5    and listen to the testimony without any show of emotion, then if

6    you would, please leave, and you can return as soon as the

7    testimony is over and we move on to the next witness.

8            This is to protect the integrity of this trial.  Okay?

9    It's not because I'm not sensitive.  I promise you that.  It's

10   just this is my role and it's my responsibility to both sides.

11           And the woman who had the issue, she is welcome to

12   return to the courtroom if she feels she can do so under those

13   strict parameters.

14           Okay.  All right.  Would you please bring the jury in.

15   Thank you.

16           Counsel, I have IT working on the projector issue.

17   We're trying to get something in here just as quickly as we can.

18   It's not as easy as you might think.

19       *(Jury present.)*

20           THE COURT:  All right.  Be seated, please.  Thank you,

21   ladies and gentlemen, very much.  We are ready now to proceed

22   with -- are we missing someone?

23           DEPUTY CLERK:  The light is glaring.  I'm going to

24   turn the overhead.

25           THE COURT:  That's probably a good idea.  Maybe we'll

1   get a better picture.

2          We have requested and are trying our best, our IT

3   department is, to get a new projector here as soon as we can.

4   It is not as easy as you might think, but we're working on it.

5   And so I do apologize.

6          All right.  We are ready to proceed with Mr. Bullard's

7   testimony.  Mr. Bullard, you still are under oath.

8          Mr. Kauffman, go ahead.

9   BY MR. KAUFFMAN:

10  Q.   Mr. Bullard, we were discussing this photo, and I want to

11  be clear about something.  The number that's at the bottom, 942,

12  that's not the time of any of these documents?

13  A.   Right.

14  Q.   Okay.  What's the time of this document?

15  A.   044.

16  Q.   What time is that in --

17  A.   That's 12:44 a.m.

18  Q.   And the photo that we saw earlier of the desk in the

19  bedroom, what time was that photo taken?

20  A.   That was 10:38 p.m.

21  Q.   Did you leave the house that day -- or that -- I'm sorry.

22  This is now April 30th when this is taken?

23  A.   Correct.

24  Q.   Did you -- were you able to leave the house that day?

25  A.   We were rescued at 4:45 in the morning.

1    Q.   Did it continue to rain after you took this photo?

2    A.   Yes.

3    Q.   Did it continue to rain until the time when you were

4    rescued?

5    A.   Yes.

6    Q.   After you were rescued, did you go back to the house?

7    A.   Yes, sir.  We went back about 11:00 the next day.  11:00

8    a.m. on the 30th.

9    Q.   When you went back to the house at 11:00 a.m., was there

10   any water in the house?

11   A.   No.

12          MR. KAUFFMAN:  Pass the witness.

13          THE COURT:  All right.  Mr. Hill.

14          MR. HILL:  May it please the Court.

15          THE COURT:  Yes, sir.

16                    **CROSS-EXAMINATION**

17   BY MR. HILL:

18   Q.   Mr. Bullard, good afternoon.  We've met before a couple

19   times.

20   A.   Yes, we have.

21   Q.   I want to be sure before we get started that I understand

22   what your direct testimony was about when water first entered

23   your home.  So could you tell the jury when you believe that

24   water first entered your home?

25   A.   10:30.

1   Q.   10:30.

2   A.   10:30 p.m.

3          MR. HILL:  Your Honor, may I approach the witness with

4   interrogatory --

5          THE COURT:  You may.

6          MR. HILL:  -- responses?  I have a copy for the Court

7   too.

8          THE COURT:  Okay.  Thank you.

9          Ladies and gentlemen, so that you know, prior to trial

10  there is a period in the litigation known as discovery in which

11  each side gets to -- has an opportunity to discover the factual

12  information from the other side.  And part of that discovery can

13  include something called interrogatories in which one party

14  propounds questions, written questions, to the other party.

15         That party answers those questions and provides

16  them -- answers them under oath and provides them back to the

17  other side.  And I believe that's what Mr. Hill has just handed

18  Mr. Bullard, is a set of interrogatory questions that he was

19  given as part of this litigation.

20         All right.  Go ahead, Mr. Hill.

21         MR. HILL:  Thank you, Your Honor.

22  BY MR. HILL:

23  Q.   Mr. Bullard, I'd ask you to turn to Number 3 on the

24  interrogatory.

25  A.   I'm on it.

1   Q.   All right.  And could you read the part of your

2   interrogatory answer that states, Plaintiffs state that water

3   began to enter their home.

4   A.   It entered the home around 9:30 p.m. on April 29, 2014.

5   Q.   Now, these interrogatories were signed by you in front of a

6   notary public, correct?

7   A.   Yes.

8   Q.   So is it your testimony that the water began to enter your

9   home at 9:30, as stated in that interrogatory answer, or --

10  A.   Well, at the time of this, it was before I knew about the

11  time stamps on the photos.  The photos have time stamps on them

12  to tell you exactly when they were taken and where they were

13  taken.

14  Q.   So this was from your memory of what happened on the night

15  of the incident.

