UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


JOHN NAVELSKI, LINDA NAVELSKI,  )
ERICK ALEXANDER, JACOB HUTCHINS, )
AMBER HUTCHINS, JEANNE HENDERLY, )
RICHARD BULLARD, and BEVERLY     )
BULLARD, on their own behalf and )
those others similarly situated, )
                         )
       Plaintiffs,       )
                         )
                         )  Case No. 3:14cv445/MCR
                         )
vs.                     )  Pensacola, Florida
                         )  February 21, 2018
                         )  8:03 a.m.
                         )
INTERNATIONAL PAPER COMPANY,     )
                         )
       Defendant.       )
_____)


**JURY TRIAL - DAY TWO**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury
(Pages 1-300)

## APPEARANCES

FOR THE PLAINTIFFS:       ***JONATHAN R. MARSHALL, ESQUIRE***
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia  25301

                                         ***JAMES L. KAUFFMAN, ESQUIRE***
***BRIAN A. GLASSER, ESQUIRE***
Bailey & Glasser, LLP
1054 31st Street NW, Suite 230
Washington, DC  20007

                                         ***CHRISTOPHER M. VLACHOS, ESQUIRE***
Christopher M. Vlachos, PLLC
244 E Intendencia
Pensacola, Florida  32502

                                         ***J.J. TALBOTT, ESQUIRE***
Law Offices of Jeremiah J. Talbott, PA
900 E Moreno Street
Pensacola, Florida  32503

FOR THE DEFENDANT:       ***T. LARRY HILL, ESQUIRE***
Moore, Hill & Westmoreland, P.A.
P.O. Box 13290
Pensacola, Florida  32591

                                         ***DANIEL W. NELSON, ESQUIRE***
***MEGAN B. KIERNAN, ESQUIRE***
***JASON R. MELTZER, ESQUIRE***
Gibson Dunn & Crutcher, LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036

1              P R O C E E D I N G S

2              **THE COURT:**  Good morning.  Let me start off with an

3        issue that came up yesterday with Mr. Bullard's testimony.

4              Mr. Kauffman, I think I acted hastily in not allowing

5        you to redirect and rehabilitate or attempt to rehabilitate

6        Mr. Bullard in regards to the timing.

7              I am such a stickler for the rules and for disclosure,

8        but it is true, the rule excepts impeachment.  A number of the

9        cases except rebuttal to impeachment.

10             Our local rules don't refer to this, we don't have

11       anything in the local rules about it.  I thought my trial order

12       did, but it doesn't.  And it's going to, but that would be

13       unfair to you to ex post facto apply something to you that

14       isn't in existence now.

15             So, I'm going to allow you to re-call him and I guess

16       show him the exhibit you were going to show him.  He's here, so

17       it's not an issue.

18             Anything that we need to discuss?

19             **MR. GLASSER:**  Can we just mark that 300?  That's

20       probably an unused number.

21             **THE COURT:**  Sure.  I'm sure the Defendants have -- I

22       imagine you would prefer that I not change my ruling, but I do

23       think the ruling is incorrect, unless you know otherwise.

24       Unless you know of some -- I mean, actually the civil rules

25       except impeachment material.

1    **MR. HILL:**  I understand, Your Honor.  Our objection

2    stands, but we understand the Court's ruling.

3          **THE COURT:**  Thank you.  But fair warning, I am going

4    to amend my trial order so that it will include the requirement

5    that you disclose and exchange and identify all exhibits to be

6    used at trial including those for impeachment or rebuttal to

7    impeachment.

8          Is there anything that had come up during the evening

9    recess that we need to address, any issues?

10          **MR. GLASSER:**  No, ma'am, not from the Plaintiffs.

11          **MR. NELSON:**  Nothing from the Defense, Your Honor.

12          **THE COURT:**  So you'll call Mr. Bullard first, do that?

13          **MR. GLASSER:**  Yes, ma'am.

14          **THE COURT:**  And then your next witness was an IP

15    employee?

16          **MR. GLASSER:**  Yes, ma'am, Kyle Moore, manager of

17    environmental and safety at the relevant period.

18          **THE COURT:**  For your planning purposes, just so you

19    know, I will take a break for the morning recess around 10:10,

20    10:15.  Now, I won't cut you off if you're in the middle of --

21    if it's something very important, I'll let you finish that.

22          **MR. GLASSER:**  All the good stuff.

23          **THE COURT:**  Right.  And then, we'll likely recess for

24    lunch around sometime between 12:15 and 12:30 for one hour.

25    The afternoon recess is usually around 3:10 to 3:15, and those

1    are 20-minute recesses.

2              We are working on the IT issue with the projector.  I

3    do apologize.  My feeling is this should have been corrected by

4    the time of this trial, but it wasn't, and I take

5    responsibility for that, and we're working on it.

6              Mr. Nelson?

7              **MR. NELSON:**  Just one related point, Your Honor.  To

8    the extent we're going to be using butcher paper in addition to

9    the screen, I would just request that it be positioned in a way

10   that we can see this, too, during witness examinations.

11             **MR. GLASSER:**  So the only issue, Judge, is how far

12   away I'm allowed to go from the --

13             **THE COURT:**  I'll allow you to move from the lectern.

14   The only caveat is you're going to have to speak louder.

15             **MR. GLASSER:**  That's no problem for me.

16             **THE COURT:**  Once you remove yourself from the lectern,

17   then you're away from the microphone and everybody has trouble

18   hearing you, most importantly Ms. Boland because she's making

19   our transcript.

20             **MR. GLASSER:**  All right.  So I think if I put it right

21   here, you can see it, right?

22             **MR. NELSON:**  Yes.

23             **THE COURT:**  Is that for the witness?

24             **MR. GLASSER:**  Yes, just for keeping track of a few

25   things.  It won't be that much.

1      **THE COURT:**  Make sure the jury can see it, too.

2   There's not a lot of room.

3      **MR. GLASSER:**  That would work fine and I think the

4   witness --

5      **THE COURT:**  The witness can probably see it better

6   there as well.

7      **MR. GLASSER:**  May I approach?

8      **THE COURT:**  Yes.  Very good.  I will step off the

9   bench, the jury will be seated at 8:30, and we will get started

10  with your presentation for the Plaintiffs.

11      *(Recess taken 8:09 a.m. to 8:32 a.m.)*

12      *(Jury in the box.)*

13      **THE COURT:**  Good morning, ladies and gentlemen.  We

14  are ready to proceed with the trial.  And as you'll recall from

15  yesterday afternoon, we're in the Plaintiffs' case in chief.

16      Before we do get started, though, let me give you an

17  IT update.  I just got a call from our IT director, and we are

18  going to have a new projector overnighted, it should be here

19  tomorrow, but we have a consultant who has to come up from West

20  Palm Beach to program everything, and so it looks like it's

21  probably going to be Monday before we actually are back using

22  the document camera or your laptops but using our projector and

23  screen.  So we're going to have to make do.

24      This feels like this is almost the old fashioned way,

25  but it's really not.  That would be very painful and slow.  But

1    we'll make do with this.

2          Thank you all for being here on time.  We will proceed

3    now.  Mr. Kauffman is going to re-call Mr. Bullard for a

4    question or two.  I've permitted him to do that.  So we'll

5    start with that examination, and it is redirect.

6          Mr. Bullard, if you'd come forward, please.

7          **RICHARD BULLARD, PLAINTIFF WITNESS, DULY SWORN**

8          **MADAM CLERK SIMMS:**  Be seated.

9          **THE COURT:**  All right, Mr. Kauffman, go ahead.

10                    **REDIRECT EXAMINATION**

11   **BY MR. KAUFFMAN:**

12   Q.   Good morning, Mr. Bullard.  You recall a couple of

13   questions yesterday regarding the time the water entered your

14   house?

15   A.   Yes.

16   Q.   I'm going to show you what's been marked as now Plaintiffs'

17   300.

18          **THE COURT:**  Is it in?  No -- is this in evidence?

19          **MR. KAUFFMAN:**  This is not in evidence yet, Your

20   Honor.  It's been marked as Plaintiffs' 300.

21   **BY MR. KAUFFMAN:**

22   Q.   Mr. Bullard, do you recognize Plaintiffs' 300?

23   A.   Yes, sir.

24   Q.   What is it?

25   A.   That's a picture taken from my master bedroom looking down

1    the hallway.  That was taken about 10:28, and it's showing

2    about 2 to 3 inches of water in the house already.

3             **MR. KAUFFMAN:**  Move to admit and publish.

4             **THE COURT:**  Subject to discussions we've had, it will

5    be admitted.  Plaintiffs' 300, is that --

6             **MR. KAUFFMAN:**  Yes, Your Honor.

7             **THE COURT:**  That's admitted.

8             *(Plaintiffs' Exhibit 300 admitted into evidence.)*

9             **THE COURT:**  And you may publish it.

10   **BY MR. KAUFFMAN:**

11   Q.   Mr. Bullard, what time do you think this photo was taken?

12   A.   10:28.

13            **MR. KAUFFMAN:**  May I approach?

14            **THE COURT:**  Yes, sir.

15   **BY MR. KAUFFMAN:**

16   Q.   Mr. Bullard, I'm handing you what has been marked as

17   Plaintiffs' 128.  Now, Mr. Bullard, if you would, turn to the

18   fifth page of that document.  Now, do you know what the Bates

19   stamps -- the designation on the document that we showed you --

20            **MR. KAUFFMAN:**  Can we show up the previous exhibit,

21   Exhibit 300.

22   **BY MR. KAUFFMAN:**

23   Q.   Now, there's a number at the bottom of this, right,

24   Mr. Bullard?

25   A.   Yes, sir.

1   Q.   And that's not the time the photo was taken, correct?

2   A.   Correct.

3   Q.   Let's go to this right here and that's -- 933 is that

4   identification.

5        Do you see the identification for 933 --

6   A.   Yes, I do.

7   Q.   -- on this?  And what time is the timestamp for the data

8   file for the photo that was taken?

9   A.   10:28 p.m. on April 29th, 2014.

10  Q.   Have I marked this accurately?

11  A.   Yes, sir.

12  Q.   What device was this photo taken with?

13  A.   It was taken on an iPhone 4.

14  Q.   There was a question yesterday about how fast water had

15  risen in your testimony.

16       **MR. KAUFFMAN:**  Could I show 110, please.

17  **BY MR. KAUFFMAN:**

18  Q.   Mr. Bullard, what is this -- this is the photo of your

19  bedroom, correct?

20  A.   Correct.

21  Q.   And the number is not the time at the bottom, but this is

22  the file, correct?

23  A.   Correct.

24  Q.   935?

25  A.   Correct.

1  Q.   Now, this photo has about a foot of water in your house,

2  correct?

3  A.   Correct.

4  Q.   Now, going back to the Exhibit 128, if we were looking for

5  935, what is the time that that photo was taken according to

6  the data?

7  A.   10:38 p.m. on 4/29/2014.

8  Q.   I'm going to mark 935 at 10:38 p.m.  Have I marked that

9  correctly?

10  A.   Yes, sir.

11  Q.   Looking at these timestamps, do you have an understanding,

12  if we go back to Plaintiffs' 300, how much water is in your

13  house in Plaintiffs' 300?

14  A.   That's about 3 inches.

15  Q.   So 3 inches compared to the next photo at 110, how much

16  water is in this photo?

17  A.   About 12 inches.

18  Q.   So from 3 to 12 inches between the two photos, correct?

19  A.   Correct.

20  Q.   And then looking at the data, what's the amount of time

21  between these two photos?

22  A.   Ten minutes.

23  Q.   In ten minutes water rises --

24  A.   Nine inches.

25  Q.   -- from 3 to 12 inches?

1    A.    Right.

2    Q.    What time do you think the water entered your house based

3    on these photos?

4    A.    Well, shortly before 10:28 p.m.

5              **THE COURT:**  Mr. Hill, do you want to recross?

6              **MR. HILL:**  I do, Your Honor.

7              **THE COURT:**  I'll allow it.

8              **MR. HILL:**  May I come around this way, Your Honor, to

9    avoid the wiring?

10             **THE COURT:**  Yes, you may.

11                         **RECROSS-EXAMINATION**

12   **BY MR. HILL:**

13   Q.    Mr. Bullard, you just mentioned that the water in the photo

14   that we just saw for the first time today was a different

15   location in your house than the other photos that we saw

16   yesterday, correct?

17   A.    It's a few feet away from each other.

18   Q.    A different location?

19   A.    Right.

20   Q.    You had all of these photos in your possession because you

21   took them, correct?

22   A.    Correct.

23   Q.    And you had those in your possession before you answered

24   the interrogatories -- sworn interrogatories in your attorneys'

25   offices, no pressure, no courtroom setting, and said 9:30,

1  correct?

2  A.   That is correct.

3  Q.   And you had those photos in your possession before you gave

4  sworn deposition testimony in this case and said 9:30 was when

5  water came into your house, correct?

6  A.   Yes, sir.

7  Q.   And you had all of those photos in your possession before

8  you gave testimony before Judge Rodgers in this very courtroom

9  at the evidentiary hearing in which you said 9:30, correct?

10  A.   Yes, sir.

11          **MR. HILL:**   Thank you.   No further questions.

12          **THE COURT:**   All right, sir, you may step down.

13          *(Witness excused.)*

14          Your next witness?

15          **MR. GLASSER:**   The Plaintiffs call Mr. Kyle Moore, Your

16  Honor.

17          **THE COURT:**   All right.

18           **KYLE MOORE, PLAINTIFF WITNESS, DULY SWORN**

19          **MADAM CLERK SIMMS:**   Be seated.   Please state your full

20  name and spell your last name for the record.

21          **THE WITNESS:**   My name is Kyle Joseph Moore.   Last name

22  is spelled M-o-o-r-e.

23          **THE COURT:**   All right, Mr. Glasser, when you're ready.

24          And Mr. Moore, could I ask you to move a little closer

25  to the device with the red light on it; that's your microphone.

1    Thank you.

2         Go ahead.

3                    **DIRECT EXAMINATION**

4    **BY MR. GLASSER:**

5    Q.   Can you -- well, you just told the jury your name.  I take

6    it you work at International Paper Company?

7    A.   I do, yes.

8    Q.   And you and I have never met; isn't that true?

9    A.   That is correct.

10   Q.   You worked at the Pensacola mill from 1992 until 2015; is

11   that right?

12   A.   I actually left in 2009 and went to another assignment at

13   another facility in Alabama and then came back in 2012.

14   Q.   Okay.  So from 1992 to 2009 you worked there, and then you

15   worked there 2012 to 2015; is that correct, sir?

16   A.   That is correct.

17   Q.   Your college education is in chemical engineering?

18   A.   That is correct.

19   Q.   Let me take you back to 2014, okay?

20   A.   Okay.

21   Q.   At that time, your position was manager of environmental

22   health and safety for the Pensacola mill; is that correct?

23   A.   Yes, that's right.

24   Q.   You had oversight responsibility for all the physical

25   devices at the plant including those handling any stormwaters;

1    is that correct?

2    A.    That is correct, yes.

3    Q.    That includes the Kingsfield Road damn, isn't that right,

4    sir?

5    A.    It does include that, that structure.

6    Q.    In 2014 -- oh, and you have testified earlier in this case

7    as what's called the corporate designee where the corporation

8    put you forward as the person most knowledgeable about the

9    history of this dam; is that right?

10   A.    That is correct.

11   Q.    In 2014, International Paper owned that dam, right?

12   A.    Yes, they did.

13   Q.    In 2014, International Paper was responsible for the

14   operation of that dam, correct?

15   A.    That is correct, yes.

16   Q.    In 2014, International Paper was responsible for the

17   maintenance of that dam; isn't that correct?

18   A.    That is correct.

19   Q.    International Paper was responsible for the very existence

20   of that dam, isn't that true, Mr. Moore?

21   A.    That is correct, yes.

22   Q.    I want to show you what has been previously marked as

23   Plaintiffs' Exhibit 185(a).  It should be on your screen.  Do

24   you see it there, sir?

25   A.    It's a little bit out of focus, but yes, I can make it out.

1    Q.    How is that?

2    A.    A little bit better.

3    Q.    So I'll just move in and out so you can see it better.

4    A.    Okay.

5    Q.    So you recognize Plaintiffs' Exhibit 185(a) as an aerial

6    shot of the plant and the ponds at the plant looking upstream

7    of Elevenmile Creek; isn't that true?

8    A.    Yes, I believe I do, yes.

9          **MR. GLASSER:**  I move the admission of Plaintiffs'

10   Exhibit 185(a), Your Honor.

11         **THE COURT:**  That will be admitted.

12        (Plaintiffs' Exhibit 185(a) admitted into evidence.)

13         And you may publish it.

14         **MR. GLASSER:**  Your Honor, because of the issues we're

15   having with the -- nevermind.

16         The jury can see 185(a)?

17         **THE COURT:**  They can see it there.  That's their only

18   monitor at this time.

19   **BY MR. GLASSER:**

20   Q.    Just because we're a long way away, let me focus in.  Along

21   the north of 185(a) is the International Paper plant, is that

22   correct, at the top of the picture?

23   A.    Yes, that's right.

24   Q.    And that's what I'm focused in on now.

25         **THE COURT:**  Excuse me, Mr. Glasser.

1          Ladies and gentlemen, can you see that when it's

2    zoomed in?

3          **THE JURY:**   *(Indicating affirmatively.)*

4          **THE COURT:**   I know it's not great, but you're able to

5    see it?   It's probably better when there's a zoom; is that fair

6    to say?

7          **THE JURY:**   *(Indicating affirmatively.)*

8          **THE COURT:**   If you can, when you're talking about a

9    specific feature on a photo, it's probably a good idea to zoom

10   for the jury just like you did.

11         **MR. GLASSER:**   I do, Your Honor, have five copies of

12   it, that the jury could share.   That would be easier to see.

13         **THE COURT:**   That's fine.   If you want to pass it

14   around, ladies and gentlemen.   They have five, so maybe you can

15   share.   You're seated fairly close to one another.

16         Please let Mr. Nelson review that before you --

17         All right.   Go ahead, you may.

18         Thank you, Ms. Adams.

19         Do you have an extra copy for Mr. Moore?

20         **MR. GLASSER:**   Yes, ma'am.   I won't do this with every

21   photo, Your Honor.

22         **THE COURT:**   It's your examination.   But where is

23   Mr. Moore's copy?

24         **MR. GLASSER:**   Oh, on the screen.   You wanted another

25   copy for Mr. Moore?

1          **THE COURT:**  Mr. Moore, would you like to have a hard

2     copy, or are you able to see fine enough with your monitor?

3     We're having some IT issues.

4               **THE WITNESS:**  It is a bit more --

5               **THE COURT:**  Thank you for that.

6     **BY MR. GLASSER:**

7     Q.    So at the very top of 185(a) is the plant, right?

8     A.    Yes, that is correct.

9     Q.    And then as we move downstream from the plant, we have a

10    series of large ponds; is that correct?

11    A.    Yes, that's correct.

12    Q.    And I'm going to put my finger -- there's one, right,

13    there's a pond there?

14    A.    Right.

15    Q.    There's a pond here, right, in the middle?

16    A.    Yes.

17    Q.    There's a pond farther down, right?

18    A.    Yes.

19    Q.    There's another pond over here, right?

20    A.    Correct.

21    Q.    And there's another series of ponds here, right?

22    A.    What I would say -- what you're pointing to there is more

23    properly characterized as a riffle section.

24    Q.    And then below the riffle section is the actual dam down

25    here at the bottom of the picture; is that correct?

1    A.    Yes, way on down.

2              **MR. GLASSER:**   This is a new exhibit.

3    **BY MR. GLASSER:**

4    Q.    I'm showing you what has been marked as Exhibit 181(e).

5    You see it on your screen?

6    A.    I do.

7    Q.    Do you recognize 181(e) as a blowup of one of the ponds on

8    185(a) -- or actually, three of the ponds on 185(a)?

9    A.    Yes, I do.

10             **MR. GLASSER:**   I move the admission of 181(e), Your

11   Honor?

12             **THE COURT:**   That's admitted.

13        (Plaintiffs' Exhibit 181(e) admitted into evidence.)

14             **MR. GLASSER:**   I'd like to publish that to the jury.

15             **THE COURT:**   Yes.

16   **BY MR. GLASSER:**

17   Q.    So, Mr. Moore, comparing these ponds to those trees that we

18   see in the photo, is it fair to say that these are large ponds?

19   A.    They're -- I think they're approximately 20 million gallons

20   apiece or something like that, 25 million gallons capacity.

21   Q.    And we'll actually walk through each of them here in a

22   minute.   Let's go to Exhibit 186(a).   Do you have it in front

23   of you?

24   A.    I do.

25   Q.    Do you recognize that as a pond -- as one of the ponds at

1    International Paper's plant?

2    A.    I do.

3              **MR. GLASSER:**  I move the admission of 186(a), Your

4    Honor.

5              **THE COURT:**  That's admitted.

6         (Plaintiffs' Exhibit 186(a) admitted into evidence.)

7              **MR. GLASSER:**  I'd like to publish it to the jury.

8              **THE COURT:**  Yes.

9    **BY MR. GLASSER:**

10   Q.    Again, if you compare the trees to the ponds -- to the pond

11   there, you can see that the pond is large; isn't that true?

12   A.    In comparison to those trees, yes.

13             **MR. GLASSER:**  This is another one he hasn't seen.

14   **BY MR. GLASSER:**

15   Q.    I'm showing you what's been marked as 187(j).  You

16   recognize that as a view -- aerial view of the plant and the

17   ponds; is that right?

18   A.    Yes, it's similar to the 185(a).

19             **MR. GLASSER:**  Move the admission of 187(j), Your

20   Honor.

21             **THE COURT:**  187(j) is admitted.

22        (Plaintiffs' Exhibit 187(j) admitted into evidence.)

23             **MR. GLASSER:**  I'd like to publish this to the jury.

24   **BY MR. GLASSER:**

25   Q.    Focusing on the right side of 187(j), that right there is

1   called the -- is one of several surge ponds, isn't that

2   correct, Mr. Moore?

3   A.    It is a stormwater retention pond, yes.

4   Q.    And that's on the right side of this photo 187(j), right?

5   A.    Yes.

6          **THE COURT:**  Mr. Nelson, are you handling this witness?

7          **MR. NELSON:**  I am, Your Honor.

8          **THE COURT:**  Let me ask both of you, Mr. Glasser and

9   Mr. Nelson, to approach, please.

10          *(Bench conference between the Court and counsel:)*

11          **THE COURT:**  Again, I apologize.  Because of how we're

12  having to function with the IT, there's a lag that we usually

13  don't have, a delay with Ms. Simms having to turn the monitor

14  on and off.  Is there any objection to these photos?

15          **MR. NELSON:**  The photographs?

16          **MR. GLASSER:**  They're all the aerials.

17          **MR. NELSON:**  At least the ones that he's been showing

18  so far I don't have an objection to, but I'm not sure --

19          **MR. GLASSER:**  I'm about out of photos.  I have a

20  couple of the dam after it breached, they're the ones we showed

21  in opening.

22          **MR. NELSON:**  Those are fine.

23          **MR. GLASSER:**  I would ask for their admission.

24          **THE COURT:**  Do you know the numbers?

25          **MR. GLASSER:**  104 and 178(f), I think.

1    **THE COURT:** 104 and 178(f), I'll go ahead and admit.

2    (Plaintiffs' Exhibits 104 and 178(f) admitted into evidence.)

3    *(Bench conference concluded.)*

4    **THE COURT:** Mr. Glasser, go ahead when you're ready.

5    **MR. GLASSER:** Ms. Simms, this has been admitted

6    185(d).

7    **THE COURT:** That's admitted, yes.

8    **BY MR. GLASSER:**

9    Q.  Mr. Moore, showing you Exhibit 185(d), you'll agree that

10   this is a shot of the dam in the foreground after it has failed

11   and it shows its relation to the Kingsfield Road bridge

12   immediately downstream; is that correct?

13   A.  It does look to me that is the structure down there near

14   the Kingsfield Road, yes.

15   **MR. GLASSER:** And Your Honor, I'd like to publish

16   185(d) physically to the jury.

17   **THE COURT:** Okay.

18   **BY MR. GLASSER:**

19   Q.  So, the foreground of 185(d), if I focus in on it, shows

20   the cut made by the water, correct?

21   A.  It does show erosion, yes.

22   Q.  And just downstream is a bridge called the Kingsfield Road

23   bridge; is that correct?

24   A.  I believe that is correct, yes.

25   Q.  I want to show you an exhibit that is not objected to.

1    **THE COURT:**  What's the number, please?

2        **MR. GLASSER:**  82, Your Honor.

3        **THE COURT:**  82 is admitted.  Thank you both.

4        (Plaintiffs' Exhibit 82 admitted into evidence.)

5    **BY MR. GLASSER:**

6    Q.   And you recognized what has been admitted into evidence as

7    Exhibit 82 as a schematic representation of the Pensacola mill

8    wastewater treatment system layout; is that correct?

9    A.   Yes, I do.

10   Q.   Just -- wastewater is the water that's used in the plant to

11   make the paper and I guess the diapers or the diaper stuff that

12   we heard about in opening and then is pushed to these series of

13   ponds for cleaning; is that correct?

14   A.   That is correct.

15   Q.   Wastewater is also, as I understand it, the water that

16   comes off of the ash pile?  You see over here on the right side

17   of this schematic there's a place called the ash pile; is that

18   right?

19   A.   Yes.

20   Q.   So water that goes through the ash pile and comes out

21   likewise is wastewater, right?

22   A.   Yes.

23   Q.   Has that ash pile been growing since 1940?

24   A.   I don't know the answer to that question.

25   Q.   To your knowledge, during the time you were manager of

1    environmental and safety at International Paper from 1992 to

2    2009, was any ash -- well, was any ash, to your knowledge,

3    trucked away from the plant or was it instead piled in this

4    pile?

5             **MR. NELSON:**  Your Honor, I object to the relevance.

6             **THE COURT:**  Approach, please, if you would.

7             *(Bench conference between the Court and counsel:)*

8             **THE COURT:**  To the relevance of the ash pile?

9             **MR. NELSON:**  Of trucking ash off of the facility.  I

10   mean, I think your rulings made clear that this case is not

11   about the content of the water and whether any ash cut into it.

12            **THE COURT:**  Where are you going with this?

13            **MR. GLASSER:**  In opening Mr. Nelson said that the

14   plant had been in operation since 1940.

15            **THE COURT:**  Right.

16            **MR. GLASSER:**  And the ash pile, I will establish with

17   this witness, or certainly with our expert indeed, though I

18   think he'll admit it, holds water like a sponge.  Mr. Nelson

19   discussed the sponge effect in opening, this is a huge

20   reservoir of water added to the water that comes --

21            **THE COURT:**  Off of the ash pile?

22            **MR. GLASSER:**  Yes.

23            **THE COURT:**  I'm going to allow it.

24            **MR. NELSON:**  But the trucking --

25            **THE COURT:**  Well, the trucking --

1          **MR. GLASSER:**  I'm just trying to say how big it is.

2          **THE COURT:**  Yeah, I think he's trying to establish

3    that it has not changed.

4          **MR. GLASSER:**  Yes, ma'am.

5          **THE COURT:**  Okay.  Thank you.

6          *(Bench conference concluded.)*

7          **THE COURT:**  Okay, Mr. Glasser, go ahead.

8    **BY MR. GLASSER:**

9    Q.   So, from 1992 to 2009, when you were manager of

10   environmental and safety, are you aware of any trucking of ash

11   away from the pile?

12   A.   I'd like to correct something you just said.  I was not

13   manager of environmental and safety from 1992 to 2009.

14   Q.   Oh, okay.  So, when did you become manager?

15   A.   I became manager of the environmental health and safety in

16   Pensacola in 2012.

17   Q.   2012, okay.  Let me just make a note of that.  What was

18   your job before 2012?

19   A.   I was environmental group leader at Pensacola from 1992

20   until 2002, and then I was working on a special project -- a

21   special environmental project from 2002 until 2009.

22   Q.   At this plant?

23   A.   At this plant.

24   Q.   So, back to my question, though:  In all your time coming

25   to the plant, did you ever see any trucking of ash away from

1    the plant?

2    A.   I believe some trucking did take place where they were

3    using the ash for a beneficial reuse at a cement kiln in

4    Mobile.

5              **THE COURT:**  Did you say cement kiln?

6              **THE WITNESS:**  Cement kiln, yes.

7              **THE COURT:**  Thank you.

8    **BY MR. GLASSER:**

9    Q.   How big is this ash pile?

10   A.   I don't recall the number of acres of the ash.  I really

11   don't know how big it is.

12   Q.   Bigger than a city block?

13   A.   It's probably on the order of a city block, yes.

14   Q.   And you agree with me that when it rains the ash piles take

15   water in and then push water out?

16   A.   It does have a drain -- it does -- rain does fall on it and

17   it does have a drain system that takes it to the wastewater

18   system.

19   Q.   And so the ash pile is like a sponge, right, it takes water

20   in, it lets water go?

21   A.   Generally, yes.

22   Q.   Have you ever calculated how much water the ash pile can

23   hold?

24   A.   No, I have not.

25   Q.   Let's go to what's been marked -- what's marked here as

 1   pond 1.  That's one of the big ponds we saw in the pictures; is

 2   that right, sir?

 3   A.    Yes.

 4   Q.    And what, sir, is the volume of water pond 1 is designed to

 5   hold?

 6   A.    The design of that is roughly 100 million gallons.

 7   Q.    Mr. Moore, if I approached you with an exhibit that you

 8   used at your deposition to remind you of the capacity of these

 9   ponds, would it help you recollect better the capacity of these

10   ponds?

11   A.    It probably would, yes.

12         **MR. GLASSER:**  May I approach, Your Honor?

13         **THE COURT:**  Yes, you may.

14   **BY MR. GLASSER:**

15   Q.    Just read to yourself what I've handed you and then when

16   you're satisfied look up.  I'm interested in pond 1.

17   A.    Okay, I'm done.

18   Q.    You can put that aside.  What, sir, is the volume of pond

19   1?

20   A.    It's 120 million gallons.

21   Q.    So I'm going to write 120 in here, okay?

22   A.    Okay.

23   Q.    I'm going to write up here on the board 120 million.  That

24   is pond 1, right?

25         Now, let's go to pond 2, this pond.  You agree that that's

1    pond 2?

2    A.    Yes, it is.

3    Q.    What is the volume for pond 2?

4    A.    I believe it is 87 million.

5    Q.    So I'm going to write 87 in here, okay?  Did I write that

6    correctly?

7    A.    Yes.

8    Q.    Pond 3 right here below pond 1 and pond 2, what's its

9    capacity?

10   A.    It's 22 million.

11   Q.    I'm going to write 22 in here.  Did I write that correctly?

12   A.    Yes.

13   Q.    Pond 4, which is just down from pond 3, what's the capacity

14   of pond 4?

15   A.    The design capacity is 22.

16   Q.    22 million?

17   A.    Yeah.

18   Q.    Did I write that correctly?

19   A.    Sure.

20   Q.    So going back to our butcher paper over here, pond 2 is 87

21   million, right, pond 3 is 22 million, pond 4 is 22 million,

22   right?

23   A.    That's correct.

24   Q.    I'll put down here the things we don't know exactly.  The

25   ash pile.  Is the ash pile bigger or smaller than pond 3?

1    A.    In what terms?

2    Q.    Footprint.

3    A.    Footprint?  It's probably bigger than pond 3, yes.

4    Q.    Is the ash pile bigger in footprint than pond 2?

5    A.    They're getting close to being equal here, I'm not sure.

6    Q.    How many stories high or feet high, if you know, does the

7    ash pile stand?

8    A.    I don't know that.

9    Q.    Is it more than 50 feet?

10    A.    It's hard for me to estimate that.  I've never really

11    thought about it in that term.

12    Q.    Is there not a permit limit to the size of the ash pile,

13    the height of the ash pile?

14    A.    I'm not aware of a limit on the height of the ash pile, no.

15    Q.    All right.  Back to what's been admitted as Exhibit 82.  I

16    now want to go to -- back upstream.  So we've walked down the

17    ash pile, pond 1, pond 2, pond 3, and pond 4.  I want to go

18    back upstream before we go downstream.

19          Those ash sluice ponds, do you see those?

20    A.    I do.

21    Q.    That's what takes the dirty -- the water that comes through

22    the ash pile and puts it back in the wastewater system; is that

23    right?

24    A.    Not exactly.

25    Q.    Does it contribute to the wastewater system?

1    A.   It does contribute to the wastewater system, the water.

2    Q.   What is the capacity of the ash sluice ponds?

3    A.   I don't know that.

4    Q.   Are the ash sluice ponds bigger or smaller than pond 4?

5    A.   I don't really -- I would say they're on the same order and

6    size as pond 4.

7    Q.   Okay.  So I'm going to write -- so the ash pile, you said,

8    was somewhat equivalent to pond 2 in size, right?

9    A.   Yes, I did say that.

10   Q.   And the ash sluice was somewhat equivalent to pond 3; is

11   that right?  Or pond 3 and pond 4 are the same?

12   A.   I think you said pond 4, but yes.

13        **THE COURT:**  Mr. Glasser, I need a point of

14   clarification.  I don't know that it's been clarified.  Is

15   there one or two sluice ponds?

16        **MR. GLASSER:**  There are two sluice ponds.

17   **BY MR. GLASSER:**

18   Q.   Is each about the size of pond 3 or together?

19   A.   I believe that the one on the right-hand side is larger.

20   Although it looks like it's smaller, I think it's actually

21   larger than the one on the left side.

22   Q.   All right.  So the one on the right is even larger than

23   pond 3?

24        **THE COURT:**  Wait.  3 or 4?

25        **MR. GLASSER:**  They're the same, 3 and 4 are the

1    both --

2           **THE WITNESS:**  I don't think it would be significant.

3    My judgment -- opinion would be it would not be significantly

4    different, but I don't really know.

5    **BY MR. GLASSER:**

6    Q.   Okay.  So, is it fair to say that the two ash sluice ponds

7    are each equal to pond 3?

8    A.   Roughly, yes.

9    Q.   I'm just going to put 2X here.  So I'm going to put -- this

10   is the symbol for "approximately," right?  Approximately pond 3

11   times 2, right?

12   A.   Yes.

13   Q.   And the ash pile we have approximately pond 2, right, in

14   footprint?

15   A.   *(No response.)*

16   Q.   Now, going back to the multi-purpose surge basin --

17          **THE COURT:**  Excuse me.  Ms. Boland just asked a

18   question.

19          Did you answer, Mr. Moore, the question about the ash

20   pile in pond 2?

21          **MR. GLASSER:**  Yes.

22   **BY MR. GLASSER:**

23   Q.   It's approximately equal ponds in footprint?

24   A.   In terms of footprint, I don't know.  I guess -- I'm trying

25   to remember.  I believe, I mean, it's -- I think the ash -- I

1    guess probably roughly equivalent.

2    Q.    The multi-purpose surge basin, now, just to go back to

3    what's already been admitted as Plaintiffs' Exhibit 185(a), you

4    can see here this is one such surge basin but this is not the

5    multi-purpose surge basin, right?

6    A.    That is correct.

7    Q.    In the right bottom?  The multi-purpose surge basin I don't

8    think you can see it on this photo, can you, on this photo

9    187(j)?

10   A.    No, I don't think you can, no.

11   Q.    What is the size of the multi-purpose surge basin that's

12   not visible on the aerial photo in terms of capacity for water?

13   A.    It's about 30 million gallons.

14   Q.    30 million gallons?

15   A.    Yes.

16   Q.    So, did I write that correctly on the exhibit, 30?

17   A.    Yes.

18   Q.    The multi-purpose surge basin also contributes water

19   downstream; is that correct?

20   A.    It does.

21   Q.    What is the dewatering plant?

22   A.    The dewatering plant is a part of the -- what is commonly

23   referred to as the primary clarification -- part of the primary

24   clarification treatment step of the water process.

25   Q.    I think you have to sit a little forward so we can hear you

1    a little better.

2    A.    Okay.  The dewatering plant is associated with the first

3    step of the wastewater system which is called primary

4    clarification.

5    Q.    So it takes the water from the plant and, whatever, takes

6    the pulp and mashes the water out basically?

7    A.    It clarifies it.  It reduces those suspended solids and

8    then those suspended solids are filtered and come up with a

9    solid material.

10   Q.    And it looks like there's structure there.  Do you know the

11   capacity of that structure for what it holds in water?

12   A.    The dewatering plant does not hold water.  That's process

13   equipment, so it does not hold water.  But the primary

14   clarifiers would hold a small amount of water, a few million

15   gallons.

16   Q.    Does it go to this east decant basin right here?

17   A.    It does not.

18   Q.    What is the capacity of the east -- well, what is the east

19   decant basin?

20   A.    Those were -- the east decant basin is an area where solid

21   material that will ultimately be landfilled is staged

22   temporarily.

23   Q.    Is there water in the east decant basin?

24   A.    I don't know at this time whether there is or not.

25   Q.    So how does it decant?  Doesn't "decant" mean drain of

1    water?

2    A.   It does mean drain of water, yeah.

3    Q.   So how does it decant if there's no water in it?

4    A.   It would not be able to decant if there was no water in it.

5    Q.   So what's its capacity for water?  Well, let me step back.

6         Does water in the decant basin go into this system?

7    A.   Are you talking about the east decant basin?

8    Q.   Yes.

9    A.   It is not -- when I was there as EHS manager, it was not

10   operating as an online system.  It was kind of a temporary

11   system that would be used intermittently and then that water

12   would drain back to the multi-purpose surge basin.

13   Q.   All right.  So I'm not going to put new numbers for that.

14        The cell 15 (M1), what is that pond?

15   A.   That is actually a cell that has been filled with solid

16   material that the mill has discarded and has -- we've

17   constructed that into a landfill cell, the company has, so it

18   does not hold any water any longer.

19   Q.   Now, let's go up here at the top.  Experimental wetlands,

20   you see that?

21   A.   I do.

22   Q.   So the wetlands hold water, right?  Correct?

23   A.   They do.

24   Q.   How many football fields wide are the experimental

25   wetlands?

1   A.   I'd say less than one.

2   Q.   How many football fields long are the experimental

3   wetlands?

4   A.   I'd say less than one.

5   Q.   So one football field by one football field, or slightly

6   less; is that fair?

7   A.   Yes.

8   Q.   How much water is held in those wetlands?

9   A.   I don't know.

10  Q.   So that's a question mark, you don't know.  Okay.  Did I

11  put a question mark there properly?

12  A.   Uh-huh.

13  Q.   All right.  Now, let's go downstream to the north surge

14  pond.  I'm showing you what has already been admitted as trial

15  Exhibit 187(j).  Can we see the north surge pond on this

16  picture?

17  A.   Yes.  It's to the right there.

18  Q.   Is it this one right here?

19  A.   That is correct.

20  Q.   What is the capacity of the north surge pond?

21  A.   I don't know.

22  Q.   The north surge pond is larger, don't you believe, than

23  pool 1?

24  A.   Pool?

25  Q.   Yes, No. 1, is the north -- is this surge basin here on the

1    bottom of 187(j) larger than this pool up here?

2    A.   Oh, the pond, okay.

3              **THE COURT:**  Pond.

4    **BY MR. GLASSER:**

5    Q.   Pond.  I'm sorry, pond 1.  My fault.

6    A.   I mean, on the schematic it looks to be roughly the same,

7    but I honestly don't know.

8    Q.   Do you believe it would hold about the same amount of

9    water?

10   A.   I don't know.

11   Q.   Do you agree with me that it would hold more water than

12   pond 2?

13   A.   I don't know.

14   Q.   Do you think it would hold more water than pond 3?

15   A.   It might hold more water than pond 3, yes.

16   Q.   As the manager of safety at the plant, was it important to

17   know the capacity of your surge ponds for rain events?

18   A.   It would not be common for me to know every specific number

19   in those basins.

20   Q.   Was there anybody during the time you were there more

21   responsible for the volume of water that can go in these surge

22   basins than you?

23   A.   Well, the whole department was involved with this.

24   Q.   But were you the boss?

25   A.   I was the manager.

1    Q.   So, just to be clear, do you think the north storm basin is
2    larger than pond 3?
3    A.   It probably is, in my judgment, to be a larger area.
4    Q.   Is it larger than pond 2?
5    A.   I would say no.
6    Q.   All right.  So it's greater than pond 3.  Did I write that
7    correctly, greater than pond 3?
8    A.   Yes.
9    Q.   Now we go to the south storm surge pond.  You see that on
10   this schematic?
11   A.   I do.
12   Q.   Then, turning back to 187(j), I take it we can't see the
13   south surge pond on 187(j); is that right?
14   A.   Right.
15   Q.   The south storm surge pond is larger than the north storm
16   surge pond, isn't that right, Mr. Moore?
17   A.   On this schematic it shows to be a little bit larger.
18   Q.   And in real life you think it is, too, right?
19   A.   Not in 2014 it was not.
20   Q.   Do you think it was smaller than the north surge basin?
21   A.   If you're referring to 2014, yes.
22   Q.   What was the capacity of the south storm surge pond in
23   2014?
24   A.   I never saw a liquid level in that basin in 2014.
25   Q.   Do you think it could hold 70 acre-feet?

1   A.   I don't know.

2   Q.   Do you think it was at least as big as pond 4?

3   A.   It would depend on the situation.

4   Q.   So as the manager of environmental and safety in 2014 you

5   have no knowledge of the amount of water that would go in the

6   south storm surge pond behind the dam?

7   A.   It would not -- that area was highly variable and would

8   only see water during rain events.

9   Q.   And as the manager of safety at this plant, to your

10  knowledge, you never calculated or asked somebody else to

11  calculate for you what that could hold, did you?

12  A.   I don't recall doing that, no.

13  Q.   When you prepared for your deposition as the corporate

14  representative most familiar with the wastewater system and the

15  history of this dam, you couldn't find any evidence in your

16  company about what this could hold, could you?

17  A.   I don't recall seeing any information, no.

18  Q.   And you made a fair effort to locate such documents, didn't

19  you?

20  A.   The company did, yes.

21  Q.   So we have to put a question mark here at the south storm

22  surge basin because you don't know; is that right?

23  A.   I personally do not know.

24  Q.   Now, there's another piece of water here called the Turtle

25  Pond, Turtle -- that's Turtle, right?  You see that?

1    A.    I do.

2    Q.    And that comes from a creek called Turtle Creek, right?

3    A.    I think that receives drainage from the west side of the

4    mill, yes.

5    Q.    Right.  So that is -- there's a road or something -- Turtle

6    Creek and the south storm surge pond are two different things,

7    right?  Turtle Pond and south storm surge pond are two

8    different things --

9    A.    Correct.

10   Q.    -- hydrologically?  What is the capacity of this Turtle

11   Pond?

12   A.    I don't know.

13   Q.    And it's only called Turtle Pond because it runs off Turtle

14   Creek, right?

15   A.    I don't know how the name Turtle Pond came to be.

16   Q.    I'm sure there's a turtle or two in there.

17   A.    I'm sure that's right.

18   Q.    Okay.  So you have a question mark here, too.  You don't

19   know what the Turtle Pond held, right?

20   A.    No.

21   Q.    Now, we have been discussing to this point wastewater, is

22   that correct, the wastewater system, except for Turtle Pond.

23   That's some freshwater or pure stormwater?  It doesn't go

24   through the plant to get to the Turtle Pond, right?

25   A.    The basins that you've been discussing are a part of the

1    wastewater system, yes, except for the south storm surge pond.

2    Q.   So your wastewater system ends here at the last outfall,

3    the effluent test station; is that correct?

4    A.   Depending on the time period you're referring to.

5    Q.   Well, let's go after 2012.

6    A.   After 2012, no, it did not end there.  It would have ended

7    at the south end of pond 4 where it went into a pipeline.

8    Q.   All right.  So south end of pond 4, I'm going to put an

9    asterisk there, okay?

10   A.   Okay.

11   Q.   So before -- so this asterisk is the end of stormwater

12   system, right, 2012?  Is that fair?

13          **MR. NELSON:**  I object, Your Honor.  I think that's

14   inconsistent with the testimony.

15          **THE COURT:**  Let me ask Mr. Moore to clarify.

16          **THE WITNESS:**  I think the term we were just talking

17   about was wastewater system.

18          **MR. GLASSER:**  I'm sorry.  Yeah, you're right.  I

19   apologize.  That's what I meant.

20   **BY MR. GLASSER:**

21   Q.   Right there, was that your last outfall?

22   A.   Yes.

23   Q.   So that's where the jurisdictional line is for the

24   stormwater -- I'm sorry -- for the NPDES wastewater permit?

25   A.   That permit also includes stormwater, so it's not the --

1    it's the jurisdictional line for the wastewater but it's not

2    the jurisdictional line for the stormwater system.

3    Q.   We're going to have to explain some things here.  To have

4    water that's clean in a plant you get a permit called a

5    National Pollutant Discharge Elimination System permit,

6    correct?

7    A.   That's correct.

8    Q.   That's called a wastewater permit, right?

9    A.   Correct.

10   Q.   When it storms, the Government understands that you're

11   going to discharge more water than normal over that permitted

12   area, correct?

13   A.   Yes.

14   Q.   So it's a wastewater/stormwater permit for that purpose,

15   correct?

16   A.   Yes, I believe that's a fair characterization.

17   Q.   And this asterisk is where it stopped in 2012

18   jurisdictionally; isn't that correct?

19   A.   That was the compliance point for the wastewater system.

20   Q.   And as the manager of environmental at this plant, you know

21   that's the jurisdictional limit of your permit, correct?

22   A.   That permit also covered the north storm surge pond and it

23   did the Kingsfield structure, too.

24          **MR. GLASSER:**  May I approach, Your Honor?

25          **THE COURT:**  Yes, sir, after you share with Mr. Nelson.

1  **BY MR. GLASSER:**

2  Q.   If I showed you the map of the jurisdictional line of your

3  permit, would that help refresh your recollection on where it

4  ends?

5  A.   Yes, it would.

6  Q.   Can you just look at this document that I've given you in

7  Defendant's Exhibit 9.  And I've blown up the bottom of it here

8  for you.

9             **MR. NELSON:**  Your Honor, permission to approach?

10            **THE COURT:**  Okay.

11            *(Bench conference between the Court and counsel:)*

12            **MR. NELSON:**  The portion of this document that he's

13  using is a copy of the facility permit, which was Exhibit 1 as

14  well, the full facility permit.  Plaintiffs moved in limine to

15  exclude that, and Your Honor ruled that that would be excluded.

16  So either it's in or it's not.  But we had removed that from

17  our copy of Exhibit 9 pursuant to Your Honor's in limine

18  ruling.  If he's going to introduce the full copy of Exhibit 9,

19  that's fine, but when I plan to go into that permit --

20            **THE COURT:**  You'll certainly be able to.

21            **MR. GLASSER:**  I'm not going to.  I just wanted to

22  remind him where the jurisdictional limit is.  It's relevant

23  because in opening Mr. Nelson said that they had a permit from

24  the EPA for this dam and this jurisdictional limit is north of

25  this dam.

1      **THE COURT:**  If he's not going to admit it, then it's

2  not in.

3      **MR. NELSON:**  Then I'll be moving to admit it I expect.

4      **MR. GLASSER:**  And I will still object because it's not

5  relevant.  This permit -- if you kill a deer you can't show the

6  conservation officer your fishing permit.  It's not relevant.

7      **THE COURT:**  Well, I can tell you, from someone who

8  doesn't know the case nearly as well as you all do, it sounds

9  relevant because we've been hearing a lot about it.

10      **MR. GLASSER:**  Because they -- we objected to bringing

11  it in in the case at all, and in opening Mr. Nelson went after

12  it anyhow.

13      **THE COURT:**  Well, then it -- I don't know.  There was

14  no objection --

15      **MR. NELSON:**  That was in reference to a permit in 2005

16  and '06.

17      **THE COURT:**  We may have to take this up at a break,

18  but for now it's not coming in, and then we'll address it

19  later.

20          *(Bench conference concluded.)*

21      **THE COURT:**  Mr. Moore, Mr. Glasser is just asking you

22  to look at that to refresh your memory.  Please don't read from

23  it because it's not in evidence.

24      **THE WITNESS:**  Okay.

25      **THE COURT:**  I mean don't read it out loud.

1   **BY MR. GLASSER:**

2   Q.   Once you're done looking at the map, you can put it away

3   after you're done.

4   A.   Okay.

5   Q.   Can you confirm for me that the lowest outfall under that

6   permit is where that asterisk is?

7   A.   I cannot confirm that for you.  That is the --

8           **THE COURT:**  Could we get the picture back up, please.

9           I'm sorry, Mr. Moore, go ahead.

10  **BY MR. GLASSER:**

11  Q.   Right there.

12  A.   So the facility permit had three different outfalls, and so

13  what you're marking there is one of those three.

14  Q.   The lowest outfall down the creek?

15  A.   No, it's not.

16  Q.   Is the effluent test station the lowest outfall down the

17  creek?

18  A.   The effluent test station is lower than the other one.

19  That is on 001, the north storm surge pond is 002, and then you

20  have your asterisk is 003.  The permit goes on to describe the

21  Kingsfield structure as part of the stormwater system, so the

22  jurisdiction goes all the way down there.

23  Q.   There is no jurisdiction for you to get in trouble for what

24  is coming out of your plant south of those outfalls that I've

25  marked on this asterisk, correct?

1   A.    That is not correct.

2                 **MR. GLASSER:**  May I have that back?

3                 **THE COURT:**  Yes.

4   **BY MR. GLASSER:**

5   Q.    Now, to this point we've been discussing wastewater and a

6   little bit stormwater.  We talked about stormwater at the

7   Turtle Pond and at the south surge pond, right?

8   A.    Yes.

9   Q.    Now I want to talk about -- well, before we go off

10  wastewater, it's also fair to say that in transient among these

11  various structures there's also at any one time millions of

12  gallons of water; isn't that true?

13  A.    Yes, there is, there is in transient.

14  Q.    Now let's talk about -- oh, and also I understand Escambia

15  County's wastewater comes into the system somewhere, too.

16  Where does that happen?

17  A.    It actually goes into the mill and is used as process water

18  makeup in the mill, so it reduces the amount of freshwater that

19  that mill has to withdraw.

20  Q.    And do you know how many gallons a day of Escambia County

21  wastewater comes into the mill to process?

22  A.    It's highly treated and it's roughly 5 million gallons a

23  day.

24  Q.    So 5 million gallons a day.  And how many million gallons a

25  day does the mill itself use?

1   A.    Around 20 to 25, I believe.

2   Q.    All right.  Now, let's just talk about stormwater.  The

3   plant itself, which we saw in the photo, the large plant, water

4   that falls on the apparatus in the plant, is it shunted through

5   this wastewater system or around it?

6   A.    It drains in through the wastewater system.

7   Q.    What about the parking lots, does it come into the

8   wastewater system or does it go around it?

9   A.    It goes around it.

10  Q.    And where does it enter back into the system above the dam?

11  A.    It enters into the north storm surge pond.

12  Q.    So the north storm surge pond is receiving water that falls

13  on the parking lots and the other areas of the plant like

14  the --

15  A.    The outer areas of the plant that are not associated with

16  production or operations.  It also receives water from north of

17  the facility actually off site of the mill property.

18  Q.    Do you know the volume of water -- well, but all that comes

19  in here to the north storm surge pond -- I'm getting tongue

20  tied on that -- north of the dam, above the dam, upriver of the

21  dam, upstream of the dam?

22  A.    It does go into that north storm surge pond.

23  Q.    Is there any water that comes in from the bottom here and

24  goes in?

25  A.    The west side of the mill also goes into that same pond,

1    the peripheral areas of the west side of the mill, not the west

2    side of the mill proper, but the peripheral areas.

3    Q.   How long has Escambia County depended on the mill that's

4    handled 5 million gallons of wastewater?  The whole time you've

5    been there?

6    A.   It started in roughly 2012, early part of 2012.

7    Q.   So all that pure stormwater is different from the water

8    we've talked about that would go to the ponds above the north

9    storm surge, correct?

10   A.   Yes, it is a different system.

11   Q.   Because all that water comes in below, right?

12   A.   Yes.

13   Q.   Now, we talked about this asterisk and why the asterisk is

14   there, and that's because up until 2012 the wastewater and the

15   stormwater of the plant all discharged past your last effluent

16   test station and went down Elevenmile Creek; is that right?

17   A.   That is correct.

18   Q.   And the project you worked on, probably, I'm guessing, from

19   '09 to '12, was to change that and put a pipe here at this

20   asterisk to take wastewater to Perdido Bay, I think it's 11

21   miles away, right?

22   A.   Yes, the project that I worked on from 2002 to 2009 was to

23   put in that pipeline and discharge that water to wetlands down

24   near Perdido Bay.

25   Q.   Actually, let me show you Exhibit 182(a) --

1     **MR. GLASSER:**  To which I think there's no objection,

2     Your Honor.

3              **THE COURT:**  182(a) will be admitted.

4              (Plaintiffs' Exhibit 182(a) admitted into evidence.)

5     BY MR. GLASSER:

6     Q.   And 182(a) is a look at -- actually, it's an area I haven't

7     put the volume up.  It's this right here, this area right here

8     above the effluent test station, right, on Exhibit 82?  You see

9     where it says "effluent test station" and then it has the

10    squiggly line back to pond 4?

11    A.   Right.

12    Q.   That's what's depicted on 182(a); is that right?

13    A.   Let me look at this.  Yes, you are correct, yes.

14    Q.   What's the volume of water in that riffle section, if you

15    know?

16    A.   The riffle section is only maybe a foot deep.  That's the

17    way it's designed to operate.

18    Q.   Do you know how many million gallons a riffle section could

19    have?

20    A.   It would not be equal to pond 4 or pond 3, I don't believe.

21    Q.   Right.  So I'll put -- on the riffle section I'll put "less

22    than pond 4."  Is that fair?

23    A.   Shouldn't pond 4 be on the right side of the --

24    Q.   Pond 4 is right here.

25    A.   I'm talking about mathematically.

1    Q.   Oh, like that?

2    A.   Yes.

3    Q.   Okay, thank you.  So, anyhow, the only reason I was showing

4    you 182 is this thing in the bottom that I'm going to zoom in

5    on, that's that pipe, right?  Is that the pipe that takes the

6    water to -- the wastewater to Perdido Bay?

7    A.   Can you move that and give me perspective on that?

8    Q.   Yeah.

9    A.   That's a pretty -- the picture is not really good.  I think

10   that's right but it's not focused very well, but that's what it

11   looks like.

12   Q.   Now, the potential volume of that pipe to Perdido Bay is

13   how much per day?

14   A.   It's typically 25 million gallons a day.

15   Q.   So about a million gallons an hour?

16   A.   Yes.

17   Q.   What's its circumference?

18   A.   I believe it's 48 inches in diameter.

19   Q.   So 4 feet in diameter?

20   A.   Yes.

21   Q.   In a storm event, though, it can be bypassed, correct?

22   A.   It can physically be bypassed, but it is never bypassed

23   during a storm event.

24   Q.   Yeah, I'm sorry, I had that picture upside down, I guess,

25   on Exhibit -- I've got to orient you on Exhibit 182(a).  It

1    looks like that's downstream of 182(a), the top of the picture,

2    right?

3    A.   *(No response.)*

4    Q.   Is that right?  Would it help if I brought it to you?

5    A.   It sure would.

6    Q.   Which way is downstream, the top or bottom?

7    A.   The top is downstream.

8    Q.   So, we were right about the location of the pipe, right?

9    A.   Yes.

10   Q.   So, the top of 182(a) is downstream?

11   A.   Yes.

12   Q.   So, just to sum up this section of the testimony, the plant

13   is above the ponds, right?

14   A.   Yes.

15   Q.   The ponds are above the storm surge down here in the south,

16   except for the multi-purpose, right?

17   A.   Yes.

18   Q.   And all of that's above the dam?

19   A.   All of that is above the Kingsfield structure, yes.

20   Q.   So, 120 million plus 87 million is 207 million gallons,

21   right?

22   A.   Yes.

23   Q.   Plus 22 is 229 million?

24   A.   Yes.

25   Q.   Plus 22 is 251 million?

1  A.   Yes.

2  Q.   Plus 30 is 281 million, right?

3  A.   Yes.

4  Q.   So the subtotal here is 281 million gallons, right?

5  A.   Yes.

6  Q.   Ash pile, like pond 2, so that would be plus 87 million,

7  right?

8  A.   *(No response.)*

9  Q.   Right?

10 A.   Yeah, based upon our assumptions today, yes.

11 Q.   Two pond 3's would be another 44 million, right?

12 A.   Based upon today's discussion, yes.

13 Q.   And then, north surge pond 3, that would be another 22

14 million, right?

15 A.   If those assumptions are correct, yes.

16 Q.   I agree.  That's why I did a subtotal here.  We know these

17 are right, right?

18 A.   Yes, we are more confident in those.

19 Q.   So 281 -- I'll get the calculator or I'm going to mess this

20 up.  281 plus 87, 368?

21 A.   I don't have a calculator so --

22 Q.   Do you want a calculator?

23 A.   I trust you.

24 Q.   Plus 44, 412; plus 22, 434 million gallons, right?

25 A.   That sounds about what the calculator would do, yes, would

1    come up with.

2    Q.   And that's before we get to the question marks, right?  It

3    doesn't count the south storm surge pond, which is a question

4    mark, right?  It doesn't count Turtle Pond, which is a question

5    mark, right?  You have to say yes or no just for the record.

6    A.   Yes.

7    Q.   And you said yes on the south surge pond, too, right?

8    A.   Well, I guess I want to point out one thing on Turtle Pond.

9    It flows to Elevenmile Creek, it does not go through the south

10   storm surge pond.

11   Q.   Yeah, I got that.  We established that in testimony.

12   A.   Okay.

13   Q.   And then, you don't know the volume in the experimental

14   wetlands, right?

15   A.   Right.

16   Q.   And you don't know the volume in transient normally along

17   all these things, right?

18   A.   Right.

19   Q.   And so, it should be a number higher than 434 million

20   gallons of water; is that right?

21   A.   Yes.

22        **MR. GLASSER:**  Your Honor, I want to mark what I've

23   been marking up with the witness as Exhibit 82 as 82(a) and

24   move its admission?

25        **THE COURT:**  Any problem?

1          **MR. NELSON:**  No objection.

2          **THE COURT:**  That will be admitted as 82(a).

3          (Plaintiffs' Exhibit 82(a) admitted into evidence.)

4  **BY MR. GLASSER:**

5  Q.    I want to show you a demonstrative that was used in

6  opening --

7          **MR. GLASSER:**  May I, Your Honor?

8          **THE COURT:**  Yes.

9  **BY MR. GLASSER:**

10  Q.    -- by International Paper.  So, what we've been talking

11  about to date is International Paper and the Kingsfield Road

12  dam; is that right?

13  A.    Yes.

14  Q.    This drainage basin to the left, which goes to the Turtle

15  Pond, to your knowledge, is there any industrial facility up

16  there holding more than 434 million gallons of water?

17  A.    Can I see this -- I don't think I have -- if I have seen

18  this before, it's been a long time.  I'm having trouble getting

19  oriented.

20  Q.    So, this is the Elevenmile Creek basin drainage?

21  A.    The entire basin?

22  Q.    The basin, yes, sir, right here, above the Bristol Park and

23  Ashbury Hills neighborhood, you see that?

24  A.    Okay.

25  Q.    And in opening your counsel talked about other parts of the

1   basin that could contribute to flooding here, okay?  And you've

2   worked in the area since 1992, right?

3   A.   Right.

4   Q.   Are you aware of any major industrial facility on this

5   watershed here to the left of yours that has 434 million

6   gallons of storage?

7   A.   I'm not aware of any other major industrial facility.

8   Q.   Are you aware of any industrial facility anywhere on this

9   demonstrative in blue that holds at least 434 million gallons

10  of water on it?

11  A.   I don't recall any, no.

12  Q.   I'm going to a new topic now.  We're done with the water.

13       Prior to 2014, there was a history of erosion for the sandy

14  part of that dam in large rain events from time to time; is

15  that right?

16  A.   The Kingsfield structure was -- was modified and improved

17  several times over the years, yes.

18  Q.   Because it suffered a history of erosion on that sandy part

19  of the dam; is that correct?

20  A.   I don't know that it was sandy, I don't recall that.  But I

21  do recall that there were modifications made, and the

22  justifications for those modifications was some erosion that

23  had occurred during storm events -- large storm events.

24  Q.   So there's a pretty long history of problems with erosion

25  at this site; is that correct?

1    A.   Well, I think the way that the modifications were made was

2    in order to try to build the capacity to handle a certain storm

3    event.  If you go back to the early '90s, just before I got

4    here, they had just put in systems to handle a 100-year storm

5    event and so to prevent that.

6    Q.   So, I'm going to approach you with your testimony from the

7    evidentiary hearing in this case at page 29.

8    A.   Okay.

9         **THE COURT:**  Mr. Glasser, please ask to approach.

10        **MR. GLASSER:**  I'm sorry.

11   **BY MR. GLASSER:**

12   Q.   I'm looking at line 11, 12, and 13.  Can you read them to

13   yourself, and then line 14, 15, and 16.  Do you see that?

14   A.   Yes, I do.

15   Q.   Were you asked this question:

16        **QUESTION:**  "And were these modifications done in

17   response to various erosional-type issues?"

18        Were you asked that question?

19   A.   Yes, I was.

20   Q.   Did you give the answer, "Yes"?

21   A.   I did.

22   Q.   Do you stand by that answer?

23   A.   Yes.

24   Q.   Were you asked the question:  "And so there is a pretty

25   long history of problems with erosion at this site; isn't that

1   correct?"

2   A.   Yeah, the --

3   Q.   Were you asked that question?

4   A.   Yes.

5   Q.   Did you answer, "Yes"?

6   A.   Yes.

7   Q.   Do you stand by that answer?

8   A.   Yes.

9           **MR. GLASSER:**  This has not been admitted yet.

10  **BY MR. GLASSER:**

11  Q.   I'm going to show you what's been marked as Plaintiffs'

12  Exhibit 166.  Do you recognize that as a picture you brought

13  from the records of International Paper to your deposition to

14  discuss the history of the dam?

15  A.   It's kind of -- can you get a better --

16          **MR. GLASSER:**  Can I approach, Your Honor?

17          **THE COURT:**  Yes, you may.

18  **BY MR. GLASSER:**

19  Q.   From 2005, April 7?

20  A.   Yeah.  I guess what's confusing me is you said I took it to

21  the deposition, and I don't believe I --

22  Q.   Or you were shown it at your --

23  A.   I was shown it, okay, yes, right.

24  Q.   So, you recognize that as pictures from International

25  Paper's records dated April -- the date of the picture is April

1    2005; is that right?

2    A.   Yes.

3          **MR. GLASSER:**   I move the admission of Plaintiffs'

4    Exhibit 166, Your Honor.

5          **THE COURT:**   That's admitted.

6          (Plaintiffs' Exhibit 166 admitted into evidence.)

7    **BY MR. GLASSER:**

8    Q.   So, what we have here is a picture from April 1st of 2005

9    that you located in that search of records that we discussed

10   earlier or was located for you so you could discuss it at the

11   deposition; is that correct?

12   A.   That's correct.

13   Q.   And according to the records of the company, this had

14   occurred at a rate of 10.5 inches in 24 hours, right?

15   A.   That's what that says, yes.

16   Q.   Or a 25-year event.  You weren't there -- or maybe you were

17   there but that's just what the records said, right?

18   A.   Right.

19   Q.   And this is a picture of the water in that event

20   overflowing what was then the dam that existed in 2005; is that

21   correct?

22   A.   That's what it appears to be, yes.

23   Q.   I'm showing you --

24          **MR. GLASSER:**   This he hasn't seen before.

25   **BY MR. GLASSER:**

1   Q.   -- a second picture from that series of the same date.

2   This shows it closer to the concrete box part of the structure,

3   right?  Same day, same event, right?

4   A.   Could I see that up close?

5            **MR. GLASSER:**  May I approach, Your Honor?

6            **THE COURT:**  Yes.

7            **THE WITNESS:**  It's a different perspective in the

8   picture, that's what's taking me a while.  I think it's the

9   same.

10  **BY MR. GLASSER:**

11  Q.   And this, again, was found in the records of International

12  Paper and you discussed it as its representative; is that

13  correct?

14  A.   Yes, I did.

15           **MR. GLASSER:**  I move the admission of 167, Your Honor.

16           **THE COURT:**  167 is admitted.

17       (Plaintiffs' Exhibit 167 admitted into evidence.)

18  **BY MR. GLASSER:**

19  Q.   And we can see it's being overtopped, right?

20  A.   Yes.

21           **MR. GLASSER:**  This is another one that he hasn't seen

22  yet.

23  **BY MR. GLASSER:**

24  Q.   I think you'll recognize this one.  Do you recognize

25  Exhibit 95 as another one of that series, this from downstream

1    after the water had receded; is that right?

2    A.   Yes, I believe so, yes.

3            **MR. GLASSER:**   I move the admission of Exhibit 95, Your

4    Honor.

5            **THE COURT:**   95 is admitted.

6            (Plaintiffs' Exhibit 95 admitted into evidence.)

7    **BY MR. GLASSER:**

8    Q.   So the prior pictures we showed were above the dam looking

9    downstream, and now the water has gone and we've gone around to

10   the other side of the dam and we're looking upstream, right?

11   And this is in 2005, to be clear, right?

12   A.   That's what the picture says.  I actually was not involved

13   in all that in 2005, I don't believe.

14   Q.   But that's -- but you know that because those -- because of

15   the aspect of the picture and the two 48-inch pipes that used

16   to go under that dam, this is looking upstream, right?

17   A.   Yes, I believe it is.

18   Q.   And see this collapsed concrete there?

19   A.   Yes.

20   Q.   That's what happened in the 2005 storm event, right?

21   A.   I believe that's correct, yes.

22   Q.   All right.  And at that time this dam had a completely

23   different design than the 2014 dam; isn't that correct?

24   A.   It was modified substantially.

25   Q.   And we'll go into that in a little bit.

1    A.    Well, it was modified.  I don't know that I could say

2    substantially.  I'm not an expert on that.

3    Q.    We'll cover that in a minute.  I'm just trying to say this

4    concrete was there in 2005, and we'll talk about 2014 in a

5    little bit, okay?

6    A.    All right.

7              **MR. GLASSER:**  May I approach, Your Honor?

8              **THE COURT:**  Yes.

9    **BY MR. GLASSER:**

10   Q.    There was a series of photos that were also discussed at

11   that deposition that were marked Plaintiffs' Trial Exhibit 96.

12   Can you just flip through that and confirm that those are

13   likewise exhibits of the state of the dam after 2005 -- the

14   2005 dam, a series of photos?

15   A.    Yes.

16   Q.    And these likewise came from the records of your company,

17   and you discussed them as the corporate representative; is that

18   right?

19   A.    That is correct.

20             **MR. GLASSER:**  I move the admission of Plaintiffs' 96,

21   Your Honor.

22             **THE COURT:**  96 is admitted.

23             (Plaintiffs' Exhibit 96 admitted into evidence.)

24   **BY MR. GLASSER:**

25   Q.    I want to focus in -- it may be better to go to the

1    computer on this.  Well, let me focus in on this and then we'll

2    try the computer to get it bigger.

3         So, this right here, this concrete apron is what's known in

4    your records as the Arkansas Crossing; is that right?

5    A.    That is correct.

6    Q.    And this concrete apron was over the dam on both sides --

7    I'll call it like a turtle carapace, a turtle shell -- right?

8    A.    Right.

9    Q.    It was made of concrete, right?

10   A.    Right.

11   Q.    It's hard to see.  Can we pull it up on the computer.  Can

12   we switch to the computer, just to give some perspective.  Up

13   here is a truck, a big truck.  You see the truck here in the

14   top corner?

15   A.    Yes.

16   Q.    And so, this apron of concrete went across the dam like a

17   turtle shell on both sides, right, and then it went to what we

18   call the outfall box over here off the picture that had the two

19   big 48-inch pipes coming out, right?

20   A.    Yes.

21   Q.    So that was the design of the dam in 2005, right,

22   obviously, because this picture is in 2005?

23   A.    Yeah, right, I guess -- that's right.

24   Q.    It was put in in like '96 or something after another

25   erosional event?

1   A.   I do agree with that.

2   Q.   Correct?

3   A.   Yes, sir.

4   Q.   For an even prior iteration of the dam, a prior version,

5   right?

6   A.   Yes, of that structure, yes, the stormwater structure.

7   Q.   So, in '96 there was a stormwater structure; it didn't work

8   out as well as y'all wanted with erosion, had a problem in '96,

9   and this -- I'll call it turtle shell design -- was put in

10   after that '96 erosional problem, right?

11   A.   Yes, I believe that's correct.

12   Q.   And lasted until 2005 about nine years, right?

13   A.   That's when it was modified last.

14   Q.   And just while we're on the subject, there was another

15   prior one prior to '96 in '86 that was replaced by the dam that

16   existed until '96, right?

17   A.   That's right.

18   Q.   So that one lasted about ten years.  Okay.  We don't have

19   any photos of the '96 or the '86 dam, right, so we'll just

20   focus on the -- do you agree?

21   A.   Yes, I don't recall any.

22   Q.   So we'll just focus on the 2005 dam right now.  That's the

23   one on the screen.

24        I'm showing you what the parties agree to admit into

25   evidence as Exhibit 118.

1          **THE COURT:**  118 is admitted.

2          (Plaintiffs' Exhibit 118 admitted into evidence.)

3     **BY MR. GLASSER:**

4     Q.   This is an aerial of the 2014 dam.  You see that?

5     A.   Barely.

6     Q.   I know it's hard.  We'll get a picture down close.  But as

7     you can see, this right here is that south surge pond, right,

8     that we talked about over here on the left side of the picture?

9     A.   Okay.

10    Q.   And this right here on the right side is probably the

11    Turtle Pond, right?  Or maybe we can't see the Turtle Pond.

12    A.   I don't believe you can see the -- if the perspective I

13    have is correct, you can't see the Turtle Pond in this picture.

14    Q.   All right, fair enough.  And this dam in 2014 did not have

15    the concrete turtle shell over the earthen portion that existed

16    in 2005; isn't that true?

17    A.   The -- it did not.  They had taken that apron out.

18    Q.   And that's a decision made in 2005, right?

19    A.   They had replaced it with a rectangular vertical channel,

20    concrete channel.

21    Q.   I'm showing you what the parties have agreed to admit as

22    Exhibit 104.  This is a picture of the 2014 -- the hole in the

23    dam in 2014, right?

24    A.   Yes.

25         **THE COURT:**  104 is admitted.

1       (Plaintiffs' Exhibit 104 admitted into evidence.)

2  **BY MR. GLASSER:**

3  Q.   And while we're looking for 104, this is what the parties

4  have agreed to admit as 178(f).

5       **THE COURT:**  Wait a minute, Mr. Glasser.

6  **BY MR. GLASSER:**

7  Q.   This the parties have agreed to admit as 178(f) shows that

8  cut from the level of the creek, right, the cut on the -- it

9  shows the size of the cut.  So 104 shows the cut, the open

10 area, right, you agree?

11 A.   Yes.

12 Q.   And 178(f), which was taken in December of 2014, just shows

13 it from down below, right?

14 A.   Yes, it is a different perspective, yes.

15      **MR. GLASSER:**  I'd like to publish 104 to the jury

16 physically, Your Honor.

17      **THE COURT:**  Okay.

18      **MR. GLASSER:**  And 178(f).

19      **THE COURT:**  All right.

20 **BY MR. GLASSER:**

21 Q.   So, looking at Exhibit 104, the size of the hole made in

22 2014 was 41 feet long; isn't that right, Mr. Moore?

23 A.   I don't recall that number.  I don't know.

24 Q.   And there was no concrete apron as existed in 2005 armoring

25 the section that went out in 2014; isn't that true, Mr. Moore?

1    A.    So, I believe that the earthen section you're referring to

2    probably never had a concrete apron.  I think it always was on

3    that side of the --

4    Q.    So there is no concrete -- when you went down there the day

5    after, did you find any concrete in the creek from this earthen

6    portion of the dam?

7    A.    Yeah, you saw some concrete downstream.

8    Q.    You're -- I understand in 2005 there was a turtle carapace

9    over the earthen portion of the dam?

10   A.    I don't know what you mean by turtle --

11   Q.    It had armory, it had concrete, correct?

12   A.    Yeah, that's right.

13   Q.    Do you see any concrete in Exhibit 178(f)?

14   A.    No, but I think you're to the left -- I think that picture

15   is to the left of that concrete that you're referring to.

16   Q.    Why, if that area -- are you saying that the area that gave

17   way had a concrete armory up one side, across the top, and down

18   the other, yes or no?

19   A.    No, I'm not saying that.

20   Q.    Are you trying to say that there was no concrete over that

21   part in 2005 that gave way?

22   A.    No.  I'm saying -- I'm not saying that.  I'm saying that

23   your picture was to the left of the structure, the stormwater

24   structure.

25   Q.    All right.  So independent of my picture, near the cut --

1    it's hard to have a picture of -- Plaintiffs' Exhibit 104 shows

2    the concrete box that replaced the thing with the two big holes

3    in it --

4    A.   Right.

5    Q.   -- that we saw in -- so, remember when we looked at Exhibit

6    95, there's a concrete box with two big holes in the bottom?

7    A.   Right.

8    Q.   48 inches apiece, right?

9    A.   Yes, sir.

10   Q.   That was replaced in 2014 by this structure that's here in

11   the creek, right?

12   A.   That is correct.

13   Q.   And then this opening here, right, had no concrete armory

14   in 2014, right?

15   A.   I believe that's correct.

16   Q.   It was earth, right?

17            **THE COURT:**  It was what?

18            **MR. GLASSER:**  Earth.

19            **THE COURT:**  Oh, thank you.

20   **BY MR. GLASSER:**

21   Q.   Right?

22   A.   Yes.

23   Q.   It was of the same type soil pictured in Exhibit 178(f);

24   right?

25   A.   I don't know that.  I'm not a soils person.

1    Q.   So, during the entire time you were manager of safety for

2    International Paper, you must have never had an engineer come

3    and check the internal competency of the earthen portion of the

4    dam, then; isn't that true, sir?

5    A.   I personally would not have done that.  I mean, it was

6    inspected all the time.

7    Q.   No, no.  I asked you a very specific question.  Did you

8    ever have the competency of the inside of the dam tested, ever?

9    A.   Well, in '96 and in 2005 when we made those modifications,

10   we had our own mill engineering folks involved in those

11   structure modifications, so they would have looked at those --

12   that whole structure, I'm sure.

13   Q.   So the answer is, in 2014, no, right?

14   A.   I'm not aware of anybody looking at it in '14.

15   Q.   '13, no, right?

16   A.   We had annual inspections --

17   Q.   The internal competency testing -- you know you put probes

18   in the dam to check its internal competency, don't you,

19   Mr. Moore?

20   A.   I'm not sure I understand what you're asking me.

21   Q.   How would an engineer check the internal competency of an

22   earthen dam without a probe?

23   A.   I don't know how an engineer would check that.  I might

24   contract an engineer and say, *Please check the integrity of the*

25   *dam.*

1  Q.   You didn't do that in 2014, did you?

2  A.   I did not do that.

3  Q.   You didn't do that in 2013, did you?

4  A.   I don't recall that being done.

5  Q.   You didn't do that in 2012, did you?

6  A.   I don't recall that being done.

7  Q.   To your knowledge, it was not done at all except for maybe

8  what you said when it was built in 2005, correct?

9  A.   I actually don't know.  It could have been checked.  I

10  mean, it was --

11  Q.   You have no personal knowledge, as the person who searched

12  the records, who knows the most about the history of the dam,

13  of that ever happening; isn't that correct?

14  A.   I don't recall that being checked, no.

15        **MR. GLASSER:**  May I approach, Your Honor?

16        **THE COURT:**  Yes.

17  **BY MR. GLASSER:**

18  Q.   I'm handing you what's been marked as Plaintiffs' Exhibit

19  89.  Can you take a minute to look at that.  Please review it

20  enough to recognize that you likewise discussed this as part of

21  your deposition about the history of the dam and got it from

22  the records of International Paper or it was obtained from the

23  records of International Paper and discussed it at your exam,

24  correct?

25  A.   Yes, I recognize the document.

1    Q.   All right.  And the document involves a discussion of the

2    history of the dam, correct, in part?

3    A.   Yes.

4    Q.   And the discussion -- and the document involves a

5    discussion among the line engineers and the management of the

6    plant about exactly what to replace the 2005 dam with; isn't

7    that correct?

8    A.   Yes.

9          **MR. GLASSER:**  I move the admission of Plaintiffs'

10    Exhibit 89, Your Honor.

11          **THE COURT:**  89 is admitted.

12          (Plaintiffs' Exhibit 89 admitted into evidence.)

13    **BY MR. GLASSER:**

14    Q.   So, just to orient the jury, Plaintiffs' Exhibit 89 is a --

15    what I guess everybody knows about this now, it's an email

16    chain, right?  And so the last date of the email chain is June

17    15th, 2005, at 4:32 p.m., right?

18    A.   Yes.

19    Q.   And then we go back to the beginning of the chain.  The

20    first date of the chain, which is on -- in the back, can you go

21    back to -- at the bottom there's some numbers, they're called

22    Bates numbers on a lot of the documents.  I'm looking at

23    Document 11877, just to orient you.  At the top of the page

24    this email chain starts April 14th, 2005, is that right, at

25    7:13 p.m.?

1    A.    Yes.

2    Q.    Can you just orient the jury?  Who is Joel Bolduc?

3    A.    Joel at the time was the environmental engineer at the

4    plant.  I think he was actually leading the environmental group

5    at that time.

6    Q.    So, Joel Bolduc -- how do you spell it?

7          **THE COURT:**  It's on the document, it's B-o-l-d-u-c.

8    **BY MR. GLASSER:**

9    Q.    Was the environmental engineer?

10   A.    He was -- I'm trying to remember.  He was an environmental

11   engineer.  He was in the environmental group.  I believe he was

12   leading the environmental group.  I believe he was the

13   environmental supervisor, but I'm not sure.  I don't know.

14   Q.    And he was the supervisor?

15   A.    I'm not sure, I don't know.

16   Q.    Supervisor maybe, you're not sure?

17   A.    No.

18   Q.    And who was Michael Hitchcock?

19   A.    Michael was a mill employee, and I don't recall what his

20   title was or what he was doing at that time.

21   Q.    And then let's go further while we -- just to pull a few

22   more names that are going to come up in our exam here.  Now I'm

23   on page 11871, okay?  And I'm going to ask you -- Clay Ellis,

24   was he the mill manager at the time, Mr. Clay Ellis who comes

25   into this?

1    A.    No, Clay was not.

2    Q.    What was Clay's job?

3    A.    Clay's job was -- he managed the operations of the facility

4    and reported to the mill manager.

5    Q.    So he was operations manager?

6    A.    Uh-huh.

7    Q.    So he reported to -- so he was under the mill manager?

8    A.    That is correct.

9    Q.    And above the mill manager I guess is probably corporate?

10   A.    Right.

11   Q.    And then on the last page -- the front page is another

12   person, Ron Waters.  What's his job at this time?

13   A.    I believe Ron was the engineering -- the mill engineering

14   group manager.

15   Q.    Okay.  So, Ron Waters was another engineer.

16         Turn with me to page 11875 where at the beginning of this

17   at April 14th, 2015, okay --

18              **THE COURT:**  Wait, not 2015.

19              **MR. GLASSER:**  Yeah, that's terrible.

20   **BY MR. GLASSER:**

21   Q.    April 14th, 2005.  Are you with me?  I'm on page 11877.

22   A.    Okay.

23   Q.    All right.  So Mr. Bolduc is explaining to the people on

24   the email that, "During Hurricane Ivan in 2004 the outfall

25   structure sustained damage due to erosion and undermining."

1    You see that?

2    A.    I do.

3    Q.    And then it says, "During the rainstorm of April 1, 2005,

4    further damage occurred," you see that?

5    A.    Yes.

6    Q.    And so those two -- those pictures about April 2005 are

7    Exhibits 95, 96 that we've looked at already, correct?

8    A.    Yes.

9    Q.    Now I want to go -- here I am.  I'm sorry.  I showed you

10   the wrong page.  I highlighted page 11877 at the top.  You see

11   that?  You agree?

12   A.    Yes.

13   Q.    Now let's go back to 11875.  11875 is the next day, right,

14   4/15/2005?

15   A.    Yes.

16   Q.    And Clay Ellis has joined in on this discussion, the

17   operations manager, right, he's now copied?

18   A.    Yes.

19   Q.    "Mike Hitchcock had two civil engineers do a quick and

20   dirty evaluation of the structure.  Both concluded that the

21   structure is getting dangerously close to a compromised

22   condition.  They have recommended various repair options of

23   $70,000 to $200,000.  In addition to repair to pre-Ivan

24   condition, there are some changes we should make to keep this

25   structure from having similar problems in the future."  Do you

1   see that?

2   A.   Yes, I do.

3   Q.   So Mr. Bolduc, the line -- the environmental engineer, had

4   asked some people for some options, right?  Agreed?

5   A.   Yes.  I'm looking at where you -- yes, he did.

6   Q.   And Mr. Bolduc recommends:  "My recommendation is to rip

7   out the concrete apron, replace both pipes, repour an apron

8   with a low center to increase capacity, and add walls to the

9   sides of the downstream apron to prevent erosion at the edges,"

10  right?

11  A.   That's what he says in the email, yes.

12  Q.   So, the environmental engineer who had consulted with other

13  engineers recommended repouring the concrete armory to cover

14  the dam, right?

15  A.   Yes, that's what he said.

16  Q.   Let's go back to 1183 -- I'm sorry -- 11873.  Are you with

17  me?  11873, it's further back in the email chain, in other

18  words, after the email we just saw.  Okay?  Got this page in

19  front of you?

20  A.   11873, yes, I do.

21  Q.   And you can look on the prior page and confirm this is a

22  further email from Joel Bolduc, 6/1/2005, so about 45 days

23  later, right?

24  A.   Yes.

25  Q.   And he again copies Clay Ellis, the operations manager at

1   the mill, right?

2   A.   Yes, he does.

3   Q.   Under "Structural Deficiencies" he says, "Failure appears

4   to be due to undersizing as well as poor design/construction

5   features," right?

6   A.   He does say that.

7   Q.   And then his option 3 is:  "Replace structure, install an

8   open concrete channel," you see that?

9   A.   Yes.

10  Q.   "Remove existing structure except north wall," you see

11  that?

12  A.   Yes.

13  Q.   So, "install an open concrete channel" means no dam, right?

14  A.   I think he was talking about the structure that was built

15  in '96 and replacing that structure -- the stormwater overflow

16  Arkansas Crossing with this open channel.

17  Q.   He's saying leave it open to the creek, "open channel,"

18  bold, bold, right?

19  A.   In bold he did say "Install an open concrete channel," yes.

20  Q.   That's option 3, right?

21  A.   Yes.

22         **THE COURT:**  Mr. Glasser, you probably have a bit more

23  with this email exchange?

24         **MR. GLASSER:**  Yes.

25         **THE COURT:**  We need to stay on track and take our

1    morning recess now.

2            Ladies and gentlemen, we'll be in recess for the next

3    20 minutes.  Please don't discuss the case amongst yourselves

4    during the recess, and also please don't begin to form any

5    opinion about the merits of the case.  We'll see you back in 20

6    minutes.  Thank you.

7            *(Jury out.)*

8            Mr. Moore, you may step down.  You'll be back on the

9    witness stand in 20 minutes.  And please don't discuss your

10   testimony with anyone during the recess.

11           We'll be in recess for 20 minutes.

12           *(Recess taken 10:21 a.m. to 10:45 a.m.)*

13           *(Jury in the box.)*

14           **THE COURT:**  Mr. Moore, you're still under oath.

15           **THE WITNESS:**  Yes, ma'am.

16           **THE COURT:**  Mr. Glasser, go ahead when you're ready.

17           **MR. GLASSER:**  Your Honor, we were on Plaintiffs'

18   Exhibit 89, Bates No. 11873.

19           **THE COURT:**  Correct.

20   **BY MR. GLASSER:**

21   Q.   So, I'm down here at the bottom where we left off,

22   Mr. Moore, right where Mr. Bolduc proposed to install an open

23   concrete channel.  And he puts what he thinks the pros of that

24   approach are here, right?

25   A.   Yes, he does.

1    Q.   The pros, according to Mr. Bolduc, are:  It's simple, it's

2    permanent, and it's cost effective, right?

3    A.   Yes.

4    Q.   And he puts the cons:  It will require energy dissipation

5    and may be more expensive than another option which is to put

6    riprap.  You see that?

7    A.   I do.

8    Q.   Which is option 4.

9         Energy dissipation is like baffles in the concrete

10   structure to slow the water as it goes through the open

11   structure, right?  That's what energy dissipation would be?

12   A.   I believe that would be the application here.

13   Q.   Now, let's go back one more page to the very beginning of

14   the email.  And just to orient the jury, this is an email

15   Mr. Bolduc sent on June 11th, 2005, at 11:02 a.m.; is that

16   right, Mr. Moore?

17   A.   Yes.

18   Q.   And he is copying kind of the team who has been working on

19   this including Mr. Ellis, the operations manager; is that

20   right?

21   A.   Yes.

22   Q.   And this guy Mike Steltenkamp, is he also an engineer?

23   A.   Mike was the -- no.  Mike was EHS manager in 2005.

24   Q.   He had your job, environmental health and safety manager?

25   A.   Yes.

1    Q.   So, Mike Steltenkamp, let me put him up here. So now he

2    was the -- so Mr. Bolduc, by June, copies in the manager of

3    safety who had your job on this email chain; is that right?

4    A.   That is correct.

5    Q.   And he, in this email, gives some background information

6    again, right? Right there in that first paragraph, background

7    information, you see that?

8    A.   Yes, I do see that.

9    Q.   All right. He says to the larger group -- he's now copied

10    a larger group, right?

11    A.   Compared to?

12    Q.   The prior email chains. The chain is growing, you agree?

13    A.   Well, I guess I need to look at the --

14    Q.   Was Mr. Steltenkamp on here before?

15    A.   He was not. That's one.

16    Q.   This guy Darrell Daubert, what's his job?

17    A.   I don't recall what Darrell performed at that time.

18    Q.   Well, what do you know him to have done ever?

19    A.   Maybe he was -- I don't know.

20    Q.   What about Brian Wintrode, what was his job?

21    A.   I believe Brian was a maintenance supervisor.

22    Q.   And then, Michael Hitchcock, we already learned about him.

23    He's a line engineer, right? What's his job?

24    A.   No. Michael Hitchcock's education is finance.

25    Q.   Finance. So, he's the finance guy, all right. And this is

1    Exhibit 89.

2         So, Mr. Hitchcock is finance and then Mr. Ron Waters -- we

3    talked about him -- he's the engineer?

4    A.   Ron Waters is, yes.

5    Q.   Do you know who Harry Dail is?

6    A.   Harry, I believe -- Harry was another environmental

7    engineer in the environmental group.

8    Q.   Another engineer, Harry Dail.

9    A.   Or had the title "environmental engineer."  Probably be

10   worth me making a distinction here.  The titles were

11   "environmental engineer," but Harry did not have a degree in

12   engineering, nor did Joel Bolduc, that I know of.

13   Q.   In any event, Mr. Bolduc grows the chain to include finance

14   and some other people, right?

15   A.   Yes.

16   Q.   And Chris Road [sic], is he on here?  Oh, yeah, and now

17   we've got the whole mill manager on there.  Chris Read, he was

18   the mill manager at the time, right?

19   A.   Yes.

20   Q.   So, I'm going to put an asterisk by him on the butcher

21   paper here because he's the mill manager.  He's the top guy,

22   right?

23   A.   He was at that time, right.

24   Q.   So, Mr. Bolduc maybe -- for whatever reason, maybe because

25   he's bringing in more people to the conversation, backs up a

1    little bit and gives some background information, right?  All

2    right.  And he says, "We need to repair the structure in order

3    to prevent a complete failure that could damage the Kingsfield

4    Road bridge and cause downstream flooding."  Do you see that?

5    A.    Yes.

6    Q.    So, Mr. Bolduc puts the plant manager on notice of his view

7    that the failure of this dam could cause downstream flooding in

8    Exhibit 89, in 2005; isn't that true, Mr. Moore?

9    A.    Well, he did say that in this email, yes.

10   Q.    And he says immediately after that, "Replacing the entire

11   structure with a concrete channel or riprap appears to be the

12   best option."  You see that?

13   A.    Yes.

14   Q.    So the man who is leading this discussion, or at least the

15   lower level guy who is making this email chain, stakes out the

16   position that replacing the entire structure would be his view

17   of the best option, isn't that correct, with an open channel?

18   A.    He did say that in this email, yes.

19   Q.    So there would be no dam, right?

20   A.    I don't -- I guess it's unclear to me if I read these that

21   he was saying to replace the entire thing.  I was -- I always

22   believed when I read it that he was saying to replace the

23   Arkansas Crossing with an open channel.

24   Q.    So you don't think the words "entire structure" mean entire

25   structure?

A.   No, I -- again, I was not involved, I have to say that. But that was what I took from it.

Q.   And he says, "A permanent fix will be in the $200,000 to $300,000 range."  Do you see that?

A.   Yes.

Q.   And then to go back to the -- and then he explains that, installing an open concrete channel, remove existing structure except north wall is a permanent solution, you see that?  Up on your screen right there, "permanent solution"?

A.   Yes.

Q.   And then here he's saying that permanent fix is $200,000 to $300,000, right?

A.   That's what he said.

Q.   Obviously International Paper could afford to spend two to $300,000 to remove this dam, don't you agree with me, Mr. Moore, it has the financial capacity to do so?

        **MR. NELSON:**  Objection, Your Honor, vague as to time period.

        **MR. GLASSER:**  I'm asking in 2005.

        **THE COURT:**  2005.

        **THE WITNESS:**  $200,000 to $300,000, in my experience, would not be too much money.

BY MR. GLASSER:

Q.   For International Paper, a corporation --

A.   To invest in some structures.  They very well may have

1    spent that to make these changes that he's proposed.

2    Q.   And he goes on to just give a little history to make the

3    new people on the chain, "It was built in the '90s following

4    the breaching of an earthen dike."  You see that?

5    A.   Yes.

6    Q.   "Was damaged during Hurricane Ivan in September 2004," you

7    see that?  "Was further damaged during two storms in April

8    2005," and he has "11-inch and 7-inch storms," you see that?

9    A.   Yes.

10   Q.   Now, Ron Walters [sic] responds to him, right -- Joel --

11   and then down there at the bottom it's Ron Walters [sic]

12   responds to Joel Bolduc, correct?  I'm on page 11872.

13   A.   Yes.

14   Q.   He says -- now, Ron Walters [sic] was an engineer.  Was he

15   boss of Bolduc?

16   A.   No.

17   Q.   Was he in charge of capital projects?

18   A.   He was.

19   Q.   So he's the guy who is the keeper of the capital budget,

20   right?

21   A.   Right.

22   Q.   So he's capital budgeting -- Mr. Walters [sic], right?

23   A.   Waters.

24   Q.   Waters, sorry.  He says, "There is no capital to fund this

25   project" -- it doesn't say "project" -- "There is no capital to

1    fund this... and the 200 to 300 M would definitely be capital."

2    Do you see that?

3    A.   Yes.

4    Q.   And just to be clear, the letter "M" is Roman numeral

5    1,000, right, not million?

6    A.   Right.

7    Q.   So, we're talking about -- the exact same $200,000 to

8    $300,000 that's set forth in the email below, he just uses a

9    shorthand of M, the Roman numeral 1,000, instead of writing the

10   next three zeros, right?

11   A.   Right.

12   Q.   So, he's not talking about spending $200 million, he's

13   talking about spending $200,000?

14   A.   Right.

15   Q.   And he says, "This was not included in the Ivan capital

16   project.  Initially remediation efforts have been in the

17   neighborhood of 32 to 45 M dating back to November 2014."  You

18   see that?

19             **THE COURT:**  Does that say 2014 or 2004?

20             **MR. GLASSER:**  I'm sorry.  2004.  Let me do that again.

21   BY MR. GLASSER:

22   Q.   "There is no capital project to fund this... the 200 to

23   300 M would definitely be capital," right?  That's thousands?

24   And, "This was not included in the Ivan capital project.

25   Initially, remediation efforts have been in the neighborhood of

1   32 to 45 M dating back to November 2004." You see that?  So

2   that "M" is also thousands, right?

3   A.   Yes.

4   Q.   "Capital funding for this will take a lot of convincing and

5   time," you see that?

6   A.   Yes.

7   Q.   So, that is an internal debate at International Paper in

8   2005 about spending two to $300,000 to remove the structure and

9   have it an open concrete channel; isn't that true?

10          **MR. NELSON:**  Objection, lack of foundation.

11          **THE COURT:**  Well, if you have the knowledge and

12  experience to answer the question, you can.  If not, then

13  Mr. Glasser needs to lay a foundation.

14          **THE WITNESS:**  I was not involved in this part.  I was

15  actually working on a special project at the time, so I don't

16  know how this all went back and forth.

17          **THE COURT:**  All right.  Sustained.

18  **BY MR. GLASSER:**

19  Q.   Let's go to the next page, the front page.  Then, Clay

20  Ellis, the operations manager, chimes in, right?  On the next

21  page, which is 11871, he says, "Joel" -- and here is Clay,

22  right?  Clay chimes in; is that correct?

23  A.   Yes.

24  Q.   "I can't understand the need to rebuild the crossing."  Did

25  he say that?

1   A.   He did write that, yes.

2   Q.   And that's the Arkansas Crossing that we started this

3   examination with, correct?  Remember I showed you Exhibit 96,

4   we saw the truck on top of the concrete apron?  That's called

5   the Arkansas Crossing, correct?

6   A.   Yes, that is correct, yes.

7   Q.   "We can't design for a cat 5 hurricane and 100-year

8   floods," do you see that?

9   A.   I do see that, yes.

10  Q.   So, when you told me earlier that you thought it had been

11  designed for a 100-year storm or a 100-year flood, you had not

12  remembered this email, right, where the operations manager

13  said, no?

14  A.   So, the basis of my comment before was of a study done by

15  engineering back in -- the SERENE environmental engineers back

16  in the early '90s proposing changes which were completed in the

17  early '90s that allowed that system to handle a 100-year storm

18  event.

19  Q.   So, whatever existed from 1996 to 2005 we're not talking

20  about right now.  We're talking about what's going to replace

21  the failed 2005 forward; isn't that true?

22  A.   Yes.

23  Q.   So, the engineering discussion you just had with me had to

24  do with a dam from 2006 [sic] to 2005, correct?

25  A.   Yes.

1    Q.   Not this dam in 2014?

2    A.   It pertained to -- well, it was -- that engineering study

3    prescribed a number of changes with this Kingsfield structure

4    only being one of them.  So the other structures were still in

5    effect and were still -- would still be applicable to that time

6    frame.

7    Q.   So, Joel Bolduc responds on 6/15 at 3:51 p.m., right, to

8    the operations manager and Mr. Walters [sic], correct?  That's

9    the next email.  Mr. Bolduc is sending another email responding

10   to these comments from the operations manager, right?

11   A.   Yes.

12   Q.   He says, "Let me get the cost estimates for the various

13   options so we have information we need to make a good

14   decision," you see that?

15   A.   Yes.

16   Q.   Is it fair to say Mr. Bolduc is trying to keep the

17   conversation going, right?

18   A.   Yes.

19   Q.   He says, "Patching the existing structure though without

20   addressing the design flaws would be a temporary solution."  Do

21   you see that?

22   A.   I do.

23   Q.   "I want to develop the other options in case there's a

24   permanent solution out there," you see that?

25   A.   Yes.

1    Q.   And the permanent solution -- one of the solutions he said

2    was permanent that he bolded was "open channel, no dam," isn't

3    that right?

4    A.   Yes, he did.

5    Q.   And it's clear from the next sentence -- "Right now I'm

6    questioning why we even have this structure," you see that?

7    A.   Yes.

8    Q.   "We should be able to permanently remove the rest of the

9    structure so we don't have to keep repairing it," you see that?

10   A.   Yes.

11   Q.   "Only the front retaining wall is needed to force normal

12   flow into the inlet box," you see that?

13   A.   Yes.

14   Q.   He's clearly advocating for no dam, isn't he?

15        **MR. NELSON:**  Objection, Your Honor, lack of

16   foundation.

17        **THE COURT:**  I agree, Mr. Glasser.  He doesn't know

18   what was in Mr. Bolduc's mind when he wrote that.

19        **MR. GLASSER:**  Okay.

20   **BY MR. GLASSER:**

21   Q.   Now we're at the end of the email, Ron Walters [sic]

22   responds to Mr. Bolduc, right -- Ron Waters responds to

23   Mr. Bolduc?

24   A.   Right.

25   Q.   Last page of the email?

1  A.   What's the number?

2  Q.   This is -- well, it's the very front page, 11870.

3  A.   Thank you.

4  Q.   He gives Joel some history now, right?

5  A.   Yes.

6  Q.   He says, "This project was installed for 70 M capital and

7  28.5 M expense in 1996 due to repeated erosion and dam breached

8  from excess flow from storm events."  You see that sentence?

9  A.   I do.

10 Q.   Again, that's not millions, that's thousands, right?  It's

11 a Roman numeral for thousands, right?

12 A.   Yes.

13 Q.   So, the dam that you were discussing, the 1996 version,

14 according to the records of the company, was something about

15 $100,000 to put in, is that right, the 70 in capital plus the

16 28.5 in expense?

17 A.   According to Ron Waters, that's right.

18           **MR. NELSON:**  Objection.

19           **THE COURT:**  Excuse me?

20           **MR. NELSON:**  I'm sorry, Your Honor.

21           **THE COURT:**  All right.

22 **BY MR. GLASSER:**

23 Q.   And then he says, "That being said, I remember the event

24 that actually breached a portion of the pond and undermined

25 supports for the 48-inch diameter main spillway and the

1    Kingsfield Road bridge as well -- a nightmare."  You see that?

2    A.    Yes.

3    Q.    When you read that, he's talking about a breach in 1996,

4    right?

5    A.    Yes, that's right.

6    Q.    And I'm showing you what's been previously admitted and

7    shown to the jury, this is an Exhibit 185(d), and this shows

8    the relation of the 2014 dam to that bridge discussed in this

9    email chain, correct?

10   A.    Yes, it does.

11   Q.    So, this bridge in Exhibit 185(d) is the bridge that's

12   being discussed in this sentence that says, "the event that

13   actually breached a portion of the pond and undermined supports

14   for the 48-inch diameter main spillway and the Kingsfield Road

15   bridge as well -- a nightmare," you see that?  That's the

16   bridge we're talking about?

17   A.    Yes, I believe that's true.

18   Q.    Then he says, "I don't know but suspect the spillway gate

19   valve was not opened soon enough."  Do you see that right here?

20   "I don't know but suspect that the spillway gate valve was not

21   opened soon enough," you see that?

22   A.    Yes.

23   Q.    That's to let water run out from under the dam, a low valve

24   on the dam to let the water out behind it, right?

25   A.    There was a spillway gate valve, yes.

1    Q.   But he does say that "Doing nothing is not an option.  At a

2    minimum, there must be some erosion remediation of the dam.

3    The risk for another rain event dam breach would certainly be a

4    big issue with regulators and possibly with the community."

5    You see that?

6    A.   Yes.

7    Q.   So, he wants to do something, right?

8              **MR. NELSON:**  Objection, lack of foundation.

9              **THE COURT:**  Overruled.  I think he can answer that

10   based --

11   **BY MR. GLASSER:**

12   Q.   And then --

13             **THE COURT:**  Excuse me.  I think he can answer that

14   based on his reading of the letter.

15   **BY MR. GLASSER:**

16   Q.   You understand that Mr. Walters [sic] wants to do

17   something?

18   A.   Yeah.  He does say, "Doing nothing is not an option."

19   Q.   And then he reminds everyone that the '96 event was an

20   April rain as well, does he not?

21   A.   He does.

22   Q.   Oh, sorry, it's -- the last date of that is June 15th,

23   2005, that last email, correct?

24   A.   Yes.

25             **MR. GLASSER:**  May I approach?

1            **THE COURT:**  Yes.

2      **BY MR. GLASSER:**

3      Q.    I'm approaching you with Plaintiffs' Exhibit 268.  Do you

4      recognize Plaintiffs' Exhibit 268 as another email on June

5      30th, 2005?  Among the people on this list is Clay Ellis, Ron

6      Waters, Chris Read, Mike Steltenkamp, Mike Hitchcock, and Harry

7      Dail, correct?

8      A.    Yes.

9      Q.    All the people I've put up on this piece of butcher paper,

10     right?

11     A.    Yes.

12            **MR. GLASSER:**  I move the admission of Plaintiffs'

13     Exhibit 268, Your Honor.

14            **THE COURT:**  268?

15            **MR. GLASSER:**  Yes, ma'am.

16            **THE COURT:**  Just a moment.

17            **MR. NELSON:**  We don't have that, Your Honor.

18            **THE COURT:**  Just a moment.  There's nothing on the

19     screen right now.

20            **MR. GLASSER:**  I can put it up so you can see it.

21            **THE COURT:**  Any objection?

22            **MR. NELSON:**  No, Your Honor.

23            **THE COURT:**  That will be admitted, 268.

24          (Plaintiffs' Exhibit 268 admitted into evidence.)

25            **MR. GLASSER:**  May I publish to the jury?

1          **THE COURT:**  Yes.

2     **BY MR. GLASSER:**

3     Q.   So, this is just some days later in June, June 30th this

4     time, after Exhibit 89, right?  Up here, from Joel Bolduc to

5     all those people?

6     A.   Yes.

7     Q.   And then he describes the short-term fix:  "We have filled

8     in the collapse at the north end with dirt," you see that?

9     A.   Yes.

10    Q.   "For the permanent fix, whether we repair the existing

11    structure or replace the structure with an open channel, will

12    cost roughly the same, $100,000," you see that?

13    A.   Yes.

14    Q.   "Given the original structure lasted only nine years, a

15    more permanent structure is preferable," you see that?

16    A.   Yes.

17    Q.   "Also, an open channel will be able to transmit much higher

18    flow," you see that?

19    A.   Yes.

20    Q.   So, this is an email from the environmental engineer to the

21    operations manager, the capital manager, the plant manager, the

22    finance manager, saying an open channel transmits more water,

23    right?

24    A.   Yes, that's what he said.

25    Q.   And you know because there was a dam there on April 29th,

1   2014, that the open channel option was not taken by

2   International Paper; isn't that true?

3   A.   I think an open channel option was taken.  If you look at

4   the back of this, that's what that design was changed to.

5   Q.   You think there was no dam there on April 29th, 2014,

6   that's what you're trying to tell us?

7   A.   Again, what I took this meaning was he was changing the

8   Arkansas Crossing to a v notch -- or not a v notch, but a

9   rectangular concrete channel, and I think that's what he was

10  talking about when he -- again, I was not involved, but that's

11  my opinion or that's what I believe he was talking about.

12  Q.   And that follows with your view that the words "remove the

13  entire structure" don't mean entire structure?

14  A.   I think he was talking about the overflow structure of the

15  Arkansas Crossing.

16  Q.   You agree that the part that went away in the 2014 storm

17  was made of earth?

18  A.   The erosion that occurred was the earthen portion of that

19  structure.

20  Q.   And I showed you Exhibit 178(f) -- let me put that back up

21  on the screen -- and I asked you did that appear to you to be

22  sandy soil.  Yes?

23  A.   I can't tell from that picture if I see sand or if it's

24  just a fill dirt that would be mostly clay.

25  Q.   Okay.  But whatever it was, you agree with me that earth is

1   cheaper than concrete?

2   A.    Not necessarily.  I can't agree with that.

3   Q.    So you have done capital projects at the mill in the course

4   of your time there, right?

5   A.    I have received cost estimates for various things.

6   Q.    What does a yard of concrete cost?

7   A.    I don't know.

8   Q.    Order of magnitude?

9   A.    I don't know.

10  Q.    No idea?

11  A.    I have not done that in a long time.

12  Q.    Do you think based on -- well, did you do capital projects

13  each and every year that you worked at this plant?

14  A.    I did not.

15  Q.    Did you do capital projects -- was it a big capital project

16  putting in this pipeline to Perdido Bay?

17  A.    It was.

18  Q.    Did that involve a lot of concrete?

19  A.    It involved some concrete.

20  Q.    How much, roughly, do you believe, based on your experience

21  with that pipeline to Perdido Bay that went in service in 2012,

22  a yard of concrete costs?

23  A.    The basis of my comment was based upon that I have seen

24  cost estimates for removing dirt and positioning dirt, and it's

25  many times as expensive as concrete options.  And that's based

1    upon my experience.  I can't quote you a concrete cost per ton
2    of concrete.
3    Q.   So you think -- well, let me ask you this:  You don't think
4    it's -- it's not obvious to you that rebuilding this dam out of
5    sandy soil or whatever the soil -- earth, whatever you want to
6    call it -- was the cheaper option than putting a concrete
7    turtle apron over the thing and re-armoring?
8    A.   I think probably it depends on what you were doing.  I
9    mean, if you are -- in my experience, if you're putting in
10   earthen structures and you're putting them in and getting the
11   -- and I forget the term, but the -- getting the density of the
12   earth, packing it down enough, it can be quite expensive to do
13   that.
14   Q.   When you searched the records of this company, you found no
15   evidence that anybody packed any earth in here and did
16   compression testing on this dam when they rebuilt it, did you?
17   A.   I did not.
18   Q.   You didn't find one single speck of evidence in your
19   records that anybody compacted this dam when it was built, did
20   you?
21   A.   I did not, no.
22   Q.   So, given that there is no evidence that you could locate
23   in your entire company that this dam was compacted, let's
24   assume for purposes of my question it's an uncompacted dam,
25   fair?

1  A.   No, I don't think that's a fair assumption.

2  Q.   Well, if it were uncompacted, wouldn't it be a lot less

3  expensive than doing it in concrete?

4  A.   In my experience, it would have been.

5  Q.   All right.  So if it's an uncompacted earthen dam, the

6  company chose the cheaper solution in 2005, correct?

7          **MR. NELSON:**  Objection, lack of foundation,

8  hypothetical.

9          **THE COURT:**  Overruled.

10         **THE WITNESS:**  If they had made that choice, if.

11 **BY MR. GLASSER:**

12 Q.   Which is weaker, sandy soil or concrete -- when it's being

13 run over by water, which is the weaker substance?

14 A.   Sandy soil is going to erode.

15 Q.   All right.  So the earthen soil was the weaker choice made

16 by the company in 2005 in the rebuilding of this dam, correct?

17 A.   I don't know that.

18 Q.   Didn't you just tell me that concrete withstands erosion

19 better than soil?  Do you stand by that?

20 A.   I did just tell you that, that's right.

21 Q.   Do you stand by that?  That's a true statement?

22 A.   Yes, I think that's a true statement.

23 Q.   All right.  So, it's clear to you, given that that is a

24 true statement, that -- it wasn't you, I'm not saying it was

25 you -- that somebody at International Paper chose to rebuild

1    this dam weaker than a concrete dam; isn't that true?

2         **MR. NELSON:**  Objection, lack of foundation.

3         **THE COURT:**  Sustained.

4    **BY MR. GLASSER:**

5    Q.   You don't have any evidence from the records of

6    International Paper that it was made strong, do you?

7    A.   What was made strong?

8    Q.   The way this earth was --

9         **THE COURT:**  Mr. Glasser, you and Mr. Nelson come up

10   here, please, for a minute.

11        *(Bench conference between the Court and counsel:)*

12        **THE COURT:**  I think that you need to establish what

13   they did.

14        **MR. GLASSER:**  It's in the emails, they put the earth

15   back in there, they just piled up the earth.  It was in Exhibit

16   89 that I just read.

17        **THE COURT:**  I don't know that that's exactly what was

18   done, and this gentleman has a difference of opinion with your

19   characterization of what was done.

20        **MR. GLASSER:**  Yeah, that's fine.  We'll call an expert

21   and we'll --

22        **THE COURT:**  Right, that's what you need to do.  You

23   can't testify.

24        **MR. GLASSER:**  I get it, I'll move on.

25        **MR. NELSON:**  There are engineering drawings that show

1  what --

2          **THE COURT:**  Mr. Moore just referred to one, and that's

3  where I'm coming from.

4          **MR. GLASSER:**  Okay.

5          *(Bench conference concluded.)*

6          **THE COURT:**  All right, Mr. Glasser, go ahead.

7  **BY MR. GLASSER:**

8  Q.   I want to move to another topic.  Up to the failure of this

9  new dam in 2014, including your time as manager of safety, you

10 never personally filed or caused to be filed any documentation

11 whatsoever with the Northwest Florida Water Management District

12 attesting to the safe design of this dam; isn't that true?

13 A.   That structure was permitted under the mill's NPDES permit.

14 Q.   I'm going to ask you that question again.  Up to the

15 failure of this dam in 2014, including as manager of safety,

16 you never personally filed or caused to be filed any

17 documentation whatsoever with the Northwest Florida Water

18 Management District attesting to the safety of this dam, true?

19 A.   Not that I'm aware of, to that agency specifically.

20 Q.   When you researched the records of International Paper for

21 purposes of testifying as its corporate representative most

22 familiar with the history of the dam, you did not locate any

23 such filings; isn't that true?

24 A.   That is correct.

25 Q.   Up until the failure of this dam in 2014, including your

1    time as manager of safety, you never personally filed or caused

2    to be filed any documentation whatsoever with the Northwest

3    Florida Water Management District attesting to the capacity of

4    this dam to withstand a storm or any other aspect of its

5    capacity, correct?

6    A.   Not to that agency, no.

7    Q.   And in researching the records of the company for this case

8    in your role as the corporate representative, you didn't find

9    any such documentation either; isn't that true?

10   A.   That is correct.

11   Q.   As the manager for safety of the dam, you only learned

12   after the dam had already failed that it should have been

13   subjected to safety review by the Northwest Florida Water

14   Management District; isn't that true?

15   A.   I did learn after the storm event that those regulations

16   existed, yes.  I never concluded whether or not it was

17   applicable to that structure.

18   Q.   That means that when you took the job as manager for

19   safety, nobody at International Paper ever trained you on dam

20   safety or licensure law in the state of Florida; isn't that

21   true?

22   A.   I was never trained on that, no.

23   Q.   You personally cannot attest -- personally -- to the

24   internal stability of this dam the day before the storm on

25   April 2014, can you?

1    A.   I cannot, no.

2    Q.   It's true, however, that once it went out of service in

3    2012 the flow of water against it over time did degrade it, to

4    your knowledge; isn't that true?

5    A.   No.

6         **MR. GLASSER:**  I show the witness a document that's not

7    admitted.

8         **THE COURT:**  You have to give her a few minutes because

9    with this system it takes -- there's some delay.

10   **BY MR. GLASSER:**

11   Q.   You recognize this document, which is Plaintiffs' Exhibit

12   240, as an email from John Taylor to you and Ron Waters,

13   correct?

14   A.   Yes, to Ron copying me.

15   Q.   Yeah, dated July 29th, 2013, do you see that?

16   A.   Yes.

17        **MR. GLASSER:**  Move the admission of Plaintiffs' Trial

18   Exhibit 240, Your Honor.

19        **THE COURT:**  That will be admitted.

20        (Plaintiffs' Exhibit 240 admitted into evidence.)

21        **MR. GLASSER:**  May I publish to the jury?

22        **THE COURT:**  Yes.

23   **BY MR. GLASSER:**

24   Q.   Do you see this?  John Taylor, what's his job?  He's not on

25   my list.  What is John Taylor's --

1    A.    John is an environmental engineer.

2    Q.    Does he work for you?

3    A.    He did at that time.

4    Q.    I'm not going to put him on that list because that's my

5    Exhibit 89 list.  So John Taylor, environmental engineer.  I'll

6    make a new list.  Exhibit 240.

7         Now, Mr. Taylor says, "With the mill's flow out of the

8    creek, the old Kingsfield foam control structure is no longer a

9    regulatory requirement."  Do you see that?

10   A.    Yes.

11   Q.    So, earlier today when we were discussing whether or not

12   the dam was a regulatory requirement and we were arguing back

13   and forth, Mr. John Taylor in July of 2013 says it's not,

14   right?

15   A.    Nope.  He's talking about something else.  He's not talking

16   about the structure that you've been talking about.

17   Q.    "With the mill's flow out of the creek, the base of the

18   structure on the south creek side is more visible and appears

19   to be damaged," you're saying that has nothing to do with the

20   Kingsfield Road dam?

21   A.    It does not have anything to do with the Kingsfield Road

22   storm overflow structure.  It's a structure on the south side

23   of Kingsfield that took the mill's effluent flow back when the

24   mill was discharging in that -- through that area.

25   Q.    And where on the Exhibit 82 is that?  Let me go to Exhibit

1  82(a).  Is that near the dam?

2  A.   It's on the south side of Kingsfield Road.

3  Q.   South side of Kingsfield Road, okay.  Is it on Exhibit

4  82(a)?

5  A.   Did you give me a copy of that?

6  Q.   I can approach and you can just point it to me.

7              **MR. GLASSER:**  If the Court allows?

8              **THE COURT:**  Yes.

9  **BY MR. GLASSER:**

10 Q.   Is the structure being discussed on 82(a)?  Just point it

11 to me.

12 A.   It's right there.

13 Q.   Got it, okay, great.  So, I have here outfall gate on

14 Exhibit 82(a), that's what's being discussed in Exhibit 240; is

15 that correct?

16 A.   That's correct.

17 Q.   And that's a concrete structure right there, right?

18 A.   It was a combination of concrete and I believe it had

19 steel, too.

20 Q.   All right.  So, the jury has seen the dam.  There's the

21 dam.  And then downstream is this -- this is the bridge, right?

22 And then, there's some pipes from behind the dam -- a 48-inch

23 pipe that goes beyond the bridge to this concrete outfall box?

24 A.   Right.

25 Q.   So, you're saying Exhibit 240 is saying that the flow of

1    water -- since the foam control structure is no longer a

2    regulatory requirement -- so that was after 2012, right?

3    A.    Right.

4    Q.    It is being degraded, right?

5    A.    I'm not sure what your question is.

6    Q.    Well, I'm saying -- well, you were there, you worked there,

7    you were the manager of safety at that time.  Do you agree that

8    at that time Mr. Taylor is correct, the flow of water was

9    degrading the structure?

10   A.    There was no flow of water, I don't believe.  I guess I'm

11   confused now with what you're asking me.

12   Q.    Do you agree with me that, even though your wastewater

13   after 2012 was designed to go to Perdido Bay, that every time

14   it rained stormwater passed over the dam, through the dam, out

15   the structure?  There was still water in the creek, wasn't

16   there?

17   A.    Yes.

18   Q.    Okay.  And do you agree that he's saying, hey, since 2012

19   this concrete structure needs repair, it's degrading?

20   A.    Can I read this email?

21   Q.    Sure.

22          **THE COURT:**  Can you give him a hard copy, please, I

23   think is what he's asking.

24          **MR. GLASSER:**  Sure.

25          **THE COURT:**  Thank you.

1           **THE WITNESS:**  So, I believe what he was saying is this

2    foam control structure, when the flow from the facility was put

3    into the pipeline going to the wetlands, the level in the

4    Elevenmile Creek had decreased or gone down and had exposed

5    some what appeared to him to be damage of that foam control

6    structure on the south side of the creek.

7    **BY MR. GLASSER:**

8    Q.   Can you think of any reason why the flow of water over time

9    on a concrete structure could harm the integrity of a concrete

10   structure but not an earthen structure?

11   A.   Well, obviously water will erode different materials at

12   different rates.

13   Q.   It's true that when you took over the job as safety manager

14   in 2012 International Paper had no written maintenance policies

15   and procedures with respect to the Kingsfield Road dam, no

16   written procedures; is that true?

17   A.   I'm not aware of any written procedures.

18   Q.   And during your time --

19   A.   Other than -- I take that back.  We had a PMG management

20   plan that specifies inspections of the stormwater system which

21   include that structure.  That is a written document.

22   Q.   Unless Mr. Taylor is right and that after 2012 it wasn't

23   included?

24   A.   No, I think it is included after 2012.

25   Q.   During your entire time as manager of safety up to 2014,

1   you yourself did not write any written maintenance procedures

2   for the dam; isn't that correct?

3   A.   I wrote no procedures for the stormwater system or

4   Kingsfield structure, no.

5   Q.   Do you still have your testimony from the evidentiary

6   hearing up there with you?

7   A.   Yes.

8   Q.   I'd like you to turn to page 25 of that testimony and look

9   at page 2 -- page 25, line 2 to line 5.  Are you with me?

10  A.   Page 25, 2 to 5, yes.

11  Q.   Were you asked this question:  "Did you ever develop

12  written maintenance policies and procedures with respect to the

13  Kingsfield Road dam?"  Were you asked that question?

14  A.   It says so here, yes.

15  Q.   Yes.  And did you give this answer:  "I don't believe we

16  did.  I don't recall any"?

17  A.   Yeah, that's what it says.

18  Q.   Do you stand by that answer?

19  A.   Yes.  I thought I just told you that I don't believe I

20  recall -- I did not write any of those -- any procedures.

21  Q.   You are now aware that Florida requires written maintenance

22  policies and procedures to ensure dam safety and stability;

23  isn't that correct?

24  A.   I am aware that there are regulations that regulate dams.

25  I still don't know whether or not that applies to that

1    Kingsfield structure.

2    Q.   So you, in all your time as safety manager, never measured

3    the downstream toe to see if it was more than 10 feet high?

4    A.   I never measured the -- that sort of thing around the

5    Kingsfield structure, no.

6    Q.   And if the downstream toe is 13 feet high, you know it's

7    covered, right?

8    A.   I don't know that.

9    Q.   You never to this day went and read them?

10   A.   I have not read those regulations.

11   Q.   Okay.  It is entirely true to say that International Paper

12   could have removed the dam from the waterway after the water

13   treatment system was redesigned in 2012; isn't that true?

14   A.   It could have been done, it could have been feasible.  We

15   would have had to get permits to do that.

16   Q.   It was entirely feasible financially for International

17   Paper to remove it, right?

18   A.   We could have removed it, yes.

19   Q.   Instead, International Paper left an unused dam in the

20   middle of a stream; isn't that true?

21   A.   There was still the storm overflow structure and it was

22   still part of our NPDES permit.

23             **MR. GLASSER:**  May I approach, Your Honor?

24             **THE COURT:**  Yes.

25   **BY MR. GLASSER:**

1    Q.   I'm approaching you with what's been marked as Plaintiffs'

2    Exhibit 243.  Do you recognize Plaintiffs' Exhibit 243 as an

3    email chain with Janice Holmes on May 12th, 2014, after the

4    flood where you're working with her on a statement that

5    International Paper will put out to the public about the dam?

6    A.   I did work with her at times.  I don't have a specific

7    recollection of this, but yes.

8    Q.   And you see you're on this email chain?

9    A.   Correct, I am.

10   Q.   And you see that it was on May 12th, 2014, at 3:32 p.m.,

11   right?

12   A.   Yes.

13          **MR. GLASSER:**  I move the admission of Plaintiffs'

14   Exhibit 243.

15          **THE COURT:**  243 will be admitted.

16          (Plaintiffs' Exhibit 243 admitted into evidence.)

17   **BY MR. GLASSER:**

18   Q.   Now, let's just go to the statement, the International

19   Paper Pensacola Mill Statement.  Now, Janice Holmes is the

20   communications director at the mill, right?

21   A.   That is right.

22   Q.   She's in charge of interfacing with the press, right?

23   A.   Yes.

24   Q.   So, to orient this in time, this is after the events of

25   April 29th, right?

1    A.    Yes.

2    Q.    And this is a statement that she's putting -- she's working

3    on with you, right, because you're right here on this email

4    chain, correct?

5    A.    Yes.

6    Q.    Okay.  And it says so right at the top, "International

7    Paper Pensacola Mill Statement," right?

8    A.    Yes.

9    Q.    It says here, "There was significant erosion and wash-out

10   of an inactive spillway structure near Kingsfield Road."  You

11   see that?

12   A.    Yes.

13   Q.    Janice Holmes is an employee of International Paper,

14   correct?

15   A.    Yes.

16   Q.    She is charged in her job with speaking for the company to

17   the public; isn't that correct?

18   A.    Yes.

19   Q.    She used the term "inactive spillway structure," correct?

20   A.    That is right.

21   Q.    And that is something that's not in use, right?

22   A.    Typically that's my understanding of inactive.

23   Q.    That's your view of the common meaning of the word, right?

24   A.    Potentially, yes.

25   Q.    "The spillway structure was previously used to control

1  erosion at this now abandoned outfall point," do you see that?

2  A.   Yes.

3  Q.   The word "abandoned" means not used anymore, right?

4  A.   Yes.

5  Q.   Those were the words that the person charged with speaking

6  to the public from International Paper used to describe this

7  dam; isn't that true?

8  A.   That's what this email says, yes.

9  Q.   "But it has been out of service since the mill completed

10  transition to the pipeline in October of 2012," right?

11  A.   Yes.

12  Q.   It also says here, "During and after the storm the

13  Pensacola mill continued to discharge the maximum capacity of

14  our pipeline which bypasses the Elevenmile Creek watershed."

15  Do you see that?

16  A.   Yes.

17  Q.   Isn't it true, Mr. Moore, that at 9:20 p.m. on the night of

18  April 29th, 2014, that pipe was turned off and didn't continue

19  to discharge one million gallons now?

20  A.   That is not true.

21       **MR. GLASSER:**  May I approach?

22       **THE COURT:**  Yes.

23  BY MR. GLASSER:

24  Q.   I'm handing you a document that you saw as your exhibit

25  dated April 30th, 2014, at 6:54 a.m.  You see that?  It's an

1  email, correct?

2  A.   Yes.

3  Q.   And this is an email that you discussed at your deposition,

4  it's a deposition exhibit at the bottom, right?

5  A.   I don't have a specific recollection of discussing it,

6  but --

7  Q.   Okay.

8        **MR. GLASSER:**  I move the admission of --

9  **BY MR. GLASSER:**

10  Q.   And it discusses the effluent flow to the International

11  Paper wetland being temporarily suspended as of 9:20 April

12  29th, 2014, right?

13  A.   This is the flow from the ECUA, this is not the mill flow.

14  Q.   All right.  Now --

15        **THE COURT:**  This hasn't been admitted.

16        **MR. NELSON:**  I still haven't actually seen the

17  document.

18        **THE COURT:**  Counsel needs to share it with you.

19        Please don't ask any more questions until I find out

20  if it's going to be admitted.

21        **MR. GLASSER:**  I move the admission of what will be

22  Exhibit 301.

23        **THE COURT:**  Mr. Nelson?

24        **MR. NELSON:**  No objection.

25        **THE COURT:**  No objection, so 301 is admitted.

1     (Plaintiffs' Exhibit 301 admitted into evidence.)

2 **BY MR. GLASSER:**

3 Q. So, I'm showing you what has been marked as Exhibit 301.

4 This says that as of nine -- 2120 is 9:20, right?

5 A. Yes.

6 Q. On April 29th, 2014, okay?  "Effluent flow to the

7 International Paper wetlands has been temporarily suspended,"

8 you see that?

9 A. Yes.

10 Q. Isn't it true that the power went out around 9:20 and there

11 was an electrical failure at the plant?

12 A. There was.

13 Q. And isn't it true that it requires pumps to pump the water

14 into that pipeline?

15 A. No, that is not true.

16 Q. It can roll off a million gallons an hour without it?

17 A. It can flow -- the pipeline -- the water from the mill

18 flows by gravity through the pipeline to the wetlands and it

19 can flow its maximum capacity without power on.

20 Q. But if you stop it to the wetlands how does that not affect

21 the pipe that comes out of the wetlands?

22 A. It flows by gravity, it opens up, it flows like water

23 flowing downhill.

24 Q. What parts of the mill went down -- what parts of that

25 wastewater treatment went down because of the electrical

1   failure?

2   A.   I don't know which parts went down.  But even if they were

3   to go down, the water flow would flow through that system by

4   gravity.  That's the way it's set up to flow.

5   Q.   So one million of that 434 million an hour?

6   A.   No, 40 million.

7   Q.   No, one million an hour you said?

8   A.   No.  The capacity of the pipeline is like 42 million

9   gallons a day.

10  Q.   I thought you told me 25?

11  A.   That's the normal flow.

12  Q.   All right.  Let me show you what's been marked as Exhibit

13  --

14           **MR. GLASSER:**  This is just for him, Ms. Simms.

15  **BY MR. GLASSER:**

16  Q.   -- 241.  This is another email chain in May 13th, 2014,

17  between you and the then plant manager Bretton DeJong.  Do you

18  recognize it?

19  A.   Again, I don't have a specific recollection, but I see that

20  it's from me, yes.

21  Q.   Well, it's to you -- from you first, to you later, right?

22  A.   Yeah.

23  Q.   You see that?

24  A.   Yes, sir.

25  Q.   Well, first from Janice Holmes copying you and him about

1    what she's going to say to the public, right?  Is that correct?

2    A.    Yes, sir, I think that's correct, yes, sir.

3    Q.    And then him asking you a question, right?

4    A.    Yes.

5         **MR. GLASSER:**  I move the admission of Plaintiffs'

6    trial Exhibit 241.

7            **THE COURT:**  241 is admitted.

8         (Plaintiffs' Exhibit 241 admitted into evidence.)

9    **BY MR. GLASSER:**

10   Q.    So, Janice Holmes asks you and the plant manager if she can

11   say, "The inactive spillway structure was eroded and washed out

12   due to the magnitude of the storm event," right?  And you said

13   you agree, and we already saw the statements that that appeared

14   in there, right?

15   A.    Right.

16   Q.    And then Mr. DeJong wants to say -- he says, "The inactive

17   spillway structure was in good repair when it was eroded and

18   washed out due to the magnitude of the storm event," do you see

19   that?

20   A.    Yes.

21   Q.    And question marks?

22   A.    Yes.

23   Q.    And he asks if he can say that, right?  That's the question

24   marks?

25   A.    Yes.

1    Q.   And then when Janice Holmes sends this "On call" does it

2    say in there -- oh, I'm sorry, let me put up one without my

3    writing on it.

4         When Janice Holmes does the statement, it doesn't say it's

5    in good repair, does it?

6              **MR. NELSON:**  Objection, Your Honor.  There's vagueness

7    here on the dates in these two different documents.

8              **THE COURT:**  I'm not sure what you mean by vagueness.

9              **MR. GLASSER:**  Yeah, I see.  I'll clear it up.

10             **THE COURT:**  All right.

11   **BY MR. GLASSER:**

12   Q.   So this statement is from May 12th, right?  The one 243 is

13   from May 12th, right?

14   A.   Well, the email -- I mean, I guess it's not clear to me.

15   The email that's May 12th, she's saying "Thanks, Kyle."  And

16   then there's an email on top and I don't know -- there's no

17   date or anything.  I don't know when that was sent.  I don't

18   know --

19   Q.   Right.  It says "On call" like she's on a call?

20   A.   Yeah.

21   Q.   This is how it was produced to us.

22   A.   I don't know.

23   Q.   Anyhow, and then this is the next day in the evening asking

24   if he can say it was in good repair, right?

25   A.   Uh-huh.

1    Q.   I'm showing you another email, Plaintiffs' Exhibit 244.  Do
2    you recognize this, Plaintiffs' Exhibit 244?
3              **MR. GLASSER:**  May I approach?
4              **THE COURT:**  Yes.
5    **BY MR. GLASSER:**
6    Q.   Do you recognize Plaintiffs' Exhibit 244 as a communication
7    between Janice Holmes and a TV reporter, Amber Southard, using
8    that statement?
9    A.   I don't have a specific recollection of this.
10             **MR. GLASSER:**  Do you object?
11             **MR. NELSON:**  I haven't seen the document.
12             **THE COURT:**  Is there any objection?
13             **MR. NELSON:**  No, Your Honor.
14             **THE COURT:**  Thank you.  244 is admitted.
15         (Plaintiffs' Exhibit 244 admitted into evidence.)
16             **MR. GLASSER:**  Sorry, Your Honor.
17             **THE COURT:**  That's all right.
18   **BY MR. GLASSER:**
19   Q.   So, this email which has been admitted is Janice Holmes
20   just using the statement we saw earlier with Amber Southard, a
21   TV reporter; is that right?
22   A.   Okay, I see what you're saying, yes.
23   Q.   And then she asks the question, "Even though this area was
24   not in use, wouldn't it still be IP's responsibility to keep up
25   with maintenance?"  You see that?  And Janice Holmes says back,

1    "The erosion control structure was in good repair at the time

2    of the event," do you see that?

3    A.   Yes.

4    Q.   I'm going to show you what's been marked as Plaintiffs'

5    Exhibit 183(h).  Do you recognize that as the 48-inch low valve

6    on the Kingsfield Road dam structure?  Yes?

7    A.   Well, it looks like a large valve, but the picture --

8    there's not a perspective on the picture to tell me that or

9    not.

10            **MR. GLASSER:**  Can I approach?

11            **THE COURT:**  Yes.

12   **BY MR. GLASSER:**

13   Q.   Can you think of any other dam structure -- you can

14   recognize that the picture on Exhibit 183(h) has a knife gate,

15   right?  That's a gate that's supposed to go up and down that's

16   a circle.

17         As the manager of safety, are you aware of any other knife

18   gate that looked like that on the property with a screw that

19   brings it up other than the Kingsfield Road dam?

20   A.   Well, there's a lot of knife gates on the property.  More

21   than likely -- I mean, it's -- so, I mean, I really need more

22   perspective on the picture to be able to say, yeah, this is it.

23   Q.   We're going to break for lunch in a while and I'll get one

24   with more perspective.

25            **MR. GLASSER:**  But can I conditionally admit this, Your

1   Honor?

2            **THE COURT:**  No, sir.

3            **MR. GLASSER:**  May I approach, Your Honor?

4            **THE COURT:**  Yes.

5   **BY MR. GLASSER:**

6   Q.   I'm handing you what's been marked as Plaintiffs' Trial

7   Exhibit 254.  Do you recognize this as a statement given by

8   International Paper to a country music station about the dam?

9   A.   I see who it's addressed to, yes.

10           **MR. GLASSER:**  I move it's admission, Your Honor.

11           Any objection?

12           **MR. NELSON:**  Not to the admission of the document.

13           **THE COURT:**  254 is admitted.

14           (Plaintiffs' Exhibit 254 admitted into evidence.)

15  **BY MR. GLASSER:**

16  Q.   So, this is another statement.  This is the same statement

17  saying it's an inactive spillway, right?

18  A.   Yes.

19  Q.   "Now abandoned outfall," right?

20  A.   Right.  The context of that was it was no longer used for

21  the mill's wastewater system.  I think that was the -- and it

22  probably was not the best wording we could have done, but we

23  were trying to do that quickly and get communications out.

24  Most people's perception was it was no longer needed because of

25  the wastewater system changes and going to the pipeline.  It

1    still had a purpose in terms of stormwater flow and management.

2    Q.   Mr. Moore, the date of this official statement from the

3    company is May 13th, 2014.  Do you see that at the top?

4    A.   Yes.

5            **MR. NELSON:**  Objection.  That's a mischaracterization

6    of the document.

7            **THE COURT:**  Fair enough.  The email is dated that

8    date, if that's what you're referring to as the document.

9            **MR. GLASSER:**  Yes, it's dated that date.

10   **BY MR. GLASSER:**

11   Q.   And it says, "Here is the statement I gave him."  Do you

12   see that, Mr. Moore, say "Here is the statement I gave him"?

13   A.   Yes.

14           **THE COURT:**  That objection will be sustained.

15   **BY MR. GLASSER:**

16   Q.   And if you look down here at the bottom, Janice Moore [sic]

17   is emailing a guy at Cat Country 98.7, right?

18   A.   Right.

19   Q.   That's a country music station, right?

20   A.   Right.

21   Q.   So, does it appear to you that Ms. Holmes gave him this

22   statement on or about May 14th, 2014?

23   A.   It appears that way to me, yes.

24           **MR. NELSON:**  Can we publish the actual date of the

25   statement, Your Honor?

1        **THE COURT:**  Well, you can cover this in cross.  This

2   is the date that the email reflects it was sent, not

3   necessarily the date of the statement.

4   **BY MR. GLASSER:**

5   Q.   So, I am not saying this is the only date you gave this

6   statement, Mr. Moore, okay?  You gave this statement on May

7   13th, okay?  You agree?  Your company did?

8   A.   The date on the email is May 13th, I agree with that.

9   Q.   So, because the event happened on April 29th, at the time

10  this statement was given the company had 14 days to revise,

11  fix, or otherwise update anything that it thought was not true;

12  isn't that right?

13  A.   Yes, by the calendar.

14        **MR. GLASSER:**  Ms. Simms, have I moved 241, 243, 244,

15  and 254?

16        **THE COURT:**  241 is in, 243 is in, and 254 is in.

17        **MR. GLASSER:**  244, I move it's admission, Your Honor.

18        **THE COURT:**  It's in.  The only one not in is 248.

19  **BY MR. GLASSER:**

20  Q.   Let's go back to the night of April 29th, okay?  When did

21  you leave the property on April 29th?

22  A.   I don't really remember.  It was late afternoon.

23  Q.   So sometime in the afternoon?

24  A.   Yeah.

25  Q.   At the time you left it was not raining; isn't that right?

1    A.    That is correct, I don't recall it raining while I was

2    there.

3    Q.    I want to show you what has been marked as Plaintiffs'

4    Exhibit 228, which is an email between you and Janice Holmes.

5    You see that on April 29th, 2014, at 7:20 p.m.?

6    A.    Okay.

7    Q.    Yes?

8    A.    I see that, yes.

9            **MR. GLASSER:**  I move its admission, Your Honor.

10           **THE COURT:**  That's admitted, 228.

11          (Plaintiffs' Exhibit 228 admitted into evidence.)

12   **BY MR. GLASSER:**

13   Q.    So, let's publish this to the jury.  So, you weren't at the

14   mill at 7:20 p.m. on April 27 [sic], 2014, right?

15   A.    Well, this is from me to Janice, so it sounds like I was at

16   the mill at that point.

17   Q.    So, you misremember that you left early, right?

18   A.    Yeah, I don't remember when I left that day, I honestly

19   don't.

20   Q.    So, it appears from this email that at 7:20 you're at the

21   mill, right?  And the rain hasn't got there yet, there are a

22   cluster of pretty dark clouds coming; is that correct?

23   A.    To the northwest, right.

24   Q.    So, so far as you can remember, it wasn't raining at the

25   mill by 7:20 p.m. that night; isn't that right?

1    A.    That's correct, yes.

2    Q.    You never went down to the -- you must have -- well, that

3    night you never went to the dam or the wastewater ponds, right?

4    A.    I did not, no.

5    Q.    So, you understand that it later started raining and the

6    plant wastewater ponds overflowed but you don't know when,

7    right, you personally?

8    A.    I personally do not.

9    Q.    But you agree with me that when those ponds that we went

10   over earlier today overflow the water runs down towards the dam

11   as we discussed?

12   A.    A portion of it.  But remember the pipeline continued to

13   flow, and so 40 million gallons a day would have continued

14   through that pipeline diverted away from that -- the Kingsfield

15   structure.

16   Q.    You agree with me that International Paper keeps an eye on

17   the weather and had advanced warning that the storm was coming,

18   right?

19   A.    We knew rain was coming, but we did not know to the extent

20   of what a terrible storm that was going to be, a record storm.

21   Q.    At the time the storm was on the way, the paper mill itself

22   was shut for routine maintenance, correct?

23   A.    Yes.

24   Q.    So the water that would normally be inside the mill had

25   actually been pumped out to the ponds so the mill could be

1    cleaned and maintenanced; isn't that correct?

2    A.    That's not entirely true.  Part of the mill was in an

3    outage mode, but the other part of the mill -- the what I would

4    call the container board operations, which is the higher

5    production-related operation, was continuing to operate, and

6    the flow from that part of the operation was approximately 15

7    to 20 million gallons a day.

8    Q.    All right.  So, part of the water that normally was in the

9    facility itself had already been pumped out to the ponds, so

10   they were just -- they're relatively more full when you're in

11   maintenance shutdown mode than just a normal day when there's

12   millions more of gallons inside the plant, right?

13   A.    I'm sorry, I missed what you're asking me.

14   Q.    So, when the plant is normally operating, it has millions

15   of gallons in it, right?  Agreed?

16   A.    Millions of gallons in it?

17   Q.    In it in water.  It has big rollers, vats?  It makes paper

18   using water, correct?

19   A.    Yes.  And then they drain them for maintenance, is that

20   what you're asking?

21   Q.    Yes, sir.

22   A.    Okay, yes.

23   Q.    And they drain them to the ponds, right?

24   A.    Correct.

25   Q.    So, those millions of gallons are extra in the ponds

1    compared to normal operation day, correct?

2    A.   That's right.  We would impound that water so that we could

3    then pump it back over time and treat it.

4    Q.   In any event, knowing that the storm was coming,

5    International Paper did not order anyone to go down to the dam

6    and open the 4-foot diameter plug in the bottom of it, did

7    they?

8    A.   I'm not aware of anybody opening that plug or pour valve.

9    Q.   So it follows from the fact that International Paper,

10   knowing the storm was coming and didn't order anybody to go

11   open the 4-foot in diameter valve at the bottom of the dam, had

12   no written policy and procedure requiring that plug to be open

13   when a storm came, right?

14   A.   It's important to note that we had no idea of the magnitude

15   of the storm.  And while we knew rain was coming, the

16   predictions that we saw were on the order of a couple of

17   inches.

18              **MR. GLASSER:**  May I approach, Your Honor?

19              **THE COURT:**  Yes.

20   **BY MR. GLASSER:**

21   Q.   I'm showing you two documents now.  The first is

22   Plaintiffs' 61 to orient you to Plaintiffs' Trial Exhibit

23   183(h).  Does that help?

24   A.   So, assuming this one is the same as that, then yes, that

25   is the knife gate that you've been referring to.

1   Q.   Okay.

2          **MR. GLASSER:**  By agreement, Your Honor, I move the

3   admission of Plaintiffs' Trial Exhibit 61, Plaintiffs' Trial

4   Exhibit 183(h).

5          **THE COURT:**  Why not 248?  It wasn't 248 the one

6   that --

7          **MR. GLASSER:**  248 was a different -- an email.  These

8   are two photos.

9          **THE COURT:**  I apologize.  Give me the numbers again.

10  61, and then what is the other one?

11         **MR. GLASSER:**  183(h).

12         **THE COURT:**  All right.

13    (Plaintiffs' Exhibits 61 and 183(h) admitted into evidence.)

14  **BY MR. GLASSER:**

15  Q.   I'm showing you Exhibit 61.  This was taken in December

16  2014, and it shows that concrete part of the dam.  So let's

17  orient the jury with Plaintiffs' Trial Exhibit 104.  You see on

18  Plaintiffs' Trial Exhibit 104 there's this concrete box, right?

19  And that's what's left of this -- and then there's the open

20  area.

21       So, now, Exhibit 61 is just a closeup closer to that

22  concrete box in December, right?  Okay.  And on that concrete

23  box in the bottom there is a gate with a screw-top that opens

24  -- could open, in theory, a knife gate, right?

25  A.   In theory, yes.

1   Q.   And this is the 4-foot hole in the bottom of the dam you

2   and I were just talking about, right?

3   A.   It certainly looks like it, yes.

4   Q.   And here is a closeup of that knife gate, right?

5   A.   Right, looks like it.

6   Q.   Do you recall, Mr. Moore, a little bit ago the email

7   traffic asking if the dam was in good repair?

8   A.   Yes.

9   Q.   Do you agree with me that this knife gate, this 4-foot gate

10  is rusted -- completely rusted out?

11  A.   I think what you have to remember is that this knife

12  gateways not important anymore as it had been in years past.

13          **MR. GLASSER:**   Can I publish Exhibit 183(h) to the

14  jury, Your Honor?

15          **THE COURT:**   Yes.   Mr. Glasser, follow the protocol

16  that we've been using.

17  **BY MR. GLASSER:**

18  Q.   I just want to talk about Exhibit 183(h) from a maintenance

19  perspective.   Mr. Moore, is this the standard of care that

20  International Paper uses for the equipment inside its plant?

21  A.   No.   I mean, it's clearly rusted.

22  Q.   You would agree with me that a proper maintenance program

23  for a piece of equipment would not have it rusted in this

24  condition?

25  A.   It would -- I mean, it's not uncommon for the mild steel

1    type stuff to be corroded at some point.  It doesn't always

2    affect their functionality.  But, I mean, I don't disagree that

3    that does show some corrosion and rust.

4    Q.   And so, the statement that the dam was in good repair

5    obviously could not depend on the 41 feet that was missing,

6    right?

7    A.   Well, it wasn't missing at that point in time.

8    Q.   Well, yes, it was.  In Exhibit 104 at the time that

9    statement went out about this dam having been in good repair,

10   this picture 104 shows what happened on August [sic] 29th,

11   2014, right?

12   A.   What Janice was talking about was --

13   Q.   I mean April, sorry.

14   A.   -- prior to the storm.

15   Q.   I get it.  But I'm saying, to go down there and say, okay,

16   I can prove this was in good repair, obviously the missing part

17   doesn't help, right?

18   A.   Right.

19   Q.   And then the part that's not missing is this concrete, and

20   that's the condition it's in, isn't it, sir?

21   A.   That shows the rust, yes.  But, again, it was an overflow

22   structure that could pass beyond a 100-year storm event, so

23   from its ability to pass that water flow it was in good repair.

24            **MR. GLASSER:**  No further questions, Your Honor.

25            **THE COURT:**  Mr. Nelson, we're going to get started.

1    We'll recess for lunch at 12:30.

2                       **CROSS-EXAMINATION**

3    **BY MR. NELSON:**

4    Q.   Good afternoon, Mr. Moore.  You recall Mr. Glasser asking

5    you some questions toward the end of the direct examination

6    about the storm event on the night of April 29th?

7    A.   Yes.

8    Q.   Where were you in the later evening hours that night?

9    A.   I was at my home in Pensacola.

10   Q.   And what was it like there?

11             **MR. GLASSER:**  Objection, relevance.

12             **THE COURT:**  Overruled.

13             **THE WITNESS:**  It was an unbelievable storm event.  It

14   was the most intense lightning storm and rainfall I ever have

15   experienced.  I recall getting -- seeing water in my back yard

16   and making the comment to my wife that --

17             **MR. GLASSER:**  Objection.

18             **THE COURT:**  Overruled.

19             **THE WITNESS:**  I'm concerned that we're going to have

20   water -- we're going to be flooded, you know, in our house.

21   And so we fretted and worried about that for a while and -- but

22   it was the most intense rainfall I've ever seen.

23   **BY MR. NELSON:**

24   Q.   And then the next morning, April 30th, did you drive to

25   work that day?

1    A.    I did.

2    Q.    And can you describe that, please.

3    A.    Again, just a tremendous -- it was just so obvious the

4    tremendous rain event that we had -- that Pensacola had

5    experienced, the county, water running everywhere, parts of

6    roads still blocked from high water, you know, small streams

7    were rushing torrents, and just it was like water everywhere.

8    Q.    And roughly what time did you get to the International

9    Paper facility the morning of the 30th?

10   A.    I want to say it was between 6:30 and 7:00 a.m.

11   Q.    And at the time you got there, what was the condition of

12   the facility?

13   A.    The facility was in good shape.  It was still operational

14   and the wastewater system was good, and the basins were still

15   intact.  And there was a lot of water, a lot of water flow, and

16   we spent a lot of time managing that and keeping that in

17   working order, but it was in -- came through the storm pretty

18   well.

19   Q.    I would like to republish Plaintiffs' Exhibit 82(a).

20            **THE COURT:**  Is that the schematic?

21            **MR. NELSON:**  It's the annotated schematic, Your Honor.

22   And to save time, while we're doing that, if we could just

23   publish Plaintiffs' 82 and start with that and I can get to

24   82(a) in a moment.

25            **THE COURT:**  Let me -- I always get nervous when you

1    all keep the exhibits in your notebooks.  I know Ms. Simms gets

2    nervous with that as well.  I guess I haven't been paying close

3    enough attention.  When an exhibit is admitted, it needs to

4    come to the exhibit table.  Have y'all not been doing that.

5           **MR. GLASSER:**  We've been meeting on the breaks, Your

6    Honor, and we've been double checking it on the breaks.

7           **THE COURT:**  I'm accustomed to you putting it on the

8    clerk's bench at the time it's admitted.

9           **MR. GLASSER:**  Okay.

10          **THE COURT:**  We don't want exhibits to disappear.  And

11   believe me, I've been guilty of it myself, so I know it can

12   happen.  Thank you.

13          Go ahead, let's get it published then.  Are you going

14   to put it on the document camera or --

15          **MR. NELSON:**  I'm going to start from the computer

16   system.

17          **THE COURT:**  What exhibit is this?

18          **MR. NELSON:**  This is Exhibit 82, Plaintiffs' Exhibit

19   82.

20          **THE COURT:**  Without the annotations, all right.

21   **BY MR. NELSON:**

22   Q.   So, I think a moment ago, Mr. Moore, you said when you got

23   to the facility the morning of the 30th, one of the things that

24   you ascertained was that the wastewater treatment system was

25   intact?

1  A.    That's correct.

2  Q.    What was the condition of the ponds associated with the

3  wastewater treatment system?

4  A.    They were still intact and still functional.

5  Q.    Can you identify for the jury by reference to Exhibit 82

6  what you mean by the ponds were intact?

7  A.    It would have been the multi-purpose surge basins, starting

8  on the left-hand side of the drawing there.  The dewatering

9  plant that was discussed and the associated equipment with that

10  was still intact.  Pond 1, pond 2 were intact, although full.

11  Pond 3 and pond 4 were also intact, along with the north storm

12  surge pond.

13  Q.    Thank you, Mr. Moore.  Looking back over here, during

14  direct examination Mr. Glasser made quite a show of writing

15  volumes of water in these different impoundments on this

16  butcher paper?

17  A.    Yes.

18  Q.    Were those volumes of water still impounded in each of

19  the --

20  A.    Yes, they were.

21  Q.    So there was no release of any of the water that is denoted

22  on the butcher paper --

23  A.    Right.

24  Q.    -- on the night of the 29th and the morning of the 30th?

25  A.    Yes, that's correct.

1    Q.   And in fact, Mr. Moore, had the mill taken some steps to

2    free up capacity in any of the ponds?

3    A.   Yes.  The procedures that the mill uses and that's executed

4    by the wastewater operators that run this facility is we are

5    always reclaiming from pond 2 -- excuse me -- pond 2, the

6    multipurpose surge basin, and pond 4 we would reclaim.  And

7    whenever we have to impound water in those basins, we

8    immediately start reclaiming and working that volume back down

9    to have this surge volume that is available for storm events

10   and that sort of thing.

11   Q.   And so just -- if we look at the number Mr. Glasser wrote

12   up there for pond 2, 87 million, that's the total capacity of

13   that pond, right?

14   A.   It's the design volume, yes.

15   Q.   But before the storm event, there was actually more room in

16   that pond?

17   A.   That's correct, there was -- we had pumped it down and it

18   had, I want to say, I think it was 70 million gallons available

19   to impound water into.

20   Q.   And so stormwater runoff during the event went into that

21   pond, correct?

22   A.   Went into that pond, yes.

23   Q.   And so, in some ways, if we really wanted to redo the math,

24   we should actually have some negative numbers up there if our

25   real question is how much of that water could have ever passed

1    the Kingsfield Road structure; right?

2    A.    That is correct, plus the fact that a lot of that water

3    would have gone down the pipeline and not the Kingsfield

4    structure.

5    Q.    Could you describe a little bit more about that, Mr. Moore,

6    how the water would go down the pipeline?

7    A.    The water is -- again, I mentioned this before, but it's a

8    gravity flow through the wastewater system.  What that means is

9    you don't have to use a pump to pump it, and it flows, it flows

10   based upon the change in elevations, the same concept as water

11   flows downhill.

12          And so, the pipeline, which is at the end of pond 4, the

13   water, when it comes through the wastewater system, it then

14   falls into the pipeline and flows all the way down to the

15   Perdido Bay wetlands that we developed a few years back.  That

16   pipeline was designed to be able to flow by gravity up to

17   around 40, 42 million gallons a day, and it continued doing

18   that throughout the storm event.

19   Q.    And roughly how many million gallons a day was kind of the

20   what I'll call the process flow?

21   A.    During that event it probably was roughly 20 million

22   gallons a day, I believe.

23   Q.    And so what's the significance of that difference between

24   the roughly 20 million gallons a day and 44 million gallons a

25   day?

1   A.   So another 20 million gallons a day of rainfall would have

2   gone down that pipeline and gone to the wetlands and bypassed

3   the Kingsfield structure and Elevenmile Creek.

4   Q.   So that would be another 22 million gallons we could deduct

5   off of Mr. Glasser's butcher paper, right?

6   A.   That's correct.

7   Q.   And again, if the real question is the water that passed

8   the Kingsfield Road structure?

9   A.   That's right.

10        **MR. GLASSER:**   May I publish -- we do now have 82(a)

11   which is annotated.

12        **THE COURT:**   Yes.

13   **BY MR. NELSON:**

14   Q.   This was the document that Mr. Glasser annotated during his

15   direct examination, and I think here he has written this

16   asterisk was the end of the wastewater system in 2012, right?

17   A.   Yes.

18   Q.   And could you describe for the jury, Mr. Moore, what

19   exactly that asterisk represented at the time of the storm in

20   2014?

21   A.   Yeah, that represented the flow -- that's the beginning of

22   the pipeline, the 48-inch diameter pipeline.  It also

23   represented where the water flowing, whether it's rainfall or

24   processed water, flowing through the wastewater system would

25   then flow by gravity into that pipeline.

1   Q.   Okay.  And so things like pond 1, pond 3, pond 4 that are

2   situated to the left of that asterisk, what does that mean in

3   terms of where the flow from those sources goes?

4   A.   So the normal flow -- or the way the water will flow

5   through the system is it first goes through the dewatering

6   plant and the clarifiers there, the two circles, and then flows

7   by an open channel into pond 1.  Then from pond 1 it would go

8   to pond 3, and then from pond 3 it would go to pond 4, and then

9   pond 4 into the pipeline.

10  Q.   And the water that goes into the pipeline at the asterisk

11  does not continue down toward the Kingsfield Road outfall

12  structure; is that right?

13  A.   That's correct.

14  Q.   Mr. Moore, the item here that's mentioned, outfall box,

15  what does that describe?

16  A.   That describes the overflow structure -- stormwater

17  structure at Kingsfield.  It's the -- what was modified to a

18  concrete channel during 2005 and is part of the stormwater

19  management system that conveys stormwater off the site into

20  Elevenmile Creek.

21  Q.   That's the location of what Mr. Glasser was referring to as

22  the dam; is that right?

23  A.   Yes, I believe so, yes.

24  Q.   And there was also some discussion in your direct

25  examination about Turtle Pond and Turtle Creek.  Do you recall

1    that?

2    A.    Yes.

3    Q.    And you see that there's a line that runs from Turtle Pond

4    down here?

5    A.    Yes.

6    Q.    What does that line tell us about where any water runoff

7    from Turtle Creek entered Elevenmile Creek?

8    A.    The water from that area would run around -- into

9    Elevenmile Creek by that route of that line which would be

10   downstream of the Kingsfield Road structure and would not have

11   an impact on that Kingsfield Road structure.

12   Q.    So any water that started at or flowed into Turtle Creek,

13   would that go past the Kingsfield Road structure itself?

14   A.    It would not.

15   Q.    There was also some discussion during your direct

16   examination about an email exchange that you had with

17   Mr. Taylor, and it referred to a foam control structure.  Do

18   you remember that?

19   A.    Yes.

20   Q.    Where was that located?

21   A.    That was on the right hand -- the extreme right-hand side

22   of this exhibit, it's called the outfall gate.  It was a

23   structure that was designed to control foam formation, and it

24   was applicable when the mill -- prior to 2012, when the mill

25   still had their treated process wastewater going through the

```
 1    Kingsfield Road structure and through that pipeline into
 2    Elevenmile Creek.
 3    Q.   So, is the foam control structure the same thing as the
 4    Kingsfield Road outfall structure?
 5    A.   No.
 6    Q.   So, what Mr. Glasser was referring to as the dam is
 7    something different from the foam control structure?
 8    A.   That is correct.
 9    Q.   And one is located south of Kingsfield Road and the other
10    is north of Kingsfield Road?
11    A.   Yeah, the foam control structure is south of Kingsfield,
12    the stormwater overflow is north of Kingsfield.
13    Q.   Is it fair to consider those two things one and the same?
14    A.   No, I do not consider them one and the same.
15              MR. NELSON:  I'd like to publish, if I could, Exhibit
16    185(a).
17              THE COURT:  Is this a good time for recess or do you
18    need to go a little bit further?
19              MR. NELSON:  If I could ask two or three questions
20    about this document?
21              THE COURT:  That's fine.
22              MR. NELSON:  Thank you, Your Honor.
23    BY MR. NELSON:
24    Q.   This was a photograph -- I think this was actually towards
25    the very beginning of Mr. Glasser's direct examination where he
```

1    was talking about the wastewater treatment ponds at the mill.

2    And there was -- let me ask as a beginning matter, do you know

3    when this photograph was taken?

4    A.   I don't, no.

5    Q.   There's an area that was described as the riffle section.

6    Do you remember that?

7    A.   Yes.

8    Q.   Is that this area?

9    A.   It is.

10   Q.   Was that area in service as part of the wastewater

11   treatment system in April of 2014?

12   A.   No, it was not.

13   Q.   So, would that area have contained any of the mill's

14   wastewater effluent in 2014?

15   A.   It would not have.

16   Q.   And so, if this picture is showing an operating wastewater

17   treatment system, would that suggest anything to you about when

18   it was taken?

19   A.   So, if showed a flow through here, then that would mean it

20   was probably taken prior to 2012 when we put all the flow into

21   the pipeline.

22            **MR. NELSON:**  Thank you, Mr. Moore.

23            Your Honor, that was the set of questions.

24            **THE COURT:**  Very good.

25            Ladies and gentlemen, we'll be in recess for lunch

1    until 1:30.  Please don't discuss the case at all during this

2    lunch recess, avoid any news reports of the trial should there

3    be any, and please don't yet begin to form any opinion about

4    the merits of the case.

5            Leave your pads on your chairs, have a nice lunch, and

6    we'll see you back at 1:30.

7            *(Jury out.)*

8            Mr. Moore, you may step down.  You'll be back on the

9    stand at 1:30.  Please don't discuss your testimony during the

10   recess.  Thank you.

11           Do we need to discuss, counsel, before 1:30?

12           **MR. GLASSER:**  No, ma'am.  We'll work with Ms. Simms to

13   get the exhibits --

14           **THE COURT:**  Thank you.  It's really for your benefit,

15   too.  I know you want a complete and accurate record.

16           We'll be in recess for lunch until 1:30.

17           *(Recess taken.)*

18

19

20

21

22

23

24

25

1          (Luncheon recess was taken from 12:26 to 1:32 p.m.)

2          (Jury present.)

3               THE COURT:  Ladies and gentlemen, I hope you had a

4    nice lunch.  We're ready to proceed.  Continuation of the

5    cross-examination by Mr. Nelson of Mr. Moore.

6               Mr. Moore, you're still under oath.  You may proceed

7    when you're ready.

8               MR. NELSON:  Thank you, Your Honor.

9               Put back up 82A, which has been....

10   BY MR. NELSON:

11   Q.   Mr. Moore, before we broke for lunch, we talked a little

12   bit about Exhibit 82A, which is the annotated version of the

13   paper mill's wastewater treatment system Mr. Glasser went

14   through in his examination.

15               Just for completeness, if we were to identify things

16   like the ash pile, the ash sluice ponds, to the extent any water

17   drained from those, where would it go?

18   A.   It drains into the pond 2 area.

19   Q.   And from pond 2 where would it go?

20   A.   From pond 2 it would be reclaimed and pumped back through

21   pond 1, 3, and 4, and into the pipeline.

22   Q.   So that any water that drained from those areas would go

23   into the wetlands pipeline.

24   A.   It would.

25   Q.   What about any water that left the multipurpose surge

1    basin?  Where would that go?

2    A.    So that would go to -- again, that is reclaimed, and that

3    would be pumped through the wastewater system, pond 1, followed

4    by pond 3 and pond 4, and then into the pipeline.

5    Q.    Thank you, Mr. Moore.

6              I'm going to show you a document marked as

7    Exhibit 301, which has been admitted.  This is an e-mail that

8    Mr. Glasser showed you during the direct examination.  And there

9    was some discussion around this e-mail about whether it

10   reflected a reduced ability of the wetlands pipeline to receive

11   wastewater from IP property.  Do you recall that?

12   A.    I do.

13   Q.    And I think you started to say something about what CWRF

14   effluent was, but I don't think that came across.

15   A.    That is the -- that is the ECUA central water reclamation

16   facility which is located up near the -- International Paper's

17   facility.  And what this e-mail was simply communicating was

18   that they had -- ECUA had suspended their flow from the

19   pipeline -- to the pipeline.  So, therefore, what that did is

20   that actually freed up more capacity in the pipeline for

21   International Paper.

22   Q.    So that the actual result would be that International Paper

23   could put more water into the pipeline.

24   A.    That's correct.

25   Q.    Do you know how much capacity, roughly speaking, was freed

1    up?

2    A.    They typically put in 5 to 7 million gallons a day.

3    Q.    So contrary to indicating that there was a reduced volume

4    flow into the pipeline sometime around 9:20 p.m. on April 29,

5    what does this indicate?

6    A.    That there was actually additional volume in the pipeline,

7    additional room in the pipeline to put flow from International

8    Paper.

9    Q.    Thank you, Mr. Moore.

10           You mentioned a study during direct examination about

11   Sirrine, or by Sirrine.  Do you recall that?

12   A.    Yes, I do.

13           MR. NELSON:  Your Honor, if I may approach.

14           THE COURT:  Yes.

15           MR. GLASSER:  No objection, Your Honor.

16           THE COURT:  All right.  Thank you.

17   BY MR. NELSON:

18   Q.    Mr. Moore, can you describe in general terms what this --

19   I'm sorry.  Mr. Moore, is this a document you've seen before?

20   A.    It is, yes.

21   Q.    Is this a business record of the company?

22   A.    It is.

23           MR. NELSON:  I would move for admission of IP

24   Exhibit 2.

25           THE COURT:  All right.  2 is admitted.  No objection.

1      *(DEFENSE EXHIBIT 2:   Received in evidence.)*

2    BY MR. NELSON:

3    Q.   There might be one nuance here that we should clarify for

4    the jury.  The title refers to what company?

5    A.   Champion International.

6    Q.   And what's the date of this document?

7    A.   The date of this document was 1990, I believe.  Yeah,

8    October 1990.  And so at the time, the facility was actually

9    owned and operated by Champion International.

10   Q.   And then the facility later became owned and operated by

11   International Paper?

12   A.   Yes, in the year 2000.

13   Q.   So this is a study that is referring to the same facility

14   that's at issue in this case?

15   A.   That is correct.

16   Q.   And what's the title of the study, Mr. Moore?

17   A.   Stormwater Runoff Study.  It's for the mill.

18   Q.   Okay.  I would like to refer you to page 22 of the study,

19   please.  Okay.  Bates Number 13302.  And if we take a look at

20   the top, Roman numeral 5, what does that say?

21   A.   Says Proposed System Enhancements.

22   Q.   And the I'd like to go down to Section B that says "base

23   condition."

24   A.   Base condition consists of increasing the capacity of the

25   stormwater system to handle runoff from storms up to the

1   100-year storm event.

2   Q.   And can you describe a little bit more generally,

3   Mr. Moore, what you recall being done at the facility after the

4   Sirrine study in 1990?

5   A.   The base condition was several construction --

6          MR. GLASSER:  Objection, Your Honor.  Foundation.

7   Witness went to work in 1992 --

8          THE COURT:  Excuse me.  Excuse me.  Approach the

9   bench, please.

10      *(Following conference held at the bench.)*

11         MR. GLASSER:  Foundation.

12         THE COURT:  I suspect this is something that he's

13  aware of as a result of his position -- I mean, you can --

14         MR. GLASSER:  The question was from his personal

15  knowledge.

16         THE COURT:  Well, if he learned it through his --

17  through the scope of his employment at IP, I mean, what's the

18  objection to that?

19         MR. GLASSER:  I mean, the document's admitted.  I

20  think it speaks for itself.  I don't think there's any

21  foundation for him having personal knowledge of any of the

22  designs of this, for him having any capacity to understand the

23  designs.  He's a chemical engineer, not a civil engineer.  I

24  don't think he can testify to how good a design it is.  I think

25  the document speaks for itself.

1          THE COURT:  All right.  Mr. Nelson?

2          MR. NELSON:  I can establish personal knowledge.

3          THE COURT:  Okay.  Very good.  Thank you.

4      *(End of bench conference.)*

5          THE COURT:  All right, Mr. Nelson.  Go ahead.

6          MR. NELSON:  Thank you, Your Honor.

7  BY MR. NELSON:

8  Q.   Mr. Moore, at the time you were working at the Pensacola

9  mill in the 1990s, what was your position?

10 A.   Environmental -- when I came to the mill in 1992, I was

11 environmental supervisor.

12 Q.   And the scope of your employment as environmental

13 supervisor?

14 A.   Was to coordinate, facilitate, and ensure that the

15 compliance activities and reporting required for the facility

16 were executed.

17 Q.   And during the 1990s did you work on issues related to the

18 stormwater management system?

19 A.   I did.

20 Q.   And is this a document that you have familiarity with from

21 your work in the 1990s?

22 A.   Yes.

23 Q.   And, Mr. Moore, do you have firsthand knowledge about any

24 changes that were made at the Pensacola mill along the lines of

25 what's recommended in the Sirrine study?

1   A.    That is correct, yes.

2   Q.    You can go on, I believe, Mr. Moore.

3             THE COURT:  Objection will be overruled.

4             THE WITNESS:  The base condition was a series of

5   enhancements to the stormwater system to increase its capacity

6   and ability to convey stormwater runoff from around the

7   peripheral areas of the mill and from outside the mill, and to

8   separate that stormwater from the mill's wastewater.  And so it

9   also modified the -- proposed to modify the final outfall or the

10  final pond at Kingsfield Road and structure, all of that to

11  handle this 100-year storm event.

12  Q.    And that is work that was completed; is that correct?

13  A.    That was work that was completed in the -- in '92 -- when I

14  got to the mill in June of '92, I recall those -- the

15  construction activity, complete -- the newly completed

16  construction activity, the ditches and that sort of thing.

17  Q.    Thank you, Mr. Moore.  I'd like to now forward to page 38,

18  Number 13318.  Zoom in on the top there where the title says

19  Final Pond.

20            In the second sentence, Mr. Moore, there's a reference

21  to the outlet structure?

22  A.    Yes.

23  Q.    Do you have an understanding what that's referring to?

24  A.    That is the Kingsfield structure, the overflow structure.

25  Q.    And what was the recommendation made in terms of the flow

1  that that structure should be able to withstand?

2  A.   It was a recommendation to bring it up to being able to

3  pass a hundred-year storm event or 2000 -- roughly

4  2000-cubic-feet-per-second flow.

5  Q.   Thank you Mr. Moore.

6        Have you reviewed or had the opportunity to review

7  engineering design drawings relating to the Kingsfield Road

8  structure in the course of your employment?

9  A.   Generally yes, mm-hmm.

10       MR. NELSON:  May I approach, Your Honor?

11       THE COURT:  Yes, you may.

12       Has Mr. Glasser seen this?

13       MR. GLASSER:  No objection, Your Honor.

14       THE COURT:  Okay.  Are they marked.

15       MR. NELSON:  Yes, Your Honor.  This is IP Exhibit 8.

16       THE COURT:  All right.  IP's 8 will be admitted.

17       (DEFENSE EXHIBIT 8:  Received in evidence.)

18  BY MR. NELSON:

19  Q.   Have you had a chance to look at the document, Mr. Moore?

20       THE COURT:  Can we go ahead and get it up on the

21  monitor?  It's admitted.  Thank you.

22  BY MR. NELSON:

23  Q.   I'd like to turn to page 11886.  Mr. Moore, is this a

24  schematic of the weir structure of the Kingsfield Road outfall

25  that was in place in 2014?

1    A.    Yes, it was.

2    Q.    Let's turn to the next page.  And if we look at -- it says

3    Calculations.  And if we look at the top, it says Existing

4    Structure.

5    A.    Yes.

6    Q.    This would be the structure that was in existence before

7    the 2005 and 2006 upgrade; is that right?

8    A.    That's correct.

9    Q.    And down at the bottom, it says Flow.  I'm sorry.  Let's go

10   back to the -- what is the flow for the existing structure?

11   A.    It was 2211 cubic feet per second.

12   Q.    And this would have been the so-called Arkansas crossing;

13   is that right?

14   A.    Yes, that is correct.

15   Q.    And that's the amount of flow that it was designed to pass

16   2,211 --

17   A.    2,211.

18   Q.    -- CFS, right?

19   A.    That would be a 100-year storm event.

20   Q.    Now let's take a look at the future structure.  And the

21   future structure would be the structure we saw on the last page,

22   which is the structure that was in place in 2014; is that right?

23   A.    That's correct.

24   Q.    Okay.  If we look at the total area, concrete plus grass,

25   what amount of flow could that pass?

1    A.    According to this, it was 5,996 cubic feet per second.

2    Q.    So that would be an increase over the structure that was in

3    place in 1996?

4    A.    Roughly three times.

5    Q.    And that would be the entirety of the structure, right?  It

6    would be the concrete weir structure that was designed to pass

7    flow, plus other features?

8    A.    Yes.  I think it would be the concrete structure, yes.

9    Q.    Thank you, Mr. Moore.

10            I'd like to talk about Plaintiff's Exhibit 89.  And

11   I'm going to bring you a copy.

12            MR. NELSON:  I'm sorry.  May I approach, Your Honor?

13            THE COURT:  Yes, thank you.

14            MR. NELSON:  Publish 89, please.  It's admitted.

15   BY MR. NELSON:

16   Q.    This is the e-mail chain you and Mr. Glasser spent a fair

17   bit of time on.  Do you recall that?

18   A.    Yes.

19   Q.    And there was a suggestion, based on some of the internal

20   e-mail, that back in 2005, 2006 it would have been feasible for

21   the mill to entirely remove the Kingsfield Road outfall

22   structure and replace it with an open channel.  Do you recall

23   that suggestion?

24   A.    Yes.

25   Q.    If we turn to page 11877, this is part of the initial

1    e-mail string from Mr. Bolduc; is that right?

2    A.    Yes, it is.

3    Q.    And if we flip forward a little bit further in that string

4    to page 11873, and we look down in the Options section, this is

5    a little further in the exchange where Mr. Bolduc is describing

6    some potential options for the improvement made to the structure

7    in 2005, 2006, right?

8    A.    Right.

9    Q.    And Mr. Glasser focused on item 3, replace structure,

10   install an open concrete channel.  Do you recall that?

11   A.    Yes.

12   Q.    What does it say in the parenthetical right after that?

13   A.    It says, Remove existing structure except north wall.

14   Q.    So was there a suggestion, to your reading in this e-mail,

15   that the entirety of the structure would be removed?

16   A.    No.  I believe that what they were talking -- when he said

17   replace structure, he was replacing the Arkansas crossing

18   structure, the concrete portion only, and replace it with an

19   open channel.

20   Q.    And that portion would be what was described as the

21   concrete turtle shell?

22   A.    Yes.

23   Q.    So that portion would be replaced with a concrete channel?

24   A.    Open channel that we saw just a moment ago.

25   Q.    Would there be any replacements to the earthen section?

1    A.   Nothing other -- I don't believe so, other than to tie it
2    into the new structure.
3    Q.   I'd like to turn to page 11871.  And let's zero in on the
4    part of that e-mail toward the top that Mr. Glasser talked about
5    that says "right now."  And this is an e-mail from Mr. Bolduc
6    with some other people at the company.  It says, Right now I'm
7    questioning why we even have this structure.
8         Do you recall that during your direct examination?
9    A.   Yes, I do.
10   Q.   So Mr. Bolduc is asking why do we have the Kingsfield Road
11   outfall structure.
12        Now, let's turn to the front page of the e-mail,
13   Mr. Ron Waters' response to Mr. Bolduc.  I'd like to zoom in on
14   that first paragraph about some history of the structure.  And
15   Mr. Glasser highlighted the first sentence of this e-mail, along
16   with some other portions.
17        I'd like to highlight the second sentence of this
18   e-mail.  It begins "the ARA, CIP."  Can you read that,
19   Mr. Moore, and tell us your understanding of what Mr. Waters is
20   telling Mr. Bolduc?
21   A.   It says, The ARA, in parentheses, CIP, states we are
22   required by state and county regulations to control surges in
23   our effluent system and prevent them from discharging from our
24   plant site.  The control structure will meet this criteria.
25   Q.   So would it have been possible in 2005 and 2006 to

1    completely remove all the parts of Kingsfield Road structure and

2    restore that to an open channel?

3    A.   Based upon this e-mail, I mean, I think Ron is accurate.  I

4    think we probably would not have.  We would have had to have

5    gotten that approved and a permit approved, the FDEP, if we had

6    contemplated that.

7    Q.   In the 2005, 2006 time period, was the mill still

8    discharging effluent past the Kingsfield Road point?

9    A.   We were.

10   Q.   And you need to have an outfall structure at your final

11   effluent discharge point, right?

12   A.   Plus we would -- that's right.  We still would have had to

13   have the outfall structure, mm-hmm.

14   Q.   So as part of the regulatory compliance for your wastewater

15   treatment system --

16   A.   This would have been required.

17   Q.   And what you mean by "this"?

18   A.   The Kingsfield structure, Kingsfield Road structure.

19   Q.   So if the mill wanted to continue to operate in 2005 and

20   2006, did it have to have the ability of discharging its

21   wastewater effluent?

22        MR. GLASSER:  Your Honor, objection.  We've had lots

23   of leading on this witness.

24        THE COURT:  He's on cross.  Overruled.  Go ahead.

25        THE WITNESS:  Yes.  Could you repeat the question?

1    Sorry.

2    BY MR. NELSON:

3    Q.   Yes, Mr. Moore.

4            In 2005, 2006, where was the mill's treated effluent

5    being discharged?

6    A.   It was still discharging into Elevenmile Creek; and as a

7    result, it was still flowing down through riffle section that

8    we -- we had looked at it with pictures, and then from there

9    into this -- through this Kingsfield Road overflow structure

10   into Elevenmile Creek.

11   Q.   And the discharge of the treated effluent is regulated; is

12   that right?

13   A.   That is correct.

14   Q.   And can you operate the mill without discharging treated

15   effluent?

16   A.   We cannot.

17   Q.   So if you wanted to keep operating the mill in 2005, 2006,

18   did you need to have a structure down at Kingsfield Road?

19   A.   We did.

20   Q.   Thank you, Mr. Moore.

21           Did you consider, during the time you worked at the

22   Pensacola mill, the Kingsfield Road structure to be a dam?

23   A.   No.  We considered it to be part of the wastewater

24   NPDES-permitted stormwater control system after 2012.  Prior to

25   that it was part of the wastewater system itself.

1    Q.   Was the structure intended to prevent any flow of

2    stormwater into Elevenmile Creek?

3    A.   It was structured to just manage that flow, and convey it

4    into the creek.

5    Q.   And did the -- let's pull up the Google Earth.  That might

6    be helpful.

7              This is an image from Google Earth.  And if we zoom in

8    a little bit on the area of the Kingsfield Road structure --

9              MR. NELSON:  Maybe just a little bit more.

10   BY MR. NELSON:

11   Q.   What is this, Mr. Moore?  Can you tell?

12   A.   It looks like the Kingsfield Road overflow, the open

13   channel flow that was built in '05, '06 time frame.  Looks like

14   it's after the storm event, to me, in 2014.

15   Q.   What is that?

16   A.   That's that north wall that was referred to with the -- it

17   also was the upper end of that overflow structure and contained

18   the valve that we were talking about earlier too.

19   Q.   Is it also known as the weir structure?

20   A.   Yeah, for sure.  It's known as the weir structure.

21   Q.   And so what was the weir structure made out of?

22   A.   Concrete.

23   Q.   And what is this spillway made out of?

24   A.   Concrete.

25   Q.   And there was a lot of discussion about concrete when we

1    were talking about the replacement of the Arkansas crossing.  Do

2    you recall that?

3    A.    Yes.

4    Q.    And a lot of business about how expensive is concrete

5    versus packed dirt?  Do you remember that?

6    A.    Right, I do.

7    Q.    So the structure that was actually rebuilt in 2005 and 2006

8    and that was in place in April of 2014, what was it made out of?

9    A.    Concrete.

10   Q.    We may need to zoom in a little bit more, but can you tell

11   from this image, Mr. Moore, what it is that I've circled?

12   A.    I believe that is the old -- we always called it the drop

13   box, where when the mill's effluent from the mill operations

14   came through this area, the water would drop down into that pipe

15   and go under the Kingsfield Road and then go through that foam

16   control structure, and then into Elevenmile Creek.

17   Q.    Do you recall approximately the size of the pipe that

18   allowed water to flow?

19   A.    I believe it was 48 inches in diameter.

20   Q.    And so that was a 48-inch pipe that would run from the drop

21   box by the Kingsfield Road outfall structure to a point that's

22   south of Kingsfield Road?

23   A.    That is correct.

24   Q.    And was this designed to allow the conveyance of water?

25   A.    It was, and to control foam.  During normal times it would

1  convey all of the water, and then during a storm condition it

2  would -- the excess water would then overflow that concrete

3  structure.

4  Q.   And then prior to the storm damage in April of 2014, what

5  was that area made out of?

6  A.   I believe it was -- it was soil that was tied into the

7  concrete overflow structure.

8  Q.   And was that higher than the height of the concrete weir

9  structure?

10 A.   It was, yes.

11 Q.   So if water rose up behind the Kingsfield Road outfall

12 structure, where would it go first?

13 A.   It would first go through the concrete structure.

14 Q.   Or the drop box?

15 A.   The drop box, yes.

16 Q.   There was also discussion during your direct examination

17 about a BMP.  Do you recall that?

18 A.   Yes.

19      MR. GLASSER:  No objection, Your Honor.

20      THE COURT:  Okay.  Thank you.

21      MR. NELSON:  May I approach, Your Honor?

22      THE COURT:  Yes.

23 BY MR. NELSON:

24 Q.   Mr. Moore, is IP Exhibit 9 a copy of the BMP that you

25 referenced during your direct examination?

1   A.   Yes, it is.

2         MR. NELSON:  I'd like to move admission of IP 9.

3         THE COURT:  It will be admitted.

4      (DEFENSE EXHIBIT 9:  Received in evidence.)

5   BY MR. NELSON:

6   Q.   Mr. Moore, if you would, would you please turn to the page

7   that is Bates-labeled 89.  This is the introduction.  I'm going

8   to focus you on the first paragraph.  What does this tell us

9   about how stormwater is regulated?

10  A.   It tells us that it's regulated under the Florida

11  Department of Environmental Protection, National Pollutant

12  Discharge Elimination System, Permit Program.

13  Q.   And what does the second paragraph say?

14  A.   Stormwater discharges from the Pensacola mill are covered

15  under the mill's NPDES permit.

16        THE COURT:  Excuse me.  I'm going to ask you to repeat

17  that, with two conditions.  If you'll speak up a little bit and

18  slow down for the court reporter, please, thank you.

19        THE WITNESS:  Should I go back to the beginning?

20        THE COURT:  Yes, please do.

21        THE WITNESS:  Okay.  The first paragraph, it says that

22  stormwater discharges from the International Paper Company,

23  Pensacola mill, are regulated under the Florida Department of

24  Environmental Protection, National Pollutant Discharge

25  Elimination System NPDES, Permit Program.

1           Facilities -- and in the second paragraph it says,

2    Stormwater discharges from the Pensacola mill are covered under

3    the mill's NPDES industrial wastewater permit, and a SWP3/BMP

4    plan is required under this permit.

5    Q.    So this BMP plan for stormwater management was actually a

6    requirement of the facility's NPDES permit; is that correct?

7    A.    That's correct.

8    Q.    And did the stormwater plan that was subject to this permit

9    include the Kingsfield Road structure?

10   A.    It did.

11   Q.    So would it be fair to say that the Kingsfield Road

12   structure was not permitted at all in 2014?

13   A.    It would not be fair to say that.

14   Q.    What do you believe, Mr. Moore?

15   A.    It was permitted under the National Pollutant -- under the

16   mill's facility wastewater permit, what we just read here, the

17   NPDES permit.

18   Q.    Thank you, Mr. Moore.

19           All right.  Now I'd like to turn to Section 8 of the

20   document.  This is Bates Number 9119.  What's the title of this

21   section, Mr. Moore?

22   A.    Annual Comprehensive Site Compliance Evaluation and

23   Inspection.

24   Q.    And was this a protocol that was in place while you were

25   the EHS manager?

1   A.   It was, yes.

2   Q.   Was this -- I'm sorry.

3   A.   It was in place.

4   Q.   It was in place in 2014?

5   A.   It was.

6   Q.   The first paragraph notes, Qualified personnel will conduct

7   a comprehensive site inspection to -- and then in item 3 it

8   says, Assess compliance with the terms and conditions of the

9   stormwater permit.

10  A.   Right.  It does say that, yes.

11  Q.   And was that done during the period you were the EHS

12  manager?

13  A.   It was.

14  Q.   In the second paragraph, the BMP plan states, in the last

15  sentence, Erosion controls and structural stormwater management

16  devices will be inspected to ensure that each is operating

17  correctly.  Do you see that?

18  A.   I do.

19  Q.   Was the Kingsfield Road structure an erosion control and

20  structural stormwater management device?

21  A.   Yes, it was.

22  Q.   Was that also inspected?

23  A.   Yes.

24  Q.   If you look at the next section, it says, The evaluation

25  will include the following, as required by the permit.  We look

1    at the last bullet point.  It says, Observations of structural

2    measures, sediment controls, and other stormwater BMPs to ensure

3    proper operation.  Do you see that?

4    A.    I do.

5    Q.    Would this include the Kingsfield Road structure?

6    A.    It would, yes.

7    Q.    If we go down to the next paragraph, it states, The results

8    of each inspection will be documented and the report signed by

9    the EHS manager and/or his or her designated alternate.  The

10   report will describe the following.  And it has a list of items:

11   Scope of the inspection, personnel making the inspection, dates

12   of the inspection, major observations related to the

13   implementation of the BMP.  Do you see that?

14   A.    I do.

15   Q.    Was that done during the period you were the EHS manager?

16   A.    Yes.

17   Q.    If we take an example and go to page 9133, is this an

18   example of the compliance evaluation that was performed?

19   A.    Yes, it is.

20   Q.    Okay.  And if we look down at the bottom of the document,

21   it's signed.  Can you tell who signed it?

22   A.    Yes, it's John Taylor.  J Taylor.  That's John Taylor.

23   Q.    And can you identify again who Mr. John Taylor --

24   A.    John is the environmental engineer that works at the

25   International Paper Pensacola facility.

1  Q.   And did he have responsibility for the inspections?

2  A.   He did.

3  Q.   Was Mr. Taylor the only one who inspected the stormwater

4  management system?

5  A.   The wastewater treatment plant operators would also inspect

6  the structure and then the stormwater system also, routinely.

7  Q.   When you say "routinely," what do you mean by that?

8  A.   Typically it was at least once a day.  Visual inspection

9  once a day.

10  Q.   And did those inspections of the stormwater condition

11  continue in 2013 and 2014 after conversion of the wetlands

12  pipeline?

13  A.   Yes, they did.

14  Q.   And did those inspections continue to include the

15  Kingsfield Road structure?

16  A.   Yes, they did.

17  Q.   So even after the conversion to the wetlands pipeline,

18  there were still inspections of the Kingsfield Road structure.

19  A.   That is correct.

20  Q.   Did Escambia County conduct any inspections to the

21  stormwater system?

22  A.   Yes.  Escambia County has -- was delegated by the Florida

23  Department of Environmental Protection to conduct stormwater

24  compliance inspections.  And so they would come out annually and

25  conduct an inspection of the stormwater system that included the

1  Kingsfield Road structure.

2  Q.   Mr. Moore, both during the direct examination by

3  Mr. Glasser and in reference to the BMP plan, you referred to an

4  NPDES facility permit.  Do you recall that?

5  A.   Yes.

6          MR. NELSON:  May I approach, Your Honor?

7          THE COURT:  Yes, you may.

8  BY MR. NELSON:

9  Q.   Mr. Moore, during the period that you were the EHS manager,

10 did you --

11         MR. GLASSER:  Objection, Your Honor.  Can we approach?

12         THE COURT:  Okay.

13     *(Following conference held at the bench.)*

14         MR. GLASSER:  Your Honor, we just reiterate our

15 objection that caused you to grant our in limine motion.  This

16 is showing the jury a permit that is not relevant to the failure

17 of the dam.  It is a stormwater permit.

18         Frankly, I've already -- I can show the Court the map.

19 It's not even -- the dam is not even on the permit map.  I can

20 bring it to you right now.  The BMP he just put in doesn't have

21 the dam on the map.  It's -- this is misdirection of the jury.

22 It's not relevant.  It's unfair prejudice.

23         THE COURT:  What's the relevance?  How are you going

24 to establish that?

25         MR. NELSON:  I'm going to establish this, that the

1    stormwater system was, in fact, regulated under this facility

2    permit, and --

3              THE COURT:  What are you -- I'm sorry.  What are

4    you-all -- what number is that?

5              MR. NELSON:  This is IP Exhibit 1.

6              MR. MARSHALL:  Here, Your Honor, is the map of the

7    stormwater permit.  There is the riffle section, right there.

8    It ends before the dam.  It's not permitting the dam.

9              THE COURT:  That's -- you're saying that.

10             MR. GLASSER:  I am saying that, as a matter of law.

11             MR. NELSON:  It's actually -- the face of the

12   documents contradicts that.

13             THE COURT:  Yeah.  I mean, and you don't -- you can't

14   testify as to what the law is, Mr. Glasser.

15             MR. GLASSER:  I know.

16             THE COURT:  It's -- after everything that I've heard

17   from this witness, and mainly through the direct examination, it

18   seems relevant to me.  I'm going to let him go forward with it;

19   and if it turns out that it's not and I'm convinced of that,

20   then I'll strike it.

21             MR. GLASSER:  Your Honor may I speak to that?  Because

22   this is an adverse witness, I feel like I was doing the cross

23   and he's doing the direct now, so --

24             THE COURT:  That's not my policy.

25             MR. GLASSER:  Okay.

1          THE COURT:  If you call a witness that's an adverse

2    witness, you get to lead them all the way through.

3          MR. GLASSER:  But they do too?

4          THE COURT:  They do too.  Yep.

5          MR. GLASSER:  Okay.  Thank you.

6       *(End of bench conference.)*

7          THE COURT:  All right.  I'm going to admit Number 1.

8    This is International Paper 1.  Mr. Nelson, I'll ask you to

9    conduct your examination consistent with the discussion here at

10   the bench.

11         MR. NELSON:  Thank you, Your Honor.

12   BY MR. NELSON:

13   Q.   Mr. Moore, can you identify for the jury what this document

14   is?

15   A.   Yes.  This is the mill's permit to operate the wastewater

16   system and stormwater system.  It's the NPDES permit that we

17   have been talking about, it was issued by the Florida Department

18   of Environmental Protection.

19   Q.   And the Florida Department of Environmental Protection was

20   a regulator of the facility?

21   A.   Yes.

22   Q.   There was some discussion during Mr. Glasser's examination

23   about whether the Kingsfield Road outfall point was outside the

24   jurisdiction of the Florida Department of Environmental

25   Protection.  Do you recall that?

1   A.   Yes.

2   Q.   Okay.  I would like to direct your attention to page 8574

3   of the document.

4   A.   Yes.

5   Q.   And zoom in under the portion that says, Surface water

6   discharge outfalls.

7   A.   Yes.

8   Q.   And this is a NDEP permit regulating the facility, right?

9   A.   That is correct.

10  Q.   And there's a title that says Surface Water Discharge -- we

11  lost it.

12         THE COURT:  The cord may have been disconnected at

13  counsel table.  We have it back.

14         MR. NELSON:  Thank you, Your Honor.

15  BY MR. NELSON:

16  Q.   So this permit has a title that says, Surface Water

17  Discharge Outfalls, doesn't it?

18  A.   It does.

19  Q.   If we look under Outfall DO2 -- do you see that?

20  A.   I do.

21  Q.   In the second paragraph, what does this tell us about

22  whether the Kingsfield Road outfall structure was or was not

23  subject to the DEP permit?

24  A.   It tells us that it is subject to the DEP permit, this

25  permit.  It is regulated by it.

1  Q.   And indeed, it refers specifically to discharges from the

2  D-001 and D-002, which are outfalls you talked about before,

3  combined with other stormwater and a unnamed tributary that flow

4  into an on-site impoundment.  It says, The on-site impoundment

5  discharges through a 48-inch pipe into Elevenmile Creek south of

6  State Road 186.  Do you see that?

7  A.   I do.

8  Q.   So that's specifically describing the Kingsfield Road

9  outfall structure, isn't it?

10  A.   It is.

11  Q.   So the Kingsfield Road outfall structure, in fact, was

12  subject to the Florida DEP permit.

13  A.   It was.

14  Q.   Now, there's also some examination by Mr. Glasser about the

15  Northwest Florida Water Management District.  Do you recall

16  that?

17  A.   Yes.

18  Q.   And do you recall what you said about your understanding of

19  who was the chief regulator of the facility and the stormwater

20  system?

21  A.   Yes.

22  Q.   And who was that?

23  A.   The Florida Department of Environmental Protection, as

24  stated in this permit.

25  Q.   I'd like to turn your attention, Mr. Moore, to page 8571 of

the document.  And up at the top, there are some stamps, filing

and acknowledgment, you know, filed on this date under

Section 1252.FS, with a designated deputy clerk receipt, which

is hereby acknowledged.  There's a certificate of service.  And

it's signed by someone.  Looks like somebody Smith, the clerk.

Do you see that?

A.    I do.

Q.    If you look down at the copy line, I'd like to highlight

the fourth entity that received a copy of this Florida

Department of Environmental Protection permit that specifically

included the Kingsfield Road structure.  Who got it?

A.    It's the Northwest Florida Water Management District.

Q.    So this Northwest Florida Water Management District

received a copy of the Florida DEP permit issued to the

International Paper Pensacola facility, right?

A.    That is correct.

Q.    And this is the same permit that specifically includes the

Kingsfield Road outfall structure.

A.    That is correct.

        MR. NELSON:  Thank you, Mr. Moore.  I have no further

questions.

        THE COURT:  All right.  Thank you.  It's time for

redirect.

        MR. GLASSER:  Oh, was that it, Your Honor.

        THE COURT:  I believe he's passed the witness.

**REDIRECT EXAMINATION**

BY MR. GLASSER:

Q.   So let's start where you started, at home, at the

beginning, when your counsel examined you.  Do you agree with me

that it's about a 30-minute drive from your house to the mill?

A.   No.

Q.   All right.  Where do you live?

A.   I live right off of Airport Boulevard.

Q.   By the airport?

A.   Yes.

Q.   All right.  So how many miles is it from the airport to the

mill?

A.   I don't know the answer to that question.

Q.   How long did it normally take you to commute?

A.   15 to 20 minutes.

Q.   Okay.  I'd like to turn your attention to this Strine (sic)

report from 1990.  Okay.  Do you agree with me that whatever dam

was designed by Strine in 1990 was replaced after it failed in

2005?

A.   Yes, it was replaced in 2005.

Q.   And whatever dam existed in 2005 is not the same as the dam

in 2014, correct?

A.   The stormwater overflow structure was replaced in 2005.

Q.   Okay.  So this discussion in the Strine report about what

the 1990 dam was going to be designed for is two dams ago,

1    correct?

2    A.   Yes.

3          THE COURT:  Mr. Glasser, what's the exhibit number?

4          MR. GLASSER:  This is Defense Exhibit 2, Your Honor.

5          THE COURT:  Okay.  Thank you.

6    BY MR. NELSON:

7    Q.   You have in front of you -- you've seen Defense Exhibit 8,

8    right, which was the drawings that your lawyer went over?

9    A.   Yes.

10   Q.   Okay.  You have not produced and I do not see any drawings

11   respecting the dam that have a circular professional engineer's

12   stamp on them.  You have not seen any such drawings, have you?

13   A.   I don't -- I don't recall this Cornerstone Engineering on

14   this one drawing, that is a consulting firm that the mill uses.

15   That is a licensed professional engineer.

16   Q.   I understand that.  But you, as the person who researched

17   the history of the dam, you know that when an engineer stamps

18   official his designs for safety, they do a raised stamp.  It's

19   circular.  It's called the professional engineer stamp.  You're

20   aware of that, right, sir?

21   A.   Yes.

22   Q.   You have never seen such a document stamped by a

23   professional engineer, have you, with respect to this dam?

24   A.   I don't recall seeing one, no.

25   Q.   Turning to Defense Exhibit Number 9 that you were shown --

1    you have it in front of you?

2    A.    Yes.

3    Q.    There is a map at page 9128 on this exhibit.  Can you

4    please turn to it.  Are you at page 9128?

5    A.    Yes.

6    Q.    Okay.  Do you see there's a label there?  Outfall 1.  See

7    that?

8    A.    Talking about at the bottom of the page?

9    Q.    Yes, sir.

10   A.    Yes.

11   Q.    And you see there's another label, Outfall 2, that's above

12   the riffle section.  Do you see that?

13   A.    Yes.

14   Q.    Okay.  This map, which is attached to your best management

15   practices for your pollution prevention plan, which is your

16   National Pollution Discharge Elimination permit, ends prior to

17   the Kingsfield Road dam.  Isn't that a fact?  It's off the map.

18         MR. NELSON:  Your Honor, I object to the

19   characterization of what part of the document this is attached

20   to.

21         THE COURT:  Well, I don't know the answer to that

22   question.

23   BY MR. GLASSER:

24   Q.    Is the title of this document Best Management

25   Practices/Pollution Prevention Plan?

1          MR. NELSON:  May we approach, Your Honor?

2          THE COURT:  Yes, I think you need to.

3          MR. NELSON:  I can explain it for the --

4          THE COURT:  I need to have the exhibit.  That was

5     Number 9, Mr. Glasser?

6          MR. GLASSER:  Yes, ma'am.

7       (Following conference held at the bench.)

8          MR. NELSON:  Is that attached to the copy of a

9     document --

10         THE COURT:  Talk to me.

11         MR. NELSON:  Oh, I'm sorry.  I apologize, Your Honor.

12         MR. GLASSER:  Yes.

13         MR. NELSON:  I think that that was attached to the

14    copy of the document that included the facility permit, so

15    it's --

16         THE COURT:  Number 1.

17         MR. NELSON:  Correct, which --

18         THE COURT:  That's where you were --

19         MR. NELSON:  No, it's attached --

20         MR. GLASSER:  Your Honor, if I may --

21         THE COURT:  Where you were -- you were speaking about

22    this when you were talking about your objection to Number 1.

23         MR. GLASSER:  I was, but it's also --

24         MR. NELSON:  Everything that's behind C here --

25         THE COURT:  Okay.

1          MR. NELSON:  -- that's the facility permit that I took

2     out, subject to you issuing a motion in limine until we

3     revisited the issue today, and we admitted the facility permit

4     as Exhibit 1.  So when he says that that page is attached to the

5     BMP, it's not attached to the copy of the BMP that's marked as

6     an exhibit because it doesn't include this.

7          MR. GLASSER:  He has it right there.

8          MR. NELSON:  But you're saying it's attached to the --

9          THE COURT:  It's not.

10          MR. GLASSER:  It is.

11          THE COURT:  It's only attached because he attached it.

12          MR. GLASSER:  Wait, wait.  When you introduced the BMP

13     it doesn't have the --

14          MR. NELSON:  What got identified as the BMP is the

15     copy of the document that doesn't have the facility permit

16     attached to it.  So that schematic is attached to the facility

17     permit --

18          THE COURT:  Right.

19          MR. NELSON:  -- which in turn was attached to the BMP.

20          THE COURT:  It was produced.

21          MR. NELSON:  It's true.  So as long as we're clear

22     that it's part of the BMP that includes the facility permit, I

23     don't have any objection to it, but --

24          THE COURT:  So we should be clear about that, that

25     it's not independently a part of BMP outside of the permit.

1    MR. GLASSER:  Your Honor, all I know is he handed me

2   the his exhibit.  It's the BMP.  The BMP has attached the

3   permit, which is not unusual.

4    THE COURT:  It's attached as part of the permit.  The

5   map is attached as part of the permit.

6    MR. GLASSER:  My only point with this map is that it

7   does not cover the dam.  That's the only point.

8    THE COURT:  That's relevant as to the permit.

9    MR. GLASSER:  Yes, ma'am.  And so that's the map in

10  the permit.  That's the map.  That's the very map that I'm

11  showing the witness right now.

12   THE COURT:  But you're not connecting it to the

13  permit.  You're connecting it to the BMP.

14   MR. GLASSER:  Well, that's -- it was introduced to us

15  attached to the BMP.  I don't know --

16   THE COURT:  It was attached to the BMP only because

17  the permit was attached to the BMP.

18   MR. GLASSER:  Okay.

19   THE COURT:  I'm going to allow you to clear this up on

20  recross.

21   MR. NELSON:  Okay.

22   *(End of bench conference.)*

23   THE COURT:  Go ahead, Mr. Glasser.

24  BY MR. GLASSER:

25  Q.   So going to this map, which is attached to the Best

1   Management Practices pamphlet -- document, you agree with me,

2   focus in on the bottom here, the Kingsfield Road dam is south of

3   this map, below Outfall 1 and Outfall 2.  Isn't that true?

4   A.   The Kingsfield Road structure is below, downstream of 001

5   and 002, yes.

6        MR. GLASSER:  And just so the jury can track that,

7   Your Honor, I've made -- I've blown that up and printed it.

8   It's Exhibit 302.  Just that part I just blew up.  I'd like to

9   move the admission of 302.

10        THE COURT:  All right.  Plaintiff's 302 will be

11   admitted, which is a blowup of this map.

12        MR. GLASSER:  One page of Defense Exhibit Number 9,

13   Your Honor, the bottom of the map.

14   *(PLAINTIFF'S EXHIBIT 302:  Received in evidence.)*

15   BY MR. GLASSER:

16   Q.   Now, turning to the -- turning to the permit, which is

17   Defense Exhibit 1 which your lawyer showed you, let's focus in

18   on the words, the exact words.  See that?

19   A.   Hold on.  Okay.

20   Q.   Discharge from D-001 and D-002 combined.  Do you see that?

21   A.   Yes.

22   Q.   Do you agree with me that when the EPA gives you a legal

23   discharge point, they give it a number, 1 or 2 or whatever.

24   They give it a number, a specific number, correct?

25   A.   Yes.

1    Q.   Okay.  Combined with other stormwater and an unnamed

2    tributary -- that would be Turtle Creek, right?  That's the only

3    one you can think of there.

4    A.   Would be the only one I could think of.

5    Q.   All right.  South of D -- south of D-1 and D-2, the only

6    unnamed tributary is the Turtle Creek that flow into an

7    impoundment.  The on-site impoundment discharges through a

8    48-inch pipe into Elevenmile Creek south of State Road 186.

9    Okay?  There is not an outfall number on the description of that

10   discharge, is there, Mr. Moore?

11   A.   The way DEP will do this sometimes is they will put at an

12   outfall, but they will then go on and describe additional things

13   that they expect to be part of the permitted system -- let me

14   finish -- and part of the permitted system, even -- and they

15   expect you to do that and keep that system in effect, even

16   though there may not be an outfall number associated with it.

17   Q.   Without a outfall number there is no effluent limit.  There

18   is no legal test for whether you're in or out of compliance of a

19   permit if you're not at an outfall; isn't that correct?

20   A.   But if they establish the --

21   Q.   Wait.  Before you answer something else, isn't that

22   correct?  Don't -- the "but" means --

23   A.   Would you say the question again?

24   Q.   Isn't it true that you test for compliance of your

25   stormwater effluent limits at your designated outfall so the

1  Government knows where you got the test from?

2  A.   That is true, but it's not that important, or that is.

3  Q.   You are legally required under criminal penalties to test

4  every year at your outfall.

5  A.   That's not what I was saying.  What I was saying is if they

6  have calculated the amount of discharge you can have for a given

7  ecosystem and you meet that limit well beyond before you get to

8  that ecosystem, it's okay.

9  Q.   You've seen permits like this that might say, And then it

10 proceeds down Elevenmile Creek to Perdido Bay.  That could have

11 been written here.  It wouldn't make Perdido Bay part of your

12 permit, would it?

13 A.   It depends.  I mean, that's the way it tends to work with

14 the agencies.

15 Q.   Are you here telling the jury that the existence of a

16 stormwater permit excuses compliance with any other permitting

17 law?

18 A.   No.  I'm telling you that this permit has a description,

19 and it's important to DEP that we go by the description in the

20 permit.

21 Q.   But there's no legal way to be out of the compliance with

22 your permit south of your discharge point.  Isn't that true?

23 A.   No, I think there is.

24 Q.   How would they know if you don't legally test it?

25 A.   If we did not have that structure in place while we were

1    discharging down through there, they would say that's out of

2    compliance.

3    Q.   Not if I were your lawyer (audible laugh).

4           THE COURT:  Excuse me?

5           MR. GLASSER:  I -- okay.

6           THE COURT:  Mr. Glasser, come up here, please.

7        *(Following conference held at the bench.)*

8           THE COURT:  You're going to go back to the lectern and

9    you're going to apologize.

10          MR. GLASSER:  All right.  Yes, ma'am.

11       *(End of bench conference.)*

12          MR. GLASSER:  I apologize, Mr. Moore.  I shouldn't

13   have commented on your testimony.

14   BY MR. GLASSER:

15   Q.   In 2012 -- so I think you testified that you felt like,

16   when talking about Exhibit 89, that the idea of going to an open

17   stream was not good until you stopped using that dam area.  But

18   in 2012 that change was made, and you had the pipe to Perdido

19   Bay, right?

20   A.   Yes.  2012, yes.

21   Q.   So after 2012 any objection to removing the dam was mooted,

22   correct?

23   A.   It could have been feasible then, but we would have had to

24   have permitted it and got approval from that DEP.

25          MR. GLASSER:  No further questions.

1          THE COURT:  All right.  On the one issue.  This is not

2     an invitation for a complete recross.

3          MR. NELSON:  Thank you, Your Honor.

4          Can we put back up page 8574, please.

5                        **RECROSS EXAMINATION**

6     BY MR. NELSON:

7     Q.   Mr. Moore, there is a difference between the regulation of

8     effluents and the regulation --

9          THE COURT:  Mr. Vlachos, you're distracting me.  I'm

10    sorry.  I'm going to have to ask you to sit down.  Thank you.

11         Go ahead.

12         MR. NELSON:  Thank you, Your Honor.

13    BY MR. NELSON:

14    Q.   Mr. Moore, is there a difference between regulation of

15    treated effluent and the regulation of stormwater?

16    A.   Yes.

17    Q.   The questions that Mr. Glasser just asked you about outfall

18    points and compliance and criminal prosecution, do those relate

19    to treated wastewater effluent or stormwater?

20    A.   They typically -- they can relate to both.  I mean, I

21    had -- the D-002 is a stormwater discharge at the facility.

22    D-003 is a process wastewater facility.

23    Q.   But if we look at the specific language in the permit under

24    the heading Surface Water Discharge, it says, The on-site

25    impoundment discharges through a 48-inch pipe into Elevenmile

1  Creek south of State Road 186.  Do you see that?

2  A.   Yes.

3  Q.   Is there any 48-inch pipe down around Kingsfield Road other

4  than the one that originates at the drop box by the Kingsfield

5  Road structure?

6  A.   No.  I don't believe so.  No.

7  Q.   So this permit does specifically refer to the Kingsfield

8  Road structure, right?

9  A.   It does.

10         MR. NELSON:  Thank you, Mr. Moore.

11         THE COURT:  All right, Mr. Moore.  You may --

12         MR. GLASSER:  No more questions.

13         THE COURT:  Okay.  You may step down.  Your next

14  witness, Plaintiffs, Mr. Glasser.

15      (Witness excused.)

16         MR. GLASSER:  Mr. Quackenbush, Your Honor.

17         THE COURT:  Do you-all have Mr. Moore under subpoena?

18         MR. GLASSER:  Oh, he can be released, Your Honor.

19         THE COURT:  Mr. Moore, you're released from your

20  subpoena.

21         THE WITNESS:  Okay.  Thank you.

22         THE COURT:  Thank you.

23         I did not see, did someone go to retrieve Mr. --

24         MR. GLASSER:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.

1          Ms. Adams, will you check -- thank you.

2          MR. GLASSER:  May I approach the --

3          THE COURT:  Yes, sir.  Yes, thank you for removing

4     those.

5     **CHRISTOPHER QUACKENBUSH, PLAINTIFF WITNESS, DULY SWORN**

6          DEPUTY CLERK:  Please state your full name and spell

7     your last name for the record.

8          THE WITNESS:  Christopher Alan Quackenbush,

9     Q-U-A-C-K-E-N-B-U-S-H.

10         THE COURT:  All right, Mr. Glasser.  When you're ready

11    you may proceed.

12         MR. GLASSER:  Yes, ma'am.

13                       **DIRECT EXAMINATION**

14    BY MR. GLASSER:

15    Q.   Mr. Quackenbush?

16    A.   Yes.

17    Q.   You work currently at International Paper?

18    A.   Yes, sir.

19    Q.   And how long have you worked there?

20    A.   This is my 30th year.

21    Q.   Are you still an operator at the wastewater treatment

22    plant, sir?

23    A.   Yes, sir.

24    Q.   So in 2014, on April 29, 2014, you were, likewise, a

25    wastewater treatment plant operator?

1  A.   Yes, sir.

2  Q.   In that job you're one of the people responsible for the

3  effluent from the paper mill that we've talked about already in

4  this case; is that right?

5  A.   Yes.

6  Q.   On April 29, 2014, you were scheduled to work the graveyard

7  shift.  Isn't that true, sir?

8  A.   Yes, sir.

9  Q.   Even before you got to the plant, you knew that the paper

10 plant was in outage status for its annual maintenance.  Isn't

11 that true?

12 A.   I don't recall -- I don't recall that.

13 Q.   Okay.  So you don't recall if at the time of the rain on

14 April 29th the plant itself was in outage status such that the

15 water in the plant had been pumped out to the ponds?  You

16 don't --

17 A.   I don't recall that we were in outage.

18 Q.   Is that part of your job to know that, even?

19 A.   Not necessarily, no, sir.

20 Q.   Okay.  You arrived at the parking lot of the plant around

21 9:00 p.m.  Isn't that right, sir?

22 A.   Yes.

23 Q.   You believe you checked in formally around 9:20 p.m.

24 A.   I rung in about 9:10.

25 Q.   Okay.  At the time you arrived, it was raining hard.

1  A.   Very, yes.

2  Q.   The rain made you worry about the state of the ponds and

3  the dam.  Isn't that true?

4  A.   I was concerned, yes.

5  Q.   To your knowledge, nobody had opened the safety valve in

6  the bottom of the dam.  Isn't that true?

7  A.   That's correct.

8  Q.   In fact, to your knowledge, nobody had opened that valve

9  for years; isn't that right?

10 A.   Correct.  Yes, sir.

11 Q.   That's the four-foot-diameter hole.

12 A.   Yes.

13 Q.   In fact, it was not in any condition to be opened.  Isn't

14 that true?

15 A.   Oh, I think it could have been opened.

16 Q.   But no one has?

17 A.   No, sir.  Not that I know of.

18 Q.   You got in the company truck and you drove down to look at

19 the dam.

20 A.   I went to make rounds, the entire wastewater treatment

21 system.

22 Q.   But you went straight to the dam first?

23 A.   No, sir.  That was the last place I went.

24 Q.   So you didn't make any stops on the way down till you got

25 to the dam.  Isn't that true?

1    A.    I checked everything, yes, sir.  I stopped everywhere.  I

2    looked at everything.

3    Q.    On the way down to the dam.

4    A.    Yes, sir.

5    Q.    I'm approaching you with some testimony you gave in an

6    evidentiary hearing here a couple of years ago.  Do you remember

7    giving testimony in this Court before?

8    A.    Yes, sir.

9    Q.    Handing you a copy of that testimony.

10            I'd like to turn your attention to page 53, line 17.

11   The lines are on the left side, sir.  Were you -- read the

12   question that you were asked and the answer that you gave, then

13   look up, and I'll ask you some questions, okay?

14   A.    Did you stop anywhere when you were making your rounds,

15   making your drive?

16   Q.    Hold up.  Just read it to yourself and then I'll ask you.

17   A.    Oh, okay.

18   Q.    All right.  Were you asked the following question:  Did you

19   stop anywhere when you were making your drive?

20   A.    I can't remember -- recall being asked that question

21   exactly.

22   Q.    Okay.  And did you give the answer:  No, no.  I slowly

23   passed the other ponds on the way down, but I pretty much drove

24   straight to the bottom.

25   A.    Well, that's the rounds.  That's how we make rounds.

1    Q.   So when I asked you did you stop before you got to the dam

2    from the parking lot, is your answer today, No, I didn't stop?

3    A.   I don't know if I exactly stopped.  I know I looked at

4    everything.

5    Q.   So two years ago when you testified, was that near in time

6    to the event?

7    A.   I'm sorry?

8    Q.   So the event happened in 2014, right?

9    A.   Yes, sir.

10   Q.   In April.  And then you testified about it -- sorry --

11   May 31st, 2016, first page of that -- well, I'll approach.

12           THE COURT:  That's all right.  That was the date of

13   the hearing.  That's fine.

14   BY MR. GLASSER:

15   Q.   Yeah.  On May 31st, 2016, when you testified about it,

16   isn't it true that you testified that no, no, I slowly passed

17   other ponds on the way down, but I pretty much drove straight to

18   the bottom?

19   A.   I -- honestly, I don't recall exactly saying that I didn't

20   stop.  I did check everything.

21   Q.   All right.  Now, you agree with me that when you got there

22   at 9:00, it was dark.

23   A.   Yes, sir.

24   Q.   It was raining hard.

25   A.   Yes, sir.

1    Q.   Your windshield wipers were on the highest setting?

2    A.   Yes, sir.

3    Q.   You drove -- as you drove, you're on -- is it a dirt or a

4    paved road?

5    A.   It's dirt.

6    Q.   It's a dirt road.  I take it there's not a lot of street

7    lighting down there on the way to the dam.

8    A.   No, sir.

9    Q.   All right.  So it's dark; it's raining hard; the windshield

10   wipers are on; your sole light source is your beams off your

11   truck?

12   A.   Right.

13   Q.   It was no weather to be outside the truck, so you never did

14   get out of the truck on this drive.  Isn't that true?

15   A.   I did not, correct.

16   Q.   You think it took you about 15 minutes to get to the dam;

17   is that right?

18   A.   It took longer than that.  I'm not exactly sure how long,

19   but --

20   Q.   Turning back to the hearing at page 53, can you look at

21   lines 13 through 16; and then when you've read them to yourself,

22   just look up.

23        Were you asked the following question:  And I believe

24   you indicated that your total drive from the top end of the

25   property down to the outfall at Kingsfield was about 15 minutes;

1   is that correct?

2           Were you asked that question?

3   A.   I don't recall that exact question.  I don't recall.

4   Q.   And did -- does the transcript reveal that you gave the

5   answer, yes, sir?

6   A.   It does.

7           MR. GLASSER:  So can I put this on the ELMO, Your

8   Honor?

9           THE COURT:  What else is there to --

10          MR. GLASSER:  Well, there's not.

11  BY MR. GLASSER:

12  Q.   Do you think the court reporter might have taken down your

13  answer wrong?

14  A.   I don't recall.  I don't remember if I answered that.

15  Q.   Are you trying to say what you said before is not true?

16  A.   No.

17  Q.   So it is true that it took about 15 minutes, correct?

18  A.   It probably took me longer than that, but that's obviously

19  what I said in the beginning.

20  Q.   All right.  In any event, we know you checked in at 9:10.

21  A.   Yes, sir.

22  Q.   Now, when you drove down to the dam, you pulled up beside

23  it on that access road, right?

24  A.   Yes, sir, head on to the spillway.

25  Q.   All right.

1          MR. GLASSER:  And may I approach, Your Honor?

2          THE COURT:  Yes, sir.

3    BY MR. GLASSER:

4    Q.   Showing you Exhibit 91, which you were shown at that

5    evidentiary hearing.  Do you recognize this as a photo you've

6    previously used to describe where your truck was parked?

7    A.   I don't recall.

8    Q.   Okay.  But does this photo, Plaintiff's Exhibit 91, show

9    where your truck would have been parked?

10   A.   I was over here.

11   Q.   All right.  So --

12   A.   Facing this way.

13   Q.   All right.  At the top of the photo.

14   A.   But, I mean, a lot of it is gone from when I was there.

15   Q.   I understand.

16   A.   This is not how it looked when I was there.

17   Q.   I understand, but -- so is this -- but this will help the

18   jury orient to where you saw?

19   A.   Yes, sir.  Yes, sir.

20         MR. GLASSER:  Move the admission of Plaintiff's 91.

21         THE COURT:  91 is admitted, Plaintiff's 91.

22      (PLAINTIFF EXHIBIT 91:  Received in evidence.)

23   BY MR. GLASSER:

24   Q.   Okay.  Can you see that, sir?

25   A.   Yes.

1   Q.   So just to orient you, there's the gap where the dam is

2   gone, right?

3   A.   Correct.

4   Q.   And up here, if you would have parked up here, your

5   passenger-side door would be facing the person taking the

6   picture, right?  So you were --

7   A.   South.  Yes, sir.

8   Q.   Yes, sir.  And so your high beams are shooting across on

9   top of this -- on this road right here, right?

10  A.   Correct.

11  Q.   So everything you observed that night, you observed through

12  the windshield of your truck in pouring rain at night, relying

13  on the headlights on that road, right?

14  A.   Yes, sir.

15  Q.   You saw that the water was already overtopping the earthen

16  portion that is sheared away in this picture, 91.  Isn't that

17  true?

18  A.   I saw the water coming over the concrete structure area.

19  Q.   Okay.  So the hearing testimony is still in front of you.

20  Let's turn to page 57.  Can you read to yourself lines 10

21  through 19, sir.

22          Have you read the testimony?

23  A.   Yes, sir.

24  Q.   All right.  You were asked the question, weren't you:  Were

25  you able to determine whether the water was overtopping the

1   earthen berm just adjacent, just to the actual left of the

2   structure?  That was the question you were asked.  Isn't that

3   right, sir?  That's from line 10 to 12.

4           Mr. Quackenbush.

5   A.   Yes, sir.

6   Q.   Were you -- does this transcript reflect that you were

7   asked the question, quote, Were you able to determine whether

8   the water was overtopping the earthen berm just adjacent to the

9   actual left of the structure?

10          And do you see here on Exhibit 91, there's concrete

11  structure, and there's the left of the concrete structure.

12  That's where the earthen berm is missing, right?

13  A.   Yes, sir.  Yes, sir.

14  Q.   All right.  You were asked that question; correct, sir?

15  A.   I was asked if I thought it was going over the earth, yes,

16  sir.

17  Q.   And your answer was:  I would say it was, yes, sir.  It

18  just -- it was just at that point.  I mean, I could still see

19  the earthen berm, but I would say the water was wider than the

20  concrete area at that point.

21          Next question:  So it was up in that earthen area.

22  You would agree with that, correct?

23          Answer:  It was higher.  Yes, yes, higher.

24  A.   It was higher.

25  Q.   So your answer then and your testimony today is when you

1  pulled your truck up there in the rain --

2  A.   Yes, sir.

3  Q.   -- and the windshield wipers were flapping and you were

4  looking through the windshield --

5  A.   Yes, sir.

6  Q.   -- you saw the water over the earthen portion of the dam

7  which is gone.

8  A.   It looked like it was a little wider than the concrete, but

9  I couldn't see the earth.

10  Q.   And your exact answer was then, and is today -- I'm

11  asking -- it was higher; yes, yes, higher.

12  A.   It looked like it -- it could have been higher, yes, sir.

13  Q.   At that time, because of the fact that you were sitting up

14  in your truck, but you were back from the edge of it -- right?

15  A.   Yes, sir.

16  Q.   In your truck?

17  A.   Yes, sir.

18  Q.   Because of the rain, because of the windshield wipers, you

19  could tell the water was above where the earth should have been,

20  but you couldn't tell what was happening under that dark water,

21  could you?

22  A.   It looked like it was high -- all I could see was the

23  handrail of that catwalk, so it looked like it was higher than

24  the earthen -- the concrete structure.

25  Q.   Yes, sir.

1  A.   I could not see it going over the earth, but I'm assuming.

2  It looked like it was higher.

3  Q.   All right.  And the water was up to this --

4  A.   Now, I could see both handrails.

5  Q.   Okay.  These handrails.

6  A.   Yes, sir.

7  Q.   And you don't know if the water was going up or coming

8  down, do you?

9  A.   No, sir.

10 Q.   And you say you checked in at 9:10, and what -- and you got

11 in your truck, and you think you got there by at least 9:45?

12 A.   Yes, sir.

13 Q.   But if it took 15 minutes, it may have been 9:25.

14 A.   I very slowly looked at everything on the way down.  I

15 don't recall the 15 minute question.

16 Q.   All right.  You then turn around and you drive back up,

17 right?

18 A.   Yes, sir.

19 Q.   As you drive past the ponds, it's obvious to you that

20 they're overflowing; is that right?

21 A.   The only spot that water was moving on the road was at the

22 south end of Number 2 pond.  I could not tell if it was exactly

23 coming out -- where it was coming from, but that was the only

24 place the water was moving.  Everywhere else it was just

25 standing.

1    Q.   So the water is coming over the dam, and over the earthen

2    portion; and as you're driving back up, the ponds are

3    overflowing.

4    A.   It looked -- the only place I saw water moving was the

5    south end of Number 2 pond.

6    Q.   It was overflowing.

7    A.   I can't tell you for sure if the pond was overflowing.

8    That's the only place it was moving.

9    Q.   It continued to rain into the night.  Isn't that true,

10   Mr. Quackenbush?

11   A.   Yes, sir.

12   Q.   You recall that about the time you went off shift, about

13   6:30 a.m. in the morning, it had converted to drizzle; is that

14   right?

15   A.   I believe so, yes, sir.

16   Q.   So you saw the dam overflowed relatively early in that

17   night, since it rained till the morning.

18   A.   Yes, sir.

19           MR. GLASSER:  No further questions, Your Honor.

20           THE COURT:  All right.  Thank you.

21           Mr. Hill.

22           MR. HILL:  May it please the Court.

23           THE COURT:  Yes, sir.

24

25

**CROSS-EXAMINATION**

BY MR. HILL:

Q.   Mr. Quackenbush, I want to start with where we kind of

ended off, and then I'm going to circle back and ask you a few

other questions.

            When you were at the Kingsfield Road area and you were

parked there, with your headlights shining over, you mentioned

that you could see the top two railings of that catwalk, right?

A.   Clearly.

Q.   So from the catwalk and that concrete structure, does the

berm area then rise from that area up to the area where your

truck would have been parked?

A.   Yes, sir.

Q.   So you could see down to where the concrete structure was

and see the two rails.

A.   Yes.

Q.   And you could see part of the earthen berm that ran down.

A.   Yes, sir.

Q.   And you said that water was coming over part of the earthen

berm and the concrete structure, right?

A.   It looked a little wider than the concrete, higher and a

little wider.

Q.   A little wider.  How far up that slope?  Was it anywhere

close to your truck?

A.   No, sir.

1    Q.   So we saw that big gap in the picture.  It was nothing like

2    that, was it?

3    A.   Oh, no.

4              MR. GLASSER:  Objection, Your Honor.  Foundation.

5              THE COURT:  He was there.  Overruled.

6              MR. GLASSER:  He said he couldn't see through water.

7              THE COURT:  Overruled.

8    BY MR. HILL:

9    Q.   So you could see water on part of the berm down close to

10   the concrete structure?

11   A.   Yes, sir.

12   Q.   But the rest of the berm was still there intact.

13   A.   Yes, sir.

14   Q.   And it wasn't a big gully like we've seen in the picture

15   that was just shown to you.

16   A.   No, sir.

17   Q.   Everything was intact and was working properly?

18   A.   Yes.  I was very pleased with what I saw.

19   Q.   And why did you go all the way down there if that structure

20   had been abandoned?

21   A.   Well, I wouldn't say it was abandoned.  We checked it

22   daily, but -- see, it had rained all day long at my house, so I

23   was concerned about -- and I don't think anyone else had been

24   down there that evening, afternoon.  I just wanted to go down

25   and see, make sure, see what was going on.

1  Q.   Okay.  So now that takes me to where I want to go back to.

2  I want to start with the point in time when you were still in

3  your house.

4  A.   Yes, sir.

5  Q.   So where do you live?

6  A.   On the beach.

7  Q.   So you live on Pensacola Beach, so --

8  A.   Yes, sir.

9  Q.   -- how do you come in to work?

10 A.   Across the bridges, up the interstate, and up Highway 29.

11 Q.   So when you're heading up Highway 29, how long does it

12 take you to get from the interstate up Highway 29 to the mill?

13 A.   Probably 10 minutes, maybe.  15 minutes, maybe.

14 Q.   That night when you left your home, what were conditions

15 like at your home on Pensacola Beach?

16          MR. GLASSER:  I object on relevance.

17          THE COURT:  All right.  Overruled.  I'll allow this.

18 BY MR. HILL:

19 Q.   What were the conditions like, Mr. Quackenbush?

20 A.   It varied.  It had been raining almost all day,

21 torrentially raining.  And there was water puddling on the

22 interstate.  It was passable, but it was -- there was water

23 everywhere, standing every -- all the sides of the roads were

24 flooded.  It was really bad.

25 Q.   Did you leave your house early because of the weather

1   conditions?

2   A.   Yes, sir, I did.

3   Q.   Did you plan on trying to get to work early?

4   A.   Yes, sir.

5   Q.   What time do you normally get to work?

6   A.   Normally 10:15.

7   Q.   And so you were about an -- over an hour early.

8   A.   Yes, sir.

9   Q.   Okay.  What was the roughest part?  You described some of

10  the interstate and coming across the bridges and what have you.

11  A.   Yes, sir.

12  Q.   What was the roughest part that you faced when you were

13  driving up to the mill?

14  A.   When I went -- after I went through the traffic light on

15  Kingsfield Road, 29 dips down.  And the water got really deep

16  there.  And I got caught at the traffic light at Chemstrand

17  Road, where the Winn-Dixie and the Burger King is; and the water

18  was very, very deep there.  When the light changed and I started

19  to go through the intersection, it was buffering, pushing back

20  on my truck, the water, because the water was running east to

21  west.  And I actually saw a Dumpster float across in front of

22  me.

23  Q.   I'm sorry.  You saw a what?

24  A.   A Dumpster.  A big metal garbage Dumpster, commercial

25  garbage Dumpster.

1    Q.    Like one of the ECUA Dumpsters?

2    A.    Yes, sir.

3          MR. HILL:  Could we pull up demonstrative on the

4    Chemstrand Road, and just for the witness to see it?

5    BY MR. MARSHALL:

6    Q.    Okay.  Is this a map that depicts with the labels of where

7    the old Chemstrand Road is and the McDonald's?

8    A.    Yes, sir.  Right in between the McDonald's and the Burger

9    King is Chemstrand to the right, yes, sir.

10   Q.    Does that accurately depict the area where you were driving

11   that night?

12   A.    Yes, sir.

13         MR. HILL:  Your Honor, request permission to publish

14   to the jury.

15         THE COURT:  I'll allow it.

16   BY MR. HILL:

17   Q.    All right.  So if we could, let's zoom in on the McDonald's

18   and the Burger King area.

19         So Kingsfield Road runs east and west, basically, in

20   that area?

21   A.    Yes, sir.

22   Q.    And the Kingsfield Road dam is over to the left off of this

23   little inset, right?

24   A.    Correct.

25   Q.    All right.  So you were heading north on Highway 29.

1   A.   29, yes, sir.

2   Q.   And as you went through that traffic light, you said the

3   water was so deep that you were worried about your vehicle?

4   A.   My car started to stall.  I thought it was going to stall

5   out, so I kept buffering my accelerator to try to keep it going.

6   That's when the front end was getting pushed back from the water

7   a little bit.  I could feel the car wanting to come up a little

8   bit as -- I didn't think I was going to make it through.  I was

9   surprised that I did.

10  Q.   So is this the area where the -- you saw the Dumpster?

11  A.   Yes, sir.

12  Q.   And is it true that the Dumpster was basically floating

13  across Highway 29?

14  A.   Yes.  Yes, it was.  It was moving pretty quickly.

15  Q.   Do you know where it wound up?

16  A.   I saw it several days coming and going from work, sitting

17  up along the railroad tracks on the west side of Highway 29.

18  Q.   So the Dumpster that you personally observed the night of

19  the storm, when you were coming in to relieve your -- relief at

20  the mill, you saw later, on the opposite side of the highway, up

21  against the railroad tracks.

22  A.   Yes, sir.  For several days it sat there, yes.

23          MR. HILL:  Could we pull up IP Exhibit 44, please.

24          THE COURT:  Is this 44?

25          MR. HILL:  I'm sorry.  It's not 44.

1          THE COURT:  That's not admitted.  Is this an actual

2   exhibit or is this a demonstrative?

3          MR. HILL:  I'm sorry, Your Honor?

4          THE COURT:  Is this an exhibit?

5          MR. HILL:  It is a photograph.

6          THE COURT:  But, I mean, was it just a demonstrative

7   aid or is this something you're going to seek to admit?

8          MR. HILL:  The photograph is something that we're

9   seeking to admit.  It's an IP exhibit, Number 47, I think.

10         THE COURT:  47.

11         MR. HILL:  I'm sorry.  It's 45.  I'll get it straight,

12  Your Honor.

13         THE COURT:  Okay.

14         MR. GLASSER:  Objection, relevance.

15         THE COURT:  I'll allow it.

16         Tell me again.  This is along Highway 29 at Kingsfield

17  Road or Chemstrand Road?

18         MR. HILL:  Right.  Chemstrand Road.

19         THE COURT:  Chemstrand.  All right.  I'll allow it.

20  So that's admitted.

21         MR. HILL:  Okay.

22     *(DEFENSE EXHIBIT 45:  Received in evidence.)*

23         MR. HILL:  Would you -- thank you.  And my drawing is

24  still on there, I got to figure out how to undo it.

25

1    BY MR. HILL:

2    Q.   Can you show us -- there's a pen, I think, in front of you,

3    a white pen.

4    A.   Okay.

5    Q.   Can you show us where the Dumpster is that's in that

6    photograph?

7    A.   Right here.

8    Q.   Does that appear to be the Dumpster that you saw floating

9    across --

10   A.   It looks like it.  I remember the white sticker.  That's

11   how I realized what it was as it was going across.  That's when

12   I realized it was a Dumpster, because of that big white sticker.

13   There wasn't a whole lot of the Dumpster above the water level.

14   A lot of it was below it.  I could see the top half of that

15   sticker.  That's when I realized that that's what it was.

16   Q.   Now, you mentioned that you traveled back and forth that

17   way to work in the days following the storm as well.

18   A.   Yes, sir.

19   Q.   And you also saw something else over there by the railroad

20   tracks?

21   A.   There was an ice chest, like a big commercial "buy a bag of

22   ice" ice chest.  I believe it was a two-door.

23   Q.   Let's --

24         MR. HILL:  If we could, I'd like to show the witness

25   IP Exhibit 43.

1          THE COURT:  Okay.  Mr. Glasser, do you object to this

2    as well?

3          MR. GLASSER:  Yeah.  Can I -- do I have to object

4    every time?  Can I have a standing objection to relevance on

5    pictures that are not in the, you know --

6          THE COURT:  In the class area?

7          MR. GLASSER:  Elevenmile Creek above the class area.

8          THE COURT:  Okay.  You can have a standing objection,

9    and those will be overruled.

10          MR. HILL:  Yes, ma'am.

11          THE COURT:  Now, if we move past this, you'll need to

12    object.

13          MR. GLASSER:  Okay.  Yes, ma'am.

14          THE COURT:  Thank you.  43 will be admitted.

15          MR. HILL:  Thank you, Your Honor.

16          (DEFENSE EXHIBIT 43:  Received in evidence.)

17    BY MR. HILL:

18    Q.    All right.  So now your drawing from before is on --

19    A.    How do you erase that?

20    Q.    Actually, you're drawing from before may be okay.

21    A.    It's pretty close, isn't it?

22    Q.    Is that now kind of circling where the white --

23    A.    Yes.  That's it right there.

24    Q.    -- ice chest --

25    A.    Sorry.  I made it worse.

1   Q.   And is that on the same side of the highway as the Dumpster

2   was in the prior photograph?

3   A.   It's on the same side as the Dumpster, the west side,

4   alongside the railroad tracks.

5           THE COURT:  So you can't get the markings off?  Is

6   that --

7           THE WITNESS:  I don't --

8           THE COURT:  Ms. Simms, I need you to help -- oh, there

9   we go.

10          THE WITNESS:  There we go.

11          MR. HILL:  I think I managed, finally.

12  BY MR. HILL:

13  Q.   Can you show us where the icebox was located?

14  A.   That's it right there.

15  Q.   And was this a small ice chest or is this like a -- one of

16  the commercial iceboxes that sits out in front of a convenience

17  store?

18  A.   It was the big one that sits out in front of a convenience

19  store.

20  Q.   And you saw that several times as you went back and forth

21  to work?

22  A.   Coming and going from work after, yes.

23  Q.   I want to go back to the point in time when you got through

24  that intersection and were heading to the plant.

25  A.   Yes, sir.

1    Q.    Did you call anyone at the mill at any point in time?

2    A.    I'm pretty sure I called Ms. Pat before I got there.  I

3    know I called her when I got there, but I know I talked to her

4    before I saw her.

5    Q.    And is Ms. Pat -- Ms. Pat --

6    A.    She was working 3:00-to-11:00s.  She was at the control

7    room.

8    Q.    All right.  So she was the person you were going to

9    relieve?

10    A.    Yes, sir.

11    Q.    Do you remember her last name?  Pat Lockridge?

12    A.    Yes.

13    Q.    When you called her, what was she doing?

14    A.    She was in the control room.  She had told me she had been

15    in -- talked with other coworkers and had already done all she

16    could do to try to catch water.

17    Q.    Okay.  Now, when you got there and you relieved Ms. Pat, is

18    that after you made your rounds?

19    A.    That was -- I asked her if she could stay in the control

20    room.  I wanted to make rounds while somebody was in the control

21    room, and then I'd come back up and get her out of there so she

22    could try to get home.

23    Q.    And so you relieved her after you went down and you were

24    looking at the Kingsfield Road area.  It was after that that you

25    relieved her and she could go home?

1    A.    Yes, sir.

2    Q.    All right.  When you were making your way down to the

3    Kingsfield Road area, making your rounds, and you observed the

4    ponds --

5    A.    Yes, sir.

6    Q.    -- were they full?

7    A.    Yes, sir.

8    Q.    All of them were completely full?

9    A.    Yes, sir.

10   Q.    Had you ever seen that before?

11   A.    No.

12   Q.    And how many years have you been working around these

13   ponds?

14   A.    Directly around the ponds for almost 25.

15   Q.    25 years.

16   A.    Yes, sir.

17   Q.    And you had never seen these ponds at full capacity.

18   A.    No, sir.  No, sir.

19   Q.    But you did that night.

20   A.    Yes, sir.

21   Q.    And that's the same night that you saw the Dumpster

22   floating across the road in front of you.

23   A.    Yes, sir.

24   Q.    How long have you lived in Florida?

25   A.    32, 33 years.

1    Q.    And on the beach?

2    A.    I've been out there 20, about 20.

3    Q.    Have you ever seen a rain event like the rain event of

4    April 29?

5    A.    No.

6    Q.    You never --

7    A.    Never in my entire life have I seen rain like that.

8              MR. HILL:  Could I have one moment, Your Honor?

9              THE COURT:  Yes.

10             MR. HILL:  That's all I have, Your Honor.

11             MR. GLASSER:  I don't have any more questions for this

12   witness.

13             THE COURT:  Okay.  Thank you.  Sir, you may step down.

14       (Witness excused.)

15             MR. GLASSER:  And he may be released as well.

16             THE COURT:  Mr. Quackenbush, you're released from your

17   subpoena.

18             THE WITNESS:  Thank you.

19             THE COURT:  Your next witness.

20             MR. VLACHOS:  Your Honor, at this time we'd like to

21   call Mr. Pat Giddins.

22             THE COURT:  Okay.

23        **CHARLES EDWARD GIDDINS, PLAINTIFF WITNESS, DULY SWORN**

24             DEPUTY CLERK:  Be seated.  Please state your full name

25   and spell your last name for the record.

1          THE WITNESS:  Charles Edward Giddins, G-I-D-D-I-N-S.

2          THE COURT:  Sir, if you wouldn't mind moving your

3   chair closer to the device with the red dot in front of you.

4          THE WITNESS:  Sure.

5          THE COURT:  That's your microphone.  All right.  Thank

6   you.

7          All right, Mr. Vlachos.  Go ahead.

8          MR. VLACHOS:  Thank you, Your Honor.

9                         **DIRECT EXAMINATION**

10  BY MR. VLACHOS:

11  Q.   Good afternoon, Mr. Giddins.  Do you recall giving a

12  deposition in this case back in July of 2015?

13  A.   Yes.

14  Q.   Okay.  Where do you live, sir?

15  A.   I live in McDavid, Florida.

16  Q.   And how long have you lived in McDavid, Florida?

17  A.   It's not really McDavid.  It's Walnut Hill area.  I've

18  lived there 42 years.

19  Q.   Okay.  So the date of this storm event that we're talking

20  about on April 29th of 2014, you lived at that McDavid address

21  and drove from the north of the mill to the mill, correct?

22  A.   Yes, I did.

23  Q.   And I believe in that deposition -- do you recall

24  testifying at your house you only got three inches of rain?

25  A.   That's about right, yes.

1   Q.   Wasn't an extraordinary catastrophic rainstorm, was it?

2   A.   Not at my house, no.

3   Q.   And, sir, who do you work for?

4   A.   I work for Reed maintenance company out of Huntsville,

5   Alabama.

6   Q.   And before that, it's my understanding you worked for PSI,

7   which was the pre-company that bought a contract that does work

8   at IP; is that correct?

9   A.   Yes.

10   Q.   How long in total have you worked for a contractor at IP or

11   International Paper?

12   A.   Approximately 18 years.

13   Q.   And what was your position at the time of the storm in

14   2014?

15   A.   I was the site manager for Reed.

16   Q.   Okay.  And what were your duties as site manager under that

17   contract with International Paper?

18   A.   I basically handled all the men and equipment, put them on

19   the jobs that was to be done for the mill, and to inspect and --

20   all the ponds, levees and everything.  In turn, they'll --

21   mainly pertaining to wastewater and woodyard.

22   Q.   Do you recall testifying that your job was to oversee and

23   work around ponds and levees and solid waste removal and

24   maintain the integrity of the levees?  Do you recall that?

25   A.   Yes.

1    Q.   Is that fair?

2    A.   Yes.

3         MR. MELTZER:  Objection, Your Honor.  Improper use of

4    prior depositions.  You should ask the question first --

5         THE COURT:  Right.  You should ask the question first

6    and then have him read the testimony.

7         MR. VLACHOS:  Understood.

8         THE COURT:  All right.  Thank you.

9    BY MR. VLACHOS:

10   Q.   Do you also recall that you maintained and repaired the

11   erosion roads and ponds following rainstorms?

12   A.   We maintained all the levees, any washouts, any stormwater

13   ditches, vegetation growing in ditches.  Just basically anything

14   pertaining to stormwater or ponds that needed to be done.  We'd

15   recommend it.  The mill would decide when to do it and what to

16   do.

17   Q.   Do you recall testifying about wanting to maintain?

18        MR. MELTZER:  Your Honor, same objection.

19        THE COURT:  Let me ask you both to approach.  Mr.

20   Nelson, would you --

21      *(Following conference held at the bench.)*

22        THE COURT:  I think you need to ask the question --

23        MR. VLACHOS:  Sure.

24        THE COURT:  -- because you're reading, you know, his

25   testimony without him having an opportunity to do so prior to --

1          MR. VLACHOS:  I'm just asked him if he recalled

2    testifying, but I'll change it.  That's fine.

3          THE COURT:  Okay.  Thank you.

4      *(End of bench conference.)*

5          THE COURT:  Okay.  Mr. Vlachos, go ahead.

6    BY MR. VLACHOS:

7    Q.   Was it your position that you -- as a Reed construction

8    employee that you wanted to maintain two and a half feet of

9    freeboard at the levee tops around the ponds?

10   A.   Yes.  Minimum of two and a half foot.

11   Q.   Pardon me?

12   A.   Minimum of two and a half, yes.

13   Q.   And why is that?

14   A.   Well, that's to allow any normal rainfall or anything,

15   allow room for ponds to expand due to water.

16   Q.   Do you recall what time you arrived at the plant on

17   April 30th?

18   A.   It was around -- it was between 6:00 and 6:30.  Normally

19   around 6:15.

20   Q.   And what did you do when you arrived at the plant?

21   A.   I seen there was an excessive amount of water at Gate 7,

22   where we sign in at.  There was water everywhere, just as we was

23   getting into the mill.  And we could tell there'd been an

24   extreme amount of water fell in that area.  So the first thing I

25   did was I went to the east decant basin, surge basin, and M1.

1    That's ponds that's up on the hill that would possibly -- could

2    possibly overflow with too much water.  They were the highest

3    elevated ponds.  Those ponds were in good shape.

4    Q.   And you worked your way down towards the Kingsfield Road

5    dam structure; is that correct?

6    A.   Yes, I did.

7             THE COURT:  Could I ask you to -- would you mind

8    asking the witness to restate the areas that he looked at first

9    that he just --

10            MR. VLACHOS:  Sure.

11   BY MR. VLACHOS:

12   Q.   Where did you first start out at the mill?

13   A.   I started out -- I went by the surge basin.  That's beside

14   wastewater.  Went on up to M1, which is just a cell, a holding

15   cell, and east decant basin.  That's just how the mill

16   identifies these two particular cells.

17            THE COURT:  What was the one after M1?

18            THE WITNESS:  M1 and east decant.

19            THE COURT:  Thank you.

20            THE WITNESS:  And that's just what the mill calls

21   these particular cells.

22            MR. VLACHOS:  I think to help us we'll bring up

23   Exhibit 82.

24            THE COURT:  That's a good idea.

25            MR. VLACHOS:  Try to get the technology to help us

1    here.  And then we'll publish when it's up.

2            THE COURT:  We have a drawing or schematic of the

3    area.

4            THE WITNESS:  Sure.

5            THE COURT:  So that's what he's going to pull up now.

6            MR. VLACHOS:  We'll do it the old-fashioned way.

7            THE COURT:  All right.

8            MR. VLACHOS:  There we go.

9    BY MR. VLACHOS:

10   Q.  Does that help identify where you would have started out,

11   being the left-hand side would be north and the -- where the

12   plant would have been, to the mill?

13           Mr. Giddins, do you recognize this as the general

14   layout?  I know it's not exactly to scale.

15   A.  Yeah.  I am just trying to figure out how everything is

16   laid on this piece of paper and the way -- from the way that I

17   remember it.

18           There's M1, yes.  Those two right there where it says

19   M1 and east decant basin, it's wrote on the thing --

20   Q.  Why don't you do this.  There's a little pen up there.  If

21   you want to mark where you first went, we can number, if you

22   will, where you would have started out and what you looked at.

23   A.  When we come in, we come in -- up -- and go between these

24   two ponds.  I don't see it -- there it is.  These decant basin

25   and M1.  We go through there, and we go down the levee on this

1   side, and we come -- should be pond 1, pond 2.  I went between

2   them two ponds.  Pond 3, pond 4, and then --

3   Q.   Let me stop you right there.  When you were up at the

4   first -- the first thing you marked, I believe, was the east

5   decant basin.

6   A.   Right.

7   Q.   Was that full of water?

8   A.   It had water in it.  It was not overflowing.

9   Q.   Okay.  But it was full of water.

10  A.   It had a lot of water.

11       THE COURT:  I think M1 was the first?  Is that right?

12       THE WITNESS:  Well, you actually go between the two of

13  them.

14       THE COURT:  Okay.

15       THE WITNESS:  So it's one on the left, one on the

16  right, down the levee.  So probably I'd get to the east decant

17  basin first because it's the first one on top of the levee.

18  BY MR. VLACHOS:

19  Q.   Let me ask you this:  Was there two -- would this be one of

20  those structures you wanted two and a half feet of freeboard on?

21  A.   Oh, yeah.  You always want two and a half foot of freeboard

22  on --

23  Q.   Was there two and a half feet of freeboard when you went

24  there that morning?

25  A.   Probably at this time there was probably -- probably not.

1    There probably was more than two foot in the east decant but a

2    little less than two foot in M1.

3    Q.    Let's go down as you kind of head south.

4    A.    Okay.  Go down -- head south between pond 1 and 2, pond 1

5    being when you headed south on through the mill.  Pond 1 being

6    on the right, pond 2 on the left.  Then you come to pond 3.

7    Q.    Let's stop at ponds 1 and 2.

8    A.    Okay.

9    Q.    What was their condition as far as being full and having

10   two and a half feet of freeboard?

11   A.    They didn't have any freeboard.  There was a complete lake

12   from pond -- coming out of the -- from wastewater, all the ponds

13   looked like one complete sheet of water down -- from pond to

14   pond.  The roads were open and it hadn't run out in the roads,

15   but the ponds was one level sheet of water from --

16   Q.    So to describe for the jury, as you're looking down towards

17   Kingsfield, it just looked like one lake from down there --

18   A.    From there to pond 4.  Pond 4 is where the water goes out.

19   The outfall box in the back.

20   Q.    And at some point did you meet up with Mr. Yuhasz?

21   A.    Talked to Mr. Yuhasz at the bottom of pond 4.  We looked at

22   pond 4.  The water was discharging through the pipe as normal.

23   It was flowing.  Then we went -- he went on down to Kingsfield,

24   and I waited around just a little bit to watch the water and see

25   what the water was doing.  And then I went on down to

1    Kingsfield, probably -- not over three or four minutes behind

2    him.

3    Q.    You met him at the -- what would have been the ECUA outfall

4    structure where the pipeline started; is that correct?

5    A.    Yeah, that's where I -- that's where I met him at, yes.

6    Q.    And then he had his -- he had his own truck.  You were in a

7    Reed truck; is that correct?

8    A.    That's right.

9    Q.    And then at some point you went and met him at the

10   Kingsfield Road structure?

11   A.    Right.  He went down and then I went on down because we

12   always checked the structure and everything after a rain event.

13   We checked the structure pretty much every day, period.

14          MR. VLACHOS:  This has not been published yet, so I'm

15   going to have to go off line here.

16          THE COURT:  Thank you.

17   BY MR. VLACHOS:

18   Q.    Can you see that on your screen, Mr. Giddins?

19   A.    I sure can.

20   Q.    You didn't take any photographs that day; is that correct?

21   A.    I did not.

22   Q.    But you were with Mr. Yuhasz, correct?

23   A.    I was with Mr. Yuhasz when this picture was taken, yeah.

24   Q.    So you recognize this photo, correct?

25   A.    Yes, I do.

1   Q.   And this was taken the morning of April 30th, 2014,

2   correct?

3   A.   That's correct.

4        MR. VLACHOS:  I move -- plaintiff's trial Exhibit 92

5   and ask for it to be published to the jury, please.

6        THE COURT:  92 is admitted.  And you may publish it.

7        *(PLAINTIFF'S EXHIBIT 92:  Received in evidence.)*

8   BY MR. VLACHOS:

9   Q.   Where were you in relation to Mr. Yuhasz?  Were you

10  standing next to him or were you --

11  A.   We were standing right next to one another on the bank

12  there, yes.

13  Q.   Do you recall what time of day it was?

14  A.   It was between 7:00 and 7:30.  The exact time I don't know,

15  but it was between 7:00 and 7:30.

16  Q.   So split the difference, 7:15?

17  A.   That's good with me.

18  Q.   Okay.  And as you recall on the way down there, were any

19  roads flooding or anything overtopping when you were on your way

20  to the Kingsfield structure?

21  A.   I didn't notice any roads that was over -- because there

22  was some washing to the right side of the road going to

23  Kingsfield, but there was no washouts when we went down.  There

24  was water in all the roads, but it was rainwater from so much

25  rain.

1   Q.   Do you recall that you had barricaded areas off between the

2   ponds?

3   A.   Then?

4   Q.   Yes, that you had -- that you were barricading off roads

5   between the ponds.

6   A.   Oh, we always -- when we got that much water, you always

7   barricade roads to keep somebody from driving into a pond or

8   something.  That's why we put up barricades.

9   Q.   Was there so much water that you were worried about people

10  driving into a pond?

11  A.   Sure.  There was enough water that people could have drove

12  into it.  I told you it was a complete sheet of water from the

13  front to the back.  There's roads between each one of these

14  ponds.

15  Q.   Okay.

16  A.   Mill people knows where they at.  Other people,

17  contractors, different ones coming in don't know where

18  everything is.

19  Q.   And I believe you've previously testified that -- strike

20  that.

21       As part of your maintenance out there, you check the

22  outfall box structure on a daily basis; is that correct?

23  A.   Yeah.  The one at Kingsfield?

24  Q.   Yes.

25  A.   Yes.

1    Q.    And how often would you clean it?

2    A.    As needed.  Normally -- it depended on the weather, of

3    course.  If we had quite a bit of rain, like in the rainy

4    season, we'd probably clean it every week or every two weeks and

5    right after a rain, a big rain.  If not, we would inspect it.

6    If there was no debris around the grating, then it wasn't

7    necessary to clean it.

8              MR. VLACHOS:  James, can you put on Plaintiff's

9    Exhibit 180E.  This one shouldn't be published either.

10             THE COURT:  We're going to need to take our recess

11   when it's -- we could go another five minutes or so or we could

12   stop now.

13             MR. VLACHOS:  We could stop now and I'll get the

14   pictures.

15             THE COURT:  All right.  Ladies and gentlemen, we'll be

16   in recess, for your comfort, for the next 20 minutes.  Please

17   don't discuss the case during the recess; and also, as always,

18   please don't begin to form any opinion yet about the merits.

19   We'll see you back shortly.

20        *(Jury excused.)*

21             THE COURT:  Mr. Giddins, you may step down.  You'll be

22   back on the stand in 20 minutes.  Please don't discuss your

23   testimony with anyone during the recess.

24             All right.  Be seated, please.

25             Mr. Vlachos and Mr. Meltzer, if you want to come up

1    just for a moment.

2         *(Following conference held at the bench.)*

3              THE COURT:  So I just want to explain to you why I

4    called you out and said you were distracting.  There were

5    several back and forth between you and counsel table and the --

6    I guess these are the class members.

7              We don't have a real division between the well and the

8    gallery area of the courtroom.  You were very close to the jury

9    box, and I noticed jurors -- those two at the end paying more

10   attention to you than they were to the witness --

11             MR. VLACHOS:  Okay.

12             THE COURT:  And so I felt like I had to say something.

13             MR. VLACHOS:  I understand.  I'll be respectful of

14   that, Your Honor.  Sorry.

15             THE COURT:  I just wanted to explain why.

16             MR. VLACHOS:  Thank you.

17        *(End of bench conference.)*

18             THE COURT:  We'll be in recess for the next few

19   minutes.

20        *(Recess was taken from 3:24 to 3:45 p.m.)*

21             THE COURT:  Mr. Giddins, you're still under oath.

22   Mr. Vlachos, you may proceed.

23             MR. VLACHOS:  Thank you, Your Honor.

24             James, can you bring up 180 -- plaintiff's 180E,

25   please.

1          MR. MELTZER:  What number is it?

2          MR. VLACHOS:  180E.

3          MR. MELTZER:  Your Honor, objection.  Permission to

4    approach.

5          THE COURT:  All right.

6        (Following conference held at the bench.)

7          MR. MELTZER:  Mr. Vlachos gave me these and said he

8    intends to show them.

9          MR. VLACHOS:  I'm not moving them in, either of those.

10   Just E.

11         MR. MELTZER:  Okay.  These were taken more that seven

12   months after the event.

13         THE COURT:  Okay.  He's not moving -- just E.  So any

14   objection to E?

15         MR. MELTZER:  Yes, Your Honor.  I would say to the

16   extent he's going to suggest that's what it looked like at the

17   time of the event, that would be prejudicial.  These were taken

18   in December of 2014, more than seven months after the event.

19         THE COURT:  So what's the point of this?

20         MR. VLACHOS:  He can identify that that's the box

21   structure.

22         MR. MELTZER:  They could just --

23         MR. VLACHOS:  He's worked down there.  He cleaned it.

24   It doesn't -- it's not -- it shows that the grates were there.

25   He can testify whether those -- you know, this is within a year

1    later.

2              MR. MELTZER:  A year later.

3              MR. VLACHOS:  I think he can testify to that.  It

4    hasn't been altered or changed.  He can say I either recognize

5    it or I don't.

6              THE COURT:  I'll allow it.  You can cross on it.

7         *(End of bench conference.)*

8              THE COURT:  All right.  Go ahead.  180E is admitted.

9         *(PLAINTIFF'S EXHIBIT 180E:  Received in evidence.)*

10             MR. VLACHOS:  Can you please publish for the jury?

11   BY MR. VLACHOS:

12   Q.   Mr. Giddins, do you recognize this as the outfall or drop

13   box structure?

14   A.   It looks like it, but I can't say a hundred percent that

15   that's it.

16   Q.   Were there times that you went to clean out this structure?

17   You talked about cleaning out an outfall box; is that correct?

18   A.   Right.

19   Q.   Okay.  Was this the outfall box that you talked about in

20   your deposition?

21   A.   It looks like it, but you don't have all the surrounding

22   vegetation and area around.  It could be a drop box anywhere.

23   Q.   Okay.  But does this -- there was a catwalk structure,

24   correct?

25   A.   Right.

1   Q.   Does that -- if -- does that represent that -- what you

2   recall, the out box structure looking like that you cleaned out?

3   A.   It looks something like this, but you don't have a complete

4   picture of everything around this.  Are you talking about the

5   outfall box that's up to the front of the pond, or are you

6   trying to talk about the structure that had an outfall box down

7   that way?  I mean --

8   Q.   There's the dam structure which was -- I'm going to show

9   you another picture.

10  A.   This picture is not clear.

11  Q.   Maybe this will help you.

12       Can we go to the ELMO, please?

13  A.   Okay.  The outfall box we cleaned out is to the left there.

14  Yes.  Now I recognize the whole picture.

15  Q.   Okay.  Does that help you going -- back to Exhibit 180E, it

16  gives you some perspective, correct?

17  A.   Yes, it does.

18  Q.   Does that outfall box depict the -- where the water would

19  have gone to drain under Kingsfield, to your understanding?

20  A.   Yes.  Through the -- through those rails and over the top.

21  There's a set of bars over the top.  Basically what those bars

22  are there for is to keep any large wood or limbs from going into

23  the pipe.

24  Q.   Okay.  And I believe you testified on occasion,

25  approximately once a year, you would bring down a backhoe to

1  clean out that structure area, correct?

2         MR. MELTZER:  Objection.  That testimony is not

3  applicable today.

4         THE COURT:  I think -- Mr. Vlachos, can you just ask

5  him and then -- what his testimony is today about that issue;

6  and then to the extent there's an inconsistency, then we can

7  refer to -- you can refer to the deposition.

8  BY MR. VLACHOS:

9  Q.   Prior to 2014, in your employment with Reed, would you on

10 occasion periodically, sometimes semiannually, take a backhoe

11 down to clean out that structure?

12 A.   There was no set amount of times that we cleaned it out

13 with a backhoe.  We cleaned out with a backhoe as necessary.  If

14 we went down and seen debris around the thing and it warranted a

15 backhoe, we used a backhoe.  If it was a minor amount of stuff

16 and we could remove it without using a backhoe, that's what we

17 did.  We cleaned it out anywhere from once a month to every two

18 months to every three months, depending -- a lot of it depended

19 on the rain.  If we didn't get a lot of rain, then there wasn't

20 a lot of debris or water went to that box.

21 Q.   Do you recall, prior to April of 2014 and the year prior,

22 how many times you would have used a backhoe to clean out this

23 area?

24 A.   Normally, about every 30 to 60 days, we would use the

25 backhoe.  And like I say, again, it's all according to how much

1    water we got.

2            MR. VLACHOS:  May I approach, Your Honor?

3            THE COURT:  Yes, sir.

4    BY MR. VLACHOS:

5    Q.   Just read that testimony to yourself, starting on about

6    line 9, page 38.

7            Do you recall being asked how often you took a backhoe

8    down to that area?

9    A.   I don't remember but it's possible I was asked.

10   Q.   Well, does that -- was that your testimony, sir?

11   A.   It says we didn't use a crane; we used an excavator or a

12   backhoe.  That's over a long period of time.  Usually about once

13   a year for the -- with the excavator.

14   Q.   So you just said -- your testimony is you used an excavator

15   once a year to clean that out; is that correct?

16   A.   As needed.  It depends on how much stuff that's in there

17   and how much debris moves into the place.  Also depends on how

18   much vegetation grows up because of no water going down the

19   ditch.

20   Q.   But as we sit here today, and going back in time, you don't

21   recall when the last time prior to April of 2014 which you used

22   an excavator to clean out this area, do you?

23   A.   I don't remember whether it was an excavator or backhoe.

24   But if you'll look on the -- probably on the mill records,

25   you'll probably find an SWR, which is a -- a CWR, a contractor

1   weekly report.  It'll tell you what -- when the last time it was

2   done.  And I think it was the week of April the 20th.

3   Q.   April 20th.  Okay.

4   A.   I'm --

5   Q.   Would you have done that?

6   A.   We would have done it.  I wouldn't have done it, no.  I

7   would have had people to do it.

8   Q.   Okay.  Thank you.

9        MR. VLACHOS:  I have nothing further?

10       THE COURT:  Okay.  Thank you.  Mr. Meltzer.

11                      **CROSS-EXAMINATION**

12  BY MR. MELTZER:

13  Q.   Good afternoon, Mr. Giddins.  This is the last picture that

14  Mr. Vlachos showed you, and this is December 16th, 2014.  Is

15  that what that area would have looked like prior to the April

16  2014 storm event?  Would you call that vegetation?

17  A.   No, probably not.  This was probably after the storm.

18  Q.   In fact, this is seven months after the storm; isn't that

19  correct?

20  A.   Right.  I mean, once you move the -- you know, the earth

21  and stuff around, then you have -- in the swamp you have swamp

22  grasses and different vegetation that grows up around the stuff

23  that drifts in over a period of time.  No, it would not have

24  looked like this.

25  Q.   Thank you, Mr. Giddins.

1          Mr. Giddins, how far north of the mill did you live at

2    that time?

3    A.   Between 20 and 25 miles.

4    Q.   25 miles.  Okay.  And after 2012 and the mill went to the

5    pipeline, and prior to April 29, 2014, how often would you visit

6    and maintain the Kingsfield Road area?

7    A.   We visited all of the ponds, the levees, the header ditches

8    and all, once a day, five days a week.  Monday through Friday.

9    Q.   And would that include the Kingsfield Road structure?

10   A.   Yes, it would.

11   Q.   After 2012.

12   A.   After 2012.

13   Q.   What would you do during your inspections?

14   A.   Well, we would look to make sure there was no -- during the

15   rain it hadn't washed some limbs and logs that comes down

16   creeks, that floats up, which would go against those grates that

17   you saw, would restrict the water flow.  Also, by water not

18   flowing through there a lot, your vegetation has a tendency to

19   grow into the swamp, in the water, in the back water, which

20   would also restrict.

21   Q.   So when you were down there every day, and if you saw

22   debris, what would you do?

23   A.   We would report it to probably somebody like Gene Yuhasz,

24   who was the supervisor over wastewater, or someone in

25   wastewater, and tell them that it looked like it was starting to

1   build up a little silt or the vegetation was getting high.  And
2   they would say let's go ahead and clean it out or not.
3   Q.   And would you do that?
4   A.   Yes, we would.
5   Q.   And after 2012 and prior to April 29, 2014, how often would
6   Mr. Yuhasz visit that area?
7   A.   Pretty regular.  He -- I won't speak for him and say he did
8   it every day, but he did it several times a week.
9   Q.   And how would weather or rain affect what you might do or
10  whether you might visit that area?
11  A.   Repeat that?
12  Q.   Sure.  If there had been some rain, how would that affect
13  whether you would go down to that area?
14  A.   Well, anytime you get rain, if it -- you know, the creeks
15  rise when you get a rainfall.  It had to be a fairly significant
16  rainfall.  And limbs, sticks, driftwood, all that stuff comes
17  down the creek, which would go up against the box.  So we would
18  always check it after the -- after a rain event to make sure.
19  Q.   Would you say that would have been your routine?
20  A.   Oh, yes.
21  Q.   I think you mentioned that you might use a backhoe or an
22  excavator, right?
23  A.   That's correct.
24  Q.   And I think you mentioned that you think you may have
25  cleaned it close to the April 29, 2014, storm event?

1    A.   Yeah.   Seemed like we'd had some rain earlier in the week,

2    and seemed like we had went down -- we'd have to go back on the

3    mill records to know exactly what week or what day that we did

4    this.  But I made a CWR, which is a contract weekly report, on

5    every job that was done in that mill.  That was part of my job.

6    If it was done during that week, there will be a sheet that says

7    it was done and who done it and, you know, where it was done and

8    what location.

9            MR. MELTZER:  Your Honor, I'd like to --

10           MR. VLACHOS:  No objection, Your Honor.

11           THE COURT:  Thank you.

12           MR. MELTZER:  -- show the witness what's been marked

13   Exhibit 71.

14           THE COURT:  Would you like to admit it?

15           MR. MELTZER:  Yes, I would.

16           THE COURT:  Okay.  71 will be admitted.

17       (DEFENSE EXHIBIT 71:  Received in evidence.)

18           MR. MELTZER:  Permission to approach the witness.

19           THE COURT:  Yes, sir.

20   BY MR. MELTZER:

21   Q.   Now, Mr. Giddins, if you turn to -- looking at the first

22   page of this document --

23           Can you publish this to the jury, please?

24           Do you recognize this document?

25           THE COURT:  Mr. Meltzer, we lose you when you're away

1   from the microphone.  Thank you.

2            MR. MELTZER:  Thank you.

3   BY MR. MELTZER:

4   Q.   Looking at this first page, do you know what this document

5   is?

6   A.   Looks like a contract.

7   Q.   Okay.  And then flipping -- could you turn to where it says

8   at the bottom  Reed 0035?

9   A.   Is this way back toward the back or -- all right.  I'm

10  there.

11  Q.   Okay.  And have you seen this document before?

12  A.   Yes.

13  Q.   And what is this document?

14  A.   It's, like, a Contract Weekly Report, what we bill off of

15  to bill the mill.

16  Q.   Sorry.  Couldn't hear you.

17  A.   It's a Contract Weekly Report, and this is actually the

18  bill that's sent to the mill after, took off the report.

19  Q.   And do you know who prepared this particular document?

20  A.   Well, I prepared the stuff that went on this document, but

21  I didn't do the document.

22  Q.   Okay.  And what is the date of this document?

23  A.   4-20-2014.

24  Q.   And if you look -- what it says there on the page that is

25  marked April 20th, 2014, could you read the second sentence in

1  the description?

2  A.   Are you talking about the bottom here?

3  Q.   Mm-hmm.

4  A.   Cleaned grass out of rake, cleaned outfall box at

5  Kingsfield.

6  Q.   And what does that reflect, cleaned outfall box at

7  Kingsfield?

8  A.   That means that it probably had some debris around it or in

9  it, and we removed the wood and the -- or any debris that was

10 around the out structure.  Now, the rake is not part of that.

11 Q.   Right.  Just referring to the part that says cleaned out

12 the box.

13        So, Mr. Giddins, does this reflect that your company

14 was actually down there cleaning the outfall box about a week in

15 advance of the storm with heavy equipment?

16 A.   We did do it that week, and more than likely with a backhoe

17 because that's the equipment used.

18 Q.   Mr. Giddins, are you aware of notches in the cement

19 structure down there?

20 A.   Yes, I am.

21 Q.   What is your understanding of the purpose of those notches?

22        MR. VLACHOS:  Your Honor, this goes into hydrology.  I

23 don't think this witness is qualified to testify as to actual

24 capacity.

25        THE COURT:  I'm not sure where that question is going.

1    Approach the bench, please.

2          *(Following conference held at the bench.)*

3          THE COURT:  Okay.  Where are you going with this.

4          MR. MELTZER:  Just want to see what his understanding

5    of what they are and why they were cut.

6          THE COURT:  Why he was --

7          MR. MELTZER:  Why they were cut.  He's down there

8    every single day.

9          MR. VLACHOS:  It's beyond the scope.

10         MR. MELTZER:  And when they were cut.  He's down there

11   every single day.

12         THE COURT:  Well, it is a little bit beyond the scope,

13   but you can certainly cover it in redirect.  He can always

14   recall this man for one question.

15         MR. MELTZER:  He came down yesterday and waited all

16   day.  They told us they wanted him yesterday.  He's been waiting

17   all day.

18         THE COURT:  Yeah, I'm going to let you ask the

19   question, but he can't provide professional engineering --

20         MR. MELTZER:  I don't think he'll do that.

21         THE COURT:  Just don't ask him to do that.

22         MR. MELTZER:  Fair enough.

23         *(End of bench conference.)*

24         THE COURT:  All right.  Mr. Meltzer, go ahead.

25   BY MR. MELTZER:

1   Q.   What is your understanding of why the notches were cut into
2   the top of the overflow structure?
3   A.   My understanding -- and I was down there when it was done.
4   We did not do the notch cutting.  That was someone else that did
5   that.  It was to make notches at the top of the concrete.  It
6   had an old-style gate that had to be opened manually, and you
7   had to walk out on the catwalk.  The reason they cut that
8   down -- the reason that they told me they cut it down was they
9   were going to get the same amount or more flow over that --
10          MR. VLACHOS:  Your Honor, again, this gets into an
11   opinion.
12          THE WITNESS:  That's what I'm giving you is why they
13   did it.
14          THE COURT:  Right.  Right.
15   BY MR. MELTZER:
16   Q.   You don't have to give an opinion.  So your understanding
17   was that it was cut in lieu of the need to use the gate.
18   A.   That's exactly right because --
19          THE COURT:  Okay.  Wait, sir.  That's enough.
20          THE WITNESS:  Okay.
21          THE COURT:  Thank you.
22   BY MR. MELTZER:
23   Q.   And do you know approximately when those notches were cut?
24   A.   I'm going to say somewhere around 2009.
25   Q.   2009.  Okay.

1    A.    Long time ago.

2    Q.    Are you aware of any other modifications to that area or

3    structure that were with the purpose of improving how that

4    structure might --

5              MR. VLACHOS:  Objection, Your Honor.

6              THE COURT:  Well, as long as this is before 2014 --

7              MR. MELTZER:  This is before 2014.  Let me step back.

8    BY MR. MELTZER:

9    Q.    Prior to April 29, 2014, are you aware of any other

10   modifications the mill made to that area?

11   A.    Yes.  They -- we put down -- and we did this.  We put down

12   sheet piling alongside the structure to shore up or make sure

13   that -- or to help maintain a good solid clay bank so the water

14   wouldn't wash around it.  It just made the structure stronger by

15   having sheet piling down the sides of the structure.

16   Q.    And was that on both sides of the structure?

17   A.    Yes.

18   Q.    And I'm sorry.  What was the material you said was next to

19   it?

20   A.    We call it sheet pilings.

21   Q.    Right.

22   A.    It's pilings that interlock to one another and is drove

23   into the ground deep alongside the structure to keep it -- you

24   know, to help maintain the stability.

25   Q.    And about how large was the sheet piling?

1    A.   They're about 3 feet wide, and there was about -- if I

2    remember, there was about 25 on each side, maybe more.

3    Q.   Okay.  And I think you mentioned it was dirt and clay?

4    A.   Yes.

5    Q.   And where was that in -- in reference to where the cement

6    structure was?

7    A.   Well, when you put sheet piling in, you always go back in

8    and put dirt in and pack it down to ensure you have a good

9    solid, tight fit.

10   Q.   So you would put the clay and the dirt in, you would pack

11   it down, and you put sheet piling in?

12   A.   We put the put sheet piling in first, yes.

13   Q.   Okay.

14        THE COURT:  Do we have time frame for that?

15        THE WITNESS:  It was sometime in 2009, I believe it

16   was, or maybe '10.

17        THE COURT:  Okay.  Thank you.

18        THE WITNESS:  It was along about that time.

19   BY MR. MELTZER:

20   Q.   Now, earlier Mr. Vlachos showed you an image, right?

21        THE COURT:  What is it you're looking for?

22        MR. MELTZER:  I'm sorry.

23        THE COURT:  I'm sorry.  We were going to try to help

24   you in terms of whatever it is you're looking for.

25        MR. MELTZER:  I'll go --

 1          THE COURT:  It's Plaintiff's Exhibit 92, if you're

 2     looking for the photo.

 3          MR. MELTZER:  I am looking for the photo.

 4          THE COURT:  Do you have that, Mr. Vlachos?

 5          MR. VLACHOS:  I do not.  I think I put it back up.

 6          THE COURT:  It may be here at the clerk's bench, Mr.

 7     Meltzer, consistent with my instructions.  Thank you.

 8     BY MR. MELTZER:

 9     Q.   So Mr. Vlachos showed you this picture before; is that

10     correct?

11     A.   Yes.

12     Q.   Now, it looks like this is taken with a panoramic camera;

13     is that correct?

14     A.   I'm pretty sure.  Gene took these pictures; I didn't.

15     Q.   Well, in reference to where the structure is, isn't that

16     further out to the left than it would typically be?  I mean, is

17     this picture distorted?

18     A.   It looked like it because the outfall box should have been

19     more around to the left, looking at the picture this way.

20     Q.   All right.  So you testified earlier that you arrived at

21     the mill the morning of April 30th around 6:15?

22     A.   Mm-hmm.

23     Q.   And you also testified that you went down to the Kingsfield

24     area around 7:00 to 7:30?

25     A.   Somewhere in that area, yes.

1   Q.   Right?  And when you were down there, when you first got

2   down there, was water still overflowing the cement structure and

3   catwalk?

4   A.   Yes, it was.  The whole area was covered in water; and it

5   was coming over the concrete structure, down the ditch, and

6   across the land too.

7   Q.   So at that point, the water behind the structure had not

8   receded?

9   A.   No.

10  Q.   And you saw this area later on in the day and in the week,

11  correct?

12  A.   Later on that day, yes.

13  Q.   And you saw how far it ultimately eroded down to the

14  ground; is that correct?

15  A.   Yes.  It cut the whole place completely out between the

16  time that I was down there and 10:00 o'clock.

17  Q.   At the time you were down there, is it possible that it had

18  cut the erosion down that far to the bottom?

19  A.   No.  Water was flowing across the top.  It wasn't going

20  down.  It was flowing across the top.  So all the -- everything

21  was still there when we went down there between 7:00 and 7:30.

22          MR. MELTZER:  No further questions, Your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Vlachos.

25          MR. VLACHOS:  Nothing more of this witness, Your

1    Honor.  He can be released.

2           THE COURT:  Sir, you're released from your subpoena,

3    and you're excused.  Be careful stepping down.

4           THE WITNESS:  Thank you, ma'am.

5      *(Witness excused.)*

6           THE COURT:  Plaintiff's next witness.

7           MR. VLACHOS:  Your Honor, at this time we call Erick

8    Alexander.

9           **ERICK ALEXANDER, PLAINTIFF WITNESS, DULY SWORN**

10          DEPUTY CLERK:  Be seated.

11          Please state your full name and spell your last name

12   for the record.

13          THE WITNESS:  Erick Mark Alexander, A-L-E-X-A-N-D-E-R.

14          THE COURT:  All right.  Mr. Vlachos, when you're

15   ready.

16          MR. VLACHOS:  Thank you, Your Honor.

17                      **DIRECT EXAMINATION**

18   BY MR. VLACHOS:

19   Q.   Mr. Alexander, what is your address?

20   A.   1911 Joshua Drive.

21   Q.   And how long have you lived at that address, 1911 Joshua

22   Drive?

23   A.   I've lived there now currently 12 years.

24   Q.   And where is that home located?

25   A.   It is located on the second entrance into the neighborhood

1   off of Harlington Drive.

2   Q.   Which part of Bristol Park is that, or is that Bristol

3   Woods?  How is that identified?

4   A.   That's Bristol Woods.

5   Q.   But it's in the Bristol Park subdivision; is that correct?

6   A.   Correct.

7   Q.   And when is it that you purchased your home at 1911 Joshua

8   Drive?

9   A.   That would have been -- I believe it was April of 2006.

10  Q.   And who lives with you at that address or who lived with

11  you in April of 2014?

12  A.   At that time it was my wife and my three sons.

13  Q.   And, sir, what do you do for a living?

14  A.   I'm a plumbing and gas contractor.

15  Q.   You have your own company?

16  A.   Yes, sir.

17  Q.   And you said you purchased the home in 2006.  Before the

18  home, did you determine whether it was in a flood zone?

19  A.   We were told it was not.

20  Q.   Prior to April of 2014, did you ever have flooding in your

21  home or on the street near your home?

22  A.   No, we did not.

23  Q.   James, can you throw up demonstrative 7, please.

24          Mr. Alexander, can you, for the jury, demonstrate

25  where your home is located on demonstrative 7?

1   A.   Do you want me to circle it?

2   Q.   Yeah, circle it.  It's a little bit off.  It's a little

3   down, so you can clear it.

4   A.   How do you clear that.

5   Q.   Bottom right.  There you go.

6           So where that -- I believe it's a blue box, that

7   demarks where your home is; is that correct?

8   A.   That is correct.

9   Q.   And you were home the evening of April 29th 2014; is that

10  correct?

11  A.   Yes.

12  Q.   And do you recall what time you would have gotten home?

13  A.   Sometime between 5:00 and 7:00 that evening.

14  Q.   Okay.  Do you recall anything about the rain event of that

15  evening?  Or at the time you came home.  I'm sorry.

16  A.   It was raining pretty good when I got home.

17  Q.   And when you got home, what did you do that evening?

18  A.   I got home, showered, did my normal things when I got home.

19  Ate dinner with the family, and was watching some TV.

20  Q.   And what time did you become aware that there was water in

21  the neighborhood?

22  A.   It was probably sometime around 10 o'clock.

23  Q.   And how was it you came to understand that?

24  A.   We had a neighbor who lives up the road from us who was in

25  Scouts with us, and some of the other Scouts that lived in the

1    same neighborhood were having water in their residence, starting

2    to get in their residence at that time.

3    Q.   What did you do when you found that out?

4    A.   Was concerned.  We took some precautionary things.  You

5    know, watched the water level out in the street to see if it was

6    still continuing to rise.

7    Q.   Did you see water in the street when you went out at

8    10:00 o'clock?

9    A.   Yes.

10   Q.   And in relation to where your house is, how -- what's the

11   elevation change or the dropoff to the street from where you

12   are?

13   A.   From the threshold to the street level is about three and a

14   half feet.

15   Q.   And did you watch -- did you see the water rise after

16   10 o'clock?

17   A.   Yes.  It continued to rise at a substantial rate.

18   Q.   Okay.  And at some point that evening did you leave?

19   A.   Yes.

20   Q.   And why did you leave?

21   A.   The water had reached our threshold, and we were getting

22   reports that people were being rescued off their roofs.

23   Q.   Okay.  And where did you go?

24   A.   We went up the road to the neighbor who had called us.  She

25   lived further up on the hillside.

1   Q.   And on this map, can you kind of show us where you would

2   have evacuated to and kind of take us the route you would have

3   done to get there?

4   A.   This -- up there where we evacuated to, we would have come

5   out of the house and ended up walking down the road and up to --

6   I believe that's Witt Drive there, where she met us in her car

7   to pick us up.

8        We had to -- I had to pull my vehicles up to the

9   garage door so they wouldn't -- hopefully not get flooded.  So

10  when we evacuated, we had to go down to the street and walk up.

11  When we opened the door to leave, there seemed to be a gentleman

12  who was with search-and-rescue.  We don't know.  He had a couple

13  of axes, life jackets.  We put them on my young kids and waded

14  through the water up there to meet her.

15  Q.   How far up the street did you have to wade -- or let's

16  strike that.

17       When you went, you had to walk down your driveway and

18  kind of into the sidewalk area; is that correct?

19  A.   Correct.

20  Q.   And how deep was the water --

21  A.   Past my --

22  Q.   -- when you evacuated?

23  A.   Past my waist.  It was almost to my chest.

24  Q.   And as you walked further to the -- what direction would

25  that be?  To the south?

1    A.    Be about -- I guess maybe west --

2    Q.    Southwest?

3    A.    West southwest, yeah.

4    Q.    As you were walking towards the house you evacuated to

5    that's depicted in the diagram, how far did you have to get --

6    like, how many houses did you have to get to to get out of the

7    water that you were -- that was at your house?

8    A.    Well, the water stopped about four houses up from there, in

9    their yard.  It gradually kind of tapered off there because of

10   the hill going up, so -- but about right here is where the water

11   ended.

12   Q.    But as far as your house, you didn't get any water in your

13   actual house, but in your garage; is that correct?

14   A.    Correct.  We had five inches inside of our garage.

15   Q.    And you stayed at that friend's house overnight; is that

16   correct?

17   A.    That's correct.

18   Q.    Did you ever go to sleep?

19   A.    No.

20   Q.    Do you recall when you went back to your house?

21   A.    Sometime around 7:00 or 8:00, sometime in that time frame.

22   Probably closer to about 7:30.

23   Q.    Okay.  And when you returned to your house, was there any

24   standing water in the street?

25   A.    Just some puddles but no standing water.

1  Q.   Had the water receded?

2  A.   Yes.  It was completely gone.

3  Q.   How did you get back?

4  A.   Walked down to my house.

5          MR. VLACHOS:  That's all I have.

6          THE COURT:  Thank you.  Mr. Hill.

7          MR. HILL:  Thank you, Your Honor.

8                      **CROSS-EXAMINATION**

9  BY MR. HILL:

10 Q.   Mr. Alexander, we've met before.

11 A.   Yes, sir.

12 Q.   I just have a few questions for you.

13         Can we leave that demonstrative 7, up on the screen,

14 please?

15         Mr. Alexander, do you know whose house is located or

16 whose property is located in the yellow square toward the bottom

17 of that photograph?

18 A.   Looks like, according to this, it's the Bullard residence.

19 Q.   The Bullard residence?  So Bristol Park Road is the one

20 that kind of runs down to the Bullard residence from the first

21 entrance?

22 A.   That's correct.

23 Q.   All right.  And it kind of goes downhill generally, doesn't

24 it, from the highway entrance down to where the Bullard

25 residence is located?

1   A.   Bristol Park Road is pretty level.

2   Q.   It doesn't go down?  Doesn't slope down?

3   A.   It may be a slight slope, but nothing that I would consider

4   to be a huge drop-down.

5   Q.   All right.  Can you show the jury on here where Elevenmile

6   Creek is in relation to the Bullards' home?

7   A.   Looks like this is Elevenmile Creek right through here.

8   Q.   So would you say that the Bullard home is closer to the

9   creek than your home?

10  A.   Obviously, yes.

11  Q.   And do you think that the elevation of the Bullard home is

12  lower in elevation than your home?

13  A.   Yes.

14  Q.   All right.  In general, are the houses that are down close

15  to Elevenmile Creek in your neighborhood a lower elevation than

16  the other houses, than your house?

17  A.   Yes.  My house was built on a retaining hill pond.

18  Q.   Okay.  So from your house, then, water would reach your

19  house probably later than any other houses, correct?

20  A.   Probably.

21  Q.   Because it takes time to raise up to your level?

22  A.   Well, correct.

23  Q.   Did you tell us on direct examination that you got a call

24  around 10:00 o'clock?

25  A.   I believe that's when it was, yes.

1    Q.    And I could not hear your -- what you told us about the

2    reason for that call.  I just couldn't hear it.  I'm sorry.

3    A.    That the neighbors over on Bristol Park Road, some scouting

4    people, had been getting some water that entered their dwelling.

5    Q.    So some folks down on Bristol Park Road, by 10:00 o'clock,

6    had already had water entering their dwelling, their homes?

7    A.    That's what I was told, yes.

8    Q.    And that's -- that was by the call that you got.

9    A.    It was sometime after 10:00.  I don't know exactly what

10   time it was but it was after 10:00.

11   Q.    All right.  Earlier you said it was around 10 o'clock.

12   A.    Around 10:00 o'clock, yeah.

13   Q.    So obviously some flooding had occurred down here along

14   Elevenmile Creek before 10:00 o'clock.

15   A.    No, I wouldn't say before.

16   Q.    Not before?

17   A.    No, not before.

18   Q.    You got the call around 10:00 o'clock, right?

19   A.    Sometime around 10:00 o'clock, yes, sir.

20   Q.    So let's just take the time of the call, then, as opposed

21   to 10:00 o'clock.  Before that call, some of the houses along

22   Bristol Park Road had flooded, right?

23   A.    I can't speak to that.

24   Q.    But somebody called you and told you that, didn't they?

25   A.    Not before, no.

1    Q.   They told you that at the call, that houses were flooding

2    along Bristol Park Road, correct?

3    A.   Correct.

4    Q.   Thank you.  Now, are you aware of any flooding in any other

5    areas outside of these neighborhood?

6    A.   Not that I can recall at this point, no.

7    Q.   I believe you told us that your house itself did not have

8    any water come into your house; is that correct?

9    A.   Not in --

10   Q.   Came into your garage but not into the living --

11   A.   Not into the dwelling, that's correct.

12   Q.   Is that because your living area is more than five inches

13   above the level of your garage?

14   A.   Correct.

15   Q.   Do you recall telling us during your deposition that you

16   knew that other houses in Escambia and Santa Rosa Counties,

17   other than these two neighborhoods, had flooded?

18   A.   I don't recall at this point.

19   Q.   Is it possible that you had told us that?

20   A.   It's possible, but I don't have none of that in front of

21   me.  I can't answer that question.

22   Q.   So as we sit here today, you just can't recall one way or

23   the other?

24   A.   Right.  I mean....

25            MR. HILL:  That's all I have.  Thank you,

 1    Mr. Alexander.

 2              THE COURT:  All right.  Redirect?

 3              MR. VLACHOS:  Nothing for this witness, Your Honor.

 4              THE COURT:  Okay.

 5              MR. VLACHOS:  Mr. Alexander can be excused.

 6              THE COURT:  All right.  Thank you, Mr. Alexander.

 7    You're excused.

 8         *(Witness excused.)*

 9              THE COURT:  Mr. Kauffman, you're up next.

10              MR. GLASSER:  Yes, Your Honor.

11              THE COURT:  Who's your witness?

12              MR. KAUFFMAN:  Plaintiffs call Linda Navelski.

13              THE COURT:  Okay.

14         **LINDA NAVELSKI, PLAINTIFF WITNESS, DULY SWORN**

15              DEPUTY CLERK:  Be seated.

16              Please state your full name and spell your last name

17    for the record.

18              THE WITNESS:  Linda Mary Navelski, N-A-V-E-L-S-K-I.

19              THE COURT:  All right.  Mr. Kauffman, when you're

20    ready.

21                         **DIRECT EXAMINATION**

22    BY MR. KAUFFMAN:

23    Q.   Ms. Navelski, what address do you live at?

24    A.   2706 Silhouette Drive, Cantonment, Florida.

25    Q.   Did your house get flooded on the evening of April 29,

1    2014?

2    A.    Yes, it did.

3    Q.    What town is your house in?

4    A.    Cantonment.

5    Q.    At what neighborhood?

6    A.    Bristol Park.

7    Q.    How long have you lived there?

8    A.    Since September of 2005.

9    Q.    Are you married?

10   A.    Yes.

11   Q.    Do you have any children?

12   A.    Yes.

13   Q.    How many children do you have?

14   A.    I have three.

15   Q.    Do you have any grandchildren?

16   A.    Yes.  I have --

17   Q.    How many?

18   A.    Five.

19   Q.    Did any of your children or grandchildren live with you at

20   the home in Bristol Park?

21   A.    Yes.  My daughter and her son.

22   Q.    What's the son's name, or the grandson?

23   A.    Eli.

24   Q.    Before you bought the home, what did you understand about

25   any prior flooding in that home?

1   A.   We understood that there was no prior flooding.

2   Q.   When you bought the home, what did you understand was the

3   status of the home with regard to the FEMA floodplain?

4   A.   That it was not in a flood zone.

5   Q.   Prior to April 2014 did you ever get any flooding in your

6   house?

7   A.   No.

8   Q.   Prior to April 2014, did you ever see any flooding in the

9   neighborhood?

10  A.   No.

11       MR. KAUFFMAN:  Could you please put up demonstrative

12  number 7.

13  BY MR. KAUFFMAN:

14  Q.   Now, Ms. Navelski, there's several boxes on demonstrative

15  number 7.  They're in different colors?

16  A.   Yes.

17  Q.   Could you please tell the jury which color box is your

18  house?

19  A.   The red.

20  Q.   Could you just go ahead and circle, just so that we're very

21  clear about where that is.

22  A.   Oh, something's wrong.

23  Q.   You've put a mark by it.  That's good enough.  The jury can

24  see that pink mark right there.  That's fine.  That's good

25  enough.

1          So do you see about where the creek is relative to
2    your house on this map?
3    A.    Yes.
4    Q.    Okay.  Could you just put a little, kind of, line where,
5    about, the creek is near your house.  Okay.  I think you've
6    drawn that a little --
7    A.    A little bit, yeah.
8    Q.    -- a little off from where that creek actually is.
9    A.    Can't get the pen to do it right.
10   Q.    That's okay.  That's okay.  I think that the -- if I'm
11   going to -- if you could just go ahead and -- I'll clear this
12   off real quick.
13         Is this area right here, this -- you see a kind of
14   depressed area right here?
15   A.    Yes.
16   Q.    Is that Elevenmile Creek?
17   A.    Yes.
18   Q.    Okay.  Very good.  Now, how far is the creek from your
19   house?
20   A.    Oh, probably about a length of a football field.
21   Q.    When you bought the home in -- was it 2005?
22   A.    Yes.
23   Q.    Okay.  When you bought the home in 2005, did you know
24   anything about a dam being upstream from your house in the
25   creek?

1   A.    No, I did not.

2   Q.    Now, on the day of the flood, April 29, 2014, did you have

3   any idea that there was a dam in the creek upstream from your

4   house?

5   A.    No.

6   Q.    Now, were you at home on the evening of April 29, 2014?

7   A.    Yes.

8   Q.    When were you home that day?

9   A.    All day.

10  Q.    Was there anyone else at the house?

11  A.    Yes.

12  Q.    Who?

13  A.    My daughter Joelle and her son Eli.

14  Q.    Was your husband home that evening?

15  A.    No.

16  Q.    Where was he?

17  A.    He was in Louisiana, getting ready to go offshore.

18  Q.    Do you have a usual routine for going to bed?

19  A.    Yes.

20  Q.    What's that routine?

21  A.    I usually get into bed around 8:00 and turn the TV off

22  around 9:00.

23  Q.    So you get in the bed, and you watch some television until

24  you fall asleep?

25  A.    I usually turn it off before I fall asleep.

1   Q.   Okay.  And what time do you typically fall asleep?

2   A.   Around 9:00, a little after 9:00.

3   Q.   Now, did you follow that same routine, to the best of your

4   recollection, on the evening of April 29, 2014?

5   A.   Yes.

6   Q.   Now, before you went to sleep, was there any flooding in

7   your house?

8   A.   No.

9   Q.   At some point during the night were you woken up?

10  A.   Yes.

11  Q.   How were you awoken later that evening?

12  A.   My daughter woke me up and said there was water coming in

13  the house.

14  Q.   And when you woke up, what did you do?

15  A.   I went in the front of the house to see about the water.

16  Q.   Do you know what time she woke you up?

17  A.   No, I don't.

18  Q.   And once she woke you up, how much water did you already

19  have in the house?

20  A.   Oh, none in my bedroom, but it was starting to come in

21  through the front of the house.

22  Q.   Okay.  So if we look at demonstrative 7, this is Silhouette

23  right here, correct?

24  A.   Yes.

25  Q.   The drive?  Is your bedroom on the front or the back of the

1   house?

2   A.    The front.

3   Q.    Your bedroom is on the front corner here?

4   A.    Front right corner.

5   Q.    Front right corner.  Are we talking facing the street, you

6   face the street?

7   A.    No.

8   Q.    You face the backyard.

9   A.    The side.

10  Q.    The side of the house?

11  A.    Mm-hmm.

12  Q.    Towards the front of the -- towards the street or towards

13  the backyard?

14  A.    Towards the -- no, towards the side.

15  Q.    I'm sorry.  I didn't hear that.

16  A.    To the side.

17  Q.    Okay.  So you're on the side.

18  A.    The bedroom, yeah, faces the side.

19  Q.    Is your front door closer than where your bedroom is to the

20  street?

21  A.    Yes.

22  Q.    Now, how fast was the water rising as you saw it come into

23  your house?

24  A.    It was rising fast.

25  Q.    Now, did anyone take any photos?

1    A.    Yes.  My daughter did.

2    Q.    Okay.  What device did she take the photos with?

3    A.    Her phone.

4    Q.    Could I please see Exhibit 107?

5          Ms. Navelski, do you recognize 107?

6    A.    Yes.

7    Q.    What is it?

8    A.    It's my kitchen with water in it, and our refrigerator's

9    floating.

10         MR. KAUFFMAN:  I would move to admit and publish.

11         THE COURT:  That will be admitted, Plaintiff's 107.

12         *(PLAINTIFF EXHIBIT 107:  Received in evidence.)*

13         MR. KAUFFMAN:  Publish.

14   BY MR. KAUFFMAN:

15   Q.    Now, Ms. Navelski, this is your kitchen; is that correct?

16   A.    Yes.

17   Q.    And who is that in the photo?

18   A.    Eli.

19   Q.    How tall is Eli?

20   A.    About 5, 9.

21   Q.    5, 9.  And would you agree that this water is about coming

22   up close to his hip?

23   A.    Yes.

24   Q.    How deep do you think the water is in this photo?

25   A.    Probably about three feet.

1   Q.   How long do you recall the water took to get from just

2   coming into your house to three feet?

3   A.   Oh, 45 minutes, maybe.  I don't know because I didn't know

4   what time it was.

5   Q.   Okay.  So you weren't watching a clock --

6   A.   No, I was not.

7   Q.   -- but what's your best understanding of how long it took

8   the water to get to this point?

9   A.   The stamp on the picture.

10  Q.   Okay.

11  A.   Stamp of the time.

12  Q.   All right.  Do you know what time this picture was taken?

13  A.   11:39.

14  Q.   And do you think that that's the -- and do you have an

15  idea, based on the stamp of 11:39 of the photo, do you have an

16  understanding about how long it took the water to raise to about

17  three feet?

18  A.   No.  I don't know.  I'm guessing, really.

19  Q.   Okay.  Fair enough.

20        I'm going to show you -- and I just want to mark

21  this -- what's been already admitted as 128.  And this is photo

22  612 that we're looking at here.  So we're looking at 612, and

23  what time is the stamp on 612, if you just follow across.  If I

24  highlight correctly, just let me know.

25  A.   Okay.

1    Q.    Did I highlight the one for 612 correctly?

2    A.    Yes.

3    Q.    And what's the time of this photo?

4    A.    11:39.

5    Q.    Okay.  Now, I'd like to also show you what's been marked as

6    Exhibit 108.  Okay.  Ms. Navelski, do you recognize 108?

7    A.    Yes.

8    Q.    What is it?

9    A.    It's my front door.

10            MR. KAUFFMAN:  Move to admit, Your Honor?

11            THE COURT:  108's admitted.

12            MR. KAUFFMAN:  Oh, 108.

13            THE COURT:  Yes, it's admitted.

14            MR. KAUFFMAN:  I'm sorry.  I thought you asked what

15    exhibit it was.  I apologize.

16            THE COURT:  No, it's admitted.

17        (PLAINTIFF EXHIBIT 108:  Received in evidence.)

18    BY MR. KAUFFMAN:

19    Q.    Ms. Navelski, what time do you think this photo was taken?

20    A.    11:39.

21    Q.    And you said earlier this is your front door.  This is the

22    front door that leads to the street, correct?

23    A.    Yes.

24    Q.    And the water is about how high in this photo?

25    A.    Three feet.

1  Q.   And this is the photo -- or I'm sorry.  I'm going to just

2  mark it on this metadata we saw.  This is number 613.  And these

3  are the files from the iPhone, correct?

4  A.   Yes.

5  Q.   And these files are time stamps for each of the photos.

6  A.   Yes.

7  Q.   And if we look here, I'm going to mark 613, taken right

8  after.  And did I mark that correctly, that it's -- this picture

9  that is Exhibit 108 was taken at 11:39 p.m.?

10  A.   Yes.

11  Q.   Now, going back to 108, if we could.

12       Now, did you leave your house that evening?

13  A.   Yes.

14  Q.   How did you leave?

15  A.   Eli opened the door and went outside, and he was hollering

16  for help.  And the neighbors, the Sweets, were trying to secure

17  their boat because it had floated up; and they heard Eli, and

18  they came over in their boat and rescued us.

19  Q.   Where did you go once you left the house?

20  A.   We went to the Sweets' house.  They have a two-story house.

21  Q.   Are they next door to you?

22  A.   Yes.

23  Q.   So you stayed on their second floor.

24  A.   Yes.

25  Q.   Did you sleep?

1   A.   No.  Tried but couldn't.

2   Q.   Did you go back to the house after you were rescued?

3   A.   Yes, the next morning.

4   Q.   About what time do you think you went back to the house the

5   next morning?

6   A.   Probably around 7:00.  It was after the sun was up a little

7   while.

8   Q.   So you recall it being just after sunrise?

9   A.   Yes.

10  Q.   And when you went back to the house, was there any water

11  left in the house?

12  A.   No.

13  Q.   Is it -- would it be fair to say that the water had

14  completely drained out of your house by the time you went back,

15  maybe around 7:00 a.m.?

16  A.   Yes.

17         MR. KAUFFMAN:  Pass the witness.

18         THE COURT:  Thank you, Mr. Hill.

19         MR. KAUFFMAN:  Actually, I have one -- I wanted to

20  admit what we've marked.  I apologize.

21         MR. HILL:  I'm sorry?

22         MR. KAUFFMAN:  I just wanted to admit it with the

23  markings on it.

24         MR. HILL:  No objection.

25         MR. KAUFFMAN:  We'll mark it as 128A.

1        THE COURT:  Okay.  Very good.

2        *(PLAINTIFF EXHIBIT 128A:  Received in evidence.)*

3        THE COURT:  Okay, Mr. Hill.  Go ahead.

4        MR. HILL:  Thank you, Your Honor.

5                        **CROSS-EXAMINATION**

6    BY MR. HILL:

7    Q.   Hi, Ms. Navelski.  How are you?

8    A.   Okay.

9    Q.   Good.  It's good to see you again.

10   A.   Good to see you.

11   Q.   When we met once before, I think that you told us, in your

12   deposition, that you had fallen asleep after you saw a news

13   account of some flash flooding?

14   A.   Yeah.  The little scroll that's on the TV.

15   Q.   Right.  And that was sometime before 9:30?

16   A.   Yes.  It was before 9:00.

17   Q.   Before 9:00.  Okay.  So before you went to sleep around

18   9:00 o'clock, you saw that crawling along the bottom of the

19   screen that said Flash Flood Warning.

20   A.   Yes.

21   Q.   Was that specifically for your neighborhood or just in

22   general?

23   A.   It didn't say.

24   Q.   All right.  Were you aware that there was flooding in other

25   parts of Escambia and Santa Rosa County other than just the

1  neighborhood?

2  A.   That night?

3  Q.   Yes, ma'am.  Well, later were you aware of it, at any time?

4  A.   No.

5  Q.   You never became aware that there was flooding --

6  A.   Oh, later, yes.  You know, probably that day or the next

7  day.

8  Q.   And so when you went to sleep at 9:00 o'clock, you weren't

9  aware that there was any water in your house at that point,

10  right?

11  A.   No.  There was no water.

12  Q.   All right.  You were aware there was no water?

13  A.   Yes.

14  Q.   All right.  So from 9:00 o'clock until whenever it was that

15  you were awakened with the water that was already in your house,

16  during that time frame, you don't know and you can't tell us

17  today at what point in time water started coming into your

18  house, can you?

19  A.   No.

20  Q.   And that's exactly what you told us in your interrogatory

21  answers, right?

22  A.   Yes.

23  Q.   And also at the deposition, right?

24  A.   Mm-hmm.  Yes.

25  Q.   Okay.  Thank you, ma'am.

1          MR. HILL:  No further questions?

2          THE COURT:  Any redirect?

3          MR. KAUFFMAN:  No redirect -- none.

4          THE COURT:  Ma'am, you may step down.

5          THE WITNESS:  Thank you.

6     *(Witness excused.)*

7          THE COURT:  And your next witness.

8          MR. VLACHOS:  Yes, Your Honor.  Ms. Cindy Kersey.

9          **CINDY KERSEY, PLAINTIFF WITNESS, DULY SWORN**

10         DEPUTY CLERK:  Be seated.

11         Please state your full name and spell your last name

12    for the record.

13         THE WITNESS:  Cynthia Kersey, K-E-R-S-E-Y.

14         THE COURT:  All right.  Mr. Vlachos, go ahead.

15         MR. VLACHOS:  Thank you, Your Honor.

16                    **DIRECT EXAMINATION**

17    BY MR. VLACHOS:

18    Q.   Good afternoon, Ms. Kersey.  As of April 2014, what was

19    your residence address?  Where did you live?

20    A.   10112 Bristol Park Road.

21         THE COURT:  Ms. Kersey, may I ask you to please move

22    your chair closer to the device with the red dot on it in front

23    of you.  That's your microphone.

24         THE WITNESS:  Oh, okay.

25         THE COURT:  We'll all hear you better.  Thank you.

1  BY MR. VLACHOS:

2  Q.   And who lived with you at that address?

3  A.   My husband.

4  Q.   And what's his name?

5  A.   Joe.

6  Q.   And in April 2014, was he at home with you on April 29 of

7  2014?

8  A.   No.

9  Q.   Where was he?

10  A.   He was in Childersburg, Alabama.

11  Q.   Is that where you now reside?

12  A.   Yes.

13  Q.   When did you move there?

14  A.   May 2014.

15  Q.   Going back to April of 2014, how long is it that you owned

16  that home in Bristol Park?

17  A.   About nine years.

18  Q.   Do you recall what month you bought it?

19  A.   I think it was in October.

20  Q.   Before you bought the home, did you determine whether it

21  was in a flood zone?

22  A.   At closing, you know, with the mortgage company, yes.  They

23  said it wasn't.

24  Q.   Were you aware when you bought your home that there had

25  been flooding in your home before?

1    A.    Yes.

2    Q.    And how did you come to know that?

3    A.    I believe the Realtor told us that there was some freak

4    accident with International Paper.  During '98 they released a

5    lot of water out of their holding ponds.

6    Q.    Okay.  I'm going to go to --

7          Can you show Number 43, please.

8          And I'm showing you what's been marked and received as

9    Plaintiff's trial Exhibit Number 43.  This is an aerial -- kind

10   of an aerial diagram of the Bristol Park and Ashbury Hills

11   neighborhoods.  Can you identify where your home would have been

12   located on April 29, 2014?

13   A.    Yes.

14   Q.    And I think there's -- there's a little pen up there.  You

15   kind of circle it or mark where that location is.

16   A.    I don't know how this works.

17   Q.    You can clear it.  Go to the bottom corner.

18   A.    Oh.

19   Q.    There you go.  All right.  We'll try again.

20   A.    We'll try again.

21   Q.    Would you have been on the other side on Bristol Park?

22   That's on Silhouette.  That looks to be -- was that where you

23   were?  Okay.

24   A.    That's where I was.

25   Q.    Okay.

1    A.    There were two houses -- our house and the house next door

2    had pools.  Our house with the pool was closest to the entrance

3    of the neighborhood.

4    Q.    All right.  So there's a -- looks like a large woods that

5    goes behind you, and then can you identify for the jury where

6    the creek is?

7    A.    Back in here somewhere.

8    Q.    Where that blue line is?

9    A.    Yes.

10   Q.    Okay.  Do you recall April 29?  Were you home the day of

11   the storm?

12   A.    I was there all day.

13   Q.    Okay.  Do you recall that day whether it was raining?

14   A.    It was raining.

15   Q.    Do you recall anything about the rain in particular that

16   day?

17   A.    No.  It was just a rainy day.

18   Q.    Was there anybody else at the house with you?

19   A.    No.  It was just me and my dogs.

20   Q.    You have a couple of dogs?

21   A.    Yes.

22   Q.    What kind of dogs do you have?

23   A.    A Golden Retriever and a Golden/Lab mix.

24   Q.    And what did you -- do you recall what you did that

25   evening?

1   A.    I ate dinner and I watched TV.

2   Q.    Where do you typically watch TV in your house?

3   A.    The sun-room.

4   Q.    And would that have been at the back of the house nearest

5   where the creek area was?

6   A.    Yes.

7   Q.    And anything happen while you were watching TV back in that

8   sun-room?

9   A.    No.

10  Q.    What time do you usually go to bed?

11  A.    9:30, 10:00 o'clock.

12  Q.    And would it have been that same time that day?

13  A.    Yes.

14  Q.    And was there something that alerted you to any issues

15  outside?

16  A.    No, not till I got ready to go to bed.

17  Q.    Okay.  What happened when you got ready to go to bed?

18  A.    My neighbor across the street called me and asked me if I

19  had looked outside, that it looked like water was coming up into

20  the yards.  So I said no.  And I went to the door and I looked,

21  and it was -- there was some water in the yard.

22  Q.    Let me stop you there.  Did you go to your front door and

23  look out?

24  A.    To the front door, yes.

25  Q.    And at that time what do you recall seeing?

1    A.   Water was up about halfway to the house.  And so I went

2    around to the rest of the house and looked out all the way

3    around the house; and when I got back to the front door, the

4    water had receded back to the street.

5    Q.   Okay.  Then what happened?

6    A.   I decided, Well, okay.  Everything's good, so I'll go on

7    and go to bed.  And I went and locked all the doors, and I went

8    back to the slider doors to the sun-room, and that's when I

9    noticed that water was pouring into the dog door.

10   Q.   And that sun-room you're talking about was in the back of

11   the house?

12   A.   Yes.

13   Q.   And from your regular part of the house to the sun-room, is

14   there a step-down into that area?

15   A.   Yes.

16   Q.   Okay.  And are there sliding doors that separate your house

17   from the sun-room?

18   A.   Yes.

19   Q.   And describe what you saw at that time.

20   A.   The water was just gushing into the sun -- through the dog

21   door onto the -- into the sun-room.  So I kind of panicked, and

22   I called my husband and told him that water was coming in the

23   house.

24   Q.   And then what did you do?

25   A.   I went and turned the circuit breakers off, the subpanel in

1   the house; and I put my dogs in our bedroom on the bed.  And by

2   that time the water was getting close to knee deep, so I climbed

3   up on the kitchen counter that was the highest place I could

4   find to get.

5   Q.   And so as the water was rising, you get on the kitchen

6   counter, right?

7   A.   Yes.

8   Q.   How long were you on the kitchen counter?

9   A.   Until the rescuers came and got me.

10  Q.   Do you recall what time that was?

11  A.   I don't know exactly.  It seemed like -- I believe it was

12  sometime after 1:00 o'clock in the morning.

13  Q.   You didn't take any photos that night; is that correct?

14  A.   I did not.

15  Q.   Did the water stop rising during that time you were in the

16  house?

17  A.   I don't believe it did.

18  Q.   So is --

19  A.   There -- there was still power to the house until right

20  before the rescuers came and got me.  So there were lights on in

21  the sun-room, and I could see the water level in the sun-room

22  was higher than what was in the house.

23  Q.   So you could see water level higher through the glass?

24  A.   Yes.

25  Q.   How much higher was it?

1    A.    Probably a foot.

2    Q.    And how high did it get inside your house?

3    A.    I don't know exactly.  I just know that I was waist deep in

4    water, at least, when the rescuers came and got me.

5    Q.    You were waist deep in water and you were standing on your

6    counter; is that correct?

7    A.    Yes.

8    Q.    And where did the rescuers take you?

9    A.    To the first house at the entrance of Bristol Park.

10   Q.    How did you get there?

11   A.    Boat.

12   Q.    And you stayed at that first house.  Did you go back the

13   next morning to your house?

14   A.    Yes.

15   Q.    And how did you get there?

16   A.    My husband drove down from Childersburg that morning, and

17   we drove the truck down to the house.

18   Q.    Do you recall what time it was that you returned back down

19   to your house?

20   A.    Sometime around 11:00 o'clock.

21   Q.    And when you got back there with Joe, was there any water

22   in the streets?

23   A.    No.

24   Q.    Was there any water left in your house?

25   A.    No.

1   Q.   Was there any standing water that you could see back in the

2   backyard behind where your pool was?

3   A.   No.

4           MR. VLACHOS:  That's all I have.

5           THE COURT:  All right.  Mr. Hill.

6           MR. HILL:  Thank you, Your Honor.  May it please the

7   Court.

8           THE COURT:  Yes, sir.

9                        **CROSS-EXAMINATION**

10  BY MR. HILL:

11  Q.   Hey, Ms. Kersey.  I can barely see you for that screen.

12          I want to be sure that I'm correct that I didn't hear

13  that you were able to tell the jury exactly what time water

14  started coming into your house; is that correct?

15  A.   That's correct.  I don't know.

16  Q.   You don't know.  So even as we sit here today, you don't

17  know?

18  A.   No.

19  Q.   And you've given testimony in a deposition before, correct?

20  A.   Yes.

21  Q.   In this case?  Did you also testify at the evidentiary

22  hearing in this case?  Do you remember testifying in this

23  courtroom --

24  A.   Yes.

25  Q.   -- once before?

1    A.    Yes.

2    Q.    With Judge Rodgers?  Yes?

3    A.    Yes.

4    Q.    Okay.  You mentioned on direct examination that you became

5    aware that the house had flooded before you bought it from a

6    Realtor, correct?

7    A.    Yes.

8    Q.    Now, you told us all of that in your deposition and at the

9    hearing as well, did you not?

10   A.    Yes.

11   Q.    But you didn't mention during those times, did you, that

12   something had to do with the International Paper Company dam?

13   A.    I may not have.  I don't remember.

14   Q.    Is that the same conversation with the same Realtor that

15   you did tell us about in your deposition and at the hearing?

16   A.    Yes.

17   Q.    Or were there two different conversations?

18   A.    It's the same Realtor.

19          MR. HILL:  Okay.  I don't have any other questions.

20   Thank you, ma'am.

21          THE COURT:  Okay.  Redirect?

22          MR. VLACHOS:  No, Your Honor.  This witness is

23   excused.

24          THE COURT:  All right, ma'am.  You may step down and

25   you're excused.

1      *(Witness excused.)*

2            THE COURT:  Your next witness.

3            MR. MARSHALL:  Plaintiffs call David Carrier.

4      **DAVID CARRIER, PLAINTIFF WITNESS, DULY SWORN**

5            DEPUTY CLERK:  Be seated.  Please state your full name

6      and spell your last name for the record.

7            THE WITNESS:  Full name, William David Carrier III,

8      C-A-R-R-I-E-R.

9            THE COURT:  Mr. Marshall.

10           MR. MARSHALL:  Thank you, Your Honor.

11                          **DIRECT EXAMINATION**

12     BY MR. MARSHALL:

13     Q.   Dr. Carrier, you were a little worried you weren't going to

14     testify today.

15     A.   I was hoping.

16     Q.   You might get to testify for two days now.

17           Dr. Carrier, where do you live?

18     A.   I live in Lakeland, Florida.

19     Q.   And how long have you lived and worked in Florida?

20     A.   About 40 years.

21     Q.   And what do you do for a living?

22     A.   I'm a consulting geotechnical engineer.

23     Q.   And what is that?

24     A.   Geotechnical engineers get involved with things to do with

25     dirt, with the earth, things like earth dams, foundations for

1    structures, that sort of thing.

2    Q.   And how long have you been a geotechnical engineer?

3    A.   It's about 50 years now.

4    Q.   I'd like to show you Exhibit 70.  What is -- do you have it

5    there?

6    A.   I do.

7    Q.   Okay.  What is Exhibit 70?

8    A.   It's a copy of my resumé.

9         MR. MARSHALL:  Without objection from the defense, can

10   I publish Exhibit 70 to the jury, please?

11        THE COURT:  If there's no objection.  Mr. Meltzer, is

12   that --

13        MR. MELTZER:  Your Honor, he could probably ask him

14   questions about his experience.  I don't know if we need

15   potential hearsay in this document.

16        THE COURT:  It is hearsay.  If there's an objection,

17   it won't come in.  I mean, it's up to you to --

18        MR. MELTZER:  He can ask Dr. Carrier his experience.

19   The objection is on the record.

20   BY MR. MARSHALL:

21   Q.   Dr. Carrier, what college degrees do you have?

22   A.   I have a bachelor's, a master's, and a doctorate in civil

23   engineering from MIT.

24   Q.   Is that the Massachusetts Institute of Technology?

25   A.   That's the one.

1    Q.    Any particular focus of your studies?

2    A.    Through the bachelor's it was in civil engineering, and

3    then master's and doctorate was specializing in geotechnical

4    engineering.

5    Q.    And do you hold any professional licenses?

6    A.    I do.

7    Q.    Do you hold any professional licenses in Florida?

8    A.    I'm a professional engineer in Florida.

9    Q.    What does it mean to be a professional engineer in Florida?

10   A.    It allows me to sign and seal drawings and designs and

11   specifications for purposes of construction and protecting the

12   public.

13   Q.    Can only licensed professional engineers in Florida do

14   that?

15   A.    That's correct.

16   Q.    And when you put your stamp on a design, what does that

17   mean?

18   A.    It means I've done all the calculations personally and I

19   stand behind the design.

20   Q.    Does it have to do with -- anything with the safety of the

21   public?

22   A.    It's all to do with the safety of the public.

23   Q.    Dr. Carrier, I'd like to go a little more in depth in your

24   background.  I see that you claim that you've done work on two

25   planets.  Is that true?

1    A.    That's true.

2    Q.    What two planets have you worked on?

3    A.    Well, one is Mars; and the other one is the moon, which is

4    not technically a planet, but within the astronomical community

5    it's considered a planetoid or planetesimal, and so it's easier

6    to just say two planets.

7    Q.    I might give you one and a half.  But setting that aside,

8    what work did you do on the moon?

9    A.    I worked for NASA during the Apollo program, and I helped

10   train the astronauts for their operations on the lunar surface,

11   and I studied the return samples when they came back.  And I was

12   also in the science support room with Mission Control during

13   each mission.

14   Q.    Did you work on Apollo 11?

15   A.    Yes, I did.

16   Q.    Is that the one that went to the moon for the first time?

17   A.    First time, yes.

18   Q.    Regarding the soil on the moon, did you give those

19   astronauts any advice?

20   A.    I was able to brief them before they went and tell them how

21   deep the lunar module was going to sink into the surface, as

22   well as how deep their boot prints walked around.

23   Q.    Were you right?

24   A.    Yes, I was.

25   Q.    What did you tell them?

1   A.    Sorry?

2   Q.    What did you tell them?

3   A.    Well, they had had various estimates given to them, and I

4   told them that the landing pads of the lunar module would go in

5   about two or three inches and that their boot prints would be

6   about a half inch thick on average, which is what it was.

7   Q.    Dr. Carrier, are you a published author?

8   A.    I am.

9   Q.    How many scientific publications have you issued?

10  A.    Honestly, I stopped counting.  But of peer-reviewed,

11  probably 115.  Other major things that were not peer-reviewed,

12  it's got to be over 200.

13  Q.    And what is a peer-reviewed article?

14  A.    That's where you might submit an article to a journal, and

15  the editor of that journal will distribute copies of that paper

16  to other people who are in the field; and they will review it

17  anonymously, typically, and they will make suggestions or they

18  may reject it or they may simply accept it.

19  Q.    What are some of the topics of some of those publications?

20  A.    A number of areas.  I've worked on articles about

21  foundations.  I've done theoretical analyses.  Let me think.

22  It's so many.  I did a lot on the moon.  We did an awful lot of

23  publications on the moon.

24          More recently -- let me think what the most recent

25  was.  I did an article on seepage through soil, how to calculate

1  that, predict that in advance.

2  Q.   And have you received any awards?

3  A.   I was very fortunate to receive the Norman Gold Medal,

4  which is the highest award by the American Society of Civil

5  Engineers for a paper.

6  Q.   And over your 45-year span as a geotechnical engineer, have

7  you done any work with respect to the safety, construction,

8  design, permitting, and failure of dams?

9  A.   Yes.

10 Q.   Can you briefly describe some of that experience?

11 A.   I've personally designed a dam and gotten it permitted here

12 in Florida.  I've done the same thing for two dams in the state

13 of Washington.  A couple of dams in Arizona.  A dam in Texas.

14 And then I've been involved in the safety review of a number of

15 other dams, maybe -- including the ones I've designed, maybe 20

16 all together, including I was a consultant to the Florida

17 Department of Environmental Protection for the permitting of two

18 major reservoirs here in Central -- here in Florida, in Central

19 Florida, in fact.

20 Q.   Was that a unique situation that you were working for the

21 Florida DEP?

22 A.    It was.  The Southwest Florida Water Management District

23 was a financial partner in these two projects that I'm referring

24 to.  And so, so that they wouldn't be licensing themselves, they

25 had the DEP do the licensing.  DEP came to me and hired me as a

1   consultant to help them with that process.

2   Q.   Have you assisted with the development of rules and

3   regulations concerning the design, construction, maintenance,

4   and operation of dams in Florida?

5   A.   Yes.  In the 1980s, the state had various subcommittees at

6   different times; and I've been involved in a couple of those at

7   different times, helping develop rules.

8   Q.   And are you being paid?

9   A.   Yes, I am.

10  Q.   Have you been paid in full?

11  A.   Yes.

12  Q.   How much have you been paid?

13  A.   I think to date it's 21,000.

14          MR. MARSHALL:  I move that Dr. Carrier be admitted as

15  an expert in geotechnical engineering, construction,

16  maintenance, and design of dams and their failures, and the

17  permitting requirements for dams in Northwest Florida.

18          THE COURT:  All right.  Any *voir dire*?

19          MR. MELTZER:  I'm going to object to the extent that

20  Mr. Marshall is suggesting he's a expert in Northwest Water

21  Management District.  I don't believe Mr. Carrier has ever done

22  any permitting in that district.

23          THE COURT:  Would you like to *voir dire* him on that?

24          MR. MELTZER:  Sure.  Sure.

25  BY MR. MELTZER:

1    Q.   Sir, you haven't, in fact, ever worked on permitting in the

2    northern district -- northern water management district of

3    Florida?

4    A.   Northwest Florida Water Management District, no, I have

5    not.

6              MR. MELTZER:  No further questions?

7              THE COURT:  Approach the bench, please.

8         (Following conference held at the bench.)

9              THE COURT:  So I don't know enough about the

10   permitting requirements in any of the water management districts

11   in the state, so I don't know if they're the same.

12             MR. MARSHALL:  They're all the same.

13             MR. MELTZER:  They are not even close to the same.

14             MR. MARSHALL:  They are the same.

15             MR. MELTZER:  And I'm going to be able to show you.

16             MR. MARSHALL:  No, no.

17             MR. MELTZER:  They're not the same.

18             THE COURT:  Okay.  I'm going to let the jury go home

19   early.  It's 5 after 5:00, and we need to talk about this.  I

20   need to hear from you.

21             Excuse me.  Come back.

22             I'm was up here talking to myself.

23             MR. MELTZER:  Sorry.

24             THE COURT:  Okay.  All right.  We're going to stop and

25   let the go jury.  It's 4 after 5:00.  This is an issue that

1    I'm -- you're both telling me something black-and-white

2    different.  I need to hear from you, and we'll do it outside the

3    jury's presence.

4              MR. MELTZER:  Sure.

5              THE COURT:  Thank you.

6         *(End of bench conference.)*

7              THE COURT:  Ladies and gentlemen, this is one of those

8    times that there's an issue that's come up that's probably going

9    to require more time than we have left in our trial day for me

10   to resolve.  So I'm not going to excuse you to the jury room for

11   10 or 15 minutes only to have you come in for another 5 minutes

12   of testimony.  So I think it's best that we go ahead and call it

13   a day.  I know it's been a long one for you.

14             We will reconvene tomorrow morning at 8:30.  Please

15   keep my instructions -- keep my instructions close in mind this

16   evening.  Do not discuss the case, anything you've heard here in

17   the courtroom, with anyone during the evening recess.  That

18   includes amongst yourselves as you leave this evening and you

19   return tomorrow morning.

20             Please avoid any news report of the trial should there

21   be any.  Very importantly, do not conduct any research on your

22   own, an independent investigation to the matters that have been

23   discussed here during the trial.  And also very importantly,

24   please don't begin to form any opinion yet about the merits of

25   the case.

1    Thank you very much for your service today.  I hope

2  you have a nice evening, safe travels, and we'll see you

3  tomorrow.

4    *(Jury excused.)*

5    THE COURT:  Dr. Carrier, you may step down.  You're a

6  guest in our city for, I guess, another evening.  You'll be back

7  on the stand tomorrow morning at 8:30, sir.

8    *(Witness excused.)*

9    THE COURT:  All right.  Be seated, please.

10    All right.  Up at the bench just now, we had a

11  discussion.  I explained to Mr. Meltzer and Mr. Marshall that I

12  am not familiar with the permitting requirements for the

13  Northwest Florida Water Management District.  I do not know if

14  they differ from those requirements that apply to the southern

15  district of Florida Water Management System.  Mr. Marshall

16  insists that they're the same.  Mr. Meltzer insists that they

17  are different.

18    So let me hear.  How am I going to resolve this?

19    MR. MARSHALL:  Your Honor, I would like to get another

20  opportunity to *voir dire* the witness a little bit more.

21    THE COURT:  Well, tell me what you expect him to say.

22  Come to the lectern, first, so we can hear you.  Thank you.

23    MR. MARSHALL:  I apologize.

24    THE COURT:  That's all right.  Just need to hear you.

25    MR. MARSHALL:  He can certainly explain why he

1  believes that they are the same.  He's probably in the best

2  position out of all of us to explain that.

3        THE COURT:  Well, let me ask this:  Is there one set

4  of permitting requirements that -- maybe I need to just go ahead

5  and let you *voir dire* him now.  Yeah, probably should do that.

6  Where is --

7        MR. MELTZER:  Your Honor, if I could -- maybe I could

8  point you to a couple of guidebooks by the Northwest and other

9  districts, as well as regulations that reflect that Northern --

10  the Northwest Water Management District is different.

11        THE COURT:  Okay.  What I'd like to do first is hear

12  from Dr. Carrier and let Mr. Marshall conduct his *voir dire*.

13        Oh, there he is.  I couldn't see him from the flip

14  chart.

15        And then, Mr. Meltzer, you can cross; and then to the

16  extent I need to review those matters that you've just

17  mentioned, I'll do that.

18        All right.  You're still under oath, Dr. Carrier.

19        All right, Mr. Marshall.  Go ahead.

20  BY MR. MARSHALL:

21  Q.   Dr. Carrier, are you aware of Chapter 48A-4?

22  A.   Of the Northwest Florida Water Management District?  Yes, I

23  am.

24  Q.   And are -- is there a set of regulations?

25        THE COURT:  Can I ask you to -- how are you aware of

1    that, sir?

2              THE WITNESS:  I looked them up.

3              THE COURT:  For purposes of this case?

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.  Go ahead.

6    BY MR. MARSHALL:

7    Q.   Are those regulations the same or substantially similar to

8    those that are present in the Southwest Water Management

9    District?

10   A.   Yes.

11   Q.   Are there differences?

12             THE WITNESS:  I didn't catch your name.  I'm sorry.

13             MR. MELTZER:  My name is Jason Meltzer.

14             THE WITNESS:  Meltzer?

15             MR. MELTZER:  Mm-hmm.

16   A.   I think what Mr. Meltzer was referring to was that the

17   Northwest District was slow to adopt rules as the other

18   districts had.  So in 1998 they finally adopted some rules that

19   were very similar to what others had.  Similar and yet thin.

20             The basic definition of a dam that the district

21   adopted was the same one that the industry has used for decades

22   to define a dam.  Then -- well, you can ask me another question.

23   But come October 1, 2013, all of the districts began using the

24   same regulations, which differ very little from '98 in terms of

25   what a dam is.

1          THE COURT:  Okay.  When did Northwest Florida adopt

2     the regulations that you're referring to that you said most of

3     the districts adopted the regulation in 2013?

4          THE WITNESS:  Well, prior to that, 1998 is when the

5     district had its own regulation.

6          THE COURT:  And did this district, Northwest Florida

7     Water Management District, have its own rules, regulations,

8     guidelines from '98 to 2013?

9          THE WITNESS:  Correct.

10          THE COURT:  Okay.  So it wasn't until 2013 that they

11     adopted the regulation that you're telling me is substantially

12     similar to what's in the Southern District?

13          THE WITNESS:  In terms of what is a dam, that hasn't

14     changed among the districts going back into the '70s.

15          THE COURT:  Right.  But what I'm interested in is

16     permitting requirements.  And so, I mean, are you saying that

17     because they had the same definition of what constitutes a dam,

18     that those regulations that they hadn't adopted applied to them?

19          THE WITNESS:  No.  What I'm saying is that the 1998

20     regulations which defined a dam applied as of then.

21          THE COURT:  The 1998 regulations for the state or for

22     the --

23          THE WITNESS:  For the district.

24          THE COURT:  -- management district?

25          THE WITNESS:  For the district.

1          THE COURT:  Okay.  So they had -- and are those

2    requirements the same or substantially the same or similar as

3    those in the other districts that you've referred to?

4          THE WITNESS:  Yes.  Yes.

5          THE COURT:  Well, what did the Northwest Florida Water

6    Management District differently do in 2013 if it was doing

7    everything the same in 1998?

8          THE WITNESS:  Well, the difference is that the

9    regulations in 1998 are 12 pages or something.  It was thin.  So

10   come 2013, it ended up being this thick, covering a whole bunch

11   of things in addition to the basic definition of a dam.

12         THE COURT:  Okay.  Well, I don't want to conduct your

13   examination.  Go ahead.

14         MR. MARSHALL:  I mean, I think Your Honor has --

15   BY MR. MARSHALL:

16   Q.   I mean, the regulations that existed in 1998 are the

17   same -- substantially similar to the ones that existed in all

18   the water districts; is that correct?

19   A.   That is correct.

20   Q.   And it's the same process?

21   A.   Basically the same process.

22   Q.   And you've reviewed these regs and are familiar with them

23   and understand how that would work, that entire process would

24   work?

25   A.   Yes.

1   Q.   And in terms of the -- you said the 2013 regulations, are

2   those the same if not -- or similar if not the same as those

3   that exist in all the other water management districts?

4   A.   Yes.

5   Q.   Is the only difference that the Northwest Florida Water

6   Management District adopted those a little later than some of

7   the other water districts?

8   A.   Correct.

9          THE COURT:  When were they adopted?

10         THE WITNESS:  The 1998 --

11         THE COURT:  No, the ones that you're saying in 2013,

12   the thicker --

13         THE WITNESS:  They were all -- all at the same time,

14   October 1, 2013.  This was -- I'm sorry if I'm confusing you.

15         THE COURT:  No, you're not.

16         THE WITNESS:  The other districts had their own

17   regulations prior to 1998.  Northwest District was slow, for

18   whatever reason.  October 1, 2013, was a great leveling to get

19   everybody all doing exactly the same thing.

20         THE COURT:  Okay.  Well, now, I do need clarification.

21   Did you just say that Northwest Florida did not have any

22   regulations from '98 to 2013, or they had this very thin, thin

23   version --

24         THE WITNESS:  They had regulations from 1998 to 2013.

25         THE COURT:  All right.  And am I right, these are

1  regulations that the Water Management District adopts for

2  itself?

3            THE WITNESS:  Yes.

4            THE COURT:  So these are not state regulations?

5            THE WITNESS:  They're not state regulations.

6  BY MR. MARSHALL:

7  Q.   But are the regulations substantially similar if not the

8  same as the regulations that existed in all the other Water

9  Management Districts?

10 A.   They're substantially the same.

11            THE COURT:  From '98 to 2013?

12            THE WITNESS:  Yes.

13            THE COURT:  All right.  Let me -- thank you,

14 Mr. Marshall and Dr. Carrier.

15            Mr. Meltzer?

16            MR. MELTZER:  So, Your Honor, I'll just start out by

17 saying that nothing with respect to any particular regulations

18 is in Dr. Carrier's report.  So anything he's going to

19 potentially testify about with respect to permitting

20 regulations, Your Honor, we would say is outside the scope.

21            THE COURT:  Well, that's a problem.  I don't know.  I

22 haven't -- I'm sure I read his report way back when, but I

23 haven't read it recently.

24            MR. MARSHALL:  Your Honor, he actually -- in his

25 deposition the regulations were made an exhibit.  And it

1    specifically references in his report that the dam was not

2    permitted, and that was one of his opinions.  And he was

3    examined extensively on that issue and the regulations.

4            THE COURT:  All right.  So Mr. Meltzer, if these

5    were -- if this was an issue at his deposition, then that

6    objection will be overruled.

7    BY MR. MELTZER:

8    Q.   Dr. Carrier, you said before that the Northwest Water

9    Management District differed before 2013 in terms of regulations

10   generally.  How did they differ?

11   A.   The regulations that they had put in place in 1998 were not

12   as detailed as you would find in other districts.

13   Q.   Is there anything else?

14   A.   In terms of the basic definition of the dam, I would say

15   they're all the same.

16   Q.   In terms of how the --

17   A.   All of these --

18   Q.   -- Northwest Water Management regulation worked, do you

19   have any idea what other differences there were?

20   A.   I've not worked in this district, but the word on the

21   street was that they didn't go into as much detail as other

22   districts.

23   Q.   Do you know if there was someone else regulating,

24   historically?

25   A.   So historically, at first, in the -- prior to the '70s,

nobody was regulating. There were a series of dam failures
associated with the phosphate industry, where they had one
failure a year for about 20 years. And they decided to write
regulations specifically for the phosphate industry. Those were
administered by the DEP.

When it became obvious that they needed -- and in that
sense, Florida was behind many other states in the U.S. When it
became obvious that they needed regulations to cover dams in
other parts of Florida besides the phosphate industry, that's
when the committees began to meet to try and hammer out what the
regulations should be.

The basic definitions of a dam had been used by the
engineering community long before that; and that's how, in
effect, we engineers wrote those regulations.

THE COURT: I'm going to stop you and ask Dr. Carrier:
How is it that you know what definition of a dam Northwest
Florida Water Management District used between '98 and 2013?

THE WITNESS: I can look at the regulations and see
what they used.

THE COURT: So it defines -- I haven't seen the
regulations. So it's defined?

THE WITNESS: It says specifically in there what
determines a dam.

THE COURT: Okay. The concern is -- the concern I
would have is that you would testify, not intentionally, but

1    apply a standard to the Northwest Florida Water Management

2    District that it did not impose upon itself.  And they're not on

3    trial.  That district is not on trial here.  And whatever

4    regulations existed that that district adopted for itself and,

5    you know, whatever was under its jurisdiction, that's what will

6    be testified in this courtroom, not some other standard.

7              Do you see what I'm saying?

8              THE WITNESS:  I think --

9              THE COURT:  Because Southwest Florida -- I mean,

10   because South Florida had a certain standard that it adhered to,

11   that's not binding on Northwest Florida, unless you know

12   differently.

13             THE WITNESS:  You're correct.

14             THE COURT:  So that's the concern.  But if you -- if

15   you feel you can confine your testimony to, you know, those --

16   you characterize them as thin regulations from 1998 and 2013,

17   and confine your opinions to what those regulations provide, the

18   letter and the spirit of those regulations, then I'm going to

19   let him testify.

20             MR. MELTZER:  I'm sorry.  But you're not going to

21   qualify him as an expert with respect to the Northwest Florida

22   Water Management District; is that right?

23             THE COURT:  Well, Mr. Marshall, is that what you're

24   seeking for him to be an expert --

25             MR. MARSHALL:  He's going to be qualified to talk

1    about, you know, the permitting issues, which is what -- what

2    we're really here to do.  And again, these are thin regulations

3    he's already talked about.

4         And, Your Honor, if I could just tender you the

5    regulations.  We're not talking about a lot of materials here.

6         THE COURT:  Right.  But, I mean, the defendants have

7    a -- you know, a good point, Mr. Marshall.  I mean, this --

8    Dr. Carrier is obviously very well experienced and knowledgeable

9    about these issues.  But you're seeking to certify him as an

10   expert on the permitting requirements for the Northwest Florida

11   Water Management District, and he doesn't have any experience

12   with the Northwest Florida Water Management District.

13        MR. MARSHALL:  Your Honor, he's reviewed the

14   standards.  They're written down.  The process is written down.

15   The definition of a dam is the same as it is in any other water

16   district.  He can read and understand this and testify as to

17   what the practice would be in terms of does a dam meet these

18   regulatory standards.  If so, what would have to happen; you'd

19   have to have a permit.

20        There has been a fair and full opportunity to examine

21   him.  The regs are right here.

22        THE COURT:  Why not a motion in limine on this,

23   Mr. Meltzer?

24        MR. MELTZER:  Your Honor, as the Court has noted

25   previously, Dr. Carrier never cited any specific regulations in

1    his report.  He never referred to, you know, any water

2    management district -- or he didn't refer to any Northwest

3    Florida Water Management District --

4          THE COURT:  Now -- well, maybe not his report but it

5    was -- what I'm hearing, and I wasn't there, but that this was

6    thoroughly discussed at his deposition.  So this --

7          MR. MELTZER:  And in his deposition he testified

8    specifically that he's never done permitting in the Northwest

9    Florida management district.

10         MR. MARSHALL:  Your Honor, Exhibit -- again, this was

11   thoroughly examined.  These issues were thoroughly addressed;

12   and they are, in fact, an exhibit to his deposition.

13         THE COURT:  Yeah.  Why don't you-all have somebody

14   from the Northwest Florida Management District here to testify

15   in your case, Mr. Hill?

16         MR. MELTZER:  I'm sorry, Your Honor?

17         THE COURT:  I'm just curious.  If this is an issue,

18   why not have somebody, you know, to testify from the Northwest

19   Florida Water Management District in your case?

20         MR. HILL:  Obviously, Your Honor, one reason is we're

21   way beyond the discovery cutoff period.  So, I mean, this all

22   occurred back when Dr. Carrier was deposed.  And when you're

23   working up for the evidentiary hearing that we had before Your

24   Honor, we did not do that.

25         They could have done that as well in their

1  case-in-chief if they wanted to show that permitting was

2  required.  They didn't do that here.  And they didn't offer this

3  opinion, I don't believe, by Dr. Carrier at all at the hearing.

4  It wasn't --

5       THE COURT:  It wasn't at the hearing.

6       MR. MARSHALL:  He wasn't --

7       THE COURT:  It was not an issue at the hearing, but

8  the hearing was really about causation.

9       MR. MELTZER:  Your Honor, I mean, Dr. Carrier --

10  Dr. Carrier's experience, I mean, is at issue.  He has zero

11  experience doing any kind of permitting in the Northwest Water

12  Management District.  He cannot be permitted to testify about

13  what the company should have done, you know, before -- when he

14  says 2013, and these regulations, you know --

15       THE COURT:  Well, obviously I'm going to have to read

16  his deposition because part of what -- an issue that is at play

17  here is whether there was sufficient notice of this opinion

18  before trial.  I need to see his report as well, so -- because

19  I'm looking at defendants, wanting to know where there wasn't a

20  motion in limine.  This is obviously, in my opinion, something

21  that should have been addressed before Dr. Carrier took the

22  stand.

23       MR. MELTZER:  This was noted in some of our prior

24  briefing.

25       THE COURT:  I can't hear you, Mr. Meltzer.

1      MR. MELTZER:  As we noted in some of our prior

2  briefing, this whole dam safety permit issue was disclosed for

3  the first time ever the day that the pretrial stipulation was

4  submitted.

5      THE COURT:  But how could it be thoroughly -- again,

6  you two are telling me things that are diametrically opposed.

7  How could this have been thoroughly covered in his deposition

8  and then you tell me that this is the first time this was

9  disclosed?

10      MR. MARSHALL:  Your Honor --

11      MR. MELTZER:  It was not thoroughly covered in his

12  deposition.

13      THE COURT:  I'm going to make the decision on that.

14  I'll have some --

15      MR. MARSHALL:  Your Honor, again --

16      THE COURT:  -- fun reading tonight.

17      MR. MARSHALL:  I can tender the regulations to the

18  Court, or his deposition.

19      THE COURT:  I am going to need to see the regulations,

20  I'm going to need to see his deposition, and I'm going to need

21  to see his report, all of which I would have preferred to have

22  seen prior to this trial in resolving this issue that is now

23  facing me.

24      MR. MARSHALL:  And I can also -- I mean, all of this

25  really goes to weight.  They're going to have a full opportunity

1    to explore, you know, what's the basis for his opinions in front

2    of the jury.

3              THE COURT:  They're not going to if this was not

4    something they had notice of, and I'm going to decide that and

5    look at that deposition, and I'll decide if I feel like they had

6    sufficient notice.

7              I mean, this certainly was his opinion at the hearing;

8    but as I said, the hearing wasn't necessarily focused on this.

9              MR. MARSHALL:  Well, your Honor, he didn't testify at

10   the hearing.

11             THE COURT:  Oh.  Okay.  Well, that's why I don't

12   remember it, then.

13             MR. MARSHALL:  He didn't testify at the hearing, and

14   so that's really not an issue, obviously.

15             But he says -- he says, To date I've not found any

16   documents indicating -- this is in his report -- whether or not

17   International Paper's dam was permitted; but based on the

18   Northwest Florida Water Management District regulations, I

19   believe it should have been permitted.

20             THE COURT:  Okay.  Let me see his report with that.

21             MR. MARSHALL:  Your Honor, may I approach?

22             THE COURT:  This is the sole purpose for you

23   designating him as a permitting expert?

24             MR. MARSHALL:  There's a couple of different bases.

25   Obviously to address some of the permitting issues, which is one

 1  part of his opinions, but also to talk about the design of this

 2  dam and why it wasn't appropriate.

 3          THE COURT:  Which is what his report is directed to.

 4          MR. MARSHALL:  Well, his report addresses both issues.

 5          THE COURT:  So in his report he addresses the

 6  permitting issue.

 7          MR. MARSHALL:  Yes.  Yes.

 8          THE COURT:  Well, Mr. Meltzer, Mr. --

 9          MR. MELTZER:  Your Honor, I apologize.  In his

10  report -- in his report the entire issue of permitting comes up

11  in connection with abandonment, and he says you have to have a

12  permit to abandon the structure.  That is what he's talking

13  about.  Okay?  He never says --

14          MR. MARSHALL:  Your Honor, it's --

15          MR. MELTZER:  -- anything about --

16          MR. MARSHALL:  I mean, I'm just -- I'm reading the

17  report:  I have not found any documents -- this is from his

18  report -- indicating whether or not International Paper's dam

19  was permitted; but based on the Northwest Florida Water

20  Management District regulations, I believe it should have been

21  permitted.  And, yes, it did come up in the context of whether

22  the dam was abandoned or not --

23          THE COURT:  Yeah, I remember that.

24          MR. MARSHALL:  -- and he said it should have been --

25  it should have been permitted.

1          MR. MELTZER:  To abandon it.

2          MR. MARSHALL:  And so --

3          THE COURT:  Let me have the deposition.  Let me have

4     the report.

5          So, Mr. Marshall, if I don't allow Dr. Carrier -- I

6     don't designate him on this issue because of a -- not -- well,

7     because of notice, or if I happen to decide that it's not

8     qualified, what's he going to testify to?

9          MR. MARSHALL:  He would talk about the design of the

10    dam.

11         THE COURT:  Okay.

12         MR. MARSHALL:  How it failed -- you know, why it

13    failed.

14         THE COURT:  So you'll have him designated as a civil

15    engineer?

16         MR. MARSHALL:  Yeah, geotechnical.

17         THE COURT:  Geotechnical expertise.

18         All right.  Well, I can't give you a ruling this

19    evening.  I'll give you a ruling at 8:00 a.m.

20         So, Dr. Carrier, you'll be back.

21         MR. MARSHALL:  Your Honor, for your reference, in

22    the -- as an exhibit to that will be the regulations.  You'll

23    see the --

24         THE COURT:  As an exhibits to the depo or the report?

25         MR. MARSHALL:  The deposition.

1          THE COURT:  Okay.  You said that.

2          MR. MELTZER:  Your Honor, if I might, can I give you

3    one more thing?

4          THE COURT:  Yes, sir.

5          Dr. Carrier, I think you can step down.  Thank you

6    very much, though.

7          MR. MELTZER:  Court's indulgence, Your Honor.  I

8    apologize.

9          THE COURT:  While Mr. Meltzer is looking for that, my

10   inclination -- and I'm not going to give you my final ruling.

11   My inclination is to find that he's qualified.  I don't think

12   his experience has to be that specific to discuss the

13   regulations.  As long as he confines his opinion to the

14   regulations themselves that pertain to Northwest Florida Water

15   Management District --

16         Mr. Meltzer, if you'll hand that to Ms. Simms.  Thank

17   you.

18         -- as long as he confines his opinion to the

19   regulations that existed during the pertinent time and doesn't

20   impose a standard that did not apply to the Northwest Florida

21   Water Management District during that time period, then I think

22   my -- giving you the benefit of my preliminary thoughts here, no

23   advisory ruling, but I'm likely to allow him to testify as

24   qualified.

25         Now, this issue of notice is a separate issue, though;

1  and I need to, like I said, review the report and the depo for

2  that.

3          Let me raise another issue while Mr. Meltzer is

4  looking for the document that he's searching for.

5          When Ms. Kersey testified, she -- her testimony -- and

6  I'm sure she didn't realize it, but it impacted a decision that

7  I made in this case in one of my pretrial orders pertaining to

8  the CarlanKillam study.  And that pertained to a brief excerpt

9  from the study that I excised and admitted at the -- this is --

10  I don't have the document number on this.  Oh, 209.  Thank you.

11  It is 209.

12          MR. MELTZER:  Your Honor, I'm going to give you the

13  Environmental Research Permit Applicant's handbook and direct

14  the Court, with your permission, to Section 1.2 of that

15  handbook, where it says the grant between DEP and NWF the --

16          MR. MARSHALL:  What are you showing her?

17          MR. MELTZER:  This handbook.

18          MR. MARSHALL:  These -- so he's going to show you the

19  2013 handbooks, which Dr. Carrier just told you were the same

20  thing that existed on the water management districts --

21          THE COURT:  If there's a reference in the handbook to

22  Northwest Florida Water Management District then -- tell me the

23  cite again, Mr. Meltzer.

24          MR. MELTZER:  Sure.  It's Section 1.2.

25          THE COURT:  All right.  I'll take a look at that as

1    well.

2          Back to what I was explaining earlier in regards to

3    Document 209 and a pretrial ruling.  In regards to the

4    CarlanKillam study, this was the subject of a motion in limine

5    by the plaintiffs.  And I determined to allow in the study;

6    however, I excised a specific portion of the study because I --

7    under 403, and it was a reference to residents' perceptions of

8    the cause of historical flood events, i.e., wastewater runoff,

9    that are substantially different, in my view at the time I wrote

10   this order, from the alleged cause of the flooding in this case,

11   the failure of the dam.

12         Well, this was exactly what she was referring to,

13   Mr. Glasser.

14         MR. GLASSER:  Your Honor, I suggest, instead of

15   reversing the motion in limine, you just give a limiting

16   instruction to the jury in the morning that no other flood is at

17   issue in this case prior to 29-2014, and the plaintiffs are not

18   making any claims in relation to any other flood.

19         THE COURT:  Well, they just heard from Ms. Kersey that

20   she was told by a Realtor that the cause of the flood in her

21   home, prior to the time she bought it, was the fault of

22   International Paper.

23         MR. GLASSER:  And I'm proposing a curative instruction

24   to Your Honor on that issue.

25         THE COURT:  Well, the only curative instruction I

1 would give is that there's no evidence whatsoever that they were

2 the cause of that flooding.

3        MR. GLASSER:  That would be fine, Your Honor.

4        THE COURT:  Anything from the defendants?

5        MR. NELSON:  Your Honor, I believe that the door was

6 opened during Ms. Kersey's testimony to readmitting, so to

7 speak, the excised portion of the '99 CarlanKillam study.  That

8 bell has been rung, and I think it is hard to unring unless it

9 is an extremely direct curative instruction.  But I think it can

10 also be addressed through the evidence.

11        THE COURT:  I'm sorry.  What -- you mean through the

12 study -- the portion of the study that I had excised?

13        MR. NELSON:  That's correct, Your Honor.

14        MR. GLASSER:  And the reason, Your Honor, that I'm

15 proposing a curative instruction instead is because I don't want

16 the idea of there being minitrials about other floods for which

17 there are no other experts, there's no --

18        THE COURT:  I know, but you-all brought this in.  It's

19 not as though the defense brought it in.  You-all brought it in.

20        MR. GLASSER:  And I believe the strong curative

21 instruction that Your Honor just articulated more than tamps

22 down the door on that.  And we would never argue in closing

23 about that.  We would not address that.

24        THE COURT:  Well, of course not, because you don't

25 have any evidence of it.

1          My preference would have been that you educated your

2     witnesses about my rulings.

3          MR. GLASSER:  My preference would have been the same,

4     Your Honor.

5          THE COURT:  Yeah.  Thank you.

6          MR. NELSON:  Your Honor, just one other quick point.

7     I think the notion that prior flooding is irrelevant is a flawed

8     foundation for Mr. Glasser's argument.

9          THE COURT:  Well, I wasn't going to instruct them that

10    prior flooding was irrelevant.  I was going to instruct them

11    that there's no evidence at all that any prior flooding of any

12    home in the class area was the fault of International Paper.  I

13    mean, that -- it would need to be that strong or else I'm just

14    going to -- I'll leave in -- reverse my order.

15         MR. GLASSER:  And, Your Honor, Plaintiffs would not

16    object and, in fact, endorse that proposal.

17         MR. NELSON:  It might concern, as I mentioned, Your

18    Honor, is I think they -- they've heard that.  And I think even

19    with a curative instruction, it is very hard to unring that

20    bell.  They've hear that someone was told the flooding was due

21    to operations at Champion.  We have an investigative report, a

22    public record, that finds the contrary.  We should be entitled

23    to directly rebut what Ms. Kersey put into evidence.

24         THE COURT:  All right.  This is something else I'll

25    take under advisement during the evening recess, and I will give

1  you my decision in the morning.

2          All right.  Is there anything else?

3          MR. GLASSER:  Not from the plaintiffs, Your Honor.

4          THE COURT:  Okay.  You all have a nice evening.  I'll

5  see you all tomorrow at 8:00.

6      *(Proceedings adjourned at 5:38 p.m.)*

7                    * * * * * * * *

8      We certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.  Any
9  redaction of personal data identifiers pursuant to the Judicial
   Conference Policy on Privacy are noted within the transcript.

10
   **/s/ Donna L. Boland**
11  _____
   Donna L. Boland,
12  Official U.S. Court Reporter

13  **/s/ Julie A. Wycoff**        2/21/2017

14  _____    _____
   Julie A. Wycoff,                Date
   Official U.S. Court Reporter
15

16                         **INDEX**

17                                                    PAGE
   WITNESSES FOR THE PLAINTIFFS:
18
   RICHARD BULLARD
19      Redirect Examination by Mr. Kauffman        7
        Recross-Examination by Mr. Hill             11
20
   KYLE MOORE
21      Direct Examination by Mr. Glasser           13
        Cross-Examination by Mr. Nelson             125
22      Redirect Examination                        165

23  **CHRISTOPHER QUACKENBUSH**
        Direct Examination by Mr. Glasser           177
24      Cross-Examination by Mr. Hill               190

25

1    **CHARLES EDWARD GIDDINS**
         Direct Examination by Mr. Vlachos          204
2        Cross-Examination by Mr. Meltzer           221

3    **ERICK ALEXANDER**
         Direct Examination by Mr. Vlachos          233
4        Cross-Examination by Mr. Hill              239

5    **LINDA NAVELSKI**
         Direct Examination by Mr. Kauffman         243
6        Cross-Examination by Mr. Hill              255

7    CINDY KERSEY
         Direct Examination by Mr. Vlachos          258
8        Cross-Examination by Mr. Hill              265

9    **DAVID CARRIER**
         Direct Examination by Mr. Marshall         267

10

11                    **PLAINTIFFS' EXHIBITS**

12   Exhibit Number                              Received

13        61:                                      122
          82:                                       22
14     82(a):                                       52
          89:                                       68
15        95:                                       58
          96:                                       59
16       104:                                       21
         118:                                       62
17       166:                                       56
         167:                                       57
18    178(f):                                       21
      181(e):                                       18
19    182(a):                                       47
      183(h):                                      122
20    185(a):                                       15
      186(a):                                       19
21    187(j):                                       19
         228:                                      118
22       240:                                       98
         241:                                      111
23       243:                                      105
         244:                                      113
24       254:                                      115
         268:                                       89
25       300:                                        8
         301:                                      108

| | | | |
|---|---|---|---|
| | **DEFENSE EXHIBITS** | | |

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 2 | Sirrine Stormwater Runoff study | 141 | 141 |
| 8 | Structural drawings and calculations | 145 | 145 |
| 9 | 2011 Best Management Practice/Pollution Prevention Plan | 155 | 155 |
| 45 | Photo of Dumpster | 197 | 197 |
| 43 | Photo of ice chest | 199 | 199 |
| 71 | Contract Weekly Report | 225 | 225 |

| | | | |
|---|---|---|---|
| | **PLAINTIFF EXHIBITS** | | |

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 302 | Blowup of 2011 BMP | 172 | 172 |
| 91 | Stormwater overflow picture | 185 | 185 |
| 92 | Stormwater overflow photo | 213 | 213 |
| 180E | Photo of outfall box | 218 | 218 |
| 107 | Photo of water, Navelski kitchen | 251 | 251 |
| 108 | Photo of water, Navelski front door | 253 | 253 |
| 128A | Photo 612 with time stamps | 256 | 256 |