UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**JOHN NAVELSKI, LINDA NAVELSKI,**   )
**ERICK ALEXANDER, JACOB HUTCHINS,** )
**AMBER HUTCHINS, JEANNE HENDERLY,** )
**RICHARD BULLARD, and BEVERLY**     )
**BULLARD,** on their own behalf and )
those others similarly situated,     )
                                     )
        Plaintiffs,               )
                                     )
                                     )   Case No. 3:14cv445/MCR
                                     )
vs.                                  )   Pensacola, Florida
                                     )   February 22, 2018
                                     )   8:03 a.m.
                                     )
**INTERNATIONAL PAPER COMPANY,**     )
                                     )
        Defendant.                )
_____)


**JURY TRIAL - DAY THREE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury
(Pages 1-288)

## <u>APPEARANCES</u>

FOR THE PLAINTIFFS:    **JONATHAN R. MARSHALL, ESQUIRE**
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia  25301

**JAMES L. KAUFFMAN, ESQUIRE**
**BRIAN A. GLASSER, ESQUIRE**
Bailey & Glasser, LLP
1054 31st Street NW, Suite 230
Washington, DC  20007

**CHRISTOPHER M. VLACHOS, ESQUIRE**
Christopher M. Vlachos, PLLC
244 E Intendencia
Pensacola, Florida  32502

**J.J. TALBOTT, ESQUIRE**
Law Offices of Jeremiah J. Talbott, PA
900 E Moreno Street
Pensacola, Florida  32503

FOR THE DEFENDANT:    **T. LARRY HILL, ESQUIRE**
Moore, Hill & Westmoreland, P.A.
P.O. Box 13290
Pensacola, Florida  32591

**DANIEL W. NELSON, ESQUIRE**
**MEGAN B. KIERNAN, ESQUIRE**
**JASON R. MELTZER, ESQUIRE**
Gibson Dunn & Crutcher, LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036

1                              P R O C E E D I N G S

2             **THE COURT:**  Good morning.  The first thing I'll do is

3       address the two issues that we ended with last evening, the

4       first being Ms. Kersey's testimony regarding a freak accident

5       involving runoff from International Paper that she said she was

6       told caused the flooding in her home in the 1990s prior to the

7       time that she bought it.

8             I do find that this is highly prejudicial to the jury,

9       not just because it suggests that flooding attributable to

10      International Paper is a recurring theme in the class area, but

11      also because, as we know from the Carlan Killam study, the

12      statement is inaccurate.

13            We know from the paragraph that I excluded previously

14      in a pretrial order that the Carlan Killam study -- and we know

15      because it's stated in the study that there were residents who

16      believed that the flooding in the '90s was caused by runoff

17      from Champion at the time, the study also indicates that the

18      engineering firm Carlan Killam investigated the claims and

19      determined that the residents were wrong because runoff from

20      Champion is only a very small fraction of the flow through

21      what's described as an enormous drainage area.  And again, this

22      is a study that was commissioned and adopted by Escambia

23      County.

24            So a limiting instruction, which is what the

25      Plaintiffs have requested, to the effect that there is no

1    evidence in this case that International Paper is responsible

2    for prior flooding doesn't go far enough to cure the very real

3    dangers of unfair prejudice in this case and also dangers of

4    misleading the jury in this trial in which the Plaintiffs' very

5    claim is that water from International Paper's property

6    substantially contributed to the flooding in their homes.

7              And so I'm going to reverse my February 17th, 2018,

8    ruling, which is at ECF 209, page 5 and 6, where I excluded a

9    single paragraph from that study, which is -- or at the time,

10   based on the pretrial exhibits, was Exhibit T, ECF 155-17, and

11   at this time I do find that the Carlan Killam study is

12   admissible in its entirety.

13             Now, the next issue pertained to Dr. Carrier.  And

14   first we had a challenge from the Defendants regarding his

15   qualifications to opine about the permitting requirements of

16   the Northwest Florida Water Management District.

17             I do find that Dr. Carrier's formal education in

18   engineering and his professional experience with dam permitting

19   regulations in other Florida districts enable him to both read

20   and analyze the Northwest Florida Water Management District

21   regulations for the management and storage of surface waters

22   and also to offer a reliable expert opinion as to whether those

23   regulations applied to the Kingsfield Road structure.

24             It is simply not the case that an expert has to have

25   knowledge, training, and experience in every single issue that

1  falls under sort of the realm of his general experience.  I

2  think that's much too stringent a reading of the qualification

3  standard of *Daubert*.

4          An expert is not necessarily unqualified simply

5  because his education and professional experience are not

6  narrowly tailored to match the exact point of dispute in a

7  case.  And here he clearly has the engineering background and

8  the experience with other similar type water management

9  district regulations to offer an opinion about the Northwest

10  Florida Water Management District regulations.  So, on that

11  grounds of qualifications, the challenge is overruled.

12          As far as notice, Dr. Carrier's opinion on this issue

13  was conveyed in his expert report.  He expressed in his report,

14  quote, "If construction and operation of the IP dam was

15  originally permitted by the Northwest Florida Water Management

16  District, then abandoning it would have also required a

17  permit."

18          This sentence includes a footnote in which he stated

19  that he had not found any documents indicating whether or not

20  the IP dam was permitted, but based on the Northwest Florida

21  regulations he believed that it should have been permitted.

22          This is not a comprehensive assessment, but the

23  language plainly conveys his professional opinion that under

24  the Northwest Florida Water Management District's regulatory

25  criteria that that structure, the Kingsfield Road structure,

1    what he refers to as the IP dam, required a permit.

2              His opinion on this issue was explored at length in

3    his deposition both during direct and cross-examination.  For

4    example, during direct Dr. Carrier testified that in rendering

5    his report he relied on the Northwest Florida regulations to

6    determine whether the Kingsfield Road structure qualified as a

7    dam for purposes of permitting requirements.

8              Then there was a discussion that ensued about which of

9    the permits, whether it be a general permit or an individual

10   permit, that he believed should have been obtained before the

11   structure was built and also before it was altered, abandoned,

12   or removed, in his mind.  This discussion was not limited to a

13   permit for abandonment.

14             And then finally, the entire Northwest Florida Water

15   Management District Chapter 40A-4 of the Florida Administrative

16   Code for Management and Storage of Surface Waters effective

17   July 1998 was a part of the deposition -- it was brought to the

18   deposition, and it was made an exhibit to his deposition, and

19   as I've said, it was used extensively during his deposition.

20             So, this isn't a situation, Mr. Meltzer, where IP only

21   learned of Dr. Carrier's opinion about permitting requirements

22   for the first time when the parties exchanged pretrial

23   disclosures in December of 2017.

24             I find that IP has been on notice since at least

25   August 2015 of this issue when Dr. Carrier's expert report was

1    issued, and then that was certainly reinforced by his

2    deposition testimony and the regulations admitted as exhibits

3    at that deposition.

4            So there's no unfair surprise here, and I do find that

5    he is qualified and that his opinion is admissible.  It will be

6    up to this jury to decide whether IP was ultimately subject to

7    these regulations.  And so the objection on notice grounds is

8    also overruled.

9            I want to address one other thing that took place on

10   Monday once we started the trial.  You'll recall we had an

11   issue where one of -- I believe it was one of the class

12   members, I'm not entirely sure, but was openly weeping in the

13   courtroom.  And as soon as I heard it -- and I think I heard it

14   pretty quickly -- the jury was excused from the courtroom

15   immediately.  And then I spoke to and admonished everyone about

16   the need to control emotions and that we could not have the

17   integrity of the proceedings impacted by sympathy for anyone,

18   no matter what the circumstances are.

19           And I'm saying this now because we had technical

20   difficulties with our recording devices at the time this

21   occurred and it was not actually transcribed -- or it was not

22   actually recorded and thus would not be transcribed, so I

23   wanted the record to reflect what took place at that moment.

24           Does anyone want to add anything to the extent I'm

25   leaving something out of what occurred?  Because the

1  transcript -- until I brought this up this morning, the

2  transcript did not reflect that event.  No?

3            **MR. GLASSER:**  No, ma'am, we have nothing to add.

4            **MR. NELSON:**  Nothing further, Your Honor.

5            **THE COURT:**  Very good.  Anything else we need to

6  discuss before we get started today?  Mr. Marshall?

7            **MR. MARSHALL:**  No, Your Honor.

8            **THE COURT:**  Mr. Nelson?

9            **MR. NELSON:**  It's a general logistical matter.  Your

10  Honor mentioned we would conduct the charge conference at some

11  point before closing.  At what juncture would the Court be

12  inclined to do that, after we've completed our case, or as we

13  have time as we go along?

14            **THE COURT:**  Well, I'm hoping to get some instructions

15  to you before the weekend, so today or tomorrow.  We will

16  probably take them up and discuss them on Monday.

17            Here is how I work this issue:  You all have submitted

18  proposed instructions.  And so, what I do, with Ms. Jacobs's

19  assistance, is we put together a packet from what you all have

20  proposed, and so you'll receive back from me what I guess I

21  propose along with your proposals, and then we'll walk through

22  those, and I'll hear from you regarding your objections or

23  comments to what I propose, and then I'll give you rulings, to

24  the extent I need to.

25            What I'd like to do in the very first meeting is to

1    get a consensus from counsel on as many instructions as we can.

2    Many of them are standard pattern instructions that hopefully

3    you're not going to have any dispute about, so I'd like to

4    narrow it down to sort of the scope of issues and then we'll

5    focus our attention on those.

6            I can't give you any timeframe more specific than that

7    right now.  But if I hear from you all -- and I was going to do

8    that this morning as well -- as to where you are, starting with

9    the Plaintiffs, in your case and how much more time you feel

10   you're going to need so I know.  Because I instruct, as you

11   know -- I'll make this brief.  I instruct the jury before your

12   closing arguments.  So as soon as the last bit of evidence is

13   admitted, we've got to have those instructions ready, because

14   that's the next thing that will take place in the trial.

15           **MR. MARSHALL:**  I believe we'll be in a position to

16   rest today, Your Honor.

17           **THE COURT:**  Oh, today?

18           **MR. MARSHALL:**  Yes, ma'am.

19           **THE COURT:**  So you have Dr. Carrier and then Dr. Ross?

20           **MR. MARSHALL:**  And Mr. DeJong.

21           **THE COURT:**  So you all be prepared to go as well.  Do

22   you think you'll require the full day?

23           **MR. MARSHALL:**  No, ma'am.  It depends on how long they

24   go but --

25           **THE COURT:**  Well, you'll need to have your first

1    witness here today.

2         **MR. NELSON:**  We will, Your Honor.

3         **THE COURT:**  I mean, I don't know what time we'll end,

4    and I suspect you'll have motions, most likely.  Depending on

5    the time of day that this occurs when the Plaintiffs rest, and

6    it seems to always happen that the jury has just come back in

7    and we've been a half-hour or so and then the plaintiff rests

8    or in a criminal case the government rests.

9         So, what I ask the defense to do, if that's the case,

10   is to just ask to approach the bench or I'll invite you to

11   approach the bench and make your motion in five words or less

12   on the record here at the bench, and then I'll take it under

13   advisement, so that way you've preserved it and then I'll hear

14   argument later, most likely at the end of the day.

15        Now, if you rest, Mr. Marshall, and your team rests at

16   anytime, say, four to 4:30-ish, we will go ahead and hear

17   arguments and I'll probably just have the jury come back

18   tomorrow to start your case.  It just depends on what time of

19   day we're at, but it doesn't sound like that's anything anybody

20   can accurately predict at this moment.

21        What are you all, Mr. Meltzer, Mr. Nelson, and Mr.

22   Hill, expecting for length of time for your case at this point?

23        **MR. NELSON:**  I would estimate, Your Honor, we're

24   looking -- again, depending on how long cross goes, two to

25   three full trial days.

1        **THE COURT:**  All right, that helps.  Well, we'll have

2   time for discussion on jury instructions, but I would like to

3   get you something, like I said, before the weekend.

4        Anything else that we need to discuss before Dr.

5   Carrier is back on the stand and Plaintiffs continue with their

6   case?

7        **MR. GLASSER:**  Nothing from the Plaintiffs, Your Honor.

8        **THE COURT:**  We'll be in recess then until 8:30 when

9   the jury is seated.

10       *(Recess taken 8:17 a.m. to 8:33 a.m.)*

11       *(Jury in the box.)*

12       **THE COURT:**  Good morning, ladies and gentlemen.

13  Welcome back.  We are ready to proceed with the trial this

14  morning.

15       As you'll recall, yesterday afternoon when we broke

16  Mr. Marshall was in his direct examination -- well, in the

17  process of qualifying Dr. Carrier to testify here in the trial

18  as an expert.

19       His request to designate Dr. Carrier as an expert in

20  the area of permitting in the Northwest Florida Water

21  Management District's regulations has been granted.  Dr.

22  Carrier will be so designated, but I do want to give you an

23  instruction now regarding expert witnesses.

24       When scientific, technical, or other specialized

25  knowledge might be helpful to the jury, a person having special

1    training or experience or knowledge in that technical field is

2    permitted to state an opinion about that matter.

3            However, merely because such a witness has expressed

4    an opinion does not mean that you must accept that opinion.

5    The same as with regard to any other witness, it is up to you

6    as the jury to decide whether or not to rely upon the

7    testimony.

8            Dr. Carrier, you're still under oath -- well, it's a

9    new trial day, so we will re-swear you.  Thank you.

10            **W. DAVID CARRIER, PLAINTIFF WITNESS, DULY SWORN**

11            **THE COURT:**  Thank you.

12            All right, Mr. Marshall, go ahead.

13            **MR. MARSHALL:**  Thank you, Your Honor.  Just as one

14   quick preliminary matter, I did ask that Dr. Carrier also be

15   admitted and qualified as an expert in geotechnical

16   engineering?

17            **THE COURT:**  He's qualified in that area, and he'll be

18   designated to give an expert opinion.

19            The same instruction applies, ladies and gentlemen,

20   but as to that area as well.

21                        **DIRECT EXAMINATION**

22   **BY MR. MARSHALL:**

23   Q.   Dr. Carrier, what were you asked to do in this case?

24   A.   I was asked to review the failure of the dam and, if I

25   could, to determine the cause of the failure as well as to

1  determine whether the dam should have been permitted.

2  Q.   Have you reached any conclusions?

3  A.   Yes, I have.

4  Q.   What are those conclusions?

5  A.   As regards the failure of the dam, it was built in and on

6  and of sandy soil that was highly erodible, which, when it was

7  overtopped by the storm surge, eroded and caused the failure of

8  the dam.  There were other possible mechanisms that I looked

9  at, but that was the primary mode of failure.

10      As regards the question about the permitting of the dam, I

11  concluded that, yes, it should have been permitted as a dam.

12  Q.   Did you have any opinion as to whether the dam should have

13  been removed?

14  A.   I concluded that it should have been removed.

15  Q.   And what did you do to reach those conclusions?

16  A.   It started with a visit to the site in December 2014 and

17  then followed up with review of various documents, the

18  depositions that have been done, reports, that sort of thing.

19  Q.   Is the Kingsfield Road dam a dam?

20  A.   Yes, it is a dam.

21  Q.   And explain from an engineering standpoint why it is a dam.

22  A.   We have certain criteria in the dam engineering community

23  as to what constitutes a dam, and obviously we don't want to

24  consider just farm ponds, for example, as a dam.  And so once

25  it meets a certain size, then it is determined to be a dam.

1    Q.   Does it impound water?

2    A.   If it has the capability to impound water, then that makes

3    it a dam, if it's a sufficient amount of water.

4    Q.   And when I say "impound water" what do I mean by impound?

5    A.   To hold water, to control water.

6    Q.   Is the Kingsfield Road dam an earthen dam?

7    A.   It is.

8    Q.   And why do you say that?

9    A.   There are various documents as to how long the dam is.  I

10   estimate it to have been approximately 200 feet long.  Most of

11   that is dirt, and that makes it an earthen dam.  There is a

12   concrete spillway structure that is part of the dam, but that

13   doesn't make it a concrete dam.  It's an earthen dam.

14          **MR. MARSHALL:**  James, could you pull up Exhibit

15   178(f), please.

16   **BY MR. MARSHALL:**

17   Q.   Dr. Carrier, what does Exhibit 178(f) depict?

18   A.   That's a view looking from the downstream upstream.  Where

19   the people are standing is what we would call the right

20   abutment, even though it's on the left side of the photograph.

21          The system for naming abutments is, if you're looking

22   downstream at the dam, the right abutment is on the right and

23   the left abutment is on the left.  So this particular view is

24   the reverse; we're looking upstream, and so the right abutment

25   is in the left-hand side of the photograph.  On the far right

1   you can see a part of the concrete structure, just it's kind of

2   in shadow, so I don't know how well that can be seen.  In

3   between there's obviously a big gap where the earth -- the dirt

4   used to be up against the concrete structure.

5   Q.   And Dr. Carrier, are you in that picture somewhere?

6   A.   Yes, actually, I am.

7   Q.   Is that when you did your site inspection?

8   A.   That's correct.

9   Q.   And when you were doing your site inspection, did you

10  examine the soil that made up the earthen part of the dam?

11  A.   Yes, I did.

12  Q.   And what conclusions did you reach regarding the soil that

13  composed the dam?

14  A.   It's a sandy soil with a bit of clay in it.

15  Q.   Did you take any core samples?

16  A.   I did not.

17  Q.   Why not?

18  A.   As you can see, the right abutment, what is left of it, is

19  completely exposed, and I was able to go up to the face and

20  examine the material visually and with my hands, and through my

21  experience I could identify the materials and conclude what I

22  needed to conclude.

23  Q.   Who regulates dams in Northwest Florida?

24  A.   The Northwest Florida Water Management District regulates

25  dams.

1   Q.   Does the Florida Department of Environmental Protection

2   regulate dams?

3   A.   They do not.  They passed that on to the various water

4   management districts in the state.  There are a total of five

5   districts, and in this area the Northwest Florida Water

6   Management District does that regulation.

7   Q.   Why does the Northwest Florida Water Management District

8   regulate dams?

9   A.   Basically it's for public safety to prevent flooding

10  downstream, that sort of thing.

11  Q.   And how does the district accomplish this purpose?

12  A.   They have regulations, and within the regulations is

13  described a permitting process where an owner has to apply to

14  have a permit to construct a dam in the first place or alter it

15  or abandon it later in the life of the structure, for example.

16  So it's a formal permitting or licensing process that the

17  district administers.

18  Q.   And what is a permit akin to?

19  A.   It's like a license.

20  Q.   And how big is the Kingsfield Road dam in terms of height

21  and width?

22  A.   The -- well, I said the width is about 200 feet, by my

23  estimation.  The height of the dam is approximately 13 feet,

24  which is measured from the downstream toe up to where it can

25  impound water.

1    Q.   And in order for the Northwest Florida Water Management

2    District to consider a dam to be a dam under the regulation,

3    how big must the dam be?

4    A.   It has to be either higher than 10 feet or impound 50

5    acre-feet of water.  Acre-feet is a measure of the volume of

6    water that the dam could impound, and either of those criteria

7    will make it a dam.

8    Q.   Did the Kingsfield Road dam meet those standards?

9    A.   Yes, it did.

10   Q.   Should the Kingsfield Road dam have been permitted?

11   A.   Yes.

12   Q.   Why do these size standards exist?

13   A.   It all goes back to public safety, the size of the

14   structure, the volume of water that can be released in an event

15   and what it can cause in terms of damage downstream.

16   Q.   Did International Paper have a permit from the Northwest

17   Florida Water Management District for this dam?

18   A.   No, they did not.

19   Q.   When a proposed structure meets the criteria for a dam

20   under the Northwest Florida Water Management District, what

21   must the owner do?

22   A.   Well, of course at that stage, if they haven't built it

23   yet, they must go through the permitting process which requires

24   a design that's been signed and sealed by a professional

25   engineer.  And there's a whole lot of information that has to

1    be provided to the district.  It's all described in the

2    regulations as to the information that has to be presented to

3    the district.

4    Q.   Does a maintenance plan have to be provided?

5    A.   A maintenance plan has to be included, yes.

6    Q.   And in order to obtain a permit, what does that design and

7    maintenance plan need to show?

8    A.   It has to show that the dam, as conceived, will be safe,

9    that it meets certain criteria regulated to safety, and the

10   maintenance plan has to show that it will be maintained in a

11   manner that allows the structure to continue to function for as

12   long as they use it.

13   Q.   Did International Paper demonstrate to the Northwest

14   Florida Water Management District that its design and

15   maintenance plans were safe?

16   A.   No.

17   Q.   Besides creating a new structure, does the Northwest

18   Florida Water Management District also require permit if you

19   intend to modify a structure?

20   A.   Yes.

21   Q.   And does the same requirements apply?

22   A.   Yes.

23   Q.   Dr. Carrier, I'm going to turn your attention to

24   Defendant's Trial Exhibit 1.

25        **MR. MARSHALL:**  I believe this has been admitted.

1  **BY MR. MARSHALL:**

2  Q.  Dr. Carrier, do you recognize Defendant's Exhibit 1?

3  A.  Yes.

4  Q.  What is it?

5  A.  This is the permit that International Paper had from the

6  Florida Department of Environmental Protection related to water

7  quality.

8  Q.  Does a water quality permit like this have anything to do

9  with the permit that you were referring to from the Northwest

10 Florida Water Management District?

11 A.  No, it does not.

12 Q.  Why do you say that?

13 A.  Well, to begin with, it's exclusively related to water

14 quality.  Furthermore, this particular permit is issued under

15 Chapter 403 of the Florida Statutes.  There's a separate

16 Chapter 373 of the Florida Statutes that relates to dam safety

17 and is -- that's the chapter that takes you to the Northwest

18 Florida Water Management District.

19 Q.  Does a permit like this have anything to do with whether a

20 dam is safe or not?

21 A.  No.

22 Q.  Dr. Carrier, do you know -- what are the general conditions

23 of a permit?

24 A.  Permits are issued with general conditions and special

25 conditions.  The general conditions are conditions -- legal

1  conditions to the permit that are essentially included in every

2  permit that the agency -- in this case, the DEP -- issues.

3  Special conditions are additional conditions specific to a

4  given project.

5  Q.   I'd like you to turn your attention to page 33 -- I'm sorry

6  -- page 33, Exhibit 1, and have you focus on the general

7  condition that's contained at the very top of this permit.  Can

8  you see that?

9  A.   Yes.

10 Q.   And what does that general condition provide for?

11 A.   Well, as you can see in the last sentence of that

12 paragraph, "This permit is not a waiver of or approval of any

13 other department permit or authorization that may be required

14 for other aspects of the total project which are not addressed

15 in this permit."

16 Q.   And could you also turn your attention to this sentence as

17 well, too, please.

18 A.   "Neither does it authorize any injury to public or private

19 property or any invasion of personal rights, nor authorize any

20 infringement of federal, state, or local laws or regulations."

21 Q.   I believe it was Mr. Moore who discussed the fact that this

22 permit, when it was issued, may have been cc'd or sent to the

23 Northwest Florida Water Management District.  Do you remember

24 that testimony?

25 A.   Yes, I do.

1   Q.   Does carbon copying or providing a copy of this permit

2   comport with the requirements for obtaining a permit of the

3   Northwest Florida Water Management District rules and

4   regulations?

5   A.   No, it does not.

6   Q.   And why wouldn't it?

7   A.   The owner is still required to go get a permit from the

8   Northwest Florida Water Management District.  The requirement

9   is always on the owner, it's not up to the district to impose

10  that.  It could happen, but it's not a requirement.

11        And in addition, in this particular permit, the dam itself

12  is not mentioned, so there's even less likelihood that the

13  Water Management District would turn around and say, *You need a*

14  *permit from us.*

15  Q.   Dr. Carrier, what is your opinion regarding the design of

16  the Kingsfield Road dam?

17  A.   It's under-designed for its original purpose.

18  Q.   And did you also offer any opinions as to armoring for the

19  soil?

20  A.   Well, the soil is easily erodible, and so one possibility

21  is to armor it in such a way that it could pass a storm, that

22  is, bypass, allow the stormwater to flow over the earthen area

23  that is protected by some kind of armoring.

24        **MR. MARSHALL:**  James, can you pull up Exhibit 104,

25  please.  This is an admitted exhibit.

1    **THE COURT:**  It is or is not?

2           **MR. MARSHALL:**  It is, ma'am.

3           **THE COURT:**  Thank you.

4    BY MR. MARSHALL:

5    Q.   Dr. Carrier, what does Exhibit 104 depict?

6    A.   This is a view from the right abutment.  It is a panoramic

7    view sort of in a half circle looking at the site.  I don't

8    know the exact date, but sometime after the failure in April of

9    2014.

10   Q.   And just starting to the left and moving to the right, will

11   you just describe -- I don't want you to spend a bunch of time

12   on this, but just generally describe the site, please.

13   A.   This is the drop box that they used at one time for

14   carrying water downstream for discharge.  This -- again, it's

15   strange because of the panorama, but this is the air gap, if

16   you will, where the dirt used to be that was eroded away during

17   the storm.  This is the concrete box structure that was

18   intended to take flow into and then out on this concrete apron.

19   Q.   And is it your testimony that the part that's missing that

20   would have been earthen, that would have been part of the dam?

21   A.   Correct.

22   Q.   I'd like you to turn your attention -- I'm going to get a

23   little closer on some of the features of the dam -- to Exhibit

24   61, please.

25          **MR. MARSHALL:**  And this is also admitted.  Actually,

1    this is not admitted.  I'm sorry, I apologize for that.

2              **THE COURT:**  61 is admitted.

3         **MR. MARSHALL:**  Oh, it is?  Okay.

4              **THE COURT:**  Yeah, this has been admitted.

5    **BY MR. MARSHALL:**

6    Q.   Dr. Carrier, do you recognize Exhibit 61?

7    A.   Yes, this is a photograph that I took.

8    Q.   And can you explain -- can you orient the jury and tell us

9    what the structures are there.

10   A.   This is that -- a view of the front side of that concrete

11   box, the front side meaning the part facing toward the water,

12   upstream.  This is the circular slide gate which is referred to

13   as a low-level outlet, it's approximately 48 inches in

14   diameter.  This is the screw mechanism up here that at least in

15   the past would be able to raise the gate by unscrewing it and

16   put the gate back down by screwing it.

17        This -- this thing is hard to draw on, sorry about that.

18   This part of the -- top of the concrete box is what I call the

19   sill.  This portion in -- sorry.  This portion in here is a

20   notch, one of two notches that were cut in the top of the sill

21   which we've called the weirs or the notches.

22   Q.   You talked about that gate at the bottom.  Why is the gate

23   important in terms of the overall operation of the dam?

24   A.   The gate allows the ability to, because of its location, to

25   drain water from the basin in case you wanted to inspect it,

1    for example.  That would be under sunny day conditions.  It
2    also allows draining the basin in anticipation of a storm.
3    Q.   Was the low-level gate operable at the time of the flood?
4    A.   My understanding is it was not.
5    Q.   Had it been inoperable for an extended period of time?
6    A.   Well, judging by its condition as I saw it in December
7    2014, it was highly rusted and could not be opened.
8    Q.   You discussed the weirs or the little notches.  Would
9    cutting these weirs into the dam have made it so that this
10   low-level gate was just not needed anymore?
11   A.   Well, no.  I mean, the -- by cutting those notches and not
12   using the gate, you no longer have the opportunity to drain the
13   basin either for maintenance inspection nor in anticipation of
14   a storm.
15   Q.   How does -- in terms of your opinions regarding the design
16   of this dam, how does the history of this dam play into those
17   opinions?
18   A.   Well, I knew that there had been multiple variations on
19   this dam and multiple erosion events, failures, if you will,
20   over the years and that it was a constant having to repair it
21   and change the way the system worked.
22        What was the last part of your question?  Sorry.
23   Q.   I think that was basically it.
24   A.   Okay.
25   Q.   I'd like you to turn your attention now to Exhibit 95.

1   What does Exhibit 95 depict?

2   A.   This is a photograph that was taken sometime after the

3   failure event in 2005.  This is on the downstream side of what

4   the dam looked like in those days, looking from the downstream

5   up toward the dam.

6   Q.   In light of the history of the dam which you have

7   recounted, is armoring important for a safe dam design?

8   A.   You have to -- you have to build a portion of your dam

9   sufficient to carry a large storm without erosion.  That's

10  basically the idea.  And that area has to be armored because

11  sandy soil will not resist flowing water.  It's just as simple

12  as that.

13  Q.   Is the rule of thumb that you want to make it so the water

14  flows over the --

15          **MR. MELTZER:**  Your Honor, if I might, these are a

16  little on the leading side.  Can he ask open-ended questions?

17          **THE COURT:**  Sustained.

18  **BY MR. MARSHALL:**

19  Q.   Dr. Carrier, is it bad for water to run over the earthen

20  part of a dam?

21          **MR. MELTZER:**  Same objection, Your Honor.

22          **THE COURT:**  Sustained.

23  **BY MR. MARSHALL:**

24  Q.   Dr. Carrier, if you were going to armor a dam, what would

25  you do?

1   A.   We have a couple of options.  One, is what we call riprap,

2   which is basically large rocks that can withstand the flow of

3   high velocity water.  They can be really big rocks.

4        And typically when you build something like that it's

5   graded in the sense that you have the big rocks on top and then

6   smaller rocks underneath and then perhaps gravel or sand

7   underneath that.  And the idea is that you want water to be

8   able to flow through this but without moving things around

9   through and over the rock.

10       Riprap is very commonly used in the upstream portion of

11  many dams as a protection against waves crashing on the

12  upstream face.

13       Another possibility is to simply cover the let's call it

14  the spillway area with concrete, which is very resistant to

15  erosion.

16  Q.   And when you cover the entire structure with concrete, what

17  are you trying to accomplish?

18  A.   You're trying to protect the underlying soil from the

19  erosion because of the flowing water.

20  Q.   Because what happens when water comes in contact with the

21  soil?

22  A.   Well, it erodes the soil and it washes downstream.  That

23  cuts a deeper and deeper section through the soil until you get

24  to the bottom basically, and that lets the water out that you

25  were trying to hold, to control, and it lets it go downstream.

1    Q.   Is water supposed to be allowed to run over the unarmored

2    portions of dams?

3    A.   No.

4    Q.   Now, turning your attention to Exhibit 95, I believe you've

5    identified this as the dam -- at least one removed from the one

6    that existed in 2014; is that correct?

7    A.   Correct.

8    Q.   In your opinion, which one of these designs was safer, the

9    one that existed in 2014 or the one that existed here?

10   A.   I think the one that existed in -- even though it was

11   damaged, I think that one was safer than the one they replaced

12   it with.

13   Q.   Why?

14   A.   For several reasons.  First, the concrete box that was --

15   that we've seen in the existing structure was in use for the

16   2005 structure basically in front of the dam.  A portion of it

17   was in the upstream embankment of the dam, but in a sense it

18   was isolated from the dam, it was not really part of the dam.

19        From that drop box, from that water to flow in, it came out

20   through the dam in two parts.  The rest of the dam had, as you

21   can see -- this was the Arkansas Crossing -- this attempt of a

22   concrete blanket over the top of the embankment and such that

23   it dropped down from the far ends of the dam.

24        I think there was a photograph where there was a truck on

25   the right abutment of the dam and you could see that there is a

1    drop-down.  That's very much on purpose so that you're able to

2    maintain a roadway, and you can have a truck drive down that

3    spillway and then back up the other side.  But the spillway

4    section itself is all covered with concrete, and that's to

5    prevent erosion.

6         In this particular case, they had -- you can see that the

7    concrete has broken and it was undermined from behind, but they

8    didn't have a catastrophic failure.  So in my opinion, this was

9    safer than the dam they replaced it with.

10   Q.   Has International Paper adequately considered the types of

11   flows that end up at this particular site?

12   A.   In my opinion, they have consistently underestimated how

13   much water can arrive at this dam site and has to be handled by

14   the spillway system in order to pass it safely downstream.

15   Q.   And I'd like you to turn your attention to Defendant's

16   Exhibit 8.  And specifically on Defendant's Exhibit 8, turning

17   to the fifth page, do you see that, Dr. Carrier?

18   A.   Yes.

19   Q.   Do you remember Mr. Moore's testimony regarding this

20   exhibit?

21   A.   Yes, I do.

22   Q.   What did Mr. Moore discuss with respect to this exhibit?

23   A.   These were presented as calculations that had been made

24   regarding what the flow capacity of the let's call it the 2005

25   dam versus the 2014 dam.  When they replaced the 2005 dam in

1    2006, that is what was there in 2014.

2    Q.    And did Mr. Moore reference the fact that at least he

3    thought that the 2014 dam, the one that existed in 2014, could

4    convey more water than the prior version?

5    A.    He did.

6    Q.    Do you think that's accurate?

7    A.    No.

8    Q.    Why do you think that's not accurate?

9    A.    Well, first, none of these calculations take into account

10   the capability of the box to take in the water to send down the

11   stream.  These calculations only have to do with the downstream

12   capacity of the system.  And in particular, there are two

13   calculations for what they're calling the future structure.

14       What they did ultimately was build a trapezoidal section.

15   You saw the broken concrete apron in the damaged section.  They

16   estimated what the capacity of that apron was to carry water.

17   The number that Mr. Moore referred to down here was based on a

18   water level -- first off, as I said, it didn't take into

19   account whether they could even get it into the trapezoidal

20   section.  But assuming you could, this particular calculation

21   would have allowed the water in the trapezoidal section to flow

22   above the concrete what they're calling on the grass section,

23   which would have led to erosion.  That erosion would have

24   worked backwards, and whatever you had done would have caused

25   it to fail also.

1    The appropriate number is up here where they've calculated

2    just the capacity of the trapezoidal section in the concrete --

3    on the concrete.  And that calculation amounted to 1,808 cubic

4    feet per second, again, a measure of volume versus time, which

5    is actually lower than the volume that they had calculated

6    through the two 48-inch pipes in the 2005 dam.

7    Q.   Is that an additional reason why you believe the prior

8    version was safer?

9    A.   Yes.

10   Q.   Does the future structure depend almost on water

11   overtopping --

12        **MR. MELTZER:**  Objection, Your Honor.

13        **THE COURT:**  It is leading, sustained.

14   **BY MR. MARSHALL:**

15   Q.   What is the significance of the total area of concrete plus

16   grass calculation on this exhibit?

17   A.   In this calculation, here is the concrete trapezoid, and

18   they've expanded the trapezoid up onto grassed embankment soil.

19   So, of course, that gives you a much bigger volume and you

20   calculate a whole lot of flow, but the problem is that you're

21   eroding -- the grass doesn't hold up very long and you're

22   eroding the sandy soil.

23   Q.   Why is it important, in your opinion, for a dam not to

24   fail?

25   A.   It's public safety, it's the potential for downstream

1    damage, the potential for killing someone, in fact.

2    Q.   I'd like to show you what's been marked as Exhibit 185(d),

3    which has been admitted, D as in dog.

4         What does this picture depict, Dr. Carrier?

5    A.   Just to orient you, this is an aerial view looking

6    downstream.  Here is the -- this is the drop box structure over

7    on the right abutment.  You can see a portion of the concrete

8    box that we've been talking about.  Here is the gap, the eroded

9    gap due to the storm event, and back here is the Kingsfield

10   Road bridge.

11   Q.   And what is significant about the proximity of the dam to

12   the bridge?

13   A.   The bridge is located about 300 feet downstream from the

14   dam, and that's an example of the sort of thing that we worry

15   about that, if you have a dam break, can it affect structures;

16   in this case, a significant bridge downstream or homes a little

17   farther downstream.  So all of that goes to public safety.

18   Q.   You heard Mr. Giddins I believe talk about sheet pile.  Do

19   you remember that testimony?

20   A.   Yes.

21   Q.   What is sheet pile?

22   A.   The name "sheet pile" is because it's very thin as opposed

23   to H-pile or pipe pile.  These are different piles that are

24   used in construction, and sheet pile is deliberately thin, it

25   has a specific purpose.  In this case it was made of plastic --

1    or vinyl, but plastic.  Do you want me to go on?

2    Q.   Is sheet pile armoring, in your opinion?

3    A.   Certainly not the plastic sheet pile that I observed.  When

4    I saw on the left abutment the vinyl sheet piling, I assumed

5    that it was for purposes of reducing seepage through the dirt,

6    and that's a common use for that particular material.  I would

7    never have used it as armoring.

8    Q.   Let's move on and talk a little bit about inspection and

9    maintenance.  What type of inspection requirements exist from

10   the Northwest Florida Water Management District?

11   A.   Typically a permit will require an owner to make regular

12   inspections of their own, but in addition they will require

13   that a professional engineer inspect the structure and prepare

14   a report on an annual basis.

15   Q.   And this professional engineer, do they have any types of

16   competences that are important?

17   A.   Yes, this has to be a professional engineer who is

18   competent to design and inspect an earthen dam in this case.

19   Q.   And why do these inspection requirements exist?

20   A.   It all goes to public safety.  The district or any

21   jurisdiction wants to be sure that the structure is remaining

22   safe and will perform as originally intended.

23   Q.   Do you believe that this dam was abandoned?

24   A.   Yes.

25   Q.   And why do you say that?

1  A.    Well, first, even before I went to the site, I had read the

2  press release or the news account that described it as

3  abandoned.

4      When I got to the site, for example, the drop inlet, which

5  is over here, is extremely rusty.  There are pieces -- there

6  are parts of it that look like they're going to disappear

7  altogether as a result of the rust.  That looked abandoned to

8  me.

9      The low-level outlet, the slide gate was rusty, the

10  apparatus was rusty and unusable, looked abandoned to me.  The

11  notches, the weirs that were cut into top of the sill looked to

12  me like, *Everything else is not functioning or about to fall*

13  *apart, we'll cut a couple of holes in the sill and walk away.*

14  Q.    What, in your opinion, should International Paper have done

15  with this structure?

16  A.    Well, after 2012 when they had the pipeline that was

17  constructed to carry the effluent to Perdido Bay, the wetlands

18  there -- I don't even know the details -- once that happened in

19  2012, this dam was no longer functioning and no longer useful,

20  and I would have removed it.

21  Q.    And why should the dam have been removed?

22  A.    Well, in fact, lots of dams have been removed in the United

23  States.  These are dams that are no longer needed, and the

24  intent is to restore the hydrology, the behavior of the stream

25  back to what it was before there was a dam.

1    Q.   And just from a sound engineering perspective, is there any

2    other reason why you would have wanted to remove a structure

3    like this?

4    A.   It just makes no sense to leave a structure that you're no

5    longer really using in the middle of a stream.

6    Q.   And did this dam erode --

7            **MR. MELTZER:**  Objection, Your Honor.  Can we have an

8    opening question?

9            **MR. MARSHALL:**  I'm just moving on to another line of

10   examination.

11           **THE COURT:**  If you have an objection based on leading,

12   just say "leading."

13           **MR. MELTZER:**  Leading.

14           **THE COURT:**  Go ahead.

15   **BY MR. MARSHALL:**

16   Q.   Did the dam erode?

17   A.   Did the dam erode, yes.

18   Q.   And did it fail during this storm event?

19   A.   Yes.

20   Q.   And how wide and how long was -- actually, how tall and how

21   long was the failure?

22   A.   The distance between the concrete box and the abutment over

23   here is approximately 41 feet at the top, and the height of the

24   gap is at least 13 feet, but I think it's probably closer to 15

25   feet based on the top of that abutment.

1    Q.   And why did the dam erode and fail?

2    A.   Obviously the water rose up behind the dam and found its

3    way over -- there was so much of it that it found its way over

4    the earthen part on both sides of the concrete structure, and

5    the right side eroded and went downstream.

6    Q.   Do you hold the opinions you've expressed today to a

7    reasonable degree of engineering and geotechnical certainty?

8    A.   Yes, I do.

9         **MR. MARSHALL:**  Pass the witness.

10        **THE COURT:**  Counsel, approach just one moment, please,

11   before we start with Mr. Meltzer's cross.

12        *(Bench conference between the Court and counsel:)*

13        **THE COURT:**  I meant to give you this back this

14   morning, that's the handbook.  And then I don't remember who

15   gave me these.  These are the only copies you have?

16        **MR. MARSHALL:**  They are but I could --

17        **THE COURT:**  That's okay.  If I need them, I'll holler.

18   Thank you.

19        *(Bench conference concluded.)*

20        **THE COURT:**  Whenever you're ready, Mr. Meltzer.

21                    **CROSS-EXAMINATION**

22   BY MR. MELTZER:

23   Q.   Good afternoon, Dr. Carrier.

24   A.   Good morning.

25   Q.   Good morning.  Now, you're aware of an analytical tool

1  called "Dam Break", correct?

2  **MR. MARSHALL:** Objection. Could I approach?

3  **THE COURT:** Okay.

4  *(Bench conference between the Court and counsel:)*

5  **MR. MARSHALL:** I'm sorry. I know where this line of

6  inquiry is going, and there's two issues with it. The first

7  thing is it's out of the scope.

8  **THE COURT:** I disagree. I mean, he's talked about how

9  the dam failed and -- how it was constructed, how it failed,

10  what the problems were. This is clearly covered.

11  **MR. MARSHALL:** The other piece to this is that they

12  filed a Motion in Limine to exclude him from talking about any

13  hydraulic issues, hydrology in general, and this is a hydraulic

14  model --

15  **MR. MELTZER:** I'm not going to ask him about hydrology

16  of waterflow.

17  **THE COURT:** What are you going to ask him?

18  **MR. MELTZER:** To see if he's aware of it and if it

19  could be used to model this break of the dam which he talked

20  about specifically. I'm just going to ask him whether he knows

21  this model, that's it.

22  **THE COURT:** I'm going to allow him to ask that

23  question. He did talk about waterflow and how it affected the

24  failure of the dam. Go ahead.

25  *(Bench conference concluded.)*

1    **THE COURT:**  All right, Mr. Meltzer, go ahead.

2           **MR. MELTZER:**  Thank you, Your Honor.

3    **BY MR. MELTZER:**

4    Q.   Now, Dr. Carrier you are aware of an analytical tool called

5    Dam Break, correct?

6    A.   Yes.

7    Q.   And that can be used to model dam failures, correct?

8    A.   In certain circumstances it's used for that, yes.

9    Q.   But you did not use it to model this failure, isn't that

10   correct, sir, yes or no?

11   A.   That is correct because I didn't feel it was appropriate.

12   Q.   Thank you.  And it would be an obvious thing to do in a dam

13   breach case, isn't that correct, sir?

14   A.   No.

15   Q.   It's not?

16   A.   No.

17          **MR. MELTZER:**  Permission to approach, Your Honor?

18          **THE COURT:**  Yes, sir.

19   **BY MR. MELTZER:**

20   Q.   Dr. Carrier, I'm going to hand you a copy of your

21   deposition that you gave on August 20th, 2015.

22        Dr. Carrier, do you remember if you took an oath before you

23   gave that deposition?

24   A.   Yes, I did.

25   Q.   Could you please turn to page 32 of your deposition

1 transcript.

2 And, sir, you were asked the question, if you look at line

3 18, "When did it first occur to you that you might want to do

4 the Dam Break analysis?" And could you please read your

5 answer, sir.

6 A. "It's an obvious thing to do for any dam failure that

7 occurs."

8 Q. And the next sentence?

9 A. "It's what we do. In fact" --

10 Q. "It's what we do"? "It's what we do when a dam failure

11 occurs," correct, that's what you said under oath?

12 A. Yes, I did.

13 Q. Thank you.

14 A. And now I'd like to explain --

15 **THE COURT:** Dr. Carrier, Mr. Marshall will have an

16 opportunity to speak to you on redirect.

17 **THE WITNESS:** All right.

18 **BY MR. MELTZER:**

19 Q. Now, at the time that you issued your report and opinion in

20 this case, your opinion that the Kingsfield Road structure was

21 abandoned rested entirely on your assumption that it was

22 abandoned in the first place and that IP considered it that way

23 prior to April 29, 2014, correct?

24 A. I'm sorry, could you say that again.

25 Q. Sure. I believe you gave an opinion that you thought the

1   Kingsfield Road dam was not abandoned properly; is that
2   correct?
3   A.    That's a separate question, but yes.
4   Q.    Is that correct?  And I believe that that opinion rested
5   entirely on your conclusion that it was abandoned in the first
6   place prior to April 29th, 2014; isn't that correct?
7   A.    Correct.
8   Q.    And when you wrote your report and gave your opinion, the
9   only evidence you relied on for your opinion that you thought
10  IP considered the outfall structure abandoned was a news
11  clipping; is that correct?
12  A.    No.
13  Q.    That's not correct?
14  A.    I just gave the reasons for why I thought it was abandoned,
15  which started with a news clipping, but there were a lot of
16  evidence on the ground --
17  Q.    We'll start with the news clipping.
18  A.    -- that it looked like --
19  Q.    The news clipping, did you ever --
20          **THE COURT:**  Excuse me.
21          **MR. MARSHALL:**  Objection.
22          **THE COURT:**  Excuse me.  You've got to let him finish
23  his testimony before you start another question.
24          And, Dr. Carrier, if you would finish your question
25  and not interrupt the -- not that you did just now, but just so

1　everybody knows the game rules.

2　　　　Go ahead, restate the question and allow him to

3　answer, please.

4　**BY MR. MELTZER:**

5　Q.　When you issued your opinion in this case and gave a

6　deposition, had you actually seen the full news clipping?

7　A.　I saw a news clipping.  I can't recall.

8　Q.　Was it a news clipping or was it an email that actually cut

9　just a piece of the news clipping out from Plaintiffs' counsel?

10　A.　I don't recall at this time.

11　Q.　It could have been that, correct?

12　A.　It could have been anything.  I don't recall.

13　Q.　Now, I think you mentioned that you thought the notches cut

14　into the structure suggested it was abandoned; is that right?

15　A.　Yes.

16　Q.　And at the time you gave your deposition you didn't know

17　when those notches were cut into the structure; isn't that

18　correct?

19　A.　Correct.

20　Q.　Now, if they were cut before the wetlands pipeline was in

21　operation, wouldn't that contradict your assumption that they

22　show abandonment?

23　A.　Specifically on the notches I would agree with that, yes.

24　Q.　And rather they would actually improve the structure's

25　ability to handle waterflow?

1    A.    Absolutely not.

2    Q.    They wouldn't?

3    A.    No.

4    Q.    Wouldn't water, as it rose up that structure, flow through

5    the notches first before it overflowed the cement structure?

6    A.    To begin with, you're assuming that the slide gate is no

7    longer operable.  So, in terms of an improvement, it was a

8    de-improvement, it was an un-improvement to not use the

9    low-level outlet and to cut the notches instead.

10    Q.    Sir --

11    A.    I would go on but --

12    Q.    Sir, you heard Mr. Giddins testify yesterday, right, that

13    the notches were cut in lieu of the slide gate; isn't that

14    right?

15    A.    I heard him say that.

16    Q.    And you heard him say that they were cut prior to 2012;

17    isn't that correct?

18    A.    Yes.

19    Q.    They were actually cut around 2009 or 2010?

20    A.    I heard him say that.

21    Q.    Okay.  Now, wouldn't it be safer to cut the notches than

22    have an employee have to go out during a storm event to have to

23    open that gate?

24    A.    What they should have done is cut a much deeper notch

25    across the entire width of the box.

1    Q.    Sir, my question --

2    A.    The little notches did almost nothing.

3    Q.    Sir, my question was --

4          **MR. MARSHALL:**  Objection to interrupting the witness,

5    Your Honor.

6          **THE COURT:**  I think he had finished.

7          Go ahead.

8    **BY MR. MELTZER:**

9    Q.    Would it have been safer to cut the notches than have an

10   employee have to go out on that structure during or right

11   before a storm?

12   A.    Right before a storm, it would not have been.

13   Q.    How about during a storm?

14   A.    During a storm, yes.

15   Q.    And wouldn't it be safer if it were difficult to open?

16   A.    Are you saying if it got rusted and you couldn't open --

17   Q.    No, I'm saying if it was difficult --

18   A.    -- it?  Yes, it would be definitely --

19   Q.    -- to open --

20         **THE COURT:**  Excuse me, Mr. Meltzer, you've got to let

21   him finish --

22         **MR. MELTZER:**  I'm sorry.

23         **THE COURT:**  Our court reporter cannot record you both

24   talking and record that at the same time.

25         Finish your answer, please, Dr. Carrier.

1      **THE WITNESS:**  If the gate had become inoperable, then

2  certainly it would be safer to have the notches than the gate.

3  **BY MR. MELTZER:**

4  Q.   In 2009 you don't know whether it was operable or not,

5  isn't that correct, sir?

6  A.   I'm trying to respond to your question.

7  Q.   And I'm asking another question.  Isn't that correct?  Yes

8  or no, sir?

9  A.   In 2009?

10  Q.   Yes.

11  A.   I think I understood Mr. Giddins to say that in lieu of the

12  gate, just as you said a few minutes ago, they cut the notches.

13  Q.   You don't know whether it was operable in 2009 or not,

14  isn't that correct, sir?

15  A.   Specifically whether they could have operated it in 2009, I

16  don't know.

17  Q.   Thank you.

18  A.   But I can infer that they had trouble opening the gate.

19  Q.   You can infer?  Okay.

20      **THE COURT:**  Mr. Meltzer, you don't need to comment on

21  the testimony.

22      **MR. MELTZER:**  Okay.

23  **BY MR. MELTZER:**

24  Q.   Now, you mentioned a drop box, right, as part of the

25  structure?

1    A.    Well, I would call it a pertinent works, but yes.

2    Q.    A pertinent works?

3    A.    You're talking about the drop box on the right abutment?

4    Q.    Yes, I am.

5    A.    And your question is?

6    Q.    You spoke about it, right?

7    A.    Yes, I did.

8    Q.    That actually would be the primary way that water would

9    flow out from behind the dam structure you described, correct?

10   A.    That was the original intent, yes.

11   Q.    Okay.

12   A.    That's why the dam was built in the first place.

13            **THE COURT:**   That's why the dam was what in the first

14   place, sir?

15            **THE WITNESS:**   Built in the first place, was to allow

16   the water to go into that drop box.

17   **BY MR. MELTZER:**

18   Q.    And that would lower the water level behind the dam

19   structure, correct?

20   A.    If it were operated, yes.

21   Q.    If it were operated, right, and if it were functional,

22   right?

23   A.    Correct.

24   Q.    And the cement structure with the notches, that would

25   essentially be a backup overflow structure if the water level

1   rose during a storm, right?

2   A.   I think that was the original intent, yes.

3   Q.   And you don't know whether the slide gate historically,

4   instead of serving as some sort of pre-storm method to open the

5   gate, actually was an alternative to the drop box if that

6   48-inch pipe needed maintenance, correct?

7   A.   Well, there were documents in the files that indicated that

8   was a procedure that they did was to open that slide gate --

9   Q.   Sir --

10  A.   -- in anticipation --

11  Q.   -- do you know historically --

12  A.   -- of a storm --

13         **THE COURT:**  Mr. Meltzer, let him finish, please.

14  **BY MR. MELTZER:**

15  Q.   Do you know historically whether that served as an

16  alternate to the drop box and pipeline if needed to be

17  maintained?

18  A.   I'm not sure I understand your question.

19  Q.   You don't know, correct, whether that was the purpose of

20  that gate, correct?

21  A.   The purpose of what?  What do you mean the purpose?

22  Q.   The gate in the structure, the original purpose was to

23  serve as an alternative means in the event that they had to do

24  maintenance on that 48-inch pipe rather than serving as some

25  sort of pre-storm method of opening?

1  A.  I can't tell you what its original purpose was.  I did

2  explain --

3  Q.  That's my question.

4  A.  I did explain to you that it is used -- can be used to

5  lower the basin for inspection, so you've touched on a reason

6  to do that through the drop box.  But in addition, the files

7  indicated that they were in the habit of opening that as an

8  extra precaution.

9  Q.  Sir, do you have any idea, any idea, other than rank

10  speculation, of whether that habit was at all the case between

11  2005 and 2014?

12  A.  I think they forgot the habit.

13  Q.  You think they forgot the habit?

14  A.  Yes.

15  Q.  But you don't know, sir; isn't that correct?

16  A.  Well, the documents indicate --

17  Q.  Isn't that correct, sir?

18          **THE COURT:**  Let him answer your question, Mr. Meltzer.

19          **THE WITNESS:**  The documents indicate they forgot.

20          **THE COURT:**  Mr. Meltzer, Mr. Marshall, come up here.

21          *(Bench conference between the Court and counsel:)*

22          **THE COURT:**  If you want to finish this examination,

23  you're going to need to allow him to finish his answer before

24  you jump back on it.  Tone it down a little bit, okay?

25          **MR. MELTZER:**  Okay.

1    **THE COURT:** Thank you.

2    *(Bench conference concluded.)*

3    **THE COURT:** Go ahead, Mr. Meltzer.

4    **BY MR. MELTZER:**

5    Q.   Dr. Carrier, given the unprecedented nature of this storm

6    event in April of 2014, even if the gate had been opened, the

7    water would have reached the notches anyway; isn't that

8    correct?

9    A.   That's correct, yes.

10   Q.   And indeed you would agree that during the storm the

11   waterflow actually came up to 5 feet higher -- 4 or 5 feet

12   higher than the cement structure?

13   A.   I think it went even higher, but yes, at least that.

14   Q.   And that water would have gone into Elevenmile Creek

15   whether or not the structure was there, correct?

16   A.   Correct.

17   Q.   Now, if employees monitored the structure on a daily basis,

18   like Mr. Giddins testified yesterday, wouldn't that undermine a

19   suggestion that it was abandoned?

20   A.   Well, in the sense that it was never inspected by a

21   professional engineer competent to do that, in a sense it was

22   abandoned.

23   Q.   And if IP had contractors monitoring the structure on a

24   daily or weekly basis, wouldn't that also undermine a

25   suggestion that it was abandoned?

1   A.    Well, again, it depends on who is looking at it.

2   Q.    And if a contractor was specifically out there the week

3   before the storm with heavy machinery, like if you have this

4   big crane-type machinery, wouldn't that also undermine and

5   contradict a presumption that the structure was abandoned prior

6   to April 29th, 2014?

7   A.    I was surprised to hear that.  And given the condition of

8   the structure, I can't imagine why they're doing that.  They

9   needed to replace the structure.

10  Q.    Now, I think in your testimony you had noted previous

11  damage and repairs to the structure, correct?

12  A.    Now we're talking about the dam.  Yes.

13  Q.    And you didn't analyze whether the structure built in 1996

14  was built to surpass substantially more waterflow than the

15  prior structure, correct?

16  A.    The 1996?

17  Q.    Uh-huh.

18  A.    Which we've been calling the 2005?

19  Q.    Yep.

20  A.    I didn't analyze?

21  Q.    Did you or not?

22  A.    I did not.  I looked at their calculations.

23  Q.    And I know you talked about the calculations a few moments

24  ago with respect to the 2005 structure.  Did it look from those

25  calculations like IP was intending to design that structure to

1   pass more flow than the prior structure?

2   A.   No.

3   Q.   It didn't look like that was their intent when they showed

4   6,000 CFS versus 2,000 CFS, the new structure would handle

5   6,000 CFS?

6   A.   Well, that may have been their intent, but they certainly

7   weren't going to achieve it.

8   Q.   They weren't going to achieve it?

9   A.   Right.

10  Q.   Okay.

11  A.   They were not --

12  Q.   And you're basing that on those drawings --

13  A.   -- having the right engineers --

14  Q.   -- at the time?

15  A.   -- do the calculations.

16  Q.   Right.  And, sir, do you know whether engineers did

17  calculations or did actually create designs after that drawing

18  picture you saw?

19  A.   I haven't seen any.

20  Q.   You haven't seen any.  This is Defendant's Exhibit 8, I'm

21  going to put it back on the screen.  This was the first page.

22  Have you seen this document before?

23  A.   Yes, that's part of the calculations.

24  Q.   Actually, I believe the calculations refer to these

25  preliminary drawings, right?

1    A.    Yes.

2    Q.    Right?  And then, if you look, if you look at this

3    particular picture, do you see where it says "Cornerstone

4    Engineering, Inc."?

5    A.    Yes.

6    Q.    "Certificate of authorization"?  And do you see the date,

7    sir?  Can you make that out, September 9, '05?

8    A.    Yes.

9    Q.    So, in fact, an engineering company did actually create

10   designs for this structure; isn't that correct?

11   A.    No.  This is not legal.

12   Q.    I'm sorry?

13   A.    This is not legal.

14   Q.    It's not legal?

15   A.    No.

16   Q.    Okay.

17   A.    A certificate of authorization simply refers to the

18   certificate that the company itself holds under the rules for

19   professional engineers.  These documents have not been signed

20   and sealed by a professional engineer.  That's required.

21   Q.    All right.  These designs provided by Cornerstone

22   Engineering, you can see here this is the cement structure,

23   right?  Can you see that?

24   A.    Yes.

25   Q.    Okay.  And then above the cement structure, what does that

1    say up in the upper left-hand corner?

2    A.    I believe it says "sod pin slopes."

3    Q.    And do you know if that was put in, sir?

4    A.    I don't.

5    Q.    Would that be something other than just grass, sir?

6    A.    It wouldn't be sufficient --

7    Q.    Would that be something -- I apologize.  Please go ahead.

8    A.    That wouldn't be sufficient to prevent erosion.  That's

9    commonly done -- when you say just grass, it's very difficult

10   to seed a slope in Florida because of the runoff, so it's very

11   common to do something like that to get the grass growing in

12   the first place.

13   Q.    And the pin slopes?

14   A.    That's just holding the grass while it gets started.

15   Q.    Now, you mentioned notches in the structure, right?  And we

16   already talked about how that would allow waterflow to pass the

17   structure as it rose before it overtopped the entire cement

18   structure, correct?

19   A.    Correct.

20   Q.    And that would improve the structure's ability to avoid

21   erosion, correct?

22   A.    A very tiny amount.

23   Q.    Okay.  And that was done between 2005 and 2012, correct?

24   A.    I heard 2009.

25   Q.    2009, right.  And you also heard that around that same time

1    sheet piles were put in on both sides of that cement structure,
2    correct?
3    A.   Correct.
4    Q.   And that also, sir, would have improved the structure's
5    ability to avoid erosion, correct?
6    A.   Very marginally.
7    Q.   But it would have, correct?
8    A.   A small amount.
9    Q.   Okay.  Now, I want to get back to permitting in the
10   Northwest Florida Water Management District.  Now, I believe
11   you testified that the IP facility is in the Northwest Florida
12   Water Management District, correct?
13   A.   Correct.
14   Q.   And at the time you wrote your report in this case and
15   issued an opinion, you had never, ever done permitting in the
16   Northwest Florida Water Management District, correct?
17   A.   That is correct.
18   Q.   And in fact, the only permitting project you worked on in
19   Florida for a dam was in the Southwest Florida Water Management
20   District, correct?
21   A.   That is correct.
22   Q.   And in that case the permit was actually sought from the
23   Florida Department of Environmental Protection as opposed to
24   the Water Management District, isn't that correct, sir?
25   A.   No, that's not correct.

1    Q.   That's not correct?

2    A.   No.

3    Q.   Could you please open your deposition, sir?

4    A.   I beg your pardon.  There was a change in the law, I had

5    forgotten that.  In those days the permit was through the DEP.

6    I beg your pardon.

7    Q.   Okay.  Would you agree that DEP is authorized or at least

8    was authorized to issue dam permits?

9    A.   In those days that was the only agency that was doing

10   permits for dams.

11   Q.   So you would agree that historically DEP has been

12   specifically authorized to do dam permitting in the Northwest

13   Florida Water Management District, correct?

14   A.   Historically up to 1998.

15   Q.   Okay.  And are you aware of certain agreements between the

16   Northwest Florida Water Management District and DEP due to

17   certain funding limitations and resource scarcity in the

18   Northwest Florida Water Management District?

19   A.   I don't know those details.

20   Q.   You don't know those details?  Because you've never done

21   permitting in the Northwest Florida Water Management District,

22   correct?

23   A.   Those are two questions.  I do not know those details, to

24   answer that question.  And no, again, I've not done permitting

25   in the Northwest Florida Water Management District.

1    Q.    Okay.  Now, you would agree that the structure in place in

2    2014 was built between 2005 and 2006, correct?

3    A.    That's my understanding.

4    Q.    And on direct examination I didn't hear you mention section

5    373.4145 of the Florida Statutes that was in effect between

6    July 1, 2005, and June 30, 2006, correct?

7    A.    You didn't hear me say it?

8    Q.    Yes, I didn't hear you say that, correct?

9    A.    No, I don't think I said that, that's right.

10   Q.    Have you ever seen that provision?

11   A.    Have I ever looked at 373?  Yes.

12   Q.    373.4145 that was in effect between July 1, 2005, and June

13   30, 2006?

14   A.    And the question is?

15   Q.    Have you ever seen that specific statute?

16   A.    I must have.

17   Q.    You must have, but you're not sure, which is the actual

18   time that this structure was constructed, you're not sure,

19   right?

20   A.    Correct.

21   Q.    And you didn't cite it in your report, correct?

22   A.    I did not cite it in my report.

23   Q.    And you didn't talk about it during your deposition,

24   correct?

25   A.    No.  I wasn't asked about it.

1    Q.   But you didn't talk about it; is that correct?

2    A.   That's true.  I only answered questions.

3    Q.   So you don't know that it specifically allowed DEP to

4    implement dam and stormwater regulations and management in the

5    Northwest Florida Water Management District during that time?

6    A.   I don't know.

7    Q.   You don't know?  Wouldn't that have been pertinent to

8    consider if you're going to give an opinion that it had to be

9    the Northwest Florida Water Management District to issue this

10   permit?

11   A.   Well, what you're saying is it had to have a permit.  So

12   whether it was issued by DEP or the Northwest Florida Water

13   Management District, it would have had to have a permit.

14   Q.   Well, who would have had to consider that?  Who would have

15   had to actually look at and review the application between 2005

16   and 2006?

17   A.   If -- if you're saying that the DEP would have reviewed

18   that, then it would have gone to a different section in the

19   DEP.

20   Q.   Do you know, sir, who was responsible for reviewing that

21   application for a permit for this dam between 2005 and 2006?

22   A.   I can't answer that definitively.

23   Q.   You can't answer that.  And sir, what -- what chapter or

24   regulation are you referring to or relying on that, you know,

25   there was a dam permit required?

1    A.    I'm referring to the Northwest Florida Water Management

2    District regulations.

3    Q.    Is there a particular chapter or anything?

4    A.    It's an exhibit in my deposition, it's 40a or something.

5    Q.    40a.  Is it Chapter 40A-4 of the Florida Administrative

6    Code, Management and Storage of Surface Waters?

7    A.    That doesn't sound right.

8    Q.    That doesn't sound right?  Is that what you said during

9    your deposition?

10   A.    I don't recall.

11   Q.    You don't recall?

12   A.    May I see it?

13   Q.    You can.

14            **MR. MELTZER:**  Permission to approach?

15            **THE COURT:**  Yes, sir.

16            **THE WITNESS:**  Yes, this is it.

17   **BY MR. MELTZER:**

18   Q.    So that is what you relied on for your opinion that there

19   needed to be an application and permit for this structure,

20   correct?

21   A.    Yes.

22            **MR. MELTZER:**  I'd ask the Court to take judicial

23   notice of that, Your Honor.

24            **THE COURT:**  Judicial notice of what?

25            **MR. MELTZER:**  I'm sorry.  It is Chapter 40A-4 of the

1    Florida Administrative Code.

2         **THE COURT:** Are you seeking to introduce the

3    regulations?

4         **MR. MELTZER:** I'm seeking to introduce what he relied

5    on for his opinion into evidence, Your Honor.

6         **THE COURT:** Is there any objection?

7         **MR. MARSHALL:** No, Your Honor.

8         **THE COURT:** What's the exhibit number?

9         **MR. MELTZER:** This would be a new exhibit, Your Honor.

10        **THE COURT:** It would be IP 74. We'll need to get that

11   marked.

12        Dr. Carrier, could I -- let's go ahead and get it

13   marked, if you don't mind, and I'll hand it right back to you,

14   just so we don't overlook doing that. One moment.

15        Thank you. There you go.

16        Okay, Mr. Meltzer, it's admitted as IP 74. Go ahead.

17        (Defendant's Exhibit 74 admitted into evidence.)

18        **MR. MELTZER:** Okay.

19   **BY MR. MELTZER:**

20   Q. Now, a moment ago I asked you if you had specifically

21   relied on -- or seen even sections 373.4145 of the Florida

22   Statutes that was in effect in 2005, correct?

23   A. Yes.

24   Q. And you said you didn't know if you had seen it, correct?

25   A. That's correct.

1          **MADAM CLERK SIMMS:** Is this admitted?

2          **MR. MELTZER:** Not yet.

3     **BY MR. MELTZER:**

4     Q.   Sir, have you ever actually seen this regulation, looking

5     at it?

6     A.   Well, for sure I've read parts of 373.  I cannot recall if

7     I read this specific part.

8     Q.   And it says 373.4145 effective July 1, 2005 to June 30,

9     2006?

10         **MR. MARSHALL:** Your Honor, I don't know what --

11         **THE COURT:** It's a Florida Statute, it's not a

12    regulation, I don't believe.  I believe it's a statute.

13    **BY MR. MELTZER:**

14    Q.   Have you seen this statute, sir?

15    A.   I think I've answered you that --

16    Q.   You don't know?

17    A.   -- I've read some parts, but I don't know if I've seen this

18    one.

19         **MR. MELTZER:** Your Honor, I would ask the Court to

20    please take judicial notice of this statute so we could admit

21    it.

22         **THE COURT:** Is there any objection?  It's a Florida

23    Statute, Mr. Marshall.

24         **MR. MARSHALL:** No objection, Your Honor.

25         **THE COURT:** That, I presume, will be admitted as IP

1   75.

2                **(Defendant's Exhibit 75 admitted into evidence)**

3                **MR. MELTZER:**  Could we publish it to the jury?

4                **THE COURT:**  Yes.

5   **BY MR. MELTZER:**

6   Q.   Now, I want to direct your attention to section (1)(c) of

7   this statute that was in effect between July 1, 2005, and June

8   30, 2006.

9        And do you see, sir, where it says, "The department may

10  implement Chapter 40A-4 of the Florida Administrative Code

11  pursuant to an interagency agreement with the Northwest Florida

12  Water Management District"?  Do you see that?

13  A.   I see that.

14  Q.   Dr. Carrier --

15  A.   Next paragraph, please.

16               **THE COURT:**  Mr. Marshall will be able to show this to

17  you.

18  **BY MR. MELTZER:**

19  Q.   Did you consider the operating agreements between FDEP and

20  the Northwest Florida Water Management District when you formed

21  your opinion?

22  A.   I haven't seen any operating agreement.

23  Q.   Ever?

24  A.   Ever.

25               **MR. MELTZER:**  Can we please put up the operating

1  agreement between FDEP and Northwest Florida Water Management
2  District, please.
3         Your Honor, this operating agreement is mandated by
4  Florida Statute 373.41 --
5         **THE COURT:** Why don't you just please just seek its
6  admission.
7              **MR. MELTZER:** I would seek its admission.
8              **MR. MARSHALL:** No objection.
9         **THE COURT:** And you're going to mark this as 76?
10             **MR. MELTZER:** Yes. Thank you.
11         **(Defendant's Exhibit 76 admitted into evidence.)**
12         **THE COURT:** We'll need to get those marked, 75 and 76.
13  Let's do that now, since we have two, Mr. Meltzer, before you
14  continue. I want to make sure that doesn't get overlooked. So
15  we need the Florida Statute, and then we'll need the operating
16  agreement.
17         Thank you. Ms. Simms will mark those and give them
18  right back to you. 75 is the statute. That's the agreement,
19  so that's 76. Where is the statute? Did we get that as well?
20  Oh, yes, that's the statute, so that's 75.
21         All right, Mr. Meltzer, I think we have that taken
22  care of.
23         **MR. MELTZER:** I think there was one more exhibit. Do
24  you already have the Chapter 40A-4?
25         **THE COURT:** That's 74. Actually, Dr. Carrier has that

1  now, I believe.

2          **THE WITNESS:**  Do you want this?

3          **THE COURT:**  No, sir, you can hold on to that.

4          What is that?

5          **MADAM CLERK:**  This is just one page.

6          **THE COURT:**  I don't know what this is, Mr. Meltzer,

7  it's one page of --

8          **MR. MELTZER:**  I'll take that back.

9          **THE COURT:**  So, Dr. Carrier has No. 74, which are the

10  regulations, 75 is the statute, and 76 is the operating

11  agreement.

12          **MR. MELTZER:**  Thank you, Your Honor.

13          **THE COURT:**  Would you like them back?

14          **MR. MELTZER:**  No, I don't need them back right now.

15  Actually, I will take them, thank you.

16  **BY MR. MELTZER:**

17  Q.   Now, Dr. Carrier, because you hadn't seen these operating

18  agreements before you issued your opinion, you don't know

19  whether they gave and still give DEP jurisdiction over projects

20  and facilities they have previous experience with, correct?

21  A.   Oh, no.  The last part of your question, in October 2013,

22  all of that was eliminated and each district does its own and

23  there's separate documents that cover all that.

24  Q.   Do you know whether this operating agreement covers past

25  2013?

1    A.    To my knowledge, it does not.  It would have --

2    Q.    Do you know whether it does or not?

3    A.    No.

4    Q.    And do you know if it says that it allows either entity,

5    the district or department, that has an extensive regulatory

6    history with the particular project to continue to regulate it

7    regardless of other divisional responsibilities in the

8    agreement?

9    A.    Are you reading somewhere?

10              **THE COURT:**  Mr. Meltzer, I think for the jury's

11   benefit, if you are reading from a specific sentence in the

12   document that's on the monitor, could you zoom in?

13              **MR. MELTZER:**  I will, Your Honor.

14              **THE COURT:**  Thank you.

15              **THE WITNESS:**  May I ask, is this February 26, 2013?

16   **BY MR. MELTZER:**

17   Q.    What's the question?

18   A.    What is the date of this document?  So it's 2013.

19              **THE COURT:**  Is that June?

20              **MR. MELTZER:**  That's what it says, June 7, 2013.

21              **THE WITNESS:**  So this is an operating agreement after

22   2006; is that right?

23   **BY MR. MELTZER:**

24   Q.    That's correct.

25         Do you see, sir, where it says "Special Cases"?

1  A.   Yes.

2  Q.   By written agreement of the district and the department

3  responsibilities may deviate from responsibilities outlined in

4  other sections and instances where that may occur is where an

5  extensive regulatory history by either district or the

6  department with a particular project that would make a

7  deviation result in more effective and efficient regulation, do

8  you see that?

9  A.   Yes.

10 Q.   Wouldn't it make sense for a particular agency or body, if

11 it had been regulating someone for a long time, to maintain

12 regulation over that specific entity or facility?

13 A.   Yes.  But for a dam that was never regulated, I'm not sure

14 what that means.

15 Q.   Okay.  And wouldn't that be particularly necessary in a

16 district where there was a scarcity of resources or funding?

17 A.   For the district you're talking about?

18 Q.   Yeah.

19 A.   Yes.

20 Q.   And because you've never seen this before, do you know

21 whether it gives DEP specific jurisdiction over particular

22 types of facilities?

23 A.   I'd have to read the rest of the document.

24 Q.   But you don't know?

25 A.   Well, from the beginning it's talking about wetlands, so

1    I'd have to read the details to see if there's anything in

2    there about dams.

3    Q.    Do you know what Chapter 6225 of the Florida Code pertains

4    to?

5    A.    6225?

6    Q.    Uh-huh.

7    A.    I don't know.

8    Q.    Do you know if pertains to stormwater permits?

9    A.    Offhand, I don't know.

10   Q.    Okay.  I'm going to turn to page 1 of this document.  First

11   of all, sir, do you know whether this structure was actually in

12   wetlands?

13   A.    I believe it was.

14   Q.    Do you see where it says, "The department shall be

15   responsible for the review and final action on all applications

16   and notices for permits, petitions for variances, and

17   verification of exemptions," and then it continues under 373

18   and it says "for the project types listed in this section."

19        Now, I believe you said before the 373 would be applicable

20   to dam permits, correct?

21   A.    Correct.

22   Q.    And then included in this section, section (k) which refers

23   to domestic or industrial wastewater treatment facilities

24   requiring a permit under Chapter 403, do you see that?

25   A.    Yes.

1   Q.   And then, do you see where it says on the page "The permit

2   applications encompassed within the departments" -- that's the

3   Department of Environmental Protection --

4   A.   I'm sorry, where are you?

5   Q.   Right here, sir.

6   A.   Okay.

7   Q.   And it says "The permit applications encompassed within the

8   department's responsibilities include those submitted under

9   Chapter 62-312, wetland resource permits, and Chapter 62-25,

10  F.A.C. stormwater permits."  Do you see that?

11  A.   Yes.

12  Q.   So, because you hadn't seen this operating agreement, you

13  didn't know that DEP would not only have regulatory authority

14  over stormwater systems on wastewater facilities, but that they

15  would also have continuing jurisdiction over a facility they

16  had extensive experience with, correct?

17  A.   Correct, but I don't see anything about dams in here.

18  Q.   Now, we looked earlier at the regulation 373.4145, right?

19  A.   Yes.

20  Q.   That was in effect in 2005, right?

21  A.   Right.

22  Q.   And that did refer --

23          **THE COURT:**  It's a statute.  I just want the record to

24  be clear, because we have regulations and we have now statutes,

25  so I think this is the statute.

1    **MR. MELTZER:**  This is the statute.

2    BY MR. MELTZER:

3    Q.   And I showed you something that said the department may

4    implement Chapter 40A-4 Florida Administrative Code, right?

5    A.   Right.

6    Q.   And that is what you say was the dam permit regulation that

7    you relied on, correct?

8    A.   That is correct.

9    Q.   Now I'd like to go to that particular exhibit.  This is the

10   chapter you relied on, correct, sir?

11   A.   That's correct.

12   Q.   Now I'm going to turn to -- looking at the bottom where it

13   says "processing of permits," okay?

14   A.   Okay.

15   Q.   Do you see where it says, "The application for a permit

16   under these rules shall be submitted on a form titled 'Joint

17   Application, Department of Army, Florida Department of

18   Environmental Protection for Works in the Waters of Florida'"?

19   Do you see that?

20   A.   Yes.

21   Q.   And this is the regulation that you relied on, correct?

22   A.   Correct.

23   Q.   And then could you turn to page 5, please, where it says

24   "Content of Application."  Do you see that?

25   A.   Yes.

1    Q.   And I believe in your deposition you testified that it

2    would fall under section 40A-4.041(1), correct?

3    A.   I don't remember what I said in my deposition.

4    Q.   Okay.  Do you see where it says in this section -- it says

5    "(2) Application for general permits under the provisions of

6    section 40A-4.041(1) shall be filed with the department" --

7    that's the Department of Environmental Protection, correct?

8    A.   I'm sorry, where are you reading?

9    Q.   This is at (2) on page six, sir, and it says, "Applications

10   for general permits under section 40A-4.041(1) shall be filed

11   with the department" --

12   A.   I must be on a different page than you.

13   Q.   Page 6.

14   A.   Okay.

15   Q.   And do you see where it says, "Applications for general

16   permits under section 40A-4.041(1) shall be filed with the

17   department on forms provided by the department or district and

18   shall include the name and address of the applicant, the name

19   and address of the owner or owners of the land, and the

20   location and scope including the location map and any plans and

21   specifications prepared for the project"?  Do you see that?

22   A.   Yes.

23   Q.   Does it say anything there about some sort of seal or

24   certification by an engineer?

25   A.   I would have licensed this structure under the specific

1  rather than the general.

2  Q.  Okay.  Is that what you --

3  A.  The specific does require the signed and sealed

4  professional engineer.

5  Q.  Is this what you said in your deposition, sir?

6  A.  I can't remember.

7  **THE COURT:**  Do you still have your deposition?

8  **THE WITNESS:**  I do.

9  **BY MR. MELTZER:**

10  Q.  Do you see on line 21 --

11  **THE COURT:**  On what page, Mr. Meltzer?

12  **MR. MELTZER:**  I'm sorry.  On page 42.

13  **BY MR. MELTZER:**

14  Q.  Line 21 where it says, "Which one required this dam to be

15  permitted?"  And you said what?

16  A.  "It required at least the general permit based on the

17  impounding capacity."

18  Q.  Now, this section (2) refers to a general permit, yes?

19  A.  Yes.

20  Q.  Okay.  And in that section we read the requirements, right?

21  A.  Yes.

22  Q.  And it said location and scope of work including the

23  location map and any plans and specifications prepared for the

24  project, correct?

25  A.  Correct.

1    Q.   And it does not say anything about an engineering

2    certification or stamp, does it?

3    A.   Correct.

4         **THE COURT:**   Mr. Meltzer, we're going to need to take

5    our morning recess.   Is this a good breaking point for you?

6         **MR. MELTZER:**   I'm almost done, Your Honor.   Yes, I'll

7    ask one or two more questions.

8    **BY MR. MELTZER:**

9    Q.   At the time you wrote your report and issued an opinion in

10   this case, do you know whether or not -- did you know whether

11   or not the company had submitted an application to DEP for the

12   construction of this specific structure in 2005?

13   A.   I know from Mr. Moore's testimony that they did not.

14   Q.   So that's the only basis for your -- okay, I'm sorry.   At

15   the time -- I'll ask it again.

16        At the time you gave your deposition and issued a report

17   you didn't know, correct, whether or not they had actually made

18   an application to DEP in 2005 and 2006?

19   A.   I'm trying to remember at that particular time how much

20   discovery had occurred because we asked for those permits at

21   some point and I -- as we sit here today, I don't know if we

22   had received all of the discovery at that time.   I can say

23   that, as a result of that discovery, never found that permit.

24   Whether I didn't know specifically when I came to that

25   conclusion or not, I don't know.

1  Q.   Okay.

2          **MR. MELTZER:**  This is a fine place to break, Your

3  Honor, thank you.

4          **THE COURT:**  Ladies and gentlemen, we'll be in recess

5  for 20 minutes.  Please don't discuss the case during the

6  recess and also please don't begin to form any opinion yet

7  about the merits.  I'll see you back in 20 minutes.  Thank you.

8          *(Jury out.)*

9          Dr. Carrier, you may step down.  You will be back on

10  the stand in 20 minutes.  We'll be in recess.

11          *(Recess taken 10:16 a.m. to 10:37 a.m.)*

12          *(Jury in the box.)*

13          **THE COURT:**  Dr. Carrier, you're still under oath.

14          Okay, Mr. Meltzer, go ahead.

15          **MR. MELTZER:**  Thank you, Your Honor.

16  **BY MR. MELTZER:**

17  Q.   Now, Dr. Carrier, we've established that you didn't know

18  the contents of the Florida Statute providing in 2005 that DEP

19  had authority to regulate and permit dam structures, correct?

20  A.   Correct.

21  Q.   Now, we've also established that you were not aware of the

22  operating agreement between DEP and the Northwest Florida Water

23  Management District that specifically gives DEP continuing

24  jurisdiction over facilities which it has a long experience

25  with, correct?

1    A.    Yes.

2    Q.    And also that it specifically gives jurisdiction to DEP to

3    do stormwater management permitting for wastewater facilities,

4    correct?

5    A.    Correct.

6    Q.    And you also said you didn't know whether or not any

7    application was submitted to DEP in 2005 or 2006, correct?

8    A.    No, I didn't say that.

9    Q.    You said at the time you formed your report you weren't

10   aware of whether they had formed any -- whether they had

11   submitted any application to DEP; isn't that correct?

12   A.    That's a different question.

13   Q.    Is that correct?

14   A.    That is correct.

15   Q.    So, since that time you've become aware?

16   A.    Well, I think I told you the timing situation that we

17   certainly had some discovery by that time and that was the

18   first thing you ask for and we didn't have it and never did get

19   it.

20   Q.    At the time you submitted your report and formed your

21   opinion about whether or not this was properly permitted you

22   had never seen an application to DEP with respect to this

23   structure, correct?

24   A.    Correct.

25   Q.    And do you think you've seen one after?

1  A.   No.

2          **MR. MELTZER:**  Your Honor, I'd like to mark IP 10,

3  please.

4          **MR. MARSHALL:**  No objection, Your Honor.

5          **THE COURT:**  That's 10?

6          **MR. MELTZER:**  Yes, Your Honor.

7          **THE COURT:**  That will be admitted.

8          **(Defendant's Exhibit 10 admitted into evidence.)**

9          **MR. MELTZER:**  Can we publish it to the jury?

10         Thank you.

11  **BY MR. MELTZER:**

12  Q.   So, Dr. Carrier, you've seen this document before?

13  A.   I don't recall seeing this, no.

14  Q.   Okay.  Now, if you look at the first page you'll see that

15  it's directed to Aaron Mitchell on October 6, 2005?

16  A.   Yes.

17  Q.   Of the Florida Department of Environmental Protection?

18  A.   Yes.

19  Q.   And then, if we turn to the second page, do you see, sir,

20  where it says "Joint Application for Works in the Waters of

21  Florida"?

22         Now, a few minutes ago we looked at the dam statute that

23  you relied on and it said you were supposed to submit it on

24  that form, correct?

25  A.   Is this the form?  I don't see that this is the form that

1    you're referring to.

2    Q.   Do you see it says, "Department of Army, Department of

3    Environmental Protection and Water Management District"?

4    A.   Yes, I see that.  This is for wetlands.

5    Q.   This says, "Joint Application for Works in the Waters of

6    Florida," that is exactly what that said in that provision,

7    sir?

8    A.   Did it?

9         **THE COURT:**  Look back.  It might help -- there's a box

10   at the top of the document that refers to the form number and

11   the title that it's taken from.

12   **BY MR. MELTZER:**

13   Q.   Sir, do you see in the permit regulation it says under

14   40A-4.091, "Joint Application, Department of the Army, Florida

15   Department of Environmental Protection for activities in the

16   waters of the State of Florida.  Forms may be obtained from the

17   department or from the district"?

18        **THE COURT:**  What are you reading from now?

19        **MR. MELTZER:**  40A-4.091.

20        **THE COURT:**  Will you show the jury that, please.

21   **BY MR. MELTZER:**

22   Q.   This is on page 3 to 4.  "Joint Application, Department of

23   the" -- and can you turn to the next page, sir -- "Army/Florida

24   Department of Environmental Protection for activities in waters

25   of the state of Florida.  Forms may be obtained from the

1    department or from the district."

2         Do you see that on the screen, sir?

3    A.   Yes, I see that it has the same title, but it doesn't have

4    the same form number, and that's what was confusing me.

5    Q.   It has the same title, correct?

6    A.   It has the same title.

7    Q.   Now, if we can turn back to IP 10, please, now, it says

8    "Department of Army Corps/Florida Department of Environmental

9    Protection and Water Management District," do you see that,

10   sir?

11   A.   Yes.

12   Q.   And if you look down at the section it includes the name

13   and address of the applicant, correct?

14   A.   Yes.

15   Q.   And then, if you turn to Navelski 00014470 --

16        **MR. MELTZER:**  Can we zoom in on the top, please.

17   **BY MR. MELTZER:**

18   Q.   And it says, "Overflow structure will be replaced.  Two

19   pipes, concrete overflow will be removed, and an open concrete

20   channel will be constructed in its place.  The northernmost

21   wall of the existing structure that determines outflow level

22   will be left in place.  Broken concrete from the existing

23   structure will be used as riprap immediately downstream along

24   with existing riprap."

25        Do you see that, sir?

1    A.   Yes.

2    Q.   And then can we turn to Navelski 14476.  It also includes

3    the engineering specifications provided and prepared by

4    Cornerstone Engineering, correct, that we saw before?

5    A.   Yes.

6    Q.   And if you turn to the next page, those specifications for

7    this particular structure continue; is that correct?

8    A.   Yes.

9    Q.   And if you look at 14475, it also includes an area map,

10   isn't that correct, sir?

11   A.   That's correct.

12   Q.   And you never saw this application before you issued your

13   opinion that this should have been permitted, correct?

14   A.   No, I don't recall seeing it.  Of course, this leaves off

15   the 160 feet of earthen dam.

16   Q.   But it does provide specific specifications for this

17   particular spillway structure, correct?

18   A.   For the spillway structure, not for the dam.  If you'll go

19   back to the description, it doesn't mention that there's a dam.

20   It describes an open channel.

21   Q.   With the northernmost wall left in place, correct?

22   A.   A spillway structure, not an earthen dam.

23   Q.   Right, and this structure that existed previously on IP's

24   property correct?

25   A.   No.  It was completely rebuilt in 2006, completely

1    different structure.

2    Q.   The northernmost wall was left in place, wasn't it?

3    A.   Actually, it was modified.

4    Q.   The drop box was left in place, wasn't it?

5    A.   Yes.

6    Q.   It was still part of the wastewater treatment facility,

7    wasn't it?

8    A.   Absolutely.

9    Q.   FDEP was very familiar with the structure in place, wasn't

10   it, sir?

11   A.   Not the dam section of FDEP.

12   Q.   FDEP, who has been monitoring this facility for 30 years,

13   right, who was specifically given permission to do dam

14   permitting, correct?

15   A.   Different section.

16   Q.   Okay, sir.  Do you know whether or not DEP responded to

17   this application?

18   A.   I don't know.

19   Q.   You don't know, right?

20         **MR. MELTZER:**  I'd like to mark for identification IP

21   14, please.

22         **MR. MARSHALL:**  No objection.

23         **THE COURT:**  Thank you.  IP 14 is admitted.

24         **(Defendant's Exhibit 14 admitted into evidence.)**

25   BY MR. MELTZER:

1    Q.   I'd like to show you, this is the Department of
2    Environmental Protection's response.  And if you look at where
3    it says "Regulatory review exemption verified," it says, "Based
4    on the information submitted, the department has determined
5    that the replacement of a damaged outfall structure is exempt
6    under Rule 62-4.040 of the Florida Administrative Code from the
7    need to obtain a regulatory permit under 373.4145 of the
8    Florida Statutes."  Do you see that, sir?
9    A.   I do.
10   Q.   And we looked at before, 4145 was the specific statute that
11   gave DEP authorization to regulate dams; isn't that correct,
12   sir, at this time?
13   A.   Correct.
14            **MR. MELTZER:**  No further questions, Your Honor.
15            **THE COURT:**  Thank you.
16            Mr. Marshall, redirect?
17                      **REDIRECT EXAMINATION**
18   **BY MR. MARSHALL:**
19   Q.   Hello again, Dr. Carrier.  I just have a few questions for
20   you.  The first thing I'd like you to do is draw your attention
21   to Exhibit 10, which is on the ELMO there.
22       Dr. Carrier, can you explain why Exhibit 10 has -- at least
23   fully explain why Exhibit 10 really has nothing to do with the
24   structure.
25   A.   This was describing an outfall structure and not the

1    earthen dam that was part of the system.  This was, in my

2    opinion, related to water quality as opposed to the safety of

3    the structure.  Those are administered by different sections of

4    large agencies, and they don't always talk to each other.

5    Q.   Dr. Carrier, you were asked a few questions about Exhibit

6    14, which I guess is some sort of response to --

7              **THE COURT:**  Please don't comment on the evidence.

8              **MR. MARSHALL:**  I apologize.

9              **THE COURT:**  Thank you.

10   **BY MR. MARSHALL:**

11   Q.   Dr. Carrier, you were asked a few questions about Exhibit

12   14, and I'd like you to turn your attention to that document,

13   please.

14        Dr. Carrier, could you please explain this document.

15   A.   I think this is a standard permit for -- related to water

16   quality and the requirement of International Paper to monitor

17   the quality of the effluent coming from its property.

18   Q.   Does this have anything to do with dam safety?

19   A.   No, it does not.

20   Q.   In 2005 and 2006, were the requirements for a dam permit

21   suspended?

22   A.   No.

23   Q.   In 2009 or '08 when modifications to this structure were

24   made were the requirements for a permit suspended?

25   A.   No.

1    Q.   What about the same question with respect to 2012?

2    A.   They were not suspended in 2012 either.

3    Q.   Has it always been the case in your opinion that a permit

4    was required to operate and have a dam on your property?

5    A.   Yes.

6    Q.   Did International Paper ever have one of these -- did

7    International Paper ever have a permit?

8    A.   No, not to my knowledge.

9    Q.   Dr. Carrier, you were also asked a few questions about an

10   agreement between the DEP and the Northwest Florida Water

11   Management District.  I'd like you to turn your attention to

12   Exhibit 76.  What is the date of this agreement?

13   A.   I saw the date on the bottom there, February 26, but I

14   guess it was signed in June 2013.

15   Q.   In your opinion, would this agreement have had anything to

16   do with what happened prior to the date the agreement was

17   signed?

18   A.   No.

19   Q.   Dr. Carrier, you had also mentioned briefly about your

20   belief that an individual permit would have been required for a

21   structure such as this.  Do you recall that testimony?

22   A.   Yes.

23   Q.   Could you elaborate?

24   A.   Did you say "Would you elaborate"?

25   Q.   Yes, sir, please.

A.   Yes.  In my opinion, this particular dam is actually a
high-hazard dam because of the potential for downstream damage,
starting with the bridge, which is nearby, and then with the
homes farther down below.

And in a case like that, you use very conservative design
criteria, which, besides the special conditions, would have
required designing for a very high flood.

Q.   In what type of flood?

A.   Typically for a high-hazard dam we would design for what is
called the probable maximum flood, which in turn is related to
the probable maximum precipitation.  How much rain could
possibly fall, for example, if a hurricane stalls offshore and
circles around, like it did in Houston just recently.

Q.   And what is a probable maximum rain event?

A.   Well, for this area the standard charts that a geotechnical
engineer goes to shows that the probable maximum precipitation
would be about 48 inches in 24 hours.

Q.   And is there a historic basis for having such a requirement
-- such a standard?

A.   These standards have been around for decades, and they are
based on meteorologists and hydrologists studying all the data
that's available and developing what the criteria should be.
Very specifically here in Yankeetown, Florida, which is around
Apalachicola, in that area, they had exactly that occurrence of
a hurricane circling -- looping, they called it in those days,

1   and it dropped a huge quantity of rainfall.  And so, when that

2   happens, then that changes the criteria, and consequently for

3   this area they estimate 48 inches in 24 hours.

4             **MR. MELTZER:**  Your Honor, permission to approach?

5             **THE COURT:**  Okay.

6             *(Bench conference between the Court and counsel:)*

7             **MR. MELTZER:**  Dr. Carrier has not been qualified to

8   talk about any kind of storm magnification or any kind of

9   interval with respect to what type of storm event this was at

10  all.

11            **THE COURT:**  You're not going there?

12            **MR. MARSHALL:**  No.

13            **MR. MELTZER:**  And he didn't include anything in his

14  report about --

15            **MR. MARSHALL:**  Yes, he did, he talked about probable

16  maximum flood.

17            **MR. MELTZER:**  He didn't say anything about any type of

18  storm event, did he?  What did he say?

19            **MR. MARSHALL:**  He talked about probable maximum flood.

20            **THE COURT:**  I'll allow you to recross on it.  But I'm

21  not expecting to hear -- I haven't read his --

22            **MR. MARSHALL:**  Meteorology?

23            **THE COURT:**  Yeah, I had that question in my mind when

24  he started testifying.

25            *(Bench conference concluded.)*

1    **THE COURT:**  Mr. Marshall, go ahead.

2  **BY MR. MARSHALL:**

3  Q.   Dr. Carrier, you were also asked a few questions about the

4  Cornerstone design.  Do you recall being asked some questions

5  about that?

6  A.   Yes.

7  Q.   Were any of those designs that you saw signed and sealed by

8  a professional engineer?

9  A.   No.

10  Q.   What does that mean?

11  A.   In my opinion, they're not really legal for construction of

12  the dam.

13  Q.   And when an engineer puts his seal on a document, what does

14  it mean?

15  A.   Well, the engineer is certifying that he's made all the

16  calculations and that he is standing behind the safety of that

17  structure.

18  Q.   Because is it the case that -- strike that.

19      What is an engineer's number one responsibility?

20  A.   Safety of the public.

21  Q.   One other question.  You were asked about dam breach

22  modeling.  Could you explain -- I think you felt like you

23  needed to elaborate.  Could you explain a little bit more about

24  dam breach modeling?

25  A.   Within our profession there is some software called Dam

1    Break and it's -- it has certain limitations to it.  It can be

2    useful for looking at a sunny day -- what we call a sunny day

3    dam break.  It's very commonly used to evaluate what might

4    happen if you -- in a day without rain if the dam broke for

5    whatever reason what kind of flooding would occur downstream.

6         In order to do that kind of analysis -- and I'm sure you'll

7    hear more about this -- it assumes what is called steady-state

8    conditions.  The -- ultimately the reason that I felt it was

9    not appropriate to do dam break analysis for this particular

10   case is because it's a very -- during the heavy rainfall it's a

11   very dynamic unsteady situation, and I did not feel that the

12   software was appropriate for capturing the effect of the

13   erosion of the dam.

14             **MR. MARSHALL:**  No further questions, Your Honor.

15             **THE COURT:**  Mr. Meltzer, do you wish to recross on

16   that one area of maximum probable rainfall?

17             **MR. MELTZER:**  No further questions, Your Honor.

18             **THE COURT:**  Sir, you may step down.

19             *(Witness excused.)*

20             **MR. MARSHALL:**  Your Honor, we would like to reserve

21   the right to call Dr. Carrier in rebuttal.  We may not.

22             **THE COURT:**  He's your witness.  That's fine by me, if

23   it's okay with him.

24             **MR. MARSHALL:**  Thank you.  Well, I don't know about

25   that, Your Honor but --

1      **THE COURT:**  Your next witness, please?

2          **MR. GLASSER:**  Bretton DeJong, Your Honor.

3      **BRETTON DEJONG, PLAINTIFF WITNESS, DULY SWORN**

4          **MADAM CLERK SIMMS:**  Be seated.  Please state your full

5   name and spell your last name for the record.

6          **THE WITNESS:**  My full name is Bretton Cassidy DeJong,

7   and the spelling of the last name is D-e-J-o-n-g.

8          **THE COURT:**  Mr. Glasser, go ahead.

9                          **DIRECT EXAMINATION**

10  BY MR. GLASSER:

11  Q.   Mr. DeJong, you work for International Paper Company; is

12  that correct?

13  A.   That is correct.

14  Q.   You have worked for International Paper Company since 1997;

15  is that right, sir?

16  A.   That's correct.

17  Q.   You moved from -- well, I guess mill to mill or factory to

18  factory in the course of your career; is that fair to say?

19  A.   Yes, sir.

20  Q.   Worked for International Paper in Ohio, Alabama, and

21  Georgia before you became the mill manager here in Pensacola;

22  is that right, sir?

23  A.   That's correct.

24  Q.   Are you still the mill manager here in Pensacola?

25  A.   I am not.

1   Q.   When did you become the mill manager and when did you stop

2   being the mill manager?

3   A.   I was officially named the mill manager in Pensacola in

4   December of 2012, and there was a little bit of a transition

5   time, and I more or less showed up here at the site in January

6   of 2013.  And then my -- I received a new assignment in

7   October, I think it was October of last year, so late

8   September/October of last year.

9   Q.   20 --

10  A.   2017.

11  Q.   So you were the mill manager at the relevant time to this

12  case, April 2014?

13  A.   I was.

14  Q.   Where are you now?  I'm just curious.

15  A.   Actually, I'm working on a project in Selma, Alabama.

16  We're converting a paper machine for making a copy paper

17  product to a different product, so that's what I'm responsible

18  for.

19  Q.   So you've moved on to another --

20  A.   Right, but still located -- we're going to relocate as my

21  children get out of school, so we'll be relocating soon, but I

22  still live where I lived then and work at that job up in Selma.

23  Q.   As mill manager in 2014, you were responsible for running

24  the business and the entire physical plant for International

25  Paper there, right?

1    A.    Right.  So, maybe a little bit of a difference on that.  We

2    run the physical plant, right?  The business is managed out of

3    Memphis, but we produce the products that the business directs

4    us to.

5    Q.    So you view it more like you're kind of the plant manager,

6    and the business aspects of selling the paper and getting the

7    money happens at -- I'll call it corporate?

8    A.    That's right.  We have influence and certainly we have a

9    piece to play, but certainly my responsibility is more on the

10   manufacturing side.

11   Q.    All right.  And also for the physical plant, including for

12   the Kingsfield Road dam; is that correct, sir?

13   A.    The structure at Kingsfield Road is part of the mill, so

14   yes, the mill plant.

15   Q.    So, you and many other witnesses have called it a

16   structure.  Is that because you dispute -- you don't think it's

17   a dam?

18   A.    I don't honestly know the technical definition of a dam.

19   We've just -- you know, we've always referred to it as the

20   Kingsfield structure or the outfall structure.

21   Q.    So I take it, because neither you as the manager nor anyone

22   else to your knowledge recognizes it as a dam, that's why you

23   wouldn't try and get dam safety permits, right?

24   A.    I don't know that much about I guess a dam permit, but

25   we've always referred to it as an outfall structure.

1    Q.   As mill manager, prior to April 29th, 2014, no one at the

2    plant under you had ever told you about the washout of that dam

3    in 2005; isn't that true?

4    A.   I'm not aware of any history of that structure prior to me

5    coming to the mill in 2013.  Obviously, I was there for that,

6    but anything prior to that I was not aware of anything.

7    Q.   Right, but I'm taking you to 2014.  So, during the period

8    of time you were manager --

9    A.   Right.

10   Q.   -- you never got a briefing on the history of that dam?

11   A.   I don't recall any briefing, no.

12   Q.   Okay.  So at the time it failed, you had -- I'm talking

13   about your personal knowledge -- you had no personal knowledge

14   of any issues in 2005, right?

15   A.   I don't recall any, no.

16   Q.   You had no personal knowledge of any issues in 1996, right?

17   A.   I don't recall any, no.

18   Q.   And you had no personal knowledge of any issue in 1986?

19   A.   That's correct.

20   Q.   So you were, on the day it failed, kind of innocent of that

21   history personally, right?

22   A.   I was unaware of the history of the area, yes.

23   Q.   In all of 2013 while you were mill manager, you never went

24   down and looked at the Kingsfield Road dam; isn't that true?

25   A.   I don't recall ever specifically going down to the

1  Kingsfield Road area.  I don't have -- and I may have, but I

2  don't have a specific recollection of having been down there

3  before April of 2014.

4  Q.   So the first time that you can recall laying eyes on this

5  piece of the mill was the day after it had failed; isn't that

6  true?

7  A.   Shortly after.  I don't remember if it was exactly the day

8  after, but it was shortly thereafter.

9  Q.   At the time that you first laid eyes on the mill shortly

10 after it had -- on the dam shortly after it had failed, at that

11 time your company was receiving inquiries from the media

12 respecting what had happened; isn't that fair to say?

13 A.   Yeah, within some period of time we were getting questions,

14 that's correct.

15 Q.   So, in order to respond to those questions, you basically

16 met with at least -- there may have been more and we can get

17 into that -- at least Kyle Moore and Janice Holmes to work on a

18 response; isn't that right?

19 A.   Kyle and Janice and I worked on a number of communications

20 after the event for the *teams and I think also to respond to

21 those external inquiries about what was happening.

22 Q.   And one of the -- so the statements that Janice Holmes

23 ultimately put out -- and some of them have been discussed in

24 this courtroom -- had your full authorization and approval, I

25 take it?

1    A.    And so it is very normal for me to have looked at things

2    that Janice would publish externally, not necessarily in every

3    case, though, you know, she is our communications manager, and

4    had delegated authority to communicate.  I would say -- without

5    seeing specific documents, I can't say that any particular one

6    was or wasn't, but it would be normal for me to have looked at

7    most things that were released.

8    Q.    And given that there was this dam failure, this was a

9    pretty high priority item for you at that moment in time right

10   after April 29th to, say, May 15th, that two-week window?

11   A.    That's correct.

12   Q.    One such statement was that the dam at the time of the

13   flood was in, quote, "good repair."  Do you recall that

14   statement?

15   A.    There were a lot of statements that we exchanged emails on,

16   so it's possible that there was one that said that for sure,

17   yes.

18   Q.    Okay.  So, if there was a statement put out by the mill

19   that it was in good repair, do you agree that that was an

20   appropriate statement to make to the media after the event,

21   that at the time of the failure the dam was in good repair?

22   A.    So, obviously, if we had -- if we have a document that says

23   that, then that would have been what we believed at the time

24   based on input from myself, Janice, Kyle, others who were

25   familiar with the condition of the equipment at that location

1    prior to the event.  We would have said that, if it were true.

2    We would not have said it if we believed it not to be true.

3    Q.    Putting on the ELMO what's been previously admitted into

4    evidence as Plaintiff's Exhibit 244.  At the bottom, do you

5    recognize -- and I'll give you a second to read it -- I'll call

6    it the general statement that y'all put out.

7    A.    Okay, yeah.

8    Q.    Fair to say that's the general statement y'all put out?

9    A.    That looks like something we would have published, yeah.

10   Q.    And then Amber Southard, a reporter for a local TV station,

11   asked, "Even though this area was not in use, wouldn't it still

12   be IP's responsibility to keep up with the maintenance?"  You

13   see that?

14   A.    I do.

15   Q.    And then the response to Amber from Janice was, "The

16   erosion control structure was in good repair at the time of the

17   event," okay?

18   A.    I see that.

19   Q.    So, is that a statement that you personally authorized?

20   A.    Again, there's a lot of things that happened at that time.

21   I'm not sure I remember specifically one way or the other, but

22   it's likely or possible I would have seen that and authorized

23   it.

24   Q.    Well, based on your personal experience with this dam, is

25   there any way you could actually possibly authorize that

 1   statement based on your personal experience?

 2   A.   So, personally I did not see the area, but also I work

 3   closely with many people in our facility that would have seen

 4   the area and had knowledge of the condition of it and we would

 5   have discussed it, and so therefore I would have been relying

 6   on their experience and their expertise in assessing it in that

 7   area.

 8         So, personally, I did not see it personally, but if, you

 9   know, if -- had I been involved in that statement, which I

10   think I was, I would have talked to them first and gauged their

11   sense of it, and we would have used that as our statement.

12   Q.   Okay.  Have you ever written the words "You know they say

13   if you believe it's true it isn't really lying"?

14   A.   I think there was a joke in one of my emails about kind of

15   a lighthearted statement as part of a larger statement during

16   the emails exchanged during that time.  It was -- I don't know

17   if you got it, you know --

18   Q.   So, the answer is yes, you have written those words?

19   A.   I have with -- with -- with an emoji smiley face after it

20   to indicate that it was a lighthearted statement, not intended

21   to be taken seriously.

22         **MR. GLASSER:**   I'm putting on the ELMO for the witness

23   Plaintiff's Exhibit 173.

24   **BY MR. GLASSER:**

25   Q.   Do you recognize Plaintiff's Exhibit 173 as the email in

1    which you are discussing?

2    A.   One second.  Yeah, it says -- I can't remember exactly --

3    Q.   Before you tell me what it says, I've got to get it

4    admitted.  So, do you recognize it?

5    A.   I recognize it, yes.  I'm sorry.

6         **MR. GLASSER:**  I move the admission of Plaintiff's

7    Exhibit 173, Your Honor.

8         **MR. NELSON:**  No objection.

9         **THE COURT:**  Thank you.  173 is admitted.

10        **(Plaintiff's Exhibit 173 admitted into evidence.)**

11   **BY MR. GLASSER:**

12   Q.   Mr. DeJong, before we get to the content of the statement,

13   I want to focus in on the date.  May 4th, 2014, is the date

14   that you wrote this jocular statement; is that correct?

15   A.   It looks like the email was written -- according to this

16   document, it was dated May 4th, yes.

17   Q.   And the content of the document to begin with, before we

18   get to your joking, the first cut is from Kyle Moore suggesting

19   talking points for dealing with the media; is that correct?

20   A.   I don't remember what the purpose of the -- specifically

21   him calling out "media" the purpose of the talking points.  We

22   were also -- and I would say primarily, is my recollection,

23   primarily attempting to gather information for our team

24   members, the mill employees who were working during that time.

25        We were in the middle of what we call an annual outage

1    which is a large down-time event, lots of maintenance happening

2    at our facility when this storm came through.  And so, it was

3    extremely impactful to the mill after the storm came through,

4    and so it would be typical and normal for something like this

5    of this severity for us to gather information for internal

6    communications as well because they may not have a sense or all

7    the information of what's going on in the mill.  They may know,

8    hey, something happened and, you know, both inside the mill and

9    maybe with the effluent system and so we're trying to gather

10   information that we can share with our team members as well --

11   and perhaps the media, but certainly for our team members.

12   Q.   Okay.  So, fine.  Let's assume for a minute -- go with your

13   idea that this is what you're going to disseminate internally,

14   this is to people with knowledge or at least people who care in

15   the mill, right?

16   A.   Our mill team members, yes.

17   Q.   All right.  And so you're telling them that there was a

18   significant erosion and wash-out of a structure near Kingsfield

19   Road, right?

20   A.   That's what the bullet says, yes.  I believe this was our

21   earliest draft.

22   Q.   Yeah, it says the structure previously served as the mill's

23   final treated effluent discharge point," you see that?

24   A.   It does say that, yes.

25   Q.   "Since 2012 when the mill completed transition to the

1  pipeline, the structure serves no purpose, and it simply sits

2  in the path of stormwater moving from the natural drainage area

3  of the nonproduction areas of the mill."  Do you see that?

4  A.    It does say that.  And I think the context of that

5  statement is referring to the earlier commentary about it not

6  being part of the effluent system anymore, not a treated

7  effluent discharge point, rather stormwater continuing to flow

8  through the area but not part of the effluent system.

9  Q.    To put this in perspective, we're now May 4th, 2014 -- or

10  maybe this is May 3rd, it's an email chain -- you personally,

11  as the man responsible for this mill, don't have a lot of

12  knowledge about this dam, it's fair to say, right?

13  A.    So, I don't have a lot of knowledge, that's correct.

14  Q.    Okay.  And so, as you said I think in your testimony, you

15  went to people with knowledge, and the person who is sending

16  you this statement is Kyle Moore, the manager of environmental

17  and safety, right?

18  A.    I believe that's correct.  I don't have the --

19  Q.    I'll show you right here, Kyle Moore.

20  A.    Okay.

21  Q.    He is, at the relevant time, the manager of environmental

22  and safety, right?

23  A.    That's correct.

24  Q.    And I take it, because you went to him in that time right

25  after the storm when the focus is on this mill, you couldn't

1   think of anybody more knowledgeable to ask this question of,

2   could you?

3   A.   So, he would be very knowledgeable, certainly, but we have

4   lots of very capable and qualified folks, but he certainly

5   would be the first person that we would talk to for sure.

6   Q.   So, the "served no purpose" is the first communication you

7   got from Kyle Moore about the history of the dam to talk about

8   either disseminating internally or externally, correct?

9   A.   As a first draft, yes.  But again, in the context of a full

10  statement referencing that back to the treated effluent

11  discharge, it did not have a purpose for that anymore, so the

12  context I think is important as you read the whole bullet.

13  Q.   And he goes on to say that the structure was not intended

14  to retain or hold stormwater, that's what he says, right?

15  A.   It does say that in this draft, yes.

16  Q.   You went down and you saw that there was a 41-foot hole in

17  an earthen embankment, right?  Saw a big hole?

18  A.   I saw a damaged structure when I went down after the rain

19  event, yes.

20  Q.   And you saw the concrete outfall structure beyond the hole,

21  right?

22  A.   Yes, I did.

23  Q.   Was it apparent to you that in rainstorms it would in fact

24  hold water behind the earthen dam?

25  A.   It appears to me that the rain passes through that, over

and around and into the headwaters of Elevenmile Creek is what
it appears to me, that it just -- it allows the water to pass
through that area.

Q.   And then Mr. Moore points out that -- he said FDEP
classified the storm event on the 29th as a 300- to 500-year
event, do you see that?

A.   I do see that.

Q.   And then you respond "K.  Was taking the 500-year rain and
extrapolating.  Maybe it's true.  You know they say if you
believe it's true it isn't really lying."  You see that?

A.   I do, and also, again, I see the smiley face emoji after it
indicating that I was being lighthearted about that statement.
And I followed it -- just in case there was a question, I
followed it with a statement that says, "We won't say it if
it's not reasonably verifiable as true, of course, or rephrase
using the rate of rainfall in the statement.

     So the intent was to clarify and make sure it was, again,
to -- in retrospect maybe the lightheartedness was not
necessary, but for many people it was a very difficult time, a
difficult time for the mill.  We were in outage mode, and the
rainfall event, and the people affected outside the mill and
within the mill, and there's a long history to our mill that
would have elevated concern about our facility and its
viability after that, and a lot of stress, and a lot of people
working really, really hard.

1       And so the lightheartedness was intended to put a smile on

2   their face for at least a brief period of time, not intended to

3   direct -- to do anything other than, you know, we're going to

4   keep this -- clarity, truthfulness, transparency.

5       And so my following statements were intended to make sure

6   that there was no misunderstanding about that, but maybe take a

7   little stress off for a few minutes.  That's why it's written

8   that way.

9   Q.   Mr. DeJong, when I ask a question -- I didn't have a

10  question pending, sir.

11  A.   I'm sorry.  I just wanted to share some context about the

12  statement and make sure it was --

13          **MR. NELSON:**  I object to that kind of colloquy and

14  issuing directions to the witness.

15          **THE COURT:**  If there's a problem, I'll -- I thought he

16  was answering a question.

17          **MR. GLASSER:**  Okay.

18  **BY MR. GLASSER:**

19  Q.   I want to show you the statement that you did put out,

20  okay?

21  A.   Okay.

22          **MR. GLASSER:**  Exhibit 253?

23          **MR. NELSON:**  No objection.

24          **MR. GLASSER:**  It's admitted by agreement, Your Honor.

25          **THE COURT:**  What's the number?

1          **MR. GLASSER:**  253.

2          **THE COURT:**  253 is admitted.

3          **(Plaintiff's Exhibit 253 admitted into evidence.)**

4    BY MR. GLASSER:

5    Q.   And this is kind of the formal statement you made inside

6    the mill to the Pensacola team on May 13, 2014, right?

7    A.   It appears that it is, yes, it sure does.

8    Q.   And you'll agree with me there's no statement in there that

9    there was a 300 to 500-year storm event, is there?

10   A.   Give me a chance to read it.  I don't see it, but hold on

11   one second.

12        Right, there's no reference to the severity of the storm

13   event.

14   Q.   So, when you were joking about it maybe being a 500-year

15   storm event and asked your people to verify, that was on May

16   4th, right?

17   A.   It appears that that was when that happened.  And again, as

18   this is an iterative process, we started with a draft, and we

19   continued to work the draft based on the best available

20   information, and so there were, you know, as you see, there

21   were changes over time.

22   Q.   And eight days later when you put it out, that statement

23   wasn't in there, right?

24   A.   It does not appear that it was in there.

25   Q.   And to determine whether it would be a three-to-500-year

1    storm event, we would have to know the length of time it rained

2    over the mill as to the mill and what time the dam failed,

3    right?

4              **MR. NELSON:**  Objection, Your Honor.

5    **BY MR. GLASSER:**

6    Q.   That's how we would determine whether the failure was

7    caused by a three-to-500-year storm event; isn't that what you

8    believe?

9              **THE COURT:**  There's an objection.

10             **MR. NELSON:**  Lack of foundation.

11             **THE COURT:**  Sustained.

12   **BY MR. GLASSER:**

13   Q.   Why -- you took it out for a reason.  It was because you

14   couldn't verify it, right?

15   A.   I don't remember why we would have taken it out, but I --

16   you know, our general iterative process, as we discussed, we

17   started with a draft, and as information changed and we learned

18   new things, and so we always attempt to be as up to date as we

19   can be with our information.  We don't want to say something

20   that we can't verify or that's not reasonably verifiable or

21   maybe, you know, somebody might challenge or whatever for no

22   good reason, so we, you know, we --

23        I don't remember why we changed it, but if we didn't have a

24   very solid foundation for believing that we had a verifiable

25   resource to say it was a 300- to 500-year event, then we

1  wouldn't have said it, for that reason.

2  Q.   Okay.  But what you did after eight days of that iterative

3  process and the verification process you just described say is

4  it's an inactive erosion control structure, right?

5  A.   In the context for water treatment purposes.  I think if

6  you read the whole statement, what is true in terms of the

7  intent, whether or not even the final draft was perfectly

8  phrased or characterized, you know, we're not perfect, we do

9  our best to say things as we believe or intend to communicate

10  them, the common theme was that the intent of any statements

11  related to that was it wasn't part of our waste treatment

12  system anymore and that was it.

13       If it was inactive, it was inactive from a wastewater

14  treatment perspective, and we weren't intending to suggest or

15  communicate that it hadn't -- you know, no purpose or nothing

16  happened or there was nothing that flowed through that area,

17  but just for our mill team especially who have a long history

18  at that mill and the effluent system and the concerns related

19  to it, it was not part of our waste treatment system anymore.

20  That's what we were trying to communicate.

21  Q.   I want to show you what's been previously admitted into

22  evidence as Plaintiff's Exhibit 183(h).  Do you recognize

23  183(h)?  Do you even know what it is?

24  A.   I could guess, but I don't know what it is.

25  Q.   There's been previous testimony that this is the low valve

1    on the thing you've been calling the inactive outfall

2    structure, okay?

3    A.   Okay, right.

4    Q.   Now that I've reminded you, did you see it on that morning

5    when you finally looked at the dam?  Have you ever seen it?

6              **MR. NELSON:**  Objection, lack of foundation.

7              **THE COURT:**  Overruled.  He's asking if he's ever seen

8    it.

9              **THE WITNESS:**  So, I didn't get close enough to

10   physically see that picture at that location.  From the vantage

11   point as I was down there, I believe I remember seeing the

12   stem.  That the thing was very damaged at that point, I believe

13   I remember seeing the stem that would have operated that.  So I

14   saw something that was part of that device but not that exact

15   view or picture of it.

16   **BY MR. GLASSER:**

17   Q.   All right.  Let me ask you this:  As manager of the mill,

18   you did spend plenty of time inside the mill, right?

19   A.   Yes.

20   Q.   If you saw a piece of equipment inside your mill at this

21   level of disrepair, would that be the standard of care for

22   maintenance you would expect inside your mill?

23   A.   And so what I see is -- again, I hesitate to assess whether

24   that is a state of disrepair or not.  I see surface rust, but I

25   don't necessarily see anything that, you know, would suggest to

1  me that it wouldn't perform its function.  But, obviously, I

2  haven't tested it, and I wouldn't know for sure whether it

3  would work like that or not.

4  Q.   So, when the statement went out that the dam was in good

5  repair, you personally didn't know if this 4-foot diameter

6  valve at the bottom that lets the water out even worked?

7  A.   Right, so, so personally I wasn't aware of the condition of

8  it before, you know, 2014 when it was damaged, but I do and

9  continue to rely on those that are in that area that work in

10  that area and would have the knowledge of the condition of it

11  as we work to communicate.

12  Q.   Away from this picture, would you expect to see any

13  equipment inside your mill that the company actually relies on

14  to make money in a state of rusted disrepair?

15  A.   And so I see -- I see surface rust and there -- there is

16  quite a bit of equipment in all of our facilities that works

17  perfectly well and may have surface rust or other items on it

18  that might be visibly concerning but have absolutely no impact

19  whatsoever on the function of the equipment, and it works fine,

20  in other words.  It just depends on the equipment.

21  Q.   So, the context, though, in which these statements went

22  out, the one to the mill and the ones to the press, those

23  statements went out under your watch as a person who had a dam

24  that failed that had never hit his radar screen until it

25  failed, right?

1    A.    So, I was -- I was responsible for the mill at that time

2    and, again, as that piece of equipment was not part of our

3    active effluent treatment system when I came to the mill, it --

4    it was -- you know, it was not maybe as elevated as other parts

5    of the facility.

6    Q.    Right.  So isn't it fair to say that when you were crafting

7    these statements you personally were very concerned because

8    this had happened on your watch?

9    A.    I was, yeah, very concerned about a lot of things for many

10   reasons, obviously that included, but yeah, that was obviously

11   a very significant event for the mill and for the community.

12   Q.    So as a person -- I presume you had bosses you had to

13   report to about what exactly had happened here, right?

14   A.    That's correct.

15   Q.    And I'm sure the first day you had to make that call one

16   year into your new job as mill manager you were scared, right?

17   A.    Well, scared is not -- may or may not be the right word,

18   but I was obviously concerned about the state of the mill, the

19   state of the community.  You know, physically it was difficult

20   for me to even get to the mill the day after the rain event, so

21   yeah, it was very concerning.

22   Q.    So those statements that were put out at that time with

23   that background understanding mattered to you as a manager?

24   They weren't accidental; they were intentional statements,

25   right?

1    A.    Yeah, they were intentional statements.  We were trying to

2    be clear and, you know, communicate facts that we were able to

3    ascertain at that time to allay people's fears again because

4    there were a lot of people with a lot of questions about the

5    mill and viability and how much damage was done, so we were

6    making every attempt to be truthful and clear and, you know,

7    communicate in a way that people would understand and not give

8    misunderstandings about the facts that we were attempting to

9    share.

10        So, yes, it was important to me that we were -- that we

11   were accurate and not perfect -- we're not perfect.  And I

12   would say that, as I read, you know, some of these statements

13   again, perhaps they could have been phrased better, right, and

14   I get that.  So we weren't perfect but we were attempting to be

15   as good as we could be at that time.

16   Q.    You now know that removing that dam entirely would have

17   only cost about $600,000; isn't that true?

18            **MR. NELSON:**  Object to lack of foundation, Your Honor.

19            **THE COURT:**  Approached the bench, please.

20            *(Bench conference between the Court and counsel:)*

21            **MR. GLASSER:**  I asked the question that way to avoid

22   getting into subsequent remediation --

23            **THE COURT:**  So you're not going to?

24            **MR. GLASSER:**  Right, exactly, that's why I'm trying to

25   lead the witness, he did say that in his depo, it doesn't get

1     into subsequent remedial, and I'm trying to carefully just get

2     the evidence in but it's relatively --

3             **THE COURT:**  At what time frame are you asking him?

4             **MR. GLASSER:**  Well, I mean, the estimate came after,

5     but it's the same -- I just want the order of magnitude to take

6     this dam out, they could have done --

7             **THE COURT:**  The estimate came after that -- you're too

8     close to my ruling.

9             **MR. NELSON:**  This witness only has knowledge about

10    that in the context of the removal which is covered by the

11    subsequent remedial measure.

12            **THE COURT:**  Then why don't you ask that question?

13            **MR. GLASSER:**  Because it matters what it would cost to

14    remove at any time.

15            **THE COURT:**  No, it -- it matters -- he doesn't have

16    knowledge other than the subsequent remedial measure --

17            **MR. GLASSER:**  All right, fine, I'll --

18            **THE COURT:**  -- which I have said is not admissible.

19            **MR. GLASSER:**  But I didn't ask about a time frame, I

20    just asked --

21            **THE COURT:**  But you need a time frame to make it

22    relevant and to establish a foundation.

23            **MR. GLASSER:**  Okay.  Then, I won't ask the question.

24            *(Bench conference concluded.)*

25            **THE COURT:**  Ladies and gentlemen, you've heard me say

1   before that nothing that a lawyer says at any time during the

2   trial is evidence in the case.  I'm also going to ask you to

3   disregard the question that you just heard asked by

4   Mr. Glasser.

5   **BY MR. GLASSER:**

6   Q.   Now, were you at the mill that night?

7   A.   That night?  The night of the rain event?

8   Q.   Yes, sir.

9   A.   So, I -- we were, as I mentioned before, we were in our

10  annual outage mode, so typically when we're in that we have day

11  staff and night staff, and so I would have worked that day and

12  left sometime in, you know, the late evening, six o'clock,

13  seven o'clock, something like that, to go home.  So that night

14  I was not in the mill.

15  Q.   Okay.  So you think you left around six or seven o'clock?

16  A.   I don't remember exactly, but that would have been typical

17  for my schedule during that time.

18  Q.   And at the time you left it hadn't started raining yet at

19  the mill; isn't that true?

20  A.   It was raining during that time period.  Whether it was

21  raining when I left the mill, I don't recall that specific

22  night.  It could have been, but I don't remember specifically.

23  Q.   I'm showing you -- I'm going to show you on the ELMO

24  Plaintiff's Exhibit 252, which is admitted by agreement.  It's

25  an email from you to Kyle Moore and Brett Griffin at 6:16 p.m.

1  on April 29th, 2014.  You see that?

2  A.  I do, yes.

3  Q.  And so this email says, "May want to get the word out.  I

4  hope it slacks up a little before hitting here" --

5            **THE COURT:**  Is this in evidence?

6            **MR. GLASSER:**  Yes, ma'am, it was just agreed.

7            **THE COURT:**  Well, I have to -- you might agree, but

8  for our purposes here and how this works, Ms. Simms needs to

9  hear me say it's admitted.

10           **MR. GLASSER:**  I'm sorry.

11           **THE COURT:**  What's the number again, please?

12           **MR. GLASSER:**  252.

13           **THE COURT:**  252 is admitted.

14       **(Plaintiff's Exhibit 252 admitted into evidence.)**

15           **THE COURT:**  And then we'll put it up.

16  **BY MR. GLASSER:**

17  Q.  Okay, Mr. DeJong, I'm sorry.  The date of the email is

18  April 29th, 2014, at 6:16 p.m., correct?

19  A.  Correct.

20  Q.  It's from you, right?

21  A.  That's correct.

22  Q.  The subject is you think a hard storm is going to hit in

23  about an hour, maybe a tad more or less, right?

24  A.  That is the subject, yes.

25  Q.  All right.  And so you're telling Kyle Moore he may want to

1   get the word out, right?

2   A.   That's correct.

3   Q.   So it's fair to infer from this email, wouldn't you agree,

4   that it had not started raining on the mill property by 6:16

5   p.m.?

6   A.   I would say that it's not.  It could have been raining, but

7   not necessarily thunderstorm or lightning storm or what we

8   would consider typically a hard rain, you know, that you would

9   get in this area.  Typically during the spring you get these

10  lines of storms, but it could have been raining at the time,

11  just not storming.

12  Q.   Okay.  And then, what's already been admitted into evidence

13  as Exhibit 228 is another email on the same subject as of 7:20

14  p.m. that night from Kyle Moore saying, "Yes, I'm out in the

15  mill and I can see a cluster of pretty dark clouds to the

16  northwest.  I believe the general movement of the storm is to

17  the northeast."  Do you see that?

18  A.   I do, and the subject of that one is "Additional

19  thunderstorms and rainfall," so I guess that's a further data

20  point, it could have been raining at the time.

21  Q.   You don't have any personal recollection, you're saying,

22  whether it was in fact raining at this time?

23  A.   I don't recall.  I do recall -- we often during, again,

24  during outages where we have a lot of people working watch

25  weather, you know, storm fronts, again, which we have all the

1    time here in the spring, and we elevate that to communicate to

2    our team members to make sure they can work safely.  You know,

3    if we have a hard wind or lightning storm, we ask our folks to

4    be aware and to not be working in an area that they would be

5    exposed.  So, I'm sure in the context of that, that that's what

6    generated that email.

7    Q.   And then when -- you would agree with me that, if the dam

8    failed before, say, ten o'clock at night, it would have failed

9    relatively early in the hard rain?

10   A.   I can't even begin to guess when it may or may not have

11   done anything.

12   Q.   If it had failed at nine o'clock, it would have failed even

13   earlier in the hard rain; isn't that true?

14   A.   Again, I have no idea when it would or would not have

15   failed or how much rain fell during the night or at any point

16   in time.  I just wasn't here and I didn't see any data that

17   would help me make that agreement with you.

18             **MR. GLASSER:**  No further questions, Your Honor.

19             **THE COURT:**  Thank you.

20             Mr. Nelson?

21             **MR. NELSON:**  No questions, Your Honor.

22             **THE COURT:**  Sir, you may step down.

23             *(Witness excused.)*

24             **MR. NELSON:**  May Mr. DeJong be excused?

25             **MR. GLASSER:**  Yes.

1      **THE COURT:**  Yes, sir, you're excused.

2              The Plaintiff's next witness?

3      **MR. MARSHALL:**  Dr. Mark Ross, Your Honor.

4          **MARK ROSS, PLAINTIFF WITNESS, DULY SWORN**

5      **MADAM CLERK SIMMS:**  Be seated.  Please state your full

6  name and spell your last name for the record.

7      **THE WITNESS:**  Mark Allen Ross, R-o-s-s.

8      **THE COURT:**  Mr. Marshall, when you're ready.

9      **MR. MARSHALL:**  Thank you, Your Honor.

10                  **DIRECT EXAMINATION**

11 BY MR. MARSHALL:

12 Q.   Dr. Ross, where do you live?

13 A.   I live in Tampa, Florida.

14 Q.   And how long have you lived in Florida?

15 A.   All but two years of my life.

16 Q.   And what do you do for a living?

17 A.   I'm a professor of water resources at the Department of

18 Civil and Environmental Engineering at the University of South

19 Florida, and I direct the research center there, which is a

20 consortium of faculty in different disciplines that work in

21 water resources modeling, hydrologic water quality modeling.

22 Q.   What is your educational background?

23 A.   I have a BSE and MSE in civil engineering, water resources

24 from the University of South Florida, I was pleased to be able

25 to go there, and then a Ph.D from the University of Florida

1    some years later.

2    Q.   And what was the focus of your degrees?

3    A.   My degrees have always centered around hydrologic and water

4    resources modeling, hydraulic modeling, estuaries and stream

5    systems in Florida.

6    Q.   And you've been saying hydrologic and hydrologic modeling.

7    What is hydrology?

8    A.   It's the study of water, but my interest has always been

9    pretty much surface water, predicting stream flow.  My father

10   was a professor before me and his interest was estuary flow.

11   And I realized we didn't have a really good way of getting at

12   freshwater in an estuary, so I took on an interest in

13   freshwater.  But in Florida you have to understand the

14   groundwater system to be able to do the freshwater system, so

15   that's my interest.

16   Q.   And so, I don't want to date you, but how long have you

17   been working in the area of hydrology and hydrologic modeling?

18   A.   There's no way around that, it's 40 years.

19   Q.   And what courses do you teach at the University of South

20   Florida?

21   A.   I teach courses in that subject area, water resources

22   engineering at the undergraduate level, and hydrologic modeling

23   and coastal modeling and freshwater systems modeling at the

24   graduate level.

25   Q.   You haven't had to miss any classes, have you?

1    A.    Excuse me?

2    Q.    You haven't had to miss any classes, have you?

3    A.    I did this week, hopefully not next.

4    Q.    So, what do you do at the center?

5    A.    So, we do a lot of research in developing models for

6    governmental agencies, developing new technology, new types of

7    models, collecting data to make sure those models work properly

8    and we understand the system.  I get to work with very talented

9    graduate students and it's a real blessing.

10   Q.    Is your modeling research and expertise directed to any one

11   particular area, geographic area?

12   A.    Oh, it is, yes.  I primarily -- I've done work all over the

13   world, but I primarily focus on coastal plain settings like

14   Florida because of the unique conditions of coastal plain

15   settings like types of soils and surface and groundwater

16   interactions.  It's a very unique hydrology.

17   Q.    And why is that?

18   A.    The sandy soils that used to be, you know, on the beach not

19   too long ago are now filled with -- the groundwater and surface

20   water interact and you have to understand that process to get

21   -- to understand evolution on runoff -- of runoff and the

22   quantity of runoff because it's highly sensitive.  If it's dry

23   and water falls on the ground, it goes into the ground.

24   Q.    And have you authored any scientific peer-reviewed works?

25   A.    Yes.

1    Q.   And how many have you authored?

2    A.   In excess of 150.

3    Q.   And what has been the focus of your scientific

4    peer-reviewed work?

5    A.   All in that general area.  Hydraulic and hydrologic

6    modeling, some water quality modeling, some coastal processes.

7    Q.   Do you have any experience with respect to soils?

8    A.   Yes.

9    Q.   Can you explain that, please.

10   A.   So, I've written papers on the hydrology of soils, the

11   sensitivity, the way water moves through the soils and how it

12   affects the evolution of saturation to generate runoff, how

13   that unique process works and how they dry out afterwards and

14   the importance of that and something called evaporation

15   processes that dry out the soils, and that relates to how

16   runoff commences.

17   Q.   Are you a licensed professional engineer?

18   A.   Yes.

19   Q.   Are you licensed in Florida?

20   A.   Yes.

21   Q.   Do you have any experience with respect to forensically

22   determining the cause of a flood?

23   A.   Yes.

24   Q.   And how far does that experience go back?

25   A.   40 years.

1    Q.   Do you have any experience with dam failures and associated

2    hydrology?

3    A.   Yes.

4    Q.   And how far does that experience go back?

5    A.   The same.  I've been looking at the evolution of runoff

6    since I began working in the subject area.

7    Q.   What percentage of your modeling studies relate to the

8    calculation and interpretation of rainfall?

9    A.   Rainfall drives the train, it's 90 percent of the studies I

10   work with.  Some of the coastal processes, it's waves and wind.

11   Q.   And do you also work as a consulting engineer?

12   A.   Yes.

13   Q.   With who?

14   A.   So, I have my own consulting firm because from time to time

15   I have to give opinions, and the university doesn't like me

16   giving opinions, so they will let you do that through your own

17   means.  They -- actually, as part of the requirement to keep

18   your licensure, you have to do work, too, and I can't just be

19   an academic all the time but --

20   Q.   And what types of entities do you work with?

21   A.   I work with most of the governmental agencies.  At one time

22   or another I've worked with just about every governmental

23   agency in Florida, the Water Management Districts, the

24   Department of Environmental -- what used to be the Department

25   of Environmental Regulation, the Department of Natural

1    Resources and now DEP, Army Corps of Engineers, and I've worked

2    for private entities, some of the big mining companies,

3    phosphate mining companies.  I've worked for paper mills.  I've

4    done a lot of work for different entities.

5    Q.   And what percentage of your work is doing what you're doing

6    today, which is testifying in court?

7    A.   Very small, 10 percent, less than 10 percent.

8    Q.   And how many hours did you and your staff devote to this

9    project?

10   A.   In excess of 1600, I believe, total hours.

11   Q.   And how many years have you worked on this project?

12   A.   Surprisingly, three years now.

13   Q.   And why did you spend so much time?

14   A.   Well, this is a complex forensic investigation.  It takes

15   -- it warrants the time to do it right to understand the

16   processes and be able to deduce what happened correctly and

17   calibrate a model, and those sorts of things take time.

18   Q.   Was there any part of the study that took longer than

19   others?

20   A.   Certainly.  Always the thing that takes the most time is

21   calibration.

22   Q.   And what is calibration?

23   A.   Calibration is where you make sure your model is

24   reproducing what's actually out there and is the best estimate

25   of reality within a computer model.  You know, the real world

1    is pretty complex, and when you try to put it in a computer

2    it's not real, but it's the best reality we can get, okay, so

3    that's what we try to do with it.

4    Q.   And how much have you billed?

5    A.   About $130,000.

6    Q.   And have you been paid?

7    A.   Yes.

8         **MR. MARSHALL:**  At this time I'd like to move that Dr.

9    Ross be admitted and qualified as expert in hydrology and

10   hydrological modeling and the hydrology of soils.

11        **THE COURT:**  Any voir dire?

12        **MR. NELSON:**  No, Your Honor.

13        **THE COURT:**  He'll be so designated.

14        Ladies and gentlemen, please remember my instruction

15   yesterday with regards to Dr. Carrier about expert witness

16   testimony that ultimately it's up to you to decide whether or

17   not to rely upon that testimony.

18   **BY MR. MARSHALL:**

19   Q.   Dr. Ross, what were you asked to do?

20   A.   I was asked to look at the flooding event of April 29 and

21   30, 2014, and specifically with regards to whether a dam

22   failure contributed significantly or caused the flooding that

23   was experienced in these two neighborhoods.

24   Q.   And how serious was the flooding in the Bristol Park and

25   Ashbury Hills subdivisions on the night of April 29th, 2014?

1   A.    I think it was extremely serious, because water rose very

2   rapidly in people's homes in the middle of the night.  That's a

3   very, very big safety concern.

4   Q.    I'm going to show you what's been marked as Exhibit 5 and

5   have you identify that for the record, please.

6   A.    This is an estimate -- or a document I created that's an

7   estimate of the flood extent that's calculated by interpreting

8   high-water marks in and around the Bristol Park and Ashbury

9   Hills neighborhoods.

10         **MR. MARSHALL:**  At this time, Your Honor, I'd move

11  admission of Exhibit 5 and would ask to publish it to the jury,

12  please.

13              **THE COURT:**  Any objection?

14         **MR. NELSON:**  No objection.

15              **THE COURT:**  Thank you.  Exhibit 5 is admitted.

16         **(Plaintiff's Exhibit 5 admitted into evidence.)**

17         **MR. MARSHALL:**  And if I might, it may be just a little

18  bit better -- James, if you would pull up Exhibit 5 because

19  it's a little bit of glare on that picture, it might be better

20  on the computer.

21              **THE COURT:**  That's fine.

22  **BY MR. MARSHALL:**

23  Q.    That's a little bit better.  Thank you.  Using your screen

24  there, can you describe Exhibit 5 to the jury, please, Dr.

25  Ross?

1    A.    Sure.  This blue area here -- this thing has an offset --

2    is basically the extent of flooding that would have been

3    observed on April 29th and 30th as interpreting from high water

4    surveys at the residences and a visual elevation model and

5    elevation model of that neighborhood and GIS operation.

6         For orientation, this area is Bristol Park, and this area

7    over here is Ashbury Hills, and this is 297A.  It's a bit

8    offset.  Sorry.

9    Q.    There are a series of little circles kind of with the

10   color.  Can you describe those, please.

11   A.    Sure.  Those are various named Plaintiffs, their residences

12   -- location of their residences.  For example, you heard

13   testimony from the Bullards, there.  And this is the Navelski's

14   house.  It's different named Plaintiffs around the

15   neighborhood.

16   Q.    Where is the Navelski house?

17   A.    That one right there.

18   Q.    Why don't you circle it.

19   A.    I'll try to do that but it's off.  Okay.

20   Q.    And can you circle the Bullard house now, please?

21   A.    Yes.

22   Q.    And can you circle the Henderly house, please.

23   A.    Yes, and the Alexander right here.

24   Q.    And so, in essence, this is basically the extent of the

25   flooding that occurred on April 29th, 2014; is that correct?

1  A.   Correct, that would have been the area that had water at or

2  above ground level.

3  Q.   And how many homes flooded in the Ashbury Hills and Bristol

4  Park subdivisions?

5  A.   163.

6  Q.   Have you reached an ultimate conclusion?

7  A.   I have.

8  Q.   And what is that ultimate conclusion?

9  A.   That the dam failure and the subsequent large volume of

10  water that was released upstream of the dam caused that

11  significant flooding that was observed in this neighborhood.

12  Q.   And what was the process you used to come to that

13  conclusion?

14  A.   I -- like you do every study, you go out and collect

15  background data, you collect observations and reports of the

16  flooding and go get background rainfall data, you go get

17  elevations and other data you need, you look at what's online

18  available for it.  And then I visited the site and looked at

19  both houses and high-water marks at the houses and the dam, and

20  then I constructed a model -- I sort of formulated a hypothesis

21  and constructed a model to evaluate it.

22  Q.   Very briefly, why do you hold the opinion that the failure

23  of the dam caused this flooding?

24  A.   Particularly the timing is part of the element.  You've

25  heard testimony and we have insights into the overtopping time

1  of the spillway, and we have insights into the flooding time of

2  the spillway.  And knowing something about the travel

3  characteristics of this stream reach, the timing supports it

4  and then the model sort of verifies it.

5  Q.   What specific aspects of the timeline most support your

6  conclusion?

7  A.   Specifically the time, the commencement of flooding that

8  was somewhere after ten p.m., and the commencement of

9  overtopping, which was somewhere after nine p.m., and the

10  travel time that it takes to get from the dam to the

11  neighborhood, which is only two miles downstream.

12  Q.   And what about the rainfall at that point in time?

13  A.   And the rainfall is the clouding issue here because it was

14  a large rainfall.  But at that time it wasn't that much

15  rainfall, and that's a big consideration in timing aspects is,

16  you know, why did it flood with the limited amount of rainfall

17  by ten p.m.

18  Q.   Briefly describe the model you've prepared and the two

19  scenarios that you ran.

20  A.   I prepared a hydrology and hydraulic model of this

21  watershed.  I gathered all the available information about

22  rainfall and everything and calibrated the model and ran two

23  scenarios, one which was what would happen if the dam had held

24  through the storm.  Specifically I thought that would answer

25  the question about whether rainfall alone caused this flooding,

1    okay, and what would happen if the dam held.

2          The second scenario was what happens if the dam was removed

3    prior to the storm, not knowingly initially that the dam would

4    have failed to say what happens if the dam is not here, what

5    does that tell us.  And those were the two scenarios I ran.

6                **MR. MARSHALL:**  James, could you put Exhibit 1(a) up,

7    please.

8                This would be a new exhibit.

9    **BY MR. MARSHALL:**

10   Q.   Dr. Ross, can you just identify for the record Exhibit

11   1(a), please?

12   A.   It's a table out of our report that is the results of our

13   investigation on these two scenarios.

14               **MR. MARSHALL:**  Your Honor, at this time I ask that

15   Exhibit 1(a) be admitted.

16               **THE COURT:**  That will be admitted.  Thank you.

17          **(Plaintiff's Exhibit 1(a) admitted into evidence.)**

18               **MR. MARSHALL:**  May I publish it to the jury?

19               **THE COURT:**  Yes.

20   **BY MR. MARSHALL:**

21   Q.   Dr. Ross, I would like to have you kind of run through this

22   chart.  First can you just describe what the homeowner name

23   refers to?

24   A.   So, we were just looking at some of the residences on the

25   previous figure where they were in the neighborhood.  These are

1    the residences that are listed in this column 2, Alexander,

2    Bullard, and Henderly, and Hutchins.  And the third column is

3    the finish floor elevation, so this would have been the

4    elevation of their floor slabs inside their home, not the

5    garage, inside the home, would be the lowest elevation inside

6    their home, the kind of place where flooding in their home

7    would commence.

8        And these next two columns are the results from the model

9    interpreted at those locations for the natural condition and

10   the dam in place/no failure condition.

11   Q.   I'd like to ask you a few follow-up questions.  In terms of

12   the finished floor elevation, is that significant because

13   that's the level in which water would start getting into your

14   home?

15   A.   That's correct.

16   Q.   Meaning, a house has a foundation and that's one elevation,

17   and then a finished floor elevation would be some level above

18   that, correct?

19   A.    If you walk in the front door, when you step from the front

20   patio or front porch inside the home, that would generally be

21   your finished floor elevation.

22   Q.   And I'd like to go through just to explain some of the

23   figures on here.  So, for example, the Navelski house, under

24   your dam in place/no failure scenario, would the Navelski home

25   have flooded?

1    A.   No.  If you can see that the Navelski elevation here is

2    51.71, and the results of dam in place holding through the

3    storm gives you an elevation of 50.95, you can see that that's

4    lower than the 51, it would not have flooded the house.

5    Q.   And with respect to the Henderly, Hutchins, and Alexander

6    scenarios, with the dam in place would any of those -- dam in

7    place and no failure, would any of those homes have flooded?

8    A.   Right, just to make sure the jury knows, no dam in place is

9    no dam beginning of the storm and running through the storm

10   and, no, none of those would have indicated flooding

11   conditions.  And the dam --

12   Q.   I'm sorry, Dr. Ross.

13   A.   No, I'm sorry.  You asked me about the dam in place, right?

14   Q.   Yes.

15   A.   So, the dam in place run is the only one highlighted in red

16   here.  The only residence under the dam in place that would

17   indicate flooding and why it's highlighted in red is because

18   48.12 is above the 47.78.  So that indicates that -- that run

19   indicates that there would still be flooding in that home.

20   Q.   And to put this in perspective, what were roughly the

21   levels of flood elevation experienced by the residents who are

22   listed on this chart?

23   A.   So, the level of flooding was 5 or 6 feet in homes.  You've

24   heard testimony about that.  It varies, but up to that

25   magnitude from the storm.

1    Q.   And so, when you ran your two scenarios, they revealed that

2    in fact had the dam held or -- had the dam held, then only one

3    flood -- or one home would have received -- at least on this

4    list would have received any water in it?

5    A.   Only one of the Plaintiffs' homes would have received water

6    in it if the dam had held through the storm.

7    Q.   And that is the Bullard residence?

8    A.   That's correct.

9    Q.   And in the scenario in which the dam had been removed, how

10   many homes would have flooded?

11   A.   No homes.

12   Q.   I want to expand this out a little more broadly and have

13   you turn your attention to one of the Defendant's

14   demonstratives.  And I just want to briefly talk about -- so

15   we've looked at those selected houses.  In terms of your model

16   runs, had the dam held, how many additional homes would have

17   flooded beyond Mr. Bullard's home?

18   A.   So, had the dam held, the model predicts there's only a

19   limited number -- a handful of homes, approximately six, that's

20   all I could find, there's six homes that would have flooded.

21   Q.   And can you roughly point out on this map where they would

22   be located?

23   A.   I think so.  The Bullard -- so the Bullard home is down

24   here.  It's kind of the lowest place in the neighborhood

25   hydrologically.  It's down the creek, okay, or down Elevenmile

1    Creek.

2          There's another residence right in here that's kind of a

3    low dip, and there's one residence there that's just barely --

4    just barely gets flooded, and then there's three homes over

5    here that are pretty low, one of which is pretty low that get

6    flooded.

7    Q.   And in terms of the circle here, the larger circle, where

8    is Mr. Tarbox's home located?

9    A.   It's there.

10   Q.   And is it one of the lowest?

11   A.   It is.  It's low for two reasons.  One, it's low, and it's

12   higher than the Bullards house but it's low but it's up the

13   creek, too, so hydrologically it's lower because the creek is

14   going to slope down when it's flowing.

15   Q.   And when you ran your model with the dam removed, did any

16   of these homes flood?

17   A.   No.

18   Q.   So, no one in the class area floods if the dam had been

19   removed?

20   A.   Correct.

21   Q.   Why is there that difference between the dam holding versus

22   the dam being removed?

23   A.   So, interestingly, if the dam is removed ahead of time,

24   then at the commencement of all of this rainfall it has all

25   this period to drain before that very large rainfall event

1    occurs, so it's kind of like relieving the stress of this

2    hydrologic system before it gets this big pulse of rainfall.

3    Q.    I'd like to show you a photograph that's been previously

4    admitted, it's Exhibit 110.  I want to talk a little bit more

5    about your timeline.  What's the significance of this

6    photograph to your timeline?

7    A.    So, this I recall is the Bullards' home at I believe 10:38,

8    and this is showing roughly a foot of water in the home

9    apparently.  And it is -- it establishes the commencement of

10   the flooding at the most downstream place in the neighborhood.

11   Hydrologically it's downhill, down the creek, and so the flood

12   would have commenced before this time period.

13   Q.    And you saw the other picture that was -- I'm going to show

14   you another photograph which has also been admitted --

15            **MR. MARSHALL:**  And James knows which one.

16   **BY MR. MARSHALL:**

17   Q.    This is Exhibit 300.  Do you recognize this photograph?

18   A.    I think it was the photo that you were showing in the

19   Bullard testimony.

20   Q.    Was this photograph taken approximately 10 minutes before

21   the one you saw?

22   A.    That's my understanding during the testimony.

23   Q.    At the time the Bullard home began to flood, how much rain

24   had fallen?

25   A.    Well, our rain records indicate it was 6.3 inches up to ten

1  p.m.

2  Q.   And that would have been in the areas contributed to the

3  neighborhoods?

4  A.   Upstream of these homes that flooded.

5  Q.   And how do you know that?

6  A.   Because we constructed rainfall in a very careful way for

7  this storm.  Rainfall is the most important variable first.

8  Q.   And would you have expected the level of flooding that you

9  saw with 6 inches of rainfall?

10  A.   You know, 6 inches of rainfall is not an abnormally high

11  rainfall.  It was 6 inches in a period of I think three p.m. to

12  ten p.m., and it was heavily stacked in the last part of that,

13  but it really is no more than a slow moving afternoon

14  thunderstorm in Florida.  It's the kind of rainfall you see

15  people turn their hazard lights on, you know, the hard

16  rainfall, but it's regular rainfall.

17  Q.   So, based upon this timing, do you believe that rainfall

18  alone would have caused this flood?

19  A.   Well, I mean, I don't, because I think that the -- unless

20  they regularly flood under 6 inch kind of rainfall events, it

21  seems abnormal and likely that it was caused from the dam

22  failure, and that's the reason we went to construct the model.

23  Q.   And so where did you look to find water that may have

24  caused this flooding?

25  A.   Well, they're on a stream system, so the only place you can

1    look is upstream.

2    Q.   Where was there sufficient water to cause this flooding

3    upstream?

4    A.   So, I had to find -- if the rainfall didn't do it, there

5    had to be water already there that could have caused this

6    flooding or aggravated with the rainfall to cause this

7    flooding.  So we looked up steam to see if there are any

8    available large storages upstream that could be responsible for

9    this level of flooding.

10            **MR. MARSHALL:**  185(a), please.  And I believe this has

11   already been admitted, 185(a).

12   **BY MR. MARSHALL:**

13   Q.   Dr. Ross, do you recognize Exhibit 185(a)?

14   A.   Yes.

15   Q.   What does it depict?

16   A.   This depicts an aerial view of the International Paper

17   property roughly around the Kingsfield bridge looking

18   northward.  You can see some impoundments in the plant in the

19   background.  This is kind of a normal water level condition

20   view of that facility.

21   Q.   Was there enough water being held behind the dam at this

22   mill site to account for the flooding in the Bullards and the

23   other residents' homes?

24   A.   Certainly this was the only storage of water upstream of

25   the neighborhood, and that was the question we went to

1   investigate.  And there's certainly enough water there on a

2   day-to-day basis, but you don't expect that to be released.  So

3   there certainly could be enough water there, and that was

4   really the only source of water with that kind of storage

5   volume we could find upstream of those residences.

6   Q.   I'd like you to look at what's been marked -- actually,

7   it's not been marked.

8              **MR. MARSHALL:**   Demonstrative.

9              **MR. KAUFFMAN:**   Which demonstrative?

10             **MR. MARSHALL:**   The aerial of the mill site.

11  **BY MR. MARSHALL:**

12  Q.   Dr. Ross, do you recognize this?

13  A.   I do.

14  Q.   What is it?

15  A.   It's kind of an aerial image at the International Paper

16  mill site down Kingsfield Road.

17  Q.   And if you can, will you just kind of circle the mill site?

18  A.   Sure.  The plant is up here, and then most of the storage

19  ponds we've heard about like 1 and 2 are down here, and 3 and 4

20  are down here, 4 is down here, and then the Kingsfield bridge

21  is right there, and the dam is right there, and then there --

22  you know, that's -- and then all of this is parking, all of

23  this area here is parking and lumbar storage and industrial

24  areas, ponds, and the whole industrial complex.

25       Basically the facility goes kind of down this area here and

1    crosses the dam and goes over here, and there's basically a
2    drainage basin that goes over here somewhere, and that's kind
3    of the whole drainage basin for the pond site -- I mean, the
4    dam from that International Paper site that flows under
5    Kingsfield bridge.
6    Q.    And so, can you identify for the jury the area of storage
7    of water that you're talking about that was upstream.  Is that
8    this large circle?
9    A.    That's the whole drainage basin.  That's not necessarily
10   all the water.  There's a wetland system here that we've heard
11   about.  This is kind of a normal wetland system that's in
12   connection with the pond -- the dam, what I call the lower
13   stormwater pond, and that's an area that's frequently impounded
14   and operational with the dam, depending on water levels in the
15   dam.
16        And then there's another large stormwater area up they're.
17   There's a whole bunch of ponds and storage areas -- water
18   storage areas here and here.  And then there's another big
19   wetland system here.  And then there's all kinds of impervious
20   areas here and here and other storage features and industrial
21   features there, maybe some more storage ponds.  A fairly large
22   area of water storage.
23   Q.    During a storm event versus a sunny day situation, what are
24   the areas that are being influenced by the existence of the
25   dam?

1    A.    So all of these are contributing runoff and would be in

2    various states of filling or full or, you know, draining

3    systems.  It's a large drainage basin with a lot of

4    imperviousness and a lot of industrial land use and other land

5    uses there, so it generates a lot of runoff, and so these are

6    all storage features that would be in some kind of degree of

7    contact with that dam.

8    Q.    And why would this entire area be in contact with the dam?

9    A.    Because it's -- in Florida the slopes are very mild, it's

10   called a -- hydraulically it's called a mild gradient system,

11   so what goes on downstream influences what goes on upstream.

12        Kind of an analogy, if you go out when the water is flowing

13   down kind of the curb and gutter system along your road and you

14   stick your foot in front of that water, that water kind of

15   backs up the curb, right?  And if you take your foot away, it

16   flows out like that.  It's sensitive to that downstream

17   condition.

18        And that's what these -- our wetland systems do here, they

19   react to downstream conditions.  It's called backwater effect,

20   and it's because it's mild slope.

21   Q.    And during a heavy rainstorm event, how do these ponds act?

22   A.    Well, the ponds are all controlled by structures, and so

23   they -- hopefully they have storage capacity, and so as the

24   runoff goes into these ponds, they begin to fill, they have a

25   controlled and regulated stormwater structure or wastewater

1    structure that controls their flow, and then normally that's

2    designed in the capacity of the dam so that when they're at a

3    certain level they're contributing.

4        And then these wetland systems down here -- this one and

5    this one has a structure on it, but this one in the lower part

6    is free to flow over the dam.  And then all of these other

7    features are draining to that lower wetland system.  That's the

8    outlet for the watershed.

9    Q.   So, in order for this water to get down to the

10   neighborhood, what had to happen?

11   A.   So had you to have a rapid release of water, I mean, that's

12   normally stored there, you had to have a rapid release of

13   water.  And obviously, we had a dam failure which could be a

14   cause of that.

15   Q.   And do you believe that is the cause of that?

16   A.   I do.

17   Q.   When do you believe the dam failed?

18   A.   Well, we have testimony that -- and I had previously

19   insight that the water was already overtopping the dam after

20   nine p.m.  We had an IP person that went down there and visibly

21   observed water overtopping the earthen part.

22       And my experience with sediment transport and overtopping

23   of dam failures is that this type of sediment doesn't stay in

24   place.  There's no armoring.  Grass doesn't hold up but just a

25   few minutes.  It's fine, sandy soil mixed with a little clay,

1    that's what our Florida sands are.  And I observed that

2    sediment when I went there -- that soil when I went there, and

3    it would have rapidly eroded after overtopping, especially the

4    severity of this rainfall event, it rapidly rose up to very --

5    and there was very high velocities over the top of the dam.

6        So we have testimony that there was an IP person went out

7    there and visibly observed it, and then it was very much

8    confirmed by the model, the overtopping time in the model after

9    nine p.m.

10   Q.   And so just to put this into context, are dams designed to

11   be overtopped?

12   A.   All dams overtop, but you design them to be controlled

13   overtopping so that they go through a structure, okay, to

14   control for erosion.  But in dam design and hydrology design,

15   an overtopping over the earthen part is called a failure,

16   whether it breaches or not.

17       You have to control overtopping.  And you can't design a

18   structure for every -- for the largest rain.  You can't afford

19   to do that.  So, what you do is you design a place for an

20   emergency overtopping which is controlled for stabilization.

21   Usually it's not on placed material, it's on native material

22   that you route it over into the woods or something, it's called

23   emergency stowing.  Overtopping hydrology is a failure.

24   Q.   So, when in your opinion would the earthen part of this dam

25   have started to get overtopped by water?

1    A.    After nine p.m.

2    Q.    And how rapid would the erosion -- do you have an

3    estimation of how rapid the erosional process would have been

4    in order to get all that dirt out?

5    A.    I've written a lot of papers on this.  Soil starts to move

6    at one foot per second velocities.  The velocities that would

7    have been sitting there are on an order of magnitude of 10 to

8    12 feet per second.  You've seen a picture of that.  It's not a

9    place you can swim across.  And it would have been a very rapid

10   erosional condition, just a matter of minutes.

11   Q.    Could it have lasted a little bit longer than a matter of

12   minutes?

13   A.    It could have, yes.  It's a large area to erode, it could

14   have been up to an hour or something.

15   Q.    But you think no more than that?

16   A.    I don't.

17   Q.    And how does the testimony from Mr. Quackenbush play into

18   your opinions?

19   A.    Well, it confirms that the dam -- what the model predicted

20   was the dam was overtopping after nine p.m.

21   Q.    And once the dam failed, what would have happened to the

22   water being stored behind it?

23   A.    Well, it would have been rapidly released to Elevenmile

24   Creek which flows down to the neighborhood.

25   Q.    And at the same time that this dam is being overtopped,

1    what's happening to the ponds that you see on International

2    Paper's mill site?

3    A.    So this gets into the evolution of this and why you need to

4    understand it through modeling and through all of the context

5    of the testimony we've heard.  It's kind of the perfect storm

6    scenario.

7         All the ponds, all the storages are filled, rainfall is

8    progressing at a very high rate, and the impoundment fails, and

9    it releases all of that water, which it's previously showed to

10   hold up to that point.

11        At the same time all of this other water is coming and

12   other water is coming from other watersheds, other

13   contributions downstream.  But it's that little bit of extra

14   hold storage that occurred at the release of that critical time

15   that releases all of this volume sufficient to flood the

16   neighborhood.

17   Q.    And how big was the failure of the Kingsfield Road dam in

18   terms of size?

19   A.    Well, it's sizeable for that dam.  It was 40 foot wide by

20   13 feet deep.

21   Q.    And once that section opened up, what would the flow of

22   water have been like at that site?

23   A.    It drops 5 or 6 feet all the way to -- in just 300 feet to

24   the bridge, the Kingsfield Road bridge, it would have had very

25   high velocities, it would have been a torrent.  You've seen a

1    picture of what it looked like the next morning, and it would

2    have looked much more severe than that when it opened up.

3              **MR. MARSHALL:**  James, can you pull out the larger

4    aerial, please.

5    **BY MR. MARSHALL:**

6    Q.   Just for orientation purposes, can you circle the mill site

7    again, please.

8    A.   Sure.  So this is the watershed with the mill site, and the

9    dam is approximately right there, and this is Elevenmile Creek

10   that goes down to Highway 297, and this is Bristol Park

11   neighborhood and Ashbury Hills over here.

12   Q.   Once the dam released the water, where would it have gone?

13   A.   The only place for it to go is it would have funneled right

14   down Elevenmile Creek.

15   Q.   And can you describe Elevenmile Creek?

16   A.   Yeah.  In this neighborhood right here it's fairly

17   constrained.  I think that's also IP right of way or something.

18   It's fairly constrained right here.  The channel is quite

19   incised, meaning it's very deep, it's about 20 feet deep

20   regularly to go what we call out of banks.  So the channel goes

21   down to a very -- in a very controlled, funneled way through

22   this section.  Very little opportunity to sort of fill out

23   floodplains and attenuate or lower the peak flows.

24   Q.   Did you actually get down into the creek and walk around?

25   A.   I did, I walked this creek down a ways.

1   Q.   And setting aside these neighborhoods, is there anywhere

2   this water could have gone?

3   A.   No, there's no other place for it to go.

4   Q.   Following the dam failure, how fast would the water have

5   been flowing down to the neighborhood?

6   A.   So, water -- storm velocities, I've measured them many,

7   many times, they're 8, 10 feet per second.  The flood actually

8   moves faster than the velocities, and it moves in excess of 10

9   miles an hour.  You couldn't outrun this flood the way it moved

10  downstream.

11  Q.   And then once it got to the neighborhoods, what would it

12  have done?

13  A.   So, it's wider there, it's uncontrolled, so it floods out

14  into the neighborhood and it would have filled, you know -- it

15  would have -- there would have been a floodplain -- flood areas

16  that would have, you know, taken that volume of water.

17  Q.   Would the residents have seen some sort of wall of water?

18  A.   No.  The way a flood commences is you just see the water

19  level -- even when people who are inundated in -- or lost in

20  creeks, it just comes up very fast.  It doesn't come as like a

21  front or a strong wave of water.  It comes -- just the water

22  level rises really fast.

23  Q.   We've previously looked at the pictures the Bullards have

24  taken, one at 10:28 and one at 10:38.  Is this timing

25  consistent of your observation of when the dam would have

1    breached and failed?

2    A.   Yes.

3    Q.   And the travel time of the water down to the neighborhood?

4    A.   Yes, the fact that the water level is rising feet in

5    minutes is an indication there just has to be a very large

6    release of water upstream.

7    Q.   You've heard some testimony from some of the other

8    residents, the Bullards, that the water stayed up for a period

9    of time.  Are those observations consistent with your

10   conclusions here?

11   A.   Yeah, the model supports this and everything we

12   investigated supports this because, you know, there was a

13   sizeable rainfall that filled the whole -- there was runoff

14   from a lot of areas, the whole watershed, but there was an

15   awful lot of storages upstream in that basin that were

16   releasing even into the next morning, okay.

17        So there was evidence of it, there was pictures that I saw

18   from the next morning that shows these storages filled.  We've

19   heard testimony, you know, of the fact that all these ponds

20   just ran together with the wetlands and looked like a giant

21   lake.  And that's consistent with the severity of this rainfall

22   event and the storages that were already high on the IP

23   facility, there would have been a slow release of this water.

24   Q.   I'd like for you to look now at Exhibit 92 --

25           **THE COURT:**  We need to break for lunch.  Is this --

1       **MR. MARSHALL:**  It's perfect.

2       **THE COURT:**  We'll do that.

3          Ladies and gentlemen, we'll be in recess until 1:30.

4    Please don't discuss the case during the recess, also please

5    don't begin to form any opinion yet about the merits.  Enjoy

6    your lunch and we will see you back in an hour.

7          *(Jury out.)*

8          Dr. Ross, you may step down.  You'll be back on the

9    stand in an hour.

10         Anything we need to discuss?

11         *(No response.)*

12         Have a nice lunch.  We'll reconvene at 1:30.

13         *(Recess taken 12:29 p.m.)*

14

15

16

17

18

19

20

21

22

23

24

25

1    *(Recess was taken from 12:29 to 1:34 p.m.)*

2          **THE COURT:**  Dr. Ross, you're still under oath.

3          You may proceed.

4          **MR. MARSHALL:**  Thank you.

5    **BY MR. MARSHALL:**

6    Q.   Before we left off we were talking a little bit more about

7    the timeline.  We were kind of at the -- basically at the end of

8    that.  Just a few more questions.

9          When was -- you've heard the testimony.  When was the

10   water out of the neighborhood?

11   A.   Before daybreak, I think, or -- daybreak.  Early morning

12   hours.

13   Q.   I'm going to show you what's marked as Exhibit 92.  It's

14   already admitted as an exhibit.

15         Dr. Ross, have you seen Exhibit 92 before?

16   A.   Yes.

17   Q.   What does it depict?

18   A.   It depicts the section of the breach in the early morning

19   hours on April 30th.  It was taken by, I think, Mr. Giddins,

20   showing the flow through the breached section at the dam site.

21   Q.   And how does this picture impact your opinions in this

22   case?

23   A.   It totally supports my opinions -- my opinion on this, that

24   the breach occurred in the middle of the -- you know, somewhere

25   in the night, shortly after overtopping; and there would have

been some very high water levels that would have occurred during
the night, much more severe than this.  And all of that storage
that's up there takes time to drain out.  So it's still the
remnants of that storage release.  There's a lot of water.

Q.   At the time that this picture is taken, are people flooding
down at the neighborhood?

A.   No.

Q.   And looking at this picture, do you believe that the dam
has failed at this point?

A.   Fully, yes.

Q.   Does it make sense to you that the dam would have held all
night, and only to fail right around this point in time?

A.   No.

Q.   And why do you say that?

A.   Because why would it fail on the end?  It would be within
the structure at this point.  And it would have failed when it
overtopped and you had that very high velocity, high flows.  It
would have been -- the model predicts five foot deeper than
that, way over that railing that you see in the background; and
the velocities would have been worse than they are now.  And it
just -- it can easily take material out fast.

Q.   When this picture was taken, had it stopped raining?

A.   Oh, yes, several hours ago.

Q.   And why would the water have stayed up like that?

A.   Because it takes time for the -- all of that storage behind

1    there, the ponds and the wetlands that have been receiving this

2    runoff, they've staged up and they're draining out.  And once

3    they get -- they start draining out, they get more and more

4    controlled by the structures that are influencing them and so

5    they drain more slowly.  But, you know, it was a lot of water.

6    There was a lot of water in storage up there.

7    Q.    And so just to conclude on the timeline, can you sum up why

8    you believe the timeline supports your opinions?

9    A.    So we have overtopping, visually observed, after 9:00.  We

10   have model-predicted overtopping after 9:00, and we have

11   flooding at 10:00.  We have flooding in the homes easily

12   observed after 10:00.  Time frame would have been, in my

13   opinion, very short after overtopping because also the model

14   predicted that the water level got very high over the dam at the

15   incident overtop.  And so it would have failed, and then it

16   would have taken a reasonable amount of time, a few minutes, to

17   get down to the neighborhood.  Doesn't take very long.  It's a

18   nice inside channel.  It's only two miles long.  Travel time on

19   the order of ten minutes; maybe, at the most, 30 minutes.  And

20   it -- the time is consistent.  The timeline is consistent.

21   Q.    Let's move on, then.

22   A.    Okay.

23   Q.    I'd like to talk a little bit more now about your model.

24   Why did you do a model?

25   A.    Well, you can't -- models give you the quantification.

1 They give you, you know, what's going on in more precise terms

2 and give you the ability to give you some more information about

3 what's going on and give you the answer, so to speak, or at

4 least to support an answer or refute it.

5 Q.   And again, what were the two scenarios that you ran?

6 A.   I ran one where the dam was held in place.  Would not have

7 failed.  It's what you can do with a model.  And one where the

8 dam was removed before the storm.

9 Q.   And why did you pick those two scenarios?

10 A.   Well I wanted to understand if it -- again, if the rainfall

11 could have caused the flooding and the dam held and to see what

12 would happen if the dam was not there.

13 Q.   And what model did you decide to use?

14 A.   I used the model that I have a lot of familiarity with,

15 continuous simulation model, which means that you can model

16 several storms so that you can -- a period of time so you can be

17 sure that the model -- the conditions before the storm are

18 reasonably well defined.  That is, an input in the model, how

19 wet is it before the storm.  It's called antecedent conditions.

20        I ran a continuous simulation model I've used

21 developed for the state of Florida.  Most of the state agencies,

22 the water management districts use it now.  And it's called

23 HSPF.  It's an EPA-supported hydrologic model for calculating

24 the runoff.  And then I used an Army Corps of Engineers model

25 for the hydraulic portion, which calculates the flow in the

1   stream and how high the -- how deep the water gets and how fast

2   it moves downstream.

3   Q.   So is it a fair summation to say that the HSPF model tells

4   you how much water?

5   A.   It gives you the volume and timing of run off.  That's

6   correct.

7   Q.   And the other model you mentioned tells you how high it

8   gets.

9   A.   Right.  The timing and the velocity and the depth.  And the

10  timing is real important too.

11  Q.   Now, what was your level of confidence in the model that

12  you selected?

13  A.   Well, we calibrated it like I do -- I wouldn't do a model

14  without calibrating it, and I calibrated it to two years of

15  observed record, and I had a very high confidence in the

16  predicted capabilities of the model.

17  Q.   Have you used this model in looking at coastal floodplains

18  like Florida?

19  A.   I modeled over a hundred river systems in Florida with this

20  model.

21  Q.   Are there limitations with just using standard FEMA

22  modeling?

23  A.   So of course there are.  It's an event model, what we call

24  an event model.  It's a very useful tool for evaluating a

25  floodplain and comparative set of alternatives downstream.  It's

1   very quick and dirty to apply.  So an experienced hydrologist

2   can apply it or an engineer can apply it very quickly and sort

3   of assess floodplains with designed storm, theoretical

4   conditions, not real events.  It's not very suitable for

5   evaluating real events.  We use a very simple parameterization.

6   You don't calibrate it to multiple events, and it's just not

7   very suitable for forensic investigation.

8          Very suitable for evaluating a floodplain and maybe

9   what you do downstream, and comparing this versus that, whether

10  that improves the flooding, but not very suitable for a real

11  event.  Kind of understand what happened with a real event.

12  Q.   What is a designed storm?

13  A.   A designed storm is a theoretical storm.  It has a

14  theoretical time behavior and a certain volume that you can look

15  up.  And it's published by the water management districts; and

16  as an engineer you -- you look these up, and they're theoretical

17  storms.  They're not real storms.  They're made to look like

18  real storms on average, but they're not an actual event.

19  Q.   And this is a nonengineering term.  Is it kind of like a

20  made-up storm?

21  A.   It is, kind of.  But it's -- it's a smart made-up storm,

22  but it's a made-up storm.

23  Q.   Fair enough.  Fair enough.

24          We've also earlier heard a little bit of testimony

25  about a dam break model.  Did you prepare one?

1    A.    No.

2    Q.    And why not?

3    A.    I didn't need it.  It was not going to shed any light on

4    it.  You can look at the magnitude of the little pond that's in

5    question, sort of the -- what we've heard as the sunny day

6    impoundment behind the pond -- behind the dam.  And you could

7    have tried to use that to model the breach opening and the

8    sequence of the breach, but it would only use that volume that's

9    in there.  The volume that's coming to that section is like a

10   spigot.  It's just -- it's independent of what's going on in

11   that section, and that's not the real world.  The volume that's

12   coming to that section is influenced by that dam there.  And so

13   it wouldn't have been appropriate.  I tried just throwing the

14   volume in the model and see if that affected it.  That little

15   static volume doesn't affect it.

16   Q.    And in terms of -- you mentioned kind of a sunny day

17   concept.  What is a sunny day model?

18   A.    That's if you could imagine this structure with a full pool

19   of water behind it, no real significant runoff coming in, maybe

20   a little tributary coming in or something like that, but a full

21   pool, full pond behind the dam, what would be happening with

22   discharge over the dam.  It's a finite volume of water.

23          It's a little pool.  It's like 75 acre-feet.  And an

24   acre-foot of water is -- if you can imagine, an acre about a

25   third of this courtroom.  This courtroom is about third an acre,

maybe a little less. If you take that times three and multiply
it by 75-feet deep, that's the volume of water. And that's the
volume of water in the static pool or still pool of the
reservoir.

Q. And how would the conditions change when you have a storm
event versus a sunny day event?

A. So during a storm event there's that volume sitting there,
even more if it's overtopping, quite a bit more if it's
overtopping a lot, plus a large volume of water that's coming to
that pond at the same time. Again, it's like your foot in the
gutter. That volume is coming to that pond, feeling that
downstream -- or reflecting the -- the flow to that pond is
reflecting that pond -- that dam in place. And so when you
remove the dam, that flow is free to come faster. It's called
dynamic storage, and it's quite a bit more than that 75
acre-feet.

Q. How much more?

A. It's an order of magnitude more. I stopped the model at
the time and looked at the volume that was coming there, and it
was 850 to a thousand acre, between 9 and 10 acre-feet.

Q. And just for a matter of perspective, how much water would
it take to fill the neighborhood?

A. The volume from our modeling results to fill the
neighborhood is only 230 acre-feet.

Q. Okay. Let's drill down on the model. What inputs are

1  necessary to build a model?

2  A.   So you got -- you have to gather elevation data.  You have

3  to define the region that influenced -- if you're involving for

4  a team flow, the region, called the watershed, that

5  influenced -- that contributes runoff to that stream system.

6  You have to define that area.  The watershed.  You have

7  elevations, you have land use, you have soil types, all of those

8  kinds of parameters.

9        **MR. MARSHALL:**  I'm actually done with this exhibit.

10  Thank you.

11  **BY MR. MARSHALL:**

12  Q.   So let's start -- first things first.  What's the first

13  thing you did in terms of building out this model?

14  A.   So in general you need to define -- define the area that

15  contributes to that section.  So you define the drainage basin,

16  the area that contributes to that flow system, that stream,

17  creek or what -- a river.

18        **MR. MARSHALL:**  Can you pull up Exhibit 3, please.

19  **BY MR. MARSHALL:**

20  Q.   Dr. Ross, do you recognize Plaintiff's Exhibit 3?

21  A.   Yes.

22  Q.   What is it?

23  A.   It's the watershed for Elevenmile Creek down to the Highway

24  90 bridge.

25        **MR. MARSHALL:**  Your Honor, at this time I move the

1    admission of Plaintiff's Trial Exhibit 3.

2              THE COURT:  That will be admitted.

3         (PLAINTIFF EXHIBIT 3:  Received in evidence.)

4              MR. MARSHALL:  May I publish?

5              THE COURT:  Yes.

6              MR. MARSHALL:  Thank you.  I don't know if there's a

7    way to dim the lights a little bit?

8              THE COURT:  We can try.

9    BY MR. MARSHALL:

10   Q.   Okay.  Just to orient the jury, please describe Exhibit 3.

11   A.   So --

12             THE COURT:  Just a minute.  We're turning lights on.

13             THE WITNESS:  I can draw over that line if you're

14   worried about that line.

15             MR. MARSHALL:  Why don't you do that.

16             THE WITNESS:  So this is the watershed for Elevenmile

17   Creek, which is -- here's the IP property and basin we've been

18   talking about.  Here's Elevenmile Creek that flows down through

19   this little red area.  In the middle is the subject

20   neighborhood.  And Elevenmile Creek flows down here to the

21   Highway 90 bridge.  Probably have that drawn not exactly right,

22   but there's a USGS, United States Geological Survey, flow

23   station down at that location.  So we were very fortunate.  We

24   had a very good flow record that was being recorded for that

25   watershed.

1          The watershed basically is this red line which -- it

2    looks kind of washed out.  Goes up here, and goes down here, and

3    closes.  And basically that defines the area that contributes to

4    Elevenmile Creek, the flows in Elevenmile Creek down to the USGS

5    flow gauge down here.  Okay.  So there's some tributaries that

6    come in along the way, a couple different tributaries; and all

7    of that contributes drainage to that USGS flow station.

8          Now, a watershed is basically the area which runoff

9    would accumulate to the river system.  Outside of that runoff,

10   it goes somewhere else.  Okay.

11         And in this figure as well, there's a number of

12   rainfall stations.  There's one there.  There's one there.  And

13   there's a USGS flow and rainfall station up there, and this USGS

14   station down here.

15         So those are places where there's very good point

16   measurement of rainfall.  Okay.  So that's also part of the

17   puzzle.  You have rainfall -- really good measurements of

18   rainfall inside that domain.  But that's basically a layout of

19   the watershed.

20   Q.   Okay.  Just a few clarifying questions.  So I'm going to

21   try this.  I think it will work.

22         Let's say, for instance, a drop of rain falls there.

23   Does that have anything to do with what's happening in this

24   green area?

25   A.   No.

1  Q.   Okay.  And in terms of a drop of water that falls there, is

2  that going to have anything to do with drainage into the

3  neighborhood?

4  A.   No, because a drop of rainfall there is going to make its

5  way to the stream system.  The only way it can have any

6  influence on the neighborhood is somehow a backwater effect,

7  which is somehow -- it's a mile of slope system.  You do

8  something down here and it effects it up there.  But the runoff

9  that really comes through the neighborhood through Elevenmile

10  Creek, through this region right there, is really from upstream

11  of that, which is some kind of region up from that neighborhood.

12  Q.   But you were able to use this gauge down here to help you

13  calibrate or make sure that your model was actually predicting

14  what was happening through here, correct?

15  A.   That is correct.

16  Q.   I'd like to show you a demonstrative that was used during

17  the opening.  Dr. Ross, just a few questions about this.  And if

18  you could, could you roughly orient the jury as to where your

19  drainage basin is in relation to this one?

20  A.   It's -- I'm not exactly sure where Highway 90 is.  Maybe

21  it's down there somewhere.  So maybe we have a drainage basin

22  like that, roughly.  I'm probably off a little bit, but that's

23  our drainage basin.

24  Q.   Why did you not include Eight Mile Creek in your drainage

25  basin?

1  A.   It's way too far downstream, way too far downhill to ever

2  be an influence.  Same reason I didn't include Perdido Bay in

3  the model.

4  Q.   And how far downstream is it?

5  A.   Well, it's at least four or five miles, by estimating

6  this -- I don't know that number exactly -- along the stream.

7  Q.   Did your model, though, take into account these other

8  tributaries?

9  A.   Yes.

10  Q.   Did your model -- and you mentioned this before -- take

11  into account any type of backwater effect?

12  A.   Not from Eight Mile Creek.  We use a boundary condition in

13  the model below the neighborhood called a uniform flow depth

14  boundary, which is -- it's assumed to be in equilibrium with the

15  slope of the creek.  So it has -- it didn't have backwater

16  effects there, from the bridge -- from anything downstream.  But

17  I did a sensitivity study before I did the model to see what --

18  I've done this a million times.  You have to see if there is a

19  backwater effect that you need to incorporate, and I didn't.

20  Q.   And why wouldn't there have been a backwater effect?

21  A.   Because you would have added a whole lot more complexity to

22  the model, and the amount of variation at the downstream end is

23  very small.  It's not -- it's not warrant -- doesn't warrant the

24  extra effort.

25  Q.   And why is that?  Why is that contribution small?

1    A.    Because backwater -- this -- as Florida systems go, in the

2    central part of this watershed, the slopes along the stream are

3    more significant than they are most other places.  They're like

4    10 feet of drop per mile instead of one foot of drop per mile.

5    So the steeper it goes in the middle like that, the less

6    whatever you do down here influences whatever's going on up

7    here.  Okay?

8         If it's mild, like it is in the upper part, then

9    whatever you do down here affects whatever's going on up here.

10   But if it's steep and the Froude number -- the hydraulics get

11   steep, hydraulic and detail, and there's -- in hydraulics it's

12   called the Froude number.  But if the Froude number approaches

13   1, they don't -- it's not influenced by what's going on

14   downstream.  Okay.  And it's a steep-gradient river system, so

15   it's -- there's not backwater effects there that are

16   significant.

17   Q.    Is it a fair statement we were dealing with a mild

18   gradient here?

19   A.    Yes.  And when everything's filled, it's mild.

20   Q.    But a steep gradient as it flows down through here?

21   A.    Correct.

22   Q.    Let's talk about rainfall.

23         Did you gather rainfall?

24   A.    I did spent a lot of time on rainfall.

25         **MR. MARSHALL:**  Finished with this exhibit.  Thank you

1  very much.

2  **BY MR. MARSHALL:**

3  Q.   Do you recognize Exhibit 14?

4  A.   Yes.

5  Q.   And what is Exhibit 14?

6  A.   Exhibit 14 is basically the watershed showing a contour map

7  of colored areas representing interpreted NEXRAD radar rainfall

8  data.

9       **MR. MARSHALL:**  Your Honor, I'd ask at this time that

10  Plaintiff's Trial Exhibit 14 be admitted.

11       **THE COURT:**  All right.  14's admitted.

12       *(PLAINTIFF EXHIBIT 14:  Received in evidence.)*

13       **MR. MARSHALL:**  May I publish it, Your Honor?

14       **THE COURT:**  Yes.

15       **MR. MARSHALL:**  Thank you.

16  **BY MR. MARSHALL:**

17  Q.   Can you orient the jury real quickly as to Plaintiff's

18  Exhibit 14?

19  A.   So this is raw radar data interpreted for rainfall.  You'll

20  see it on the evening news, a weather map, and here's the heavy

21  rainfall.  Well, you can keep track of that with time and get a

22  estimate of what the rainfall totals are, and they publish that.

23  And so each one of these dots represent a large raster cell of

24  rainfall that was recorded from a radar-based rainfall record.

25       And this shows basically the intensity of rainfall

that was seen in that two-day event, April 29 to 30, from the north of the basin up here to the south of the basin, reflecting the kind of character of that storm.  It came in from the northwest and came through, and the highest intensities were all down in here.  So these are raw rainfall radar estimates from the record that you can download from the National Weather Service.

Q.   And again, this is a two-day total; is that correct?

A.   Yeah, this is a two-day total.  So you see upper -- this upper blue area up here is on the order of 8 to 9.7 inches of rainfall, and down here it's 15.6 to 17 inches of rainfall for the two-day period, as interpreted -- as you'd get directly from the National Weather Service for raster rainfall.

Q.   Can you just take raster rainfall and just plug that into a model?

A.   Never.  It's reflective.  It's a good -- it's a good set of data to show you variability in rainfall.  It's very useful for that.  But you always have to calibrate it to point measurements.

     They do that before they publish it, to a bunch of point measurements, but it's never to the point measurements you have.  And so you have to -- remember that watershed I showed you earlier where there's different rainfall gauges.  Those are real measurements.  So you take your raster rainfall and compare it to the point measurements because that's a real measurement.

1   Q.   And did you do that in this case?

2   A.   I did.

3   Q.   And when you say point measurements, you're talking about

4   actual rain gauges?

5   A.   Rain gauges on the ground.

6   Q.   And so once you -- how did you calibrate this to those

7   point measurement?

8   A.   So again, raster data is reflectance.  It's a signal from a

9   radar.  It's not real rainfall, but it's a good measure of

10  rainfall intensity.  So you take that and you compare it to a

11  point measurement, and you can scale it by that point

12  measurement.  And there's different algorithms for doing that.

13          But basically we compared that raster record to the

14  three or four rain gauges that were there, and it had a -- what

15  we call a bias.  And it was a very organized bias.  It was -- it

16  was, like, 3 inches uniformly low or 20 percent uniformly.  So

17  we took that raster record, compared to the point record, and

18  scaled it to that bias, which is something I do all the time,

19  and developed a better map of rainfall because rainfall is so

20  important.

21  Q.   Did you scale your rainfall up or down?

22  A.   I scaled it up.

23  Q.   All right.  I'd like you now to look at Exhibit 15.  What

24  does Exhibit 15 depict?

25  A.   So this is the watershed again and major tributary basins

1   within the watershed.  This is the IP basin.  This is -- we've

2   heard of Turtle Creek.  That's Turtle Creek.  These are some

3   other named creeks.  But we took that rainfall record, once it's

4   scaled, and we averaged it over the basin to get a

5   representative amount of rainfall in each sub-area because it

6   varies.  It's really important to get that variability.

7          **MR. MARSHALL:**  Your Honor, at this time I move the

8   admission of Exhibit 15.  I'm going to ask to publish it to the

9   jury.

10         **THE COURT:**  Any objection?

11         **MR. NELSON:**  No objection, Your Honor.

12         **THE COURT:**  15's admitted.

13     (*PLAINTIFF EXHIBIT 15:  Received in evidence.*)

14  **BY MR. MARSHALL:**

15  Q.   Now, you're going to have to start that -- we're going to

16  do that all over again.

17  A.   I'm bad in my classroom about that, too.  Just put it on

18  the projector and talk away.

19  Q.   So looking at Exhibit 15, I would like you to orient the

20  jury.  Where is the neighborhood?  Where's the mill site?

21  A.   Okay.

22  Q.   Where's Elevenmile Creek?

23  A.   The neighborhood is down here.  All right.  The mill site

24  basin is up here.  And this is Turtle Creek.  I see the mill

25  site basin goes over here.  And the tributaries aren't showed on

1    here, but these are different sub-basins for the different

2    tributaries down to the neighborhood.  Stream comes down through

3    here.  And these are -- once you scale the rainfall, the

4    interpreted rainfall by sub-basin, so these are rainfall those

5    by sub-basin, and basically there's 16 or so inches in the IP

6    basin, 15.37 over here, 17, 18.  And down here is a, like,

7    19-point something, once you scale it.  It's getting bigger as

8    you go south again.

9          So those are rainfall totals by each sub-basin.

10   Q.   And again, this is over a two-day period; is that correct?

11   A.   That's correct.

12   Q.   And in terms of the two-day total, can you -- give some

13   perspective as to the severity of the storm up here?

14   A.   So the severity of the storm in two-day totals are

15   16 inches.  This is, in two-day totals, not even a 50-year

16   return.  So there are parts of it that are higher return, but

17   not -- much less than a hundred-year return in rainfall totals.

18   Q.   And did it get more severe as you traveled down?

19   A.   Yes.

20   Q.   And was it even more severe still when you went over there?

21   A.   Yes.  Heard reports of, like, 23 -- 20 to 23 inches at the

22   airport.

23   Q.   Was this a 500-year storm event over this area?

24   A.   No, sir.  It's less than anything like that.  It's less

25   than a hundred-year return, at least for the -- anything up

1  there.

2  Q.   In the areas that are actually contributing to the

3  neighborhood?

4  A.   Correct.

5  Q.   And so if rain -- can we move over to the ELMO, please.

6          Is this the airport -- what am I doing?  Is this the

7  airport?

8  A.   Yes.

9  Q.   Rainfalls on the airport, does that have anything to do

10  with what's happening up here?

11  A.   No.

12  Q.   Finished with that.

13          Do you believe that the rainfall you used in your

14  model is accurate?

15  A.   I do.

16  Q.   Was it consistent with other reports that you saw in this

17  case?

18  A.   Yes.  I checked it against other sources.

19  Q.   Okay.  So as I understand, first step, drainage basin;

20  second step, calculate the rainfall.

21  A.   Correct.

22  Q.   What was the next step?

23  A.   Well, you gather all the other pieces of the puzzle that

24  control runoff, and the first one is land use.

25  Q.   I'm going to show you what's been marked as Exhibit 7.  Can

1  you identify Exhibit 7 for the record, please?

2  A.   This figure is our raw land use data as you would download

3  from a county -- GIS database or the Florida DEP database.

4  They're called Florida land use codes, but they're raw land

5  uses.  They have, like, residential, residential single family,

6  multifamily, urban, forest, wetland, all these different land

7  uses.

8           There's 70 colors here, but they correspond all to a

9  particular land use.  And they're analyzed to put them into

10  certain categories to generate runoff from because a residential

11  area generates runoff very different from a forested area, from

12  a pasture area, from an urban area.

13  Q.   I'm going to try this.  Is it a fair statement to say that

14  basically you need to -- in order to figure out how much runoff

15  you're going to have, you've got to figure out how much of that

16  rain is going to be absorbed into the ground?

17  A.   That's the most important thing in coastal settings.

18  You'll hear a lot.  And you'll hear me talk a lot about

19  antecedent conditions.  How wet is it before the storm.

20           In Florida it plays a very strong role in what you get

21  out of your model.  If it's very dry, a lot of the water will

22  infiltrate.  If it's very wet, it'll all run off.  You can have,

23  you know, a smaller event that will generate a lot more runoff,

24  and you can have a larger event that doesn't generate much

25  runoff at all if the soil is really dry.

1          It's the proximity and condition of the groundwater

2    condition.  Antecedent moisture conditions are really important.

3    They go with two -- they're defined with two coverages:  Land

4    use and soil type.  So soils are real important.

5    Q.   So in terms of this particular exhibit, a land use will

6    have a different characteristic of absorption than other land

7    uses.

8    A.   Right, and they'll have a different degree of impervious

9    area.  So a low-density residential area will have a, like,

10   15 percent impervious area.  High density residential area will

11   have, like, 30 percent impervious area.  Impervious area like

12   driveways, roofs, and roads.

13          **MR. MARSHALL:**  I'm sorry.  Your Honor, I'd actually

14   move the admission of Plaintiff's Trial Exhibit 7.

15          **THE COURT:**  All right.  Any objection.

16          **MR. NELSON:**  No objection?

17          **THE COURT:**  Okay.  Thank you.  7's admitted.

18       (PLAINTIFF EXHIBIT 7:  *Received in evidence.*)

19          **THE WITNESS:**  Oh, I apologize.  My students go like

20   this.

21   **BY MR. MARSHALL:**

22   Q.   And so what you see there is essentially all the different

23   land uses that were plugged into your model?

24   A.   Yes.

25   Q.   And so let's pick the brown one.  What is the brown one?

1    A.   Well, there's different land uses.  I don't have the

2    association.  These are just numbered polygons.  But we can look

3    up here and see that there's -- in this industrial area, there's

4    going to be a couple of different land uses, and there's some

5    urban area over here on the northeast corner of that basin.

6              And then there's some forested areas.  This brown one

7    right here is a forested area.  I know that.  And there's

8    different land uses in there.  They're organized into a smaller

9    subset of land uses, which really do have strong variability in

10   runoff.

11   Q.   I believe Mr. Nelson kind of mentioned this, but is it a

12   fair characterization that essentially what you're trying to

13   figure out is how wet the sponge is?

14   A.   Right.  He talked about a sponge, and his -- they talked

15   about the important -- that is the -- that is important.  The

16   sponge has -- has everything, and there's very many sponges in

17   our model.  You have to describe how wet each of those sponges

18   are with time, and it's really important.

19   Q.   How many different sponges did you use?

20   A.   Oh, in excess of a hundred.  There's 70 land use

21   conditions.  Each of those have different soil conditions.

22   Q.   And a simplistic model.  How many sponges does a simplistic

23   model use?

24   A.   Well, you'll probably hear reference to something called a

25   lump parameter model, where it's all reduced -- and this is,

1　like, a FEMA flood model.  It's all reduced to one simple

2　coefficient called a curb number.  So every bit of runoff

3　characteristics in that basin is reduced to one coefficient.

4　Its simplicity is very nice.  You can rapidly apply it.  But the

5　real world isn't very simple.

6　Q.   And so essentially if you were to use a model like that,

7　your sponge would be that big?

8　A.   That's correct.

9　Q.   Okay.  Let's talk about what you did next.

10　　　　　**MR. MARSHALL:**  I'm finished with that exhibit.

11　**BY MR. MARSHALL:**

12　Q.   So what did you do next in your model?

13　A.   So we gather information about elevation and the stream

14　system, the storages in the stream system, and other parameters

15　that are used in the model.

16　Q.   Did you next calibrate your model?

17　A.   Yes.

18　Q.   And why did you calibrate your model?

19　A.   A model is just worthless without calibrating.  It's a

20　black box that creates a result, but it's -- it's not real until

21　you calibrate it.  You've got to make sure that it replicates

22　what's going on so that you can have some confidence that the

23　results give you an answer you can live with.

24　Q.   And so in terms of the steps, we've now defined our

25　drainage basin.

1    A.    Right.

2    Q.    We've calculated the rainfall.  We've calculated the

3    sponge.  And now we're at the point where we're looking at

4    results?

5    A.    Right.  Correct.

6    Q.    And we're -- is a fair characterization to call it result

7    or is it something else, really?

8    A.    No, it's a result from your model.  The second you run your

9    model, you get a result.  And when you start looking at the

10   behavior against what -- gathering all the observations you can

11   for stream flow and water levels, you look at how well your

12   model reproduces those conditions over a period of time.  And

13   it's really important over multiple periods, multiple events,

14   because each of those have different rainfall totals and

15   different antecedent conditions, how dry it was before that

16   event.  And you can make sure that your model does a pretty good

17   job at getting those individual events, and you have a highly

18   reliable predictive tool.

19   Q.    So is the process of calibration essentially attempting to

20   take your model and to see if it can actually predict what

21   happened in reality?

22   A.    That's correct.

23   Q.    And did you do that in this particular case?

24   A.    I do that in every particular case.

25   Q.    And why do you do it?

1    A.    Because I teach the subject.  I can give a whole bunch of

2    students the same area and say, Go model this for your project,

3    and they'll give me a wide range of results because until you

4    calibrate it, it's -- it's just a number.

5    Q.    And how did you calibrate your model?

6    A.    I gathered two years of USGS record at the Highway 90

7    bridge.  That was the only record for flows in the watershed.

8              And I downloaded that, I checked it, and incorporated

9    an estimate for the storm at that time.  And I said, okay.

10   We'll kill two birds with one stone.  We'll calibrate to this

11   condition of two years.  We'll get all the little rainfall

12   events in there, plus we'll get the antecedent conditions for

13   that storm, and we'll get a prediction for that storm.  We'll

14   see how well we did for that particular storm.

15   Q.    Antecedent conditions being the sponge, right?

16   A.    How dry is the sponge.  Antecedent conditions are how dry

17   is the sponge.

18   Q.    And -- let's actually do it this way.  Can I show

19   Exhibit 19, please.

20             Can you briefly identify Exhibit 19 for the record?

21   A.    Yes.  That's a plot of our calibration.

22        **MR. MARSHALL:**  Your Honor, at this time I'd move the

23   admission of Plaintiff's Exhibit 19.

24             **THE COURT:**  Any objection?

25             **MR. NELSON:**  (Shaking head.)

1          **THE COURT:**  Thank you.  19 is admitted.

2          *(PLAINTIFF EXHIBIT 19:  Received in evidence.)*

3          **MR. MARSHALL:**  May I publish, Your Honor?

4          **THE COURT:**  Yes.

5   **BY MR. MARSHALL:**

6   Q.    Okay.  There's a lot going on here.

7          James, could you zoom in at the very top there,

8   please.

9          Using Exhibit 19, could you tell the jury how you

10  calibrated or how this illustrates your calibration?

11  A.    So this is a plot of discharge and time.  And there's

12  basically two colors there, the blue and the red.  And the model

13  is red and the observations are blue.  My students know never to

14  mess with that color pattern.  That's important.

15         So the blue is, you know, true measurement.  So we

16  look at how well the red mimics that, and on average -- we're

17  using one rainfall record for the calibration.  We didn't -- you

18  can't spend all that much time in getting all that rainfall for

19  two years.  You just can't.  You take one rainfall record in the

20  basin, you run that, and you live with the variability that

21  occurs.

22         But there's some statistical tests that you can run to

23  make sure your model is statistically valid and has a high

24  predictive capability.  But overall there's also a gut check,

25  which is how well are we reproducing, when it's dry, the little

1  behavior, and when then it's wet, the big behavior, and, you

2  know, are we getting runoff when the runoff occurs or when it

3  doesn't occur.

4         And overall this is a pretty reasonable calibration.

5  It's -- you know, you're never totally satisfied with

6  calibration, but there's 400 hours or so that went into doing

7  this calibration.  And it basically shows you, you know, you can

8  reproduce the wetter conditions when there's a lot more

9  discharge and the dryer conditions when there's a lot less.

10 Q.   And so when you actually were modeling the storm event on

11 April 29th through the 30th, was there any evidence that you saw

12 that gave you confidence in your calibration efforts?

13 A.   There is.  And this happens a lot.  You calibrate to a

14 period; and especially in this case, there was a big extreme

15 there.  And we go, Okay, there's this one big extreme, and we

16 got this calibration result of, like, 2800 -- 28,000 CFS or

17 something, 2800 CFS, and -- 28,000, and the USGS record that we

18 had downloaded was way off by 15,000.  We go, Whoa, what's going

19 on?  Because our water levels were reasonably well predicted.

20 There's another plot of water levels.  And we go, What's -- you

21 know, we're scratching our head, what's going on, you know, the

22 calibration effort.

23        And then the USGS updated their flow record and it was

24 28,000, right on what we had in the model.  So we go, Don't

25 touch it.  Let's go.  Let's move from that effort.

1    Q.   All right.  Let's move forward.  So as I understand it,

2    we've defined our draining basin.  We calculated the rainfall.

3    We've identified the sponge.  We've now calibrated those things.

4    What did you do next?

5    A.   So we went and did the investigation of the two what-ifs,

6    the two scenarios, dam in place, dam out.

7    Q.   And to do that, did you -- I'm finished with this, thank

8    you.

9            To do that, did you draw some cross sections?

10   A.   Yes.  So the hydrology part of model predicts the runoff

11   and the water levels reasonably well as you go downstream, but

12   it doesn't do it with enough detail to really map out the

13   neighborhood.  So you do a more detailed hydraulic model diagram

14   in the stream.  And so we did cross sections there to get a

15   better understanding of how deep it gets, how high it gets in

16   the neighborhood, and that's the hydraulic cross sections.

17   Q.   I'm going to show you what's been marked as Plaintiff's

18   Trial Exhibit 12.  Can you briefly identify that for the record?

19   A.   Sure.  That's our cross sections used in our hydraulic

20   analysis of the neighborhoods.

21          **MR. MARSHALL:**  Your Honor, I'd move admission of

22   Plaintiff's Trial Exhibit 12.

23          **THE COURT:**  12 is admitted.

24          (PLAINTIFF EXHIBIT 12:  Received in evidence.)

25          **MR. MARSHALL:**  May I publish?

1          **THE COURT:**  Yes.

2    **BY MR. MARSHALL:**

3    Q.    I apologize for this.

4          Dr. Ross, could you please orient the jury as to what

5    they're looking at?

6    A.    Sure.  So we have this runoff model calculates flows

7    everywhere, and then we constructed a hydraulic model of the

8    stream system down through the neighborhood.  And these cross

9    sections, these green lines that are here like that, are

10   basically oriented to be hydraulically perpendicular to the

11   stream, and they represent the flow area of the stream as you go

12   downhill, including, potentially, the neighborhood, where it

13   flows out into the neighborhood.

14         So there's -- for each one of these green lines,

15   there's a cross section of flow, including the channel down in

16   the middle, the river system down in the middle.  And it was

17   focused on the neighborhood.  That's all we needed to do.  And

18   so we took inputs from the hydrology model, the flows, and we

19   modeled the stages and velocity -- or the water depths and

20   velocities in this section very carefully with the hydraulic

21   model.

22   Q.    So essentially that process you've previously described

23   tells you how much water, correct?

24   A.    Right.  The timing and volume of runoff, right.

25   Q.    And with this model you're trying to determine how high,

1  correct?

2  A.    Correct.  And timing.

3  Q.    And what are the two inputs for this model?

4  A.    So there's a collective discharge here into that stream

5  system, and there's a boundary condition down here which I

6  previously talked about, a stage boundary.  And then there is,

7  you know, cross-sectional information, bridges, survey

8  cross-section information through this section.  And the inputs

9  are the time series of flows from the hydrology part of the

10  model.  Hydrographs we call them.

11  Q.    But in terms of determining how high, what are the inputs

12  that go into these?

13  A.    Oh, in terms of the cross sections, the cross sections are

14  elevations and friction values.

15  Q.    Let's talk about friction values first.  What are friction

16  values?

17  A.    So friction values are resistance to flow.  And basically,

18  if you have flow through a forested area or a bunch of trees,

19  it's the resistance of the flow through that forested or --

20  trees or whatever, houses.  It's the resistance in and around

21  those obstructions.  It's the way we characterize that

22  resistance in the model.

23  Q.    And so if you have really high friction values, what

24  happens to your water levels?

25  A.    So if you have high friction values, the trees are close

1    together or, you know, the obstructions are significant, the

2    water stacks up behind it because it can't flow through it very

3    well.

4    Q.    And what happens to the speed of the water?

5    A.    It slows to the -- so the velocities drop a lot.

6    Q.    And did you calculate friction values throughout the

7    neighborhood?

8    A.    I did.

9    Q.    And what is your experience with developing and using

10   friction values in geographies like this?

11   A.    I've done it hundreds of times.  I've been out in storms

12   measuring the flows in hurricanes.  I've done this a lot of

13   times.  I know what the friction values are for Florida's

14   alluvial systems or stream systems like this, but especially for

15   this urban area, because it's pretty wide open.

16   Q.    And did your friction values take into consideration --

17   actually, let me do this a little differently.

18           Can I have the demonstrative, please.

19           Did your friction values take -- or did you plug into

20   your model, houses and fences and things of that nature?

21   A.    Any obstructions that are -- that were assigned with the

22   cross sections are plugged in as obstructions directly, and then

23   all the trees and bushes and wide open roads and front yards are

24   interpreted for the friction values.

25           These kind of flow sections are very efficient.  You

1    know, that's why you see the water running down the road.  It's

2    the very efficient flow way.  The front yards are very

3    efficient.  The backyards aren't.  Usually there are some fences

4    and some -- and the houses themselves have obstruction.

5    Q.   All right.  Coming down to the end.  So you've now defined

6    your basin, calculated your rainfall, calculated your sponge,

7    calibrated, plugged that into these cross sections to figure out

8    how high and how fast the water's flowing.  Did you then pick a

9    mode to run the model in?

10   A.   Yes.  So the hydraulic model that we were -- or the cross

11   sections we were just looking at, can we go back to that figure?

12   Q.   Yes?

13   A.   That one.  Yeah, you'll have to blow it up.

14        So this portion of the model, this flooding event,

15   you've heard already testimony it was very rapid.  It was

16   minutes, the water level rose, and then -- and then receded.

17        So this -- in hydrology this is called a very unsteady

18   flow.  It's not like a lazy river that stages up and it stages

19   up over days like the Mississippi River does or some of these

20   big rivers.  This was a very rapid rainfall event that went

21   downstream.

22        And so we set up an unsteady flow model, time steps of

23   minutes, of this section right through here so we could find the

24   precise depths of the flooding and the timing of that because

25   it's very important.  So it's -- so we ran our model in unsteady

1    flow or dynamic flow.

2              **THE COURT:**  Is this Exhibit 12?

3         **MR. MARSHALL:**  I'm sorry, Your Honor.

4         **MR. KAUFFMAN:**  Yes, it is.

5         **MR. MARSHALL:**  Yes, it is.

6         **THE COURT:**  All right.  Thank you.

7         **MR. MARSHALL:**  Could we publish it again, please?

8         **DEPUTY CLERK:**  It's admitted.

9         **MR. MARSHALL:**  Yes, it is.

10   **BY MR. MARSHALL:**

11   Q.   Okay.  So let's take a couple of steps back.

12   A.   Okay.

13   Q.   What are the two modes that you can run your model in?

14   A.   Dynamic and steady.

15   Q.   Okay.  And what would a steady mode be appropriate for?

16   A.   So like I said, a lazy river system, where you have -- it

17   stages up over days, you can run what's called a steady state

18   solution.  And it assumes that all the peak flows are all at the

19   same time, and it gives you the maximum level that would occur.

20   Q.   And what was the mode that you ran your model in?

21   A.   We ran it in unsteady mode with very short time steps, in

22   minutes.

23   Q.   And then as I understand it, you then ran two different

24   scenarios with your model?

25   A.   Correct.

1    Q.    What did the first -- what was the first scenario you ran?

2    A.    The scenario of the rainfall runoff event if the dam had

3    held.

4    Q.    And the second?

5    A.    Was, again, the dam being removed.

6    Q.    And so essentially you took that -- this entire process and

7    inputted two different hypotheticals; is that correct?

8    A.    That's correct.

9    Q.    And you saw what would have happened.

10   A.    Correct.

11   Q.    And was this process time-consuming?

12   A.    Yes.

13   Q.    What did the model reveal in terms of the first scenario?

14   If the dam would have held, what would the level of -- how many

15   homes would have flooded?

16   A.    Well, the -- had the dam held, there would only be a

17   handful of homes -- six, precisely -- that would have flooded.

18   Q.    As opposed to how many flooded that night?

19   A.    163.

20   Q.    And had the dam been removed, how many homes would have

21   flooded?

22   A.    None.

23   Q.    When you performed this modeling, did you consider all the

24   variables that could have caused this flooding independently?

25   A.    Yes.  There was nothing else that could have caused this

1  flooding.

2  Q.    In your opinion was there anything outside of the failure

3  of this dam that could have caused this flooding?

4  A.    The failure of the dam and the consequent release of all of

5  that storage upstream in sort of a perfect storm scenario was

6  the cause of this flooding.

7  Q.    Do you hold your opinions to a reasonable degree of

8  engineering hydrologic certainty?

9  A.    Yes.

10                    **CROSS-EXAMINATION**

11  **BY MR. NELSON:**

12  Q.    Good afternoon, Dr. Ross.

13  A.    Good afternoon.  I'm sorry, I don't know your name.

14  Q.    My name is Mr. Daniel Nelson.

15  A.    Hi, Mr. Nelson.

16  Q.    Nice to meet you.

17  A.    Nice to meet you too.

18  Q.    You were in court yesterday; is that correct?

19  A.    That's correct.

20  Q.    So you were here when Mr. Ed Giddins testified?

21  A.    Yes.

22  Q.    And you were here when Mr. Giddins testified that when he

23  visited the Kingsfield Road dam area the morning of

24  April 30th sometime in the 7:00 or 7:30 time period, the erosion

25  of the earthen embankments had not completed, right?

1   A.   I didn't hear him testify to that.

2   Q.   Well, if Mr. Giddins did testify to that, it would

3   undermine your assumption that the structure began to erode the

4   night of April 29th, wouldn't it?

5   A.   It doesn't matter if he testified to it or not.  It

6   wouldn't undermine my conclusion about this, that it eroded

7   sometime earlier.

8   Q.   Well, I'm sorry, Dr. Ross.  How is it possible that a

9   structure that you said would erode in a matter of minutes or at

10  most a hour could have eroded both the night of the 29th and

11  also sometime after 7:00 o'clock on the morning of the 30th?

12  A.   It's not possible.

13  Q.   So either Mr. Giddins was wrong with his eyewitness account

14  or your assumption about when the breach occurred is wrong,

15  right?

16  A.   Correct.

17  Q.   Did you also hear Mr. Christopher Quackenbush testify

18  yesterday?

19  A.   Yes.

20  Q.   And you heard that when he was down at the Kingsfield Road

21  structure the night of April 29th, sometime in the 9:30 to 9:45

22  time period, he could still see part of the earthen embankment,

23  right?

24  A.   Yes.

25  Q.   So if Mr. Quackenbush was right, the erosion had not

1    occurred as of 9:30 or 10:00 o'clock at night on the night of

2    the 29th, right?

3    A.    Look, when it was overtopping, I promise you -- I stake my

4    professional opinion on this -- it was eroding.  It was failing

5    at that point.  Whether it was fully failed at that point, I

6    don't know.  But it was failing when it was eroding, I know

7    that.

8    Q.    But you don't know for a fact whether it was eroding at

9    9:15, 9:30, 9:45 --

10   A.    I do not.

11   Q.    -- on the 29th.

12   A.    No.  I just know for a fact that it would have eroded after

13   9:00.

14   Q.    And you don't know for a fact whether that erosion did not

15   begin until sometime on April 30th, do you?

16   A.    It would not be my opinion that it would because it

17   overtopped earlier, and it had come down by that point.  Why

18   would it fail after it came down in the model?  That picture is

19   a clear indication that it's fully failed.  If you look at those

20   eddies that are in that picture, those eddies are sizable.

21   That's an indication of large depth.  I study this all the time.

22   Q.    I'm sorry.  What picture are you referring to, Dr. Ross?

23   A.    The flow section early in the morning.  The picture that

24   Mr. Giddins took.  That section is fully developed at that

25   point, in my opinion.

1    Q.    And what time was that?

2    A.    7:15, 7:30, something in that neighborhood.

3    Q.    And if the erosion had been fully developed as of 7:15 or

4    7:30 in the morning on April 30th, you would not expect there to

5    be any further failure, right?

6    A.    No.  Those velocities are very large.  They would have

7    continued to erode, still.

8    Q.    Well, you said at one point on your direct examination that

9    the breach was 41 feet, right?

10   A.    That's correct.

11   Q.    Where did you go get that number?

12   A.    That was in your consultant's, Mr. Lan's, study.  And I

13   visually visited -- I visited the site, so I visually saw that.

14   Q.    Did you have any data or survey measurements that --

15   A.    I did, mm-hmm.  Yes, sir.

16   Q.    And what did they show?

17   A.    In terms of the width or the depth?

18   Q.    The width.

19   A.    No, I had the depth -- they showed the cross section -- I

20   mean, I didn't need the survey of cross section.  It was

21   approximately that wide.

22   Q.    So you don't actually have a measurement of the width of

23   the breach, do you?

24   A.    I have observation, and I have a published measurement,

25   yes.

1    Q.    As of the time you did your work, you did not have a

2    surveyed measurement of the breach size, did you?

3    A.    No, but I had the observation.

4    Q.    And of this 41 feet that you talked about on your direct

5    testimony, how much of that 41 feet of erosion had already

6    occurred as of 7:15 in the morning?

7    A.    I would say most of it, from the picture.

8    Q.    Okay.  So you agree that there would have been very little,

9    if any, additional erosion after 7:15 in the morning on

10   April 30th; is that right?

11   A.    Well, the recession shows that it was -- it dropped very

12   quickly after that.  So no, there would have been some continued

13   erosion as long as velocities were high.

14   Q.    Dr. Ross, you'll have to help me here.

15   A.    Okay.

16   Q.    You say that the fully eroded width of the breach was

17   41 feet, right?

18   A.    That's correct.

19   Q.    How much of that 41 feet had already eroded as of 7:15 the

20   morning of the 30th?

21   A.    A substantial amount of it, from that picture.

22   Q.    And what do you mean by "a substantial amount"?

23   A.    More than half of it.  Maybe most of it, from that picture.

24   Q.    Okay.  You say half.  If this breach could have occurred in

25   a matter of minutes, how is it possible that it could have

1    started sometime before 10:00 o'clock on the 29th and only been

2    halfway gone as of 7:15 in the morning on the 30th?

3    A.   I didn't say it was halfway gone.  I said it was more than

4    halfway gone.  "Substantial" means more than half.

5    Q.   Well, when I asked you what "substantial" was -- and I

6    apologize if I didn't understand it -- I thought you said maybe

7    half.

8    A.   I don't have that measurement.

9    Q.   You don't know, do you?

10   A.   I do know that it substantially eroded when it failed.  And

11   I know that it probably would have continued to erode as it

12   flowed, but at that point it's on its recessional limb.

13   Q.   Dr. Ross, we're talking about the width of the breach, the

14   41 feet that you said breached, right?

15   A.   Right.

16   Q.   Okay.  And I'm trying to get your best judgment, as of 7:15

17   in the morning on April 30th, how much of that 41 feet had

18   already been eroded?

19   A.   Most of it.

20   Q.   And what do you mean by "most"?  Can you give me an

21   estimate?

22   A.   38 feet.

23   Q.   Thank you.

24   A.   Okay.  I don't have that precise number.  I'm just saying

25   most of it.

1   Q.   Well, is 38 feet your best judgment today?

2   A.   It's close to 41 feet at that point.

3   Q.   So there would have been very little, if any, additional

4   erosion, in your opinion, between 7:15 in the morning on

5   April 30th and sometime later that morning; is that right?

6   A.   Yes, that's my opinion.

7   Q.   Dr. Ross, on your direct examination I believe I understood

8   you to say that the timing in the -- of the flooding in the

9   class area matched up well with your model; is that right?

10  A.   No.

11  Q.   Okay.  Help me understand what you meant to say, or maybe I

12  misunderstood.

13  A.   No, I said the timing of the flooding matched from an

14  observation standpoint.  It's very important to understand what

15  happened ahead of time.  Okay.  And so the timing is really

16  observations.  That's not model results.  But it was supported

17  by model results in the standpoint of overtopping times.  So the

18  model does predict an overtopping time of 9:00 p.m.

19  Q.   That's what your model predicts is the time that water

20  would have first gone over what part of the Kingsfield Road

21  structure?

22  A.   The earthen part.  The failure part.

23  Q.   Did you take account of the time of flooding in the class

24  area?

25  A.   Yes.  Did I take that into consideration in the model?  I

1    want to understand your question correctly.

2    Q.   In forming your opinion.

3    A.   Yes.

4    Q.   And it's true that you did not model the time of any

5    flooding in the class area; is that correct?

6    A.   I modeled the event as if the dam had held or the dam had

7    been removed.  That is what I did.

8              **MR. NELSON:**  May I approach, Your Honor?

9              **THE COURT:**  Yes, you may.

10   **BY MR. NELSON:**

11   Q.   Dr. Ross, your deposition is two volumes, taken on

12   August 19th, 2015.  And I'm going to hand a copy to you.

13   A.   Okay.

14   Q.   Dr. Ross, would you please turn to page 50 of the

15   deposition, line 4 -- I'm sorry, Dr. Ross.  I apologize.  Yes.

16   No, that's right.  Page 50.

17             Have you had an opportunity to look at that, Dr. Ross?

18   A.   Correct.

19   Q.   Okay.  So you're asked the question on line 4.  Question:

20   Okay.  I understand all of that, and I appreciate your getting

21   into all of that, but right now I'm really only interested in a

22   timing element and what you could or couldn't do.

23             And then what did you answer?

24   A.   I couldn't tell you the timing of the flood that was

25   experienced in the neighborhood from the modeling investigation

1  that we did because we didn't do -- and you're referring to a

2  dam break analysis.  We didn't precisely define the failure of

3  the dam and try to do any dam failure analysis.  So all I could

4  tell you is the timing of those hypothetical conditions, which

5  in fact do line up with the timing of the flood, they just don't

6  go to the severity.

7  Q.   Okay, Dr. Ross.  You deviated from what you actually --

8  A.   Okay.  I'm sorry.

9  Q.   -- answered in the deposition.

10 A.   So all I said was, I could tell you the timing of what we

11 found.

12 Q.   Okay.  So you were asked the question, I'm really only

13 interested in the timing element and what you could or couldn't

14 do.

15      And you say, I couldn't tell you the timing of the

16 flood that was experienced in the neighborhood from the modeling

17 investigation that we did because we didn't do a -- we didn't

18 precisely define the failure of the dam and try to do any dam

19 failure analysis.

20      That's what you testified to in your deposition.

21 Right, Dr. Ross?

22 A.   Right.  I -- correct.  Can I explain?

23 Q.   I'm --

24      **THE COURT:**  Mr. Marshall will be able to --

25      **THE WITNESS:**  Okay.

1      **THE COURT:**  -- talk to you on redirect.

2  **BY MR. NELSON:**

3  Q.   Okay.  So in terms of your modeling investigation, you

4  didn't do any modeling investigation of what time water released

5  through a breach in the Kingsfield Road dam in fact reached the

6  class area, did you?

7  A.   No.

8  Q.   And that was notwithstanding the assignment in this case of

9  trying to determine whether or not the water that, in the real

10 world, went through a breach in that structure, flooded the

11 class area, right?

12 A.   I was asked to do an investigation that -- as to the cause

13 of the flooding.  I did that investigation.  I could not -- I

14 did not want to get into predicting the evolution of the section

15 and trying to come up with some hokey modeling effort to

16 reproduce that.

17 Q.   Well, you didn't even try.

18 A.   I did try.

19 Q.   Oh.  I'm sorry.  I -- so you --

20 A.   No, I didn't try to run a breach because I didn't need to

21 run a breach.  I didn't -- I'm not interested in the evolution

22 of the section.  I know what happened there.  That occurred in a

23 few minutes, I was not -- I was not interested in predicting the

24 evolution of the section.  I was interested in the hydraulics of

25 the section, what that did to the flow.

1    Q.   So you were not interested in actually conducting an

2    analysis of the timing of that breach, right?  You're basing

3    that on your estimation of what must have happened, right?

4    A.   Keep in mind my charge was to do an investigation to

5    determine whether that dam failure caused the flooding.  I did

6    an investigation to show that if the dam hadn't failed, it

7    wouldn't flood.

8            I also looked at available storages at the time of the

9    overtopping and to see if that was sufficient to generate a

10   flood, and that was sufficient to base my opinion on.  There's

11   not a suitable model in existence to do this dynamic flood wave

12   investigation, nor am I going to get into trying to model the

13   evolution of that section with time because there's too many

14   uncertainties.  I just know that it's going to be in a few

15   minutes.

16   Q.   You just know that the breach is going to occur within a

17   few minutes?

18   A.   I do a lot of sediment transport modeling, sir.

19   Q.   And even though you just know it's going to occur within a

20   few minutes, a moment ago you couldn't tell me whether a breach

21   that was 41 feet wide would have occurred a few minutes after it

22   first started the night of April 29th or whether it somehow

23   could have taken from 9:00, 9:30, 10:00 o'clock on the 29th

24   until sometime after 7:15 to fully form, right?

25   A.   I can tell you definitively that the breach occurred --

1   based on my professional opinion, the breach occurred shortly

2   after that dam failed, that dam breached.  When the hydrology,

3   you call it -- dam breaching is the water level coming over the

4   earthen section.  The breach -- and as a dam engineer is how it

5   opens up with time.  Those two things are very different.

6   Overtopping -- in hydrology it's called breaching.  It's

7   overtopping the earthen part.  But in dam design breaching is

8   the evolution of the section.

9           I can tell you that the evolution of the section

10  occurred in just a few minutes, I can tell you precisely when

11  the overtopping occurred, and I can tell you precisely how deep

12  it got over the dam before that section eroded.  So when it

13  got -- and I was out there, and I could see visually how high it

14  got.

15  Q.   Well, let's just back up for a minute, Dr. Ross.

16  A.   Mm-hmm.

17  Q.   What you can tell us from your model is a prediction of the

18  time that water would have begun to go over the earthen

19  embankment, correct?

20  A.   Correct.

21  Q.   That's what you can tell us.

22  A.   Correct.

23  Q.   The other things are your opinions about how long it would

24  take for a breach to form and complete after water first started

25  to go over the earthen embankment, correct?

1    A.    Correct.

2    Q.    Thank you.

3    A.    Okay.

4    Q.    Dr. Ross, I think you said on direct that the class area

5    was located approximately two miles down Elevenmile Creek from

6    the Kingsfield Road structure; is that correct?

7    A.    Correct.

8    Q.    From the time that the Kingsfield Road dam first breached,

9    how long would it take water that went through the breach to get

10   down to the class area?

11   A.    So that -- I can tell you very carefully.  It was between

12   10 and 30 minutes, depending on the depths.

13   Q.    So sometime between 10 and 30 minutes.

14   A.    Yes.  Depends precisely on what the water depths were

15   downstream at the time it breached.

16   Q.    So if flooding were experienced in homes sometime -- say at

17   10:00 o'clock at night on the 30th, the dam breach would have

18   had to have occurred sometime between 9:30 and 9:50 in order for

19   there to be flooding in homes, right?

20   A.    Correct.

21   Q.    And --

22   A.    Something in that time frame.

23   Q.    And if we take Mr. Bullard's testimony -- you were here for

24   that, right?

25   A.    Correct.

1  Q.   Okay.  He said he first noticed water in his house at 10:30

2  at night on the 29th.  Do you remember that?

3  A.   I do.

4  Q.   So in order for water to get into his house from the dam

5  breach, if it was due to the breach of -- water going through

6  the breach of the dam --

7  A.   Correct.

8  Q.   -- that dam breach initiation would have been sometime

9  between 10:00 and 10:10, right?

10  A.   Or earlier.

11  Q.   I thought the water was going to take -- how long to get --

12  A.   Keep in mind, Mr. Nelson, it was already overtopping it at

13  whatever this time was, 9:30 or 9:45, so it was already

14  breaching.

15  Q.   Well, wait a minute, now.  Are you saying that overtop is

16  the same as breach?

17  A.   No.  Overtopping is going to result in breaching.  Okay.

18  Breaching commenced the second it started overtopping that

19  earthen structure.  Now, its evolution takes time, but breaching

20  commenced the second it starts running on that dirt.

21  Q.   But you're not saying water that is flowing over the

22  Kingsfield Road structure -- that's -- it's going to go over the

23  structure whether it breaches or not, right?

24  A.   Correct.

25  Q.   And that's water that's going to flow down Elevenmile Creek

1   whether the dam breaches or not.

2   A.   Correct.

3   Q.   So that can't be the water that caused the flooding in the

4   class area under your analysis, right?

5   A.   That's correct.

6   Q.   The only water that can produce the flooding that you say

7   was attributable to Kingsfield Road structure is water that went

8   through the breach.

9   A.   No, I didn't say that.  I said the breach opens up the

10  valve.  The valve opens up, and all this water that's sloping

11  down towards that dam is now free to flow.  It's already

12  flowing.  But that valve opens up even more.  And all of a

13  sudden all that water is coming down the creek in a faster way.

14  It's enough to create the flooding.

15  Q.   So help me understand, Dr. Ross, that in the simulation you

16  have water going over the top of the concrete weir structure.

17  A.   Correct.

18  Q.   You have water going over the top of the earthen

19  embankment, right?

20  A.   Yes.

21  Q.   And I think you said on direct that you thought that water

22  was 5 feet above the dam structure.

23  A.   The peak might be 5 feet because there was visible evidence

24  there.

25  Q.   Okay.  And that water that's over the top of the structure,

1   that's going to go down Elevenmile Creek whether the dam

2   breaches or not.

3   A.   Correct.

4   Q.   So now, in your model, we have a breach in the dam, right?

5   A.   Correct.

6   Q.   Okay.  Now we have water that's going through the breach.

7   A.   Correct.

8   Q.   Okay.  That's what you kind of analogized to opening the

9   drain.

10  A.   Correct.

11  Q.   When you open the drain, isn't the water level going to

12  drop down over the top of the structure?

13  A.   How can it drop down if upstream is like a giant lake?

14  Okay.  There's so much water up there that it's not going to

15  drop down because it's also raining at the same time.  So all

16  this water is coming to the dam at the time it breaches.

17  Somebody opens the valve.  The dam opened up, opens the valve,

18  and all that area gets flooded downstream.

19  Q.   Well, wait a minute.  You know, it's like the analogy of

20  the person with their thumb in the dyke, right?  You know,

21  there's water already coming over the top --

22  A.   There is; and if the dam doesn't breach, they don't get

23  flooded.

24  Q.   Well, but it's 5 feet high, and it's coming over the top.

25  And you pull your finger out and, you know, more water starts to

1    come through.  Then you get a hole, right, and you've got water

2    that's going through that hole.

3    A.   Right.

4    Q.   So if some of the water that's upstream is going through

5    that hole, it necessarily follows it's not going over the top,

6    which means that comes down, right?

7    A.   Counselor, when it's full, it's 80 acre-feet right there.

8    There's 800 acre-feet that's coming to the dam.  There's no way

9    it's going to fall.  It's going to continue to rise, even though

10   that section is opening up.  If somebody opened that valve and

11   all that water's coming, it's going to still rise.  It's just

12   going to flow more.

13   Q.   Dr. Ross, the valve that we're concerned about here is not

14   water that's falling someplace above the structure and is going

15   to be runoff anyway.  The valve that's at issue here is the

16   breach in the dam, right?

17   A.   Correct.

18   Q.   And when you open that valve, some of the water's going to

19   go through that valve, right?

20   A.   Correct.

21   Q.   And that means that's not water that's going over the top

22   anymore.

23   A.   You're thinking that that water is just there and it's just

24   going to disappear and things are going to come down.  There's

25   all this additional water coming.  It's going to continue to

1    rise.  It's that complex.

2    Q.   I understand, Dr. Ross, but that other water, that's coming

3    from Mother Nature.

4    A.   It's coming from the IP complex with all those ponds

5    overflowing.  My contention is those ponds probably didn't have

6    the storage capacity they needed to have.

7    Q.   Well, but wait a minute.  There's stormwater that's falling

8    all over the area, right?  You agree with that.

9    A.   Right.

10   Q.   And you're getting runoff from a large volume of the

11   watershed, right?

12   A.   Getting water from primarily the IP property.

13   Q.   I mean, some of it's running --

14   A.   Sure.

15   Q.   -- into the IP property.

16   A.   Correct.

17   Q.   Right?  And any of that water that's falling from

18   rainfall --

19   A.   Correct.

20   Q.   -- is ultimately going to drain down into Elevenmile Creek.

21   A.   Correct.

22   Q.   Right?  And it's going to drain into Elevenmile Creek

23   whether the Kingsfield Road structure breaches or not.

24   A.   Correct.

25   Q.   Thank you, Dr. Ross.

1   A.   Okay.

2   Q.   Okay.  There was some testimony in your direct examination

3   about rainfall data, and I think everyone may be grateful that

4   that's going to save us some time because that was some of the

5   terrain I was going to plan to cover.

6           I did want to ask you a question or two, though, about

7   rainfall.  You testified, I believe, that you adjusted the radar

8   rainfall up, right?

9   A.   Yes.

10  Q.   And you adjusted it upwards by about 20 percent?

11  A.   Correct.

12  Q.   And I think you also testified that it was very similar to

13  rainfall data that one of IP's experts used; is that right?

14  A.   Correct.

15  Q.   And that's Dr. Frank Lan, correct?

16  A.   Correct.

17  Q.   Do you agree that you and Dr. Lan used very, very

18  consistent rainfall data?

19  A.   In some parts and some parts not.  He did a different

20  investigation.  But it's pretty similar.

21  Q.   Okay.  Dr. Ross, I want to show you something.  Do you

22  remember testifying at an evidentiary hearing in this courtroom?

23  A.   I do.

24          **MR. NELSON:**  May I approach, Your Honor?

25          **THE COURT:**  Yes.

1   **BY MR. NELSON:**

2   Q.   Okay.  And this was an evidentiary hearing right here in

3   front of Judge Rodgers and the date on the front is May 31st,

4   2016.  Okay.  Would you take a look at page 220 of the

5   transcript, please.

6   A.   Okay.

7   Q.   Okay.  So there's a question asked at the bottom on line

8   25.  And this is asked by your own lawyer, Mr. Marshall.

9        He says, And in terms of the rainfall amounts that you

10  calculated versus what International Paper's expert, Dr. Lan,

11  calculated, was there really any meaningful differences?  What

12  did you answer then?

13  A.   No, they were very consistent.

14  Q.   They were very, very consistent is what you actually

15  testified to.

16  A.   In the IP basin.  In International Paper's basin, yes.

17  Q.   So the rainfall data in the study area above the Kingsfield

18  Road structure that you and Dr. Lan used was very, very

19  consistent.

20  A.   Yeah.  They're not fundamentally different, no.  There's

21  some difference.

22  Q.   Well, what about the rainfall data in the watershed above

23  the class area?  Was your and Dr. Lan's data in that area also

24  very, very consistent?

25  A.   Depends which watershed you're talking about.  We have to

1  look at the different -- which ones you're talking about.

2  Q.  Okay.

3         MR. NELSON:  And this is not yet been admitted, Your

4  Honor, so if I could publish it to Dr. Ross only first?

5         THE COURT:  Yes.

6  BY MR. NELSON:

7  Q.  Dr. Ross, do you recognize this graphic from your report?

8         THE COURT:  What's the number, please?

9         THE WITNESS:  I do.

10        MR. NELSON:  It's not yet been marked, Your Honor.

11  It's a figure from Dr. Ross's report that's --

12        THE COURT:  I'm going to just -- we'll give it a

13  number for record purposes for now.  It would be IP 77.

14        MR. NELSON:  Thank you, Your Honor.

15        THE COURT:  Thank you.  So do you recognize.

16        THE WITNESS:  I do, yes, Your Honor.

17        MR. NELSON:  May we publish to the jury, please?

18        THE COURT:  No objection?

19        MR. MARSHALL:  You may.

20        THE COURT:  We'll admit -- or I will admit IP 77.

21        MR. NELSON:  Oh, I'm sorry.  Thank you, Your Honor.

22        (DEFENSE EXHIBIT 77:  Received in evidence.)

23  BY MR. NELSON:

24  Q.  Okay, Dr. Ross.  What is this?

25  A.  This is basically a DEM, demarcation of -- it's elevations

1    and giving coloration for high elevations and low elevations.

2    And it has basins, sub-basins delineated on it.  So this is the

3    watershed with elevations.  Let me see if I can draw it.  So

4    these are high elevations, these hot areas up here; and these

5    are low elevations, the blue areas in the stream system.  And

6    these are sub-basins in the watershed.

7    Q.   Okay.  And so if we -- does this help you orient yourself

8    to answer the question about areas above the class area, which I

9    think here would be hydraulically upgradient, right?

10   A.   Correct.

11   Q.   Let's start with the basin that you circled there.  Did you

12   and Dr. Lan have any real difference in rainfall data in that

13   basin?

14   A.   You know, I think we have an inch or two difference in the

15   rainfall in that basin.

16   Q.   And who had more?

17   A.   He has more rainfall in that basin.

18   Q.   Oh, okay.

19   A.   Right.

20   Q.   And what about the next basin over to the right?

21   A.   I don't know in particular.

22   Q.   Okay.  How about the basin below the one you circled?

23   A.   I don't know that either.

24   Q.   Okay.  How about the basin to the right of that?

25   A.   I don't know that either, the comparison.  I just remember

1   that one basin that stood out.

2   Q.   All right.  So then when you testified in the evidentiary

3   hearing that your rainfall data and Dr. Lan's rainfall data were

4   very, very consistent, you were referring to the three basins

5   above the class area that we've just discussed other than the

6   one you circled; is that right?

7   A.   I'm referring to generally the rainfall distribution around

8   this watershed and the total rainfalls we got, yes, sir.

9   Q.   Other than a possible difference of 2 to 3 inches of

10  rainfall in the basin that you circled, are there any other of

11  the sub-basins in this exhibit where you believe you and Dr. Lan

12  had a meaningful difference in rainfall data?

13  A.   I don't have the data in front of me, so I don't know, sir.

14  Q.   You don't know?

15  A.   I don't know right now.  I don't.  I looked at it from a

16  total amount, sometime back, and we both get about the same

17  totals.  And I looked at that particular basin.  We were very

18  consistent.  And then other ones weren't remarkably different.

19  Q.   Okay.

20  A.   Are there differences, yes?

21  Q.   But --

22  A.   But if two people do rainfall, there are going to be

23  differences.

24  Q.   Maybe modest differences.  But before your own lawyer asked

25  you the question at the evidentiary hearing whether your

1   rainfall data and Dr. Lan's rainfall data were consistent, you

2   looked at the data, right?

3   A.   I did.

4   Q.   And at that time you said they're very, very consistent.

5   A.   I still stand by them, very consistent for this event.

6   Q.   Thank you, Dr. Ross.

7   A.   Okay.

8   Q.   I'm going to keep that exhibit up there.  Can we keep that

9   up, please?  I'm sorry.  I apologize, Dr. Ross.

10  A.   That's okay.

11          **THE COURT:**  There it is.

12  **BY MR. NELSON:**

13  Q.   Do you recall being asked some questions about this

14  watershed delineation in your deposition?

15  A.   I don't recall, no, sir.

16  Q.   You described on direct examination the border of your

17  watershed, and that's the outside boundary, right?

18  A.   That's correct.

19  Q.   And then the areas in the middle are sub-basins, right?

20  A.   Yes, sir.

21  Q.   You agree that the volume of water that originates below

22  the Kingsfield Road dam structure is greater than the volume of

23  water that originates above the Kingsfield Road dam structure in

24  reference to the class area?

25  A.   There's tributaries that come in downstream of the

1   Kingsfield Road dam structure -- I mean, crossing, yes.

2   Q.   Do you agree with me, Dr. Ross, that the Kingsfield Road

3   structure is about there?

4   A.   Yes, sir.

5   Q.   And you've got some arrows drawn on the map, right?

6   A.   They're qualitative arrows, counselor.  Careful.

7   Q.   But generally you're trying to depict the flow of water,

8   right?

9   A.   Correct.

10  Q.   And you agree that in simple lay terms, most of the water

11  that runs down through the class area is coming from south and

12  east of the Kingsfield Road dam structure, right?

13  A.   No.  I don't agree with that.

14  Q.   Okay.  You have your deposition transcript up here, Dr.

15  Ross.  Would you turn to page 103, please?

16  A.   The deposition or --

17  Q.   The deposition.  Do you have that page, Dr. Ross?

18  A.   103?

19  Q.   Yes, sir.  So at line 12 you're asked the question -- the

20  examiner says, Yes, Figure 4.  Do you agree that in the

21  sub-basin that surrounds the tributary that forms the upper

22  boundary of your model area, that sub-basin drains mostly from

23  areas that are not -- that do not go through the area where the

24  International Paper dam is located.

25        What did you answer?

1   A.   Okay.  So if you -- the question is do I agree that most of

2   the area that comes in by the neighborhood is an external to the

3   IP dam basin I say yes, that's consistent.

4   Q.   Well, I asked you a moment ago the question, In simple lay

5   terms --

6   A.   No, you asked me a different question, counselor.

7        **THE COURT:**  Please let him finish the question, and

8   then you can --

9        **THE WITNESS:**  Okay.  I'm sorry.  Go back.

10  **BY MR. NELSON:**

11  Q.   I asked, In simple lay terms, most of the water is coming

12  from south of where the dam is located, right?

13  A.   Those are two different questions.  The question you asked

14  me here was do you agree that most of the area does not come to

15  the International Paper basin.  And what you asked me just now

16  is does most of the area come south of the Kingsfield Road

17  bridge.  And I -- I don't know what the relative area south of

18  the Kingsfield Road bridge is because it includes two basins.

19  So I don't know particularly if there's -- it looks to me like

20  it could be slightly bigger, but I can't tell from this map

21  whether -- they're about equal, far as I can look.

22  Q.   Well, in the deposition you were asked, So in simple lay

23  terms, most of that water is coming from south of where the dam

24  is located.

25  A.   You asked me --

1   Q.   And your answer says, South and east, right.  That's what

2   you said when you were asked questions in the deposition about

3   this figure.

4   A.   Okay.  In the deposition you asked a different question.

5   You asked did most of the area come in from outside the IP

6   basin, and I said yes.  And you asked does most of the area come

7   from the south and east, and I said yes.  But that's not the

8   same question you just asked.

9   Q.   Okay, Dr. Ross.

10  A.   Okay.  Or I don't interpret it the same way.  I'm sorry.

11  But you asked me just now about most of the area outside of the

12  IP basin, and moves the area outside the IP basin, most of the

13  area outside the IP basin is -- I mean, you asked me about the

14  relative size of the basin outside the IP basin, that's a

15  different question, as I interpreted it.

16  Q.   Okay.  Just --

17  A.   I'm sorry if I interpreted it incorrectly.

18  Q.   No, I -- we should be on the same page.  I apologize if I

19  wasn't asking a good question.

20  A.   So I stand by my deposition a hundred percent, and I stand

21  by the answer I just gave to the question you just gave.  Now,

22  you can rephrase the question if you like.

23  Q.   So that we're on the same page, I'm not talking about area.

24  I'm referring here to water runoff volume, okay?

25  A.   Okay.

1   Q.   And I interpreted the question you were asked in your

2   deposition as referring to water runoff, right?

3   A.   I was referring to area, okay.  Runoff volume area.

4   Q.   Okay.  So there's -- let's just maybe go through this one

5   more time --

6   A.   Okay.

7   Q.   -- so it's clear.

8   A.   Okay.

9   Q.   You were asked -- the question says, Yes, Figure 4.  Do you

10  agree that in the sub-basin that surrounds the tributary that

11  forms the upper boundary of your model area --

12  A.   I'm sorry.  What line are we on again?

13  Q.   We were starting on line 12.

14  A.   Okay.

15  Q.   Okay.  So yes, Figure 4.  Do you agree that the sub-basin

16  that surrounds the tributary that forms the upper boundary of

17  your model area, that sub-basin drains mostly from the areas

18  that are not -- that do not go through the area where the

19  International Paper dam is located.  You say, Correct, I agree.

20          Then you're asked, So in simple lay terms, most of

21  that water is coming from south of where the dam is located.

22  You say, South and east, right?

23  A.   Right.

24  Q.   And so it is talking about water, not --

25  A.   You said most of the water that comes from the basin --

1    let's clarify this question.  This question is very clear.  Most

2    of the water that comes from the basin outside of IP property's

3    basin, the dam, comes from south and east basins, yes.  But that

4    doesn't say anything about most of the area or most of the

5    water.  You said most of the water outside of IP property.

6    Q.    And that would be this basin here, right?

7    A.    No.  No, that's within the dam.  Oh, outside of that area,

8    yes, sir.  Okay.  Most of the area outside of that area.  Most

9    of the area -- there's a good portion of area here, there's a

10   good portion of area here, and there's a good portion of area

11   here.  All are outside the IP property boundary.

12   Q.    And all of the water from those areas drains down into the

13   class area, right?

14   A.    Correct.

15   Q.    And it doesn't go past the Kingsfield Road dam structure?

16   A.    Correct.

17   Q.    Thank you.

18   A.    You're welcome.

19         **THE COURT:**  Is this a good stopping point for our

20   afternoon recess?

21         **MR. NELSON:**  Sure.

22         **THE COURT:**  All right.  Thank you.

23         Ladies and gentlemen, we'll be in recess, as you know,

24   for 20 minutes.  Please enjoy the break.  Don't discuss the case

25   in any way during the recess, and don't begin to form any

1  opinion yet, please, about the merits.  See you back in 20

2  minutes.

3        *(Jury excused.)*

4        **THE COURT:**  All right, Dr. Ross.  You may step down.

5  You'll be back on the stand in 20 minutes.

6        **THE WITNESS:**  Thank you.

7        **THE COURT:**  Do you-all have any water that Dr. Ross

8  could have here?

9        **MR. MARSHALL:**  Oh, sure.  Absolutely.

10        **THE COURT:**  I think he might appreciate that.  He said

11  he needs some water.  I don't have a problem with you having

12  some since you're on the stand for such a long period of time.

13        **THE WITNESS:**  I can get some out there.  It's fine.  I

14  don't need it in here.

15        **THE COURT:**  Well, I don't mind you having it here as

16  long as you keep it on the floor --

17        **THE WITNESS:**  Sure.

18        **THE COURT:**  -- and just not up on the bench.

19        **THE WITNESS:**  Sure.

20        **THE COURT:**  We'll be in recess for 20 minutes.

21        *(Recess was taken from 3:14 to 3:37 p.m.)*

22        **THE COURT:**  Mr. Nelson, you may proceed.  And

23  Dr. Ross, you're still under oath.

24  **BY MR. NELSON:**

25  Q.   Dr. Ross, if I followed you correctly, on your direct

1    examination you indicated that you used two different models

2    during your work on this case; is that right?

3    A.    Yes, sir.

4    Q.    Okay.  One of the models is called HEC-RAS, H-E-C hyphen

5    R-A-S, right?

6    A.    Yes.

7    Q.    And is that a model that is sanctioned by the United States

8    Corps of Army Engineers [sic]?

9    A.    It's maintained -- yes, it's maintained -- written and

10   maintained by the Corps of Engineers.

11   Q.    And that's the model you used to evaluate the hydraulic

12   aspects, the height of the water and the speed of the water flow

13   on those cross sections; is that right?

14   A.    Yes, sir.

15   Q.    And then the other model that you used was called HSPF,

16   right?

17   A.    Yes.

18   Q.    And did I hear you correctly that that is a model that's

19   sanctioned by the EPA?

20   A.    It's supported by the EPA, yes, and quite a few agencies.

21   Q.    And the EPA is the Environmental Protection Agency?

22   A.    Yes, sir.

23   Q.    And I think you said that a lot of the work that you do is

24   on water quality issues?

25   A.    No, not really.  Not very much water quality.

1    Q.    Okay.  So you don't do a lot of water quality work?

2    A.    I do water quality; but as a percentage, it's a small

3    percentage.

4    Q.    Is the HSPF model sanctioned by the United States Corps of

5    Army Engineers?

6    A.    They have their own set of models.  There are people at the

7    Corps of Engineers who do continuous simulation modeling who use

8    it, as well as people from the U.S. Geological Survey.  A lot of

9    people from the U.S. Geological Survey.

10   Q.    The U.S. Army Corps of Engineers, for its hydrologic model,

11   uses something called HEC-HMS, correct?

12   A.    Correct.

13   Q.    HEC-HMS?

14   A.    Correct.

15   Q.    Or an older version of that model called HEC-1.

16   A.    Correct.

17   Q.    Those are not models that you used.

18   A.    No, sir.

19   Q.    Is the HSPF model that you used sanctioned by Escambia

20   County?

21   A.    I'm not sure.  Counties aren't usually in business to

22   sanction models.

23   Q.    Do you know if it's used by the county for any of its flood

24   studies?

25   A.    Again, not generally used for flood studies.

1    Q.    HSPF is not?

2    A.    Correct.

3    Q.    But you used HSPF here for a flood study.

4    A.    Correct.

5    Q.    Dr. Ross, I would like to show you -- and this has not been

6    marked yet -- a copy of Figure 24 from the report that you wrote

7    in this case.  Can you identify this, Dr. Ross?

8    A.    Yes.

9    Q.    And what is it?

10   A.    This is the water levels from the natural channel or

11   dam-removed scenario that we ran.  Running it through the

12   HEC-1 -- HEC-HMS solution and the interpreted high-water flooded

13   areas.

14           **MR. NELSON:**  I'd like to move to admit as IP

15   Exhibit 78.

16           **THE COURT:**  That will be admitted.

17       (DEFENSE EXHIBIT 78:  Received in evidence.)

18   **BY MR. NELSON:**

19   Q.    So this, Dr. Ross, is -- according to your analysis, the

20   model that you did of the natural channel, it depicts the

21   computed flood depths that the model predicted would occur in

22   the class area had there been no Kingsfield Road structure?

23   A.    Correct.

24   Q.    You also modeled a depiction -- or excuse me -- modeled the

25   volume of water that would be in the class area had there been a

1   dam in place with no breach, correct?

2   A.   Correct.

3   Q.   And the model with the dam in place and no breach predicted

4   higher water levels in the class area than what's shown in this

5   exhibit, right?

6   A.   Correct.

7   Q.   But I did not find a figure in your report showing the

8   water levels for the dam in place, no breach; is that right?

9   A.   Correct.

10  Q.   I'd like to show you Figure 25 from your report, which has

11  not yet been admitted.  Can you identify this figure, Dr. Ross?

12  A.   Yes.

13  Q.   And what does this figure show?

14  A.   This figure shows the interpreted predicted flood depths

15  from high-water marks, surveyed high-water marks, GIS analysis

16  of high-water levels that were observed from the flood.

17          **MR. NELSON:**  Move to admit.

18          **THE COURT:**  As 79?

19          **MR. NELSON:**  Yes, Your Honor.

20          **THE COURT:**  That will be admitted.

21      (*DEFENSE EXHIBIT 79:  Received in evidence.*)

22  **BY MR. NELSON:**

23  Q.   So this shows, Dr. Ross, what you've entitled Observed

24  Flood Depths from High-Water Marks, right?

25  A.   Yes, sir.

1    Q.   And this is -- is it a -- would it be fair to call it sort

2    of an interpolation of the high-water marks put onto a graphical

3    depiction of water depths, or would -- is there a better way to

4    describe it?

5    A.   Well, okay.  So you take the high-water -- surveyed

6    high-water marks and you develop a surface, and you compare that

7    to the land surface.  And that's -- the areas that are 1 feet

8    deep are in one color, and the areas that are up to 5 or 6 feet

9    deep are in a different color.  Correct.  It's an interpreted

10   water surface elevation compared to a very precise elevation

11   model.

12   Q.   And if we wanted to ascertain the volume of water that

13   ended up in the class area as a result of the breach of the

14   Kingsfield Road structure in the no-dam condition of your model

15   we could deduct the volumes depicted in Exhibit 78 from what's

16   shown here in Exhibit 79, right?

17   A.   Roughly, yes, sir.

18   Q.   And did you do that?

19   A.   Didn't do that, no.

20   Q.   But you had the data available to do that computation,

21   right?

22   A.   Mm-hmm.  Yes, sir.

23   Q.   So if we wanted to calculate the actual volume that your

24   model predicted would have been in the class area as a result of

25   the breach of the Kingsfield Road dam in the no-dam natural

1    condition, we could have done that?

2    A.    Correct.  I don't know the purpose for that because the

3    no-dam scenario, as we have said, allows a lot of water out

4    of -- prior to the storm, but certainly you can do that.

5    Q.    If we wanted to know just how much water ended up in the

6    class area as a result of the dam failure, we had a tool, with

7    these two graphs, or maybe more accurately the data underlying

8    them, to do that, right?

9    A.    Incorrect.  No.  You need -- in order to understand the

10   volume of water that would have been associated with a breach,

11   you have to run the dam in place first and get the elevations

12   there.  And that's the -- and then from the observed water

13   level, you get the difference from the effect of the breach.

14   You have the dam in place, you get the high water, and then you

15   compare it to the high water that was observed, and you get the

16   volume of water that's required to fill that space from that run

17   because the dam was in place at the time it breached, not the

18   dam removed.

19   Q.    Okay.  So I believe you said, if we go back to

20   Exhibit 78 -- this is the depiction of the modeled flood depths

21   in the natural channel, right?

22   A.    Correct.

23   Q.    So what you said we just needed would actually be more

24   water than what is shown in this graphic.  It would be the dam

25   in place, no breach.

1    A.    Correct.

2    Q.    Okay.  So if we had a number larger than what's shown in

3    this graphic and we deducted it from what is shown in

4    Exhibit 79, that would show us the amount of water contributed

5    to the class area as a result of the breach; is that right?

6    A.    No, no, no.  You can't use this to determine the amount of

7    water that was associated with the breach.  You have to use the

8    dam-in-place elevations.

9          Am I misunderstanding something?  I'm sorry.

10   Q.    I'm trying to determine, Dr. Ross -- you said you had the

11   data available to perform a calculation of the amount of water

12   in the class area as a result of the dam breach.

13   A.    Correct.

14   Q.    Right?

15   A.    Correct.

16   Q.    And we've shown here in Exhibit 78 and 79 depictions of,

17   number one, the amount of water that you say actually was in the

18   class area.

19   A.    Associated with no dam in place.

20   Q.    The observed condition.

21   A.    Oh, observed condition is the high water.  Yes.  I'm sorry.

22   Q.    So we start with that.  That's the water that, to the best

23   of your ability, actually was in the class area.

24   A.    Right.  Yes, sir.

25   Q.    So that's what was actually there.

1    A.    Correct.

2    Q.    And then you have modeled the amount of water in the class

3    area that was contributed without the dam breach, right?

4    A.    Correct.

5    Q.    So if we deduct the amount that was contributed by the --

6    excuse me.  If we deduct the amount that was there separate from

7    the dam breach, or independent of the dam breach, from the

8    amount that was observed --

9    A.    Yes, sir.  That would be --

10   Q.    -- the equation should tell us the volume that came from

11   the dam breach.

12   A.    Correct.  That would be the volume represented by that

13   large area.

14   Q.    And it is -- in broad terms, it would be taking the volume

15   that is shown in Exhibit 78 --

16   A.    Yeah.

17   Q.    -- and deducting it from 79.

18   A.    No.  This is a different run.  This is -- the dam is not in

19   place, so this would be lower.  This would be a different run

20   all together.  This didn't happen because that water is already

21   out of the system.  There's a lot of water already out of the

22   system associated with the natural channel, so the --

23   Q.    Well --

24   A.    -- you would need the dam-in-place run like this, and you

25   compare it to the observed levels, yes, sir.

1    Q.   So you haven't depicted or provided in the report

2    information that would allow us to determine the volume of water

3    in the class area that was there because of the dam breach,

4    right?

5    A.   You have been provided all the GIS layers.  You have all of

6    these layers in your -- in the previous transmittal.  So you

7    could do that calculation.  I didn't do the calculation for you,

8    but you could do that calculation.

9    Q.   Okay.  But you haven't done it, right?

10   A.   I did a quick analysis, and that's the order of magnitude

11   of the volume, yes.

12   Q.   But in your report and here in court today, you have not

13   done the work necessary to tell the jury how much water in the

14   class area was there because of the dam breach, have you?

15   A.   No, sir, I have.  I've done in a calculation of this area,

16   and the broad water level difference in the order of magnitude

17   of that storage is 230 acre-feet.  So I have done the analysis.

18   Q.   So --

19   A.   And I've provided that.  I testified to that before, I

20   think.  I don't know.  I think it was in the evidentiary

21   hearing, but --

22   Q.   I did not see that in any transcript, Dr. Ross.

23   A.   We were talking about acre-feet, so I don't know.  I'd have

24   to go back and look.

25   Q.   You did refer to the number of acre-feet that you believed

1    were behind the -- that were behind Kingsfield Road structure in

2    a dynamic condition.

3    A.    Correct.  And I did comment that was more than sufficient

4    to flood that area.

5    Q.    Well, you testified again today about the 850 to 1,000

6    acre-feet that you determined was behind the Kingsfield Road

7    structure.

8    A.    Correct.

9    Q.    And that's water that either flowed over the top of

10   structure or flowed through the breach, right?

11   A.    Well --

12   Q.    Both.  But you haven't quantified how much went over the

13   top and how much went through the breach, have you?

14   A.    Don't need to.  I know how much came down as a consequence

15   of the breach.  This volume to fill this area.  That's my

16   estimate.

17   Q.    Okay.  So you're saying because there was water in the

18   class area, it must have come from the dam breach, right?

19   A.    That's the only place it could have come.

20   Q.    But you didn't do any analysis or calculation of how much

21   water was released through the dam breach and how that compares

22   to the volume of water in the class area, did you, Dr. Ross?

23   A.    I didn't do that calculation, no, sir.

24   Q.    Thank you.  During the direct examination when you were

25   talking about the hydraulic modeling -- that would be the

1   HEC-HMS model -- you talked about the variables that were

2   important variables in that model; and one of them was friction,

3   right?

4   A.   Correct.

5   Q.   Is the friction in the model also known as a Manning's

6   coefficient?

7   A.   Yes, sir.

8   Q.   And just to make sure we're all on the same page, could you

9   remind all of us what that approximates in the model?

10  A.   So that's a parameter that describes the resistivity to

11  flow or the resistance to flow.  So that parameter gets bigger,

12  there's more resistance to flow.  So if a surface is concrete,

13  nice and smooth, it has low resistance of flow.  If it's got a

14  lot of vegetation, it has a high resistance of flow.

15  Q.   And did you use Manning's coefficient for the Elevenmile

16  Creek channel?

17  A.   For what -- that level section of channel that we have in

18  there, yes, sir.  Well, the section along the -- yes.  Yes.  The

19  whole section we did, yes.

20  Q.   And you also used a Manning's coefficient for the

21  floodplain area; is that right?

22  A.   Right.

23  Q.   And you used one Manning's coefficient for the channel and

24  a second different Manning's coefficient for the floodplain.

25  A.   Yes, sir.

1  Q.   Is it correct, Dr. Ross, that in your view a commonly used

2  frictional value for a water channel in Florida is .04 to .05?

3  A.   .03 to .05.  Yes, sir.

4  Q.   Okay.  Dr. Ross, I think you have the evidentiary

5  transcript up there.  Would you take a look at page 232, please.

6  And I'm going to direct you to line 20.

7       Do you see at the evidentiary hearing, Dr. Ross, you

8  were asked, and what frictional values did you use?  And what

9  does your answer say for the main channel?

10 A.   So we used the very commonly used values in Florida for

11 this training, .04 to .05.

12 Q.   .04 to .05 for the main channel.

13 A.   Right.

14 Q.   That's what you said that the common values were at the

15 evidentiary hearing, right?

16 A.   Right.

17 Q.   What did you actually use for the channel in your model?

18 A.   .03.

19 Q.   So you used a Manning's value for the main channel that is

20 lower than what you said at the evidentiary hearing is a

21 commonly used value.

22 A.   .03 and .04 are effectively the same.  It's just I was

23 reciting common values.  They're not -- they're common values.

24 If I'm mistaken and said .04 to .05, I should have said .03 to

25 .05.

1    Q.    But you used a lower frictional value in the model than

2    what you testified to in the evidentiary hearing, right?

3    A.    Right, and I was getting confused with whether you were

4    talking about the channel or the floodplain.  I'm sorry.

5    Q.    And is it correct, Dr. Ross, that a lower frictional value

6    results in water moving faster and at lower levels?

7    A.    Yes.

8    Q.    Okay.  So the commonly used value of .04 to .05, if you had

9    used that in your model, the water would have been slower and

10   higher.

11   A.    Slightly, yes.

12   Q.    And, again, this is a model that shows the amount of water

13   that you say was going to be in the class area whether or not

14   the Kingsfield Road structure was there --

15   A.    Correct.

16   Q.    -- and whether or not it breached.

17   A.    Correct.

18   Q.    So you used a number that kind of tamped that down a little

19   bit and got the number a little bit lower --

20   A.    It's not very --

21   Q.    -- than the commonly used .04 and .05.

22   A.    It's not very sensitive to it, counselor.  It's not -- it

23   would result in higher levels, but not that much higher.  Those

24   numbers -- .03 to .05 is kind of very similar in magnitude in

25   terms of the function of the model.  I did sensitivity analyses

1   on the model.  But I am mistaken.  I did use .03 in the channel.

2   Q.   And you recognize that .03 produces lower water levels in

3   the class area than .05?

4   A.   Yes, but it's appropriate for the system.

5   Q.   What Manning's value did you use for the floodplain cross

6   sections in your model?

7   A.   An out-of-bank region, since it was primarily neighborhood,

8   it was .05.

9   Q.   You used .05.

10  A.   Correct.

11  Q.   Let's take a look in that evidentiary hearing transcript at

12  page 232, line 20.

13  A.   Correct.

14  Q.   That same question.  And then you say in there, And then

15  the floodplain sections, which are very complex in this case,

16  they include forested and open areas.  We used .08.  Do you see

17  that?

18  A.   Correct.

19  Q.   Was that just a mistake when you said it at the evidentiary

20  hearing?

21  A.   Do I have the date?  I'm sorry.

22  Q.   This -- I'm sorry?

23  A.   So what was the question?  I'm sorry.

24  Q.   The question is, at the evidentiary hearing when you're

25  asked about the frictional value --

1   A.    Right.

2   Q.    -- you used for the floodplain in your model, what answer

3   did you give?

4   A.    I said .08, and that's -- I was working off a recollection,

5   and I'm mistaken there.

6   Q.    But you're sure today that what you really used was .05 for

7   the floodplain?

8   A.    I am positive.  I went back and checked at 4:00 o'clock

9   this morning.

10  Q.    That's an early morning, Dr. Ross.

11  A.    It's normal for me.

12  Q.    You beat me by a little bit too, but not by much.

13          Okay, Dr. Ross.  So you're sure today that what you

14  used for the floodplain was .05.

15  A.    I am.

16  Q.    And is the -- does the Manning's coefficient work the same

17  way for the floodplain, that the higher the number, the more

18  friction; the slower the water, the higher it rises?

19  A.    Correct.

20  Q.    So that if you had used a higher frictional value for the

21  floodplain, you would have shown more water in the class area,

22  whether or not the Kingsfield Road structure breached?

23  A.    Slightly.  Only slightly.

24  Q.    And you agree that you can, as a modeler, crank up or crank

25  down a frictional value, and that will have an effect on the

1    results, right?

2    A.   You can, but I looked at the velocities.  And the

3    velocities would be too low if you raise the friction values

4    much more.  I did a sensitivity analysis of the friction values

5    when I did it.

6    Q.   Okay.  Let's take a look in that evidentiary hearing

7    transcript again at page 274.

8    A.   Okay.

9    Q.   Okay.  And this is line 10.  You're asked the question, So

10   it would have increased it, and it would have affected different

11   homeowners in the neighborhood differently, right?  The

12   discussion here is the coefficient of friction, right?

13   A.   Yes.

14   Q.   And then you say, I could have artificially cranked up the

15   friction so that I could have flooded it above the roof, right?

16   A.   Correct, if you have enough water.

17   Q.   So you can turn those knobs up and down and have a real

18   effect on how much water you get in the class area.

19   A.   Not that much.  It's -- if you -- you know, if you go up

20   beyond reasonable values, it's going to flood -- it could flood

21   them over the roof, sure.  But those are consistent values, what

22   I've used.

23   Q.   But you agree if you turn those numbers up, you're going to

24   get higher water levels in the class area.

25   A.   Slightly, yes.

1   Q.   But we don't know just how much because you did not, in

2   your analysis, show what the results would have been had you

3   used slightly higher Manning's coefficients, right?

4   A.   Right.

5   Q.   So the jury's not going to have the benefit of looking at

6   what the flooding would have been if you had used the commonly

7   used value of .04 to .05 for the channel, right?

8   A.   This is a value I use all the time.

9   Q.   I understand that but --

10  A.   Okay.  I was mistaken when I was referring to them in the

11  testimony.

12  Q.   But what -- you haven't done the work that allows the jury

13  to look at how sensitive your modeling might or might not be if

14  you had used higher Manning's coefficients, right?

15  A.   Correct.

16  Q.   You didn't show that?

17  A.   No.  It's part of the calibration I did of the friction

18  values.

19  Q.   And you said on direct that a model was sort of like a

20  black box, right?

21  A.   Right.

22  Q.   And the jury can't look inside a black box, can it?

23  A.   No.  They have to trust the modeler.

24  Q.   Dr. Ross, on your direct examination you talked a little

25  bit about peak flow, and I think you were referring to a U.S.

1   Geological Survey gauge at Highway 90, right?

2   A.   Correct.

3   Q.   And you said that that had a calculated peak flow during

4   this event of how much?

5   A.   Well, there was two flows, and I don't remember them

6   specifically, but there was a daily total -- a daily maximum and

7   a daily average, and they were in the neighborhood of -- one was

8   28,000 or something like that.

9   Q.   Okay.  So that Highway 90 gauge --

10  A.   Correct.

11  Q.   -- had actual data that indicated 28,000 cubic feet per

12  second?

13  A.   I'd have to go back to my report to look at it.  My

14  recollection is not as good as it used to be.

15  Q.   Would you like to have your report to look at, Dr. Ross?

16  A.   Sure.  I'd like to have the USGS record.

17          **MR. NELSON:**  May I approach, Your Honor?

18          **THE COURT:**  Yes, sir.

19          One second, Mr. Nelson.

20          ██████████, does that work?  Is it working?

21          **THE JUROR:**  Yes.  Much better.  Thank you.

22          **THE COURT:**  Okay.  Go ahead.

23          **MR. NELSON:**  Thank you.

24  **BY MR. NELSON:**

25  Q.   Have you had a chance to find the figure, Dr. Ross?

1  A.   So the figure I have is the calibration figure, which

2  doesn't tell you too much about the -- it's very difficult to

3  read, but it's -- it looks like it's on the order of 28,000 CFS,

4  from the figure close to 3,000.  30,000, sorry.  Yes.

5  Q.   So your model showed what as the peak flow?

6  A.   So I don't have the model results here that you can read

7  very well.  They're in these figures.  They're hard to read, but

8  you can read them closely.  I mean, you can read them

9  approximately.

10  Q.   Well, did you say on direct examination, Dr. Ross, that one

11  of the things that you felt really good about on your model is

12  that --

13  A.   It was.

14  Q.   -- that your model matched right up with the peak flow at

15  the Highway 90 gauge?

16  A.   Correct.

17  Q.   But you can't remember now what either of those figures

18  was?

19  A.   It was either the peak or the daily average.  I can't

20  remember which one of those two it was.  But whatever the model

21  had, we had the same in the USGS flow record at the time they

22  corrected it.

23  Q.   So you don't remember the number, but you do believe that

24  whatever your model showed for peak flow matched peak flow or

25  perhaps peak stage.  Is that what you're saying?

1   A.   Correct.  Correct.

2   Q.   And --

3   A.   And they might have revised it at this point.  They do that

4   from time to time.  But they revised it at the time we were

5   calibrating.

6   Q.   And at the time you were calibrating, your model showed

7   about 28,000 cubic feet per second peak flow?

8   A.   I can't remember, counselor.  I'd have to look at it in

9   detail.  I'd have to go to the model and get the detail number.

10  I mean, I can look at it approximately in this figure.

11  Q.   All right.  You have your evidentiary hearing transcript up

12  there.  We'll try to help you out with that.  Would you take a

13  look at 229, please.

14  A.   Okay.

15  Q.   This is on line 11, and this is a question from your

16  lawyer, Mr. Marshall, okay?

17  A.   On page 229.

18  Q.   Right, 229, line 11.  Now, does that refresh your

19  recollection of what your model indicated --

20  A.   Yeah, it is.

21  Q.   -- the peak flow --

22  A.   Yeah, that's my recollection, 28,000.

23  Q.   Okay.  So your model predicted a peak flow at the Highway

24  90 --

25  A.   Correct.

1  Q.   USGS gauge site of 28,000 cubic feet per second, right?

2  A.   According to my testimony, that's correct, and my

3  recollection at the time, correct.

4  Q.   Do you have any reason to believe, Dr. Ross, that when you

5  testified in 2016 in this Court that the peak flow in your model

6  at the Highway 90 gauge was 28,000 cubic feet per second, that

7  was not right?

8  A.   I have no -- I believe that would have been right, yes,

9  sir.It --But numbers are hard to remember.  You're asking for

10 particular numbers, but, yes.

11 Q.   But you did your best to give a truthful answer at the

12 evidentiary hearing, right?

13 A.   Correct.

14 Q.   Thank you.

15 A.   Okay.  Now, you have to also remember this might have been

16 peak flow and not daily average, because the USGS reports daily

17 average.

18 Q.   Well, in fact, what you testified to was, We predicted that

19 the peak flow was 28,000 cubic feet --

20 A.   Correct.

21 Q.   -- per second.

22 A.   Correct.

23 Q.   That's all I'm asking, what your model predicted.

24 A.   Right.

25 Q.   And your model predicted a peak flow at the Highway 90

1    gauge of 28,000 cubic feet per second.

2    A.    To the best of my recollection, which would -- you know,

3    it's a number.

4    Q.    What would you have done if your model prediction of peak

5    flow at the Highway 90 gauge was off by 25 percent, high or low?

6    A.    Have to look at why that occurred.  But since we calibrated

7    it, I wouldn't -- I wouldn't have grounds to just necessarily

8    change it because one event was different.

9    Q.    But that --

10   A.    Okay.  So that's why you calibrate.  Any particular event

11   may not be directly on, but you have to realize a USGS flow

12   record is also an estimate.  And they're particularly

13   problematic with high estimates because they don't go out there

14   and gauge high flows.  So when they give you a high flow, they

15   report 10 to 15 percent error possible.

16   Q.    All right.  So maybe calibrating the peak flow at the

17   Highway 90 gauge was not such a great calibration tool.  Is that

18   what you're --

19   A.    No, it was.  When we looked at the revised flow estimate

20   from USGS, it was very much in line with their flow estimate,

21   whatever the number was, which I believe was 28,000 CFS.

22   Q.    Okay.  So you do believe that calibrating the peak flow at

23   the Highway 90 gauge is a valid tool.

24   A.    Yes, I do.

25   Q.    And so if it is a good validation tool, would you be

1   concerned if your peak flow number was off, high or low, by

2   25 percent?

3   A.   No, I would be concerned if my volume was off considerably.

4   But, you know, the peak flow plus or minus a taller amount is

5   normal in modeling.

6   Q.   Okay.  So volume is maybe the better indicator than peak

7   flow?

8   A.   Yeah, because you're getting -- yes, sir.  You're getting

9   the volume of runoff from a runoff event.

10  Q.   Okay, Dr. Ross.  You were retained in this case in the fall

11  of 2014, right?

12  A.   Correct.

13  Q.   And your assignment was to evaluate whether or not the dam

14  breach at the Kingsfield Road structure caused all of the

15  flooding in the class area, right?

16  A.   I was charged with evaluating whether the dam failure

17  caused the flooding in the Kingsfield Road -- I mean, in the

18  Bristol Park and Ashbury Hills neighborhoods.

19  Q.   And at the time of your retention in the fall of 2014, were

20  there any limitations placed on what you could or couldn't do to

21  develop your opinions?

22  A.   There's always limitations.  No, they didn't give me any

23  financial limitations, but they didn't also want me to be still

24  working on it ten years later.

25  Q.   So you had a deadline.

1   A.   Yes.

2   Q.   Okay.  But other than a deadline, did anybody tell you, You

3   can do this but not that, I don't want you to do this?

4   A.   No.  They said, Do what you need to do to make your

5   determination.

6   Q.   So it was left up to you to decide the best way to answer

7   the question posed in your assignment?

8   A.   Correct.

9   Q.   And to do your work in this case -- I think you described

10  this on your direct examination -- you collected a lot of data,

11  right?

12  A.   Yes, sir.

13  Q.   You had topographical data for this specific basin, right?

14  A.   Yes, sir.

15  Q.   You had precipitation data for this specific storm, right?

16  A.   Correct.

17  Q.   You visited the site, right?

18  A.   Correct.

19  Q.   And Dr. Carrier was there at the site with you, wasn't he?

20  A.   He certainly was.

21  Q.   And when the two of you were there, you discussed the

22  hydrologic modeling that could be done, right?

23  A.   Correct.

24  Q.   And you had a survey crew there from a firm called

25  Rebol-Battle, and they could shoot any elevation that you

1  needed, right?

2  A.  No, sir.  They weren't even available.  So we got them to

3  get some critical survey information, but they were pretty busy

4  at the time.

5  Q.  All right.  Let's take a look at the evidentiary hearing

6  transcript at page 256, please.  Again, I'm going to be at lines

7  6 to 14, Dr. Ross.

8  A.  And they could shoot elevations for us, yes.

9  Q.  Well -- well, the question was, And you had a survey crew

10 there from Rebol-Battle survey company, and they could shoot

11 elevations for you, right?  Answer, Correct.

12 A.  Correct.

13 Q.  Next question:  So you could get any sort of survey

14 information you needed, including, like, the dimensions of the

15 dam and all of the -- anything you needed upstream and

16 downstream of the dam from that surveying crew, right?

17 A.  Correct.

18 Q.  What did you answer?

19 A.  Yes.

20 Q.  So you had a crew there.  You could have gotten data that

21 you thought you needed.

22 A.  I got all the data I felt I needed, Mr. Nelson.

23 Q.  But you didn't get any data about the size of the dam

24 breach that day from the survey crew, did you?

25 A.  No, I didn't.

1    Q.    Okay.  Now, we -- I think may have touched on this maybe in

2    the direct examination.  You're aware of models that can be used

3    for a specific dam failure, right?

4    A.    Correct.

5    Q.    And in fact, United States Army Corps of Engineers has a

6    model called Dam Break.

7    A.    Correct.

8    Q.    And you had access to that Army Corps of Engineers dam

9    break model during this assignment, right?

10   A.    I certainly did.

11   Q.    And in fact, you and Dr. Carrier actually discussed

12   performing a dam break model for this case, didn't you?

13   A.    We certainly did.

14   Q.    But you did not actually run the dam break model, did you?

15   A.    No, I did not.

16   Q.    In other words, you never ruled in that a dam failure such

17   as occurred on the night of April 29th and 30th could actually

18   cause the flooding by running a model, with all the data that

19   you had available to you to see whether the neighborhoods would

20   flood when that dam breached, right?

21   A.    If we had such a model to run the dynamic way that comes to

22   that dam and the breach of the opening of the dam, I would have

23   run that -- such a model.  The dam break model was not suitable

24   for this analysis.  The dam break model uses a static volume

25   upstream of it, which was the 70 acre-feet.

1          I can dump all that 70 acre-feet in a time step and

2    run it down the model and it doesn't flood to the level that was

3    observed there.  So it's not the 70 acre-feet that's causing the

4    flood.  It's much larger volume.  The dynamic storage is coming

5    to the dam, and there's not a model that does that.

6    Q.   Dr. Ross, are you saying that the Army -- United States

7    Army Corps of Engineers would be unable to run its dam break

8    model for a dam that's holding back a river that has water

9    running down into a reservoir?  Is that what you're saying,

10   Dr. Ross?

11   A.   You would have to run a fully unsteady sort of model

12   analysis upstream of that dam with an evolving section, which is

13   not the dam break model.  This would have been code that we

14   would have to write and we would have to get peer reviewed, and

15   we would be ten years from now getting an answer.

16   Q.   But you're not saying that the Army Corps of Engineers can

17   only run the dam break model if there's a dam on a pond with no

18   water coming into it?

19   A.   No, Counselor.

20   Q.   You're not saying that?

21   A.   I'm not saying that.

22   Q.   So obviously, the model can be used for a dam break where

23   you have a dynamic flow of water coming, for example, from a

24   river.  Right, Dr. Ross?

25   A.   No.  No, that's not exactly it.  The dam break model does

1    not handle dynamic flows to the -- to a reservoir.  It assumes a

2    large reservoir and you put a pipe in it.  You put a flow into

3    it that's unaffected by the dam.  That's your inflow.  That's

4    not the way this system worked.

5           Now, if it was a thousand-acre reservoir, it would

6    have been appropriate to run a dam break model, but not a

7    70-acre reservoir affected by runoff from a series of ponds that

8    were all overflowing.  I could not tell you how they were

9    overflowing at the time and the sequence they came in, but that

10   dynamic water is going down to the dam, and that model would not

11   handle that.

12   Q.   When you've testified about this in the past, have you

13   cited to any guidance by the United States Corps of Army

14   Engineers or any other source that says you can't use the dam

15   break model where you have water flowing into an impoundment?

16   A.   I teach this subject.  I know about the models.  Okay?

17   This model was not appropriate.  If I want to write code to it,

18   I could do that; but we would be in a peer-review setting.  I do

19   that from time to time.  I've written code for HSPF.  But it has

20   to go through a rigorous peer review.

21   Q.   Okay.  But you're not, even today, pointing to any actual

22   guidance from the Army Corps of Engineers that says you can't

23   use --

24   A.   No.

25   Q.   -- the model to do that, right?

1   A.   No.

2   Q.   Right?

3   A.   Right.

4   Q.   Okay.  Dr. Ross, what is your hourly rate that you're

5   charging for your work on this matter?

6   A.   $265 an hour.

7   Q.   Okay.  On direct I believe you testified that you have been

8   paid a total of $130,000.  Do you remember that?

9   A.   Right.  I have staff that work on it too.

10  Q.   I understand that.  But you said paid $130,000, right?

11  A.   Right.

12  Q.   And that there had been 1600 hours of work?

13  A.   Something in that neighborhood.

14  Q.   And I did the calculations.  So 1600 hours of work for

15  $130,000 is an average hourly rate of $81.25, right?

16  A.   Right.  It's a lot cheaper to use graduate students and

17  staff to do the model.  And I work with them.  Saves the client

18  a lot of money.

19  Q.   So in terms of the amount of time you personally spent on

20  this, it was dwarfed by the amount of graduate student time; is

21  that fair?

22  A.   I don't know.  I haven't looked at the differences -- you

23  know, the distribution.  There are other expenses on this too.

24  Q.   There are also expenses on the 130,000?

25  A.   Some -- some expenses yes, sir.

Q.   So our 81.25 --

A.   And it might be 138,000.  I don't know what the exact

number is, but it's over 130,000.

          **MR. NELSON:**  Thank you very much for your time,

Dr. Ross.

          **THE COURT:**  Thank you.  Mr. Marshall.

                    **REDIRECT EXAMINATION**

**BY MR. MARSHALL:**

Q.   Dr. Ross, has this been a long day?

A.   It has.  It's okay.

          **MR. NELSON:**  I have no further questions of this

witness.

          **THE COURT:**  Okay.

          **MR. MARSHALL:**  And at this time, Plaintiff would rest.

          **THE COURT:**  All right.  Very good.  Thank you,

Mr. Marshall.

          Dr. Ross, you may step down.

          **THE WITNESS:**  Thank you.

     *(Witness excused.)*

          **THE COURT:**  All right, ladies and gentlemen.  You've

now heard all of the evidence that the plaintiffs have to

present in their case in chief.  The next phase in the trial

will be the defendant's case; but before we get started with

that, I need to speak to the attorneys for just a moment here at

the bench, and then we'll get started.

1          If you would approach, please.

2      *(Following conference held at the bench.)*

3          **THE COURT:**  All right.  As I indicated, I need to ask

4  before we proceed if you have any motions.

5          **MR. NELSON:**  Yes.  We do want to make a Rule 50 motion

6  and ask for judgment as a matter of law.

7          **THE COURT:**  On all counts?

8          **MR. NELSON:**  On all counts.

9          **THE COURT:**  I will take that under advisement and hear

10  argument from you just a little bit after you get through -- I

11  don't know how many witnesses you can get through in the next

12  hour and six minutes, but we're going to proceed.  You have a

13  witness here?

14          **MR. NELSON:**  We have a witness ready, Your Honor.

15          **THE COURT:**  Let's do that, then.  Thank you.

16          **MR. NELSON:**  Thank you.

17      *(End of bench conference.)*

18          **THE COURT:**  All right, ladies and gentlemen.  I've

19  noted that you have paid very careful attention as the

20  plaintiffs presented their case in chief to you.  I'm going to

21  ask if you would please continue with that careful attention as

22  the defendant, International Paper, presents its case to you.

23          Mr. Nelson, you may call your first witness.

24          **MR. NELSON:**  Thank you, Your Honor.  We would like to

25  call Mr. Stephen Wistar.

1                **STEPHEN WISTAR, DEFENSE WITNESS, DULY SWORN**

2             **THE COURT:**  And, ladies and gentlemen, the instruction

3     I've given to you now on a couple of occasions regarding expert

4     witnesses will apply equally in the defendant's case with its

5     expert witnesses.

6             **DEPUTY CLERK:**  Be seated.

7             **THE WITNESS:**  Thank you.

8             **DEPUTY CLERK:**  Please state your full name and spell

9     your last name for the record.

10            **THE WITNESS:**  Stephen M. Wistar.  Stephen has a P-H,

11    and Wistar is W-I-S-T-A-R.

12            **THE COURT:**  All right.  Mr. Nelson, when you're ready.

13            **MR. NELSON:**  Thank you, Your Honor.

14                          **DIRECT EXAMINATION**

15    BY MR. NELSON:

16    Q.   Good afternoon, Mr. Wistar.

17    A.   Good afternoon.

18    Q.   Would you please tell us a little bit about your

19    educational background.

20    A.   Well, I was a weather nut from a very young age.  And I

21    grew up in the Philadelphia area, where we had the Franklin

22    Institute, named after Ben Franklin.  And so in sixth grade I

23    began to attend a club there called the Future Meteorologists of

24    America and went there every Saturday from sixth grade through

25    12th grade, so learned a lot about the weather.

1              Then went on to attend Penn State University, and

2    graduated from Penn State in 1974 with a bachelor's of science

3    degree in meteorology.  Penn State is one of the top meteorology

4    programs in the United States then and now.

5    Q.   And what's your line of work?  I could probably guess, but

6    what is it?

7    A.   I'm a meteorologist.

8    Q.   And how long have you been a meteorologist?

9    A.   Technically since I graduated, 1974.  We become a

10   meteorologist once we get our degree.

11   Q.   Thank you.  After you got your degree, where did you go to

12   work, Mr. Wistar?

13   A.   I had two short-term jobs after college.  My first one was

14   doing satellite meteorology research at a Government agency in

15   the Washington DC area that at that time was called the National

16   Environmental Satellite Service.  We were involved in using --

17   it was the very beginning of when satellite pictures of clouds

18   were being put into motion, so we actually watched movies and

19   tried to figure out what the weather was doing.  And then --

20   that was less than a year.

21              And then I moved on to Alaska, and I actually worked

22   at the University of Alaska in Fairbanks and did research using

23   satellite pictures to get some understandings of the weather up

24   in Alaska.

25   Q.   And where did you go to work after that?

1    A.    After that I came back to my home state of Pennsylvania and

2    started working at AccuWeather, which is based and headquartered

3    in State College, Pennsylvania.

4    Q.    And are you still working at AccuWeather today?

5    A.    Yes.  41 years later I am still there.

6    Q.    And can you tell us a little bit about what AccuWeather is

7    and what it does?

8    A.    AccuWeather is one of world's largest private weather

9    services, so we're nothing to do with the Government, and we're

10   a private company.  We provide every possible weather

11   information you could imagine, past, present, and future.

12         We're best known over the years for our work with our

13   media clients, radio and television stations, also newspapers,

14   and I did a lot of that.  And in more recent years we're well

15   known for AccuWeather.com, our website that has all the local

16   forecasts on it.

17         And certainly in the last ten years or so, our

18   AccuWeather app is on smart phones all around the world.  We

19   have a forecast database that has about 2 million sites on the

20   planet.  So wherever you are, the GPS will tune you in to the

21   local forecast from AccuWeather, all coming from Pennsylvania.

22   Q.    How would you describe your work over the years at

23   AccuWeather, Mr. Wistar?

24   A.    Well, for all 41 years I've been a forecaster, and I still

25   to this day work a little bit of forecasting for our radio and

1    television clients.  I still go on the radio, do broadcasts from

2    time to time.

3            But in the last 22 years, my emphasis has shifted over

4    to our forensic department.  So instead of predicting the future

5    weather, we use the same expertise to look back in time to

6    reconstruct weather at a particular time and place that's

7    already happened.

8    Q.   And is that known as forensic meteorology?

9    A.   Yes.

10   Q.   Are you a certified consulting meteorologist?

11   A.   I am.

12   Q.   And can you explain what that is?

13   A.   A CCM is a designation given by our primary professional

14   body, which is the American Meteorological Society.  It's a

15   rigorous two-year process to become a certified consulting

16   meteorologist, involving written exams, oral exams, in which you

17   have to demonstrate your knowledge about all aspects of how the

18   weather works, as well as professional ethics and things like

19   that.  And so I was designated a CCM in the year 2000.

20   Q.   How many CCMs are there, roughly, in the United States?

21   A.   There really aren't that many.  It is a rigorous process

22   and most people don't want to go through it.  But there's

23   roughly, I would estimate, 300 or so active CCMs right now

24   practicing in the U.S.

25   Q.   And are you the only CCM at AccuWeather?

1  A.  Almost.  We have over a hundred meteorologists; and as of

2  last year, two of us were two CCMs.  We just got two more, so

3  we're up to four now.  But it's a very minority of the staff.

4  Q.  Does your work at AccuWeather involve projects throughout

5  the United States?

6  A.  Yes, and occasionally overseas as well.  But most of our

7  work is in the U.S. for our forensic work.  Our AccuWeather

8  forecasting is absolutely worldwide, but our forensic work turns

9  out to be mostly within the U.S.

10  Q.  And is this matter your first occasion to forensically

11  study weather events in the Gulf region?

12  A.  Not at all.  I've done many times before.

13        **MR. NELSON:**  Your Honor, at this time we would like to

14  tender Mr. Wistar as an expert in the timing, amount, and rarity

15  of rainfall.

16        **THE COURT:**  Any voir dire?

17        **MR. KAUFFMAN:**  Just a little bit, Your Honor.

18        **THE COURT:**  Okay.  Mr. Kauffman.

19  **BY MR. KAUFFMAN:**

20  Q.  Mr. Wistar, your analysis or forensic analysis is limited

21  to radar analysis, correct?

22  A.  No.

23  Q.  The amount that is not limited to radar in this case was

24  performed by another company, correct?

25  A.  No.

1   Q.   Okay.  You did not use OneRain?

2   A.   We did.

3   Q.   And OneRain calibrated your results, correct?

4   A.   OneRain didn't calibrate our results.  It was another

5   opinion.  So we came up with our own results, and then we also

6   hired OneRain to provide their input.

7   Q.   But OneRain performed calculations for you, correct?

8   A.   We did look at the results of their work.  So they did

9   perform calculations to come up with their results, but we

10  already had results before we used OneRain.

11  Q.   The results that you had before were based on radar,

12  correct?

13  A.   Not just radar.  Radar and rain gauge data.

14  Q.   How many rain gauges --

15  A.   Together.

16  Q.   -- in the study area?

17  A.   How many rain gauges did we look at?

18  Q.   In the study area?

19  A.   I looked at about 8 or 10 rain gauges, and a fair number of

20  them had incomplete information.  So the number of actual rain

21  gauges we were able to use shrunk down to a smaller number.

22       **MR. NELSON:**  Your Honor, may we approach?

23       **THE COURT:**  Yes.

24       (Following conference held at the bench.)

25       **MR. NELSON:**  Your Honor, this does not appear to be

1   headed toward qualification.  It seems like it's Daubert

2   challenges, which were denied.

3           **THE COURT:**  It does seem to go more --

4           **MR. KAUFFMAN:**  Your Honor, this --

5           **THE COURT:**  Excuse me.  It does seem to go more to

6   weight than admissibility.

7           **MR. KAUFFMAN:**  This is -- my issue is, is that at the

8   evidentiary hearing, Your Honor, they tendered the same witness,

9   and they asked for it to be -- basically said the same words

10  that Mr. Nelson just said, but said, Based on radar.  We didn't

11  object to that, Your Honor.  But now they're saying just based

12  on timing, amount, and the rarity of rainfall.

13          That's my issue is that when he was tendered in this

14  case before, he was tendered just based on rainfall -- based on

15  radar.  Now, they're saying it was generally rainfall.

16          **THE COURT:**  What does his report cover?

17          **MR. NELSON:**  It covers radar and rain gauge.

18          **MR. KAUFFMAN:**  And my issue, Your Honor -- and I just

19  am stating this for the record.  His report has radar analysis

20  in it.  There's another report, which was the subject of our

21  motion, which was based off of a company called OneRain.  He did

22  not perform that analysis.  I won't get into it, but it goes to

23  weight.  But for right now I want to preserve the record that

24  for his analysis, he is not qualified as an expert to comment on

25  the OneRain report, because he did not perform that analysis.

1    Radar, if he wants to talk about radar --

2              **THE COURT:**  This is what -- did you try to raise this

3    objection as a motion in limine?

4              **MR. KAUFFMAN:**  We did try to raise it --

5              **THE COURT:**  And I denied it.

6              **MR. KAUFFMAN:**  Yes, you did, Your Honor.

7              **THE COURT:**  And it's denied again.  He's qualified.

8         *(End of bench conference.)*

9              **THE COURT:**  Mr. Nelson, Mr. Wistar is designated as

10   requested.  You may proceed.

11             **MR. NELSON:**  Thank you, Your Honor.

12   **BY MR. NELSON:**

13   Q.   Mr. Wistar, when were you first contacted generally for

14   this case?

15   A.    In April of 2015.

16   Q.   And what were you asked to do?

17   A.    We were asked to reconstruct the storm that occurred, the

18   heavy rainfall event that occurred on April 29th and 30th, 2014,

19   in the area of the Elevenmile Creek drainage basin.

20             **MR. NELSON:**  Can we pull up the image of the drainage

21   basin, please?

22             **THE COURT:**  And I'm sorry.  What are you pulling up?

23             **MR. NELSON:**  This is a satellite image of the drainage

24   basin, just so -- for orientation for the area that Mr. Wistar

25   studied, Your Honor.

1        **THE COURT:**  Is it marked?

2        **MR. NELSON:**  We have marked it in the past, but I can

3  just do this as a demonstrative.  I think it'll be faster --

4        **THE COURT:**  All right.

5     *(Attorneys conferring.)*

6        **THE COURT:**  Yes, please do.  Mr. Nelson, please make

7  sure that Mr. Kauffman sees what you're going to be putting up

8  before you put it up.

9        **MR. NELSON:**  Yes, Your Honor.

10        **THE COURT:**  Thank you.  Are you seeking to admit this

11  or just --

12        **MR. NELSON:**  No, just publish, Your Honor.

13        **MR. MARSHALL:**  I said no objection.

14        **MR. NELSON:**  You said it to me.

15        **MR. MARSHALL:**  Oh, no objection.

16        **THE COURT:**  Okay, thank you.  You may publish it.

17  **BY MR. NELSON:**

18  Q.   Just generally, Ms. Wistar -- and I know you had not seen

19  this before, but does the shaded area reflect the drainage basin

20  that you studied?

21  A.   Yes.

22  Q.   What was your approach to the assignment in this case?

23  A.   Well, once we were given the dates and the area we're

24  looking at, my approach in all of the forensic reconstructions

25  is first to step back and look at the big picture.  So I wanted

1   to see essentially a weather map of the entire country to see

2   where the highs and lows were, where the storm systems were.

3   Because I've spent decades watching these cross the nation, I

4   have a feeling for what each one does.  So I wanted to know what

5   essentially we're dealing with here.

6           So there's a product called Daily Weather Maps that's

7   called by the National Oceanic and Atmospheric Administration.

8   It's a good snapshot, just to see where all the systems were.

9   So my first step was to look at the big picture like that.

10  Q.   And we'll get into the details in a moment, but can you

11  tell us in general what conclusions you reached after analyzing

12  the data available?

13  A.   So what I saw was there was a strong storm system,

14  low-pressure area centered in the Midwest U.S.  It had a very

15  pronounced cold front extending southward into the -- at least

16  in the early part of the period, west of the area we're

17  concerned about into the Gulf of Mexico.  And ahead of that

18  front was a very long fetch of southerly flow of tropical air

19  coming up out of the western Caribbean, up across the Gulf of

20  Mexico, and into the Florida panhandle.

21          So that was the initial set-up.  We have this front

22  approaching from the west, and we have a really -- we might call

23  it a very -- a very moist, juicy atmosphere in place in this

24  area.

25  Q.   Did you reach any conclusions about the magnitude of this

1  storm event?

2  A.   Well, initially when I started gathering the data, it was

3  obvious it was just an incredible, extreme rainfall event

4  that -- I mean, one of the first things I came across was that

5  it was the all-time record rainfall at the Pensacola airport.

6  Now, I know the airport's not in the drainage basin, but it's in

7  the vicinity.  So right away it essentially raised my eyebrows

8  that we were looking at something very, very unusual here.

9  Q.   And can you tell us, Mr. Wistar, what the next steps were

10 that you took to gather more information to study this event?

11 A.   The next steps were to gather all the available National

12 Weather Service Doppler Radar data that we could obtain and also

13 start digging into all the detailed rain gauge data, all the

14 different kinds of sites that report rainfall.

15        Early in the process, I realized that a number of them

16 failed during the storm, which is a tribute to the magnitude of

17 the storm but also presents some challenges in reconstruction

18 because some of the rainfall data was incomplete.

19 Q.   Did you also look into information regarding the status of

20 the area prior to April 29th?

21 A.   Yes.  Whenever we're asked to reconstruct a flooding

22 situation, and that's something I've done many times over the

23 years, we always want to look at the -- what we call the

24 antecedent conditions or what happened before.  It can be very

25 different, the reaction from heavy rain, if it had been a

1    drought before and there had not been much rain, as opposed to

2    if there'd already been a lot of rain saturating the ground

3    before the storm we're looking at.

4            So in that process, I learned that the month of April

5    2014 was extremely wet before this event happened on the last

6    two days.  And normally in Escambia County, average is about

7    4 inches of rain per April -- for the month of April.  And

8    that's average over many years.  There had already been between

9    8 and 12 inches of rain in this area before April 29th, before

10   this event arrived, so....

11           We also looked at -- there's a product called a Palmer

12   Drought Severity Index which shows nine categories of soil

13   moisture, ranging from very, very dry to very, very wet.  And so

14   we had that index for about two days before this event, and it

15   showed it second to highest category of wetness.  So it wasn't

16   the most extreme, but it was very, very wet soil, which you

17   would expect from the heavy rain that had already occurred that

18   month.

19   Q.   So April of 2014, even before we get to the 29th, was a

20   much wetter than usual month?

21   A.   Yes.

22   Q.   And why does it matter, if you're studying a storm event on

23   the 29th and 30th, that there had been antecedent earlier

24   rainfall during April?

25   A.   The amount of flooding that results from such an intense

1  rain is going to be somewhat affected by how wet the ground is,

2  the soil is, how high the water table is, things like that,

3  beforehand.  And I'm not a hydrologist, and I can't go into the

4  details you just heard; but nevertheless, it's within our

5  expertise, when we're doing forecasting for our clients at

6  AccuWeather, and we're predicting heavy rain to come, that we

7  have some understanding of what has happened before.  So that's

8  important.

9  Q.   So I think one of the sources of data that you indicated

10 you looked at was radar data; is that right?

11 A.   Yes.  That was very key to the reconstruction.

12 Q.   And what type of radar data did you look at?

13 A.   Well, the state of the art is the National Weather

14 Service -- it's called NEXRAD, which is just short for Next

15 Radar.  That's a term that was applied back in the '80s when it

16 first came on, but we more often hear Doppler radar.  It's the

17 same radar you'll see on television or see on weather websites.

18        And so there's a couple different products, though,

19 that are very useful.  The first one is called reflectivity, and

20 it is simply the radar site sending energy out into the

21 atmosphere, and then that energy bounces back off any

22 precipitation in the atmosphere.  And the radar site's able to

23 measure how much energy comes back.

24        So if there's no precipitation, essentially nothing

25 comes back.  If there's a light rain, a little bit will come

1    back.  If there's heavy rain, then more will come back.  It

2    depends essentially how much water is in the atmosphere, you

3    know, in the precipitation.  So reflectivity was very important.

4    That's very basic data that comes from the Doppler radar.

5            Also in this project -- I think this is what you're

6    asking me to go into now.  Also we -- the radar has the

7    wonderful ability, using its software, to tabulate the amount of

8    rain.  So by taking the intensity of rain at one time, and then

9    the intensity of rain again minutes later, and then again

10   minutes later, it has the ability to add up all that amount of

11   rain and give us either a one-hour rainfall total or a storm

12   total for the entirety of the event.

13           And so in a case like this it was very important to

14   look not only at what was happening at the particular moment but

15   how much it was adding up over time.

16           **MR. NELSON:**  Your Honor, permission to approach the

17   witness.

18           **THE COURT:**  Yes, sir.

19   **BY MR. NELSON:**

20   Q.   Mr. Wistar, I have handed you what we've marked as IP

21   Exhibit 63B, which contains information that was attached to

22   your report in this case.  You're familiar with this?

23   A.   Yes, I am.

24           **MR. NELSON:**  I move to admit, Your Honor.

25           **THE COURT:**  Okay.

1          **MR. KAUFFMAN:**  No objection.

2          **THE COURT:**  And the number?

3          **MR. NELSON:**  We put 63B.

4          **THE COURT:**  All right.  Defendant 63B is admitted.

5          *(DEFENSE EXHIBIT 63B:  Received in evidence.)*

6     **BY MR. NELSON:**

7     Q.   Okay.  Mr. Wistar, could you just describe -- and maybe we

8     can go to the first page, it might be more effective that

9     way -- what these data are?

10    A.   Okay.  So I'll start with the first map here.  Okay.  So

11    what we're looking at here, this is reflectivity data.  It says

12    that in the lower right.  It says National Reflectivity Mosaic.

13    What "mosaic" means is the weather service has a program to

14    combine image -- combine the data from different radars to make

15    an overall picture of the area.

16         And the purpose of this series of radars is to look at

17    an area larger than we're concerned about with the drainage

18    basin to see the evolution of the weather.  This is how -- as a

19    meteorologist we want to reconstruct what happened here.  And

20    these mosaics are available every five minutes; but so that we

21    don't have way too many to look at, I've created one for the top

22    of each hour during the event so we can essentially step through

23    here.

24         Now, what we're seeing here on the colors, it's

25    essentially the same colors that are usually shown on television

or you'll see on the internet.  There's a scale down in the lower right of the intensity; but just to simplify, the blue colors -- well, first of all -- let's see.  I don't have a thing to point, right?  Or I can draw on it?

            **THE COURT:**  You can draw there on your monitor, and it will --

            **THE WITNESS:**  Right.  And then you can see it?

            **THE COURT:**  Yes.

            **THE WITNESS:**  Okay.  So, for example, I'm going to just draw a little circle out here.  There's no precipitation there.  So that -- that's the background color.  The orangey-red lines on there are major highways.  And then as you go west, we get into where the precipitation is.

            So the blue color is very light rain.  The green color is light rain but not -- you know, it's a little heavier than very light.  And as you start progressing, you get into the yellow colors, which is moderate rain.  And there actually is a definition of moderate rain, but for our purposes it's just heavier than light but lighter than heavy, essentially.  And then, of course, the reds, the bright red area, is the various heavy -- the very heaviest rain of all.  Occasionally you'll even go almost to purple, which has hail, but I don't think there's much of that in this case.  So essentially our red areas on here are the very heavy rain.

            And now do you want me to step through and sort of

1  tell the story of the event?

2  Q.   If you would, Mr. Wistar.  Thank you.

3  A.   Okay.  So this is -- this is the very first wave of rain

4  coming in.  The date and time is at the top, around 2:00 a.m. on

5  April 29th.  And what is happening here, our main cold front is

6  still well to the west, not on this screen.  But there's a

7  squall line, a line of thunderstorms that's running out ahead of

8  the cold front, and it's very easily seen here as this

9  northwest -- northwest to southwest band of precipitation.

10        Now, I'm going to draw on here roughly where our study

11  area is, and -- and this is very rough on this map, but roughly

12  here.  It doesn't even respond to where I'm pointing at exactly.

13  But that is roughly the study area.  A little bit to the lower

14  right of that is Pensacola itself, and you can see -- farther to

15  the west you can see Mobile Bay, and so -- and then farther to

16  the east is just deeper into the Florida panhandle.  So we're

17  basically looking at a couple of different states here.

18        One other thing I can also point out.  This mosaic is

19  put together from two National Weather Service Doppler Radars

20  that are bracketing our site here.  The first one is Eglin Air

21  Force Base, and I am going to circle this little spot here off

22  to the east.  And then to the west is the Mobile, Alabama,

23  Doppler.  And it doesn't land right where I think I'm looking

24  at.  But anyway, those are the two radar sites, where they are

25  located.  And so essentially what we're now going to look at is

1    a blending of the data from those two radar sites.

2            And so this is 2:00 a.m., and then at -- oh, that's

3    cool.  It stays on there.  So we have our drainage basin, and

4    it's going to -- I guess it's going to stay there for us.

5    That's really nice.  That's -- well, I think -- it's the one

6    that's closest to the center, directly under 2014 at the top.

7    Q.   Mr. Wistar, we do have the ability to undo the circles if

8    you want to --

9    A.   Oh.  I'll put on just the one we need.  Okay.  That's

10   great.  And it's hard to see this exactly.  So this is going to

11   be just about where it is.  I'm not claiming that's exactly it,

12   but --

13           So at 3:00 a.m. this line of intense storms is -- as

14   you can see, is just arriving.  And at 4:00 a.m. the heaviest

15   rain is already past.  Pretty quick moving line.  It rained

16   really hard from 3:00 to 4:00 a.m.  And then just jumping ahead

17   by 5:00 a.m., that first band of rain is moving to the

18   southeast.  By 6:00 a.m., farther.  It's out over the Gulf to

19   the south.  Very light rain lingering in the drainage basin at

20   6:00 a.m. on the 29th.

21           And then there's -- that first band continues to push

22   southeastward out of the area.  So we've skipped a bunch of

23   hours here.  There was a break.  The cold front is still

24   approaching from the west.  And so what happened in the

25   afternoon of the 29th, there's a whole rebuilding and a whole

1    new development of thunderstorms to the west of the drainage

2    basin, in Alabama and Mississippi.

3           So this is at 1:00 p.m. on the 29th, and you can see

4    there's no rain falling in our drainage basin.  The old rain's

5    off to the east, and some new storms are developing to the west

6    at 1:00 o'clock.

7           At 2:00 o'clock they're continuing to develop to the

8    west.  At 3:00 p.m. they're starting to line up a little bit,

9    but they're still to the west.  And then between 3:00 and

10   4:00 p.m., the first of many lines of thunderstorms move over

11   the basin in the afternoon of the 29th between 3 and 4.  So

12   there is a burst of rain, and then that first band moves away,

13   and it lightens up again temporarily.

14          At 5:00 p.m., it -- it's a line, but it's down to

15   the -- just to the south.  The southern part of the basin is

16   getting a little bit of heavier rain there on the 29th at

17   5:00 p.m.  And then at 6:00 p.m. a little piece breaks off to

18   the east, some new stuff developing to the west, and it's kind

19   of looking pretty chaotic at this point.

20          But then at 7:00 p.m. there's a significant growth in

21   the rainfall to the south and west of the basin.  And at this

22   point the individual thunderstorms, which are the red areas on

23   here, are moving generally from west-southwest to

24   east-northeast.  So it's already raining in the basin now, but

25   the worst is ahead.  And so at 7:00 p.m. this is what it looks

1    like.

2            Now we're going into the evening.  At 8:00 p.m., a

3    very heavy cell.  That bright red has now moved into the basin,

4    and there's other cells to the west, but there's extremely heavy

5    rain falling at this time.  And so, this is the core of the

6    event.  The heaviest rain was under way at this point.

7            At 9:00 p.m. there's still heavy rain around.  There's

8    still some red echos in there.  Some have moved off to the east.

9    There's more to the west.

10           At 10:00 p.m. there's a whole resurgence here, almost

11   like a redevelopment, you know, lying east-northeast to

12   west-southwest, right across the basin.  We're now getting into

13   what we call training of thunderstorms, just like a train on a

14   track.  And you get one storm after another following each other

15   across a particular area.

16           This is one of the most common weather scenarios for

17   getting really serious and devastating flooding in the United

18   States, is not just the lone thunderstorm that drifts by but a

19   whole parade of them.  And that's what we have going on here at

20   10:00 p.m.  There it is at 11:00 p.m.  They're all lined up.

21   There's still heavy rain back in the basin, and -- but some of

22   the heaviest has moved off to the east at this point.

23           When we get to midnight, there's actually some new

24   development to the west.  You can sort of see here we have a

25   repeating cycle.  The storms go through, they move off to the

1  east, and new ones keep forming to the west.

2          It's complicated to explain why.  It's a very rare

3  event.  The main cold front is still to the west, and it just

4  essentially is generating new storms in the very warm and humid

5  air that's blowing in from the south and running into this

6  frontal zone.

7          So here we are at midnight.  We go to 1:00 a.m.  Still

8  some very moderate to heavy rain in the area, you know,

9  significant rain piling up.  And then we go to 2:00 a.m.  More

10 of the same.

11         Now we're in the early morning hours of the 30th.

12 3:00 a.m., still impressive rainfall there and, you know,

13 yellows to reds, moderate to heavy rain.  And 4:00 a.m. we're

14 starting to see the back edge, but we're still in it.  At

15 5:00 a.m. on the morning of the 30th, now most of the heavy rain

16 has passed.  We're getting into the lighter rain.

17         6:00 a.m., the whole rain area's moved by.  The rain

18 has stopped in the drainage basin.  And you look at this and

19 say, Oh, no, it's redeveloping again to the west.  But at

20 7:00 a.m., that stuff to the west, there's not much left of it.

21 By 8:00 a.m. it disappeared.

22         And so what was happening here is the whole frontal

23 system is finally moving through.  The mechanism for reforming

24 storm after storm after storm has shifted eastward, and

25 essentially the storm is done in the drainage basin by 7:00 to

1    8:00 a.m. on the morning of the 30th.

2           So all that took place -- we saw it begin around

3    3:00 a.m. and it ended around 7:00 a.m., so the whole storm is a

4    little bit more than 24 hours.

5    Q.   Thank you, Mr. Wistar.  These graphics tells us about

6    rainfall intensity, right?

7    A.   Yes.

8    Q.   Do they tell us the volume of rainfall?

9    A.   No.  They don't tell us how much.  They just show us the

10   snapshots, where it is, you know, how hard it's raining, but

11   they don't add -- they don't give us any numbers for how much.

12   Q.   Did you also look into the volume of rainfall during this

13   storm event?

14   A.   Yes.  And so --

15          **MR. NELSON:**  Your Honor, may I approach?

16          **THE COURT:**  Yes, sir.

17          **THE WITNESS:**  I'm sorry.  Thank you.

18   **BY MR. NELSON:**

19   Q.   Mr. Wistar, can you identify the document that we've marked

20   as Exhibit 63C?

21   A.   Yes.  That is the collection of hour-by-hour images showing

22   the rainfall amounts in each hour.

23          **MR. KAUFFMAN:**  No objection.

24          **THE COURT:**  Thank you.  63C is admitted.

25          *(DEFENSE EXHIBIT 63C:  Received in evidence.)*

1          **MR. NELSON:**  Thank you, Your Honor.  May we publish?

2          **THE COURT:**  Yes.

3    BY MR. NELSON:

4    Q.   Oh, Mr. Wistar, I think you -- you have the wheel here, so

5    I think you need to click forward to publish this exhibit.

6    A.   Yes.  And if you could, take that yellow circle away.  I'm

7    going to draw a new one because this -- the map we're about to

8    see is zoomed in more on the area we really care about here, so

9    it doesn't go as far west or east on the Gulf coast as the

10   previous one.

11         So what we're seeing here -- and I guess right here

12   and now I can draw again.  This is going to be roughly the

13   drainage basin.  Not claiming to have it exactly right, but

14   that's about where it is.

15         And so what we're seeing here is from the National

16   Weather Service Doppler radar in Eglin.  So now we're not using

17   a mosaic.  This is all from the closest radar.  This is the

18   closest site to the area we care about.  And this is using the

19   software built into the system to integrate over time all of

20   that reflectivity we were looking at and come up with how much

21   rain fell across the area hour by hour.

22   Q.   And, Mr. Wistar, before we move on, are you able to maybe

23   put a dot roughly in the area within the watershed where the

24   class area is located?

25   A.   I'll try.  It's not putting it where I think it's putting

1    it, so -- what -- I should say what is on there, the dot that's

2    currently there that I had already placed on the map is the

3    northern part of the International Paper property at Muskogee

4    Road.  So it's not where the dam is that was being talked about

5    earlier.  This is up at the address that we were given in the

6    beginning of the -- I guess where you drive into the building or

7    something.

8    Q.   Okay.  We've heard before that the Kingsfield Road

9    structure is about a mile south of the facility, and the class

10   area is about two miles further south of that.

11   A.   Okay.

12   Q.   Is that consistent with your general understanding?

13   A.   Yes.  Yeah.  Okay.  So you want me to put a dot where an

14   estimation of the class --

15   Q.   If you could.  And we can do it again if you feel like you

16   don't get it in the right place.

17   A.   I'll try to adjust.

18   Q.   Okay.  Let's --

19   A.   Yeah.  I think I need to do it again.

20          The red line that cuts through the earlier circle I

21   drew is Interstate 10.  So this system puts the interstates on

22   there.

23   Q.   I'm trying to draw it, Mr. Wistar, because I think it may

24   be a little bit easier on this screen.  Do I have it in roughly

25   the right place, or should we redraw that?

1    A.    I think that's fine.  Okay.  We can move forward?

2    Q.    Please.

3    A.    Okay.  So what we're looking at now, instead of an

4    instantaneous snapshot, it's an accumulation of rain over one

5    hour.  And it's the hour ending at the time on the top, so this

6    is the hour ending about 3:00 a.m. on the 29th.  And so what

7    we're seeing here as we went back -- this is the very first line

8    that came through, and so by 3:00 a.m. it hadn't arrived yet.

9    So all the precipitation amounts are to the north and west.

10           There's a key on the right side that shows a color

11   associated with the number of inches of rain.  And so on our

12   image here, the heaviest totals we see to the -- well to the

13   north of the drainage basin are blue colored; and that, on our

14   key, matches up to between 2.5 and 3 inches of rain in one hour.

15   And so -- and then it goes down from there.

16           And so I'm just going to -- we're going to progress

17   through this like we did the other ones, but this is going to

18   show us rainfall amounts.  And so this is by 3:00 a.m.

19           Okay.  By 4:00 a.m., as we learned previous, the heavy

20   rain had moved across the area.  And so at the site of the

21   International Paper site and the homes we're looking at, we're

22   looking at an amount of generally around 2 inches of rain had

23   fallen in one hour.  And so essentially what that did, after

24   some dry weather on prior days, this got the soil totally

25   saturated again with a quick 2-inch downpour in one hour, and

1    then it moved on.

2            So by between 4:00 and 5:00 a.m., most of the rain had

3    passed to the southeast.  As we saw before, at 6:00 a.m., mostly

4    to the south.  And now we're going to skip ahead.  We're going

5    to skip that quiet period.  And so this map shows rainfall total

6    ending at 2:00 p.m. on the 29th, nothing much on the screen yet.

7    At 3:00 a.m. it's growing in from the west but it has not

8    reached the drainage basin yet --

9    Q.   I'm sorry to interrupt, Mr. Wistar, but you said 3:00 a.m.?

10   A.   Oh, yeah, 3:00 p.m.  I'm sorry.  By 3:00 p.m on the --

11   thank you -- on the afternoon of the 29th, the rain had not yet

12   reached there, the renewed second batch of rain.

13           So by 4:00 p.m., it's starting to move in.  If we look

14   at the class site, it's around a quarter inch of rain has fallen

15   in this first hour.  So just an appetizer, essentially.  Just

16   the beginning.

17           And then the next hour, as you recall, that shifted to

18   the south.  So between 4:00 and 5:00 p.m. not much happens.

19   Between 5:00 and 6:00 there's that cell that comes back up

20   again, a resurgence.  And so here we start to see on this hour a

21   significant difference across the drainage basin from north to

22   south, with not much rain in the north, but we have totals of

23   around 2 inches or so in the south, with the class site in the

24   middle.

25           Then skipping ahead, the next hour, from 6:00 to 7:00,

1    again there was not too much going on.  From 7:00 to 8:00 is

2    when we started seeing the really intense action to the west

3    starting to move in.  So we have totals that are between 3 and 4

4    inches in that purple area to the west, not in our area yet.  In

5    our area the heavier rains are just starting to move in, so by

6    8:00 p.m. we have upwards of an inch or so that has fallen.

7            Now we go ahead one more hour.  Here is where it

8    really got under way.  Again, it's a little bit heavier in the

9    south than the north.  If you look at our key to the right, we

10   can see we have rainfall -- this purple area is between 3 and

11   4 inches of rain has fallen in this hour from the neighborhood

12   that we're talking about southward.  To the north a little bit

13   less, but still 2 and a half to 3.  So this was one of the, you

14   know, really big hours in the event.

15           From 8:00 to 9:00, one more hour.  9:00 to 10:00 it's

16   basically more of the same, or anywhere from 2 inches up to

17   3 inches of rain in the area during this one hour.

18   Q.   If I could just stop you there for a moment, Mr. Wistar.

19   Were you here during Dr. Ross's testimony?

20   A.   Yes.

21   Q.   And he mentioned something to the effect of, you know,

22   rainfall before 10:00 o'clock was like a Sunday afternoon drive.

23   Did you hear that?

24   A.   I did hear that.  I was surprised to hear that, yes.

25   Q.   Do you view --

1    A.   There is a very serious and rare rain event that is nothing

2    like your run-of-the-mill Florida tropical downpours that happen

3    a lot here, but -- the difference here is this one kept going.

4    You know, the other ones, it rains hard for a while and then

5    they move on and the sun comes back out; but this training of

6    thunderstorms, this repeating development just kept piling up

7    the rain.

8    Q.   Thank you, Mr. Wistar.

9    A.   Okay.  So this is between 9:00 and 10:00.  Still very

10   fierce.  Same thing between 10:00 and 11:00.  We have totals

11   ranging from about 2 inches in the far north of the basin to

12   between 3 and 4 inches in the middle and southern part of the

13   drainage basin, with the resultant serious flooding that you

14   would expect from all of this.

15        Of course, this is part of a larger system, so this

16   tremendous flooding is occurring to the west in Baldwin County,

17   Alabama.  It's occurring to the east in Santa Rosa County,

18   Florida, and then in Escambia County, Florida.  So it's not a

19   localized event.  It's organized, you know, lasting --

20   carrying -- extending over a number of counties.

21   Q.   And, Mr. Wistar, you may have mentioned this, and if you

22   did I apologize.  But when the chart says 11:00 p.m., what time

23   interval is being shown here?

24   A.   That's the end of the hour.  So what the radar does, it

25   adds it up.  It accumulates it over a one-hour period.  So this

1    is -- the 11:00 p.m. is the ending of the hour we're showing

2    here.  So this is the rainfall from 10:00 to 11:00.

3    Q.   And the radar data don't allow us to drill down into, you

4    know, how much fell between 10:00 and 10:15 versus -- at least

5    the way this is aggregated.  Gives us an hour, right?

6    A.   It's available every hour.  Now, the tricky thing is that

7    the hour accumulation of rainfall is available every five

8    minutes.  So you can go from 10:00 to 11:00; you can go from

9    10:05 to 11:05, from 10:10 to 11:10.  But then again, we got so

10   many maps; and so you can look at different maps and try to

11   tease out how much fell in different time periods.  It's hard

12   because the radar basically only gives us a one-hour total and a

13   storm total for the whole event, which we haven't look at yet,

14   so --

15   Q.   Thank you, Mr. Wistar.

16   A.   Okay.  So this is 10:00 to 11:00, and then we go 11:00 to

17   midnight.  And now the heaviest rain has sagged southward, you

18   know, down right on the Gulf coast, on the beaches.  And in our

19   drainage basin we're looking at more like an inch in the north

20   to a little bit over 2, 2 1/2 inches in the south in the

21   drainage basin during this hour.  So that's 10:00 to 11:00.

22           Now, there still was some healthy rainfall after

23   midnight for a few hours.  So this is midnight to 1:00 a.m., the

24   first hour of April 30th; and you can see there's still

25   substantial rains.  Looking at our color code, it ranges from

1    one inch in the north to as much as 2 1/2 inches in the south

2    part of the drainage basin during this hour.  So this is on top

3    of what's been happening for hours.  It just keeps happening.

4            From 1:00 to 2:00 a.m., again, worse to the south.

5    It's a bit less in our drainage basin.  The storm is -- the

6    worst is passed.  From 2:00 to 3:00 a.m., still rainfall but not

7    extreme.  From 3:00 to 4:00 a.m., we're still up near an inch.

8    So it's significant rain, but it's not as extreme as what

9    happened earlier.  And then finally, from 4:00 to 5:00 a.m. it's

10   really lightening up, and we're looking at a tenth of an inch of

11   rain.  And then from 5:00 to 6:00 it's negligible; and so

12   essentially, you know, the storm is ending at this point.

13   Q.   Thank you, Mr. Wistar.

14           In addition to looking at the hourly data, did you

15   also look at total rainfall for this event?

16   A.   We did.

17           **MR. NELSON:**  May I approach, Your Honor?

18           **THE COURT:**  Yes, sir.

19   **BY MR. NELSON:**

20   Q.   Mr. Wistar, can you identify the document that we have

21   marked as Exhibit IP 63D?

22   A.   That is the Eglin Doppler radar's tabulation of the total

23   rainfall for the entirety of this event on April 29th and 30th,

24   2014.

25   Q.   And this was part of your report, correct?

1    A.    Yes.

2              **MR. NELSON:**  I would like to move to admit.

3              **THE COURT:**  Okay.

4              **MR. KAUFFMAN:**  No objection.

5              **THE COURT:**  Thank you.  63D is admitted.

6         *(DEFENSE EXHIBIT 63D:  Received in evidence.)*

7              **THE COURT:**  And you may publish.

8              **THE WITNESS:**  So this is again a slightly different

9    zoom, map background, so -- do you want me to redraw an

10   approximation of the basin on this one?

11   **BY MR. NELSON:**

12   Q.    Well, yes, if you would.  I think that would be helpful.

13   A.    Just to help orient.  Again, an approximation.  It's rough.

14   Q.    And, you know, if we just look at this graphic, what kind

15   of conclusions can one draw about the rainfall event on the 29th

16   into the 30th of April of 2014 in this Elevenmile Creek drainage

17   basin?

18   A.    Well, as I was gathering this data and looking at it, it's

19   amazing how much rain fell.  This is -- of all the flood

20   reconstructions and weather cases I've worked on, this is -- has

21   the largest rainfall amounts of any case I've ever worked on.

22   So it's extremely impressive, very unusual.

23   Q.    Did you stop your analysis, Mr. Wistar, with the review of

24   radar data?

25   A.    No.

1    Q.    What else did you look at?

2    A.    Well, it was important in these kind of cases to look at

3    how rare this event was.  So is that what you're asking about

4    or --

5    Q.    I wanted to know if you looked at other sources of data.

6    A.    Okay.  Yes.  But before we get to the rarity, we also

7    looked at rain gauge data.  Once I saw this radar showing these

8    massive amounts of rain, I wanted to get confirmation that this

9    wasn't some error in the radar or some overreaching or some

10   fluke.  So I wanted to see actual evidence that this amount of

11   rain fell.  And so that was part of our early data gathering was

12   to gather up rainfall reports.

13          As I said earlier, there was a number of rain gauges

14   that had problems dealing with this much rain, especially the

15   automated systems that are linked up to computers.  At the

16   Pensacola airport they lost power at the height of the storm,

17   and so it was recording quite well and then all of a sudden it

18   stopped around 10:15, 10:20 that evening of the 29th.

19          And so the -- so we looked at all the -- gathered all

20   available rain gauge information.  We did find some that was

21   complete and had a good match with the radar, but there were a

22   number of stations that, like I said, got knocked off the air at

23   some point during the storm.

24   Q.    And how does a meteorologist use rain gauge data and radar

25   data together?

1    A.   Well, what we want to do at this point, and we've done this

2    in many cases, is compare them.  So once we know where there's a

3    certain rain gauge, we want to take a look at that, see how much

4    it says.  You know, first of all, make sure it's working, it

5    worked through the whole storm and has it all there, and then

6    locate it on this map that you're looking at and see -- this map

7    is a presentation of the inches of rain.  Again, it's got a

8    color key on the right so we can see how much rain fell in the

9    different color codes.  And then we just take the rain gauge and

10   match it up and see how it's doing and make sure it's

11   reasonable.

12   Q.   And what kind of a match did you find here between the

13   available gauge data and the radar data?

14   A.   The ones that reported all of the rain were very close to

15   this radar picture.

16   Q.   In addition to the radar data and the rain gauge data that

17   you reviewed and looked at, did you look at any other source of

18   data?

19   A.   Now, are you asking me about OneRain or about return

20   periods?

21   Q.   Well, that was -- it's getting on in the day, and that was

22   not the best of questions.  I was really thinking about

23   different types of radar -- rain gauge information, and there's

24   some that are maintained by public entities and other --

25   A.   Yes.  There are -- okay.  You're still asking about rain

1    gauges.  There are different kinds of rain gauges.  There are

2    different sources we use for rainfall information.  Some of it

3    is as simple as someone with a tube in their backyard and they

4    go out and measure it every day and see how much rain is in it.

5    I'm actually personally a member of a network that does that, so

6    I take those readings every morning when I'm at home.  And so

7    that's, you know, low tech.  There's no electronics that go

8    wrong or there's no power to go out.  It's just someone reading

9    how much water is in the tube.

10           But then there's -- for example, it's an automated

11   station at the airport that all the airports use, and it does

12   rely on electricity.  So when the power when out, it stopped

13   reporting.

14           There were some other stations that we do rely on a

15   lot.  They're automated stations.  There was a couple of them

16   right in the drainage basin; but amazingly enough, once they got

17   past 10 inches, the totals didn't make sense anymore.  So

18   they're designed, apparently, not to be able to handle that much

19   rain when they need an extra digit because they would record

20   just perfectly, consistent with the radars up to 10 inches, and

21   then all of a sudden it stops.  So that happened.

22           And then there was one rain gauge that seemed to be

23   deficient.  It was, again, automated, electronic.  It had

24   rainfall through the entire event but fell a good 20 to

25   25 percent short of what the radar was showing.  So with other

1    ones being close to the radar reading, that one looked like it

2    was deficient.

3           So rarely have I worked on a case where there was this

4    amount of difficulties with the rain gauge data.  But

5    fortunately we had enough to still have a good level of

6    confidence that combining that with the radars is giving us a

7    good picture of what happened based on what we just went through

8    looking at those radars.

9    Q.   So, Mr. Wistar, in addition to your review of radar data

10   from the Eglin Air Force Base and from the Mobile radar station,

11   as well as the available rain gauge data, were you also asked to

12   develop rainfall totals that were more particularized over the

13   entire Elevenmile Creek drainage basin?

14   A.   Yes.  What happens, it's easy for us -- when we're asked to

15   figure out how much rain fell at one spot, you get all the rain

16   gauge data; you get all the radar data.  You compare them, see

17   how it's doing.  And then you've got your spot on the radar, and

18   that's -- you know, once we make the adjustments for the --

19   comparing those two, we can give our estimate.  But it's

20   really -- would be time-consuming and complicated to do that for

21   an entire -- I think this drainage basin is almost 50 square

22   miles, the whole thing.

23          So in cases like this in the past, we have gone to an

24   outside provider who was -- they're one of two in the U.S. who

25   take rain gauge data and take radar data and use software to put

1   it together and combine it and smooth it out to produce maps of

2   how much rain fell, using rain gauge and radar together, over a

3   whole area instead of just a point.

4           So we can do the point at AccuWeather in our home

5   office.  But to get the area, we go to one of two companies

6   there are in the U.S. that do this, one of which is OneRain.

7   We've used them before.  They've done good work for us.  And so

8   in this case we did use them.

9   Q.   So you used OneRain to provide some additional data; is

10  that right?

11  A.   It's another viewpoint.  I mean, from them we get a map of

12  the rainfall total in this event using rain gauges and radars

13  combined over the whole drainage basin.  So instead of us, like,

14  just eyeballing it, they actually send us a map showing that.

15          So that was nice confirmation because, again, their

16  map was pretty close to this radar picture we're looking at

17  right here.  You know, one place might have had 19 inches

18  instead of 18 inches or something like that, but they're all

19  showing that there was a very major event that happened in this

20  area.

21  Q.   So as a general matter, how did the OneRain data compare to

22  your own analysis of the rainfall and gauge data?

23  A.   It was a nice confirmation that the work we did ourselves

24  was, you know, certainly right in the ballpark and very close.

25  Q.   I would like to turn now, Mr. Wistar, to the severity

1  portion of the work that you did here, or maybe the rarity of

2  the rainfall event.

3           Did you evaluate the rarity of this rainfall event?

4  A.   Yes.

5  Q.   And how does a meteorologist evaluate the issue of

6  frequency or rarity of rainfall events?

7  A.   Okay.  The National Oceanic and Atmospheric Administration,

8  which is the government agency that the Weather Service is part

9  of, they have done a statistical analysis and made it available

10 in map form for the whole country of what's called return

11 periods.  And so they are using all existing rainfall data from

12 the beginning of rainfall records.

13          For example, in Pensacola, the rainfall records go

14 back to 1879, which obviously predates the airport.  So it was

15 somewhere else in Pensacola.  But there is that data available

16 since 1879.  And so whatever the length of data is in various

17 points all over the United States, they will develop a

18 statistical analysis and then present it, make it available in a

19 fairly easy-to-read format so we can plug in, say, this much

20 rain fell in two hours or this much rain fell in 12 hours or

21 this much rain fell in 24 hours at this location.  And actually,

22 on their website, you can actually click right on the spot where

23 you want this data for, this information for.

24          And then from that, we can get a good estimate of how

25 rare this event was, and so --

1    Q.   If we were to look at the area around the class area, the

2    neighborhoods, Bristol Park and Ashbury Hills neighborhoods at

3    issue here, what kind of recurrence interval, roughly, was this

4    storm event for that area?

5    A.   Okay.  For the entirety of the storm, from the predawn

6    hours of April 29th to the predawn hours of April 30th, a little

7    bit more than 24 hours, the amount of rain that fell in the

8    class area, according to this statistical analysis, would be

9    expected to occur, on average -- and we say on average because

10   the weather's full of variations and random chaos.  But on

11   average, once every 150 to 200 years you would expect this

12   amount of rain over a period of slightly more than 24 hours.

13   Q.   And, Mr. Wistar, if we zeroed in on the time period where

14   the most intense rainfall occurred, is there a different

15   recurrence interval for that around the class area?

16   A.   There is, because you can get return periods for almost any

17   length of rainfall, 5 minutes, 1 hour, 12 hours, whatever.

18        So the most concentrated rain -- as we saw, there was

19   that initial rain of a couple of inches, then a break for a

20   while, and then it really got heavy for a series of hours.  And

21   so that concentrated second part of the storm, about 14 hours

22   worth of serious rain in the class area, the return period for

23   just that part of the storm is about once in 400 years.  So

24   that -- it's an extremely rare event.

25   Q.   And, Mr. Wistar, are rainfall recurrence intervals the same

1  thing as flood recurrence intervals?

2  A.   They are not.  The rainfall and all the work that we have

3  done to analyze this only deals with the rain falling from the

4  sky and down to the ground.  Once it hits the ground and it's

5  running across the ground, that's the question for the

6  hydrologists, and there's other factors involved.

7        We know from lots of experience that if the soil's

8  very wet before this happens, the flooding will be worse than if

9  it's dry.  So you can have a -- you can have a 200-year rainfall

10 event, which means, on average, once every 200 years; but you

11 can have a hundred-year flood resulting or a 300-year flood

12 resulting, depending on what the conditions were beforehand.

13 Q.   And what were the conditions beforehand in this area on

14 April 29th?

15 A.   As we talked about, there had been a lot of heavy rain

16 already in this area in that month before this event.  And so

17 essentially the return periods that we -- that I've just shared

18 for rainfall have nothing to do with what happened before.  They

19 were neutral to that.  It doesn't affect.  We're only talking

20 about how much fell in the individual event.

21        But if you take the fact that you have this event on

22 top of already soaking wet soil, it makes it even more rare.

23 There's no table for me to go to to quantify it.  But if you're

24 saying it's a once-in-400-year event, just this rainfall, and

25 then you put that on top of already sopping wet soil, it's going

1   to be more rare, some number higher than 400.

2   Q.   Thank you, Mr. Wistar.

3           **MR. NELSON:**  Pass the witness, Your Honor.

4           **THE COURT:**  All right.  Mr. Kauffman.

5       **MR. KAUFFMAN:**  Yes, Your Honor.

6           **THE COURT:**  You two come up for just a minute, please.

7        *(Following conference held at the bench.)*

8           **THE COURT:**  How much -- and I'm not tying your hands,

9   but if you have more than 15 minutes or so, we're probably going

10  to --

11          **MR. KAUFFMAN:**  I probably have 15 to 20 minutes, Your

12  Honor.

13          **THE COURT:**  And you may have redirect?

14          **MR. NELSON:**  I don't think it would be long, but I

15  understand it's --

16          **THE COURT:**  I don't think we're behind schedule.  I

17  think I'm going to have them come back in the morning.

18          **MR. NELSON:**  I understand.

19          **THE COURT:**  Thank you.

20        *(End of bench conference.)*

21          **THE COURT:**  Mr. Wistar, you're going to have the good

22  fortune of being a guest of our city for the night.

23          **THE WITNESS:**  Yea.  It's a great place.

24          **THE COURT:**  It's not raining.

25          **THE WITNESS:**  Not now, no.

1    **THE COURT:**  Ladies and gentlemen, we're going to stop

2    for the evening.  Please do remember my instructions.  As

3    always, don't discuss the case with anyone during the evening

4    recess.  Avoid any news reports of the trial should there be

5    any.  Please don't conduct any investigation on your own of the

6    matters that you've heard discussed.  And very importantly,

7    please don't begin to form any opinion yet about the merits of

8    the case.  And I know you could all repeat that back to me now

9    verbatim.  But do have a nice evening, and we'll see you

10   tomorrow morning at 8:30.  And tomorrow, smiles all day.  It's

11   Friday.

12        All right.  See you tomorrow.

13     *(Jury excused.)*

14        **THE COURT:**  Mr. Wistar, you may step down.  And you'll

15   be back on the stand tomorrow morning at 8:30.

16        **THE WITNESS:**  8:30.  Okay.

17     *(Witness excused.)*

18        **THE COURT:**  Thank you, sir.

19        You may be seated.

20        We need to hear motions.  That's another reason,

21   probably the main reason I decided to go ahead send the jury

22   now.  Mr. Nelson.

23        **MR. NELSON:**  Thank you, Your Honor.

24        **THE COURT:**  Your motion was made here at the bench and

25   was preserved, but I'll now hear your argument.

**MR. NELSON:**  Thank you, Your Honor.

International Paper moves for a judgment as a matter of law pursuant to Rule 50(a)(1) as to the entirety of Plaintiff's case because Plaintiffs have failed to present sufficient evidence for a reasonable jury to find IP liable, under any of Plaintiff's four causes of action, for causing the flooding that is at issue in the class area in this case.

With regard to each of the individual causes of action, we respectfully submit that the causes of action for trespass nuisance have been abandoned, as was discussed during the pretrial conference, and that there's been no evidence introduced in support of the trespass and nuisance claims.

**THE COURT:**  Okay.  Thank you.  I'll hear from you on the other two.

**MR. NELSON:**  Thank you, Your Honor.

With regard to the strict liability claim, in order to prevail on their claim for strict liability, the plaintiffs must establish that the impoundment of water by the Kingsfield Road dam constituted an ultrahazardous activity and that the breach of the Kingsfield Road dam caused the flooding at issue within the class area.

Turning to the first element regarding ultrahazardous activity, IP respectfully submits that Plaintiffs have not tendered evidence to support that necessary requirement of the cause of action.

1          Under Florida law, an activity is ultrahazardous if it

2    necessarily involves a risk of serious harm to the person, land

3    or chattels of others which could not be eliminated by the

4    existence of the utmost care and is not a matter of common

5    usage.  And this comes from the case *Cities Service Company v.*

6    *State*, reported at 312 So.2d 799, page 802.

7          We would submit that there was not a risk of serious

8    harm because the -- that could not be eliminated through the

9    exercise of utmost care for several reasons.  First, the

10   Kingsfield Road outfall structure existed for years as part of

11   the permitted and regulated wastewater treatment system at the

12   International Paper facility in Cantonment, Florida.

13         As we -- and there was no evidence entered in this

14   case, in Plaintiff's case, that it was an activity that could

15   not have been performed with the exercise of reasonable care.

16   And indeed, while we disagree with Plaintiff's contention and

17   Dr. Carrier's position on the application of the Northwest

18   Florida Water Management District permitting standard, or

19   otherwise stated, that the permit should have issued from the

20   Northwest Florida Water Management District, the fact that there

21   is such an entity and such a structure we believe demonstrates

22   that this is indeed the type of activity that can be carried on

23   without a risk of serious harm to others through the exercise of

24   the utmost care.

25         We also submit that the structure, in fact, was

1   properly permitted and that the evidence adduced during

2   Plaintiff's case shows that.

3          We also would submit that this case is unlike a couple

4   of cases where Florida courts have found an impoundment

5   structure to constitute an ultrahazardous activity.  We contrast

6   this case, where the issue is impoundment of stormwater and the

7   potential for release of stormwater, with a case like *Cities*

8   *Service v. State*, where the Court upheld the imposition of

9   strict liability on the operator of a reservoir storing

10  hazardous materials; in that case, phosphatic slime.  And in

11  making that finding, the Court specifically observed that this

12  is not clear water which is being impounded.  In this case, in

13  2014, the impoundment was stormwater.

14         We also contrast this case with the *Bunyak v. Clyde*

15  case, which is reported at 438 So.2d 891, where the Court held

16  that there was sufficient evidence for a jury to find that the

17  storage of liquified cow manure in a lagoon was abnormally

18  dangerous activity because of the ineradicable risks

19  attendant -- excuse me, because an -- apologize, Your Honor.

20  Long afternoon without water here.

21         **THE COURT:**  Do you want to go get a drink of water?

22         **MR. NELSON:**  I appreciate that, Your Honor.  I'll try

23  to just finish here.  I don't have a lot more.

24         **THE COURT:**  Okay.

25         **MR. NELSON:**  -- because ineradicable risks attend such

1    impoundment, despite reasonable care.

2            That's not the case with the structure at issue here

3    because we're talking about the impoundment of surface water,

4    which does not pose an abnormal danger that cannot be mitigated

5    through the exercise of reasonable care, particularly where

6    there were permits and where even if the plaintiffs are right

7    about application being required through the Northwest Florida

8    Water Management District of the existence of a structure or

9    statutory scheme that would allow a structure to be on a

10   facility indicates that it is indeed the sort of activity that

11   can be carried on through the exercise of reasonable care.

12           We also, with regard to the strict liability count,

13   would respectfully submit that causation has not been

14   established, that the plaintiffs cannot establish that the cause

15   of flooding in the class area was the failure to exercise --

16   excuse me -- had to do with the Kingsfield Road dam structure.

17           Finally on the strict liability count, we would state

18   that in the event the Court does not enter judgment as a matter

19   of law under Rule 50(a), we have maintained -- and I think the

20   point was preserved on this, that we think if the Court does not

21   enter judgment as a matter of law, it would be a question of

22   fact that goes to the jury.  But if it is not going to the jury

23   at that stage, we would submit that International Paper is

24   entitled to move the Court again on the strict liability cause

25   of action after it has completed its case and submitted its

1   evidence.

2          Turning next to Plaintiff's negligence count, the

3   plaintiffs must establish that IP failed to exercise reasonable

4   care in its maintenance of the Kingsfield Road dam structure and

5   that IP's failure to exercise reasonable care caused the

6   flooding at issue in the class area homes in this case.  The

7   plaintiffs have failed to submit or introduce evidence to

8   support their contention that IP failed to exercise reasonable

9   care.

10         We've heard testimony from several witnesses that we

11  believe establishes that reasonable care was indeed exercised

12  during the course of the operation of the facility on Kingsfield

13  Road.

14         **THE COURT:**  But as you know, on this type of a motion,

15  I have to consider the evidence in the light most favorable to

16  the plaintiffs.  And Dr. Carrier's testimony -- it's clear his

17  testimony is that reasonable care was not exercised and that a

18  permit was required and should have been obtained.  So I think

19  that presents a jury question.

20         **MR. NELSON:**  Thank you, Your Honor.

21         **THE COURT:**  All right.  Thank you, sir.  Who is going

22  to respond for Plaintiffs?  Mr. Marshall?

23         Mr. Marshall, let me -- if it is you that's going to

24  address the motion, my ruling on the negligence count is that

25  the motion for judgment as a matter of law is denied, and that

1 will be presented to the jury based on the evidence and, again,

2 taken in the light most favorable to the plaintiff.

3         As far as the trespass and nuisance counts, consistent

4 with our discussion at the pretrial conference, is it your

5 understanding as well, or your memory consistent with mine, that

6 judgment as a matter of law will be entered on those two counts,

7 so the motion granted, based on the absence of any evidence to

8 support those counts and the pursuit of those claims as a legal

9 matter?

10         **MR. MARSHALL:**  Yes, ma'am.

11         **THE COURT:**  All right.  Then that leaves you with

12 strict liability to address in your argument.

13         **MR. MARSHALL:**  Yes.  Thank you, Your Honor.

14         **THE COURT:**  From the lectern, please.

15         **MR. MARSHALL:**  Oh, I apologize.

16         **THE COURT:**  That's right.  It's much easier to hear

17 you and for -- well, for all of us to hear you.

18         **MR. MARSHALL:**  As the Court knows, strict liability is

19 a matter of a multifactored test.  The original standard for

20 strict liability arose out of the concept of impoundments of

21 water and the recognition that impoundments of water do pose an

22 unreasonably high risk of harm.  We've established --

23         **THE COURT:**  Is that surface water?  I mean, waters --

24 you're talking about, you know, how the doctrine established.

25         **MR. MARSHALL:**  Well, Your Honor, any kind of water.  I

1 mean, if you look at the traditional Restatement, it doesn't

2 make any distinction between clear water or any other type of

3 water.  Certainly, obviously, if there are certain things in the

4 water, that can pose a greater risk.  But that's not the end of

5 the inquiry.  And so --

6 **THE COURT:**  But do you have any cases, Mr. Marshall,

7 where the impoundment of surface water in a natural waterbed was

8 held to be ultrahazardous?

9 **MR. MARSHALL:**  You know, Your Honor, I believe that

10 they're referenced in the --

11 **THE COURT:**  Maybe these were in your motion or

12 response to --

13 **MR. MARSHALL:**  Yes.

14 **THE COURT:**  -- the motion.

15 Well, let me ask, then -- I'm going to take this

16 motion under advisement and I'm going to consider it tonight,

17 and I'll give you my ruling tomorrow, or certainly before the

18 case goes to the jury.  So on the issue of what case law says

19 and the Restatement says, I'll continue to look carefully at

20 that.

21 But as far as the evidence in this case, what evidence

22 is there of this being an ultrahazardous activity?

23 **MR. MARSHALL:**  I think you heard a fair amount of it

24 today and yesterday.  You heard, actually, testimony from some

25 of International Paper's own witnesses that have talked about

1    proximity of the dam to a bridge and the fact that that bridge

2    itself has suffered damage.  That is a -- you know, a fact that

3    is evidence.

4         You heard Dr. Carrier testify about the issues with

5    this damage, its proximity to that structure.  You also heard

6    Dr. Ross testify as to how the flows out of this -- the

7    particular dam breach, how they would -- you know, we're talking

8    about a lot of water coming out of a dam breach, which in the

9    past has, in fact, caused damage to that structure.  And that's

10   uncontroverted, and that's from their own witnesses.

11        Then you factor in the evidence that we've produced,

12   which is this dam breach has caused a major flood in the

13   community of Ashbury Hills and Bristol Park.  And on those bases

14   alone, we've established the fact that this is abnormally

15   dangerous condition that's been on -- that was on the property.

16        Another factor, I think, that is particularly relevant

17   here is the utility, the good that exists with respect to a

18   particular structure.  As the Court knows, if something serves a

19   purpose, that can be considered as, you know, possibly

20   mitigating it.  Here the evidence is that the structure

21   essentially served no purpose and shouldn't have been there at

22   all in the first place.

23        And so when you put those pieces of evidence together,

24   we believe that, in fact, a showing has been made -- evidence

25   has been presented in support of that theory.

1    **THE COURT:**  All right.  Thank you very much.

2    I guess I'm going to take that motion for the -- on

3    the strict liability under advisement and will give you my

4    ruling hopefully in the morning, maybe the start of next week.

5    So we'll start tomorrow morning, continue with

6    Mr. Wistar.  And then you say you expect, Mr. Nelson, two or

7    three days of -- so I'm sure all of tomorrow and Monday as well,

8    are you still expecting?

9    **MR. NELSON:**  I do, Your Honor.  I expect we'll go into

10   Monday for sure, and whether we spill over into Tuesday is --

11   will depend on how we go tomorrow.

12   **THE COURT:**  Okay.  All right.  I do anticipate, as I

13   said this morning, giving you-all a packet of instructions

14   sometime tomorrow.  We won't be discussing them -- most likely

15   we won't discuss them tomorrow.  We'll discuss them Monday

16   morning at the conference.  And I may even have the jury come in

17   at 9:00 so we have from 8:00 to 9:00 to work on those

18   instructions.  But I'll make that decision tomorrow, Mr. Nelson,

19   in consultation with you and Plaintiff's counsel, but mainly you

20   in terms of where you are in your case and how much you get

21   through tomorrow.

22   All right.  Okay.  Well, you all have a nice evening,

23   and I'll see you tomorrow morning at 8:00 a.m.

24   *(Proceedings adjourned at 5:42 p.m.)*

25   **\* \* \* \* \* \* \* \***

1    We certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.  Any
2  redaction of personal data identifiers pursuant to the Judicial
Conference Policy on Privacy are noted within the transcript.

3

**/s/ Donna L. Boland**

4  _____
Donna L. Boland,
5  Official U.S. Court Reporter

6  **/s/ Julie A. Wycoff**              2/22/2017

7  _____    _____
Julie A. Wycoff,              Date
Official U.S. Court Reporter

8

9

10                          **INDEX**

11

WITNESSES FOR THE PLAINTIFFS:                          PAGE

12

13  **DR. W. DAVID CARRIER**
     Direct Examination by Mr. Marshall          12
14   Cross-Examination by Mr. Meltzer            35
     Redirect Examination by Mr. Marshall        77

15

**BRETTON DEJONG**
16   Direct Examination by Mr. Glasser           84

17  **DR. MARK ROSS**
     Direct Examination by Mr. Marshall          110
18   Cross-Examination by Mr. Nelson             175
     Redirect Examination by Mr. Marshall        234

19

20  WITNESSES FOR THE DEFENSE:

21  **STEPHEN WISTAR**
     Direct Examination by Mr. Nelson            236

22

23

24

25

**PLAINTIFF EXHIBITS**

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 1(a) | Dr. Ross Table | | 121 |
| 5 | Dr. Ross Aerial of Neighborhoods | | 117 |
| 3 | Rainfall/stream-flow data near Elevenmile Creek | 149 | 149 |
| 7 | Land use classifications | 161 | 161 |
| 12 | Cross sections used in our hydraulic analysis | 168 | 168 |
| 14 | Raw radar data interpreted for rainfall | 154 | 154 |
| 15 | Corrected total rainfall for Elevenmile Creek area | 157 | 157 |
| 19 | Plot of calibration | 166 | 166 |
| 173 | DeJong's Emailed Statement | | 92 |
| 252 | DeJong's 4/29/14 Email | | 107 |
| 253 | DeJong's 5/13/04 Statement | | 98 |

**DEFENSE EXHIBITS**

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 10 | 10/6/05 Correspondence | | 72 |
| 25 | Email from Taylor to Moore | | 76 |
| 60 | Operating Agreement | | 60 |
| 74 | 40A-4 Florida Admin Code | | 57 |
| 75 | FS 373.4145 | | 59 |

63B     National Reflectivity Mosaic             250     250

63C     Hour-by-hour images showing the          257     257
        rainfall amounts

63D     Eglin Doppler radar's total rainfall     266     266

77      Map of watershed with elevations         195     195

78      Map HEC-RAS analysis for natural         207     207
        channel

79      Predicted flood depths from high         208     208
        watermarks