UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


**JOHN NAVELSKI, LINDA NAVELSKI,** )
**ERICK ALEXANDER, JACOB HUTCHINS,** )
**AMBER HUTCHINS, JEANNE HENDERLY,** )
**RICHARD BULLARD, and BEVERLY** )
**BULLARD,** on their own behalf and )
those others similarly situated, )
                                 )
       Plaintiffs,       )
                                 )     Case No. 3:14cv445/MCR
                                 )
vs.                      )     Pensacola, Florida
                               )     February 23, 2018
                               )     8:06 a.m.
                               )
**INTERNATIONAL PAPER COMPANY,**     )
                               )
       Defendant.      )
_____)


**JURY TRIAL – DAY FOUR**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury
(Pages 1-262)

## <u>APPEARANCES</u>

FOR THE PLAINTIFFS:     ***JONATHAN R. MARSHALL, ESQUIRE***
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia  25301

***JAMES L. KAUFFMAN, ESQUIRE***
***BRIAN A. GLASSER, ESQUIRE***
Bailey & Glasser, LLP
1054 31st Street NW, Suite 230
Washington, DC  20007

***CHRISTOPHER M. VLACHOS, ESQUIRE***
Christopher M. Vlachos, PLLC
244 E Intendencia
Pensacola, Florida  32502

***J.J. TALBOTT, ESQUIRE***
Law Offices of Jeremiah J. Talbott, PA
900 E Moreno Street
Pensacola, Florida  32503

FOR THE DEFENDANT:     ***T. LARRY HILL, ESQUIRE***
Moore, Hill & Westmoreland, P.A.
P.O. Box 13290
Pensacola, Florida  32591

***DANIEL W. NELSON, ESQUIRE***
***MEGAN B. KIERNAN, ESQUIRE***
***JASON R. MELTZER, ESQUIRE***
Gibson Dunn & Crutcher, LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036

1                         P R O C E E D I N G S

2              **THE COURT:**  Good morning.  Well, we have a brand new

3      state of the art projector, and we do need sunglasses.

4      Somebody just told me we need sunglasses in the courtroom.

5              So I want to thank -- I don't know if Ernie is in here

6      but I want to thank Ernie Mirisola, who came up from West Palm

7      Beach, who is with his audio visual media company to do this

8      for us.  And he'll be out this morning making sure everything

9      is working and they'll be working on the calibration settings

10     as well over the weekend, so if we have any glitches today,

11     they'll be worked out by next week.

12             All right.  I have my decision on the Motion For

13     Judgment as a Matter of Law on Count Four, the strict liability

14     claim.  And I have this written out so that the record is very

15     clear as to my reasoning, and so I'm going to actually read it

16     into the record.  But I do find that the motion should be

17     granted and that the strict liability claim cannot go forward.

18             As you all know, Florida has adopted the Restatement

19     (Second) of Torts approach for determining whether an activity

20     is abnormally dangerous.

21             There are six factors that are applied under this

22     approach:  First, whether the activity involves a degree of

23     risk of some harm or hardship to the person, land, or chattels

24     of others; second, whether the harm which may result from that

25     is likely to be great; third, whether the risk cannot be

1    eliminated by the exercise of reasonable care; fourth, whether

2    the activity is not a matter of common usage; five, whether the

3    activity is appropriate to the place where it is carried on;

4    and finally, six, whether the value of the activity to the

5    community is outweighed by its dangerous attributes.

6              What the Plaintiffs have presented here in their case

7    is that International Paper's -- and I put in quotes "use"

8    because there is no activity involved here, it is the use of

9    the Kingsfield Road dam structure for storing or allowing

10   stormwater to store there, whether that was an abnormally

11   dangerous, non-natural use of the property that created a high

12   potential for damage to property owners many miles away.

13             Now, not every factor under the restatement approach

14   must support a finding that an activity or use in this case is

15   abnormally dangerous.  Generally the presence of at least

16   several of the factors is necessary to impose strict liability.

17             The essential question is whether the risk created is

18   so unusual, either because of its magnitude or because of the

19   surrounding circumstances, to justify the imposition of strict

20   liability for the harm that results from it even though the use

21   or the activity is carried on with all reasonable care.

22             In this case I note as an initial matter that it's not

23   altogether clear to me that the mere presence of the Kingsfield

24   Road dam structure on IP's property constitutes a use for

25   purposes of strict liability.

1     The evidence that has been introduced in the

2     Plaintiffs' case shows that International Paper in fact had not

3     used that dam structure in any meaningful way since 2012 when

4     it rerouted its wastewater disposal system to a pipeline, as

5     you all know, out to Perdido Bay, the Perdido Bay wetlands.

6     The Plaintiffs have gone to great lengths during their

7     case to show that as of 2012 International Paper had, for all

8     intents and purposes, abandoned the dam structure and allowed

9     it to fall into disrepair.  In other words, from the evidence,

10    International Paper was not using the structure for any

11    purpose.

12    So I'm not entirely convinced that the mere fact that

13    stormwater runoff could still pool and accumulate behind this

14    structure in and of itself amounts to use or activity on the

15    part of International Paper.  There doesn't appear to be much

16    guidance in the case law or in the restatement on the question

17    of what constitutes an activity for the purposes of strict

18    liability.  I suspect this is because in the vast majority of

19    cases the defendant was clearly and affirmatively engaged in an

20    activity as that term is normally understood.

21    That said, International Paper has not challenged the

22    use or activity aspect of this analysis.  Also, I note from the

23    Plaintiffs' case that Kyle Moore testified that International

24    Paper considered the Kingsfield Road dam structure to be a part

25    of the company's stormwater control system and that the

1    structure was -- and I'm quoting from his testimony --

2    "intended to manage the flow of water into the Elevenmile

3    Creek."

4           So viewed in a light most favorable to the Plaintiffs,

5    I do find this testimony is sufficient to establish that the

6    dam structure's impoundment and discharge of stormwater runoff

7    constitutes a use or activity for purposes of this strict

8    liability analysis, although, as a matter of law, I find it

9    questionable.

10          I don't need to make that final decision because I --

11   even assuming that this was an activity or use within the

12   meaning of strict liability, I find that it did not involve a

13   high degree of risk of harm to the person, land, or chattels of

14   others.  Again, the activity that we're talking about is

15   allowing stormwater runoff to discharge into Elevenmile Creek

16   through the dam structure.

17          The evidence in the Plaintiffs' case shows that,

18   generally speaking, relatively little stormwater runoff

19   accumulated behind the Kingsfield Road dam structure under

20   normal conditions.  And so, under normal conditions, I would

21   find that the dam structure posed very little risk of flooding

22   properties downstream.

23          It appears from the evidence that the structure may

24   not have been designed to withstand a category 5 hurricane or

25   100-year storms, but storms of that magnitude do not occur with

1   sufficient regularity in this region to justify the imposition

2   of strict liability simply because a structure cannot protect

3   against their possibility.

4         For the purposes of the abnormally dangerous analysis,

5   the risk posed by the activity must be major.  It's not enough

6   that there is a recognizable but comparatively slight risk of

7   harm, so this factor weighs against a finding of abnormal

8   dangerousness.

9         Next, I also find there is ample evidence that any

10  flooding risks associated with the Kingsfield Road dam

11  structure could have been controlled or eliminated with the

12  exercise of reasonable care.  For example, during the

13  Plaintiffs' case in chief, they identified several ways in

14  which the structure could have been redesigned or fortified so

15  as to prevent its breach or failure during a rainstorm.

16        Of course, negligence, not strict liability, is the

17  more appropriate theory under which to proceed when there are

18  reasonable means by which risks associated with an activity can

19  be made less dangerous.

20        With respect to the likelihood that the harm would be

21  great, this factor also weighs in favor of the Defendants.

22  There is no evidence that under normal conditions -- and that's

23  what I'm looking at, under normal conditions -- the volume of

24  the stormwater impounded behind the dam structure, even in

25  combination with the water in Elevenmile Creek, would have the

1   capacity to cause widespread flooding.  We didn't hear anything

2   of that nature through the evidence.

3        Moreover, the Plaintiffs have failed to present any

4   evidence that International Paper's activity of allowing the

5   stormwater to accumulate behind the dam structure was not a

6   matter of common usage or that it was inappropriate to the

7   place where it was carried on.

8        I find that directing stormwater runoff into a river

9   or a creek, such as was done here, is a common activity, and

10   therefore is considered a matter of common usage.  There's no

11   evidence or even argument that the Kingsfield Road dam

12   structure's location approximately two miles upstream from the

13   Plaintiffs' neighborhoods was inappropriate in terms of its

14   placement.

15        The restatement factors weigh against a finding of

16   abnormal dangerousness.  Florida's common law doctrine of

17   strict liability is limited to a few narrowly defined

18   categories of activities such as blasting -- that's the *Poole*

19   case; storage of propane gas, which is the *West* case;

20   fumigation, which is the *Old Island Fumigation* case; and the

21   impounding of phosphate slime in connection with mining

22   operations, which is the *City Services Company* case.

23        IP's discharge of stormwater into Elevenmile Creek

24   just doesn't fit into those categories.

25        Mr. Marshall mentioned yesterday that -- although I

don't believe he referred to the case by name, but mentioned

that the seminal case on strict liability, which is the case of

*Rylands v. Fletcher*, did involve the storage of water.  But I

find that *Rylands* is distinct from this case, because there the

defendant built an artificial water reservoir over an

underground mine shaft.  When the reservoir broke, the water

that it held poured into the plaintiff's mine.  This isn't akin

to what happened here.

Also, Florida courts have repeatedly stated that

strict liability applies to, quote, "water collected in

quantity in a dangerous place."  But that does not apply to,

quote, "a dam in the natural bed of a stream."  That is a

Second DCA case, the *City Service Company* case, 312 So.2d 799,

Florida Second DCA, 1975.

Courts in other jurisdictions have likewise determined

that strict liability applies, quote, "to situations involving

the maintenance of artificial reservoirs for the collection of

water as distinguished from mill dams across flowing streams."

That case is *Romanoff versus City of Mansfield Ohio*.

It can be found at 1981 Westlaw 6354, pincite page 15, Ohio

Court of Appeals, July 8th, 1981.

I do find that this standard in the *Romanoff* case and

the *City Services Company* case are consistent and completely in

accord with *Rylands*.

So, in this case IP was not collecting water in a

1    dangerous place, it was not maintaining an artificial reservoir

2    for the collection of water and, of course, the Kingsfield Road

3    dam structure is more accurately considered a dam in the

4    natural bed of a stream, and therefore I do conclude that its

5    use of the Kingsfield Road dam structure was not an ultra

6    hazardous or abnormally dangerous activity and that in the

7    exercise of reasonable care the risk of flooding could be

8    properly and safely managed.

9            And for those reasons, International Paper's Motion

10   For Judgment as a Matter of Law on Count Four of the

11   Plaintiffs' complaint is granted.

12           Anything we need to discuss before we get started this

13   morning?  I believe we'll start with Mr. Kauffman -- is that

14   right, you were just starting your cross-examination?

15           **MR. KAUFFMAN:**  That's right, Your Honor.  And there is

16   one issue I'd like to raise that I discussed with Mr. Nelson

17   just before we started today.

18           **THE COURT:**  Okay.

19           **MR. KAUFFMAN:**  And there are two exhibits that

20   Plaintiffs would like to offer for Mr. Wistar to identify with

21   regard to the amount of rain that was at the mill, and these

22   are mill hot sheets that record rainfall at the mill.

23           Now, these hot sheets also contain some other chemical

24   information in them, Your Honor, about measurements of

25   different BOD's and different chemical substances in the hot

1    sheet.

2         I'm looking to use this only for demonstrative

3    purposes, not to discuss any of the chemicals with him, and to

4    only discuss with him the rainfall amounts that are listed in

5    the hot sheets.

6         **THE COURT:**  Can the chemical -- I haven't seen these

7    documents, but can the chemical information not be redacted?

8         **MR. KAUFFMAN:**  Yes, Your Honor, we could redact the

9    chemical information, yes.

10        **THE COURT:**  Mr. Nelson?

11        **MR. NELSON:**  Your Honor, we have two objections to the

12   use of this document even for a demonstrative purpose.  The

13   first is that we believe it is subject to the Court's ruling on

14   our Motion in Limine to exclude evidence about the content of

15   the wastewater treatment system.

16        Before trial started, we had contacted Plaintiffs'

17   counsel and identified a number of documents that we believed

18   were covered by that order, including these two.  They did not

19   engage us in a discussion on that, they just said they couldn't

20   agree.  So that was reason number one, we think these documents

21   were excluded.

22        **THE COURT:**  Well, they can be redacted.  So, what's

23   the second ground?

24        **MR. NELSON:**  Reason number two is that there's no

25   authentication of the document and no context surrounding the

1   rainfall number on this document.  There was testimony from an

2   IP employee, Andrew Yuhauz, about the rainfall number on this

3   document, and he said that the gauge on the company property

4   only went up to 10.5 inches, and so the number that he wrote

5   down on the sheet is something that he thought might be right.

6           And so, I think this would be highly misleading

7   without any evidentiary context underlying this document, even

8   if it's used only as a demonstrative.  And had the Plaintiffs

9   wanted to use this information, they should have called

10  Mr. Yuhauz as a witness to properly contextualize the

11  information on the sheet, but they didn't do that.  And so we

12  would object to its publication even as a demonstrative.

13          **THE COURT:**  It sounds like it could be very

14  misleading, Mr. Kauffman, even as a demonstrative aid.

15          **MR. KAUFFMAN:**  Your Honor, this is International

16  Paper's --

17          **THE COURT:**  Tell me what -- who took his deposition?

18          **MR. KAUFFMAN:**  Mr. Yuhauz?

19          **THE COURT:**  Yes.

20          **MR. KAUFFMAN:**  I believe Mr. Talbott took his

21  deposition.

22          **THE COURT:**  And what did he say about -- is Mr. Nelson

23  accurate in terms of his explanation about the numbers on the

24  page?

25          **MR. KAUFFMAN:**  What I understand from the deposition

1   and from my reading of the transcript, Your Honor, is that

2   Mr. Yuhauz had a gauge that went up to a certain amount.  The

3   gauge did overflow, Your Honor.  Mr. Yuhauz has to fill this

4   out every day to record an amount of rainfall to the mill.

5          **THE COURT:**  So, you're saying the gauge did overflow

6   or did not?

7          **MR. KAUFFMAN:**  It overflowed, yes, Your Honor.  And he

8   called a couple of different places and looked at a couple of

9   different places to estimate the best rainfall that he could

10  put down for that number at the mill, and that's the number

11  that he wrote down.

12         **THE COURT:**  Called a couple of different places?  I

13  don't understand.

14         **MR. KAUFFMAN:**  My understanding is that he contacted a

15  gauge that was -- or contacted -- there's also a CoCoRaHS gauge

16  across the street from the mill.  I understand that maybe he

17  contacted that person or had someone look at that gauge as well

18  and also contacted maybe the airport and looked at what

19  possibly fell at the airport as well and used that to estimate

20  the amount on the hot sheet.

21         **THE COURT:**  So on the hot sheet you have an estimate

22  that may or may not be close to being accurate?

23         **MR. KAUFFMAN:**  No.  We believe that it's close to

24  accurate, Your Honor, and it's --

25         **THE COURT:**  But you don't have him here to explain

1     that.  I mean, when you stood just now to ask to introduce this
2     or to even use it, I assumed it was accurate.
3           **MR. KAUFFMAN:**  Your Honor, I do think that it's
4     accurate, but we do not necessarily need to use this hot
5     sheet --
6           **THE COURT:**  Right, your thought -- your opinion that
7     it's accurate is, I mean, with all due respect, is not what
8     matters right now.  What matters is whether the person who
9     prepared it thought it was accurate.
10          **MR. KAUFFMAN:**  We believe that his testimony would
11    bear out the fact that this is an accurate reading.
12          **THE COURT:**  But you don't have him.
13          **MR. KAUFFMAN:**  I understand.
14          **THE COURT:**  You don't have him to testify, so it's
15    misleading.  I'm going to exclude it under 403 as misleading to
16    the jury, certainly has that strong potential.
17          **MR. KAUFFMAN:**  Thank you.
18          **THE COURT:**  Anything else?
19          **MR. NELSON:**  No, Your Honor.
20          **THE COURT:**  We'll be in recess for approximately five
21    minutes until the jury is seated.
22          *(Recess taken 8:24 a.m. to 8:32 a.m.)*
23          *(Jury in the box.)*
24          **THE COURT:**  Welcome back.  It is Friday.  Like I said,
25    when I look over at you all today, be smiling all day since the

1    weekend is coming.

2              We are ready to proceed, ladies and gentlemen, with

3    the trial this morning.  As you'll recall from yesterday

4    afternoon, we are now in International Paper's case.

5    Mr. Wistar is on the stand.  Mr. Nelson completed his direct

6    examination.  Mr. Kauffman is going to start this morning with

7    the cross-examination.

8              It's a new trial day so, Mr. Wistar, I'm going to have

9    you resworn.  If you would, please rise and raise your right

10   hand for that purposes.

11             **STEPHEN WISTAR, DEFENSE WITNESS, DULY SWORN**

12             **THE COURT:**    Thank you.

13             Mr. Kauffman, when you're ready.

14                            **CROSS-EXAMINATION**

15   **BY MR. KAUFFMAN:**

16   Q.    Good morning, Mr. Wistar.

17   A.    Good morning.

18   Q.    I'd like to show you what's been marked as Plaintiffs' 302.

19   This is the study area from your analysis of the rainfall,

20   correct?

21   A.    This is a study area used by -- well, this shows two

22   things.  This shows the outline of the Elevenmile Creek

23   drainage basin in red, and this is the map given to us by

24   OneRain that they used in their study area.

25   Q.    Did you use a different map than the study area?

1    A.   I would say yes.  Yeah, I did not rely on this map.  This

2    was of interest to me because this shows the stations that they

3    used.  There's eleven rainfall reporting sites scattered around

4    in and outside the basin on this chart.  I did not look that

5    far afield out of the basin when I did my analysis.

6    Q.   Okay.  So as far as the red line portion of this area, is

7    this the same area that you looked at when you defined your

8    study area?

9    A.   The red portion, yes.

10   Q.   So, although this includes a lot of other parts, for

11   example, downtown Pensacola where we see all the activity in

12   the diagram kind of in the southeast portion, but as far as the

13   red line area that's the same that you're talking about the

14   study area in your report?

15   A.   Yes.  When I -- just to be clear, when I began our analysis

16   before we ever did anything with OneRain, I looked at the radar

17   data and the rain gauge data in this area.  I didn't confine it

18   exactly to the red area because I wanted to see, for example,

19   what the data from Pensacola showed even though it was outside

20   the exact drainage basin.  But I didn't go as far afield as

21   OneRain did because they wanted more stations to get a -- they

22   wanted more stations for their analysis than I use for my

23   initial analysis.

24   Q.   So when you say the basin in your report, you're referring

25   to the red line area, correct?

1    A.    The basin, yes.

2    Q.    Now, the northern end of the basin is -- where we see that

3    FL-ES-4, that's near International Paper's mill, correct?

4    A.    Yes.

5    Q.    And the southern end of this basin -- or, rather, the

6    southwest end of this basin is almost towards this body of

7    water down here.  Do you know what that body of water is above

8    C114?  I'm pointing to it right there.

9    A.    Perdido Bay.

10   Q.    All right.  So your basin goes almost out to Perdido Bay,

11   is that fair to say?

12   A.    Yes.  The Elevenmile Creek basin goes all the way to the

13   bay.

14   Q.    So, you calculated the rainfall amounts and applied it to

15   the basin, correct?

16   A.    Yes.

17   Q.    And in your report you said rainfall totals in the entire

18   event ranged from 13 to 23 inches from north to south across

19   the basin, correct?

20   A.    Yes.

21   Q.    You also say in your report in your conclusion, "Return

22   periods for the entire event ranged from 50 to 100 years in the

23   northern part of the basin to approximately 500 years in the

24   south," correct?

25   A.    Yes.

1   Q.   Do you know where the neighborhood is, sir, with regard to

2   the drawing?

3   A.   Pretty close, yes.

4   Q.   I'm going to mark on here -- does that look like about

5   where the neighborhood is?

6   A.   Yes.

7   Q.   Is that fair?  And I've marked the area just south of --

8   there's kind of a triangle in the center of this basin,

9   correct?

10  A.   Yes, it's just northeast of Interstate 10, which is on that

11  map.

12  Q.   Now, did you provide your rainfall to any other experts in

13  this case?

14  A.   We were asked to get an estimate of the rainfall for the

15  whole basin and provide it to a hydrologist, so that's --

16  Q.   Which hydrologist did you provide it to?

17  A.   Who?

18  Q.   Who?

19  A.   Jim Duke.

20  Q.   Did you give it to also Frank Lan?

21  A.   Yeah, I think it went to him, too, but my conversations

22  were more directly with Jim Duke.

23  Q.   Well, I'm just wondering did you give your rainfall

24  analysis to Frank Lan?

25  A.   I sent on the OneRain information that we're looking at

1    here to both of them, as I recall.

2    Q.   Now, looking at what you were showed yesterday, this is

3    Defendant's 63(c).  I'm sorry, we're zoomed in a little too

4    much here.  You recognize this from yesterday?

5    A.   I do.

6    Q.   Okay.  And this is a radar accumulation of the April 29th

7    storm, correct?

8    A.   Yes.

9    Q.   And the times here, they're difficult to see.  I'm going to

10   kind of move in on this part of the graph.  I want to

11   understand this legend right here.

12        We've got the beginning time that starts Greenwich Mean

13   Time, which Central Time is about five hours before that in

14   Daylight Time, correct?

15   A.   Exactly five hours, yes.

16   Q.   So this is going from 4:29 Greenwich Mean Time to June

17   [sic] 1st Greenwich Mean Time, correct?

18   A.   Yes, May 1st.

19   Q.   Okay, May 1st.  I'm sorry, I said June.  So how much --

20   what's the period of time that it goes from beginning to end?

21   Two days?

22   A.   I'm not sure I understand your question.  Do you mean the

23   storm or this --

24   Q.   I'm talking about what this says is the beginning, if I

25   were to just go 4/29 and I go for -- forward in time until the

1    end at the early morning of June [sic] 1st, I've gone two days,

2    correct?

3    A.    Yeah.    That period is almost 48 hours.    That's not the

4    duration of the storm.    That's the duration of --

5    Q.    That's not the question I asked you, Mr. Wistar.    I just

6    wanted to know if you could explain that this graph shows that

7    this is a two-day accumulation?

8    A.    I'm about to explain and you cut me off.    That is the radar

9    -- the time that the entirety of the Eglin radar scope has some

10   precipitation on it, so it starts tabulating with the very

11   first rain it finds anywhere within a 200-mile radius of the

12   radar site, and it continues to tabulate and total it up and

13   add it up until the very last raindrop leaves.

14        And so, that time has nothing to do with the length of our

15   storm in our basin.    That time is the time the Eglin radar

16   scope is seeing something, and it stops adding it all up when

17   it's finished seeing any rain on the scope.    So, within that

18   time is our storm.

19   Q.    And this storm is 26 hours, correct?

20   A.    Yes.

21   Q.    And that's over one day?    That's more than one day, you'd

22   agree with that?

23   A.    It's more than one day, yes, slightly more than one day.

24   Q.    Now, looking at this legend, you do agree with me that

25   these are 4-foot increments in these different colors?

1   A.   Well, it depends on where on the scale you are, and it's

2   actually inches, it's inches of rain.

3   Q.   Oh, I'm sorry.  Four-inch increments between each one in

4   accumulation rainfall, correct?

5   A.   Well, on the lower part of the scale it's much less than

6   that, but when you get up to 12, 16, and 20, then it's 4-inch

7   increments.

8   Q.   Well, let's just look at the colors that we see here.  So,

9   yellow is 8 inches, right?

10  A.   Yeah, okay, correct.

11  Q.   Correct?

12  A.   The colors we have on our screen here are on the higher end

13  so they're the 4-inch separations, yes.

14  Q.   All right.  So these are 4-inch increments between these

15  colors, correct, Mr. Wistar?

16  A.   Yes, between the colors on the radar picture, yes.

17  Q.   Okay, thank you.  And then International Paper is in an

18  area that's shaded orange, correct?

19  A.   Yes, they're right at the southern end.  That's the

20  northern part of their property up on the Muskogee Road, and

21  yes, it's right at the lower end of the radar estimate of 12 to

22  16 inches.

23  Q.   Right.  So that's -- orange, that's 12 inches, correct?

24  A.   Well, it's 12 to 16, and they're almost up to where it

25  changes to 16 to 20.  They're very close to 16.

1   Q.   Okay.  So it's your opinion that 16 to 20 is what's shown

2   in light red?

3   A.   Yes, that's what the key shows.

4   Q.   And then you're saying that even the dark red is 20 to 25?

5   A.   Correct.

6   Q.   So, this is showing, if I understand this correct, upwards

7   of 20 inches and it's south of International Paper, according

8   to what you're looking at?

9   A.   Yes.

10  Q.   Now, as far as this area right here, if it is looking at

11  let's just say 16 inches, let's just say 16 inches at

12  International Paper's property, I'd like to show you --

13            **MR. KAUFFMAN:**  This has not been admitted, Your Honor.

14            **THE COURT:**  Okay.

15  **BY MR. KAUFFMAN:**

16  Q.   Mr. Wistar, do you recognize this document?

17  A.   Yes.

18  Q.   This is a rainfall frequency analysis, correct?

19  A.   Correct.

20            **MR. KAUFFMAN:**  Any objection?

21            **MR. NELSON:**  I haven't seen it.

22            **MR. KAUFFMAN:**  Oh, I'm sorry.

23            **MR. NELSON:**  No objection.

24            **THE COURT:**  And the number is what, again?

25            **MR. KAUFFMAN:**  It's Plaintiffs' 223, Your Honor.

1          **THE COURT:**   That's admitted.

2          **(Plaintiffs' Exhibit 223 admitted into evidence.)**

3          **MR. KAUFFMAN:**   May I publish?

4   **BY MR. KAUFFMAN:**

5   Q.   Mr. Wistar, you mentioned yesterday about pinpointing a

6   plot on a map and being able to -- basically being able to pull

7   up a table that would tell you the frequency of the storm; is

8   that correct?

9   A.   Yes.

10  Q.   And this is pinpointed on -- when we zoom in on the

11  crosshairs here, you see the ponds there?

12  A.   I do.

13  Q.   And this is International Paper's property, correct?

14  A.   Yeah, it's actually the northern part of the property, yes.

15  Q.   And you said the northern part of the property that the

16  rainfall low end was 13 inches, correct?

17  A.   Well, not at the property but --

18  Q.   Within the basin; is that correct?

19  A.   At the very top of the basin, yeah, north of the property.

20  Q.   So if we look at 13 inches -- and that's for the entire

21  storm, correct?

22  A.   Yes.

23  Q.   If we look at this grid down here -- I know this is a

24  little -- this is a table so I want to be clear about this.  On

25  the left side is duration of time for -- for the measurement,

1    correct?

2    A.    Yes.

3    Q.    And along the top are average occurrence intervals in

4    years.  So, when we're talking about a 1-in-10-year storm, it's

5    the 10 column?

6    A.    Correct.

7    Q.    If we're talking about a 1-in-100-year storm, it's the 100

8    column, correct?

9    A.    That's true, yes.

10   Q.    So, if I'm looking at a two-day total on this for 13 inches

11   at the top of the basin, I'm looking at the number right here,

12   correct?

13   A.    That's what you're looking at, yes.

14   Q.    Right.  And that would be in the interval of 25 or less

15   than a 25-year storm, correct?

16   A.    That would be if the storm lasted for 48 hours, but it did

17   not.  That's not the appropriate place to look.

18   Q.    I want to zoom in on that just a little bit.  So this is

19   the one for -- what I've marked as the one for two days, right?

20   A.    Yes.

21   Q.    Well, let's look at the one for 28 -- I'm sorry -- for 24

22   hours.  13 inches is what you say fell in the northern part of

23   the basin.  And if I mark this correctly, if I were to apply

24   this to this table, 13 inches is below this number right here,

25   right?

1    A.    Yes.

2    Q.    So, even on the 24-hour scale, even though it rained for 26

3    hours longer than that, what fell at the northern end is less

4    than 50-year, correct?

5    A.    That's very close to how much fell at the northern end, so

6    it's about 50 years.

7    Q.    So, right?  It's below the number -- 13 is lower than 13.6,

8    correct, Mr. Wistar?

9    A.    Yeah.  You need to be careful of getting too precise here

10    because --

11    Q.    You can't get too precise, I mean, you said that you were

12    able to --

13    A.    In other words, it's much closer to 50 than 25.

14    Q.    So, you're saying that when you decide in your report what

15    amount of years you're going to put on it, there's a lot of

16    wiggle room as far as where you can put it along the chart?

17    A.    We're just trying to get to the closest value.  I mean,

18    it's much closer to 50 than 25, if you look at that column.

19    Q.    Okay.  So, even though the number is lower than 13, you

20    would say this is 13 inches, that's less than a 50-year storm,

21    but I can call it a 50-year storm?

22    A.    It's very close to a 50-year storm.  I mean, our 13 inches

23    is a radar estimate, so there is maybe a 5 percent error factor

24    in the analysis using the radar so -- but we're within that

25    ballpark.  It might be 45.

1    Q.    There were some rain gauges in the study area, correct?

2    A.    Yes.

3              **MR. KAUFFMAN:**   This has not been admitted.

4    **BY MR. KAUFFMAN:**

5    Q.    Mr. Wistar, you mentioned a network on your direct

6    testimony that measures rain at their houses or other places

7    and they actually measure them in a physical rain gauge.  You

8    remember that yesterday?

9    A.    Yes.

10   Q.    You said you're part of that community as well?

11   A.    I am.

12   Q.    Is that the CoCoRaHS community?

13   A.    Yes, I'm a member.

14   Q.    What I've shown you is a rain gauge from CoCoRaHS, and it

15   is from a gauge that is FL-ES-4.  Do you have an idea where

16   that gauge is?

17   A.    Yeah, it's just east of the IP plant in a neighborhood

18   about -- there's a road that runs up the east side of the

19   plant, my memory says it's Route 29, I'm not 100 percent sure

20   about that, but it's about five houses on the other side of

21   that road from the International Paper property.

22   Q.    Right.

23   A.    So, it's up there right near where Muskogee Road comes into

24   what I think is Route 29.

25   Q.    So, you thinks it's over by Route 29, and it's a little

1   farther south in the basin than the top of International

2   Paper's property?

3   A.    It's a little farther east, like five house east across

4   Route 29 to the east.

5   Q.    Okay, so it's a little bit to the east?

6   A.    Yes.

7   Q.    Do you recognize -- this is part of the rain gauge data

8   that you used in your report, correct?

9   A.    Yes.

10          **MR. KAUFFMAN:**  Move to admit.

11          **MR. NELSON:**  No objection.

12          **THE COURT:**  It will be admitted.

13          *(Plaintiff's Exhibit ** admitted into evidence.)*

14          **MR. KAUFFMAN:**  And publish to the jury.

15  **BY MR. KAUFFMAN:**

16  Q.    Now, Mr. Wistar, this is the printout from the FL-ES-4

17  gauge, and this one is at the mill, basically, on the east

18  side.  I'm going to go down here.  And, first, these are daily

19  amounts, correct?

20  A.    Yes.

21  Q.    So, these are 24-hour amounts that are recorded, correct?

22  A.    That is correct.

23  Q.    So, when I see 4/28/2014 at 4:00 a.m., T just means that

24  there was a trace of rain, right?

25  A.    Yes.

1  Q.   And then all the zeros above that are all the times it

2  didn't rain prior to April 29th, correct?

3  A.   Yes.  I see there's a missing day there, but yes.

4  Q.   There's a missing day on 4/21, right?

5  A.   Right, it's not there.  They, I don't know, didn't take the

6  observation that day.

7  Q.   Right.  So, looking at the storm, we've got a 4:00 a.m.

8  measurement on 4/30/2014, and that's 13.93 inches?

9  A.   Yes.

10 Q.   Now, I'm just going to put down two numbers here -- we're

11 going to have to do just a little bit of math.  13.93 and then

12 we're going to add 1.5 to it.  Do you agree with me that that

13 would be 15.43?

14 A.   Yes.

15 Q.   And that's a two-day total, correct, because it's measuring

16 24 hours and then another 24 hours?

17 A.   Yes.  And you need to add the 37, too, at the bottom.

18 Q.   So, even if I add the 37 to the bottom --

19 A.   Yeah, because these observations -- you can see on the left

20 -- near the left side is the time, 4:00 a.m.  This person,

21 amazingly, goes out at 4:00 a.m. every day to take the rainfall

22 observations.  And it rained a bit more after 4:00 a.m. on the

23 30th, so that's -- that rain, that last part of the storm is

24 the 37-hundredths in the bottom row.

25 Q.   I understand.  So, if I add up all three numbers from the

1    observation on the 29th, the observation on the 30th, the

2    observation on the 1st, is my math right, I've got 15.8?

3    A.    Yes.

4    Q.    15.8 would be a two-day number we could use, right?

5    A.    It's the storm, it's the 26-hour total.

6    Q.    Okay.  So, if I were to look back here at our chart, it's

7    Exhibit 223, remember the bottom line is the two-day where I've

8    marked it above one is 24 hours?

9    A.    Right.

10   Q.    So, if I were to take that first number of 13.93, I'm close

11   to that 25-year event if I were to look at a two-day total,

12   right?  I'm sorry.

13   A.    You've left me behind there.

14   Q.    If I was to look at a 24-hour total for 13.93, I'd be at a

15   50-year event, correct?

16   A.    That's not the whole storm.  Why would do you that?

17   Q.    I'm just asking you, for 24 hours of rain would this be a

18   50-year event?

19   A.    About, yeah.  You've left out an important part of the

20   storm there, but yes.

21   Q.    Okay.  Well, if I look at the entire amount, which you said

22   is over two days, and I look at 15.8, 15.8 is less than 16.3

23   right here, correct?

24   A.    That is correct mathematically, but that's not what you

25   want to look at here.  That bottom line you just highlighted is

1    for 48 hours.  This storm was nowhere near that long.

2    Q.   Right.  But it's 26 hours?

3    A.   Yes.

4    Q.   So, how can you really use the 24 range because you're

5    adding in two hours of rain in there somewhere?

6    A.   You can interpolate between that.

7    Q.   You can add rain to the --

8    A.   Well, the 26-hour --

9    Q.   -- 24 hours and get there?

10            **MR. NELSON:**  Your Honor, I'm sorry --

11            **THE COURT:**  Let's -- if you'll allow him to finish his

12   question --

13            **THE WITNESS:**  Okay, sorry.

14            **THE COURT:**  -- before you answer.

15            And please allow him to answer before you ask another

16   question.  Thank you.

17   **BY MR. KAUFFMAN:**

18   Q.   So, I was asking, Mr. Wistar, is it, you can take 26 hours

19   of rain and apply it to a 24-hour interval; is that what you're

20   saying?

21   A.   Not exactly.  But 26 hours is much closer to -- the 24-hour

22   number is the one we want to look at, not the 48-hour, which is

23   much longer.  But yes, there is some -- you have to interpolate

24   here a little bit between the numbers, because we don't have a

25   26-hour line here, so we have 24 and 48.  26 is much closer to

1    24 than 48, so that is the line that's going to get us much

2    closer to the number we want.

3    Q.   Is there some set of rules that you're aware of that says

4    that within 26 you go by the 24 or something that -- that says

5    that you can basically add rain that happened after a 24-hour

6    period to apply it to a 24-hour period?

7    A.   There's not a rule.  It's just common sense.

8    Q.   Well, there's not a rule?

9    A.   We're trying to figure out how unusual this storm is, so it

10   was slightly more than 24 hours, we have to -- we know that.

11   Q.   Okay, so, slightly more than 24 hours, okay.  So, going

12   back, we had a two-day total of 15.8.  And even applying it,

13   although it's 26 hours of rain, to the 24 hours, in the line

14   above it's less than a 100-year, right?

15   A.   It's very close --

16   Q.   I'm going to highlight the 16 there, right?  You see the

17   16?

18   A.   Yes.

19   Q.   Yeah, it's less than that, right?  15.8 is less than 16?

20   A.   It's a little bit less, yes, it is.

21   Q.   Now, you said that you gave your rainfall amounts to

22   Dr. Lan.  And this is not in evidence, but I'd like to show you

23   a figure and see if you recognize it.

24           **MR. KAUFFMAN:**  This is Dr. Lan's -- for identification

25   purposes, this is Dr. Lan's report, page 4-4.

1    **THE COURT:**  Is there any objection?

2         **MR. NELSON:**  I don't object to the admission, but I

3    don't know what the witness knows.

4         **THE COURT:**  Yeah, okay.  Is this marked?

5         **MR. KAUFFMAN:**  Your Honor, it is Defendant's Exhibit

6    60 and this is page 4-4 from Defendant's Exhibit 60.

7         **THE COURT:**  Right, but it's not in evidence.

8         **MR. KAUFFMAN:**  No, it's not.  I'd like to show it for

9    demonstrative purposes.

10        **THE COURT:**  All right.  If there's no objection, then

11   I won't object.

12   **BY MR. KAUFFMAN:**

13   Q.   Mr. Wistar, you said you provided your rainfall to Dr. Lan,

14   correct?

15   A.   I believe so, yes.

16   Q.   And Dr. Lan did his own work with that rainfall applying it

17   to the basin, correct?

18   A.   I presume.

19   Q.   And what's in front of you is Dr. Lan's representation of

20   that rainfall, correct?

21   A.   If you say so.  I've never seen this before.

22   Q.   Okay.  But you would be able to look at these numbers and

23   be able to understand and apply it to the chart we were looking

24   at, correct?

25   A.   Maybe.  I don't know what these colors mean at this point.

1   Q.   Okay, well --

2          **THE COURT:**  If you're going to ask him to testify

3   based on this document, it's got to be admitted.

4          **MR. KAUFFMAN:**  Okay.  Well, then I move --

5          **THE COURT:**  If you're going to be asking him questions

6   about a document that he's never -- I don't know if he's seen

7   it but he certainly didn't prepare it, the record has got to be

8   clear what it is and it will have to be admitted.

9          **MR. KAUFFMAN:**  All right.  Well, I will move for the

10  admittance of Figure 4-4 from Dr. Lan's report.

11         **THE COURT:**  And what number are you going to use?

