UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


| | |
|---|---|
| **JOHN NAVELSKI, LINDA NAVELSKI,** )<br>**ERICK ALEXANDER, JACOB HUTCHINS,** )<br>**AMBER HUTCHINS, JEANNE HENDERLY,** )<br>**RICHARD BULLARD, and BEVERLY** )<br>**BULLARD,** on their own behalf and )<br>those others similarly situated, )<br>                           )<br>      Plaintiffs, )<br>                           )<br>                           )<br>vs.                       )<br>                           )<br>                           )<br>**INTERNATIONAL PAPER COMPANY,** )<br>                           )<br>      Defendant. )<br>_____) | Case No. 3:14cv445/MCR<br><br>Pensacola, Florida<br>February 26, 2018<br>8:06 a.m. |


**JURY TRIAL – DAY FIVE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE, and a jury
(Pages 1-240)

## APPEARANCES

FOR THE PLAINTIFFS:    ***JONATHAN R. MARSHALL, ESQUIRE***
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia  25301

***JAMES L. KAUFFMAN, ESQUIRE***
***BRIAN A. GLASSER, ESQUIRE***
Bailey & Glasser, LLP
1054 31st Street NW, Suite 230
Washington, DC  20007

***CHRISTOPHER M. VLACHOS, ESQUIRE***
Christopher M. Vlachos, PLLC
244 E Intendencia
Pensacola, Florida  32502

***J.J. TALBOTT, ESQUIRE***
Law Offices of Jeremiah J. Talbott, PA
900 E Moreno Street
Pensacola, Florida  32503

FOR THE DEFENDANT:    ***T. LARRY HILL, ESQUIRE***
Moore, Hill & Westmoreland, P.A.
P.O. Box 13290
Pensacola, Florida  32591

***DANIEL W. NELSON, ESQUIRE***
***MEGAN B. KIERNAN, ESQUIRE***
***JASON R. MELTZER, ESQUIRE***
Gibson Dunn & Crutcher, LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036

1                          P R O C E E D I N G S

2              **THE COURT:**  Let me start with the issues that we left

3     off on Friday, the first being the issue of the representative

4     nature of this litigation and whether or not the Defendants are

5     able to address the flooding of other homes in the class area

6     versus just the named class members' homes flooding.

7              And I have to apologize, I think I was having some

8     brain fatigue on Friday afternoon.  While this certainly is

9     representative litigation and the evidence has to be common as

10    to all the class members, which is what was determined at the

11    time of class certification, and certainly any judgment applies

12    to all class members, in terms of proof and the validity and

13    credibility of Dr. Ross's opinion, the Defendants are most

14    certainly able to point out to argue the dissimilarities

15    between the named Plaintiffs' homes flooding and other members

16    of the class.

17             So, in other words, Dr. Ross's opinion may or may not

18    be determined to be credible.  That's a matter of proof for you

19    all here at trial.  I certified the class, but that wasn't a

20    determination of credibility of that opinion.

21             So, Mr. Marshall, I don't know if that addresses the

22    concerns that you have.  I'm afraid I got a little focused,

23    probably too much so, on protecting the integrity of the class.

24             But, no question, you and your team will be able to

25    present evidence and make argument in an attempt to discredit

1    Dr. Ross's opinion.  And if that means showing that the homes

2    that did flood in the class area were homes of non-named

3    Plaintiffs, then that's a problem for the Plaintiffs.

4         Anything else we need to address in that regard?  I

5    made the changes we did in the jury instructions and we have

6    referred to all of the flooding in the class members' homes.

7         Mr. Nelson, you had an issue with the jury

8    instructions on the permitting instruction under negligence and

9    felt there should also be a causation instruction given.  And I

10   disagree.  This just falls under negligence.  And you certainly

11   can make that argument, and no problem with that, but I don't

12   see the need for an instruction in that regard.

13        And I feel the same way as to Mr. Marshall's concern

14   about needing an instruction regarding the removal of the dam.

15   I disagree.  I changed the language somewhat to negligence in

16   the design, maintenance, and then I added "and/or continued

17   operation of the dam structure," and that "continued operation"

18   would I think include your position on removal of the dam.

19        And so, that leaves the Act of God, Mr. Nelson.  And I

20   do want to note, as you get prepared to present whatever it is

21   you want to present to me, that you all did raise this as an

22   affirmative defense.  It was your third affirmative defense.

23        So, do you wish to address the cases that I spoke to

24   you about on Friday?

25        **MR. NELSON:**  Yes, Your Honor.  Thank you.  The

1    affirmative defense was raised.  As we have discussed, we don't

2    believe it has application to the negligence cause of action.

3    But I believe that the simplest course at this juncture would

4    be for IP to simply withdraw the affirmative defense of Act of

5    God.

6            There's an Eleventh Circuit opinion, *Goulah vs. Ford*

7    *Motor Company*, 118 F.3d 1478, pincite 1486, that addressed a

8    defendant withdrawing an affirmative defense after the close of

9    evidence.  And in that case the Eleventh Circuit affirmed and

10   stated that the defendant has a right to waive any defense.

11           **THE COURT:**  Was this an Act of God defense?

12           **MR. NELSON:**  It was a comparative negligence defense,

13   Your Honor.

14           **THE COURT:**  You see, I think the problem for you all

15   is this law in Florida I think is unique to Act of God.  And

16   I'm not sure that -- I mean, obviously you represent your

17   client, but if there is a show of negligence that combines with

18   an Act of God, then you all lose in Florida.  If there's an act

19   of negligence that combines with an Act of God, then the

20   defendant is responsible for all of the loss.  That's the two

21   cases that I cited to you.

22           So, I'm trying to think how this would play itself

23   out.  You're still going to have to show that there's the Act

24   of God or the rain event, the storm event was the sole cause.

25           **MR. NELSON:**  Well, that would only be for operation of

1    the Act of God defense, Your Honor.  On the fundamental

2    question of whether or not any negligence caused the flooding,

3    the Plaintiffs bear the burden of proof on that.  And the issue

4    that we would have with an Act of God discussion -- or excuse

5    me, an Act of God instruction is that it would be extremely

6    confusing to the jury and prejudicial about the burden of proof

7    on the threshold issue of whether or not IP is negligent.

8            In order for IP's negligence to be found as the legal

9    cause of all of the flooding, the Plaintiffs have the burden of

10   proof.  And if we instruct the jury on the one hand that it is

11   their burden to find that all of the flooding was caused by the

12   breach of the Kingsfield Road structure, if they make that

13   finding, you necessarily never get to the affirmative defense.

14         **THE COURT:**  I'm not going to instruct this jury in

15   that regard that they have to find that all of the flooding was

16   due solely to the -- the problem here is, if they find that

17   there was negligence in the operation of the dam and that that

18   negligence caused the flooding in the home, there's obviously

19   rain that is a part of that.  There's no way to separate the

20   two.

21           And so, when I certified the class -- and I may have

22   put this in the order, I know it was certainly something that I

23   had considered, is that, if any of the flooding of the

24   Plaintiffs' homes occurred before the dam breached, then

25   obviously it's not attributable to any act of negligence of IP,

1    correct?  That would solely be the weather event.

2              **MR. NELSON:**  Right, Your Honor.  But you could also

3    have a situation where the jury could conclude that there was

4    an insufficient amount of water from the dam breach to produce

5    the flooding that caused the damage.

6              And this could be a situation like one of the model

7    runs that Dr. Lan did where you had a contribution in a worst

8    case scenario of two to three inches of additional water from

9    the dam breach that was added to the four to five feet of

10   water.  And I think, in that setting, the Act of God

11   instruction would be confusing and unfairly prejudicial to IP

12   because that would be interpreted as meaning IP should lose

13   because it has failed to carry its burden.

14             I've looked at the cases that the Court cited, and I

15   think those are quite distinguishable.

16             **THE COURT:**  Wait, let me stop you.  In the scenario

17   you just mentioned, the water never gets into the homes; is

18   that what you're saying?

19             **MR. NELSON:**  No.  This would be a scenario where the

20   water does get into the homes, but it is principally rainwater

21   that has fallen below the Kingsfield Road structure or that was

22   going to come down through the watershed anyway but the jury

23   finds that there might have been some additional water that was

24   released through the breach in the Kingsfield Road dam that

25   commingled with that water, and then the question becomes is

1    that sufficient for Plaintiffs to carry their burden.

2              **THE COURT:**  Not under Florida law.  If it commingles,

3    I think you lose.

4              **MR. NELSON:**  Well, I think, Your Honor, that --

5              **THE COURT:**  If there's a commingling of an Act of

6    God -- a storm event -- and an act of negligence, these two

7    cases stand for the proposition that the Defense loses.

8              **MR. NELSON:**  Your Honor, we would object to that

9    interpretation of the two cases.  The two cases are addressing

10   the quantum of damage, not a burden of proof on whether there

11   was causation.  And here the issue has been to find -- the

12   causation issue, by the Plaintiffs' own doing, is whether or

13   not the breach of the dam caused all of the flooding in the

14   Plaintiffs' homes.  That is the issue this liability jury is

15   being tasked to decide.

16             The Florida Supreme Court case was specifically

17   addressing apportionment of damages in the context of a

18   defendant that raised an affirmative defense.  That's going to

19   be an issue this jury is not going to address.  And it was in

20   the context of an affirmative defense.  And I don't think

21   there's anything unique about the affirmative defense of Act of

22   God that would cause that to operate differently than the

23   comparative negligence affirmative defense at issue in the

24   *Goulah* case.

25             **THE COURT:**  I don't have that case.  I will have to go

1    and look at it.

2         **MR. NELSON:**   The Eleventh Circuit points out the

3    defendant has a right to waive any defense, and that was a

4    defense that was waived after the evidence was submitted.   And

5    we are hereby waiving the affirmative defense of Act of God,

6    which means that the jury should not be instructed on that

7    affirmative defense.

8         **THE COURT:**   See, I don't agree with your

9    interpretation, with all due respect, Mr. Nelson, of the two

10   cases, particularly I think the Fifth Circuit case, the *Hendry*

11   case is 1933.

12        And so I don't read it to just speak to apportionment

13   of damages, because I'm reading from headnote 1 and 2, "The

14   defense of vis major may be successfully interposed in an

15   action for damages resulting solely from an act of God; but if

16   defendant's negligence is a present contributing proximate

17   cause, which, commingled with the act of God, produces the

18   injury, then the defendant is liable notwithstanding the act of

19   God."

20        So, I don't see this as an issue solely limited to an

21   apportionment of damages.   I will look at the case that you've

22   cited, but I guess, just fair warning, I'm likely to follow

23   these two binding -- this binding case law.

24        **MR. NELSON:**   I would respectfully point out, Your

25   Honor, that the portion of the *Wm. G. Roe* opinion that the

1    Court focused on is preceded by the statement, "Under Florida

2    law when there is a determination that two concurrent causes

3    result in damage, one of which was an act of the defendant and

4    one an act of God, vis major, the burden is on the defendant to

5    prove the amount of damage caused by the vis major" --

6         **THE COURT:**  That doesn't change the impact of the law

7    that's stated just below that, and in the Florida Supreme Court

8    case it's the first statement of law.

9         So, my interpretation of the Florida Supreme Court

10   case is, later in the opinion when they're referring to

11   damages, they're referring to the injury.  And I don't read

12   anything in this case about -- I don't even know if it uses the

13   term "apportionment."  Again, it's 1933.

14        Yeah, I mean, again, to carry on, this is the Fifth

15   Circuit case but it's relying on the Florida Supreme Court,

16   "The burden is on the defendant who interposes the defense to

17   show that the damages resulted solely from the act of God" --

18   and again, I interpret that as the injury resulted solely from

19   the act of God -- "and that it contributed in no way thereto."

20        **MR. NELSON:**  But, Your Honor, here we will not be

21   interposing the defense.

22        **THE COURT:**  Well, the jury is still going to get the

23   instruction.  I'm not going to change the law in Florida for

24   this case.

25        **MR. NELSON:**  We're not asking that, Your Honor.  This

1    is law about an affirmative defense and it is an affirmative

2    defense that we have withdrawn.

3                **THE COURT:**  It's law, in my opinion, Mr. Nelson, that

4    deals with an injury produced by an act of negligence by a

5    defendant coupled with an act of God.

6                **MR. NELSON:**  That is where the concurrent cause issue

7    comes in.  The issue -- and Your Honor has included that in the

8    instruction.  The concern that we have with an Act of God

9    defense is it makes it sound like IP bears the burden of

10   proving that all of the flooding was due to natural causes.

11   And that is not the issue that's been framed.

12                The Plaintiffs have the burden of proof on the

13   threshold issue of whether or not all of the flooding was

14   caused by the breach into the Kingsfield Road structure.

15                **THE COURT:**  No, they don't have that burden.  They

16   don't have that burden.  They have that burden in terms of

17   proof because of their expert.  So they do -- they're stuck

18   with that because of their expert.  But as I said in an earlier

19   pretrial order, the law in Florida is "substantially

20   contributes" when you have concurring causes.  And so, there

21   was nothing in my order that said there couldn't be a

22   concurrent cause, in my certification order.

23                **MR. NELSON:**  I recognize that, Your Honor, and that's

24   why the Court has included in the causation instruction the

25   concurrent cause provision, so that issue is already addressed

1    in the concurrent cause portion of the causation instruction

2    that the Court has provided the parties.

3         **THE COURT:** But the jury is not going to be asked to

4    decide how much of the rain -- excuse me -- how much of the

5    water in the homes was due to the rain versus how much was due

6    to an act of negligence. They're not going to be given that

7    task, because that's not consistent with my certification

8    order, for starters.

9         The only way that it would be consistent -- that I

10   think this issue would come up is if it is established -- I'm

11   not going to speak to burden right now -- but if it is

12   established through the evidence that there was water in the

13   homes before the dam broke, then I think the Plaintiffs

14   certainly have a problem.

15        And I think it's also a problem for the Plaintiffs if

16   there is evidence that homes in the class area did not flood

17   other than the six under the one model. I think that's a

18   problem, and that's a problem because of their expert opinion.

19   It's not a problem because of the law. It's a problem because

20   of the evidence in the case and what they have to prove.

21        **MR. NELSON:** I think, Your Honor, there's also an

22   issue, if you have a home that has 5 feet of water and the jury

23   believes that 4 feet 10 inches was in the house independent of

24   the dam breach --

25        **THE COURT:** That's impossible for this jury -- how

1  would this jury find that?

2       **MR. NELSON:** Well, one of the modeling simulations,

3  the dam breach simulation that Dr. Lan has run --

4       **THE COURT:** Well, he didn't run a dam breach

5  simulation.

6       **MR. NELSON:** Dr. Lan did, Your Honor.

7       **THE COURT:** This dam breach?

8       **MR. NELSON:** Yes.

9       **THE COURT:** I don't remember him running this dam

10  breach.

11       **MR. NELSON:** He did, Your Honor, he ran a simulation

12  of this dam breach under what he characterizes as a worst case

13  scenario at 12:15 in the morning.  And if the dam had breached

14  at 12:15 in the morning, the simulation indicates that there

15  may have been 2 to 3 inches of additional water in the class

16  area that came through the dam breach.

17       And if the jury were to believe that that is what

18  happened, then you have a situation where you would have, from

19  my example, 4 feet 10 inches of water that was there

20  independent of the dam breach and two inches of water that was

21  there with the dam breach.

22       **THE COURT:** I have to go back and look at this, Mr.

23  Nelson.  I mean, I realize you weren't in the case back when we

24  had the evidentiary hearing and when the class was certified,

25  but my memory is that it was all or nothing.  And that's why

1    this class was certified.  So I just may not be recalling this

2    specific opinion that you're referring to with Dr. Lan, but my

3    understanding -- and again, this is reflected throughout my two

4    orders on the class certification -- is that all of the homes

5    flooded because of the breach or none of them did; so the

6    breach was there but none of them flooded.  That's where we

7    came up with the all or nothing proposition.

8            **MR. NELSON:**  Well, we have some issues with that

9    because we know Dr. Ross's simulation of the dam in place and a

10   breach doesn't show that.

11           **THE COURT:**  You have six homes excepted, right, and

12   I'm going to deal with that.

13           **MR. NELSON:**  And there is a Dr. Lan simulation that

14   indicates, if you assume a breach at the worst case timing,

15   there could have been an additional, albeit small, quantum of

16   water in the class area through the dam breach.

17           **THE COURT:**  In the class area or in the class homes?

18           **MR. NELSON:**  Both, Your Honor.

19           **THE COURT:**  I'm going to have to go and look at that.

20           **MR. NELSON:**  Just to sum up, we would object to the

21   inclusion of the act of God defense.  But if it is included, I

22   believe it is essential that it be put in a separate

23   instruction and not included in the same instruction that

24   articulates the Plaintiffs' claim and what the causation

25   threshold is for the Plaintiffs to affirmatively prevail on

1    their claim.

2        **THE COURT:**  Okay.  I don't have a problem with that.

3    Okay, thank you.

4        Mr. Marshall, do the Plaintiffs wish to be heard

5    briefly?  We have the jury here.

6        **MR. MARSHALL:**  Your Honor, I think the cases speak for

7    themselves.  There's also an additional case, the *State Road*

8    *Department of Florida v. United States*, 85 F.Supp. 489.  It's a

9    Northern District of Florida case from 1949 which further

10   provides some additional support.

11       **THE COURT:**  Do you have a copy of that?

12       **MR. MARSHALL:**  The case, no, Your Honor, sorry.

13       **THE COURT:**  We'll pull it up.

14       Are you going to start with Dr. Lan or Dr. Duke?

15       **MR. NELSON:**  Dr. Lan, Your Honor.  And I also just do

16   want to formally note for the record that we object to the

17   inclusion of an instruction 401.9, negligence related to

18   violation of a statute, because we don't believe that the

19   proper evidentiary foundation for that instruction has been

20   provided given the deficiencies in Dr. Carrier's testimony is

21   the fact that he didn't look at the statute that was in place

22   from 2005 to 2006, the fact that there's evidence showing that

23   the Wastewater Management District's regulations in effect when

24   the structure was designed and built in the 2005/2006 time

25   period are found in Chapter 40A-4 of the Florida Administrative

1    Code, the fact that Florida law in 2005 authorized the Florida

2    Department of Environmental Protection to issue permits --

3            **THE COURT:**  These go to credibility not -- weight, not

4    to admissibility, and these are arguments that you'll be able

5    to make to the jury, so your objection is overruled.

6            **MR. MARSHALL:**  And, Your Honor, one other point, and

7    this may help our discussion.  I have taken a look at the

8    verdict form, and I'd like to tender something for the Court to

9    look at.  It may not be helpful, it may be helpful, just for

10   the Court's consideration.

11           **THE COURT:**  All right, provide a copy to Mr. Nelson,

12   please.

13           **MR. MARSHALL:**  And Your Honor, I do understand the

14   Court's ruling as to the failure to remove issue.  The only

15   thing I would say in that respect is that one of our

16   contentions is that the Defendant abandoned the structure and

17   that saying that -- framing it in terms of operation may be a

18   little bit confusing with the jury in terms of the way we

19   framed it.

20           **THE COURT:**  I disagree.

21           **MR. MARSHALL:**  Understood.

22           **THE COURT:**  I think you can clarify that in your

23   argument, if you need to.

24           **MR. MARSHALL:**  Thank you.

25           **THE COURT:**  Because it's not just a continued

1  operation, it's design, maintenance, and continued operation.

2  There are a lot of decision that can fall under that very broad

3  heading.

4      **MR. MARSHALL:** Yes, ma'am.

5      **THE COURT:** I'm going to step off the bench, the jury

6  will be seated, and we'll get started with the continuation of

7  the Defendant's case.

8      **MR. GLASSER:** Your Honor --

9      *(Recess taken 8:32 a.m. to 8:45 a.m.)*

10      **THE COURT:** Mr. Glasser, I heard you as I was walking

11  off the bench, but I was at the door and it would have been

12  awkward for everybody if I had turned and come back.

13      **MR. GLASSER:** No problem, Judge. I just wanted to

14  have this talk outside the presence of the jury.

15      **THE COURT:** Okay, go ahead.

16      **MR. GLASSER:** Your Honor, as the Court will recall,

17  the Defendants gave us 97 demonstratives at the beginning of

18  the case, many of which we objected to, to them. And looking

19  through them last night, it's apparent to me that some will be

20  proposed to be used with Lan, and we object, Your Honor, to any

21  testimony from Mr. Lan or any use of demonstratives having to

22  do with the backwater effect of bridges.

23      That is not discussed in either report. I searched

24  last night again, the word "backwater" is not in either report.

25  At his deposition, there was a two-page colloquy on backwater,

1   it's pages 28 and 29.  I'll approach the Court, if you will

2   allow, for that testimony, where he clearly was discussing a

3   backwater event from Eightmile Creek.

4           The Court will recall that the watershed -- there's a

5   dispute, among the watershed, between Dr. Lan and Dr. Ross

6   about whether Eightmile Creek ought to be included.  Eightmile

7   Creek is a large creek that goes in at the bottom.  He

8   discussed in that deposition, in particular on page 29, the

9   backwater effect of Eightmile Creek.  He said he didn't know

10  what that amount would be, and he didn't have any particular

11  file it could be found in in his report.

12          So, given that we have not had fair notice, there is

13  not a report on the backwater effect of bridges, we didn't

14  write a counter-report or ask for a reply or bring up the

15  backwater effect of bridges, it ought not be allowed.  It's a

16  brand new opinion.

17          **THE COURT:**  Mr. Nelson?

18          **MR. GLASSER:**  I have a few more.

19          **THE COURT:**  Oh, all right.  Well, let me just hear

20  each one separately.

21          **MR. NELSON:**  Your Honor, the backwater effect is --

22  it's a foundational aspect of hydrologic and hydraulic

23  modeling.  It was discussed in Dr. Lan's deposition.  We heard

24  Dr. Ross testify about it during his direct examination.  I

25  could go back and double check, but I'm pretty confident there

1    was no specific discussion in his report about the backwater

2    effect.

3          That is how hydrologists design their models.  And

4    having an order entered that Dr. Lan is not permitted to talk

5    about the backwater effect would be inconsistent with how

6    modelers work and it would also be inconsistent with the fact

7    that it was discussed in his deposition.

8          **THE COURT:**  Where in his deposition is it discussed?

9    I see one question that says "In the hydraulic model that's

10   when the backwater effect is -- okay, so you would check -- you

11   have to check the hydraulic model and that is all calculated

12   within the model internally."  So is that what he's -- that's

13   his answer to a question.

14         **MR. NELSON:**  Well, it's at page 28 of the deposition,

15   lines 6 to 18, part of the answer that he gives is, "So,

16   basically what happened downstream could potentially impact in

17   the other tributary sub-stream, we call that a backwater

18   effect."

19         **THE COURT:**  All right, the objection is overruled.

20   Next?

21         **MR. GLASSER:**  Just to be specific, Your Honor, I'm

22   talking only about the backwater effect of bridges, bridges.

23         **THE COURT:**  No, I'm not going to narrow his testimony

24   in that respect.

25         **MR. GLASSER:**  Second, Your Honor, they have produced

1      to us a demonstrative of a video, a hypothetical dam failing

2      video.  It's a cartoon-type video.  It has -- it was not

3      produced in the discovery period.  We have no way to check its

4      relation to any of the hydrology, hydraulics of any of the

5      opinions of any of the experts.  It's kind of a fugitive

6      cartoon dam failure video, and I think it's potentially

7      misleading.  We have no way to check its validity.  I object to

8      it.

9               **THE COURT:**  Mr. Nelson?

10              **MR. NELSON:**  We're not going to use that, Your Honor.

11              **THE COURT:**  Thank you.

12              **MR. GLASSER:**  Last, Defendants have put in some

13     pictures about Route 29.  You'll recall that ice chest on top

14     of a bank on Route 29, that testimony.

15              **THE COURT:**  In a Dumpster?

16              **MR. GLASSER:**  In the Dumpster, yes, ma'am.  There's

17     nothing in Lan's report about that, about a fight about the

18     boundary about the Route 29.

19              **THE COURT:**  That objection will be overruled.

20              Anything else?

21              **MR. GLASSER:**  That's it, Your Honor.

22              **THE COURT:**  Let's bring the jury in, please.

23              *(Jury in the box.)*

24              Good morning, ladies and gentlemen.  Thank you all for

25     being here on time.  I apologize for the delay in getting

started this morning.  Again, I appreciate you all being here

on time.  I hope you all had a nice, relaxing weekend.

        We are ready to proceed with the continuation of the

trial this morning.  If you'll recall, on Friday when we broke

we were in the Defendant International Paper Company's case,

and that's where we'll start this morning.

        The expert witness for International Paper is here,

and I believe that, Mr. Nelson, you're going to start with Dr.

Lan this morning?

        **MR. NELSON:**  Yes, Your Honor.

        **THE COURT:**  You may call him at this time.

        **MR. NELSON:**  Your Honor, International Paper calls

Dr. Frank Lan.

        **THE COURT:**  Thank you.

        **YONGQIANG "FRANK" LAN, DEFENSE WITNESS, DULY SWORN**

        **MADAM CLERK SIMMS:**  Be seated.  Please state your full

name and spell your last name for the record.

        **THE WITNESS:**  My full name is Yongqiang Lan, spelled

as Y-o-n-g-q-i-a-n-g, Lan, L-a-n, but everybody calls me Frank.

So, if you have questions, you can call me Frank, make it easy.

        **THE COURT:**  Dr. Lan, if you would, make sure and be as

close as you can to that device with the red light on it,

that's your microphone.

        **THE WITNESS:**  Thank you.

        **THE COURT:**  Mr. Nelson, you may proceed.

1 **MR. NELSON:**   Thank you, Your Honor.

2                         **DIRECT EXAMINATION**

3 BY MR. NELSON:

4 Q.   Good morning, Dr. Lan.

5 A.   Good morning.

6 Q.   Can you tell us a little bit about your background, please.

7 A.   I originally came from China in 1985.  Before that, I grew

8 up in China in the countryside on a farm, and I went to school

9 when I was barely 16 to one of the best universities in China,

10 and I graduated there in four years.  And right after that, I

11 got a scholarship at a university to pursue graduate study in

12 the United States.

13     My background was in hydrology and hydraulic and water

14 research, and I was chosen at Colorado State University to

15 pursue my undergraduate studies.  So, I was there working on my

16 master's and Ph.D.  And right after that, I went to the

17 University of Mississippi for a one year postdoc.

18 Q.   Thank you, Dr. Lan.  Can you tell us what year you attained

19 your Ph.D. from Colorado State University?

20 A.   My -- I was in the hydraulic and sediment transport

21 program.  My Ph.D. dissertation was mainly in hydraulics and

22 sediment and river meandering and migration.

23 Q.   What year were you awarded your Ph.D.?

24 A.   I was awarded my Ph.D. in December, I think, 1990.

25 Q.   What did do you after your postdoctoral study, Dr. Lan, in

1    terms of your work?

2    A.   Right after my postdoc study, I was given the job -- I got

3    a job with Woodward-Clyde, it's one of the old engineering

4    firms, which was acquired later by URS, which became AECOM

5    later.  And that's the one I'm working for now, AECOM.  So I

6    have been with AECOM since I left school pretty much and for a

7    little bit over 25 years, almost 26 years now.

8    Q.   Thank you, Dr. Lan.  What areas of work do you focus on at

9    AECOM?

10   A.   My job duties mostly are more hydrology and hydraulics

11   related.  And I do a lot of work related to dam and spillway

12   design and flood control.  I have done a lot of dam breach

13   analyses through the country and all over the world for

14   different kind of flood conditions.

15   Q.   Dr. Lan, are you a licensed professional engineer?

16   A.   I'm a licensed professional engineer in the state of

17   Colorado.

18   Q.   Is your work limited to the state of Colorado, Dr. Lan?

19   A.   No.  It's -- an engineer is a scientist.  There's no

20   boundary where you can practice your science.  I do -- as I

21   said, I do work all around the world, not just the United

22   States, in like Australia, New Zealand, Chile, Argentina, all

23   around the world, and my work is always respected.

24   Q.   And Dr. Lan, I want to talk a little bit more about your

25   areas of work at AECOM.  The first one you mentioned was

hydrology.  Can you tell us what hydrology is?

A.   Well, hydrology is the science study more like cycling of
water.  Put in a very simple way, it's how much flow is going
where.  And the cycling, like precipitation, how it falls from
the clouds and then how precipitation translates into
evaporation or underground groundwater and how much that
distribution would be in the cycling around the globe.

Q.   Thank you, Dr. Lan.  And you also mentioned hydraulics.
What is hydraulics?

A.   Hydraulics is just another aspect of science dealing with
water, basically, that studies the mechanics of water flowing.
So it would determine how fast it would flow and what kind of
depth in the river in the channel, and hydrology typically
wouldn't give you that kind of information.

Q.   And the final area you mentioned was dam failure and dam
breach analysis.  What is that?

A.   Dam breach analysis is basically we'll look at the dam
would fail under a lot of failure conditions, including piping
failure, which is normally you have a design fault and it would
fail under piping condition.  And a lot of what would fail
under overtopping condition caused by flood.  So we do a lot of
those kind of analyses to determine the consequences of a dam
breach during the storm or under sunny day conditions.

Q.   Over the course of your career at AECOM, how many dam
projects have you worked on?

1    A.   I don't have an exact count.  I would say it would have to

2    be greater than a hundred.  Even a dam breach analyses I have

3    done or directed, it has to be more than 50.

4         In the last two years we have done about 25 dam breach

5    analyses of dams for the State of New Mexico, and I just

6    recently in the last couple of weeks did a couple of dam breach

7    analyses too.

8              **MR. NELSON:**  Your Honor, International Paper tenders

9    Dr. Lan as an expert in hydrology, hydrologic modeling,

10   hydraulic modeling, and dam breach analysis.

11             **THE COURT:**  Any voir dire, Mr. Glasser?

12             **MR. GLASSER:**  No, ma'am.

13             **THE COURT:**  Ladies and gentlemen, Dr. Lan will be so

14   designated.  But please do remember my instruction to you

15   regarding expert witness testimony, the same as with any other

16   testimony in the case, it is up to you to decide whether or not

17   to rely upon it.

18             Go ahead, sir.

19             **MR. NELSON:**  Thank you, Your Honor.

20   **BY MR. NELSON:**

21   Q.   Dr. Lan, before this morning, have you ever testified in a

22   trial as an expert witness?

23   A.   No.  This is my first time.

24   Q.   Dr. Lan, before this case, have you ever worked on a

25   litigation matter as a testifying expert witness?

1    A.    No.

2    Q.    Dr. Lan, what were you asked to do in this case?  In other

3    words, what was your assignment?

4    A.    Well, my assignment was looking at exactly to evaluate the

5    hydrology and hydraulic leading to the dam breach and what is

6    consequences when the dam breached.

7    Q.    And did you write two reports as part of your work in this

8    case, Dr. Lan?

9    A.    Yeah, we prepared two reports.

10   Q.    What was the name of the first report?

11   A.    The name of the report of -- the first one is hydrologic

12   and hydraulic modeling for the dam.

13   Q.    And can you please tell the jury generally -- we'll get

14   into more details later -- what kind of work was covered by

15   your hydrologic and hydraulic report?

16   A.    Well, my hydrologic report and hydraulic report, basically

17   we did almost the same analysis as Dr. Ross did.  We ran the

18   model, the simulation of the runoff on the watershed, and that

19   goes to the Elevenmile Creek, and then conjugated to the

20   Elevenmile Creek.  And then we ran the hydraulic model to

21   determine the water elevation for the two scenarios that we

22   looked at, the same as Dr. Ross did.

23   Q.    And Dr. Lan, just at a high level, what conclusions did you

24   reach from your hydrologic and hydraulic analysis?

25   A.    Hydrologic and hydraulic analysis indicated that the flood

1    caused a significant flooding in the class area under both

2    conditions, with the dam in place and not fail and without a

3    dam being in place.

4    Q.   And so the hydrologic and hydraulic report found that there

5    wouldn't --

6              **MR. GLASSER:**  Objection, leading.

7              **THE COURT:**  Sustained.

8    **BY MR. NELSON:**

9    Q.   Dr. Lan, with regard to the effect in the class area, what

10   did the hydrologic and hydraulic report find?

11   A.   Well, our analysis indicated that the flood caused

12   significant flooding in the class area under both conditions I

13   just mentioned.

14   Q.   Thank you, Dr. Lan.  What was the subject of your second

15   report?

16   A.   The second report was mainly a focus on the dam breach

17   processes and how -- what the sequences of the dam breach,

18   consequences of the dam breach.

19   Q.   And just at a high level, what did you conclude from the

20   dam breach analysis?

21   A.   Our analysis basically indicated that the dam breach alone

22   did not cause all the flooding in the class area.

23   Q.   Thank you, Dr. Lan.  As part of your work in this case, did

24   you conduct a site visit?

25   A.   Yes, I did.  I mean, it's typically kind of the first thing

1    we would do in looking at this kind of project.

2    Q.   And did you visit the International Paper site during your

3    site visit?

4    A.   Yeah.   I think I remember we kind of stopped by the

5    International Paper site and then we drove to the dam

6    immediately.

7    Q.   And what did you do when you visited the site of the

8    Kingsfield Road dam?

9    A.   Well, we were there -- I was there, basically observed the

10   breach -- the breach opening and how wide it was and look at

11   the kind of size -- get a feeling of the size of the pond

12   upstream, the vegetation around the area, even the embankment

13   material, and look at -- on top of the embankment is quite a

14   thick layer of gravel, and look at the soil condition a little

15   bit and noticed the kind of cohesiveness of the soil there a

16   little bit, too.   I looked at the structure -- the overflow

17   structures and what the size of it.

18   Q.   Thank you, Dr. Lan.

19            **MR. NELSON:**   Your Honor, may I approach?

20            **THE COURT:**   Yes, sir.

21            **MR. GLASSER:**   No objection, Your Honor.

22            **MR. NELSON:**   What I've handed Dr. Lan is what we've

23   marked as IP Exhibit 82.   It is a photograph that was included

24   as Figure 1-2 in Dr. Lan's H and H report.

25            **THE COURT:**   That will be admitted.

1    (Defendant IP Exhibit 82 admitted into evidence.)

2        **MR. NELSON:**  May we publish, Your Honor?

3        **THE COURT:**  Yes.

4    BY MR. NELSON:

5    Q.   Dr. Lan, what does Figure 1-2 show?

6    A.   Well, this one is an aerial photo of the site.  It

7    basically shows you where the principal spillway was.  I mean,

8    the concrete structure of that was designed to pass flow under

9    normal conditions.  And then the embankment and this outlet

10   structure to your right side looking downstream.  The arrow

11   kind of -- you probably can't really see it but it's very tiny,

12   it's a small structure there.  You can see the embankment that

13   that road leading to -- can I kind of point to the computer,

14   no?

15   Q.   Yes, Dr. Lan, there should be a little pen up there that

16   you can mark on the screen with.

17   A.   Oh, yeah.  So this is the road coming to the embankment,

18   and this is part of the embankment.  This is part of the

19   natural ground that's leading to the dam.  This is basically

20   the principal spillway there, and all the structure is right

21   here.

22        When you see there's a little bitty island kind of

23   separating the both sides of the pond here, and from here to

24   here to the Kingsfield Road it's about 400 feet.  And to give

25   you an idea of the length of the embankment there and it's all

1    the way to here and you can see probably 600 feet that can be

2    surrounding it.  And the road here, it sits up at a little bit

3    higher elevation.  And the embankment got the -- the elevation

4    change gradually to the dam -- to the structure site.

5    Q.   Dr. Lan, how does the size of the Kingsfield Road dam

6    structure compare to other dam projects you've worked on?

7    A.   Well, I have to say this is probably the smallest dam I

8    have ever worked on compared to the hundreds of dams I've

9    worked on.  As I mentioned, I've worked on all kind of dams,

10   concrete dams, earthen dam, tailings dam -- that's for the

11   mining industry.

12   Q.   Dr. Lan, did you also visit the Bristol Park and Ashbury

13   Hills area?

14   A.   Yes, I did, after visiting the dam, yeah.

15   Q.   And what did you do when you went and visited the Bristol

16   Park and Ashbury Hills area?

17   A.   Well, we walked around in the neighborhood and tried to get

18   a feeling of the structure in the area, the vegetation, and

19   notice all the trees, the fences, which are typical around, you

20   know, of course a residential area.  And we were trying to walk

21   to the creek from the neighborhood and tried different --

22   several locations, and we couldn't really get to the creek

23   because it's just too heavily vegetated with a lot of trees,

24   bushes between the neighborhood to the creek.