16  A.   A lot happened between 9:30 and 11:00 o'clock at night.

17  Q.   When you answered these interrogatories, you weren't

18  sitting in front of a jury or in a courtroom.  You were in an

19  office somewhere to answer the interrogatories?

20  A.   Yes.  Yes.

21  Q.   And you had your time to think about the answers to these

22  interrogatories?

23  A.   Yes.

24  Q.   And when you swore that these interrogatories were correct,

25  at that point in time what was the date on the back?  When were

1    they answered?

2    A.    The date that we did this?

3    Q.    Yes.

4              THE COURT:  It's on the last page, sir.

5              THE WITNESS:  The last page?

6              THE COURT:  The notary stamp.

7              THE WITNESS:  April 17th, 2015.

8    BY MR. HILL:

9    Q.    All right.  So that was just a little over -- a little

10   under a year after the flooding, correct?

11   A.    Correct.

12   Q.    And now we're years later, correct?

13   A.    Correct.

14   Q.    So you realized that when you were answering those

15   questions before a notary public, because they were part of the

16   discovery process in this lawsuit, you were trying to tell the

17   truth, as best you knew it --

18   A.    I was.

19   Q.    -- in --

20   A.    I was.

21   Q.    You also recall that we took your deposition in this case?

22   A.    Yes.

23   Q.    Do you recall the date of the deposition we took in this

24   case?

25   A.    No, I don't.

1           MR. HILL:  Your Honor, may I --

2           THE COURT:  Yes, sir.  Yes.

3           MR. HILL:  Your Honor, I also have a condensed copy of

4   the deposition.

5           THE COURT:  Thank you.

6   BY MR. HILL:

7   Q.   Mr. Bullard, this deposition was taken on May 22nd of 2015;

8   is that correct?

9   A.   Yes, it is.

10  Q.   And you were sworn to give true testimony at the time of

11  that deposition, were you not?

12  A.   Yes, I was, to the best of my knowledge.

13  Q.   And you did that at that time?

14  A.   Yes.

15  Q.   And at the time we took your deposition, do you recall what

16  time you told us then that the water came into your house?

17  A.   I don't remember that.  It may have been 9:30.  It may have

18  been 10:30.  I don't know.

19  Q.   You told us before that your son texted you before he came

20  over, correct?

21  A.   He never came over.

22  Q.   Okay.  So he texted you at about 9:15?

23  A.   Yes.

24  Q.   All right.  Then in your deposition, at least in your

25  interrogatory answers, did you not tell us that by 9:30 water

1    was coming into your house?

2    A.    Yes, I did.

3    Q.    Okay.  So you do recall now that in your deposition you

4    told us it was 9:30?

5    A.    Yes.  But again, that was before I knew about the time

6    stamp on the pictures.

7              MR. HILL:  Your Honor, may I approach the witness --

8              THE COURT:  Yes.

9              MR. HILL:  -- with the evidentiary hearing?

10             THE COURT:  Yes, sir.

11             MR. HILL:  Thank you.

12             Your Honor, I apologize I only have the extra.

13             THE COURT:  That's all right.  It's not a problem.

14   Thank you, though.

15   BY MR. HILL:

16   Q.    If you would, turn to page 79 of the evidentiary hearing

17   transcript, Mr. Bullard.  Do you remember testifying in this

18   courtroom?

19   A.    Yes, I do.

20   Q.    And that would have been May of 2016?  I believe it's on

21   the first page of the transcript I just handed you.

22   A.    Yes, sir.

23             THE COURT:  Ladies and gentlemen --

24             THE WITNESS:  May 31st.

25             THE COURT:  What?  May 31st?

1      THE WITNESS:  May 31st, 2016.

2      THE COURT:  Ladies and gentlemen, we had a pretrial

3  evidentiary hearing and that's what they're referring to.  It

4  was here in this courtroom, and Mr. Bullard testified at that

5  hearing.  He was placed under oath at that time.

6  BY MR. HILL:

7  Q.   Do you recall, Mr. Bullard, giving the following testimony

8  at page 79, line 20 and 21:  And when did you first notice that

9  water was coming into your house?  And your answer was 9:30?

10 A.   9:30.

11 Q.   Now, this was a full year after your interrogatory answers,

12 correct?

13 A.   Right.

14 Q.   Was it before you saw the time stamp?

15 A.   I don't know.  I must have gone back and looked at some of

16 the other paperwork and just put 9:30 or it said 9:30 at the

17 same -- for this period.

18 Q.   So you can't tell the jury today whether or not that

19 testimony was given before or after you saw time stamps on these

20 photographs?

21 A.   I don't think I even saw time stamps until this year.

22 Q.   Getting ready for trial?

23 A.   Yes.

24 Q.   So it's your testimony that your best recollection was

25 simply wrong when you were testifying before?

1    A.   Like I said, a lot happened between 9:30 and 11:00 o'clock

2    that night.

3    Q.   Do you remember approximately what time the water peaked in

4    your house?

5    A.   No.  I remember about 3:00 o'clock in the morning when the

6    water started going down.  So I didn't know when it peaked.

7    Q.   Okay.  So at some point you saw it going down, but that was

8    at 3:00 a.m.?