12         **MR. KAUFFMAN:**  We will use 60a, Your Honor,

13  Defendant's Exhibit.

14         **THE COURT:**  No, please don't identify it by a

15  Defendant's exhibit.

16         **MR. KAUFFMAN:**  I'm sorry.  Plaintiffs' 303, Your

17  Honor.

18         **MR. NELSON:**  Your Honor, I object at this time to this

19  exhibit.

20         **THE COURT:**  Approach the bench, please.

21         *(Bench conference between the Court and counsel:)*

22         **THE COURT:**  Why are you attempting to admit Dr. Lan's

23  exhibit with this witness?

24         **MR. KAUFFMAN:**  Mr. Wistar indicated that he gave his

25  rainfall to Dr. -- he gave it to Dr. Lan, and Dr. Lan put it

1    into his analysis.  I'd like to ask him about the frequency

2    intervals.  He's a meteorologist who can address the frequency

3    intervals that are in the report.  I'm not asking about the --

4              **THE COURT:**  Well, it's hearsay.

5              I mean, I assume that's your reason --

6              **MR. NELSON:**  That's the objection, Your Honor.

7              **THE COURT:**  It's hearsay.

8              **MR. KAUFFMAN:**  I don't have a response, Your Honor.  I

9    mean, I think that this document -- I do recognize that it's

10   hearsay.  I think it's not offered for the truth of the matter

11   for this being the rainfall in that area.  I would like to

12   say that, assuming that this rainfall fell -- I'm not saying

13   that that's the rainfall that was -- what would the interval

14   be.

15             **THE COURT:**  Your request is denied.

16             Your objection is sustained.

17             *(Bench conference concluded.)*

18             **THE COURT:**  Ladies and gentlemen, that exhibit will

19   not be admitted at this time.

20             I do hope you all are pleased with our new projector

21   and your ability to hopefully see the evidence, along with

22   everyone in the courtroom, to see the evidence better, not that

23   you couldn't see it, but it's easier to see now.

24   **BY MR. KAUFFMAN:**

25   Q.   Mr. Wistar, I'm going to show you what's been marked for

1  identification as Plaintiffs' 304.  And do you recognize the

2  area that is on the map in front of you?

3  A.  I'm struggling with it.  I'm trying to figure out what

4  we're looking at here.  Yes, I -- I basically recognize the

5  area, yes.

6  Q.  And you recognize this as gridded rainfall over the

7  Pensacola area, correct?

8  A.  I see that.  I don't know where it came from.

9  Q.  The top of the document says that it's a Escambia County

10 2014 Stormwater Event Re-Creation.  Do you see that?

11 A.  I see that, yes.

12 Q.  And that's prepared by HDR?

13 A.  Do you want this up there on the screen?

14      **THE COURT:**  If you're going to ask him any more

15 questions about it, it certainly does need to be -- we need to

16 admit it.  Are you moving to admit it?

17      **MR. KAUFFMAN:**  I'll move to admit it.

18      **THE COURT:**  304?

19      **MR. KAUFFMAN:**  304, yes, Your Honor.

20      **MR. NELSON:**  Your Honor, there's a completeness issue

21 about this particular page from a larger exhibit.

22      **THE COURT:**  Well, you can cover that on redirect.  I'm

23 going to allow this one page -- it's a one-page exhibit, am I

24 right?

25      **MR. KAUFFMAN:**  That's correct, Your Honor.

1      **THE COURT:**  There may be more to it later.  So 304 is

2   admitted.

3      (Plaintiffs' Exhibit 304 admitted into evidence.)

4   **BY MR. KAUFFMAN:**

5   Q.   Now, Mr. Wistar, I was asking you about this gridded

6   rainfall.  And you can see the time period that we're talking

7   about here was 4/29, 4:00 a.m. to 4/30, 9:00 a.m.  That covers

8   the time of the storm event on April 29th to April 30th,

9   correct?

10  A.   Not quite.  The heavy rain in our basin fell between 3:00

11  and 4:00 a.m. on the 29th, so this seems to begin right after

12  that.

13  Q.   So, the rain began within an hour of the rainfall in this

14  gridded analysis, correct?

15  A.   A whole lot of rain fell in the hour that's missing.

16  Q.   And then this is prepared by Escambia County, Storm Event

17  Re-Creation result, final Z-R gridded rainfall analysis, you

18  see that?

19  A.   I see it.

20  Q.   And it's got HDR, that's a company that does rainfall

21  re-creation, correct?

22  A.   I've not heard of them.  I believe you.

23  Q.   And looking at this map, how much rain do you think fell

24  between 3:00 and 4:00 a.m., just so I know whether you think

25  it's the heavy amount that may be missing?

1  A.   Approximately 2 inches of rain fell in the class area.

2  Q.   You think 3 inches of rain fell between 3:00 a.m. and 4:00

3  a.m.?

4  A.   Yeah.  We looked at that yesterday.  That was the initial

5  burst with that initial band that came through, and it hit them

6  during that hour.

7  Q.   Right, and it went between three and 5:00 a.m., right?

8  A.   Well, most of it fell in one hour, a little bit lingered

9  after four.

10  Q.   Okay.  Well, we'll take your statement that it's 2 inches

11  that may be missing from this.  But I want to ask you, if we

12  look at this from the standpoint of what is on this chart right

13  here, the edge of your basin stops around here, right, where

14  I've marked right here or I've put my pen?

15  A.   Roughly, yes.

16  Q.   Roughly.  And your area goes up and through -- basically,

17  if I were to take this and go like this, that may be your basin

18  going up through there, correct?

19  A.   Something like that, yes.

20  Q.   Something like that.  So, if I were to look at the numbers

21  here, and let's just see in the southern part which has, you

22  know, the heaviest rainfall, I see 18 inches.  You see that?

23  A.   I see it, yes.

24  Q.   Okay.  So, if I were to look at 18 inches, this is the

25  heaviest rainfall in the event, and you said that there was how

1   many inches of rainfall in the top end of the event?

2   A.   In that area there was more than 20.  This data looks

3   wrong.

4   Q.   Okay.  So, you think that the data from Escambia County is

5   wrong?

6   A.   It doesn't -- I don't know where it comes from and I don't

7   know how they do it but it doesn't -- the rainfall got heavier

8   as you went south, which is not what this is showing.

9   Q.   This doesn't show heavy rainfall north to south?  We've got

10  18, 17, going all the way up to 15.  That looks heavier in the

11  south than --

12  A.   Well, if you look carefully, it starts around 15 in the

13  north and it climbs to 19, approximately, where it says

14  Pensacola 9.2 northwest, and then it goes down again as you go

15  south.  And I don't think that going-down part is accurate.

16  Q.   Looking at this, you have 23 inches of rain in this area.

17  And even if looking at this number that you don't think is

18  correct with 18 inches down here in the bottom left, do you

19  have an idea of what the interval would be for actually this

20  time period, which is two days, because we're talking about 26

21  hours, correct?

22  A.   Yes, 26 hours.

23  Q.   Right, 26 hours, two days, so 18 was the number off of that

24  document.  We've looked at -- back on the rainfall gauge, if

25  you look at a two-day total for 18, going over here, the bottom

1    line that's been highlighted is the two-day total.  18 is less

2    than this column right here, which, if we zoom out, is a

3    100-year event.  So, you would agree with me that Escambia

4    County is recording in the southwest corner of your study area

5    an amount that's less than 19 inches, correct?

6    A.    There's two mistakes in your premise.  Number one is you're

7    using the wrong row because it's much closer to 24 than 48

8    hours; and number two is it looks like their Escambia rainfall

9    map has errors in it because on this -- on the radar image we

10   looked at earlier there was 20 to -- over 20 inches of rain

11   down in that area.

12   Q.    Well, let's compare the two here.  So, the Escambia County

13   map, just looking at that, this is gridded rainfall, and they

14   have all these numbers around here, all these numbers, right,

15   by decimal points, if we look at this?

16   A.    Okay.

17   Q.    Decimal points everywhere, right?

18   A.    Yeah.

19   Q.    And then your analysis, we have this.  We have orange, red,

20   and dark red, and we have 4-inch increments between all these?

21   A.    Yes.

22   Q.    And you're saying that your analysis is more reliable or

23   more accurate than the Escambia County analysis, even though

24   yours doesn't show as much detail as theirs, correct?

25   A.    I have no idea how they did their analysis, but I assume

1  they must have looked at radar data.  This is the radar data

2  that they would have had to start with.

3  Q.   But their presentation -- and you didn't present it this

4  way?  You didn't present it in a way where we could really

5  identify the amount of rain that was actually in the

6  neighborhood, did you?

7  A.   I would not take something like this and put it down to two

8  decimal places when there's uncertainty involved.  I don't know

9  -- I mean, you can take a computer program and make it go to

10  two decimal places, but that doesn't mean it's more accurate,

11  it just means you have impressive numbers.

12  Q.   Well, let's look at what Escambia County said for the storm

13  event that happened at the neighborhood, because we can

14  actually drill down on the exact area -- the exact square for

15  the neighborhood.  And this is an event, remember, that lasts

16  actually 27 hours, according to them, right, if I have that

17  right, 4:00 a.m. to 9:00 a.m.?

18  A.   The rain did last longer down in their map area toward

19  Pensacola itself, but the rain didn't last until 9:00 a.m. in

20  our basin.  We discussed that yesterday.  By 9:00 a.m. it was

21  all done.

22  Q.   So, this a 27, and you have 26 hours.  And if we look --

23  this is very important -- the neighborhood at issue is north of

24  I-10 off of 97 up here.  So it's north of I-10 and it's

25  probably -- looking at this, there's Jack's Branch Road, we see

1   Kingsfield Road, comes down -- I'm going to identify it -- I'm

2   going to just take this one right here, I think it's between

3   these two, but 16.35 looks to be about the location of the

4   neighborhood, in fact, faintly I think we can see the

5   neighborhood maybe under 16.06, but I'll put 16.35.

6       Have I located the neighborhood fairly on this

7   demonstrative, on Exhibit 304?

8   A.   I think so.

9   Q.   So, this is saying 16.35, according to Escambia County,

10  fell at the neighborhood over the event?

11  A.   Well, you've got to add -- it's missing a couple of inches,

12  so you've got to take it up to between 18 and 19.

13  Q.   Looking back at our chart, remember it was 16.35, and it's

14  a 27-hour event.  So let's look at the two-day total first.

15  It's on the bottom line, right, two-day total?  We're going to

16  follow this column -- this is 50, right?  So, 16.35 is pretty

17  close to 16.3, you'd agree?  Yes?

18  A.   Mathematically, yes.  But again, you've got two errors in

19  what you're asking me.

20  Q.   And that would be a 50-year storm according to this table?

21  A.   Correct, according to the table, but that's not reality.

22  Q.   Okay.  And then, if we were to take the 24-hour total, even

23  though it's 27 hours of rain, the 24-hour total, this would be

24  just at no more than a 100-year storm, correct?  Looking at

25  what I've already highlighted, we've already highlighted 16,

1    we've seen it in other areas?

2    A.   But you're presenting me with data from a map that does not

3    include two additional inches of rain because the period of the

4    map began after the two inches fell.  So I can say yes to your

5    questions that you're pointing at here, but this isn't the

6    reality of what happened.

7    Q.   Well, the map is from 27 hours of rain, and then you're

8    saying that you want to add 2 inches to it, so not just go

9    longer than 24 hours but now add another 2 inches to it?

10   A.   What I'm saying is the map you presented me -- and I have

11   no idea how they made it, who made it, but the time on the

12   bottom of it starts at 4:00 a.m.  It rained like crazy in the

13   basin from three to four, about 2 inches worth, and that's

14   apparently missing from the map if it starts at 4:00 a.m.

15   Q.   The map had --

16   A.   So that's --

17   Q.   The number was 16.35, and that would be closest to the 100

18   interval on this chart, yes or no?

19   A.   On that chart, yep, it is.

20            **MR. KAUFFMAN:**  Pass the witness.

21            **THE COURT:**  Thank you.

22            Mr. Nelson?

23                      **REDIRECT EXAMINATION**

24   **BY MR. NELSON:**

25   Q.   Good morning, Mr. Wistar.

1    A.   Good morning.

2    Q.   I hope you enjoyed your not rainy evening in Pensacola last

3    night.

4    A.   I did.

5    Q.   I just have a few questions this morning.  There was quite

6    a bit of questioning during Mr. Kauffman's examination about

7    rainfall at the International Paper mill site and the CoCoRaHS

8    gauge that was near the mill site on Muskogee Road and Highway

9    29.  Do you recall that?

10   A.   Yes.

11   Q.   About how far north of the class area is the International

12   Paper mill and that CoCoRaHS gauge?

13   A.   My understanding is about 3 miles apart.

14   Q.   And was there a different amount of rainfall running north

15   to south?

16   A.   Yes.

17   Q.   And in the storm event where did more rain fall?

18   A.   To the south.

19   Q.   I think we saw that before.  If we could just pull up again

20   IP Exhibit 63(d), this is Exhibit 63(d) from your analysis,

21   Mr. Wistar; is that right?

22   A.   Yes.

23   Q.   What does this exhibit show us in terms of amounts of

24   rainfall near the IP mill as opposed to around the class area?

25   A.   You can see the differences.  The northern part of the

1    International Paper property is marked with a circle on this

2    map just above the red area.  That's up by -- you know, when we

3    started working on this case, I was given that address 375

4    Muskogee Road, so that's what I used to put this dot on the

5    map, I created this map background and put this dot on it.

6          And so, that is showing slightly under 16 inches of rain up

7    at that northern part of the area.  But as you go down, it's a

8    little bit hard to see, but I-10 is on there running from

9    southeast to northwest to the southwest of the site.  So, where

10   the class area is, it's right about the boundary between the 16

11   to 20 and the 20 and above.

12         So this radar makes it look like there was close to 20

13   inches of rain at the class site south of the northern -- you

14   know, three miles difference to make that difference -- three

15   miles to make that difference.  I'm not sure it was fully 20,

16   it might have been 19, but it was a very, very major rain event

17   there.

18   Q.   And in your opinion, Mr. Wistar, was the recurrence

19   interval of the rain event higher in the class area or up by

20   the International Paper mill site?

21   A.   Definitely higher in the class area.

22   Q.   Is there also an important element here relating to the

23   intensity of the rainfall the night of April 29th?

24   A.   Sure.

25   Q.   And how does the intensity of the rainfall the night of

1    April 29th factor into your assessment of the recurrence

2    interval for this storm event around the class area?

3    A.   Because it had rained hard early in the early morning hours

4    of the 29th and then stopped for several hours -- quite a few

5    hours, actually -- we did a second analysis on the 14-hour

6    period of most concentrated rain from the late afternoon of the

7    29th into the pre-dawn hours of the 30th, so that's a shorter

8    time period of 14 hours.

9    Q.   And if we considered that 14-hour time period around the

10   class area, what is your opinion about the recurrence interval

11   for the rainfall itself?

12   A.   Approximately once every 400 years for that concentrated

13   14-hour event.

14           **MR. NELSON:**   Thank you, Mr. Wistar.  No further

15   questions, Your Honor.

16           **THE COURT:**   Thank you.

17           Sir, you may step down.

18           **THE WITNESS:**   Okay.

19           *(Witness excused.)*

20           **THE COURT:**   Your next witness?

21           **MR. NELSON:**   Would be Mr. Christopher Curb.

22           Mr. Wistar may be excused?

23           **THE COURT:**   Yes.

24           **MR. GLASSER:**   Your Honor, may I approach?

25           **THE COURT:**   Yes.

1          *(Bench conference between the Court and counsel:)*

2          **MR. GLASSER:**  Your Honor, I just wanted to reiterate

3     for the record our objection to this witness.  He was disclosed

4     only as a fact witness, as we've argued, not disclosed as a

5     hybrid expert.

6          **THE COURT:**  I've ruled on this.  It's on the record.

7          **MR. GLASSER:**  I just wanted to preserve it.

8          **THE COURT:**  You don't waive it by not raising it now.

9          **MR. GLASSER:**  Okay.  I also just for the record want

10    to raise a 403 objection as well and also that the County

11    wasn't named as a *Fabre* defendant, and for me to cross him in

12    some ways kind of puts to the question what the County was

13    doing and, you know, that puts me in an awkward position.

14         **THE COURT:**  It should have been the subject of a

15    motion in limine.  I would have considered 403 in your

16    argument, the one you did present.

17         **MR. GLASSER:**  Your Honor, I'm making that argument now

18    just for the record.

19         **THE COURT:**  It's overruled.

20         *(Bench conference concluded.)*

21         **THE COURT:**  Sir, raise your right hand, please.

22         **CHRISTOPHER CURB, DEFENSE WITNESS, DULY SWORN**

23         **MADAM CLERK SIMMS:**  Be seated.  Please state your full

24    name and spell your last name for the record.

25         **THE WITNESS:**  Christopher Allen Curb.  Last name is

1    C-u-r-b.

2                    **THE COURT:**  Mr. Nelson, when you're ready.

3                    **MR. NELSON:**  Thank you, Your Honor.

4                         **DIRECT EXAMINATION**

5    **BY MR. NELSON:**

6    Q.   Good morning, Mr. Curb.

7    A.   Good morning.

8    Q.   We've met before this morning, correct?

9    A.   Yes, sir.

10   Q.   Have you provided me with factual information that you have

11   in your capacity as an employee of Escambia County?

12   A.   Yes, sir, I've provided you several documents and reports

13   that are from the county records.

14   Q.   What is your current occupation, Mr. Curb?

15   A.   I am at stormwater engineering manager for Escambia County

16   engineering department.

17   Q.   How long have you worked for Escambia County?

18   A.   22 years.

19   Q.   And in what area have you worked over that period?

20   A.   I've done stormwater the whole time.  I've done development

21   review of subdivisions, commercial site plans, permitting.  I

22   work in infrastructure and management now.  If it's got to do

23   with stormwater, I pretty much handle it.

24   Q.   And that's been the case now for 20 years?

25   A.   22.

1    Q.   What is your educational background, Mr. Curb?

2    A.   I have an associate's degree in applied science of drafting

3    and a bachelor's degree from Auburn University in civil

4    engineering.

5    Q.   Mr. Curb, are you aware of flooding in the Bristol Park and

6    Ashbury Hills neighborhoods before April of 2014?

7    A.   Yes, sir.

8    Q.   Have you personally observed the aftereffects of flooding

9    in the Bristol Park and Ashbury Hills area before April 2014?

10   A.   Yes, sir.  After I think it was Hurricane George in 1998, I

11   witnessed a good bit of damage from flood -- flooding in the

12   subdivisions of Bristol Park and Ashbury Hills.  The flood

13   stage in the creek had gotten so high that it was knocking

14   brick mailboxes over in the subdivision.  There was a big brick

15   fence in front of the Ashbury Hills subdivision, took that

16   brick fence out.  So a lot of houses flooded, people taking,

17   you know, all their belongings out and putting them by the

18   road, ripping out carpet, Sheetrock, that type of thing.  That

19   was after Hurricane George.

20        Ashbury Hills, which is right next to Bristol Park on the

21   other side of the creek, they had flooding more times than --

22   than I can probably count because their road is in a low valley

23   around the back side of the subdivision.

24        So yeah, I've witnessed quite a bit of flooding in the

25   Bristol Park area mainly from major storm events like Hurricane

1   George, April 2014 storm.

2       I can't remember in April 2005 what the extent of the

3   flooding was in there, but that was another storm event of

4   significant proportion.

5       **THE COURT:**  Mr. Nelson, could I ask you and

6   Mr. Glasser to come up just one minute.  I apologize for

7   interrupting you.

8       *(Bench conference between the Court and counsel:)*

9       **THE COURT:**  Mr. Glasser, as I indicated, you did not

10  need to re-raise your objection to preserve it, the objection

11  that was raised in the Motion in Limine regarding Mr. Curb

12  testifying here as an expert.  I deemed him to be qualified to

13  testify within the scope of his experience and work with

14  Escambia County in stormwater management.

15      But to the extent you believe a particular question by

16  Mr. Nelson exceeds the scope of my order, then you would need

17  to object.  Not to him being admitted as a witness allowed to

18  testify; I've already ruled on that, so you have a standing

19  objection that's been dealt with.

20      But to a particular question that you believe exceeds

21  the scope of the ruling I've already made, then you can -- and

22  I'll rule, you can stand up and say you object.

23      **MR. GLASSER:**  Your Honor, I appreciate that.  I do

24  want to raise particularly that I don't think he should be

25  giving any causation opinions personally.  I understand the '99

1    report is coming in.  But as he was not disclosed as a hybrid,

2    I don't believe he should be a new ultimate issue causation to

3    be elicited by the Defendant from this witness about 2014.

4    That goes to the ultimate --

5          **THE COURT:**  I didn't expect you to be asking him on

6    what his opinion is as to the cause of --

7          **MR. NELSON:**  No, absolutely not, I'm not going to ask

8    him his opinion on the cause of the 2014 event.

9          **THE COURT:**  Thank you.

10          *(Bench conference concluded.)*

11          **THE COURT:**  Thank you.  You may proceed.

12   **BY MR. NELSON:**

13   Q.   Mr. Curb, you mentioned the flooding that you had

14   personally observed in the Bristol Park and Ashbury Hills area

15   after Hurricane George in 1998.

16   A.   Yes, sir.

17   Q.   Did the County receive any expression of concern or

18   complaints from residents regarding that flood event?

19   A.   Yes, sir.

20   Q.   And can you describe what you remember about that?

21   A.   Well, we -- there was a lot of homes that flooded in there.

22   And in response, the County contracted a drainage study --

23   master drainage plan study for the area to -- in response to

24   the complaints from the residents.

25          **MR. NELSON:**  Your Honor, permission to approach?

1      **THE COURT:**  Yes.

2   **BY MR. NELSON:**

3   Q.   Mr. Curb, I've handed you a document that we have marked as

4   IP 51.  Can you identify -- without get into detail, but just

5   identify what this document is?

6   A.   This is Elevenmile Creek drainage study.  It was contracted

7   with a company called Carlan Killam to provide this study to

8   the County in response to the 1998 Hurricane George event.

9   It's actually a re-study of the 1994 master drainage plan of

10   Elevenmile Creek.

11   Q.   And is the document that we've marked as IP Exhibit 51 a

12   public record of Escambia County?

13   A.   Yes, sir, it is.

14   Q.   Do you have personal familiarity with this document?

15   A.   It's -- for a stormwater guy, it's more of a bible for a

16   stormwater guy.  This tells us what we need to do in the basin

17   and it outlines cost, conceptual plans for stormwater flood

18   prevention and water quality.  I use this as well as other

19   master drainage plans that we've contracted out with the County

20   on a daily basis.  So, yes, I'm real familiar with this.

21      **MR. NELSON:**  Your Honor, I move to admit IP Exhibit 51

22   into evidence.

23      **THE COURT:**  Consistent with my prior rulings, it will

24   be admitted.

25      (Defendant's IP Exhibit 51 admitted into evidence.)

1          **MR. NELSON:**  May we publish?

2     **BY MR. NELSON:**

3     Q.   If we just look at the front page of the document,

4     Mr. Curb, up at the top is -- there's a seal.  What is that?

5     A.   That's the Escambia County Board of County Commissioners

6     county seal.

7     Q.   Does this make this an official county document?

8     A.   Yes, sir.

9     Q.   If we could turn, please, to page 1-1 of the document, and

10    just talk a little bit about the objectives of the study and

11    the purpose of the study, please.

12    A.   Any one of our master drainage plans study, the purpose of

13    the study is to model the entire basin, basically get a picture

14    in time of what the drainage is doing in the basin.

15         In this particular one, Elevenmile Creek basin study, it's

16    22,600 acres of a basin with a natural creek and 56 tributaries

17    that drain into this creek.

18         What we do is we model all the stormwater ponds in the

19    basin, all the major drainage systems, channels, anything 30 to

20    36 diameter pipe or equivalent channel sizes, those are all

21    modeled in a big stormwater model and they run this model to

22    determine where all the flooding problems are.

23         We calibrate this stormwater model with flooding

24    questionnaires and rain gauge data.  So, for example, we'll run

25    a 25-, 100-year storm event through the ICPR model, and it will

1    tell us what the flood stage is in of the creek, what the

2    problems would be under water in a 100-year floodplain.  It

3    identifies where there's areas that have flooded.

4         This is also calibrated by flooding questionnaires that are

5    sent out to the -- all the property owners in the basin.

6    That's how all our stormwater master plans are done.  Then it

7    goes into identifying existing problems and what are the

8    proposed solutions and what does it cost for those solutions.

9         We use this document to come up with our capital

10   improvement plans for stormwater.  And this is just one of many

11   master drainage plans that the County has for various basins in

12   the county.  Elevenmile Creek is one of three basin studies

13   that were started in 1994, Scenic Hills is another one, and

14   Eightmile Creek, which is another basin study.

15        And the County learned that the best way to approach

16   capital improvement plans is to do a master drainage plan and

17   come up with an organized plan instead of, you know, putting

18   Band-Aids out there and trying to -- oh, this culvert is not

19   big enough, if you make it bigger what happens downstream or

20   upstream.  So that's why we utilize master drainage plans for

21   coming up with capital improvement plans.

22   Q.   Thank you, Mr. Curb.  You mentioned questionnaires.  Could

23   you flip to page 3-1 and take a look at the section "Data

24   Compilation."

25   A.   Yes.

1    Q.   So was there a questionnaire process that was incorporated

2    in the 1998 -- I'm sorry -- the 1999 County study?

3    A.   Yes, sir.  The questions there that are highlighted from

4    the questionnaires that we received from the zone of Bristol

5    Park area, the residents in the subdivision felt that Champion

6    was the cause of the flooding.

7         This was a main question that we had our consultants

8    evaluate.  And pretty much Champion is a fraction of the runoff

9    compared to the size of the basin.  And several of the homes

10   are constructed in that 100-year floodplain.  So the conclusion

11   was that Champion is not the cause of the flooding in -- the

12   flood stage at Elevenmile Creek.

13   Q.   Can I just ask you, Mr. Curb, what is Champion known as

14   today, if you know?

15   A.   IP, International Paper.

16   Q.   Thank you, Mr. Curb.  Let's flip back to that Appendix A,

17   if we could, just so the jury has an opportunity to see the

18   nature of the questionnaire process.

19   A.   Okay.

20   Q.   And we'll put it up on the screen, too, Mr. Curb, if it's

21   easier for you to look there, but if the hard copy is better --

22   A.   Oh, right here, okay, I didn't even see that.  That is a

23   typical flooding questionnaire that's sent out to all the

24   property owners.  The engineering firm at that time, Carlan

25   Killam Consulting takes those questionnaires and typically

1    summarizes them into a table.

2    Q.   And then if we flip back two pages into the document -- one

3    more -- can you identify what this is that we're looking at,

4    Mr. Curb?

5    A.   That's a summary of the questionnaires or the type flooding

6    that was witnessed by property owners in the area.

7    Q.   And there's a reference to Zone 1, do you see that?

8    A.   Yes, sir, that's the Bristol Park area, Ashbury Hills area.

9    Q.   And indeed under addresses we see several properties in the

10   Bristol Park and Ashbury Hills area?

11   A.   Total count was 19 that filled out questionnaires and

12   reported flooding of their business or residence.  That number

13   there of 19 is not representative of how many have flooded in

14   there, it's just what is based off the flooding questionnaire.

15   There were likely -- well, there are more than 19 that flooded

16   in that area.

17   Q.   Let's turn back to page 3.1 and look at the section 3.2.

18   This is describing that Zone 1, right?

19   A.   Yes, sir.  Approximately 11,000 acres that drain through

20   the Elevenmile Creek between Ashbury Hills and Bristol Park.

21   The upland watershed includes Champion International -- or

22   International Paper.  And the residents in the subdivision

23   witnessed the flood stage to where the flood stage exceeded the

24   banks of the creek during Hurricane George.

25   Q.   Thank you, Mr. Curb.  Let's flip forward to the next page,

1    3-2, and take a look -- you mentioned a conclusion that was

2    reached as a result of this study.

3    A.    Simply put, the residents felt that IP caused the flooding,

4    which is not the case.  International Paper is a very small

5    fraction of the flow compared to the 11,000 acres that drain

6    through the creek.  It's an enormous drainage basin that runs

7    through there, and there were several homes that were

8    constructed in the 100-year floodplain that flooded.  When you

9    have a watershed that big and you have an extreme event like we

10   had in April or Hurricane George --

11             **THE COURT:**  Excuse me, sir, just a minute.

12             Approach the bench.

13             *(Bench conference between the Court and counsel:)*

14             **THE COURT:**  I'm going to ask you to redirect him and

15   confine him to this event, not April -- I think he's talking

16   about April 2014.

17             **MR. GLASSER:**  In other words, 1998.

18             **MR. NELSON:**  Right.  And it's not my intent to elicit

19   that testimony.

20             **THE COURT:**  No, I know it isn't.

21             **MR. GLASSER:**  Your Honor, the witness is volunteering

22   broadly.  I think he -- I hope that we would keep him confined

23   to the questions.

24             **THE COURT:**  Well, okay.

25             *(Bench conference concluded.)*

1   **BY MR. NELSON:**

2   Q.   Mr. Curb, for purposes of this document, we want to keep

3   focused on the 1998 Hurricane George event.

4   A.   Yes, sir.

5   Q.   And I think you were pointing out that the reason the

6   County reached the conclusion it did about the flooding in

7   Bristol Park and Ashbury Hills in 1998.  So you may continue.

8   A.   The reason is, International Paper is a small contribution

9   to the basin compared to the entire basin.  As we read earlier,

10  it's 11,000 acres.

11  Q.   Thank you, Mr. Curb.  Let's move away from this paragraph

12  and take a look at the paragraph before it which describes some

13  of the work that went into analyzing the situation.  Do you see

14  that?

15  A.   Yes, sir.  It basically says our model -- we modeled the

16  25- and 100-year storm event, and several homes along Bristol

17  Park Drive are located within the 100-year flood stage.  Same

18  thing on Ashbury Lane, there's areas there that are below the

19  100-year flood stage as well.

20  Q.   And did the County have confidence in the conclusions that

21  were reached in the 1999 study?

22  A.   Yes, sir.

23           **MR. GLASSER:**  Objection.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  Yes, we have confidence in the basin

1    study.

2              **THE COURT:**  That's enough, sir, thank you.

3    **BY MR. NELSON:**

4    Q.   Let's move forward.  You had mentioned, Mr. Curb, that

5    there had been additional basin studies of the Elevenmile Creek

6    area conducted by the County; is that right?

7    A.   Yes, sir.

8              **MR. NELSON:**  May I approach, Your Honor?

9              **THE COURT:**  Yes, sir.

10   **BY MR. NELSON:**

11   Q.   Mr. Curb, again, without getting into the details yet about

12   this document, can you identify generally what IP Exhibit 52

13   is.

14   A.   This is the ICPR model.  It's basically another basin study

15   for a portion of Elevenmile Creek watershed.  It was completed

16   in May 2008 by Hatch Mott MacDonald, which is former Carlan

17   Killam.

18   Q.   So, the same company that had done the earlier study but

19   had changed names?

20   A.   Yes, sir.

21   Q.   Is this document IP 52 a document with which you have

22   personal familiarity?

23   A.   Yes, sir.  I was actually working on the project -- there

24   was a grant to Escambia County to rehabilitate one of the

25   drainage areas in here called Blue Pit.  As part of that grant,

1    the funding also allowed us to do an update to our Elevenmile

2    Creek basin, primarily the northern part of the Elevenmile

3    Creek basin, and that's what this study is.

4         **MR. NELSON:** Your Honor, I move to admit IP Exhibit 52

5    into evidence.

6         **THE COURT:** Consistent with prior rulings, that will

7    be admitted.

8         *(Defendant's IP Exhibit 52 admitted into evidence.)*

9         **MR. NELSON:** May we publish?

10        **THE COURT:** Yes.

11   **BY MR. NELSON:**

12   Q.   If we take a look at the cover of the document, Mr. Curb,

13   what is that stamp up in the top right-hand corner?

14   A.   That's the Escambia County seal.

15   Q.   Is this document an official public record of Escambia

16   County?

17   A.   Yes, sir.

18   Q.   Let's flip forward to page 1.1 of the document, please.

19   And you've touched on this already, but again, with the benefit

20   of the exhibit I think it might be helpful for you to explain a

21   little bit how this study is factored into the County's

22   approach into stormwater management.

23   A.   Well, in summary, this general -- this particular study

24   right here was an update.  It added in newer developments that

25   had been permitted since 1998 when that study was done.  Same

1    model was used, ICPR model.  It covered basically the same

2    area, the northern boundary.  It explains there where your

3    northern boundary was Kingsfield Road, south boundary was Nine

4    Mile Road, west boundary was Elevenmile Creek, and east

5    boundary was Highway 29, southeast boundary at Eightmile Creek

6    basin.  So it gives a general area of what this particular

7    study is based off.

8         The model, however, when they run the model, it still uses

9    the entire basin.  We just update it as new developments came

10   in, they build stormwater ponds, add new stormwater pipes, and

11   investigate known drainage problems.

12   Q.   And if we zero in on those last two bullets on the scope of

13   work, could you describe a little bit more about those

14   purposes?

15   A.   Yes.  Develop a ranking matrix of recommended flood control

16   infrastructure, that bullet right there, when you have a lot of

17   conceptual projects or a lot of money, you want to prioritize

18   or rank those which project needs to come first, whether it's

19   dependent or independent from another project.

20        When you're doing drainage, you want to make sure you get

21   the lower areas.  If you've got another project that's going to

22   tie into the lower areas, you want to make sure those projects

23   are done first.  And whether independent or dependent, cost

24   versus benefit, constructibility, are there environmentally

25   sensitive lands, wetlands, all those factors are used to rank

1    the projects.

2         And then it summarized in a summary of findings.  In this

3    particular report, they go back to the 1998 report and actually

4    come up with some different solutions for the area, but they

5    reference the previous solutions, and that's where it's talking

6    about by developer report summarizes findings of all previous

7    tasks and determine solutions and their cost.

8    Q.   Thank you, Mr. Curb.  If we flip forward to page 4.2 and

9    take a look, did this study in 2008 specifically include the

10   Bristol Park and Ashbury Hills areas?

11   A.   Yes, sir.  It's identified there as Area C, Elevenmile

12   Creek between the Interstate 10 and Highway 297A.

13   Q.   And why was that area specifically included in this study?

14   A.   Well, it was also included in the 1999 study.  For similar

15   reasons, when this study got contracted out, we actually had

16   grant funding, so it made sense to utilize that grant funding

17   to re-evaluate the portion of the basin.  They used the same

18   ICPR model and added updates to it.

19   Q.   And in the heading here there's a reference to Figure 4.1

20   Area C; you see that?

21   A.   Yes, sir.

22           **MR. NELSON:**  May I approach, Your Honor?

23           **THE COURT:**  Yes, sir.

24   **BY MR. NELSON:**

25   Q.   Mr. Curb, without commenting on the document, can you

1  identify what it is?

2  A.   This is Figure 4-1.

3  Q.   Of the?

4  A.   Of the Elevenmile Creek basin study that was done in 2008.

5  Q.   Thank you.

6         **MR. NELSON:**  Your Honor, I'd move the admission of IP

7  Exhibit 66.

8         **THE COURT:**  66 is admitted, consistent with prior

9  rulings.

10        *(Defendant's IP Exhibit 66 admitted into evidence.)*

11  **BY MR. NELSON:**

12  Q.   Okay, Mr. Curb, so that everybody can see this better,

13  we're going to look at it broadly and then we'll zero in on

14  parts of it so it's easier to follow the document.  Can you

15  describe in broad terms what this figure shows?

16  A.   In broad terms, the gray area represents the 100-year

17  floodplain that was calculated from the ICPR model.  It shows

18  Area C, also referred to as Zone 1 in the 1999 report.  There

19  are different colored lines within that gray area that

20  represent -- the green line is a 25-year -- no, the green line

21  is a 100-year and the yellow line is a 25-year storm event

22  floodplain.

23       There's stars on there.  The red stars represent flooding

24  complaints.  If you'll look at the top of the gray area where

25  that red star is, that's a new subdivision that was built

1    between 1998 and 2008 when this was commissioned.  That

2    subdivision, they had to put in drainage so that was modeled

3    and added to the report.

4              **MR. NELSON:**  Can we zoom in on Area C.

5    **BY MR. NELSON:**

6    Q.   Broadly, what neighborhoods are shown in Area C?

7    A.   Bristol Park and Ashbury Hills, Bristol Creek, Phase I and

8    II of Bristol Creek, and Bristol Park Unit 1 and 2, and the

9    Ashbury Hills subdivision.

10   Q.   And the green line shows a 100-year flood zone?

11   A.   Yes, sir, that's the calculated 100-year flood zone based

12   off the model -- stormwater model.

13   Q.   So, if you're inside that green line or the gray area,

14   you're in the 100-year flood zone?

15   A.   That is correct.

16   Q.   What does --

17             **MR. GLASSER:**  Objection.

18             **THE COURT:**  Overruled.

19   **BY MR. NELSON:**

20   Q.   What does it mean to be located within a 100-year flood

21   zone?

22   A.   A 100-year flood zone, it's a -- stormwater modeling is

23   based off the statistical rainfall data.  A 100-year storm is

24   basically 14 -- or 13.44 inches of rain in a 24-hour period.

25        Stormwater is not linear.  When you have a storm, it

1    doesn't rain consistently 1 inch per hour so there's an actual

2    curve that is used when these stormwater models are done.

3         If you're located in the gray area, that means the flood

4    stage has a statistical percentage based off of accepted flood

5    zone data that you will flood if you're in that gray area.

6              **MR. GLASSER:**  Objection, Your Honor.

7              **THE COURT:**  Overruled.

8    **BY MR. NELSON:**

9    Q.   And that is if it's a 100-year storm event?

10   A.   Yes, sir.

11             **THE COURT:**  Next question.

12   **BY MR. NELSON:**

13   Q.   Are there houses in the Bristol Park neighborhood that are

14   located within Escambia County's delineated 100-year flood

15   zone?

16   A.   Yes, sir, multiple.

17   Q.   So it would be all those houses inside the green line that

18   I just drew?

19   A.   Yes, sir, all those houses within the green line.  That map

20   right there doesn't show the Bristol Creek Phase 3, which is

21   where Harlington loops around and ties back into Bristol Park

22   Road.  That was built after this study was done.  So there's

23   actually more homes within the flood zone.

24   Q.   Mr. Curb, there should be a pen up there for you, too, if

25   you want to just put an X on the monitor for the jury to show

1  the area that you referenced.

2  A.  That would be the road right here where it extends out, and

3  the subdivision lots would go back up into this way, so right

4  in here.