25   Q.   And Dr. Lan, was the class area the only portion of the

1   Elevenmile Creek channel that you observed on your site visit?

2   A.   No.  We kept -- kept looking around and basically we drove

3   all the way down to the USGS stream gauge site, which is at

4   Mobile Highway.  So, on every breach we looked at when I got a

5   breach opening, the condition of the channel, the floodplain,

6   all the way to dam, wherever we can get access to it, honestly.

7   Q.   Thank you, Dr. Lan.  For the first part of your analysis,

8   that hydrologic and hydraulic analysis, did you perform

9   modeling?

10  A.   Yes.  That's part of our analysis and the major part of the

11  analysis.

12  Q.   And what type of models did you use?

13  A.   Well, we used the standard and universally used Army Corps

14  of Engineers flood model called HEC-HMS that the majority of

15  engineers uses.

16  Q.   The HEC-HMS model, which part of the assignment did that

17  address?

18  A.   Could you say that again.

19  Q.   Yes.  I'm sorry, Dr. Lan.  There were -- there's a

20  hydrologic component and a hydraulic component?

21  A.   Yeah.  The hydraulic model we used actually is also the

22  U.S. Army Corps of Engineers model, it's called HEC-RAS.

23  That's the one that Dr. Ross also used in his hydraulic

24  analysis.

25  Q.   Did Dr. Ross use the HEC-HMS model for his hydrologic

1   analysis?

2   A.   No.  He used a different hydrologic model that's called

3   HSPF it stands for Hydrological Simulation Program for Fortran,

4   one of the oldest program languages.

5   Q.   Is the HSPF model developed and sanctioned by the United

6   States Corps of Army Engineers?

7   A.   No, it's not.  It was developed by EPA.  It was not

8   sanctioned by U.S. Army Corps of Engineers, as far as I know.

9   And HSPF is mainly -- we call it a water quality model.  It is

10  used within a small community.  And also, if you ask a lot of

11  engineers, nobody even heard of HSPF.  A lot of people --

12           **MR. GLASSER:**  Objection.

13           **THE COURT:**  Overruled.

14  **BY MR. NELSON:**

15  Q.   Thank you, Dr. Lan.  After you selected the models to use,

16  what did you do to establish the area that you were going to

17  study?

18  A.   Well, I mean, we look at the problem and we evaluate really

19  how to model it downstream, so we would delineate the drainage

20  area, select the model, and then, I mean, just put all the

21  properties into the model and build the model and run the

22  model.  It's a long process.

23           **MR. NELSON:**  I'd like to put up a demonstrative that

24  was used during opening.

25           **THE COURT:**  All right.

1  **BY MR. NELSON:**

2  Q.  Dr. Lan, what is shown in the areas shaded by yellow?

3  A.  This is the drainage area we had started.  On the top you

4  can see it's labeled "International Paper dam."  That's in the

5  upper watershed area.  And the Kingsfield Road, it's right

6  below the dam.  And the class area is almost like the middle of

7  Elevenmile Creek to the downstream end of our study area.

8      And the downstream area right here, it's just -- downstream

9  on the confluence with Eightmile Creek.  This is Eightmile

10  Creek right here.

11  Q.  And if we were to focus on the part of the drainage basin

12  that's located above the class area, how large is that?

13  A.  As far as I can remember, that total drainage area is about

14  10-and-a-half -- 14-and-a-half square miles.

15  Q.  And out of that approximately 14-and-a-half square miles,

16  how much of the drainage area is below the Kingsfield Road dam

17  but still above the class area?

18  A.  That's about 10.2 miles, so that basically tells you about

19  4.2 miles above the dam and then 10.2 miles below the dam

20  before the class area.  So the drainage area below the dam is

21  significantly higher than the drainage area upstream of the

22  dam.

23  Q.  And what significance does that have for the modeling work?

24  A.  So, basically it would tell you with the same precipitation

25  pattern, the flow coming in below the dam is much greater than

1    the flow coming into the dam to the class area.  And you might

2    notice -- and probably Dr. Ross also illustrated earlier, for

3    this storm event the rainfall actually is heavier south than in

4    the north.  So, if you look at the map there, the area upstream

5    of the dam that's just on the north.  So it has to -- it would

6    have less precipitation than the area south.  So with that kind

7    of combination, we had even more runoff on the drainage area

8    downstream of the dam to the class area.

9    Q.   Thank you, Dr. Lan.  Did you incorporate topographical data

10   into your modeling investigation?

11   A.   Yeah.  That is necessary to delineate the drainage area,

12   yeah.

13   Q.   Did you and Dr. Ross use the same source for topographical

14   data in your modeling?

15   A.   I believe so.

16   Q.   Thank you, Dr. Lan.  Did you use rainfall data for the

17   April 29 to 30th storm event in your model investigation?

18   A.   Yeah, that's basically input in a hydraulic model.

19   Q.   And are the rainfall amounts that you and Dr. Ross used

20   very similar?

21   A.   Yeah, they're all based on the radar data.  It came out

22   with a very similar adjustment and similar amount.  I was

23   curious just before I came here as to what the exact amount is,

24   and it came out with our model actually averaged about 18.2

25   inches for the drainage area upstream of the USGS gauge, and

1  Dr. Ross's model is 18 inches.  It was coincidence, but I just

2  looked at it and I was surprised that it was so close.

3  Q.   Thank you, Dr. Lan.  I'd like to go back to that

4  demonstrative of the drainage basin.  You had circled -- I'll

5  put it back up because I hit the clear button so that we didn't

6  have it on the screen in the last image.

7      What did you do in terms of thinking about how far south of

8  the class area to establish the southern perimeter of your

9  study area?

10  A.   As experience with the hydraulic model, we've always been

11  told that you need to establish a downstream boundary far away

12  from the area of interest -- in this case, the class area -- so

13  we would be able to include all the what we call the backwater

14  impact from the drainage area coming into the Elevenmile Creek

15  downstream of the class area.

16      And that would also eliminate any boundary effect.  What we

17  call boundary effect is, you could have a little bit of error

18  in specifying your downstream boundary condition.  But if it's

19  far away from your area of interest, then that little error

20  will not translate directly into your class area -- in your

21  area of interest.

22      So, we selected the downstream boundary far -- sufficiently

23  far away so we wouldn't be impacted by the boundary condition.

24  Also that would include all backwater effect that possibly

25  could get all the way back to the class area.

1    Q.   And Dr. Lan, how did your drainage basin compare size-wise

2    to the drainage basin that Dr. Ross used in his modeling work?

3    A.   Our drainage area is basically just a little bigger.  You

4    can see from there where it's side by side, on the left is Dr.

5    Ross and on the right is ours.  But if you impose that on Dr.

6    Ross's drainage area, so basically we included -- this is

7    Elevenmile Creek drainage coming in, and we still have a little

8    bit more coming in on this side, too.

9    Q.   And on this graphic, Dr. Lan, what does the red perimeter

10   signify?

11   A.   The red perimeter signifies Dr. Ross's drainage area.

12   Q.   And then this green line here, what is that?

13   A.   That's the Eightmile Creek drainage.

14   Q.   So that was included in your work?

15   A.   Yes, that's included in our work, right.

16   Q.   Thank you, Dr. Lan.  Now, you touched on this just a moment

17   ago, you referred to backwater effect.  Could you explain a

18   little bit more what the backwater effect is and how that

19   impacts modeling?

20   A.   Well, backwater impact -- backwater effect basically is a

21   hydraulic phenomenon that it happens on a very mild stream like

22   Elevenmile Creek.  What happens is, if you drop a drop of water

23   in a creek, backwater basically means that the drop of water

24   creates a wave, that wave would travel upstream.  If it doesn't

25   have backwater effect, then the wave would not travel upstream,

1  it only travels downstream.  If there's backwater, it travels

2  both directions.

3      So, in a mild creek that's very important, because whatever

4  comes in from the drainage area, that's going to create a

5  backwater effect, that would propagate as far as the theory

6  would get you to.  And sometimes it could be a half mile,

7  sometimes it could be several miles, it depends on the slope

8  and the velocity of the flow.

9  Q.  And Dr. Lan, do you have a demonstrative that illustrates

10  how a backwater effect impacts the flow of water?

11  A.  Yeah.  I think I've almost forgotten that, but yeah, let's

12  do that.

13          **MR. NELSON:**  May we show that, Your Honor?

14          **THE COURT:**  Yes.

15          **THE WITNESS:**  So this is a just very simplified

16  illustration of how backwater kind of impacts the flood area of

17  interest.  This one is showing all the houses there.  This

18  would represent all the drainage or what we typically call

19  tributaries coming in.

20      So, for this area here, if you only have this one

21  drainage coming in, the flow is pretty low and goes all the way

22  down without any flooding issue in the area.  Now we turn on

23  all the tributary flows coming in from all sides and

24  immediately it would back up a lot of water.

25      So, all the tributaries flows coming in will have

1   backwater effect all the way to this area.  It's not just the

2   water in this area that was causing the flooding, it's

3   everything coming in downstream or immediately around the

4   neighborhood, so it would cause a backwater effect to it and

5   raise the water level, so the result would raise your water

6   level in the area.

7   **BY MR. NELSON:**

8   Q.   And Dr. Lan, are there things in addition to downstream

9   tributaries that can produce a backwater effect?

10  A.   Well, yeah, there's other things that could cause backwater

11  effect like bridges, culvert, any other obstructions you can

12  think of.  I mean, trees is considered an obstruction that can

13  cause a backwater, yeah.

14  Q.   Dr. Lan, do you have a demonstrative that illustrates how a

15  bridge can produce a backwater effect?

16  A.   That's correct, yeah.

17  Q.   Can you describe this, please.

18  A.   So, basically, in addition to the little illustration I

19  presented and this one basically kind of tells you and the

20  water level upstream and downstream of the bridge.  And this

21  one here it has the flow coming in and tributary flow coming in

22  and have the bridge here.  You can see the water level upstream

23  and downstream and it makes quite a difference.  You have a

24  good effect from the bridge opening.

25       So, when the flow goes through the bridge opening, because

1   the bridge opening is typically much smaller than your entire

2   floodplain, so the flow has to be squeezed through the opening,

3   so it creates a backwater.  Just like you're going in a traffic

4   and four lanes turns into two lanes, more traffic being slowed

5   down, the same thing effectively here.

6   Q.   And Dr. Lan, is there an issue with Dr. Ross's southern

7   model boundary below the class area?

8   A.   Dr. Ross's southern boundary, I don't know if you have seen

9   it or not.  You might have seen it in his testimony.  It's very

10  close to the class area, so I would have to say it's right

11  immediately -- yeah, here we show you the picture here.

12       So, this is his downstream boundary of his hydraulic model,

13  and you can see this is the class area here, so it's right

14  there, it's right there.  So, what it tells you is we have all

15  this backwater effect, and this cross section is not able to be

16  -- not able to see the flow coming from here and it's not able

17  to see the backwater from the bridges right here, this bridge

18  here.  And whatever you specify at the boundary right here, it

19  will translate directly back to your class area.  So, if you do

20  something wrong here and incorrectly, that will directly

21  translate into your class area.

22  Q.   And how would putting the downstream boundary so close to

23  the class area affect the model results in Dr. Ross's

24  investigation?

25  A.   Well, in running a model you have to give it a condition of

1    the downstream boundary, I mean, that's what I mentioned to

2    you.  A condition in Dr. Ross's model is using the rating

3    curve, so the rating curve determines what flow rate was

4    corresponding to what elevation.

5         So, if that rating curve is incorrectly established,

6    basically that will wrongly translate into this area directly.

7    So, in a hydraulic modeling, the rule is and the general

8    guidance is you have -- you do need to put the boundary far

9    away so your boundary condition would effectively be eliminated

10   and the model would gradually calculate all the backwater to

11   the area.

12   Q.   And if you're not calculating that backwater effect, what

13   does it do to the predicted water levels in the class area?

14   A.   Well, generally you would have a lower water level.

15   Q.   And if this boundary condition had been moved farther away,

16   what water levels -- what effect would that have on water

17   levels in the class area?

18   A.   You would have the impact from tributaries, you would have

19   the impact from the bridge because the wall would raise up your

20   water level of the stream if a bridge is there.

21   Q.   Thank you, Dr. Lan.  And I just want to show you a blowout

22   from this demonstrative to compare your southern model boundary

23   with Dr. Ross's.

24   A.   Yeah, our model boundary, as I mentioned earlier, it's

25   downstream at the confluence of Elevenmile Creek and Eightmile

1   Creek.  I believe this is about four-and-a-half miles from the

2   class area to the downstream boundary.  The dam is around here,

3   and the dam to the class area is about two, two-and-a-half

4   miles, that kind of range there.

5   Q.   So, what does that mean in terms of what your model

6   accounted for but Dr. Ross's did not account for?

7   A.   So, our model would account for any backwater impact that

8   are from all the tributaries coming in downstream of the class

9   area, which has three major tributaries coming in, your

10  Eightmile, this one that we don't have a name for it, we don't

11  have a name for this one either, and all the structures, all

12  the bridges -- we have one bridge here and we have two more

13  bridges here, I think, Nine Mile and on Highway 10 right there,

14  so we have three major bridges.

15  Q.   Thank you, Dr. Lan.  I'm going to change subjects at this

16  point.  Are you familiar with the term "coefficient of

17  friction" or "Manning's Coefficient"?

18  A.   Yes, we do that all the time.  We have that on the

19  databases.  We know that.  It's an empirical factor to use to

20  calculate the velocity and flow of discharge.  So, it measures

21  the resistance of the ground or any trees or obstruction to the

22  flow.

23       So, if you have a very heavily vegetative area, then

24  basically you would have a higher Manning's Coefficient that

25  would slow down your flow.  Of course, if the flow is running

1    on concrete, you will have a low Manning's Coefficient.  So

2    basically the Manning's Coefficient, it's kind of a lump

3    parameter to measure your resistance to the flow, and the flow

4    has to overcome.

5    Q.   And so, if there is a lower Manning's Coefficient, what

6    effect does that have on the flow?

7    A.   Well, using the lower Manning's Coefficient basically,

8    given the same flow discharge, and we're talking the same

9    amount of flow, it would lead to typically a lower water level

10   and higher velocity.

11   Q.   And conversely, if you have a higher Manning's Coefficient,

12   what's the effect?

13   A.   Well, obviously, I mean, you will raise your water level

14   and have a higher water level.

15   Q.   Dr. Lan, how did you determine the Manning's Coefficients

16   that you used in your hydrologic and hydraulic model

17   investigation?

18   A.   Well, we selected the Manning's Coefficient based on

19   several things.  First we look at the picture I took in the

20   future, and the future was taken May 15, 2015, which is about a

21   year, almost exactly a year later after the storm occurred.

22   So, seasonal-wise they should have the same vegetation, all the

23   trees would be very similar.

24        Based on the picture we took and older other pictures that

25   were taken from our team and then to compare with some

1    reference, the USGS reference, United States Geological Survey,

2    and those are kind of a textbook and bible to select the

3    Manning's Coefficient.  The last thing is we used the FEMA

4    flood insurance study to compare what kind -- get a feeling of

5    what kind of value we use.

6    Q.   Dr. Lan, did you use the same Manning's Coefficient for the

7    Elevenmile Creek channel as you did for the floodplain?

8    A.   No.  It varies.  We looked at the vegetation cover, the

9    buildup, residence buildup, and then we varied quite a little

10   bit.

11   Q.   And what Manning's Coefficient did you use for the

12   Elevenmile Creek channel itself?

13   A.   I believe mostly we used a value of .045.

14   Q.   And how did that Manning's Coefficient for the channel

15   compare to the Manning's Coefficient used by Dr. Ross?

16   A.   Dr. Ross, I believe he used a constant value, he used .03.

17   Q.   You mentioned FEMA having Manning's Coefficient for the

18   Elevenmile Creek channel.  What did FEMA use in its model?

19   A.   Well, yeah, I looked at a FEMA model, I mean, the FEMA

20   model used a value between .04 to .08, so our number is .045,

21   so it would lie there in the low -- part of the low end of it.

22   Q.   And how did Dr. Ross's Manning's Coefficient for the

23   channel compare to the FEMA Manning's Coefficient for the

24   channel?

25   A.   I just mentioned, Dr. Ross used a .03 as compared to .04 to

1  .08 in the FEMA model.

2  Q.   Thank you, Dr. Lan.  What Manning's Coefficient did you use

3  for the floodplain?

4  A.   We used a value between -- as I mentioned, it varied

5  between .05 to all the way to .08.  The majority of the time it

6  varied between .12 to .18.  Those are consistent with also

7  FEMA's number.

8  Q.   And what number did Dr. Ross use as the Manning's

9  Coefficient for the floodplain?

10  A.   He used a value of .05, a constant value.

11  Q.   Constant value for the whole floodplain?

12  A.   Yeah.

13  Q.   And you mentioned photographs that you took during the site

14  visit and how you used the photographs during the site visit.

15  A.   Yeah, I mean, we -- this is a picture I took in the

16  neighborhood.  And I'm trying to get to the creek and you can

17  see it's just heavily vegetated with all the trees and the

18  bushes.  We were trying to get to the creek and we wasn't able

19  to do that.  It's very heavily vegetated, that's all I can

20  tell.

21  Q.   And when you're comparing an area like this to the textbook

22  and other resources to try to figure out what the right

23  Manning's Coefficient is for the study area, how do you do

24  that?

25  A.   Well, yeah, we look at a textbook USGS and compare with

1    similar type of vegetation cover.  This is a quote from the

2    USGS reference there.  You can see here, this one has some

3    trees there, some underbushes surrounded by mostly -- it really

4    doesn't have a lot of leaves and things like that.  So, in my

5    opinion, they fall into the same kind of range there, so that

6    was selected .18 mostly for the floodplain.  And FEMA also, I

7    believe they used probably a very similar reference to select

8    their use of .18 for the floodplain.

9    Q.   So, this is a textbook of Manning's Coefficient.  Let's

10   flip back and see how that compared to the photograph.

11   A.   So, you can definitely tell the similarity there, and I

12   would have to say this is a little bit heavier even than the

13   textbook showing.

14   Q.   And the textbook referenced what Manning's Coefficient for

15   this type of floodplain?

16   A.   It referenced .18.

17   Q.   What is your view, Dr. Lan, about whether Dr. Ross used the

18   correct Manning's Coefficient for the channel?

19   A.   Well, I mean, from what I saw over there --

20             **MR. GLASSER:**  Objection.

21             **THE WITNESS:**  -- and compared with --

22             **THE COURT:**  Excuse me?

23             **MR. GLASSER:**  May I approach?

24             **THE COURT:**  Yes.

25             *(Bench conference between the Court and counsel:)*

1     **MR. GLASSER:**  Your Honor, in his deposition Dr. Lan

2     was asked if he had any comment on any of Dr. Ross's inputs to

3     his model and his answer was no, so this is beyond the scope of

4     his report in any prior deposition.

5           **MR. NELSON:**  It was discussed at length at the

6     evidentiary hearing, Your Honor, and you'll recall there was a

7     lot of discussion --

8           **THE COURT:**  I don't recall, but I have the

9     transcripts.  But if this was discussed at the hearing, I'm

10    going to allow it.  Overruled.

11          *(Bench conference concluded.)*

12          **THE COURT:**  Go ahead, Mr. Nelson, you can restate the

13    question, please, or state it again.

14          **MR. NELSON:**  Thank you, Your Honor.

15    **BY MR. NELSON:**

16    Q.   Dr. Lan, what is your view about whether Dr. Ross used an

17    appropriate Manning's Coefficient for the Elevenmile Creek

18    channel?

19    A.   I mean, based on my experience and my colleague's

20    experience, too, I'm looking at pictures or all of his

21    references will tell me that Dr. Ross's coefficient is on the

22    low side.

23    Q.   And do you have a view about the Manning's Coefficient that

24    Dr. Ross used for the floodplain?

25    A.   Yeah, it's also on the low side, too.  I mean, if you look

1  at the aerial picture, you can see it's just so heavily

2  vegetated in the floodplain.

3  Q.   And what is the effect on predicted water levels in the

4  class area with lower Manning's Coefficients?

5  A.   Well, obviously, you will have a lower water level in the

6  class area.  It would lead to lower water if you have a low

7  Manning's Coefficients.

8  Q.   Thank you, Dr. Lan.  Now, you mentioned at the beginning of

9  our examination today a model called HEC-HMS.  Do you recall

10  that?

11  A.   Yes, that's the hydrologic model we used.

12  Q.   What kind of outputs do you get from the hydrologic model?

13  A.   The hydrologic model, as I said, it doesn't tell you

14  exactly how fast the water moves.  It will give you a

15  hydrograph, a hydrograph meaning the flow as a function of time

16  at a certain location.

17       So, like at the class area we have a gauge flow with time

18  at that location, and at the USGS gauge it gave you a different

19  -- a different hydrograph there.

20  Q.   And what do you do with the outputs from the HEC-HMS

21  hydrologic model?

22  A.   The hydrologic model, so at each location you have a

23  hydrograph and you have peak flow.  So that peak flow is

24  typical to determine the peak water level.  So we used those

25  peak flows into the hydrologic model to more accurately predict

1    the water level along the entire Elevenmile Creek.

2    Q.   Dr. Lan, did you calibrate your modeling you did in this

3    case?

4    A.   Yeah, we did a pretty rigorous model calibration, I have to

5    say.

6    Q.   Can you explain how you calibrated your model, please.

7    A.   For model calibration we look at several things normally.

8    One is the volume of runoff.  We have a USGS gauge at the

9    Mobile Highway.  They do have the measure of the volume of

10   runoff for a storm event.  They also measure the peak of the

11   storm at that location, peak of the runoff at that location.

12        Also, you can look at the rising level and falling level of

13   the hydrograph so you can see something you can compare to.  So

14   we look at all of those.  We compare the volume, we compare the

15   timing, especially important.  If you view a wrong timing,

16   basically your travel time in the watershed is incorrectly

17   estimated.

18        We also calibrate to the water level right at the gauge

19   because the gauge measures the water level.  And just -- the

20   USGS gauge actually measures the water level; they don't

21   measure the flow directly.  So the water level would be

22   translated into a flow rate according to some kind of recorded

23   rating curve.

24        So we try to calibrate to mostly the volume, the water

25   surface there and then the timing of it.  We try to best match

1    the peak flow, too.

2    Q.    And how did your model fair in that calibration process,

3    Dr. Lan?

4    A.    Well, in my opinion, they matched very well.  And for

5    instance, maybe look at all the numbers, like volume was within

6    like 1 or 2 percent.  And then, in terms of peak timing, when

7    the time of peak arrives at that location, our model's

8    particular timing is 4:45 a.m. on April 30, and the USGS

9    recorded it at 5:00 a.m.  So we're 15 minutes apart.  Just

10   remember the USGS gauge only recorded every 30 minutes, so 15

11   minutes is actually right there, the difference there.

12   Q.    Thank you, Dr. Lan.  Now, you said that you looked at the

13   same two hypothetical scenarios as Dr. Ross -- dam in place/no

14   breach and no dam/natural channel; is that right?

15   A.    That's correct.

16   Q.    And what did you find in your investigation when you

17   modeled those two scenarios in terms of water levels in the

18   class area?

19   A.    Well, our conclusion has some similarities to Dr. Ross and

20   some differences.  The similarities is that with the dam in

21   place or without a dam in place --

22   Q.    Dr. Lan, I apologize to interrupt, but I should present you

23   with an exhibit which I think will make it easier to follow.

24   A.    Oh, sure.

25             **MR. NELSON:**  May I approach, Your Honor?

1            **THE COURT:**  Yes.

2            Mr. Glasser?

3            **MR. GLASSER:**  No objection.

4            **THE COURT:**  Thank you.  Is this marked?

5            **MR. NELSON:**  This will be IP 83, Your Honor, and it is

6    a copy of Figure 8-4 from Dr. Lan's H and H report.

7            **THE COURT:**  Thank you.

8        *(Defendant IP Exhibit IP 83 admitted into evidence.)*

9    **BY MR. NELSON:**

10   Q.   And again, I apologize, Dr. Lan, but I thought it might be

11   easier to follow along if we --

12   A.   Sure, absolutely.

13   Q.   Can you describe what Figure 8-4 shows?

14   A.   So, this figure basically shows you the flooded area for

15   both cases, dam in place but not fail and without a dam being

16   in place.  So around the class area -- this is the class area

17   here, I believe, and we kind of map it a little bit farther

18   upstream and downstream.  Actually the map extends all the way

19   to the downstream boundary, and then on the upstream it extends

20   all the way to Kingsfield Road, but we just only took a look at

21   this area.

22        So, basically you can tell -- and this kind of shows you

23   the flow depths there for both cases.  The red one is scenario

24   2, the dam in place scenario.  There's only a green line there

25   right there -- it's actually -- it's almost the same.  You

1    can't really tell unless you really magnify it really closely,

2    so around the same boundary as the others in the area dam in

3    place scenario.

4        In terms of water level difference, they're like -- I

5    remember it's like .16 foot, so like 2 inches difference.  And

6    looking at a plain you don't see any difference there, and on

7    the depths it's only 2 inches difference.

8    Q.   And that's a difference between scenario 2 and scenario 3?

9    A.   Right, scenario 3 would cause a little bit more depths

10   there.  In terms of that, it's very similar to Dr. Ross's

11   conclusion that both scenarios would lead to almost the same

12   result.  The difference between ours and his, as our model

13   indicates, either case would create a significant flooding in

14   the area.

15   Q.   And just the legend down at the bottom there, Dr. Lan, with

16   the colors, what is that showing?

17   A.   The closers show you different flow depths in the area.  I

18   don't know if you can see that but it's kind of -- yeah, like

19   this, the first one is 0-2.2 feet and 2.35 the next color.  And

20   all the way to the creek, as you can see, it's more -- yeah,

21   16-and-a-half to 24 feet in the channel there, and it's pretty

22   obvious.

23   Q.   Okay.  And I think you touched on this already, Dr. Lan,

24   but you reached a different conclusion about the levels of

25   water in the class area with the dam in place/no breach and no

1    dam/natural channel than Dr. Ross did?

2    A.    Uh-huh, yes.

3    Q.    And your conclusion was what under either scenario?

4    A.    Our conclusion was, under either condition, there's

5    significant flooding in the class area, dam in place or without

6    a dam being there.

7    Q.    Now, did you stop your analysis at this point, Dr. Lan?

8    A.    No.   That was never our intention.  Our intention was to

9    really look at what happened when the dam breached.

10   Q.    And how do you look at what really happened when the dam

11   breached?

12   A.    So I would have to apply the hydrologic and hydraulic

13   modeling assuming the dam breached with some kind of geometry

14   and some kind of -- with some information we collected.

15   Q.    And did you run a dam breach model as part of your work in

16   this case?

17   A.    Yes, that's part of our analysis.

18   Q.    Have you run a dam breach model before your work in this

19   case?

20   A.    Oh, I mentioned earlier I have run a lot, a lot of dam

21   breach analyses all around the world.  It's more than -- I

22   would say at least like 50 or 60 dams, different kind of dams,

23   huge dams maybe five or 600 feet, or even small dams.  This is

24   the probably the smallest dam I have dealt with.

25   Q.    And Dr. Lan, are you familiar with the terms "static

1    condition" and "dynamic condition"?

2    A.    Yeah, of course.

3    Q.    And can you elaborate on what the difference is between

4    those two conditions for modeling?

5    A.    Well, a static condition basically means that you follow it

6    -- it doesn't change with time.  A dynamic condition indicates

7    you have a continuing changing in your flow, like in this case

8    you have the flood coming in and keeps changing, the flow keeps

9    coming into your pond, and when the dam breached it would keep

10   going out, so it's all dynamic.  And you can see the flood --

11   the hydrograph I mentioned earlier, you can see the hydrograph

12   going up and down all the way through the entire Elevenmile

13   Creek.

14   Q.    And Dr. Lan, in your work do you typically run the dam

15   breach analysis in a static condition or in a dynamic

16   condition?

17   A.    Well, typically in our dam classification we look at both

18   scenarios, static condition and design storm event condition.

19   So that could fall 100-year, 500-year, even the worst condition

20   -- the worst flood we call probable maximum flooding.  You

21   might have heard of that, it's just physically the maximum

22   possible, possible storm that could happen in the area.

23   Q.    So, you said in your other work for dam analysis you've run

24   a dam breach model for design storms?

25   A.    Yes, we do that all the time.

1    Q.   And what was the design storm?

2    A.   A design storm is basically -- it's a storm that would be

3    required to be handled properly by the structure of the dam.

4    Like this here, when you design a dam spillway there, basically

5    we'll have to design a spillway sufficiently large to pass that

6    storm.  So a design storm could vary from the PMF all the way

7    down to a 10-year storm event, it depends on the hazard

8    classification.  The higher the hazard, the bigger storm it has

9    to pass.  The lower the hazard, obviously it doesn't need to

10   pass all the bigger storm events.

11   Q.   And so when you in your work run the dam breach model for,

12   let's say, a 500-year design storm, what type of events are you

13   trying to use that model to evaluate?

14   A.   Well, we would evaluate that event with a 500-year

15   precipitation and all the runoff from the tributaries coming

16   into the pond and during the breach of the dam.

17   Q.   If someone were to say to you that you cannot use the dam

18   breach model for a dynamic condition like a 500-year storm

19   event, would that be right?

20   A.   That would be -- that would be totally wrong, I would say,

21   because all the dam breach modeling, the HMS model we use --

22   the HEC-RAS actually can also model the dam breach analysis,

23   and the majority of the models can handle static and dynamic

24   conditions.

25   Q.   If someone were to describe a sunny day dam break, would

1  that be like a static condition?

2  A.  Yeah, you can say that's like a static condition because

3  under that kind of condition you don't have any water coming

4  into your reservoir or pond, whatever you call it, so it starts

5  from a certain level of water surface there in the pond.

6  Typically it's where the spillway crest is.  Because it's

7  called sunny day, you don't have any flow coming in and out, so

8  the water will sit right at the crest of your spillway.

9  Q.  But in all of your work evaluating dams and running the dam

10  breach analysis, you're not confined to only looking at sunny

11  day breaks?

12  A.  No.  I'm able to -- sunny day would be part of that.  We --

13  as I said, we always look at the dynamic conditions for

14  variable types of storm events.

15  Q.  But you look at that in addition to the dynamic --

16          **MR. GLASSER:**  Objection, leading.

17          **THE COURT:**  Sustained.

18  **BY MR. NELSON:**

19  Q.  Do you limit your analysis to only the static condition,

20  Dr. Lan?

21  A.  Excuse me?  Could you say again?

22  Q.  Do you limit your dam breach analysis to only a static

23  condition?

24  A.  No, no, we never do.

25  Q.  And for purposes of your dam breach model in this case,

1    what condition did you use?

2    A.   We modeled the dynamic condition just like we did in other

3    hydrological and hydraulic analyses, so we have the runoff from

4    all the tributaries coming in, and in this case, because we

5    modeled overtopping failure, if you're looking at a static

6    condition, you won't have overtopping, you won't overfill the

7    dam.  So we have to have the dynamic condition and have the

8    water running down from the upstream tributary and overtopping

9    the dam, and when you overtop the dam to a certain level,

10   typically a few feet, and the dam will stop breaching, and the

11   flow will keep coming out overtopping the dam and coming over

12   the spillway as far as the breach opening.  So this is a whole

13   dynamic process and that's handled by the majority of the dam

14   breach models.

15   Q.   Now, Dr. Lan, when a dam breaches, does the impounded water

16   come out all at once?

17   A.   No.  You can't have the water coming out at once because it

18   has to follow the physics of flow going through the dam, going

19   through the breach opening and going through the spillway.  It

20   has to be governed by the hydraulic equations.  The higher the

21   water level and the higher flow, and when the water level

22   drops, the flow would keep -- it decreases.

23   Q.   So, for your dam breach model in this case, Dr. Lan, what

24   generally -- and I don't need you to go into details yet, but

25   what types of inputs did you need?

1    A.    Well, we have -- we would need the hydrologic information,

2    the hydrologic and hydraulic section of it.

3    Q.    So you need hydrologic information.  What else do you need?

4    A.    We also need the dam information, and we also need the

5    breach characteristics.  Dam breach characteristics includes

6    like the breach opening, how wide it would eventually breach

7    to, and the time of how fast can that breach form.  It could

8    take minutes, it could take hours, something like that.  And

9    then, the last thing we need is when the breach was started.

10   Q.    Thank you, Dr. Lan.  Let's turn to the first of those types

11   of information, the hydrologic information.  Where did you get

12   that for your work here?

13   A.    Well, it's the same thing we use in our other part of

14   analysis, in other first -- part of our analysis.

15   Q.    Is that the same type of information that Dr. Ross had

16   available from his analysis?

17   A.    Yeah, very similar.  I mean, hydrologic information, it has

18   all the flow conditions in and out.

19            **MR. NELSON:**  May I approach, Your Honor?

20            **THE COURT:**  Yes, you may.

21            **MR. GLASSER:**  No objection, Your Honor.

22            **THE COURT:**  Thank you.  What's the number, please?

23            **MR. NELSON:**  Your Honor, this will be IP Exhibit 84

24   and it's Fig. 6-1 from Dr. Lan's dam breach analysis.

25            **THE COURT:**  Thank you.

1          *(Defendant's IP Exhibit 84 admitted into evidence.)*

2              **MR. NELSON:**  May we publish?

3              **THE COURT:**  Yes.

4      BY MR. NELSON:

5      Q.   Dr. Lan, can you describe for us what is depicted in

6      Exhibit IP 84?

7      A.   Well, this picture is kind of showing you all the survey

8      conducted after the storm.  It shows you the actual breach

9      opening here all the way to here.  In this case we're lucky,

10     actually, that we have a measurement.  The majority of the dam

11     breach analysis we don't, we have to make some assumptions,

12     kind of guesses.  So this is good, actually.

13          So this is actually based on the survey conducted.  So you

14     can tell at the bottom it's a little bit narrower than 12 feet

15     and it goes up a little bit wider going up this way.  That's

16     why we kind of simplify that as a trapezoidal shape, it

17     averages about 25 feet.  At the top it's a little bit wider,

18     close to 40 feet, and at the bottom it's 12 feet.

19          The reason we have to simplify that as a trapezoidal shape

20     is because all of the dam breach analysts assume, they have to

21     make some assumptions as close to the actual opening as

22     possible, but that's the kind of simplifications all the models

23     use.

24     Q.   And Dr. Lan, where did you get the measured data for the

25     dam breach opening?

1   A.   This is the survey from the field.

2   Q.   These are field survey results?

3   A.   Yeah, the survey results.

4   Q.   The next item that you mentioned that you need to build

5   into a dam breach model is how long it takes for the breach to

6   fully form.  Can you explain what that means and how that fits

7   into your model?

8   A.   Yeah.  It was an earthen dam.  Even a concrete dam, it

9   would take time from the beginning of the breach to fully

10  develop.  An earthen dam, the mechanism to cause the failure

11  mostly is by sediment transport, sediment erosion, if you

12  prefer that term.

13       The higher flow, the higher potential to erode sediment.

14  Of course, the sediment is all the dam embankment would have

15  resistance to the flow, and so only the flow gets to a certain

16  velocity, a certain shear stress or some other hydraulic

17  condition, it would cause erosion.  It's not like when you're

18  overtopping you start erosion right away.

19       How long does this take from initiation of the breach to

20  the end, it's difficult to predict.  But we have a -- in the

21  literature a lot of very standard procedures to estimate that.

22  And several of the approaches they're approved by like FEMA,

23  U.S. Army Corps of Engineers, Bureau of Reclamation.  They all

24  use the very same methodology to predict how fast that breach

25  is forming, so we use those methods to estimate it.

1    I mean, it varies between .1 hour or 6 minutes all the way

2    to about one hour.  That's an average.  It depends on the site

3    conditions, because average basically means you could have --

4    you have some cases could go over -- way over an hour there.

5    So, an average would be varied between, based on the size of

6    the dam and the flood condition there, it would vary between 6

7    minutes to about an hour.

8    Q.   Thank you, Dr. Lan.  And does the breach in an earthen dam

9    begin immediately after there's overtopping by water?