9    A.   I could see the dirt -- the line around the house where it

10   was -- had arisen to that point and it started going down.

11   Q.   And when you came back the next day at around

12   11:00 o'clock, sometime shortly before noon, it was gone?

13   A.   The water was gone.

14           MR. HILL:  Thank you, Mr. Bullard.

15           THE COURT:  Thank you.  Mr. Kauffman, redirect?

16                      **REDIRECT EXAMINATION**

17   BY MR. KAUFFMAN:

18   Q.   Mr. Bullard, I'd like to show you what's been marked -- and

19   it's Exhibit Bullard 933.  It's on your screen, Mr. Bullard.

20           THE COURT:  I don't have a 933.

21           MR. KAUFFMAN:  Your Honor, this is an exhibit to

22   respond to -- on redirect.  It's not part of our exhibit list.

23   It's to respond to -- may I approach?

24           THE COURT:  Yes.

25       *(Following conference held at the bench.)*

1          MR. KAUFFMAN:  Your Honor, now that he has impeached

2     the -- or tried to impeach the witness, I have to basically

3     respond to that impeachment, Your Honor.

4          THE COURT:  What is it?  Is this more testimony?

5          MR. KAUFFMAN:  No.  It's a photo that he took that is

6     at the time of 10:28, when he said the water actually got in the

7     house.  Water going in the house at 10:28.

8          MR. HILL:  This wasn't on their exhibit list, Your

9     Honor.  We're going to object to it.

10          MR. KAUFFMAN:  It wasn't on our exhibit list, but it

11     was on their demonstratives that they were going to use --

12          THE COURT:  If it's not on your exhibit list, it's not

13     coming in.

14          MR. KAUFFMAN:  I can't show it to --

15          THE COURT:  No.  No.  No.

16          MR. KAUFFMAN:  Okay.

17          MR. HILL:  Thank you.

18        *(End of bench conference.)*

19          THE COURT:  Mr. Kauffman, go ahead.

20     BY MR. KAUFFMAN:

21     Q.   Mr. Bullard, during the events of April 29, 2014, and the

22     flooding in your house were you watching a clock closely?

23     A.   No.  I didn't even have a clock, except for the ones on our

24     phones.

25     Q.   Would you agree that this was -- do you think that this was

1  a traumatic experience?

2  A.   Very.

3  Q.   Do you think that your memory may have been influenced by

4  the trauma of the event?

5  A.   Sure.

6  Q.   Do you have any reason to think that the time stamps on the

7  photographs that we've seen today are wrong?

8  A.   No.

9          MR. KAUFFMAN:  No further.

10          THE COURT:  All right.  Sir, you may step down.

11      *(Witness excused.)*

12          THE COURT:  Your next witness.

13          Yes, the attorneys will need to gather any exhibits.

14          Mr. Hill, were some of these your exhibits, or were

15  they Mr. Kauffman's?  I don't know which ones are up there.

16          MR. KAUFFMAN:  One of them is mine.

17          MR. HILL:  May we both approach?

18          THE COURT:  Yes, sir.

19          MR. HILL:  Thank you.

20          THE COURT:  All right.  I'm sorry, who's the next

21  witness.

22          MR. VLACHOS:  Amber Hutchins, Your Honor.

23          **AMBER HUTCHINS, PLAINTIFF WITNESS, DULY SWORN**

24          DEPUTY CLERK:  Be seated.  Please state your full name

25  and spell your last name for the record.

1          THE WITNESS:  My name is Amber Spring Hutchins,

2     H-U-T-C-H-I-N-S.

3          THE COURT:  Okay.  Go ahead, Mr. Vlachos.

4                    **DIRECT EXAMINATION**

5     BY MR. VLACHOS:

6     Q.   Good afternoon, Ms. Hutchins.  Where did you live in 2014?

7     A.   We lived at 3020 Ashbury Lane in Cantonment.

8     Q.   And that was the date of the flood of April 29, 2014,

9     correct?

10    A.   Yes, sir.

11    Q.   And how long have you lived at 3020 Ashbury Lane?

12    A.   We bought the house December of 2012.  I believe it was in

13    July.

14    Q.   And who lived with you at that address?

15    A.   The date of the flood, who was there?

16    Q.   Yes.

17    A.   My husband.  Jacob Hutchins, and we adopted older children,

18    so they were there with us that day as well.

19    Q.   And what are their names and ages?

20    A.   Elizabeth Hutchins and Christian Hutchins.  They're

21    siblings.  And Libby was 10 years old and Christian was around 9

22    years old the year of the flood.

23    Q.   And what neighborhood is your home located in?

24    A.   Ashbury Hills subdivision.

25    Q.   And are you currently employed?

1  A.    I am not.

2  Q.    Were you employed at some point in the past, like 2012?

3  A.    Yes.

4  Q.    And where did you work?

5  A.    Navy Federal Credit Union.

6  Q.    And why did you cease work?

7  A.    I was born with a rare congenital defect in my neck.  I was

8  missing some parts of the bone in my spine, so I had to have

9  corrective surgery.  And when they went in and added all the

10  hardware into my neck, I've been on disability since, and that

11  would have been in 2012.