5  Q.  Thank you, Mr. Curb.  Has Escambia County had discussions

6  with FEMA about the delineations of the 100-year flood zone in

7  parts of the Elevenmile Creek drainage basin?

8  A.  Yes, sir.  There was a -- there's been a couple of

9  workshops with Northwest Florida Water Management District

10  acting on behalf of FEMA to update our federal flood insurance

11  maps -- rate maps.  This particular area has been discussed

12  with the Water Management District in those workshops.  There's

13  multiple areas.  Currently FEMA has Northwest Florida Water

14  Management District contracting out to have the flood zone maps

15  updated.

16        **MR. GLASSER:**  Objection.

17        **THE COURT:**  Approach please.

18        *(Bench conference between the Court and counsel:)*

19        **MR. GLASSER:**  It's all hearsay.  I mean, *They haven't*

20  *updated the map*, is the answer.

21        **THE COURT:**  I assume you're going to be asking him

22  questions about FEMA?

23        **MR. GLASSER:**  Yeah, but I don't think they ought to be

24  able to get into this whole issue about who said what to who.

25  In other words, it feels like he's going to get into talking

1    about a workshop where they're arguing back and forth.

2         **THE COURT:**  Well, I won't allow Mr. Nelson to get into

3    that.  I can't speak to whether you open the door to something

4    or not.

5         **MR. GLASSER:**  I get it.

6         **THE COURT:**  Move on to the next --

7         **MR. NELSON:**  Yes, Your Honor.

8         *(Bench conference concluded.)*

9    **BY MR. NELSON:**

10   Q.   Mr. Curb, at the time of the 2008 study was the County's

11   100-year flood zone different than FEMA's 100-year flood zone?

12   A.   Yes.

13   Q.   And which was bigger?

14   A.   The County's 100-year flood zone extends farther out along

15   the creek bed than the FEMA's flood zone maps.

16   Q.   And why is that?

17   A.   FEMA uses a different stormwater model.  They use a model

18   called HEC-RAS.  Typically ICPR, which is the model we use, is

19   allowed now by FEMA for those modeling -- those types of

20   models.

21        **THE COURT:**  Okay, next question.

22   **BY MR. NELSON:**

23   Q.   Does the County have confidence in the accuracy of its

24   modeling for the 100-year flood zone in the Elevenmile Creek

25   drainage basin?

1  A.   Yes, sir, we do.

2          **THE COURT:**  Okay, that's yes or no.

3  **BY MR. NELSON:**

4  Q.   Mr. Curb, do you remember the storm that came through

5  Escambia County on April 29th and 30th, 2014?

6  A.   Yes, sir, very much so.

7          **MR. GLASSER:**  Objection, 403.

8          **THE COURT:**  Overruled.

9  **BY MR. NELSON:**

10 Q.   What do you recall about that storm event, Mr. Curb?

11 A.   Mass devastation from floodwaters.  When we have a storm

12 event or a hurricane or a natural disaster, the County goes out

13 and does damage assessments to all our public infrastructure.

14      There were reported through building inspections department

15 over 3,000 homes that had flooded in the April storm event.

16 More projects than we could handle.  We -- ponds blown out all

17 over Escambia County, damage to people's property.  It was

18 devastating.  Simply put, it was a devastating storm event.

19 Q.   Were you personally involved, Mr. Curb, in the assessment

20 of damage following the April 29-30 storm?

21 A.   Yes, we did three or four days of assessments.  The County

22 is divided out into different zones, and there's a team of two.

23 One operates the computer and one drives the truck, and we

24 drive the entire county, every county road, we evaluate every

25 pond, every roadway, so we could come up with an estimated

1    damage cost.  That damage cost has to be a certain amount

2    before federal funding kicks in through FEMA.

3        I remember on the third day of doing those damage

4    assessments, we were -- I was in one area and the residents

5    came out and were like, you know, *Are you here to help us?*  And

6    I'm like, *No, I'm here to assess the damage.*

7        And it was heartbreaking.  They asked me to come in their

8    house, and there's mud all in their house.  It was just -- it

9    brought me to tears.  And that's kind of rough for me as a

10   stormwater engineering manager to deal with that type of

11   devastation because I -- you know, I have the ability to do

12   something about these type of storm events if I have the

13   adequate funding.

14       I have over 300 projects right now that are identified and

15   needs assessment, and frankly I don't have enough money that is

16   awarded for it to do these drainage projects.

17            **THE COURT:**  Okay, Mr. Nelson.

18            **MR. NELSON:**  May I approach, Your Honor?

19            **THE COURT:**  Yes.

20            **MR. GLASSER:**  Objection, 403, Your Honor.

21            **THE COURT:**  I haven't seen it, I don't know what it

22   is.  What's it marked?

23            **MR. GLASSER:**  It's 80, Your Honor.

24            **MR. NELSON:**  This is an excerpt of the Escambia County

25   damage assessment map that was covered in the parties' pretrial

1  stipulation.

2          **THE COURT:**  Yes, I've seen it.  Objection is

3  overruled.

4          **MR. NELSON:**  May we move for admission of IP Exhibit

5  80?

6          **THE COURT:**  Yes, it's admitted.

7          *(Defendant's IP Exhibit 80 admitted into evidence.)*

8          **MR. NELSON:**  May it be published?

9          **THE COURT:**  Yes.

10 **BY MR. NELSON:**

11 Q.  Mr. Curb, can you describe what this Exhibit IP 80 shows.

12 A.  This is a map -- GIS map representation of the damage that

13 occurred in the April 2014 storm.  If you look over to the

14 left, there is different types of symbols.

15     The building inspection damage assessment is what the

16 building department reviewed, and the public works department

17 it shows the damage assessment for bridges, drainage, flooding,

18 ponds, and roads.  We have a different category for -- in our

19 damage assessment tool that, for instance, a bridge would get a

20 different type of evaluation than a roadway or a flooding, and

21 it's the way the program is set up to estimate the cost.

22     There's also -- at the very top there's green stars that

23 show citizen surveys and flooding reports.  That's something

24 that I started after the April storm event.  The flooding

25 questionnaire is still online today for people to fill out, but

1   it's the same thing as you see in these master drainage plans,

2   it's a questionnaire on flooding.

3      So all that is mapped out where damage occurred in Escambia

4   County in the 2014 event that was visually observed by County

5   staff.

6   Q.  Thank you, Mr. Curb.

7        **MR. NELSON:**  Permission to approach, Your Honor?

8        **THE COURT:**  Yes, sir.

9  **BY MR. NELSON:**

10  Q.  Mr. Curb, without discussing the document, could you take a

11  look at it and identify what it is.

12  A.  This is the Lake Charlene area of the Warrington basin

13  study following the April 2014 storm.  It's also an event

14  re-creation of that storm event.

15  Q.  Is this a document with which you have personal

16  familiarity?

17  A.  Yes, sir.  I'm actually the project manager who contracted

18  this document.

19       **MR. NELSON:**  Your Honor, at this time we would move

20  for admission of IP 48.

21       **THE COURT:**  IP 48 is admitted.

22         *(Defendant's IP Exhibit 48 admitted into evidence.)*

23       **MR. NELSON:**  May we publish the cover page?

24       **THE COURT:**  Yes.  And again, this is consistent with

25  prior ruling.

**BY MR. NELSON:**

Q.   The title up at the top is "April 2014 Storm Event Re-Creation Report"?

A.   Yes, sir.

Q.   An analysis commissioned by the County?

A.   Yes.  We contracted HDR Engineering company to evaluate the storm event.  Now, this was set up for Lake Charlene.  But if you're going to do a study, an event re-creation, you might as well do the whole county, so that's what we did with this report.

Q.   And did this report lead to any conclusions by the County about the April 2014 storm event?

A.   Absolutely.  It basically verifies that we had a disaster, a major storm event that exceeded a 100-year storm event.  Some places were 300- to 500-year storm events.  The company that did this, they took Doppler radar and analyzed it and basically divided the county up into grids.  And you can look through the report and see how much rain in each one of these grids had occurred based off that Doppler radar, and then it was confirmed by actual flooding.  The picture you see on the front is Lake Charlene, that was another hard hit area.

Q.   We don't want to get into Lake Charlene, Mr. Curb.

A.   Okay.  But this is that report.

Q.   And you noted, though, that the report was corroborated by observations of flooding.  Did that include in Escambia County?

1  A.   Yes.  It was calibrated with rain gauge data as well as

2  Doppler radar and visual flooding, you know, that was

3  experienced in that storm.

4  Q.   Thank you, Mr. Curb.  Are you familiar with Escambia

5  County's Stormwater Advisory Team known as SWAT?

6  A.   Yes, sir.  I played a large role in that, yes.

7          **THE COURT:**  Can we take our morning recess right now

8  before you get into another area?

9          **MR. NELSON:**  Yes, Your Honor.

10          **THE COURT:**  Ladies and gentlemen, we'll be in recess

11  for the next 20 minutes.  Please don't discuss the case during

12  the recess and, again, continue to keep an open mind.  Thank

13  you.

14          *(Jury out.)*

15          Mr. Curb, you may step down.  You'll be back on the

16  stand in 20 minutes.  Please don't discuss your testimony with

17  anyone during the recess.

18          **THE WITNESS:**  Yes, ma'am.

19          **THE COURT:**  Be seated.

20          **MR. GLASSER:**  There was one item, Your Honor, we could

21  bring up during this break.  One of the documents -- and it may

22  be one you're about to get into -- has some summary partial

23  redactions of the cost of repairs and I objected -- I object to

24  the extent of the redactions.  I think all the pricing ought to

25  be redacted.  I don't know which document -- was that in the

1    SWAT?

2              *(Conference between counsel.)*

3              **MR. GLASSER:**  So, Your Honor, for this, it basically

4    summarizes it's going to cost $46 million -- or they propose to

5    spend $46 million to fix Elevenmile Creek, and they propose to

6    buy $6.1 million worth of properties in the class area.

7              **THE COURT:**  Why would that be relevant, Mr. Nelson?

8              **MR. NELSON:**  It's -- this is the part of the exhibit

9    that relates to the needs assessment for Escambia County.

10             **THE COURT:**  I understand.

11             **MR. NELSON:**  But we can redact that.

12             **THE COURT:**  I prefer you take the dollar figures out.

13             As to the 403 objection that's been raised, that is

14   something that I considered earlier and it's in my order, in

15   187, where I did a 403 analysis of evidence coming in regarding

16   prior flooding of the subject neighborhoods.

17             It's plainly relevant to -- I mean, it's abundantly

18   probative to the Defendant's case.  And the fact that it's

19   harmful to the Plaintiffs' case doesn't mean that it stays out

20   under 403.

21             **MR. GLASSER:**  Your Honor, the --

22             **THE COURT:**  Relevant evidence is inherently

23   prejudicial.  And the probative value is, because it is so

24   important to the Defendant's case, is not substantially

25   outweighed by the danger of unfair prejudice to the Plaintiffs'

1   case.  That just simply is not the case here.

2            **MR. GLASSER:**  Your Honor, just for the record, I

3   objected to Exhibit 80 because it has 3,000 damage assessments

4   across like a -- I don't know if Escambia is a 100-mile area or

5   something, it was materially larger.  That was the objection

6   for Exhibit 80, Your Honor.

7            **THE COURT:**  That issue would go to weight, not

8   admissibility.  And I've already ruled and denied your motion

9   to exclude evidence as to flooding in other areas in Escambia

10  County outside of the class area, and so that ruling stands.

11           **MR. GLASSER:**  I understand, Your Honor.  I'm just

12  making a record.

13           **THE COURT:**  All right.  We'll be in recess until

14  10:30.

15           *(Recess taken 10:11 a.m. to 10:32 a.m.)*

16           *(Jury in the box.)*

17           **THE COURT:**  Mr. Curb, you're still under oath.

18           **MR. NELSON:**  Thank you, Your Honor.

19  **BY MR. NELSON:**

20  Q.   Mr. Curb, right before our recess, I brought up the subject

21  of the Escambia County Stormwater Advisory Team known as SWAT.

22  A.   Yes, sir.

23  Q.   Are you familiar with that?

24  A.   Yes, sir.  That was a committee formed by the board of

25  county commissioners in response to the April storm event to

1    take public input and share information.

2              **MR. NELSON:**  Your Honor, may I approach?

3              **THE COURT:**  Yes.

4    **BY MR. NELSON:**

5    Q.   Mr. Curb, without getting into any of the details at this

6    point, can you identify the document that has been marked as IP

7    54?

8    A.   Yes, sir.  This is the countywide stormwater recommendation

9    report that came from the SWAT team.

10   Q.   Is this a document with which you have personal

11   familiarity?

12   A.   Yes, sir.  I've worked with the company that put it

13   together, which was Baskerville-Donovan.  They took notes and

14   compiled all the information from the SWAT team.

15   Q.   Is the document that we've marked as IP 54 a public record

16   of Escambia County?

17   A.   Yes, sir.

18             **MR. NELSON:**  Your Honor, I would move the admission of

19   IP 54 as redacted pursuant to the Court's direction.

20             **THE COURT:**  Consistent with prior orders, that will be

21   admitted as IP 54.

22        *(Defendant's IP Exhibit 54 admitted into evidence.)*

23             **MR. NELSON:**  Thank you, Your Honor.

24             **THE COURT:**  And you may publish.

25   **BY MR. NELSON:**

1    Q.   If we take a look at the cover page here, Mr. Curb, I think

2    you've already described this, but could you just point out the

3    date of the report.

4    A.   July 28, 2015.

5    Q.   And this is the recommendation report issued by the

6    Escambia County commissioned Stormwater Advisory Team; is that

7    right?

8    A.   That is correct.

9    Q.   If we turn to the document -- and we can publish this on

10   the screen, I think, Mr. Curb, if that's easier -- to Appendix

11   E.  We go back one page -- I'm sorry, two pages.  This is a

12   SWAT Design Storm and Precipitation Frequency paper?

13   A.   Yes, sir.

14   Q.   And this is a part of a paper that you would have seen

15   before; is that right?

16   A.   Yes, sir.

17   Q.   If we flip forward a couple of pages and the title here is

18   Stormwater Advisory Team Report March 2015.  I'd like to focus

19   in on the second paragraph.

20   A.   Yes, sir.

21   Q.   And what did the County take away in terms of conclusions

22   about the April 29-30 storm event through this report?

23   A.   Basically there was a lot of rain in a short period of

24   time.  And right here it says reported 19.56 inches of rain in

25   a 24-hour, 100-year rainfall event.

1   Q.   There's also a reference to the rainfall profile intensity

2   versus time is a significant factor in producing flooding.  Can

3   you describe what that means?

4   A.   The rain profile intensity versus time.  There are rainfall

5   intensity curves that are generated for stormwater design -- as

6   I mentioned earlier, statistical information.  The intensity

7   versus time is typically in inches per hour over time.  So,

8   your rainfall curves are for a 24-hour period.  You have peak

9   times in a storm event where the rainfall is a lot stronger

10  intensity than the whole 24 hours, so it's really an inches per

11  hour versus time type of factor.  And in the April storm event

12  in this report that there was a major -- I mean, it proved as a

13  major storm event.

14  Q.   Is there a difference, Mr. Curb, between getting eight

15  inches of rain in a three-hour period as opposed to eight

16  inches of rain over a 24-hour period?

17            **THE COURT:**  Excuse me.  Approach, please.

18            *(Bench conference between the Court and counsel:)*

19            **THE COURT:**  I think you're getting into questions that

20  he -- he has not been designated as an expert and he shouldn't

21  be answering.

22            **MR. NELSON:**  Okay, thank you.

23            *(Bench conference concluded.)*

24            **THE COURT:**  All right, Mr. Nelson, I'll ask you to ask

25  another question, please.

1        **MR. NELSON:**   Thank you, Your Honor.

2    **BY MR. NELSON:**

3    Q.    If we take a look at the first paragraph of the document,

4    there's a reference to the design basis rainfall amount for

5    Escambia County has been specified as the 25-year storm

6    rainfall for critical duration.  Can you describe what the

7    design basis rainfall is?

8    A.    Escambia County requires new development, when it's

9    permitted through our development review committee, that they

10   -- that the developers, the engineers design to satisfy 25-year

11   critical duration storm event.  That's been our basis for ever

12   since we had a stormwater ordinance for attenuation.

13        In other words, if you build a subdivision, the runoff rate

14   before development should be equal to or less than the runoff

15   rate after development.  And that's based off the 25-year

16   rainfall intensity curve.  And DOT Zone 1 has published

17   rainfall intensity curves that is your inches per hour versus

18   time for the 25-year event and 100-year event.

19   Q.    Thank you, Mr. Curb.  I'd like to shift to Appendix B and

20   take a look at the first page of Appendix B.  I think you made

21   a reference to this before we introduced the document, but what

22   was, generally, the needs assessment component of the SWAT

23   report?

24   A.    The needs assessment is basically a list of drainage

25   projects and their costs ranked and prioritized based off all

1   the master drainage plans that we have at the County, known

2   projects that need to be done.  And that helps us establish our

3   capital improvement projects and do the worst ones first.  The

4   areas that need the most drainage improvements are ranked

5   higher than the ones that, for instance, maybe have street

6   flooding as opposed to home flooding.  Home flooding would take

7   priority over street flooding.

8   Q.   I'd like to move forward two pages.  And I'll note,

9   Mr. Curb, this document is going to appear differently today in

10  court as a result of the redaction of some information, so I

11  just wanted to give you that heads-up, it's different than the

12  way it looked when it was in your file.  We've made some

13  redactions and there are -- you'll see the right-hand side

14  construction estimates, and we've blacked all of those out, and

15  I would ask that you not comment on any of those numbers even

16  if you know them.

17  A.   Okay.

18  Q.   Okay.  So just as a general matter, this appears to have a

19  numbered ranking of projects; is that right?

20  A.   Yes, sir.

21  Q.   And if we take a look at project No. 5 and zoom in on that,

22  I'll give you a moment to read that, Mr. Curb, and then just

23  ask you to describe what that is referring to.

24  A.   That is a project for the Elevenmile Creek basin floodplain

25  management wetland restoration and regional pond construction.

1    That came out of the basin studies that we discussed earlier.

2    It's a large-scale project doing stream restoration and

3    floodplain restoration.  It also includes nine regional ponds.

4         That was a project that was identified after the April

5    storm event -- it was actually identified in the previous basin

6    studies but it was ranked as No. 5 out of all the projects.

7    Q.   And you may know this off the top of your head, but if we

8    look to the end of the document there are a total of 228

9    projects listed?

10   A.   Correct.

11   Q.   And so this project regarding the Elevenmile Creek basin

12   was ranked No. 5 out of 228 projects?

13   A.   Yes, sir.

14   Q.   And is the Bristol Park and Ashbury Hills area located

15   within this basin?

16   A.   Absolutely.

17   Q.   Thank you, Mr. Curb.  Let's take a look down at project No.

18   13 and let you have a look at that.  And then, again, without

19   getting into any specific details of dollars or property

20   addresses, what is that describing?

21   A.   That is a project that deals with acquisition and

22   demolition of properties within the 100-year floodplain of

23   Elevenmile Creek, specifically associated with a hazard

24   mitigation grant project that was submitted to FEMA.

25   Q.   And are these properties located within the Bristol Park

1   subdivision?

2   A.   Yes.

3   Q.   And you mentioned the FEMA hazard mitigation program.   Can

4   you describe for the jury what that is?

5   A.   Yes.   Earlier I mentioned that the County comes up with a

6   cost of damages.   And I don't know how much that costs, but it

7   was a lot.

8        What FEMA has done through something called the Stafford

9   Act is -- you're trying to prevent future disasters from being

10  such an impact to homeowners and property owners.   So, what

11  they do is they take a percentage of -- Congress takes a

12  percentage of that storm damage cost and they put it into a

13  hazard grant mitigation program.

14       That program not only deals with flooding, it can be wind

15  damage, any type of disaster, and they -- FEMA gives grants out

16  to municipalities that mitigate those types of disasters from

17  occurring again.

18       For example, in the Bristol Park area we got a hazard

19  mitigation grant that allowed us to purchase properties that

20  are in the flood zone therefore removing the hazard.

21            **THE COURT:**   Okay, Mr. Nelson.

22  **BY MR. NELSON:**

23  Q.   Mr. Curb, there was an application that the County made to

24  FEMA for the hazard mitigation grants; is that correct?

25  A.   Yes, sir.

1    Q.   Were you personally involved in the preparation of that

2    application?

3    A.   Yes, sir.  I am the grant manager for five projects that

4    were submitted through the Hazard Mitigation Grant Program.

5              **MR NELSON:**  Permission to approach, Your Honor?

6              **THE COURT:**  Yes.

7    **BY MR. NELSON:**

8    Q.   Mr. Curb, without getting into any details at this time --

9    and I will let you know that this document has been excerpted,

10   so it's going to be -- there's less here than what I think you

11   know was really there, and that was to remove some information

12   that was really extraneous to what we're here for in the trial.

13   But without describing the document, can you identify what it

14   is.

15   A.   This is the FEMA Hazard Mitigation Grant application for

16   the Bristol Park area.

17   Q.   Do you have personal familiarity with this document?

18   A.   Yes, sir.  I'm the project manager and the grant manager

19   for this project.  It's been assigned to one of my coworkers to

20   manage the project.  I still have the grant management

21   responsibilities.

22             **MR. NELSON:**  Your Honor, I would move the admission of

23   IP 53.

24             **THE COURT:**  Consistent with the Court's prior rulings,

25   it will be admitted.

1    *(Defendant's IP Exhibit 53 admitted into evidence.)*

2         **MR. NELSON:** May we publish?

3         **THE COURT:** Yes.

4  **BY MR. NELSON:**

5  Q.   So the first page here is the cover of the Hazard

6  Mitigation Grant Program application?

7  A.   Yes, sir.

8  Q.   If we take a look at page 2 of the document, this is the

9  application overview.  And take a look at the first bullet

10 point.  And if you would, in your words, Mr. Curb, describe

11 what the County was representing to FEMA in the course of

12 making this application.

13 A.   Basically the way the grant works is property owners that

14 are willing to participate in the grant, they sign a form that

15 says we're going to participate in the grant, and this project

16 was to acquire and demolish 27 residential properties --

17 residential homes in the Bristol Park area which also includes

18 Ashbury Hills.

19      What this does in FEMA's eyes is --

20         **MR. GLASSER:** Objection.

21         **THE COURT:** Sustained.

22         **MR. GLASSER:** May I approach, Your Honor?

23         **THE COURT:** Yes.

24      *(Bench conference between the Court and counsel:)*

25         **MR. GLASSER:** Since at this time we're kind of deep in

1    what I regard as collateral source, I think it would be an

2    appropriate time and I propose a limiting instruction to the

3    jury that the purpose of this trial is to determine

4    responsibility for the flood, it has nothing to do with

5    damages, and this is not for their consideration.  Whether a

6    class member would or wouldn't ever get money from a case or

7    from FEMA, it's not relevant to the case, because I think it's

8    dangerous, dangerous stuff, this.  Because back in the room

9    they're going to be like, *Oh, well some of these people are*

10   *getting paid anyway; why should we be bothered?*

11          **MR. NELSON:**  The relevance is that FEMA has made the

12   judgment that these homes are so at risk for future flooding --

13          **THE COURT:**  Sure.  That's why I overruled the Motion

14   in Limine.  But there's no evidence that any specific --

15   well --

16          **MR. GLASSER:**  Yes, there are.  In this document there

17   are addresses -- some of the class houses are in the addresses

18   and, I don't know, maybe even one of them could include named

19   Plaintiffs.  I mean, there's a whole list of 27 addresses in

20   there that's already been admitted in this exhibit, but I just

21   think a limiting instruction saying, *Look, this is a case about*

22   *causation, it's not about money, that, if ever, that's later,*

23   *that's not for your consideration, jury, it's just not an*

24   *issue, but we're letting this in for other purposes*, or

25   whatever.

1    **THE COURT:**  Okay.

2        *(Bench conference concluded.)*

3        Ladies and gentlemen, as I explained to you at the

4    start of the trial, as the jury in this trial you're going to

5    be asked to decide whether or not International Paper is

6    legally responsible for the flooding that occurred in the class

7    area and more specifically in the Plaintiffs' homes.

8        I'll be giving you instructions at the conclusion of

9    the trial in which I'll remind you of that, and I will

10   specifically tell you that you should not consider in any way

11   in deciding those issues any issues related to damages in the

12   case.  I think I mentioned this at the beginning when I gave

13   you your preliminary instructions.

14       So I'll be telling you that again when I give you your

15   concluding instructions on the law, but I'll remind you now

16   that you should not consider in any way at any point during

17   your decision in this case whether any Plaintiff in the class

18   received any benefit from grant proceeds.  Simply, the matter

19   of damages will not be for you to decide at all.

20       And so, to the extent there is information in this

21   report that some of this grant money was used in the class

22   area, that is not for you to consider in any way in deciding

23   your verdict in this case.

24       Go ahead.

25       **MR. NELSON:**  Thank you, Your Honor.

**BY MR. NELSON:**

Q.   Let's move forward to page 14 of the application, please.
And the heading here is the Project Description, Scope of Work,
and Protection Provided (Must be completed in detail).  So,
this is the federal government asking for the County to
substantiate the bases for its request; is that right?

A.   Yes.

Q.   And then, if we zoom in on paragraph 2, can you walk us
through, Mr. Curb, what the County put together for its
submission to FEMA as the support for the grant application
relating to the Bristol Park area?

A.   Yes.  Elevenmile Creek runs in between Bristol Park and
Ashbury Hills subdivision.  There is -- the overall base is
22,000 acres.  There were 160 homes that reported flooding in
the April storm event, and several other homes have had
repetitive flooding or were flooded before.

     The goal of this application is to increase the floodplain
storage area by purchasing the properties and demoing them
along the creek.  That area can be used to expand the
floodplain just by the fact that there's not homes there, but
we also have a stream restoration project in the works that
would complement this grant.

Q.   Mr. Curb, has FEMA acted on the grant application?

A.   Yes, we've been approved.  We were actually in the
implementation of the grant.

1    Q.   And did the County's application to FEMA for funding for

2    flood mitigation efforts in Bristol Park have anything to do

3    with International Paper Company?

4    A.   Not at all.

5    Q.   You mentioned other efforts that have been undertaken by

6    the County for flood mitigation in the Bristol Park area.  Is

7    that known as the Restore Program?

8    A.   Yes, sir.

9    Q.   And can you describe what the Restore Program is, Mr. Curb?

10   A.   Sure.  The grant allows us to buy property.  You can't do a

11   project without having the property.  We have an application --

12   we actually have two applications in with Restore.  One is to

13   build regional ponds in the Elevenmile Creek basin.

14        What the regional stormwater ponds do is they attenuate the

15   flow so you have less of an impact down gradient to the creek,

16   you don't have as much water going in the creek.

17        The stream restoration -- restore project is to take the

18   properties that we're able to acquire through the grant and,

19   for a better term, dig out the creek and make it wider so it

20   holds more water.  That stream restoration -- with stream

21   restoration you have to do wetland planning, bank

22   stabilization, and that type of design.

23        We have two applications right now that have been submitted

24   through the board of county commissioners and prioritized and

25   sent to treasury to be awarded to the County for planning

1   assistance.  That starts the design process for these two

2   projects.

3   Q.   Mr. Curb, how much effort have you personally put into the

4   FEMA hazard mitigation process and the restore process with

5   regards to the Bristol Park area?

6   A.   After the storm, I was asked to put some applications

7   together for this grant.  We put five projects together;

8   Bristol Park was one of those.  I decided, based off of the

9   worst hit areas from the storm, which projects would be

10  eligible for these types of grants.  Bristol Park was eligible.

11  So we submitted the applications.  We actually hired

12  consultants to prepare those applications and put the data

13  together to submit them to FEMA.

14          **THE COURT:**  Mr. Nelson.

15  **BY MR. NELSON:**

16  Q.   And are these all efforts, Mr. Curb, that you undertook

17  because of the County's concern for future flood risks in the

18  Bristol Park area?

19  A.   Yes, sir.  I mean, as I said earlier, these projects had

20  been identified in our basin study as a need.  And with SWAT it

21  was ranked --

22  Q.   And did those risks have --

23          **MR. GLASSER:**  Objection.

24          **THE COURT:**  Overruled.

25  **BY MR. NELSON:**

1   Q.   Did those risks have anything to do with International

2   Paper?

3   A.   No, sir.

4   Q.   Mr. Curb, just a couple of more.  The documents that we've

5   gone through today, did you make those available to both the

6   Plaintiffs' lawyers and the Defendant's lawyers during

7   discovery?

8   A.   Yes, sir.  I actually had it on our FTP site where you

9   could download all the documents, I've also put it on a flash

10  drive that I gave to both --

11  Q.   And did you give a deposition in the case?

12  A.   Yes, sir, I gave a deposition.

13  Q.   And who took your deposition?

14  A.   You were there and the Plaintiffs was there.

15  Q.   Was it Mr. --

16  A.   I don't know how many attorneys that I talked to, but there

17  were a lot of attorneys asking me questions.

18  Q.   Was it Mr. Kauffman --

19  A.   Yes.

20  Q.   -- on the telephone who asked you a lot of questions?

21  A.   Yes, sir.

22  Q.   One of Plaintiffs' counsel?

23  A.   Yes, sir.

24         **MR. NELSON:**  Thank you, Mr. Curb.

25         Pass the witness.

1          **THE COURT:**  Thank you.

2               Mr. Glasser?

3                         **CROSS-EXAMINATION**

4     **BY MR. GLASSER:**

5     Q.   Hey, Mr. Curb.  Nice to meet you.  You and I have never

6     met, right?

7     A.   Yes, sir.

8     Q.   And you said you met with Mr. Nelson and you met with Mr.

9     Meltzer as well?

10    A.   Yes, sir.

11    Q.   And Mr. Hill over there?

12    A.   Yes, sir.

13    Q.   And the lady in the back as well, Megan?

14    A.   Yes.

15    Q.   And maybe some younger lawyers, too?

16    A.   I've met with a lot of people on this case.

17    Q.   Did you meet with them yesterday?

18    A.   Other than in the witness room.

19    Q.   And how about the week before?

20    A.   Yes, they had questions.

21    Q.   How many times?

22    A.   I think I've had two meetings with them other than my

23    deposition.

24    Q.   All right.  Just some background.  I take it that when the

25    county engineers approved, say -- you talked about Phase III of

the Bristol Park subdivision -- they were looking at the FEMA 100-year floodplain?

A. Correct.

Q. So I want to approach with that map.

**MR. GLASSER:** May I, Your Honor?

**THE COURT:** Yes.

**BY MR. GLASSER:**

Q. You recognize Plaintiff's Exhibit 305 as the FEMA floodplain map that exists as of today and existed as of 2006, right?

A. Yes, sir.

Q. And let's just focus in on the ELMO on that map.

**MR. GLASSER:** I move the admission of Plaintiff's Exhibit 305, Your Honor.

**THE COURT:** 305 is admitted.

*(Plaintiff's Exhibit 305 admitted into evidence.)*

**BY MR. GLASSER:**

Q. Am I orienting correctly here on the FEMA map as it goes through the neighborhood coming down from Elevenmile Creek?

A. Yes. You'll see the blue line is Zone A.

Q. And it's just fair to say that the County's map -- and we'll get to those that were shown to the jury that came out of the 2008 county flood study and the '99 drainage study which we'll talk about -- they were drainage studies, right?

A. Yes, sir.

1    Q.    Substantially differs from what the Federal Emergency

2    Management Agency as of today regards as the 100-year

3    floodplain?  There's a disagreement among the County and the

4    federal government on that point officially?

5    A.    I wouldn't say there's an official disagreement, but they

6    are inconsistent as far as where the line is for the 100-year

7    floodplain.

8    Q.    And as of even today, but certainly as of April 29th, 2014,

9    the map on Exhibit 305 was the official Federal Emergency

10   Management area floodplain?

11   A.    Yes, it was.

12   Q.    And the county engineers that approved, say, the Bristol

13   Park subdivision, that's the map they relied on to make those

14   decisions?

15   A.    Maybe the Bristol Creek.  I'm not sure the date in this.

16   Q.    So, you talked about Phase III was built -- I think you

17   were showing us one of the study maps, I think it was Figure

18   4-1, and you drew in where the new development went in after

19   the figure had been made by Hatch MacDonald, remember that

20   testimony?

21   A.    Yes, sir.

22   Q.    So, obviously the County approved that subdivision

23   subsequent to that figure being made by Hatch MacDonald, right?

24   A.    Yes, we did.  And during the review process the Elevenmile

25   Creek basin study information was given to the engineer of

1    record for that subdivision specifically pointing out 100-year

2    flood stages of our basin study.

3    Q.   So you're saying that the County engineers who approved

4    that subdivision had full knowledge of the Hatch MacDonald

5    study?

6    A.   Yes.  I was the one who reviewed it.

7    Q.   You approved that subdivision?

8    A.   I reviewed it for stormwater.  I didn't approve it.  The

9    County engineer -- I work under the County engineer.

10   Q.   So the County engineer, having full knowledge of the Hatch

11   MacDonald study that you showed the jury from 2008, approved

12   the Bristol Park III subdivision?

13   A.   Yes, they did, with the caveat that the finished floor

14   elevations be above the 100-year flood elevation.

15   Q.   So, after -- so, I'm going to ask a question.  And then

16   after I -- if you'd just answer the question I ask, then they

17   get to stand up and ask whatever else they want.  Is that fair?

18   A.   Okay, that's fair.

19            **MR. NELSON:**  Your Honor, I object to that.

20            **THE COURT:**  I think that was a fair explanation.

21   **BY MR. GLASSER:**

22   Q.   So, the two studies, we'll call them both the Hatch

23   MacDonald studies because the Carlan Killam, which did the 1999

24   study, became Hatch MacDonald?

25   A.   Right, yes, sir.

1    Q.   So, just for ease of keeping track, I'm just going to call

2    them the Hatch MacDonald studies.  Are you okay with that?

3    A.   That's good.  They're actually now Mott MacDonald.  They

4    split.

5    Q.   But you're going to confuse me.  Let's just go with that.

6         So, going to the first one that was admitted, the 1999

7    study that was admitted as Defendant's Exhibit 51, you'll

8    recall this page where we -- where the questionnaires

9    identified people who had suffered flooding in Hurricane

10   George, right?

11   A.   Correct.

12   Q.   So, this was in -- the hurricane was in 1998, right?

13   A.   Correct.

14   Q.   And 19 houses reported they had water in them?

15   A.   Correct.

16   Q.   The Hatch MacDonald study does not discuss -- so, there's

17   been discussion in this case about a dam on the International

18   Paper property called the Arkansas Crossing dam built in 1996,

19   okay?

20   A.   Okay.

21   Q.   This study does not specifically address whether the

22   Arkansas Crossing dam built two years earlier failed during

23   Hurricane George; it's not in the study, right?

24   A.   It's not part of the study.

25   Q.   But what is part of the study is, despite Hurricane George,

1    which you'll agree was a giant storm, only 19 houses reported

2    flooding to Hatch MacDonald based on the 300 questionnaires,

3    correct?

4    A.   Reported flooding.

5    Q.   I agree.  You gave 300 questionnaires in the neighborhood,

6    19 houses reported flooding?

7    A.   Yes.

8    Q.   So, the second one -- now, from 1999 and really all the way

9    until today, but there's constantly more development in

10   watersheds, right?

11   A.   Yes.

12   Q.   In fact, that's one of the reasons why you do what you do,

13   right?

14   A.   Yes.

15   Q.   Because, I mean, it's good for everyone if you can get

16   money for the County to improve stormwater systems in

17   Elevenmile Creek or any other basin, right?

18   A.   Right.

19   Q.   It puts people to work, right?

20   A.   Yes, sir.

21   Q.   It keeps the county people working, right?

22   A.   Yes.

23   Q.   Allows the county to accommodate great new developments

24   like Navy Federal, right?

25   A.   Yes.

1    Q.   Because, as those developments from 1999 to 2015 happen,

2    the runoff characteristics can change as a result of those

3    developments in the future, and so you want to prepare for them

4    as best you can, so it's good for everyone?

5    A.   Right.  That's why we have the land development code

6    requirements to attenuate stormwater flow.

7    Q.   Okay.  And I think you showed those to us at the -- when

8    you were being examined by Mr. Nelson?

9    A.   Yes, sir.

10   Q.   And you said that when a subdivision like Bristol Park III

11   was approved, they had to design all their stormwater drainage

12   on the subdivision so as not to cause or contribute to flooding

13   at least up to the end of a 25-year storm, right?

14   A.   That is correct.  The -- they actually had a stormwater

15   pond in Bristol -- it's actually Bristol Creek Phase III, not

16   Bristol Park, and they had a stormwater pond constructed at the

17   lower end of the subdivision to attenuate stormwater flows.

18   Q.   Great.  So let me show you what's been admitted into

19   evidence as Plaintiffs' Trial Exhibit 223, which is the NOAA

20   frequency table.  You're familiar with it?  You recognize these

21   tables?  That's what you were talking about with Mr. Nelson,

22   the storm intensity table, right?

23   A.   That is one source, yes.

24   Q.   And I'm taking my finger to the 25-year storm and I'm going

25   to go to two hours.  You see that?

1    A.    4.91 inches.

2    Q.    And then three hours, 5.71 inches, right?

3    A.    Correct.

4    Q.    So, basically the stormwater system inside the neighborhood

5    itself should be able to take over a three-year [sic] storm and

6    not cause or contribute to flooding the first 5.71 inches in

7    three hours, correct?

8    A.    Let me look at the rest of the timing.  Your finger is over

9    it.

10   Q.    I'm not looking at the --

11            **MR. NELSON:**  Your Honor, may we approach.

12            **THE WITNESS:**  That is not correct.

13            **THE COURT:**  Hold on just a minute, Mr. Curb.  I have

14   an objection.

15            Yes.

16            *(Bench conference between the Court and counsel:)*

17            **MR. NELSON:**  I think we're getting close to opening

18   the door on opinion testimony about what can cause a flood and

19   what can't.

20            **THE COURT:**  That was my thought exactly.

21            **MR. GLASSER:**  Mr. Nelson asked about -- he

22   specifically pointed out the design of the stormwater systems

23   in the neighborhood had to meet the 25-year --

24            **THE COURT:**  I don't remember that.

25            **MR. GLASSER:**  It was in the direct testimony, Your

1    Honor.  It was one of the things he highlighted on the screen

2    and I'm just following up on that.

3            **THE COURT:**  Okay.  Well, you're going to end up with

4    -- I don't know what the answer is going to be.