10   A.   No.  As I mentioned, the embankment has resistance before

11   the erosion could take off.  When you have a highest sufficient

12   velocity shear situation and now there are conditions that can

13   cause the erosion of dam.

14   Q.   And so that 6 minute to one hour estimate that you

15   developed, what does that represent?

16   A.   The 6 minutes to one hour is after it started breaching it

17   would represent that.

18   Q.   So that doesn't mean breach starts six minutes --

19        **MR. GLASSER:**  Objection.

20        **THE COURT:**  Sustained.  It's leading.

21        **MR. NELSON:**  I'm trying to help.  I'm sorry, Your

22   Honor.

23        **THE COURT:**  I understand.

24   **BY MR. NELSON:**

25   Q.   Does that 6 minute to one hour increment tell us or inform

1  when the breach started?

2  A.   No, it didn't tell you that.  It just tells you how fast it

3  breaches from the beginning of the breaching to the end of the

4  breaching.

5  Q.   Dr. Lan, for your work in this case, how did you go about

6  estimating the time that the breach started?

7  A.   Well, as I said, I mean, a lot of the our dam breach

8  analysis we don't have any information to help us decide when

9  the breach started.  In this case we have some pictures taken

10  by an IP employee, and that was very helpful in determining

11  when the breach actually happened, started.

12  Q.   If we could, Dr. Lan, maybe as you're describing this --

13         **MR. NELSON:**   Could we publish IP Exhibit 34 which has

14  been previously admitted?

15         **THE COURT:**   Yes.

16         **THE WITNESS:**   What I'm showing you is several pictures

17  that were taken during and after the event.  This one was taken

18  about 7:17 or 7:15, around that time, in the morning of April

19  30.  At that time you can see the concrete structure over here

20  is being overtopped significantly.  And this opening here is

21  very, very, I mean, real high velocity coming in.  That would

22  be the condition that would cause -- still causing erosion, so

23  that means the area could still be developing.  I'm not saying

24  it's still developing but it could still be developing.

25  **BY MR. NELSON:**

1    Q.   And then, I think another picture that you had in your

2    report was what's been marked as IP Exhibit 33.  And can you

3    describe what you saw in this picture that informed your

4    estimate about the time of breach formation, Dr. Lan?

5    A.   Yeah, this one was also taken about 7:17, that time in the

6    morning on April 30.  It was on the right-side embankment here.

7    So, you can see, I mean, you can even see here the kind of soil

8    is falling down at that time, and so that means this area is

9    still enlarging a little bit.  Also, one important thing that

10   you notice is the water level in the pond there, it's barely

11   below the crest level of the dam, probably about a foot or

12   something like that, and that means that it is still a very

13   high water level in the pond at that time, 7:15.

14   Q.   And were you able to compare this photograph to any later

15   photographs?

16   A.   Yeah, I think we have one picture showing you that after

17   the storm event.

18   Q.   Just one minute, Dr. Lan.

19             **MR. NELSON:**  The next picture has not been admitted.

20   It's IP 40.  May I approach, Your Honor?

21             **THE COURT:**  Yes.

22             **MR. GLASSER:**  No objection.

23             **THE COURT:**  Do you wish to admit it?

24             **MR. NELSON:**  Yes, Your Honor.

25             **THE COURT:**  I'll admit IP 40.

1          *(Defendant's IP Exhibit 40 admitted into evidence.)*

2     **BY MR. NELSON:**

3     Q.    And what -- can you describe what we see in IP 40, Dr. Lan?

4     A.    Well, this one was taken after the storm event, obviously.

5     Our impression is this is not much wider.  And there's supposed

6     to be a big tree right there in the other picture you saw and

7     it's gone, and all this soil here has been eroded.  So

8     basically it's -- I mean, it was enlarged and formed at the

9     time the picture was taken until the end of the storm event.

10    Q.    If we maybe flip back --

11    A.    And on this side, too -- let me finish.  On this side, too,

12    you can compare with the other picture and you can tell it's a

13    little bit enlarged, too.

14    Q.    So, if we compare IP 40 post-event back with IP 33 --

15    A.    Yeah, I mean, there's a tree here, and there it's gone.  I

16    would say it probably eroded like around here, yeah, and on

17    this side this part will be gone.

18    Q.    And so, Dr. Lan, how did your analysis of these photographs

19    factor into an estimate about the time of the breach of the

20    earthen section of the Kingsfield Road dam?

21    A.    Yeah, I mean, now this gave us some basic information

22    actually when we ran the model.  We could assume it could start

23    breaching at midnight, three o'clock, five o'clock, six

24    o'clock, something like that.  As far as the breach started, it

25    takes time to form, as I said, 6 minutes to one hour.

1    When you have a large opening, you have more water coming

2    out, obviously.  That means the water level in the pond would

3    drop quickly then because of the breaching.  And our model

4    simulated the water level in the pond, okay, and it would tell

5    -- the model would tell if you fail at this stuff.  Breaching

6    the dam at five o'clock, the water level in the pond would be

7    about 75 feet at 7:15.  So, when you start to compare with

8    actually what we saw there, it's about a foot below the crest

9    of the dam, so it would be probably elevation 75 or 74, that

10   kind of range there.  So we used that to calibrate, kind of

11   more fine tune when we think the dam breach started breaching.

12   Q.  Let's back up a little bit, Dr. Lan, and I would like to

13   show an exhibit.

14            **MR. NELSON:**  May I approach, Your Honor?

15            **THE COURT:**  Yes.

16            **MR. NELSON:**  Your Honor, if I might, this is a figure

17   from Dr. Lan's report, Fig. 7-3.  We would like to have it

18   admitted as IP 85.

19            **MR. GLASSER:**  No objection, Your Honor.

20            **THE COURT:**  Thank you.

21       *(Defendant's IP Exhibit 85 admitted into evidence.)*

22            **THE COURT:**  You may publish it.

23   **BY MR. NELSON:**

24   Q.  Before we discuss the figure, Dr. Lan, I want to back up a

25   little bit and focus on the bottom part which says breach

1  initiation at 6:45 a.m.  Do you see that?

2  A.  Yes, I see that.

3  Q.  And how did running the breach initiation at 6:45 a.m.

4  match up with your review of the photographs that were taken

5  the morning of April 30th?

6  A.  Right.  When we initiated breaching at 6:45 basically the

7  water level at 7:15 would match the observation from the

8  picture we looked at.

9  Q.  And can you describe -- it says hydrograph.  What is a

10  hydrograph for people who -- I know people who work in your

11  field really know this, but can you explain a little bit more

12  what a hydrograph is and what it tells us?

13  A.  Yeah.  A hydrograph is -- when you look at it -- it's the

14  other way around.  This way is flow versus time at a certain

15  location.  An analogy would be, if you look at a highway

16  crossing at X location at how many cars are passing through

17  there, this is very, very similar.  You have a cars a hundred,

18  a thousand different times a day.  So this is what a hydrograph

19  is.

20  Q.  And so what is the kind of at the very top of each of the

21  hydrographs saying?

22  A.  Right, the top of -- these are hydrographs, one here, one

23  here.  This represents hydrographs at different locations.

24  This one is the one on Kingsfield Road, this one here and then

25  Highway 10, I believe, and then Kingsfield Road on the bottom,

1    and next one is in the class area.

2    Q.   I apologize, Dr. Lan, but it's not really showing up super

3    well on the screen.  So the bottom hydrograph, what location is

4    that?

5    A.   That would be at Kingsfield Road.  Sorry if I didn't make

6    it clear.

7    Q.   I think it was very clear, Dr. Lan, it's just that it

8    wasn't marking on the screen so I wanted to go back through

9    that.

10   A.   Yeah, the words are difficult to read, of course.

11   Q.   What is the next hydrograph up?

12   A.   The next hydrograph up is at the class area, the County

13   Road 297A.

14   Q.   And then, what is the third hydrograph up?

15   A.   The third hydrograph is Highway 10.

16   Q.   And then, what is the final highest hydrograph?

17   A.   The final hydrograph is at the USGS gauge on Mobile

18   Highway.

19   Q.   Thank you.  And then, if we turn back to that bottom

20   hydrograph, right -- and that's the one right at Kingsfield

21   Road below the dam structure, right?

22   A.   Yeah, that's correct.

23   Q.   What does that hydrograph tell us about the influence of

24   the dam breach?

25   A.   So, you can tell just a little bit spiked there right at

1　about 6:45 to seven o'clock, and that's the cause of the dam

2　breach.  So right there at the Kingsfield Road you have a

3　pretty significant increase in the flow at that time at 6:45

4　caused by the dam.  So that flow is going to propagate

5　downstream and reach --

6　Q.　If we could, Dr. Lan, let's back up for a second.  That

7　peak is -- what does it mean with a peak that's below the top

8　of the hydrograph?

9　A.　Right, yeah, that peak here is -- it's already way below

10　the peak that it reached earlier.

11　Q.　Is there an analogy that you can think of for how it is

12　that you can have something like a dam breach but the high

13　watermark, so to speak, is not affected by the breach?

14　A.　Yeah.  I mean, one thing I could think about -- and

15　everybody uses a sink, a tub or anything -- let's say a sink.

16　You have the drain open, you have to -- have faucets open, so

17　your water level it would reach -- rise up and down, it depends

18　on how you open that.  At certain conditions you open more of

19　your faucet and the water level in your sink would rise until

20　it overflows your sink at some point.  And you try to turn your

21　faucet down a bit and that water level would drop -- start

22　dropping.  When it drops to a certain level, all of a sudden

23　you put a bottle of water inside it, which is kind of similar

24　to your impact from your dam breach, that bottle of water would

25　probably raise your level in the sink a little bit, but it will

1    never be able to reach the overtopping condition that it had

2    reached earlier.

3    Q.   And so --

4    A.   So this is the same thing that happened there.

5    Q.   Thank you, Dr. Lan.  And so, if we turn to that second --

6         **MR. GLASSER:**  Objection, Your Honor, can I approach?

7         *(Bench conference between the Court and counsel:)*

8         **MR. GLASSER:**  Your Honor, could you ask Mr. Nelson not

9    to thank the witness every time he gets an answer he likes.

10   It's just commenting on the testimony and I think it's

11   objectionable.

12        **THE COURT:**  I guess because he's raising it --

13        It didn't occur to me that he was doing that for other

14   than being polite.

15        But let me ask you to try to refrain from --

16        **MR. NELSON:**  Yes, Your Honor, and I was just

17   endeavoring to be polite.

18        **THE COURT:**  Okay, thank you.

19        *(Bench conference concluded.)*

20   BY MR. NELSON:

21   Q.   Dr. Lan, let's turn to the second hydrograph up from the

22   bottom.  And can you remind us what location that hydrograph

23   represents?

24   A.   Yeah, that hydrograph represents the location the County

25   Road 297A, which is right at the class area.  Now, you can tell

1    there are two lines right there, one dotted line and one solid

2    line.  And then you can't really see it very well, but

3    hopefully we can enlarge it a little bit.  The line a little

4    bit lower represents no failed condition, no breach condition,

5    and the top line represents the consequence of the breach.

6         So you can see that peak here when it translates to 297A

7    it's very little already, very little.  But also you can see

8    the peak there, the peak flow here is right below the peak --

9    so little increase in peak flow here doesn't have any impact to

10   the peak flow there.

11   Q.   And Dr. Lan, one other question about this.  Why is the

12   peak flow at 297 higher in your model than the peak flow at

13   Kingsfield Road?

14   A.   Well, as I explained earlier, we have a significant

15   drainage coming in below the dam, between the dam and the class

16   area.  It's, what, 10, 10.2 square miles compared to 6.2 miles

17   upstream of the dam.  So the majority of the flow would come

18   below the dam, so that's why we have a much higher peak in the

19   class area than at Kingsfield Road.

20   Q.   Dr. Lan, did you confine your dam breach modeling analysis

21   to the 6:45 a.m. time period?

22   A.   No, we didn't -- we didn't start right there.  As I said,

23   we didn't know exactly when the breach started, so we wanted to

24   look at it what is the worst condition during the flood,

25   assuming it failed at different times, assuming it failed

1   before the peak flow coming to the pond, during the peak, right

2   at the peak it failed.  And typical in our experience -- and

3   all the dam breach analyses shows -- when a dam breaches at the

4   peak of the hydrograph, it normally leads to the worst case in

5   terms of flooding downstream.

6        But we look at different timings.  The modeling is there,

7   you can run the model and very quickly in the hydrologic model.

8   So we found out that the worst condition was when the breach

9   started at the peak of the hydrograph, which is about 12:15, I

10  believe.

11            **MR. NELSON:**  May I approach, Your Honor?

12            **THE COURT:**  Yes.

13            **MR. NELSON:**  This is Fig. 7-7 from Dr. Lan's dam

14  breach report.  It has not yet been admitted.

15            **MR. GLASSER:**  No objection.

16            **MR. NELSON:**  We would move admission of IP Exhibit 86.

17            **THE COURT:**  That will be admitted.

18       *(Defendant's IP Exhibit 86 admitted into evidence.)*

19  **BY MR. NELSON:**

20  Q.   Dr. Lan, can you describe what Fig. 7-7 is showing?

21  A.   Basically this is showing the group of hydrographs at

22  different locations.  We just look at the same thing happen --

23  the same when you look at it in other cases.  The bottom two

24  lines is at the Kingsfield Road, and the next two lines are at

25  the class area, and the next two lines are at I-10, and the

1   last two lines up there is at the USGS gauge.

2        So, basically at the Kingsfield Road you can see quite a

3   bit spike there due to the dam breach, which is quite obvious.

4   But when it translates to the class area, which is the next one

5   here, so you can see the peak flow it affected by the breach.

6   How much is that?  It's about probably 2 percent that's kind of

7   a peak flow increase.

8        So, when that trend goes farther downstream to I-10, it's

9   attenuated a little bit, the increase becomes smaller, which is

10  obvious, I mean, it definitely attenuated.  When you get to the

11  USGS gauge there, it's small, the increase is really small.

12       So, we use those informations to look at what kind of water

13  level increase it would create in the class area -- actually,

14  the entire Elevenmile Creek, not just the class area.

15  Q.   Okay.  And Dr. Lan, this was breach initiation at what

16  time?

17  A.   That was for the initiation of 12:15 a.m. on April 30.

18  Q.   And what were the conditions in the model at 12:15 a.m.?

19  A.   Oh, that -- that is when the flow reached the peak.

20  Q.   And what does it mean if the flow is at its peak in the

21  model in terms of the potential impact of the dam breach?

22  A.   That would be the worst case, and that would create a

23  maximum increasing in water flow as well as water level from

24  the dam breach.

25  Q.   So, in this worst case simulation of the dam breach, what

1   was the additional impact of the dam breach in the class area?

2   A.   Yeah, it's in the report.  We -- the model indicated

3   there's two-tenths of a foot increase in the water level over,

4   what, five, six feet already in the class area.  Two-tenths of

5   a foot is about two-and-a-half inches, that kind of range.

6   Q.   So even in this worst case scenario of a breach initiation

7   at 12:15 a.m., would the dam breach have caused all of the

8   flooding in the class members' homes?

9   A.   No.

10  Q.   Thank you, Dr. Lan.

11          **MR. NELSON:**  Pass the witness, Your Honor.

12          **THE COURT:**  Thank you.

13          Mr. Glasser?

14                    **CROSS-EXAMINATION**

15  **BY MR. GLASSER:**

16  Q.   Let's start where Mr. Nelson ended with your hydrograph,

17  and let's start with the one that's Defendant's Exhibit 85.  Do

18  you have it up there with you?  I'd like to go to the ELMO.

19  A.   Yeah.

20  Q.   So, this is hard to read, so we may have to go slow.  This

21  assumes that the dam breaches at 6:45 a.m., correct?

22  A.   That's correct.

23  Q.   This exhibit right here?

24  A.   That's correct.

25  Q.   If you assume that the breach happens at 6:45 a.m., you are

1    telling the jury that the rain -- everything on this graph

2    prior to that breach is caused by rain?  That's what you're

3    saying, right?

4    A.    Yeah.

5    Q.    Okay.  Now, let's go to ten o'clock in the morning -- I

6    mean, ten o'clock in the evening, 10:00 p.m.  You would agree

7    with me it's about right there, 10:00 p.m.?

8    A.    Well, I can't really see it.

9    Q.    Well, I know it's small.

10             **THE COURT:**  You can zoom in.

11   **BY MR. GLASSER:**

12   Q.    There is eleven -- let me just mark on this.  There is 11,

13   right, and there's nine, so you agree 10 is in between?

14   A.    Uh-huh, yeah.

15   Q.    Let's go up until we hit the line.  Bang, we hit the line

16   at the neighborhood, right?

17   A.    Well, that hydrograph is at the Kingsfield Road.

18   Q.    All right.  So is it the second -- is it this line?

19   A.    No.  That line -- let's move it down a little.

20   Q.    Which line?

21   A.    That line, the down line there actually is for the USGS,

22   the last one.

23   Q.    So it's here?

24   A.    Right, you need to look at it farther out.

25   Q.    Now, let's put a line across.  It's right at or below

1  5,000, do you agree with me?

2  A.  Well, probably around five, six, depending how you line up

3  the graph, because it rises very quickly.

4  Q.  I understand that.  But we're at ten o'clock, it's around

5  5,000 cubic feet per second going through the neighborhood,

6  according to your model, isn't that correct, Dr. Lan?

7  A.  That's correct.

8        **MR. GLASSER:**  May I approach, Your Honor?

9        **THE COURT:**  Yes.

10  **BY MR. GLASSER:**

11  Q.  You discussed the FEMA flood study when you were

12  testifying, right?  Let me ask you this:  Do you remember what

13  the FEMA flood study says a 10-year storm's cubic feet per

14  second through the neighborhood would be?

15  A.  The 10-year storm, if I can remember, it's about 10,000,

16  11,000, that kind of range there.

17  Q.  All right.  So, according to FEMA, at the neighborhood a

18  10-year storm should be 10,000 cubic feet per second, right,

19  Dr. Lan?

20  A.  Yeah, according to the FEMA.

21  Q.  And since your model shows that at 10 p.m. the rain is only

22  putting in 5,000 cubic feet per second, we can know from your

23  model that the creek isn't out of its banks at ten o'clock

24  p.m.; isn't that right, Dr. Lan?

25  A.  I -- I don't think so, to answer your question, because the

1  channel has very limited capacity.  5,000 will definitely get

2  to the neighborhood.  We didn't have the mapping at that time,

3  but 5,000 is a significant fall that would overtop the

4  embankment.

5  Q.   So, you think FEMA believes this neighborhood floods in

6  every 10-year storm, that they define their 100-year floodplain

7  based on 10-year storms?

8  A.   Well, I said --

9  Q.   Or 10-year floods?

10  A.   I said the 5,000 CFS is going to overtop the embankment.

11  Q.   But you don't believe it will get above the FEMA 100-

12  flood --

13  A.   No, no, no, to answer your question, no.

14  Q.   -- because FEMA draws its map of the limit of the 100-year

15  flood based on the 100-year flood, not the 10-year flood,

16  right?

17  A.   They have water level for the 10-year, too.

18  Q.   I understand.  But I'm saying the water level that you've

19  described as under 10,000 cubic feet per second is not the

20  water level for the 100-year flood?

21  A.   You may say that.

22  Q.   It's for the 10-year flood, right?

23  A.   Yeah.

24  Q.   So, the 10-year flood should logically be under the

25  boundary of the 100-year flood, much under the boundary of the

1    100-year flood on the FEMA map, right?

2    A.    That's not necessarily right, okay, let me tell you that.

3    10,000, 11 is the FEMA map.  If you look at FEMA's map, it

4    already flooded the area in the neighborhood, part of the

5    neighborhood, okay.  From 5,000 to 10,000 your water level is

6    not going to increase dramatically.

7    Q.    All right.  But the bottom line is, according to your

8    scientific work in this case, the water is flowing 5,000 cubic

9    feet per second around 10:00 p.m.?

10   A.    It could be six, it depends, six or 7,000.

11   Q.    But under the FEMA 10-year flood line?

12   A.    Yeah, it seems like under the 10-year flood plan.

13   Q.    Now I want to talk about your Exhibit 87, which is the

14   assumption that the breach initiates at 12:15 a.m., okay?

15   A.    Yeah.

16   Q.    Is it fair to say that it's certainly the case that the

17   rain was the same?

18   A.    Yeah, the rain was the same.

19   Q.    And therefore at 10:00 p.m. it should be the exact same

20   number in the hydrograph, 5,000 cubic feet per second,

21   approximately, correct?

22   A.    If it doesn't fail.

23   Q.    Right.  Because under this document here you're saying it

24   doesn't fail until 12:15 a.m.?

25   A.    That's correct.

1   Q.   So, it follows from that that everything before 12:15 a.m.

2   is the exact same as Exhibit 85, right?

3   A.   That should be correct.

4   Q.   All right.  So, therefore -- but in this one you are saying

5   that if the dam breaches during the night after 12:15 it does,

6   in conjunction with the rain, cause more flooding in the

7   houses, correct?

8   A.   It will lead to a higher water level in the area at the

9   peak stage, at the peak stage.

10  Q.   So, in conjunction with the rain, if it fails -- basically

11  if it fails after -- well, actually, if it fails at any time --

12  if it fails at any time prior to when it starts down, which I'm

13  going to have to -- is my piece of paper close to where it

14  starts down, in your opinion?

15  A.   I can't make any guess there.  You'll have to look at --

16  rerun the model to really identify exactly, I would have to

17  investigate.

18  Q.   You think -- where should I stop moving this piece of paper

19  on this?

20  A.   Probably a little bit earlier, I would say, because through

21  the neighborhood you're talking about -- it's already attenuate

22  through the neighborhood.

23  Q.   Oh, the neighborhood is the blue one?

24  A.   Yeah.

25  Q.   Okay, I'm sorry.  My fault.  There we go.  Is that right?

1    A.    Yeah.

2    Q.    So now am I in the right place?

3    A.    Right.

4    Q.    Let me mark it.  Right there, you agree that's kind of the

5    peak on your model?

6    A.    Actually, that's the line for the I-10.

7    Q.    Oh, I'm sorry.  Is it here?  Is it this lower line?

8    A.    Yeah, those two lower lines.

9    Q.    So should I mark it here?

10   A.    That's correct.

11   Q.    So I'm going to make a cross so it's clear that it's not

12   the circle, okay?  Are we okay with that?

13   A.    Yeah, we're okay with that.

14   Q.    All right.  It looks like sometime between one and two,

15   closer to one.  Do you agree with that?

16   A.    Umm --

17   Q.    When is the peak in the neighborhood, according to this

18   hydrograph; between one and two?

19   A.    Yeah, about one o'clock.

20   Q.    All right.  So, if it breaches any time prior to one a.m.,

21   it's your professional opinion that, in conjunction with the

22   rain, it causes more flooding in the neighborhood, correct?

23   A.    Yeah, that's what our analysis indicated, it would have an

24   increase of about a maximum of two-tenths a foot under the

25   floodwater scenario.

1    Q.   I understand that, approximately, I think you said on

2    direct examination 2 percent?

3    A.   Oh, that's the flow rate in terms of water level.  The flow

4    rate, that means the --

5    Q.   Two-and-a-half inches?

6    A.   -- flow of discharge, it's two different things.

7              **MR. NELSON:**  Objection, Your Honor, to --

8              **THE COURT:**  Yeah, you're --

9              **MR. GLASSER:**  Your Honor, this might be a good time to

10   take a break.

11             **THE COURT:**  No, I'm not ready to take a break.  I'll

12   let you know when I'm ready.

13             **MR. GLASSER:**  All right.

14             **THE COURT:**  Mr. Glasser, let him finish his testimony

15   before you start talking again.

16             **MR. GLASSER:**  Okay.

17   **BY MR. GLASSER:**

18   Q.   Go ahead.  I'm sorry I interrupted you.

19   A.   I don't have anything more to say.

20             **THE COURT:**  It's difficult on the court reporter, if

21   not impossible.

22             **MR. GLASSER:**  I'm sorry.

23   **BY MR. GLASSER:**

24   Q.   While I'm here we might as well do Exhibit 84.  You see

25   Exhibit 84?  You remember this one?

1    A.    Yeah, I have it here.

2    Q.    I think you testified that the top of this breach is about

3    40 feet?

4    A.    Yeah, about 40 feet at the crest of the dam.

5    Q.    Now I want to talk about this demonstrative.  You remember

6    this one, Eightmile Creek, where we talked about the boundary

7    condition in Dr. Ross's model?

8    A.    Yeah, you mentioned that.

9    Q.    And so you put your boundary condition down here at

10   Eightmile Creek; is that correct?

11   A.    That's correct.

12   Q.    And I understand it's approximately 4 miles from the class

13   area to Eightmile Creek?

14   A.    That's correct.

15   Q.    And you'll see that Eightmile Creek -- this body of water

16   down here is Perdido Bay, correct?

17   A.    Yeah, close to the bay.

18   Q.    All right.  And you will agree with me that the backwater

19   effect can only be caused if the water is at the place to cause

20   the backwater effect, correct?

21   A.    Well, the backwater could be created by other factors.

22   Q.    Okay.  And so, you agree with me that the elevation at this

23   point at Eightmile Creek is approximately 15 feet above sea

24   level; is that correct?

25   A.    I didn't say that.  I don't have a recollection of that

1    number.

2    Q.   You don't know what level it is?

3    A.   I'll have to check the model of what the number is.  I

4    don't have a recollection of what that --

5    Q.   Is it written -- I saw you brought your reports with you.

6    Is it written down in your reports?

7    A.   I don't remember if we have mentioned that.  The boundary

8    condition there is based on the energy stored.

9    Q.   So what is the elevation of Perdido Bay?

10   A.   I don't know.  That's not my concern.

11   Q.   Do you think it might be sea level?

12   A.   As I said, I don't have an idea.

13   Q.   All right.  So you defined the boundary condition of

14   Eightmile Creek but you don't know -- well, what is the height

15   of, say, the normal Plaintiff's house like the Bullard's house

16   above sea level?

17   A.   It's about, what, 50?  I'd say in the --

18   Q.   Okay, 50 feet?

19   A.   -- 50 range, yeah, uh-huh.

20   Q.   So, is it a fair assumption for my questions about this

21   backwater effect that Eightmile Creek is below 50 feet or above

22   50 feet?

23   A.   Definitely below, below.

24   Q.   Is it a fair assumption that it's at least 10 feet below?

25   A.   I would have to say so.

1    Q.   Is it a fair assumption that it is at least 20 feet below?

2    A.   I'll have to look at the numbers.  Honestly, I don't have

3    the number for you, but we have -- that was based on the model.

4    Q.   Okay.  But you don't know?

5    A.   I have the number in the model but, as I said, I don't have

6    it in the report.

7    Q.   Assume that Eightmile Creek for purposes of my question is

8    approximately 15 feet above sea level, okay?  Just assume that.

9    A.   You may say that.

10   Q.   What?

11   A.   You may say that, but I don't have the number.

12   Q.   I understand.  And that the Plaintiffs' houses are

13   approximately 50 feet.

14   A.   Yeah.

15   Q.   So, we're talking about a 35-foot difference in elevation 4

16   miles away in that hypothetical, correct?

17   A.   You may say that.

18   Q.   And so, for that 4-mile-away location to have a backwater

19   effect 4 miles upstream, it has to basically affect a wedge of

20   water that goes all the way up to an elevation of 50 feet; is

21   that correct?

22   A.   No.  When I say -- when we talk about backwater, you may

23   have heard it already said, the backwater could be a half mile,

24   a quarter mile, or several miles, depending on the slope of the

25   channel.  The reason we put a downstream boundary far away is

1    because we don't want to miss anything that we could have

2    missed.

3    Q.   But my question is, it has to be a 4-mile long effect back

4    up the creek and up hill to 50 feet?

5    A.   We didn't say exactly that the backwater would reach that

6    far, but we want to make sure, we would have to -- the model

7    would cover that in case it hasn't.  If the model is showing

8    that it doesn't have the backwater that far, that's okay, and

9    we had the model cover that part.

10   Q.   Which thing, Dr. Lan, in your opinion, would have a much

11   greater backwater effect, an open channel of Elevenmile Creek

12   at Eightmile Creek's confluence or a dam?

13   A.   Well, it depends on the location you're talking about.  And

14   the backwater effect right at Elevenmile Creek, it would have a

15   significant backwater impact from Eightmile Creek.

16   Q.   So you think it is possible that Elevenmile Creek, 4 miles

17   south at Eightmile Creek, that backwater effect could be more

18   significant than an actual dam?

19   A.   I'm not -- I'm not clear what area you're talking about

20   because that's -- you have to refer to a different area

21   because --

22   Q.   All right, let's put it right there.

23   A.   -- I'm not clear where you're talking about.

24   Q.   If there were a dam --

25              **MR. NELSON:**  Your Honor, objection.

1        **THE COURT:**  Mr. Glasser, you've got to allow him to

2   finish.  He was still talking.

3   **BY MR. GLASSER:**

4   Q.   Let's put a dam right there where Eightmile Creek meets

5   Elevenmile Creek, let's say there was a dam there.  Would the

6   backwater effect -- just below the confluence, would the dam

7   make the backwater effect materially, materially higher?

8   A.   Well, yeah, if you put a dam there, it would have backwater

9   effect different than a tributary.

10  Q.   And indeed, approaching you with Exhibit 74 --

11       **MR. GLASSER:**  May I approach, Your Honor?

12       **THE COURT:**  Yes.

13  **BY MR. GLASSER:**

14  Q.   -- which is Fig. 7.4 from your report.

15       **MR. GLASSER:**  I move its admission, Your Honor.

16       **THE COURT:**  This is Plaintiffs' 74?

17       **MR. GLASSER:**  Plaintiffs' 74, yes, Your Honor.

18       **THE COURT:**  Mr. Nelson?

19       **MR. NELSON:**  No objection, Your Honor.

20       **THE COURT:**  Plaintiffs' 74 is admitted.

21       *(Plaintiff's Exhibit 74 admitted into evidence.)*

22  **BY MR. GLASSER:**

23  Q.   Plaintiffs' 74 is a your graphical description of what

24  happens at the dam that night if it breaches at 6:45 a.m.;

25  isn't that true?

1    A.    That's correct.

2    Q.    All right.  And let's --

3    A.    It tells you the water level in the pond.

4    Q.    Got it.  The pond immediately behind the dam?

5    A.    Right.

6    Q.    You did not look at any other ponds in the International

7    Paper property to calculate the backwater effect here; isn't

8    that true?

9    A.    We assumed that ponds were full at that time.

10   Q.    But you didn't have a lake of water coming down to the dam

11   where the backwater effect could go more than several hundred

12   feet at this place?

13   A.    No, no, it would be according to the --

14   Q.    Right, several hundred feet, right?

15   A.    It could reach several hundred feet, right.

16   Q.    Several hundred feet.  So the backwater effect that you're

17   talking to the jury about here at the open channel of Eightmile

18   Creek stretches 4 miles at 10:30 in the evening, correct?

19   A.    I didn't say that.  I said it might have the chance to do

20   that.  That would have to be determined by the model.  The

21   model won't calculate that if the backwater effect is

22   significant.

23   Q.    But the backwater effect you're presuming for your dam

24   breach analysis is approximately a few hundred feet?

25   A.    Did you say -- can you say that again.

1  Q.   This size of the pool just behind the dam, a few hundred

2  feet?

3  A.   I would say so.

4  Q.   So even though Eightmile Creek, because of all the water

5  coming to it, affects four miles of creek, this dam up here

6  only affects a few hundred feet?

7  A.   The dam is a level pool reservoir, yeah.  If the water

8  level keeps rising and falling, it can only reach at the top.

9  The upstream could be a steep hill in the area and we didn't

10  really look at how far actually it stretched in the back.  And

11  it's just all according to the topo.

12  Q.   So you didn't look whether anything -- name me the water

13  structures farther upstream from this pond.

14  A.   Well, we looked at all the water coming from the pond when

15  I --

16  Q.   Name me one water structure --

17        **THE COURT:**  Mr. Glasser, I'm not going to ask you

18  again.

19  **BY MR. GLASSER:**

20  Q.   Can you identify by name for me one water structure

21  upstream of the dam?

22  A.   There was some wastewater ponds there that we didn't model,

23  we didn't put in the model.

24  Q.   You didn't not put those wastewater ponds in the model,

25  correct?

1    A.   Right.  If we put those ponds in the model it basically

2    eliminates the attenuation of the pond.  After the ponds have

3    all the attenuation they didn't fail during the storm event, as

4    I understand.

5    Q.   Was there any other source of water other than the

6    wastewater ponds above the pond that you can remember?

7    A.   Well, it comes from the entire watershed, upper watershed.

8    Any water coming from the upper watershed would go down to the

9    pond.

10   Q.   But you can't name for the jury any manmade structure or

11   manmade water holding thing upstream other than the wastewater

12   ponds, correct?

13   A.   I don't need to know.  When -- those are probably very

14   small structures, it doesn't play any impact to our analysis.

15   Q.   So, when you did the analysis that calculated the water

16   contribution that is expressed in Exhibits 85 and 86, you

17   limited your analysis to the pond immediately behind the dam

18   because that's the only one other than the wastewater ponds you

19   knew about?

20   A.   Well, let's make it clear.  The analysis included the

21   entire drainage coming to the pond, not just the pond itself.

22   The pond has a very small surface area, what we call surface

23   area, all 4.2 square miles.

24   Q.   I understand.  But you didn't include any other water

25   storage?

1   A.   The storage -- as I understand, the wastewater storage,

2   let's say, and it was there, and before the storm and after

3   storm, none of them, as I understand, failed.  So whatever

4   water was in the pond before the storm, it stayed there.  It's

5   not affected by -- if the water level in those wastewater ponds

6   is actually a little bit below -- let's say the outlet weir and

7   they have some attenuation effect there, so you would have less

8   water coming to the IP pond.

9   Q.   So, to your knowledge, all the ponds or other possible

10  basins -- surge basins or whatever up above here never became a

11  lake during the night?

12  A.   I'm not aware of it.

13  Q.   If it happened, you're not aware of it?

14  A.   If it happened, I'm not aware.  I wasn't told that that

15  kind of circumstances happened.

16  Q.   And because you're not aware of it, your calculation of the

17  volume of water behind the dam at the breach does not include

18  that?

19  A.   Well, of course, we include every rainfall coming from that

20  because we didn't include the attenuation effect of those

21  storages.  If we had to include those storages, basically we

22  would actually have less fall from that area.  So we included

23  every drop of runoff on the entire upland area.

24  Q.   Okay.  So now let's talk about what your analysis shows.

25  You agree with me that you're saying that the lip here is at 73

1    feet?  The lip, I take it that's the two notches behind the dam

2    are at 73 feet?

3    A.    Yeah, probably around that, yeah.

4    Q.    And I want to draw your attention to this time right here.

5    You see what I've marked time 1, you see that?  You with me?

6    A.    Uh-huh.

7    Q.    All right.  You're saying that that pool behind the dam

8    that was full up to its lip by sometime as early as one p.m. on

9    the 29th?

10   A.    Yeah, because it's an earlier storm, yeah.

11   Q.    So what happened was, it rained in the morning a couple of

12   inches, right?

13   A.    Yeah.

14   Q.    You with me?

15   A.    Right.

16   Q.    And everywhere else in this watershed where there was not a

17   dam the water from the -- I think it was between 3:00 and 4:00

18   a.m., do you agree, between 3:00 and 4:00 a.m. two inches rain?

19   A.    I think so.

20   Q.    The water from that rain between 3:00 and 4:00 a.m. had

21   time to drain out of the watershed, correct, wherever it wasn't

22   captured?

23   A.    Our model includes that, okay, it didn't drain.

24   Q.    I'm not -- I'm just focusing in on whether there's, to your

25   knowledge, any other dam in the watershed.

1    A.    No.

2    Q.    Okay.  The Kingsfield Road dam stopped the drainage of it

3    at 73 feet in height because that's where those two little

4    notches in the dam are, that's the height of those notches,

5    right?

6    A.    Well, yeah, they are.  On the bottom of the notch, I think,

7    if I remember, is about 71, 71.something.  It could be a little

8    bit lower, but the crest of the spillway of the big concrete

9    structure is about 72-and-a-half, I believe.

10   Q.    All right.  But in any event, it's up to the lip?

11   A.    Yeah, it's close to the lip.

12   Q.    All right.  And it's also the case that any other storage

13   in that basin that was capable of stormwater would have kept

14   and retained that morning rain, right?