12  Q.    Prior to April 2014, in that two years that you lived in

13  your house, did you ever have flooding?

14  A.    Never.

15  Q.    And did you ever -- were you ever aware of any prior

16  flooding in your home prior to the time you bought it?

17  A.    Not at all.

18  Q.    And was your house in a FEMA flood zone?

19  A.    No, sir.

20  Q.    At any time in the time that you owned the home, did you

21  ever walk down to the creek?

22  A.    I have not.

23  Q.    Could you see the Elevenmile Creek behind your house from

24  your house?

25  A.    No, it's a lot of property.  You cannot see it back there.

1          MR. VLACHOS:  James, can you pull up Exhibit 43.  It's

2    already marked and admitted, Exhibit 43.

3    BY MR. VLACHOS:

4    Q.   Ms. Hutchins, I'm showing you what you've previously seen

5    and what's been marked and admitted as Plaintiff's trial

6    Exhibit 43.  Can you locate on this aerial map where your house

7    is located?

8    A.   The long rectangular property.

9    Q.   So that's where your house is located.  And looking back

10   towards the Bristol Park side, there's kind of a blue line in

11   between, and I'll ask you kind of to mark where the creek would

12   have been.

13   A.   Yes, sir.

14   Q.   Okay.  And so in that photograph, where would your house

15   have been located in relation to the creek?

16   A.   Our house is by the road up there -- no, right here.

17   Q.   And is there a woods behind your home?

18   A.   Yes, sir, there's some.  There's a little bit of a cleared

19   yard, and then there's a big row of big Magnolia trees, and then

20   it's just woods that drop down to an embankment where the creek

21   would be.

22         MR. VLACHOS:  James, can you bring up exhibit

23   demonstrative 7, please.  Thank you.  You know how to clear it?

24   Two taps.  You cleared it, yes.  All right.

25   BY MR. VLACHOS:

1   Q.   Ms. Hutchins, I'm going to show you a demonstrative

2   which -- does this depict where your home -- the mark in green,

3   where your house would have been in relation to the Bristol Park

4   neighborhood and where you're located in Ashbury Hills?

5   A.   Yes, sir.

6   Q.   And were you home the entire day of April 29 of 2014?

7   A.   I can't recall.

8   Q.   Your children were in school; is that correct?

9   A.   Yes, sir.

10  Q.   And do you recall anything about the evening of April 29,

11  2014?

12  A.   There was nothing really of note that day different than

13  other days as far as --

14  Q.   Okay.  At some point in the evening, you were in the --

15  strike that.

16          Describe for the jury kind of how your house is laid

17  out from street level and how it works.

18  A.   Okay.  So our house is built completely into a hill.  So

19  from the road there's -- we have a little bit of a circular

20  driveway, and our house is here.  That's the top level.  But if

21  you go down the driveway, we have an entire bottom level that

22  you can't see from the road, but from the back of the house you

23  can see both levels.  So it's built into a hill, and our entire

24  property just kind of slopes down.

25  Q.   And on that lower level it's not a basement.  Is it a

1  walkout?

2  A.  Yeah.  It's considered a walkout.  There's -- it's

3  technically built into a hill, but the whole back of our

4  downstairs is -- you know, opens up to our yard.

5  Q.  At some point that evening, were you in the upper part of

6  the house?

7  A.  Yes, sir.  We've -- we have bedrooms upstairs and

8  downstairs, but our bedrooms and our children's bedrooms are

9  upstairs.  And so we were -- my husband had already went to bed,

10 and so I was watching television upstairs with a headset on.

11 Q.  And at some point did you go downstairs?

12 A.  Yes, sir.  So we have a -- we had a Greyhound, and she was

13 very scared of any sort of rain.  And so we have a bathroom

14 that's downstairs that doesn't have big windows.  And so anytime

15 it's raining, we take her downstairs and put her in that

16 bathroom.  So after the -- after I got done watching the show

17 around 11:30ish, I was taking the dog downstairs to put her in

18 the bathroom.

19 Q.  And what happened as you were taking her downstairs?

20 A.  It was pitch black down there, but I'm going down the

21 stairs, and our stairs kind of go down -- there's a landing, and

22 then they come down this way.  And I heard, like, running water

23 which is very -- was very odd.  And I'm walking down the stairs.

24 And as I got kind of, I guess, towards the bottoms of the

25 stairs, my foot was wet.  I kind of froze, and I kind of leaned

1    along the wall and flipped on the light switch.

2            MR. VLACHOS:  Oh, yeah.  Excuse me.  I'm going to just

3    go to the -- actually the next exhibit.  Actually it will be --

4    it will be photograph 114.

5    BY MR. VLACHOS:

6    Q.   I'm going to ask you to identify Exhibit 114.  What does

7    that show?

8    A.   That's our downstairs.

9    Q.   And you took that photograph; is that correct?

10   A.   I did.

11           MR. VLACHOS:  Your Honor, at this point I would move

12   to admit and publish to the jury.

13           THE COURT:  Plaintiff's 114 will be admitted.

14           (PLAINTIFF EXHIBIT 114:  Received in evidence.)