5            **MR. GLASSER:**  All right.

6            **THE COURT:**  Okay.

7            *(Bench conference concluded.)*

8    **BY MR. GLASSER:**

9    Q.   But in any event, Mr. Curb, the purpose of those designs --

10           **THE COURT:**  Excuse me.  Did you withdraw your

11   question?

12           **MR. GLASSER:**  Yes, ma'am.

13   **BY MR. GLASSER:**

14   Q.   The purpose of those designs that you discussed -- do you

15   remember discussing how stormwater systems are designed in the

16   neighborhood?  It was highlighted up on the screen, right?

17   A.   Yes, sir.

18   Q.   Okay.  The purpose of that is to attenuate storms --

19   A.   Correct.

20   Q.   -- at least up to the 25-year storm but not cause or

21   contribute to flooding in the neighborhood or anywhere else,

22   right?

23   A.   Up to and including a 24-hour event, is what our

24   regulations require.  So you look at each --

25           **THE COURT:**  Excuse me, Mr. Curb, wait for another

1    question.

2    **BY MR. GLASSER:**

3    Q.   I'm just saying they're not haphazardly made, the engineers

4    in the County look to make sure it's not causing or

5    contributing to flooding, correct?

6    A.   Correct.

7    Q.   Now I want to turn to the 2008 Hatch MacDonald report,

8    okay?

9    A.   Okay.

10   Q.   And that report was obviously after Hurricane Ivan, which

11   was in 2004, right?

12   A.   A windstorm, yes.

13   Q.   And then there was some big rain in April of 2005 as

14   well --

15   A.   Yes, sir.

16   Q.   -- prior to this second Hatch MacDonald report, correct?

17   A.   Yes.

18   Q.   All right.  And the second Hatch MacDonald report in 2008

19   does not discuss any dam that was built -- that existed at the

20   International Paper property in April of 2005, right?

21   A.   No, it does not.

22   Q.   It doesn't discuss it at all?

23   A.   It's looking at the overall basin, not specific.

24   Q.   And I think you pointed out that the boundary of that

25   second study, the northern boundary was actually the Kingsfield

1    Road, right?

2    A.    Yes.

3    Q.    Which is south of the dam, any dam, right?

4              **THE COURT:**  Is that a yes.

5              **THE WITNESS:**  Yes.  Sorry.

6              **THE COURT:**  That's okay.

7    **BY MR. GLASSER:**

8    Q.    So it's fair to say that -- well, and also you personally

9    have never been to the International Paper property -- well,

10   you've never been there up to 1999 to see that dam, right?

11   A.    You can see it from the road when you drive down Kingsfield

12   Road.

13   Q.    Have you seen it before 1999, you think?

14   A.    I've driven down that road many times.  You can see it from

15   the road.

16   Q.    But you've never been on the property to inspect it?

17   A.    No.

18   Q.    And never to this day?

19   A.    No.

20   Q.    Okay.  Both these models, the 1999 Hatch MacDonald model

21   and the 2008 Hatch MacDonald model, use what's called Design

22   Storms, right, to model?

23   A.    Yes, the ICPR program that is utilized requires them to

24   calibrate those rainfall intensities based off of actual rain

25   gauge data.

1    Q.   They both use Design Storms, right?

2    A.   Yes.

3    Q.   I think in the 2008 study there were the two stars?

4    Remember the two red stars on the study?

5    A.   Yes.

6    Q.   Is that because there were two questionnaires that came

7    back reporting flooding up to the time of the 2008 study, those

8    were the two red stars?

9    A.   Those were area flooding complaints, yes.

10   Q.   And when you say that, do you know if went into the

11   finished floor elevation of the two places or not?

12   A.   Bristol Park, 160 homes flooded in --

13   Q.   No, no, I'm not talking about 2014.  I'm talking about the

14   2008 study.  I think actually -- yeah, oh, here it is.  In this

15   figure that you were shown, there's two stars?

16              **THE COURT:**  We need an exhibit number for that.

17              **MR. GLASSER:**  IP 66.

18              **THE COURT:**  Thank you.

19   **BY MR. GLASSER:**

20   Q.   This is the floodplain.  There's one star there on the left

21   and then there's one star back here?

22   A.   If you go to the legend at the very bottom right corner --

23   Q.   Yeah.  Flood complaints?

24   A.   -- the red stars mean flood complaints, the yellow stars --

25   Q.   So this one over here looks like it's pretty far away from

1     Ashbury Hills over here, right?  This one over here?

2     A.    That's Man O War subdivision there or the Man O War Road.

3     We've got a project there, too.

4     Q.    Okay.  And this one, though, I'm just saying that's one

5     questionnaire, right, that came back positive?

6     A.    I'm not sure if that reflects one questionnaire.  I'd have

7     to go specifically to the report.  But there were multiple

8     complaints in that area.

9     Q.    But you -- I guess I'm saying -- okay, let me ask it this

10    way.  The 2008 report, unlike the 1999, does not identify

11    individual homes that got any water in them, correct?

12    A.    The 2008 study wasn't based off of an event.  It was a

13    re-study because we had a grant.

14    Q.    I got it.  But from '99 to the 2008 study, we all know

15    there was Hurricane Ivan at least, right?

16    A.    A windstorm, yes.

17    Q.    And then the April 2005 rains, we know that, right?

18    A.    The April -- and there was also the June 2012 storm event.

19    Q.    But that was after the 2008 report.  I'm just focused on

20    the 2008 report.

21    A.    All right.

22              **MR. GLASSER:**  May I approach, Your Honor?

23              **THE COURT:**  Yes.

24    BY MR. GLASSER:

25    Q.    I want to show you what's been marked as Plaintiff's

1    Exhibit 306.

2        So you recognize Plaintiff's Exhibit 306 as a publication

3    of the National Weather Service with respect to Hurricane

4    George in the Mobile/Pensacola area; is that correct?

5    A.    Yes.

6            **MR. GLASSER:**  I move the admission --

7    **BY MR. GLASSER:**

8    Q.    And the National Weather Service, it's public, correct,

9    it's just public -- anybody can read it?

10   A.    Yes.  I've went to this site many times.

11   Q.    So you recognize this and it has the National Weather

12   Service logo on it, too, right?

13   A.    Correct.

14           **MR. GLASSER:**  I move the admission of Plaintiffs'

15   Exhibit 306.

16           **MR. NELSON:**  Object, Your Honor, on foundation and 403

17   grounds.

18           **THE COURT:**  Approach the bench.

19           *(Bench conference between the Court and counsel:)*

20           **THE COURT:**  Was this provided?

21           **MR. GLASSER:**  No.  It's impeachment.  I didn't -- it's

22   impeachment for the -- I'm just trying to -- actually it's not

23   even impeachment, I'm just trying to show --

24           **THE COURT:**  It wasn't provided, the fact that it's

25   publicly available, I've already made a ruling on that in this

1    case, it does not make it admissible.

2            **MR. GLASSER:**  Your Honor, it's just to establish the

3    rain that Hurricane George --

4            **THE COURT:**  It doesn't matter.  It's hearsay.

5            **MR. GLASSER:**  Okay.

6            **THE COURT:**  Sustained.

7            *(Bench conference concluded.)*

8            **THE COURT:**  306, was it?

9            **MR. GLASSER:**  Yes, ma'am.

10           **THE COURT:**  Is not admitted.

11   **BY MR. GLASSER:**

12   Q.   So, it sounds like you're familiar with the general

13   building code process in the county, right?  And I think you've

14   testified before you know that if a house needs more than 50

15   percent rebuilding after a flood it has to get a new building

16   permit, right?

17   A.   Yes.

18   Q.   So, if a house is being modified -- it's been damaged in a

19   flood and it needs to be rebuilt, it has to go get a building

20   permit, right?

21   A.   Yes.

22   Q.   And I take it you've -- you agree that that building permit

23   process is actually a safety process?

24   A.   Yes.

25   Q.   It protects the resident in the house from maybe putting in

1    the wrong electrical systems or designing something wrong,

2    right?

3    A.    Correct.

4    Q.    And it protects the neighbors because if the house catches

5    on fire somebody else's house could catch on fire, correct?

6    A.    Correct.

7    Q.    So, do you think it's important for people to comply with a

8    safety permitting law from a public safety perspective even if

9    they're just rebuilding their home?

10   A.    Yes.

11   Q.    I want to turn to the Lake Charlene basin study that you

12   discussed, which was Defendant's Exhibit 48.  It should

13   probably still be there in front of you somewhere.

14   A.    Yeah, I've got it right here.

15   Q.    And I want to turn to page 11, please, which is -- I think

16   you'll recognize it's a map of the grid squares of the rain.

17   A.    Yes, sir.

18   Q.    This map of the grid squares of the rain is what you were

19   discussing with Mr. Nelson when you were talking about that the

20   County did a lot of work to figure out how much it rained,

21   right?

22   A.    They analyzed Doppler radar and calibrated it with the

23   rainfall gauge data.

24   Q.    And it's fair to say there was a distribution across the

25   county, green is lighter rain and red in the south is the

1   heavier rain, right?

2   A.   That is correct, that's the 24-hour rainfall total.

3   Q.   Okay.  And obviously they started at a certain time in the

4   morning and they ended at another time.  Did the engineering

5   company that the County hired to do this work pick those times

6   because they were regarded as relevant to their task of

7   figuring out the rain in the storm?

8   A.   They took the rain event of April 29th and 30th and

9   analyzed the storm and did an event re-creation of that storm

10  event based off of Doppler radar and rain gauge data.

11  Q.   And it looks like -- how big are these squares?  Are they a

12  kilometer by a kilometer or something like that?

13  A.   That's what it says at the bottom, one kilometer by one

14  kilometer.

15  Q.   And they were able to get pretty detailed data down to 2

16  decimal points to satisfy them enough to put in their report,

17  right?

18  A.   Yes.

19  Q.   And like you said on direct examination, you have

20  confidence in this report?

21  A.   Yes.

22       **MR. GLASSER:**  That's all I have for Mr. Curb, Your

23  Honor.

24       **THE COURT:**  Thank you.

25       Redirect?

1　　　　　**MR. NELSON:**　Your Honor, none.　Mr. Curb has been here

2　a long time.

3　　　　　**THE COURT:**　All right, Mr. Curb, you may step down.

4　　　　　**THE WITNESS:**　Thank you.

5　　　　　**THE COURT:**　Thank you.

6　　　　　*(Witness excused.)*

7　　　　　Your next witness?

8　　　　　**MR. NELSON:**　Clarence Morgan, Your Honor.

9　　　　　**CLARENCE MORGAN, DEFENSE WITNESS, DULY SWORN**

10　　　　　**MADAM CLERK SIMMS:**　Be seated.　Please state your full

11　name and spell your last name for the record.

12　　　　　**THE WITNESS:**　Clarence Morgan, M-o-r-g-a-n.

13　　　　　**THE COURT:**　All right, Mr. Morgan, would you move a

14　little closer to the device with that red dot on it.　Thank

15　you.　That's your microphone.

16　　　　　Mr. Hill?

17　　　　　**MR. HILL:**　Thank you.　May it please the Court?

18　　　　　**THE COURT:**　Yes, sir.

19　　　　　　　　　　**DIRECT EXAMINATION**

20　**BY MR. HILL:**

21　Q.　Good morning, Mr. Morgan.

22　A.　How you doing, Larry?

23　Q.　Good.　How are you?

24　A.　Good.

25　Q.　Good.　Would you tell the jury who you are employed with.

1    A.    International Paper.

2    Q.    And how long have you been with International Paper?

3    A.    Since 1979.

4    Q.    What is your current job title?

5    A.    Crew leader of the wastewater treatment.

6    Q.    And what was your job at the time of the April 29, 2014,

7    storm event?

8    A.    I was a wastewater operator.

9    Q.    Could you run through the history of your employment

10   briefly with International Paper starting with when you first

11   started through today.

12   A.    When I first hired in, I was what they called a sample

13   runner for the lab.  I stayed in that position probably two or

14   three months and then went to the storeroom for a straight day

15   job for probably about the same length of time.  From there I

16   went to the recovery about a month or two, and then to the

17   power house, from the power house to the wood yard, and then

18   out of the wood yard to P3 paper machine cleaning up.

19          And then I was able to put in a transfer -- that was my

20   first permanent job, I put in a transfer there and I went to

21   shipment.  I stayed there twenty-something years and had an

22   injury with my neck, I had to get off the fork truck that I was

23   driving.  I put a transfer in for the wastewater treatment, and

24   I've been there ever since.

25   Q.    As a wastewater operator what were your duties?

1    A.    As a wastewater operator?

2    Q.    Yes, what were your duties?

3    A.    Run the dewatering plant, make my rounds through the pond

4    system, check the flows of the water.

5    Q.    Are you familiar with the layout of the Kingsfield Road

6    structure in April of 2014?

7    A.    Yes.

8    Q.    Did you have a particular name that you called that area of

9    Kingsfield Road?

10   A.    I just called it the final --

11   Q.    Final?

12   A.    The final outfall.

13   Q.    What type of maintenance or inspections -- and I'm talking

14   about before April of 2014 -- would you perform on that area

15   when you were doing your grounds work?

16   A.    We would go back there and clean out what they call the bar

17   screen where trash and stuff, limbs and sticks and sometimes

18   bigger than that got up against the bar screens, cleaned it out

19   with a potato rake and another thing called a pipe pole.

20   Q.    I want to see if we can orient ourselves a little bit to

21   what you're talking about.  So, if this is kind of upstream and

22   the water is flowing down from that way to that way and we

23   consider this to be the concrete weir structure, you know what

24   I'm talking about?

25   A.    Right.

1  Q.  And it has a catwalk across it, doesn't it, all the way

2  across?

3  A.  Right.

4  Q.  If I point my arm this way, is this where the outfall was?

5  A.  Yeah, there was the catwalk that you were talking about

6  there, and then there was a catwalk that walked out to the

7  outfall and you walked out on it and on three sides you got the

8  trash out from around the bar screen.

9  Q.  Just so we're clear, this is the concrete weir, this is

10  that walk out to the outfall, and that's what you had to clean

11  out?

12  A.  Right.

13  Q.  And so you had a catwalk.  Did you walk out on it

14  regularly?

15  A.  Yes, that's what we done, we walked out on it to clean the

16  bar screen.

17  Q.  And where is the bar screen in relation to where you're

18  standing when you're on the catwalk?

19  A.  Straight underneath it, right out at the end of it, at the

20  end of the catwalk.

21  Q.  Do you have to remove a part of the catwalk to reach down

22  in there with equipment?

23  A.  No.  Hand running around it and you're up against it and

24  reaching over it and pulling the trash out.

25  Q.  All right.  And you felt safe doing that?

1   A.   Oh, yeah.

2   Q.   How many times do you think you cleaned out the drop box?

3   A.   I'm not sure.  It was every morning, you know, whenever I

4   was working straight days doing that.

5   Q.   Did it need cleaning every single morning?

6   A.   Not every single morning, no.

7   Q.   Let me ask you this:  In relation to the concrete weir

8   structure, the drop box, is it lower in the water level than

9   the concrete weir structure?

10  A.   Oh, yeah, yeah.

11  Q.   So, if water is standing behind the entire structure, where

12  does it go first?

13  A.   Where does the water go first?

14  Q.   Right, if it's going to drain out.

15  A.   There's a pipeline that goes underneath the bridge and

16  comes out at Elevenmile Creek.

17  Q.   So, this pipeline, is this the 48-inch pipe that runs

18  underneath?

19  A.   I don't know the diameter.

20  Q.   That's fine.  But it's a pipeline that has run there

21  historically?

22  A.   Oh, yeah, yeah.

23  Q.   So it was there before the dam -- the concrete weir

24  structure was built?

25  A.   I think so, yeah.

1    Q.   All right.  Now, when you would clean that out, could you

2    describe for us how you would do that?

3    A.   Yes.  You'd -- you would stand on top of a grating, like I

4    said, reaching over a handrail with a potato rake, pulling the

5    trash up and kind of throwing it towards your feet, so to

6    speak.  And you go around, like I said, three sides of it until

7    you got it cleaned out.  And sometimes you might have a bigger

8    limb or something, a stump or something come in there and you'd

9    have to stick it with a pipe pole and pull it over to the side

10   and pull it all the way to the bank and then pull it up on the

11   shore there.

12   Q.   Do you remember whether or not Reed Construction ever had

13   to get equipment down in there?

14   A.   Yeah, occasionally they'd have to come down in there with a

15   bigger piece of equipment if it was a bigger stump or something

16   that come in there.

17   Q.   Do you know who Ed Giddins is?

18   A.   Yes, I know Ed Giddins.

19   Q.   Is he with Reed Construction?

20   A.   Yes.

21   Q.   Now, I want to turn to the April 29 storm event itself,

22   okay?  So, did you work on the day of April 29th?

23   A.   Yes, I was on day shift that week.

24   Q.   What time did you get off?

25   A.   I got off at 2:30.

1    Q.   Would you tell us what you did the rest of that day.

2    A.   That day I got off at 2:30 and I just kind of piddled

3    around at the house and my boys -- I've got two boys, they

4    called me and wanted to know if I wanted to eat super because

5    my wife had a graduation to go to.  And we went up to Beef 'O'

6    Brady's to eat I'd say between five and six.  And so we ate

7    supper, and then I left there probably about 6:30 to seven,

8    something like that, and that's when it started raining -- I

9    mean, it started raining while I was in there and it was really

10   coming down heavy.

11   Q.   Let me back up just a second.  So, you met your boys for

12   supper between five and six o'clock?

13   A.   Between five and six.

14   Q.   And it was raining then?

15   A.   Uh-huh.

16   Q.   While you were in Beef's, was it raining really hard?

17   A.   Right, it was raining very, very hard when I was in Beef

18   'O' Brady's.

19   Q.   All right.  So, when you left there to go back to your

20   house, how long does it take to drive back to your house?

21   A.   Back to my house?  About 10, 15 minutes, at the most,

22   probably, probably about 10 minutes.

23   Q.   Ten minutes?

24   A.   Yes.

25   Q.   Which side of the International Paper mill property is your

1    house located, not which side -- to the west or east?

2    A.   Kind of to the south and kind of to the west.

3    Q.   Southwest side?

4    A.   Southwest, yes.

5         **MR. HILL:**  Could we put up the MacDonald exhibit?

6    This is the demonstrative that we used the other day with

7    Mr. Quackenbush.

8    **BY MR. HILL:**

9    Q.   Could you tell us the name of the road where you live.

10   A.   Pleasant Valley Drive.

11   Q.   So right almost in the middle is the legend Pleasant Valley

12   Drive, do you see that?

13   A.   Uh-huh.

14   Q.   Is that the location where your house is?

15   A.   Yeah, I live right on the corner of 297A and Pleasant

16   Valley.

17   Q.   Just so we can orient ourselves, if you look up where it

18   says Burger King and McDonald's and Old Chemstrand Road, is

19   that Highway 29 that runs up to the west of those?

20   A.   Yes.

21        **MR. HILL:**  Could we zoom in on the Pleasant Valley

22   Drive part, please.

23   **BY MR. HILL:**

24   Q.   All right.  Could you tell us, from the time you left

25   Beef's and went back home, was it still raining heavily?

1    A.    Very heavily.

2    Q.    So when you got home, what happened next?

3    A.    When I got home, either it was on the radio or when I got

4    home I heard there was a waterspout in the bay close to where

5    my wife was at.

6    Q.    Was she down at the Civic Center?

7    A.    Civic Center, yes, sir.

8    Q.    So what did you do?

9    A.    I called her, got ahold of her.  Just so happens I got

10   ahold of her, I hadn't got started down there yet, and I just

11   let her know how concerned I was about it and to make sure she

12   didn't get out in it.  And she said that they had already

13   discussed it and said that she would be fine as long as they

14   stayed inside there.

15   Q.    Did you stay at the house then?

16   A.    Oh, yes, I stayed there.

17   Q.    And how long did you stay at the house at that point in

18   time before you left?

19   A.    Probably until about somewhere between 8:30 and nine.

20   Q.    So what caused you to leave the house between 8:30 and

21   nine?

22   A.    Well, she -- I told her to call me before she left because

23   of the weather.  And she called me and she gave me concern

24   about how much water was on the road and stuff, and I told her

25   let me come meet her somewhere and she insisted I didn't.  So

1    she started on her way home on the interstate.  And somewhere

2    between 29 and Pine Forest the traffic stopped.  It was so much

3    rain that it evidently was flooded at the Pine Forest exit and

4    had come to a complete stop.  And finally I talked her into

5    letting me meet her and I got her to -- she said other vehicles

6    was turning around and --

7              **MR. VLACHOS:**  Your Honor, objection, hearsay.

8              **THE COURT:**  It is.

9              **MR. HILL:**  I understand.  Let me rephrase the

10   question.

11   **BY MR. HILL:**

12   Q.   Don't tell us what your wife told you because that is

13   hearsay.  But can you tell us what you did in terms of leaving

14   the house.  Why did you leave the house?

15   A.   I left the house and I was going to meet her.  And I was

16   going to go south on 297A, and I couldn't because the water was

17   across the road at the bridge there, it hasn't got a name but

18   it was just to the left of my house, the driveway that I pull

19   out.  There was actually cars trying to cross it and it was

20   coming up above their headlights, so I had to turn to the

21   right.

22   Q.   Let me stop you there for just a second.  Is that a bridge

23   that -- when you were coming from Beef 's to go home, did you

24   have to go over that bridge?

25   A.   Yes, I did.

1  Q.   Can you describe what it looked like when you left Beef's
2  to come home to go over that bridge?
3  A.   It looked normal except the water was probably a foot or
4  two underneath the bridge, it was a lot of water going through
5  there.
6  Q.   Normally how does it look underneath that bridge?
7  A.   Dry.
8  Q.   Dry?
9  A.   Dry.
10 Q.   So when you came home, there was already water up close to
11 the bottom of the bridge?
12 A.   Right, yes, there was.
13 Q.   Which direction does it flow, if you could?  From west to
14 east?  East to west?
15 A.   It goes from west to east to Elevenmile Creek.
16 Q.   It flows into Elevenmile Creek?
17 A.   Elevenmile Creek, yes.
18 Q.   Now, if we look up there on the demonstrative, is your
19 house and that street, Pleasant Valley Drive, all of that is
20 below the Kingsfield Road dam, correct?
21 A.   Correct.
22 Q.   So, the water that's coming in from the left side of that
23 demonstrative, does that flow into Elevenmile Creek below the
24 Kingsfield Road area?
25 A.   Yes, sir.

1    Q.   And is it above the neighborhoods that are involved in

2    this --

3    A.   Yes, yes, it's above.

4    Q.   So, when you went home, the water was up almost to the

5    bottom of the bridge.  When you came out, you looked to your

6    left?

7    A.   Yeah.  I wanted -- that's the direction I would have

8    normally went to get to the interstate, but I couldn't.

9    Q.   How deep was that water then by 8:30, nine o'clock?

10   A.   Three, four foot.

11   Q.   Four foot above the bridge?

12   A.   It was up to the guardrails.

13   Q.   I'm sorry, I cut you off.

14   A.   Excuse me?

15   Q.   I'm sorry, I talked over you and I apologize.

16   A.   You asked me how deep it was, and it was up to the

17   guardrails on the side of the road.

18   Q.   That are on the bridge?

19   A.   That are on the bridge, yeah.

20   Q.   So you could see the actual guardrail?

21   A.   Just barely.

22   Q.   Could you see the -- does it have like reflectors or

23   something?

24   A.   Yeah, it's road signs there that's got stripes on it that

25   lets you know there's a bridge there, and I could see those,

1   and I could see the water coming across the guardrails, and

2   that's the only reason I knew there was a guardrail -- I mean,

3   I knew there's guardrails there, but the reason I seen the

4   guardrails was there, the water was coming across it.

5   Q.   Did you say you could see cars that were trying to come in

6   from the other direction?

7   A.   Yeah, yeah, people from the south of me on my road trying

8   to go north, and the water would get up to their headlights

9   and, thank God, they backed up, you know.

10  Q.   So you did not go that way?

11  A.   No, I did not go that way.

12  Q.   What kind of vehicle did you have?

13  A.   I have a Z71 GMC, four-wheel drive.

14  Q.   Does it sit up high off the ground?

15  A.   Yeah, it sits up higher, yes, sir, not real high.

16  Q.   Can you give us your best estimate of the distance that

17  that floodwater was standing above the highway, the distance

18  that you would have had to drive through?

19  A.   100 feet, 150 feet.

20  Q.   So you turned the other direction?

21  A.   Right, turned to the right.

22  Q.   And tell me what you encountered heading in the other

23  direction.

24  A.   As I went north on 297A towards Kingsfield, Pine Wood

25  Church is the next church that's on the right-hand side, and

1  there's a little bottom there, and I had to cross some water

2  there that was probably a foot, foot-and-a-half deep.

3  Q.   So you turned right to head up toward Kingsfield Road?

4  A.   Yes, sir.

5  Q.   And the church there, is it in another low spot?

6  A.   It's a low spot there, yes, sir.

7  Q.   Can you estimate how wide that area of water was that was

8  about two, two-and-a-half feet?

9  A.   It was about 50 feet wide.

10 Q.   Did you feel safe going through that?

11 A.   Yeah, yeah, I felt safe going through that.

12 Q.   Now, is that little low area also south of the Kingsfield

13 Road area?

14 A.   Yes, yes.

15 Q.   So which direction was the water flowing in that area?

16 A.   From west to east going to Elevenmile Creek.

17 Q.   So all of that water that was flowing from the northwest to

18 the southeast was flowing into Elevenmile Creek, it never went

19 through the Kingsfield Road structure, did it?

20 A.   No, it never did, uh-uh, no.

21 Q.   Can you tell us what happened after you crossed that water.

22 A.   After I crossed that water, I went on up to Kingsfield,

23 made a right onto Kingsfield and crossed the bridge, which is

24 Elevenmile Creek.  I looked out the window, I didn't see the

25 water.  I mean, I could hear it, but I didn't see it.  It

1    wasn't over the road of any kind, and I made my way towards 29

2    to meet my wife.

3    Q.   All right.  And then you met her where?

4    A.   Ensley.

5    Q.   At Ensley?

6    A.   Yes.

7    Q.   So had you to go all the way to Ensley to meet your wife?

8    A.   Yeah, yeah, I had to go all the way to Ensley.

9    Q.   What happened next after you met her?

10   A.   After I met her, I got her in front of me and I followed

11   her home, and we came back and parked her car at the Pine Wood

12   Church because she didn't feel like -- her car sat low, so she

13   didn't feel safe crossing the water, so I had her park it

14   there, she got in the car with me and we rode on to the house.

15   And then there was a deputy sitting at the end of my road

16   stopping anybody that was trying to cross the road because the

17   water was real deep going across the road.

18   Q.   Let's start with the water that you experienced when you

19   turned right to go up towards Ensley and you told us it was

20   two-and-a-half feet of water.  How did it look when you came

21   back with your wife after you --

22   A.   It was a little bit deeper.

23   Q.   Was it ?

24   A.   Yeah, a little bit.

25   Q.   What time, about, was that?

1  A.   I'd say somewhere between 9:30, ten o'clock, maybe quarter

2  to ten.

3  Q.   And when you came back down to where you were going to go

4  into Pleasant Valley Drive, which is that the road that

5  actually goes into your house, your neighborhood?

6  A.   Pleasant Valley?

7  Q.   Yes.

8  A.   Yeah, as soon as you turn on Pleasant Valley my house is

9  the first one on the left.

10  Q.   So when you were coming back down, could you still see down

11  at the bridge level?

12  A.   Yes.

13  Q.   So had that water risen as well?

14  A.   Oh, I'm sure it had, yeah.

15  Q.   Was there any activity going on around that water at that

16  time?

17  A.   No, because of the deputy sitting there not letting nobody

18  cross.

19  Q.   That's where they blocked it?

20  A.   Yeah, they blocked it off out there.

21  Q.   Now I understand.  So what time do you think it was when

22  y'all finally got back home?

23  A.   Somewhere around 10:30.

24  Q.   How long have you lived in Florida?

25  A.   All my life.

1    Q.   How does this storm event compare with any other storm

2    event that you've experienced since you've lived in Florida?

3    A.   I've never seen anything like it, not even a hurricane.

4    Q.   Let's turn to the next day now, April 30th.  What time did

5    you arrive on April 30th?

6    A.   I probably got to work between 5:30 and six.

7    Q.   And do you remember who you were relieving, the shift you

8    were relieving?

9    A.   I was relieving Chris Quackenbush.

10   Q.   How deep was the water in the parking lot when you arrived?

11   A.   It was four to six inches in the whole parking lot.

12   Q.   Did you -- at some point in time during that dayshift, did

13   you drive down to the Kingsfield Road area?

14   A.   Yes, somewhere around between nine, nine o'clock, maybe a

15   little later, nine and twelve, something like that.  I don't

16   know exactly what time it was.

17   Q.   You didn't take any photographs, did you?

18   A.   Excuse me?

19   Q.   You didn't take any photographs?

20   A.   No, no photographs.

21   Q.   What did you see when you got down to that area around the

22   Kingsfield Road structure?

23   A.   I seen the catwalk that was on the concrete structure still

24   standing, water was running around it, and I seen our catwalk

25   to walk that went out to the bar screen, but it was -- you

1    could just barely see it sticking up.

2    Q.   So you could see the catwalk on the concrete structure?

3    A.   Yes.

4    Q.   The catwalk on the fall box -- the drop box?

5    A.   Yes, just the handrails sticking up.

6    Q.   The handrails you could see?

7    A.   Yeah.

8    Q.   And then in between you could see water going over the

9    entire structure?

10   A.   Yes.

11   Q.   And coming around?

12   A.   Coming around it a little bit, yeah.

13   Q.   A little bit.  So was there still soil underneath the water

14   that was coming around the concrete structure?

15   A.   I'm not sure.  I'm sure it had washed it some.

16   Q.   You couldn't see anything but the water?

17   A.   No, I couldn't see anything for the water.

18   Q.   Fair.

19             **MR. HILL:**  That's all I have.  Thank you, Mr. Morgan.

20             **THE COURT:**  Mr. Vlachos?

21             **MR. VLACHOS:**  Thank you.

22                        **CROSS-EXAMINATION**

23   BY MR. VLACHOS:

24   Q.   Good morning, Mr. Morgan.

25   A.   Good morning.

1   Q.   Do you recall giving a deposition in this case, giving some

2   testimony?

3   A.   Yes, sir.

4   Q.   Do you recall -- you talked about this box structure you

5   cleaned out, right?

6   A.   I think, yeah, yeah, we did.

7   Q.   And when did you stop going down to clean that out, like

8   what year was that?

9   A.   I don't remember what year.  We stopped whenever we started

10  going in the pipeline.

11  Q.   So 2012 you can't say what happened at that box?  You don't

12  have any personal knowledge, correct?

13  A.   No, I don't have any personal knowledge because I wasn't

14  doing that crew leader job at that time.

15  Q.   And when we're talking about that -- where the catwalk on

16  the outfall box, the different one where -- there was a

17  low-level outlet and a big turn screw, you remember talking

18  about that?

19  A.   Oh, you talking about on the concrete wall?

20  Q.   The concrete wall, yes.

21  A.   There was a valve there, yeah, a gate.

22  Q.   And I believe you stated before that you had turned that --

23  had opened that a couple of times?

24  A.   I stated that I hadn't opened it.  I remember him asking me

25  that and then he corrected me, that he said Gene said I had

1  opened it.  And if Gene said I opened it, then I went down

2  there with him and I opened it, then.

3  Q.  Okay.  Well, you testified before that you had been down

4  there to turn that, correct?

5  A.  Yes.

6            **MR. VLACHOS:**  That's all I have.

7            **THE COURT:**  Redirect?

8            **MR. HILL:**  Thank you, Your Honor.

9                    **REDIRECT EXAMINATION**

10  **BY MR. HILL:**

11  Q.  After 2012 when the pipeline went online, it wasn't your

12  responsibility to go down there and clean it out every day,

13  right?

14  A.  No, no.

15  Q.  Reed Construction was still employed to do maintenance in

16  that area, correct?

17  A.  Yes, yes.

18            **MR. HILL:**  Thank you.

19            **THE COURT:**  Sir, you may step down.

20            *(Witness excused.)*

21            Your next witness?

22            **MR. HILL:**  Your Honor, we would call Gene Yuhasz.

23        **WILLIAM EUGENE YUHASZ, DEFENSE WITNESS, DULY SWORN**

24            **MADAM CLERK SIMMS:**  Be seated.  Please state your full

25  name and spell your last name for the record.

1    **THE WITNESS:**  William Eugene Yuhasz, Jr., Y-u-h-a-s-z.

2    **THE COURT:**  Mr. Hill?

3    MR. HILL:  Thank you, Your Honor.

4                    **DIRECT EXAMINATION**

5    **BY MR. HILL:**

6    Q.   Mr. Yuhasz, good morning.

7    A.   Good morning.

8    Q.   Would you tell us who you're employed with?

9    A.   International Paper Company.

10   Q.   And what is your job title?

11   A.   Wastewater operator.

12   Q.   Between 2005 and 2014, what was your job title?

13   A.   Wastewater crew leader.

14   Q.   So, still the same job, you were the leader of the crew; is

15   that right?

16   A.   Yes, sir.

17   Q.   Tell us, if you would, when you first hired on with

18   International Paper and what your various jobs have been during

19   that time.

20   A.   When I hired on in 1987, I started on P5 paper machines,

21   transferred to lime kiln, transferred to mill services, and now

22   I'm in what's turned into wastewater, wastewater treatment.

23   Q.   All right.  Do you have any other previous work experience?

24   A.   Prior to the paper mill I worked nine years at Sacred Heart

25   hospital; prior to that, three years in the Marine Corps; prior

1    to that, bagging groceries; and prior to that, just any farm

2    labor I could find to do.

3    Q.   Could you tell us what your responsibilities were as an

4    environmental services operator?

5    A.   Primarily wastewater treatment, removing solids from the

6    water system.

7    Q.   And how did your responsibilities change when you became

8    the crew leader in 2005?

9    A.   They remained about the same, I was just responsible for

10   the actions of the entire crew.

11   Q.   I want to focus on the period between 2012 when

12   International Paper went on the pipeline and 2014 of this storm

13   event.  So who was in your crew during that time period?

14   A.   That would have been myself, Clarence Morgan, Chris

15   Quackenbush, Tony Hall, and Pat Lockridge.

16   Q.   So, this is Clarence Morgan who just left the courtroom?

17   A.   Yes, sir.

18   Q.   And then Chris Quackenbush who testified earlier in the

19   trial?

20   A.   Yes, sir.

21   Q.   And then Pat Lockridge and Tony Hall, I think you said?

22   A.   Yes.

23   Q.   What were their roles as your crew?  What did they do?

24   A.   Their primary was running the wastewater treatment plant

25   and dewatering the material sludge and just overseeing, you

1  know, in general anything that came up.

2  Q.  Did they work different shifts?

3  A.  Yes, sir.  We worked the southern swing:  a week of

4  dayshift, a week of 3-to-11, a week of graveyard 11-to-7 shift.

5  Q.  As the crew chief, did you work mostly days?

6  A.  Just about days unless an emergency came up or an absentee.

7  Q.  I want to focus now on the stormwater system.  Can you tell

8  us a brief description of the mill's stormwater system?

9  A.  Works -- primarily it's just three stormwater ponds --

10  excuse me.  The east and west pond, which is just what it --

11  I'm sorry -- ditch, which contained any stormwater before it

12  gets into our system on the west side, the west ditch gathers

13  it up.  On the east side, the east -- any stormwater on that

14  side.  And then there's what's called the Muskogee ditch, which

15  comes in off of 3-mile -- I'm sorry -- Muskogee Road, and it's

16  all routed together into a stormwater pond and kept separate

17  from the wastewater plant that has -- water that has to be

18  treated.

19  Q.  Now, are these ditches concrete or are they natural ditches

20  or manmade ditches?

21  A.  They're all manmade.  They consist of sections that are

22  earth and other places that are concrete slab or concrete

23  culverts as needed.

24  Q.  What do you have to do to maintain those ditches?

25  A.  It's pretty straightforward.  It's just to keep any dirt

1    and debris, limbs, or any bushes or grass that's grown into it

2    that may hold back any flow on it.

3    Q.   Who was responsible for the maintenance to be sure that

4    they flowed regularly?

5    A.   Primarily, mine.  Now, on a regular basis, I forget how

6    often, there was an official look at them.  But in mine, on a

7    daily basis you drove by them; if you seen any soil washed in,

8    any limbs or dirt, you called the contractors and have them

9    come dip them out.

10   Q.   And what contractor was that at the time?

11   A.   That would have been Reed.

12   Q.   Reed Construction?

13   A.   Reed Construction, yes.

14   Q.   Do you know Mr. Ed Giddins with Reed Construction?

15   A.   Yes, sir.

16   Q.   So, was there also a regularly scheduled cleanup inspection

17   by Reed Construction?

18   A.   Periodically, but not -- I did not deal with that.

19   Q.   Fair enough.  But were those ditches part of your regular

20   rounds?

21   A.   Yes, sir.

22   Q.   With respect to the changeover in 2012 to the pipeline, did

23   anything change about the way you maintained those stormwater

24   ditches?

25   A.   No, sir, nothing has changed.

1   Q.   It's still within your responsibility?

2   A.   Yes, sir.

3   Q.   And is that true -- was that true all the way down to the

4   Kingsfield Road area?

5   A.   Yes, sir.

6   Q.   So, all of that remained under your responsibility even

7   after the 2012 pipeline conversion?

8   A.   Yes, sir.

9   Q.   Including the concrete weir?

10  A.   Yes, sir.

11  Q.   And including the drop box?

12  A.   Yes, sir.

13  Q.   During the changeover time for the pipeline, was there a

14  period of time where you couldn't pump full capacity or all of

15  your wastewater directly into the pipeline?

16  A.   Yes, sir.

17  Q.   And how long a period of time was that?

18  A.   I'm not giving you an exact number, I'm going to say

19  approximately four months.  When we first started, we were --

20  we could not go 100 percent immediately out of Elevenmile Creek

21  to our new pipeline to the wetlands.  It started off

22  approximately at 25 percent reduction to Elevenmile Creek into

23  the pipeline, and there was testing done, and then at a point

24  we went to 50 percent, and then 75 percent, and then the last

25  one we moved would have been 100 percent to the pipeline and

1   out of Elevenmile Creek.

2   Q.   So, at that point in time up to let's say roughly four

3   months, or whatever the time period was, there was still some

4   wastewater that was going over to the area that was retained by

5   the Kingsfield Road structure?