15   A.    It would flow out through those notches, too.

16   Q.    All right.  So that's the antecedent condition, as we say,

17   of this dam prior to the night rain that started around 8:00

18   p.m., right?

19   A.    That's correct.

20   Q.    And so you start the pool up, you see that?  You start the

21   pool rising?

22   A.    Right.

23   Q.    Now, the pool crosses 75 feet, according to your model,

24   right here, right?

25   A.    Yeah, maybe a little bit to the right, where at 75 you can

1  see it crossed that line there, a little bit more to your right

2  I would say.

3  Q.   But very close in time to that area, right?

4  A.   Yeah, I mean, the problem is I would have to say it's

5  right -- I'm sorry --

6  Q.   Right here?

7  A.   Yeah, it's more like that.

8  Q.   All right.  So this right here is 9:00 p.m.  Bang, okay.

9  So you agree with Dr. Ross that this dam was overtopping by

10 9:00 p.m.?

11 A.   Yeah, that's what our model shows.

12 Q.   And all the area in the crosshatch I just drew is the water

13 that you're saying in that one pond backs up behind the dam;

14 isn't that true?

15 A.   Yeah, during that duration, during that duration.

16 Q.   Because the dam doesn't fail, right?

17 A.   Yeah, because the dam didn't fail.

18         **THE COURT:**  All right, Mr. Glasser, we do need to take

19 our recess now.

20         Ladies and gentlemen, we'll be in recess for 20

21 minutes.  Please don't discuss the case during the recess and,

22 again, please don't begin to form any opinion yet about the

23 merits.  We'll see you back shortly.  Thank you.

24         *(Jury out.)*

25         Dr. Lan, you may step down.  You'll be back on the

1     witness stand in 20 minutes.

2                    We'll be in recess.

3                    *(Recess taken 10:48 a.m. to 11:13 a.m.)*

4                    *(Jury in the box.)*

5                    **THE COURT:**  Dr. Lan, you're still under oath.

6                    Mr. Glasser, you may proceed.

7                    **MR. GLASSER:**  Thank you, Your Honor.

8     **BY MR. GLASSER:**

9     Q.   Dr. Lan, when we left off the exam, we were --

10                   **MR. GLASSER:**  May I have the ELMO, Ms. Simms.

11    **BY MR. GLASSER:**

12    Q.   -- we were talking about the volume of water your model

13    does build behind the dam prior to its breach, correct?

14    A.   That's correct.

15    Q.   I'm going to approach you with what we've marked as

16    Plaintiff's Exhibit 174(a).  Do you recognize Plaintiff's

17    Exhibit 174 -- I'm sorry, it's 74(a) as Table 2-2 from your

18    report?  74(a) is Table 2-2 from your report?

19    A.   That's correct.

20                   **MR. GLASSER:**  I move the admission of 74(a).

21                   **MR. NELSON:**  No objection, Your Honor.

22                   **THE COURT:**  Thank you.  74(a) is admitted.

23         *(Plaintiff's Exhibit 74(a) admitted into evidence.)*

24    **BY MR. GLASSER:**

25    Q.   74(a) is titled "Summary of Elevation of Area Storage for

1    IP Dam," based on the assumptions about the size of the storage

2    area behind the dam that we discussed already, correct?

3    A.    That's correct.

4    Q.    And it says here, "The low point of the embankment," that's

5    the earthen embankment, right?

6    A.    That's correct.

7    Q.    This dam should be holding right at 69 -- 70 acre-feet of

8    water, right?

9    A.    That's correct, about 70, yeah.

10   Q.    And then, looking at Exhibit 74, it's your opinion that the

11   backwater effect rises to 80 feet, so the water gets to 80 feet

12   according to your model in Exhibit 74 fairly early, you know,

13   here it looks like around eleven o'clock, right, Exhibit 74?

14   A.    Yeah.

15   Q.    80 feet, gets up to 80 feet around, somewhere --

16   A.    About 12:00 o'clock.

17   Q.    Right around there, all right.  So, as the water builds,

18   you're saying it would build to 80 feet behind this dam?

19   A.    No, no, no.  That's a totally different concept.  I'm

20   sorry.  From 75 to 80, how much is that?

21   Q.    5 feet?

22   A.    5 feet, okay.

23   Q.    So you agree?

24   A.    Yeah, it's not 80 feet, it's 5 feet additional water.

25   Q.    I get it.  I'm sorry I wasn't precise.  So, 80 feet of

1   elevation, which is 5 feet of water above the dam?

2   A.   Right, that's correct.

3   Q.   And when it's doing that before it fails, on this chart,

4   which is Exhibit 74(a), we looked at 80 line and we see that it

5   should be holding back 218 acre-feet of water, right?

6   A.   That's correct, that's coming from the watershed.

7           **MR. GLASSER:**  May I approach, Your Honor?

8           **THE COURT:**  Yes.

9   **BY MR. GLASSER:**

10  Q.   Handing you a calculator, I'd like you to calculate for the

11  jury the gallons of water.  Do you agree with me that the

12  formula for gallons is acre-feet, so it's 218.2, right, times

13  square feet in an acre 43,560, right?

14  A.   Yeah.

15  Q.   Times gallons in a cubic foot, 7.48?

16  A.   Uh-huh.

17  Q.   What's that number?

18  A.   It tells you 71 million --

19  Q.   Right.  So at this moment in time --

20  A.   -- gallons.

21  Q.   -- when the dam has built water standing over it by 5 feet,

22  there are 71 million gallons, according to your opinion, behind

23  the dam?

24  A.   At that moment, right.

25  Q.   And that assumption about the volume of water behind the

1    dam, obviously -- or that calculation of the volume of water

2    that 71 million gallons depends on the assumptions you made to

3    get to it, correct?

4    A.   Well, that's the volume that's behind the dam at that

5    moment, 71 million gallons.

6    Q.   Now, I think you agreed with me that it rained hard after

7    eight o'clock, right?

8    A.   I think so, yeah.

9    Q.   And so, at ten o'clock it was still raining very intensely,

10   right?

11   A.   Yeah.

12   Q.   And according to your model, the dam has been overtopped

13   since nine o'clock, right?

14   A.   That's correct.

15   Q.   Mr. Nelson showed you a picture of Defendant's Exhibit 34.

16   Remember this picture taken from the right abutment across to

17   the box?

18   A.   That's right.

19   Q.   And this, you said I think under direct examination, was

20   taken at 7:17 in the morning, correct?

21   A.   7:17 or 7:15, around that time.

22   Q.   Okay.  So you agree with me that the -- and I think you

23   described on direct examination that this water was going fast,

24   this was high velocity water?

25   A.   Yeah, according to the hydraulics.

1   Q.   Do you agree with me that at nine o'clock at night in the

2   midst of the intense part of the rainstorm it's already over

3   the dam, the hydraulic intensity should be materially higher

4   than this?

5   A.   If you look at the dam there, which is at elevation 75,

6   okay, so 5, and that would be -- at nine o'clock it would reach

7   the crest of the dam, elevation 75.

8   Q.   Ten o'clock, eleven o'clock.  I'm saying when we're at the

9   point where you had the water five feet above the embankment,

10  five feet above the embankment and it's in the middle of the

11  intense rainstorm, do you agree that the velocity should be

12  materially higher than these shown in the morning when it

13  stopped raining three hours ago?

14  A.   It could potentially.  When it overtops the dam, it's a

15  different velocity calculation, it could be higher.

16  Q.   Because the intense part of the rain was pounding in the

17  night after eight a.m., right?

18  A.   Yeah, I mean, it could potentially be higher.  I don't have

19  a number for you without a calculation.

20  Q.   It's fair to say it should in fact be higher than it is

21  here at seven in the morning, three hours after the rainstorm

22  ended, right?

23  A.   You may say so, but I don't have a number for you how much

24  higher.  It could be ten or eleven or something, but we can do

25  the calculations to figure it out.

1   Q.   You never did that calculation?

2   A.   We didn't have to.

3   Q.   But you agree it would be more?

4   A.   It could be more.

5   Q.   And if this amount of intensity that is showing here at

6   seven in the morning is still making the hole bigger, wouldn't

7   the more intensity in the night have made it faster?

8   A.   No.  If you look at the picture -- let me say look at the

9   picture on your bottom half, that's the main part of the

10  embankment.  Did you see it fail?  Did you see it fail?  It

11  didn't actually.  It overtopped it by 5 feet.  That doesn't

12  mean velocity was high sufficient to cause the breaching there.

13  It's still existing even after a big storm event.

14  Q.   So let's look at your Exhibit 84.  You still got that up

15  there?  You agree that picture 34 was taken from approximately

16  this right abutment up here at elevation 75, right?

17  A.   I believe so, it looks like so.

18  Q.   It looks that way, right?

19  A.   I didn't take the picture.

20  Q.   Right, but I'm saying here is elevation 75, and here at

21  elevation 65 is a line of the island, right?  That's the

22  island?

23  A.   Right, that's the island.

24  Q.   You agree?

25  A.   Yeah.

1    Q.   All right.  So it's shooting from elevation 75 down towards

2    this island over here, which this is elevation 65, right?

3    A.   That picture is shooting at the structure, the concrete

4    structure, the picture you showed.

5    Q.   I'm saying this thing right here is that island?

6    A.   Yeah, yeah, that's part of the island.

7    Q.   All right.  And I think --

8         **MR. GLASSER:**  I move the admission of Plaintiffs'

9    trial Exhibit 272, Your Honor.

10        **THE COURT:**  That will be admitted.

11        *(Plaintiff's Exhibit 272 admitted into evidence.)*

12   **BY MR. GLASSER:**

13   Q.   And here is a shot of that right embankment and the island,

14   you agree?

15   A.   Yeah, that would be 75 elevation there on top of that.

16   Q.   Right.  And so this is where the picture Exhibit 34 was

17   shot from; isn't that correct?

18   A.   It looks like so.

19   Q.   And when you shoot Exhibit 34 from up there, you're

20   shooting from 10 feet higher across to the island, correct?

21   A.   No.  75 is at the top of the dam, and the island actually

22   is along the same elevation, 71, 72, according to the topo

23   survey.  Actually, the survey indicates the island at the top

24   is 75 elevation.

25   Q.   All right.  And so the island is over here?

1    A.    They're almost the same.

2    Q.    And the shot is across that, and then there's a step down,

3    and then there's kind of an area here that's not as eroded

4    right by the island, right?

5    A.    Right.

6    Q.    And this shot is looking downstream past that concrete

7    abutment, right, that concrete outfall box, right?

8    A.    That's correct.

9    Q.    And the other concrete box is probably near where the

10   picture is being taken from, right, the one that's over here on

11   the -- let's see if there's been an aerial photo used.

12   A.    It's to your right, to the right.

13   Q.    To your right, is that what we've called the drop box?

14   A.    Yeah, it's the lower structure.

15   Q.    And so the picture you used in your report is by that drop

16   box, which is to the right exactly, right?

17   A.    Right.

18   Q.    So this shot is -- this shot, which is Defendant's Exhibit

19   33, is actually shot from the place where -- near where

20   Plaintiffs' Trial Exhibit 272 is shot?  This Exhibit 33 shows

21   the drop box, agreed?

22   A.    Yeah, right there you can see the guardrail there.

23   Q.    And Exhibit 272 is a shot from the drop box down towards

24   the right embankment and the outfall structure, correct?

25   A.    I don't know exactly that location of where the -- from my

1    impression, it didn't look like it was shot from drop box.  It

2    was shot from the channel.

3    Q.    So the drop box should be on the right?

4    A.    Yeah, on the right.  But I think this picture -- or in my

5    opinion it was probably taken along kind of in the pond.

6    Q.    All right.  So this picture at 7:17 in the morning shows

7    this lake over here -- you see that lake on the top of the

8    picture?

9    A.    Yeah.

10   Q.    And it's going towards -- you can't tell how deep the water

11   is through that picture in that lake, can you, Exhibit 33?

12   It's not possible to see through that water, is it?

13   A.    Well, you can't really see exactly.  But it's a level pool

14   reservoir, as a hydrologist we're assuming that that water

15   level would be about the same as when the water level touched

16   the bank.

17   Q.    I understand.  But this water in Exhibit 33 that's on the

18   ELMO now is heading towards that; is that correct?

19   A.    Yeah.

20   Q.    And then, what's already been admitted into evidence as

21   Defendant's Exhibit 32 also taken at approximately 7:17 in the

22   morning, is looking -- so here is Plaintiff's Exhibit 272,

23   that's looking downstream at the -- on the left side of the

24   picture is the concrete outfall box, on the right side is the

25   right abutment, correct?

1    A.    That's correct.

2    Q.    And this picture is looking upstream, upstream where the

3    right abutment is actually on the left side, although you can't

4    -- it kind of is cut off, you can't see the whole thing over

5    there, right, on the left?

6    A.    That's correct.

7    Q.    And what we've been calling the outfall box is over here on

8    the right side, right?

9    A.    You can see it's still overflowing.

10   Q.    Okay.  And you agree with me that in Exhibit 32 that is --

11   that water is highly turbulent?

12   A.    Yes.

13   Q.    That water is hard to see through?

14   A.    I would say so.

15   Q.    That water -- you can't tell from that water how deep it

16   is, can you?

17   A.    No, I don't think you can really do that.

18   Q.    But those eddies are typical of deep water, are they not?

19   A.    When you run down a steep slope, yes, it is.  And below the

20   breach opening, that section of a channel, when it's still

21   developing, it's steeper.

22   Q.    Yes.  And we can see from Exhibit 272 the cut on the right

23   embankment; isn't that right?

24   A.    Right.

25   Q.    So, this picture on Plaintiff's Exhibit 74 is beside the

1    outfall box, not at the cut by the embankment; isn't that

2    correct?

3    A.    We represent that as the water level in the pond.

4    Q.    And then to look at Exhibit 74(a), it actually goes further

5    and shows higher acre-feet, if the water in fact had risen to a

6    higher head than you precisely calculated; isn't that correct?

7    A.    That would be correct.

8    Q.    And the numbers grow fairly rapidly; isn't that true?

9    A.    Well, it has a certain rate of rising, yeah.

10   Q.    Now, away from this particular case, put aside this case.

11   In the five years prior to this case, had you physically been

12   in the state of Florida?

13   A.    Let me see, we had taken vacation -- as I can remember, I

14   don't think I had physically been in the state before this

15   case.

16   Q.    So now I've taken you back to roughly 2009, right?

17   A.    Well, 2014, I went there in 2015, that would be 2010.

18   Q.    All right, 2010.  In the ten years from 2000 to 2010 were

19   you physically ever in the state of Florida?

20   A.    Oh, I -- that's far -- that was a long time ago.  I don't

21   think I could remember correctly.  If ever I was there, it

22   would be like on vacation.

23   Q.    All right.  So, it's fair to say in the 15 years prior to

24   rendering your opinion in this case you had never worked a

25   single day inside the state of Florida; isn't that true?

1   A.   That's -- that's true.

2   Q.   Let's go back another five years from 2005 to 2010.  Does

3   your answer change?

4   A.   I know I went to Florida a couple of times, but I don't

5   know exactly -- I can't remember exactly when I went there.

6   Q.   So not for any work that you can remember?

7   A.   Not work that I can remember.  But when I work, I work for

8   projects all over the world, I don't have to be in a particular

9   location to work on the project.  And the majority of my work

10  is office work.  And even the work in Australia and New

11  Zealand, I don't go there to work.

12  Q.   So, I think you said you came to -- you got your degree in

13  1990, so let me just take those 15 years.  1990 to 2005, same

14  answer, right?

15  A.   I got my Ph.D. in 1990.

16  Q.   Right.  So, from 1990 to 2005 you did not physically work

17  in the state of Florida; is that true?

18  A.   No, I have never physically -- I can tell you I have never

19  physically worked in the state of Florida.

20  Q.   So, it follows from that that you have never personally

21  measured stream velocities in the state of Florida?

22  A.   I'm not a stream measurer.  USGS does its job.  Sorry.

23  Q.   You said in your direct examination when you were showed

24  the pictures that you couldn't get down to the creek through

25  the -- right?

1    A.    Yes, I said that.

2    Q.    All right.  So it's fair to say that, in choosing the

3    coefficient of friction appropriate for this creek, you never

4    walked the length of the creek; isn't that true?

5    A.    We never got a chance to be able to walk along the creek

6    because it's so heavily vegetated.

7    Q.    So the value -- so you didn't go to a bridge and walk down

8    and then walk down the creek?  You chose not to do that?

9    A.    No.  It prevented us from walking due to safety.  And also

10   -- and when we looked at the Goggle Map -- and you have the

11   Google Map all around the world and you can look at that, and

12   it's all green there, all vegetation there.

13   Q.    So, when you chose the coefficient of friction for the

14   creek funnel, I'll call it, or the incised part of the creek,

15   the main bed of the creek, you did it without personal

16   knowledge of what it exactly physically looked like from a

17   geometry [sic] perspective since you've never walked it; isn't

18   that true?

19   A.    Well, we took a picture a little bit down the creek from

20   the breach and that's as far as we could get, and I could see

21   everything down there.

22   Q.    So you could see from the breach the two-mile length of the

23   creek all the way to Bristol Park along the bed of the creek,

24   you could see that from the breach?

25   A.    Well, I couldn't do that, but I can't imagine it would

1    change dramatically from place to place.

2    Q.   But you made your choice -- well, and you've criticized Dr.

3    Ross for the choice he made about what the velocity the water

4    would have traveled down that corridor, which is the creek bed,

5    which is the main transport system for this water, you agree?

6    A.   Well, I mentioned that he used a lower Manning's

7    Coefficient than us.

8    Q.   You agree with me that that creek bed, that incised,

9    whatever you want to call it, canyon-type creek, whatever word

10   you would -- what word would you use to describe that transport

11   area?

12   A.   Well, we call it the main channel.

13   Q.   Okay, the main channel.  Is the main mode by which the

14   water would get from the dam to the floodplain by the

15   neighborhood, correct?

16   A.   Well, the flow would travel -- if it comes from the dam, it

17   would travel along the main creek first, and then it will reach

18   a certain level and then it will go to the floodplain.

19   Q.   So, because you had never personally worked in Florida

20   during the whole of your career, you relied on a book that you

21   found that talked about vegetation, not personal experience

22   with Florida streams to criticize Dr. Ross?

23   A.   Well, we always have based our -- the FEMA study, which is

24   the study by the local and the county, and it has the same

25   Manning's Coefficient as we use, all the same range.  And even

1    though I have never worked in Florida, the one who developed

2    the FEMA map, they have worked in the state of Florida, I

3    believe.

4    Q.   You don't know that, do you?

5    A.   What?

6    Q.   You don't know who developed the FEMA map?

7    A.   You don't know either, so I'm sorry.

8    Q.   So you're just jumping to an assumption?  You don't know if

9    somebody --

10   A.   Well, typically a FEMA map would be done by the one

11   sponsored by the county to.

12   Q.   You would agree that you are not a licensed professional

13   engineer in the state of Florida, correct?

14   A.   No, I'm not.

15   Q.   So you would not be legally able to certify the design of a

16   dam in the state of Florida, right?

17   A.   If it's required, someone has -- a PE in Florida has to

18   certify it.

19   Q.   And in fact, you wouldn't be able to even certify the

20   design of a sewage system in Florida, correct?

21   A.   That's correct, if it's required.

22   Q.   So, you're not legally allow to sign and seal any hydraulic

23   structure in the state of Florida; isn't that true?

24   A.   That's not true.  As I said, if the contract requires an

25   engineer to sign your -- sign the spec, then it will need to be

1    stamped by a professional engineer in Florida.  And there's

2    many studies, many studies does not require a PE to do the

3    study.

4    Q.   You're not a professor of hydrology, right?

5    A.   I'm not a professor in hydrology.

6    Q.   You agree, though, that the rain that fell on the airport

7    had no effect on this drainage basin, right?

8    A.   No, it's far away.  I mean, if the rain doesn't fall into

9    the watershed, the drainage area, it has no effect.

10   Q.   So that rain over at the airport is not relevant to your

11   analysis, correct?

12   A.   That's not totally true.  I mean, Dr. Ross used the

13   rainfall distribution outside the drainage area to adjust his

14   precipitation, so in a hydrological analysis you try to use all

15   kind of information you would need, and there's some

16   interpretation or extrapolation you might need to do, I mean,

17   that's -- and they are relevant.  But in terms of rainfall, if

18   it doesn't travel to the watershed, it has no effect to the

19   watershed.

20   Q.   It took you about 100 hours of work to render your opinion

21   in this case; is that correct?

22   A.   I believe that's what I said in my deposition.  And I have

23   several other engineers that helped me.

24   Q.   So, to go into that 100 hours?

25   A.   I don't think I said that.  100 hours for me and then hours

1    for others.

2    Q.    How many hours did your team work on this?

3    A.    We have time records.  I don't have the exact number for

4    it.

5    Q.    Are you aware that Professor Ross and his group spent 1600

6    hours working on their model?

7    A.    Well, all I know is the final budget we work on at this

8    point is about $210,000, something like that.

9    Q.    So, we already talked about your assumptions about

10   available water to the dam.  Now let's talk about the

11   Plaintiffs', okay?

12          A big difference between you and Dr. Ross is you did not

13   consider the testimony of the Plaintiffs or the residents of

14   the area as to what they actually experienced in their home on

15   the night of April 29th as relevant to your analysis; isn't

16   that true?

17   A.    We didn't use that to calibrate the model because I haven't

18   seen any pictures of those when the flood actually gets into

19   that area and the water level in the area.  I mean, if there

20   was, at least I wasn't offered to have those pictures or

21   information.

22   Q.    All right.  So it would have helped you -- so I understand

23   when you said you calibrate your model you calibrated it to the

24   one day total at the USGS gauge, right?

25   A.    Yeah.  That's the only data we had at the time we developed

1   the model to calibrate it.

2   Q.   So when you use the word "calibrate" you mean one day

3   calibration to that gauge on that day?

4   A.   No.  We calibrated it to the entire storm event.

5   Q.   On that one day?

6   A.   Well, you see the rain on one day but runoff could last

7   several days.

8   Q.   I understand.  But you did not calibrate to other rain

9   events over, say, a two-year period?

10  A.   No.  We didn't have to.

11  Q.   You calibrated to one day?

12  A.   We calibrated to the specific storm we worked on and that

13  caused the flooding.

14  Q.   And in doing that work, would knowing the high-water marks

15  in the houses have helped?

16  A.   It would.

17  Q.   And that's not knowledge that you had when you did your

18  model; is that correct?

19  A.   We didn't use that information, but eventually our model

20  result actually matched what is the high water elevation in the

21  neighborhood in the class area.  They are -- they almost map

22  our inundation mapping and the water level almost match what

23  was observed according to the high water survey.

24  Q.   So another thing that you talked about in your model is

25  time of concentration, right?  The velocity of the water

1  affects time of concentration, you agree?

2  A.   Yeah, the time of concentration is -- it's the time that it

3  takes a drop of water from one point to -- Point A to Point B.

4  Q.   Right.  So if a drop of water -- say it starts raining at

5  8:00 p.m. and a drop of water falls here in Eightmile Creek.

6  You see where my finger is?  Whether it can get down to the

7  confluence of Elevenmile Creek depends on its velocity,

8  correct?

9  A.   Yes.

10  Q.   And its time of concentration?

11  A.   Right.

12  Q.   So, I understand that your velocities in your model are

13  fairly low; is that correct?

14  A.   We have a number on the report.  I don't remember exactly,

15  but we have that number.

16  Q.   You have your report with you?

17  A.   I have my report with me and we have the table that

18  summarizes the time of the concentration.  For that watershed

19  it would take about 670 minutes.

20  Q.   670 minutes for the raindrop here to get to here, right?

21  A.   Right.

22  Q.   More than ten hours -- more than 11 hours?

23  A.   Yeah, that's according to the calculation.

24  Q.   All right.  So if we go halfway up, can we just roughly say

25  it might take five hours?

1   A.    Yeah, that's five hours.

2   Q.    All right.  So any rain that fell in Eightmile Creek

3   upstream of my finger took about five hours to get to the

4   confluence with Elevenmile Creek, correct?

5   A.    Well, in calibration of time concentration you need to

6   understand the three sections the flow goes.  The first part it

7   would go over the overland flow and basically go over your

8   grass or something like that and it would travel very slow.

9   And once you get to a certain distance, it concentrates in

10  swells like that and it will travel faster.  When it goes to

11  the main channel it moves faster.  So it's a combination of

12  three sections to determine the entire time of concentration.

13  Q.    So let's go three-quarters of the way down Eightmile Creek.

14  How long would it take drops of water falling here to get to

15  the confluence of Elevenmile Creek, approximately, roughly?

16  A.    I don't have a number for you.

17  Q.    Two hours, maybe?

18  A.    It depends on where the water dropped.  If it drops right

19  on the creek, you're talking about, yeah, it travels with the

20  creek.  If it's farther away from the creek, it will have to go

21  over land and over the concentrated flow area and go to the

22  creek.  So it's a lot more complicated than just pointing a

23  finger there and tell you the exact number.

24  Q.    Right.  So, if it fell, say, here, it would take time to

25  get to the creek and then go to Elevenmile Creek?

1    A.    Right.

2    Q.    So, rain that fell from 8:00 p.m. to 10:00 p.m. up

3    Eightmile Creek was unlikely to have reached the confluence of

4    Eightmile Creek in mass in the first two hours of the storm; do

5    you agree with me?

6    A.    Can you say that again.

7    Q.    So, I think you told us it would take about 11 hours for

8    the raindrops falling in this part of Eightmile Creek to get to

9    the confluence, correct?

10   A.    Yeah, from the farthest point.

11   Q.    From the farthest part.  And then in the middle part I

12   think you were telling me it's about five hours?

13   A.    It would take shorter.

14   Q.    And then in the lower region, let's say, not the bottom 25

15   percent, but the middle 25 percent, say two hours?

16   A.    Yeah, it could happen.

17   Q.    All right.  So, none of that water can be causing backwater

18   that lasts 4 miles back to Bristol Park at 10:00 p.m., can it?

19   A.    Well, the model will tell you if it has the effect.

20   Q.    Well, the laws of physics tell us it hadn't even gotten

21   there yet, right?

22   A.    Well, you have water tributaries coming in.  Each tributary

23   gets to the main creek almost at the same time, if you have the

24   same distance, time of travel.

25   Q.    I'm concentrating on the backwater effect that you say --

1    you criticized Dr. Ross because his backwater boundary was not

2    down here at Eightmile Creek.  I'm just exploring, by the 10:00

3    hour -- 10:00 to 11:00 p.m. hour, how much of the Eightmile

4    Creek watershed could have possibly even gotten to that point?

5    A.   Well, Eightmile Creek is -- and remember, just remember,

6    okay, it would take a lot longer time for the entire Elevenmile

7    Creek to reach the downstream at .2.

8         So, let's say you have a peak flow coming from the

9    Elevenmile Creek at 10:00 o'clock, and your peak flow coming

10   from Eightmile Creek could be 11:00.  But the model will not

11   add them together.  Whatever I tell you eleven o'clock --

12   whatever happened at eleven o'clock from the same time to the

13   mainstream they don't add the peak flow together, they don't

14   correspond at the same time.  So that's done in hydrologic and

15   hydraulic analysis.

16   Q.   And this time of concentration is how you know the cubic

17   feet per second at different times, according to your model, in

18   the creek?

19   A.   That's correct.  I mean, the model will tell you the timing

20   from each tributary and the flow rate from each tributary, they

21   will add up according to exact time at that location.

22   Q.   Now, the rain event -- a rain event yields a flood event,

23   you agree?

24   A.   Normally a rain event would cause a flood event.

25   Q.   Exactly.  Two different things?

1    A.    Uh-huh.

2    Q.    So, someone could say, well, there's been a 500-year rain,

3    but it may only cause a 50-year flood, right, in a certain

4    watershed?

5    A.    Yeah, it's not a direct answer for that.  I mean, typically

6    in hydrology you look at what they assume 500-year

7    precipitation would cause a 500-year flood, but it's not 100

8    percent correct.

9    Q.    But you agree with Dr. Ross -- you both concluded that the

10   flood event in Elevenmile Creek was somewhere between a 50-year

11   flood and a 100-year flood; isn't that true?

12   A.    Well, when I said that, I didn't detail why -- or give you

13   full explanation of that.  The 50-to-100-year event, remember,

14   has no reference to any other published 100-year or 500-year

15   data.  That's very important.

16        Second, the 70-to-100-year flood was based on statistical

17   analysis of the 27-year data we have.  So, it was just out of

18   curiosity we wanted to look at it, do a little bit of

19   statistical analysis to gauge.  Because we have only 27 years'

20   data.  And trying to extrapolate it to 100 years, that would be

21   really like a stretch.  And in order to project a 100-year

22   flood, you need -- the more data the better in close to

23   100-years, so you don't need to do an extrapolation.

24        So, if you're using 27 years' data to extrapolate to a

25   100-year or even a 50-year, we call extrapolation, basically

1  you have a larger margin of error and your confidence is

2  smaller.

3          **MR. GLASSER:**  May I approach, Your Honor?

4          **THE COURT:**  Yes.

5  **BY MR. GLASSER:**

6  Q.  Do you remember testifying in this courtroom in May of

7  2016, Dr. Lan?

8  A.  Yeah, I remember that.

9  Q.  Now, I'm drawing your attention to the top of page 29.  It

10  was from that same witness stand; isn't that right?

11  A.  That's correct.

12  Q.  And can you read to yourself lines 2, 3, and 4 and then

13  look up when you've read those lines.  Just look up when you've

14  read those lines.

15  A.  So, between 50- and 100-year flood event, that's correct.

16  Q.  All right.  So you were asked this question:

17          **QUESTION:**  "So, did you conclude that this was

18  somewhere between a 50-year and a 100-year flood event?"

19          And what was your answer?

20          **ANSWER:**  "That's correct," based on the statistical

21  analysis we did, it was very clearly mentioned in the report.

22  Q.  So your answer was "That's correct"?

23  A.  Yeah, that's correct.

24  Q.  You agree?

25  A.  But I didn't give any further explanation.

1    Q.   So you didn't explain at that time that -- well, is it

2    still -- it's still correct it's your best professional

3    understanding even though you're saying you didn't have as much

4    statistics as you might have liked?

5    A.   No.  I mean, that is totally based on the 27-year data.

6    Q.   It's based on all the data that exists, correct?

7    A.   Based on all the 27 years' data existing.

8    Q.   That's all there is?

9    A.   So, let me say, if that event turned out to be -- let's say

10   we have 100 years or 200 years more data, if that event turned

11   out to be 200-year event, basically your extrapolation would be

12   totally different.  But based on the 27 years, that's -- the

13   program tells you --

14   Q.   So, based on the scientific evidence available to you, you

15   concluded it was between a 50- and a 100-year flood?

16   A.   That was based on the limited data.

17   Q.   The answer is yes, correct?

18   A.   Yeah, but it was -- has no reference to any FEMA 100-year,

19   which is much smaller, or 500-year flow.

20   Q.   You and Dr. Ross both agree that a properly designed dam

21   ought to be able to handle a 100-year flood, correct?

22   A.   In general, you have to to design a storm event properly

23   for the dam.  As I mentioned earlier, it could be a PMF, it

24   could be a 500-year or a 10-year.  It depends on the hazard of

25   the dam.

1    Q.  And so to decide if a dam is a high hazard dam, you would

2    ask yourself is there any, say, important infrastructure near

3    downstream from the dam, right?  That would be the question the

4    dam designer would ask, right?

5    A.  Well, yeah, typically you would need to know what is the

6    condition downstream.

7    Q.  Assume for purposes of my question that you're asked, Dr.

8    Lan, to design a dam, okay?  You with me?  And you know that

9    the prior version of the dam had undermined the supports of a

10    roadway bridge that was near to the dam.  Would that tend in

11    your mind to make the dam's design something that needs to be

12    looked at more or less carefully?

13    A.  I haven't heard of a dam the way you talk about that

14    undermines a roadway downstream.  That's the first time I've

15    heard of it, first.  And then the second, of course, I wasn't

16    offered to design this dam in this case.

17    Q.  Right.  I'm just asking you for purposes of answering my

18    question to assume these facts:  I don't care where it is,

19    you're brought in to design a dam, you're told that a prior dam

20    that was there had failed and had undermined the structures of

21    a road bridge nearby.  In that instance, would you increase --

22    would you want to design for higher flood events?

23    A.  Well, I'll do a thorough analysis, okay, and that would

24    lead to do we need to design a different kind of flood, right?

25    If it's not -- if it's just not working, we have to design a

1    flood -- of course, the structure is a different aspect, too.

2    Q.   If it's the case that you concluded that that road bridge

3    -- that danger to that road bridge was qualified as hazardous

4    to the public, you would want to design that dam for the

5    probable maximum flood, right, given the assumption that the

6    road bridge could be -- taking out the road bridge could be

7    hazardous to the public, right?

8    A.   Yeah, if we had created a hazard to the public, it would

9    have to be designed -- normally it would designed for that kind

10   of flood.  But a hazard classification is a lot more

11   complicated than just saying that.

12   Q.   I understand.  But if it's the case that you're designing

13   for the probable maximum flood, we would be designing for

14   something in the state of Florida that could take like 48

15   inches of water, right?

16   A.   Yeah, that would be correct.  As I said, hazard

17   classification is very complicated.  You want to know a little

18   bit about it, it would be you look at a sunny day -- you have a

19   dam there, look at sunny day breach there to see what kind of

20   hazard it created downstream.  And now you go through, if it

21   doesn't create any damages downstream, the little dam would be

22   classified as a low hazard.

23        And you could go to a PMF -- and PMF, remember, we have a

24   tiny pond there behind that.  Actually, the dam -- it was old

25   flow structure, it never intended to hold much water, under

1    normal conditions only like 30 acre-feet of water.  Under those

2    circumstances, the tiny surface area compared with the entire

3    drainage area indicates under all kinds of circumstances, with

4    dam breach or without the dam breach, that the incremental --

5    we call incremental damage, it's minimum, very minimum

6    downstream.

7         Under those circumstances, you can lower the design storm

8    from PMF to 500-year and subsequently to 100-year and to even

9    lower event.

10   Q.   So you do agree, though, that there are hundreds of feet of

11   earthen embankment here at this dam, right?

12   A.   Well, from what I saw, yeah.

13   Q.   It was obvious to you when you saw it, right?

14   A.   The road -- elevated road -- I didn't quite notice if all

15   the road was built up or was natural.  I'm sorry.  Probably I

16   should have paid a little more attention.  But the dam looked

17   pretty wide.

18   Q.   Hundreds of feet wide?

19   A.   Yeah, probably at least 100 feet wide.

20   Q.   Probably more than 200 feet of earthen embankment, right?

21   A.   You are correct.

22   Q.   All right.  And so there's no doubt in your mind that it is

23   in fact a dam, right?

24   A.   It's a small dam, yeah.  As I mentioned earlier, this is

25   the tiniest dam I have ever worked on.

1    Q.   But you were never, in advance of writing your opinion,

2    provided any engineering design specifications for that 200

3    feet, roughly, of earthen embankment, were you?

4    A.   I wasn't asked to design the embankment of the dam.  Sorry.

5    Q.   So, in doing your opinion, you had no way to look at or

6    know or even -- you had no basis to believe that any civil

7    engineer or PE had in fact designed that earthen embankment of

8    two-hundred-something feet; isn't that true?

9    A.   I have no information of that, if it's designed or how it

10   was designed, of the embankment, and I didn't need that

11   information for my analysis.

12   Q.   Now, you understand that the land use type affects flow

13   conditions, that time of concentration we've been discussing,

14   right?

15   A.   Yeah, that's soil map.

16   Q.   Yeah, because, say, a forest would move water more slowly

17   than an industrial site like the IP plant, correct?

18   A.   That's correct, in terms of -- that's why we use the TR-55

19   to really calculate the concentration through overland flow and

20   then concentrated flow and then a channel.

21   Q.   All right.  And so, you used two curve numbers in your

22   model for those flows, 91 and 92; is that correct?

23   A.   I believe it's summarized in the report and, mostly, yeah,

24   91 and 92.

25   Q.   All right.  And just to put it in perspective, a 95 would

1  be a concrete parking lot, right?