15           THE COURT:  And you may publish it.

16   BY MR. VLACHOS:

17   Q.   Amber, you recognize this as your basement -- your, not,

18   basement but the lower level of your house, correct?

19   A.   Yes, sir.

20   Q.   And what is noticeable about this photo?

21   A.   In this photo the door with the deadlocks that you see is

22   our garage, and this is just shortly after we went downstairs

23   and we had flipped on the light switch.  I had woken my husband

24   up at this point, and we went down there.  And the running water

25   I heard, there is a stream of water that is arced and coming out

1  of our garage door probably a good foot higher than the water

2  that's currently in our house in that photo.

3  Q.   Okay.  Let's back up a minute.  When you first went

4  downstairs, did you have -- did you have a camera or phone with

5  you?

6  A.   So when we first went downstairs, I was trying to find a

7  container of baby photos.  I thought that they may have been in

8  the guest room, which is the other door you see kind of across

9  the way, and so I had went in there to look for the baby photos.

10 I couldn't find them and the water was coming in very high, and

11 so I came up and I had the camera at that point.

12 Q.   Okay.  So these photographs were taken after you had

13 already been downstairs and through the water; is that correct?

14 A.   Yes, sir.

15 Q.   Okay.  And I'm going to show you what's been marked as

16 Plaintiff's Exhibit 115.

17 A.   Would it be okay if I pointed out something on this as

18 well?

19 Q.   Yeah.  Back up.  Go ahead.  114.

20      THE COURT:  Wait a minute.  She needs a question.

21 BY MR. VLACHOS:

22 Q.   Okay.  What else do you want to point out on that

23 photograph?

24      THE COURT:  Well, approach the bench, please.

25      *(Following conference held at the bench.)*

1          THE COURT:  I'm going to allow you to do this this one

2    time, but not again.

3          MR. VLACHOS:  Okay.

4          THE COURT:  You have to conduct the examination; she

5    doesn't.

6          MR. VLACHOS:  I gotcha.

7       *(End of bench conference.)*

8          THE COURT:  All right.  Go ahead, Mr. Vlachos.

9    BY MR. VLACHOS:

10   Q.   Okay.  Before we move on to any other photographs, identify

11   anything else that you want to point out to the jury.

12   A.    I'm standing on the stairwell in this photo, looking down,

13   and the water was coming in very fast.  You can see, obviously,

14   the stream of water there.  And kind of around the corner from

15   this picture, our downstairs, there's a wall of glass sliding

16   doors.  And there was water on the outside of those doors,

17   probably about a foot or so higher than the inside as well.  But

18   I just kind of wanted to mark in here to kind of show how fast

19   the water came in.

20   Q.   Let me ask you something else about this photograph.

21   Was -- your garage is outside the door where you have the

22   circle, correct?

23   A.   Yes, sir.

24   Q.   Okay.  And is the garage -- do you step down into your

25   garage?

1    A.   Yes.  It's more than a landing.  It's a good step-down.

2    Q.   Okay.  And at the time that you went to bed, was your

3    garage door down?

4    A.   It was.  We have an external door in the garage, and the

5    garage door, and they were both shut.

6    Q.   Thank you.  I'm going to now show you what's been marked as

7    Exhibit 115.

8            Do you recognize this photograph?

9    A.   Yes.

10   Q.   And you took this photographer the evening of April 29,

11   2014?

12   A.   Yes, sir.

13   Q.   And what did you use to take the photograph?

14   A.   My cell phone.

15           MR. VLACHOS:  Your Honor, at this point I would move

16   to admit and publish to the jury Exhibit 115.

17           MR. HILL:  No objection.

18           THE COURT:  Thank you.  115 is admitted, and you may

19   publish it.

20       (PLAINTIFF EXHIBIT 115:  Received in evidence.)

21   BY MR. VLACHOS:

22   Q.   I'm sure your husband doesn't want this up here but --

23   A.   He's a little upset.

24   Q.   What does this photograph depict?

25   A.   So the water -- the water was coming in, obviously, very

1  fast.  You can -- it's probably hard for you to see it on there,

2  but there's actually -- the water stream at this point is about

3  knee length on my husband coming through that door.  He's trying

4  to unplug the television in this photo.  The water was coming in

5  very quickly; and, I mean, just from this photo to the previous

6  one, at this point, I mean, the water level is up to this

7  cushion now.

8  Q.   Can you mark that?

9  A.   I can try.

10         THE COURT:  Excuse me a minute.  You-all can zoom on

11  this document camera.  I don't know if y'all realize that.

12         THE WITNESS:  Let's do this.

13         THE COURT:  Right.  You can zoom in on the photo.

14         MR. VLACHOS:  Very good.  Thank you, James.

15         THE COURT:  Well, with the document camera.

16         DEPUTY CLERK:  He's using --

17         THE COURT:  They can their own laptop?

18         MR. VLACHOS:  He can do it from that.

19         THE COURT:  Oh, he's not on the document camera.

20  Thank you.  We still should be able to zoom in.  I think that

21  would help the jury --

22         THE WITNESS:  Yes.

23         THE COURT:  -- because the monitor, obviously, is

24  small compared to what we're used to.