6   A.   Yes, sir.

7   Q.   All right.  So it was serving a purpose for both wastewater

8   and stormwater at that point?

9   A.   Yes, sir.

10  Q.   After that trial period, so sometime in 2012, after the

11  conversion, it started just doing stormwater?

12  A.   Yes, sir.

13  Q.   All right.  And it was that way at the time of the April of

14  2014 flood?

15  A.   Yes, sir.

16  Q.   Now, after that conversion and after that trial period, was

17  it still your responsibility to maintain the area around the

18  drop box?

19  A.   Yes, sir.

20  Q.   For stormwater purposes?

21  A.   Yes, sir.

22  Q.   And the area where the concrete structure was?

23  A.   Yes, sir.

24  Q.   So that was still within your responsibilities?

25  A.   Yes.

1   Q.   And you checked it regularly?

2   A.   Yes, sir.

3   Q.   Was there any change in the way that some of the ponds that

4   had formally been used in wastewater were now converted into

5   stormwater ponds?

6   A.   Yes, sir.

7   Q.   Which were those?

8   A.   That would have been the -- pond 2 was converted into a

9   storm surge basin which was for just that, storm surge.  We

10  also had the multi-purpose surge basin, but that was a portion

11  of the phase 1 that occurred in -- from 2005 to 2012, in that

12  time frame.

13  Q.   So after the conversion, then there was actually additional

14  ponds that could be used to capture rainwater, stormwater?

15  A.   Yes, sir.

16  Q.   How often do you think at the point you were the crew chief

17  and you were working primarily days, how often would you go

18  down to the area, whether you had to clean it out or not?

19  A.   Every day I was at work.

20  Q.   Every day?

21  A.   Yes, sir.

22  Q.   Where you would visually inspect that area?

23  A.   Yes, sir.

24  Q.   The Kingsfield Road area every day?

25  A.   Yes, sir.

1    Q.   Would you inspect to be sure that the drop box structure,

2    the area around the bottom of it was cleaned out every day?

3    A.   Yes, sir.

4    Q.   So you'd walk out on that catwalk?

5    A.   Yes, sir.

6    Q.   You would -- would you visually look at the concrete

7    structure with the catwalk across it every day?

8    A.   It was impossible not to see it because when you pulled up

9    that was your first view.

10   Q.   Would you ever get out and just walk around the catwalk and

11   walk around, check things out?

12   A.   Yes, sir, look for deer tracks and stuff.

13   Q.   Would you do that every day or just occasionally?

14   A.   No, sir, just as necessary.

15   Q.   Was Reed also -- Reed Construction, were they also

16   responsible for continuing to maintain that area if heavy

17   equipment was needed to get down in there and clean some --

18   A.   Yes, sir, they were our contractor, and I seen them a lot

19   because, I mean, they were out looking for extra work, if

20   possible, so I seen them quite a bit looking at it themselves.

21   Q.   I'm going to focus on the actual days leading up to the

22   April 29th of 2014 storm event.  Do you remember yourself the

23   last time before that storm event you actually cleaned out that

24   fall box area?

25   A.   Very much so.  The Monday night into Tuesday prior to the

1    flood there was a bad thunderstorm and heavy rain Monday night

2    into Tuesday.  I think it was Tuesday being the 29th.  And I

3    was called in early at approximately four o'clock because of a

4    power failure.  We lost power to the entire wastewater system.

5         And once I got in to work, the electricians had already

6    restored, you know, reset breakers or whatever was necessary

7    and restored power, and at that time we were starting

8    everything back up.  And once we got everything running back to

9    normal, part of the -- my shift that day and an important part

10   of it was to continue on down to the final because of the heavy

11   rain and clean out the debris at the drop box and the outfall

12   at Kingsfield.

13   Q.   Did do you it that day?

14   A.   Yes, sir.

15   Q.   Personally you did it?

16   A.   Yes, sir, myself, and Reed was down there also that day.

17   Because any heavy rain like that we generally have to do

18   something.

19   Q.   Do you remember what -- how you cleaned it out that

20   particular day?

21   A.   I think it was -- I'm thinking backhoe, a backhoe,

22   probably, but it could have been -- I'm going with backhoe.  We

23   had some large stuff.  Of course, I used a pipe pole, which is

24   just a pole with a hook on the end of it for pulling out

25   material, a rake for grass and such as that.  Anything any

1   larger that took any more effort we'd usually get Reed to bring

2   a piece of equipment.

3   Q.   Now, when they would bring a piece of equipment down, did

4   they usually have to invoice for the cost of using that

5   equipment on a job and cleaning out like that?

6   A.   Yes, sir, that's what I believe.  I wasn't involved in it

7   but I'm sure they did.  It was extra work.

8   Q.   So if they had done that, say, on April 20th, they would

9   actually invoice the company for having to use that equipment

10  to do that?

11  A.   Yes.

12  Q.   So, on the 29th, the morning of the 29th when you cleaned

13  it out, if there's not an invoice, then does it indicate

14  probably you and some Reed employees were doing it without

15  equipment?

16  A.   Yes, sir, it's possible.  Due to the fact that there are

17  laborers there at all hours of the day, and they can be

18  utilized anywhere as necessary and there's no extra cost

19  involved.

20  Q.   Oh, I see.  So Reed doesn't have to bill extra for that

21  type of maintenance if they're not involved with heavy

22  equipment?

23  A.   That's correct.

24  Q.   Okay, got you.  I'm going to back up for just a minute and

25  talk about the actual structure, concrete structure, not the

1    fall box part.  Are you familiar with the history of how that's

2    evolved over the years?

3    A.    Pretty much, yes, sir.

4    Q.    Can you tell me in the 2005-2006 time frame what changes do

5    you remember that happened at that particular location?

6    A.    The concrete structure would have been -- there was a gate

7    that was installed in the middle of the -- in the middle of the

8    structure.  It very seldom got used.  And it's hard to tell

9    when something is going to, you know, have enough rainfall that

10   you'll need to open it, which requires extra labor.

11         And so what was done was there were -- I guess additional

12   drainage was cut out of each wall that, instead of having to

13   use the gate, it would automatically accept excess flow and let

14   it go ahead and escape.

15   Q.    I think we've heard those called notches that were cut in

16   the top of the wall?

17   A.    That's a good name for it, notches, right.

18   Q.    Do you recall when those notches were cut?

19   A.    Not exactly, no, I don't.

20   Q.    Do you recall who did that work?

21   A.    It was an outside contractor.  That's pretty heavy work

22   cutting concrete.

23   Q.    Do you remember if it was Partridge-Sibley?

24   A.    I don't think it was.

25   Q.    Were there any other changes that were made on or around

1    the concrete structure other than cutting the notches, that you

2    remember?

3    A.    There was always, you know, activity, if any had occurred

4    that was necessary, such as there were times when it overflowed

5    some and there was erosion, and so there was sheet piling

6    placed around the edges to maintain the earth so it didn't wash

7    away.

8    Q.    Do you remember when the sheet piling was put in?

9    A.    No, sir, I don't, not exactly.

10   Q.    Was that an outside contractor that came in to do that?

11   A.    I think it was Partridge-Sibley, which was the hired one,

12   yes.

13   Q.    That may be where I heard the name.  Could you describe the

14   type of material that was used in those sheet pilings?

15   A.    It was corrugated steel sheets, is what it was.  And from

16   what I've seen of installation of them in other places, it's

17   necessary for them to be forced into the ground with heavy

18   equipment.

19   Q.    You weren't involved in that?

20   A.    No, sir.

21   Q.    Fair enough.  I'm going to ask you a little bit now about

22   the April 2014 storm event.  Can you tell us what type of

23   advanced notice you had -- and I'm not talking about the rain

24   that had occurred the night before and into the morning of the

25   29th, but the later storm event.  You were working days that

1  day?

2  A.   Yes, sir.

3  Q.   Can you tell us what sort of advanced warning you had that

4  there was going to be a storm?

5  A.   The only thing I would have known was we were expecting

6  thunderstorms and rain.

7  Q.   Is that something you get often especially in the

8  springtime?

9  A.   Yes, sir.  That was nothing out of the ordinary.

10  Q.   So when were you first aware that it was a severe weather

11  situation?

12  A.   I was sitting on my back deck, and I'm going to say it was

13  around seven or eight o'clock, and there was nothing happening

14  in my house in Molino, Florida.  But I was watching bright

15  flashes of lightning and hearing thunder seconds or minutes

16  behind.  And I realized that there was a, you know, heavy rain

17  or something happening somewhere.  And then I got a call or

18  either I had called Patricia Lockridge, who is the evening

19  operator, and she was telling me how much was going on.  And

20  over the phone I heard the lightning that I saw at that

21  distance and it -- it's bad timing for her, it was her first

22  day being turned loose on her job.  And she just got through

23  with her training and that was her first day by herself, as bad

24  as you could expect.  And she was telling me what she had been

25  doing and where she was at, and I asked her, I said, "Are you

1  out in this weather now?"  And I realized that over the phone

2  that the lightning flash that I was seeing was what I was

3  hearing on the phone, and she told me "Yes."  And I asked her

4  again what she had done as far as opening the gates, and I

5  said, "You've done all you can do.  Get out of there and get

6  back in the control room."  It was dangerous.

7  Q.   So she was out in the rain walking around the pond areas?

8  A.   Yes, sir, she was outside doing everything that she knew to

9  do that she had been trained to do.

10 Q.   And how long had her training been?

11 A.   A couple of months, I know, I just have to throw that

12 number out.  It had been several, several weeks, yes.

13 Q.   So was she -- how was that training done?  Just like on the

14 job following you other folks around?

15 A.   It was on-the-job training primarily, although she was

16 questioned by supervision at, you know, periodic times to make

17 sure she was progressing, you know, to the point where she was

18 able to be turned loose.

19 Q.   I do want to back up for just one second.  I think this was

20 probably obvious but I want to be sure.  When you went down

21 there the morning of the 29th -- now we're backing up a little

22 bit in time -- and you cleaned out that area because it had

23 rained the night before, how much water was standing behind --

24 or upstream of the concrete structure?

25 A.   It was nothing that was out of the ordinary during a normal

1   heavy rainfall.  There was nothing that would have caused any,

2   you know, problems.  We did have some extra stuff come in but

3   it was normal, normal amounts.

4   Q.   But you could actually get down to the fall box to clean it

5   out?

6   A.   Yes, sir.

7   Q.   So it wasn't even up to the level of going into that pipe?

8   A.   No, sir.  It would go into the pipe as it normally would.

9   Q.   All right.

10  A.   But nothing out of the ordinary.

11  Q.   Okay, got you, thank you.  What time did you leave for work

12  on the 29th?

13  A.   That was a little longer day, and I'm going to say it was

14  four to 4:30 range.  My normal shift would end at 2:30.

15  Q.   So you were describing what happened when you went home and

16  all that.  I want to turn to the next morning.  When did you

17  return to the mill on the next morning?

18  A.   I went in on regular shift, so I would have got to the mill

19  between 5:30 and six.  My normal day was from six to 2:30.

20  What did I see?

21  Q.   Well, let me ask the question.  I appreciate it.  Please

22  walk us through what happened after you arrived at the mill.

23  A.   When I pulled in the parking lot, I knew we had had

24  something go on that I hadn't ever seen.  There had been

25  puddles of water and stuff in the past in the parking lot.  I

1  got out in the parking lot this time and it was ankle deep
2  water all the way into the mill.  And Pete Morgan was the
3  operator that was making relief of Chris Quackenbush who had
4  the nightshift, the graveyard shift, 10:30 to 6:30.  And there
5  was just water everywhere you looked, and this is up in the
6  mill itself at the timeclock.
7  Q.  This was up in the mill before you even went down to the
8  pond areas?
9  A.  Yes, sir.
10  Q.  So, about what time do you think you started going down
11  into the pond areas to make your rounds?
12  A.  Probably -- well, we went after relief -- we went down and
13  Chris Quackenbush had already told us what he had saw as he
14  went out and tried to do what he could do.  I would say I
15  started my round at 6:30.
16  Q.  All right.  Describe the route that you took from the pond
17  areas down to the Kingsfield Road area that day.
18  A.  Okay.  We -- our first stop was at the wastewater treatment
19  building, which is essentially the front end of our ditches.  I
20  dropped Clarence Morgan off, the one that was in here just a
21  little while ago, I dropped him off to go to the control room
22  because he would go to the control room and I would be able to
23  call him on the phone or him call me and let me know what was
24  happening.  We knew something was up because of shift turnover
25  from Chris Quackenbush who gave us a turnover about what he had

1    seen and where to be careful.

2         How I got there was by the west road.  I went down through

3    the ponds and was looking and taking some photos as I went, but

4    I did not go around the east road around pond 3 because what he

5    had told me that it was overflowing and to avoid that area, you

6    know, for safety, and I did, and I stayed on the west road.

7    And I went down, I could see water in every ditch.  Stormwater

8    ditches were full, ponds were full, and I went on down and

9    that's when I went to the final and seen the water at the drop

10   pipe.

11   Q.   So let's start up at the pond area.  You said all the ponds

12   were full.  They were still retaining water?

13   A.   Oh, yeah.

14   Q.   Every one?

15   A.   Any water that I saw coming out of them was essentially

16   slow and just overflowing.

17   Q.   So it's still raining a little bit?

18   A.   Very -- yeah.  It had slacked off a lot, but it was still

19   raining some.

20   Q.   So you went down the west side?

21   A.   Yes, sir.

22   Q.   And would that be toward the Turtle Creek side?

23   A.   Yes, sir, right back in places.

24   Q.   Tell us what you saw when you got down to the Kingsfield

25   Road area.

1    A.    I seen more water than I've ever seen in my life there.

2    Water was coming over the concrete wall, it was coming -- where

3    the pipeline was, water was coming over and above it.  There

4    was no -- there was no walkway to get out on.  I just seen the

5    water level, and I could see water going -- heading towards

6    Kingsfield bridge and I took some photos of that.

7          But what I saw was that we were still retaining a bunch of

8    water behind our earthen dam and the concrete structure.  Water

9    was still being held back.

10   Q.    All right.  So you got the earthen dam and you've got -- it

11   leads out to the concrete structure, and you've got the fall

12   box over here?

13   A.    Yes.

14   Q.    Now, the catwalk that goes over the concrete structure,

15   could you see the rails of the catwalk?

16   A.    I recall that I could, yes.

17   Q.    And could you see any of the rails on the fall box, that

18   catwalk that led out?

19   A.    Maybe the top rails, yes, possibly.

20   Q.    And then you said you took some photos, right?

21   A.    Yes.

22   Q.    And I want to show you some of those photos, if I could.

23   Let's start with Exhibit 34.

24          **MR. HILL:**  And I don't think it's been admitted yet,

25   Your Honor.  I'm not sure, it may have been admitted in the

1  Plaintiffs' case with a different number.

2        **THE COURT:** Let's go ahead and -- even if has been

3  admitted, we can match it up later. Is there any objection,

4  Mr. Vlachos?

5        **MR. VLACHOS:** No objection, Your Honor.

6        **THE COURT:** IP Exhibit 34 is admitted.

7        *(Defendant's IP Exhibit 34 admitted into evidence.)*

8        **MR. HILL:** Thank you, Your Honor. May we publish?

9        **THE COURT:** Yes.

10       **MR. HILL:** Thank you.

11 **BY MR. HILL:**

12 Q.   Do you recognize this photograph?

13 A.   Yes, I do.

14 Q.   Is that one you took?

15 A.   Yes, sir.

16 Q.   And do you remember about what time that photograph was

17 taken?

18 A.   7:15 range, around there.

19 Q.   Somewhere around 7:15?

20 A.   Yes, sir.

21 Q.   So, if you're looking at the photograph, is it fair to say

22 that, if my arm now is that way for the concrete structure,

23 that's what we're looking at in the upper right hand portion of

24 that photograph?

25 A.   Yes, sir.

1   Q.   And if my other arm is pointed towards this direction, that

2   would be where the fall box/catwalk would be, but it's not in

3   this photo?

4   A.   Right, it's not in the photo.

5   Q.   So it would be over this way?

6   A.   Yes, sir.

7   Q.   So can you tell the jury, is this water still being

8   retained behind the concrete structure?

9   A.   Yes, sir.

10  Q.   So it's flowing over the top of it?

11  A.   Right, yes, sir.

12  Q.   And you also can see the water that's flowing around part

13  of the earthen dam that's been covered with water, correct?

14  A.   Yes, sir.

15  Q.   Does this accurately reflect what you saw around 7:15 or so

16  when this photograph was taken?

17  A.   Yes, it does.

18  Q.   You said a minute ago that it appeared that there was a

19  whole bunch of water still behind the dam or upstream of the

20  dam.  Is that the water that's all up in the area to the left

21  of the dam that you were talking about?

22  A.   Yes, sir.

23  Q.   And you see that the water that's flowing on this side of

24  the dam -- you see the waves and what have you on the water?

25  Was that water rushing through there?

1    A.    It -- it was -- it was running over the earth that was

2    still there and causing the waves as it dropped over.

3    Q.    So you thought there was still some earth underneath that

4    water?

5    A.    Yes, sir.

6    Q.    It had not completely eroded away?

7    A.    Yes, sir, I did not think so.

8    Q.    If I could, I'd like to show you Exhibit 33.

9          **MR. HILL:**  And this, again, has not been admitted yet,

10   Your Honor, although I think it was shown earlier, so we would

11   offer it.

12         **THE COURT:**  Any objection?

13         **MR. VLACHOS:**  No objection.

14         **THE COURT:**  Thank you.  That's admitted, IP 33.

15         *(Defendant's IP Exhibit 33 admitted into evidence.)*

16   **BY MR. HILL:**

17   Q.    I'd like to try to orient us a little bit here.  Is this

18   rail that you see that's kind of going at an angle off the left

19   side of the photograph, is that the rail on the catwalk that

20   leads out to the fall or drop box?

21   A.    Yes, sir, that would be the top rail.

22   Q.    So there are actually some steps that you would normally

23   walk down to get onto that catwalk to then walk out and clean

24   out the area?

25   A.    Yes, sir, there's concrete steps in the very bottom of the

1  photograph.

2  Q.   So you can't really see the concrete structure in this

3  picture, can you?

4  A.   No, sir.

5  Q.   But you can see the water that's rushing down towards the

6  -- where the earthen embankment is being eroded away, right?

7  A.   Yes, sir.

8  Q.   And that water appears to be flowing over the catwalk that

9  goes out to the fall box?

10  A.   Yes, sir.

11  Q.   Is that photograph -- does that depict the way it looked to

12  you at the time you took the photograph?

13  A.   That is exactly what I saw when I took the photograph.

14  Q.   And do you remember the time of this photograph?

15  A.   It was at the 7:15 range.  They were taken within minutes

16  of one another.

17  Q.   Okay, fair enough.  Let's look at International Paper

18  Exhibit 32.

19         **MR. HILL:**  And I would move this into evidence as

20  well, Your Honor.

21         **MR. VLACHOS:**  No objection, Your Honor.

22         **THE COURT:**  Thank you.

23         32 is also admitted.

24         *(Defendant's IP Exhibit 32 admitted into evidence.)*

25  **BY MR. HILL:**

1  Q.   About what time do you think that photograph was taken?
2  A.   That would have probably been something -- 7:15, 7:20.  If
3  the first one was 7:15, this would have been some four or five
4  minutes later probably.
5  Q.   And you had to walk down this way and kind of take that
6  picture looking back?
7  A.   Yes, sir, looking upstream.
8  Q.   So you can't see the fall box in this picture, right?
9  A.   No, sir.
10 Q.   But you can see the concrete structure and the catwalk and
11 the rails for the catwalk?
12 A.   Yes, sir.
13 Q.   Can you see the water coming over the top of the concrete
14 structure?
15 A.   Yes, sir.
16 Q.   And you can see that there's still a considerable amount of
17 water that's flowing down the spillway?
18 A.   Yes, sir.
19 Q.   And it also has eroded the earthen berm on the left side of
20 this photograph of that concrete structure, right?
21 A.   Yes, sir.
22 Q.   But it is still falling, isn't it?
23 A.   Oh, yes, yes, sir.  On the bottom right that's where it's
24 actually dropping down to the creek level going under
25 Kingsfield Road.

1      **MR. HILL:**  Thank you, Mr. Yuhasz.  That's all my

2   questions.

3      **THE COURT:**  Mr. Vlachos, how much time do you think

4   you have?  And I'm not pressing you, I just want to know if we

5   should go ahead and take lunch.

6      **MR. VLACHOS:**  Not very long, Your Honor.

7      **THE COURT:**  We'll go ahead and wrap up with Mr. Yuhasz

8   and then take a lunch break.

9                         **CROSS-EXAMINATION**

10  **BY MR. VLACHOS:**

11  Q.   Good afternoon, Mr. Yuhasz.  How are you?

12  A.   Pretty good.  Afternoon.

13  Q.   Good.  You recall you were deposed in this litigation back

14  in July of 2015, correct?

15  A.   Yes, sir.

16  Q.   And you also testified in this courtroom in June of 2015,

17  you recall that?

18  A.   I'll have to take your word for the date, but I remember

19  being here, yes.

20  Q.   I might have been wrong on my date, I apologize.  You

21  stated before that when you got there you were kind of

22  debriefed by Mr. Quackenbush; is that correct?

23  A.   Correct.

24  Q.   And he told you on that day -- when you met with him, he

25  told you that the night before he saw the earthen part of the

1  dam being overtopped, didn't he?

2  A.   At some point, yes, he did, uh-huh, he let me know that he

3  saw it, yes.

4  Q.   So he saw water coming over the earthen part, not the

5  concrete part, but the earthen part?

6  A.   To the best of my recollection, yes.

7        **MR. VLACHOS:**  Thank you.  That's all I have.

8        **THE COURT:**  Redirect?

9        **MR. HILL:**  No other questions.

10       **THE COURT:**  Sir, you may step down.

11       *(Witness excused.)*

12       Ladies and gentlemen, we'll recess for lunch now.

13  We'll be in recess until 1:30.  Please don't discuss the case

14  during the recess, and please continue to keep an open mind.

15  We'll see you back at 1:30.  Thank you.

16       *(Jury out.)*

17       How is the Defendant's case looking from your

18  standpoint, Mr. Hill?

19       **MR. HILL:**  I appreciate you asking, Your Honor.  We

20  have run into a situation with Dr. Lan.  He lives in Denver and

21  works in Denver, and he tried to catch a plane yesterday to get

22  here yesterday.  The plane he was going to get on had

23  mechanical problems and they cancelled the flight.  He could

24  not get in until sometime today.  I'm not sure if he's even

25  gotten here yet.  We have other witness that we're going to put

1    on today.  But the reason I bring that to your attention now is

2    that, if we were to finish all of those witnesses and he's not

3    arrived and we can't put him on, it might be a good time if we

4    could break, you know, four, 4:30.

5         **THE COURT:**  That's not a problem.  And we can -- if

6    there's something else, if we want to look through jury

7    instructions, we can start with that.  But obviously this is

8    something that's not within your control and we're not behind

9    schedule.

10        **MR. HILL:**  Other than that, I think Mr. Nelson may

11   have a better feel for how much longer we might take with our

12   case, but I think we'll probably finish Monday.

13        **MR. NELSON:**  I suspect that's right.  Again, it's

14   contingent on how long cross runs, but we're moving along

15   faster than we had anticipated.

16        **THE COURT:**  Okay.  That's what I wanted to know.

17        **MR. GLASSER:**  Can we maybe have an idea who is coming

18   this afternoon so we can have our exhibits ready?

19        **MR. NELSON:**  It would be Taylor and Steltenkamp.

20        **MR. GLASSER:**  That's it?  And then Lan?

21        **MR. NELSON:**  Right.

22        **THE COURT:**  So just two witnesses this afternoon short

23   of Dr. Lan?

24        **MR. HILL:**  That's correct.

25        **THE COURT:**  During the lunch recess will you all reach

1  out to him and see if you can find out where he is in transit.

2  We'll be in recess until 1:30.

3            *(Recess taken.)*

1    *(Luncheon recess was taken from 12:27 to 1:35 p.m.)*

2    *(Jury present.)*

3              **THE COURT:**  All right.  Mr. Meltzer, you're up.

4              **MR. MELTZER:**  We will call John Taylor.

5              **JOHN TAYLOR, DEFENSE WITNESS, DULY SWORN**

6              **DEPUTY CLERK:**  Be seated.

7              Please state your full name and spell your last name

8    for the record.

9              **THE WITNESS:**  John Andrew Taylor.  T-A-Y-L-O-R.

10             **THE COURT:**  All right, Mr. Meltzer.  Go ahead.

11                         **DIRECT EXAMINATION**

12   **BY MR. MELTZER:**

13   Q.   Good afternoon, Mr. Taylor.

14             What is your current position at International Paper?

15   A.   Environmental engineer.

16   Q.   And what was your position in April of 2014?

17   A.   Also environmental engineer.

18   Q.   And when did you begin working at International Paper?

19   A.   Approximately 2006.

20   Q.   And where had you worked before that?

21   A.   Before working with International Paper, I was an

22   environmental consultant with SES Engineers for approximately

23   five years in Pensacola.  Before that I was an environmental

24   manager with US Liquids for approximately seven years in Tampa,

25   Florida.  And before that I was an environmental engineer with

1  Lockheed aerospace in Orlando, Florida, also about seven years.

2  And before that, I worked in the oil service industry with

3  Dallas Schlumberger for approximately four years overseas, in

4  Africa and the Middle East.

5  Q.   Thank you.  And what is your educational background?

6  A.   Bachelor of Science in Chemical Engineering from the

7  University of Florida.

8  Q.   Now, in the 2014 time frame, what were your duties,

9  stormwater-related duties as a wastewater engineer?

10 A.   I was responsible for compliance and reporting regarding

11 stormwater.

12 Q.   And how was the management of stormwater regulated on IP's

13 property during the 2014 time frame?

14 A.   It's regulated under our NPDS permit.

15 Q.   And where would rain that -- or stormwater that drained

16 onto the mill's property go during a rainstorm?

17 A.   During rain events, we had three primary ditches for

18 conveying stormwater.  One was the northern ditch, which was

19 the -- what we refer to as the Muscogee ditch; and one was on

20 the eastern boundary of the facility, referred to as the eastern

21 ditch; one was on the western side, referred to as the western

22 ditch.

23 Q.   And where would those ditches go?

24 A.   All three commingled and ended up at a stormwater pond that

25 was south of the mill just north of Kingsfield Road.

1    Q.   And where would that go?

2    A.   We had a drop structure that went to -- discharged to

3    Elevenmile Creek.  Predominantly, during normal rain events, it

4    would go through the drop structure to Kingsfield creek -- to

5    Kingsfield Road to Elevenmile Creek.

6    Q.   So did the Kingsfield Road structure still serve a

7    stormwater purpose at the time?

8    A.   Yes.

9    Q.   What types of inspections of the mill's stormwater systems

10   were conducted prior to April 29, 2014?

11   A.   We did an annual internal inspection.  And in addition, the

12   wastewater treatment operators and our contractor would do

13   inspections that could be as frequently as daily.  And we had

14   regulatory inspections, typically once a year.  And I, myself,

15   would also conduct more than the annual inspections.  Sometimes

16   weekly, sometimes monthly.

17   Q.   And who would conduct the regulatory inspections of the

18   stormwater management systems?

19   A.   It was always the county under the jurisdiction of the

20   Florida Department of Environmental Protection.

21   Q.   So the county had authority from DEP to do stormwater

22   inspections?

23   A.   Yes, that's correct.

24        **MR. MELTZER:**  I'd like to show what's been marked

25   IP 22.

1    **MR. KAUFFMAN:** No objection.

2    **THE COURT:** Okay. Thank you. 22 will be admitted.

3    *(DEFENSE EXHIBIT 22: Received in evidence.)*

4    **MR. MELTZER:** Would you publish to the jury, please.

5  **BY MR. MELTZER:**

6  Q.   Mr. Taylor, have you had a chance to look at this document?

7  A.   Yes.

8  Q.   And what is this document?

9  A.   It's an e-mail from myself to mill management notifying

10 them that we had been inspected on July 6, 2013, by the county.

11 Q.   And would that inspection by the county in July of 2013

12 have included the Kingsfield Road structure area?

13 A.   Yes, it would have.

14 Q.   And what does your e-mail reflect with respect to the

15 county's inspection?

16 A.   It was a successful inspection by the county and no issues

17 were noted.

18 Q.   And is that consistent with your recollection?

19 A.   Yes.

20 Q.   And this is after 2012 and the pipeline conversion,

21 correct?

22 A.   Yes, that's correct.

23 Q.   What records were generally kept of inspections?

24 A.   We typically kept an annual internal inspection, and that

25 would be the main document for inspections.

1    Q.   I'd like to show what's been marked as IP 22 -- I'm sorry,

2    IP 16, actually.

3           **MR. KAUFFMAN:**  No objection.

4           **THE COURT:**  All right.

5           **MR. MELTZER:**  Please publish to the jury.

6           **THE COURT:**  That's admitted, 16.

7           *(DEFENSE EXHIBIT 16:  Received in evidence.)*

8    **BY MR. MELTZER:**

9    Q.   Do you recognize this set of documents?

10   A.   Yes.

11   Q.   And what are they?

12   A.   This would be the -- looks like to me the template that we

13   would use for our inspections.

14   Q.   Could we turn to the page that says "Navelski 59919"?

15           And, Mr. Taylor, what is this document?

16   A.   This is the document for the annual inspection from

17   July 26, 2013, which was conducted by the county inspector and

18   myself.

19   Q.   And what is the first item checked on the inspection

20   report?

21   A.   Evaluated structural stormwater management and erosion

22   control measures.

23   Q.   And you did that inspection with Ms. Jones, the county

24   stormwater inspector?

25   A.   Yes, that's correct.

1  Q.   And what was the date, again, of that inspection?

2  A.   July 26, 2013.

3  Q.   And would that have included the Kingsfield Road area?

4  A.   Yes, that would have.

5  Q.   During your time with the mill and prior to April 29, 2014,

6  what improvements to the Kingsfield Road area are you aware of?

7  A.   The major improvements that were -- of the stormwater

8  management of that area was we cut two notches in the wall to

9  allow flow -- increase the flow capacity of the area, and then

10 we put some sheet piling on each side of the structure.

11 Q.   And how would you describe those notches?

12 A.   The notches were -- we -- the contractor that put --

13 installed the notches, they did an initial calculation to make

14 sure that the notches exceeded the flow of the circular valve

15 opening that we had so that we could have those open permanently

16 and allow for a flow without having to open the valve.  And we

17 actually increased it beyond what the contractors had originally

18 specified so that it was even larger.

19 Q.   And why did you do that?

20 A.   Just to allow a greater margin for error.

21 Q.   Did you get regulatory approval for cutting those notches?

22 A.   We notified the DEP that we were going to be doing that and

23 asked if they had any objections to that.

24        **MR. MELTZER:**  I'd like to mark IP 17.

25        **MR. KAUFFMAN:**  No objection, Your Honor.

1      **THE COURT:**  All right.  Thank you.  IP 17 will be

2   admitted and you may publish.

3      *(DEFENSE EXHIBIT 17:  Received in evidence.)*

4   **BY MR. NELSON:**

5   Q.   And, Mr. Taylor, do you recognize this document and an

6   e-mail chain that you were included on?

7   A.   Is it possible to make it a little larger?

8           Oh, yes.  Okay.  Yes.

9   Q.   And if we turn to the bottom e-mail on that page, do you

10  see who the e-mail is from?

11  A.   Yes, it's from myself.

12  Q.   And who is it to?

13  A.   To William Armstrong with the DEP.

14  Q.   Okay.  And do you see the second bullet, first sentence?

15  A.   Yes.

16  Q.   Can you read that?

17  A.   A rectangular notch will be cut out of the top of the

18  emergency spillway overflow structure known as the Arkansas

19  crossing gate north of Kingsfield Road.

20  Q.   Okay.  Thank you.  Now, you mentioned sheet pilings a

21  moment ago.  What can you tell us about those sheet pilings?

22  A.   They -- I can't recall what they were fabricated out of,

23  but they were large prefab structures, approximately 3-feet wide

24  and maybe 6- or 8-feet long.

25  Q.   Now, what can you tell me about their installation?

1    A.    They were driven in to a depth where only approximately 1

2    to 2 feet was above grade.  So it could have been driven in as

3    much as 6-feet deep.

4    Q.    Do you recall who installed them, again?

5    A.    Our on-site mill contractor.  It was Reed.

6    Q.    Did they do any dirt or soil work at the time?

7    A.    Yes.  They fixed some minor erosion and put some dirt and

8    clay in also.

9          Actually -- I'm sorry -- I think the contractor at

10   that time was Partridge-Sibley.  I'm not sure if it was

11   Partridge-Sibley or Reed.  It was essentially the same

12   employees, but Reed took over from Partridge-Sibley at a certain

13   point.  But I think it might have been Partridge-Sibley that

14   installed them.

15   Q.    How would you describe the soil near the Kingsfield Road

16   structure?

17   A.    It was compacted soil with a clay material on top to

18   prevent erosion, and vegetative layer on top of the clay.

19   Q.    Prior to the April 29, 2014 storm, what did the mill do to

20   prepare for a storm?

21   A.    Typically, we would review our stormwater structures and

22   make sure there's no obstructions that would restrict stormwater

23   flow.  We would also reduce our impound wastewater and

24   stormwater so that we would have a higher capacity to impound

25   stormwater.

1  Q.   And do you know if the mill was reclaiming water from its

2  ponds as fast as it could at that time?

3  A.   Yes, we were.

4  Q.   Do you know approximately how much impound capacity there

5  was in the ponds shortly before the April 2014 storm?

6  A.   Typically, we would try and maintain at the greatest amount

7  of impound capacity possible, depending on the operations of the

8  mill.  And at that time, it would likely have been somewhere in

9  the 60 to 80 million gallons available impound capacity.

10  Q.   So other than reclaiming as much as they could and

11  maintaining the facility as well as it could, what else could

12  the mill have done to prepare for that storm?

13  A.   Really nothing.

14  Q.   I want to talk about the April 29, 2014, storm.  How much

15  advance notice do you recall the mill having of the storm?

16  A.   Well, we knew we were going to have a rain event.  We had

17  no idea it was going to be the order of magnitude of what it

18  was.

19  Q.   Where were you during the April 29th and 30th rain event.

20  A.   I had worked at the mill the entire day.  And I had arrived

21  home, and it was in the evening where I contacted a coworker to

22  get an update on the mill status for other work that was not

23  storm related.  And when I talked to them, they mentioned that

24  the rain event was much more significant than what we had

25  originally envisioned.  And at that point, I became aware that

1    it was a much more catastrophic rain event.

2    Q.   How does the April 29th storm compare to prior storms

3    you've witnessed in your life?

4    A.   It far exceeded any storm I've ever been involved in.  I've

5    been living in Florida off and on since 1969.  I've lived in

6    subtropic climates in Bangkok, Thailand, and in Africa and never

7    saw a storm even close to that.

8    Q.   What do you recall about the morning after the storm?

9    A.   The morning after the storm, I went in to work, and my

10   first thought was to try and go and inspect the mill and

11   wastewater area and stormwater areas for any impact.  And the

12   rain was still draining all the -- the storm activity was still

13   draining, and a lot of the roads were not rarely (sic) safely

14   manageable.  So I made a decision it would be safer to wait and

15   let things drain a little before going out there.

16           So I could not see anything -- the entire system.  I

17   saw parts of our wastewater system, but not the entire system

18   early in the morning.  And then after a few hours, I went back,

19   and it was more passable, and I was able to get to the areas to

20   see the full extent of the mill.

21   Q.   And when you went early in the morning to see the ponds,

22   the wastewater ponds, what do you recall about how they fared

23   during the storm?

24   A.   On the wastewater ponds?

25   Q.   Yes.

1  A.   The wastewater ponds were intact and full of wastewater and

2  stormwater.  And I was amazed that they had weathered the storm,

3  you know, so to speak, with no -- no impact where they were not

4  damaged and where still full and contained all the water.

5  Q.   Did you go down to the Kingsfield Road area that day?

6  A.   Yes, I did.

7  Q.   And do you recall approximately what time that was?

8  A.   It was before lunchtime but later in the morning.

9  Q.   Did you take any pictures during your visit?

10 A.   Yes, I did.

11       **MR. KAUFFMAN:**  No objection.

12       **MR. MELTZER:**  I'd like to show what's been marked IP

13 Exhibit 35.

14       **THE COURT:**  All right.  Admitted.

15       Oh, this has already -- has this already been

16 admitted?  No, 35 is not.

17       **MR. MELTZER:**  I don't think so.

18       **THE COURT:**  Okay.  So it will be admitted at this

19 time.

20       (DEFENSE EXHIBIT 35:  Received in evidence.)

21 **BY MR. MELTZER:**

22 Q.   Do you recognize this as a photograph you took?

23 A.   Yes, I do.

24 Q.   Do you recall approximately what time you took this

25 photograph?

1    A.   It was before lunchtime, later in the morning, probably

2    somewhere 9:30 to 11:00.

3    Q.   And can you describe what this is a photograph of?

4    A.   That's a photograph of the structure.

5         **MR. MELTZER:**  All right.  I'd like to show what's been

6    marked IP Exhibit 36.

7         **THE COURT:**  Any problem with that?

8         **MR. KAUFFMAN:**  No objection.

9         **THE COURT:**  Okay.  Thank you.  IP 36 will be admitted.

10        *(DEFENSE EXHIBIT 36:  Received in evidence.)*

11   **BY MR. MELTZER:**

12   Q.   Do you recognize this as a photograph you took?

13   A.   Yes.

14   Q.   And approximately what time do you think you took this

15   photograph?

16   A.   Approximately the same time.

17   Q.   And what are we looking at in this photograph?

18   A.   That's the spillway from the structure heading towards

19   Kingsfield toward Elevenmile Creek.

20   Q.   And that square-looking block in the middle of the

21   spillway, what is that?

22   A.   That's a concrete object that was part of the flow

23   dissipation concrete that was on the spillway.

24   Q.   So that's not something that came off the structure?

25   A.   No.

1    Q.   That was placed there intentionally?

2    A.   Yes.

3         **MR. MELTZER:**  I'd like to show what's been marked IP

4    Exhibit 37.

5         **THE COURT:**  All right.  Thank you.  37's also

6    admitted.