2  A.   It would be close to a concrete parking lot, I would say.

3  Q.   And a 100 would be like glass?

4  A.   Yeah, everything would run off.

5  Q.   Everything would run off like on a windshield on a car --

6  glass -- that's 100?

7  A.   Yeah.

8  Q.   Okay.  So, across -- to concentrate the water across this

9  entire watershed -- is this 48-mile watershed on the ELMO?

10 This is 48 miles, right?

11 A.   I think it's 40 square miles.

12 Q.   All right.  For a 40-square-miles watershed you used two

13 curve numbers, 91 and 92, right?

14 A.   Right.  I mean, look at the soil type, they're very

15 similar.

16 Q.   Okay.  So, you treated the most -- basically the entire

17 48-square-mile basin somewhere south of a concrete parking lot,

18 slightly?

19 A.   Well, changing from 90 to 95, this is a -- even the curve

20 number looks close, but in terms of a loss in the infiltration

21 it's more than just that 5 percent.

22 Q.   But you --

23 A.   There's a method to calculate that.

24 Q.   You're aware, though, that Dr. Ross had more than 70

25 different types of land uses, right?

1  A.   But according to the curve number, they're classified as

2  the same group.  I'm sorry.  And basically the high curve

3  number we used reflects the very wet conditions, very wet

4  conditions prior to that storm event, which is agreed by Dr.

5  Ross.  Actually, he modeled -- he used the two-year event to

6  look at the moisture condition at the start of the storm.  I

7  remember he said it's a wet condition.  So, 90, 91 we present

8  that kind of condition.

9  Q.   And to go back to your dam pool elevation, did you not tell

10 us that once water moved over the earthen part of the dam you

11 would expect it to rapidly fail in somewhere between 6 minutes

12 and one hour?

13 A.   That's not true because I already mentioned earlier a

14 failure time between 6 minutes to one hour, that's how long it

15 would take after the dam -- after the breach is initiated.

16 It's not the time that after it overtopped the dam, okay?

17 Those are two different concepts.

18      As I said -- as I mentioned earlier, overtopping can be

19 very significant before the erosion or the breach of the dam

20 can occur.

21 Q.   And that depends on whether this dam was made of sand or

22 not, right?

23 A.   Well, it -- yeah, it's -- a lot of it depends on the

24 geological condition.

25 Q.   Okay.  Assume for purposes of my question that this dam is

1  -- earthen embankment was made of sand.

2  A.   Well, I went there, I mean, I noticed not everything is

3  sand.  On top of the embankment there's a lair of gravel,

4  pretty large gravel on top of the dam.  And I walked around a

5  little bit and, I mean, my shoes were sticking when I was

6  trying to step on this.  I don't think it's quite sand.  I

7  would say probably clayey sand, but I don't have a sample of

8  the sediment of the material to look at it.

9  Q.   All right.  Well, turn -- you still have the hearing

10  transcript in front of you?  Turn to page 159, please.  I draw

11  your attention to line 18 where you testified before.

12  A.   159, did you say?

13  Q.   Yeah, at page 159, line 18, were you asked this question:

14       **QUESTION:**  "And so, based upon the information that

15  you received, how long do you think that the earthen dam

16  structure took to erode in terms of minutes?"

17       Were you asked that question?

18  A.   Yeah.

19  Q.   And did you give this answer:

20       **ANSWER:**  "Based on the empirical relationship we have

21  we used from the literature and that the dam could fail within

22  between .1 hours, which is 6 minutes, to 1 hour, which is 60

23  minutes."

24       Is that the answer you gave?

25  A.   That's the answer I gave.

1    Q.   Turn in the hearing transcript to page 194.  I draw your

2    attention to line 2.  So let's go to 193, line 24.  You ready?

3    A.   194?

4    Q.   Yep, 193, line 24, prior page line 24.

5    A.   193.

6    Q.   Page 193, line 24.  Were you asked this question:  "And in

7    Fig. 5-1 of Exhibit 33 you stated that the breach initiation

8    was assumed to be overtopping of the dam embankment; is that

9    correct?"

10        Were you asked that question?

11   A.   Yeah, it's by overtopping.  I mentioned earlier two types

12   of failure, one is piping failure and overtopping failure.

13   Q.   So you believe this failure in this case was the

14   overtopping failure?

15        **THE COURT:**  Excuse me, we have an objection.

16   Actually, a request to approach the bench.

17             *(Bench conference between the Court and counsel:)*

18        **MR. NELSON:**  He's reading from the transcript, this is

19   not proper impeachment.

20        **THE COURT:**  I agree.  I just didn't have an objection.

21   I agree.

22             *(Bench conference concluded.)*

23   **BY MR. GLASSER:**

24   Q.   Having established that you believe this failure type was

25   overtopping the embankment, that is the sand or, as you call

1    it, the clayey sand, correct?

2    A.   Yeah, that's the earthen embankment.

3    Q.   And you agree, once it's overtopped, initiation of the

4    breach function would rapidly progress and last less than an

5    hour?

6    A.   That's totally true.   But if you look at that sentence

7    again, initiation was assumed to be overtopping but that's --

8    my answer didn't say how much overtopping would cause

9    initiation of the breach, that's what I said before.   You look

10    at all the literature, it's generally a few feet overtopping

11    before the initiation of the breach can occur.

12    Q.   And part of the dispute over that might be whether it's

13    sand or not?

14    A.   That's totally correct.

15    **MR. GLASSER:**   No further questions.

16    **THE COURT:**   Redirect?

17    **MR. NELSON:**   Thank you, Your Honor.

18    **REDIRECT EXAMINATION**

19    **BY MR. NELSON:**

20    Q.   I just have a couple of questions, Dr. Lan.   During Mr.

21    Glasser's cross-examination there were quite a few questions

22    about the backwater effect in Eightmile Creek.

23    A.   Yeah.

24    Q.   I put back up a copy of the demonstrative showing

25    orientation of the Elevenmile Creek drainage basin.   What body

1 of water is this here that I'm pointing to?

2 A.   It's pretty significant, the volume coming down.  I don't

3 remember exactly.

4 Q.   What was that waterway called?

5 A.   Excuse me?

6 Q.   The name of this creek, do you remember?

7 A.   Eightmile Creek.

8 Q.   And a lot of Mr. Glasser's questions about your critique of

9 Dr. Ross's boundary condition were based on Eightmile Creek.

10 But what part of Dr. Ross's boundary condition really concerned

11 you?

12 A.   Actually, it's not Eightmile Creek.  It's that it is too

13 close to the class area, so it's just no distance between the

14 class area and downstream boundary.  But, yeah, if you look at

15 that, the downstream boundary is pretty much across the class

16 area.

17 Q.   Mr. Glasser didn't ask you about this tributary here.

18 Would that have a backwater effect?

19 A.   Yeah, absolutely.  I mean, you are -- that's a major

20 tributary coming in.  You have a flow coming up, and whatever

21 happened from the tributary would back up the water right into

22 Elevenmile Creek.

23 Q.   And what's this here?

24 A.   That's Highway 10, I believe.

25 Q.   And there's a bridge?

1  A.    There's a bridge, yeah.

2  Q.    Mr. Glasser didn't ask you about that.  Would that have an

3  effect?

4  A.    Yeah, that would have an effect because that's very close

5  to the class area.  As I said, Eightmile Creek is far away.

6  Another reason we use Eightmile Creek is we used the USGS gauge

7  to calibrate our model.  The USGS gauge is not that far away

8  from Eightmile Creek.

9        So the backwater from Eightmile Creek could potentially --

10  I'm saying that that would be determined by the model -- could

11  potentially have a backwater effect all the way back to the

12  USGS gauge, so we need that information to dynamically simulate

13  the impact of that water.

14  Q.    This was Figure 7-7 in your report, it had been marked as

15  IP Exhibit 86.  Do you recall this?

16  A.    Yeah.

17  Q.    And what time of breach initiation is shown in IP 86?

18  A.    11:15 a.m.

19  Q.    What time --

20  A.    The breach is 11:15 a.m.

21  Q.    11:15 or 12:15?

22  A.    I'm sorry, it's 12:15.  It has been long time.  I'm sorry.

23  Q.    If the breach, Dr. Lan, had occurred before 12:15 a.m.,

24  would any effect in the class area from the breach of the

25  Kingsfield Road dam be more or less than what is shown in this

1 | worst case scenario?

2 | A.   It would be less.

3 | Q.   And what was the amount in inches of impact from the breach

4 | in the class area even at the worst case breach time of 12:15

5 | a.m.?

6 | A.   As I said before, it would be two-tenths of a foot over

7 | five, six feet flooding in that area.

8 | **MR. NELSON:**  Thank you, Dr. Lan.

9 | **MR. GLASSER:**  I don't have any further questions for

10 | this witness, Your Honor.

11 | **THE COURT:**  All right.  Dr. Lan, you may step down,

12 | sir.

13 | **THE WITNESS:**  Thank you.

14 | **MR. NELSON:**  Your Honor, may I approach to retrieve

15 | exhibits?

16 | **THE COURT:**  Yes, sir.

17 | *(Witness excused.)*

18 | Let me ask you to approach, please.

19 | *(Bench conference between the Court and counsel:)*

20 | **THE COURT:**  We're up to your last witness?

21 | **MR. NELSON:**  We're not going to need to call him, Your

22 | Honor.  I think we can rest now.

23 | **THE COURT:**  All right.  Well, then, what are you all

24 | going to do?

25 | **MR. GLASSER:**  I think we're going to do nothing.

1    Could you give us ten minutes to -- I think if you send the
2    jury to lunch.
3            **THE COURT:**  I don't want to do that.  I want to know
4    what you're going to do before I send the jury away.
5            **MR. GLASSER:**  I'd like to talk to my co-counsel, just
6    out of fairness, so could we have a ten-minute break and
7    then --
8            **THE COURT:**  No.  You can go down to counsel table and
9    speak to them and we'll sit here and wait until you do.
10           **MR. GLASSER:**  Okay.
11           **THE COURT:**  Thank you.
12           *(Bench conference concluded.)*
13           **MR. GLASSER:**  Okay, Your Honor.
14           **THE COURT:**  Mr. Nelson, your next witness?
15           **MR. NELSON:**  Your Honor, we have decided we do not
16   need to call Dr. Duke, so we rest.
17           **THE COURT:**  Very good.
18           Ladies and gentlemen, you've now heard all of the
19   evidence that the Defendant has to present in its case.  Now
20   would be the opportunity for a rebuttal case, if the Plaintiffs
21   choose to present one.
22           Mr. Glasser?
23           **MR. GLASSER:**  The Plaintiffs do not choose to present
24   a rebuttal case.
25           **THE COURT:**  Very good, thank you.

1    Ladies and gentlemen, you've now heard all of the

2    evidence to be presented during this trial.  The next phase in

3    the trial would be your instructions on the law followed by the

4    closing arguments of counsel, and then you'll retire to begin

5    your deliberations.

6    I do need to continue with my discussions with the

7    attorneys in regards to jury instructions.  And since we're at

8    the lunch hour, I think we'll go ahead and recess now.  When

9    you return, we'll start with instructions.  So I'm going to ask

10   you to return at -- just so I'm confident that we're going to

11   be ready for you when you return, we're going to take an

12   hour-and-a-half for lunch.  So you'll return ready to go at

13   1:45.

14   Please don't have any discussions about the case

15   during this recess, and also please continue to keep an open

16   mind.  You have heard all the evidence, but you haven't

17   received your instructions nor the closing arguments of

18   counsel.  We'll see you back at 1:45.  Thank you.

19       *(Jury out.)*

20   Be seated.  I've looked at a number of the cases of

21   those that you presented this morning and then some others, and

22   I do believe that the Defendant is correct that in Florida --

23   and this is very clear in this *Ford Motor Company* case, the

24   *Goulah* case, that it's the defendant's decision as to whether

25   or not to withdraw an affirmative defense that had previously

1    been raised.

2           This is also consistent with a Seventh Circuit case

3    entitled *Bauer v. J.B. Hunt Transport, Inc.*, and in that case

4    the Seventh Circuit even discussed the plaintiff's position

5    that it didn't seem fair that a defendant could withdraw an

6    affirmative defense and remove the burden of proving that --

7    and this is on the issue of causation -- proving that issue.

8           But the Seventh Circuit noted that, like the plaintiff

9    is the master of his or her complaint, the defendant is the

10   master of, in this case, its answer.  And that does not deprive

11   the defendant of arguing essentially the position that it

12   stated in the affirmative defense.  It really does just remove

13   the burden.

14          The cases that I cited to you, the Florida Supreme

15   Court case *Atlantic Coastline Railroad* and the Fifth Circuit

16   case, *Wm G. Roe Company,* neither of those cases deal with a

17   withdrawal of an affirmative defense, they were dealing with

18   that affirmative defense.  And so I certainly can't rely on

19   those cases, including the one, Mr. Marshall, that you also

20   gave me out of this court, the 1949 case, of the *State Road*

21   *Department of Florida v. United States*.  None of those were

22   addressing specifically what was addressed in the *Goulah* case

23   and the *Bauer* case, and that is the defendant's right to

24   withdraw the defense and the fact that that does not deprive

25   them of the ability to make the argument on causation.

1      My intent is to give essentially the standard

2  instruction on concurrent causes and then let you both argue

3  what you believe to be supportive of your causation position in

4  the case.

5      **MR. MARSHALL:**  Ma'am, if I may be heard just briefly

6  on the Act of God issue?

7      **THE COURT:**  Well, they won't be able to refer to it as

8  an act of God, but they certainly can refer to the storm event.

9      **MR. MARSHALL:**  And our position is that, by

10  essentially invoking rain, they are essentially invoking an act

11  of God defense and that they've been doing it throughout this

12  trial, and I expect they'll do it in their closing, and that

13  that particular instruction would be appropriate under the

14  circumstances.

15      **THE COURT:**  Well, the Seventh Circuit case deals with

16  rain, deals with a storm event.

17      So you won't, Mr. Nelson, be able to refer to an act

18  of God.  You can refer to the storm event, but not as an act of

19  God.

20      **MR. NELSON:**  Thank you, I understand, Your Honor.

21      **THE COURT:**  Also, just so we're clear before you start

22  your closings, the Plaintiffs' position and the evidence from

23  Dr. Ross is that all -- all -- of the water in the class

24  members' homes, no matter the individual amounts present in the

25  respective class members' homes, is attributable to the

1  Defendant's negligence.

2         The Defendants are entitled to argue that the

3  Plaintiffs' causation position cannot be credible or accurate

4  based on the evidence that's been presented here in the trial,

5  and that being the evidence of water levels in the class

6  neighborhoods.

7         That's not inconsistent with any rulings that I have

8  made.  And in fact, I have not made any ruling regarding the

9  credibility of Dr. Ross's opinions in this case.  That would be

10  improper for me -- as you all know, it would be improper for me

11  to do.

12         That is what I, again, am trying to do as far as an

13  instruction.  I am going to need a few minutes to revise the

14  instructions.

15         On the legal cause instruction I intend to make one

16  change to the standard instruction in the second paragraph

17  where the instruction states, "In order to be regarded as a

18  legal cause of harm, negligence need not be the only cause.

19  Negligence may be a legal cause of harm even though it operates

20  in combination with some other cause if the negligence

21  contributes substantially to producing the harm."

22         I'm going to add the words "but only if the negligence

23  contributes substantially to producing the harm."

24         And then I will continue with, "If you find that

25  International Paper's negligence produced or substantially

1    contributed to producing all of the flooding in the class

2    members' homes, then your verdict must be in Plaintiffs' favor.

3    In that event, you will be asked to identify on the verdict

4    form the basis of your causation determination.  On the other

5    hand, if you find that IP's negligence did not produce or

6    substantially contribute to producing all of the flooding in

7    the class members' homes, then your verdict must be in IP's

8    favor."

9           I believe that was the only instruction that was

10   outstanding.

11          **MR. MARSHALL:**  Your Honor, there was one change -- I

12   don't know if the Court's practice was to read the jury the

13   jury instructions or if they would take it back but --

14          **THE COURT:**  I'm sorry, what page are you on?

15          **MR. MARSHALL:**  Page 19.

16          **THE COURT:**  Okay.

17          **MR. MARSHALL:**  I just think it's a typo at the top, it

18   says "Only Plaintiffs claim damages" at the very top, duty to

19   deliberate.

20          **THE COURT:**  I have a different page number.

21          **MR. MARSHALL:**  It would be basic instruction --

22          **THE COURT:**  Well, the title is removed.  There's no

23   title.  Once these are final, we remove the titles, so it would

24   not even refer to damages at all.

25          **MR. MARSHALL:**  Okay.

1     **THE COURT:** And I did review the Plaintiffs' -- the

2     verdict form you gave me this morning, Mr. Marshall. And I'm

3     going to stick with the one that I drafted. That's consistent

4     with Dr. Ross's opinion as far as the models.

5         Mr. Nelson?

6         **MR. NELSON:** Your Honor, just two notations. On the

7     verdict form we would need to eliminate references to the third

8     question.

9         **THE COURT:** That would come out, you're right.

10        **MR. NELSON:** And then, I think this was probably

11    subsumed in what the Court has already noted, but removal of

12    the affirmative defense would have a carry-through effect on

13    basic instruction 3.7.1 and 3.7.2.

14        **THE COURT:** I'm sorry, I didn't know we were going to

15    wrap up quite so quickly. I might have taken my verdict form

16    back into the -- I have the instructions but I don't think I

17    have the verdict form. Oh, the instruction. I'm sorry, I

18    thought you were referring to the verdict form. What page are

19    you on?

20        **MR. NELSON:** This is page 11, Your Honor, and it's the

21    general instruction on responsibility of proof that has --

22        **THE COURT:** Oh, that would change, yes, it would

23    change. It would just refer to the Plaintiffs' claim and the

24    preponderance standard. So yes, that will be changed as well.

25        Anything else? Mr. Marshall?

1    **MR. MARSHALL:**  Yes, just two housekeeping matters.

2    Once we get the final jury instructions, will we have an

3    opportunity to review those and make any record we'd like to

4    make?

5         **THE COURT:**  Yes.  What we'll do is, when we're

6    finished here, Ms. Jacobs will go and make these changes that

7    we just discussed and bring them in to you, and then I can come

8    back in, if you want to make a record.

9         **MR. MARSHALL:**  Great, I appreciate that, Your Honor.

10   Also, I would like to mark my proposed verdict form just for

11   identification purposes.

12        **THE COURT:**  What is different about your verdict form?

13   Why isn't what I have drafted -- why doesn't it cover what you

14   have?

15        **MR. MARSHALL:**  In all honesty, I think my verdict form

16   is just a little clearer exactly, and I think it matches how we

17   framed the issues and how the evidence has come in.

18   Essentially, obviously, with respect to question A that's --

19   there's really no difference there.  But when it comes down to

20   causation, the concurrent causation -- obviously, I understand

21   the Court's ruling about the Act of God defense, so really

22   there's a yes or a no, and then it allows them, if yes, to go

23   ahead and pick the two scenarios that were run by Dr. Ross.

24        **THE COURT:**  It doesn't outline the scenarios as

25   clearly as mine does.  And I don't think they need to have any

1    reference to the six class members' homes.  That's something I
2    need to be concerned about in terms of subclasses depending on
3    the verdict, and that's why I've outlined it the way I have,
4    and their choice will be either the dam structure was the legal
5    cause or that the continued operation by failing to remove it,
6    which is what I know has been your position consistent with Dr.
7    Ross -- was the legal cause of the flooding.  That will tell
8    me, if they select the first option, that the six class members
9    -- the evidence would not a support a verdict in their favor.

10              **MR. MARSHALL:**  I understand, Your Honor.

11              **THE COURT:**  Mr. Nelson, anything you want to add?

12              **MR. NELSON:**  Nothing further at this time, Your Honor,
13    thank you.

14              **THE COURT:**  We'll make those changes.  I'm going to
15    have to ask you to stick around, obviously, until we can get
16    the instructions and verdict form back to you, I'll give you a
17    few minutes with them, and then I'll come back in if you want
18    to make a record.

19              **MR. MARSHALL:**  Your Honor, in terms of just timing for
20    the afternoon, would we be expected to close at any particular
21    time?

22              **THE COURT:**  We'll start back at 1:45.  The
23    instructions won't take me more than a half-hour, and that's
24    when you'll start your closings.

25              **MR. MARSHALL:**  Your Honor, if I may make one request

1  -- or my request, and that is, we expect to have a fair number

2  of people in here, and if I could have maybe five minutes with

3  them beforehand while everybody is in here, you know, we've

4  obviously told folks that we don't -- you don't -- you can't

5  make noise and things like that --

6      **THE COURT:**  Oh, I'll talk to everyone before the --

7  we're a ways away, I think, from the jury verdict coming back

8  in.

9      **MR. MARSHALL:**  I understand.  But just in the interest

10  of not having issues --

11      **THE COURT:**  Oh, during closings?

12      **MR. MARSHALL:**  Yes.

13      **THE COURT:**  Oh, no, I'll -- you're free to speak to

14  all of them.  I'll tell those that are here now there won't be

15  any, any audible sounds made, show of expression one way or the

16  other by any side during anyone's closing arguments.

17      **MR. MARSHALL:**  Understood.

18      **THE COURT:**  All right.

19      **MR. MARSHALL:**  That's it.

20      **THE COURT:**  Sit tight or go use the restroom

21  facilities if you need to and it won't take us long to get the

22  changes made and printed off for you.  We'll be in recess.

23      *(Recess taken 12:25 p.m. to 1:00 p.m.)*

24      **THE COURT:**  Let me bring up an issue on the verdict

25  form.  We did, as you know, modify page 2 of 3 -- well,

1    actually 2 and 3 to include reference to the six class members'

2    homes, and I do think that's appropriate.

3          But the problem with it is then in question B on

4    causation we reference whether the negligence was the legal

5    cause of all of the flooding in the class members' homes, which

6    of course, is the language we've used throughout, but then an

7    answer or a check for the first option would not be consistent.

8          So, I guess I'm proposing to take out all of the --

9    and just say whether the negligence was the legal cause of the

10   flooding in the class members' homes -- or I'm not sure how to

11   fix that.  Ms. Jacobs just brought that to my attention.

12         **MR. MARSHALL:**  Your Honor, that was my concern as

13   well, too, because it is somewhat inconsistent.  One option

14   might be --

15         **THE COURT:**  Well, it's your expert's opinion.

16         **MR. MARSHALL:**  Well, I understand that, but it's two

17   variations, how to capture the two variations.  And one option

18   might be quite simply just to -- quite simply just to cut B

19   down in terms of saying -- and actually just bring up the two

20   options, and instead of just saying yes or no, what you could

21   say is you could, you know, do you find -- you would ask them,

22   do you find whether International Paper's failure to --

23   essentially you would --

24         **THE COURT:**  I see what you're saying.  That would

25   work.

1    Mr. Nelson, what he's suggesting is just in B we say

2    "Do you find that the negligence was the legal cause of," and

3    then I guess put a colon there, and then put "the flooding in

4    all six of the class members' homes or all of the flooding in

5    the class members' homes."

6        **MR. MARSHALL:**  Yes, ma'am.

7        **MR. NELSON:**  Your Honor, I think maybe the better fix

8    to that would be to leave B as it is, which I believe is

9    correct, and then to put a period in the first sub-question

10   after the word "flooding."

11       The inquiry that the Court was concerned about making

12   is which of the two negligence mechanisms -- or maybe it was

13   both -- the jury based its finding on.  And I don't think that

14   last clause is necessary in order to ascertain the theory of

15   negligence underlying the jury's determination.

16       **THE COURT:**  That's fine, too.  So, I mean, we would

17   just -- and I think that's where I started when I came in --

18   "Do you find that IP's negligence was the legal cause of the

19   flooding," is that what you're saying?  But we're going to have

20   to focus them on the class members' homes and excluding the six

21   so that I know how they handled and decided those six.

22       **MR. MARSHALL:**  I think the way that Your Honor was

23   looking at it makes sense to me, essentially just to propound

24   the question.

25       **THE COURT:**  I think so, Mr. Nelson.  I'm going to go

1  back to that.  So, "was the legal cause of," and then there

2  will be a colon and they'll be given an option, you know, "the

3  flooding in all but six of the class members' homes" or "all of

4  the flooding in the class members" -- it would have to be "the

5  flooding in all of the class members' homes," same difference,

6  except the six, or all of the flooding.

7        **MR. NELSON:**  If we do it that way, Your Honor, I would

8  suggest that we reverse the order so it starts with "All of the

9  flooding of class members' homes" and then there's a second

10  question that's the "all but six."

11        **THE COURT:**  That makes sense to me.

12        **MR. MARSHALL:**  That's fine, Your Honor.

13        **THE COURT:**  I understand the Plaintiffs have asked for

14  an electronic version of the verdict form?

15        **MR. MARSHALL:**  Yes, ma'am.

16        **THE COURT:**  We will make these changes and get that to

17  you.  So there will just be the two choices -- well, they need

18  a choice of no.

19        **MR. MARSHALL:**  Essentially what you have, Your Honor,

20  is say, "if yes" --

21        **THE COURT:**  No, because we're stopping it with a colon

22  at "the legal cause of."

23        **MR. MARSHALL:**  I see, that's right.  Well, they would

24  be able to check.

25        **THE COURT:**  I suppose after that, Tevenia, we could

1    say "None" or "International Paper's negligence was not the

2    cause" -- I don't want to get into that.  I guess we'll just

3    say "No."

4            What do you all think?

5            **MR. MARSHALL:**  That's fine, Your Honor.

6            **MR. NELSON:**  Your Honor, I still believe that the best

7    way to address it is the way the Court had it in the first

8    instance, which is to have a yes/no question to the principal

9    questions.

10           **THE COURT:**  But that doesn't except the six class

11   members.

12           **MR. NELSON:**  I understand, Your Honor.  I think that

13   the yes question doesn't need to reiterate all of the flooding

14   in six or all of the flooding in the class area, because the

15   only reason the jury would get to those sub-questions is if

16   they've already found all of the flooding.

17           **THE COURT:**  All of the flooding is not the Plaintiffs'

18   injury.  I don't know if you're thinking about in the class

19   area.  That's not the Plaintiffs' injury.

20           **MR. NELSON:**  Okay.

21           **THE COURT:**  The Plaintiffs' injury is the flooding in

22   the homes.  Of course, that doesn't preclude you from arguing

23   about the flooding in the class area, you know, to contradict

24   Dr. Ross's opinion, but that's not their injury.

25           **MR. NELSON:**  Another alternative, Your Honor, might be

1    to address this issue in the context of the negligence question

2    rather than trying to shoehorn it into the causation question.

3              **MR. MARSHALL:**  But it is --

4              **THE COURT:**  I'm afraid it's a causation issue because

5    of Dr. Ross's opinion.

6              Do you want to make a record as far as the

7    instructions, Mr. Marshall?

8              **MR. MARSHALL:**  Yeah.  In terms of the instructions,

9    Your Honor, we would just -- we believe that the Defendant is

10   in fact -- I know they said that they've waived their Act of

11   God defense.  We believe they are invoking an Act of God

12   defense by raising the issue of the rainstorm as causing the

13   flooding, and on that basis we believe that it would be

14   appropriate to add an Act of God instruction as well as to add

15   a question on the verdict form that would include that

16   standard.

17             **THE COURT:**  All right.  Based on the *Goulah* Eleventh

18   Circuit decision and the *Bauer* Seventh Circuit decision, that

19   objection is overruled.

20             Anything you want to add to the record, Mr. Nelson?

21             **MR. NELSON:**  Your Honor, we would just reiterate our

22   objection to the instruction regarding a violation of the

23   statute could be evidence of negligence.

24             **THE COURT:**  And that, too, will be overruled.

25             I'm going to make a decision about this, and I'll send

1   you both -- are you wanting it an electronic version for the

2   Defense?

3          **MR. NELSON:**  Sure, if you're going to email it, that

4   would be great.

5          **THE COURT:**  And I'm going to try to step off the bench

6   and see if I can't play with this wording a little bit and then

7   I'll send it to you.  If you want to make a record, I'll let

8   you do that before we start back with the jury, if you have an

9   objection to how it reads other than the objections you've

10  already noted.

11         We'll be in recess.

12         *(Recess taken.)*

13

14

15

16

17

18

19

20

21

22

23

24

25

1      *(Luncheon recess was taken from 12:25 to 1:45 p.m.)*

2      *(Jury not present.)*

3            **THE COURT:**  Mr. Nelson.

4            **MR. NELSON:**  Thank you, Your Honor.  We have a concern

5      with the reworked verdict form, specifically the predominant

6      paragraph B, which refers to legal cause.  The words "all of

7      the" have been deleted there before "flooding."  And when we

8      think about the issue that has been certified under Rule 23 that

9      this jury will be deciding, it is all of the flooding, not some

10     flooding.

11           **THE COURT:**  Well, that's why we asked the question the

12     way we did in the next two -- the next two options that they

13     have to answer do include "all."  But the problem with that is

14     if we include all of the flooding in the main question, then

15     we -- we don't know how -- I don't know how to ask the question

16     that excepts the six members whose homes would not have flooded

17     had the dam held.

18           **MR. NELSON:**  One alternative might be to have a

19     question C that uses the same beginning language as B, and it

20     says "legal cause of all of the flooding," but then add "in all

21     but six of the class members' homes."  So question B would ask

22     all of the flooding for all of the class members' homes.

23     Question C would ask all of the flooding of all but six of the

24     class members' homes.

25           **THE COURT:**  And then have a yes or no for each?

1          **MR. NELSON:**  Correct, Your Honor.

2          **THE COURT:**  Mr. Marshall, any problem with that?

3          **MR. MARSHALL:**  So as I would -- as I understand it, it

4     would be question B would be all, Question C would be all but

5     six, and then option D would be no?

6          **THE COURT:**  No.  I mean, that's not the way I

7     understood Mr. Nelson.  We'd have a yes or no for each.

8          **MR. NELSON:**  That was my intent, Your Honor.

9          **MR. MARSHALL:**  So essentially -- okay.  So question B

10    would be yes or no; question C would be yes or no.

11         **THE COURT:**  Mm-hmm.  That would work.

12         **MR. MARSHALL:**  I don't have any objection to that.

13         **THE COURT:**  You-all probably need another electronic

14    version of this, then.

15         **MR. MARSHALL:**  Yes, ma'am.

16         **THE COURT:**  All right.  While I am -- other than that,

17    are there any other objections other than we've already

18    addressed and are preserved in the record for your purposes?

19         **MR. MARSHALL:**  No other objections other than those

20    that have already been raised.

21         **MR. GLASSER:**  I would like a physical copy of it to at

22    least be able to walk through with the jury before the closing

23    starts, if that's okay with the Court.

24         **THE COURT:**  To walk through the jury --

25         **MR. GLASSER:**  A physical copy of the actual verdict

1    forms that we're going to use so that I can talk about it in the

2    closing.

3              **THE COURT:**  That's why I was giving you an electronic

4    version, but if you want a -- we can make --

5              **MR. GLASSER:**  Yeah.  I don't have a way to print.

6              **THE COURT:**  That's fine.  We can get you a hard copy.

7    That's fine.  Both sides.  That's fine.

8              **MR. NELSON:**  Thank you, Your Honor.

9              And just for clarity, both B and C will say "all of

10   the flooding" -- B will say all of the flooding in the class

11   members' home, and C would say all of the flooding in all but

12   six --

13             **THE COURT:**  Yes.

14             **MR. NELSON:**  Thank you, Your Honor.

15             **THE COURT:**  Is that what you understood, Mr. Marshall?

16             **MR. MARSHALL:**  Yes, ma'am.

17             **THE COURT:**  Okay.  So we will make that change, and

18   provide hard copies to both sides.  And then I'll have the jury

19   seated, and then when I come back in, I'll instruct them.

20             I believe I explained to you, but on the chance I

21   hadn't, I will instruct them up to -- up through page 16 -- I'm

22   sorry.  Actually through 15.  Yeah, through page 15, you'll make

23   your closing arguments, and then I'll give them final

24   instructions 16, 17, and then the verdict form.

25             This doesn't preclude you from speaking to them about

1    the verdict form.  I just will not have talked to them about it

2    yet.

3           All right.  And then let me have a word with all those

4    in the courtroom.  We do have a full courtroom.  During the

5    Court's instructions on the law and also the attorneys' closing

6    arguments, I will ask that everyone in the courtroom remain

7    quiet so that there's no distraction to the jury, and also to

8    refrain from any show of approval or disapproval during the --

9    particularly during the attorneys' closing arguments.

10           If you don't feel that you can sit quietly as the

11    attorneys present their closing arguments, then I'll ask you to

12    step outside, until those closing arguments have been completed.

13    Again, I don't want any distraction to the closing arguments or

14    to the Court's instructions on the law.  The jury needs to be

15    focused on what the attorneys and I are presenting to them.

16           All right.  So when I come back in the jury's going to

17    be seated.  Understood?

18    *(Recess was taken from 1:50 to 2:05 p.m.)*

19    **THE COURT:**  All right.  I thought it best to confirm

20    on the record before we bring the jury in that you have no

21    objection to the verdict form as drafted other than has already

22    been discussed.  So Mr. Marshall?

23    **MR. MARSHALL:**  No objection.

24    **THE COURT:**  Mr. Nelson?

25    **MR. NELSON:**  This addresses the concerns, Your Honor.

1  Thank you.

2  **THE COURT:**  Thank you.  Thank you.

3  All right.  We're going to bring the jury in, please,

4  Mr. Thomas.

5  *(Jury present.)*

6  **THE COURT:**  Ladies and gentlemen, in just a moment I'm

7  going to give you your instructions on the law.  But before I

8  begin, let me take just a moment on behalf of our Court and also

9  from myself personally and also, I believe, on behalf of all

10  those who've been involved in this trial to thank you very much

11  for your service thus far as jurors in this trial.  It's been

12  obvious to me and I suspect to -- again, to all those who've

13  participated in the trial that you've taken your oath very

14  seriously, and I know you'll continue to do so, and we

15  appreciate that very much.

16  So I'm going to give you 98 percent of the

17  instructions, and then I'm going to have the attorneys present

18  their closing arguments to you, and I will follow up with two

19  final instructions.  But do keep in mind at all times that you

20  should consider all of the Court's instructions on the law as a

21  whole.

22  You may follow along on the overhead screen as I

23  deliver the instructions to you.  They'll appear there.

24  Also, each one of you will have a copy -- a hard copy

25  of the instructions for your convenience with you in the

1    deliberation room.

2            All right.  Members of the jury, it is now my duty to

3    instruct you on the rules of law that you must follow and apply

4    in deciding this case.  When I have finished you will go into

5    the jury room and begin your discussions, or what we call your

6    deliberations.

7            Your decision in the case must be based only on the

8    evidence presented here, and you must not let your decision be

9    influenced in any way by sympathy or by prejudice for or against

10   anyone.

11           You must follow and apply all of the law as I explain

12   it to you, whether you agree with that law or not.  You must not

13   single out or disregard any of the instructions on the law.

14           The fact that a corporation is involved as a party

15   must not affect your decision in any way.  A corporation and all

16   other persons stand equal before the law and must be dealt with

17   as equals in a court of justice.  When a corporation is

18   involved, of course, it may act only through people as its

19   employees; and in general, a corporation is responsible under

20   the law for the acts and statements of its employees that are

21   made within the scope of their duties as employees.

22           As I said before, you should consider only the

23   evidence, that is, the testimony of the witnesses in this case

24   and the exhibits that I've admitted.  But anything that the

25   lawyers say is not evidence and is not binding on you.

1    Also, you should not assume from anything that I've

2  said that I have any opinion about any factual issue in the

3  case.  Except for my instructions to you on the law, you should

4  disregard anything I may have said during the trial in arriving

5  at your own decision about the facts.  Your own recollection and

6  interpretation of the evidence is what matters.

7    As you consider the evidence, both direct and

8  circumstantial, you may use reasoning and common sense to make

9  deductions and to reach conclusions.  Direct evidence is the

10  testimony of one who asserts actual knowledge of a fact, such as

11  an eyewitness.  Circumstantial evidence is proof of a chain of

12  facts and circumstances tending to prove, or disprove, any fact

13  in dispute.  However, you need not be concerned about whether

14  the evidence is direct or circumstantial, because the law makes

15  no distinction between the weight that you may give to either

16  direct or circumstantial evidence.

17    Now, in saying that you must consider all of the

18  evidence, I do not mean that you must accept all of the evidence

19  as true or accurate.  You should decide whether you believe what

20  each witness had to say and how important that testimony was.