25         MR. VLACHOS:  Okay.  James, can you go back to

1    Exhibit 114, please, and zoom in a little bit for that -- on the

2    sofa.

3    BY MR. VLACHOS:

4    Q.   Amber -- Ms. Hutchins, you indicated that the water rose

5    about a sofa cushion height?

6    A.   Yes, sir.  You can see in this photo and the previous photo

7    that we just looked at, it was to that dark crease of the couch

8    cushion.  And this one which was taken prior, so obviously

9    about, you know, a full couch cushion difference in height.

10   Q.   And you heard Mr. Bullard testify about Exhibit 128 and the

11   time stamps; is that correct?

12   A.   Yes, sir.

13           MR. VLACHOS:  May I approach, Your Honor?

14           THE COURT:  Yes, sir.

15           MR. VLACHOS:  I do need another copy?

16           Can I use the ELMO, please.

17           I think it's on page 6.

18           THE COURT:  Is this 128?  Is that --

19           MR. VLACHOS:  This is Exhibit 128.

20           In going back to Number 114, which was the first

21   photograph, that is marked Bates Number 002059.  If we can go

22   back to 128 and go back to the ELMO.

23           I'm going to mark this and make sure I marked it

24   correctly.

25   BY MR. VLACHOS:

1    Q.    That says 2341, or 11:41; is that correct?

2    A.    Yes, sir.

3    Q.    And I believe you'd indicated that the next photo -- let's

4    go to 115.  Go back off the ELMO.

5          That is photo 2061.  Go back to the ELMO.

6          Did I correctly mark 2061 with the time stamp of 2347?

7    A.    Yes, sir.

8    Q.    So that's six minutes' difference, correct?

9    A.    Yes, sir.

10   Q.    Did you ever leave your house anytime during the night?

11   A.    I did.  I mean, we didn't leave in a vehicle, but I went

12   out, went outside of the front of the house.

13   Q.    And what did you do when you went outside the house?

14   A.    Well, we had woken our children up.  When the water kept

15   coming up, we went and woke them up and told them to pack some

16   clothes in a hamper and some of their favorite toys, because we

17   thought we may have to evacuate if it got too high.  And so we

18   went outside.

19          We had a -- you know, one of our vehicles was in the

20   garage, unfortunately, but the other one was parked on our

21   circular driveway outside of the house, and so we -- my husband

22   went out there and kind of loaded the car up.  And I also had

23   walked out there to just kind of look and see the water and what

24   was going on.

25   Q.    Did you check on the water downstairs?

1    A.   Yes, kind of throughout the night.

2    Q.   And how did you do that?

3    A.   Well, it was -- since it was coming up our stairs, that was

4    the easiest way is to just kind of look at the stairs and, you

5    know, kind of count, you know, as it was going up.

6    Q.   Did -- was there any flooding in the front of your house or

7    in the street?

8    A.   There was not.  So when we went out, and it was around

9    maybe 1:00 a.m. or thereabouts, there was no flooding in our

10   front yard.  There was no flooding by our car.  There was no

11   flooding on the road in front of our house.

12            Our neighbor's house you can see directly across the

13   street.  They didn't have any flooding in their yard.  It was --

14   our driveway goes literally straight down.  So when you go down,

15   you're at the garage.  And when I walked to the top of the

16   garage to look down, the water all came from creek up.  There

17   was no water running down the driveway.  There was no standing

18   water anywhere around the front of our house at all.

19   Q.   When you went back inside -- did you lose power that night?

20   A.   Yes, sir, somewhere maybe around 2:00 a.m.

21   Q.   And did you ever go to sleep that evening?

22   A.   Yes, sometime around 3:00-ish.  We had been, you know, kind

23   of watching the stairs, and it had seemed to have plateaued.

24   And after watching it for a little bit, it wasn't getting any

25   higher, so I went ahead and tried to lay down for a few hours.

1  Q.   Okay.  You went and laid down for a few hours.  Do you

2  recall what time you would have gotten up?

3  A.   I don't.  I mean, it was only a couple of hours that -- I

4  mean, just relying on -- I mean, I know I was taking photos the

5  next morning, so it was sometime after the sun was up.  But I

6  had only laid down for a few hours, but I'm not sure the exact

7  time I got up.

8  Q.   And when you got up, describe the scene.  What did you

9  observe?

10 A.   When I went down the stairs, there wasn't water in the

11 house anymore, but there was just a black gunk, mud, filth,

12 debris.  And I kind of rounded the corner -- I'm really sorry.

13 I rounded the corner of my --

14          THE COURT:  Ladies and gentlemen, let me --

15          THE WITNESS:  Sorry.

16          THE COURT:  Let me explain.  And it's okay.  This

17 obviously was a traumatic event for the plaintiffs in this case.

18 But I want you to know that that does not mean that

19 International Paper Company did anything wrong in this case.

20          That's the question you're going to decide is whether

21 International Paper is responsible for the dam failure; and if

22 so, whether that dam failure caused the flooding in the

23 plaintiff's home.  But that decision must be made free of any

24 sympathy for anyone.  Do you all understand?