7         *(DEFENSE EXHIBIT 37:  Received in evidence.)*

8    **BY MR. MELTZER:**

9    Q.   Does this also look like a photograph you took?

10   A.   Yes.

11   Q.   And is this approximately the same time?

12   A.   Yes, approximately the same time.

13   Q.   And what are we looking at in this area?

14   A.   Again, that's the area just to the left of the structure.

15        **MR. MELTZER:**  Okay.  I'd like to show IP 39.  And this

16   is a video.  I'd like to mark it for plaintiff's counsel to see.

17        **MR. KAUFFMAN:**  No objection.

18        **MR. MELTZER:**  I'd like to publish to the jury.

19        **THE COURT:**  All right.  39 is admitted.

20        *(DEFENSE EXHIBIT 39:  Received in evidence.)*

21   **BY MR. MELTZER:**

22   Q.   Mr. Taylor, do you recognize this as a video you took?

23   A.   Yes.

24   Q.   And would it be about approximately the same time as the

25   other photographs?

1    A.    Yes.

2    Q.    So that would be in the 10:00-to-11:00 time frame?

3    A.    Probably 9:30 to 11:00, somewhere in there.

4    Q.    9:30 to 11:00 time frame?

5    A.    Around 10:00.

6    Q.    Thank you.  Where do you live in relation to the mill?

7    A.    I live approximately five miles south of the mill in

8    Cantonment.

9    Q.    And how would you drive from your home to the mill?

10   A.    Highway 29.  I would go from Kingsfield Road -- from east

11   Kingsfield Road not the west side -- to Highway 29, then Highway

12   29 to Muscogee Road to the mill.

13   Q.    And about how far are you from the mill?

14   A.    Approximately five miles.

15   Q.    Five miles?

16   A.    In Cantonment, yes.

17         **MR. MELTZER:**  Okay.  I'd like to show what's been

18   marked Defendant's Exhibit 46.

19         **MR. KAUFFMAN:**  No objection.

20         **THE COURT:**  All right.  46 is admitted.

21         *(DEFENSE EXHIBIT 46:  Received in evidence.)*

22   **BY MR. MELTZER:**

23   Q.    Mr. Taylor, do you recognize what is depicted here?

24   A.    Yes, I do.

25   Q.    And what is depicted here?

1   A.   That's the portion of the railroad that is -- that runs

2   parallel to Highway 29 on the west side of Highway 29, and it

3   had been washed out in several major areas underneath the

4   tracks.

5   Q.   And do you recall seeing this and what is depicted here

6   during your commute the day after the storm?

7   A.   Yes, I do.

8   Q.   Now, how high were those train tracks?

9   A.   It -- I believe they're at least 6 or 7 feet above the road

10  elevation.  They were quite elevated.

11  Q.   And where is that in relation to International Paper's

12  property?

13  A.   It's approximately -- well, it's east of International

14  Paper upstream, and the flow from there goes to the

15  International Paper mill.

16  Q.   So that's upgradient and east of the Kingsfield Road area?

17  A.   Yes.

18        MR. MELTZER:  I'd like to pull up the McDonald's.  I'd

19  ask the Court to take this into evidence as an exhibit.

20        THE COURT:  Is it marked?

21        MR. MELTZER:  I don't actually think it's been marked.

22        MR. KAUFFMAN:  No.  Your Honor, this is not part of

23  their exhibit list.  I do object to its admission.

24        MR. MELTZER:  This is a Google aerial photo with some

25  identifying --

1    **THE COURT:**  You can use it as a demonstrative aid.

2    **MR. MELTZER:**  Yes.

3    **THE COURT:**  Okay.

4    **MR. MELTZER:**  So this will be --

5    **THE COURT:**  No.  You can use it as a demonstrative aid

6    for his testimony, but if it gets any more detailed, I'm going

7    to -- if you get into a lot of detail about this, I'm going to

8    need for you and Mr. Kauffman to approach and let me talk to you

9    about this further.

10   **MR. MELTZER:**  About?

11   **THE COURT:**  Come on up.  I don't want to have this

12   discussion with you-all --

13   *(Following conference held at the bench.)*

14   **THE COURT:**  What are you going to ask him about with

15   this?

16   **MR. MELTZER:**  I was going to ask him where that

17   railroad track was eroded.

18   **THE COURT:**  Okay.  You can just do that.  We've --

19   **MR. MELTZER:**  Fair enough.

20   **THE COURT:**  This has been used as a demonstrative

21   aid --

22   **MR. MELTZER:**  Yes.

23   **THE COURT:**  -- in the trial already --

24   **MR. MELTZER:**  Sure.

25   **THE COURT:**  -- so it's not going to be admitted.

1          **MR. MELTZER:**  Okay.

2          **THE COURT:**  If you get into -- if there's going to be

3     a lot of discussion about it --

4          **MR. MELTZER:**  There's not.  I just want him to locate.

5     That's it.

6          **THE COURT:**  Okay.

7      *(End of bench conference.)*

8          **THE COURT:**  Mr. Meltzer, you're free to use it as a

9     demonstrative aid.

10         **MR. MELTZER:**  Thank you, Your Honor.

11   **BY MR. MELTZER:**

12   Q.   Can you identify in this aerial satellite image where those

13   railroad tracks would have been?

14   A.   They would have been approximately across the street from

15   the Burger King.

16   Q.   Can you -- are you able to draw on -- okay.  Is that where

17   you're referring to?

18         Can you bring it back up?

19         Can you just circle where the train tracks would have

20   been, approximately?

21   A.   Approximately.

22   Q.   Okay.  Now, had you ever seen trains on that track before?

23   A.   Oh, yes.

24   Q.   And what did they look like?

25   A.   Just normal freight trains, long trains.  Numerous cars, up

1    to, I guess, 70 or 80 cars would not be unusual.

2    Q.   So that must have been a lot of pressure packing down on

3    that train track, right?

4    A.   Oh, yes, yes.

5    Q.   And can we pull back up IP 46.

6         And this is the day after the April 29, 2014 storm, or

7    in the days after?

8    A.   That's what it looked like after.

9         **MR. MELTZER:**  No further questions.

10        **THE COURT:**  All right.  Thank you.

11        Mr. Kauffman.

12                        **CROSS-EXAMINATION**

13   **BY MR. KAUFFMAN:**

14   Q.   Good afternoon, Mr. Taylor.

15   A.   Hi.

16   Q.   First of all, I want to understand a little bit of your

17   background.  You started working in 2006 at IP, correct?

18   A.   Yes.

19   Q.   IP is International Paper?

20   A.   Yes.

21   Q.   And you're first job and really the job that you've had for

22   the entire time is an environmental engineer; is that correct?

23   A.   The title is environmental engineer, but my duties have

24   changed oven the years.

25   Q.   Okay.  And your first job and your primary duty is

1    hazardous waste management; is that correct?

2    A.    My first job initially as I was hired was to assist on

3    wastewater but primary responsibility for waste and byproduct

4    management and safety data sheet, chemical approvals.

5    Q.    And your education is in -- a BS in chemical engineering?

6    A.    Chemical engineering, yes, sir.

7    Q.    And so you know a lot about chemicals and chemical

8    compounds?

9         **MR. MELTZER:**  Your Honor, objection.  Permission to

10   approach.

11        **THE COURT:**  Okay.

12        *(Following conference held at the bench.)*

13        **MR. MELTZER:**  I would just object to the extent he's

14   trying to suggest -- he's talking about chemicals and the

15   effluent -- or the effluent treatment system.

16        **MR. KAUFFMAN:**  I'm not suggesting that.  I'm --

17        **MR. MELTZER:**  Or that he's intending to go down that

18   line of questioning.

19        **MR. KAUFFMAN:**  I'm identifying his background,

20   engineering and making -- and chemicals.  That's what I'm doing,

21   assuming --

22        **THE COURT:**  Okay.  That's fine.  I mean, that's fair

23   game.  But don't -- please don't get into --

24        **MR. KAUFFMAN:**  I'm not going to follow it up.

25        **THE COURT:**  Okay.

1          **MR. MELTZER:**  You're not going to --

2          **THE COURT:**  Excuse me.  Don't talk to him.

3          **MR. MELTZER:**  I apologize.

4          **THE COURT:**  Talk to me.  There's an in limine ruling

5     on the composition of the water.

6          **MR. KAUFFMAN:**  Oh, I understand.

7          **THE COURT:**  So don't go into that.  You certainly can

8     point out that he's not a civil engineer.

9          **MR. KAUFFMAN:**  Yes, Your Honor.

10         *(End of bench conference.)*

11         **THE COURT:**  All right, Mr. Kauffman.  Go ahead.

12    **BY MR. KAUFFMAN:**

13    Q.   All right.  So Mr. Taylor, your expertise is in civil

14    engineering, correct?

15         **THE COURT:**  Excuse me?

16         **THE WITNESS:**  Can you repeat the question?

17         **THE COURT:**  Chemical engineering.

18         **MR. KAUFFMAN:**  Oh, I'm sorry.

19    **BY MR. KAUFFMAN:**

20    Q.   Chemical engineering, correct?

21    A.   My degree is in chemical engineering.

22    Q.   And your work at International Paper from 2006 to 2014 has

23    been as a chemical engineer, correct?

24    A.   As an environmental engineer.

25    Q.   The annual inspections that Mr. Meltzer showed you are for

1  regulatory purposes, correct?

2  A.   They're internal documents that is part of our permit.

3  Q.   And you're the person in charge of doing those inspections?

4  A.   I'm in charge of making sure those inspections get

5  completed, yes, sir.

6  Q.   All right.  I am going to show you from Defense Exhibit 16,

7  already been admitted.  See where we have the 2009 annual

8  compliance, and then it says "inspected by," and that's you and

9  County Inspector Shauna Jones.  Do you see that?

10 A.   Yes.

11 Q.   And it's July 2009?

12 A.   Yes.

13 Q.   And down here in 2009, we see:  Storm damage caused by

14 washout on each side of the Arkansas Crossing overflow structure

15 and will require repair.  Correct?

16 A.   On Item Number 4, storm damage --

17 Q.   Number 4?

18 A.   Yes.

19 Q.   Do you see that?

20 A.   Yes.

21 Q.   So that's the Kingsfield Road structure, the Arkansas

22 Crossing.  You understand that, correct?

23 A.   Yes.

24 Q.   So in 2009, this is basically noting some washout on each

25 side.  Do you know what repair was done?

1  A.   There was some minor erosion, and that's when we made the

2  plans to install the sheet piling.

3  Q.   Okay.  And then in 2010, this time the inspection, it's

4  just you, right, 2010?

5  A.   Yes.

6  Q.   All right.  So there's no one noted from the county on this

7  one, correct?

8  A.   Yes.

9  Q.   Okay.  And when you do these inspections, I just want to

10  ask you really quickly, you do the inspection in one day?

11  A.   Typically one day.

12  Q.   Okay.  So you have to inspect all of the wastewater and

13  stormwater facilities at the entire mill and get it done in one

14  day?

15  A.   Yes, sir.

16  Q.   Okay.

17  A.   There's no reason to get it done in one day, but typically

18  it would take about a day.  And occasionally I may do it a half

19  a day one day and half day the next.  But typically about a day.

20  Q.   Typically you do it in a day?

21  A.   Yes.

22  Q.   So the process involves, you have to inspect all of the --

23  like the purifiers and the clarifiers and things like that, all

24  the machinery at the top part of the mill, correct?

25  A.   This is just the stormwater inspection, so it did not apply

1    to the industrial wastewater.  We have other inspections for

2    that.

3    Q.    Okay.  So you have to look at all the ponds?

4    A.    Yes.

5    Q.    So you have to look at ponds 1, 2, 3, and 4?

6    A.    Yes.

7    Q.    And what -- your inspection is a visual inspection?

8    A.    Yes.

9    Q.    Do you do any testing on the ponds?

10   A.    No.

11   Q.    Okay.  And so when you do a visual inspection, you also

12   inspect the storm-surge basin?  You do a visual inspection?

13   A.    Yes, sir.

14   Q.    So you're just looking for --

15   A.    For anything that's a deficiency.

16   Q.    Okay.  For a deficiency.  So you go around and then you

17   look at that, the storm-surge basin.  And then you also look at

18   the -- what we've seen called the north storm-surge basin,

19   correct?

20   A.    Yes.

21   Q.    Then there's also a riffle section?

22   A.    Yes.

23   Q.    You have to go and look at that.  And you do a visual

24   inspection, so that means you kind of look at it, basically?

25   A.    Yes.

1    Q.   And you don't do anything more than that?

2    A.   I typically have a pickup truck, and I'll drive the

3    perimeter of all the areas.  At certain points I may get out and

4    do a more thorough look at areas.  And I'm looking for any --

5    anything that might obstruct structures for -- that would impact

6    stormwater flow, looking for potential pollutants or erosion

7    that might discharge to stormwater.

8    Q.   And because your background is more in chemicals, you're

9    looking for, like, seepage, correct?  You're looking for

10   spillage?

11   A.   Not really, no.  I'm just looking at general overall

12   condition.

13   Q.   Okay.  And so you also have to look at the Turtle Pond, is

14   that one place you have to go as well?

15   A.   Yes.

16   Q.   Okay.  And then there's also stormwater ditches that are

17   going down towards the Arkansas crossing?

18   A.   Yes.

19   Q.   You got to look at all of those --

20   A.   Yes.

21   Q.   -- as well.  And then you also have to look at the area

22   above the Arkansas crossing as well?

23   A.   Yes.

24   Q.   And you just look around to see if there's anything out

25   there or if there's any issues that you see?

1   A.   Yes.

2   Q.   And so in a single day, you go through all of this, and you

3   just do a visual inspection?

4   A.   Yes.

5   Q.   Okay.  And that's -- that's what we see in these is just

6   your observations based on going around in a pickup truck around

7   the property, maybe getting out at some ponds, looking around at

8   them, correct?

9   A.   Correct.

10  Q.   Now, I want to say -- we were talking about the county.

11  Now, the county wasn't on your 2010 one that we saw.  Was your

12  2011 one, is the county on this one?  Did the county attend this

13  inspection?

14  A.   No.

15  Q.   Okay.  2011.  2014, right here.  Did the county attend the

16  one in 2014?

17  A.   No.

18  Q.   And this is the one where you actually noted the failure,

19  right, down at Kingsfield Road?  Erosion of the south berm wall

20  stormwater pond north of Kingsfield Road?

21  A.   Which?

22  Q.   I'm talking about Item 1.

23  A.   Okay, yes.

24  Q.   15 inches, is that referring to rain?

25  A.   What's that?

1    Q.    That's that -- that's referring to rain:  15-inch --

2    A.    Yes.

3    Q.    -- rain event?

4          So when you did your inspection, you figured out there

5    was a 15-inch rain event for the entire event in April 2014?

6    A.    We believe it was much more than --

7          **MR. MELTZER:**  Objection, Your Honor.  Lack of

8    foundation.

9          **THE COURT:**  Overruled.  He can answer.  He started to.

10          Go ahead, sir.

11   **BY MR. KAUFFMAN:**

12   Q.    Go ahead.

13   A.    We believe it was much more than 15, but we noted it as 15.

14   Q.    All right.  But you signed the report, right?  That's your

15   signature, right?

16   A.    Yes.

17   Q.    All right.  And when you signed it, you said it was a

18   15-inch rain event.  And this is plenty of time to figure it

19   out.  I mean, you're -- this is 8-6-2014 -- four months later,

20   right?

21   A.    That's correct.

22   Q.    All right.  And you wrote that down as a 15-inch rain

23   event, correct?

24   A.    Yes.

25   Q.    Now, you're the person in charge of these inspections,

1   Mr. Taylor, correct?

2   A.   Yes.

3   Q.   Mr. Taylor, you're not a civil engineer, are you?

4   A.   No, sir.

5   Q.   You don't have a professional engineering license, do you?

6   A.   No.

7   Q.   And you're not -- because you don't have a professional

8   engineering license, I assume that you don't have a Florida

9   license to be a professional engineer in Florida, correct?

10  A.   I do not have a PE license.

11         **MR. KAUFFMAN:**  Pass the witness.

12         **THE COURT:**  All right.  Thank you.

13         Mr. Meltzer.

14         **MR. KAUFFMAN:**  No further questions, Your Honor.

15         **THE COURT:**  Sir, you may step down.

16     *(Witness excused.)*

17         **THE COURT:**  Your next witness.

18     **MR. NELSON:**  Your Honor, we call Mike Steltenkamp.

19     **MIKE STELTENKAMP, DEFENSE WITNESS, DULY SWORN**

20     **DEPUTY CLERK:**  Be seated.

21         Please state your full name and spell your last name

22  for the record.

23         **THE WITNESS:**  It's Michael S. Steltenkamp.  That's

24  S-T-E-L-T-E-N-K-A-M-P.

25         **THE COURT:**  All right, Mr. Nelson.  Go ahead.

1        **MR. NELSON:** Thank you, Your Honor.

2                    **DIRECT EXAMINATION**

3    BY MR. NELSON:

4    Q.    Good afternoon, Mr. Steltenkamp.

5    A.    Good afternoon.

6    Q.    What is your current job?

7    A.    I'm currently a professor of chemistry at Pensacola State

8    College.

9    Q.    Is that a full-time position?

10   A.    It is not.  Part time.

11   Q.    Where did you work before doing that?

12   A.    I was with International Paper Company since 1979, 35-year

13   employee with the company.  Retired in 2014.  And upon

14   retirement, after 35 years of -- with the company, I joined

15   Pensacola State College as an adjunct professor.

16   Q.    Over that span of the years, 1979 to 2014, was there a

17   period of years that you were working at the Pensacola mill

18   facility?

19   A.    Yes.  I joined the Pensacola facility as an employee of the

20   mill in 1999.  I was there in 1998 on special projects, but I

21   was representing corporate, or the corporation.  And then I

22   stayed on and worked for the mill in 1999 and until I concluded

23   my assignment in 2012.

24   Q.    Okay.  So in 1998 you were doing a corporate project but

25   you were based in the Pensacola mill?

1   A.   That is correct.

2   Q.   And then you permanently, so to speak, were assigned to the

3   Pensacola mill from 1999 until 2012?

4   A.   Correct.

5   Q.   At what time in 2012 did you transition away from the

6   Pensacola mill?

7   A.   Springtime.  February, I believe.

8   Q.   And where did you go to work after the spring of 2012?

9   A.   I went to an IP facility, a manufacturing plant, in

10  Louisiana; Bogalusa, Louisiana.

11          THE COURT:  Mr. Steltenkamp, would you please move

12  your chair closer that device with the red light on it.  That's

13  your microphone.

14          THE WITNESS:  That's the microphone?

15          THE COURT:  Yes, sir.  Thank you.

16  BY MR. NELSON:

17  Q.   Mr. Steltenkamp, do you recall Hurricane George in 1998?

18  A.   I do.

19  Q.   And that occurred at the time when you were working out at

20  the Pensacola mill?

21  A.   Correct.

22  Q.   Was there significant damage to the mill's stormwater

23  system in 1998?

24  A.   I would say no, there was not significant damage.  There

25  were effects from Hurricane George due to the heavy rain event,

1   but I would not say it was significant damage.

2   Q.   If I referred to an outfall structure near Kingsfield Road,

3   would you know what that is?

4   A.   Yes.

5   Q.   Did that structure, an outfall structure at Kingsfield Road

6   exist in 1998?

7   A.   It did.

8   Q.   Was there damage to that structure in 1998 during Hurricane

9   George?

10  A.   If there was, it was not significant.  I don't recall any

11  significant damage to that structure.

12  Q.   So you don't recall it, you know, being washed out and

13  needing to be replaced in 1998?

14  A.   Nothing of that magnitude, no.

15  Q.   Are you aware of any flooding in neighborhoods down

16  Elevenmile Creek in 1998?

17  A.   I do.

18  Q.   What neighborhood?

19  A.   The ones I'm mostly familiar with are those along 297A very

20  close to the 297A bridge.  I don't remember all the

21  neighborhoods.  Bristol Park was certainly one of them, I

22  believe.  There was another neighborhood that was just south of

23  that bridge.  On the east side, the name escapes me of that

24  neighborhood.  And then further down, past -- south of

25  Kingsfield Road area towards -- some of those homes in that

1   area, as I recall.

2   Q.   Mr. Steltenkamp, did you visit the Bristol Park

3   neighborhood after Hurricane George?

4   A.   Yes, visited that neighborhood and other neighborhoods as

5   well.

6   Q.   Why did you do that?

7   A.   Well, I was knew to the Pensacola mill in terms of that

8   assignment, and I knew that my future assignment was going to be

9   as the environmental health and safety manager.  So I was kind

10  of transitioning into that role.  And there had been concerns

11  from those neighbors of flooding that occurred from Hurricane

12  George.  And there was concern that maybe there was a factor or

13  contribution from the mill to that flooding.  So I got involved

14  to learn more about it myself, to engage the community, to talk

15  to them, to understand their concerns.

16  Q.   And when you visited Bristol Park after Hurricane George in

17  1998, did you see indications of there having been flooding

18  there?

19  A.   That whole area, it was obvious to me that there had been

20  some flooding, yes.  I don't remember one neighborhood versus

21  the other neighborhood, but I do remember that whole area struck

22  me as being impacted by the heavy rains from that storm.

23  Q.   And Mr. Steltenkamp, are you personally aware of

24  investigation into whether or not runoff from the International

25  Paper property contributed to flooding in the Bristol Park area

1    in 1998?

2    A.    I know, based on the concerns that some of the residents of

3    the community expressed at that time, that the Florida

4    Department of Environmental Protection did a study to determine

5    that exact question, just what impact did the paper mill have.

6    The paper mill continued to run its operation during that storm.

7    And so the question would be could -- if the mill had shut down,

8    could the impact of that flooding been reduced if that event had

9    occurred; and so the state of Florida had done an investigation.

10   Q.    And what was the conclusion of that investigation?

11   A.    The conclusion was that the rain event was so significant,

12   20-plus inches over several days is what I recall, that the

13   whole area flooded from all the tributaries and streams that fed

14   Elevenmile Creek, that the impact of the operation of the mill

15   was de minimis.  That was the conclusion by the state, the

16   Florida Department of Environmental Protection.  In other words,

17   if the mill had not operated the plant, those homes would still

18   have flooded to the extent that was observed during that storm.

19   Q.    So the runoff from the mill's property did not produce the

20   flood impacts in Bristol Park; is that right?

21   A.    It did not contribute to the impacts that they observed to

22   any significant degree.

23   Q.    During the time you were the Environmental Health and

24   Safety manager at the Pensacola mill, did you ever have occasion

25   yourself to walk parts of Elevenmile Creek?

1   A.   Very much so.  Did so many times.

2   Q.   And can you tell the jury what it was that occasioned you

3   to actually walk parts of Elevenmile Creek?

4   A.   Well, many reasons, actually.  Since I was relatively new

5   to the Pensacola mill at that time, I wanted to become very

6   familiar with the outlines of the creek because we were about

7   ready to launch a project to remove our effluent from the creek.

8   And I wanted to understand what the concerns were, what the

9   issues were, not just in terms of the water quality but also the

10  geography and the whole nature of the site, how many homes

11  resided along the creek, what was the vegetation like.

12       Because we were thinking about making significant

13  changes along the creek in terms of removing our effluent, I

14  wanted to make sure I knew exactly what the implications of

15  those changes would be on the creek.  So the creek's eleven

16  miles long, and I probably walked all eleven miles at one point

17  in time.

18  Q.   And what was the creek like in the area between the, I

19  would say, Kingsfield Road bridge down to the Bristol Park area?

20  A.   First of all, it's heavily wooded.  It's very difficult to

21  get access to.  You've got to climb through trees and so forth

22  and get to it.  But at the headwaters of the creek, it looks

23  like a gully.  It looks like a very narrow ditch, which is

24  somewhat surprising because the creek at that point has a very

25  low flow.  If it was not for the paper mill's effluent, very low

1    flow.  But yet it had these features of very high side walls,

2    and then it began to dissipate the further you went down to the

3    creek.

4           So ultimately, by the time you got to Perdido Bay,

5    which is the outlet of the creek, it was very flat.  So I would

6    characterize the features of the creek more like a gully or a

7    ditch at the headwaters, and then it began to dissipate the

8    further and further you went down.

9    Q.    And were there tributaries that came into Elevenmile Creek

10   between Kingsfield Road and Bristol Park?

11   A.    Yes.  There's all kinds of flows coming from runoffs and

12   drainage ditches from all over the area, from across Highway 29,

13   from adjacent neighborhoods to the east of the mill.  And there

14   were streams.  There's natural springs that fed water into the

15   creek.  I don't know exactly where Eight Mile Creek comes into

16   Elevenmile Creek relative to those neighborhoods, but it's not

17   too far from that area that Eight Mile Creek, for example, would

18   flow into that.

19          So I would say it was a significant drainage basin.

20   There's a lot of water coming into Elevenmile Creek from

21   multiple sources.

22   Q.    And that would be including between Kingsfield Road and

23   Bristol Park?

24   A.    Yes.

25   Q.    In the 2005-2006 time period, what was your position at the

1  Pensacola mill?

2  A.    I would have been the Environmental Health and Safety

3  manager at the time.

4  Q.    And do you recall repair work that was made to the

5  Kingsfield Road structure around that time frame?

6  A.    Yes.

7  Q.    I'd like to show you a document, Mr. Steltenkamp, that's

8  been previously marked as Plaintiff's Exhibit 89.  This is an

9  e-mail chain that we heard a lot about earlier in the case

10 during the examination of an individual who actually was not

11 included in this e-mail chain.  But if we were to zoom in --

12 A.    Okay.

13 Q.    Do you see your name in this e-mail chain, Mr. Steltenkamp?

14 A.    I see that I'm copied on a part of that e-mail chain.  The

15 one that was addressed from Mr. Joel Bolduc to Clay Ellis, I see

16 that I'm copied on that memo.

17 Q.    Thank you, Mr. Steltenkamp.

18        Before we get into the document, what generally do you

19 recall about the repair work that was done to the Kingsfield

20 Road structure in the 2005-2006 period?

21 A.    First of all, there was Hurricane Ivan that occurred in the

22 fall of 2004.  And then there were two significant days of heavy

23 rain in the Pensacola area in 2005.  And I can't recall the

24 number -- the amount of rainfall; but it was significant, very

25 significant.  And after the rain event, I remember my own

1   personal inspection as well as that of the staff that worked for

2   me.  It was clear that we had some erosion problems and erosion

3   concerns, and we felt that it was imperative that those repairs

4   be made, had to be made, and otherwise they would compromise

5   part of the integrity of the rest of the system.

6   Q.   And what was your role in the process of evaluating and

7   implementing that repair work?

8   A.   I provided an oversight.  I did not get directly involved

9   in the engineering.  I'm not a engineer by background.  Chem is

10  my background.  But I would have been the Environmental Health

11  and Safety manager for the mill, so I would have had a

12  responsibility to make sure the necessary repairs were completed

13  and that -- and that they satisfied the needs of the mill, which

14  was to protect that site.

15  Q.   Go back in the document, in the -- and the first e-mail in

16  the chain is authored by a person named Joel Bolduc?

17  A.   Yes.

18  Q.   Did you know him?

19  A.   Yes.  I hired Joel Bolduc.  He worked for me and my staff.

20  Q.   And do you recall what Mr. Bolduc's position was in the

21  April 2005 time frame?

22  A.   He would have been an environmental engineer in my

23  department.

24  Q.   Do you recall what his role was on this project?

25  A.   He provided the -- almost like the lead role, the lead

1    engineer representing my department on this project.  And he

2    would have interacted and solicited input and support from the

3    rest of the mill staff, mill engineering, as well as any

4    corporate resources that could be applied to the project.

5    Almost like a project manager.

6    Q.    So he was sort of like the project manager --

7    A.    Yes.

8    Q.    -- for this?  And you had more of a sponsorship role

9    overall?

10   A.    Sponsorship.  Yeah.  That would be correct.

11   Q.    This is a portion of an e-mail that Mr. Bolduc wrote on

12   June 11th of 2005.  And it goes to a group of people, and do you

13   see your name in the group of recipients there, Mr. Steltenkamp?

14   A.    I do see my name there, yes.  The e-mail looks like it was

15   addressed to this group that included me.

16   Q.    And if we just look at the second sentence of the Joel

17   Bolduc e-mail, it says, We need to repair the structure in order

18   to prevent a complete failure that could damage the Kingsfield

19   Road bridge and cause downstream flooding.  Do you see that?

20   A.    I do.

21   Q.    Did you hold the view in June of 2005 that there was any

22   risk of downstream flooding in the Bristol Park area?

23   A.    No, I don't.  I look at those comments, and it's -- I can

24   certainly agree with the concern about the integrity of the

25   Kingsfield Road bridge and maybe some flooding in that immediate

1    area at the bridge; but downstream flooding, I would not have

2    expected that.

3    Q.   And to be fair, we don't know exactly what Mr. Bolduc

4    himself was referring to by downstream flooding, right?

5    A.   I do not.

6    Q.   But we do know what your perception was, as Environmental

7    Health and Safety manager, about whether you perceived there to

8    be any risk of downstream flooding in the Bristol Park area,

9    right?

10   A.   You mean from the integrity of the outfall structure that

11   we're talking about that needed to be repaired?

12   Q.   Yes.

13   A.   No, I do not.

14   Q.   You did not believe that the integrity of the structure

15   posed any risk of downstream flooding?

16   A.   That is correct.  It was the integrity for the purposes of

17   other reasons but not downstream flooding.

18   Q.   There was a discussion about some options that Mr. Bolduc

19   had identified in the e-mail chain, and in particular there was

20   an Option Number 3 that says, Replace structure, install an open

21   concrete channel, remove existing structure except north wall.

22   Do you see that?

23   A.   Option Number 3, yes.

24            **MR. NELSON:**  Your Honor, I have an image from Google

25   Earth that I would like to have marked and moved into evidence.

1      **MR. GLASSER:**  No objection.

2      **THE COURT:**  All right.  Thank you.  Your next exhibit

3   would be 81, I believe.

4      *(DEFENSE EXHIBIT 81:  Received in evidence.)*

5   **BY MR. NELSON:**

6   Q.   And I apologize, as we've zoomed in, that the image has

7   become a little bit grainy, but are you able to still make out a

8   part of a structure in this image, Mr. Steltenkamp?

9   A.   I do.

10  Q.   And what would you describe this structure as being?

11  A.   Well, on the upper portion of the graph, the upper

12  left-hand portion, you can see, like, a walkway out to a device.

13  That would have been a significant part of the overall structure

14  from my point of view because that was -- exactly.

15  Q.   And what is that?

16  A.   That is the outfall box, if you -- I mean, that is the

17  drop-leg part of a pipe where the water that's in that area

18  would be allowed to drop into and then travel from there into

19  Elevenmile Creek underneath the Kingsfield Road.  So I'm

20  familiar with that.

21  Q.   And then what is this?

22  A.   That would be an area in -- in the presence of heavy rain

23  event, there would be a tendency for that pond or those areas to

24  begin to fill up, to flood.  And so we had an overflow device

25  that allowed the water to find its way into Elevenmile Creek

1    because only so much water can go through that drop-leg pipe.

2    And you needed to have another outlet for that much water from a

3    heavy rain event to bypass to find its way into Elevenmile

4    Creek.

5    Q.    So was the elevation of the drop box lower than the top of

6    the concrete weir structure?

7    A.    Most definitely.

8    Q.    And that was so that you could cause the water to run

9    through the drop box --

10   A.    Yeah.  You had to do -- part of the structure was intended

11   to retain enough water to cover that drop box so water -- the

12   water could be allowed to go into that pipe and into Elevenmile

13   Creek.  And you can imagine, if you have a very significant rain

14   event, that level will get higher and higher and higher, but

15   only so much water can go through that pipe.

16          For fear of washing away that drop-leg pipe to cause

17   damage to the pipes themselves that would feed that water to

18   Elevenmile Creek, which was the only outlet that the mill had to

19   discharge its effluent, you wanted to make sure it was

20   protected.  So you had an overflow that allowed the water to

21   bypass that structure under a heavy rain event, and what you see

22   on the second circle to the right of that graph was part of that

23   structure that allowed that to happen.

24   Q.    Okay.  And so the design was not to impound a large volume

25   of water from a storm event, was it --

1        **MR. GLASSER:**  Objection.  Leading.

2        **THE COURT:**  Sustained.

3  **MR. NELSON:**

4  Q.  Was the structure designed to impound water?

5  A.  Only enough water to allow water to get into that drop-leg

6  pipe.  That would be the only purpose.  It wasn't -- it was not

7  a lot of water.  I mean, I could stand on that -- on that

8  walkway to the drop-leg pipe, and I see egrets or -- I don't

9  know if egret is the right bird, but it's -- maybe egret.  Birds

10  walk across that pond, so it wasn't that deep.  But it was

11  enough to be able to keep water above that pipe so that water

12  could flow into that pipe.

13  Q.  And then if the water got to a certain level, where would

14  it go?

15  A.  It would build up to some point.  It would rise to some

16  point, of which then it would overflow into that second

17  structure that you are circled, and that would be meant to be an

18  overflow.  And I can't remember the design, how many inches of

19  rain would have to take place for that to happen, but, you know,

20  that was the purpose of that structure.

21  Q.  Okay.  So this -- which direction is north in this image?

22  A.  Top.

23  Q.  What is this?  Can you tell from this image?

24  A.  If the water went through that device -- it's a brick wall,

25  a lined wall.  And then the -- if enough water went through that

1   device, it had a concrete apron, so to speak, that would allow

2   the water to flow down into the creek.

3   Q.   And was that concrete -- I'm sorry, Mr. Steltenkamp.   I

4   apologize.

5   A.   The water would flow towards the creek, then, using that

6   concrete apron as an outlet.

7   Q.   And was that concrete apron open, or were there structures

8   in it?

9   A.   The only structure that was in it would have been a gate

10  that -- I believe that preceded it.  And that was an operating

11  tool that was used, like, if we anticipated a significant amount

12  of rain, then in advance of the rainstorm, we would open the

13  gate -- if I'm not mistaken, we would open the gate to allow the

14  water to drain as low as possible.  And then when the storm came

15  or a significant rain event came, then it -- the water then had

16  not -- not -- so much water would not have been allowed to go

17  through that other device.  You still had water going through

18  the drop-leg pipe.

19          But it was very hard to control.  I mean, imagine an

20  operator going out there and controlling the gate during a heavy

21  rain event or during high wind conditions.  It was a tool, but I

22  don't know how effective a tool it was because you do not always

23  have easy access to it.

24  Q.   We'll come back to the gate, maybe, in a moment.  But in

25  the meantime, so that we've got features here, we've got the

1    drop box, we've got the north wall or the weir.

2    A.   Yes.

3    Q.   Then we have this concrete spillway, right?  Those are the

4    features of the structure?

5    A.   Yes.

6    Q.   And was this the structure that existed at the time you

7    left the facility in 2012?

8    A.   To the best of my recollection, it is.  Very similar, if

9    it's not.  I think so.

10   Q.   So we go back to that e-mail of Mr. Bolduc's.  His

11   recommendation back in 2005 on replacing the structure was

12   install an open concrete channel.  Did we see that in the Google

13   Earth image?

14   A.   I think so, yes.

15   Q.   Then he says, Remove existing structure except north wall,

16   right?

17   A.   I'm not too sure -- I honestly don't remember what he meant

18   by removing existing structure.  But I do remember the open

19   concrete channel, and the north wall would have been retained,

20   so....

21   Q.   Do you remember a gentleman by the name of Ron Waters?

22   A.   Yes.

23   Q.   Who is Mr. Ron Waters?

24   A.   He would have been the mill engineer, the lead engineer for

25   the mill.

1   Q.   Okay.  And I'm going to have to flip the page, but that's

2   just the way it printed out.  So this -- what I'm showing now is

3   an e-mail dated June 13th of 2015 from Ron Waters.  And it goes

4   to a group of people.

5   A.   Yes.

6   Q.   You see that, you know, you're included on the CC list?

7   A.   That's right.  I'm copied on the memo.

8   Q.   Okay.  There's a reference in this e-mail to Mr. Waters

9   starting out, There is no capital project to fund this.  And

10  then he ends the e-mail -- well, in the middle of the e-mail he

11  says, I'd recommend we proceed with a repair immediately.  Then

12  he ends the e-mail by saying, We could then evaluate the repair

13  and plan a capital project properly, if necessary.

14          Can you explain to us in general terms how the capital

15  project process worked at the Pensacola mill at this time?

16  A.   Well, it's like a budget.  You plan major capital projects

17  or major projects that you know that you want to have

18  implemented in the mill over a one-year, five-year period.  So

19  you put together a five-year capital plan, maybe a one-year

20  capital plan.

21          And repair of that structure would not have fallen

22  under the umbrella of a planned project.  It was an event that

23  took place that obviously needed to be repaired, but it had not

24  been budgeted money.  It was not moneys that had been budgeted

25  for this purpose.  So we had to find funding.  We had to secure

1   funding for this project since capital funding was not available

2   for it in the conventional sense.

3          And that's not atypical; that's common.  Anytime you

4   have any issues that might represent the safety or an

5   environmental issue, there are emergency funds available, made

6   available by the corporation, even made available by the mill.

7   There's always a reserve fund to handle situations like an

8   emergency issue involving the infrastructure of the mill.

9          You would never leave the infrastructure of the mill

10  compromised and not address it.  That would be absurd.  So

11  moneys could be found.  It's just that in this memo he says

12  there's no capital fund project to fund this, which tells me

13  what kind of emergency authorization would we then begin to

14  seek.

15  Q.  So you start with a repair and then get into further --

16  A.  Well, and then based on the nature of the work, based on

17  the nature of the work, if it was work that could be done with

18  some type of interim improvement to stabilize the situation, and

19  then you can go back and begin the process of justifying the

20  funding and maybe part of next year's funding, then that also

21  can be done.  But you'd have to convince yourself that the

22  interim remedy is sufficient to justify a delay of about six

23  months or whatever it would be to get it into the capital

24  funding program.  I don't believe that's what happened in this

25  case at all.

1   Q.   Thank you.

2   A.   It was funded almost immediately.

3   Q.   I'm sorry?

4   A.   It was funded relatively quick.

5   Q.   The funding for the repair of the Kingsfield Road --

6   A.   Yes.

7   Q.   Okay.  Are you familiar with an individual by the name of

8   Clay Ellis?

9   A.   Yes.

10  Q.   Back in the 2005 time period, what position did Mr. Clay

11  Ellis have, if you remember?

12  A.   He was -- his title would have been operations manager, I

13  believe.  Operations manager.  That's not the same thing as a

14  plant manager.  He reported to a plant manager, but he would

15  have been responsible for the manufacturing operations,

16  overseeing them.