21  In making that decision, you may believe or disbelieve any

22  witness, in whole or in part.

23    Also, the number of witnesses testifying concerning

24  any particular dispute is not controlling.

25    In deciding whether you believe or do not believe any

1   witness, I suggest that you ask yourself a few questions:

2           First, did the witness impress you as one who was

3   telling the truth?

4           Did the witness have any particular reason not to tell

5   the truth?

6           Did the witness have a personal interest in the

7   outcome of the case?

8           Did the witness seem to have a good memory?

9           Did the witness have the opportunity and the ability

10  to observe accurately the things that he or she testified about?

11          Did the witness appear to understand the questions

12  clearly and to answer them directly?

13          Did the witness's testimony differ from other

14  testimony or other evidence?

15          You should also ask yourself whether there was

16  evidence tending to prove that the witness testified falsely

17  concerning some important fact or whether there was evidence

18  that at some other time the witness said or did something, or

19  failed to say or do something, that was different from the

20  testimony the witness gave before you during the trial.

21          You should keep in mind, of course, that a simple

22  mistake by a witness does not necessarily mean that the witness

23  was not telling the truth, as he or she remembers it, because

24  people naturally tend to forget some things or to remember other

25  things inaccurately.  So if a witness has made a misstatement,

1   you will need to consider whether that misstatement was simply

2   an innocent lapse of memory or, instead, an intentional

3   falsehood.  And the significance of that may depend on whether

4   it has to do with an important fact or with only an unimportant

5   detail.

6           When specific, technical or other specialized

7   knowledge might be helpful, a person who has special training or

8   experience in that field is allowed to state an opinion about

9   the matter.  However, merely because such a witness has

10  expressed an opinion, does not mean that you must accept that

11  opinion.  As with any other witness's testimony, you must decide

12  for yourself whether to rely on the opinion.

13          When a witness is being paid for reviewing and

14  testifying about the evidence, you may consider the possibility

15  of bias; and you should view with caution the testimony of such

16  witness where court testimony is given with regularity and

17  represents a significant portion of the witness's income.

18          You've been permitted to take notes during the course

19  of the trial.  Most of you, perhaps all of you, have taken

20  advantage of that opportunity and have made notes from time to

21  time.  You will have your notes available to you during your

22  deliberations, but you should make use of them only as an aid to

23  your memory.  In other words, you should knot give your notes

24  any precedence over your own independent recollection of the

25  evidence or the lack of evidence, and neither should you be

1   unduly influenced by the notes of other jurors.

2           I emphasize to you that notes are not entitled to any

3   greater weight than the memory or the impression of each juror

4   as to what the testimony may have been.

5           As I explained to you at the outset of the trial, this

6   case is proceeding as a class action.  A class action procedure

7   allows the filing of one lawsuit by a representative or small

8   number of representatives on behalf of a whole group of

9   plaintiffs who have similar claims.

10          In this case the representative plaintiffs are John

11  and Linda Navelski, Richard and Beverly Bullard, Jacob and Amber

12  Hutchins, Erick Alexander, and Jean Henderly.  You should not

13  hold the physical absence of any class member against the

14  representative plaintiffs.

15          Because this case is a class action, the

16  representative plaintiffs are allowed to try to prove their

17  claims by evidence which applies to the class as a whole, and

18  they do not need to prove each class member's claim

19  individually.  Importantly, your verdict here will be binding on

20  all class members.  The class is comprised of all persons who,

21  as of April 29, 2014, owned real property in the Bristol Park,

22  Bristol Woods, Bristol Creek or Ashbury Hills subdivisions in

23  Cantonment, Florida.

24          The Court has divided the case into two phases.  In

25  this phase, which is the first phrase, you will be asked to

1    decide whether International Paper is legally responsible for

2    all of the flooding in the class members' homes between April 29

3    and 30, 2014.  You will not decide whether or to what extent

4    individual class members may be entitled to damages.

5          If you determine that International Paper is not

6    legally responsible for all of the flooding in the class

7    members' homes, then the case will end and there will not be a

8    second phase.  If you determine that International Paper is

9    legally responsible for all of the flooding in the class

10   members' homes, then the case will proceed to a second phase.

11   In that second phase, other jurors will determine whether and to

12   what extent individual class members are entitled to damages for

13   the flooding in their homes.

14         This case involves a single claim of negligence, which

15   I'll explain in a moment.  It is the responsibility of the party

16   bringing the claim to prove every essential part of that claim

17   by a preponderance of the evidence.  This is sometimes called

18   the burden of proof or the burden of proof of persuasion.

19         A preponderance of the evidence simply means an amount

20   of evidence that is enough to persuade you that the party's

21   claim is more likely true than not true.  If the evidence fails

22   to establish any essential part of a claim by a preponderance of

23   the evidence, you should find against the party making the

24   claim.

25         In deciding whether any fact has been proved by a

1   preponderance of the evidence, you may consider the testimony of

2   all of the witnesses, regardless of who may have called them,

3   and all of the exhibits received into evidence, regardless of

4   who may have produced them.

5           The plaintiffs claim that International Paper was

6   negligent in its design, maintenance, and/or continued operation

7   of the Kingsfield Road dam structure and that International

8   Paper's negligence was the legal cause of all of the flooding in

9   the class members' homes.

10          International Paper denies this claim and asserts that

11  the April 2014 storm event was the legal cause of all of the

12  flooding in the class members' homes.

13          To succeed on their claim, the plaintiffs must prove

14  the following facts by a preponderance of the evidence:

15          First, that International Paper was negligent in its

16  design, maintenance, and/or continued operation of the

17  Kingsfield Road dam structure; and, second, International

18  Paper's negligence was the legal cause of all of the flooding in

19  the class members' homes.

20          In the verdict form that I'll explain in a moment,

21  you'll be asked to answer questions about these factual issues.

22          You will first be asked to decide whether

23  International Paper was negligent in its design, maintenance or

24  continued operation of the Kingsfield Road dam structure.

25          Negligence is the failure to use reasonable care,

1  which is the care that a reasonably careful person or

2  corporation would use under like circumstances.  Negligence is

3  doing something that a reasonably careful person or corporation

4  would not do under like circumstances or failing to do something

5  that a reasonably careful person or corporation would do under

6  like circumstances.

7        Violation of a statute or regulation is evidence of

8  negligence.  It is not, however, conclusive evidence of

9  negligence.  If you find that a statute or regulation applied to

10  the Kingsfield Road dam structure, and also that International

11  Paper violated the statute or regulation, then you may consider

12  those facts, together with the other facts and circumstances, in

13  deciding whether International Paper was negligent.

14        If you decide that the plaintiffs have not met their

15  burden to prove that International Paper was negligent, your

16  verdict must be in favor of International Paper.  If you decide

17  that Plaintiffs have met their burden to prove that

18  International Paper was negligent, then you will need to decide

19  whether that negligence was the legal cause of all of the

20  flooding in the class members' homes.

21        Negligence is a legal cause of a harm if it directly

22  and in natural and continuous sequence produces or contributes

23  substantially to producing such harm so that it can reasonably

24  be said that but for the negligence, the harm would not have

25  occurred.

1     In order to be regarded as legal cause of a harm,

2 negligence need not be the only cause.  Negligence may be a

3 legal cause of harm, even though it operates in combination with

4 some other cause, but only if the negligence contributes

5 substantially to producing the harm.

6     If you find that International Paper's negligence

7 produced or substantially contributed to producing all of the

8 flooding in the class members' homes, then your verdict must be

9 in Plaintiffs' favor.  In that event you will be asked to

10 identify on the verdict form the basis of your causation

11 determination.

12     On the other hand, if you find that International

13 Paper's negligence did not produce or substantially contribute

14 to producing all of the flooding in the class members' homes,

15 then your verdict must be in favor of International Paper.

16     All right, ladies and gentlemen.  As I said I'll have

17 a couple of additional instructions for you after the closing

18 arguments.  But at this time I'm going to ask for your continued

19 careful attention as the attorneys present their closing

20 arguments to you.

21     You are free, obviously, to take notes during the

22 closing argument phase of the trial; but do remember, as always,

23 nothing the attorneys say at any time during the trial,

24 including the closing arguments, is evidence in the case.  This

25 is the attorneys' memory of what the evidence was.

1          So if you take notes, please make a notation to

2   yourself that this is not the evidence phase of the trial, and

3   instead, this is the attorneys' closing argument, and, thus,

4   their memory of what the evidence was.  But as always, it is

5   your memory that must control over your deliberations -- that

6   is, memory of the evidence.

7          All right.  Mr. Glasser is going to proceed on behalf

8   of the plaintiffs.

9          **MR. GLASSER:**  Thank you, Your Honor.

10         Just take me a second to get my --

11         **THE COURT:**  I do apologize.  Mr. Glasser and

12  Mr. Nelson, I'm going ask you to approach briefly, one moment,

13  before you get started, Mr. Glasser.

14     *(Following conference held at the bench.)*

15         **THE COURT:**  Are you reserving any of your time?

16         **MR. GLASSER:**  Yes, ma'am.

17         **THE COURT:**  How much of that?

18         **MR. GLASSER:**  Like 15 minutes.

19         **THE COURT:**  Okay.  I'll let you know when you're --

20         **MR. GLASSER:**  Yeah, getting there.  And it may be 45

21  minutes.  Hopefully I'll be done.  I don't have 45 pages.

22         **THE COURT:**  Okay.  So an hour is what you're thinking?

23         **MR. NELSON:**  Yes, Your Honor.

24         **THE COURT:**  And Mr. Glasser?

25         **MR. GLASSER:**  Maybe an hour and 15 minutes.  I don't

1 think I'll go that.  I just don't want to run out at the very

2 end.  I've got 37 pages to cover, and it's double-spaced,

3 18-inch.  So I typically would take about 30 minutes.

4       **THE COURT:**  All right.  Well, you can have the amount

5 of time that Mr. Glasser takes on his direct plus 15 minutes.

6       **MR. NELSON:**  Okay.

7       **MR. GLASSER:**  Perfect.  Thanks, Judge.

8    *(End of bench conference.)*

9       **THE COURT:**  All right.  Thank you, you may proceed

10 when you're ready.

11      **MR. GLASSER:**  Thank you.  Ladies and gentlemen of the

12 jury, I'm standing before you today on behalf of 163 homeowners

13 in Bristol Park and Ashbury Hills who suffered flooding in their

14 homes on the night of April 29, 2014, after 10:00 p.m.

15       It's a sacred duty to stand here and speak for 163

16 families who can't speak for themselves, and I always worry when

17 I do it that I won't do it quite perfectly or I'll forget

18 something.  And that's why the jury system is the best system in

19 the world because when you get back in that jury room, you'll

20 have eight minds thinking about the evidence; and somebody, no

21 doubt, will remember something I've forgotten to talk about.

22       In any event, it's my goal and job right now to help

23 you with that important task, so I want to summarize the

24 evidence in the case.

25       At the heart of the case, we are saying that

1   International Paper was negligent in designing, maintaining,

2   operating, and failing to remove the dam.  It's not a criminal

3   case.  This is a case saying that they caused an accident with

4   that dam through lack of reasonable care.

5           It's just like if somebody is too busy checking their

6   cell phone and they run up in the back of the car in front of

7   them.  The driver could be the Reverend Billy Graham.  We know

8   he didn't intend it, but it was not reasonably careful to be

9   checking the cell phone.  Didn't exercise the ordinary care

10  expected of a careful driver.

11          Negligence is just the same thing as the Court just

12  read you on the instructions.  It's the failure to act as a

13  reasonably careful person would act in similar circumstances.

14          We say International Paper fell below that standard of

15  the reasonably careful dam operator, the reasonably careful dam

16  owner, three ways:  Poor design, poor maintenance and operation

17  that matters -- and when I get to that, I'll explain that -- and

18  the failure to remove the structure once it became unused and

19  abandoned after 2012, when it was no longer in commercial use.

20          Design.  Our evidence of under-design and lack of

21  design is overwhelming.  It's back-breaking.

22          Imagine a scale.  The Court told you about the

23  preponderance of the evidence standard.  In a civil case, which

24  this is, we have to tip the scale slightly in our favor; and if

25  the scale's like this in our favor, we win.  It's not a criminal

1    case where it's way up here.  We blow this standard of proof,

2    this preponderance standard, away in this case.

3            Here's the evidence:  There is a long history of

4    erosional problems with this dam.

5            In 1996, this dam had to be replaced -- in 1986 there

6    was a dam built.  In 1996 it was first replaced.

7            May I go -- that's Exhibit 89 up there.

8            And you'll recall that on the very first page of

9    Exhibit 89, it says, I remember the event that actually breached

10   a portion of the pond and undermined supports for the 48-inch

11   diameter -- that's four foot in diameter -- spillway and the

12   Kingsfield Road bridge as well.  A nightmare.

13           So this is the e-mail that a man sent to explain what

14   happened to build the 1996 dam because of what happened to the

15   1986 dam.

16           Obviously, as Dr. Carrier pointed out, undermining

17   support for a road bridge is a high hazard thing.  It's a high

18   hazard risk, and it's something to keep in mind when designing

19   replacement dams.

20           You heard Dr. Lan today talk about probable maximum

21   flood or hundred-year storms, and it depends on whether there's

22   a risk to downstream structures.  Here in 1986, 1989, they had a

23   risk demonstrated to a downstream structure and did not upgrade

24   the design of the dam.

25           So they built this dam.  I have a picture up here

because that's a long way away.  This is the version of the dam

that was built in 1996 that stood from '96 till the erosion

collapse of this apron after the rains in 2005.  This version of

the dam had two 48-inch holes -- not one, two.  It could pass a

lot more water under it than the dam that replaced it which, as

you'll remember, had the one safety valve that they never

opened.

Also, this dam had this concrete apron here and here.

It's what we talked about with Dr. Carrier, the turtle shell.

So this was the replacement dam in '96.  It stood till 2005,

when it broke.

Here's another view of another part of it, which is

Exhibit 96, and the other one was Exhibit 95.  And you'll see

there's a truck here, so you can get some idea of the scale from

that.

Now, this dam was replaced with the dam we know about,

which we see on the Google Earth and we put a lot of pictures in

of.  The dam that was made of this sandy material, which I'll

get to that minute, replaced it; and as you can see, it just had

earth.  It didn't have concrete.  Didn't have the turtle shell

anymore.

So our evidence on design is this:  If you need a new

dam about every nine years, you've had plenty of notice that

you're not well understanding the amount of water that's coming

at your dam in storms.  Dams shouldn't need to be replaced about

1    every nine years.  That's plenty of notice and plenty of

2    foreseeability to any reasonable careful dam owner that, hey,

3    maybe I need to think about making it stronger, not weaker.

4         Two:  IP has no engineering documentation whatsoever

5    for this 200-foot earthen part of the structure.  Yes, they have

6    some engineering documentation, not signed and sealed, for this

7    outfall box.  They have nothing for all this.  All this earthen

8    berm, all this earthen berm with all this water, and all this

9    wetland, they don't have any -- single engineer drawing for any

10   of this.  They don't even have it on a napkin.

11        What does that tell you?  That tells you they had

12   their regular contractor go out there and pile up some dirt.

13   That's what that tells me.  That's what I infer from that.  They

14   did not get an engineer to design it, attest to it, confirm the

15   soil was appropriate for the intended purpose, supervise and

16   certify the construction, and inspect it thereafter.  Nothing.

17   Nothing.

18        They may show you Defense Exhibit 10.  When you're in

19   the jury room -- it's about five pages long -- look through it.

20   It has no designs for this earthen structure whatsoever.  It's

21   solely a design for an outfall box.  It has nothing to do with

22   200 feet of earthen dam.  Nothing to do with it.

23        This means that this dam, this 200-foot earthen dam

24   was not built under the supervision of a professional engineer,

25   licensed in Florida to opine as to the safety and the design as

1    to what kind of flood it could withstand, and -- and that the

2    soil would meet the intended purpose.

3           Dr. Carrier told you that this special stamp is the

4    only time an engineer is saying, Yes, I personally certify and

5    stand behind the safety of this dam.  Dr. Carrier and Dr. Ross

6    carry that certification.

7           Dr. Carrier said that any dam ought to be able to

8    withstand at least a hundred-year flood and that a high hazard

9    dam needs to be designed for the probable maximum flood.  And

10   because of the evidence from Exhibit 89 where the struts of the

11   Kingsfield Road bridge were affected, in his view this would be

12   a high hazard dam.  There is no documentation that IP ever

13   designed to meet these standards, even the hundred-year

14   standard.

15          And here's Exhibit 89 again.  And the boss frankly

16   says, We can't design for Cat 5 hurricanes or hundred-year

17   floods.  And indeed they didn't.  That's what he said, that

18   they -- and that's what they followed.

19          You heard Dr. Lan earlier today admit that this was

20   between a 50- and 100-year flood.  Why did this dam fail if it

21   had been designed for a hundred-year flood?  Dr. Lan just told

22   you that in his opinion it was between a 50- and 100-year flood,

23   based on the available scientific evidence.  Why did this dam

24   fail?

25          I'll tell you why it failed.  The dam failed because

1  it's made of sand.  This is Exhibit 91, and this is

2  Exhibit 178F.  We brought one of the foremost geotechnical

3  engineers in the state of Florida to this courtroom, Dr. David

4  Carrier.  Dr. Carrier has three degrees from MIT, including a

5  Ph.D.  He helped NASA design and understand exactly how deep the

6  lunar module would sink into the surface of the moon.

7  He's worked as a geotechnical engineer in this state,

8  designing dams, reviewing and approving the safety of dams for

9  something like 40 years.  He helped write the dam safety rules.

10  He walked down here and he took this soil in his hand, and he

11  looked at it with his own eyes, and do they think he can't

12  recognize sand?  Do you, ladies and gentlemen of the jury,

13  honestly believe any person who lived in Florida for 40 years

14  can't recognize sand?

15  Sand is easily erodable.  Professor Ross said that

16  once it's overtopped in this storm, it would have failed in

17  under an hour, maybe minutes.

18  Dr. Lan today agreed that if it were sand, it would

19  fail in six minutes to an hour once it was overtopped, and he

20  agreed it was overtopped early.

21  Dr. Carrier said that if you make a dam of sand, you

22  need to armor it or riprap it.  It's just common sense.  But

23  sand is cheaper than concrete, and International Paper made the

24  choice to go with a weaker, cheaper solution compared to the

25  prior version that had the concrete aprons.

1          And for those three sufficient reasons, ladies and

2     gentlemen of the jury, we ask that you find that IP did not act

3     with reasonable care in the design of the dam.  History of

4     erosion put them on notice.  New dam was weaker and cheaper than

5     the old 2005 dam.  The new dam was made of unarmored sand.

6     That's bad design.  Simple as that.

7          If you agree with me about this point, then you check

8     yes on the first question on the verdict form.  The first

9     question on the verdict form is were they negligent.  And one of

10    the grounds they can be negligent is bad design.  So you check

11    yes if you agree with me on bad design, and you can move to the

12    next section of the verdict form without worrying about the

13    other things I'm about to tell you.

14         If you want to go past bad design, you can get to

15    negligent maintenance and operation.

16         I want to be very specific here.  I know that the

17    chemical engineer, Mr. Taylor, did a drive-by eyeball inspection

18    from year to year.  I know that sometimes the county employee --

19    county person went with him in the drive-by inspections.

20         I agree that employees and contractors from time to

21    time cleaned out the outfall box that we've discussed.  The

22    outfall box, by the way, just -- because we just had an exam on

23    that.  This is the outfall box where the water falls in, and

24    this is the outflow structure.  So I'm talking about that box

25    right there when I'm talking about the outflow [sic] box.  It's

1      kind of around the corner.  There's a peninsula before the thing

2      washed away.  There was a peninsula between the outfall box and

3      the outfall structure.  This peninsula is gone in the pictures

4      that you see once  the flood has happened.

5            In any event, I'm talking about maintenance and

6      operation that matters.  Let's look at Exhibit 61 and

7      Exhibit 183F –– I mean 183H.  This is the one valve left on the

8      bottom of the dam after they replaced –– knocked out the two big

9      holes that you saw in the earlier photo.  They replaced them

10     with one hole at the bottom of dam.  It basically cut off the

11     concrete structure and just left one hole there.  Okay?

12           You recall the testimony of Mr. Steltenkamp, the old

13     safety manager.  And Exhibits 61 and 183H show that the state of

14     disrepair that that safety valve had gotten into by 2014.

15     Basically they cut those weirs in the top that you can see here,

16     those little cuts, and they forgot about the safety valve.  It

17     just kind of went away from their memory.

18           Dr. Carrier and Mr. Steltenkamp both said that this

19     bottom gate was needed to be functional, and this is not

20     functional, for proper maintenance and proper inspection, and in

21     advance of storms to lower water levels.  I know you heard

22     Mr. Steltenkamp say that, that back when he was safety manager,

23     if they knew a storm was coming, they would open this valve and

24     relieve the pressure.  And today you heard the examination with

25     Dr. Lan, how he agrees that because of the morning storm, it

didn't have six hours or eight hours to run out, and it was up to the lip when the later evening storm started.  That wouldn't have happened if they had followed the rules and opened the safety valve during the 11 hours between the storm events.

If you fail to maintain a critical part of your dam infrastructure, you've been negligent in the maintenance that matters.

They also never had a professional engineer qualified to assess the safety of the earthen embankment ever inspected in the eight years the thing stood.  Dr. Carrier told you that periodic inspection by a professional engineer is maintenance that matters.  They called no witness to contradict him on that.

So when we talk about maintenance and operation, we're talking about maintenance and operation that matters.

Doctor -- I mean Mr. Steltenkamp was very clear that it was standard operating procedure when he was safety manager to drain the impoundment from time to time to check the -- you know, how the dam was doing, and in advance of storms.  That's its intended purpose.  That's why it's there.

Because this company operated the dam in storms up to 2012 by oral tradition and not by written policies and procedures, when Mr. Steltenkamp left his job they forgot about the oral tradition, and it just went away.  That's negligence. You have to have written policies and procedures for how to handle safety issues like this.

1       Exhibits 252 and 228 are two e-mails discussing the

2  coming storm.  I talked about these e-mails with Mr. Moore and

3  Mr. DeJong, and basically they're at 6:16 and again at like

4  7:20.  And it's clear that there's plenty of warning that the

5  storm is coming, and they don't go down and open anything.

6       If you agree that they fell short in the maintenance

7  that matters, you can check yes without worrying about failure

8  to remove.

9       Failure to remove.  If a bad design and negligent

10  maintenance and not paying attention to operating this thing

11  safely in a storm are not enough, after 2012 there's just no

12  valid reason for this old dam to stand in the middle of this

13  stream.  Mr. Moore admitted that their legal compliance testing

14  points after 2012 were up at the riffle ponds by the dam.  He

15  fought with me on whether the dam was included in the permitted

16  area.  But Mr. Moore clearly and without reservation admitted

17  that after 2012, there was no operational impediment to removing

18  the dam and that at all relevant times International Paper had

19  the financial ability to do so.

20       When the dam failed in April of 2014, you saw what the

21  company said.  They sent out press releases, and they talked to

22  the press, and they talked to their internal team members and

23  they said that it's an inactive spillway structure.  It's an

24  abandoned outfall point.  It's out of service.  The structure

25  served no purpose.

1        They should be held to their words.  Those were the

2   words they gave to the public and to their own employees in the

3   8 to 14 days after this event.  There is no unfairness in this

4   courtroom, there is no unfairness in this courtroom to hold them

5   to these words.

6        Mr. DeJong understood these words were going to be

7   important.  He approved all these words.  He had plenty of time

8   to think this through.  This is what they believed at the time.

9   Now they get to court, and they don't want to follow the words

10  in Exhibits 241, 243, 173, 253.  That's 241, 243, 173, and 253.

11        Once they got here they realized that abandoned,

12  inactive, unused dams that serve no purpose shouldn't be left in

13  the middle of streams.  It's not safe because it leads to the

14  proper conclusion that it's perfectly reasonable to expect a

15  person to clean up after themselves.  Leaving an unused,

16  inactive, abandoned out-of-service structure in the middle of a

17  stream violates the normal standard of life that you clean up

18  after yourself.

19        In this case, that standard ought to have more force

20  because leaving this old uninspected, under-designed dam in the

21  middle of the stream is flat not safe.

22        As Professor Ross testified, it's much safer from a

23  hydrologic standpoint to have an open channel.  An open channel

24  will pass much more water.

25        And think about it.  Rain in the morning.  That rain

1   was captured behind the dam, and all other drainages that ran

2   out for 11 hours.  Here it was captured, that's concrete

3   evidence of how the existence of a dam captures water and

4   changed the hydrology here for the worse for no reason.  There

5   was no commercial reason.  It was abandoned.  Out of service.

6   Served no purpose.

7           Dr. Ross, in no uncertain terms, testified that if

8   there were no dam, then the inside of these homes would not have

9   flooded.  No dam; no inside-the-house flooding.

10          Now, our case does not depend on there not being

11  flooding in the streets or in the yards.  We acknowledge there

12  would be flooding in yards and streets.  Inside the home, no

13  dam, no flooding.  That's what Dr. Ross found.

14          And why?  Because the open channel would have passed

15  materially more water and not had the backwater effect that

16  Dr. Lan talked about.  Dr. Lan's backwater effect can go all the

17  way from Eight Mile Creek enough to influence four miles up.

18  Surely this dam could back up a ton of water.

19          And we saw some of his calculations where he said it

20  could back it up till it was 5 feet above the embankments.

21  80 feet compared to 75.  And he calculated, without calculating

22  the lake that Mr. Giddins talked about, that that was 218

23  acre-feet or 71 million gallons of water backed up behind this

24  thing.

25          If you believe that you should clean up after

1  yourself, you can check yes on this negligence.

2        All right.  So those are all three independent,

3  sufficient reasons why they were negligent in this case.

4        Let's go to part 2, which is questions B and C, which

5  is the causation part of the case.

6        We say the existence and failure of the dam was a

7  concurrent cause, along with the rain, of the house flooding.

8  It happened together.  The dam caused the flooding.  Obviously,

9  it rained.  But the dam caused the flooding, the breaking of the

10 dam.

11       Why do we say that?  Both experts agree that at

12 10:00 p.m. the rain alone could not have caused this flood.

13 That's what Dr. Ross said.  I looked at the hydrograph and all

14 the water that could come from below the dam, and at 10:00 p.m.

15 there wasn't enough water to cause this flood.  So I had to look

16 upstream and figure out -- obviously some available storage had

17 been released.

18       Dr. Lan today admitted that according to his

19 hydrograph, at 10:00 p.m. there's not enough water in the stream

20 to be past the 10-year FEMA flood, the 10-year FEMA flood.  At

21 10:00 p.m., not enough water in the stream.

22       So Dr. Ross said, There's a problem here.  There's not

23 enough rain -- he said, It's only rained 6 inches by 10:00 p.m.

24 Dr. Lan did not dispute Dr. Ross's rain totals.  So there's not

25 enough rain to have this stream outside the 10-year flood.

Where did the water come from?  It had to come from somewhere because we know from these photographs, we know from these photographs that have metadata time stamps -- 10:28, Exhibit 300, the low house in the neighborhood, Mr. Bullard's house, has about an inch of water in it.  You can still see the floorboards here.

10:38 he's got about a foot of water.  This is, like, 11:28.  It's up to his kitchen counter -- you know, bottom of his counters, and he's on his kitchen countertop shooting down.

12:44, Exhibit 111.  It's up to his chest while he's on the kitchen counter.  This water is obviously past the 10-year flood stage at this time.  Where did the water come from?

Here's the evidence.  Irrefutable time-stamp pictures, modeling by professor Ross, the admission by Dr. Lan, that this entire storm only created a 50- to 100-year flood and that there wasn't enough water in the stream at the 10-year flood stage to be flooding these houses.

Let's talk about this.  Recall that the mill was down for annual maintenance, they had emptied the millions and millions of gallons from the building itself into the ponds.  In the morning when it rained, all the water ran down the watershed into the surge ponds, into those big ponds that were at the plant, and congregated behind the dam.

Dr. Lan admitted that the pool behind the dam was full

1  at the beginning of the 8:00 o'clock rain.

2         By 10:00 o'clock it had rained 6 inches.  And we know

3  10:28, 10:38, 11:30, 12:44.  So there's not enough rain to do

4  it.  It had not rained enough by 10:30 to fill this neighborhood

5  like this.

6         Because this amount of water could not have come down

7  from the rain alone, we have to look upstream for available

8  storage catastrophically released.  The only storage of that

9  magnitude is the IP property.  There is not a single witness in

10 this case who says there's other storage of water in any

11 watershed above the neighborhood that could cause that filling

12 of the tub when the rain alone is not enough at this point in

13 time when the flooding begins.

14        The time of concentration issue is relevant here.  All

15 the rain that fell in the first two hours had not already got

16 down to the neighborhood by 10:00, 10:30.  It takes time.

17        The timing of the flood and the timing of the rain do

18 not match.  The only way to fill that gap is somebody's storage

19 blew out.  It is not refutable that this water was in these

20 homes too early in the storm.  These pictures are direct

21 evidence of the time the water was in these homes.

22        Now, let me talk about circumstantial evidence.  Okay?

23 Circumstantial evidence is like -- I call it footprints in the

24 sands.  You go down to the beach, and you walk along the beach.

25 You see human footprints in front of you.  It's safe to infer

1   that a human being walked on that beach before you did.  That is

2   circumstantial evidence.  It's like a fingerprint or something

3   like that.  It's powerful evidence.  It's equal, as this Court

4   told you.

5           Now, the combination of the fact that it had not

6   rained enough to fill this neighborhood by this point but yet it

7   is, in fact, full compels the conclusion that upstream water

8   storage blew out before 10:30, before 10:00.  That's the

9   timeline evidence.

10          And Dr. Lan admits this dam was overtopped by

11  9:00 p.m.  He just wants to fight about how long it took to

12  fail.  They want it to fail at 6:45 in the morning so all the

13  rain has time to concentrate before the dam fails.  That's why

14  this dam has to hang up there 9:00 p.m., 10:00, 11:00, 12:00,

15  1:00, 2:00, 3:00, 4:00, 5:00, 6:00.  Nine hours, of which seven

16  of them were pounding rain, six of them were pounding rain

17  through the middle of the night?  This sand dam took that

18  beating till 6:45 in the morning.  No way.  No.  No way.

19          What happened is -- what happened is it was overtopped

20  by 9:00, and it was failing or had already failed by the time

21  Mr. Quackenbush got down there.

22          Mr. Quackenbush went down there in pouring rain,

23  windshield wipers flapping, dark, you know, torrential rain.  He

24  never got out of the truck and his windshield wipers -- went

25  across that earthen embankment.  He saw there was water going

across.  He couldn't see through that water in the middle of the
night.  He admitted that.  That dam could have already been
failing by the time he got there.  And if not, it failed shortly
thereafter.  He got there between 9:35 and 9:45.  How do we
know?  Dr. Ross.

We went out in this case, and we hired some of the
best experts possible in Florida.  Dr. Carrier, unbelievably
qualified.  Dr. Ross, a giant in his field.

He is the director for the Center of Hydrologic
Modeling at the University of South Florida.  He's offered more
than 100 peer-reviewed scientific papers, mainly on the theory
and practice of modeling in coastal plain environments exactly
like the one at issue here.  He's written parts of the code for
the hydrologic models now relied on by state agencies.  He's
worked in Florida his entire life.

We could not possibly locate somebody more qualified
to examine this question.  We put no limitation on his work.  We
gave him the problem, and we turned him loose.  He took his
dynamic sophisticated model that he's worked on for decades and
he drilled down on this watershed.  He identified 70 different
land use types and soil types to make his model results
statistically match two years of recorded rain data.  Two years
of flow in that stream.  Not one day; two years.  And his model
predicted overtopping of the dam by 9:00, and that's what
happened.

1       Dr. Ross's model confirms the circumstantial evidence

2  that the release storage building up behind the dam was

3  sufficient to fill the neighborhood and keep it full until the

4  time the residents actually saw the water start to recede.

5       Dr. Lan had no clue from that witness stand about the

6  storage above the dam.  He just didn't put it in his model.  You

7  heard him.  I didn't put anything but the pool right behind the

8  dam in my model.  He didn't know about Mr. Giddins' lake.  He

9  didn't credit that these ponds and surge basins had

10  hydrologically failed and joined up.

11      Mr. Giddins told you there was still a lake across all

12  those ponds in the morning.  No one sees any water in the

13  neighborhood when Dr. Lan says the dam failed at 6:45 a.m. in

14  the morning.  The water was already out of the neighborhood by

15  the morning.

16      Based on the objective timeline evidence, IP has the

17  only available stored water in sufficient quantity to do this.

18  For the 163 families I speak for, I ask you to press yes on the

19  causation, that they are the legal cause of all the flooding in

20  the class members' home.  You check yes here, and we're done.

21      Now, if you think that it was okay to leave the dam

22  up, you go to the next question because remember Dr. Ross said

23  had the dam held through the night -- had the dam held,

24  Mr. Bullard and five other families at lower elevation, would

25  have received flooding even if the dam had held.  Okay?  So that

1   is that chart, Exhibit 1A.  And it shows Mr. Bullard's house in

2   red, that he would have had about 6 inches of flooding had the

3   dam held through the night.  That's question C.

4           If you think it's okay that they did not remove the

5   dam, then you got to answer the question -- and that no dam, no

6   flood -- if you agree no dam, no flood in the house, question B,

7   check yes.  You got to write yes, actually.  There's no check.

8   You got to write yes.  So you got to write yes on both of these.

9           But let me talk about this.  So this one is if you

10  think, well, the dam -- if the dam had held, that's more fair to

11  International Paper; and if the dam had held, six people, we

12  agree would have had water in their homes.  But I want to talk

13  about that from a credibility standpoint.

14          Professor Lan spent 1600 hours statistically verifying

15  his model.  Building this model.  And then he ran it, and he let

16  the chips fall where they may.  And it fell that had the dam

17  held, six of these members of the class would have received

18  water anyway.  He doesn't believe nor does Dr. Carrier believe

19  the dam should have been there.  They should have taken it out

20  after 2012.  That shouldn't be the question here.  If you

21  disagree with that, then you have to get to question C on the

22  verdict form and deal with the lower houses, the six.

23          All right.  Now I want to talk for a minute about what

24  I expect you'll hear from Mr. Nelson when he stands up.

25          First, I think he will criticize Professor Ross.  When

1    he does that, I want you to think about the powerful evidence of

2    the independence of Professor Ross that I just talked about it.

3    He doesn't say, If the dam held, no one would have flooded.  He

4    doesn't say that at all.

5          Second, I think he's going to talk about Mr. Curb and

6    the FEMA money issue, and FEMA in general.  And when that issue

7    came up at trial, the Court gave an instruction that what, if

8    any, money FEMA may have involved in this case is not relevant

9    in any way.  I want you to hold to that oath.  Please, when

10   you're in the jury room, don't let that issue of FEMA money

11   creep into your evaluations in any way.  This is a

12   liability-only trial.  There are mechanisms in the law to deal

13   with that stuff later.

14         Third, I think he'll point out that 19 plaintiff class

15   houses -- houses in the plaintiff class area, including

16   Mr. Bullard's, had flood damage of some amount after Hurricane

17   Georges in 1998, according to those questionnaires.

18         Mr. Bullard did not know that.  He didn't buy the

19   house until 2012, and it wasn't disclosed to him at closing.  We

20   have no idea, nor does he, what the extent of that 1998 damage

21   was.  But that was a different storm, totally different order of

22   magnitude, a dam ago.  It's not relevant to this case.  Nobody

23   went out and did a forensic examination of what happened in that

24   case.  The evidence is about this case.

25         You heard Mr. Curb discuss that he wanted FEMA to

1    change its floodplain, and I expect you'll hear a lot about that

2    from Mr. Nelson.  Just remember, FEMA hasn't changed its

3    floodplain.  FEMA has not agreed.  And Dr. Lan, on the stand

4    today, said at 10:00 p.m. there wasn't enough water here to be

5    out of the 10-year floodplain.

6           In any event, we are not comparing Dr. Ross's work to

7    FEMA floodplain studies in '99 and 2008.  Totally different

8    watershed at that time.  And that's like comparing a detailed

9    model to a rough model.  A Chevy Chevette to a Corvette.