25          THE JURY:  (Nodding heads.)

1          THE COURT:  All right.  Thank you.

2          THE WITNESS:  Sorry.

3          THE COURT:  Okay.  That's all right.  Go ahead.

4          THE WITNESS:  When I came around the corner, my

5    husband was down there with our 10- and 9-year-old.  And the

6    kids had big push brooms, and they were just trying to clear the

7    mud off the floor and just kind of moving the -- all of our

8    furniture and belongings and stuff had -- you know, kind of all

9    had floated when the water got high, and so everything was just

10   displaced everywhere and --

11         MR. HILL:  Your Honor, I must object to this

12   continuing line of answer to the question --

13         THE WITNESS:  I'm done.  They were clearing out the --

14   they were just clearing out mud.

15         MR. HILL:  Thank you.

16         THE COURT:  All right.

17   BY MR. VLACHOS:

18   Q.   One final question.  Was the water -- the water was out of

19   the house at that point, right?

20   A.   Yes.  There was no water in the house.

21   Q.   Was the water out of the yard that you could observe?

22   A.   Yes.  So there's -- we kind of have a fenced-in dog area.

23   There was no standing water -- there was no standing water in

24   the cleared yard that I could see.

25         MR. VLACHOS:  Thank you.

1    THE COURT:  All right.  Thank you.  Mr. Hill.

2    MR. HILL:  May it please the Court.

3    THE COURT:  Yes.

4                **CROSS-EXAMINATION**

5    BY MR. HILL:

6    Q.   Ms. Hutchins, we've met before a couple times.

7    A.   Yes.

8    Q.   I know this is traumatic for you.  I won't take very long

9    with you at all.

10        I want to start back from when you first walked

11   downstairs --

12   A.   Yes, sir.

13   Q.   -- the night of the flood.  It's true, is it not, that you

14   had not seen water in your house at any point before the time

15   you walked downstairs?

16   A.   Correct.

17   Q.   And when you walked downstairs, I believe you told us that

18   you stepped into some water.  You felt water.

19   A.   I don't know if I stepped in water.  My foot was wet.

20   Q.   Okay.

21   A.   So --

22   Q.   How many steps up were you when that occurred?

23   A.   I have no idea.  It was pitch black.

24   Q.   Okay.  Do you have any recollection at all as to how much

25   water was in the lower level at the time that you first noticed

1   water in your house?

2   A.   I don't -- well, the very first photos that we took when we

3   were going down there, it was around ankle deep.

4   Q.   So you stepped into ankle-deep water -- you're saying ankle

5   deep on the first step?

6   A.   No, sir.  I didn't step into ankle-deep water.  The stair

7   was wet, but I didn't step into water.  I don't know if just the

8   water kind of traveled up.  It's fabric.  Our stairs aren't

9   wood.  They're made out of carpet --

10  Q.   Fair enough.

11  A.   -- and so when I stepped and it squished, that's what it

12  was.

13  Q.   Okay.  I appreciate that.  Fair enough.

14          So my question to you is this:  Do you know for a fact

15  when the water first started coming into the lower level of your

16  house from the garage?

17  A.   No.

18  Q.   All right.  Do you know for a fact when water first started

19  coming into your garage?

20  A.   I do not.

21          MR. HILL:  No further questions, Your Honor.

22          THE COURT:  All right.  Thank you.  Mr. Vlachos, any

23  redirect?

24          MR. VLACHOS:  No redirect, Your Honor.

25          THE COURT:  Ma'am, you may step down.

1          THE WITNESS:  Thank you.

2      *(Witness excused.)*

3          THE COURT:  Let me ask counsel to -- let me ask to you

4      approach.

5      *(Following conference held at the bench.)*

6          THE COURT:  Who is your next witness?

7          MR. KAUFFMAN:  It's a lengthy witness.  It's Kyle

8      Moore.  They're head of safety and environmental, so it's going

9      to be a couple hours.

10          THE COURT:  We'll probably go ahead and recess now.

11      Jury selection day is always a long first day.  Okay.

12      *(End of bench conference.)*

13          THE COURT:  Ladies and gentlemen, we're going to go

14      ahead and recess for the evening.  I suspect I won't have any

15      objection from over here.  I don't hear any objection.  Jury

16      selection day is always -- and the first day of the trial,

17      because we do include jury selection, is always a long day.  I

18      appreciate you-all hanging in there with us so that we could get

19      at least through some of the evidence today.

20          I'll ask you to return tomorrow morning at 8:30.

21      Please remember my instructions this evening:  Do not discuss

22      the case amongst yourselves, nor with anyone else, including

23      your loved ones at home.  As I said, you can tell them where

24      you've been all day and where you're going to have to be

25      tomorrow, but please leave it at that.

1        Do not conduct any investigation or research on your

2   own into the matters that have been discussed here during the

3   trial.  Avoid any news reports of the trial, should there be

4   any.  And, very importantly, please continue to keep an open

5   mind; don't begin to form any opinion yet about the merits of

6   the case.