17  Q.   Thank you, Mr. Steltenkamp.  You'll see that this is an

18  e-mail dated June 13 of 2005.

19  A.   Yes.

20  Q.   Mr. Ellis.  And again, you're in a group of CC individuals

21  in this e-mail string.

22          There has been a suggestion that Mr. Ellis was

23  communicating, Don't spend money on repairing the Kingsfield

24  Road structure.

25          **MR. GLASSER:**  Objection.  Leading.

1    **THE COURT:**  Approach the bench, please.

2    *(Following conference held at the bench.)*

3    **THE COURT:**  Is it your position that that misstates

4    the facts in evidence?

5    **MR. GLASSER:**  I don't remember what Moore's exact

6    answer was to the question.  The question I remember asking was

7    we can't design for Cat 5 or a hundred-year flood, and I can't

8    remember his exact answer.

9    **MR. NELSON:**  Well, I think Mr. Glasser asked several

10   questions about the 200- or $300,000 and pretty directly

11   indicated that Mr. Ellis was communicating, Don't spend the

12   money.

13   **MR. GLASSER:**  That's not in that e-mail.  The 2- or

14   300,000 is not in there.

15   **MR. NELSON:**  It's in the chain.  And it's Mr. Ellis --

16   *(Attorneys speaking simultaneously.)*

17   **THE COURT:**  It's in the next e-mail?

18   **MR. NELSON:**  It is.  It's in the e-mail before this

19   one, and this is Mr. Ellis responding.  Would you like me to

20   bring the exhibit?

21   **THE COURT:**  You don't think it's in this chain?

22   **MR. GLASSER:**  It's in the chain.  It's not in what the

23   witness is being asked about.  It's not in this e-mail on the

24   screen.

25   **THE COURT:**  And I don't have Mr. Moore's testimony --

1      **MR. GLASSER:**  There was no foundation for the

2  question.  I mean, I just -- he didn't show the whole chain.

3      **THE COURT:**  Is there another way you could ask it as

4  opposed to --

5      **MR. NELSON:**  I can rephrase, yes.

6      **THE COURT:**  -- to prefacing it with somebody else's

7  testimony?  All right.  Thank you.

8      *(End of bench conference.)*

9      **THE COURT:**  Go ahead, Mr. Nelson.  Thank you.

10     **MR. NELSON:**  Thank you, Your Honor.

11 **BY MR. NELSON:**

12 Q.   Mr. Steltenkamp, in the third sentence of Mr. Ellis's

13 e-mail, he writes, We need to consider how not to spend money

14 and control procedurally by opening weir sooner.  We can't

15 design for Cat 5 hurricanes and 100-year floods.  Do you see

16 that?

17 A.   I do.

18 Q.   Do you have a perspective on whether or not cost was the

19 controlling factor on whether or not to make the repair work to

20 the Kingsfield Road structure in the 2005-2006 period?

21 A.   Cost is always a consideration, but it was not a

22 controlling factor in this case.

23 Q.   And was the company going to spend the money that was

24 necessary in order to repair the structure?

25 A.   Absolutely.

1    Q.   And repair it the right way?

2              **MR. GLASSER:**  Objection, leading.

3              **THE COURT:**  Sustained.

4    **BY MR. NELSON:**

5    Q.   Would the company have compromised the quality of the

6    repair for a price?

7              **MR. GLASSER:**  Same objection.

8              **THE COURT:**  It is leading, Mr. Nelson.  Sustained.

9    **BY MR. NELSON:**

10   Q.   Mr. Steltenkamp, what is your view of what was the

11   controlling factor in the repair of the Kingsfield Road

12   structure in the 2005-2006 period?

13   A.   Well, we had an engineer, Joel Bolduc, that had the role of

14   project manager.  And it was not absolutely clear how best to

15   make these repairs.  Obviously we had to correct the situation

16   of -- or the concerns that we had with erosion so that the

17   system was not compromised any further with any heavy rain

18   event.

19              So his initial objective would be what are the options

20   available to us to modify the structure.  And he -- I believe,

21   if I'm not mistaken, he came up with several options, three or

22   four options to consider.  And typical within IP's management

23   system is that everybody checks off on it to make sure if you

24   have any questions, concerns.  And I think Clay Ellis has

25   provided feedback on that.

1          But in the end Clay Ellis did not make the decision,

2    obviously.  It was a management decision.  I had to sign off on

3    it.  And cost is always a consideration, but in this case the

4    driver would be can you make the repairs necessary to protect

5    the integrity of the system, period.

6    Q.   And was that done?

7    A.   It was done.

8    Q.   I'm going to turn to an e-mail toward the top of the page.

9    and in the second paragraph -- and this is from Mr. Bolduc -- he

10   writes, Right now I'm questioning why we even have this

11   structure.

12         Do you see that?

13   A.   I do.

14   Q.   And then in the next e-mail, Mr. Waters writes back with

15   some history.  Do you see that?

16   A.   Okay.  Yes, I do.  Ron Waters to Joel.  There is some

17   history, yes.

18   Q.   The second sentence of Mr. Waters' e-mail refers to the ARA

19   (CIP) making a statement about state and county regulations to

20   control surges.  Do you see that?

21   A.   Yes.

22   Q.   Would it have been possible in the 2005-2006 time period to

23   entirely remove the Kingsfield Road structure and still operate

24   the paper mill?

25   A.   I don't see how possible -- I don't see how that would have

1    been possible.

2    Q.   And at that time, where was the mill's treated effluent

3    going?

4    A.   The mill's treated effluent went through the same outlet

5    device as the stormwater management, through that drop-leg pipe,

6    out into Elevenmile Creek.  It merged with stormwater runoff in

7    some parts, and -- but it all went through that same structure.

8    So without that structure, the mill would not have had a means

9    of discharging its effluent into Elevenmile Creek.

10   Q.   Thank you, Mr. Steltenkamp.

11        Did the mill need to obtain regulatory approval for

12   the rebuild of the Kingsfield Road structure in the 2005-2006

13   period?

14   A.   I don't think regulatory requirements were needed in that

15   particular case.  Certainly we talked to the agencies.  We would

16   never make a change to our operating facility without consulting

17   with the appropriate regulatory agencies.

18        In this case I'm sure our application -- an

19   application would have been submitted to the Florida Department

20   of Environmental Protection.  And then we probably would have

21   submitted -- we did submit an application to the Corps of

22   Engineers, which I don't think any type of regulatory work was

23   required beyond that, other than notification, because those

24   waters that we just referred to, the state -- or the state could

25   regard that as waters of the state, wetlands.  And so any time

1    you do any type of construction activities that might have any

2    impact on wetlands, we have an obligation to notify -- or to get

3    permission from the regulatory agencies.

4          So the two agencies that stand out in my mind would

5    have been the Florida Department of Enviromental Protection and

6    the U.S. Army Corps of Engineers.  The county would have been

7    consulted on this to some degree because of their vested

8    interest in stormwater management, but typically the Florida

9    Department of Environmental Protection includes them in part of

10   their process of any type of permission.

11         **MR. NELSON:**  I would like to refer to IP 10, which has

12   been previously admitted in the case, if we could.  And if we

13   could just zoom in on the top part so it's a little easier for

14   Mr. Steltenkamp to look at.

15   **BY MR. NELSON:**

16   Q.   You see the subject line here, Mr. Steltenkamp?

17   A.   It's a 2005 memo from Aaron Mitchell to --

18   Q.   Well, let's move it back out.

19   A.   Okay.

20   Q.   I can get you a hard copy.

21   A.   Oh, it's addressed to Aaron Mitchell.

22   Q.   So looks like this is a letter from Mr. Bolduc to Aaron

23   Mitchell at Florida DEP; is that right?

24   A.   Correct.

25   Q.   And the subject is Wetlands Application for Outfall

1   Structure Replacement?

2   A.   Yes.

3   Q.   Consistent with what you just said, but I thought we should

4   show you the document.

5            Let's turn to the next page and take a look up at that

6   top part.  It's a joint application for works in the waters of

7   Florida.  Department of the Army Corps, Florida Department of

8   Environment Protection, DEP, and Water Management District.  Do

9   you see the joint application there?

10  A.   Yes.

11  Q.   And let's go to the third page of the document, please,

12  item 10.  And take a look up there at item 10.  And this is a

13  description of the work that the company is submitting on the

14  joint application to DEP, Army Corps, and Water Management

15  District.  Do you see that?

16  A.   Yes.

17  Q.   And an application that went in to the regulators in the

18  2005-2006 time period when you were the EHS manager, is that

19  something you would have looked at?

20  A.   Yes.

21  Q.   And what does the description of work indicate here in

22  terms of what the company was seeking approval to do?

23  A.   Well, it says the existing damaged overflow structure will

24  be replaced.  Then it goes on to talk about two pipes and

25  concrete overflow will be removed and an open concrete channel

1    would be constructed in its place.

2           I guess it speaks to the fact that the existing

3    structure -- the northernmost wall of existing structure would

4    remain in place.  So that is -- that is physical work being done

5    to a control device at the mill that controlled the outfall into

6    Elevenmile Creek.  So therefore, the state has an obligation to

7    be aware of any changes to advise and consent.

8    Q.   And is that describing a particular structure on the

9    facility?

10   A.   It does.

11   Q.   What is it describing?

12   A.   What you were referring to earlier in your drawing.  You

13   had a second circle there that showed the overflow structure and

14   an apron -- I think that's what that's referring to, the

15   overflow structure of that apron and any other structure to

16   the -- I guess part of the wall, if need be.  But I'm not too

17   sure exactly what the entire scope of that might be.  That's....

18   Q.   So this is that -- what we've been referring to in the case

19   as the Kingsfield Road dam structure down by Kingsfield Road?

20   A.   Yes.  It's in that -- that whole structure.

21           **MR. NELSON:**  I'd like to show you a copy of IP 14 to

22   Mr. Steltenkamp.  This has been previously --

23           **THE COURT:**  Okay.  Yes, it's in.

24   **BY MR. NELSON:**

25   Q.   Now, when you were the EHS manager, Mr. Steltenkamp, when

1   the company received a permit document back from the regulators,

2   is that something you would have reviewed?

3   A.   More than likely, yes.

4   Q.   Can you imagine a situation when you were the EHS manager

5   when you would not have known whether or not you had obtained a

6   permit for something?

7   A.   Not a permit, absolutely no.  Of course I would be

8   absolutely aware.

9   Q.   Let's take a look, if we can, at the -- zero in a little

10  bit on the top of the document.  This is from DEP --

11  A.   Mm-hmm.

12  Q.   -- back to Mr. Bolduc.  This is referring to replacement of

13  damaged outfall structure.

14  A.   Yes.

15  Q.   And then down in item one it states "the regulatory

16  review."  You see that?

17  A.   Yes.

18  Q.   And then it says, Exemption verified.

19  A.   Yes.

20  Q.   And when DEP gives an exemption, what generally does that

21  mean?

22  A.   Well, this is my understanding of exactly what happened.

23  Exemption -- the way I interpreted that exemption was that the

24  state did not feel that this -- the project that was being

25  proposed to replace or improve that structure had any bearing

1  whatsoever on the waters of the state.  It would not impact the

2  quality or the amount that would leave the mill.  Therefore,

3  there was no need for any regulatory obligations, other than the

4  submittal of the application and made -- for its awareness.

5          So in other words, it says here, I think, at -- the

6  determination is made based -- because the activity in

7  consideration of its type is not expected to cause or contribute

8  to the release of pollutants or to harm the resources in

9  sufficient quantity, quality, or content.

10          That's my understanding of that project.  Did not have

11 any impact, so it was not needed to have any further regulatory

12 action.

13 Q.  And it goes on to observe it's not reasonable to justify

14 regulation under Section 373.4145 of the Florida statutes,

15 right?

16 A.  It says that, yes.

17 Q.  Thank you, Mr. Steltenkamp.

18          You also mentioned the Army Corps of Engineers, and

19 I've got document --

20          **MR. NELSON:**  If I could approach, Your Honor.  It's

21 not been --

22          **THE COURT:**  Yes.

23          **MR. GLASSER:**  No objection.

24          **THE COURT:**  Okay.  Thank you.

25 **BY MR. NELSON:**

1    Q.   Do you recognize the document that we have published -- or

2    not published.  That's a wrong choice of words -- that I

3    provided you and that's marked as IP 15, Mr. Steltenkamp?

4    A.   Yeah, I generally recognize it.  It looks familiar.

5    Q.   Can you just identify what it is?

6    A.   Well, it's feedback from the Army Corps of Engineers with

7    respect to the application that was submitted to the state,

8    jointly submitted to the Corps of Engineers.  And they're

9    providing their response, and apparently reviewed what was

10   submitted to them:  The application, they reviewed the drawings.

11   And with regard to what was being planned --

12          **THE COURT:**  Just one moment.  Mr. Nelson, I don't

13   believe Mr. Glasser has any objection to the admission of the

14   document, so at this time I'll admit 15.

15          **MR. NELSON:**  Thank you, Your Honor.

16        *(DEFENSE EXHIBIT 15:  Received in evidence.)*

17   **BY MR. NELSON:**

18   Q.   And just so we can zero in on the top, this is a permit

19   verification from what entity?

20   A.   I'm sorry, what?

21   Q.   What entity issued this permit verification?

22   A.   This would have been coming from the Army Corps of

23   Engineers, the U.S. Army Corps of Engineers.  The signature was

24   an individual on behalf of Robert Carpenter, who was the colonel

25   of U.S. Army Corps of Engineers at that time.  I'm not too sure

1  if I answered your question or not, but --

2  Q.   You did, Mr. Steltenkamp.  Thank you.  It's from the Army

3  Corps of Engineers, and it's a permit verification, and this

4  relates to that same Kingsfield Road outfall structure, correct?

5  A.   Yes.  Yes.

6  Q.   So we've looked at permits from DEP and the Army Corps of

7  Engineers.  Are you aware of whether there was any additional,

8  you know, permitting requirements to go to the Northwest Florida

9  Water Management District to get some sort of a specific dam

10 permit?

11 A.   No.

12 Q.   And have you heard from DEP or any of the other regulators,

13 the county, at any time that there was a perception that the

14 Kingsfield Road structure should have a permit from the

15 Northwest Florida Water Management District?

16 A.   No.

17 Q.   And who do you believe was your primary regulator with

18 regard to the Kingsfield Road outfall structure?

19 A.   It would have been the Florida Department of Environmental

20 Protection.  They would be the lead.  They would have the lead

21 role, the lead responsibility; and they likely would have

22 engaged any other entity, like Escambia County, to be aware of

23 any proposed changes.  They would usually communicate to them on

24 their behalf -- or on our behalf, I should say, or whatever --

25 that would keep them engaged.  But the Florida Department of

1    Enviromental Protection would be the lead entity that we would

2    interact with.

3            Sometimes they communicate directly to the Corps of

4    Engineers; but since this was an area that was potential

5    perceived as a wetlands area, we -- I believe we communicated

6    directly to the Corps of Engineers as well.  I remember

7    communicating to the county, but it was more of an informal

8    basis.  Just a heads up; this is what we're doing.  I think they

9    came out to see the site.

10   Q.   In the time period when you were the EHS manager of the

11   mill, how was the mill's stormwater system regulated?

12   A.   Eventually, it came within the umbrella of our NPDES permit

13   which was issued to us by the state of Florida, and they had

14   specifications on specifically how we were to manage our

15   stormwater flows, as well as other issues like solid waste

16   management and so forth.

17           And so in addition to conditions being specified in

18   the permit, it was regulated by the fact that the state would do

19   periodic inspections on the whole treatment system.  They would

20   often include the way we managed our stormwater flows, but I

21   believe also the county itself did regular inspections.  They

22   would come out -- I think on an annual basis would come out and

23   inspect our stormwater management.  Of course, we do this almost

24   every day, quite often, at the mill itself; but from a

25   regulatory oversight, the county and the state both had some

1    regulatory oversight, inspections that they would do on a common

2    basis, regular basis.

3    Q.    For stormwater management?

4    A.    Including stormwater management, yes.

5    Q.    And would stormwater management include the Kingsfield Road

6    structure?

7    A.    Yes.

8    Q.    Mr. Steltenkamp, you had mentioned a little bit earlier a

9    gate in the concrete weir structure at the Kingsfield Road

10   outfall.  Do you remember that?

11   A.    Yes.

12   Q.    Did you ever open or attempt to open that gate yourself?

13           **THE COURT:**  You may answer.

14           **THE WITNESS:**  I think I tried one time.  Quite often

15   I'd have an engineer that worked with me or a technician or

16   someone that worked in the field take that responsibility to

17   adjust that gate.  It was obvious to me that it was a difficult

18   job.  It was a challenging job.  I went out there and tried

19   myself just to convince myself that I didn't feel comfortable

20   with that practice because it had some issues pertaining to it.

21           It's a gate that can be controlled easily under ideal

22   weather conditions.  We walk out on that walkway.  You can open

23   the gate, tighten the gate.  But to ask someone to go out during

24   a storm where wind conditions could be -- I don't know,

25   whatever, heavy rain, I didn't feel comfortable asking employees

1   to do that.

2   **BY MR. NELSON:**

3   Q.   And so you had concerns about employees being out there

4   opening that gate; is that right?

5   A.   During the storm.  We would adjust it before the storm and

6   we would adjust it after the storm, but it would not be an area

7   that -- if the weather conditions did not permit, we would not

8   make adjustments to that gate.

9   Q.   And did you have any concerns about the gate separate and

10  apart from during storm conditions?  Was that a safe task for

11  people to be out doing?

12          **MR. GLASSER:**  Objection.  Leading.

13          **THE COURT:**  You can ask if he had any concerns.  So

14  restate the question, please.

15  **BY MR. NELSON:**

16  Q.   Did you have any concerns about the operability of that

17  gate even if there were not a storm?

18  A.   No.  No.  You got to keep in mind that the only reason you

19  would even use that gate would be because of a storm event.  I'm

20  scratching my head.  I'm thinking, why would I ever use that

21  gate if it wasn't to prepare for a storm event, because the

22  gate -- that area that is impounded to allow the water to go

23  into the pipe, into Elevenmile Creek, you always want that water

24  level to be at a certain area to guarantee water went through

25  that pipe, the effluent went through that pipe.

1          And if I knew that we were going to have five inches

2     of rain the next day, based on weather forecasting, I might

3     drain that pond down as far as I can to give more capacity to

4     store water during the storm events.  So we would make a

5     modification of the gate to drop the water level.  But before

6     the storm came, and before it became impossible to have an

7     employee go out there, we would close it back up or secure it

8     somehow, but then walk away from it.

9          It became a tool, but it -- in my humble opinion, it

10    was not an effective tool.

11    Q.   Do you recall whether any notches were cut in the top of

12    the concrete weir structure at some point?

13    A.   Yes.  That was -- I believe that was a -- Joel Bolduc came

14    up with that idea, and I thought it was pretty clever.  By

15    reducing the pressure on that wall, to allow water to flow out

16    before it would overflow the rest of the structure, it allowed

17    water to get to a certain point and then would begin to be

18    released in a gradual manner.  And so by putting in these

19    notches, it was -- it seemed to be a smart thing to do.

20          **MR. NELSON:**  No further questions.

21          **THE COURT:**  All right.  Thank you, Mr. Glasser.

22          **MR. GLASSER:**  Thank you, Your Honor.

23                          **CROSS-EXAMINATION**

24    BY MR. GLASSER:

25    Q.   Hi, Mr. Steltenkamp.  My name is Brian Glasser.  We've

1  never met, right?

2  A.   Never met you.

3  Q.   I want to start where Mr. Nelson stopped and just talk

4  about those two notches I think you said that were cut in -- I

5  didn't hear you.  I'm sorry.  If you even remember.

6  A.   It would have been that same time period that the rest of

7  the structure was worked on.

8  Q.   Okay.  All right.  But in any event, I take it that one of

9  the reasons for the notches is because --

10       MR. GLASSER:  Well, can I get a copy of your picture

11  back?  Did you put it -- thank you.

12  BY MR. GLASSER:

13  Q.   I'm going to put this Google Earth picture back up that's

14  Defense Exhibit 81.  I think you testified that -- let's do it

15  like that.  That's oriented north, correct, now?  This will be

16  north, going that way?

17  A.   Yes.

18  Q.   Okay.  And I think you testified just a few minutes ago

19  that this shows the condition of the structure -- or the way the

20  structure was after the repairs discussed in Exhibit 89, the

21  e-mail, kind of the modern structure.

22  A.   I don't know when that photograph was taken, and I

23  cannot -- I didn't mean to imply it was done after the structure

24  was repaired.  I don't know when that picture was taken, to be

25  honest with you.  It looks familiar.  I'm familiar with that

1  outfall, so I wouldn't be surprised if it was after the repairs

2  were made.

3  Q.  Well, let me just -- okay.  Sorry.  Let me just point out

4  that this area here is dirt, is earthen in this picture.  It

5  doesn't have the Arkansas concrete crossing.  Does that help you

6  that this is the modern structure?

7  A.  I would be surprised if that's a modern structure.  I don't

8  recall it in that detail.  You mentioned Arkansas crossing?

9  Q.  Well, there's -- we've seen some pictures of where there

10  used to be a swale where there was concrete, like a concrete --

11  A.  Cover?

12  Q.  Yes.  Armor.

13  A.  In that area?

14  Q.  In this area here and this area.

15       **MR. NELSON:**  Objection, Your Honor.  That misstates

16  the facts.

17       **THE COURT:**  Sustained.

18  **BY MR. GLASSER:**

19  Q.  Well, let me ask you -- let me ask this a different way.

20  Here is the structure that Mr. Nelson was asking about, okay?

21  And here are the notches.

22  A.  Yes.

23  Q.  You agree with that?

24  A.  That would be my -- consistent --

25  Q.  Is --

1    A.    -- with my understanding.

2    Q.    -- one of the goals of the notches to keep --

3         **MR. NELSON:**  Your Honor, he was interrupting the

4    witness.

5         **THE COURT:**  Mr. Glasser, please be mindful of that.

6    Let him finish his answer.

7    **BY MR. GLASSER:**

8    Q.    Is one of the goals of the notches to keep water from going

9    onto the earthen part, to keep the water level lower so it

10   doesn't go on the earthen part?

11   A.    My best recollection would be the notches were created

12   because if the notches were not created, the water level could

13   have risen to the point where it went over the top of the

14   structure, and could that or could that not compromise the

15   entire structure if it went over the top.  Erosion would have

16   been a part of it.

17   Q.    On the earthen --

18   A.    On both sides.  And the pressure on the wall itself.

19   Q.    Could move it or whatever?

20   A.    That was the concern.  So he felt -- as I recall, we put

21   the notches in so that as the water level rose to a certain

22   level, it had a chance to go out before it reached the point

23   where it would either overflow or go around the structure.  If

24   it goes around the structure, you always have the potential for

25   erosion from anything that is earthen-based.  You always have

1  that possibility.

2  Q.   Because when the water reaches a certain velocity, it's

3  going to take the earth away.

4  A.   Velocity and level, yes.  There's always that risk.  Not

5  necessarily what happened, but there is that risk.

6  Q.   Okay.  So I'm going to go back to Exhibit 89 that you

7  discussed with Mr. Nelson.  I want to turn to the June 11th

8  e-mail that discussed complete failure could damage the

9  Kingsfield Road bridge and cause downstream flooding.  Do you

10  see that?

11  A.   Yes.

12  Q.   All right.  And I think you said on direct examination on

13  the -- in answer to the questions asked by Mr. Nelson that you

14  didn't see any risk of downstream flooding when you get this.

15  Is that a fair characterization?

16  A.   Yeah.  Let me clarify that.  If that structure failed -- if

17  you can allow me to be kind of illustrative here, I have a

18  structure here and I have a level of water up to here.  And if

19  there's no water level behind it and that structure, for

20  whatever reason, would fail, there would be a certain amount of

21  water that would flow down.

22       So the Kingsfield Road structure had the potential to

23  be somewhat flooded.  And any type of flooding or force of water

24  to go underneath that bridge, I would worry could that

25  compromise the integrity of that bridge.

1   Q.   Okay.

2   A.   So the downstream flooding that I interpret by this

3   statement is in that regard.

4        With regard to downstream flooding further down the

5   stream, by the time I get to 297A bridge, I don't -- there was

6   no concern of flooding from the structure.

7   Q.   All right.  So we're on the same page.  That's what I

8   thought I heard you say, that as to the neighborhoods down

9   there, when you got this you didn't have a concern?

10  A.   I did not.

11  Q.   All right.  So it's fair to say that the -- that the whole

12  of Exhibit 89 is a debate about what to do and how strong to

13  build the replacement structure for what was hurt in 2005,

14  right?

15  A.   How strong and how smart.

16  Q.   Got it.

17  A.   A list of options.

18  Q.   And at least as to you, your mind-set was that it wasn't a

19  big issue to think about downstream homeowners.  It wasn't --

20  when you were evaluating the pros and cons and what to do and

21  how much money to spend, that was your mind-set.

22  A.   My mind-set would -- you have to rephrase that.  My

23  mind-set was what, now?

24  Q.   I'm saying that fairly informed your consideration of the

25  various options, that view.

1   A.   I reviewed the options to make sure they were -- they all

2   accomplished the task at hand.  And with regard to the

3   downstream flooding, I did not see a risk of downstream flooding

4   beyond the immediate area of Kingsfield Road.

5   Q.   Exactly.

6   A.   So all of the options met that criteria as far as I was

7   concerned.

8   Q.   Exactly.  I understand.

9   A.   They all met the criteria.

10  Q.   Okay.  That's what I thought you were telling us.

11       And so when we think about this e-mail and how you

12  were thinking about it, that's the prism we should see it

13  through.

14  A.   I suppose so, from my perspective.

15  Q.   Now, in preparation for your examination, did you have a

16  chance to read this entire e-mail, you know, over the last

17  couple of days?

18  A.   I recognize it, but I don't believe I've read it, no.

19  Q.   Okay.

20  A.   At least not in detail.

21  Q.   This e-mail formed a basis of a discussion about the

22  history of the dam, okay?  History of the, kind of, replacement

23  of the dam.  And I understood there was one dam back in 1986

24  that was replaced by what we've called the 1996 dam, okay?

25       **MR. NELSON:**  Objection, Your Honor.  Foundation.

1          **MR. GLASSER:**  Just trying to orient --

2          **THE WITNESS:**  You use a reference to --

3          **THE COURT:**  Well, you need to make sure that he knows

4     that.  I agree.

5          **MR. GLASSER:**  All right.  All right.

6          **THE COURT:**  I agree.  Sustained.

7          **MR. GLASSER:**  Maybe this would be a good time to take

8     the lunch -- he could read the e-mail -- I mean the afternoon

9     break, and then I can ask him generally these questions so he

10    will have read the e-mail, to be fair.

11         **THE COURT:**  That's fine.

12         **THE WITNESS:**  Is the e-mail just that one page?

13         **MR. GLASSER:**  No, it's like four pages.

14         **THE COURT:**  So ladies and gentlemen, we'll be in

15    recess for 20 minutes.  Please don't discuss the case during the

16    recess, and don't begin to form any opinion yet about the

17    merits.  See you back in 20 minutes.  Thank you.

18         *(Jury excused.)*

19         **THE COURT:**  Mr. Steltenkamp, you'll be back on the

20    witness stand in 20 minutes.  And please do, Mr. Glasser, let

21    him have the e-mail, please.

22         **MR. NELSON:**  Your Honor, you have asked for an update

23    on Dr. Lan's status.

24         **THE COURT:**  Well, I've been wondering if I was going

25    to get an update on that.

 1          **MR. NELSON:**  He is on a flight.  It's not scheduled to

 2     arrive in Pensacola until 4:00 o'clock, so I think probably the

 3     earliest he could get here would be 4:30.

 4          **THE COURT:**  Okay.

 5          **MR. NELSON:**  We won't finish -- I don't think we'll

 6     even finish the direct examination if we started at 4:30 today.

 7          **THE COURT:**  Okay.  Well, let me give it some thought.

 8     We'll probably -- we will probably stop -- is this your last

 9     witness, then, other than Dr. Lan?

10          **MR. NELSON:**  Well, for -- that's all we identified for

11     today was through Dr. Lan.  The only two potential remaining

12     witnesses would be Dr. Lan and Mr. Duke, or Dr. Duke.

13          **THE COURT:**  Okay.  Well, we do have instructions that

14     need to be discussed.  So we'll probably recess after

15     Mr. Steltenkamp and take up instructions.  But for now we're

16     going to be in recess until 3:40.

17          *(Recess was taken from 3:21 to 3:42 p.m.)*

18          **THE COURT:**  Mr. Steltenkamp, you're still under oath.

19          Mr. Glasser, go ahead when you're ready.

20     **BY MR. GLASSER:**

21     Q.   So really just going to draw your attention to the first

22     two paragraphs here, which you've now had a chance to read.  And

23     the way I read this was basically -- I'm asking if you agree

24     it's talking about there was some structure prior to the '96

25     structure that had a problem and had this what was described in

1  here as nightmare.  Is that your understanding?  It was the

2  structure before the '96 structure.

3  A.   Well, I certainly was not here at the time for the '96 --

4  to know much about the '96 structure.

5  Q.   Okay.

6  A.   I came to the mill in '99 --

7  Q.   Okay.

8  A.   -- in '98 in the corporate world, in '99 in my role as EH&S

9  manager; but yet I'm somewhat familiar with erosion being a

10  persistent problem throughout the treatment system, particularly

11  downstream in this area in prior events, but I can't speak to

12  any details on that.

13  Q.   I'm just trying to get straight that now the debate that

14  this e-mail chain in 89 is talking about is a debate about what

15  to do about the -- the structure that was built in '96 and was

16  damaged in 2005?

17  A.   Right.

18  Q.   Is that fair?

19  A.   Fair enough.

20  Q.   Okay.  So it's not talking about any damage in 1998 for

21  Hurricane George.  That's not what this e-mail chain's about,

22  right?

23  A.   Right.

24  Q.   Okay.  And as you just said, you said -- and I think you

25  said it on direct examination as well.  When you were thinking

1    about this, you know, wetland application -- this is

2    Exhibit 10 -- for structure repair, for outfall structure

3    repair, you were focused on the -- I think you said integrity of

4    the white water [sic] system was the priority; is that right?

5    Integrity of the wastewater system was your priority.

6    A.   Yes.

7    Q.   So it was the -- so in interpreting 89, we should

8    understand that as the manager for environmental and safety at

9    the time, the environmental aspect of managing the wastewater

10   was the paramount -- the integrity of the wastewater system was

11   the priority, right?

12   A.   Yes.

13            **MR. GLASSER:**  No further questions.

14            **THE COURT:**  Okay.  Redirect.

15            **MR. NELSON:**  No questions, Your Honor.

16            **THE COURT:**  All right.  Mr. Steltenkamp, you may step

17   down.

18       *(Witness excused.)*

19            **THE COURT:**  Let me ask counsel to approach for just a

20   moment.

21       *(Following conference held at the bench.)*

22            **THE COURT:**  Okay.  So I didn't know that was going to

23   go quite so fast.  Do you have any other witnesses?

24            **MR. NELSON:**  No.  I apologize.  Dr. Duke's wife is

25   receiving chemotherapy treatment on Wednesdays, so we told him

1    he didn't need to come yesterday because had Dr. Lan been here,

2    there's no way we would have finished him today. And I regret

3    this, but he just -- Dr. Lan had repeated problems yesterday

4    getting here, and he left early this morning and had to come

5    through Atlanta --

6          **THE COURT:** That's no problem. We'll pick back up on

7    Monday morning.

8          **MR. GLASSER:** What I'd like to do, Judge, if you're

9    kind of up for it, is do the instructions at least --

10         **THE COURT:** We're going to.

11         **MR. GLASSER:** Okay. Great. Okay. Thanks.

12         **THE COURT:** To the extent we can get through them on

13    the first round.

14     *(End of bench conference.)*

15         **THE COURT:** All right. Ladies and gentlemen, there is

16    a travel issue with the next witness. And through no fault of

17    anyone's -- mechanical problems, actually, with the airplane,

18    this witness is not going to be able to take the stand today.

19    And so what we're going to do -- I suspect I won't hear any

20    objections -- we're going to stop early on this Friday

21    afternoon.

22     I will say that and add -- in saying that I will add

23    that the attorneys are well ahead of schedule with the trial as

24    well. So this should not impact you, you know, next week in

25    terms of the end of the trial. Like I said, they're way ahead

1  of schedule, so things look positive.

2          But don't hold me to anything because I still don't

3  have the crystal ball I've been asking for for all these years.

4  So I can't tell you exactly when you'll get the case to

5  consider, but we are in good shape, and so I'm comfortable going

6  ahead and breaking early, hopefully for your enjoyment on Friday

7  afternoon.

8          On the other hand, we will be here discussing your

9  jury instructions for the rest of the afternoon, which is

10  something we also need to do.  So this is a good opportunity for

11  us to do that.

12          Now, because of the extended recess that we have over

13  the weekend, I want to make sure to stress to you all my

14  instructions.  Very important that you not have any discussions

15  with anyone about the case, that you avoid any news reports of

16  the trial, and, very importantly, that you not conduct any

17  research or investigation on your own into the matters.  No

18  matter how interesting they've been, you may not conduct any of

19  your own research into them.

20          Also, enjoy the weekend.  Just put the trial out of

21  your mind.  Like I said, please don't begin to form any opinion

22  about the merits.  Come back rested, refreshed on Monday

23  morning.  We'll start at 8:30, and we'll continue with the

24  defendant's case at that time.

25          All right.  Any questions about our schedule?  All

1    right.  Thank you very much for your service all week.  I hope

2    you enjoy your weekend.

3         *(Jury excused.)*

4         **THE COURT:**  All right.  Be seated.  We'll need to take

5    a short recess for me to get together with Ms. Jacobs and put

6    the packets together for you, so please don't leave the

7    courthouse.  We'll get those out here to you as quickly as we

8    can.

9         Why don't we plan to reconvene at hopefully 4:00, so

10   about ten minutes or so.  Hopefully you'll have packets on your

11   counsel table by 4:00 o'clock.  All right.  And we'll just start

12   going through them.

13        Any questions.  No?  All right.  We'll be in recess

14   until 4:00.

15        *(Recess was taken from 3:49 to 4:21 p.m.)*

16        **THE COURT:**  All right.  So as I indicated is my

17   practice, I'm going to walk through this packet with you in

18   hopes of obtaining an agreement on as much as we can, and then

19   we'll focus our attention on any disputes.

20        So we're down to one claim.  That's the plaintiff's

21   negligence claim.  I'm going to walk page by page.  The pages

22   are numbered, so I'll refer to them by page number as opposed to

23   instruction number, in terms of just keeping you on the same

24   page with me.

25        First page, obviously I don't anticipate there to be

1   any objection to.  It's the standard.

2          The second page, there are a couple of different

3   versions of this instruction.  I find that in this case because

4   we -- as in all cases in which we have a corporate party, the

5   third paragraph is not only appropriate; it's required.

6          Any objection?

7          Mr. Nelson, any objection?

8          **MR. NELSON:**  No, Your Honor.

9          **THE COURT:**  Okay.  And then page 3, 4, and 5 are

10  standard pattern instructions.  Same with 6.

11         7 is a modified instruction for expert witnesses

12  because we do have testimony in this trial about payment for

13  expert services, and I suspect there will be more.

14         Page 8 is standard.

15         All right.  And then on page 9, I don't know if you've

16  had a chance to go over this.  This is an explanation of the

17  class action proceeding.  I do believe it's appropriate to

18  explain to this jury about the two phases, and that's what I

19  will intend to do.  But if you want to object -- I mean, if you

20  have an objection, I'll hear from you on this on Monday; but for

21  now, I'll let you know that this is my intent to instruct them

22  in this regard so that they understand the full context of their

23  role.

24         **MR. NELSON:**  Your Honor, if I might.  Just one point

25  of clarification.  The way this is worded, the only issue being

1  decided is flooding of homes, which would mean if there's a

2  damage claim for something other than flooding of homes, this

3  class verdict would have no application.

4        **THE COURT:**  I'm not aware of any other damage claims.

5        **MR. NELSON:**  An example -- I'm sorry, Your Honor.

6        **THE COURT:**  There's no evidence of IP's negligence

7  causing any damages other than the flooding in the home.  That's

8  all we heard about from Dr. Ross.

9        **MR. NELSON:**  So that would include, you know, no

10  damage to a car parked in a driveway, no damage --

11        **THE COURT:**  That's correct.  That's correct.  We

12  haven't heard any of that.  There was no evidence of it --

13  because, I mean, this is about causation and not -- and for

14  better, for worse, like it or not, that's how this case got

15  framed, the issue got framed on causation.  Not by me but by

16  your experts.

17        So, Mr. Glasser, do you agree with that?

18  Mr. Marshall?

19        **MR. MARSHALL:**  Your Honor, I mean, it is an

20  interesting point.  I think that the evidence, of course, that

21  we presented has framed the issue in terms of water in homes.

22        **THE COURT:**  Right, because if we start talking about

23  something else, I may need to think about decertifying the

24  class.

25        **MR. MARSHALL:**  I understand.

1    **THE COURT:**  I mean, outside of -- outside of the way

2    the causation inquiry was framed, again, for the Court at the

3    evidentiary hearing, if we're going to veer off, venture from

4    that, then the motion for reconsideration might have been

5    decided differently.  And I'm referring to the motion for

6    reconsideration of the class certification order.  You're

7    nodding your head like you agree with me.

8    **MR. MARSHALL:**  Yes, ma'am.

9    **THE COURT:**  It would be problematic.

10   **MR. MARSHALL:**  Yes, ma'am.

11   **THE COURT:**  And that's going to raise another issue.

12   I'm going to save it -- save the best for last, until after we

13   work through these instructions.  What I'm referring to that we

14   will need to discuss -- I'd like to at least have an initial

15   discussion about it today -- is the fact of the six plaintiffs

16   whose homes would have flooded in any event had the dam

17   structured been removed.

18   **MR. NELSON:**  Your Honor, if I might, just with regard

19   to this instruction, in light of the --

20   **THE COURT:**  And you can stay seated, Mr. Nelson.

21   You're fine.  Thank you.

22   **MR. NELSON:**  Thank you, Your Honor.

23   At the very end, I would request that we add the

24   flooding in homes.

25   **THE COURT:**  Thank you.  I actually read that earlier

1    and meant to add that.  It will read "are entitled to damages

2    for the flooding in their homes."

3          Okay.  Let's talk a minute about affirmative

4    defenses -- defense here.