10   They're both cars, but one's technologically superior to the

11   other.  This flood happened too early in the night to be caused

12   solely by the rain.

13          Fourth, I expect you'll hear what I call the Dutch boy

14   argument, which focuses only on the size of the hole.  Everybody

15   remember the Dutch boy and the finger in the dyke?  That is an

16   unscientific argument.  Dr. Ross and Dr. Lan both agreed that

17   the dam backs up water and it gets to a head well above the size

18   of the hole.  And Dr. Lan admitted it would go to 80 feet before

19   it failed.  80 feet.  That means that dam is causing the water

20   to back up to 80 feet.

21          Dr. Ross believed, because he understood the water

22   coming to the dam from the surge basins and the ponds, that it

23   was a much bigger backup than Dr. Lan.  But none of them,

24   neither of the scientists, credit the Dutch boy argument.

25          Finally, maybe they'll pull out Mr. Wistar.  Remember

1  that exhibit with all red that showed the rain in four-inch

2  increments?  When they do that, I hope you'll look at the county

3  rain map that goes down to two decimal points, Exhibit 304, and

4  you'll see that the total rain in this watershed above the dam

5  and in the class area was only 15.94 inches, not the problems

6  going down at the airport.

7          And last, I think there'll be a lot of talk about

8  pictures, so I want to spend some time on these pictures.

9          Defense Exhibit 33 was the one that Lan had on his

10  model -- I mean on his -- yeah, on his exhibit -- on his Figure

11  7.4.  Remember where I calculated the volume?

12          **THE COURT:**  Mr. Glasser, I'm going to ask that you-all

13  put those on the monitor as well, please, for the defendants.

14          **MR. GLASSER:**  Can you please put -- I don't have all

15  these together on the monitor, Your Honor.

16          **THE COURT:**  Well, if you're showing them, counsel

17  needs to be able to see what you're showing.

18          **MR. GLASSER:**  All right.  Can you put 92 up?  We'll

19  talk about that.

20          First let's talk about 33.  That's right here.  The

21  drop box.  At the time of the -- before the dam failed that

22  night it was behind the peninsula island, away from --

23          **MR. NELSON:**  We still don't --

24          **THE COURT:**  Mr. Glasser, you need to wait until it's

25  up.

1          **MR. GLASSER:**  Okay.

2          **THE COURT:**  Thank you.

3          **MR. GLASSER:**  Exhibit 33, please.  Defense Exhibit 33.

4          Okay.  This is shot by this drop box -- using the

5     Google Earth -- this drop box, which is Exhibit 118.

6          Can you put that up, Exhibit 118?  Plaintiff's Exhibit

7     118.

8          Okay.  Right here around the corner from that, before

9     this island got taken out by the flood, okay.  So this shot has

10    nothing to do with what happened at the cut -- at the dam, or

11    little to do.

12         Bring up Plaintiff's Exhibit 272, please, James.

13         Exhibit 272 is shot from that drop box area -- that

14    drop box area across what used to be a big peninsula.  And you

15    can see the peninsula's been ripped out, and you can see right

16    down the creek, and there's a large cut here in the -- Dr. Lan

17    measured the cut.  Dr. Carrier said it was 41 feet.  Dr. Lan

18    said it was 40 feet.  He said it was about 25 feet here, and it

19    was, I think, 12 or 13 feet deep.  Dr. Carrier said 13.  I can't

20    remember what Lan said.  He may have said 12.  Okay?

21         This shot shows the water when it's up here, back at

22    the drop box.  Exhibit 33 has nothing to do with this cut in the

23    morning.

24         Now, Exhibit 34.  Can you bring up defense 34.

25         Defense 34 is shooting from this hill down to the drop

1   box or across to the drop box.  But because the person taking

2   the shot is standing on this hill, you can't see what's below

3   his feet, which is all this, this U on Exhibit -- Plaintiff's

4   Exhibit 272.

5           Can you bring up 272 again, James?

6           So the U here is just not visible in Exhibit 34.  This

7   spot is right there.

8           And looking upstream --

9           Can you bring up Exhibit 91, James, Plaintiff's

10  Exhibit 91?

11          That's what it looks like, 41 feet across.  And the

12  island is in the background, what's left of the island.  So

13  defendant's 34 doesn't give you that perspective either.

14          The only picture that actually manages to get both the

15  outfall box and the old structure and show the island is the

16  panoramic photo because you have to look from over here past

17  what used to be the island to over here.  So when you're back in

18  the jury room and you're looking at the pictures, please

19  understand where each one is.

20          And lastly Plaintiff's Exhibit 92, which is the same

21  as Defense Exhibit 32 -- can you pull that up, James?

22          This is the last one I talked to Dr. Lan about.

23  Dr. Ross said those waves are indicative of deep water.  That's

24  consistent with all of the photos we've shown you after the cut.

25  Deep water.  Dr. Lan agreed that was consistent with deep water.

1  Dr. Lan couldn't see through that photo [sic].  Mr. Giddins

2  couldn't see through the water on the morning of.  Only

3  Mr. Yuhasz claimed he could see through that water.

4          Professor Ross has studied water all his life; and

5  while he said so long as the velocity is high there will be

6  growth, it's substantially formed by the morning.  And I think

7  you'll have to agree that it must have been a much, much, much

8  more powerful hydraulic system in the middle of the night when

9  it was pouring rain and storming like crazy.

10          So those are my thoughts about the basic evidence in

11  this case.  Please write yes on the verdict form for negligence,

12  for bad design, bad operation of maintenance, failing to remove

13  that structure.  And please put yes on the verdict form because

14  the rain alone was not sufficient to put this water in this --

15  up in this neighborhood this early in the storm.

16          Thank you.

17          **THE COURT:**  All right.  Thank you.  If you wouldn't

18  mind please removing the --

19          **MR. GLASSER:**  Yeah.

20          **THE COURT:**  Thank you.

21          All right.  Ladies and gentlemen, Mr. Nelson is now

22  going to present closing argument on behalf of International

23  Paper, and I'd ask you to continue careful attention, just as

24  you gave to Mr. Glasser, as he presents his closing argument.

25          Come forward, sir.  You may proceed.

1    **MR. NELSON:**  Ladies and gentlemen of the jury, it has

2    been my privilege to try this case to you these last five days.

3    I am here representing International Paper Company, which is

4    represented by Ms. Laurie McLain, the current environmental

5    health and safety manager at the facility, and the 450 other

6    employees of IP's Pensacola mill.

7         International Paper is not responsible for all of the

8    flooding of the class members' homes during the historic

9    rainstorm of April 29 and 30 of 2014.

10        The key question in this case is causation, whether

11   the breach of the Kingsfield Road dam structure caused all of

12   the flooding in the class members' homes.  I respectfully submit

13   that the evidence that you have witnessed during this trial

14   shows that it did not.

15        There was flooding experienced all across Escambia

16   County as a result of the record rainstorm, and there were

17   tragic consequences.  Mr. Christopher Curb, the long-time

18   stormwater manager at Escambia County, testified about over

19   3,000 homes in Escambia County that were flooded during this

20   storm event.  As he testified, there was just devastation.

21        That's the damage assessment map that you saw during

22   the opening statement, you saw just during trial, and you heard

23   Mr. Curb testify about.

24        Now, the plaintiffs, Mr. Glasser, have made an

25   argument that it had not rained enough by the time flooding was

1   reported in the class area to have been the cause of the

2   flooding.  I would respectfully submit to you that the evidence

3   does not show that.

4          You heard testimony from Mr. Wistar, a meteorologist

5   at AccuWeather.  He walked through the radar data showing the

6   intensity of the storm event and the volume of rainfall, and you

7   heard him describe how there were periods of 2 to 4 inches of

8   rain an hour that were falling during the early evening hours of

9   April 29.

10         Now, it was raining probably when everybody came to

11  court this morning.  That rainfall was nothing remotely like

12  what the rain was like during the early evening hours of

13  April 29, 2014.  You heard eyewitness testimony from people who

14  were out in the 8:30 and 9:00 o'clock time period that night.

15         You heard from Mr. Quackenbush, who described his

16  drive up Highway 29 on his way in to work.  Remember he was the

17  gentleman who came in early.  He was supposed to work the

18  graveyard shift, and he was driving up Highway 29.  And at

19  approximately 9:00 o'clock at night, there was so much water

20  already on Highway 29 that he felt it lift the front of his

21  truck up.  And he saw a giant Dumpster float across Highway 29

22  in front of his truck.

23         You heard eyewitness testimony from Mr. Clarence

24  Morgan, the man who drove down to I-10 to meet his wife because

25  she was down at the convention center and he was concerned about

1    her during the storm.  When Mr. Morgan left his house, he was

2    going to try to drive down Highway 297A, which is on the other

3    side of the IP facility from where Mr. Quackenbush came up

4    Highway 29.  He described conditions so severe that there was a

5    sheriff's car there with its lights on telling people you

6    couldn't cross the bridge because there was so much water

7    already coming across that bridge by 9:00 o'clock at night.

8    This is all water that was flowing down into Elevenmile Creek

9    and running right down that narrow channel toward the class

10   area.  These are the effects that produce the flooding in the

11   class area.

12            As Mr. Curb testified, and you saw evidence about

13   this, there are many homes in the class area that are located in

14   an area that Escambia County, well before this storm event, has

15   identified as being within a 100-year flood zone.  This was

16   unquestionably a storm event of greater magnitude than 100

17   years.  In fact, Mr. Wistar testified about the intensity of the

18   storm in the early evening hours of April 29th and how when you

19   looked at that time period, the shorter time period, this was

20   somewhere in the range of a 200-year to 400- year storm event.

21            You heard Dr. Lan testify this afternoon for

22   yourselves.  And what he said about his modeling was not that it

23   predicted a ten-year FEMA flow down Elevenmile Creek.  What he

24   testified is that that wasn't approximating a recurrence

25   interval.  He testified that he looked at a limited dataset that

1  was available.  He testified that if he had had data for the

2  entire period, it might have shown a 200-year flood event.  And

3  more to the point, Dr. Lan testified that the volume of the

4  water flowing down Elevenmile Creek, in his opinion, clearly was

5  enough to rise out of the creek and flood the class area.

6      Why?  Bristol Park and Ashbury Hills are located in a

7  flood zone.  They are located at a choke point as Elevenmile

8  Creek runs down and as the other tributary that you saw during

9  Dr. Lan's testimony runs in right below the class area.  There's

10  a lot of water that flows through there to begin with.  The

11  class area is right in the middle of Elevenmile Creek, and

12  there's a tributary that comes in right below it.  That produces

13  conditions that lead to flooding.

14      Now, this is not the first time that there has been

15  flooding of homes in the class area.  In 1998 you heard evidence

16  from Mr. Curb about Hurricane Georges.

17      This was an excerpt from the 1999 Escambia County

18  basin study that points out the low-lying area in the class area

19  and the fact that there has been flooding there in the past.

20      Now, Escambia County, in this same study, included a

21  list of the homes that had flooded.  Mr. Curb discussed this

22  with you.  And if we look at it, you'll see there are two

23  addresses of plaintiffs in this case, the Bullard address and

24  the Hutchins address.  And this is just what was reported to the

25  Escambia County survey in 1999.  As Mr. Curb testified, the

1  exhibit doesn't reflect all of the homes that actually flooded

2  during that event.

3          So there has been flooding before in the class area.

4          Now, in 1998 there were concerns expressed that the

5  cause of the flooding at that time was runoff from the Champion

6  property.  The Champion property is now International Paper's

7  property.  What was found in response to this investigation is

8  very clear.  It was investigated, and Escambia County found that

9  the runoff from Champion is only a very small fraction of the

10 flow through this area.  The enormous drainage area through this

11 portion of Elevenmile Creek, along with the homes constructed in

12 the 100-year floodplain, is the cause of the flooding.  That's

13 what caused the flooding in 1998, and that's what caused the

14 flooding in 2014.

15         1998 was a significant storm, but it was a lesser

16 storm than the 2014 storm.  Now, remember, too, in 1998 there's

17 no evidence of a failure of any structure on International

18 Paper's property, back when Mr. Glasser in his various

19 examinations has talked about the 1996 structure and then the

20 rebuild structure in 2004, 2005.

21         So we have an investigation of flooding by Escambia

22 County in 1998 that has nothing to do with a failure of any

23 water impoundment on IP's property or dam structure on IP's

24 property.  It's investigated and it's found that the cause is

25 the size of the drainage basin and the runoff down through that

1  drainage basin into an area that's low-lying and is prone to

2  flooding.

3       I respectfully submit that the evidence in this trial

4  shows that it was through no act or omission by IP that led to

5  the cause of all or substantially contributed to all of the

6  flooding in the class members' homes.  And that's what you would

7  need to find when you go back to the jury room and you evaluate

8  causation in this case in order to find IP liable.  You need to

9  find that IP's actions caused or substantially contributed to

10 all of the flooding in the class members' homes.

11      Now, let's turn to Plaintiffs' theory of the case.

12 During Mr. Marshall's opening statement and again during the

13 course of Mr. Glasser's closing argument, there were assertions

14 made that the structure was put in place without a permit and

15 that it was built using sandy soil.  I respectfully submit to

16 you that neither of those assertions is supported by the

17 evidence.

18      Let's turn first to the permit issue.  The evidence

19 shows that when the mill rebuilt the structure in 2004 and 2005,

20 it filed for a permit with its primary regulator, the Florida

21 Department of Environmental Protection.  It submitted drawings.

22 They were on an application that was a joint application

23 addressed to the Florida DEP, the Army Corps of Engineers, and

24 the Water Management District.  In response to that application,

25 the Florida DEP issued an exemption, and the Army Corps of

1    Engineers issued a permit.

2          This was not a secret structure.  The company acted

3    reasonably, and it attempted to procure the permits that you've

4    heard multiple IP witnesses say to the best of their knowledge

5    and belief were the permits that they needed to have when they

6    rebuilt that structure in 2005 and 2006.

7          Now, Dr. Carrier has a different opinion.  And

8    Dr. Carrier is entitled to that opinion, but I would ask that

9    you consider the things that Dr. Carrier doesn't know about the

10    permit requirements for this specific structure.

11          Dr. Carrier admitted on cross-examination that he had

12    not reviewed the underlying Florida statute that was in place in

13    2005 and 2006 when this structure was rebuilt.  When we put that

14    statutory provision before you, and talked about it with

15    Dr. Carrier, you saw that it authorized both the Florida

16    Department of Environmental Protection, IP's primary regulator,

17    and the Northwest Water Management District to exercise

18    authority over structures like the Kingsfield Road dam.

19          Dr. Carrier also was not aware of the operating

20    agreement that was in place between the Northwest Florida Water

21    Management District and the Florida DEP.  So the honest answer

22    is Dr. Carrier really does not know who was charged with primary

23    authority to regulate the Kingsfield Road structure and the

24    rebuild of that structure in the pertinent time period, which is

25    2005 and 2006.

Second point is the sandy soils point.  And
interesting thing is the plaintiffs have persisted with that
allegation, but they have no soil samples.  Dr. Carrier
eyeballed it, and he has experience, but he doesn't have soil
samples.

You also heard testimony from men who worked around
that area for decades.  They told you about the work they did
there.  They told you about compacting that area, is a
combination of not just sandy soils but also clay and also dirt.
You heard about the gravel on top.  So it's not like this was a
sand castle and it was made of nothing other than sand.  That's
not what it was.

Next, Mr. Marshall in his opening, and Mr. Glasser in
his closing, told you that the Kingsfield Road structure was
abandoned after 2012.  You heard a lot about a couple of e-mail
communications that were inside the company and then a couple
that went outside the company, you know, back in 2014 after the
structure failed.

You can judge those for yourselves against the
testimony of the humans who were involved in that exchange,
Mr. DeJong and Mr. Moore, and they told you what their intent
was in putting together that communication.  And that's
something that we will trust your judgment on.

I would also ask, though, that you consider the facts
in evaluating whether, in the real world, that structure was

actually abandoned and served no purpose.

What the real facts show is that the men who worked at the facility in the wastewater team system -- Mr. Yuhasz, Mr. Giddins, Mr. Quackenbush -- part of their job, including in 2014, was to go down to that structure and maintain it. Ask yourselves: Why would they have been doing that if the company had abandoned the structure?

You heard specifically from Mr. Yuhasz that he was down there the morning of April 29, the day of the storm. Because of the rainfall earlier in the day, part of his job was to go down there, look around the outfall box and make sure it was free of debris. He told you he had done that the morning of the storm.

Mr. Giddins, the gentleman who works at Reed Construction Company, told you about work that his company had done down there with heavy equipment. And it's not just him telling you that. You saw evidence.

This is a copy of the agreement his company, Reed, has with International Paper. It was a document produced during discovery. And what it tells us is that on April 20th of 2014, Mr. Giddins' company invoiced IP for being down there around the Kingsfield Road structure, cleaning it out with heavy equipment. I would ask that you ask the question: Why would the company have paid for a contractor to be down there with heavy equipment if the structure had been abandoned?

1          And what about Mr. Quackenbush, the man who came in

2    early during this intense rainstorm, and the first thing he did

3    was look around the wastewater treatment system during this

4    intense storm.  Did he stop up around the ponds that you've

5    heard about?  No.  He drove all the way down to the Kingsfield

6    Road outfall structure.  Why would he have done that in the

7    height of this storm if the structure had really been abandoned

8    and served no purpose.

9          I submit that the evidence shows that the Kingsfield

10   Road structure had not been abandoned and it was not a structure

11   that served no purpose.

12         The plaintiffs have also argued, in both the opening

13   statement and in their closing, that the structure was

14   inadequately designed, and that IP did not act with reasonable

15   care.  We'd respectfully submit that that too is not supported

16   by the evidence.

17         You saw preliminary engineering drawings for the

18   structure in place from 2000 -- that went in in 2005 and 2006,

19   showing that the company intended for the structure to pass more

20   water than the structure that had been in place and built in

21   1996.  That was the intent.  More flow.  There's been a lot of

22   criticism about whether there is a stamped engineering drawing

23   or not.  But if you look at what the company intended, the

24   intent was to upgrade that structure and to make it better.

25         You also saw final professional engineering

1  specifications from a company called Cornerstone Engineering.

2  Those were engineering drawings for the structure.  They weren't

3  stamped, but they were engineering drawings.  And I say they

4  weren't stamped.  I'm not sure, in all candor.  We haven't found

5  stamped drawings, and I'm not going to argue to you that they

6  might have existed, but I just want to be candid in saying what

7  we found were not stamped drawings.  But there were engineering

8  drawings that were submitted with the application that went to

9  DEP and resulted in the permit for the rebuild of that

10 structure.

11        You also heard testimony from Mr. Giddins and John

12 Taylor about the reason the notches were cut.  They told you

13 that the reason the notches were cut was to allow additional

14 flow to go over the top of the structure and to remove what was

15 perceived as a safety hazard of going out and opening the gate

16 in the midst of the storm.

17        Now, was that gate open?  No, it wasn't.  But would

18 the opening of a small 4-foot gate have really made a difference

19 when you had, by Dr. Ross's own account, 5 feet of water

20 overflowing the top of the structure and the earthen embankment?

21        Now, I'm not going to stand before you and say that

22 the Kingsfield Road structure was perfect, and I'm not going to

23 stand before you and say that every action of every

24 International Paper employee was perfect, but that is not the

25 standard for negligence.  The standard for negligence is the

1   failure to use reasonable care, which is care that a reasonable

2   person or corporation would use under like circumstances.

3         The Kingsfield Road structure was a reasonable

4   structure for its intended purpose.  Its intended purpose was

5   never to dam up and stop the flow of all water into Elevenmile

6   Creek.  The intended purpose was -- is an overflow structure.

7   It was to route water to the drop box so that the water would

8   run first through that 48-inch pipe from the drop box to the

9   discharge point south of Kingsfield Road.  And then the weir was

10   lower, and it was designed to allow water to flow over the weir

11   as a means of erosion control and stormwater control before it

12   could rise up and go over the earthen embankments.

13         You also heard evidence about some improvements that

14   were made along the way:  The notches being cut, the sheet

15   pilings being put in on the sides.

16         But the structure failed, and that -- that's an

17   unfortunate occurrence.  But so did structures throughout

18   Escambia County during this unprecedented rain event.  That

19   included things like industrial railroad tracks, this is a

20   photograph that Mr. Taylor described.  It's along Highway 29,

21   over on the east side of where the International Paper facility

22   is located.

23         Now, these tracks blew out during this storm.  These

24   are industrial railroad tracks compacted by freight trains that

25   go over them.  This storm was significant, it was unprecedented,

1    and it wrought substantial damage, not just to the Kingsfield

2    Road structure.

3         An unprecedented rainfall event by definition is not

4    reasonably foreseeable.  The company's acts in connection with

5    the structure, including monitoring and maintaining it

6    regularly, were reasonable, and not negligent.

7         We respectfully ask that you find that IP was not

8    negligent in its design, maintenance, and/or continued operation

9    of the Kingsfield Road structure.

10        Now, finally, in terms of the plaintiffs' theory, I

11   want to turn to their hypothesis about where all the water in

12   the class neighborhoods came from.  It just doesn't add up.

13        Plaintiffs' experts themselves admitted that the water

14   during the storm was flowing so forcefully, there was so much

15   water, that it rose up 5 feet above the Kingsfield Road

16   structure during this storm.

17        Now, Dr. Ross was honest in his testimony and told us

18   that that was water that was going to go down Elevenmile Creek,

19   whether the structure was there or not and whether the breach

20   happened or not.  That is the stormwater runoff from an

21   unprecedented massive rainfall event.

22        Well, Mr. Glasser stood up during Mr. Kyle Moore's

23   testimony earlier in this trial and had the butcher paper out

24   and was writing a lot of numbers on it about, you know, large

25   storage volume at the International Paper mill.  I believe that

1    theory was not established.  In fact, it was discredited as the

2    rest of the evidence came in, and that's probably why we didn't

3    see the butcher paper again in the closing argument.

4           The evidence shows that those water storage

5    impoundments or ponds at the International Paper mill remained

6    intact during the storm.  There was not any sort of cataclysmic

7    release of water from those ponds during this event.

8           To the contrary, the evidence shows that the ponds had

9    been pumped down.  Mr. Taylor and Mr. Moore testified about some

10   70 million gallons of additional capacity that was available in

11   pond 4 that allowed stormwater runoff to go into that pond.

12   That's all runoff that never went down Elevenmile Creek.

13          That's what Dr. Lan meant when he talked about an

14   attenuating effect from those ponds.  They don't contribute to

15   the runoff.  They detract from it.

16          The same is true about the wetlands pipeline.  You may

17   remember that Mr. Glasser initially tried to use an e-mail with

18   Mr. Moore and suggest that the pipeline had been turned off and

19   that there was a power outage, and that reduced the flow of

20   water into the wetlands through the pipeline.

21          Well, it turns out that he misunderstood that e-mail.

22   And what Mr. Moore testified to is that that was another entity

23   that was downstream, so to speak, in the pipeline that had

24   turned off its flow so that there could be more flow running

25   through the wetlands pipeline during the storm.  That was

1    another 20 million gallons a day that the company was able to

2    pipe out through that wetlands pipeline and that was not

3    available for transport down Elevenmile Creek.

4         The plaintiffs have done everything they can to try to

5    distract you from where the water really came from.  It came

6    from the massive rainfall event.  As you heard Mr. Wistar and

7    the other witnesses testify, there was a massive amount of rain

8    that was already falling in the early evening hours of

9    April 29th.

10        The plaintiffs' argument that there was enough rain to

11   cause the breach in the Kingsfield structure by 10:30 but not

12   enough rain to cause flooding in the class neighborhoods by that

13   time without the failure of the dam also doesn't make any sense.

14   There was enough rain falling down in the watershed, including

15   those 10.2 square miles below the Kingsfield Road dam structure,

16   to flood the class neighborhoods the evening of April 29th.

17        Now, I want to turn now more directly to the causation

18   issue.  And on this one, even if you find -- and you check that

19   first box and you find that International Paper was negligent,

20   you must go on and look at the next two questions on the verdict

21   form, each of which pertains to causation.  And as I mentioned

22   in the opening statement and as I mentioned as I started today

23   in the closing argument, causation really is the key issue in

24   this case.

25        If you find that IP, in its operation of the

1  Kingsfield Road structure, did not cause all of the flooding in

2  the class members' homes, then you need to find for IP because

3  the burden Plaintiffs have here is establishing that the breach

4  of the Kingsfield Road structure caused or substantially

5  contributed to causing all of the flooding in the class members'

6  homes.

7          Now, the plaintiffs' causation case rests on a single

8  leg:  Dr. Mark Ross.  Mr. Glasser described Dr. Ross as the best

9  available.  And Dr. Ross is a gentleman.  I hadn't met him

10  before I cross-examined him, but we had a -- what I thought was

11  a very professional exchange.  But Dr. Ross is not qualified as

12  an expert on dam breach analysis.  The Court did not qualify him

13  as an expert on that issue.  There's only one person who was

14  qualified as an expert on dam breach analysis, and that was

15  Dr. Lan.

16          Now, to credit Dr. Ross's opinion that the dam

17  breached caused all of the flooding of homes within the class

18  area, you must accept several of his assumptions, most

19  significantly his assumption that the earthen portion of the

20  Kingsfield Road structure failed in time to produce the flooding

21  in the class area.

22           In fact, Dr. Ross testified the two things that most

23  support his conclusion are, one, the timing of the breach, and

24  two, the timing of the reported flooding in the class area.  The

25  evidence undermines both of those assumptions.

1    Let's start with Dr. Ross's claim that the breach

2    began to form at about 9:00 o'clock at night on April 29th and

3    that, according to Dr. Ross, it had fully formed within a matter

4    of minutes.

5    Dr. Ross made this claim not based on any analysis or

6    any modeling but on his perception that that just must be what

7    happened.  He didn't cite any literature he looked at.  He

8    didn't cite any modeling he'd done.  He didn't cite other

9    scientific information to explain why he believed that.

10   Now, Dr. Ross was present in the courtroom when

11   Mr. Giddins testified.  Dr. Ross heard Mr. Giddins testify that

12   the structure was still partially intact and retaining water

13   between 7:00 and 7:30 in the morning on April 30th.

14   At the beginning of Dr. Ross's cross-examination, I

15   asked him, How can that testimony be squared with your

16   conclusion about the dam breach starting at 9:00 o'clock and

17   happening within a matters of minutes?  And Dr. Ross answered

18   directly.  He said, It can't.  It's one or the other.  It can't

19   be both.

20   As I examined Dr. Ross further, you may remember that

21   he was a little all over the map about how much of the breach

22   would have been left on the morning of the 30th.  His answers

23   ranged from a substantial amount would have happened by then,

24   more than half, maybe most.  When pressed he ultimately gave an

25   estimate of 38 feet, 38 feet of the 41 feet that he said.

1          None of this sounds like somebody who really had a

2     scientific basis to say that the breach started at 9:00 o'clock

3     and would have been fully formed within a matter of minutes.

4     Dr. Ross's assumption about the breach timing is just that:

5     It's an assumption.

6          So let's look at the facts about the time of the

7     breach.

8          We know that Mr. Quackenbush personally inspected that

9     structure sometime between 9:35 and 9:45 p.m. the night of

10    April 29th.  He observed that everything was intact.  He told

11    you about how he could see part of the railing on the catwalk

12    over the concrete weir, how his perception was the water was

13    starting to come up onto the earthen embankment, but he could

14    see it was still there.

15         Now, Mr. Glasser suggested that, you know,

16    Mr. Quackenbush couldn't see anything because the windshield

17    wipers were running.  That will be a credibility assessment for

18    you as the jury to make.  But you heard what Mr. Quackenbush

19    told you was his honest assessment of what he saw that night.

20    You have to decide.  Do we credit that or do we credit

21    Dr. Ross's assumption?

22         We also know, from uncontroverted eyewitness testimony

23    the morning of April 30th, that two men, Mr. Giddins and

24    Mr. Yuhasz, who had spent years down around that structure, told

25    you what they saw that morning.  They told you that what they

saw was part of the earthen embankment still there between

7:00 and 7:30.  It's not consistent with Dr. Ross's assumption.

And again, you need to decide do you want to credit the

eyewitness testimony from the morning of the 30th or do you want

to credit Dr. Ross's assumption.

Mr. Yuhasz also took pictures that morning.  I'm going

to show these again.

These are the pictures that he took the morning of

April 30th around 7:15 in the morning.  You need to decide, when

you look at these pictures, whether you want to credit them or

whether you want to credit Dr. Ross's assumption.

Mr. Yuhasz and Mr. Giddins also said that the earthen

berm portion of the Kingsfield Road dam continued to erode

between 7:15 and later on that morning when they were back down

there.  Again, you need to decide whether to credit what they

saw or whether to credit Dr. Ross's assumption.

But you also have the opportunity to look at the

evidence yourself on this and trust your own eyes.

On the left is a copy -- or a version of the picture

that Mr. Yuhasz took at about 7:15 in the morning.  You may

remember that we also showed you, during Mr. Taylor's testimony,

the clip of a video that he took later on in the morning on

April 30th.  He estimated it was sometime between 9:30 and

11:00 o'clock in the morning.  And I would ask that you look at

these and say, Do they look the same or does it look like there

1  was more erosion that occurred between 7:15 and sometime between

2  9:30 and 11:00 o'clock that morning?

3         If there was more erosion, that undercuts Dr. Ross's

4  assumption that the breach must have started at 9:00 o'clock at

5  night and would have fully occurred within a matter of minutes.

6  The evidence shows that his assumption is not valid.  And

7  Dr. Ross recognizes that if that assumption is not valid, the

8  rest of his analysis and his conclusions about all of the

9  flooding in the class area being caused by either the presence

10  of the Kingsfield Road dam structure or the breach of the

11  Kingsfield Road structure can't stand.

12         Now, let's turn to the other thing that Dr. Ross used

13  as the real, kind of, calibrating tool for his modeling; and

14  that's the record evidence about when Plaintiffs first

15  experienced flooding in their homes.  Dr. Ross said this was

16  important in terms of supporting his work.

17         Now, Mr. Bullard -- he was the first witness who

18  testified at trial.  He said he owns one of the lowest homes in

19  the class area.  And he testified at trial that he took

20  photographs at 10:28 a.m. [sic], and then a little bit later,

21  and that these photographs illustrated the floodwater first

22  entering his home.

23         But if you look very carefully -- can we pull up 128,

24  please -- at Exhibit 128, which is the metadata that the

25  plaintiffs used early in their case to talk about photographs,

1  you'll see on there Mr. Bullard was taking pictures at

2  10:00 o'clock that night.  What was he taking pictures of at

3  10:00 o'clock?  Why was he taking pictures then if the flooding

4  hadn't already started?

5       In addition, why did Mr. Bullard change his testimony?

6  You heard that on three occasions prior to his testimony in

7  court, Mr. Bullard swore under oath that the flooding in his

8  home started at 9:30.  He put that in interrogatories that he

9  answered in his lawyer's office with his lawyer, he said it in

10 his deposition, and he said it in this courtroom in an

11 evidentiary hearing before Judge Rodgers.

12      That's Mr. Bullard.

13      You also heard from Ms. Hutchins, who said she first

14 discovered water in her basement at about 11:30 at night.  So

15 one hour, maybe two hours later than what Mr. Bullard said he

16 had.

17      Mr. Alexander testified that he didn't have any

18 flooding inside the finished floor elevation of his house.  He

19 had some water in his garage.  But he received a call from

20 somebody down around Mr. Bullard's house at approximately

21 10:00 o'clock reporting flooding in their home at that time.

22      Ms. Navelski and Ms. Kersey testified that they don't

23 know what time water entered their homes.  And the Henderlys

24 were not called as witnesses at trial.  They're the other

25 plaintiffs in this case.

So Dr. Ross says that he calibrated his model based on observations of the flooding in the class area. But those observations are at best based on a very unstable foundation. If that was so important to his investigation, why isn't there more information about when the flooding began in the class area?

Now, Mr. Wistar from AccuWeather -- I should step back.

Dr. Ross also had his own observation about the rainfall in the evening of April 29 being like a Sunday afternoon drive. Mr. Wistar, the meteorologist from AccuWeather, was in the courtroom; and he heard Dr. Ross say that. And you had the opportunity to hear Mr. Wistar's reaction to rainfall rates that were coming down at 2 to 4 inches an hour for at least three hours in the early evening hours not being anything remotely like an afternoon thunderstorm. There was a lot of rain.

I touched on this already, so I'll be very quick about it now. This is the area that shows Highway 29. You see where the McDonald's is. That's the approximate location of where Mr. Quackenbush saw the Dumpster float across the highway in front of his truck because there was so much water. And this was before 9:00 o'clock at night. Lifted up the front of his truck. That's all water that's going to flow down into Elevenmile Creek above the class area.

1     You heard Mr. Morgan, the man who met his wife on

2     I-10, testify about his house on Pleasant Valley Drive and the

3     police car there, by 9:00 o'clock at night, with its light on

4     because there's already so much water coming down that green

5     area just below Pleasant Valley Drive and running into

6     Elevenmile Creek that it was unsafe for cars to pass.  There

7     were massive volumes of water flowing into Elevenmile Creek

8     before 9:00 o'clock at night.

9     Now, Dr. Ross also testified about some of the

10    variables in his model.  And I won't belabor the point because

11    you've heard a lot about it, but the two key variables are those

12    Manning's coefficients and the boundary condition.  And you

13    heard Dr. Ross talk about how the Manning's coefficient, if it's

14    low, the water level's low; if it's high, the water level would

15    be higher.  And Dr. Ross used very low Manning's coefficients.

16    He used Manning's coefficients that are lower than what FEMA

17    used for its work in the Elevenmile Creek drainage basin,

18    including specifically this very area.

19    You also had the opportunity to hear from Dr. Lan and

20    see some graphics that show the truncated boundary that Dr. Ross

21    used that had the water essentially disappearing right after it

22    got past the class area.

23    You heard about the backwater effect.  When we have a

24    tributary coming in right below the class area, and you have a

25    bridge down there, it slows the flow of water and causes it to

1  back up.  Well, if Dr. Ross had included those features in his

2  model, he would have gotten higher water levels in the class

3  area.

4  Now, there's an implication that it doesn't matter

5  that much, but I would dispute that because -- this is the

6  boundary condition again, and I'm trying to move faster because

7  you've seen a lot about that already.

8  Okay.  So this is something Mr. Glasser showed you,

9  and it's Exhibit 1A.  And this is a depiction of Dr. Ross's

10  model results.  And as has been noted with his modeling scenario

11  of the dam in place, no failure, which really represents the

12  real world because there was a dam structure there, there was

13  flooding in the Bullard home, separate and apart from any breach

14  of the dam.

15  But let's look at the no dam number there.  Okay.  The

16  finished floor elevation for Mr. Bullard is 47.78 feet.  The

17  natural no dam channel, according to Dr. Ross, produced

18  47.64 feet.  So he was able to, you know, tune this model in a

19  way that he -- the water came literally within two-tenths of an

20  inch of flooding the Bullard home.  If those dials had been

21  turned a little bit differently, there would have been water in

22  the Bullards' home.

23  But Bullard isn't the only home.  Look at the Henderly

24  home.  In his dam-in-place no-failure scenario, it comes within

25  three-tenths of an inch of flooding in the home and

1    three-quarters of an inch if the dam never existed.

2        For a flood that involved such large amounts of water

3    in the plaintiffs' homes -- and we're talking about, you know, 4

4    to 5 feet or more -- these are awfully thin margins to base a

5    decision on, particularly where Dr. Ross used such low Manning's

6    coefficients and where he had such a truncated boundary

7    condition, where we know -- because he agreed and you heard

8    Dr Lan testify that both of those things have an effect on water

9    levels, and the effect that they have is to make them lower than

10   what would really happen in the real world.

11       But what Dr. Ross did not do here is even more

12   striking.  Dr. Ross could have, just as Dr. Lan did, used the

13   dam break model  to actually measure the amount of water that

14   would have come out through the breach and what the effect of

15   that water would have been in the class area.  And remember,

16   that's the water that matters.

17       That 5 feet of water going over the top, as Dr. Ross

18   said, that's going down Elevenmile Creek no matter what.  That's

19   runoff from this major storm event.  So what matters is the

20   water that goes through the breach and is there enough water

21   going through that breach to produce all of the flooding in the

22   class area.