7        Thank you all very much for your service today.  Have

8   a nice evening, safe drive home and back tomorrow.  Maybe some

9   orange juice on the way, ready for what will be, I'm sure,

10  another long day.  Thank you and good night.

11       *(Jury excused.)*

12       THE COURT:  All right.  Be seated, please.

13       Mr. Kauffman and Mr. Hill, when Mr. Bullard was

14  testifying in redirect.  Mr. Kauffman, you sought to introduce

15  an exhibit that you wanted to use for sort of an attempt to cure

16  what you characterized as an attempt to impeach by the defense.

17  And I did not allow you to do that because my understanding was

18  the exhibit was not listed on your exhibit list.

19       My reason for that is, given this circumstance, the

20  way the -- and I'm not going to -- don't misinterpret anything I

21  say as far as referring to it as impeachment.  I'm not saying

22  that Mr. Hill impeached or didn't impeach, but I'm going to use

23  that term, impeachment.  You-all should have -- I'm sure you

24  did -- anticipate, anticipated this line of questioning.

25       I mean, you had interrogatories that said 9:30; you

1 had deposition testimony that said 9:30, as far as the water

2 coming in; and then you had also the hearing testimony that said

3 9:30. So you -- clearly this was not a line of questioning of

4 impeachment that was any surprise to you-all. Because of that,

5 I feel it was only, you know, fair that that response, exhibit,

6 had been listed on the exhibit list, because I suspect you knew

7 you were going to use it, or need to use it. That's the basis

8 for my ruling.

9 All right. Is there anything else we need to discuss

10 before tomorrow?

11 MR. KAUFFMAN: There's only one item, Your Honor. The

12 exhibit list we gave you has some names of witnesses, not

13 necessarily the witness we'll use to put an exhibit in. I think

14 it's residual from the evidentiary hearing.

15 THE COURT: Okay. It threw me off a little, as you

16 could tell. I'm used to seeing the exhibit list with the

17 witness who's going to be introducing -- you're going to be

18 introducing the exhibit through. But I understand now. As long

19 as the numbers line up and the title of the exhibit, or the

20 description of it, matches, then that's fine. I appreciate the

21 explanation. Okay.

22 MR. KAUFFMAN: Plaintiff's don't have anything else,

23 Your Honor.

24 THE COURT: Okay. And Mr. Hill, Mr. Nelson, were you

25 all satisfied with the Court's limiting instruction or

1  cautionary instruction to the jury regarding the emotional

2  displays?

3          MR. HILL:  We were, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you.

5          Okay.  If there's nothing else, then we'll be in

6  recess until tomorrow morning at 8:00 a.m.  As I believe I

7  discussed with you -- and if I didn't, I apologize -- at the

8  pretrial conference, the attorneys must be here at 8:00.  The

9  parties are not necessarily required to be here at 8:00.  They

10  need to be here -- the named plaintiffs and Ms. McLain -- by

11  8:30 when the jury arrives.  But, otherwise, you're free to

12  waive your right to be here at 8:00 a.m., but please just make

13  sure that your attorneys announce that on the record tomorrow

14  morning if you choose not to be here at 8:00 a.m.  Okay?

15  Counsel, does that make sense?  Clear that with your clients.

16          All right.  Otherwise, I hope you-all have a good

17  night.  I know you'll be, I'm sure, preparing for tomorrow.  But

18  I hope it is a good evening, and I'll see you at 8:00 a.m.

19  tomorrow morning.

20          We're in recess.

21      *(Proceedings adjourned at 5:22 p.m.)*

22                  *  *  *  *  *  *  *  *

23

24

25

1       We certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.  Any
2   redaction of personal data identifiers pursuant to the Judicial
Conference Policy on Privacy are noted within the transcript.
3
**/s/ Donna L. Boland**
4   _____
Donna L. Boland,
5   Official U.S. Court Reporter

6   **/s/ Julie A. Wycoff**              2/20/2017
_____  _____
7   Julie A. Wycoff,                    Date
Official U.S. Court Reporter
8

9

10                          **I N D E X**

11                                                        Page

12  Attorney Conference                                    3

13  Preliminary Jury Instructions                         36

14  Opening Statements by Mr. Marshall                    51

15  Opening Statements by Mr. Nelson                      60

16

17  Plaintiff Witnesses

18  **RICHARD BULLARD**

19      Direct Examination by Mr. Kauffman                83
        Cross-Examination by Mr. Hill                    108
20      Redirect Examination by Mr. Kauffman             115

21  **AMBER HUTCHINS**

22      Direct Examination by Mr. Vlachos                118
        Cross-Examination by Mr. Hill                    133
23

24

25

**PLAINTIFF EXHIBITS**

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 43 | Tax plat of subject property | 85 | 85 |
| 110 | Flood photo | 94 | 94 |
| 111 | Flood photo | 100 | 100 |
| 114 | Flood photo | 123 | 123 |
| 115 | Flood photo | 126 | 126 |
| 128 | Plaintiff's photos - date/time from file data | 96 | 96 |
| 271 | Flood photo | 99 | 99 |