5          We discussed the defendant's affirmative defense, the

6    act of God defense at the pretrial conference; and then

7    following the pretrial conference, I had you all brief the

8    issue.  And at that time what I recall was the defendants --

9    "conceded" might not be the right word, but indicated that the

10   act of God defense applied only to -- and I believe this came on

11   a motion in limine from the plaintiffs, actually, but that the

12   defendant indicated that it would only apply to strict liability

13   to that claim and that to the extent the strict liability claim

14   didn't go forward, then this issue of act of God affirmative

15   defense wouldn't -- there won't be an affirmative defense.

16         The case law is just not consistent with that.  I

17   agreed and entered an order to that effect because it seemed the

18   path of least resistance at the time.  And I thought, well, if

19   the strict liability claim goes away, then this won't be an

20   issue.

21         And so I really didn't spend a lot of time on it, not

22   that I was presupposing what was going to happen with your

23   strict liability claim, although I'd had some concerns about it,

24   but I didn't know what I was going to do with it.  But it just

25   seemed to me at the time when I entered my order in 201 that I

1  would just deal with this at the time I dealt with the strict

2  liability claim because I knew I would get the motion for

3  judgment as a matter of law.

4        So the case law -- and I may -- here it is, there

5  actually -- there's binding case law on this, and one case out

6  of the Florida Supreme Court and the other out of the old Fifth

7  Circuit, 1967, which is applying Florida law, which is, of

8  course, binding on this Court as a former Fifth Circuit case.

9  Let me just go ahead and give you the case names and cites

10 first.

11       The Fifth Circuit Court of Appeals decision is in

12 *Wm. G. Roe & Company v. Armour & Company*.  It's found at 370

13 F.2d 829.  And then the Florida Supreme Court case of *Atlantic*

14 *Coast Line Railroad Company v. Hendry*, 1933.

15       That case is actually strikingly similar to this case.

16 Involved an act of God, a storm event that destroyed a large

17 portion of one of the parties' crops.  But the claim was that it

18 wasn't just the storm event that had resulted in the damage but

19 also the -- and the Florida Supreme Court refers to the

20 defendant in the manner in which I would refer to the

21 plaintiffs, so I'm not sure what was going on procedurally in

22 this opinion.

23       But the way we would look at this is that the

24 defendant had placed a four-foot culvert for the passage of

25 water into a natural waterway known as Two Mile Creek.  And the

defendant constructed a fill for the road bed, and in that they

placed this culvert for the passage of water.  And the claim is

that the overflow from the rains caused the damage to the crops,

but the claim was that that was from Defendant's failure to

place sufficient culverts or openings in the fill to permit the

passage of water during periods of heavy flooding.

And what both of these cases stand for is that the

defense of -- the act of God defense may be successfully raised

in a claim of negligence.  But if the defendant's negligence is

a present contributing proximate cause -- and this is the

Florida Supreme Court case -- which, commingled with the act of

God, produced the injury, then the defendant is liable

notwithstanding the act of God.

So that's the defense, is that the defendant has to

prove that the act of God was the sole proximate cause of the

injury and that it is on the defendant -- the burden is on the

defendant to show that the damages resulted solely from the act

of God and that it contributed in no way to the injury.

The Fifth Circuit case is the same and actually cites

this Florida Supreme Court case.

I don't see anyway around this for you all,

Mr. Nelson, at all.  It seems like it's directly on point in

this case because here, the plaintiffs, as I've said now over

and over a number of times, you all are going to have to prove

that all of the -- consistent with your expert's opinion, that

1    all of the water in the homes was a direct -- or was a result of

2    the negligence or failure to use reasonable care by

3    International Paper in the operation, maintenance of that dam

4    structure.

5           But that doesn't mean that some of the water in the

6    home can't be from the rain as well or from the storm event as

7    well.  Obviously it can be.  I mean, it would be an impossible

8    burden for the plaintiffs to prove that there was no rainwater

9    in their home if the dam failed and all of that water came

10   rushing down Elevenmile Creek that is clearly rainwater

11   stormwater, and that entered the plaintiffs' home, then that's

12   sufficient.  The problem for the plaintiffs will be if the jury

13   decides that there was any rainwater in the plaintiffs' homes

14   before the dam failed.

15          So that's the way I see this.  But I'll -- you know,

16   and you'll have the weekend to think about this.  I don't know

17   if you want to add anything now to give me the opportunity of

18   the weekend to think about it; but that's the way I'm seeing

19   this is that, you know, Mr. Nelson, you-all are going to have

20   the burden to prove that those homes would have flooded,

21   regardless of any act of -- or inaction of International Paper.

22       **MR. NELSON:**  Your Honor, we'll take a look at the

23   cases.  I am not familiar with them.  But I am likely end up

24   where we were in our prior filings, which is that the

25   affirmative defense does not come into play in a negligence

1    setting.  It was our view that the act of God defense would have

2    application if we were trying a strict liability claim, but

3    we're not.

4          **THE COURT:**  Well, these aren't strict liability cases

5    that I'm reading to you from.  They're negligence cases.

6          **MR. NELSON:**  I understand, Your Honor.  I'll have to

7    take a look.

8          **THE COURT:**  And they're binding precedent.  You have a

9    Florida Supreme Court case and -- a Florida Supreme Court case

10   and a Fifth Circuit Court of Appeals case.  Couldn't be any more

11   binding in this type of case than these two cases.

12          So please, do spend time this weekend researching,

13   looking at these cases.  I always want to say Shepardizing, but

14   boy, do I date myself when I had say that.  KeyCiting is, I

15   believe, the proper term.  But, yes, please research on your own

16   and come in on Monday and educate me if I have this incorrect,

17   but that's the way I see it.

18          And so because of that, then I have crafted -- or we

19   have crafted, Ms. Jacobs and I have crafted the instructions

20   that you'll see on pages 11 through 17.  In order to frame the

21   issue correctly and to focus the jury in its deliberations

22   properly.

23          So let the -- page 11 is standard; and to the extent

24   there is an affirmative defense, I think this is a correct

25   statement of the law.  And then as to page 13 and the negligence

1  claim, I address that first.  And we'll just walk through this

2  and I'll read it to you as we go.

3      Starting off by telling the jury that as they know,

4  Plaintiffs claim that International Paper was negligent in its

5  design, operation, and maintenance of the Kingsfield Road dam

6  structure -- that's my effort to marry your own phraseology --

7  which caused their homes to flood.  International Paper denies

8  this claim and asserts that it was not negligent in the design,

9  operation, and maintenance of the Kingsfield Road dam structure.

10      International Paper also asserts an affirmative

11  defense, and they would have heard what an affirmative defense

12  is at that point -- that the flooding in the class area and more

13  specifically in the plaintiffs' homes -- and we can change this

14  to class members' homes.  I saw that in the defendant's

15  objections, and it's appropriate -- was solely caused by the

16  rainfall that occurred during the April 2014 storm.

17      You will first be asked to decide whether

18  International Paper was negligent.  On this issue Plaintiff

19  bears the burden of proving by a preponderance of the evidence

20  that International Paper was negligent in designing, operating,

21  and maintaining the Kingsfield Road dam structure.  I then tell

22  them what negligence is under Florida law.

23      **MR. MARSHALL:**  Your Honor --

24      **THE COURT:**  Yes.

25      **MR. MARSHALL:**  -- may I raise one issue with respect

1  to -- it'll carry over.  You know, it's our belief, or the

2  evidence to be presented that International Paper was negligent

3  in its design, operation, maintenance, or its failure to remove

4  the structure.  We presented a lot of evidence that the

5  structure should have been removed.  And those are --

6       **THE COURT:**  But isn't that subsuming -- I mean, you're

7  going to be able to make that argument, but isn't that subsumed

8  in operating and maintaining it, that --

9       **MR. MARSHALL:**  Your Honor, as we presented it to the

10 jury -- you saw how I discussed it with Dr. Carrier

11 particularly.  I mean, we talked about design; we talked about

12 operation; we talked about maintenance.  Then we talked about

13 removal.  We always framed it as those types -- those four types

14 of issues because operation means you're using it; maintenance

15 means you're maintaining it; design obviously means you

16 designed it.  Removal is a separate, distinct action.

17      **THE COURT:**  I think that's appropriate.  I can add

18 that.  This is your -- this is what you claim.  All right.

19      **MR. NELSON:**  Your Honor, just on that, if we do

20 include something like that, I worry a little bit about a phrase

21 that just has four items, as opposed to something that is

22 clearer -- you know, design, operation, maintenance, or failure

23 to remove?  I mean, is it clearly going to be --

24      **THE COURT:**  Why don't we just say -- I can just say

25 International Paper was negligent in its control of the

1   Kingsfield Road structure.  I mean, you've got -- I mean,

2   nobody's going to argue that you can't -- I mean, I'm not going

3   to preclude you from arguing control is very broad.

4          You also run the risk, if I give them this laundry

5   list, that they're going to hold you to proving every single

6   one.

7          **MR. MARSHALL:**  Your Honor, I've been thinking about

8   this too.  One option is just to strike design, operation,

9   maintenance or failure to remove to just say, As you know,

10  Plaintiffs claim that International Paper was negligent with

11  respect to, or in regards to, or something like that.

12         **THE COURT:**  We could do that too.

13         **MR. MARSHALL:**  Certain phraseology to just eliminate

14  that.  My mind is not really working right now, but I think that

15  something like that might work.

16         **MR. NELSON:**  The question there is how that ultimately

17  ties in to the duty to exercise reasonable care, which will be

18  the inquiry the jury must make in order to find negligence, have

19  we given enough context.

20         **THE COURT:**  "Oversight" is not the right word.

21  "Control" would be a better word.

22         I guess I still feel like "operation" covers it, but I

23  see your point that that can be construed as or suggested that

24  that means you're operating it.  Let me think about this over

25  the weekend as well.  You all do the same.

1    **MR. NELSON:**  Thank you, Your Honor.  And just one

2    other point while we're in that same sentence.  If we're going

3    to include the clause at the end, which I'm not sure is really

4    necessary --

5         **THE COURT:**  Where are you?  I'm sorry, Mr. Nelson.

6         **MR. NELSON:**  I apologize.  In the first paragraph of

7    the general negligence instruction --

8         **THE COURT:**  Right.

9         **MR. NELSON:**  -- we say Plaintiffs claim that

10   International Paper was negligent and cite that -- the

11   Kingsfield Road dam structure, and then it says "which caused

12   their homes to flood."  I think if we're going include that

13   clause, it should say "which they claim."

14        **THE COURT:**  Yeah, that's a good point.  But I'm not

15   sure, now that you say that, that we should put the cause in

16   this section.  I might end that after "structure" and then take

17   out -- here, in the second paragraph, remove the reference to

18   the affirmative defense and move that to the cause section.  So,

19   in other words, this -- page 13 will deal just with negligence

20   or sort of duty breach here.  I think that might be more

21   appropriate.

22        And, of course, whatever we decide to use for

23   International Paper's handling of that dam we'll put in this

24   section as well, whatever language we decide on.

25        Okay.  We have negligence.  And then page 15, of

1    course, is modified to include -- I mean, I think that it's

2    appropriate in this case for the jury to be told that they first

3    have to find that the statute or regulation applied to that

4    structure because that is an issue that I think you-all have

5    framed, or that the evidence supports --

6          **MR. NELSON:**  Your Honor, also on the statute, it seems

7    to me that there is an additional causal step.

8          **THE COURT:**  Which is?

9          **MR. NELSON:**  Which is that, you know, a failure to

10   comply with the dam-permitting statute, as Plaintiffs claim,

11   doesn't necessarily mean that that's what caused the structure

12   to fail.

13         **THE COURT:**  Right.

14         **MR. NELSON:**  That structure may have failed whether or

15   not the permit had been issued.

16         **THE COURT:**  We'll need to work in -- we'll have to

17   work language in about that because that's -- that's true.  Just

18   as with their failure to -- if the jury finds that they failed

19   to maintain it, there's still a causal element that has to be

20   proven.  So likewise -- I mean, because we don't have negligence

21   per se, likewise this is necessary to add the causal element to

22   this as well.  So I've made note.

23         And then as far as legal cause, the instruction on

24   page 16 reads, If you decide that plaintiffs have not met their

25   burden to prove that International Paper was negligent, your

1   verdict must be in favor of International Paper.  If you decide

2   that Plaintiffs have met their burden to prove that

3   International Paper was negligent, then you will need to decide

4   whether that negligence was the legal cause of Plaintiffs -- or

5   the class members' injury.  And I'm going to take out "harm or

6   injuries" and just put "injury."

7           **MR. NELSON:**  Your Honor, at that juncture I worry a

8   little bit -- where we're talking about harm or injury.  This is

9   harm or injury to the class; and if we refer to Plaintiffs'

10  homes, there's a very good risk that the jury thinks that it's

11  just the five people who testified.

12          **THE COURT:**  I said I was going to change Plaintiffs to

13  class members.

14          **MR. NELSON:**  Oh, I'm sorry, Your Honor.  That's a

15  global change?

16          **THE COURT:**  Yes.

17          **MR. NELSON:**  Thank you.

18          **MR. MARSHALL:**  One thought about that.  I don't know

19  if the Court's -- I know we're saving the best for last.  But

20  one thought, though, is, Your Honor, I mean, it is a

21  representative case, albeit the proof is class-wide.  Probably

22  is appropriate to say "the plaintiffs" in that sense.

23          **THE COURT:**  I had not thought about this until I

24  looked at the defendant's objections, so I'll have to think

25  about it more and look at some of the case law, I suppose.  I

1    don't remember what I've done in the past.  I don't even know if
2    I've ever had this come up.  I think I've probably aways just
3    used plaintiffs, but I was intrigued when I saw the objection
4    and thought, well, that may be more appropriate.  I'll have to
5    look at it closer since there's an objection.
6         **MR. NELSON:**  Understood.  And this may be somewhat
7    different than perhaps the typical class action case, where it's
8    the same exact product for everybody.  Here there is a question,
9    and we've already heard testimony about this, about how far the
10   water went, where it went, who was in the hundred-year flood
11   zone, who wasn't.  And I think without being clear that this
12   finding is flooding in all of the class member homes, where
13   there was flooding, it'll be unclear what the jury finds.  And
14   that's even before we get to the five or six, whoever they are.
15        **THE COURT:**  Well, there hasn't been any evidence at
16   all about any other specific home other than the named
17   Plaintiffs, and that's all there should be.  Correct?
18        **MR. NELSON:**  There's been expert testimony about
19   impact to the class area homes.
20        **THE COURT:**  Impact in the class area.  But in this
21   case, the way that the evidence has come in -- and it didn't
22   surprise me because it's consistent with what I heard at the
23   evidentiary hearing -- is that what you're suggesting really
24   doesn't matter.  It really doesn't matter because Dr. Ross's
25   testimony is that all of the flooding in every single home in

1   the class area was as a result of your client's actions.

2           **MR. NELSON:**  And that's a point I think needs to be

3   made clear in the instruction.  And if we just say Plaintiff

4   homes, that may be understood to mean only those five people.

5           **THE COURT:**  Well, that's what they have to find.  In

6   other words, you're -- not you, but let's just say class member

7   Number 400 home flooded five feet.  Mr. and Ms. Navelski's home,

8   let's just say the jury -- and this is hypothetical -- decides

9   that there was six inches of rain in that house before the dam

10  broke.  Class member Number 400 loses, I mean, because of the

11  evidence, because of Dr. Ross's -- you know, his opinion.

12          **MR. NELSON:**  That's true.  But if the jury were to,

13  you know, come to the conclusion, We heard five plaintiffs

14  testify about the water in my home and I believe that those five

15  people flooded, if we're not clear in the instruction that they

16  need to make the finding as to the entire class, we won't know

17  whether they reach the conclusion only as to the five or whether

18  they believe Dr. Ross in his conclusion that it was everybody in

19  the class area.  And for this --

20          **THE COURT:**  Well, it seems to me, then, that we should

21  focus them on Plaintiffs, not class members, because that's --

22  these plaintiffs are representative of the entire class.  And so

23  whatever -- you know, obviously whatever happens in regards --

24  there's not a need to look behind the jury verdict.  They've

25  only got five -- they've got the named plaintiffs who are

1   representing the rest of the class, and that's the evidence that

2   we've heard about.

3           MR. NELSON:  Your Honor, for this verdict to stand up

4   under Rule 23 and have application to the entire class, there

5   needs to be a finding that applies to everybody in it.

6           THE COURT:  It does.  I've already made that finding.

7   That's why the class got certified.

8           MR. NELSON:  I understand.  But if the jury is

9   instructed that you're only finding causation for the plaintiff

10  homes or they're confused about what they're finding --

11          THE COURT:  I don't know how they could be confused.

12  I mean, I can certainly give them the instruction -- and I

13  thought I -- we have an instruction on what a class action is

14  and that their finding will apply to all of the class members.

15  If it doesn't say that, it should.  I think it did in my

16  preliminary instructions.

17          MR. NELSON:  This is a class action, and I think we

18  need to be clear that the finding on causation is for the class.

19          THE COURT:  Let me look back at my instruction on

20  class actions because -- I thought it covered that.

21          Because this is a class action, the class plaintiffs

22  are allowed to try to prove their claims by evidence which

23  applies to the class as a whole.  They do not need to prove each

24  class member's claim individually.  Importantly, your verdict

25  here will be binding on all class members.

1          I don't know how more specific I can get than that.

2          **MR. NELSON:**  My concern here, Your Honor, is not that

3    it won't be binding but rather the risk of jury confusion in

4    looking at the causation issue, not understanding that the issue

5    that they have to decide is whether Dr. Ross was right when he

6    said all of the homes in the class area that experienced

7    flooding, experienced flooding because of the dam breach.

8          **THE COURT:**  Well, I think my instruction tells them

9    that.  I think my instruction on negligence and causation,

10   particularly causation, tells them that.  Every time I referred,

11   I believe -- and if I didn't, I'll go back -- and we'll have the

12   weekend to look at this as well.  These were literally hot off

13   the press.  But I believe my instruction tells them all of the

14   flooding in the plaintiffs' homes.  All of it.

15         **MR. NELSON:**  But it has to be all of the flooding in

16   class members' homes in order for this to credit Dr. Ross's

17   testimony.

18         **THE COURT:**  I'm not sure where you're headed with

19   this.  I mean, this class was certified, and I think my order on

20   reconsideration was very clear about why we were -- why I was

21   certifying the class.  And it was because of Dr. Ross's

22   testimony versus Dr. Lan's testimony, the all or nothing

23   proposition.

24         And so when I certify that class, the named

25   plaintiffs -- excuse me -- the entire class, their claim rises

1    or falls with the named plaintiffs' claim.  So I would -- I'm

2    not sure what you're concerned about, or maybe I'm reading too

3    much between the lines.  I don't know -- we're not going to get

4    into closing argument and argue something different than what's

5    been framed by the Court for this case.

6            **MR. NELSON:**  Understood.  But the plaintiffs' claim is

7    that all of the flooded homes in the class area flooded because

8    of the breach in the dam.  That's the representational claim

9    that's being made.

10           **THE COURT:**  I don't disagree with that.  And that's

11   why it was certified the way it is.  So but by -- if I refer to

12   them as class members, then I don't see the problem, plus

13   every -- I mean, if I change "plaintiffs" to class "members" and

14   I refer to all of the flooding in the class members' homes, I

15   don't see how that fails to cover what concern you have.

16           **MR. NELSON:**  I think that would address the concern,

17   Your Honor.

18           **THE COURT:**  Okay.  Yes.

19           **MR. MARSHALL:**  Your Honor, this is a class action.  We

20   have representative plaintiffs.  The evidence is to the

21   representative plaintiffs --

22           **THE COURT:**  What is the plaintiffs' -- what's

23   counsel's concern about this?  I guess I'm getting very --

24   growing very suspicious about where the two sides are on this.

25   I thought it was fairly black and white.

1      **MR. MARSHALL:**  From our perspective, I mean, this

2  is -- again, it's a class action.  We're talking about the named

3  plaintiffs.  Their claims -- the entire class's claims, based

4  upon the evidence, rises and falls on the existence of the

5  survivability of the named plaintiffs' claims.

6      **THE COURT:**  Like I said, you two are causing me

7  concern.  I feel like I'm going to need to be even more specific

8  in these instructions to make it very clear as to what this

9  jury's role is.

10      **MR. GLASSER:**  Here's the issue as I see it, Your

11  Honor.  We put in the finished floor elevations for five

12  representative plaintiffs.  We didn't put it in for 163 because

13  they're representative plaintiffs.  They shouldn't be able to

14  stand up in closing and go argue that, you know, somebody in the

15  back corner isn't blue on Ross's map; therefore, the class

16  loses.  That's not -- there are people in the class area that

17  everyone knows didn't flood because they're too high.  They're

18  past Mr. Alexander.  Mr. Alexander is a representative plaintiff

19  who had the least flooding --

20      **THE COURT:**  I did not know this.  Are you talking

21  about beyond the six?

22      **MR. GLASSER:**  No, no, no, no.  No.  No.  I'm saying

23  the representative plaintiffs each have different finished floor

24  elevations in evidence.  We put the specific evidence in for

25  those plaintiffs.  That's why we can argue to the jury about

1    what happened to those houses.  There's no -- this case is a

2    representative case.  They would come in and argue, Well,

3    where's the proof of this other house out here?  Well, yeah,

4    it's blue on Dr. Ross's map, but we didn't -- you know, there's

5    not specific proof as to every aspect of that house like there

6    are with the representative plaintiffs.  So when you switch it

7    to class members, you're making a whole different burden of

8    proof is what my point is.

9            The representative plaintiffs testified.  They said, I

10   saw the water.  It's in my house.  That doesn't exist for class

11   members as a whole.  It just doesn't.

12           **THE COURT:**  Well, but you're stuck with Dr. Ross's

13   testimony.

14           **MR. GLASSER:**  I'm not saying -- I agree, Your Honor,

15   totally.

16           **THE COURT:**  What is it you're anticipating,

17   Mr. Nelson -- I mean, I need you to give me some preview.  I

18   don't want to make you reveal your closing argument here, but

19   what are you anticipating -- you know, based on what Mr. Glasser

20   just represented, what can you share with me as far as your

21   strategy here, so I know how to properly instruct this jury?

22           **MR. NELSON:**  My concern, Your Honor, is that the

23   representative claim is not, you know, my house flooded and,

24   therefore, all of my neighbors were harmed in the same way.  The

25   representative claim here is that according to Dr. Ross, all of

1    the houses that were flooded, flooded because of the failure of

2    the Kingsfield Road dam structure.  That's the representative

3    claim.

4           **THE COURT:**  Correct.

5           **MR. NELSON:**  And if we just talk about Plaintiffs'

6    harm or Plaintiffs' flooding, I think there is a very real risk

7    that the jury starts to think, well, if Bullard's house flooded,

8    that's good enough.  That means that we should find for the

9    plaintiffs.  And the issue must be, as the Court stated in its

10   orders, they would have to credit Dr. Ross that all of the

11   houses that flooded in the class area flooded because of the

12   breach of the dam.

13          **THE COURT:**  I'll have to give this more thought over

14   the weekend.

15          **MR. MARSHALL:**  Your Honor --

16          **MR. NELSON:**  And to respond to one of the Court's

17   other questions, there are something on the order of 150 class

18   members who there's no dispute they didn't flood.  And then

19   there's this five or six that are in Dr. Ross's simulation

20   that --

21          **THE COURT:**  Well, those -- I believe the class members

22   that you're talking about -- I mean, they could -- I think I've

23   made a ruling they could have individual claims of stigma

24   because of the flooding.

25          **MR. NELSON:**  And it would be based on flooding down

1   the street?

2           **THE COURT:**  Correct.

3           **MR. NELSON:**  Okay.

4           **MR. GLASSER:**  That's what I was talking --

5           **MR. NELSON:**  And we haven't -- you know, our intent is

6   not to argue that the plaintiffs have a burden of proofing that

7   somebody's house that never flooded must have flooded.  That's

8   not my concern.

9           My concern is, is that when we're in the orbit of the

10  houses that Dr. Ross says would have never flooded but for the

11  breach of the dam, that, to me, is the all or none proposition.

12  The jury must find that that entire universe, according to Ross,

13  flooded because of the dam.  If they find that entire universe

14  flooded because of the dam, they find for Plaintiffs.  If they

15  find that entire universe did not flood because of the dam, they

16  should find for IP.

17          If we start to introduce the concept of Plaintiffs'

18  homes, I think somebody could say, well, I believe Mr. Bullard,

19  and look where his house is, and his house flooded; therefore,

20  we should find for the class.  And that's not the inquiry -- at

21  least I don't think that's a fair presentation of the inquiry

22  that was framed in the Court's certification order.

23          **THE COURT:**  It is all or nothing, so it's all of the

24  plaintiffs -- I mean, all of the class members' homes that

25  flooded had to have flooded as a result of the dam breach.

1        I'll have to -- I'll just -- I need to -- it's light

2   in the day.  I'll need to spend more time on that.  But it does

3   raise the issue -- or segue into the issue of the six class

4   members, including Mr. Bullard, whose homes would have flooded

5   notwithstanding any negligence on the part of International

6   Paper.

7        The only way I can think to deal with this, at least

8   at this point -- and maybe you all will be able to suggest

9   something better -- is to have the jury make a finding, an

10   interrogatory finding on the verdict form, regarding the two

11   models that Dr. Ross has run because clearly, under one, the dam

12   should have been removed completely.  Those homes flood anyway.

13        **MR. MARSHALL:**  If the dam holds.  I'm sorry.

14        **THE COURT:**  Did I have it backwards?

15        **MR. MARSHALL:**  Yes, ma'am.

16        **THE COURT:**  Okay.  Sorry.  So if the dam holds, that

17   they would have flooded anyway.

18        So I've certified the class.  These individuals are in

19   the class.  My thought is to -- and the jury doesn't need to be

20   told this, but is to create a subclass of those six homes, and

21   then at -- then direct the jury's focus such that we know what

22   they decided, and have them select either/or or both of those

23   theories of causation, if you will, or opinions on causation.

24   And if both are checked, then we're okay.  But if only "dam

25   holds" is checked, then those six would have to be subject to a

1    judgment contrary to the other plaintiffs so, obviously, a

2    judgment in IP's favor on those six.  This is assuming -- you

3    know, assuming the jury gets to this point.

4              **MR. NELSON:**  I am concerned about this issue, Your

5    Honor, because I think it raises a whole host of other issues.

6              If you think about, for example, the negligence

7    instruction on violation of a statute, if the jury were to find

8    that the no-dam scenario caused flooding, but based their

9    negligence determination on the absence of a permit, that would

10   make no sense because there wouldn't be a need for a permit if

11   the structure weren't there.

12             **MR. MARSHALL:**  Actually there would, Your Honor.

13             **MR. NELSON:**  It wouldn't be a violation of the statute

14   because in that hypothetical world even, if you're right, they

15   would have gotten the permit, removed the structure, and away it

16   goes.  But I think we're introducing a series of issues in

17   that --

18             **THE COURT:**  But these people have to be dealt with,

19   and I've had no motion from anyone raising this issue before

20   this trial.

21             **MR. NELSON:**  I've always felt that this was an issue

22   of the plaintiffs' own making; and I think they're just going to

23   need to live with it for better or for worse.

24             **THE COURT:**  I disagree.  I mean, if there's a way --

25   if there's a way to address this to reduce confusion -- there

1    may be confusion -- you're suggesting there's going to be

2    confusion in any event; but if I can reduce it, then that's what

3    I'm going to try to do.

4         **MR. NELSON:**  Your Honor, we tried a TCPA class

5    action -- Mr. Glasser did, actually.  And there was -- it dealt

6    with separate pots of call records.  And essentially it's --

7    that's exactly how that case was tried.  There were special

8    interrogatories that dealt with -- you know, that were different

9    segments; and the jury was able to, you know, pick, if you will,

10   based upon the theories of the case.  And it worked fine in that

11   case.  I mean, that's how it was done.

12        **THE COURT:**  Yeah.  But I think here the subclass is

13   important because there's only six; and it's crystal clear,

14   based on your evidence, that if the dam holds, they flood

15   anyway.  They can't have a claim in this case.  They can't have

16   a judgment in their favor and they cannot be represented by the

17   other members of the class, the named members.

18        So that's what I'm thinking about.  No decisions are

19   being made here right now.  We're just -- I'm raising the

20   issues.  We're talking about them.  Everyone will take the

21   weekend to consider them, and we'll come back fresh on Monday

22   and hopefully, hopefully resolve them.

23        But I do want to ask if I have your agreement as to

24   through page 12 of the instructions.  And like -- they're all

25   pattern jury instructions, standard instructions.

1          **MR. NELSON:**  Your Honor, just the two -- the one point

2     we've already talked about on page 10 --

3          **THE COURT:**  Right.  I have that.

4          **MR. NELSON:**  -- homes.  And then on the affirmative

5     defense instruction, there are issues we need to take under

6     advisement about that, that whole issue, and whether it should

7     still be in the case, how it's characterized if it is.  But we

8     need to do some homework on that, in all honesty, Your Honor,

9     before I can give you a full answer.

10          **THE COURT:**  Go ahead.

11          **MR. NELSON:**  One other small change, just on page 10.

12     Just on the last page, If you determine that International Paper

13     is not legally responsible for all the flooding in homes,

14     just --

15          **THE COURT:**  Yes.  That needs -- we'll go through and

16     make those corrections.

17          **MR. NELSON:**  And then the second sentence, responsible

18     for all of the flooding in homes.

19          **THE COURT:**  Yea.  Thanks.

20          **MR. NELSON:**  Class members.

21          **MR. MARSHALL:**  I'll flip a coin.  How about that?

22          **THE COURT:**  Surely it hasn't come to that.

23          **MR. MARSHALL:**  We could.

24          **THE COURT:**  All right.

25          **MR. MARSHALL:**  Then on -- I'm sorry.

1        **THE COURT:** Go ahead. No, go ahead.

2        **MR. MARSHALL:** I think that we're generally -- I think

3  we're fine through page 12.

4        **THE COURT:** Right, with those changes. And I

5  understand the defendants still want to consider the affirmative

6  defense.

7        And then pages 18 through -- 18 and 19 are standard.

8  20 through 26 are proposed instructions that I'm not inclined to

9  give. You can -- you can argue them, if you'd like, on Monday

10  morning, but I'm not -- I'm not likely to give them, but I'll

11  certainly hear from you. They're not -- there are no

12  instructions in Florida on most of them, and I think they're

13  covered.

14        So I feel like I probably should have told the jury to

15  come in at 9:00 instead of 8:30.

16        **MR. MARSHALL:** Your Honor, just to define the issue,

17  it sounds to me that essentially what we have left to decide or

18  what we're discussing is whether you say class member or

19  plaintiff.

20        **THE COURT:** Well, the affirmative defense is still an

21  issue, not so much in my mind, but in the defendant's mind it

22  is, and I'm going to give them an opportunity to address it with

23  the Court on Monday morning, and you-all as well to the extent

24  you find something on point that you want to address with me.

25        **MR. MARSHALL:** And --

1      **THE COURT:**  And then the substantive instruction

2  covering negligence and legal cause.  Okay.

3      And then, of course, the issue of the verdict form

4  with the interrogatories also still outstanding and how we

5  address that.  But I don't see the harm in -- I don't see the

6  harm in that.  I see potential for harm if I don't do that.  So

7  I'll leave it at that for this afternoon.

8      Anything else before we recess?

9      **MR. MARSHALL:**  Not from the plaintiffs, Your Honor.

10     **MR. KAUFFMAN:**  Actually, Your Honor, I just have one

11  housekeeping issue.

12     **THE COURT:**  Okay.

13     **MR. KAUFFMAN:**  And that's this morning I entered an

14  exhibit into evidence that was 302.  We already had a 302.  It

15  was with Mr. Wistar.  It was the first exhibit of the day.  I

16  didn't realize 302 was already in from the day before, and I'd

17  like to state on the record that 302 should be marked as 302A.

18     **THE COURT:**  Okay.  I didn't catch that either.

19  Ms. Simms and I didn't catch that.  So that will be 302A.  All

20  right.  Thank you for that clarification.  We'll make the

21  correction.

22     You have Dr. Lan first or --

23     **MR. NELSON:**  It would be Dr. Lan first, Your Honor.

24     **THE COURT:**  How long do you anticipate him being on

25  the witness stand, at least in your examination?

1          **MR. NELSON:**  We're going to try to slow Dr. Lan down

2    so it's easier to get the transcript for him.  You know, 90

3    minutes to two hours would be my estimate.

4          **THE COURT:**  And then what about Duke?

5          **MR. NELSON:**  Dr. Duke --

6          **THE COURT:**  Dr. Duke.  I'm sorry.

7          **MR. NELSON:**  -- I think would be faster.  Dr. Duke,

8    you know, could go on in an hour on less.

9          **THE COURT:**  Thank you.  At this point are you-all

10    anticipating rebuttal or do you know?

11          **MR. GLASSER:**  Well, so as to the cross of Lan and

12    Duke, as you can tell, we're not long crossers, so it'll be

13    short.  And it just really depends on what Lan says or Duke

14    says.  Right now, I can only think of a one-question rebuttal

15    case thus far.

16          **THE COURT:**  Okay.

17          **MR. NELSON:**  And would the rebuttal just be recalling

18    Dr. Ross or do you envision trying to put on a new witness?

19          **MR. GLASSER:**  Well, I mean, right it would just -- it

20    may be --

21          **THE COURT:**  You don't have to tell me right now.  I'm

22    just -- yeah.  You can have the weekend to decide.

23          **MR. NELSON:**  I tried.

24          **MR. GLASSER:**  Basically, I haven't seen a rebuttal

25    that will take more than five minutes to date in the trial.

1          **THE COURT:**  Well, we'll see how -- I'm not going to

2    change the jury's schedule at this point.  We'll do what we can,

3    get accomplished what we can between 8:00 and 8:30, and then we

4    may need to take a longer lunch break or, depending on -- just

5    depending on where we are when all the evidence is in, we may

6    break at that point and go ahead and iron out these jury

7    instructions and have them come back on Tuesday for jury

8    instructions and closings.  I just -- it's really difficult to

9    predict that right now because I just don't know.

10          If you all are done with all the evidence, you know,

11   by noon, then we'll probably just take a little bit longer lunch

12   break, finish up the instructions, and they'll come back and

13   we'll proceed.

14          Any idea on length for closings at this point?

15          **MR. GLASSER:**  I'd say an hour, Your Honor.

16          **THE COURT:**  Okay.  Mr. Nelson?

17          **MR. NELSON:**  Somewhere in that range, maybe slightly

18   longer.

19          **THE COURT:**  All right.  Well, we'll just play it by

20   ear in terms of how we proceed on Monday in getting the case  to

21   the jury, whether it's Monday or Tuesday.  Certainly it'll be

22   Tuesday at the latest.  And because you-all are so far ahead of

23   schedule, I would probably err on the side of having them come

24   back on Tuesday for instructions and closing as opposed to

25   trying to get all of that in Monday afternoon and then having

1    them go out to deliberate because I would not instruct them,

2    have you give closings, and send them home.  So I don't --

3    again, it'll depend on when we wrap up the evidence.

4           With that said, be prepared for closings in the

5    event -- it doesn't sound like that's going it happen, but I --

6    it doesn't sound like it because I really -- I don't want to

7    rush things in the afternoon; but if Dr. Lan talks really fast

8    and you all wrap up early, then, you know, we probably would

9    press on.  So you might want to just practice your closings over

10   the weekend.

11          All right.  We'll see you all on Monday at 8:00.

12      *(Proceedings adjourned at 5:15 p.m.)*

13                     * * * * * * * *

14      We certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.  Any
15   redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.
16
     **/s/ Donna L. Boland**
17   _____
     Donna L. Boland,
18   Official U.S. Court Reporter

19   **/s/ Julie A. Wycoff**                 2/23/2017

20   _____   _____
     Julie A. Wycoff,                   Date
     Official U.S. Court Reporter
21

22

23

24

25

# INDEX

WITNESSES FOR THE DEFENSE:                              PAGE


**STEPHEN WISTAR**
     Cross-Examination by Mr. Kauffman                    15
     Redirect Examination by Mr. Nelson                   42

**CHRISTOPHER CURB**
     Direct Examination by Mr. Nelson                     47
     Cross-Examination by Mr. Glasser                     90

**CLARENCE MORGAN**
     Direct Examination by Mr. Hill                      107
     Cross-Examination by Mr. Vlachos                    124
     Redirect Examination by Mr. Hill                    126

**WILLIAM EUGENE YUHASZ**
     Direct Examination by Mr. Hill                      127
     Cross-Examination by Mr. Vlachos                    150

**JOHN TAYLOR**
     Direct Examination by Mr. Meltzer                   154
     Cross-Examination by Mr. Kauffman                   171

**MIKE STELTENKAMP**
     Direct Examination by Mr. Nelson                    181
     Cross-Examination by Mr. Glassman                   216

## PLAINTIFF EXHIBITS

| Exhibit | Description | Admitted |
|---------|-------------|----------|
| 223 | Rainfall frequency analysis | 23 |
| 304 | Gridded Rainfall | 36 |
| 305 | FEMA Floodplain Map | 91 |

**DEFENSE EXHIBITS**

| Exhibit | Description | Marked | Admitted |
|---------|-------------|--------|----------|
| 32 | Photo Gene Yuhasz Took | | 148 |
| 33 | Photo Gene Yuhasz Took | | 147 |
| 34 | Photo Gene Yuhasz Took | | 145 |
| 48 | Lake Charlene Study | | 70 |
| 51 | Elevenmile Creek Drainage Plan Study | | 51 |
| 52 | ICPR Model | | 59 |
| 53 | Hazard Mitigation Grant Application | | 83 |
| 54 | SWAT Report | | 75 |
| 66 | Fig. 4-1 of Elevenmile Basin Study | | 62 |
| 80 | GIS Map of April 2014 Storm | | 69 |
| 15 | Permit Verification from Army Corps of Engineers | 210 | 210 |
| 16 | Template for inspections | 158 | 158 |
| 17 | E-mail from Taylor to Armstrong | 160 | 160 |
| 22 | E-mail from Taylor re county inspection | 157 | 157 |
| 35 | Photo of structure taken by Taylor | 164 | 164 |
| 36 | Photo of spillway taken by Taylor | 165 | 165 |
| 37 | Photo of left of structure by Taylor Video taken by Taylor | 166 | 166 |
| 46 | Photo of railroad on Hwy. 29 | 167 | 167 |
| 81 | Image from Google Earth | 192 | 192 |