23       Well, Dr. Ross didn't model that when he gave his

24   testimony.  Told you he doesn't know.  He didn't give you the

25   information that you need to make a judgment of whether the

1    water that went through that breach, which is the real question

2    at hand here, was sufficient to produce the flooding in the

3    homes that's at issue in this case.

4         Should also note that you heard from Dr. Carrier about

5    dam breach models.  Now, Dr. Carrier, when he was asked about

6    his deposition testimony here at trial, admitted that when he

7    was asked in his deposition about a dam breach model, he said

8    it's an obvious thing to do when a dam failure occurs.  It's

9    what we do.  If it's an obvious thing to do and it's what we do

10   when we're analyzing a dam breach, why didn't Dr. Ross do it?

11        Plaintiffs' causation case boils down to Dr. Ross.

12   That's the only evidence that has been provided to support the

13   plaintiffs' contention that all of the flooding of homes in the

14   class area was caused by the breach in the Kingsfield Road

15   structure.  You would have to agree with all of Dr. Ross's

16   assertions and assumptions and conclusions in order to find for

17   plaintiffs on the causation question.

18        Now let's talk about IP's causation defense.  In the

19   opening I talked about pillars or lines of evidence that I would

20   submit, respectfully, show that all of the flooding in the class

21   area could not have been caused by the breach of the Kingsfield

22   Road structure.

23        First, IP tendered an expert, Dr. Lan, who was

24   qualified as an expert on dam breach analysis, unlike Dr. Ross.

25   Dr. Lan explained how the first part of his model was a

1  hydrologic and hydraulic investigation like what Dr. Ross did,

2  and you heard him tell you today that he reached a dramatically

3  different conclusion.  He reached the conclusion that the runoff

4  itself was going to produce flooding in class-area homes that

5  was very close to the observed levels of flooding during the

6  event.

7          But Dr. Lan did not stop there.  He also did what

8  Dr. Carrier said is the obvious thing to do.  It's what we do.

9  Dr. Lan ran the dam breach model.  And he started with giving an

10  assessment of the likely breach time.  And we've talked about

11  that, and you'll have the opportunity to review the evidence.

12  But Dr. Lan, like Mr. Yuhasz, like Mr. Giddins, concluded that

13  the evidence tells us that the breach did not start to form the

14  night of April 29th, and the breach formation occurred later.

15          Dr. Lan did not admit, as I think Mr. Glasser said,

16  that the breach starts right after overtopping occurs.  Dr. Lan

17  specifically testified that there are instances where there is

18  water feet over the top of an earthen embankment and it doesn't

19  start to breach.  It depends on other variables.  And when we

20  look at the evidence, you can see that it does not make sense

21  that that structure started to breach on the night of the 29th.

22          But Dr. Lan did not stop his analysis there.  He put

23  up two different hydrographs.  And Dr. Lan loves to talk about

24  hydrographs.  That's what experts do.  But what the hydrograph

25  shows is the effect of the water through the breach at different

1  points in time.  And he showed you the hydrograph from the model

2  run at 6:30 in the morning on April 30th.  And a breach at that

3  time doesn't produce any effects in the class area.  And that's

4  because the large runoff volume had already passed through.

5       But he also looked at a breach time at 12:15 in the

6  morning, the worst case scenario in his modeling investigation.

7  And for him, the worst case scenario is when you've got the

8  maximum amount of water behind the Kingsfield Road structure,

9  and there's a maximum flow, and you release that water -- which,

10 by the way, does not all come out at once, as Mr. Glasser has

11 suggested.  He kind of made a little fun at the Dutch boy

12 reference.  But when you have a hole in a dam, the water doesn't

13 all come through at one time.  It flows out  over time.

14      But Dr. Lan analyzed that worst case scenario of 12:15

15 in the morning on April 30th, and what he found is that the

16 water that went through the breach, which is what we need to be

17 concerned about here, produced at most about a tenth of a foot,

18 or maybe 2 to 3 inches, of additional water within homes in the

19 class area.  That is not sufficient, when you're evaluating

20 inundation levels of 4 to 5 feet, to conclude that anything

21 International Paper did caused or substantially contributed to

22 causing all of that flooding in the homes in the class area.

23      Second, the facts about this storm show that the

24 Kingsfield Road dam breach was not the cause of all of the

25 flooding in the class members' homes.  You heard from many

witnesses about the historic nature of this storm event. You

heard from Mr. Wistar, the meteorologist. You heard from

Mr. Curb, the county stormwater engineer. You heard from

multiple individuals who were out in this storm. It was a major

storm event.

The presence of the class area right in the middle of

the Elevenmile Creek drainage channel during a historic

rainstorm is why it flooded.

You think about the watershed as a whole and the

geography of the class area. Confirms this. Mr. Curb told you

about how Escambia County has been studying the potential for

flooding in the Elevenmile Creek drainage basin dating back to

the 1990s. Talked about the 1994 study, the 1999 study, the

2008 study.

Why is the county doing all of that work? Well, it's

doing it because it knows this area is in an area prone to

flooding during significant rain events.

You saw the hundred-year flood zone that Escambia

County has. That's IP Exhibit 66. It shows numerous properties

in the Bristol Park and Ashbury Hills area that are located

inside the county's 100-year flood zone. This was

unquestionably a storm event that exceeded the 100-year

interval.

You think about the water that's running down

Elevenmile Creek. We talked about this a few times during the

1  trial.  You've got massive amounts of water flowing into

2  Elevenmile Creek below the Kingsfield Road dam.  This is all

3  water that's going to go down there separate and apart from

4  anything having to do with the dam.

5          You've got Turtle Creek, which is -- came out in the

6  map during Mr. Moore's testimony.  Flows in below the Kingsfield

7  Road structure.  You've got these other water bodies that run

8  in.  And you've got the fact that Escambia County, in its FEMA

9  hazard mitigation grant application, made the observation -- and

10 this is notable because this is specifically addressing the

11 tributary that Dr. Ross ignored -- that part of the reason for

12 seeking the FEMA grant application is because of the location of

13 the class area and a tributary from the bridge crossing at

14 Devine Farms Road joining with the main Elevenmile Creek channel

15 south of the Bristol Creek [sic] area.  These merging creeks

16 present a hydraulic and hydrological channel in addressing a

17 most serious flooding condition, regulating from the overall

18 22,000-acre basin that contributes to this portion of Elevenmile

19 Creek.

20          Now, this is not any expert's testimony.  This is a

21 third party, Escambia County's assessment of why this area is

22 prone to flooding and why it applied for a FEMA hazard

23 mitigation grant.

24          The area's flooded before.  We've seen the evidence of

25 that.  We know that it was investigated in 1999 by Escambia

1    County.  We know that there was no failure of the Kingsfield

2    Road structure on International Paper's property in 1998.  So we

3    know that even though the residents at that time thought that

4    runoff from the IP property was the source of the flooding, the

5    contrary conclusion was reached.  It flooded because of the

6    drainage basin involved and the location of the class area.

7           And there it is again.  This is a key piece of

8    evidence in this case.  Investigation well before any of these

9    allegations arose, an investigation by a third party, Escambia

10   County, in response to allegations that runoff from the IP

11   property produced the flooding, and specifically finding that it

12   wasn't.  It was due to the location in the drainage basin and

13   the large volume of runoff.

14          Now, finally, IP's -- I'm sorry.  The fifth line of

15   evidence is that IP's causation case rests on your common sense.

16   I would ask you in this regard to consider the inconsistencies

17   between the plaintiffs' case about the Kingsfield Road structure

18   and reported flooding in the class area.

19          You've heard a lot about the 1996 structure and the

20   failure of that structure.  There's no evidence that there was

21   any flooding in the class area when that structure failed in

22   1996.

23          We heard about the flooding in the class area in 1998.

24   But there's no evidence that there was a failure of the

25   Kingsfield Road structure on the IP property in 1998.

1    We heard about issues and a failure of the structure

2 in 2004 and 2005 that led to the rebuild that's been at issue in

3 this case, but there's no claim of flooding in any of the

4 plaintiffs' homes or in the class area in 2004 and 2005.

5    And so when you look at the history, the pattern just

6 doesn't add up.  The cause-and-effect relationship is not

7 failure of the structure flooding in the neighborhood.  It

8 doesn't add up.

9    When you look at the size of the area behind the

10 Kingsfield Road structure and think about the volume of water

11 that could be retained there, it just doesn't make sense that

12 that could possibly retain enough water -- even if it all went

13 through the breach at once, which it did not -- to produce 4 to

14 5 feet of flooding in homes in the class area.

15    When you look at the size of the watershed that's

16 below the Kingsfield Road structure and above the class area, it

17 just doesn't make sense that this large drainage area isn't what

18 produced the flooding.

19    Finally, you've heard a lot about the specific efforts

20 that Escambia County has undertaken for flood mitigation,

21 including the FEMA hazard grant application.  Now, contrary to

22 what Mr. Glasser said, that is not irrelevant.

23    The only thing that Judge Rodgers has said should not

24 be taken into consideration is what any money from the FEMA

25 hazard mitigation grant was used for vis-a-vis an individual.

1    But the fact that the county applied for that grant, the fact

2    that the federal government gave that grant are highly relevant

3    and probative to the inquiry at issue here.

4            You heard Mr. Curb testify that the county sought that

5    grant, which has been used to acquire and demolish homes in the

6    Bristol Park and Ashbury Hills area so that they don't flood

7    again in the future, because of its concerns about future

8    flooding in the class area.  You heard him say that anything

9    going on on the International Paper property had nothing

10   whatsoever to do with the reason the county applied for that

11   grant and the reason FEMA gave that grant.

12           You also heard Mr. Curb testify about the county's

13   efforts under the Restore program and the steps that it wants to

14   take to reshape the Elevenmile Creek drainage area around the

15   class area.  That's because the county is concerned about future

16   flooding.  And as Mr. Curb testified, those concerns have

17   nothing to do with anything going on at the Kingsfield Road

18   structure on the International Paper property.  They are because

19   of the large watershed involved and the location of the class

20   area in this drainage channel.

21           Now, although Mr. Alexander did not experience any

22   flooding inside the finished portion of his home, many other

23   homes -- and many other homes in the area did not flood at

24   all -- and that's an important point.  This is a class action,

25   and there are many homes in the class area that did not flood at

1    all -- you did hear testimony from four individuals who had

2    flooding in their homes.

3         Nobody would want flooding inside their home.  Nobody.

4    And it might be natural to feel sympathy for flooding inside

5    their home.  But as Judge Rodgers has instructed, that kind of

6    sympathy or compassion is not what drives the decision that you

7    have been asked to make in this case.  What must drive the

8    decision that you have been asked in this case is your

9    evaluation of the facts and the evidence that you have heard

10   during the course of this trial.

11        We'd respectfully submit that there is not evidence to

12   support a finding that any act or omission or negligence by

13   International Paper was sufficient to cause or substantially

14   contribute to all of the flooding in homes in the class area.

15        I thank you for your time and your service on the jury

16   this week.  And I ask that you return a verdict finding, either

17   in the first instance, that International Paper was not

18   negligent, or in the second instance, if you find that it was

19   negligent, that it was not the legal cause of all of the

20   flooding in the homes in the class area.

21        Thank you.

22        **THE COURT:**  All right.  Thank you.

23        Ladies and gentlemen, because the plaintiffs have the

24   burden of proof, Mr. Glasser goes first.  He also is entitled to

25   make a rebuttal argument.  It is much briefer in duration than

1  the initial argument, 15 minutes.  Can you-all hang in another

2  15 minutes, or would you prefer -- Can you hang in?

3  **THE JURY:**  (Nodding heads.)

4  **THE COURT:**  I see most of you are indicating

5  affirmatively, yes, you can hang in there.

6  **MR. GLASSER:**  Sorry took me a minute to get situated.

7  Let me start at some of the few things that Mr. Nelson

8  said at the end that I think are not, frankly, legitimate

9  arguments to make.

10  The first is that last point about some people in the

11  class area didn't flood.  We know that.  The extent of the

12  flooding in this case is not in dispute.  Dr. Lan's map says the

13  flooding would have been the same except for 2.5 inches more

14  because of the dam breach.  The extent of the flooding is not at

15  issue.  The cause of the flooding is what is at issue in this

16  case.

17  Secondly, Mr. Nelson pointed out Exhibit 128.  You saw

18  on Exhibit 128 there were document numbers and then time stamps

19  from the metadata.  If Mr. Nelson thought that one of those

20  other time stamped items on that list should have been put in

21  evidence, he had an equal opportunity to put that in evidence.

22  Every single number on Exhibit 128 is the number of a document

23  produced in discovery, given to the other side.  If there was

24  something on that list that could have shown that Mr. Bullard's

25  photos were wrong, they had full and fair opportunity to bring

1    that evidence up.  It was produced to them.  That's why it has a

2    document number on Exhibit 128.  That, I did not think, was a

3    legitimate argument.

4          Now, let me talk about the butcher paper and the FEMA

5    studies, okay.  These are ponds 1, 2, 3, 4, and the multipurpose

6    storage basin, you'll remember.  When you get back there in the

7    jury room, you might want to look at Exhibit 82A it will match

8    up to this, because I built 82A with the witness at that time.

9    Remember, that's the schematic.

10          And then he didn't -- Mr. Moore didn't really know how

11    much water was in the ash pile.  We just had to estimate.  And

12    he didn't know how much was in the ash sluice pond.  We had to

13    estimate.  And the north surge basin, he didn't know either, but

14    we estimated 22 million.

15          The north surge basin, the south surge basin, and the

16    multipurpose surge basin were not mentioned by Dr. Lan.  They

17    were part of those structures above the dam that he didn't take

18    into account.  And I heard Mr. Giddins testify that the next

19    morning it was a lake.  All that was a lake.  And Dr. Lan did

20    not take account of that lake.

21          So I stand by this butcher paper.  This butcher paper

22    shows the only available storage in this watershed sufficient to

23    fill those neighborhoods at 10:00 a.m. -- 10:00 p.m. early in

24    the storm.

25          Now let's talk about the FEMA studies.  I actually

1    think the 1999 and the 2008 FEMA study support Dr. Ross's

2    opinion.  Let me be exact as to why that is.

3         1999 was talking about the flood from Hurricane

4    Georges.  Mr. Steltenkamp said Hurricane Georges rained

5    20 inches.  That's the evidence in this case about Hurricane

6    Georges.  And here are the pictures, Exhibit 96 and 95.  It

7    shows the dam that was put in.

8         **MR. NELSON:**  Your Honor --

9         **THE COURT:**  Mr. Glasser, we need to pull those up.

10        **MR. GLASSER:**  Can you put up Exhibit 96, please,

11   James.

12        So Exhibit 96 is a picture of the dam that was built

13   in 1999, okay.  It did not fail in 1998.  We do not assert it

14   failed in 1998.  You have never heard me say one minute that

15   that dam failed in 1998.  I do not believe the dam failed in

16   1998.  The dam held in 1998.  It was armored.  It had concrete

17   armoring over it.  It was two years old.  It was a better dam

18   than the dam that failed in 2014.  It held through the storm.

19        What happened in the neighborhood?  We know from the

20   FEMA report 19 houses flooded.  Maybe a few -- maybe more

21   flooded and didn't report, but 19 questionnaires were reported.

22   Not a 163.  Not 163.

23        What happened in 2014 was an order of magnitude

24   different than what happened in '99.  And what's the difference?

25   The dam held -- sorry, 1998.  The dam held.  The new

1   concrete-armored turtle-shell dam -- can you bring up Exhibit

2   95? -- with two open 48-inch exit valves held through Hurricane

3   Georges.  Held through Hurricane Georges.  And what happened in

4   the neighborhood?  19 houses reported flooding, not 163.

5         I ask you when you're in the jury room, does that

6   support Dr. Ross's view that the existence of a dam that can

7   actually last through a storm, can attenuate the storm, help

8   diminish flooding?

9         Now in this storm, Dr. Ross testified it would have

10   been -- the difference would have been six versus 163, instead

11   of 19 versus however many homes were built there back in 1998,

12   but it's a difference of magnitude.  It's a difference of kind.

13         And, by the way, that gets me to Exhibit 1A.

14   Exhibit 1A --

15         If we could, bring at that back up, James.

16         -- talks about the finished floor elevation, for

17   example, in the Bullard house is almost -- is 47 feet 78 inches

18   above sea level.  You know from the pictures I showed you, the

19   water in the house got up to his chest on the kitchen counter.

20   It's not a difference of inches.  It's a different of 5 or

21   6 feet if the dam holds.

22         I don't know what Mr. Nelson was talking about there.

23   I think he's talking about that if it was no dam in the channel,

24   it wouldn't have -- it would have been 47.64.  47 feet 64 inches

25   that's.  6 feet difference, not 6 inches difference.  It's

1  6 feet difference from the pictures that you'll have in the jury

2  room of the water in the man's house.

3        So I don't frankly understand that argument.  It's

4  feet of difference.

5        Now, back to this.  Sorry, I had me a little aside.

6        Now, I was telling you about the FEMA study, 2008 FEMA

7  study.  When you're in the jury room, you'll see it.  They have

8  the map.  It has a red star on it for flooding complaints

9  associated with the period of time before the 2008 study.  It's

10  not clear from the map exactly when they were.

11        This is the picture --

12        Can you bring up Exhibit 95 again, James.

13        Exhibit 95 of what had the dam looked like after those

14  big rains in April of 2005 and after Hurricane Ivan.  Again, we

15  are not asserting this dam catastrophically blew out.  These

16  pictures are completely different than Exhibit 104 and

17  Exhibit 272 that show a big buck-tooth cut in this dam.  Clearly

18  the dam did not blow out in 2005, and so there were a few

19  complaints of flooding in the 2008 study.  Not 163 homes.

20  Again, a difference of magnitude.

21        I ask you, does this support Professor Ross?  Yes, it

22  does.  He says if the dam holds through the night, it will

23  attenuate the flooding.  It will help.  And the 2008 study does

24  not say 163 homes got flooded in Hurricane Ivan or in the 2005

25  storms.  It just doesn't say that.

1    So I have no problem with the 1999 or the 2008

2 studies. They absolutely help our case. Absolutely. They show

3 you exactly what Professor Ross is trying to say. This dam

4 holds, it helps. This dam holds, it helps.

5    Now, when you go back there in the jury room, look at

6 Exhibit 95 and ask yourself where did that concrete apron go?

7 And where did those two 48-inch open holes go? They went away

8 because the second dam was weaker and cheaper. And it was

9 weaker and cheaper for a reason: To save money. And it was

10 weaker and cheaper because somebody didn't think they should

11 design for a hundred-year storm. You saw that in Exhibit 89.

12    So don't tell me the 1999 and the 2008 study hurt my

13 case. The 1999 and 2008 studies show what happens if a dam

14 holds. If you've got a dam that can make it through the night,

15 it helps our case. I'm glad it's in evidence.

16    Now, there was another argument I heard made here.

17 And that is it trying to confuse you between the concept of a

18 storm event and a flood event. Mr. Wistar and Dr. Lan were

19 clear in their testimony. A storm event is not the same thing

20 as a flood event. A hundred-year storm event can cause a

21 ten-year flood event. Or a hundred-year storm event can cause a

22 50-year flood event. They are not the same thing.

23    And Dr. Lan testified from that witness stand that

24 this was between a 50- or hundred-year flood event, not storm

25 event. And I think you agree with me that he also said that the

1  cubic feet per second in that creek around 10:00 o'clock, based

2  solely on rainfall, was under 5,000 -- or under 6,000, somewhere

3  between 5 and 6.  And according to FEMA's model, that's a

4  ten-year flood event.

5          I did not hear anybody from International Paper stand

6  up here and explain where this water came from in a ten-year

7  flood event since it's already filled up this neighborhood.  We

8  have to prove concurrent cause.  It rained.  Everyone knows it

9  rained.  The dam wouldn't have failed if it hadn't rained.  It

10 does not throw us out of this courtroom if rain is part -- if

11 the rainwater that builds up behind the dam then comes out from

12 behind the dam.  That is not -- read the jury instruction on

13 concurrent cause.  It can rain.  That's why the dam failed.

14 Because it wasn't built to withstand a hundred-year flood event

15 like any competent dam designer would have designed it to

16 withstand.

17         Let me talk about Mr. Quackenbush.  I am not saying

18 that Mr. Quackenbush didn't see water over the earthen portion.

19 I think he did see water over the earthen portion.  I'm saying

20 he can't tell in the middle of a rainy night in the middle of a

21 thunderstorm by his headlights if that water is going up or down

22 or how big the cut is underneath that dark water in the middle

23 of the night.  He just knows it's over the earthen portion.

24         And when it goes over the earthen portion, Dr. Ross

25 said it would take between six minutes and an hour.  I think his

1   testimony was virtually the same as Dr. Lan's.  Except Dr. Lan

2   wants to fight about whether or not the gravel on top of this

3   thing could have saved it for nine hours in a pounding storm

4   with a head of water 5 feet above it.  No way.  No way.

5           I think I've addressed the main points that he made.

6   He did make the Dutch boy argument, but I already talked about

7   that, how unscientific that was because it doesn't account for

8   the water and it doesn't account for the 434 million-gallon

9   lake.

10          I appreciate and we appreciate, all the people here

11  appreciate, the time you're giving to us.  We're turning this

12  case over to you.  I know you guys will do the right thing.

13  Thanks.

14          And thank you, Your Honor.

15          **THE COURT:**  Thank you.

16          All right.  Ladies and gentlemen for your two final

17  instructions on the law, and as I said earlier when we first

18  started with the instructions, you should consider all of my

19  instructions on the law as a whole.  You may not single out or

20  disregard any of the Court's instructions on the law.

21          So, ladies and gentlemen, any verdict that you reach

22  in the jury room must be unanimous.  In other words, to return a

23  verdict, you must all agree.  Your deliberations will be secret,

24  and you will never have to explain your verdict to anyone.

25          It is your duty as jurors to discuss the case with one

1  another in an effort to reach an agreement, if you can do so.

2  Each of you must decide the case for yourself, but only after

3  full consideration of the evidence with the other members of the

4  jury.

5  While you're discussing the case, do not hesitate to

6  reexamine your own opinion and to change your mind if you become

7  convinced that you were wrong, but do not give up your honest

8  beliefs solely because the others think differently or merely to

9  get the case over with.  Remember that, in a very real way, you

10  are the judges.  You are the judges of the facts in this case.

11  Your only interest is to seek the truth from the evidence in the

12  case.

13  Now, when you go into the jury room, the first thing I

14  would ask you to do is to select one of your members to act as

15  your foreperson.  The foreperson will preside over your

16  deliberation and will also speak for the jury here in open

17  court.

18  As you've heard from the attorneys, there's a verdict

19  form that's been prepared for your convenience.  The verdict

20  form is three pages.  It has three sections:  A, B, and C.

21  "A" will ask you a question in regards to whether the

22  plaintiff has proven by a preponderance of the evidence that

23  International Paper was negligent in its design, maintenance,

24  and/or continued operation of the Kingsfield Road dam structure.

25  You have a place for your foreperson to mark yes or no, your

1    unanimous decision as to that question.

2            If the answer -- unanimous answer is no, then the

3    foreperson should sign and date the last page of the verdict

4    form, notify the court security officer that you've reached a

5    verdict, and I will have you return here to the courtroom so

6    that we may receive your verdict.  If you answer yes to that

7    question, on the issue of negligence, then you will go on to

8    Section B and C, both of which pertain to causation.

9            The first question, which is B, asks whether you find

10   by a preponderance of the evidence that International Paper's

11   negligent design, maintenance, or continued operation of the

12   Kingsfield Road dam structure was the legal cause of all of the

13   flooding and all of the class members' homes.  If the answer

14   there is yes, then your foreperson should sign and date the

15   verdict form and your verdict is complete.

16           If your answer -- unanimous -- to that question is no,

17   then you will go on to Section C, and you will answer the

18   question whether will you find by a preponderance of the

19   evidence that International Paper's negligent design,

20   maintenance, and continued operation of the Kingsfield Road dam

21   structure was the legal cause of all of the flooding in all but

22   six of the class members' homes.  Your answer there should be

23   yes or no.

24           Once you've answered that question, then your

25   foreperson should date and sign the last page of the verdict

1   form and again notify the court security officer that you've

2   reached a verdict, and I'll have you return here to the

3   courtroom.

4       Now, if at any time during your deliberations you

5   should have a need to communicate with me, I would ask that your

6   foreperson write down your message or your question,

7   communication.  He will bring it -- or she will bring it to my

8   attention, and I will respond to you in one of two ways.  Most

9   likely, I will respond to you in writing.  However, I may also

10  have you return here to the courtroom so that I can address you

11  orally as to a given question or communication.

12      I do want to caution you with regard to any question

13  or communication that is sent out of the jury room.  Please do

14  not ever indicate what numerical division may exist on the jury.

15  So if there is a division, please don't tell me what that

16  numerical division is.  We simply don't need to know if you are

17  divided four to four, seven to one, six to two.  That is not of

18  concern to us.  Just leave out any numerical division, please.

19      All right.  Counsel, let me ask, other than those that

20  have been discussed, raised and discussed and preserved, are

21  there any other objections to the Court's instructions as

22  delivered as well as the verdict form, Mr. Glasser?

23          **MR. GLASSER:**  No, ma'am.

24          **THE COURT:**  Okay.  Mr. Nelson?

25          **MR. NELSON:**  No, Your Honor.

1          THE COURT:  All right.  Thank you.

2          Ladies and gentlemen, at this time out of respect for

3    the very serious responsibility that you are all about to

4    undertake, I'm going to rise and ask that all those in the

5    courtroom rise with me as you retire to consider your

6    deliberations.

7          You may take your pads with you at this time.  Thank

8    you very much.

9      (Jury excused.)

10         THE COURT:  All right.  Be seated.

11         All right.  Counsel, I will ask that you-all work with

12   Ms. Simms to gather -- make sure and gather all of the evidence

13   so that that can be taken to the jury room.

14         I would ask that you remain here in the courthouse for

15   the next 10 or 15 minutes, just to see if we have a question or

16   communication quickly out of the jury.  Otherwise, if you'll be

17   within five minutes or so, five to ten minutes, of a phone call

18   in case we have a question or a verdict.

19         And we will be in recess -- unless there's something

20   you need to address with me, we'll be in recess awaiting the

21   jury's verdict.  Is there anything?

22         MR. GLASSER:  Just, Your Honor, on behalf of the

23   Plaintiffs, I'd like to thank the Court for all the hard work --

24         THE COURT:  Yes, sir.

25         MR. GLASSER:  -- for this week.  And you worked

1  weekends, evenings, obviously to move this trial along.  We

2  appreciate that.  And Ms. Jacobs and Ms. Simms and everyone else

3  who did that.  And just from the Plaintiffs, thanks very much

4  for that work.

5        **THE COURT:**  Well, you're quite welcome.  It's our

6  pleasure.  But the credit really does go to those around me, but

7  thank you.

8        **MR. NELSON:**  Other than to say Mr. Glasser put it very

9  well, and I'm not going to repeat it, you most certainly have

10 the thanks from me and the entire International Paper team for

11 your diligence and hard work throughout the trial.  Thank you.

12       **THE COURT:**  Well, we thank you all as well.

13       All right.  We'll be in recess awaiting the jury's

14 verdict.

15     *(Recess was taken from 4:24 to 5:40 p.m.)*

16       **THE COURT:**  Be seated, please.  We have been advised

17 that the jury has reached a verdict in the case, so in just a

18 moment, I'll have the jury brought in and the verdict will be

19 announced.

20       Of course, we never know what the verdict is in a

21 case, but one thing is for sure, we do know, is that this has

22 been a emotional trial for the parties.  I know that both sides

23 have invested a lot in the outcome that you're hoping for.  But

24 as we all know, this is an adversarial system; and one side is

25 going to likely be pleased by the verdict, and one side is

1    likely going to be very disappointed by the verdict.

2            And, again, I have no idea what the verdict is.  But

3    because of that, I do want everyone in the courtroom to consider

4    how you feel about sitting quietly and listening as the verdict

5    is read by the clerk without showing any emotion.  If you don't

6    feel that you can do that, I'm going to ask that you step out of

7    the courtroom now until after the verdict has been received.

8    And then once the jury is out of the courtroom, you're certainly

9    free to come back.

10           The point of this is -- and I don't say this

11   insensitive to, you know, an individual's personal situation

12   and, you know, emotions about what the verdict might be.  But my

13   main focus is the jury, and I do not want the jury to be made to

14   feel poorly in any way about the decision that's been reached

15   here today.  They've done the best job with what we've given

16   them.

17           You give them the facts, I give them the law, and they

18   go into the jury room, and, again, they do the best job that

19   they can.  And I want them to feel that they've done a good job

20   and they feel proud about their decision and the work that

21   they've done.  And, again, I don't want them to feel poorly in

22   any way.  So please consider these comments and consider whether

23   you can sit quietly as the verdict is received.

24           The other thing I want to say is -- to the parties, I

25   don't have a lot of the plaintiffs here, but for any plaintiffs

1    that are here and also for International Paper, both sides have

2    been very, very well represented in this trial.  The advocacy

3    has been outstanding.

4           I've enjoyed presiding over the trial.  I think you've

5    all done an excellent job.  But most of all, I'm really pleased

6    and I want to thank you-all for the professionalism that you've

7    shown each other, at least in my presence, and also that you've

8    shown the Court.  I know we've had some hard-fought battles on

9    matters of law and procedure and evidence; but you've always,

10   you know, kept your professionalism first and foremost and

11   maintained that, and I appreciate it very much.

12          All right.  Anything before the jury's brought in?

13          **MR. MARSHALL:**  No, Your Honor.

14          **MR. NELSON:**  No, Your Honor.

15          **THE COURT:**  All right.  Thank you.

16          If you will please bring the jury in.

17     *(Jury present.)*

18          **THE COURT:**  Ladies and gentlemen, has the jury reached

19   a verdict?

20          **THE FOREPERSON:**  Yes.

21          **THE COURT:**  Thank you.  ███████, if you would

22   please provide the verdict form to Mr. Thomas.  Thank you.

23          All right.  Ms. Simms, if you would please publish the

24   jury's verdict.

25          **DEPUTY CLERK:**  United States District Court, Northern

1    District of Florida, Pensacola Division.

2            John Navelski, Linda Navelski, Erick Alexander, Jacob

3    Hutchins, Amber Hutchins, Jeanne Henderly, Richard Bullard, and

4    Beverly Bullard, on their own behalf and those others similarly

5    situated, Plaintiffs, versus International Paper Company,

6    Defendant.  Case Number 3:14cr445/MCR-CJK.

7            Verdict:  We, the jury, in the above-entitled and

8    numbered case, return the following unanimous verdict.

9            Do you find by a preponderance of the evidence that

10   International Paper was negligent in its design, maintenance,

11   and/or continued operation of the Kingsfield Road dam structure?

12   The answer is no.

13           So, say we all, this 26th day of February 2018.

14   Signed by the jury foreperson.

15           **THE COURT:**  All right.  Ladies and gentlemen, I have

16   one final question for each of you, and that is whether the

17   verdict you've heard announced by the clerk is your verdict

18   individually, as well as the verdict of the jury as a whole.  So

19   I'll call you by your juror number, and all you need to do is

20   answer "yes" or "no" again to that question.

21           Number 1?

22           **JUROR NO. 1:**  Do I mind to stand up?

23           **THE COURT:**  You're fine to stay seated, as long as I

24   can hear you.

25           Was that the verdict that you've reached individually,

ma'am, as well as the verdict of the jury, as a whole?

**JUROR NO. 1:**  Yes, ma'am.

**THE COURT:**  Thank you.  Number 2?

**JUROR NO. 2:**  Yes.

**THE COURT:**  Three?

**JUROR NO. 3:**  Yes, ma'am.

**THE COURT:**  Four?

**JUROR NO. 4:**  Yes, Your Honor.

**THE COURT:**  Five?

**JUROR NO. 5:**  Yes.

**THE COURT:**  Six?

**JUROR NO. 6:**  Yes.

**THE COURT:**  Seven?

**JUROR NO. 7:**  Yes.

**THE COURT:**  And eight?

**JUROR NO. 8:**  Yes, ma'am.

**THE COURT:**  All right.  Ladies and gentlemen, based upon the jury's verdict, a judgment will be entered in favor of International Paper and against the plaintiffs in this case.

In just a moment, I'm going to excuse you for the final time, but before I do, I want to thank you very much again for your service and participation as jurors during this trial. I also want to advise you of certain privileges that are enjoyed by jurors in our system.

One of those is that no juror can ever be required to

1    talk about the discussions that took place in the jury room

2    except by way of a Court Order.  And it would be a very, very

3    rare occasion on which I would ever enter such an order.  We

4    have always recognized that the discussions, debates, comments

5    of jury should remain the private affair of the jury as long as

6    the jurors wish it to remain so; and, therefore, the law gives

7    each of you the unique privilege of refusing to speak to anyone

8    about your work here as a juror.

9           On the other hand, our Constitution certainly provides

10   for the freedom of speech; and if you wish to speak about your

11   own personal participation as a juror in this trial, you are now

12   free to do so.  I would ask, however, that if you do choose to

13   speak to someone about your work here as a juror during this

14   trial, that you protect the confidences and privacy of your

15   fellow jurors in that regard.

16          Also, an additional benefit that you will receive as a

17   result of your service here over the past week is that you'll be

18   excused from further federal jury duty in this Court for the

19   next two years.  Now, that doesn't mean you will be summoned to

20   return, because that's done at random by a big computer that we

21   don't have any control over.

22          So if you are summoned to return for jury duty in the

23   United States District Court for the Northern District of

24   Florida, all you need to do is contact the clerk's office.  The

25   number will appear on your form.  Give them your name, and we

1   will have a record of your service here, and you'll be excused,

2   no questions asked, again for the next two years.

3           Now, if you would like to return, then we would be

4   certainly happy to have you return.  So this doesn't mean we

5   don't want you back.  If you're summoned and you'd like to

6   return for duty again, then it would certainly be our

7   pleasure -- and if it's in my courtroom, my privilege -- to have

8   you back.  You all have been an excellent jury, and I do

9   appreciate very much the time and participation that you've

10  given to this trial.

11          So with my thanks and I know the thanks of all those

12  who participated in the trial, I'm going to excuse you now.

13  I'll ask you to step into the jury room for some final

14  instructions, and then you'll be on your way.

15          All right.  Thank you very much.

16      *(Jury excused.)*

17          **THE COURT:**  All right.  Is there anything else?

18          **MR. MARSHALL:**  No, ma'am.

19          **THE COURT:**  All right.  Thank you all.  Court is in

20  recess.

21          **MR. MELTZER:**  Thank you, Your Honor.

22      *(Proceedings adjourned at 5:50 p.m.)*

23                      * * * * * * * *

24

25

1     We certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.  Any
2   redaction of personal data identifiers pursuant to the Judicial
Conference Policy on Privacy are noted within the transcript.

3

**/s/ Donna L. Boland**
4   _____
Donna L. Boland,
5   Official U.S. Court Reporter

6   **/s/ Julie A. Wycoff**              2/27/2017

7   _____   _____
Julie A. Wycoff,                   Date
Official U.S. Court Reporter
8

9

10                    **I N D E X**

11                                              Page

12  Court's Charge to the Jury ...............................151

13  Closing Arguments by the Plaintiffs ......................161

14  Closing Arguments by the Defense .........................187

15  Verdict ..................................................233

16  Court Reporter's Certification ...........................239

17

18

19

20

21

22

23

24

25

1                              **INDEX**

2                                                              **PAGE**

3

4

   Attorney Conference                                            3

5

6

   **WITNESSES FOR THE DEFENSE:**

7

   *DR. YONGQIANG "FRANK" LAN*

8      Direct Examination by Mr. Nelson                           22
       Cross-Examination by Mr. Glasser                           72

9      Redirect Examination by Mr. Nelson                        125

10

11                    **PLAINTIFFS' EXHIBITS**

12     **NO.:**                                              **RECEIVED**

13         74:   Lan's Fig 7.4                                    84
        74(a):   Lan's Table 2-2                                  92

14        272:   Photo of Dam                                     98

15                     **DEFENDANT EXHIBITS**

16
           40:   Photo of Dam 4/30/14                             62

17         85:   Lan's Fig 7-3                                    64
           82:   Lan's Fig 1-2                                    29

18         83:   Lan's Fig 8-4                                    50
           84:   Lan's Fig 6-1                                    57

19         86:   Lan's Fig 6-6                                    70

20

21

22

23

24

25